BRYAN WILSON (CA BAR NO. 138842)
DARA TABESH (CA BAR NO. 230434)
ERIC C. PAI (CA BAR NO. 247604)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
E-Mail: BWilson@mofo.com
E-Mail: DTabesh@mofo.com
E-Mail: EPai@mofo.com

DAVID C. DOYLE (CA BAR NO. 70690)
STEVEN E. COMER (CA BAR NO. 154384)
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125
E-Mail: DDoyle@mofo.com
E-Mail: SComer@mofo.com

Attorneys for Plaintiff
APPLERA CORPORATION – APPLIED BIOSYSTEMS
GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>Defendants. | Case No.    07-CV-02845 WHA<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF STANDING, AND MOTION FOR PARTIAL SUMMARY ADJUDICATION**<br><br>Date:  January 10, 2008<br>Time:  8:00 a.m.<br>Place: Courtroom 9, 19th Floor<br>Honorable William H. Alsup |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION.................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND ...............................................................................2

I.     AB AND LYNX..........................................................................................2

II.    STEPHEN MACEVICZ.................................................................................4

       A.   Dr. Macevicz's Obligations to AB ................................................4

       B.   Dr. Maceviz's Work on DNA Sequencing.....................................5

            1.   Work That Dr. Macevicz Disclosed to AB ...............................5

            2.   Work That Dr. Macevicz Concealed From AB........................5

       C.   Dr. Macevicz's Departure To Lynx.................................................7

       D.   Dr. Macevicz's Purported Assignment of His Applications to Lynx......................8

ARGUMENT ..................................................................................................9

I.     ILLUMINA AND SOLEXA LACK STANDING TO BRING PATENT INFRINGEMENT COUNTERCLAIMS ..........................................................9

II.    SUMMARY JUDGMENT IS ALSO APPROPRIATE.........................................9

III.   DR. MACEVICZ BREACHED HIS EMPLOYEE INVENTION AGREEMENT WITH AB (FIRST CAUSE OF ACTION) .................................................. 10

       A.   Dr. Macevicz Failed To Disclose His Inventions................................ 10

       B.   Dr. Macevicz's Invention Is Not Protected By Labor Code § 2870 ...... 11

            1.   Dr. Macevicz used AB's resources ......................................... 12

            2.   Dr. Macevicz's inventions are within AB's line of business ................... 13

IV.    LYNX WAS NOT A BONA FIDE PURCHASER FOR VALUE................................... 15

       A.   Illumina Paid Nothing To Dr. Macevicz For The Applications........................... 15

       B.   Lynx Received Dr. Macevicz's Applications With Notice Of AB's Rights Therein.............. 17

            1.   Dr. Macevicz's knowledge of his obligations under the AB Invention Agreement is imputed to Lynx.................................... 17

**TABLE OF CONTENTS**
(continued)

Page

2. Lynx knew that AB had rights to the technology disclosed in Dr. Macevicz's Applications ............................................................ 18

3. Lynx failed to satisfy its duty of inquiry about AB's rights in the Applications ............................................................................. 20

V.   LYNX AND DR. MACEVICZ CONVERTED HIS INVENTIONS AND THE APPLICATIONS (FIFTH CAUSE OF ACTION) ........................................... 21

VI.  DR. MACEVICZ BREACHED HIS FIDUCIARY DUTIES TO AB (THIRD CAUSE OF ACTION) .............................................................................. 22

A.   Dr. Macevicz Owed Fiduciary Duties To AB ....................................... 22

B.   Dr. Macevicz Breached His Fiduciary Duties ....................................... 22

1. Dr. Macevicz entered into agreements with Lynx for his own benefit while he was AB's Senior Patent Counsel .................................... 23

2. Dr. Macevicz usurped AB's corporate opportunities ............................... 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Arachnid, Inc. v. Merit Indus., Inc.,*
939 F.2d, 1574 (Fed. Cir. 1991) ........................................................................................ 15

*Biotechnology Indus. Org. v. District of Columbia,*
496 F.3d 1362 (Fed. Cir. 2007) ......................................................................................... 14

*Burlesci v. Petersen,*
68 Cal. App. 4th 1062 (1998) ............................................................................................. 22

*Cadence Design Sys., Inc. v. Bhandari, No. C 07-00823,*
2007 U.S. Dist. LEXIS 83078 (N.D. Cal. Nov. 8, 2007) .................................................. 13

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................................. 9

*Clark Equip. Co. v. Wheat,*
92 Cal. App. 3d 503 (Cal. Ct. App. 1979) ........................................................................ 18

*Communist Party of the U.S. v. 522 Valencia, Inc.*
35 Cal. App. 4th 980 (Cal. Ct. App. 1995) ................................................................ 16, 17

*Cubic Corp. v. Marty,*
185 Cal. App. 3d 438 (Cal. Ct. App. 1986) ...................................................................... 13

*Daniel Orifice Fitting Co. v. Whalen,*
198 Cal. App. 2d 791 (1962) ....................................................................................... 23, 24

*Eisenberg v. Grand Bank for Sav., F.S.B,*
207 F. Supp. 2d 553 (S.D. Miss. 2002) ............................................................................ 15

*Eisenberg v. Ins. Co. of N. Am.,*
815 F.2d 1285 (9th Cir. 1987) ............................................................................................. 9

*FilmTec Corp. v. Allied-Signal Inc.,*
939 F.2d 1568 (Fed. Cir. 1991) .......................................................................... 15, 16, 17, 18

*Fitzgerald v. Terminal Dev. Co.,*
11 Cal. App. 2d 126 (Cal. Ct. App. 1936) .................................................................. 15, 22

*Flatt v. Superior Court,*
9 Cal. 4th 275 (1994) .......................................................................................................... 22

*Hendrie v. Sayles,*
98 U.S. 546 (1879) .............................................................................................................. 15

*Iconix, Inc. v. Tokuda,*
457 F. Supp. 2d 969 (N.D. Cal. 2006) .................................................................... 11, 12, 24

1

**TABLE OF AUTHORITIES**

2

**Page**

3

*Kahn v. Gen. Motors Corp.*,
   77 F.3d 457 (Fed. Cir. 1996) ................................................................. 9

4

*Katz v. Lear Siegler Inc.*,
   Case No. 91-1094, 1993 U.S. App. LEXIS 17507 (Fed. Cir. July 12, 1993) .................... 17, 20

5

6

*Leighton Techs. LLC v. Oberthur Card Sys.*,
   No. 04 Civ. 2496, 2007 U.S. Dist. LEXIS 57873 (S.D.N.Y. July 11, 2007) ............................ 9

7

*Oakdale Vill. Group v. Fong*,
   43 Cal. App. 4th 539 (Cal. Ct. App. 1996)........................................................ 20, 22

8

9

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
   52 F.3d 1026 (Fed. Cir. 1995) ................................................................. 9

10

*Prima Tek II, L.L.C. v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) ................................................................. 9

11

12

*Roberts v. Corrothers*,
   812 F.2d 1173 (9th Cir. 1987) ................................................................. 9

13

*Stanley v. Richmond*,
   35 Cal. App. 4th 1070 (1995) ................................................................. 22

14

15

*Stone & Webster Eng'g Corp. v. Hamilton Nat'l Bank*,
   199 F.2d 127 (6th Cir. 1952)................................................................. 15

16

*U.S. v. One 1996 Vector M12*,
   442 F. Supp. 2d 482 (S.D. Oh. 2005) ................................................................. 16

17

18

*U. S. v. Orozco-Prada*,
   636 F. Supp. 1537 (S.D.N.Y. 1986) ................................................................. 20

19

**STATUTES**

20

Cal. Civ. Code § 2332 ................................................................. 18

21

Cal. Lab. Code
   § 2870 ................................................................. *passim*
   § 2872 ................................................................. 12

22

23

Fed. R. Civ. P.
   § 12(b)(1)................................................................. 1
   § 56 ................................................................. 9

24

25

**MISCELLANEOUS**

26

California Rule of Professional Conduct 3-300 ................................................................. 22

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO ILLUMINA, INC., SOLEXA, INC., AND STEPHEN C. MACEVICZ

3

("DEFENDANTS AND COUNTERCLAIMANTS") AND THEIR ATTORNEYS OF RECORD:

4

PLEASE TAKE NOTICE THAT on January 10, 2007, in the Courtroom of the Honorable

5

William H. Alsup, located at 450 Golden Gate Avenue, San Francisco, California, in the hour of

6

8:00 a.m., pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Plaintiff Applera

7

Corp.—Applied Biosystems Group, ("Plaintiff") by and through its counsel, will move and

8

hereby does move this Court to dismiss Defendants and Counterclaimants' Counterclaims Nos. 1,

9

2, and 3 for lack of standing because Defendants and Counterclaimants do not have ownership of

10

United States Patent Nos. 5,750,341, 5,969,119, and 6,306,597.  Plaintiff also will move and

11

hereby does move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary

12

judgment that Defendants and Counterclaimants are liable for breach of contract (First Cause of

13

Action), breach of fiduciary duty (Third Cause of Action), and conversion (Fifth Cause of

14

Action).

15

These motions are based on the accompanying Declaration of Bryan Wilson and attached

16

exhibits, Declaration of Adam M. Tschop, the Memorandum of Points and Authorities, and on all

17

of the documents and records on file in this action, and all matters judicially noticeable therefrom.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19

**INTRODUCTION**

20

This is an action against Stephen Macevicz, Illumina, Inc. and Solexa, Inc. ("Illumina"

21

and "Solexa;" collectively, "Illumina") for self-dealing by Dr. Macevicz while he was Senior

22

Patent Counsel for Applied Biosytems Group ("AB"), including the taking of inventions

23

belonging to AB.  Dr. Macevicz's conduct constitutes a gross breach of his fiduciary and

24

contractual obligations to AB as its Senior Patent Counsel.

25

AB is a leading manufacturer of life sciences products, including DNA sequencing

26

machines.  While working for AB, Dr. Macevicz applied for several patents on methods of DNA

27

sequencing, including methods he had evaluated for AB.   Instead of disclosing and assigning

28

these inventions to AB, Dr. Macevicz concealed the inventions and later attempted to assign them

1    to Lynx Therapeutics, Inc. ("Lynx"), which is now owned by Illumina.  Illumina, which is a

2    competitor of AB, has sued AB for allegedly infringing patents based on these stolen inventions.

3        AB moves to dismiss Illumina's patent infringement counterclaims on the ground that

4    Illumina lacks standing to assert claims of patent infringement because it lacks ownership rights to

5    the patents.  For that motion, the Court may consider and weigh evidence as appropriate.

6    Additionally, AB moves for summary adjudication of its First Cause of Action for breach of

7    contract, Third Cause of Action for breach of fiduciary duty, and Fifth Cause of Action for

8    conversion on the grounds that Dr. Macevicz and Illumina improperly misappropriated AB's rights.

9                               **FACTUAL BACKGROUND**

10   **I.        AB AND LYNX**

11       AB (www.appliedbiosystems.com) sells a broad range of products for use in the life

12   sciences industry.  Among other lines of business, AB develops and makes instruments and

13   methods for sequencing DNA.  For example, AB's 1992 Annual Report describes AB's business as

14   "Life Science Research," including "identify[ing] the structure of DNA . . . ," as one of its major

15   goals.  (Declaration of Bryan Wilson in Support of Motion to Dismiss for Lack of Standing, and

16   Motion for Partial Summary Adjudication ("Wilson Decl.") Ex. 1 at 3; Declaration of Adam M.

17   Tschop in Support of Motion to Dismiss for Lack of Standing, and Motion for Partial Summary

18   Adjudication ("Tschop Decl.") ¶ 2.)  In a 1995 SEC filing, AB's business was described as follows:

19               [AB] develops, manufactures, markets, sells, and services analytical
             instrument systems. . . .  These automated systems are used for
20           synthesis, amplification, purification, isolation, analysis and
             *sequencing of [DNA and RNA]*, proteins, and other biological
21           molecules.

22   (Wilson Decl. Ex. 2 at 2 (emphasis added).)

23       AB invests heavily in research and development.  While Dr. Macevicz worked for AB,

24   AB spent at least 12% of its sales revenues on research and development activities.  (Wilson

25   Decl. Ex. 3.)  AB has an extensive patent portfolio, which it was Dr. Macevicz's job to maintain

26   and expand.  (*See, e.g.*, Wilson Decl. Ex. 4 at 41:13-42:16.)

27       Lynx Therapeutics was spun off from AB in 1992.  The spin-off was structured to allow

28   Lynx to develop drugs for the treatment of diseases, while AB continued to develop DNA

1  sequencing methods and machines.  (*See* Wilson Decl. Ex. 1 at 8-9.)  Several of AB's former

2  executives joined Lynx, including AB's founder, Dr. Sam Eletr, who became Lynx's first CEO.

3  (Wilson Decl. Ex. 5 at 38.)  Additionally, Lynx brought in Drs. Timothy Geiser and Gerald Zon,

4  who were AB Senior Scientists until 1992 (*id.*), Kathy San Roman, who had been AB's Corporate

5  Secretary and an Officer until 1989 (Wilson Decl. Ex. 6 at 13:7-14:7), and attorney James Kitch,

6  who had provided legal services to AB as a partner at Cooley Godward.  Cooley Godward

7  provided legal services to both Lynx and AB and had managed the spin-off of Lynx.  (*Id.* at

8  22:14-25:6 & 142:18-22.)

9      After Lynx was established as a separate entity, AB and Lynx continued to share some

10  intellectual property rights, in defined fields of use, on a limited basis pursuant to a cross-license

11  ("the Cross-License").  (Wilson Decl. Ex. 7 at 2 & Ex. 8.)  Lynx and AB also entered a Corporate

12  Services Agreement pursuant to which AB provided administrative services to Lynx, including

13  legal services, through June 30, 1995.  (Wilson Decl. Ex. 9.)  Lynx paid AB for these services.

14  (*Id.*; Wilson Decl. Ex. 10; Tschop Decl. ¶ 3.)  While he was an AB employee and in his capacity

15  as an AB employee, Dr. Macevicz provided legal services to Lynx pursuant to this agreement.

16  (Wilson Decl. Ex. 4 at 36:21-37:4.)

17      On May 11, 1994, Lynx acquired rights to the work of Dr. Sydney Brenner (who went on

18  to win the Nobel Prize in Medicine in 2002).  (*See* Wilson Decl. Ex. 11.)  AB asserted it should

19  have rights to that work pursuant to the Cross-License, because that work related to DNA

20  sequencing technology.  (*See* Wilson Decl. Ex. 12; Tschop Decl. ¶ 4.)  Lynx maintained that Dr.

21  Brenner's work was not covered by the Cross-License.  (*See id.*; *see also* Wilson Decl. Ex. 8.)

22      On March 24, 1995, Lynx formed a separate corporate entity, Spectragen, for the purpose

23  of commercializing Dr. Brenner's work.  (Wilson Decl. Ex. 13.)  The rights to Dr. Brenner's

24  inventions were assigned to Spectragen.  (*See id.*)  On October 23, 1996, 17 months after

25  Spectragen's formation by Lynx, Lynx and Spectragen merged.

26      Lynx merged with Solexa in 2005.  (Answer of Defendants Illumina, Inc. and Solexa, Inc.

27  to Applera Corporation—Applied Biosystems Group's First Amended Complaint and

28

1    Counterclaims of Defendant Solexa, Inc., D.I. 55 ("Illumina Answer") at 2.)  Illumina acquired

2    Solexa in January 2007.  (*Id.*)

3        **II.    STEPHEN MACEVICZ**

4            **A.    Dr. Macevicz's Obligations to AB**

5            Defendant Stephen Macevicz is an attorney with a doctorate in biophysics.  (Wilson Decl.

6    Ex. 14 at 92:23-93:3 & 94:4-11.)  He came to work full-time for AB in 1992.  (*Id.* at 16:25-

7    17:22.)  As a condition of his employment, Dr. Macevicz entered into an Employee Invention

8    Agreement ("AB Invention Agreement") with AB.  (Wilson Decl. Exs. 15 & 16; Tschop Decl. ¶

9    5; Answer of Defendant Stephen C. Macevicz, D.I. 15 ("Macevicz Answer") ¶ 12.)  He promised

10   to disclose to AB, to hold in trust for the sole right and benefit of AB, and to assign to AB any

11   inventions that he might make while employed by AB.  (Wilson Decl. Ex. 15 ¶¶ 2 & 7.)  The only

12   exception was for inventions that Dr. Macevicz could prove were developed entirely on his own

13   time, were developed without the use of company resources, and did not relate to the actual or

14   anticipated business or research and development of AB or result from work performed by him

15   for AB.  (Wilson Decl. Ex. 15 ¶¶ 2(a), (b) & (c).)  He further promised that if he made any

16   inventions that he believed fell within this narrow exception, he would disclose those inventions

17   to AB and provide evidence to substantiate his belief that the inventions fell within the exception.

18   (*Id.* ¶ 7.)

19           Dr. Macevicz became AB's Senior Patent Counsel.  (Wilson Decl. Ex. 17 at 16:7-17.)  He

20   was responsible for the development and maintenance of AB's intellectual property, including its

21   patent portfolio.  (*Id.* at 13:12-14:1; Wilson Decl. Ex. 14 at 22:5-25:1 & Ex. 18.)  As part of his

22   responsibility to expand AB's patent portfolio, Dr. Macevicz also reviewed research and projects

23   being developed by AB scientists to determine whether they might be eligible for patent

24   protection.  (Wilson Decl. Ex. 4 at 48:9-16.)  At least three other employees reported to

25   Dr. Macevicz.  (Wilson Decl. Ex. 17 at 14:14-25.)

26

27

28

**B.    Dr. Maceviz's Work on DNA Sequencing**

**1.    Work That Dr. Macevicz Disclosed to AB**

Dr. Macevicz prosecuted patents for AB related to DNA sequencing, including two patents that claimed novel methods for DNA sequencing (U.S. Patent Nos. 5,580,732 and 5,624,800, both entitled "Method of DNA Sequencing Employing a Mixed DNA-Polymer Chain Probe.")  (Wilson Decl. Ex. 19.)  Dr. Macevicz prosecuted at least one other patent related to DNA sequencing technologies, U.S. Patent No. 6,649,598, entitled "4,7-Dichlorofluorescein Dyes as Molecular Probes."  (Wilson Decl. Ex. 20.)

Dr. Macevicz submitted at least one invention disclosure of his own to AB, on which he identified himself as the inventor.  (Wilson Decl. Ex. 21; Tschop Decl. ¶ 6.)   AB chose not to pursue patent protection for this invention.  (*See id.*)

While he was AB's Senior Patent Counsel, Dr. Macevicz also worked on a method of DNA sequencing known as sequencing by hybridization.  Documenting this in a May 1994 performance review, Dr. Macevicz wrote that in the preceding year he had "[a]nalyzed patent positions relat[ed] to sequencing by hybridization." (Wilson Decl. Ex. 4 at 82:16-85:16 & Ex. 22; Tschop Decl. ¶ 7.)

**2.    Work That Dr. Macevicz Concealed From AB**

What Dr. Macevicz did not disclose to his superiors at AB in this performance review, or anywhere else, is that he also had invented and filed a patent application on a method of sequencing by hybridization, without disclosing or assigning the invention or application to AB. (*See* Wilson Decl. Ex. 4 at 91:25-92:21.)  He also did not disclose that, leading up to that application, he had asked an AB scientist, Dr. Steven Fung, to sign several pages of his invention notebook that described his invention for sequencing by hybridization.  (*Id.* at 54:16-55:21 & 57:1-58:4; Wilson Decl. Ex. 23.)  Dr. Fung signed these notebook pages at AB, on AB's time. (*See* Wilson Decl. Ex. 4 at 56:23-60:7.)

Dr. Macevicz invented still other methods of DNA sequencing that he likewise did not disclose to his superiors at AB.  On July 21, 1994, Dr. Macevicz asked another AB employee, Dr. Paul Grossman, to sign several pages in his invention notebook, describing inventions including

DNA sequencing by ligation and DNA sequencing by hybridization.  (*See id.* at 97:6-20 & Ex. 23.)  In addition to being a scientist and inventor at AB, Dr. Grossman was a patent agent who reported to Dr. Macevicz.  (Wilson Decl. Ex. 4 at 97:9-16.)  Dr. Grossman signed these notebook pages at AB, on AB's time.  (*Id.* at 97:6-20.)

On April 17, 1995, again without telling AB, Dr. Macevicz filed U.S. Patent Application No. 08/424,663 ("the '663 Application"), entitled "DNA Sequencing By Parallel Oligonucleotide Extensions."  (Wilson Decl. Ex. 25.)  The '663 Application claimed inventions related to those that were described in the notebook pages that Dr. Macevicz had asked Dr. Grossman to sign several months earlier.  (*See* Wilson Decl. Ex. 4 at 97:6-98:3 & Ex. 24.)  Within a two-year period, Dr. Macevicz filed three other patent applications based on a different disclosure.  These applications claimed the inventions that were described in the notebook pages that Dr. Macevicz had asked Dr. Fung to sign.  (*See, e.g.*, Wilson Decl. Ex. 4 at 58:2-11 & Ex. 23.)  All four of these applications ("the Applications")[1] covered methods of DNA sequencing, including DNA sequencing by ligation and DNA sequencing by hybridization.  (Wilson Decl. Ex. 4 at 99:4-12; 100:9-101:5; 166:11-22.)  As suggested by their titles, the inventions described and claimed in the Applications related to DNA sequencing and were squarely within AB's line of business because they were about DNA sequencing.  However, Dr. Macevicz did not disclose any of the Applications to his supervisor or anyone else at AB.  (*Id.* at 99:4-12; 100:9-101:5; 166:11-22.)  At most, he had general discussions about this work "in the hallways or at the lunch table."  (*Id.* at 99:15-21.)

The '663 Application led to at least three U.S. patents that issued after Dr. Macevicz left AB:  U.S. Patent No. 5,750,341, U.S. Patent No. 5,969,119, and U.S. Patent No. 6,306,597, all entitled "DNA Sequencing By Parallel Oligonucleotide Extensions."  (Wilson Decl. Ex. 26.)  Illumina has asserted those three patents against AB in this litigation.

---

[1] The '663 Application, as well as U.S. Patent Application No. 08/091,603 (filed July 13, 1993), entitled "DNA Sequencing by Random Primer Extension;" No. 08/436,084 (filed May 8, 1995), also entitled DNA Sequencing by Random Primer Extension;" No. 08/436,528 (filed May 8, 1995), entitled "DNA Sequence Analysis by Stringency Class Primers."

1    Although Dr. Macevicz did not disclose or assign any of the Applications to AB, he used

2    his AB phone and fax numbers on the applications and on subsequent communications with the

3    U.S. Patent and Trademark Office.  (*See* Wilson Decl. Exs. 43 & 44 at 2; *see also* Ex. 4 at 90:8-

4    91:20.)

5                    **C.    Dr. Macevicz's Departure To Lynx**

6    For at least the last six months of his tenure as AB's Senior Patent Counsel, Dr. Macevicz

7    was secretly setting up his transition to Lynx.

8    In 1994, Dr. Macevicz was recruited to join Lynx.  (*See* Wilson Decl. Ex. 27.)  Dr.

9    Macevicz was particularly interested in joining Lynx for the opportunity to work with Dr. Sydney

10   Brenner, who had granted rights to some of his DNA sequencing inventions to Lynx.  (*See*

11   Wilson Decl. Ex. 28.)  In November, Dr. Macevicz sent Lynx a draft agreement to assign certain

12   intellectual property to Lynx.  (*Id.*)  Dr. Macevicz explained that "My objective was to make my

13   patent part of the 'Brenner' package of intellectual property owned by Newco or Lynx."  (*Id.* at

14   MAC00944.)  The draft agreement provided that he would assign to Lynx his patent application

15   on sequencing by hybridization—the same technology for which he had analyzed patent positions

16   for AB.  Dr. Macevicz sent this communication from AB.  He used a standard AB fax cover

17   sheet, with his AB phone and fax numbers.  (*Compare id.* with Wilson Decl. Ex. 29.)  However,

18   Dr. Macevicz inserted his home address in place of the AB logo and return address.  (*See id.*)  Dr.

19   Macevicz also used fax machines at AB to transmit documents related to these inventions.  (*See*

20   Wilson Decl. Ex. 4 at 90:8-91:20.)  He did not disclose this draft agreement to AB.  (*Id.* at 93:7-

21   18.)

22   Shortly after Dr. Macevicz offered to assign this first patent application to Lynx to make it

23   part of the "'Brenner' package," Lynx put AB on notice of a dispute regarding rights to

24   Dr. Brenner's inventions.  Lynx emphasized that "[t]his is especially important now that Lynx is

25   trying to finance a new company to develop commercial products based on the inventions of Dr.

26   Brenner."  (Wilson Decl. Ex. 12.)  Lynx specifically requested that AB confirm that the Cross-

27   License did not give AB any rights to Dr. Brenner's inventions.  (*Id.*)

28

1   Two weeks after Dr. Macevicz filed the '663 Application, while he was still AB's Senior

2   Patent Counsel, Dr. Macevicz entered into an indemnity agreement with Lynx that identified him

3   as an "Officer" of Lynx.  (Wilson Decl. Ex. 30.)  He thought the indemnity agreement was a

4   "nice generous thing" for Lynx to do.  (Wilson Decl. Ex. 4 at 18:23-19:3.)  However, he did not

5   tell anyone at AB about this agreement.  (*Id.* at 13:11-14:24.)

6                    **D.      Dr. Macevicz's Purported Assignment of His Applications to Lynx**

7       On June 6, 1995, five weeks after entering his indemnity agreement with Lynx,

8   Dr. Macevicz resigned from AB.  In his letter of resignation, Dr. Macevicz said that he was

9   resigning "to pursue other opportunities."  (Wilson Decl. Ex. 31; Tschop Decl. ¶ 8.)  He did not

10  mention that he was going to Lynx.  (*See* Wilson Decl. Ex. 31.)

11      On July 31, again while Dr. Macevicz was still AB's Senior Patent Counsel, the Lynx

12  Board of Directors voted to grant Dr. Macevicz 150,000 stock options in Lynx. (Wilson Decl. Ex.

13  32), in consideration of his employment by Lynx (Wilson Decl. Ex. 4 at 168:6-169:10).

14  Dr. Macevicz's last day with AB was August 7, 2005.  (Wilson Decl. Ex. 33; Tschop Decl. ¶ 9.)

15      On August 31, 1995, Dr. Macevicz purported to assign the Applications to Lynx.  (Wilson

16  Decl. Ex. 34.)  Illumina is not aware of any compensation or value that was provided by Lynx to

17  Dr. Macevicz for this assignment.  (Wilson Decl. Ex. 6 at 120:15-122:13.)  On August 14, 1995,

18  *Spectragen* (not Lynx) granted Dr. Macevicz 20,000 stock options in Spectragen, (Wilson Decl.

19  Ex. 35 at No. 9).  Dr. Macevicz contends that these stock options were given in consideration for

20  the Applications assigned to Lynx.  (Wilson Decl. Ex. 4 at 168:6-169:10.)  Illumina, however,

21  does not know why these options were granted to Dr. Macevicz.  (Wilson Decl. Ex. 6 at 101:10-

22  102:9.)  The stock option grant does not mention the Applications or their assignment.  (Wilson

23  Decl. Ex. 36.)  Likewise, the assignment document does not mention a grant of stock options.

24  (*See* Wilson Decl. Ex. 34.)

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARGUMENT

## I.    ILLUMINA AND SOLEXA LACK STANDING TO BRING PATENT INFRINGEMENT COUNTERCLAIMS

AB moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss Defendants' patent infringement counterclaims for lack of standing.

Whether a party has standing to sue is a question of law. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000). Standing is a jurisdictional issue that should be resolved before proceeding with any other aspect of this case. *See Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1032-33 (Fed. Cir. 1995) ("[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.") (quotation omitted); *Kahn v. Gen. Motors Corp.*, 77 F.3d 457, 459 (Fed. Cir. 1996) ("The ownership of patent property is a matter of law, the decision of which may entail underlying factual inquiries."); *Leighton Techs. LLC v. Oberthur Card Sys.*, No. 04 Civ. 2496, 2007 U.S. Dist. LEXIS 57873, at **5, 14-15 (S.D.N.Y. July 11, 2007) ("There is no need for a jury to address the question of ownership of the patents; courts have uniformly treated the inquiry as a [ ] jurisdictional matter that does not touch upon the merits of an infringement claim but rather addresses the issue of injury in fact."). The court may hear evidence and weigh facts as necessary to determine jurisdiction, while applying no presumptive truthfulness to plaintiff's allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

## II.    SUMMARY JUDGMENT IS ALSO APPROPRIATE

Summary judgment is proper when no genuine, disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). As discussed below, summary judgment is appropriate for several causes of action in this case.

1

### III.    DR. MACEVICZ BREACHED HIS EMPLOYEE INVENTION AGREEMENT WITH AB (FIRST CAUSE OF ACTION)

2

3        Dr. Macevicz entered into the AB Invention Agreement as a condition of his employment

4    with AB.  (Macevicz Answer ¶ 12.)  Under the agreement, Dr. Macevicz expressly agreed he

5    would:

6            2. . . . promptly make full disclosure to the Company, will hold in
            trust for the sole right and benefit of the Company, and will assign
7            all my right, title, and interest to any and all inventions, discoveries,
            developments, improvements or trade secrets which I may solely or
8            jointly conceive, develop or reduce to practice, or cause to be
            conceived, developed or reduced to practice, during the period of
9            time I am in the employ of the Company, except any invention,
            discovery, development, improvement or trade secret as to which I
10           can prove that

11           (a) it was developed entirely on my own time; and

12           (b) no equipment, supplies, facility or trade secret of the Company
            was used in its development; and
13
            (c) (i) it does not relate to the business or actual or demonstrably
14           anticipated research or development of the Company, or (ii) it does
            not result from any work performed by me for the Company.
15

16    (Wilson Decl. Ex. 15 ¶ 2.)  Dr. Macevicz further agreed that he would:

17           [a]dvise the Company promptly in writing of any inventions,
            discoveries, developments, improvement or trade secretes that I
18           believe meet the criteria in subparagraphs 2(a), (b) and (c) above;
            and I will at that time provide to the Company in writing all
19           evidence necessary to substantiate that belief.

20    (*Id.* ¶ 7.)

21        Dr. Macevicz filed the Applications when he was employed by AB.  However, he

22    purported to assign them to Lynx, not AB.  (Illumina Answer ¶ 16; Macevicz Answer ¶ 15.)  He

23    never even disclosed them to AB.  (Wilson Decl. Ex. 4 at 99:4-12; 100:9-101:5; 166:11-22.)

24    Instead, Dr. Macevicz filed the Applications in secret, and immediately after he left AB, he

25    purported to assign them to Lynx.  (*See* Illumina Answer ¶ 16; Macevicz Answer ¶ 15.)

26            **A.    Dr. Macevicz Failed To Disclose His Inventions**

27        Dr. Macevicz's notebooks, signed by other AB employees, show that the inventions were

28    conceived and developed while he worked for AB.  He was therefore required to "[a]dvise the

1    Company promptly in writing" about his inventions.  (Wilson Decl. Ex. 15 ¶ 7.)  However, he did

2    not disclose anything other than what was revealed in "general discussions" with AB scientists

3    and engineers about his work.  (*See* Wilson Decl. Ex. 4 at 107:19-108:2.)  These casual

4    conversations would not satisfy the disclosure requirements of the AB Invention Agreement, and

5    Dr. Macevicz admits he did not intend them to do so.  (*See id.* at 108:4-109:4.)  There is no

6    evidence of any written disclosure, let alone any disclosure to a supervisor.  (*Id.* at 92:4-6, 99:4-

7    12, 100:9-15 & 101:6-18.)

8         Dr. Macevicz explains that he "didn't consider these inventions to be a part of the AB

9    business."  (*Id.* at 101:11-12.)  But the AB Invention Agreement required that Dr. Macevicz

10   "provide to the Company in writing all evidence necessary to substantiate this belief."  (Wilson

11   Decl. Ex. 15 ¶ 7.)  He never did so.  (Wilson Decl. Ex. 4 at 92:4-6, 99:4-12; 100:9-15; 101:6-18.)

12        The agreement reserved for AB—not just Dr. Macevicz—the right to evaluate whether an

13   inventions was covered.  As this court explained under factually similar circumstances:

> The clear terms of the [agreement] indicate that [defendants] did not
> have the discretion to retain any ideas.  Pursuant to [the agreement],
> they had to disclose not only all Inventions, but also "any idea" that
> they did not believe to be an Invention so that Plaintiff could
> determine whether or not the idea qualified as an Invention.

17   *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 990-92 (N.D. Cal. 2006).  The AB Invention

18   Agreement covers inventions that "relate to the business or actual or demonstrably anticipated

19   research or development" of AB.  (Wilson Decl. Ex. 15 ¶ 2(c)(i).)  Yet Dr. Macevicz admits that

20   he was not involved in determining AB's research and development goals, nor was he aware of

21   them.  (Wilson Decl. Ex. 4 at 139:8-140:10.)  Indeed, he admits that it was not his decision to

22   determine which technologies AB would pursue.  (*Id.* at 144:14-25.)  He was hardly in a position,

23   then, to conclude that AB was "not interested in developing" these technologies.  (*Id.* at 50:20-

24   51:3.)

25        **B.     Dr. Macevicz's Invention Is Not Protected By Labor Code § 2870**

26        Had Dr. Macevicz disclosed his invention pursuant to the AB Invention Agreement, he

27   might not have been required to assign them to AB if he could prove that they fell within the

28   exception to the agreement's assignment provision, which incorporates Section 2870 of the

California Labor Code.  (*See* Wilson Decl. Ex. 15 ¶¶ 2 & 7.)  Section 2870 saves for the inventor only:

> (a) . . .  an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that . . . .:
>
> Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; ….

Cal. Lab. Code § 2870.  Dr. Macevicz has the burden of proof under Section 2870.  *Id.* § 2872.

### 1.    Dr. Macevicz used AB's resources

Section 2870 is strictly construed.  *See, e.g.*, *Iconix*, 457 F. Supp. 2d at 991-92.  In *Iconix*, the court considered whether plaintiff company's former employees should be enjoined from operating a website allegedly subject to the terms of an agreement that incorporated Section 2870. *Id.*  The court found Section 2870 inapplicable because the former employees had developed and maintained the website while at the company, used company laptops while on vacation to maintain the website, and used company computers to handle minor operational issues for the website during normal work hours.  *Id.* at 991.

The court rejected the excuse that conducting "personal activities" on their work laptops was "acceptable" and sometimes "encouraged" by the company so that employees could be on call at all times.  *Id.*  Rather, the court noted that under Section 2870, *any* use of "the employer's equipment, supplies, facilities, or trade secret information" "clearly require[s]" that the former employees assign and transfer their inventions to the company.  *Id.*  The court also rejected the defendants' claim that because they routinely worked 14-16 hour days, it was "artificial" to categorize 9:00 am-5:00 pm as "work time."  The court emphasized that Section 2870 "only applies to an invention that the employee developed *entirely* on his or her own time."  *Id.* at 992 (emphasis in original) (quotation omitted).

As in *Iconix*, Section 2870 does not apply because Dr. Macevicz used company time, equipment, and resources to develop his invention and prepare his Applications.  Dr. Macevicz asked at least two AB employees—one of whom reported to him—to witness his lab notebook on

1    company time. (Wilson Decl. Ex. 4 at 57:1-23 & 97:6-20.) He had "general discussion[s]" about

2    this work with the AB employees who signed his notebook. (*Id.* at 97:21-98:9.) He had other

3    discussions about this work with AB's scientists and engineers "in the hallways or at the lunch

4    table." (*Id.* at 99:13-100:3). Then, when he applied for the patent, he used AB's phone and fax

5    numbers for his contact information on the '663 Application. (Wilson Decl. Exs. 43 & 44 at 2;

6    *see also* Ex. 4 at 90:8-91:20.) He even used AB's fax machines to transmit documents related to

7    these inventions. (Wilson Decl. Ex. 4 at 90:21-91:4.)

8         Based on these indisputable facts, Dr. Macevicz cannot show that he did this work

9    "entirely on his own time" and without any AB resources. Section 2870 does not apply.

10                      **2.      Dr. Macevicz's inventions are within AB's line of business**

11        "Courts interpreting employee assignment agreements in the context of section 2870 have

12   construed the 'related to' phrase broadly." *Cadence Design Sys., Inc. v. Bhandari*, No. C 07-

13   00823, 2007 U.S. Dist. LEXIS 83078, at *19 (N.D. Cal. Nov. 8, 2007) (citing *Cubic Corp. v.*

14   *Marty*, 185 Cal. App. 3d 438 (Cal. Ct. App. 1986) (assignment agreement enforceable where

15   employee's invention was new product potentially used to "enhance" company's existing

16   product)). Here, as illustrated by *Cadence* and *Cubic*, it is indisputable that the Applications are

17   "related to" AB's business. AB was one of the pioneers of DNA sequencing, and DNA

18   sequencing has always been central to its business goals. For example, AB's 1992 Annual Report

19   describes "identify[ing] the structure of DNA . . ." as one of its major goals. (Wilson Decl. Ex. 1

20   at 3.) In 1994, when Dr. Macevicz asked Dr. Grossman and Dr. Fung to witness his lab

21   notebook, AB's business was (and still is) developing "automated systems . . . used for synthesis,

22   amplification, purification, isolation, analysis and *sequencing of [DNA and RNA]* . . . ." (Wilson

23   Decl. Ex. 2 at 2 (emphasis added).)

24        Moreover, AB's interest was not limited to existing products and processes, as the

25   competitive landscape was "intensified by the ever-changing nature of the technologies in the

26   industry in which [AB] is engaged." (*Id.* at 3.) Dr. Macevicz's contention that AB was only

27   interested in developing improvements to DNA sequencing technologies it had already

28   commercialized is entirely speculative, as he readily admits that he was neither involved in

1   deciding which technologies AB should pursue (Wilson Decl. Ex. 4 at 144:14-25), nor was he

2   aware of AB's long-term research and development goals (*id.* at 139:8-140:10).  Moreover, Dr.

3   Macevicz primary job duty was securing patent protection for the inventions of AB's scientists,

4   and he does not remember ever not pursuing a patent because it was outside of the scope of AB's

5   business.  (*Id.* at 49:13-16.)

6        Dr. Macevicz's Applications related to AB's business because those Applications related

7   specifically to his job duties there.  For example, three of the applications purportedly assigned to

8   Lynx cover DNA sequencing by hybridization, a technology AB was exploring at least as early as

9   1994.  (*See id.* at 82:16-85:16.)  In fact, in his 1994 performance evaluation Dr. Macevicz

10  specifically identified sequencing by hybridization as a subject of his work for AB.  (*Id.* at 82:16-

11  85:16; Wilson Decl. Ex. 22.)  Dr. Macevicz's own writing shows that sequencing by

12  hybridization—the subject of his patents—was not only within the scope of AB's business but

13  was in fact within the scope of his own job duties.

14       Further, the very title of Dr. Macevicz's '663 Application and resulting patents shows

15  their relationship to AB's business: "DNA Sequencing by Parallel Oligonucleotide Extensions."

16  Shortly before he filed the '663 Application, Dr. Macevicz prosecuted an application on behalf of

17  AB that led to two other patents on methods of DNA sequencing: U.S. Patent Nos. 5,580,732 and

18  5,624,800, both entitled "Method of DNA Sequencing Employing A Mixed DNA-Polymer Chain

19  Probe."  Dr. Macevicz knew that AB's interest in DNA sequencing technologies was broad and

20  forward-looking.

21       Finally, even if AB had not been interested in commercializing Dr. Macevicz's

22  Applications, it still would have been interested in any patents that would issue from them.  AB

23  makes DNA products.  If it considered a new means of DNA sequencing promising but did not

24  want to commercialize it, obtaining patent protection for such technology would still benefit AB.

25  It could license the technology, or alternatively, it could block companies from exploiting DNA

26  sequencing methods that would compete with AB's products.  *Biotechnology Indus. Org. v.*

27  *District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) ("Patentees value the right to exclude

28

1  in part because the ability to foreclose competitors from making, using, and selling the invention

2  may allow them an opportunity to obtain above-market profits during the patent's term.").

3      The inventions disclosed in the Applications were not just within the scope of AB's

4  business, they were within the scope of Dr. Macevicz's own work for AB. They were not

5  exempted by Section 2870.

6              **IV.    LYNX WAS NOT A BONA FIDE PURCHASER FOR VALUE**

7      Illumina alleges it is a Bona Fide Purchaser ("BFP") for value, but that defense does not

8  apply to Illumina. The BFP for value rule, in the context of transfer of a patent right, provides

9  that "when a legal title holder of a patent transfers his or her title to a third party purchaser for

10  value without notice of an outstanding equitable claim or title, the purchaser takes the entire

11  ownership of the patent, free of any prior equitable encumbrance." *FilmTec Corp. v. Allied-*

12  *Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) (citing *Hendrie v. Sayles*, 98 U.S. 546, 549

13  (1879)). A BFP must: (1) acquire an interest in a patent (2) by paying valuable consideration (3)

14  to the legal title holder (4) without notice of an outstanding equitable claim or title on the patent.

15  *FilmTec*, 939 F.2d at 1573. The party seeking the protection of the BFP defense has the burden

16  of proving application of the defense. *See, e.g.*, *Fitzgerald v. Terminal Dev. Co.*, 11 Cal. App. 2d

17  126, 133 (Cal. Ct. App. 1936). Defendants cannot satisfy this burden. Illumina parted with no

18  valuable consideration when it received the patents, and it took the patents with notice of AB's

19  interests therein.[2]

20              **A.    Illumina Paid Nothing To Dr. Macevicz For The Applications**

21      "A bona fide purchaser for value must have departed with some valuable consideration to

22  be entitled to invoke the legal protection provided by that status." *Eisenberg v. Grand Bank for*

23  *Sav.*, *F.S.B*, 207 F. Supp. 2d 553, 560 (S.D. Miss. 2002); *Stone & Webster Eng'g Corp. v.*

24  *Hamilton Nat'l Bank*, 199 F.2d 127, 131 (6th Cir. 1952) ("[Defendant] does not occupy the

25  position of a bona fide purchaser for value. It parted with no valuable consideration in receiving

26          [2] AB has always been the equitable owner of the Applications and resulting patents.
*FilmTec*, 939 F.2d at 1572; *see also Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d, 1574, 1581
27  (Fed. Cir. 1991) ("[A]n agreement to assign in the future inventions not yet developed may vest
the promisee with *equitable* rights in those inventions once made . . . .").

28

1    the money . . . ."); *FilmTec*, 939 F.2d at 1574 ("Here the requirement is that the subsequent

2    purchaser, in order to cut off the rights of the prior purchaser, must be more than a donee or other

3    gratuitous transferee. There must be in fact valuable consideration paid . . . ."). If a party

4    provides little or no value in exchange for the property at issue, it is not a BFP. *See U.S. v. One*

5    *1996 Vector M12*, 442 F. Supp. 2d 482, 486 (S.D. Oh. 2005).

6         Here, Lynx paid *nothing* to Dr. Macevicz for the Applications. A separate corporation,

7    *Spectragen*, granted 20,000 shares of its stock options to Dr. Macevicz. (Wilson Decl. Ex. 35 at

8    No. 9.) Dr. Macevicz now claims that grant was made in consideration for the Applications.

9    (Wilson Decl. Ex. 4 at 168:6-169:10.) However, this claim is not corroborated by any

10   contemporary written evidence—the grant document does not mention the assignment and the

11   assignment does not mention the grant. Moreover, the assignment was made to *Lynx*, not

12   Spectragen. Only several months later did Lynx assign the Applications to Spectragen. (Wilson

13   Decl. Ex. 39.)

14        Anything paid by Lynx to Dr. Macevicz was in consideration for his employment, not the

15   Applications. (*See* Wilson Decl. Ex. 16.) Lynx's offer letter to Dr. Macevicz makes no mention

16   of the assignment, nor does it refer to the Application. (*Id.*) Illumina's corporate designee

17   testified that Illumina does not know why Spectragen granted the extra 20,000 stock options to

18   Dr. Macevicz. (Wilson Decl. Ex. 6 at 101:24-102:9.) She also testified that Illumina is not aware

19   of any compensation or value that was provided to Dr. Macevicz for the Applications. (*Id.* at

20   120:20-122:13.) There is no record that Lynx provided any value to Dr. Macevicz in return for

21   assigning the Applications to Lynx.

22        Dr. Macevicz and Illumina may argue that value provided by Spectragen is the same as

23   value provided by Lynx. Such an argument would be contradicted by the many SEC filings that

24   describe the separate identities of the two companies. (*See, e.g.*, Wilson Decl. Ex. 5 at 49 & Ex.

25   38 at 14.) It is also inconsistent with the fact that Lynx made a separate assignment of the

26   applications to Spectragen several months later. (Wilson Decl. Ex. 39.) Illumina cannot

27   disregard Spectragen's separate corporate existence to bootstrap itself into BFP status. As the

28   court noted in *Communist Party of the U.S. v. 522 Valencia, Inc.*:

> [A]lter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form.

35 Cal. App. 4th 980, 994 (Cal. Ct. App. 1995). Because Lynx "parted with no valuable consideration" when it received those Applications from Dr. Macevicz, it was not a bona fide purchaser *for value*.

## B. Lynx Received Dr. Macevicz's Applications With Notice Of AB's Rights Therein

Even where value is paid, a putative BFP must purchase "without notice" of an outstanding equitable claim or title. *FilmTec*, 939 F.2d at 1573. Notice sufficient to cut off a putative BFP's rights can be actual, imputed, or can arise from a duty of inquiry. *See Katz v. Lear Siegler Inc.*, Case No. 91-1094, 1993 U.S. App. LEXIS 17507, at *11 (Fed. Cir. July 12, 1993); *FilmTec*, 939 F.2d at, 1574. Lynx cannot be a BFP because it took the Applications with notice, both actual and inquiry.

## 1. Dr. Macevicz's knowledge of his obligations under the AB Invention Agreement is imputed to Lynx

A party with actual notice of an assignor's duty to assign its invention to a prior employer has actual notice of the prior company's rights in the invention. *FilmTec*, 939 F.2d at 1574. In *FilmTec*, a company's former employee was obligated to assign a patent to the U.S. government under the terms of his employment agreement. *Id.* at 1571. Instead of doing so, he assigned his patent to a new company, which he helped found. *Id.* at 1574. The court held that the assignee company took the assignment with notice of the government's rights in the patent. *Id.* "If [the employee's] contract with [his employer] contained a provision assigning any inventions made during the course of employment either to [his employer] or directly to the Government, [the employee] would clearly be on notice of the provisions of his own contract." *Id.* Because the employee was a founder of the new company to which the patent was assigned, his actual notice of his duty to assign was imputed to the new company. *Id.*

As in *FilmTec*, Dr. Macevicz's knowledge of his obligation to assign the Application to AB must be imputed to Lynx under the circumstances of this case. While working at AB, Dr. Macevicz knew that he was bound by the AB Invention Agreement, which required him to disclose and to assign his Applications to AB. (Wilson Decl. Ex. 4 at 101:1-25.) He did neither. Instead, while working at AB, he began the negotiations that led to his employment at Lynx with the President of Lynx, Dr. Eletr. Dr. Eletr was both founder and former chief executive of AB, as well as the founder of Lynx. (Wilson Decl. Ex. 2.) After starting work at Lynx, Dr. Macevicz purported to assign the Applications to Lynx. (Wilson Decl. Ex. 34.) By this time, Dr. Macevicz was acting as Lynx's agent. (Wilson Decl. Ex. 4 at 13:5-10.) He had signed an indemnity agreement as an "officer" of Lynx prior to working there. (Wilson Decl. Ex. 30.) He had filed an appearance with the patent office as Lynx's attorney. (*See* Wilson Decl. Ex. 41.) In fact, Dr. Macevicz himself filed Lynx's notice of assignment of the Application with the patent office. (Wilson Decl. Ex. 42.) Dr. Macevicz was dealing directly with Dr. Eletr. (*See* Wilson Decl. Ex. 4 at 121:8-14.) Since Dr. Macevicz had knowledge of his obligations under the AB Invention Agreement, so too did Lynx. *See* Cal. Civ. Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."); *see also Clark Equip. Co. v. Wheat*, 92 Cal. App. 3d 503, 527 (Cal. Ct. App. 1979) (citation omitted) ("The rule of imputed knowledge applies to an attorney acting for a corporate client.").

Dr. Macevicz, a former employee of AB—and a Lynx officer when the Applications were assigned—"would clearly be on notice of the provisions of his own contract." *FilmTec*, 939 F.2d at 1574. That notice, which can be imputed to Lynx because Dr. Macevicz was acting as its agent when he assigned the patents, precludes application of the BFP for value defense by Lynx.

## 2. Lynx knew that AB had rights to the technology disclosed in Dr. Macevicz's Applications

The facts known to Lynx went well beyond inquiry notice. First, Dr. Eletr negotiated Dr. Macevicz's assignment of the Applications. (Wilson Decl. Ex. 4 at 121:8-14.) Dr. Eletr was the founder of AB, held several executive positions there, and served as an AB consultant prior to

1    forming Lynx. (Wilson Decl. Ex. 5 at 38.)  He was familiar with AB's policies concerning its

2    employees' inventions.  Moreover, several Lynx employees, including those responsible for

3    having employees sign invention assignment agreements at both companies, had previously

4    worked at AB.  (Wilson Decl. Ex. 5 at 38; Ex. 6 at 43:2-12 & 63:23-64:14.)  The same law firm,

5    Cooley Godward, did work for both Lynx and AB at that time, handled the spin-off of Lynx, and

6    drafted Lynx's invention agreement, the same agreement as the AB Invention Agreement.

7    (Wilson Decl. Ex. 6 at 22:14-25:6, 60:12-16 & 142:18-22.)  Indeed, Dr. Macevicz signed

8    identical versions of that invention agreement at both companies.  (*Compare* Wilson Decl. Ex. 3

9    with Ex. 40.)  The *only* reasonable conclusion is that Lynx knew that Dr. Macevicz was working

10   under the terms of an agreement that would require him to disclose and assign his Applications if

11   they were covered by the AB Invention Agreement.

12        Second, Lynx was a spin-off of AB and cross-licensed technology with AB, and even

13   shared facilities with AB, so Lynx knew that DNA sequencing was AB's line of business.

14   (Wilson Decl. Exs. 9 & 12.)  Lynx knew that the Applications disclosed inventions related to

15   DNA sequencing.  (*See* Wilson Decl. Ex. 28 at MAC00945 ("Macevicz has developed a certain

16   invention and technology relating to improved methods for sequencing DNA.").)  Finally, Lynx

17   knew the inventions disclosed in the Applications were conceived and reduced to practice by Dr.

18   Macevicz while employed by AB.  (*See id.*)[3]

19        Thus, Lynx knew that Dr. Macevicz was working under the terms of an agreement that

20   required him to disclose and assign his Applications to AB.  Further, Lynx knew that the

21   Applications covered subject matter, DNA sequencing, that precluded application of California

22

23

24        [3] Moreover, Lynx knew that the specific inventions disclosed in the Applications were of
     *particular* interest to AB.  Dr. Macevicz told Lynx that he wanted his Applications to be part of
     the "Brenner package" of inventions. (Wilson Decl. Ex. 28 at MAC00944.)  Only a month after

25   Dr. Macevicz said this, Lynx sent a letter to AB complaining that AB was misrepresenting its
     rights to the Brenner patents. (Wilson Decl. Ex. 12.)  This was part of a dispute that Dr.

26   Macevicz characterized as "repetitive," concerning rights to the technology. (Wilson Decl. Ex. 4
     at 122:21-124:18.)  Lynx knew AB had an interest in the technology contained in the Brenner

27   patents and therefore also knew that AB also had an interest in the technology contained in the
     Applications that Dr. Macevicz wanted to make part of that package.

28

1  Labor Code § 2870.  That Lynx may not have realized the legal significance of the above facts to

2  its BFP status is irrelevant to whether the facts constitute actual notice.

3              **3.      Lynx failed to satisfy its duty of inquiry about AB's rights in
                        the Applications**
4

5          At a *minimum*, Lynx was on inquiry notice of AB's rights when Dr. Macevicz assigned

6  his Applications.  *See U. S. v. Orozco-Prada*, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986) (citations

7  omitted) ("A person must use ordinary thoughtfulness and make accessible inquiries.  If he does

8  not, and avoids the inquiry, he is chargeable with the knowledge which ordinary diligence would

9  have elicited, and cannot be considered a bona fide purchaser."); *see also Oakdale Vill. Group v.*

10 *Fong*, 43 Cal. App. 4th 539, 544 (Cal. Ct. App. 1996) (BFP defense not applicable where

11 purchaser had "knowledge of such facts and circumstances as would have put cautious and

12 prudent men on inquiry").

13         In *Katz*, 1993 U.S. App. LEXIS 17507, at *15, the Federal Circuit held on summary

14 judgment that a subsequent purchaser should be held to inquiry notice of the prior owner's rights

15 "based on a duty of inquiry" of a prior assignment.  Katz knew that the two parties involved in the

16 earlier assignment had a long-standing license agreement.  *Id.* at *14.  Nevertheless, Katz failed to

17 present evidence concerning that knowledge, nor did he present evidence relating to his

18 negotiation and purchase of the patents or whether he had made relevant inquiries to the previous

19 assignor or assignee.  *Id.* at **14-15.  It was not enough that Katz had "searched the records of

20 the PTO and they were silent" on the assignment of the patents.  *Id.* at *12.  Under the

21 circumstances, a person exercising ordinary care should have at least asked "minimal, obvious"

22 questions.  *Id.* at *15.  Thus, the Federal Circuit upheld the lower court's finding of inquiry notice

23 due to Katz's "willful or careless blindness."  *See id.*

24         Here, if Lynx did not have "actual notice" of AB's rights to the Applications, then it is

25 only because Lynx was guilty of the same "[w]illful or careless blindness" that concerned the

26 court in *Katz*.  All of the facts that support actual notice described above demonstrate

27 unequivocally that Lynx was on inquiry notice of AB's ownership rights in the inventions

28 disclosed in the Applications.  Given that Lynx was a spin-off of AB, shared facilities with AB,

1    shared legal counsel with AB, used the same invention disclosures as AB, and given that Lynx's

2    CEO and chairman of the Board, Dr. Eletr, founded AB, and brought with him to Lynx several

3    employees, senior scientists, and executives from AB, Lynx cannot credibly contend that it did

4    not know enough to inquire into AB's rights to Dr. Macevicz's inventions.  A reasonable person,

5    at the very least, would have made more than minimal inquiries into AB's ownership rights.  But

6    there is no evidence that Lynx made *any* inquiries into the matter.

7         Dr. Eletr was the only Lynx representative who spoke to Dr. Macevicz about the

8    Applications.  (Wilson Decl. Ex. 4 at 121:8-14.)  No other Lynx employees or Board members

9    discussed the assignment with Dr. Macevicz.  (*See id.*)  Nor did Lynx's outside counsel, Cooley

10   Godward, speak to Dr. Macevicz about the assignment.  (*Id.* at 121:15-19.)  Dr. Eletr's discussion

11   with Dr. Macevicz about the Applications were no more than "a telephone call here or there."

12   (*Id.* at 121:12-14 & 120:24-25)  Dr. Eletr never asked Dr. Macevicz whether he had the right to

13   assign the Applications to Lynx.  (*Id.* at 120:8-12.)  He also never asked whether Dr. Macevicz

14   had disclosed the inventions to AB.  (*Id.* at 120:17-20.)  As Dr. Macevicz testified: "I don't recall

15   our discussions being of that nature."  (*Id.*)

16        Illumina's 30(b)(6) designee on the assignment of Dr. Macevicz's inventions to Lynx,

17   Kathy San Roman, testified that Illumina has no knowledge of this topic.  (Wilson Decl. Ex. 6 at

18   120:20-122:13 & 126:16-22.)  She further testified that she did not know of any due diligence that

19   Lynx did regarding Dr. Macevicz's rights to assign his Application to Lynx.  (*Id.* at 18:18-19:11.)

20   She was also unaware of Lynx making any inquiry to Dr. Macevicz about his rights.  (*Id.*)

21        Lynx was under a legal duty of inquiry to investigate AB's rights in Dr. Macevicz's

22   Applications.  It is undisputed that Lynx failed to satisfy that duty.  Lynx is charged with the

23   knowledge that the required inquiries would have elicited.  That knowledge cuts off its rights as a

24   BFP.  The asserted patents are the property of AB, and Illumina has no standing to assert them

25   against AB.

26

27

28

1
2

## V.   LYNX AND DR. MACEVICZ CONVERTED HIS INVENTIONS AND THE APPLICATIONS (FIFTH CAUSE OF ACTION)

3
4
5
6
7
8
9

All three elements of a conversion claim were satisfied when Dr. Macevicz assigned his Applications to Lynx instead of AB: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights, and (3) damages." *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998).  Here, Dr. Macevicz was required "to disclose" and "to assign" the applications to AB.  (Wilson Decl. Ex. 15 ¶¶ 1-2.) These provisions reflect an expectant interest that vests equitable title in AB.  Lynx converted AB's equitable rights in the Applications by accepting Dr. Macevicz's assignment.

10
11
12
13
14
15
16

Conversion does not require any knowledge or intent by the defendant.  *Burlesci,* 68 Cal. App. 4th at 1066.  Knowledge and intent are relevant, however, if a party such as Illumina asserts it is a BFP.  *Oakdale*, 43 Cal. App. 4th at 547.  A party who accepts assignment of property in whom another has rights may be able to defend itself against conversion, but only if the party took for value without notice of the other party's rights.  The party seeking the protection of the BPP defense has the burden of proving application of the defense.  *See, e.g.*, *Fitzgerald*, 11 Cal. App. 2d at 133.  As explained fully in § IV above, Defendants cannot satisfy this burden.

17
18

## VI.   DR. MACEVICZ BREACHED HIS FIDUCIARY DUTIES TO AB (THIRD CAUSE OF ACTION)

19
20
21

Dr. Macevicz also breached his fiduciary duties to AB because he was entrusted to develop and protect intellectual property on behalf of AB, but he instead developed and protected the Applications for his own gain and then assigned those Applications to Lynx.

22

### A.   Dr. Macevicz Owed Fiduciary Duties To AB

23
24
25
26
27
28

Dr. Macevicz understood that he owed fiduciary duties to AB.  (Wilson Decl. Ex. 4 at 19:4-11.)  This follows from his position as the company's attorney.  *Flatt v. Superior Court*, 9 Cal. 4th 275, 289 (1994); California Rule of Professional Conduct 3-300; *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086-1087 (1995).  Dr. Macevicz was ethically prohibited from taking positions or representing himself in any way that might be adverse to the interests of AB, or from putting his own personal interests ahead of those of AB.

## B.    Dr. Macevicz Breached His Fiduciary Duties

Dr. Macevicz breached his fiduciary duties in at least two ways, first by negotiating and entering agreements with Lynx for his own benefit while working for—and without informing—AB; and second, by taking for himself and Lynx the Applications that should have been disclosed and assigned to AB. *See Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 800 (1962) (quotation omitted) (A fiduciary owes "the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation.").

### 1.    Dr. Macevicz entered into agreements with Lynx for his own benefit while he was AB's Senior Patent Counsel

Among his many duties at AB, Dr. Macevicz was tasked with providing patent prosecution services to Lynx. (Wilson Decl. Ex. 4 at 20:7-21.)  Dr. Macevicz's services to Lynx were provided by AB under the Corporate Services Agreement. (*Id.* at 36:24-37:7; Wilson Decl. Ex. 9 ¶ 4; Ex. 10 at 2.)  Lynx compensated AB for the value of Dr. Macevicz's time and service. (Wilson Decl. Ex. 4 at 36:24-37:7; Wilson Decl. Ex. 9 ¶ 4; Ex. 10 at 2.)  Dr. Macevicz understood that the work he was doing work for Lynx was in his capacity as an AB employee. (Wilson Decl. Ex. 4 at 36:24-37:7.)  Dr. Macevicz far exceeded the scope of these agreements, however, by negotiating and entering agreements with Lynx for his own benefit that he did not disclose to AB.

On November 7, 1994, long before announcing his resignation, Dr. Macevicz offered to license his DNA sequencing patent applications to Lynx. (Wilson Decl. Ex. 28.)  Lynx wanted to use that technology to help set up its subsidiary, Spectragen. (*See generally id.*)  Despite his use of AB's company resources to negotiate this agreement, and the fact that only a few months earlier he had analyzed patent positions relating to sequencing by hybridization for AB, Dr. Macevicz never disclosed the patent application or proposed agreement to AB. (Wilson Decl. Ex. 4 at 87:19-21 & 93:13-18.)  According to Dr. Macevicz, this technology was related to Dr. Sydney Brenner's work (*id.* at 74:24-75:11), to which AB contended it had rights under its Cross-License Agreement with Lynx (Wilson Decl. Ex. 12).

1    Then, in May 1995, while working at AB and without informing AB, Dr. Macevicz

2   entered into an indemnity agreement with Lynx.  (*See* Wilson Decl. Ex. 30.)  Dr. Macevicz never

3   requested or received AB's consent to enter the indemnity agreement with Lynx, and he did not

4   tell AB that he had entered it.  (*See* Wilson Decl. Ex. 4 at 14:9-13.)  According to Dr. Macevicz,

5   all of his actions after the agreement was entered on May 1, 1995—which include his final

6   several weeks of employment with AB—fall within the indemnity agreement.  (*Id.* at 22:21-24.)

7   Pursuant to that agreement, Illumina is now indemnifying Dr. Macevicz for legal fees and

8   liabilities associated with this action (*id.* at 4:8-12 &23:23-24:3), and has even asserted attorney-

9   client privilege over a communication between Dr. Macevicz and Dr. Eletr when Dr. Macevicz

10   was still working for AB (Wilson Decl. Ex. 37 at No. 157).

11    In both of these situations Dr. Macevicz pursued his own interests, and those of Illumina,

12   to the detriment of AB's interests.

13                    **2.       Dr. Macevicz usurped AB's corporate opportunities**

14    Beyond that, filing the '663 Application and assigning it to Lynx were additional breaches

15   of fiduciary duties because Dr. Macevicz usurped AB's corporate opportunities.  *See, e.g.*, *Daniel*

16   *Orifice*, 198 Cal. App. 2d at 800 (plaintiff's chief engineer breached his duty to the corporation

17   when he secretly "developed an improved version of [the company's products]" and instead of

18   turning this over to the corporation, sought to open his own competing business).

19    Dr. Macevicz was in charge of AB's patent portfolio.  (*See, e.g.*, Wilson Decl. Ex. 4 at

20   41:13-42:16.)  He reviewed AB scientists' invention disclosures as part of his job duties.  (*See id.*

21   at 48:1-8.)  But when the duty fell on him to disclose his own invention under that agreement, he

22   failed to do so.  Even though he had prosecuted patents for other inventors on methods of DNA

23   sequencing, he did not disclose his own inventions for methods of DNA sequencing.

24    After failing to disclose his inventions, Dr. Macevicz compounded the breach by taking

25   the inventions for his own use and assigning them to Lynx.  He thus violated the corporate

26   opportunity doctrine, which

27               prohibits a fiduciary from acquiring, in opposition to the
                corporation, property in which the corporation has an interest or
28               tangible expectancy.... [A] corporate opportunity exists when a

1
2

> proposed activity is reasonably incident to the corporation's present
> or prospective business and is one in which the corporation has the
> capacity to engage.

3    Iconix, 457 F. Supp. 2d at 982 (quotation omitted) (finding defendants who failed to

4    assign and disclose technology required under Labor Code § 2870 violated corporate opportunity

5    doctrine). The DNA sequencing technology disclosed in the Application is "reasonably incident"

6    to AB's "present or prospective business," specifically, DNA sequencing. *See, e.g.*, *id.* at 986

7    (rejecting defendants' argument that plaintiff was in the business of "branded email, and anything

8    not directly tied to achieving email downloads was outside the scope of plaintiff's business").

9    AB not only had the capacity to engage in the opportunity that was usurped by Dr. Macevicz, it

10   was actually engaged in business related to that opportunity, *e.g.*, through Dr. Macevicz's own

11   patent prosecution work. Instead of secretly purporting to assign his Applications to Lynx, he

12   was required to disclose and assign them to AB. By failing to do so, Dr. Macevicz breached his

13   fiduciary duties to AB.

14                                   **CONCLUSION**

15   When Dr. Macevicz was legally obligated to be working for AB as its Chief Patent

16   Counsel and fiduciary, he was instead working to advance his own interests and those of Illumina.

17   Both Dr. Macevicz and Illumina knew better. All of the relevant patents and applications should

18   be returned to AB, and Illumina's counterclaims should be dismissed for lack of standing.

19

20   Dated: December 6, 2007                MORRISON & FOERSTER LLP

21

22                                  By:    /s/ Bryan Wilson
                                          _____
23                                         Bryan Wilson
                                           Attorneys for Plaintiff
24                                         APPLERA CORPORATION –
                                           APPLIED BIOSYSTEMS GROUP
25

26

27

28