# EXHIBIT 5

# PART B

(c)    The sale, exchange, conveyance, encumbrance, hypothecation or other transfer of the real property subject to the Mortgage (hereinafter defined), or any part thereof or interest therein, or the entering into by Maker of any contract or agreement to do so.

(d)    The filing by Maker of a voluntary petition in bankruptcy, a petition for reorganization, arrangement or other relief under federal or state bankruptcy laws, or a voluntary petition for the appointment of a receiver or for other relief under the laws of any state, or the making by Maker of an assignment of all or substantially all of its assets for the benefit of creditors.

(e)    The adjudication of Maker as a bankrupt or insolvent, the appointment of a receiver of all or substantially all of Maker's assets, or the entry of an order of the reorganization of Maker under applicable federal or state bankruptcy laws, if such adjudication, order or appointment is made upon a petition filed against Maker and is not, within sixty (60) days after it is made, vacated or stayed on appeal or otherwise, or if Maker by any action or failure to act signifies its approval thereof, consent thereto or acquiescence therein.

4.    In the event of any failure on the part of Maker to make any payment when due, whether at maturity, as herein provided, or by reason of acceleration of maturity under the terms of paragraphs 3 and 8 hereof, Payee shall be entitled to recover from Maker all costs of effecting collection of the same, including reasonable attorney's fees and all costs of collection, whether suit be brought or not.

5.    Maker may prepay all or any part of the monies due hereunder without penalty.

6.    Any notice to either party hereto may be given by delivering the same in writing to such person, or by sending the same by registered or certified mail, postage prepaid, to the following mailing addresses or to any other mailing addresses within the State of California of which the parties notify each other:

Maker:              David W. Martin, Jr. and Kathleen M. Martin
                    1028-1030 Lombard Street
                    San Francisco, CA  94109

Payee:              Lynx Therapeutics Incorporated
                    3832 Bay Center Place
                    Hayward, CA 94545
                    Attn:  Chief Financial Officer

7.    This Note is secured by (i) a certain Mortgage of even date herewith (the "Mortgage"), covering certain real property located at 124 Marshall Bridge Road, Kennett Square, PA 19348 and more fully described in Exhibit A to the Mortgage.

20909506
060795                                     2.

The Mortgage and all other documents now and/or hereinafter issued in connection with the loan evidenced hereby are herein collectively referred to as the "Loan Documents".

8.    In the event that Maker, without the prior written consent of Payee sells, exchanges, conveys, encumbers, hypothecates or otherwise transfers the real property covered by the Mortgage or any interest therein or portion thereof, or agrees to do so, Payee may, at its option, declare all sums secured hereby immediately due and payable.  Consent to one such transaction shall not be deemed to be a waiver of the right to grant or withhold such consent to future or successive transactions, at Payee's sole discretion.

9.    In the event that any one or more of the provisions contained in this Note or any of the Loan Documents shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note or any of the Loan Documents, but this Note and the Loan Documents shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein or therein.

10.    Any failure of the Payee to exercise or enforce any right hereunder or under any of the Loan Documents shall not constitute a waiver of such right.  All rights of the Payee hereunder or under the Loan Documents shall be cumulative and not alternative and shall be in addition to any other rights and remedies granted to the Payee pursuant to any other agreement, by statute, or by law.

11.    This Note may not be changed orally, but only by an agreement in writing signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

12.    This Note shall be construed and enforced in accordance with, and governed by, the laws of the State of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

13.    The obligations of the undersigned under the Loan Documents shall be joint and several.

WITNESS, the undersigned have executed this Note, with the intent of being legally bound, effective as of the date first set forth above.

David W. Martin, Jr., both individually
and as Trustee of the David W. and
Kathleen M. Martin Revocable Trust
dated June 19, 1987

Kathleen M. Martin, both individually
and as Trustee of the David W. and
Kathleen M. Martin Revocable Trust
dated June 19, 1987

Exhibit 10.27

## Stock Purchase Agreement, dated as of October 2, 1995 between the Company and Karoly Nikolich

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT is made by and between LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), and Karoly Nikolich ("Purchaser").

## WITNESSETH:

WHEREAS, Purchaser holds one stock option to purchase shares of common stock of the Company pursuant to the Company's 1992 Stock Option Plan (the "Plan") which Purchaser desires to exercise;

WHEREAS, Purchaser wishes to take advantage of the early exercise provision of his options; and

NOW, THEREFORE, IT IS AGREED between the parties as follows:

1. Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of six hundred thousand (600,000) shares of the Company's common stock (the "Stock"), for an exercise price of thirty-five cents ($0.35) per share (total exercise price: two hundred ten thousand dollars ($210,000.00)), payable as follows:

| | |
|---|---|
| Cash at Closing | $  -0- |
| Promissory Note in the form of Exhibit E (the "Note") | $210,000 |
| Total Exercise Price | $210,000 |

The closing hereunder shall occur at the offices of the Company on the date of this Agreement or at such other time and place as the parties may mutually agree upon in writing.

At the closing, Purchaser shall deliver one (1) stock assignment in the form of Exhibit B, duly endorsed (with date and number of shares left blank), joint escrow instructions (the "Joint Escrow Instructions") in the form of Exhibit C, duly executed by Purchaser, and the total exercise price (including an executed Note in the form of Exhibit E if a portion of the total exercise price is to be paid by promissory note and an executed pledge agreement in the form of Exhibit F (the "Pledge Agreement") under which all shares of the Stock acquired by Note shall be pledged as collateral security for the payment of the indebtedness represented by the Note).

At the closing or as soon thereafter as practicable, the Company shall deliver to the Escrow Agent (as defined in paragraph 8 below) share certificates for all of the

1.

Stock that is to be subject to the Purchase Option (as defined in paragraph 2 below), and shall deliver share certificates to Purchaser for all of the Stock, if any, that is not to be subject to the Purchase Option or the Pledge Agreement. The certificates for all of the Stock that is subject to the Pledge Agreement but not the Purchase Option shall be retained by the Company as security pursuant to the Pledge Agreement.

2.    In accordance with the provisions of Section 408(b) of the California General Corporation Law, six hundred thousand (600,000) shares of the Stock to be purchased by Purchaser pursuant to this Agreement with an exercise price of thirty-five cents ($0.35) per share shall be subject to the following option ("Purchase Option"):

(a)    Subject to the provisions of Exhibit A, in the event that Purchaser shall cease to be an employee of the Company for any reason (including his death), or no reason, with or without cause, the Purchase Option may be exercised. The Company shall have the right at any time within the ninety (90) day period after Purchaser's termination of service with the Company and all related companies or such longer period as may be agreed to by the Company and Purchaser (for example, for purposes of satisfying the requirements of Section 1202(c)(3) of the Internal Revenue Code) to purchase from Purchaser or his personal representative, as the case may be, at the price per share paid by Purchaser pursuant to this Agreement ("Option Price"), up to but not exceeding the number of shares of the Stock set forth on Exhibit A hereto which is incorporated herein by this reference.

(b)    In addition, and without limiting the foregoing Purchase Option, if at any time during the term of the Purchase Option, there occurs: (a) a dissolution or liquidation of the Company; (b) a merger or consolidation involving the Company in which the Company is not the surviving corporation; (c) a reverse merger in which the Company is the surviving corporation but the shares of the Company's common stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of other securities, cash or otherwise; or (d) any other capital reorganization in which more than fifty percent (50%) of the shares of the Company entitled to vote are exchanged, then: (i) if there is no successor to the Company, the Company shall have the right to exercise its Purchase Option as to all or any portion of the Stock then subject to the Purchase Option set forth above to the same extent as if Purchaser's employment by the Company had ceased on the date preceding the date of consummation of said event or transaction, or (ii) the Purchase Option may be assigned to any successor of the Company, and the Purchase Option shall apply if Purchaser shall cease for any reason to be an employee of such successor on the same basis as set forth above. In that case, references herein to the "Company" shall be deemed to refer to such successor.

(c)    The Company shall be entitled to pay for any shares purchased pursuant to its Purchase Option at the Company's option in cash, by offset against any indebtedness given in payment for the Stock, or a combination of both.

(d)    As used herein, employment with the Company shall include employment with an affiliate of the Company.

(e)    This Agreement is not an employment contract and nothing in this Agreement shall be deemed to create in any way whatsoever any obligation on the part of Purchaser to continue in the employ of the Company, or of the Company to continue Purchaser in the employ of the Company.

(f)    In the event that the Stock's Fair Market Value (as defined in the Plan) is equal to or exceeds the Option Price on the date that the Purchaser ceases to be employed, the Company shall exercise its Purchase Option to the extent permitted by law.

3.    The Purchase Option may be exercised by giving written notice of exercise delivered or mailed as provided in paragraph 14. Upon providing of such notice and payment or tender of the purchase price, the Company shall become the legal and beneficial owner of the Stock being purchased and all rights and interests therein or related thereto.

4.    If from time to time during the term of the Purchase Option there is any stock dividend or liquidating dividend or distribution of cash and/or property, stock split or other change in the character or amount of any of the outstanding securities of the Company, then, in such event, any and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of his ownership of Stock will be immediately subject to the Purchase Option and be included in the word "Stock" for all purposes of the Purchase Option with the same force and effect as the shares of Stock then subject to the Purchase Option. While the total Option Price shall remain the same after each such event, the Option Price per share of Stock upon exercise of the Purchase Option shall be appropriately adjusted.

5.    All certificates representing any shares of Stock of the Company subject to the provisions of this Agreement shall have endorsed thereon legends in substantially the following form:

(i) "The shares represented by this certificate are subject to an option set forth in an agreement between the corporation and the registered holder, or his predecessor in interest, a copy of which is on file at the principal office of this corporation. Any transfer or attempted transfer of any shares subject to such option is void without the prior express written consent of the issuer of these shares. "

(ii) Any legend required to be placed thereon by the California Commissioner of Corporations.

6.    As security for his faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Stock upon exercise of the Purchase Option herein provided for, Purchaser agrees, at the closing hereunder (or

3.

as soon thereafter as practicable), to deliver (or have the Company deliver on the Purchaser's behalf) to and deposit with the Secretary of the Company ("Escrow Agent"), as Escrow Agent in this transaction, three (3) stock assignments duly endorsed (with date and number of shares left blank) in the form attached hereto as Exhibit B, together with a certificate or certificates evidencing all of the Stock subject to the Purchase Option; said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in Exhibit C attached hereto and incorporated herein by this reference, which instructions shall also be delivered to the Escrow Agent at the closing hereunder (or as soon thereafter as practicable). If a portion of the total purchase price is paid by a promissory note, the Stock is also subject to the Pledge Agreement, and possession of the certificates and stock assignments by the Escrow Agent shall also constitute possession by the Company of such instruments pursuant to the Pledge Agreement.

7.   Purchaser shall not sell or transfer any of the Stock subject to the Purchase Option or any interest therein so long as such Stock is subject to the Purchase Option or the Pledge Agreement.

8.   The Company shall not be required (i) to transfer on its books any shares of Stock of the Company which shall have been sold or transferred in violation of any of the provisions set forth in this Agreement or (ii) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

9.   Subject to the provisions of paragraphs 7 and 8 above, Purchaser (but not any unapproved transferee) shall, during the term of this Agreement, exercise all rights and privileges of a stockholder of the Company with respect to the Stock.

10.   Purchaser acknowledges receipt of a copy of Section 260.141.11 of Tide 10 of the California Administrative Code, attached hereto as Exhibit D.

11.   The parties agree to execute such further instruments and to take such further action as reasonably may be necessary to carry out the intent of this Agreement.

12.   Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in any United States Post Office Box, by registered or certified mail with postage and fees prepaid, addressed to the other part hereto at his address hereinafter shown below his signature or at such other address as such part may designate by ten (10) days' advance written notice to the other part hereto.

13.   This Agreement shall bind and inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, inure to the benefit of and be binding upon Purchaser, his heirs, executors,

administrators, successors, and assigns. Without limiting the generality of the foregoing, the Purchase Option of the Company hereunder shall be assignable by the Company at any time or from time to time, in whole or in part. Should the right of repurchase be assigned by the Company, the assignee shall pay to the Company cash equal to the excess, if any, of the Stock's Fair Market Value (as defined in the Plan) over the Option Price.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the 2nd day of October, 1995.

LYNX THERAPEUTICS INC.

By _____

Address:          3832 Bay Center Place
                  Hayward, CA 94545

PURCHASER

_____
Karoly Nikolich

Address:          450 South Rd

                  Belmont, Ca 94002

**ATTACHMENTS:**

| | |
|---|---|
| Exhibit A | Vesting Schedule |
| Exhibit B | Assignment Separate from Certificate |
| Exhibit C | Joint Escrow Instructions |
| Exhibit D | Cal. Admin. Code, Title 10, Section 260.141.11 |
| Exhibit E | Promissory Note |
| Exhibit F | Pledge Agreement |

5.

Run Date: 10/16/95
Run Time: 9:56am

Last Update: 10/13/95

## LYNX THERAPEUTICS, INC.

### Optionee Activity for Mr. Karoly Nikolich

#### All Types - All Plans As Of Monday, October 16, 1995

| Option Holder Name Plan / Next Vest | Grant No. Type | Grant Date | Shares | Price | Vested | Exercised | Subject to Repurchase | Expired or Cancelled | Outstanding | Outstanding Un-Vested | Outstanding Exercisable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nikolich, Karoly, (SSN: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) | | | | | | | | | | | |
| NQ Plan / Next Vest: 120,000 - 10/02/96 | NQ184 NQ | 09/01/95 | 600,000.0 | $0.35 | 0 | 0.0 | 0 | 0.0 | 600,000.0 | 600,000.0 | 600,000 |
| NQ Plan / Next Vest: 0 - 08/30/05 | NQ185 NQ | 09/01/95 | 100,000.0 | $0.35 | 0 | 0.0 | 0 | 0.0 | 100,000.0 | 100,000.0 | 0 |
| Totals for Nikolich, Karoly: | | | 700,000.0 { | $0.35 . } | 0 | 0.0 | 0 | 0.0 | 700,000.0 | 700,000.0 | 600,000 |
| Report Totals: | | | 700,000.0 { | $0.35 . } | 0 | 0.0 | 0 | 0.0 | 700,000.0 | 700,000.0 | 600,000 |

Numbers in braces {} represent Weighted Average Price per Share.

## EXHIBIT B

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED  Karoly Nikolich hereby sells, assigns and transfers unto Lynx Therapeutics, Inc., a Delaware Corporation ("Company"), pursuant to that certain Stock Purchase Agreement dated as of October 2, 1995 between the Company and the undersigned (the "Agreement" <u>six hundred thousand (600,000)</u> shares of the Company's Common Stock, standing in its name on the books of said corporation represented by Certificate <u>No. B1360</u> herewith, and does hereby irrevocably constitute and appoint the Company's Attorney to transfer the said stock on the books of the said corporation with full power of substitution in the premises.  This Assignment may be used only in accordance with and subject to the terms and conditions of the Agreement, in connection with the repurchase of shares of Common Stock issued to the undersigned pursuant to the Agreement, and only to the extent that such shares remain subject to the Company's Purchase Option under the Agreement.

Dated: <u>11/7/95</u>

Signature _____

Print Name: <u>Karoly Nikolich</u>

5.

# JOINT ESCROW INSTRUCTIONS

Secretary
Lynx Therapeutics, Inc.
3832 Bay Center Place
Hayward, CA 94545

Dear Sir:

As Escrow Agent for both Lynx Therapeutics, Inc., a Delaware corporation ("Company"), and the undersigned purchaser of stock of the Company ("Purchaser"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Stock Purchase Agreement ("Agreement"), dated, October 2, 1995, to which a copy of these Joint Escrow Instructions is attached as Exhibit C, in accordance with the following instructions:

1.      In the event that the Company or an assignee shall elect to exercise the Purchase Option set forth in the Agreement, the Company or its assignee will give to Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company.  Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2.      At the closing you are directed to: (a) date any stock assignments necessary for the transfer in question, (b) fill in the number of shares being transferred, and (c) deliver same, together with the certificate evidencing the shares of stock to be transferred, to the Company against the simultaneous delivery to you of the purchase price (which may include suitable acknowledgment of cancellation of indebtedness) of the number of shares of stock being purchased pursuant to the exercise of the Purchase Option.

3.      Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as specified in the Agreement. Purchaser does hereby irrevocably constitute and appoint you as his attorney-in-fact and agent for the term of this escrow to execute with respect to such securities and other property all documents of assignment and/or transfer and all stock certificates necessary or appropriate to make all securities negotiable and complete any transaction herein contemplated.

4.      This escrow shall terminate upon expiration or exercise in full of the Purchase Option, whichever occurs first.

1.

5.    If, at the time of termination of this escrow, you should have in your possession any documents, securities, or other property belonging to Purchaser, you shall deliver all of same to Purchaser and shall be discharged of all further obligations hereunder; provided, however, that if at the time of termination of this escrow you are advised by the Company that the property subject to this escrow is the subject of a pledge or other security agreement, you shall deliver all such property to the pledgeholder or other person designated by the Company.

6.    Except as otherwise provided in these Joint Escrow Instructions, your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.    You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties or their assignees. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.    You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law, and you are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree of any court, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

9.    You shall not be liable in any respect on account of the identity, authority or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

10.    You shall not be liable for the outlawing of any rights under any statute of limitations with respect to these Joint Escrow Instructions or any documents deposited with you.

11.    You shall be entitled to employ such legal counsel (including without limitation the firm of Cooley Godward Castro Huddleson & Tatum) and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

2.

12.    Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be Secretary of the Company or if you shall resign by written notice to each party. In the event of any such termination, the Company may appoint any officer or assistant officer of the Company as successor Escrow Agent and Purchaser hereby confirms the appointment of such successor or successors as his attorney-in-fact and agent to the full extent of your appointment.

13.    If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

14.    It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities, you may (but are not obligated to) retain in your possession without liability to anyone all or any part of such securities until such dispute shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

15.    Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in any United States Post Box, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties hereunto entitled at the following addresses, or at such other addresses as a party may designate by ten (10) days' written notice to each of the other parties hereto:

COMPANY:                           Lynx Therapeutics, Inc.
                                   3832 Bay Center Place
                                   Hayward, CA 94545
                                   Attn: President

PURCHASER:                         _Karoly Nikolich_____

                                   _____

ESCROW AGENT:                      Secretary
                                   Lynx Therapeutics, Inc.
                                   3832 Bay Center Place
                                   Hayward, CA 94545

16.    By signing these Joint Escrow Instructions you become a party hereto only for the purpose of such Joint Escrow Instructions; you do not become a party to the Agreement.

17.    This instrument shall be binding upon and inure to the benefit of the

3.

parties hereto, and their respective successors and permitted assigns. It is understood and agreed that references to "you" or "your" herein refer to the original Escrow Agent and to any and all successor Escrow Agents. It is understood and agreed that the Company and Lynx may at any time or from time to time assign its rights under the Agreement and these Joint Escrow Instructions in whole or in part.

Very truly yours,

LYNX THERAPEUTICS, INC.

By: _____

Title: _pres,_ _____

PURCHASER: _____

ESCROW AGENT:

_____
Secretary
Lynx Therapeutics, Inc.

4.

STATE OF CALIFORNIA - CALIFORNIA ADMINISTRATIVE CODE

TITLE 10. Investment - Chapter 3. Commissioner of Corporations

260.141.11: RESTRICTION ON TRANSFER. (a) The issuer of any security upon which a restriction on transfer has been imposed pursuant to Sections 260.102.6, 260.141.10 or 260.534 shall cause a copy of this section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b) It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rules), except:

   (1)      to the issuer;

   (2)      pursuant to the order or process of any court;

   (3)      to any person described in subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;

   (4)      to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;

   (5)      to holders of securities of the same class of the same issuer;

   (6)      by way of gift or donation inter vivos or on death;

   (7)      by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities is not in violation of any securities law of the foreign state, territory or country concerned;

   (8)      to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or a member of an underwriting syndicate or selling group;

   (9)      if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;

   (10)     by way of a sale qualified under Sections 25111, 25112, 25113, or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

   (11)     by a corporation to a wholly owned subsidiary of such corporation, or by a wholly owned subsidiary of a corporation to such corporation;

   (12)     by way of an exchange qualified under Section 25111, 25112 or 25113 of the Code, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

   (13)     between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;

   (14)     to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state; or

   (15)     by the State Controller pursuant to the Unclaimed Property Law or by the administrator of the unclaimed property law of another state if, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule, (ii) delivers to each purchaser a copy of this rule, and (iii) advises the Commissioner of the name of each purchaser;

   (16)     by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities;

   (17)     by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c)      The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letters of not less than 10-point size, reading as follows:

          "IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."

# PLEDGE AGREEMENT

1.      As collateral security for the payment of that certain $210,000.00 promissory note issued this date to Lynx Therapeutics, Inc. ("Pledgee") by the undersigned (hereinafter called "indebtedness"), the undersigned hereby assigns, transfers to and pledges with the Pledgee the securities listed on Schedule 1 hereto which, on the date hereof, were delivered for deposit with Pledgee, together with any stock rights, rights to subscribe, dividends paid in cash or other property in connection with the complete or partial liquidation of Pledgee, stock dividends, dividends paid in stock, new securities or other property except cash dividends other than liquidating dividends to which the undersigned is or may hereafter become entitled to receive on account of such property, and in the event that the undersigned receives any such, the undersigned immediately will deliver it to Pledgee to be held by Pledgee hereunder in the same manner as the property originally pledged hereunder. All property assigned, transferred to and pledged with Pledgee under this paragraph is hereinafter called "collateral."

2.      At any time, without notice, and at the expense of the undersigned, Pledgee in its name or in the name of its nominee or of the undersigned may, but shall not be obligated to: (a) collect by legal proceedings or otherwise all dividends (except cash dividends other than liquidating dividends), interest, principal payments and other sums now or hereafter payable upon or on account of said collateral; (b) enter into any extension, reorganization, deposit, merger, or consolidation agreement, or any agreement in any wise relating to or affecting the collateral, and in connection therewith may deposit or surrender control of such collateral thereunder, accept other property in exchange for such collateral and do and perform such acts and things as it may deem proper, and any money or property received in exchange for such collateral shall be applied to the indebtedness or thereafter held by it pursuant to the provisions hereof; (c) insure, process and preserve the collateral; (d) cause the collateral to be transferred to its name or to the name of its nominee; (e) exercise as to such collateral all the rights, powers, and remedies of an owner, except that so long as the indebtedness is not in default the undersigned shall retain all voting rights as to the collateral.

3.      The undersigned agrees to pay prior to delinquency all taxes, charges, liens and assessments against the collateral, and upon the failure of the undersigned to do so, Pledgee at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

4.      All advances, charges, costs and expenses, including reasonable attorneys' fees, incurred or paid by Pledgee in exercising any right, power or remedy conferred by this agreement, or in the enforcement thereof, shall become a part of the indebtedness secured hereunder and shall be paid to Pledgee by the undersigned immediately and without demand.

5.      At the option of Pledgee and without necessity of demand or notice, all or any

part of the indebtedness of the undersigned immediately shall become due and payable irrespective of any agreed maturity, upon the happening of any of the following events: (a) failure to keep or perform any of the terms or provisions of this agreement; (b) default in the payment of principal or interest when due; (c) the levy of any attachment, execution or other process against the collateral; or (d) the insolvency, commission of an act of bankruptcy, general assignment for the benefit of creditors, filing of any petition in bankruptcy or for relief under the provisions of Title 11 of the United States Code of, by, or against the undersigned.

6.    In the event of the nonpayment of any indebtedness when due, whether by acceleration or otherwise, or upon the happening of any of the events specified in paragraph 5, Pledgee may then, or at any time thereafter, at its election, apply, set off, collect or sell in one or more sales, or take such steps as may be necessary to liquidate and reduce to cash in the hands of Pledgee in whole or in part, with or without any previous demands or demand of performance or notice or advertisement, the whole or any part of the collateral in such order as Pledgee may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere, or at any broker's board or securities exchange, either for cash or upon credit or for future delivery; provided, however, that if such disposition is at private sale, then the purchase price of the collateral shall be equal to the public market price then in effect, or, if at the time of sale no public market for the collateral exists, then, in recognition of the fact that the sale of the collateral would have to be registered under the Securities Act of 1933, as amended, and that the expenses of such registration are commercially unreasonable for the type and amount of collateral pledged hereunder, Pledgee and the undersigned hereby agree that such private sale shall be at a purchase price mutually agreed to by Pledgee and the undersigned or, if the parties cannot agree upon a purchase price, then at a purchase price established by a majority of three independent appraisers knowledgeable of the value of such collateral, one named by the undersigned within 10 days after written request by the Pledgee to do so, one named by Pledgee within such 10 day period, and the third named by the two appraisers so selected, with the appraisal to be rendered by such body within 30 days of the appointment of the third appraiser. The cost of such appraisal, including all appraiser's fees, shall be charged against the proceeds of sale as an expense of such sale. Pledgee may be the purchaser of any or all collateral so sold and hold the same thereafter in its own right free from any claim of the undersigned or right of redemption. Demands of performance, notices of sale, advertisements and presence of property at sale are hereby waived, and Pledgee is hereby authorized to sell hereunder any evidence of debt pledged to it. Any sale hereunder may be conducted by any officer or agent of Pledgee.

7.    The proceeds of the sale of any of the collateral and all sums received or collected by Pledgee from or on account of such collateral shall be applied by Pledgee to the payment of expenses incurred or paid by Pledgee in connection with any sale, transfer or delivery of the collateral, to the payment of any other costs, charges, attorneys' fees or expenses mentioned herein, and to the payment of the indebtedness or any part hereof, all in such order and manner as Pledgee in its discretion may determine. Pledgee shall pay any balance to the undersigned.

8.    Pledgee shall be under no duty or obligation whatsoever to make or give any presentments, demands for performance, notices of non-performance, protests, notices of protest or notices of dishonor in connection with any obligations or evidences of indebtedness held by Pledgee as collateral, or in connection with any obligations or evidences of indebtedness which constitute in whole or in part the indebtedness secured hereunder.

9.    Pledgee at any time may deliver the collateral or any part thereof to the undersigned and the receipt of the undersigned shall be a complete and full acquittance for the collateral so delivered, and Pledgee shall thereafter be discharged from any liability or responsibility therefor.

10.    Upon the transfer of all or any part of the indebtedness, Pledgee may transfer all or any part of the collateral and shall be fully discharged thereafter from all liability and responsibility with respect to such collateral so transferred, and the transferee shall be vested with all the rights and powers of Pledgee hereunder with respect to such collateral so transferred; but with respect to any collateral not so transferred Pledgee shall retain all rights and powers hereby given.

11.    Until all indebtedness shall have been paid in full, the power of sale and all other rights, powers and remedies granted to Pledgee hereunder shall continue to exist and may be exercised by Pledgee at any time and from time to time irrespective of the fact that the indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of the undersigned may have ceased.

12.    Pledgee agrees that so long as the indebtedness is not in default, shares of common stock of Pledgee held hereunder as collateral for the indebtedness shall be released from pledge as the indebtedness is paid, at the rate of one share for Thirty-five Cents ($0.35) of principal amount of indebtedness paid for the first Two Hundred Ten Thousand Dollars ($210,000) of principal amount of indebtedness paid. Release from pledge, however, shall not result in release from the provisions of those certain Joint Escrow Instructions of even date herewith among the parties to this Pledge Agreement and the Escrow Agent named therein, from the Purchase Option of Pledgee, set forth in the Stock Purchase Agreement of even date herewith between the parties to this Pledge Agreement.

13.    The rights, powers and remedies given to Pledgee by this Agreement shall be in addition to all rights, powers and remedies given to Pledgee by virtue of any statute or rule of law. Pledgee may exercise its Pledgee's lien or right of setoff with respect to the indebtedness in the same manner as if the indebtedness were unsecured. Any forbearance or failure or delay by Pledgee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy hereunder shall not preclude the further exercise thereof; and every right, power and remedy of Pledgee shall continue in full force and effect until

Page 149 of 260

such right, power or remedy is specifically waived by an instrument in writing executed by Pledgee.

Dated: October 2, 1995

_____
Karoly Nikolich

ATTACHMENT:

Schedule 1

# PROMISSORY NOTE

$210,000

Hayward, California
October 2, 1995

**For Value Received**, the undersigned hereby unconditionally promises to pay to the order of Lynx Therapeutics, Inc., a Delaware corporation the (the "Company"), at 3832 Bay Center Place, Hayward, CA 94545, or at such other place as the holder hereof may designate in writing in lawful money of the United States of America and immediately available funds, the principal sum of two hundred ten thousand ($210,000.00) together with interest accrued from the date hereof on the unpaid principal at the rate of 6.38% per annum, or the maximum rate permissible by law (which under the laws of the State of California shall be deemed to be the laws relating to permissible rates of interest on commercial loans), whichever is less, as follows:

**Principal Repayment**.   The outstanding principal amount hereunder shall be due and payable in full on October 1, 2000 subject to earlier repayment as follows:  If the undersigned sells shares of stock subject to the Pledge Agreement of even date herewith between the undersigned and the Company, then within twenty (20) days of such sale, the undersigned shall pay as principal repayment, $0.35 per share for each share sold until the undersigned sells six hundred thousand (600,000) shares subject the Pledge Agreement; and

**Interest Payments**. Interest shall be payable upon the expiration or, termination of this Note and shall be calculated on the basis of a 360-day year for the actual number of days elapsed;

*provided, however*, that in the event that the undersigned's employment by or association with the Company is terminated for any reason prior to payment in full of this Note, this Note shall be accelerated and all remaining unpaid principal and interest hereunder shall become due and payable immediately after such termination.

If the undersigned fails to pay any of the principal hereunder when due, then the Company, at its sole option, shall have the right to accelerate this Note, in which event the entire principal balance and all accrued interest hereunder immediately shall become due and payable, and immediately collectible by the Company pursuant to applicable law.

This Note may be prepaid at any time without penalty.  All money paid toward the satisfaction of this Note shall be applied first to the payment of interest as required hereunder and then to the retirement of the principal.

The full amount of this Note is secured by a pledge of shares of Common Stock of the Company, and is subject to all of the terms and provisions of the Stock Purchase Agreement and the Pledge Agreement, each of even date herewith between the undersigned and the Company.

The undersigned hereby represents and agrees that the amounts due under this Note are not consumer debt, and are not incurred primarily for personal, family or household purposes, but are for business and commercial purposes only.

The undersigned hereby waives presentment, protest and notice of protest, demand for payment, notice of dishonor and all other notices or demands in connection with the delivery, acceptance, performance, default or endorsement of this Note.

The holder hereof shall be entitled to recover, and the undersigned agrees to pay when incurred, all costs and expenses of collection of this Note, including without limitation, reasonable attorney's fees.

This Note shall be  governed by, and construed, enforced and interpreted in accordance with the laws of the State of California, as applied to contracts made and performed entirely within the State by its residents.


Signed _____

Karoly Nikolich

Exhibit 10.28

**Technology Development and Services Agreement, dated as of October 2, 1995 between the Company and Hoechst Aktiengesellschaft and its subsidiary, Hoechst Marion Roussel**

# TECHNOLOGY DEVELOPMENT AND SERVICES AGREEMENT

THIS TECHNOLOGY DEVELOPMENT AND SERVICES AGREEMENT (the "Agreement") is made and entered into as of the 2nd day of October, 1995 (the "Effective Date") by LYNX THERAPEUTICS, INC., a Delaware corporation, and its majority-owned subsidiaries, including SPECTRAGEN, INC. (collectively referred to as "Lynx"), and HOECHST AKTIENGESELLSCHAFT, a corporation organized under the laws of Germany, and its subsidiary, Hoechst Marion Roussel, Inc. (collectively referred to as "Hoechst").

## RECITALS

WHEREAS, Lynx owns certain inventions, methods and intellectual property relating to a novel technique for determining cDNA sequence information from a sample, which Lynx has developed to the point of proof of concept; and

WHEREAS, Lynx now intends to complete development of such technique so that it may be applied in practice and thereafter to use it in the analysis of cDNA libraries for research and commercial purposes; and

WHEREAS, Hoechst desires to secure early, preferred access to Lynx's library analysis capabilities and is willing to provide financial support for Lynx's development work; and

WHEREAS, Hoechst has entered into a separate agreement with Lynx pursuant to which Hoechst will provide to Lynx certain equity financing.

NOW THEREFORE, in consideration of the foregoing premises and the covenants and promises contained in this Agreement, the parties agree as follows:

## ARTICLE 1

### DEFINITIONS

Capitalized terms use in this Agreement shall have the meanings ascribed to them in the following sections of this Article 1, unless otherwise defined in this Agreement.

**1.1** **"Massively Parallel Signature Sequencing"** or **"MPSS"** means the acquisition of at least 24 contiguous bases (a "Signature Sequence") from each of at least 500,000 templates sampled from a given cell culture or tissue cDNA library.

**1.2** **"MPSS Library Analysis"** means a report containing each 24 base sequence and its abundance within the 500,000 or more cDNA templates extracted from a given sample.

1.3    "Development Program" means the research and development program being coordinated by Lynx with respect to the Massively Parallel Signature Sequencing technology and having as its objective both implementation of MPSS and the implementation of the informatics necessary to manipulate the information obtained from MPSS Library Analyses.

1.4    "Practical Application Milestone" means achievement by Lynx of sufficient development of MPSS to demonstrate that the reproducibility and specificity of the technology is such that it is ready for practical application, as more specifically set forth in Exhibit A attached hereto.

## ARTICLE 2

### DEVELOPMENT OF MPSS TECHNOLOGY

2.1    **Lynx Program.**  Lynx agrees to pursue the Development Program and to apply the payments received from Hoechst under this Agreement to the costs of such program.  Lynx shall use commercially reasonable efforts in performing the Development Work, consistent with its normal business practices, with the goal of achieving the Practical Application Milestone expeditiously.  It is Lynx's objective to achieve the Practical Application Milestone within one (1) year from the Effective Date.  Notwithstanding, Lynx makes no representation, warranty or guarantee of any kind that it can or will achieve the Practical Application Milestone at any time.

2.2    **Reports and Information.**    Periodically during the performance of the Development Work, and in any event at least once per calendar quarter, Lynx shall provide Hoechst written reports summarizing the progress achieved by Lynx to date and its current estimate of when the Practical Application Milestone will be achieved.  At such time as Lynx achieves the Practical Application Milestone, Lynx shall deliver to Hoechst a written report to that effect, together with relevant supporting data and studies.   All such reports, and all information contained therein, shall be deemed to be "Confidential Information" of Lynx under Article 4 hereof.

2.3    **Ownership of Technology.**  Hoechst acknowledges and agrees that any and all inventions (patentable or unpatentable), information, know-how, techniques, methods, materials or other technology developed, discovered or made by Lynx during the Development Work shall be owned entirely by Lynx and shall be disclosed to Hoechst only to the extent Lynx elects to do so.  Lynx shall own and have the sole and exclusive right to prosecute and maintain all patents and patent applications covering any such technology.  Notwithstanding the foregoing, Lynx agrees to make available to Hoechst, at Hoechst's reasonable request, the cDNA libraries used in performing the MPSS Library Analyses for Hoechst under Article 3, as well as any materials created from such libraries during such analyses, to the extent such libraries and materials are retained by Lynx.

2.4    **Development Payments to Lynx.**  In consideration of Lynx's commitment to provide Hoechst with the services hereinafter described, Hoechst agrees to pay to Lynx Three Million U.S. Dollars ($3,000,000) within thirty (30) days of the Effective Date and an additional

Eight Million U.S. Dollars ($8,000,000) within thirty (30) days after Lynx notifies Hoechst that the Practical Application Milestone has been achieved and provides Hoechst with the data demonstrating achievement of such milestone, but in no event earlier than January 15, 1996. The obligations of Hoechst to make such additional payment and any subsequent payments under this Agreement shall only come into effect if the patent due diligence of Hoechst does not reveal by January 15, 1996 that Lynx could be blocked from performing MPSS Library Analyses in the United States. If such payment obligations do not come into effect due to the foregoing, then this Agreement shall terminate on January 15, 1996.

## ARTICLE 3

### LYNX MPSS SERVICES

**3.1    Initial Libraries.**  In consideration of the payments described above, once the Practical Application Milestone has been achieved, Hoechst shall be entitled to receive from Lynx, and Lynx undertakes to prepare and deliver to Hoechst, free of any further charge, an MPSS Library Analysis of each of ten (10) different cDNA samples (or cell or tissue samples from which Lynx can extract cDNA samples) supplied to Lynx by Hoechst for MPSS analysis. Lynx shall use commercially reasonable efforts to prepare each such MPSS Library Analysis as promptly as practicable after Hoechst delivers the cDNA library or cell or tissue sample.

**3.2    Subsequent Libraries.**  Within thirty (30) days after Lynx delivers to Hoechst the tenth MPSS Library Analysis report required under Section 3.1, Hoechst shall make a third payment to Lynx of Four Million U.S. Dollars ($4,000,000) in respect of analysis services to be provided during an initial subscription period. The initial subscription period shall commence on the date such payment is due, and shall terminate on the later of (a) twelve months after such date, or (b) December 31, 1997. During such initial subscription period, Hoechst shall be entitled to receive from Lynx, without further charge, MPSS Library Analyses for up to fifty (50) separate cDNA library samples delivered to Lynx by Hoechst during such period. In addition, during the same period, Hoechst shall be entitled to order from Lynx up to fifteen (15) additional MPSS Library Analyses, for which Hoechst shall pay Lynx Fifty Thousand U.S. dollars ($50,000) per additional MPSS Library Analysis. If in any subscription year, Hoechst submits for MPSS analysis less than fifty (50) cDNA library samples, Hoechst may, if it renews the subscription for the following year, submit the balance for analysis during such following year. In addition, Lynx will use best efforts to provide at least 25% of its MPSS capacity for additional MPSS Library Analyses for Hoechst at its request at a fee to be negotiated in good faith.

**3.3    Renewal of Subscription.**  Hoechst may, at its option and upon 30 days prior written notice, elect to extend its subscription on the same terms as set forth in Section 3.2 above for additional subsequent one year periods, by making in respect of each renewal period a payment to Lynx of a Four Million U.S. Dollar ($4,000,000) renewal fee prior to expiration of the then current subscription year. Each renewal fee shall be subject to increases annually to reflect increases in the U.S. Producer Price Index--All Urban Producers during the prior

subscription period. This Agreement shall expire at the end of the last subscription period paid for by Hoechst as provided for in Sections 3.2 and 3.3, if Hoechst fails to so renew its subscription for MPSS services for the subsequent year as provided in this Section 3.3.

**3.4    Extended Sequencing.**  Lynx also agrees to provide at no charge to Hoechst additional sequence information (up to 500 base pairs per clone) on the fifty (50) most important clones that Hoechst selects from each of its signature sequenced libraries (i.e., potentially as many as 3,000 such sequences with demonstrated disease relevance). These extended sequences will be derived from the original cDNA libraries using the selected signature sequences as unique amplification primers. These extended sequences will allow homology analysis on the cDNA's that Hoechst feels are most relevant to the etiology of its disease focus. The sequences to be provided shall be selected by Hoechst by written notice to Lynx.

**3.5    Informatics.**  The parties acknowledge that Lynx intends to develop software to facilitate the analysis of data secured from MPSS Library Analyses. Lynx agrees that Hoechst may at its election obtain for its own use during the term of this Agreement object copies of such software on a nonexclusive, royalty free basis.

**3.6    Access to Lynx Reference Data Base.**  Lynx also intends to build and maintain a reference data base containing MPSS information and data derived from MPSS analyses of a variety of reference tissue and cell types.  Lynx agrees that Hoechst shall have access to this reference data base as it is built in order to enable Hoechst, by comparing the results of MPSS Library Analyses with data generated from MPSS Library Analyses of pertinent reference samples, to minimize the work that Hoechst may need to do to validate data obtained from its samples. Lynx agrees to make this reference data base available to Hoechst during the term of this Agreement at no additional charge to Hoechst.  In addition, in the event Hoechst notifies Lynx that a particular Signature Sequence or extended sequence may be the object of a Hoechst patent filing, Lynx agrees that if its independent development of information intended for inclusion in its data base generates the same sequence during the ninety (90) day period following such notice, it will delay the addition of such sequence information to its data base until the end of such ninety (90) day period.

**3.7    Hoechst Intellectual Property.**  Hoechst shall own the entire right, title and interest in and to the cDNA libraries that it sends to Lynx for analysis and the results of the MPSS Library Analyses of such libraries prepared for Hoechst pursuant to this Agreement. Lynx agrees that it shall treat the identity and nature of such cDNA libraries delivered to Lynx by Hoechst hereunder and the results of the related MPSS Library Analyses as the "Confidential Information" of Hoechst pursuant to Article 4 hereof.  Nevertheless, Hoechst agrees to give appropriate credit to Lynx in any scientific publication of its research that relies on such results.

**3.8    Co-exclusive Relationship.**  Lynx agrees that it will not at any time prior to expiration of the initial subscription period provided for in Section 3.2 provide comparable MPSS Analysis services to any third party other than Hoechst and two other customers to be identified by Lynx.  In the event the terms under which Lynx agrees to provide MPSS Library Analysis services to either of such customers are more favorable to such customer than the terms

provided to Hoechst in Sections 3.2 through 3.6, then Lynx shall provide Hoechst notice of such agreement and a summary of such terms. Lynx agrees that, if Hoechst so requests, Lynx shall execute an amendment to this Agreement modifying this Agreement to provide MPSS Library Analysis services to Hoechst on the same terms set forth in such third party agreement.

## ARTICLE 4

### CONFIDENTIALITY

**4.1    Confidentiality.**  All knowledge, know-how, practices, processes or other information (hereinafter referred to as **"Confidential Information"**) disclosed by one party to the other (the **"Receiving Party"**) and which is designated in writing as Confidential Information or, if disclosed orally, is reduced to writing within thirty (30) days of disclosure and designated as Confidential Information, shall be received and maintained by such party in strict confidence and shall not be disclosed to any third party.  The Receiving Party shall not use said Confidential Information for any purpose other than those purposes specified in this Agreement. The Receiving Party may disclose Confidential Information for the purposes of this Agreement to affiliates, employees or consultants who are obliged to comply with this confidentiality provision.  This Section 4.1 shall survive for a period of five (5) years from expiration or termination of this Agreement.  The nondisclosure obligations of this Section 4.1 shall not apply to Confidential Information which the Receiving Party can establish by competent evidence (i) is in the public domain prior or subsequent to disclosure without breach by the Receiving Party, (ii) was in the Receiving Party's possession at the time of disclosure, (iii) is received by Receiving Party from a third party who has the lawful right to disclose it or (iv) is disclosed as required by law or regulation or with the written consent of the other party.

## ARTICLE 5

### TERM AND TERMINATION

**5.1    Term.**  This Agreement shall expire two years from the Effective Date if the Practical Application Milestone has not been achieved as of such date.  If such milestone is achieved before such date, this Agreement shall expire at the end of the initial subscription period provided for in Section 3.2 or, if the subscription period is renewed under Section 3.3, at the end of the last subscription period to be paid for by Hoechst under Section 3.3.

**5.2    Termination for Material Breach.**  Each party shall have the right to terminate this Agreement, in addition to pursuing any remedies available under law or in equity, upon sixty (60) days written notice to the other party if the other party is in material breach of this Agreement.  Such termination shall not be effective if the other party cures such breach within sixty (60) days of receiving written notice of breach; thirty (30) days where the alleged breach is failure to pay money when due.

**5.3　Effect of Termination; Survival.**　Upon any expiration or termination of this Agreement, Hoechst will pay to Lynx all amounts that have been earned by Lynx through the expiration or termination date. Lynx will return any remaining samples provided by Hoechst and supply Hoechst with any MPSS Library Analyses of Hoechst samples generated prior to the expiration or termination date. Section 4.1 shall survive for five (5) years following expiration or termination with respect to Confidential Information disclosed prior to expiration or termination.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES

**6.1　Lynx.**　Lynx hereby represents and warrants that it has full corporate power and authority to enter into this Agreement, that this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of Lynx, enforceable in accordance with its terms. Lynx represents and warrants that the payments made to Lynx under Section 2.4 hereof shall be used to further develop, refine and improve the MPSS technology, the capabilities and methods involved in MPSS Library Analysis, the informatics discussed in Section 3.5 and the data base discussed in Section 3.6, and inventions and improvements relating to the foregoing.

**6.2　Hoechst.**　Hoechst hereby represents and warrants that it has full corporate power and authority to enter into this Agreement, that this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of Hoechst, enforceable in accordance with its terms.

**6.3　Disclaimer.**　All materials, technology and information exchanged between the parties or used in performing this Agreement is provided "as is" and the party providing or using such technology expressly disclaims any and all warranties of any kind, express or implied, including without limitation the WARRANTIES OF DESIGN, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, noninfringement of the intellectual property rights of third parties or arising from a course of dealing, usage or trade practices, in all cases with respect thereto.

## ARTICLE 7

### MISCELLANEOUS

**7.1　Assignment.**　This Agreement may not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld, *provided, however,* that either party may assign this Agreement without such consent to any affiliate or to any successor by way of merger, acquisition or sale or transfer of substantially all of its business assets to which this Agreement relates, in a manner such that the assignee shall assume and be responsible for the performance and observance of all of such party's duties and obligations hereunder. This Agreement will be binding upon and inure to the benefit of all

20981627
092595

6.

Page 159 of 260

permitted successors and assigns of the parties hereunder, and the heirs and personal representatives of the individual parties hereunder.   The name of each party appearing herein will be deemed to include the names of such party's successors and assigns to the extent necessary to carry out the intent of this Agreement.

7.2    **Amendment.**.  No amendment, modification or supplement of any provision of the Agreement will be valid or effective unless made in writing and signed by a duly authorized representative of each party.

7.3    **Waiver.**   No provision of the Agreement (unless such provision otherwise provides) will be waived by any act, omission or knowledge of a party or its agents or employees except by an instrument in writing expressly waiving such provision and signed by a duly authorized representative or representatives of the waiving party.

7.4    **Headings.**  The headings for each article and section in this Agreement have been inserted for the convenience of reference only and are not intended to limit or expand on the meaning of the language contained in the particular article or section.

7.5    **Force Majeure.**  Any delays in performance by any party under this Agreement shall not be considered a breach of this Agreement if and to the extent caused by occurrences beyond the reasonable control of the party affected, including but not limited to acts of God, embargoes, governmental restrictions, strikes or other concerted acts of workers, failure of suppliers, fire, flood, explosion, earthquake, riots, wars, civil disorder, rebellion or sabotage. The party suffering such occurrence shall immediately notify the other party and any time for performance hereunder shall be extended by the actual time of delay caused by the occurrence.

7.6    **Notices.**  Any notices given pursuant to this Agreement shall be in writing and sent to the address below by one day delivery service or by express mail or facsimile (receipt confirmed) and shall be deemed to have been properly served to the addressee only upon receipt of such written communication.  Notices shall be delivered to the respective parties as indicated below, or at such other locations as such parties specify by like notice:

If to Lynx:

> Lynx Therapeutics, Inc.
> 3832 Bay Center Place
> Hayward, California  94545
> Attn:  President

If to Hoechst:

> Hoechst Aktiengesellschaft
> Central Patent Department, Building K801
> D-65926 Frankfurt/Main, Germany
> Attn:   Head Patents and Licenses

**7.7    Severability.**  Whenever possible, each provision of the Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

**7.8    Entire Agreement of the Parties.**  This Agreement constitutes and contains the complete, final and exclusive understanding and agreement of the parties with respect to the subject matter hereof and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, between the parties respecting the subject matter hereof.

**7.9    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to contracts entered into and to be performed in California, without reference to conflicts of laws. Each party hereby consents to the jurisdiction of the courts of the State of California and the Federal District Court for the Northern District of California for resolution of any disputes that arise hereunder.

**7.10    Withholding.**  If required to do so by applicable law, Hoechst may withhold and pay over to the relevant tax authority any withholding tax due in respect of payments to Lynx hereunder. In the event any such withholding is required, the parties will cooperate in preparing and delivering to such tax authority any documentation that may be reasonably necessary to secure the release of such withheld monies to Lynx or to enable Lynx to obtain the appropriate refund or credit in respect thereof.

**7.11    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**In Witness Whereof,** the parties hereto have duly executed this Agreement as of the date first written above.

LYNX THERAPEUTICS, INC.                              HOECHST AKTIENGESELLSCHAFT

By: _____                          By: _____

Title: _Chairman of the Board/CEO_    Title: _VP Business Development_  HMR

_Head Research Hoechst AG_

HOECHST MARION ROUSSEL, INC.

By: _____

Title: _Exec. VP._

20981627
092595                                    8.                                    Page 161 of 260

# EXHIBIT A

## PRACTICAL APPLICATION MILESTONE

The achievement of the Practical Application Milestone will be demonstrated as follows:

1.    The parties will jointly select a cell system or cell culture suitable for this demonstration experiment.

2.    One portion of the cell culture will be "induced" using an agreed upon inducer, such as a glucocorticoid, for a specified period, such as six hours.

3.    Lynx will take two samples from the "uninduced" and two from the "induced" system or culture, following its internal protocols for sampling.

4.    Lynx will extract the cDNA contained in each of the four such samples, using its internal protocols for cDNA extraction.

5.    The cDNA extracted from each of the four samples will be divided into three parts, and a separate MPSS Library Analysis will be conducted on all of the resulting cDNA samples.

6.    If the data generated from all six analyses of each of the two cultures are within the set (induced or uninduced) substantially identical, but yet between the sets substantially different, then the Practical Application Milestone has been achieved.

# LYNX THERAPEUTICS, INC.

## SERIES D CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT

### OCTOBER 2, 1995

# TABLE OF CONTENTS

Page

SECTION 1

SALE OF SERIES D CONVERTIBLE PREFERRED STOCK . . . . . . . . . . . . . . . . . . . . 1
    1.1    Sale of Series D Convertible Preferred Stock . . . . . . . . . . . . . . . . 1
    1.2    First Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.3    Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SECTION 2

SALE OF ADDITIONAL CAPITAL STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1    Sale of Additional Capital Stock . . . . . . . . . . . . . . . . . . . . . . 2
    2.2    Determination of Purchase Price . . . . . . . . . . . . . . . . . . . . . . 2
    2.3    Second Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.4    Authorization of Additional Shares . . . . . . . . . . . . . . . . . . . . 2
    2.5    Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SECTION 3

REPRESENTATIONS AND WARRANTIES OF THE COMPANY . . . . . . . . . . . . . . . . . 3
    3.1    Organization and Standing. . . . . . . . . . . . . . . . . . . . . . . . . 3
    3.2    Corporate Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    3.3    Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    3.4    Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    3.5    Financial Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.6    Material Contracts and Agreement . . . . . . . . . . . . . . . . . . . . . 6
    3.7    Compliance with Other Instruments, etc. . . . . . . . . . . . . . . . . . 6
    3.8    Litigation, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.9    Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.10    Registration Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.11    Governmental Consent, etc. . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.12    Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.13    Certain Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.14    Title to Properties and Assets; Right to Conduct Business. . . . . . . . 7
    3.15    Patents and Trademarks . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.16    Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.17    Confidentiality Agreements . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.18    Tax Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    3.19    No Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3.20    Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3.21    No Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    3.22    Corporate Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## TABLE OF CONTENTS
### (continued)

Page

SECTION 4

INVESTMENT REPRESENTATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.1      Accredited Investor; Experience . . . . . . . . . . . . . . . . . 9
    4.2      Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.3      Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.4      Rule 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.5      No Public Market . . . . . . . . . . . . . . . . . . . . . . . . 10

SECTION 5

CONDITIONS TO FIRST CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.1      Conditions to Closing of Purchaser . . . . . . . . . . . . . . . 10
    5.2      Conditions to Closing of Company . . . . . . . . . . . . . . . . 11

SECTION 6

CONDITIONS TO SECOND CLOSING . . . . . . . . . . . . . . . . . . . . . . . . 11
    6.1      Conditions to Second Closing of Purchaser . . . . . . . . . . . 11
    6.2      Conditions to Second Closing of Company . . . . . . . . . . . . 12

SECTION 7

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.1      Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.2      Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.3      Successors and Assigns . . . . . . . . . . . . . . . . . . . . . 13
    7.4      Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.5      Notices, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.6      Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.7      Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.8      Severability . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.9      California Corporate Securities Law . . . . . . . . . . . . . . 14
    7.10     Approval of Amendments and Waivers . . . . . . . . . . . . . . 14

# TABLE OF CONTENTS
### (continued)

EXHIBITS

A    Form of Series D Certificate of Designation

B    Schedule of Exceptions

C    Form of Legal Opinion to Purchaser from Cooley Godward Castro Huddleson & Tatum

# LYNX THERAPEUTICS, INC.

## SERIES D CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT

THIS AGREEMENT is entered into as of October 2, 1995 by and between LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), with its principal office at 3832 Bay Center Place, Hayward, California 94545, and HOECHST MARION ROUSSEL, INC., a Delaware corporation with its principal office at 9300 Ward Parkway, Kansas City, Missouri 64114-0480 (the "Purchaser").

### SECTION 1

### SALE OF SERIES D CONVERTIBLE PREFERRED STOCK

1.1    **Sale of Series D Convertible Preferred Stock.** Subject to the terms and conditions hereof, Purchaser agrees to purchase from the Company, and the Company agrees to sell and issue to Purchaser, 400,000 shares of the Company's Series D Convertible Preferred Stock (the "Shares"), at a price of $12.50 per share, which shares shall be initially convertible into 4,000,000 shares of the Company's Common Stock, based on an initial conversion price of $1.25. The Shares shall have the rights, restrictions, privileges and preferences set forth in the Company's Certificate of Designation of Preferences of Series D Convertible Preferred Stock, the form of which is attached hereto as Exhibit A (the "Series D Certificate of Designation"). The Company has, or before the Closing (as defined below) will have, authorized the sale and issuance to the Purchaser of the Shares and filed the Series D Certificate of Designation with the Secretary of State of the State of Delaware.

1.2    **First Closing.** The closing of the purchase and sale of the Shares hereunder (the "Closing") shall be held at the law offices of Cooley Godward Castro Huddleson & Tatum ("Cooley Godward"), Five Palo Alto Square, Fourth Floor, 3000 El Camino Real, Palo Alto, California 94306, thirty (30) days following the effective date of that certain Technology Development and Services Agreement dated as of October 2, 1995 between the Company and Purchaser (the "Technology Agreement"), or at such other time, place and manner as the Company and the Purchaser shall agree (the "Closing Date").

1.3    **Delivery.** At the Closing, the Company will deliver to Purchaser a certificate representing the Shares against payment of the purchase price therefor by wire transfer of immediately available funds to a bank account designated in writing by the Company, or by check payable to the order of the Company.

Exhibit 10.29

## Series D. Convertible Preferred Stock Purchase Agreement, dated as of October 2, 1995

# LYNX THERAPEUTICS, INC.

## SERIES D CONVERTIBLE PREFERRED STOCK PURCHASE AGREEMENT

### OCTOBER 2, 1995

# TABLE OF CONTENTS

Page

SECTION 1

SALE OF SERIES D CONVERTIBLE PREFERRED STOCK . . . . . . . . . . . . . . . . . . . . .  1
    1.1     Sale of Series D Convertible Preferred Stock . . . . . . . . . . . . . . .  1
    1.2     First Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
    1.3     Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

SECTION 2

SALE OF ADDITIONAL CAPITAL STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    2.1     Sale of Additional Capital Stock . . . . . . . . . . . . . . . . . . . .  2
    2.2     Determination of Purchase Price . . . . . . . . . . . . . . . . . . . .  2
    2.3     Second Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    2.4     Authorization of Additional Shares . . . . . . . . . . . . . . . . . .  2
    2.5     Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SECTION 3

REPRESENTATIONS AND WARRANTIES OF THE COMPANY . . . . . . . . . . . . . . . . . .  3
    3.1     Organization and Standing. . . . . . . . . . . . . . . . . . . . . . .  3
    3.2     Corporate Power . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    3.3     Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    3.4     Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    3.5     Financial Information . . . . . . . . . . . . . . . . . . . . . . . . .  5
    3.6     Material Contracts and Agreement . . . . . . . . . . . . . . . . . .  6
    3.7     Compliance with Other Instruments, etc. . . . . . . . . . . . . . .  6
    3.8     Litigation, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
    3.9     Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
    3.10    Registration Rights . . . . . . . . . . . . . . . . . . . . . . . . .  7
    3.11    Governmental Consent, etc. . . . . . . . . . . . . . . . . . . . . .  7
    3.12    Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    3.13    Certain Transactions . . . . . . . . . . . . . . . . . . . . . . . .  7
    3.14    Title to Properties and Assets; Right to Conduct Business. . . . . . .  7
    3.15    Patents and Trademarks . . . . . . . . . . . . . . . . . . . . . .  8
    3.16    Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . .  8
    3.17    Confidentiality Agreements . . . . . . . . . . . . . . . . . . . . .  8
    3.18    Tax Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
    3.19    No Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    3.20    Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    3.21    No Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    3.22    Corporate Documents . . . . . . . . . . . . . . . . . . . . . . . .  9

# TABLE OF CONTENTS
## (continued)

Page

SECTION 4

INVESTMENT REPRESENTATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.1      Accredited Investor; Experience . . . . . . . . . . . . . . . . . . . . . 9
    4.2      Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.3      Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.4      Rule 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.5      No Public Market . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SECTION 5

CONDITIONS TO FIRST CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.1      Conditions to Closing of Purchaser . . . . . . . . . . . . . . . . . . 10
    5.2      Conditions to Closing of Company . . . . . . . . . . . . . . . . . . . 11

SECTION 6

CONDITIONS TO SECOND CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    6.1      Conditions to Second Closing of Purchaser . . . . . . . . . . . . . . 11
    6.2      Conditions to Second Closing of Company . . . . . . . . . . . . . . . 12

SECTION 7

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.1      Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.2      Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.3      Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . 13
    7.4      Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.5      Notices, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.6      Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.7      Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.8      Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    7.9      California Corporate Securities Law . . . . . . . . . . . . . . . . . 14
    7.10    Approval of Amendments and Waivers . . . . . . . . . . . . . . . . . 14

# TABLE OF CONTENTS
## (continued)

EXHIBITS

A    Form of Series D Certificate of Designation

B    Schedule of Exceptions

C    Form of Legal Opinion to Purchaser from Cooley Godward Castro Huddleson & Tatum

# LYNX THERAPEUTICS, INC.

## SERIES D CONVERTIBLE PREFERRED STOCK
## PURCHASE AGREEMENT

THIS AGREEMENT is entered into as of October 2, 1995 by and between LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), with its principal office at 3832 Bay Center Place, Hayward, California 94545, and HOECHST MARION ROUSSEL, INC., a Delaware corporation with its principal office at 9300 Ward Parkway, Kansas City, Missouri 64114-0480 (the "Purchaser").

### SECTION 1

### SALE OF SERIES D CONVERTIBLE PREFERRED STOCK

**1.1    Sale of Series D Convertible Preferred Stock.**  Subject to the terms and conditions hereof, Purchaser agrees to purchase from the Company, and the Company agrees to sell and issue to Purchaser, 400,000 shares of the Company's Series D Convertible Preferred Stock (the "Shares"), at a price of $12.50 per share, which shares shall be initially convertible into 4,000,000 shares of the Company's Common Stock, based on an initial conversion price of $1.25. The Shares shall have the rights, restrictions, privileges and preferences set forth in the Company's Certificate of Designation of Preferences of Series D Convertible Preferred Stock, the form of which is attached hereto as Exhibit A (the "Series D Certificate of Designation").   The Company has, or before the Closing (as defined below) will have, authorized the sale and issuance to the Purchaser of the Shares and filed the Series D Certificate of Designation with the Secretary of State of the State of Delaware.

**1.2    First Closing.**  The closing of the purchase and sale of the Shares hereunder (the "Closing") shall be held at the law offices of Cooley Godward Castro Huddleson & Tatum ("Cooley Godward"), Five Palo Alto Square, Fourth Floor, 3000 El Camino Real, Palo Alto, California 94306, thirty (30) days following the effective date of that certain Technology Development and Services Agreement dated as of October 2, 1995 between the Company and Purchaser (the "Technology Agreement"), or at such other time, place and manner as the Company and the Purchaser shall agree (the "Closing Date").

**1.3    Delivery.**  At the Closing, the Company will deliver to Purchaser a certificate representing the Shares against payment of the purchase price therefor by wire transfer of immediately available funds to a bank account designated in writing by the Company, or by check payable to the order of the Company.

2(0981910
3(2595

## SECTION 2

### SALE OF ADDITIONAL CAPITAL STOCK

2.1    **Sale of Additional Capital Stock.** Subject to the terms and conditions hereof, Purchaser agrees to purchase from the Company and the Company agrees to sell and issue to Purchaser, at the Second Closing (as defined below), that number of shares of the capital stock of the Company (the "Additional Shares") equal to Ten Million Dollars divided by the Purchase Price, as defined below. The Additional Shares shall comprise shares of the Preferred Stock of the Company (the "Additional Preferred Stock") having substantially equivalent rights, restrictions, privileges and preferences as the Series D Convertible Preferred Stock (except for appropriate adjustments of the liquidation preference and anti-dilution provisions reflecting the different original issue price of such shares), unless the Series D Convertible Preferred Stock has converted into Common Stock of the Company prior to the date on which the Company delivers the Purchaser notice (the "Notice") of having achieved the Practical Application Milestone (as defined in the Technology Agreement), in which case the Additional Shares shall be shares of Common Stock of the Company.

2.2    **Determination of Purchase Price.** The per share purchase price for the purchase of the Additional Shares (the "Purchase Price") shall be determined as follows:

(i)    If the Additional Shares comprise shares of Preferred Stock, the Purchase Price shall be $25 per share; or

(ii)    If the Additional Shares comprise shares of Common Stock of the Company, the Purchase Price shall be the greater of (a) $2.50, or (b) the arithmetic average closing price for the Company's Common Stock for the ten (10) trading days prior to the date on which the Company delivers to the Purchaser the Notice.

2.3    **Second Closing.** The second closing of the purchase and sale of the Additional Shares hereunder ("Second Closing") shall be held at the law offices of Cooley Godward thirty (30) days following the date on which the Company delivers to the Purchaser the Notice or at such other time, place and manner as the Company and the Purchaser shall agree.

2.4    **Authorization of Additional Shares.** Prior to the Second Closing, Company will authorize the sale and issuance to the Purchaser of the Additional Shares. If the Additional Shares comprise Additional Preferred Stock, the Company will have filed with the Secretary of State of the State of Delaware, prior to the Second Closing, a Certificate of Designation of Preferences for a new series of Preferred Stock reflecting the rights, restrictions, privileges and preferences of such Additional Preferred Stock, which shares initially shall be convertible into 4,000,000 shares of Common Stock of the Company, based on an initial conversion price of $2.00.

2.5    **Delivery.** At the Second Closing, the Company will deliver to Purchaser a certificate representing the Additional Shares against payment of the purchase price therefor by

20981910
092595

2.

wire transfer of immediately available funds to a bank account designated in writing by the Company, or by check payable to the order of the Company.

## SECTION 3

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Schedule of Exceptions attached hereto as Exhibit B, the Company hereby represents and warrants to the Purchaser as follows:

**3.1    Organization and Standing.**  The Company is a corporation duly organized and validly existing under, and by virtue of, the laws of the State of Delaware and is in good standing under such laws.  The Company has all requisite corporate power to own and operate its properties and assets and to carry on its business as presently conducted and as proposed to be conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure so to qualify would have a material adverse effect on its business or properties.

**3.2    Corporate Power.**  The Company has all requisite legal and corporate power to execute and deliver this Agreement, to sell and issue the Shares under this Agreement, and to carry out and perform its obligations under the terms of the Agreements, including all exhibits and schedules hereto and thereto.

**3.3    Capitalization.**  The authorized capital stock of the Company consists of (i) 120,000,000 shares of Common Stock, par value $.001 (the "Common"), of which 22,654,394 shares are issued and outstanding as of September 8, 1995, and (ii) 25,000,000 shares of Preferred Stock, par value $.001 per share (the "Preferred"), (a) 17,000,000 shares of which have been designated Series A Preferred Stock, none of which are issued and outstanding, (b) 3,400,000 shares of which have been designated Series B Convertible Preferred Stock (the "Series B Preferred"), of which 3,322,896 shares are issued and outstanding, (c) 2,600,000 shares of which have been designated Series C Convertible Preferred Stock (the "Series C Preferred"), 1,233,000 shares of which are issued and outstanding, and (d) 400,000 shares of which have been designated Series D Convertible Preferred Stock (the "Series D Preferred"), none of which are issued and outstanding immediately prior to the Closing.  The rights, privileges and preferences of the Series A Preferred are as stated in the Company's Restated Certificate of Incorporation (the "Restated Certificate").  The rights, privileges and preferences of the Series B Preferred are as stated in the Certificate of Amendment to Certificate of Designation of Preferences of Series B Convertible Preferred Stock, the form of which has been provided to Purchaser (the "Series B Certificate of Designation").  The rights, privileges and preferences of the Series C Preferred are as stated in the Certificate of Amendment to the Certificate of Designation of Preferences of Series C Convertible Preferred Stock, the form of which has been provided to Purchaser (the "Series C Certificate of Designation").  The rights, privileges and preferences of the Series D Preferred are as stated in the Series D Certificate of Designation.  All such issued and outstanding shares have been duly authorized and validly issued and are fully paid and nonassessable.  The Company has reserved (i) 16,000,000 shares

of Common for issuance to officers, directors, employees and consultants as may be determined by the Company's Board of Directors from time to time, of which options to purchase an aggregate of 6,995,675 shares of Common are issued and outstanding as of September 8, 1995, (ii) 1,524,000 shares of Common for issuance to Applied Biosystems, Inc. ("ABI") upon exercise of the stock purchase option, granted as of October 1, 1992, with an exercise price of $.01 per share (the "Purchase Option"), and (iii) 63,000 shares of Common for issuance to Robertson, Stephens & Company pursuant to a warrant to purchase Common dated as of February 15, 1994 (the "Robertson, Stephens Warrant"). Except for (A) the conversion privileges of the Series A Preferred set forth in the Restated Certificate, (B) the conversion privileges of the Series B Preferred set forth in the Series B Certificate of Designation, (C) the conversion privileges of the Series C Preferred set forth in the Series C Certificate of Designation, (D) the conversion privileges of the Series D Preferred set forth in the Series D Certificate of Designation, (E) outstanding options to purchase an aggregate of 6,995,675 shares of Common granted pursuant to the Company's 1992 Stock Option Plan, (F) the Purchase Option, (G) rights provided in the Shareholders Agreement, dated October 1, 1992, by and among the Company, Chiron Corporation and ABI (the "Chiron/ABI Agreement"), (H) the Robertson, Stephens Warrant, (I) rights provided in the Investor Rights Agreement dated as of February 15, 1994 and April 8, 1994 among the Company and certain holders of Series B Preferred (the "Series B Investor Rights Agreement"), (J) rights provided in the Investor Rights Agreement dated as of March 24, March 28, and April 7, 1995 among the Company and certain holders of Series C Preferred (the "Series C Investor Rights Agreement"), and (K) the rights granted pursuant to this Agreement and the investor rights agreement contemplated in association herewith, there are no outstanding rights of first refusal, preemptive rights or other rights, options, warrants, conversion rights, or other agreements either directly or indirectly for the purchase or acquisition from the Company of any shares of its capital stock. Except for the Chiron/ABI Agreement, the Series B Investor Rights Agreement, the Series C Investor Rights Agreement and the investor rights agreement entered into with Purchaser, to the Company's knowledge, there are no outstanding stockholder agreements, voting trusts, proxies or other arrangements or understandings among the stockholders of the Company relating to the voting of their respective shares.

    3.4    **Authorization.** All corporate action on the part of the Company, its directors and stockholders necessary for the authorization, execution, delivery and performance of the Agreement by the Company, the authorization, sale, issuance and delivery of the Shares, the Common issuable upon conversion thereof ("Underlying Common Shares") and the performance of the Company's obligations under the Agreement has been taken. The Agreement, when executed and delivered by the Company, will constitute valid and binding obligations of the Company enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors, general equity principles, and limitations upon rights to indemnity. The Shares, when issued in compliance with the provisions of this Agreement, and the Underlying Common Shares, when issued upon conversion of the Shares in compliance with the Series D Certificate of Designation, will be duly and validly issued, fully paid, and nonassessable; *provided, however,* that the Shares and the Underlying Common Shares may be subject to restrictions on transfer under state and/or federal securities

laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed.

### 3.5    Financial Information.

(a)  The Company has delivered to the Purchaser (i) an unaudited consolidated balance sheet at June 30, 1995, (ii) an audited consolidated balance sheet at December 31, 1994, and (iii) an audited consolidated balance sheet of it and its predecessor at December 31, 1993, in each case together with the related consolidated statements of operations, stockholders' equity and cash flows for the period then ended (the "Financials"). The Financials have been prepared in accordance with generally accepted accounting principles and present fairly the financial position of the Company as of June 30, 1995.

(b)  Since June 30, 1995 there has not been:

(i)  any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financials, except changes in the ordinary course of business which have not been, in the aggregate, materially adverse;

(ii)  any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operating results, prospects or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(iii)  any waiver by the Company of a valuable right or of a material debt owed to it;

(iv)  any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and which is not material to the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(v)  any change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject;

(vi)  any material change in any compensation arrangement or agreement with any employee; or

(vii)  to the Company's knowledge, any other event or condition of any character which might materially and adversely affect the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted).

(c)  The Company has made available to the Purchaser the books, records, and ledgers of the Company, all of which are true and correct.

(d)  Except to the extent reflected or reserved against in the balance sheet contained in the Financials, the Company does not have any liability or obligation of any nature in an amount in excess of $25,000, whether absolute, accrued, contingent, or otherwise (including, without limitation, liabilities as guarantor or otherwise with respect to obligations of others) and whether due or to become due, including, without limitation, any liabilities for taxes of the Company for any period prior to such date, or arising out of any transaction of the Company entered into prior to such date or arising out of any state of facts arising prior to such date.  The Company does not know and has no reasonable ground to know of any basis for the assertion against the Company of any claim or liability of any nature or in any amount not fully reflected or reserved against in the Financials or referred to in this Section 3.5.

3.6    **Material Contracts and Agreement.**  Except as set forth on the Schedule of Exceptions, the Company does not have any material contract, agreement, lease, or other commitment, written or oral, absolute or contingent.

3.7    **Compliance with Other Instruments, etc.**  The Company is not, and will not by virtue of entering into and performing the Agreement and the transactions contemplated thereunder be, in violation of any term of its Restated Certificate of Incorporation, Series B Certificate of Designation, Series C Certificate of Designation, Series D Certificate of Designation or Bylaws or any term or provision of any mortgage, indenture, contract, agreement, instrument, judgment or decree to which it is a party or by which it is bound, and is not, and will not by virtue of entering into and performing the Agreement and the transactions contemplated thereunder be, in violation of any order addressed specifically to the Company nor, to the best of the Company's knowledge, any order, statute, rule or regulation applicable to the Company, other than any of the foregoing such violations that do not, either individually or in the aggregate, have a material adverse effect on the Company's business as presently conducted or planned to be conducted.

3.8    **Litigation, etc.**  There are no actions, suits, proceedings or investigations pending against the Company before any court or governmental agency (nor, to the best of the Company's knowledge, is there any overt threat thereof).  There is no judgment, decree or order of any court in effect against the Company.

3.9    **Employees.**  The Company has no collective bargaining agreements with any of its employees and there is no labor union organizing activity pending or threatened with respect to the Company.  There is no pension, health, profit sharing, bonus, stock purchase, stock option, hospitalization, insurance, severance, or any other employee benefit or welfare benefit plan with respect to any officer or employee of the Company.  The Company is not aware that any officer or key employee, or that any group of key employees, intends to terminate their employment with the Company, nor does the Company have the present intention to terminate the employment of any of the foregoing.  The Company is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of such employee's best efforts to promote the interests of the Company or that would conflict with the Company's business as proposed to be

conducted.  Neither the execution nor delivery of the Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as proposed, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees is now obligated.

**3.10  Registration Rights.**  Except as set forth in the Chiron/ABI Agreement, the Series B Investor Rights Agreement, the Series C Investor Rights Agreement, and the Investor Rights Agreement (as defined in Section 5.1(f)), the Company is not under any obligation to register (as defined in Section 1.9 of the Series C Investor Rights Agreement) any of its presently outstanding securities or any of its securities that may hereafter be issued.

**3.11  Governmental Consent, etc.**  No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of the Agreement, or the offer, sale or issuance of the Shares or the consummation of any other transaction contemplated thereby, except the filing of (a) the Series B Certificate of Designation, the Series C Certificate of Designation and Series D Certificate of Designation with the Secretary of State of the State of Delaware, and (b) the required notices pursuant to Regulation D promulgated by the Securities and Exchange Commission, which filing the Company agrees to make within fifteen (15) days of the Closing.

**3.12  Offering.**  Assuming the accuracy of the representations and warranties of the Purchaser contained in Section 4 hereof, the offer, issuance, and sale of the Shares are exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the Shares have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

**3.13  Certain Transactions.**  Since June 30, 1995, the Company has not (a) discharged or satisfied any obligation or liability other than in the ordinary course of business, (b) declared or made any payment or distribution to its stockholders or redeemed or purchased any of its shares of capital stock or securities, (c) mortgaged or subjected to encumbrances any of its assets, (d) sold, transferred or leased to third parties any of its assets except in the ordinary course of business, (e) canceled or compromised any material debt or any claim or waived or released any right of material value, suffered any physical damage or destruction or loss materially and adversely affecting its properties, operations or business, (f) made any loans or advances to any persons other than immaterial amounts (both individually and in the aggregate) in the ordinary course of business or (g) entered into any material transaction other than in the ordinary course of business or agreed to any of the foregoing other than with respect to transactions relating to this Agreement.

**3.14  Title to Properties and Assets; Right to Conduct Business.**  The Company has good and marketable title to its properties and assets, and to the best of its knowledge has good title to all its leasehold estates, in each case subject to no mortgage, lien, loan or encumbrance,

except such liens and encumbrances which arise in the ordinary course of business and do not materially impair the operations of the Company. With respect to property it leases, the Company is in compliance with such leases in all material respects. The Company has, or in good faith after commercially reasonable efforts believes that it will have, all rights necessary to conduct its business as now conducted and as proposed to be conducted.

**3.15  Patents and Trademarks.**  To the best of its knowledge, the Company has sufficient title and ownership of, or license rights under, all patents, trademarks, service marks, trade names, copyrights, trade secrets, information, proprietary rights and processes (collectively, "Proprietary Information") necessary for its business as now conducted and as proposed to be conducted without any conflict with or infringement of the rights of others. The Company has not received any written communications alleging that the Company has violated or infringed or that the Company would, by conducting its business as proposed, violate or infringe any of the Proprietary Information of any other person or entity.

**3.16  Conflicts of Interest.**  The Company is not indebted, directly or indirectly, to any of its officers, directors or stockholders or to their respective spouses or children in any amount whatsoever, other than for accrued salaries, vacation pay and other similar compensation-related matters or, if applicable, for expense items incurred by the officers of the Company on the Company's behalf in the ordinary course of business that have not yet been reimbursed by the Company, nor has the Company entered into any agreements, written or otherwise, with ABI, Chiron or any of its officers, directors or affiliates except as set forth in Section 3.16 of the Schedule of Exceptions. None of such officers, directors or stockholders, spouses or children are indebted to the Company. The Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation. To the best of the Company's knowledge, no officer of the Company has any direct or indirect ownership interest in any firm or corporation with which the Company presently has a material business relationship (excluding any such ownership interest arising from the beneficial ownership of less than 5% of the outstanding voting securities of any corporation any of whose securities are traded on any automated quotation system or on any national securities exchange). Except with respect to this Agreement and the transactions contemplated hereby, to the best of the Company's knowledge no officer or any member of his immediate family has, directly or indirectly, any material financial interest in any material contract with the Company.

**3.17  Confidentiality Agreements.**  All employees of the Company have entered into the Company's standard form of Proprietary Information and Inventions Agreement.

**3.18  Tax Returns.**  The Company has accurately prepared and timely filed all federal, state and other tax returns which are required to be filed and has timely paid all taxes covered by such returns which have become due and payable. The Company has not been advised that any of its returns, federal, state or other, have been or are being audited as of the date hereof. The Company is not delinquent in taxes or assessments, has no tax deficiency proposed or assessed and has not waived the statute of limitations or extended the period for assessment or collection of any tax.

**3.19   No Defaults.**   The Company has, in all material respects, performed all obligations required to be performed by it to date and is not in default under any of the contracts, loans, notes, mortgages, indentures, licenses, security agreements, agreements, leases, documents, commitments or other arrangements to which it is a party or by which it is otherwise bound, except for such defaults which in the aggregate would not have a materially adverse effect on the business or financial condition of the Company, and no event or condition has occurred which, with the lapse of time or the giving of notice, or both, would constitute such a default.

**3.20   Disclosure.**   None of the representations or warranties made by the Company in this Agreement and no information in the Exhibits hereto or otherwise provided to the Purchaser by the Company contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein not misleading.

**3.21   No Brokers.**   The Company is not obligated for the payment of fees and expenses of any broker or finder in connection with the origin, negotiation or execution of this Agreement or in connection with any transaction contemplated hereby.

**3.22   Corporate Documents.**   The Restated Certificate of Incorporation, Series B Certificate of Designation, the Series C Certificate of Designation, Series D Certificate of Designation and Bylaws of the Company as presently in effect are in the form previously provided to the Purchaser.

SECTION 4

INVESTMENT REPRESENTATIONS

The Purchaser hereby represents and warrants to the Company as follows:

**4.1   Accredited Investor; Experience.**   Purchaser is an accredited investor, as defined in Regulation D under the Securities Act.   Purchaser has, from time to time, evaluated investment in new, high technology companies and has, either individually or through the personal experience of one or more of its current officers or partners, experience in evaluating and investing in new, high technology companies.

**4.2   Investment.**   Purchaser is acquiring the Shares and Additional Shares, and will acquire the Underlying Common Shares and the Common issuable upon conversion of the Additional Shares (the "Additional Underlying Common Shares"), for its own account and not with the view to, or for resale in connection with, any distribution thereof in violation of applicable securities laws. Purchaser understands that the Shares, the Additional Shares, the Underlying Common Shares and the Additional Underlying Common Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein.

**4.3    Purpose.**  Purchaser was not formed for the specific purpose of acquiring the Shares or Additional Shares offered hereunder.

**4.4    Rule 144.**  Purchaser acknowledges that the Shares, the Additional Shares, the Underlying Common Shares and the Additional Underlying Common Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available.  Purchaser is aware of the provisions of Rule 144 promulgated under the Securities Act which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than two years after a party has purchased and paid for the securities to be sold, the sale being through a "broker's transaction" or in transactions directly with a "market maker" (as provided by Rule 144(f)) and the number of shares being sold during any three-month period not exceeding specified limitations.   Purchaser is aware that the conditions for resale set forth in Rule 144 have not been satisfied.

**4.5    No Public Market.**  Purchaser understands that no public market now exists or may ever exist for any of the securities issued by the Company.

## SECTION 5

## CONDITIONS TO FIRST CLOSING

**5.1    Conditions to Closing of Purchaser.**  The obligation of the Purchaser to purchase the Shares at the Closing is subject to the fulfillment to its satisfaction on or prior to the Closing Date of the following conditions:

      **(a)    Representations and Warranties True; Performance of Obligations.**  The representations and warranties made by the Company in Section 3 hereof shall be true and correct on the Closing Date with the same force and effect as if they had been made on and as of said date.

      **(b)    Covenants.**  All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Closing Date shall have been performed or complied with in all respects.

      **(c)    No Material Adverse Change.**  There shall have been no material adverse change in the Company's financial condition, affairs or prospects between the date of this Agreement and the Closing Date.

      **(d)    Blue Sky.**  The Company shall have obtained all necessary Blue Sky law permits and qualifications, or secured exemptions therefrom, required by any state for the offer and sale of the Shares.

(e)    **Compliance Certificate.**    The Company shall have delivered to the Purchaser on the Closing Date a certificate signed by an officer of the Company certifying that the conditions specified in Sections 5.1(a) through (d) have been fulfilled.

(f)    **Investor Rights Agreement.** The Company and the Purchaser shall have entered into an investor rights agreement granting the Purchaser certain information and registration rights (the "Investor Rights Agreement"), which agreement shall be substantially similar to the Series C Investor Rights Agreement, and such Investor Rights Agreement shall remain in full force and effect.

(g)    **Opinion of Counsel.** The Purchasers shall have received from Cooley Godward Castro Huddleson & Tatum, counsel for the Company, an opinion in the form of Exhibit C attached to this Agreement.

(h)    **Series D Certificate of Designation.**    The Series D Certificate of Designation shall have been filed with the Secretary of State of the State of Delaware, and shall remain in full force and effect.

5.2    **Conditions to Closing of Company.** The Company's obligation to sell and issue the Shares at the Closing is subject to the fulfillment of the following conditions:

(a)    **Representations and Warranties True.**    The representations and warranties made by the Purchaser in Section 4 hereof shall be true and correct at the Closing Date, with the same force and effect as if they had been made on and as of said date.

(b)    **Covenants.** All covenants, agreements and conditions contained in this Agreement to be performed by the Purchaser on or prior to the Closing Date shall have been performed or complied with in all respects.

(c)    **Blue Sky.** The Company shall have obtained all necessary Blue Sky law permits and qualifications, or secured exemptions therefrom, required by any state for the offer and sale of the Shares.

(d)    **Investor Rights Agreement.** The Company and the Purchaser shall have entered into the Investor Rights Agreement, and such agreement shall remain in full force and effect.

### SECTION 6

### CONDITIONS TO SECOND CLOSING

6.1    **Conditions to Second Closing of Purchaser.** The obligation of the Purchaser to purchase the Additional Shares at the Second Closing is subject to the fulfillment to its satisfaction on or prior to the Second Closing Date of the following conditions:

(a) **Covenants.** All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Second Closing Date shall have been performed or complied with in all respects.

(b) **Blue Sky.** The Company shall have obtained all necessary Blue Sky law permits and qualifications, or secured exemptions therefrom, required by any state for the offer and sale of the Additional Shares.

(c) **Certified Charter Documents.** The Company shall deliver certified copies of the Company's Restated Certificate (as amended, including all Certificates of Designation) and Bylaws (as amended), certified by the Company's Secretary as complete and correct copies thereof as of the Second Closing.

(d) **Representations and Warranties True.** The representations and warranties made by the Company in Sections 3.1, 3.2, and 3.4 shall be true and correct at the Second Closing Date, with the same force and effect as if they had been made on and as of that date, provided that all references in such Sections to "Shares" shall be deemed to refer to the "Additional Shares."

(e) **Officer's Certificate.** The Company shall have delivered to Purchaser a certificate, dated as of the Second Closing Date, signed by the Company's Chief Executive Officer or President, certifying that the conditions set forth in Sections 6.1(a), (b), and (d) have been satisfied.

6.2    **Conditions to Second Closing of Company.** The Company's obligations to sell and issue the Additional Shares at the Second Closing is subject to the fulfillment of the following conditions:

(a) **Representations and Warranties True.** The representations and warranties made by the Purchaser in Section 4 hereof shall be true and correct at the Second Closing Date, with the same force and effect as if they had been made on and as of said date.

(b) **Covenants.** All covenants, agreements and conditions contained in this Agreement to be performed by the Purchaser on or prior to the Second Closing Date shall have been performed or complied with in all respects.

(c) **Blue Sky.** The Company shall have obtained all necessary Blue Sky permits and qualifications, or secured exemptions therefrom, required by any state for the offer and sale of the Additional Shares.

## SECTION 7

### MISCELLANEOUS

**7.1    Governing Law.**  This Agreement shall be governed by the laws of the State of California as applicable to contracts entered into and performed entirely within the State of California.

**7.2    Survival.**  The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser and the closing of the transactions contemplated hereby.

**7.3    Successors and Assigns.**  Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto; *provided, however,* that the rights of the Purchaser to purchase the Shares or Additional Shares shall not be assignable without the consent of the Company.

**7.4    Entire Agreement.**  This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

**7.5    Notices, etc.**  All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, or otherwise delivered by hand or by messenger, addressed (a) if to Purchaser, to Purchaser's address set forth on the signature page, or at such other address or addresses as shall have been furnished to the Company in writing by Purchaser or (b) if to the Company, one copy shall be sent to its address set forth above and addressed to the attention of the President, or at such other address or addresses as the Company shall have furnished in writing to the Purchaser.  All notices and other communications mailed pursuant to the provisions of this Section 9.5 shall be deemed delivered when mailed.

**7.6    Expenses.**  Each party to this Agreement shall bear its own expenses and legal fees incurred by it with respect to this Agreement and all related transactions and agreements.

**7.7    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be enforceable against the party actually executing such counterpart, and which together shall constitute one instrument.

**7.8    Severability.**  In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; provided that no such severability shall be effective if it materially changes the economic benefit of this Agreement to any party.

**7.9    California Corporate Securities Law.**  The sale of the securities which are the subject of this Agreement has not been qualified with the Commissioner of Corporations of the State of California, and the issuance of such securities or the payment or receipt of any part of the consideration therefor prior to such qualification, if required by law, is unlawful.  The rights of all parties to this agreement are expressly conditioned upon such qualification being obtained, if required by law.

**7.10    Approval of Amendments and Waivers.**  Any term of this Agreement may be amended or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Company and holders of a majority of the outstanding Shares and Additional Shares; *provided, however,* that the obligations of the parties hereto may not be increased unless the party to be affected has expressly consented in writing to such amendment.    Any amendment, termination or waiver effected in accordance with this Section shall be binding upon each holder of any securities issued pursuant to this Agreement (including securities into which such securities have been converted or exchanged), each future holder of any or all such securities and the Company.

The foregoing Series D Convertible Preferred Stock Purchase Agreement is hereby executed as of the date first above written.

LYNX THERAPEUTICS, INC.

By:_____

Sam Eletr
Chief Executive Officer

PURCHASER: HOECHST MARION ROUSSEL, INC.

By:_____

Title: VP Business Development

Address:      9300 Ward Parkway
              Kansas City, Missouri 64114-0480

EXHIBIT A

FORM OF CERTIFICATE OF DESIGNATION

# CERTIFICATE OF DESIGNATION
## OF
## PREFERENCES
## OF
## SERIES D CONVERTIBLE PREFERRED STOCK
## OF
## LYNX THERAPEUTICS, INC.

Lynx Therapeutics, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, **DOES HEREBY CERTIFY:**

**FIRST:**  The name of the corporation is Lynx Therapeutics, Inc. (the "Corporation").

**SECOND:**  The date on which the Certificate of Incorporation of the Corporation first was filed with the Secretary of State of the State of Delaware is February 18, 1992.

**THIRD:**  The Board of Directors, acting in accordance with the provisions of Sections 151 and 242 of the General Corporation Law of the State of Delaware, adopted the following resolution:

**RESOLVED,** that pursuant to Article 4(C) of the Corporation's Amended and Restated Certificate of Incorporation relating to the shares of the Corporation, the Board of Directors hereby authorizes, fixes and creates a series of Preferred Stock having the following powers, preferences, rights, restrictions and other characteristics:

**A.**    Four Hundred Thousand (400,000) of the authorized shares of Preferred Stock hereby designated are "Series D Convertible Preferred Stock."

**B.**    The powers, preferences, rights, restrictions and other matters relating to the Four Hundred Thousand (400,000) shares of Series D Convertible Preferred Stock are as follows:

**1.**    **DIVIDENDS.**

**a.**    The holders of the Series D Convertible Preferred Stock shall be entitled to receive, if, as and when declared by the Board of Directors, out of any assets legally available therefor, dividends at the rate determined by the Board of Directors. No dividend other than a stock dividend shall be paid on any share of Common Stock or on any share of the Corporation's Series A Preferred Stock (the "Series A Preferred Stock") unless a dividend for each share of Series D Convertible Preferred Stock in an amount equal to the dividend for each share of Common Stock, or Series A Preferred Stock multiplied by the number of shares of Common Stock into which each share of Series D Convertible Preferred Stock is then convertible is first declared and paid (or set apart for payment), *pari passu*, on the Corporation's Series B Convertible Preferred Stock (the "Series B Convertible Preferred Stock"), the

Corporation's Series C Convertible Preferred Stock (the "Series C Convertible Preferred Stock") or the Series D Convertible Preferred Stock. Such dividends shall not be cumulative and no right to such dividends shall accrue to holders of Series D Convertible Preferred Stock unless declared by the Board of Directors.

2.    LIQUIDATION PREFERENCE.

   a.    In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of each share of Series D Convertible Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation legally available for distribution to its stockholders, whether from capital, surplus or earnings, on parity with any payment made in respect of the Series B Convertible Preferred Stock or Series C Convertible Preferred Stock, and before any payment or setting apart for payment of any amount shall be made in respect of the Common Stock or the Series A Preferred Stock, until such time as the holders of the Series D Convertible Preferred Stock shall have received an aggregate of $12.50 per share, adjusted for any combinations, consolidations, or stock distributions or stock dividends with respect to such shares (a "Recapitalization Event"), plus all declared but unpaid dividends thereon, if any, to the date fixed for distribution (the "Series D Preference Amount"). If upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series D Convertible Preferred Stock the full Series D Preference Amount, the holders of shares of Series B Convertible Preferred Stock the full Series B Preference Amount and the holders of shares of Series C Convertible Preferred Stock the full Series C Preference Amount, then such holders shall share ratably in any distribution of assets in proportion to the full amount to which they otherwise would be respectively entitled. The "Series B Preference Amount" shall be $5.00 per share of Series B Convertible Preferred Stock, adjusted for any Recapitalization Event, plus any declared but unpaid dividends thereon. The "Series C Preference Amount" shall be $5.00 per share of Series C Convertible Preferred Stock, adjusted for any Recapitalization Event, plus any declared but unpaid dividends thereon.

   b.    After payment has been made to the holders of the Series D Convertible Preferred Stock of their full Series D Preference Amount, to the holders of Series C Convertible Preferred Stock of their full Series C Preference Amount, and to the holders of the Series B Convertible Preferred Stock of their full Series B Preference Amount, the holders of each share of Series A Preferred Stock shall be entitled to be paid out of any remaining assets available for distribution to the Corporation's stockholders an aggregate of $1.00 per share, adjusted for any Recapitalization Event (the "Series A Preference Amount"). If upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation available for distribution to its stockholders after payment in full of the Series B, Series C and Series D Preference Amount shall be insufficient to pay the holders of shares of Series A Preferred Stock the full Series A Preference Amount, then such holders shall share ratably in any distribution of such assets in proportion to the full amount to which they would otherwise be respectively entitled.

   c.    After payment has been made to the holders of the Series A Preferred Stock, Series B Convertible Preferred Stock, Series C Convertible Preferred Stock and Series

D Convertible Preferred Stock of their full Preference Amounts, any remaining assets or surplus funds of the Corporation shall be shared by and distributed ratably to the holders of the Common Stock and the holders of Series B Convertible Preferred Stock, Series C Convertible Preferred Stock and Series D Convertible Preferred Stock (on an as-if-converted to Common Stock basis) until the holders of Series B Convertible Preferred Stock, Series C Convertible Preferred Stock and Series D Convertible Preferred Stock have received under Section 2(a) above and hereunder three times the Series B Preference Amount, Series C Preference Amount and Series D Preference Amount. Thereafter, any remaining assets or surplus funds of the Corporation shall be shared by and distributed ratably to the holders of the Common Stock.

        **d.**     For purposes of this Section 2, (i) a merger or consolidation of the Corporation into or with another corporation (other than with a wholly-owned subsidiary of this Corporation), or any other corporate reorganization in which the Corporation shall not be the continuing or surviving entity of such merger, consolidation or reorganization, or (ii) a sale, transfer or other disposition of all or substantially all of the assets of the Corporation, shall be deemed to be a liquidation, dissolution or winding up of the Corporation.

    **3.**     **VOTING RIGHTS.**

        **a.**     Except as otherwise provided herein or as required by law, the holder of each share of Series D Convertible Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such share of Series D Convertible Preferred Stock could be converted on the record date for the vote or the date of the solicitation of any written consent of stockholders and shall have voting rights and powers equal to the voting rights and powers of the Common Stock. Fractional votes shall not be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Series D Convertible Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded up). The holder of each share of Series D Convertible Preferred Stock shall be entitled to notice of any stockholders meeting in accordance with the Bylaws of the Corporation and, except as otherwise required by law, shall vote with the holders of the Common Stock, as a single class, upon all matters submitted to a vote of stockholders.

        **b.**     For so long as at least Three Hundred Thousand (300,000) shares (as appropriately adjusted for any Recapitalization Event) of Series D Convertible Preferred Stock remain outstanding, in addition to any other vote or consent required herein or by law, the vote or written consent of the holders of at least a majority of the outstanding Series D Convertible Preferred Stock shall be necessary for effecting or validating the following actions:

           **i.**     Any amendment, alteration, or repeal of any provision of the Certificate of Incorporation or the Bylaws of the Corporation (including any filing of a Certificate of Designation), that affects adversely the voting powers, preferences, or other special rights or privileges, qualifications, limitations, or restrictions of the Series D Convertible Preferred Stock; or

ii.    Any authorization or any increase, whether by reclassification or otherwise, in the authorized amount of any class of shares or series of equity securities of the Corporation ranking on a parity with or senior to the Series D Convertible Preferred Stock in right of redemption, liquidation preference, voting or dividend.

4.    CONVERSION.

The holders of the Series D Convertible Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

a.    **Right to Convert.**

i.    Each share of Series D Convertible Preferred Stock shall be convertible, at the option of the holder, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for the Series D Convertible Preferred Stock, into the number of fully paid and nonassessable shares of Common Stock which results from dividing $10.00 by the Series D Conversion Price (as hereinafter defined) per share in effect at the time of conversion. The initial "Series D Conversion Price" shall be $1.00. The number of shares of Common Stock into which one share of Series D Convertible Preferred Stock may be converted hereinafter is referred to as the "Conversion Rate."

ii.    Each share of Series D Convertible Preferred Stock shall automatically be converted into shares of Common Stock at the then effective Conversion Rate upon the first to occur of (i) the closing of an underwritten public offering of the Corporation's Common Stock at an aggregate public offering price of at least $15,000,000, (ii) the vote or written consent of the holders of a majority of the outstanding Series D Convertible Preferred Stock, or (iii) upon conversion into shares of Common Stock all outstanding shares of the Series B Convertible Preferred Stock and the Series C Convertible Preferred Stock (the "Automatic Conversion Events").

b.    **Mechanics of Conversion.** Before any holder of Series D Convertible Preferred Stock shall be entitled to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates for such shares, duly endorsed, at the office of the Corporation or of any transfer agent for the Series D Convertible Preferred Stock, or notify the Corporation or its transfer agent that such Series D Convertible Preferred Stock certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that such holder elects to convert the same and shall state in the notice the name or names in which such holder wishes the certificate or certificates for shares of Common Stock to be issued. The Corporation shall then, as soon as is practicable, issue and deliver at such office to such holder of Series D Convertible Preferred Stock, or to such holder's nominee or nominees, a certificate or certificates for the number of shares of Common Stock to which such holder shall be entitled. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Series D Convertible Preferred Stock to be converted, and the person

20974385
092595

4.

or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; *provided, however*, that in an Automatic Conversion Event, such conversion shall be deemed to have been made upon the occurrence of the Automatic Conversion Event triggering such conversion without any further action by the holders of shares of Series D Convertible Preferred Stock, although the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such automatic conversion unless the certificates evidencing such shares of Series D Convertible Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such Series D Convertible Preferred Stock certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates.

      c.      **Adjustment for Combinations or Consolidations of Common Stock.** In the event the Corporation at any time or from time to time after the date that a share of Series D Convertible Preferred Stock is first issued (hereinafter referred to as the "Original Issue Date") effects a subdivision or combination of its outstanding Common Stock into a greater or lesser number of shares, then and in each such event the Conversion Rate shall be increased or decreased proportionately.

      d.      **Adjustment for Certain Dividends, Distributions and Common Stock Equivalents.** In the event the Corporation at any time or from time to time after the Original Issue Date shall make, issue or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in additional shares of Common Stock or other securities or rights (hereinafter referred to as "Common Stock Equivalents") convertible into or entitling the holder to receive additional shares of Common Stock, without payment of any consideration by such holder for the additional shares of Common Stock or Common Stock Equivalents (including the additional shares of Common Stock issuable upon conversion or exercise), then, and in each such event, the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for subsequent adjustment of such number) of Common Stock issuable in payment of such dividend or distribution or upon conversion or exercise of such Common Stock Equivalents shall be deemed to be issued and outstanding as of the time of such issuance or, in the event such record date shall have been fixed, as of the close of business on such record date. In each such event the Conversion Rate shall be increased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Rate by a fraction,

      i.      the numerator of which shall be the total number of shares of Common Stock issued and outstanding or deemed to be issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution or upon conversion or exercise of such Common Stock Equivalents; and

**ii.**    the denominator of which shall be the total number of shares of Common Stock issued and outstanding or deemed to be issued and outstanding immediately prior to the time of such issuance or the close of business on such record date;

*provided, however,* (A) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed for such distribution, then the Conversion Rate shall be recomputed accordingly as of the close of business on such record date and the Conversion Rate shall be adjusted pursuant to this Section 4(d) as of the time of actual payment of such dividends or distributions; (B) if such Common Stock Equivalents provide, with the passage of time or otherwise, for any decrease in the number of shares of Common Stock issuable upon conversion or exercise (or upon the occurrence of a record date with respect thereto), the Conversion Rate, and any subsequent adjustments based thereon, shall, upon any such decrease becoming effective, be recomputed to reflect such decrease insofar as it affects the rights of conversion or exercise of the Common Stock Equivalents then outstanding; (C) upon the expiration of any rights of conversion or exercise under any unexercised Common Stock Equivalents, the Conversion Rate computed upon the original issue (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if the only additional shares of Common Stock issued were the shares of such stock, if any, actually issued upon the conversion or exercise of such Common Stock Equivalents; and (D) in the case of Common Stock Equivalents that expire by their terms not more than sixty (60) days after the date of issuance, no adjustment of the Conversion Rate shall be made until the expiration or exercise of all such Common Stock Equivalents, whereupon such adjustment shall be made in the manner provided in clause (C).

**e.**    **Adjustments for Other Reclassifications, Dividends and Distributions.** In the event the Corporation at any time or from time to time after the Original Issue Date shall effect a reclassification of its Common Stock (other than one resulting in the issue of additional shares of Common Stock) or shall make, issue, or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in securities of the Corporation other than shares of Common Stock, then, and in each such event, provision shall be made so that the holders of Series D Convertible Preferred Stock shall receive upon conversion of each share of Series D Convertible Preferred Stock the number of shares of stock or other securities to which a holder of the number of shares of Common Stock of the Corporation deliverable upon conversion of such Series D Convertible Preferred Stock would have been entitled in such reclassification, dividend or distribution.

**f.**    **Sale of Shares Below Series D Conversion Price.**

**i.**    If at any time or from time to time after the Original Issue Date, the Corporation issues or sells, or is deemed by the express provisions of this subsection (f) to have issued or sold, Additional Shares of Common Stock (as hereinafter defined), other than as a dividend or other distribution on any class of stock as provided in Section 4(d) above, and other than a subdivision or combination of shares of Common Stock as provided in Section 4(c) above, for an Effective Price (as hereinafter defined) less than the then effective Series D Conversion Price, then and in each such case the then existing Series D Conversion Price shall

be reduced, as of the opening of business on the date of such issue or sale, to a price determined by multiplying the Series D Conversion Price by a fraction (i) the numerator of which shall be (A) the number of shares of Common Stock deemed outstanding (as defined in the following sentence) immediately prior to such issue or sale, plus (B) the number of shares of Common Stock which the aggregate consideration received (as defined in subsection (f)(ii)) by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at such Series D Conversion Price, and (ii) the denominator of which shall be the number of shares of Common Stock deemed outstanding (as defined below) immediately prior to such issue or sale plus the total number of Additional Shares of Common Stock so issued. For the purposes of the preceding sentence, all outstanding shares of Common Stock and all shares of Common Stock issuable upon conversion of Series D Convertible Preferred Stock or other convertible instruments or upon exercise of options or warrants or other rights to acquire Common Stock that are outstanding as of the close of business on the day next preceding the date of issue or sale of Additional Shares of Common Stock shall be deemed outstanding.

ii.     For the purpose of making any adjustment required under this subsection (f), the consideration received by the Corporation for any issue or sale of securities shall (A) to the extent it consists of cash, be computed at the net amount of cash received by the Corporation after deduction of any underwriting or similar commissions, compensation or concessions paid or allowed by the Corporation in connection with such issue or sale but without deduction of any expenses payable by the Corporation, (B) to the extent it consists of property other than cash, be computed at the fair value of that property as determined in good faith by the Board of Directors, and (C) if Additional Shares of Common Stock, Convertible Securities (as hereinafter defined) or rights or options to purchase either Additional Shares of Common Stock or Convertible Securities are issued or sold together with other stock or securities or other assets of the Corporation for a consideration which covers both, be computed as the portion of the consideration so received that may be reasonably determined in good faith by the Board of Directors to be allocable to such Additional Shares of Common Stock, Convertible Securities or rights or options.

iii.     For the purpose of the adjustment required under this subsection (f) if the Corporation issues or sells any rights or options for the purchase of, or stock or other securities convertible into, Additional Shares of Common Stock (such convertible stock or securities being herein referred to as "Convertible Securities") and if the Effective Price of such Additional Shares of Common Stock is less than the Series D Conversion Price, in each case the Corporation shall be deemed to have issued at the time of the issuance of such rights or options or Convertible Securities the maximum number of Additional Shares of Common Stock issuable upon exercise or conversion thereof and to have received as consideration for the issuance of such shares an amount equal to the total amount of the consideration, if any, received by the Corporation for the issuance of such rights or options or Convertible Securities, plus, in the case of such rights or options, the minimum amounts of consideration, if any, payable to the Corporation upon the exercise of such rights or options, plus, in the case of Convertible Securities, the minimum amounts of consideration, if any, payable to the Corporation (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities) upon the conversion thereof; *provided* that if in the case of Convertible Securities the minimum amounts

of such consideration cannot be ascertained, but are a function of antidilution or similar protective clauses, the Corporation shall be deemed to have received the minimum amounts of consideration without reference to such clauses; *provided further* that if the minimum amount of consideration payable to the Corporation upon the exercise or conversion of rights, options or Convertible Securities is reduced over time or on the occurrence or non-occurrence of specified events other than by reason of antidilution adjustments, the Effective Price shall be recalculated using the figure to which such minimum amount of consideration is reduced; *provided further* that if the minimum amount of consideration payable to the Corporation upon the exercise or conversion of such rights, options or Convertible Securities is subsequently increased, the Effective Price shall be again recalculated using the increased minimum amount of consideration payable to the Corporation upon the exercise or conversion of such rights, options or Convertible Securities.  No further adjustment of the Series D Conversion Price, as adjusted upon the issuance of such rights, options or Convertible Securities, shall be made as a result of the actual issuance of Additional Shares of Common Stock on the exercise of any such rights or options or the conversion of any such Convertible Securities.  If any such rights or options or the conversion privilege represented by any such Convertible Securities shall expire without having been exercised, the Series D Conversion Price as adjusted upon the issuance of such rights, options or Convertible Securities shall be readjusted to the Series D Conversion Price which would have been in effect had an adjustment been made on the basis that the only Additional Shares of Common Stock so issued were the Additional Shares of Common Stock, if any, actually issued or sold on the exercise of such rights or options or rights of conversion of such Convertible Securities, and such Additional Shares of Common Stock, if any, were issued or sold for the consideration actually received by the Corporation upon such exercise, plus the consideration, if any, actually received by the Corporation for the granting of all such rights or options, whether or not exercised, plus the consideration received for issuing or selling the Convertible Securities actually converted, plus the consideration, if any, actually received by the Corporation (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities) on the conversion of such Convertible Securities, provided that such readjustment shall not apply to prior conversions of Series D Convertible Preferred Stock.

      iv.    "Additional Shares of Common Stock" shall mean all shares of Common Stock issued by the Corporation or deemed to be issued pursuant to this subsection (f), whether or not subsequently reacquired or retired by the Corporation, other than (A) shares of Common Stock issued upon conversion of the Series A Preferred Stock, Series B Convertible Preferred Stock, Series C Convertible Preferred Stock, or Series D Convertible Preferred Stock; (B) up to sixteen million (16,000,000) shares of Common Stock (and/or options, warrants or other Common Stock purchase rights, and the Common Stock issued pursuant to such options, warrants or other rights) issued or to be issued at any time after inception of the Corporation to employees, officers or directors of, or consultants or advisors to the Corporation or any subsidiary pursuant to stock purchase or stock option plans or other arrangements that are approved by the Board; (C) shares of Common Stock issued pursuant to the exercise of options, warrants or convertible securities outstanding as of the Original Issue Date, and (D) up to ten million (10,000,000) shares of Common Stock issued or to be issued at any time after the Original Issue Date to existing shareholders of the Corporation pursuant to a rights offering conducted by the Corporation.  The "Effective Price" of Additional Shares of Common Stock

shall mean the quotient determined by dividing the total number of Additional Shares of Common Stock issued or sold, or deemed to have been issued or sold by the Corporation under this subsection (f), into the aggregate consideration received, or deemed to have been received by the Corporation for such issue under this subsection (f), for such Additional Shares of Common Stock.

       **g.** **No Impairment.** The Corporation will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 4 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series D Convertible Preferred Stock against impairment.

       **h.** **Certificate as to Adjustments.** Upon the occurrence of each adjustment or readjustment of the Conversion Rate pursuant to this Section 4, the Corporation at its expense promptly shall compute such adjustments or readjustments in accordance with the terms hereof and furnish to each holder of Series D Convertible Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder of Series D Convertible Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (A) such respective adjustments and readjustments, (B) the Conversion Rate at the time in effect, and (C) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of such holder's shares of Series D Convertible Preferred Stock.

       **i.** **Notices of Record Date.** In the event of any taking by the Corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend which is the same as cash dividends paid in previous quarters) or other distribution, the Corporation shall mail to each holder of Series D Convertible Preferred Stock at least ten (10) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

       **j.** **Common Stock Reserved.** The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of Series D Convertible Preferred Stock, such number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series D Convertible Preferred Stock, and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series D Convertible Preferred Stock, the Corporation shall take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

**k.    Fractional Shares.**   No fractional share shall be issued upon the conversion of any share or shares (including fractional shares) of Series D Convertible Preferred Stock.  All shares of Common Stock (including fractions) issuable upon conversion of shares of Series D Convertible Preferred Stock by a holder of such stock shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share.  If, after aggregation, the conversion would result in the issuance of a fractional share of Common Stock, the Corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board of Directors of the Corporation).

**l.    Notices.**   Any notice required by the provisions of Section 4 to be given to the holders of shares of Series D Convertible Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the Corporation.

**5.    AMENDMENT.**   Any of the rights specified in this Article B may be reduced, restricted, or eliminated (either generally or in a particular instance and either retroactively or prospectively) with the written consent of (a) the Corporation and (b) holders of a majority of all Series D Convertible Preferred Stock then outstanding.   All other amendments to this Certificate of Designation and any waiver of the observance of any term thereof, shall be made in accordance with the provisions of the General Corporation Law of the State of Delaware, as in effect from time to time.  Any such reduction, restriction, elimination, amendment, or waiver so effected shall be binding upon the Corporation and any holder of Series D Convertible Preferred Stock.

**IN WITNESS WHEREOF,** Lynx Therapeutics, Inc. has caused this Certificate to be signed by its Chief Executive Officer and attested by its Secretary this _____ day of October, 1995.

_____

Sam Eletr
Chief Executive Officer

**ATTEST:**

_____

James C. Kitch
Secretary

**EXHIBIT B**

**SCHEDULE OF EXCEPTIONS**

[see attached]

## SCHEDULE OF EXCEPTIONS

The following are the exceptions of Lynx Therapeutics, Inc. (the "Company") to the representations and warranties of the Company set forth in the Series D Convertible Preferred Stock Purchase Agreement dated as of October 2, 1994 by and between the Company and the Purchaser (the "Purchase Agreement"). Capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement. Each section reference in this Schedule is a reference to the corresponding section in the Purchase Agreement.

Where the terms of a lease, contract or other disclosure item have been summarized or described in this Schedule, such summary or description does not purport to be a complete statement of the material terms of such lease, contract or other item. Items are listed only once, although they may be responsive to multiple representations and warranties.

| Section Reference | Disclosure |
|---|---|
| 3.3 | The Company intends to conclude a rights offering of its Commons Stock within the next three months. The Company expects that such rights offering would result in the sale of approximately 9,000,000 shares of Common Stock to existing shareholders. It is anticipated that the convertible Preferred Stock of the Company will convert into Common Stock upon the effectiveness of a registration statement relating to this offering. |
| | The Company has committed to issue to one of its consultants, Dr. Joel Cohen, 755 shares of Series C Preferred Stock. |
| 3.6 | Preferred Stock Purchase Agreement dated as of October 1, 1992, between the Company, Chiron Corporation ("Chiron") and Applied Biosystems, Inc. ("ABI"). |
| | Shareholder Agreement, dated as of October 1, 1992, between the Company, Chiron and ABI. |
| | Series B Convertible Preferred Stock Purchase Agreement dated as of February 15, 1994 and April 8, 1994 among the Company and the Purchasers signatory thereto. |
| | Series C Convertible Preferred Stock Purchase Agreement dated as of March 24, 1995, March 28, 1995 and April 7, 1995 among the Company and the Purchasers signatory thereto. |
| | Investor Rights Agreement dated as of February 15, 1994 and April 8, 1994 among the Company and the Purchasers signatory thereto. |

Investor Rights Agreement dated as of March 24, 1995, March 28, 1995 and April 7, 1995 among the Company and the Purchasers signatory thereto.

Agreement Regarding Formation of Spectragen, Inc., dated March 24, 1995.

Series A Preferred Stock Purchase Agreement, dated March 24, 1995, between Spectragen, Inc. and the holders of Spectragen Series A Preferred Stock.

Stockholders Agreement, dated August 21, 1995, among the Company, Spectragen, Inc. and various stock and option holders of Spectragen, Inc.

Exclusive Technology Agreement dated as of August 4, 1994 between the Company and the Wellcome Foundation Ltd.

Agreement of Assignment and License of Intellectual Property Rights dated June 30, 1992, between the Company and ABI.

Lease dated as of June 28, 1993, by and between the Company and Spieker-Singleton #87, Limited Partnership.

Master Equipment Agreement, dated as of June 30, 1993, between the Company and Phoenix Leasing, Inc.

Research Funding Agreement, dated as of January 12, 1995, between the Company and the MD Anderson Cancer Institute.

Research Funding Agreement, dated as of June 1, 1994, between the Company and Thomas Jefferson University.

Research Funding Agreement, dated as of January 1, 1992, between the Company and Thomas Jefferson University.

Research Funding Agreement, dated as of June 1, 1993, between the Company and Thomas Jefferson University.

Research Funding Agreement, dated as of June 1, 1992, between the Company and the University of Nebraska Medical Center.

Research Funding Agreement, dated as of October 1, 1992, between the Company and University of Pennsylvania.

3.9

(a) The Company provides group health, disability and life insurance benefits for its employees, (b) the Company has a 401(k) plan, and (c) the Company has adopted its 1992 Stock Option Plan and the Spectragen, Inc. 1995 Stock Option Plan.

3.15

The Company is aware of pending patent applications directed to antisense and sequencing technologies relating to the Company's present and future business. However, the Company is unable to determine at this time what effect, if any, the issuance of any patent in respect of this application would have on its antisense or sequencing programs.

3.16

Preferred Stock Purchase Agreement dated as of October 1, 1992, among the Company, Chiron and ABI.

Shareholders Agreement dated as of October 1, 1992, between the Company, Chiron and ABI.

Series B Convertible Preferred Stock Purchase Agreement dated as of February 15, 1994 and April 8, 1994 among the Company and the Purchasers signatory thereto.

Series C Convertible Preferred Stock Purchase Agreement dated as of March 24, 1995, March 28, 1995 and April 7, 1995 among the Company and the Purchasers signatory thereto.

Investor Rights Agreement dated as of February 15, 1994 and April 8,1994 among the Company and the Purchasers signatory thereto.

Investor Rights Agreement dated as of March 24, 1995, March 28, 1995 and April 7, 1995  among the Company and the Purchasers signatory thereto.

Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Timothy Geiser.

Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Gerald Zon.

Stock Purchase Agreement, dated as of August 25, 1992, between the Company and Sam Eletr.

Stock Purchase Agreement, dated as of May 1, 1995, between the Company and David W. Martin, Jr., M.D.

Promissory Note Secured by Mortgage, by David W. Martin, Jr., M.D. in favor of the Company.

Loan Agreement, between the Company and David W. Martin, Jr., M.D.

Employment Agreement between the Company and David W. Martin, Jr., M.D., dated May 1, 1995.

Form of Indemnity Agreement entered into between the Company and its directors and officers.

Agreement of Assignment and License of Intellectual Property Rights, dated June 30, 1992, between the Company and ABI.

Corporate Services Agreement, dated as of June 30, 1992, between the Company and ABI.

Collaborative Research and Development Agreement, dated as of October 1, 1992, between the Company and Chiron.

20953493
.0925·95

## Exhibit C

## Form of Opinion Letter

San Francisco, CA
415 693-2000

Menlo Park, CA
415 843-5000

Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA
94306-2155
MAIN 415 843-5000
FAX  415 857-0663

WEB  http://www.cooley.com

San Diego, CA
619 550-6000

Boulder, CO
303 546-4000

Denver, CO
303 606-4800

November ___, 1995

JAMES C. KITCH
Direct: (415) 843-5027
Internet: kitchjc@cooley.com

To Hoechst Marion Roussel, Inc.

We have acted as counsel for Lynx Therapeutics, Inc., a Delaware corporation (the "Company"), in connection with the issuance and sale to you of an aggregate of 400,000 shares of the Company's Series D Convertible Preferred Stock (the "Shares") under the Series D Convertible Preferred Stock Purchase Agreement dated as of October 2, 1995 (the "Agreement") and the Investor Rights Agreement dated as of the date hereof (the "Rights Agreement"). The Agreement and Rights Agreement are collectively referred to as the "Agreements". We are rendering this opinion pursuant to Section 5.1(g) of the Agreement. Except as otherwise defined herein, capitalized terms used but not defined herein have the respective meanings given to them in the Agreement.

In connection with this opinion, we have examined and relied upon the representations and warranties as to factual matters contained in and made pursuant to the Agreement by the various parties and originals or copies certified to our satisfaction, of such records, documents, certificates, opinions, memoranda and other instruments as in our judgment are necessary or appropriate to enable us to render the opinion expressed below. Where we render an opinion "to the best of our knowledge" or concerning an item "known to us" or our opinion otherwise refers to our knowledge or awareness, it is based solely upon (i) an inquiry of attorneys within this firm who perform legal services for the Company, (ii) receipt of a certificate executed by an officer of the Company covering such matters, and (iii) such other investigation, if any, that we specifically set forth herein.

In rendering this opinion, we have assumed: the genuineness and authenticity of all signatures on original documents; the authenticity of all documents submitted to us as originals; the conformity to originals of all documents submitted to us as copies; the accuracy, completeness and authenticity of certificates of public officials; and the due authorization, execution and delivery of all documents (except the due authorization, execution and delivery by the Company of the Agreements), where authorization, execution and delivery are prerequisites to the effectiveness of such documents. We also have assumed: that all individuals executing and delivering documents had the legal capacity to so execute and deliver; that you have received all documents you were to receive under the Agreements; that the Agreements are obligations binding upon you; that you have filed any required California franchise or income tax returns and have paid any required California franchise or income taxes; that there are no extrinsic agreements or understandings among the parties to the Agreements that would modify or interpret the terms of the Agreements or the respective rights or obligations of the parties thereunder.

Hoechst Marion Roussel, Inc.
November ___, 1995
Page 2

Our opinion is expressed only with respect to the federal laws of the United States of America, the laws of the State of California and the General Corporation Law of the State of Delaware. We express no opinion as to whether the laws of any particular jurisdiction apply, and no opinion to the extent that the laws of any jurisdiction other than those identified above are applicable to the subject matter hereof. We are not rendering any opinion as to compliance with any antifraud law, rule or regulation relating to securities, or to the sale or issuance thereof.

With regard to our opinion in paragraph 4 below, we have examined and relied upon a certificate executed by an officer of the Company, to the effect that the consideration for all outstanding shares of capital stock of the Company was received by the Company in accordance with the provisions of the applicable Board of Directors resolutions and any plan or agreement relating to the issuance of such shares, and we have undertaken no independent verification with respect thereto.

On the basis of the foregoing, in reliance thereon and with the foregoing qualifications, we are of the opinion that:

1.    The Company has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware.

2.    The Company has the requisite corporate power to enter into and perform the Agreements, to own or lease its property and assets and to conduct its business as it is currently being conducted. To the best of our knowledge, the Company is qualified as a foreign corporation to do business in each jurisdiction in the United States in which failure to so qualify would have a materially adverse effect on the business of the Company.

3.    The Agreements have been duly and validly authorized, executed and delivered by the Company and constitute valid and binding agreements of the Company enforceable against the Company in accordance with their terms, except as rights to indemnity under Section 3.5 of the Rights Agreement may be limited by applicable laws, and except as enforcement of the Agreements may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting creditors' rights and subject to general equity principles and to limitations on availability of equitable relief, including specific performance.

4.    The authorized capital stock of the Company consists of (i) 120,000,000 shares of Common Stock, par value $0.001 (the "Common"), of which 22,654,394 shares are issued and outstanding, and (ii) 25,000,000 shares of Preferred Stock, par value $0.001 per share (the "Preferred"), (a) 17,000,000 shares of which have been designated Series A Preferred Stock (the "Series A Preferred"), none of which are issued and outstanding, (b) 3,400,000 shares of which

Hoechst Marion Roussel, Inc.
November ___, 1995
Page 3

have been designated Series B Convertible Preferred Stock (the "Series B Preferred"), 3,322,896 of which shares are issued and outstanding, (c) 2,600,000 shares of Series C Convertible Preferred Stock (the "Series C Preferred"), 1,233,000 of which shares are issued or outstanding, and (d) 400,000 shares of which have been designated Series D Convertible Preferred Stock (the "Series D Preferred"), none of which were issued and outstanding immediately prior to the Closing. The rights, privileges and preferences of the Series A Preferred are as stated in the Company's Restated Certificate of Incorporation. The rights, privileges and preferences of the Series B Preferred are as stated in the Series B Certificate of Designation, as amended. The rights, privileges and preferences of the Series C Preferred are as stated in the Series C Certificate of Designation, as amended. The rights, privileges and preferences of Series D Preferred are as stated in the Series D Certificate of Designation. All such issued and outstanding shares have been duly authorized and validly issued and are fully paid and nonassessable. The Shares have been duly authorized, and the Shares, upon issuance and delivery against payment therefor in accordance with the terms of the Agreement, will be validly issued and outstanding and fully paid and nonassessable. To the best of our knowledge, except for (i) the conversion privileges of the Series A Preferred set forth in the Restated Certificate, (ii) the conversion privileges of the Series B Preferred set forth in the Series B Certificate of Designation, (iii) the conversion privileges of the Series C Preferred set forth in the Series C Certificate of Designation, (iv) the conversion privileges of the Series D Preferred set forth in the Series D Certificate of Designation, (v) 6,995,675 shares of Common reserved for issuance upon exercise of options issued under the Company's 1992 Stock Option Plan, as amended, (vi) 1,524,000 shares of Common reserved for issuance to Applied Biosystems, Inc. ("ABI") upon exercise of the outstanding balance of the stock purchase option, granted as of October 1, 1992, with an exercise price of $0.01 per share, (vii) rights provided in the Shareholders Agreement dated October 1, 1992, by and among the Company, Chiron Corporation and ABI, (viii) warrants to purchase 63,000 shares of Common held by Robertson, Stephens & Company pursuant to a warrant dated as of February 15, 1994, and (ix) rights provided in the Rights Agreement, there are no outstanding rights of first refusal, preemptive rights or other rights, options, warrants, conversion rights, or other agreements either directly or indirectly for the purchase or acquisition from the Company of any shares of its capital stock.

5.    To the best of our knowledge, there is no action, proceeding or investigation pending or overtly threatened against the Company before any court or administrative agency that questions the validity of the Agreements or that might result, either individually or in the aggregate, in any material adverse change in the assets, financial condition, or operations of the Company.

6.    All consents, approvals, authorizations, or orders of, and filings, registrations, and qualifications with any regulatory authority or governmental body in the United States required for the consummation by the Company of the transactions contemplated by the Agreement and

Hoechst Marion Roussel, Inc.
November ___, 1995
Page 4

for the execution and delivery by the Company of the Rights Agreement have been made or obtained, except for the filing of a Form D pursuant to Regulation D of the Securities Act of 1933, as amended (a "Form D"), and a Notice of Transaction Pursuant to Section 25102(f) of the California Corporate Securities Law of 1968, as amended.

7.     The offer and sale of the Shares pursuant to the terms of the Agreement is exempt from the registration requirements of the Securities Act of 1933, as amended, subject to the timely filing of a Form D, and from the qualification requirements of the California Corporate Securities Law of 1968, as amended.

This opinion is intended solely for your benefit and is not to be made available to or be relied upon by any other person, firm, or entity without our prior written consent.

Very truly yours,

COOLEY GODWARD CASTRO
HUDDLESON & TATUM

By     _____
       James C. Kitch

20964560

**Exhibit 10.30**

## Amended and Restated Investor Rights Agreement, dated as of November 1, 1995

# AMENDED AND RESTATED
# INVESTOR RIGHTS AGREEMENT

## LYNX THERAPEUTICS, INC.

### NOVEMBER 1, 1995

# TABLE OF CONTENTS

Page

SECTION 1

CERTAIN DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.1  "Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.2  "Common Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.3  "Equity Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.4  "Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.5  "Holder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.6  "Initiating Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.7  "IPO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.8  "Prior Purchaser . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.
   1.9  "Qualified Public Offering . . . . . . . . . . . . . . . . . . . . . 3.
   1.10  The terms "register," "registered" and "registration" . . . . 3.
   1.11  "Registrable Securities . . . . . . . . . . . . . . . . . . . . . . . 3.
   1.12  "Registration Expenses . . . . . . . . . . . . . . . . . . . . . . . 3.
   1.13  "Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.
   1.14  "Selling Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . 3.
   1.15  "Series B Preferred Stock . . . . . . . . . . . . . . . . . . . . . 3.
   1.16  "Series C Preferred Stock . . . . . . . . . . . . . . . . . . . . . 3.
   1.17  "Series D Preferred Stock . . . . . . . . . . . . . . . . . . . . . 3.

SECTION 2

INFORMATION RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.
   2.1  Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . 4.
   2.2  Transfer of Information Rights . . . . . . . . . . . . . . . . . . . 4.
   2.3  Termination of Covenants. . . . . . . . . . . . . . . . . . . . . . 4.
   2.4  Confidentiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5.

SECTION 3

REGISTRATION RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5.
   3.1  Requested Registration. . . . . . . . . . . . . . . . . . . . . . . . 5.
   3.2  Company Registration. . . . . . . . . . . . . . . . . . . . . . . . 7.
      3.3  Expenses of Registration. . . . . . . . . . . . . . . . . . 9.
   3.4  Registration Procedures. . . . . . . . . . . . . . . . . . . . . . . 9.
   3.5  Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10.
   3.6  Information by Holder. . . . . . . . . . . . . . . . . . . . . . . . 12.
   3.7  Rule 144 Reporting. . . . . . . . . . . . . . . . . . . . . . . . . . 12.
   3.8  "Market Stand-off" Agreement. . . . . . . . . . . . . . . . . . . 12.
   3.9  Form S-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.

# TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| 3.10 | Transfer of Registration Rights. | 13. |
| 3.11 | Certain Limitations in Connection with Future Grants of Registration Rights. | 14. |
| 3.12 | Termination of Registration Rights. | 14. |
| 3.13 | Delay of Registration. | 14. |

SECTION 4

PREEMPTIVE RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14.

| 4.1 | Preemptive Right. | 14. |
|---|---|---|
| 4.2 | Notification. | 14. |
| 4.3 | Issuance; Preemptive Rights Waived or Lapsed. | 15. |
| 4.4 | Issuance; Preemptive Rights Exercised. | 15. |
| 4.5 | Excluded Securities. | 15. |
| 4.6 | Assignment. | 16. |
| 4.7 | Termination. | 16. |

SECTION 5

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16.

| 5.1 | Board of Directors | 16. |
|---|---|---|
| 5.2 | Remedies. | 16. |
| 5.3 | Entire Agreement; Amendment. | 16. |
| 5.4 | Delays or Omissions. | 17. |
| 5.5 | Governing Law | 17. |
| 5.6 | Survival of Warranties | 17. |
| 5.7 | Successors and Assigns | 17. |
| 5.8 | Notices, etc. | 17. |
| 5.9 | Titles and Subtitles | 17. |
| 5.10 | Counterparts | 17. |
| 5.11 | Severability | 17. |
| 5.12 | Aggregation of Stock | 18. |

# AMENDED AND RESTATED
# INVESTOR RIGHTS AGREEMENT

THIS AMENDED AND RESTATED INVESTOR RIGHTS AGREEMENT (the "Agreement") is made and entered into as of November 1, 1995, by and among Lynx Therapeutics, Inc., a Delaware corporation (the "Company"), Hoechst Marion Roussel, Inc., a Delaware corporation (the "Investor"), those purchasers (the "Series B Purchasers") of the Company's Series B Convertible Preferred Stock who are listed on the attached Schedule of Series B Purchasers, and those purchasers (the "Series C Purchasers") of the Company's Series C Convertible Preferred Stock, who are listed on the attached Schedule of Series C Purchasers. The Investor, the Series B Purchasers, and the Series C Purchasers are referred to herein collectively as the "Purchasers" and each individually as a "Purchaser."

## RECITALS

WHEREAS, the Company and the Series B Purchasers are parties to that certain Investor Rights Agreement dated as of February 15, 1994 and March 8, 1994 (the "Series B Rights Agreement") pursuant to which the Company granted the Series B Purchasers certain participation, registration and information rights; and

WHEREAS, the Company and the Series C Purchasers are parties to that certain Investor Rights Agreement dated as of March 24, 1995, March 28, 1995, and April 7, 1995 (the "Series C Rights Agreement") pursuant to which the Company granted the Series C Purchasers certain participation, registration and information rights; and

WHEREAS, the Company is issuing shares (the "Shares") of its Series D Preferred Stock (the "Series D Preferred Stock") pursuant to that certain Series D Convertible Preferred Stock Purchase Agreement of even date herewith between the Company and the Investor, and desires to grant to the Investor the rights herein set forth; and

WHEREAS, the Company, the Series B Purchasers and the Series C Purchasers intend that this Agreement shall supersede the Series B Rights Agreement and the Series C Rights Agreement, and that such agreements shall terminate, upon the closing of the sale and issuance of the Series D Convertible Preferred Stock to the Purchaser;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and conditions hereinafter set forth, the parties hereby mutually agree as follows:

# SECTION 1

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following respective meanings:

**1.1** "**Commission**" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

**1.2** "**Common Stock**" means the Common Stock, $.001 par value, of the Company.

**1.3** "**Equity Securities**" means (i) Common Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and rights, options or warrants to purchase Common Stock, Series B Preferred Stock, Series C Preferred Stock or Series D Preferred Stock, (ii) any security of the Company having voting rights in the election of the Board of Directors, not contingent upon a failure to pay dividends, (iii) any security of the Company convertible into or exchangeable for any of the foregoing, and (iv) any agreement or commitment to issue any of the foregoing. All references in this Agreement to a certain percentage of the outstanding Equity Securities (e.g., Section 4.1) shall be calculated on an as-converted, as-exercised basis.

**1.4** "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, as in effect from time to time.

**1.5** "**Holder**" means the Investor, each of the Series B Purchasers, each of the Series C Purchasers, and any holder of Registrable Securities transferred in accordance with Section 3.10 hereof.

**1.6** "**Initiating Holders**" means any Holder or Holders of not less than forty percent (40%) of the then outstanding Registrable Securities; *provided, however*, that commencing on the earlier of (a) October 2, 1998, or (b) the termination of that certain Technology Development and Services Agreement dated October 2, 1995, between the Company and the Investor, the Investor shall be deemed an "Initiating Holder" with respect to a maximum of one (1) requested registration of Registrable Securities under Section 3.1(a) hereof.

**1.7** "**IPO**" means the first firmly underwritten public offering of Common Stock of the Company that is pursuant to a registration statement filed with, and declared effective by, the Commission under the Securities Act, covering the offer and sale of the Company's Common Stock to the public.

**1.8** "**Prior Purchaser**" means any of one the Series B Purchasers or Series C Purchasers.

**1.9** "**Qualified Public Offering**" means the sale in an underwritten public offering registered under the Securities Act of shares of Common Stock with aggregate proceeds (before deductions for expenses, underwriters' discounts and commissions) to the Company of at least fifteen million dollars ($15,000,000).

**1.10** The terms "**register**," "**registered**" and "**registration**" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness of such registration statement.

**1.11** "**Registrable Securities**" means (i) shares of Common Stock issued or issuable upon conversion of the Series B Preferred Stock, Series C Preferred Stock or Series D Preferred Stock, and (ii) shares of Common Stock issued as a dividend or other distribution with respect to, or in exchange for or in replacement of, any of the foregoing; *provided, however*, that Registrable Securities shall not include (A) any securities sold to or through a broker or dealer or underwriter in a public distribution or a public securities transaction, whether in a registered offering, Rule 144 or otherwise, or (B) any securities sold in a transaction exempt from the registration and prospectus delivery requirements of the Securities Act in which the transferor's rights under Section 3 hereof are not assigned, or (C) any securities that are available for sale in the opinion of counsel to the Company pursuant to Rule 144(k) of the Securities Act, provided a public trading market exists for the Company's Common Stock, so that all transfer restrictions and restrictive legends with respect thereto are removed upon the consummation of such sale.

**1.12** "**Registration Expenses**" means all expenses incurred by the Company in complying with Sections 3.1, 3.2 and 3.9 hereof, including, without limitation, all registration, qualification and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, reasonable fees and disbursements of a single special counsel for the Holders, blue sky fees and expenses, and the expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company which shall be paid in any event by the Company).

**1.13** "**Securities Act**" means the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, as in effect from time to time.

**1.14** "**Selling Expenses**" means all underwriting discounts and selling commissions applicable to the sale of shares of Common Stock pursuant to registrations.

**1.15** "**Series B Preferred Stock**" means the Series B Convertible Preferred Stock, $.001 par value, of the Company.

**1.16** "**Series C Preferred Stock**" means the Series C Convertible Preferred Stock, $.001 par value, of the Company.

**1.17** "**Series D Preferred Stock**" means the Series D Convertible Preferred Stock, $.001 par value, of the Company

# SECTION 2

## INFORMATION RIGHTS

### 2.1    Financial Statements.

(a)    **Annual and Quarterly Reports.** The Company agrees to provide each Holder with the following materials:

(i)    **Annual Reports.** As soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days thereafter, a copy of its Form 10-K filed with the Commission pursuant to the Exchange Act, or if the Company is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act, a balance sheet of the Company as at the end of such fiscal year, a statement of income, and a statement of cash flows of the Company for such year, in each case prepared in accordance with generally accepted accounting principles consistently applied and setting forth in comparative form the figures for the previous fiscal year, all in reasonable detail and certified by independent public accountants of recognized national standing selected by the Company.

(ii)    **Quarterly Reports.** As soon as practicable after the end of each of the first three quarterly fiscal periods in each fiscal year, and in any event within forty-five (45) days thereafter, a copy of its Form 10-Q filed with the Commission pursuant to the Exchange Act, or if the Company is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act, a balance sheet of the Company as at the end of such period, a statement of income and a statement of cash flows of the Company for such period and (in the case of the second and third quarterly period) for the period from the beginning of the current fiscal year to the end of such quarterly period, in each case prepared in accordance with generally accepted accounting principles consistently applied and setting forth in comparative form the figures for the previous fiscal year.

### 2.2    Transfer of Information Rights.

The rights contained in Section 2.1 hereof may not be assigned or otherwise conveyed by the Holders, in connection with a transfer, sale, or assignment of Registrable Securities or otherwise, without the prior written consent of the Company unless (i) such transfer is effected in accordance with applicable federal and state securities laws, (ii) such transferee or assignee becomes a party to this Agreement or agrees in writing to be subject to the terms of Section 2 hereof to the same extent as if such transferee were an original party hereunder and (iii) such transferee acquires at least two hundred thousand (200,000) shares of Registrable Securities (as adjusted for any recapitalization, stock dividend, stock split or similar event), and provided further, that the Company is given written notice by such Holder at the time of or within a reasonable time after said transfer, stating the name and address of said transferee or assignee and identifying the securities with respect to which such rights are being assigned.

### 2.3    Termination of Covenants.

Each of the covenants set forth in this Section 2 (other than the covenants set forth in Section 2.4 below) shall terminate at such time as no shares

of Series B Preferred Stock, Series C Preferred Stock or Series D Preferred Stock are outstanding, or, with respect to each individual Holder, at such time as such Holder no longer holds any Registrable Securities.

**2.4    Confidentiality.** Any information provided pursuant to this Section 2 that has been appropriately designated by the Company as confidential information shall be used by the Holder acquiring such information solely in furtherance of its interests as a stockholder in the Company, and such Holder shall (except as otherwise required by law) maintain the confidentiality of all non-public information of the Company obtained under this Section 2 by using reasonable secrecy measures.

## SECTION 3

## REGISTRATION RIGHTS

**3.1    Requested Registration.**

(a)    **Requested Registration.** Prior to such time as the Company has effected four (4) registrations pursuant to this Section and such registrations have been declared effective, if the Company shall receive from Initiating Holders a written request that the Company effect any registration (other than a registration on Form S-3 or any related form of Registration Statement) with respect to Registrable Securities constituting at least five million (5,000,000) shares of Common Stock, as adjusted for any recapitalization, stock dividend, stock split or similar event (or a lesser number of shares if the anticipated aggregate offering price to the public of such shares is at least ten million dollars ($10,000,000)), the Company will:

(i)    promptly give written notice of the proposed registration to the other Holders; and

(ii)    as soon as practicable, use its diligent best efforts to effect such registration (including, without limitation, the execution of an undertaking to file post-effective amendments, appropriate qualification under applicable blue sky or other state securities laws and appropriate compliance with applicable regulations issued under the Securities Act) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of the other Holders joining in such request as are specified in a written request given within fifteen (15) days after receipt of such written notice from the Company; provided that the Company shall not be obligated to take any action to effect any such registration, qualification or compliance pursuant to this Section 3.1:

(A)    In any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance unless the Company is already qualified to do business and subject to service in such jurisdiction and except as may be required by the Securities Act;

(B)    Prior to the earlier of October 31, 1996 or three (3) months following the effective date of the registration statement pertaining to a Qualified Public Offering; or

(C)    If at the time of the request to register Registrable Securities the Company gives notice within thirty (30) days of such request that it is engaged or has fixed plans to engage within sixty (60) days of the time of the request in an initial firmly underwritten registered public offering as to which the Holders may include Registrable Securities pursuant to Sections 3.1 or 3.2.

Subject to the foregoing clauses (A) through (C) and to Section 3.1(c), the Company shall file a registration statement covering the Registrable Securities so requested to be registered as soon as practicable after receipt of the request of the Initiating Holders.

Notwithstanding anything to the contrary herein, in no event shall the Company be obligated to effect more than three (3) registrations pursuant to this Section 3.1.

(b)    **Underwriting.** If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 3.1 and the Company shall include such information in the written notice referred to in Section 3.1(a)(i). The right of any Holder to registration pursuant to Section 3.1 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder with respect to such participation and inclusion) to the extent provided herein.

The Company shall (together with all Holders proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by a majority in interest of the Initiating Holders with the approval of the Company, which approval shall not be unreasonably withheld. Notwithstanding any other provision of this Section 3.1, if the underwriter determines that marketing factors require a limitation of the number of shares to be underwritten and so advises the Holders in writing (except any Holder that has indicated to the Company its decision not to distribute any of its Registrable Securities through such underwriting) and the number of shares of Registrable Securities that may be included in the registration and underwriting shall be allocated among all such participating Holders in proportion, as nearly as practicable, to the respective amounts of Registrable Securities owned by such Holders at the time of filing the registration statement; *provided, however,* that shares of securities (other than Registrable Securities) included in such registration and underwriting pursuant to registration rights granted under that certain Shareholders Agreement dated as of October 1, 1992, by and among the Company, Applied Biosystems, Inc. and Chiron Corporation (the "Chiron/ABI Agreement") may not be limited to less than thirty percent (30%) of the total securities covered by such registration. No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.

If any Holder disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the underwriter and the Initiating Holders. The Registrable Securities and/or other securities so withdrawn from such underwriting also shall be withdrawn from such registration; *provided, however,* that, if by the withdrawal of such Registrable Securities a greater number of Registrable Securities held by the other Holders may be included in such registration (up to the maximum of any limitation imposed by the underwriters), then the Company shall offer to all Holders who have included Registrable Securities in the registration the right to include additional Registrable Securities in the same proportion used above in determining the underwriter limitation; and, *provided further* that in the event that the withdrawal of a Holder, and the subsequent inclusion of additional Registrable Securities by other Holders, results in an anticipated aggregate offering price to the public of less than seven million dollars ($7,000,000), the Company no longer shall be required to effect such registration pursuant to this Section 3.1.

If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account or the account of others in such registration if the underwriter so agrees and if the number of Registrable Securities which would otherwise have been included in such registration and underwriting will not thereby be limited.

(c)     **Delay of Registration.** If the Company shall furnish to the Initiating Holders a certificate signed by the President of the Company stating that, in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company and its shareholders for such registration statement to be filed on or before the date filing would be required and it is therefore essential to defer the filing of such registration statement, then the Company may direct that such request for registration be delayed for a period not in excess of one hundred twenty (120) days, such right to delay a request to be exercised by the Company not more than once in any one-year period.

3.2     **Company Registration.**

(a)     **Company Registration.** If at any time or from time to time, the Company shall determine to register any of its Common Stock, for its own account or for the account of others (other than the Holders), other than a registration relating solely to employee benefit plans or a registration relating solely to a Commission Rule 145 transaction or a registration on any registration form which does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities, the Company will:

(i)     promptly give to each Holder written notice thereof (which shall include a list of the jurisdictions in which the Company intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

(ii)     include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, subject to Section 3.2(b) below, all of such Holder's Registrable Securities specified in a written request or

requests, made within twenty (20) days after receipt of such written notice from the Company, by any such Holder or Holders.

(b)    **Underwriting.** If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 3.2(a)(i). In such event the right of any Holder to registration pursuant to Section 3.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company with the approval of a majority in interest of the Holders, which approval shall not be unreasonably withheld. Notwithstanding any other provision of this Section 3.2, if the underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the underwriter may limit the number of Registrable Securities to be included in the registration and underwriting (i) in the case of the IPO, to any amount that the underwriter may determine, or (ii) in the case of any registration subsequent to the IPO, to not less than thirty percent (30%) of the total securities covered by the registration, *provided* that (A) any shares of Common Stock to be offered by management of the Company and by any other parties having registration rights (other than under the Chiron/ABI Agreement as to registrable securities thereunder) shall first have been excluded from the underwriting, and (B) in the event that such registration is initiated by holders of securities pursuant to registration rights granted under the Chiron/ABI Agreement as to such securities, any shares of Common Stock to be offered by management of the Company and by any other parties having registration rights (other than under the Chiron/ABI Agreement as to registrable securities thereunder) shall have been excluded first and then any Registrable Securities of Holders who have elected to participate in such underwriting may be excluded entirely from such underwriting but only to the extent required for the Company to satisfy its obligations under the Chiron/ABI Agreement, which exclusion shall be pro rata among the Holders. The Company shall so advise all Holders (except those Holders who have indicated to the Company their decision not to distribute any of their Registrable Securities through such underwriting), and the number of shares of Registrable Securities and other securities pursuant to other registration rights that may be included in the registration and underwriting shall be allocated among the Holders and other holders of securities participating in the registration and underwriting in proportion, as nearly as practicable, to the respective amounts of Registrable Securities owned by the Holders and the other securities owned by others participating pursuant to other registration rights, as the case may be, at the time of filing the registration statement.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration. If any Holder disapproves of the terms of any such underwriting, such person may elect to withdraw therefrom by written notice to the Company and the underwriter. The securities so withdrawn from such underwriting also shall be withdrawn from such registration; *provided, however,* that, if by the withdrawal of such securities a greater number of Registrable Securities held by other Holders

may be included in such registration (up to the maximum of any limitation imposed by the underwriters), then the Company shall offer to all Holders who have included Registrable Securities in the registration the right to include additional Registrable Securities in the same proportion used above in determining the underwriter limitation.

**3.3    Expenses of Registration.** All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Section 3.1 or any registration, qualification or compliance under Section 3.2 or Section 3.9 herein shall be borne by the Company. All Selling Expenses incurred in connection with any registrations hereunder shall be borne by the holders of the securities so registered pro-rata on the basis of the number of shares so registered. The Company shall not, however, be required to pay for expenses of any registration proceeding begun pursuant to Section 3.1, the request of which has been subsequently withdrawn by the Initiating Holders (unless the withdrawal is based upon material adverse information concerning the Company of which the Initiating Holders were not aware at the time of such request or unless Holders holding a majority of the affected Registrable Securities agree to forfeit their right to one requested registration pursuant to Section 3.1 in which event such right shall be forfeited by all Holders), in which case such expenses shall be borne by the holders of securities (including Registrable Securities) requesting such registration in proportion to the number of shares for which registration was requested.

**3.4    Registration Procedures.** In the case of each registration, qualification or compliance effected by the Company pursuant to this Section 3, the Company will keep each Holder advised in writing as to the initiation of each registration, qualification and compliance and as to the completion thereof. At its expense the Company will:

      **(a)**    Keep such registration, qualification or compliance effective for a period of one hundred twenty (120) days or until the Holder or Holders have completed the distribution described in the registration statement relating thereto, whichever first occurs;

      **(b)**    Furnish such number of prospectuses (including preliminary prospectuses) and other documents incident thereto as a Holder from time to time may reasonably request;

      **(c)**    Prepare and file with the Commission such amendment and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement; and

      **(d)**    Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statement therein not misleading in the light of the circumstances then existing.

### 3.5   Indemnification.

(a)   The Company will indemnify each Holder, each of its officers, directors, partners and legal counsel, and each person controlling such Holder, with respect to which registration, qualification or compliance has been effected pursuant to this Section 3, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on (i) any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular or other similar document (including any related registration statement, notification or the like) incident to any such registration, qualification or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, or (ii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification or compliance, and will reimburse each such Holder, each of its officers, directors, partners and legal counsel, and each person controlling such Holder, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, as incurred, provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by an instrument duly executed by such Holder and stated to be specifically for use therein or furnished by the Holder to the Company in response to a request by the Company stating specifically that such information will be used by the Company therein.

(b)   Each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification or compliance is being effected, indemnify the Company, each of its directors and officers, each legal counsel and independent accountant of the Company, each person who controls the Company within the meaning of the Securities Act, and each other such Holder, each of its officers, directors, partners and legal counsel and each person controlling such Holder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular or other similar document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, and will reimburse the Company, such Holders, such directors, officers, persons, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, as incurred, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by an instrument duly executed by such Holder and stated to be specifically for use therein or furnished by the Holder to the Company in response to a request by the Company stating specifically that such information will be used by the Company therein; *provided,*

*however,* that the obligations of such Holders hereunder shall be limited to an amount equal to the proceeds to each such Holder of Registrable Securities sold as contemplated herein.

(c)    Each party entitled to indemnification under this Section 3.5 (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has received written notice of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld). The Indemnified Party may participate in such defense at such party's expense; *provided, however,* that the Indemnifying Party shall bear the expense of such defense of the Indemnified Party if representation of both parties by the same counsel would be inappropriate due to actual or potential conflicts of interest. The failure of any Indemnified Party to give notice as provided herein shall relieve the Indemnifying Party of its obligations under this Section 3.5 only to the extent that such failure to give notice shall materially adversely prejudice the Indemnifying Party in the defense of any such claim or any such litigation. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.

(d)    In order to provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (i) any Holder exercising rights under this Agreement, or any controlling person of any such Holder, makes a claim for indemnification pursuant to this Section 3.5 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 3.5 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any such selling Holder or any such controlling person in circumstances for which indemnification is provided under this Section 3.5; then, and in each such case, the Company and such Holder will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that such Holder is responsible for the portion represented by the percentage that the public offering price of its Registrable Securities offered by and sold under the registration statement bears to the public offering price all securities offered by and sold under such registration statement, and the Company and other selling Holders are responsible for the remaining portion; *provided, however,* that, in any such case, (A) no such Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement; and (B) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

(e)    The obligations of the Company and Holders under this Section 3.5 shall survive the completion of any offering of Registrable Securities in a registration statement, and otherwise.

3.6    **Information by Holder.**  Each Holder including securities of the Company in any registration shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Section 3.

3.7    **Rule 144 Reporting.**  With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the Common Stock to the public without registration, after such time as a public market exists for the Common Stock of the Company, the Company agrees to:

(a)    Use its best efforts to facilitate the sale of the Common Stock to the public, without registration under the Securities Act, pursuant to Rule 144 under the Securities Act, provided that this shall not require the Company to file reports under the Securities Act and the Exchange Act at any time prior to the Company's being otherwise required to file such reports;

(b)    Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after ninety (90) days after the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(c)    Use its best efforts to then file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(d)    So long as a Holder owns any Registrable Securities, to furnish to the Holder forthwith upon request a written statement by the Company as to its compliance with the reporting requirements of said Rule 144 (at any time after ninety (90) days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed by the Company as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

3.8    **"Market Stand-off" Agreement.**  Each Holder agrees not to sell or otherwise transfer or dispose of any Common Stock (or other securities) of the Company held by it for a period not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act if so requested by the Company and underwriter of Common Stock (or other securities) of the Company, provided that:

      (a)    such agreement shall not apply to Registrable Securities sold in such offering, if any; and

      (b)    all officers and directors of the Company enter into similar agreements.

The Company may impose stop-transfer instructions with respect to the shares (or securities) subject to the foregoing restriction until the end of such period.

    3.9    Form S-3.

      (a)    As soon as reasonably practicable following consummation of a Qualified Public Offering, the Company agrees to register on Form S-3 the shares of its Common Stock issued upon conversion of outstanding Series B Preferred Stock and Series C Preferred Stock and to use its best efforts to maintain the effectiveness of such registration statement through March 31, 1997.

      (b)    In addition to the rights contained in the foregoing provisions of this Section 3, Holders holding not less than 20% of the Registrable Securities shall have the right to request registrations on Form S-3 thereafter under this Section 3.9 (such requests shall be in writing and shall state the number of shares of Registrable Securities to be disposed of and the intended method of disposition of such shares by such Holder or Holders); *provided, however,* that the Company shall not be required to effect a registration pursuant to this Section 3.9 unless the Holder or Holders requesting registration propose to dispose of shares of Registrable Securities which they reasonably anticipate will have an aggregate disposition price (taking into account all other securities of the Company proposed to be included in the registration, but before deduction of underwriting discounts and expenses of sale) of at least five hundred thousand dollars ($500,000); *provided further,* that the Company shall not be required to effect a registration pursuant to this Section 3.9 if at the time of the request for a registration on Form S-3 the Company gives notice within thirty (30) days of such request that it is engaged or has fixed plans to engage within sixty (60) days of the time of the request in a firmly underwritten registered public offering as to which the Holders may include Registrable Securities pursuant to Section 3.2; and *provided further* that the Company shall not be required to effect more than two registrations pursuant to this Section 3.9 in any twelve (12) month period.

    The Company shall give notice to all Holders of the receipt of a request for registration pursuant to this Section 3.9 and shall provide a reasonable opportunity for other Holders, if any, to participate in the registration. Subject to the foregoing, the Company will use its best efforts to effect promptly the registration of all shares of Registrable Securities on Form S-3, as the case may be, to the extent requested by the Holder or Holders thereof for purposes of disposition.

    **3.10**    **Transfer of Registration Rights.** Except as otherwise provided herein, the rights contained in this Section 3 may be assigned or otherwise conveyed to a transferee or assignee of Registrable Securities, who shall be considered a "Holder" solely for purposes of this Section 3, *provided* that (i) such transfer is effected in accordance with applicable federal and state securities laws, (ii) such transferee or assignee becomes a party to this Agreement or agrees in

writing to be subject to the terms of Section 3 hereof to the same extent as if such transferee were an original party hereunder and (iii) such transferee acquires at least two hundred thousand (200,000) shares of Registrable Securities (as adjusted for any recapitalization, stock dividend, stock split or similar event), and *provided further*, that the Company is given written notice by such Holder at the time of or within a reasonable time after said transfer, stating the name and address of said transferee or assignee and identifying the securities with respect to which such registration rights are being assigned.

**3.11   Certain Limitations in Connection with Future Grants of Registration Rights.** From and after the date of this Agreement, the Company shall not, without the prior written consent of Holders of at least a majority of the outstanding Registrable Securities, enter into any agreement with any person or persons providing for the granting to such holder of registration rights superior to those granted to Holders pursuant to this Section 3; or of registration rights (a) which might cause a reduction in the number of shares includable by the Holders in any offering pursuant to Section 3.1 or in any offering subject to Section 3.2, or (b) which might permit a demand registration that could result in the related registration statement being declared effective prior to the earlier of either of the dates set forth in Section 3.1, or within one hundred twenty (120) days of the effective date of any registration effected pursuant to Section 3.1.

**3.12   Termination of Registration Rights.** All rights and duties provided for in this Section 3 shall terminate on June 1, 2006.

**3.13   Delay of Registration.** No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Agreement.

## SECTION 4

### PREEMPTIVE RIGHTS

**4.1   Preemptive Right.** Except as set forth below, if, at any time prior to the expiration of the period set forth in Section 4.7 below, the Company should desire to issue any Equity Securities, it shall give each Prior Purchaser the first right to purchase its Pro Rata Share (as defined below), or any part thereof, of all of such offered Equity Securities on the same terms as the Company is willing to sell such Equity Securities to any other person. The Prior Purchaser's "Pro Rata Share" of such Equity Securities shall be equal to the percentage of the outstanding Equity Securities held by the Prior Purchaser on the date of the Company's written notification referred to in Section 4.2 below, assuming for purposes of such calculation (i) that all Equity Securities reserved under the Company's equity incentive plans for issuance to employees, officers and directors of, and consultants to, the Company, are issued and outstanding, and (ii) that all Equity Securities issuable upon exercise of options, warrants or convertible securities existing as of the date hereof are issued and outstanding.

**4.2   Notification.** Prior to any sale or issuance by the Company of any Equity Securities, the Company shall notify each Prior Purchaser, in writing, of its intention to sell and

issue such securities, setting forth in reasonable detail the terms under which it proposes to make such sale. Within twenty (20) days after notice, the Prior Purchaser shall notify the Company whether the Prior Purchaser exercises its option and elects to purchase its Pro Rata Share (or any part thereof) of the Equity Securities so offered.

    **4.3    Issuance; Preemptive Rights Waived or Lapsed.** If, within twenty (20) days after the Company gives its aforesaid notice the Prior Purchaser does not notify the Company that the Prior Purchaser desires to purchase all of its Pro Rata Share of the Equity Securities described in such notice upon the terms and conditions set forth in such notice, or notifies the Company that it desires to purchase less than all of its Pro Rata Share, the Company may, during a period of ninety (90) days following the end of such 20-day period, sell and issue such securities as to which the Prior Purchaser does not indicate a desire to purchase to another person upon the same general terms and conditions as those set forth in the notice to the Prior Purchaser, but at a price at least as great as the price offered to the Prior Purchaser; *provided,* that failure by the Prior Purchaser to exercise its option to purchase with respect to one offering, sale and issuance shall not affect its option to purchase Equity Securities in any subsequent offering, sale and purchase. In the event the Company has not sold the Equity Securities or entered into an agreement to sell the Equity Securities within said 90-day period, the Company shall not thereafter issue or sell any Equity Securities without first offering such securities to the Prior Purchaser in the manner provided above.

    **4.4    Issuance; Preemptive Rights Exercised.** If a Prior Purchaser gives the Company notice that the Prior Purchaser desires to purchase any of the Equity Securities offered by the Company, payment for the Equity Securities shall be by check or wire transfer, against delivery of the securities at the executive offices of the Company within ten (10) days after giving the Company such notice, or, if later, the closing date for the sale by the Company of all such Equity Securities proposed to be sold. The Company shall take all such action as may be required by any regulatory authority in connection with the exercise by the Prior Purchaser of the right to purchase Equity Securities as set forth in this Section 4.

    **4.5    Excluded Securities.** The preemptive rights contained in this Section 4 shall not apply to (a) the granting of options to purchase Common Stock or issuance by the Company of Common Stock to employees, officers, directors or consultants of the Company under stock option plans or purchase agreements or other purchase arrangements approved by the Company's Board of Directors, (b) the issuance of Equity Securities in connection with the acquisition of a third party by merger or acquisition of more than fifty-one percent (51%) of the outstanding shares or substantially all of the assets of such third party on terms approved by the Company's Board of Directors, (c) the issuance of Equity Securities in connection with venture leasing transactions or issued to the seller or lessor of equipment in equipment purchase and lease transactions approved by the Board of Directors, (d) the issuance of Equity Securities pursuant to the exercise of options, warrants or convertible securities outstanding as of the date hereof, (e) the issuance of Equity Securities in connection with any stock split, stock dividend or recapitalization of the Company, (f) the issuance of Equity Securities offered generally to the public pursuant to a registration statement (including any such issuance of rights to purchase capital stock offered to stockholders or optionholders of the Company at such time) or (g) the

issuance of Common Stock of the Company upon conversion or exercise of any Equity Security which was not subject to the preemptive rights set forth in this Section 4 or for which the preemptive rights were not exercised.

**4.6    Assignment.**  A Prior Purchaser's right to purchase any Equity Securities pursuant to this Section 4 may not be assigned by the Prior Purchaser without the prior written consent of the Company.

**4.7    Termination.**  All rights and duties set forth in this Section 4 shall terminate upon the first to occur of (i) June 30, 2002 or (ii) consummation of the IPO.

SECTION 5

MISCELLANEOUS

**5.1    Board of Directors.**  For so long as there are not less than an aggregate of two million (2,000,000) shares of Series B Preferred Stock and Series C Preferred Stock outstanding, the Company agrees to use its best efforts to cause, and the Series B Purchasers and Series C Purchasers agree to vote their shares of Series B Preferred Stock, Series C Preferred Stock or other Equity Securities in favor of, the election to the Company's Board of Directors of that number of nominees not to exceed the greater of two or one-third (1/3) of the total then authorized number of directors rounded down to the nearest whole number, who are selected by the holders of a majority of the Series B Preferred Stock and the Series C Preferred Stock, voting together, in writing to the Company and reasonably acceptable to management.

**5.2    Remedies.**  Each Prior Purchaser agrees that the Company shall be entitled to a decree of specific performance of the terms of Section 4 of this Agreement or an injunction restraining violations of Section 4 of this Agreement, such right to be in addition to any other remedies of the Company.  If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they maybe entitled.  All remedies, either under this Agreement or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

**5.3    Entire Agreement; Amendment.**

    **(a)**    This Agreement constitutes the full and entire understanding and agreement among the parties with regard to the subjects hereof.

    **(b)**    Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and holders of a majority of the outstanding Registrable Securities.

**5.4    Delays or Omissions.**   No delay or omission to exercise any right, power or remedy accruing to a Purchaser, upon any breach or default of the Company under this Agreement, shall impair any such right, power or remedy of the Purchaser nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of the Purchaser of any breach or default under this Agreement, or any waiver on the part of the Purchaser of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.

**5.5    Governing Law.**   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to the conflict of laws provisions thereof.

**5.6    Survival of Warranties.**   The warranties, representations and covenants of the parties hereto contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of any party hereto.

**5.7    Successors and Assigns.**   Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and, subject to the restrictions on transfer set forth herein, upon each Holder, his heirs, executors, administrators, successors and assigns.

**5.8    Notices, etc.**   All notices and other communications required or permitted hereunder shall be in writing and shall be effective upon receipt confirmed in writing by the addressee if sent by telecopier, or upon receipt if sent by recognized overnight delivery or courier service, or five (5) days after deposited by first-class mail, postage prepaid, with the United States mail or immediately upon delivery by hand or by messenger, if addressed (a) to a Purchaser, at each Purchaser's address set forth on the signature pages attached hereto, or at such other address as the Purchaser shall have furnished to the Company in writing, or (b) to the Company, at its principal offices at 3832 Bay Center Place, Hayward, California 94545, addressed to the attention of the President, or at such other address as the Company shall have furnished to the Purchasers in writing.

**5.9    Titles and Subtitles.**   The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**5.10    Counterparts.**   This Agreement may be executed in any number of counterparts, all of which together shall constitute one instrument.

**5.11    Severability.**   In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

**5.12    Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                     HOECHST MARION ROUSSEL, INC.

By: _____               By: _____
Dr. Sam Eletr, Chief Executive Officer

                                            Name: _____

                                            Title: _____

                                            Address:    9300 Ward Parkway
                                                        Kansas City, MO 64114-0480

SERIES B PURCHASER:                         SERIES C PURCHASER:

_____                   _____

By: _____               By: _____

Name: _____               Name: _____

Address: _____               Address: _____

_____                   _____

_____                   _____

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____

Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:      9300 Ward Parkway
              Kansas City, MO 64114-0480

ASSET MANAGEMENT ASSOCIATES 1989, L.P.

SERIES B PURCHASER:

ASSET MANAGEMENT ASSOCIATES ___

By: _____

Name: _____

Address: 2275 E Bayshore Rd
         Palo Alto, CA  94303

SERIES C PURCHASER:

By: _____

Name: _____

Address: _____
         _____
         _____

GENERAL PARTNER OF
AMC PARTNERS 89, L.P. THE GENERAL PARTNER OF
ASSET MANAGEMENT ASSOCIATES 1989, L.P.

5.12 **Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                HOECHST MARION ROUSSEL, INC.

By: _____          By: _____
Dr. Sam Eletr, Chief Executive Officer

                                       Name: _____

                                       Title: _____

                                       Address:   9300 Ward Parkway
                                                  Kansas City, MO 64114-0480


SERIES B PURCHASER:                    SERIES C PURCHASER:

                                       _Asset Management Partners_
_____

By: _____          By: _____
                                           FRANKLIN P. JOHNSON, JR.
                                           GENERAL PARTNER
Name: _____          Name: __ASSET MANAGEMENT PARTNERS__

Address: _____          Address: _2275 East Bayshore Road, Suite_

_____          _Palo Alto   CA   94303_

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
            Kansas City, MO 64114-0480

SERIES B PURCHASER:

Camdon Street Fund
Investment Advisor
By: Edward Fuller

Name: E. G. Uller

Address: P.O. Box 272
         Charlottesville, Va
                    22903

SERIES C PURCHASER:

_____

By: _____

Name: _____

Address: _____
         _____
         _____

20981916
102095

18.

Page 234 of 260

**5.12    Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                     HOECHST MARION ROUSSEL, INC.

By: _____              By: _____

   Dr. Sam Eletr, Chief Executive Officer   Name: _____

                                            Title: _____

                                            Address:    9300 Ward Parkway
                                                        Kansas City, MO 64114-0480


SERIES B PURCHASER:                         SERIES C PURCHASER:

                                            CANNON Street Fund
_____

By: _____                   By: _____

Name: _____                   Name: Edward M Miller

                                                  Investment advisor
Address: _____
                                            Address:
         _____
                                                     RR 10 Box 272
         _____
                                                     Charlottesville Va

                                                               22903

20981916
102095                              18.

                                                  Page 235 of 260

5.12   **Aggregation of Stock.**  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
                Kansas City, MO 64114-0480

SERIES B PURCHASER:
Elitzer Associates Inc. Defined
Benefit Pension Plan
By: _Donald B. Elitz_, Trustee
Name: _Donald B. Elitzer_
Address: _150 Nassau St)_
          _NY, NY 10038_

SERIES C PURCHASER:
Elitzer Associates, Inc. Defined
Benefit Pension Plan
By: _Donald B. Elitz_, Trustee
Name: _Donald B. Elitzer_
Address: _150 Nassau St)_
          _NY, NY 10038_

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
            Kansas City, MO 64114-0480

SERIES B PURCHASER:

By: _____

Name: _____Elliot Cewrtz_____

Address: c/o Milbank, Tweed, Hadley McCley
         1 Chase Manhattan Plaza
         New York, New York 10005

SERIES C PURCHASER:

By: _____

Name: _____Elliot Cewrtz_____

Address: c/o Milbank, Tweed, Hadley McCley
         1 Chase Manhattan Plaza
         New York, New York 10005

5.12   Aggregation of Stock.  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:     9300 Ward Parkway
             Kansas City, MO 64114-0480

SERIES B PURCHASER:

_Bala S. Manian._____

By: _MANIAN REVOCABLE LIVING TRUST_

Name: _BALA S. MANIAN TRUSTEE_

Address: _14240 BERRY HILL COURT_
_LOS ALTOS HILLS, CA 94022_

SERIES C PURCHASER:

_____

By: _____

Name: _____

Address: _____
_____
_____

20981916
102095

18.

**5.12** Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____

Dr. Sam Eletr. Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
            Kansas City, MO 64114-0480

SERIES B PURCHASER:

Multinvest Limited

By: _____

Thomas G. McKinley

Name: General partner

Address: c/o Partech International
         101 California Street, Suite 3150
         San Francisco, CA 94111

SERIES C PURCHASER:

Multinvest Limited

By: _____

Thomas G. McKinley

Name: General partner

Address: c/o Partech International
         101 California Street, Suite 3150
         San Francisco, CA 94111

5.12   Aggregation of Stock.  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                          HOECHST MARION ROUSSEL, INC.


By: _____                    By: _____
    Dr. Sam Eletr, Chief Executive Officer        Name: _____

                                                  Title: _____

                                                  Address:    9300 Ward Parkway
                                                              Kansas City, MO 64114-0480


SERIES B PURCHASER:                               SERIES C PURCHASER:

NEW YORK LIFE INS. CIE                            NEW YORK LIFE INS. CIE
By: _____                     By: _____
    Dominique O. Sémon                                Dominique O. Sémon
Name: Assistant Vice President                    Name: Assistant Vice President

Address: 51 Madison Ave                           Address: 51 Madison Ave
         New York, NY 10010                                New York, NY 10010

5.12   Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                      HOECHST MARION ROUSSEL, INC.

By: _____                  By: _____
   Dr. Sam Eletr, Chief Executive Officer

                              Name: _____

                              Title: _____

                              Address:    9300 Ward Parkway
                                          Kansas City, MO 64114-0480

SERIES B PURCHASER:                          SERIES C PURCHASER:
Partech International Salary Deferral Plan    Partech International Salary Deferral Plan
FBO: Thomas G. McKinley                       FBO: Thomas G. McKinley

By: _____                  By: _____
    Thomas G. McKinley                           Thomas G. McKinley
    Trustee                                      Trustee
Name: _____                Name: _____

Address: c/o Partech International            Address: c/o Partech International
       101 California Street, Suite 3150            101 California Street, Suite 3150
       San Francisco, CA 94111                      San Francisco, CA 94111

20981916
102095

18.

**Page 241 of 260**

5.12   Aggregation of Stock.  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written:

LYNX THERAPEUTICS, INC.

By: _____
     Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:      9300 Ward Parkway
              Kansas City, MO 64114-0480

SERIES B PURCHASER:

Parvest U.S. Partners II C.V.

By: Thomas G. McKinley
Name: Thomas G. McKinley
      General partner
Address: c/o Partech International
      101 California Street, Suite 3150
      San Francisco, CA 94111

SERIES C PURCHASER:

Parvest U.S. Partners II C.V.

By: Thomas G. McKinley
Name: Thomas G. McKinley
      General partner
Address: c/o Partech International
      101 California Street, Suite 3150
      San Francisco, CA 94111

5.12   Aggregation of Stock.  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
      Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:      9300 Ward Parkway
                  Kansas City, MO 64114-0480

SERIES B PURCHASER:

Second Ventures II L.P.

By: _____

Name:  WILLIAM K. BOWES , JR.

Address: 2180 SAND HILL RD
              SUITE 300
              MENLO PARK CA 94025

SERIES C PURCHASER:

Second Ventures II L.P.

By: _____

Name:  WILLIAM K. BOWES , JR

Address: 2180 SAND HILL ROAD
              SUITE 300
              MENLO PARK CA 94025

SECOND VENTURES II, L.P.
By Presidio Management Group IV, L.P.
Its General Partner

5.12  Aggregation of Stock.  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
            Kansas City, MO 64114-0480

SERIES B PURCHASER:

Sprout Capital VII, L.P.

By: Kathleen D LaPorte

Name: Kathleen D LaPorte

Address: _____
         _____
         _____

SERIES C PURCHASER:

Sprout Capital VII, L.P.

By: Kathleen D LaPorte

Name: Kathleen D. LaPorte

Address: _____
         _____
         _____

5.12   Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                          HOECHST MARION ROUSSEL, INC.

By: _____                      By: _____
      Dr. Sam Eletr, Chief Executive Officer
                                                 Name: _____

                                                 Title: _____

                                                 Address:     9300 Ward Parkway
                                                              Kansas City, MO 64114-0480


SERIES B PURCHASER:                              SERIES C PURCHASER:

Stanford University                              _____

By: Carol G. Imee                                By: _____

Name: _L GILMER                                  Name: _____
      STANT SECRETARY
      BOARD OF TRUSTEES OF THE
Address: AND STANFORD JUNICH UNIVERSITY          Address: _____

_____                          _____

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
      Dr. Sam Eletr. Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:     9300 Ward Parkway
                   Kansas City, MO 64114-0480

SERIES B PURCHASER:

_____

By: _____

Name: _____

Address: _____
_____
_____

SERIES C PURCHASER:

CRAIG    C.  TAYLOR

By: _____

Name: CRAIG   C. TAYLOR

Address: c/o Asset Management Co
2275 E. Bayshore Rd.
Palo Alto, CA 94303

5.12   Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:     9300 Ward Parkway
             Kansas City, MO 64114-0480

SERIES B PURCHASER:

Tradeinvest Limited

By: _____

Name: Thomas G. McKinley
        Director
Address: c/o Partech International
         101 California Street, Suite 3150
         San Francisco, CA 94111

SERIES C PURCHASER:

Tradeinvest Limited

By: _____

Name: Thomas G. McKinley
        Director
Address: c/o Partech International
         101 California Street, Suite 3150
         San Francisco, CA 94111

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
      Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
                  Kansas City, MO 64114-0480

SERIES B PURCHASER:

U.S. Growth Fund Partners C.V.

By: _____

Name: Thomas G. McKinley _____
          General partner
Address: c/o Partech International ·
              101 California Street, Suite 3150
              San Francisco, CA 94111

SERIES C PURCHASER:

U.S. Growth Fund Partners C.V.

By: _____

Name: Thomas G. McKinley _____
          General partner
Address: c/o Partech International
              101 California Street, Suite 3150
              San Francisco, CA 94111

5.12    Aggregation of Stock. All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                    HOECHST MARION ROUSSEL, INC.

By: _____              By: _____
Dr. Sam Eletr, Chief Executive Officer
                                           Name: _____

                                           Title: _____

                                           Address:    9300 Ward Parkway
                                                       Kansas City, MO 64114-0480

SERIES B PURCHASER:                        SERIES C PURCHASER:

U.S.V. ENTREPRENEUR PARTNERS II LP         U.S.V. ENTREPRENEUR PARTNE II LP

By: _William K. Bowes_                     By: _William K. Bowes_

Name: WILLIAM K. BOWES, JR.                Name: WILLIAM K. BOWES, JR.

Address: 2180 SAND HILL ROAD               Address: 2180 SAND HILL ROAD
         SUITE 300                                  SUITE 300
         MENLO PARK CA 94025                        MENLO PARK CA 94025


USVP ENTREPRENEUR PARTNERS II, L.P.
A Delaware Limited Partnership
By Presidio Management Group IV, L.P.
Its General Partner

**5.12    Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.

By: _____
    Dr. Sam Eletr, Chief Executive Officer

HOECHST MARION ROUSSEL, INC.

By: _____

Name: _____

Title: _____

Address:    9300 Ward Parkway
            Kansas City, MO 64114-0480

SERIES B PURCHASER:

U.S. VENTURE PARTNERS IV

By: _____

Name: WILLIAM K. BOWES, JR

Address: 2180 SAND HILL ROAD
         SUITE 300
         MENLO PARK CA 94025

SERIES C PURCHASER:

U.S. VENTURE PARTNERS IV

By: _____

Name: WILLIAM K. BOWES, JR.

Address: 2180 SAND HILL ROAD
         SUITE 300
         MENLO PARK CA 94025

U.S. VENTURE PARTNERS IV, L.P.,
By Presidio Management Group IV, L.P.,
Its General Partner.

**5.12  Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                    HOECHST MARION ROUSSEL, INC.

By:_____              By:_____
   Dr. Sam Eletr, Chief Executive Officer
                                          Name:_____

                                          Title:_____

                                          Address:    9300 Ward Parkway
                                                      Kansas City, MO 64114-0480


SERIES B PURCHASER:                       SERIES C PURCHASER:

_____                 _____

By:_____              By:_____

Name:_____             Name:_____

Address:_____             Address:_____
        _____                      _____
        _____                      _____

5.12    **Aggregation of Stock.**  All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                    HOECHST MARION ROUSSEL, INC.

By:_____                By:_____
    Dr. Sam Eletr, Chief Executive Officer

                                     Name:_____

                                       Title:_____

                                       Address:    9300 Ward Parkway
                                                     Kansas City, MO 64114-0480

SERIES B PURCHASER:                        SERIES C PURCHASER:

_____                    _____

By:_____                 By:_____

Name:_____               Name:_____

Address:_____            Address:_____

        _____               _____
        _____               _____

5.12    **Aggregation of Stock.** All Equity Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Investor Rights Agreement as of the date first above written.

LYNX THERAPEUTICS, INC.                    HOECHST MARION ROUSSEL, INC.

By:_____              By:_____
    Dr. Sam Eletr, Chief Executive Officer

                                      Name:_____

                                      Title:_____

                                      Address:        9300 Ward Parkway
                                                          Kansas City, MO 64114-0480

SERIES B PURCHASER:                        SERIES C PURCHASER:

_____                  _____

By:_____               By:_____

Name:_____             Name:_____

Address:_____          Address:_____
          _____                 _____
          _____                 _____

## Schedule of Series B Purchasers

Asset Management Associates 1989, L.P.
Basetext Limited
Bayview Investors, Inc.
Biotech Vest, Inc.
Cannon Street Fund Ltd.
DLJ Capital Corporation
Elitzer Associates, Inc. Defined Benefit Pension Plan
Fujigin Capital Company
GC&H Investments
Elliot Gewirtz
Manian Revocable Living Trust
NC No. 2 Investment Enterprises
New York Life Insurance Company
Nikko Capital Co., Ltd.
O'Connor & Associates
Old Court Limited
Paribas U.S. Growth Fund CV
Second Ventures II, L.P.
Singapore Bio-Innovations Pte Ltd.
Sprout Capital VI, L.P.
Stanford University
U.S. Venture Partners IV L.P.
USVP Entrepreneurs Partners II, L.P.

### Schedule of Series C Purchasers

Asset Management Partners
Basetext Limited
Cannon Street Fund Ltd.
DLJ Capital Corporation
Elitzer Associates, Inc. Defined Benefit Pension Plan
European Medical Ventures
Fujigin Capital Company
GC&H Investments
Elliot Gewirtz
Multinvest
New York Life Insurance Company
Old Court Limited
Partech International Salary Deferral Plan
Parvest U.S. Partners II C.V.
S.B.C. Capital Markets Inc.
Second Ventures II, L.P.
Sprout Capital VII, L.P.
Craig C. Taylor
Tradeinvest Limited
U.S. Growth Fund Partners C.V.
U.S. Venture Partners IV L.P.
USVP Entrepreneur Partners II, L.P.

21002395
103095

**Exhibit 21.1**

## Subsidiaries of the Company

# Subsidiaries of the Company

**LYNXNebraska, Inc.**

**Spectragen, Inc.**

**Exhibit 23.1**

## Consent of Ernst & Young LLP, Independent Auditors

## CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements (Form S-8 Nos. 33-86634 and 33-94872) pertaining to the 1992 Stock Option Plan of Lynx Therapeutics, Inc. of our report dated February 2, 1996, with respect to the consolidated financial statements of Lynx Therapeutics, Inc. included in the Annual Report (Form 10-K) for the year ended December 31, 1995.

*Ernst & Young LLP*

Palo Alto, California
March 26, 1996

**Page 259 of 260**

This page was left blank intentionally