# EXHIBIT 7



95 08 1569

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

RECD S.E.C.
MAR 31 1995
FEE 017

# FORM 10-K 405

**[ X ]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** *[FEE REQUIRED]*

For the year ended _____ **December 31, 1994** _____

or

**[  ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** *[NO FEE REQUIRED]*

PROCESSED BY
74 - 70·P
APR 03 1995

DISCLOSURE INC.

**Commission file number 0-22570**

# LYNX THERAPEUTICS, INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-3161073** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**3832 Bay Center Place, Hayward, CA  94545**
(Address of principal executive offices, including zip code)

**(510) 670-9300**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:  **None**

Securities registered pursuant to Section 12(g) of the Act:        **Common Stock, $.001 Par Value**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ___✓___    No _____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in any amendment to this Form 10-K. ___✓___

The number of shares of Common Stock and Series B Preferred Stock outstanding as of March 10, 1995 was 20,116,636 and 3,322,896 respectively. The Series B Preferred Stock is convertible into Common Stock on a ten-for-one basis. Information regarding the aggregate market value of the Registrant's voting stock is not included because there is currently no public trading market for the Company's voting stock.

# PART I

**Item 1.**    **Business**

Lynx Therapeutics, Inc. ("Lynx" or the "Company") seeks to discover, manufacture and market oligonucleotide-based drugs directed at leukemias and other cancers, cardiovascular and fibrotic diseases and viral infections for which no effective therapies currently exist. Oligonucleotide-based drugs are synthetic fragments of DNA-like molecules specifically designed to resist degradation by circulatory and cellular enzymes. Because they are DNA-like, their binding to bio-molecules, particularly DNA and RNA, is strongly dependent on the sequence (genetic code) embedded in their design and, therefore, is potentially more specific than that of conventional drugs, possibly resulting in reduced side effects. The Company's first efforts to develop antisense therapeutics are being evaluated clinically. For a detailed discussion of antisense targeting see: "Background - The Antisense Approach" below. Two of the Company's lead antisense compounds have received FDA approval for Phase I trials under three separate protocols submitted as physician-sponsored Investigational New Drug Applications ("INDs"). Studies of Systemic acute myelogenous leukemia ("AML") began November 1992, *ex vivo* purging for AML began September 1993, and *ex vivo* purging for chronic myelogenous leukemia ("CML") should begin in 1995. The Company filed a corporate sponsored IND for systemic treatment of CML in 1994. This trial is now underway. All of Lynx's potential products are currently in research and development. Lynx has yet to derive significant revenues from any products and there can be no assurance that the Company will ever successfully develop and market any of its proposed products.

The development of oligonucleotide-based drugs requires the ability to produce amounts of synthetic DNA far larger than those which may be obtained from research-oriented chemistries and synthesizers. Few, if any, other sources can match the quantity and quality of compounds that Lynx's technology has made available for *in vitro, in vivo* and now human testing. This production technology traces its origins to the beginning of Lynx as a division of Applied Biosystems, Inc. ("ABI"), one of the world's largest and leading suppliers of DNA synthesis reagents and instruments. Lynx was spun out of ABI in October 1992 to pursue therapeutic applications of ABI's technologies. Lynx retains royalty-free licenses to these DNA synthesis technologies and holds exclusive positions in the therapeutics field for many of them. Additionally, many of the Company's key employees were intimately involved with many of these technologies while at ABI and they have continued to develop oligonucleotide synthesis and scale up technologies to meet Lynx's therapeutic objectives.

In addition to its DNA chemistry and manufacturing technologies, Lynx owns or controls a number of intellectual properties pertaining to oligonucleotide-based therapeutics. These include specific chemical formulations of oligonucleotides and the targeting of genetic sequences implicated in the Company's disease targets.

The Company's strategy is to leverage its chemistry and synthetic know-how through the expertise of academic and government specialists active in a variety of disease areas. By supplying its collaborators with formulations and quantities of compounds unavailable otherwise, the Company has been able to sponsor investigations it could not possibly conduct on its own. When appropriate, the Company provides financial support for its

collaborators' work and, in most cases, has secured the full commercial rights of any resulting drugs.

Lynx has focused its developmental efforts on disease targets that represent significant market opportunities. The Company's initial products are targeted against leukemia, malignant melanoma, ovarian cancer, colorectal cancer and restenosis. Outside these targets the Company entered into a collaboration with Chiron Corporation ("Chiron"), which addresses hepatitis B and C viruses ("HBV" and "HCV") and Human Immunodeficiency Virus ("HIV"). In this collaboration, Lynx contributes its antisense know-how and manufacturing technology while Chiron contributes its expertise in these viral diseases. Chiron pays for all costs of development and clinical trials. Lynx retains all manufacturing rights to any products developed under the collaboration and will share in any profits resulting from their sales. In August 1994, the Company entered into an agreement with The Wellcome Foundation Ltd. ("Wellcome") to develop a synthetic antisense oligonucleotide which has entered human clinical trials for the treatment of restenosis. Lynx will retain manufacturing rights and Wellcome will manage and fund the clinical trial program and market the resulting drug. The Company will continue to seek additional collaborations to address markets Lynx could not address on its own.

## Background

Drugs are chemicals that are designed to interact with a target or receptor molecule, typically a protein, to induce or inhibit the molecule's normal function while producing as few unwanted side effects as possible. A drug is selective or specific if it has a strong binding capacity (affinity) for its target receptor and very little affinity for other receptors. More selective or specific drugs are generally more potent, more effective and less likely to cause side effects or toxicity.

Traditional drugs have certain limitations because of their relative lack of selectivity. Where drug therapy is available, treatment may be unsatisfactory due to unwanted side effects. Many diseases remain untreatable, and certain drugs, including drugs for treating chronic degenerative diseases, treat only symptoms and are not curative.

Oligonucleotide-based drugs represent a new class of therapeutics designed to be more selective and to interact at a different or earlier stage in the underlying disease process. Oligonucleotides are a versatile class of compounds which the Company believes inhibit the production of disease-causing proteins. Unlike larger therapeutic proteins and monoclonal antibodies, oligonucleotides are relatively small molecules which have been demonstrated *in vitro* and *in vivo* (in a number of animal species including primates) to penetrate tissues where most diseases occur. The Company believes that oligonucleotide-based drugs have the potential to provide safer and more effective disease treatment than currently achievable by many traditional drugs.

*The Antisense Approach*

While traditional drugs interact with proteins that have already been synthesized in the discarded tissue, antisense drugs are designed to modulate genetic expression and block the biosynthesis of the disease-associated proteins. They do so by interfering with

messenger RNA ("mRNA") by binding selectively to target regions of mRNAs known to code for specific disease-related proteins.

Antisense compounds can target to identified nucleic acid sequences using the principles of base pairing first described by Dr. James Watson and Dr. Francis Crick. The precise synthesis of these antisense compounds is very important as one or two nucleotide "mismatches" will significantly decrease the affinity of the binding interaction between the synthetic antisense oligonucleotide and its complementary RNA target. Thus, an antisense oligonucleotide of suitable length will have a low probability of attaching or hybridizing with non-target nucleic acids where one or more nucleotide mismatches would exist. These properties give the antisense approach a number of advantages as potential drugs. Thus, once perfected, antisense technology may significantly simplify and improve the process of screening and developing potential drugs.

**Lynx Antisense Technology**

The Company has invested considerable effort developing one of the most promising analogues to date, the phosphorothioate oligonucleotides, defined in the next section.

A phosphorothioate analogue is an oligonucleotide in which the backbone has been modified by the substitution of sulfur for one of the non-bridging oxygens in the nucleoside-linking phosphate, at several or all phosphodiester linkages. This modification of the oligonucleotide inhibits the degradation of the compound by housekeeping enzymes whose task it is to protect cells from unwanted or un-needed genetic material. Lynx shares with three other companies a co-exclusive license to pending National Institutes of Health ("NIH") patent applications (claims now allowed in the U.S. and Europe) covering all therapeutic applications of this phosphorothioate technology.

Because of its participation in the development of and access to the knowledge and technologies of ABI, the world's largest producer of reagents used in oligonucleotide synthesis, Lynx was able to develop unique economical and proprietary large-scale synthesis and purification processes for phosphorothioate oligonucleotides. This manufacturing capability will be key to the future success of Lynx and is a major differentiating factor between Lynx and its competitors.

These large-scale oligonucleotide production processes have already made it possible for Lynx and its collaborators to produce sufficient quantities of compounds to demonstrate the first systemic *in vivo* antisense effects in several animal cancer models including CML, malignant melanoma and colorectal carcinoma. Furthermore two candidate drugs have entered into a Phase I clinical trial involving systemic drug delivery to cancer patients. These ongoing studies support the proposition that the Company's phosphorothioate oligonucleotides do in fact make their way from the bloodstream into infected cells to exert selective inhibition of cancer cell growth without apparent side effects. The Company's collaborations and other arrangements have resulted, or are expected to result, in exclusive proprietary positions related to a number of antisense oligonucleotide compositions of matter and/or methods of treatment.

Lynx believes that phosphorothioate oligonucleotides are the leading antisense analogues since they are the only backbone for which clinical observations are already in progress.

Lynx's technology and proprietary positions should provide the Company with significant advantages over its competitors in the uses of these compounds.

*Further Analogue Chemistry Developments*

While Lynx's initial phosphorothioates have proven to be exciting drug development candidates, the Company recognizes that further enhancements of phosphorothioates and potentially better analogues are possible. Investigation of such alternatives has been underway and has led to several patent applications. Over the next six to twelve months the Company intends to expand its chemistry research in the promising directions it has identified, focusing on a new proprietary phosphoramidate backbone, targeting mRNA and nuclear double-stranded DNA.

*Phosphoramidate Chemistry*

Lynx has discovered a new DNA backbone built upon phosphoramidate DNA linkages. The oligonucleotide analogues constructed with this novel chemistry have shown marked improvements in antisense efficacy from 10- to 200-fold over currently used phosphorothioates, depending upon the targets and the cell systems used for testing. These results were obtained both at Lynx and in the laboratories of several collaborators and were presented to the scientific community at the First International Antisense Conference of Japan in December, 1994. This new phosphoramidate chemistry, which avoids problems of stereochemical purity associated with the majority of oligonucleotide analogues, has attracted strong interest in the industry. This breakthrough will be developed beginning in 1995 with priorities focused upon *in vivo* testing for toxicity, bio-distribution and efficacy in animal models. Process chemistry will be developed to the point where much larger quantities of phosphoramidates can be synthesized. The higher potency and low toxicity observed to date in cell cultures is quite encouraging, as are the early observations of easy cell penetration.

*DNA Sequencing Technology*

In 1994, as an extension of its expertise in DNA based technology, scientists working at Lynx have demonstrated a totally new method for DNA sequencing which Lynx has acquired exclusively. This technology is based on a system which permits rapid, massively parallel sequencing of relatively short sequences. Briefly described, it would enable the simultaneous identification of all the cDNA (in fact, as many as several hundred thousand templates) present in a single sample. The implications of such a powerful analytical methodology in terms of disease characterization, determination of gene functionality and diagnostic applications thereof, could be highly significant. Because the use of this technology in these applications does not call for further invention but calls, rather, for unique (and proprietary) combinations of state-of-the-art processes, we (and our outside consultants) are quite confident that we should have at least one such application implemented into a system sometime in 1996, with ß-site sales possible as early as 1996. The technology is based on several inventions that are each so novel and original that we predict a very high probability of obtaining solid patent protection. Another implementation could enable us to accumulate whole cDNA libraries far more quickly than is possible with other techniques.

The ability to rapidly identify in-house, disease related DNA sequences should considerably strengthen Lynx's competitive position in the antisense therapeutic arena.

*Lynx Drug Discovery*

Lynx's drug discovery program encompasses a broad range of diseases that includes acute and chronic leukemias, tumoral cancers, arterial restenosis and fibrotic and viral diseases for which no effective cures currently exist. Substantial *in vitro* and, in some cases, *in vivo* data underlie this focus. The diseases under investigation have well-characterized gene targets that are part of the Company's intellectual property portfolio or, in the case of viral diseases, part of the intellectual property portfolio of its corporate partners.

Most leukemias and tumoral cancers develop through modifications to genomic DNA that affect specific genes, causing them to alter the expression of specific proteins with regard to timing, quantity and/or structural form. These complex changes result in a differential growth or proliferation advantage for the diseased cells relative to normal cells, leading eventually to a crowding out or abrogation of normal cellular functions by overproduction of dysfunctional diseased cells. Drugs that selectively modulate the expression of proteins known to be necessary to the aberrant proliferation of cancer cells could cause them to die or to lose their growth advantage over normal cells.

**Lynx Drug Discovery and Development Program**

In the table below and the text that follows, the Lynx clinical and preclinical programs are summarized.

| Therapeutic Application | Estimated # of Total Cases (U.S. only) | # of New Cases per Year (U.S. only) | Market Estimates: Low /High (1) (U.S. only) (in millions) | Product Development Status (2) |
|---|---|---|---|---|
| **Cancer** | | | | |
| AML | N/A | 8,000 | $128 / $715 | Systemic Phase I completed *Ex vivo* Phase I underway |
| CML | 21,000 | 5,000 | 40 / 100 | *Ex vivo* Phase I underway Systemic Phase I underway |
| Malignant Melanoma | N/A | 30,000 | 128 / 960 | Preclinical Phase (*in vivo*) |
| Ovarian | N/A | 25,000 | 250 / 500 | Preclinical Phase (*in vitro*) |
| Colorectal Carcinoma | 1,000,000 | 160,000 | 600 / 4,500 | Preclinical Phase (*in vivo*) |
| **Cardiovascular** | | | | |
| Restenosis (balloon angioplasty procedure) | N/A | 500,000 | 500 / 3,500 | Systemic Phase I underway (outside the U.S.) |
| **Fibrotic Disease** | | | | |
| Keloid | 3,000,000 | N/A | 75 / 500 | Discovery |
| Hypertrophic Scarring | N/A | 1,000,000 | 50 / 500 | Discovery |
| **Antivirals** | | | | |
| HIV | 400,000 | 30,000 | 150 / 1,000 | Preclinical Phase (*in vitro*) |
| HBV (chronic) | 1,000,000 | 300,000 | 80 / 800 | Discovery |
| HCV (chronic) | 2,000,000 | 170,000 | 800 / 8,000 | Discovery |

(1) Assumes every potential patient is treated at costs per treatment equal to best current available treatment or, if no current treatment is available, the cost of treatment for an equally severe disease.

(2) "Discovery" includes research related to the identification of compounds ("lead compounds") active against chosen molecular targets and the characterization of molecular modifications that optimize drug potency. "Preclinical Phase" includes *in vitro* and *in vivo* biological testing in animals of lead drugs as well as formulation and manufacturing work in preparation for human testing.

*Acute Myelogenous Leukemia (AML)*

AML, one of the most aggressive human malignancies, attacks the bone marrow of affected persons. The average survival time after diagnosis for an AML patient who does not undergo treatment is 40-100 days. Induction of remission requires more than one month of hospitalization, often consuming $100,000-$150,000, mostly due to bone marrow transplantation, and antibiotic and immune suppression protocols following chemotherapy. The median duration of remission after conventional treatment is 10-12 months. About 5% to 15% of patients receiving conventional treatment achieve complete remission, and 15% to 25% of these survive five or more years and are considered cured. The median survival period following complete remission is 12-24 months.

Lynx and the University of Nebraska Medical Center ("UNMC") have collaborated for several years in an effort to treat this disease with antisense oligonucleotides directed against p53 (the p53 protein has important nuclear regulatory functions). UNMC has developed the supporting rationale and *in vitro* efficacy data from investigation of the antisense effect in primary bone marrow and peripheral blood samples of patients. They conducted extensive toxicological and pharmacokinetic studies in mice, rats and non-human primates in preparation for the human trials. These studies yielded a large amount of data that is of general use to Lynx's other phosphorothioate research programs and demonstrated encouragingly low toxicity for Lynx's LR 3523 anti-AML drug.

The FDA approved in 1992 an Investigational New Drug ("IND") application filed by Lynx and the UNMC for clinical investigation of Lynx's antisense phosphorothioate drug targeted against the p53 mRNA to treat AML. In April 1994, a Phase I dose escalating trial with LR 3523 was completed at the University of Nebraska Medical Center. No major direct toxicity was detected in association with LR 3523 administration. No adverse events took place during the Phase I trial, further supporting the low toxicity of the antisense drug.

Lynx expects to file a modified Phase II application which takes advantage of recent advances indicating a potential synergy between LR 3523 and current (and inadequate) chemotherapeutic agents.

*Chronic Myelogenous Leukemia (CML)*

CML is also a cancer of the bone marrow and was one of the first cancers shown to be caused by a specific gene defect. In what is commonly known as the "Philadelphia Chromosome Translocation," one gene, identified as the *bcr* gene on chromosome 22, is rearranged and relocated next to another gene, identified as the *abl* gene on chromosome 9, resulting in an abnormal gene coding for the production of a defective *bcr-abl* protein. More than 95% of CML patients have the *bcr-abl* defect, and it is widely believed to be a causative agent of CML. The initial clinical pattern of the disease is a chronic phase, with a median period of time of 3.5 years, followed by a rapid, accelerated phase and culminating in a "blast crisis" phase, marked by elevated levels of immature white blood cells, which usually lead, soon thereafter, to death. The average survival time after diagnosis for a CML patient is four years. In the U.S., approximately 5,000 new cases of CML are diagnosed annually. An estimated 16,000 individuals in the U.S. are affected by CML at any given time.

Currently there are no effective drugs against CML, although survival rates can be improved slightly with chemotherapy. Treatment with interferon has been used increasingly over the last 5-8 years but has resulted in limited success in approximately 25% of the treated patients. In rare cases, a patient may be cured via allogeneic bone marrow transplantation from a histocompatible donor. In an adaptation of this technique, known as autologous bone marrow transplantation therapy, some of the patient's own bone marrow is removed and stored under highly specialized conditions. The patient's cancer is then treated with aggressive levels of radiation and/or chemotherapy that kill virtually all cancer and healthy bone marrow cells. The patient is then infused with his/her own stored bone marrow in an effort to re-establish immune system functions. Autologous bone marrow transplantation therapy may be undertaken only once or twice due to the severity of the chemotherapy and radiation. However, the patient is rarely cured, since the Philadelphia Chromosome Translocation, or the *bcr-abl* gene, will have been reintroduced into the patient via the infused bone marrow.

Phosphorothioate oligonucleotides complementary to *bcr-abl* may in principle have therapeutic value. Because the *bcr-abl* protein is expressed in more than 95% of CML patients, the elimination or down-regulation of that protein might deprive leukemia cells of a component necessary for growth and proliferation. Alternatively, phosphorothioate oligonucleotides complementary to the *c-myb* protooncogene could also have therapeutic value. The protooncogene *c-myb* protein is known to regulate cell cycle transitions necessary for cellular proliferation in many types of cells, particularly bone marrow cells that are involved in a variety of leukemias. Because leukemic (CML) cells proliferate more rapidly than normal cells in the bone marrow pool, a temporary deprivation of *c-myb* protein by antisense inhibition of its mRNA could provide a growth advantage to normal cells over leukemic cells resulting in a diminution of the CML infected cells to a level where the immune system could effect more permanent control of the cancer.

Lynx and its collaborators have demonstrated efficacy *in vitro* and *in vivo* for antisense phosphorothioate oligonucleotides against CML, using both the *bcr-abl* (LR 3002, LR 3003) and the *c-myb* (LR 3001) mRNAs as targets. In both investigations, SCID mice were injected with human leukemia cell lines that proliferated aggressively, mimicking the progress of the disease in humans. Lynx's compounds were able to markedly attenuate the progress of the disease relative to controls, with none of the toxicities characteristic of treatment by conventional drugs. Two INDs for clinical investigations of *c-myb* antisense were approved in the third quarter of 1994 for both systemic treatment of patients in "blast crisis" and for *ex vivo* peripheral blood stem cell purging of patients undergoing autologous transplant.

*Malignant Melanoma*

Malignant melanoma has grown more rapidly than most other cancers, with an average increase of 4% per year since 1973. The number of cancer deaths (per 100,000 population) in the United States attributed to malignant melanoma, increased 50% for women and 122% for men during the years 1959 to 1989. In 1993 the incidence of malignant melanoma in the United States was 32,000, with more than 6,800 deaths reported in the same period. In collaboration with academic scientists, Lynx has shown that certain of its antisense compounds possess significant *in vitro* activity against primary human malignant

melanoma cells. These were recently demonstrated to show activity *in vivo*, also (in SCID mice) against aggressively proliferating human solid tumors. Lynx currently is exploring with its collaborators appropriate doses and dose-timing, and possible combination therapies, in animal models, in preparation for human clinical investigations.

*Ovarian Cancer: A Model System for the Major Solid Tumors*

Lynx has recently licensed rights to a new antisense target, the insulin-like growth factor-1 (IGF-1) receptor. The IGF-1 receptor has been shown in a series of independent studies in several laboratories to be mandatory for tumor growth but not essential for normal cell survival. Cells made even partially deficient in these critical receptors are unable to support tumor formation or development.

It has been known for many years that the growth of a tumor depends not only on the rate of cell proliferation but on the rate of cell death (apoptosis). Inhibition of apoptosis is perhaps the single most important factor in the evolution of a normal cell toward the cancerous state. Studies in the laboratories of the Imperial Cancer Research Fund in the UK have shown that IGF-1 working through the IGF-1 receptor blocks cells from dying normally through apoptosis. Furthermore, Lynx's collaborator has shown that tumor cells treated with antisense oligonucleotides to the IGF-1 receptor undergo massive apoptosis when implanted in animals. Tumor cells treated with control oligonucleotides double in number during the same period.

Suppression of the IGF-1 receptor through the antisense strategy blocks tumorigenesis in cancer cells derived from lung, breast, prostate, melanoma and ovaries. Preclinical experiments using ovarian cancer as a model have been designed and will be carried out at the MD Anderson Cancer Institute. Ovarian cancer has been selected as the initial clinical target for the new technology because of the need for improved chemotherapy and the relatively short time course of the disease.

Approximately 25,000 new cases of ovarian cancer are reported each year in the United States. Despite improvements in chemotherapy, the mortality rate for this disease remains about 60%. Lynx's antisense approach will address not only the primary tumor, but the metastases that make ovarian cancer so lethal. The antisense drug could well complement existing therapy and make it possible to obtain positive responses in a larger fraction of the treated patient population.

*Colorectal Carcinoma*

About 160,000 new cases of colorectal cancer are diagnosed each year, and about 62,000 individuals died from the disease in 1992. Surgery, at times combined with radiation, is currently the most effective method of treating colorectal cancer. Chemotherapy is generally not effective. One of Lynx's antisense compounds has been shown by academic collaborators to have significant *in vitro* activity against human malignant colorectal cells. More recently, promising *in vivo* activity against aggressive proliferation of human colorectal tumor carcinoma (in SCID mice) has been shown by intravenous injection of one of Lynx's compounds without any apparent toxic side effects. Lynx and its collaborators will continue to evaluate these compounds in animals through 1995.

*Restenosis*

Restenosis after coronary angioplasty is a major clinical problem. There are about 500,000 balloon angioplasty procedures performed each year in the U.S. Within six months, clinically important stenosis (reocclusion) occurs at the site of angioplasty in 35 to 45 percent of patients who have undergone a single-vessel procedure, and in 50 to 60 percent of those who have undergone multi-vessel angioplasty. A number of studies have demonstrated that the hallmark of restenosis is the abundant proliferation of neointimal smooth muscle cells. It has been shown that antisense phosphorothioate oligonucleotides targeted to several cell growth regulatory proteins, including c-*myb* and c-*myc*, inhibit the growth of human artery smooth muscle cells in *in vitro* cultures. Promising results have also been reported *in vivo* in animal models.

On August 5, 1994 Lynx signed an agreement with The Wellcome Foundation, Ltd. ("Wellcome") covering the restenosis project. Under the terms of the agreement, Wellcome will pay Lynx up to $30 million for rights to develop and market Lynx's LR 3280 antisense oligonucleotide targeting c-*myc* for the treatment of restenosis following balloon angioplasty. Human clinical trials began in November, 1994 in Argentina. Wellcome will assume all costs for drug development and marketing. In addition, Lynx retains and shares in the ultimate sales revenue from a commercial product.

*Fibrotic Diseases*

Several cutaneous diseases exhibit tissue fibrosis characterized by excessive collagen deposition. Included in this category of skin disorders are both systemic and localized scleroderma, hypertrophic scarring and keloids. There are currently about 3 million people in the U.S. suffering from disfigurement by keloids, and approximately 10% of the ten million surgeries performed annually in the U.S. will develop hypertrophic scarring. The disfiguring and debilitating aspects of these diseases can be controlled or eliminated by suppressing over-production of Type I collagen which has been implicated as the primary collagen molecule involved in the diseased state.

*Human Immunodeficiency Virus*

There were approximately 400,000 cases of AIDS reported in the United States by June, 1994, with approximately 60,000 new cases reported since September, 1993. Approximately 1-1.5 million additional people in the United States are estimated to be currently infected with the HIV virus. HIV-infected individuals are likely to eventually develop AIDS, which causes immune system collapse, leaving the victim susceptible to opportunistic infections and cancer. There are currently no cures for AIDS. AZT, ddI, and d4T, the three approved anti-viral drugs currently used palliatively, have significant toxic side effects and have induced resistance in a number of HIV viral strains.

Lynx's search for antisense compounds that would inhibit the progression of HIV began several years ago and now involves several collaborations with scientists at the National Instutite of Health ("NIH") and Chiron. The potential therapeutic activity of Lynx's antisense compounds as well as their ability to overcome viral resistance are being tested in a relatively new long-term bioassay developed at the NIH. A unique targeting and testing protocol, also developed at the NIH, suggests that it may be possible to circumvent drug resistance while using substantially reduced quantities of drug that

achieve near total inhibition of viral proliferation. A specific antisense oligonucleotide targeting the viral *rev* gene has been selected for the evaluation in anticipation of human clinical trials.

*Hepatitis B Virus / Hepatitis C Virus*

Lynx and Chiron have established a collaboration to discover and develop phosphorothioate compounds against hepatitis B and C viruses (HBV and HCV), utilizing Lynx's proprietary chemistry and manufacturing expertise and Chiron's knowledge of the basic molecular biology of the viruses. Approximately 200-300 million people worldwide (1 million in the USA) are infected with HBV. Chronic infection with HBV can lead to liver cirrhosis and hepatocellular carcinoma, end-stage diseases which account for more than 1 million deaths worldwide every year.

The identification of the HCV virus at Chiron several years ago has been widely recognized as a major contribution to virology and the development of compounds against this virus. HCV is causally linked to chronic hepatitis and liver cirrhosis and, possibly, hepatocellular carcinoma. Approximately thirty million individuals are infected worldwide and two million are infected in the U.S with HCV.

*Pharmacokinetics, Toxicity Studies / LYNXNebraska*

Lynx has established a wholly owned subsidiary in Omaha, Nebraska to carry out pharmacokinetic and toxicological studies in animals in support of Lynx's preclinical interests and IND applications, and to evaluate promising drug candidates selected from Lynx's analogue and drug discovery programs. This subsidiary is temporarily located in laboratories provided by the UNMC for Lynx's exclusive use to take advantage of existing expertise in oligonucleotide pharmacokinetic and toxicological methodologies. UNMC has pioneered many of the methods used to evaluate cellular uptake and tissue/organ distribution of phosphorothioate oligonucleotides in rodents and primates and has conducted, to date, all of the pre-clinical and on-going clinical toxicological studies in support of the joint Lynx/UNMC AML Phase I clinical trial.

Lynx has also installed at that subsidiary state-of-the-art DNA analysis computer systems to be used in conjunction with proprietary software algorithms invented by UNMC scientists. This effort, which is expected to yield unique antisense targeting opportunities of mRNA and nuclear double stranded DNA, is part of Lynx's funded research program at UNMC.

## Manufacturing

Lynx has concentrated much of its research and development to date on chemical processes and scale-up technology to produce and analyze phosphorothioate oligonucleotides of the highest quality and in quantities sufficient to support not only all of its collaborative drug research efforts but also the needs of pre-clinical and clinical investigations, toxicological evaluation and early commercial development. Lynx's focus has been on fundamental improvements to the complex synthesis chemistry and purification processes, coordinated with the design and development of large-scale pilot production equipment uniquely suited to the demands of oligonucleotide synthesis on

solid phase supports. These efforts have led to a number of issued and pending patents. Currently, Lynx has assignment rights to four issued patents, one outstanding patent application and a sole license to one patent pending, which relate to proprietary reagents and processes unique to the manufacture of phosphorothioate oligonucleotides. Lynx's technology is capable of producing all the drug needed for all its projected clinical investigations. As a result of these efforts, Lynx has also achieved a substantial reduction of the basic manufacturing costs of its products.

Lynx has established standard operating procedures and a documentation control system for manufacturing, process monitoring and final product analysis that enable it to produce bulk pharmaceutical products for clinical investigations under GMP in compliance with FDA regulatory requirements. In August 1992, Lynx was granted a license to manufacture drugs by the State of California, Department of Health Services, Food and Drug Branch. A significant portion of Lynx's activities is directed towards the development of technology to meet anticipated future commercial scale manufacturing needs.

Lynx currently has proven technology in an automated large scale synthesis process system that will accommodate annual production capacities well able to support the projected clinical development and commercialization needs of the next five years. By June 1995, Lynx could manufacture as much as 3 kgs/year.

## Lynx Collaborative Strategy

Lynx currently develops its antisense drugs primarily through Lynx-sponsored external molecular biology and clinical collaborations, while reserving its in-house resources for chemical research and the development of oligonucleotide analogue manufacturing technologies. This approach has allowed Lynx to leverage its chemical expertise with the molecular biology, pharmacology and clinical expertise of selected collaborators. The resulting research has thus drawn on resources and skills far greater than the Company could have assembled alone in its short history and with its limited finances. It is important to recognize the value of this strategy, which allows the Company to defer investing in expensive skills and technologies until it can ascertain their relevance to specific product developments.

One area where additional investments are justified is the creation of in-house capabilities for *in vitro* and *in vivo* assays of antisense compounds. Enough positive results are emerging from the collaborations to justify refinements that would be inadequately pursued in academic environments. For example, sequences that have been shown to successfully target certain mRNAs now need to be optimized to enhance target specificity and biological activities. New analogues need to be compared to the conventional phosphorothioates used by Lynx's various collaborators. Pre-clinical dosing and dose-timing regimens necessary for Phase I/II clinical trials need to be established. Finally, exciting new modalities of use of antisense compounds need to be systematically explored. One such modality, borne of recent studies, is a proprietary combination of antineoplastic agents and antisense oligonucleotides that has been shown by collaborators to exhibit synergistic efficacy *in vitro*. Once these capabilities are added to Lynx's existing ones, the drug discovery and development programs should progress more comprehensively and at a faster rate.

**Non-Corporate Collaborations /Sponsored Research**

Lynx has entered into a number of collaborations aimed at enhancing and extending its research and development activities. The following describes the Company's non-corporate collaborations:

- A Sponsored Research Agreement with the UNMC is directed at the discovery of targets and development of effective drugs against metastatic breast cancer and pancreatic cancer; heavy metal detoxification with phosphorothioate oligonucleotides; the pharmacology and new drug delivery modes of oligonucleotide analogues; and the further development of computer based technology to identify unique and active sites in target RNA and DNA.

- A Sponsored Research Agreement with the University of Pennsylvania is directed at *in vivo* experiments in leukemia, malignant melanoma in mice; at the study of oligonucleotide agents that dramatically reduced Polycythemia Vera (PV) in primary cells of PV patients; at the study of the mechanism and kinetics of uptake; at the fate of phosphorothioate oligonucleotides in malignant tumor cells; and at exploratory investigations of breast cancer antisense targets. Pre-clinical efficacy studies have been completed for filing a Phase I IND for systemic treatment of acute leukemia. A Phase I study of *ex vivo* bone marrow purging of CML patients with a c-*myb* antisense phosphorothioate oligonucleotide is underway. Recently a Phase I trial for systemic treatment with the same drug was launched.

- A Sponsored Research Agreement with The Jefferson Cancer Institute (Philadelphia) is directed at further *in vivo* experiments in CML and acute leukemia and at *in vitro* characterization of neuroblastoma and colorectal cancer treatment modes. *In vivo* validation of combination therapies utilizing antisense oligonucleotides and anti-neoplastic agents is on-going. Basic research is also aimed at identifying other mRNA targets that are products of nuclear protooncogenes and oncogenes, and at characterizing receptor-mediated mechanisms associated with signal transduction pathways in cancer.

- A Sponsored Research Agreement with Interventional Cardiology Group at the Thomas Jefferson University Medical Center is focused on *in vitro* studies and *in vivo* experiments using pigs, to develop anti-restenosis drugs based on oligonucleotides. This study has progressed to clinical trials in Argentina and is part of the Wellcome agreement.

- A Cooperative Research And Development Agreement (CRADA) with NIH scientists is aimed at developing a strategy for antisense oligonucleotide therapy of brain cancers such as AIDS-related B-cell lymphoma and glioblastoma through *in vitro* assays and *in vivo* studies of rats. An additional CRADA encompasses *in vivo* studies of Kaposi's Sarcomas.

- A Collaboration with the Polish Academy of Sciences is aimed at developing chiral phosphorothioate synthesis technology.

- A Sponsored Research Agreement with Thomas Jefferson University is designed to take advantage of new discoveries on the role of certain growth factors in tumorigenisis and apoptosis.

- A Sponsored Research Agreement with MD Anderson Cancer Center to develop antisense drugs for malignant melanoma, ovarian cancer and to research new strategies for the control of metastases and drug resistance.

## Corporate Collaborations

Lynx has entered into Corporate Collaborations with several firms to utilize others' expertise and eliminate the costs and lag-time that would be involved were Lynx to develop technology in the fields in which these firms specialize.

- The Chiron collaboration targets HIV, HCV and HBV with Chiron assuming technical and financial responsibility for all developmental, pre-clinical and clinical work up to and including Phase III. At the successful conclusion of the programs, Lynx would own the manufacturing rights and Chiron the marketing rights. A profit sharing arrangement for each disease category has been established which provides generally for a 50/50 sharing between Lynx and Chiron of gross profits (as defined) from sales of any resulting HIV drug and a 22.5/77.5 sharing (in favor of Chiron) of gross profits (as defined) from sales of any resulting hepatitis (HCV or HBV) drug.

- The Company has entered into an agreement with Wellcome for the restenosis project. Under the terms of the agreement, Wellcome will pay Lynx up to $30 million in licensing fees and milestone payments for rights to develop and market Lynx's LR 3280 antisense oligonucleotide targeting c-*myc* for treatment of restenosis following balloon angioplasty. Lynx will retain manufacturing rights and Wellcome will manage and fund the clinical trial program and market the resulting drug. Human clinical trials began in November, 1994 in Argentina.

## Research and Development Expenditures

Lynx has devoted its efforts primarily to research and development. Research and development expenses were $7.7 million for the year ended December 31, 1994 and $6.2 million for the year ended June 30, 1993.

**Lynx Scientific Advisors**

| <u>Name</u> | <u>Position</u> |
|---|---|
| Sydney Brenner, M.B., D. Phil. | Honorary Professor of Genetic Medicine, University of Cambridge Clinical School, Cambridge, England, and a member of the Scripps Research Institute, La Jolla, California (through December 1994) |
| Bruno Calabretta, M.D., Ph.D. | Professor, Department of Microbiology, Jefferson Cancer Institute, Thomas Jefferson University, Philadelphia, Pennsylvania |
| Alan Gewirtz, M.D. | Associate Professor of Medicine, University of Pennsylvania School of Medicine, Philadelphia, Pennsylvania |
| Patrick Iversen, Ph.D. | Associate Professor, Department of Pharmacology, University of Nebraska Medical Center and Eppley Institute for Research on Cancer and Allied Diseases, Omaha, Nebraska |
| James W. Larrick, M.D., Ph.D. | Scientific Director, Palo Alto Institute for Molecular Research |
| Robert L. Letsinger, Ph.D. | Professor of Chemistry, Department of Chemistry, Northwestern University, Evanston, Illinois |
| Patricia Marion, Ph.D. | Senior Research Scientist, Division of Infectious Diseases, Department of Medicine, Stanford University School of Medicine, Stanford, California |
| John H. Richards, Ph.D. | Professor of Organic Chemistry, Division of Chemistry, California Institute of Technology, Pasadena, California |
| Wojciech J. Stec, Ph.D. | Director, Department of BioOrganic Chemistry, Center of Molecular & Macromolecular Studies, Polish Academy of Sciences, Lodz, Poland |
| Andrew Zalewski, M.D. | Director, Cardiovascular Research Center, Division of Cardiology, Thomas Jefferson University, Philadelphia, Pennsylvania |

**Intellectual Property**

Lynx acquired significant technology from Applied Biosystems, Inc. (ABI, now a division of Perkin Elmer Corporation), has developed a number of proprietary technologies and holds a significant amount of licenses to intellectual properties. ABI assigned or transferred to Lynx all its rights, title and interest to a number of therapeutically relevant technologies, subject to reservations of some rights limited to fields other than therapeutics. Sole licenses and non-exclusive licenses to additional technologies were also granted. In summary, assignments to Lynx were made for five issued patents which expire from 1999 to 2010, and seven patent applications, two sole licenses were granted and two non-exclusive licenses were granted. These intellectual properties include the assignment of the co-exclusive license to a pending patent owned by the NIH covering the use of phosphorothioate oligonucleotides as human therapeutics, the assignment of certain exclusive licenses to Temple University patents and patent applications relating to the treatment of various cancers and the assignment of an exclusive license to an issued and pending University of Texas, M.D. Anderson Cancer Center patent relating to the systemic and *ex vivo* treatment of various cancers, as well as exclusive rights to certain reagents and processes important to the manufacture of Lynx's products. ABI has also granted non-exclusive rights to manufacturing know-how for certain other reagents and monomers used in the manufacture of Lynx's oligonucleotide products. All of the licenses granted by ABI are royalty-free.

On June 1, 1992, Lynx entered into an agreement with the UNEMED Corporation to exclusively license six UNMC patent applications relating to oligonucleotide compositions of matter to treat AML, certain other proprietary oligonucleotides for the treatment of heavy metal poisoning and hematochromatosis disease, unique genomic DNA and RNA antisense targeting methods to treat various diseases, gene targets related to liver cancers and certain methods related to the physiological manipulation of phosphorothioate oligonucleotides to augment therapy. In addition, the UNEMED Corporation is exclusively licensing to Lynx certain know-how and software for the identification of highly conserved information domains in RNA and double-stranded DNA that may serve as unique targets for antisense and antigene oligonucleotides. Lynx has also entered into a sponsored research agreement with the UNMC and Eppley Institute for Research in Cancer for mechanistic and developmental studies associated with the Phase I clinical trial for treatment of AML with Lynx's antisense drug OL(1)p53.

Lynx has licensed from Temple University, Thomas Jefferson University and the University of Pennsylvania certain patent properties relating to the *bcr-abl*, b-*myb*, c-*myb*, c-*kit*, cyclin-D1 genes and cancer therapies utilizing antisense drugs in combination with anti-neoplastic agents. Under the applicable agreements, Lynx will pay royalties to Temple University, Thomas Jefferson University and the University of Pennsylvania. A licensing agreement with Thomas Jefferson University gives Lynx exclusive rights to the use of antisense to *c-myc* for use in the treatment of restenosis. An additional license extends the coverage to include the use of c-*myc* antisense in the treatment of fibrotic diseases related to the over-production of collagen. Applications of *c-myc* antisense to restenosis have been sublicensed to The Wellcome Foundation, Ltd. In the area of cancer, Lynx licensed from Thomas Jefferson University rights to develop antisense drugs targeting the insulin-like growth factor receptor.

**Government Regulation**

The FDA and comparable agencies in foreign countries impose substantial pre-market approval requirements upon the introduction of therapeutic pharmaceutical products through lengthy and detailed preclinical and clinical testing procedures and other costly and time-consuming procedures.   Satisfaction of these requirements, which includes demonstrating to the satisfaction of the FDA that the product is both safe and effective, typically takes several years or more, depending on the type, complexity and novelty of the product.   Government regulation also affects the manufacture and marketing of pharmaceutical products.   The effect of government regulation may be to delay marketing of any new products for a considerable or indefinite period of time, to impose costly compliance procedures and to diminish any competitive advantage that Lynx may attain. It will take years before marketing approvals are obtained, if at all.   There can be no assurance that FDA or other regulatory approval for any products developed by Lynx will be granted on a timely basis, if at all, or, if granted, that such approval will cover all clinical indications for which Lynx seeks approval or will not contain significant limitations on use. Any delay in obtaining, or failure to obtain, such approvals would adversely affect Lynx's ability to generate product revenue.

Clinical trials will seek safety data as well as efficacy data and will require substantial time and significant funding.   There can be no assurance that clinical trials can be started or completed successfully within any specified time period, if at all, with respect to any of Lynx's products. There can be no assurance that such testing will show any product to be safe or efficacious.  Furthermore, Lynx or the FDA may suspend clinical trials at any time if it is felt that the subjects participating in such trials are being exposed to unacceptable health risks.  There can be no assurance that Lynx will not encounter problems in clinical trials which will cause Lynx to delay or suspend clinical trials.  Moreover, if regulatory approval of a product is granted, such approval may impose limitations on the indicated uses for which the product may be marketed.   Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities are subject to continual review and periodic inspections; and later discovery of previously unknown problems with a product, manufacturer or facility may result in restrictions on such product or manufacturer, including withdrawal of the product from the market.   Further, additional government regulation from future legislation or administrative action may be established which could also prevent or delay regulatory approval of Lynx's products.

Lynx currently does not have extensive clinical testing or regulatory compliance experience.  Lynx will need to hire additional personnel skilled in the clinical testing and regulatory compliance processes if it develops products with commercial potential.

**Competition**

There are many companies, both private and publicly traded, that are conducting research and development activities on technologies and products similar to or competitive with Lynx's antisense technology and products.  Lynx believes that the industry-wide interest in investigating the potential of such technologies will continue and will accelerate as the techniques which permit the design and development of drugs based on such technologies become more widely understood. There can be no assurance that Lynx's competitors will not succeed in developing products based on oligonucleotide technology or other novel

technologies which are more effective than any that have been or are being developed by Lynx.

Competitors of Lynx engaged in all areas of biotechnology and drug discovery in the U.S. and other countries are numerous and include, among others, major pharmaceutical and chemical companies, specialized biotechnology firms, universities and other research institutions. Many of Lynx's competitors have substantially greater financial, technical and human resources than Lynx. In addition, many of these competitors have significantly greater experience than Lynx in undertaking pre-clinical testing and human clinical trials of new pharmaceutical products and obtaining FDA and other regulatory approvals of products for use in humans. Thus, competitors may succeed in obtaining FDA approval for products more rapidly than Lynx.

## Patents and Proprietary Rights

Lynx's success will depend in part on its ability to obtain patent protection for its products both in the U.S. and other countries. Lynx has filed and will continue to file applications, as appropriate, for patents covering both its products and processes and has licensed a number of patents and patent applications covering certain of its compounds. Some of the patent applications owned by Lynx have already issued, but no assurance can be given that patents will issue from any of the pending applications or that, if patents do issue, the claims allowed will be sufficiently broad to protect Lynx's technology. In addition, no assurance can be given that any patents issued to or licensed by Lynx will not be challenged, invalidated, infringed or circumvented, or that the rights granted thereunder will provide competitive advantages to Lynx.

The commercial success of Lynx will also depend in part on Lynx neither infringing patents issued to competitors and on others not breaching the technology licenses upon which Lynx's products might be based. There can be no assurance that Lynx will be able to obtain a license to any third party technology that it may require to conduct its business or that, if obtainable, such technology can be licensed at a reasonable cost. Failure by Lynx to obtain a license to any technology that it may require to commercialize its technologies or products may have a material adverse effect on Lynx.

Litigation, which could result in substantial costs to Lynx, may also be necessary to enforce any patents issued to Lynx or to determine the scope and validity of other parties' proprietary rights. If the outcome of any such litigation is adverse to Lynx, Lynx's business could be adversely affected. Lynx may have to participate in interference proceedings declared by the U.S. Patent and Trademark Office, which could result in substantial cost to Lynx to determine the priority of inventions. Furthermore, Lynx may have to participate at substantial cost in International Trade Commission proceedings to abate the importation of products which would compete unfairly with products of Lynx.

Lynx also relies on trade secrets and proprietary know-how, which it seeks to protect in part by confidentiality agreements with its collaborators, employees and consultants. There can be no assurance that these agreements will not be breached, that Lynx would have adequate remedies for any breach or that its trade secrets will not otherwise become known or be independently developed by competitors.

**Employees**

As of March 10, 1995, Lynx employed 45 full-time employees, of which 39 were engaged in research and development and manufacturing activities and 6 in finance and administrative activities. Lynx believes that it has been highly successful in attracting skilled and experienced scientific personnel; however, competition for such personnel is intense. None of Lynx's employees are covered by collective bargaining agreements and management considers relations with its employees to be good.

**Item 2.          Properties**

Lynx's corporate headquarters and principal research and development facilities are located in Hayward, California, in a building totaling approximately 43,000 square feet. The Company currently occupies approximately 30,000 square feet of space and expects to increase its occupancy to 43,000 square feet by July 1995. The building is leased through July 2003 and the Company has options to renew the lease for two additional periods of five years each.

Lynx believes that if it achieves its anticipated growth rate it will require additional laboratory and office space. Accordingly, Lynx has first right of refusal on space in three adjacent buildings totaling 84,000 square feet. Also, Lynx has a first right of refusal on two parcels of adjacent land totaling approximately 7 acres. Lynx believes it is positioned to obtain the space needed to accommodate its growth. There can be no assurance, however, that such additional space will become available, when needed, on favorable terms, if at all.

**Item 3.          Legal Proceedings**

There are currently no material legal proceedings to which the Company is a party or of which any of the Company's property is the subject.

**Item 4.          Submission of Matters to a Vote of Security Holders**

During December 1994, the Company commenced the solicitation of proxies pursuant to Regulation 14 under the Securities Exchange Act of 1934 with respect to its Annual Meeting of Stockholders which occurred on January 24, 1995. At the Annual Meeting, the stockholders of the Company voted on proposals: (i) to elect six directors to serve for the ensuing year and until their successors are elected; (ii) to approve an amendment to the Company's Certificate of Incorporation to increase the authorized number of shares of Common Stock from 50,000,000 to 120,000,000 shares; (iii) to approve the Company's 1992 Stock Option Plan, as amended, to increase the aggregate number of shares of Common Stock authorized for issuance under such plan to 14,000,000 shares; and (iv) to ratify the selection of Ernst & Young LLP as independent auditors of the Company for its fiscal year ending December 31, 1994. Each of the foregoing proposals was approved by the Company's stockholders, and information with respect thereto will be submitted as required by this Item in the Company's report on Form 10-Q for the fiscal quarter in which such meeting occurred.

A copy of the Company's definitive proxy materials with respect to the matters approved by the stockholders as described above has been duly filed with the Securities and Exchange Commission.

## PART II

**Item 5.**        **Market for Registrant's Common Equity and Related Stockholder Matters**

There is currently no established public trading market for the Company's Common Stock. The Company's Common Stock was subject to certain restrictions on transfer as set forth in the Company's Bylaws, which restrictions expired on September 30, 1994. Although the Company's Common Stock has been registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company has not listed its Common Stock on any exchange or on the NASDAQ National Market.

The Company also has outstanding Series B Preferred Stock, the shares of which are convertible into Common Stock on a ten-for-one basis (i.e., ten shares of Common Stock for each one share of Preferred Stock). The Company's Series B Preferred has not been registered pursuant to the Exchange Act and has not been listed on any exchange or on the NASDAQ National Market. There is currently no established trading market for the Company's Series B Preferred Stock.

As of March 10, 1995, there were approximately 3,300 stockholders on record of the Company's Common Stock, 22 stockholders on record of the Company's Series B Preferred Stock.

The Company has not paid any dividends on its Common Stock or Series B Preferred Stock and does not anticipate the payment of dividends in the foreseeable future. The Company expects that any future earnings will be retained and applied toward the development of the Company's business.

**Item 6.        Selected Consolidated Financial Data (in thousands, except per share data)**

| | Year Ended Dec. 31, 1994 | Six-Month Period Ended Dec. 31, 1993 (2) | Fiscal Year Ended June 30, | | |
| | | | 1993 | Predecessor Division (1) | |
| | | | | 1992 | 1991 |
| --- | --- | --- | --- | --- | --- |
| Consolidated Statements of Operations (in thousands, except per share amounts) | | | | | |
| Revenues | $ 4,699 | $    183 | $ 1,238 | $    998 | $    593 |
| Operating expenses: | | | | | |
|    Costs of product sales and other revenue | 742 | 110 | 2 | 644 | 295 |
|    Research and development expenses | 7,715 | 3,321 | 6,194 | 2,004 | 801 |
|    General and administrative expenses | 1,768 | 650 | 1,102 | 470 | 340 |
| Total operating costs and expenses | 10,225 | 4,081 | 7,298 | 3,118 | 1,436 |
| Loss from operations | (5,526) | (3,898) | (6,060) | (2,120) | (843) |
| Interest income, net | 506 | 75 | 243 | - | - |
| Net loss | $(5,020) | $(3,823) | $(5,817) | $(2,120) | $   (843) |
| Net loss per share | $  (0.48) | $  (0.56) | $  (0.82) | | |
| Shares used in per share computation | 10,391 | 6,828 | 7,072 | | |

| | December 31, | | | June 30, Predecessor Division (1) | |
| | 1994 | 1993 | 1993 | 1992 | 1991 |
| --- | --- | --- | --- | --- | --- |
| Consolidated Balance Sheet Data (in thousands) | | | | | |
| Cash and short-term investments | $ 12,246 | $  2,383 | $  7,014 | $     5 | $    - |
| Working capital | 11,702 | 891 | 6,408 | 133 | 82 |
| Total assets | 15,142 | 4,857 | 7,396 | 452 | 326 |
| Total debt (incl. capital leases) | - | - | - | - | - |
| Stockholders' equity | 14,044 | 2,930 | 6,744 | 342 | 273 |

(1)   Consolidated Balance Sheet as of June 30, 1992 and 1991, and Consolidated Statements of Operations data for each of the two years in the period ended June 30, 1992, is for the Company's predecessor, the Therapeutics Division of Applied Biosystems, Inc., now a wholly-owned subsidiary of Perkin Elmer Corporation. Share and per share data prior to 1993 is not presented for the predecessor because

the predecessor was a division and such information is not meaningful.  See Note 1 of the Notes to Consolidated Financial Statements.

(2)   In July 1993, the Company changed its fiscal year end from a year ending June 30 to a calendar year.  See Management Discussion and Analysis of Results and Operations for an analysis of the unaudited results of operations for the year ended December 31, 1993.

**Item 7.        Management's Discussion and Analysis of Financial Condition and Results of Operation**

**Overview**

Since its inception in July 1989 (as a division of Applied Biosystems, Inc. "ABI"), Lynx Therapeutics, Inc. ("Lynx") has devoted its efforts toward research, drug discovery, and development programs. Lynx has been unprofitable since its inception and expects to incur substantial and increasing losses for the next several years, due primarily to the expansion of its research and development programs, including preclinical studies, clinical trials, and manufacturing scale-up. As of December 31, 1994, Lynx's accumulated deficit was approximately $14.7 million (the accumulated deficit including Lynx's operations as a division of ABI as of December 31, 1994 was approximately $18.8 million). Lynx does not anticipate that it will generate significant revenues and profits, if any, from the commercial sale of its products for several years at least. There can be no assurance, however, that Lynx will ever successfully develop and market any of its proposed products or that it will ever be able to achieve or sustain profitability.

Lynx's business is subject to significant risks, including the risks inherent in its research and development efforts, uncertainties associated with obtaining and enforcing patents, the lengthy and expensive regulatory approval process, and possible competition from other products. Even if Lynx's products appear promising at an early stage of development, they may not reach the market for a number of reasons. Such reasons include, but are not limited to, the possibilities that the drugs are found to be toxic or ineffective during clinical trials, the failure to receive necessary regulatory approvals, the difficulty to manufacture on a large scale, or the inability to market the drug due to proprietary rights of third parties.

**Results of Operations**

*Years Ended December 31, 1994 and (unaudited) 1993*

*Revenue*

Lynx had total revenues of $4.7 million for the year ended December 31, 1994, which consisted of a $4.0 million license fee received in connection with Lynx's collaborative research and development agreement with The Wellcome Foundation, Ltd. ("Wellcome"), approximately $600,000 in sales of compound relating to the Wellcome agreement, and approximately $100,000 in grant revenue. This is compared to $207,000 for the year ended December 31, 1993, which consisted primarily of sales of compound to a third party. Lynx does not anticipate that it will generate profits and significant revenues from the commercial sale of its products for several years. Lynx expects that if any revenues are generated during the next several years, nearly 100% of those revenues will be of a research nature and related costs will approximate such revenues. There can be no assurance, however, that Lynx will ever generate significant product revenues.

*Operating Expenses*

Costs of product sales and other revenue were $742,000 for the year ended December 31, 1994, compared to $110,000 for the year ended December 31, 1993. The increase is due primarily to increased materials and labor used in the manufacture of compounds sold.

Research and development expenses were $7.7 million for the year ended December 31, 1994 compared to $7.3 million for the year ended December 31, 1993. The increase was due primarily to increases in personnel, funding to various laboratories under collaborative research agreements, and patent and licensing expenses. Lynx expects its research and development expenses to continue to increase due to planned spending for ongoing research activities and new research applications.

General and administrative expenses were $1.8 million for the year ended December 31, 1994, compared to $1.4 million for the year ended December 31, 1993. The increase in expense was due primarily to increases in personnel, legal services, insurance, and corporate development activities. General and administrative expenses are expected to continue to increase to support growth in research and development efforts and corporate development activities.

*Other*

Interest income was $510,000 for the year ended December 31, 1994 compared to $221,000 for the year ended December 31, 1993. The increase in interest income was due primarily to a higher average cash balance during the year ended December 31, 1994 as compared to the year ended December 31, 1993.

Lynx has incurred losses since inception and therefore has not recorded a provision for income taxes. Lynx's losses through November 20, 1992 are included in the consolidated income tax returns of Applied Biosystems, Inc. or Applied Biosystems' parent. Lynx's federal net operating loss carryforward as of December 31, 1994 of approximately $12.0 million, compared to approximately $7.6 million as of December 31, 1993, may be used to offset future taxable income. Utilization of the net operating loss carryforwards may be subject to a substantial annual limitation due to the ownership change provisions of the Internal Revenue Code of 1986.

*Earnings per Share*

The net loss per share for the year ending December 31, 1994 was $(0.48) as compared to $(1.26) for the year ended December 31, 1993. On September 30, 1994, 11,358,640 shares of Series A Preferred Stock were converted to Common Stock (see Note 6, Notes to Consolidated Financial Statements). The net loss per share for the year ending December 31, 1994 would have been $(0.27) if the Series A Preferred shares were converted to common shares on January 1, 1994.

*Years ended June 30, 1993 and 1992*

*Revenue*

Lynx had total revenues of $1.2 million for the year ended June 30, 1993, compared to $1.0 million for the year ended June 30, 1992. Fiscal 1993 revenue consisted primarily of a $1.0 million non-refundable license fee and research revenue received in connection with Lynx's collaborative research and development agreement with Chiron Corporation. Revenue in fiscal 1992 consisted primarily of sales of compound to one customer under a development contract which was terminated during 1992.

*Operating Expenses*

Research and development expenses were $6.2 million for the year ended June 30, 1993 compared to $2.0 million for the year ended June 30, 1992. The increase in research and development expenses was due primarily to increases in research and development personnel, funding to various academic, government and corporate laboratories under collaborative research agreements, and patent and licensing expenses.

General and administrative expenses were $1.1 million for the year ended June 30, 1993 compared to $0.5 million for the year ended June 30, 1992. The increase in general and administrative expenses was due primarily to increases in general and administrative personnel and corporate legal and consulting services.

*Other*

Interest income was $243,000 for the year ended June 30, 1993. Lynx issued Series A Preferred Stock in October, 1992 and therefore had no interest income in the year ended June 30, 1992.

**Liquidity and Capital Resources**

Since inception, Lynx has funded its operations through advances from ABI, sales of Preferred and Common Stock, revenue from collaborative research and development arrangements, product sales, and interest income. No further advances will be received from ABI.

Net cash used in operating activities of $4.7 million for the year ended December 31, 1994 differs from the net loss for the same period primarily due to depreciation and amortization expense and changes in working capital. Net cash used in investing activities of $9.5 million for the year ended December 31, 1994 was primarily due to the purchase of short-term investments, and to the expansion of facilities and capital equipment purchases. Net cash provided by financing activities in 1994 resulted primarily from the completion of a private placement offering of its Series B Preferred Stock in February and April 1994. The net proceeds of this offering were approximately $16.1 million. Cash and short-term investments were $12.2 million at December 31, 1994.

Lynx is currently utilizing those funds for supporting preclinical research and clinical trials, patent and technology license fees, and the planned growth in Lynx's internal efforts

27                                                          Page 27 of 72

toward research, drug discovery, and development programs. Pending such uses as described above, Lynx intends to invest its excess cash in short-term, investment grade, interest-bearing securities or certificates of deposit.

The cost, timing and amount of funds required for specific uses by Lynx cannot be precisely determined at this time and will be based upon Lynx's progress in research and development, the scope and results of preclinical research and clinical trials, the cost and timing of regulatory approvals, the establishment of manufacturing capacity, administrative and legal costs, the establishment of corporate partnerships, and the availability of alternate methods of financing.

Lynx intends to seek additional financing as needed from the sale of equity and from collaborative research and development agreements with other corporate partners. Negotiations are pending to renew the Company's $1.6 million lease line of credit of which $859,000 was unused at its expiration on December 31, 1994. Lynx believes that its current capital resources, anticipated milestone payments from Wellcome, and interest income thereon will enable it to maintain its current and planned operations through the end of 1996.

The Company completed the initial closing if a Series C Preferred Stock financing with a group of current and new investors on March 24, 1995. Pursuant to the financing, the Company will sell and issue approximately 1.2 million shares of Series C Preferred Stock at a purchase price of $5.00 per share, for aggregate proceeds of approximately $6.0 million. The Series C Preferred Stock has rights, preferences and privileges substantially similar to those of the outstanding Series B Preferred Stock and is convertible at the rate of ten shares of Common Stock for each one share of Series C Preferred Stock.

**Company Stock Information**

There is no current established trading market for Lynx common stock. There were approximately 3,300 shareholders of record on December 31, 1994.

**Item 8.**        **Financial Statements and Supplementary Data**

The consolidated financial statements for the year ended December 31, 1994, the six-month period ended December 31, 1993 and the years ended June 30, 1993 and 1992 are submitted as a separate section of this Form 10-K.  (*See Item 14.*)

**Item 9.**        **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

# PART III

**Item 10.    Directors And Executive Officers Of The Registrant**

The following is a list of Registrant's directors and executive officers, their ages and their positions and offices, with the Registrant as of March 10, 1995.

| Name | Age | Director Since |
|------|-----|----------------|
| Sam Eletr, Ph.D. | 55 | Chief Executive Officer and Chairman of the Board |
| Timothy G. Geiser, Ph.D. | 50 | Vice President, Technology Development, Manufacturing and Operations |
| Gerald Zon, Ph.D. | 49 | Vice President, Medicinal Chemistry |
| William K. Bowes, Jr.(1) | 68 | Director |
| Sydney Brenner, M.B., D. Phil. | 67 | Director |
| James C. Kitch(1) | 47 | Director |
| Kathleen D. La Porte(2) | 33 | Director |
| Craig C. Taylor(2) | 44 | Director and Acting Chief Financial Officer |

(1)    Member of the Audit Committee
(2)    Member of the Compensation Committee

Dr. Eletr has served as Chief Executive Officer and a director of the Company since February 1992. Dr. Eletr founded Applied Biosystems, Inc., a manufacturer of instruments and consumables for life science research and related applications, now a wholly-owned subsidiary of Perkin Elmer Corporation ("ABI"), and served as Chairman of the Board of Directors and in various executive positions at ABI from its inception until March 1987. Dr. Eletr acted as a consultant to ABI from September 1990 until July 1992, during which time he undertook to assume the leadership of the Company.

Dr. Geiser has served as Vice President, Technology Development, Manufacturing and Operations of Lynx since July 1992. Prior to that time, he served as Senior Scientist of Applied Biosystems from May 1987 to July 1992.

Dr. Zon has served as Vice President, Medicinal Chemistry and Regulatory Affairs of Lynx since January 1993. Prior to that time, he served as Senior Scientist of Applied Biosystems from November 1986 to July 1992.

Mr. Bowes has served as a director of the Company since March 1994. He has been a general partner of U.S. Venture Partners, a venture capital partnership, for more than five years. He currently serves as a director of Amgen, Inc., Glycomed, Inc., XOMA Corporation and a number of U.S. Venture Partners' privately owned portfolio companies.

Dr. Brenner has served as a director of the Company since October 1993. He is currently an Honorary Professor of Genetic Medicine, University of Cambridge Clinical School and an independent consultant. From 1986 to his retirement in 1991, Dr. Brenner directed the Medical Research Council Unit of Molecular Genetics. From 1979 to 1986 he directed the Laboratory of Molecular Biology in Cambridge, England. He was a member of The Scripps Research Institute in La Jolla, California until December 1994.

Mr. Kitch has served as a director of the Company since February 1993 and Secretary of Lynx since February 1992. He was a director of ABI from August 1986 to February 1993. He has been a partner for more than ten years of Cooley Godward Castro Huddleson & Tatum, a law firm which has provided legal services to ABI and the Company.

Ms. La Porte has served as a director of the Company since March 1994. She is a general partner of the Sprout Group, the venture capital affiliate of Donaldson, Lufkin and Jenrette. Prior to joining the Sprout Group in 1993, Ms. La Porte was a principal at Asset Management Company, a venture capital firm focused on early stage technology investments, from 1987 to 1993. In addition, she previously served as Advisor to the Chairman of H&Q Asia Pacific Venture Group, in Taiwan. She currently serves as a director of Onyx Pharmaceuticals, CIBUS Pharmaceuticals and Sequana Therapeutics, Inc.

Mr. Taylor has served as a director of the Company since March 1994 and Acting Chief Financial Officer since July 1994. He has been active in venture capital since 1977 when he joined Asset Management Company. He is a general partner of AMC Partners and AMC Partners 1989, which serve respectively as the general partners of Asset Management Associates and AMA 89, private venture capital partnerships. He currently serves as a director of Telor Ophthalmic Pharmaceuticals, Inc. and several private companies.

All directors are elected annually and serve until the next annual meeting of stockholders or until the election and qualification of their successors. The Board of Directors elects Lynx's officers, and such officers serve at the discretion of the Board of Directors of Lynx. There are no family relationships among the directors or officers of Lynx.

Pursuant to the terms of the Shareholders Agreement between Lynx, ABI and Chiron, ABI and Chiron each have the right to nominate one member of the Board of Directors of Lynx as long as ABI and Chiron each beneficially own at least 2,000,000 shares of Lynx Stock. There are currently no nominees of ABI or Chiron on the Board of Directors.

Pursuant to the Investor Rights Agreement by and among Lynx Therapeutics, Inc. and each of the purchasers of the Company's Series B Preferred Stock, so long as at least 1,200,000 shares of Series B Preferred are outstanding, persons designated by the holders of the majority of the Series B Preferred Stock, reasonably acceptable to management, will be entitled to two Board seats or, if greater, one third of the authorized number of directors. Mr. Bowes, Ms. La Porte and Mr. Taylor are currently serving as directors as the nominees of the holders of the Series B Preferred Stock. See "Item 13. Certain Relationships and Related Transactions - Series B Financing."

**Committees of the Board of Directors**

In March 1994 the Board of Directors established an Audit Committee and a Compensation Committee.

The Audit Committee recommends engagement of the Company's independent auditors and reviews the plan of the annual audit, the results of the audit and the adequacy of internal accounting controls. The Audit Committee has not met to date. The Audit Committee is composed of Messrs. Bowes and Kitch.

The Compensation Committee reviews and recommends salaries for officers and key employees. The Compensation Committee also serves as the Stock Option Committee for the 1992 Stock Option Plan for the employees of the Company and in that capacity approves employee stock option grants. The members of the Compensation Committee are Ms. La Porte and Mr. Taylor.

**Compliance with Section 16(a) of the Securities Exchange Act of 1934.**

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors and executive officers, and persons who own more than ten percent of a registered class of the Company's equity securities, to file with the SEC initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company, during the year ended December 31, 1994, all Section 16(a) filing requirements applicable to its officers, directors and greater than ten percent beneficial owners were complied with; except that, under the applicable provisions of Section 16(a), a number of investors who purchased the Company's Series B Preferred Stock in connection with the Company's Series B Preferred Stock financing, which had closings in February 1994 and April 1994, were required to file an initial report on Form 3 in connection with their acquisition of such Series B Preferred Stock. These Form 3 filings were generally not made on a timely basis. The investors who made late filings included the following entities, and, in certain cases, the general partners or other control persons of such entities: Asset Management Associates, BIL/Rothschild Asset Management, Cannon Street Fund Ltd., New York Life Insurance Company, Singapore Bio Innovations, Sprout Capital VI, L.P. and U.S. Venture Partners IV, L.P.

**Item 11.    Executive Compensation**

The following table sets forth certain compensation paid by the Company during the year ended December 31, 1994 to its Chief Executive Officer and each of the two other most highly compensated executive officers whose compensation exceeded $100,000 (the "Named Executive Officers").

| Name and Principal Position | Year | Annual Salary | Compensation Bonus | Long Term Compensation Award Options Shares | All Other Compensation(1) |
|---|---|---|---|---|---|
| Sam Eletr, Ph.D. | 1994 | $ 160,990 | 0 | 0 | $   0 |
| Chief Executive Officer and Chairman of the Board | 1993 | $ 163,060 | 0 | 0 | $   0 |
| Timothy G. Geiser, Ph.D. | 1994 | $ 132,176 (2) | 0 | 0 | $ 750 |
| Vice President, Technology Development, Manufacturing and Operations | 1993 | $ 131,229 (3) | 0 | 0 | $ 750 |
| Gerald Zon, Ph.D. | 1994 | $ 132,468 (2) | 0 | 0 | $ 750 |
| Vice President, Medicinal Chemistry | 1993 | $ 131,348 (4) | 0 | 0 | $ 750 |

(1)   Contributions made by the Company to the Company's 401(k) Plan on behalf of such employees.

(2)   This amount includes compensation in the amount of $9,240 deferred pursuant to the Lynx Therapeutics 401(k) Plan.

(3)   This amount includes compensation in the amount of $6,890 deferred pursuant to the Lynx Therapeutics 401(k) Plan.

(4)   This amount includes compensation in the amount of $8,994 deferred pursuant to the Lynx Therapeutics 401(k) Plan.

Except as disclosed above, no compensation characterized as long-term compensation, including restricted stock awards issued at a price below fair market value or long-term incentive plan payouts, were paid by the Company during the year ended December 31, 1994 to any of the Named Executive Officers.

**Compensation Pursuant to Plans**

**1992 Stock Option Plan**

In June 1992, Lynx adopted the 1992 Stock Option Plan (the "1992 Plan"), under which 4,000,000 shares, less any shares of Lynx's Common Stock remaining outstanding which were originally issued to employees, officers of, or consultants to Lynx pursuant to stock purchase agreements approved by Lynx's Board of Directors, were initially reserved for issuance upon exercise of options granted to employees and consultants of Lynx or its affiliates. In February and December 1994, the Board adopted, and in January 1995 the stockholders approved, amendments to the 1992 Plan, to increase the number of authorized shares for issuance under the 1992 Plan to 14,000,000 shares. The 1992 Plan provides for the grant of both incentive stock options intended to qualify as such under Section 422 of the Internal Revenue Code of 1986 (the "Code"), and supplemental stock options, which are options that do not qualify as incentive stock options. The ability of Lynx to grant options under the 1992 Plan will terminate on June 30, 2002, unless sooner terminated by the Board of Directors.

The 1992 Plan is administered by the Board of Directors. Subject to the provision of the 1992 Plan, the Board has the authority to select the persons to whom grants are to be made, to designate the number of shares to be covered by each option, to determine whether an option is an incentive stock option or a supplemental stock option, to establish vesting schedules, to specify the type of consideration to be paid to Lynx upon exercise or purchase and, subject to certain restrictions, to specify other terms.

The maximum term of options granted under the 1992 Plan is ten years. The aggregate fair market value of the stock with respect to which incentive stock options are first exercisable in any calendar year may not exceed $100,000. Options granted under the 1992 Plan generally are non-transferable and expire three months after the termination of any optionee's employment, directorship or consulting relationship with Lynx. However, in general, if such termination of employment is due to the optionee's permanent and total disability, such person's option may be exercised up to one year following such disability, and if such termination of employment is due to the optionee's death, such person's option may be exercised up to eighteen (18) months following such death.

The exercise price of incentive stock options must be at least the fair market value of the Common Stock on the date of grant. The exercise price of supplemental stock options must be at least 85% of the fair market value of the Common Stock on the date of grant. The exercise price of options granted to any person who at the time of grant owns stock possessing more than 10% of the total combined voting power of all classes of stock must be at least 110% of the fair market value of such stock on the date of grant, and the term of these options cannot exceed five years. Shares covered by currently outstanding options under the 1992 Plan typically vest over a five-year period following the date of grant.

The purchase price of Common Stock under a stock purchase agreement, as well as the form of consideration to be paid to Lynx upon exercise, may be determined by the Board.

**Stock Option Grants and Exercises**

As of March 10, 1995, options to purchase a total of 5,727,859 shares had been granted and were outstanding under the 1992 Plan and options to purchase 7,917,335 shares remained available for grant thereunder. Options are granted at an exercise price equal to the fair market value of the Company's Common Stock on the date of grant as determined by the Board of Directors.

**Option Grants in the Year Ended December 31, 1994**

The following table sets forth, for each of the Named Executive Officers in the Summary Compensation Table, certain information regarding options granted during the year.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rate of Stock Price Appreciation for Option Term (4) | |
| Name | Number of Securities Underlying Options Granted (#)(1) | % of Total Options Granted to Employees in Fiscal Year(2) | Exercise or Base Price ($/sh) (3) | Expiration Date | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Sam Eletr | 800,000 | 21.65% | .10 | 04/14/04 | 50,312 | 127,499 |
| Timothy G. Geiser | 600,000 | 16.24% | .10 | 04/14/04 | 37,734 | 95,625 |
| Gerald Zon | 600,000 | 16.24% | .10 | 04/14/04 | 37,734 | 95,625 |

(1) Options granted generally vest over a five year period. The term of the options is ten years.

(2) Based on an aggregate of 3,695,000 options granted to employees of and consultants to the Company during year ended December 31, 1994, including the Named Executive Officers.

(3) The exercise price per share of each option is equal to the fair market value as determined by the Board of Directors.

(4) The potential realizable value is calculated based on the term of the option at its time of grant (ten years). It is calculated by assuming that the stock price on the date of grant appreciated at the indicated annual rate compounded annually for the entire term of the option and that the option is exercised and sold on the last day of its term for the appreciated stock price. No gain to the optionee is possible unless the stock price increases over the option term, which will benefit all stockholders.

**Aggregated Option Exercises in the Year Ended December 31, 1994 and Option Values**

The following table sets forth, for each of the Named Executive Officers in the Summary Compensation Table, the shares acquired and the value realized on each exercise of stock options during the year and number and value of unexercised options:

| Name | Shares Acquired on Exercise | Value Realized($)(1) | Number of Unexercised Options at Year-End<br>Exercisable/ Unexercisable | Value of Unexercised In-the-Money Options at Year-End(1)<br>Exercisable/ Unexercisable($) |
|---|---|---|---|---|
| Sam Eletr | 0 | 0 | 106,666/693,334 | 0 |
| Timothy G. Geiser | 72,500 | 2,025 | 37,500/597,500 | 675/6,975 |
| Gerald Zon | 0 | 0 | 110,000/597,500 | 2,700/6,975 |

(1)  Based on the fair market value of the Company's Common Stock at December 31, 1994 ($0.10) (as determined by the Board of Directors), minus the exercise price of the option, multiplied by the number of shares underlying the option.

**401(k) Plan**

In October 1992, Lynx adopted a 401(k) Plan covering all of its United States employees. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees or by Lynx to the 401(k) Plan are not taxable to employees until withdrawn from the 401(k) Plan, and so that contributions by Lynx, if any, will be deductible by Lynx when made. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to 15% (subject to an annual limit prescribed by the Code as described below) and have the amount of such reduction contributed to the 401(k) Plan. Under limitations imposed by the Code, the maximum amount of compensation reduction a participant could elect to have contributed to the 401(k) Plan for the 1994 calendar year was $9,240. This amount is subject to annual adjustments for increases in the cost of living, as determined under Internal Revenue Service regulations. The 401(k) Plan permits, but does not require, additional contributions to the 401(k) Plan by Lynx on behalf of all participants in the 401(k) Plan.

**Director Compensation**

The directors are not compensated by Lynx for service as directors, but they are reimbursed for their expenses in attending out-of-town meetings.

**Compensation Committee Interlocks and Insider Participation in Compensation Decisions**

The Company's Compensation Committee was established in March 1994 and has held no meetings to date. The only officer and employee of the Company who participated in deliberations of the Company's Board of Directors concerning executive officer compensation was Dr. Eletr, the Company's Chief Executive Officer, who is also a director.

**Indemnification of Directors and Officers**

The Company's Bylaws provide that the Company will indemnify its directors and executive officers and may indemnify its other officers, employees and other agents to the fullest extent permitted by Delaware law. The Company is also empowered under its Bylaws to enter into indemnification agreements with its directors and officers and to purchase insurance on behalf of any person whom it is required or permitted to indemnify. Pursuant to this provision, the Company has entered into indemnity agreements with each of its directors and executive officers.

In addition, the Company's Certificate of Incorporation provides that, to the fullest extent permitted by Delaware law, the Company's directors will not be liable for monetary damages for breach of the directors' fiduciary duty of care to the Company and its stockholders. This provision in the Certificate of Incorporation does not eliminate the duty of care, and in appropriate circumstances, equitable remedies such as an injunction or other forms of nonmonetary relief would remain available under Delaware law. Each director will continue to be subject to liability for breach of the director's duty of loyalty to the Company, for acts or omissions not in good faith or involving intentional misconduct or knowing violations of law, for acts or omissions that the director believes to be contrary to the best interests of the Company or its stockholders, for any transaction from which the director derived an improper personal benefit, for acts or omissions involving a reckless disregard for the director's duty to the Company or its stockholders when the director was aware or should have been aware of a risk of serious injury to the Company or its stockholders, for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its stockholders, for improper transactions between the director and the Company and for improper distributions to stockholders and loans to directors and officers. This provision also does not affect a director's responsibilities under any other laws, such as the federal securities laws, such as the federal securities laws or state or federal environmental laws.

No pending material litigation or proceeding involving a director, officer, employee or other agent of the Company as to which indemnification is being sought exists, and the Company is not aware of any pending or threatened material litigation that may result in claims for indemnification by any director, officer, employee or other agent.

**Item 12.     Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth, as of March 10, 1995, the beneficial ownership of Lynx Common Stock and Lynx Series B Convertible Preferred Stock by (i) each person who is known by the Company to be the beneficial owner of more than five percent of Lynx Common Stock or Lynx Series B Convertible Preferred Stock outstanding; (ii) each director of the Company; (iii) each of the Named Executive Officers (as defined in Item 11); and (iv) all directors and officers of the Company as a group.

| Beneficial Owner | Common Stock(1) | | Series B Preferred Stock(1) | |
|---|---|---|---|---|
| | Number | Percent(2) | Number | Percent(2) |
| Entities affiliated with the Sprout Group(3) 3000 Sand Hill Road Building 4, Suite 270 Menlo Park, CA 94025 | 5,000,000 | 19.9% | 5,000,000 | 15.0% |
| Entities affiliated with U.S. Venture Partners IV, L.P.(4) 2180 Sand Hill Road Suite 300 Menlo Park, CA 94025 | 5,000,000 | 19.9% | 5,000,000 | 15.0% |
| Singapore Bio-Innovations Partners, Ltd.(5) 250 North Bridge Road 24-00 Raffles City Tower Singapore 0617 | 4,200,000 | 17.3% | 4,200,000 | 12.6% |
| Old Court Limited(5) P.O. Box 58 St. Julian's Court St. Peter Port Guernsey, Channel Islands GYI 3BP | 4,000,000 | 16.6% | 4,000,000 | 12.0% |
| Cannon Street Fund Ltd.(5) c/o Meridian Ventures 2 Alhambra Plaza (1105) Coral Gables, FL 33134 | 4,000,000 | 16.6% | 4,000,000 | 12.0% |
| Asset Management Associates 1989 L.P.(6) 2275 East Bayshore Rd., #150 Palo Alto, CA 94303 | 3,669,984 | 15.5% | 3,600,000 | 10.8% |
| Chiron Corporation 4560 Horton Street Emeryville, CA 94608-2916 | 3,000,000 | 13.0% | 0 | ** |
| Applied Biosystems(7) Division of Perkin Elmer Corporation 850 Lincoln Centre Drive Foster City, CA 94404-1128 | 2,547,985 | 11.2% | 0 | ** |
| Becton Dickinson & Company One Becton Drive Franklin Lakes, NJ 07417 | 2,336,899 | 11.6% | 0 | ** |

| Beneficial Owner | Common Stock(1) | | Series B Preferred Stock(1) | |
|---|---|---|---|---|
| | Number | Percent(2) | Number | Percent(2) |
| New York Life Insurance Company(5)<br>51 Madison Avenue<br>Room 203<br>New York, NY 10010 | 2,000,000 | 9.0% | 2,000,000 | 6.0% |
| Paribas U.S. Growth Fund C.V. (5)<br>101 California<br>Suite 3150<br>San Francisco, CA 94111 | 1,500,000 | 6.9% | 1,500,000 | 4.5% |
| Sam Eletr (8)<br>c/o Lynx Therapeutics, Inc.<br>3832 Bay Center Place<br>Hayward, CA 94545 | 795,924 | 4.0% | 0 | ** |
| William K. Bowes, Jr.(9) | 5,177,210 | 20.6 % | 5,000,000 | 15.0% |
| Sydney Brenner (10) | 10,416 | ** | 0 | ** |
| Timothy G. Geiser (11) | 433,283 | 2.2% | 0 | ** |
| James C. Kitch(12) | 89,846 | ** | 70,000 | ** |
| Kathleen D. La Porte(13) | 5,000,000 | 19.9% | 5,000,000 | 15.0% |
| Craig C. Taylor(14) | 3,684,970 | 15.5% | 3,600,000 | 10.8% |
| Gerald Zon (15) | 437,708 | 2.2% | 0 | ** |
| All directors and officers<br>as a group (8 persons)(16) | 15,629,357 | 46.3% | 13,670,000 | 41.1% |

---

**      Less than one percent.

(1)     Represents total shares of Common Stock and Series B Preferred Stock held by such stockholders on an as-if-converted to Common Stock basis. The Series B Preferred Stock is convertible into Common Stock on a ten-for-one basis.

(2)     Percentage of beneficial ownership is based on 20,116,636 shares of the Company's Common Stock and 33,228,960 shares of the Company's Series B Preferred Stock outstanding (on an as-if-converted to Common Stock basis) as of March 10, 1995, except as otherwise noted in the footnotes.

(3)     Common Stock and Series B Preferred Stock amounts include 4,316,470 shares of Common Stock issuable upon conversion of Series B Preferred Stock held by Sprout Capital VI, L.P. ("Sprout Capital") and 683,530 shares of Common Stock issuable upon conversion of Series B Preferred Stock held by DLJ Capital Corporation ("DLJ Capital"). Ms. La Porte, a director of the Company, is a general partner of the Sprout Group, an entity affiliated with Sprout Capital and DLJ

Capital. Ms. La Porte shares the power to vote and control the disposition of shares held by Sprout Capital and DLJ Capital and therefore may be deemed to be the beneficial owner of such shares. Ms. La Porte disclaims beneficial ownership of the shares held by Sprout Capital and DLJ Capital except to the extent of her pecuniary interest therein.

(4)  Common Stock and Series B Preferred Stock amounts include 5,000,000 shares of Common Stock issuable upon conversion of Series B Preferred Stock held by U.S. Venture Partners IV, L.P. ("U.S.V.P. IV"). Mr. Bowes, a director of the Company, is a general partner of Presidio Management Group IV, the general partner of U.S.V.P. IV. Mr. Bowes shares the power to vote and control the disposition of shares held by U.S.V.P. IV and therefore may be deemed to be the beneficial owner of such shares. Mr. Bowes disclaims beneficial ownership of the shares held by U.S.V.P. IV except to the extent of his pecuniary interest therein.

(5)  Common Stock amount represents shares issuable upon conversion of Series B Preferred Stock.

(6)  Common Stock and Series B Preferred Stock amounts include 69,984 shares of Common Stock and 3,600,000 shares of Common Stock issuable upon conversion of Series B Preferred Stock held by Asset Management Associates 1989 L.P. ("Asset 1989 L.P."). Mr. Taylor, a director of the Company, is a general partner of AMC Partners and AMC Partners 1989, which serve respectively as the general partner of Asset Management Associates and AMA 89, entities affiliated with Asset 1989 L.P. Mr. Taylor shares the power to vote and control the disposition of shares held by Asset 1989 L.P. and therefore may be deemed to be the beneficial owner of such shares. Mr. Taylor disclaims beneficial ownership of the shares held by Asset 1989 L.P. except to the extent of his pecuniary interest therein.

(7)  Common Stock amount excludes 1,524,000 shares of Common Stock issuable upon exercise of an outstanding option held by ABI (the "ABI Option"). All holders of ABI stock options as of October 23, 1992, the record date for the Distribution (as defined under "Certain Transactions") (which options were subsequently exchanged for Perkin Elmer Corporation ("Perkin Elmer") options in connection with the acquisition of ABI by Perkin Elmer) (such options are referred to herein as "Perkin Elmer Options"), are entitled to receive from ABI shares of the Company's Common Stock upon exercise of the Perkin Elmer Options pursuant to the Distribution. ABI has agreed to exercise the ABI Option prior to September 30, 1996 only to the extent that it distributes a like number of shares of the Company's Common Stock pursuant to the Distribution upon the exercise of Perkin Elmer Options.

(8)  Includes 133,333 shares of Common Stock issuable upon exercise of Lynx stock option held by Sam Eletr that is exercisable within 60 days of March 10, 1995.

(9)  See Note 4 above. Common Stock amount includes 6,076 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Bowes that are exercisable within 60 days of March 10, 1995.

(10)     Includes 10,416 shares of Common Stock issuable upon exercise of Lynx stock options held by Sydney Brenner that are exercisable within 60 days of March 10, 1995.

(11)     Includes 65,000 shares of Common Stock issuable upon exercise of Lynx stock options held by Timothy G. Geiser that are exercisable within 60 days of March 10, 1995. Also includes 47 shares of Common Stock held of record by Dr. Geiser's wife to which shares Dr. Geiser disclaims beneficial ownership.

(12)     Common Stock and Series B Preferred Stock amounts include 70,000 shares of Common Stock issuable upon conversion of Series B Preferred Stock held by GC&H Investments, an investment partnership of which Mr. Kitch is a general partner. Mr. Kitch shares the power to vote and control the disposition of such shares and therefore may be deemed to be the beneficial owner of such shares. Mr. Kitch disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein. Common Stock amount also includes 6,076 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Kitch that are exercisable within 60 days of March 10, 1995.

(13)     See Note 3 above.

(14)     See Note 6 above. Common Stock amount includes 6,076 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Taylor that are exercisable within 60 days of March 10, 1995.

(15)     Includes 137,500 shares of Common Stock issuable upon exercise of Lynx stock options held by Gerald Zon that are exercisable within 60 days of March 10, 1995. Also includes 209 shares of Common Stock held of record by Dr. Zon's wife and 1,111 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Dr. Zon's wife that are exercisable within 60 days of March 10, 1995 as to which shares Dr. Zon disclaims beneficial ownership.

(16)     Common Stock amount includes 364,477 shares of Common Stock issuable upon exercise of the Company's stock options and Perkin Elmer Options held by all directors and officers that are exercisable within 60 days of March 10, 1995. See Notes 8 through 15 above.

**Item 13.         Certain Relationships and Related Transactions**

Lynx was formed in February 1992 as a wholly-owned subsidiary of Applied Biosystems, Inc. ("ABI") (now a division and wholly-owned subsidiary of Perkin Elmer Corporation) to carry on the business previously being conducted by ABI's Therapeutics Group. In June 1992, Lynx sold to ABI 8,000,000 shares of Lynx Common Stock at a purchase price of $0.01 per share. On October 1, 1992, simultaneously with the transactions entered into between Lynx and Chiron described below, Lynx sold to ABI 10,000,000 shares of Lynx Series A Preferred Stock at a purchase price of $1.00 per share, and ABI and Lynx rescinded the purchase of 3,159,000 of the 8,000,000 shares of Lynx Common Stock previously purchased from Lynx.

In November 1992, ABI distributed all but an aggregate of 16,000 shares of the Lynx Common Stock and 2,982,000 shares of the Lynx Series A Preferred Stock it held to its shareholders (the "Distribution"). The Series A Preferred shares were converted to Common shares on September 30, 1994. In connection with these transactions, Lynx granted ABI an option to purchase up to 2,159,000 shares of Lynx Common Stock at $0.01 per share which, prior to October 1996, may only be exercised by ABI in connection with the distribution by ABI of Lynx stock to its option holders upon the exercise of ABI stock options outstanding as of the date of the Distribution. Thereafter, through the termination of the option in September 1997, ABI may exercise such option provided that it promptly sells or otherwise disposes of any shares received upon such exercise (See Item 12). In connection with these transactions, Lynx also repaid approximately $975,000 that had been advanced by ABI to cover operational expenses after July 3, 1992. Under the terms of a Shareholders Agreement between ABI and Lynx, ABI has the right to nominate one member of the Board of Directors of Lynx as long as ABI beneficially owns at least 2,000,000 shares of Lynx Stock. There is currently no nominee of ABI on the Board of Directors.

In connection with the formation of Lynx, ABI and Lynx entered into a Corporate Services Agreement and an Agreement of Assignment and License of Intellectual Property Rights. The Corporate Services Agreement is intended to provide Lynx with certain general corporate and administrative support services, facilities and chemical supplies for Lynx's own use in the synthesis of oligonucleotides at ABI's full manufacturing cost and instruments and related software for Lynx's own use at ABI's full manufacturing cost (within specified limits), in order to satisfy Lynx's near-term needs and facilitate Lynx's transition to being an independent company. The Corporate Services Agreement prohibits ABI from supplying synthetic oligonucleotides to any third parties for commercial human therapeutic use or for use in human clinical trials during the term of the supply arrangement. There are no upper or lower limits on the prices of materials supplied pursuant to the Corporate Services Agreement, as the prices are dependent on manufacturing costs. ABI's obligation to provide services and chemical supplies to Lynx will terminate on June 30, 1995, while ABI's obligation to provide certain instruments and related software terminated on June 30, 1993.

Pursuant to the Agreement of Assignment and License of Intellectual Property Rights, (i) ABI has assigned to Lynx its licenses from third parties for antisense and related technologies; (ii) ABI has assigned certain patent applications related to the synthesis of oligonucleotides to Lynx; (iii) ABI has granted to Lynx royalty-free, worldwide licenses

related to its manufacturing and related technologies to make, have made, use and sell oligonucleotide-based drugs; and (iv) Lynx has granted to ABI the license to make, use and sell products outside the field of human therapeutics under certain patent applications owned by Lynx and the inventions described therein.

On October 1, 1992, Lynx sold to Chiron 1,500,000 shares of Lynx Series A Preferred Stock at a purchase price of $1.00 per share. In addition, Lynx granted to Chiron an option to purchase 1,500,000 shares of Lynx Common Stock at a purchase price of $0.01 per share (the "Chiron Purchase Option"), which Chiron has exercised in full. Under the terms of the Shareholders Agreement, Chiron has the right to nominate one member of the Board of Directors of Lynx as long as Chiron beneficially owns at least 2,000,000 shares of Lynx Stock. There is currently no nominee of Chiron on the Board of Directors. In addition, Lynx and Chiron entered into a Collaborative Research and Development Agreement, pursuant to which Chiron has paid Lynx $1,500,000 to fund Lynx's research efforts and to acquire marketing rights to any drugs developed under such agreement.

On February 15, 1994, April 8, 1994 and September 1, 1994, the Company sold to a group of investors (the "Series B Investors") 3,322,896 shares of the Company's Series B Preferred Stock, par value $0.001 per share (the "Series B Preferred") pursuant to which the Company raised net proceeds of approximately $16.1 million (the "Series B Financing"). The Series B Investors include Sprout Capital, DLJ Capital Corporation, Cannon Street Fund Ltd., Singapore Bio-Innovations Partners Ltd., Old Court Limited, Asset Management Associates and U.S. Venture Partners IV, L.P. Pursuant to an Investor Rights Agreement, dated as of February 15, 1994 (the "Rights Agreement") among the Company and the Series B Investors, so long as not less than 1,200,000 shares of Series B Preferred remain outstanding, the Series B Investors agree to vote in favor of the election to the Company's Board of Directors of such nominees designated by the holders of a majority of the Series B Preferred (equal to the greater of two (2) or one-third (1/3) of the total then authorized number of directors rounded down to the nearest whole number). In connection with this voting arrangement, Sam Eletr, the Company's Chief Executive Officer, has agreed to vote for such nominees subject to the same terms and conditions set forth in the Rights Agreement. Mr. Bowes, Ms. La Porte and Mr. Taylor serve on the Board of Directors as nominees of the Series B Investors.

The Company completed the initial closing of a Series C Preferred Stock financing with a group of current and new investors on March 24, 1995. Pursuant to the financing, the Company will sell and issue approximately 1.2 million shares of Series C Preferred Stock at a purchase price of $5.00 per share, for aggregate proceeds of approximately $6.0 million. The Series C Preferred Stock has rights, preferences and privileges substantially similar to those of the outstanding Series B Preferred Stock and is convertible at the rate of ten shares of Common Stock for each one share of Series C Preferred Stock.

For legal services rendered during the calendar year ended December 31, 1994, the Company paid approximately $282,000 to Cooley Godward Castro Huddleson & Tatum, the Company's counsel, of which Mr. Kitch, a director of the Company, is a partner.

## PART IV

**Item 14.        Exhibits, Financial Statement Schedules, and Reports on Form 8-K**

(a) (1)  The following financial statements, together with the Report of Independent Auditors, are set forth on pages F-1 through F-19 of this report:

  (i)  Consolidated Balance Sheets as of December 31, 1994 and 1993.

  (ii)  Consolidated Statements of Operations for the year ended December 31, 1994, the six-month period ended December 31, 1993 and the years ended June 30, 1993 and 1992.

  (iii)  Consolidated Statements of Stockholders' Equity for the year ended December 31, 1994, the six-month period ended December 31, 1993 and the years ended June 30, 1993 and 1992.

  (iv)  Consolidated Statements of Cash Flows for the year ended December 31, 1994, six-month period ended December 31, 1993, the years ended June 30, 1993 and 1992.

 (2)  All schedules are omitted because they are not required, are not applicable, or the information is included in the consolidated financial statements or notes thereto.

 (3)  The following documents are filed as Exhibits to this report:

**Exhibit No. Description**

  3.1.1*  Certificate of Incorporation of the Company, as amended.

  3.2*  Bylaws of the Company, as amended.

  3.3**  Certificate of Designation of Preferences of Series B Convertible Preferred Stock of the Company.

  3.4  Certificate of Amendment of Certificate of the Amended and Restated Certificate of Incorporation of the Company.

  4.1*  Shareholders Agreement, dated as of October 1, 1992, by and among the Company, Applied Biosystems, Inc. ("ABI") and Chiron Corporation ("Chiron").

  4.2*  Form of Common Stock Certificate.

  4.3*  Form of Series A Preferred Stock Certificate.

  4.4**  Form of Series B Preferred Stock Certificate.

10.1*    Preferred Stock Purchase Agreement, dated as of October 1, 1992, between the Company and ABI.

10.2*    Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Timothy Geiser.

10.3*    Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Gerald Zon.

10.4*    Stock Purchase Agreement, dated as of August 17, 1992, between the Company and Bruno Calabretta.

10.5*    Stock Purchase Agreement, dated as of August 17, 1992, between the Company and Alan Gewirtz.

10.6*    Stock Purchase Agreement, dated as of August 25, 1992, between the Company and Sam Eletr.

10.7*    Form of Indemnity Agreement entered into between the Company and its directors and officers.

10.8*†    The Company's 1992 Stock Option Plan (the "Stock Option Plan").

10.9*†    Form of Incentive Stock Option Grant under the Stock Option Plan.

10.10*†    Form of Supplemental Stock Option Grant under the Stock Option Plan.

10.11*    Agreement of Assignment and License of Intellectual Property Rights, dated June 30, 1992, between the Company and ABI (the "ABI Agreement").

10.12*    Corporate Services Agreement, dated as of June 30, 1992, between the Company and ABI.

10.13*    Collaborative Research and Development Agreement, dated as of October 1, 1992, between the Company and Chiron (the "Chiron Agreement").

10.14*    Lease, dated as of June 28, 1993, by and between the Company and Spieker-Singleton #87, Limited Partnership.

10.15*    Applied Biosystems, Inc. Stock Recission Agreement.

10.16**    Series B Convertible Preferred Stock Purchase Agreement, dated as of February 15, 1994, between the Company and the Purchasers.

10.17**    Investor Rights Agreement, dated as of February 15, 1994, between the Company and the Purchasers.

10.18*** Exclusive License Agreement dated as of August 4, 1994, by and among the Company and The Wellcome Foundation Limited ("Wellcome").

21.1    Subsidiaries of the Company.

23.1    Consent of Ernst & Young LLP, Independent Auditors

24.1    Power of Attorney.  Reference is made to page 47.


(*)    *Incorporated by reference to the indicated exhibit in the Company's Registration Statement on Form 10 (File No. 0-22570), as amended.*

(**)    *Incorporated by reference to the indicated exhibit in the Company's Report on Form 10-K for the Transition Period ended December 31, 1993.*

(***)    *Incorporated by reference to the indicated exhibit in the Company's Report on Form 10-Q for the quarter ended September 30, 1994.*

(†)    *Management contract or compensatory plan or arrangement.*


(b)    There were no reports on Form 8-K filed by the Company during the fourth quarter of the fiscal year ended December 31, 1994.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized on the 22nd day of March 1995.

LYNX THERAPEUTICS, INC.

By: _____

Sam Eletr
Chief Executive Officer and
Chairman of the Board of Directors

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoint Sam Eletr and James C. Kitch, or any of them, his attorney-in-fact, each with the power of substitution, for him in any and all capacities, to sign any amendments to this Report, and to file the same, with exhibits thereto and other documents in connections therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Date |
|---|---|
| _____ Sam Eletr Chief Executive Officer and Chairman of the Board of Directors (*Principal Executive Officer*) | March 22, 1994 |

_____                              March 22, 1994
William K. Bowes, Jr.
Director


_____                              March 22, 1994
Sydney Brenner
Director


_____                              March 22, 1994
James C. Kitch
Director


_____                              March 22, 1994
Kathleen D. La Porte
Director


_____                              March 22, 1994
Craig C. Taylor
Director and Acting Chief Financial Officer
(Principal Financial and Accounting Officer)

 **ERNST & YOUNG LLP**

■ 1451 California Avenue
Palo Alto, California 94304

■ Phone: 415 496 1600
Fax:    415 496 4660

# Report of Independent Auditors

The Board of Directors and Shareholders
Lynx Therapeutics, Inc.

We have audited the accompanying consolidated balance sheets of Lynx Therapeutics, Inc. and its predecessor division at December 31, 1994 and 1993 and the related consolidated statements of operations, stockholders' equity (and divisional equity of predecessor) and cash flows for the year ended December 31, 1994, the six-month period ended December 31, 1993 and each of the two years in the period ended June 30, 1993. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lynx Therapeutics, Inc. and its predecessor division at December 31, 1994 and 1993 and the consolidated results of their operations and their cash flows for the year ended December 31, 1994, the six-month period ended December 31, 1993 and each of the two years in the period ended June 30, 1993, in conformity with generally accepted accounting principles.

Ernst & Young LLP

February 1, 1995, except for
Note 9 as to which the date is
March 28, 1995

F-1

Lynx Therapeutics, Inc. (and Predecessor)

Consolidated Balance Sheets

|  | December 31, | |
|---|---|---|
|  | 1994 | 1993 |
|  | *(In thousands, except share and per share amounts)* | |
| **Assets** | | |
| Current assets: | | |
|   Cash and cash equivalents | $ 4,246 | $ 2,383 |
|   Short-term investments | 8,000 | – |
|   Accounts receivable | 262 | 167 |
|   Other current assets | 236 | 240 |
| Total current assets | 12,744 | 2,790 |
| | | |
| Property and equipment: | | |
|   Leasehold improvements | 2,248 | – |
|   Laboratory and other equipment | 1,063 | 776 |
|   Construction in progress | – | 1,800 |
| | 3,311 | 2,576 |
|   Less accumulated depreciation | (931) | (547) |
| Net property and equipment | 2,380 | 2,029 |
| | | |
| Other assets | 18 | 38 |
| | $ 15,142 | $ 4,857 |
| | | |
| **Liabilities and stockholders' (and divisional) equity** | | |
| Current liabilities: | | |
|   Accounts payable | $    359 | $    924 |
|   Accrued compensation | 148 | 118 |
|   Accrued professional fees | 82 | 60 |
|   Accrued license fee | – | 500 |
|   Other accrued liabilities | 128 | 217 |
|   Advance from collaborative partner | 325 | – |
|   Amounts payable to related party | – | 80 |
| Total current liabilities | 1,042 | 1,899 |
| | | |
| Noncurrent liabilities | 56 | 28 |
| | | |
| Commitments | | |
| | | |
| Stockholders' equity: | | |
|   Preferred stock issuable in series, $.001 par value; 25,000,000 shares authorized, all shares designated represent convertible preferred stock: | | |
|     Series A, 17,000,000 shares designated; none and 11,358,640 shares issued and outstanding at December 31, 1994 and 1993, respectively; amount paid in | – | 11,358 |
|     Series B, 4,000,000 shares designated; 3,322,896 shares issued and outstanding at December 31, 1994 (none at December 31, 1993); aggregate liquidation value of $16.614 at December 31, 1994; amount paid in | 16,091 | – |
|   Common stock, $.001 par value; 120,000,000 shares authorized, 20,103,434 and 7,035,192 shares issued and outstanding at December 31, 1994 and 1993, respectively; amount paid in | 12,723 | 1,332 |
|   Deferred compensation | (86) | (120) |
|   Unrealized loss on marketable securities | (24) | – |
|   Accumulated deficit | (14,660) | (9,640) |
| Total stockholders' equity | 14,044 | 2,930 |
| | $ 15,142 | $ 4,857 |

*See accompanying notes.*

F-2

Lynx Therapeutics (and Predecessor)

Consolidated Statements of Operations

|  | Year Ended December 31, 1994 | Six-Month Period Ended December 31, 1993 | Year Ended June 30, | |
|---|---|---|---|---|
|  |  |  | 1993 | Predecessor Division 1992 |
|  | *(In thousands, except share and per share amounts)* | | | |
| Net revenues: |  |  |  |  |
| License revenue | $ 4,000 | $ – | $ – | $ – |
| Revenue from collaborative arrangement with a related party | – | – | 1,215 | – |
| Product sales and other revenue | 699 | 183 | 23 | 998 |
| Total revenue | 4,699 | 183 | 1,238 | 998 |
| Operating costs and expenses: |  |  |  |  |
| Cost of product and other revenue | 742 | 110 | 2 | 644 |
| Research and development, including $428, $402 and $741 paid to ABI in the year ended December 31, 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively | 7,715 | 3,321 | 6,194 | 2,004 |
| Selling, general and administrative, including $5, $70 and $228 paid to ABI in the year ended December 31, 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively | 1,768 | 650 | 1,102 | 470 |
| Total operating costs and expenses | 10,225 | 4,081 | 7,298 | 3,118 |
| Loss from operations | (5,526) | (3,898) | (6,060) | (2,120) |
| Interest income, net | 506 | 75 | 243 | – |
| Net loss | $ (5,020) | $(3,823) | $(5,817) | $(2,120) |
| Net loss per share | $ (0.48) | $ (0.56) | $ (0.82) |  |
| Shares used in per share computation | 10,391,054 | 6,827,639 | 7,071,835 |  |

*See accompanying notes.*

F-3

Page 51 of 72

Lynx Therapeutics, Inc. (and Predecessor)

Consolidated Statement of Stockholders' Equity (and Divisional Equity of Predecessor)

For the Two Years Ended June 30, 1993, the Six-Month Period Ended December 31, 1993 and the Year Ended December 31, 1994

| | Predecessor Divisional Equity of Applied Biosystems, Inc. | Preferred Stock Shares | Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Subscription Receivable | Deferred Compensation | Unrealized Loss on Marketable Securities | Deficit Accumulated From July 1, 1992 | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *(In thousands, except share and per share amounts)* | | | | | | |
| Balance at June 30, 1991 | $ 273 | — | $ — | — | $ — | $ — | $ — | $ — | $ — | $ 273 |
| Cash advances from Applied Biosystems, Inc. | 2,127 | — | — | — | — | — | — | — | — | 2,127 |
| Net assets transferred from Applied Biosystems, Inc. | 57 | — | — | — | — | — | — | — | — | 57 |
| Issuance of common stock to Applied Biosystems, Inc. at $0.01 per share in June 1992 | — | — | — | 8,000,000 | 80 | (80) | — | — | — | — |
| Issuance of common stock to employees at $0.01 per share in June 1992 | — | — | — | 500,000 | 5 | — | — | — | — | 5 |
| Net loss | (2,120) | — | — | — | — | — | — | — | — | (2,120) |
| Balance at June 30, 1992 | 337 | — | — | 8,500,000 | 85 | (80) | — | — | — | 342 |
| Issuance of common stock to an employee and consultants at $0.01 per share in August 1992 | — | — | — | 900,000 | 180 | — | (171) | — | — | 9 |
| Cash advances from Applied Biosystems, Inc. | 463 | — | — | — | — | — | — | — | — | 463 |
| Transfer of predecessor division equity to common stock | (800) | — | — | — | 800 | — | — | — | — | — |
| Collection of subscription receivable | — | — | — | — | — | 80 | — | — | — | 80 |
| Repurchase of common stock from Applied Biosystems, Inc. at $0.01 per share in October 1992 | — | — | — | (3,159,000) | (31) | — | — | — | — | (31) |
| Issuance of Series A preferred stock to Applied Biosystems, Inc. and Chiron Corp. in October 1992 at $1.00 per share | — | 11,500,000 | 11,500 | — | — | — | — | — | — | 11,500 |
| Capital contributed in connection with a stock option granted to Chiron Corp. | — | — | — | — | 285 | — | — | — | — | 285 |
| Exercise of stock options by Applied Biosystems, Inc. at $0.01 per share for cash in January and April 1993 | — | — | — | 335,000 | 3 | — | — | — | — | 3 |
| Issuance of common stock for services in March 1993 | — | — | — | 100,000 | 20 | — | — | — | — | 20 |
| Repurchase of preferred and common stock at $1.00 and $0.20 per share, respectively, in May and June 1993 | — | (127,632) | (128) | (87,747) | (17) | — | — | — | — | (145) |
| Exercise of employee stock options at $0.01 per share for cash in June 1993 | — | — | — | 766 | 1 | — | — | — | — | 1 |
| Amortization of deferred compensation | — | — | — | — | — | — | 34 | — | — | 34 |
| Net loss | — | — | — | — | — | — | — | — | (5,817) | (5,817) |
| Balance at June 30, 1993 (carried forward) | $ — | 11,372,368 | $11,372 | 6,589,019 | $ 1,326 | $ — | $(137) | $ — | $(5,817) | $ 6,744 |

*See accompanying notes.*

## Lynx Therapeutics, Inc. (and Predecessor)

### Consolidated Statement of Stockholders' Equity (and Divisional Equity of Predecessor) (continued)

For the Two Years Ended June 30, 1993, the Six-Month Period Ended December 31, 1993 and the Year Ended December 31, 1994

| | Predecessor Divisional Equity of Applied Biosystems, Inc. | Preferred Stock Shares | Amount | Common Stock Shares | Amount | Subscription Receivable | Deferred Compensation | Unrealized Loss on Marketable Securities | Deficit Accumulated From July 1, 1992 | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands, except share and per share amounts) | | | | | | |
| Balance at June 30, 1993 (brought forward) | $  – | 11,372,368 | $11,372 | 6,589,019 | $ 1,326 | $  – | $(137) | $  – | $ (5,817) | $ 6,744 |
| Repurchase of preferred and common stock at $1.00 and $0.20 per share, respectively, in July 1993 | – | (13,728) | (14) | (9,438) | (2) | – | – | – | – | (16) |
| Exercise of stock options by Applied Biosystems, Inc. at $0.01 per share for cash in August 1993 | – | – | – | 300,000 | 3 | – | – | – | – | 3 |
| Exercise of employee stock options at $0.01–$0.20 per share for cash in November and December 1993 | – | – | – | 155,611 | 5 | – | – | – | – | 5 |
| Amortization of deferred compensation | – | – | – | – | – | – | 17 | – | – | 17 |
| Net loss | – | – | – | – | – | – | – | – | (3,823) | (3,823) |
| Balance at December 31, 1993 | – | 11,358,640 | 11,358 | 7,035,192 | 1,332 | – | (120) | – | (9,640) | 2,930 |
| Issuance of Series B preferred stock in February, April and September 1994 for cash, net of issuance costs of $524 | – | 3,332,896 | 16,091 | – | – | – | – | – | – | 16,091 |
| Conversion of Series A preferred stock to common stock in September 1994 | – | (11,358,640) | (11,358) | 11,358,640 | 11,358 | – | – | – | – | – |
| Exercise of Chiron option at $0.01 per share for cash in September 1994 | – | – | – | 1,500,000 | 15 | – | – | – | – | 15 |
| Exercise of employee stock options at $0.01 to $0.20 per share for cash | – | – | – | 185,227 | 16 | – | – | – | – | 16 |
| Issuance of common stock for services in June to December 1994 | – | – | – | 24,375 | 2 | – | – | – | – | 2 |
| Amortization of deferred compensation | – | – | – | – | – | – | 34 | – | – | 34 |
| Unrealized loss on marketable securities | – | – | – | – | – | – | – | (24) | – | (24) |
| Net loss | – | – | – | – | – | – | – | – | (5,020) | (5,020) |
| Balance at December 31, 1994 | $  – | 3,332,896 | $16,091 | 20,103,434 | $17,723 | $  – | $ (86) | $(24) | $(14,660) | $14,844 |

*See accompanying notes.*

F-5

Lynx Therapeutics, Inc. (and Predecessor)

Consolidated Statements of Cash Flows
Increase (decrease) in cash and cash equivalents

| | Year Ended December 31, 1994 | Six-Month Period Ended December 31, 1993 | Year Ended June 30, | |
| --- | --- | --- | --- | --- |
| | | | 1993 | Predecessor Division 1992 |
| | *(In thousands)* | | | |
| **Cash flows from operating activities** | | | | |
| Net loss | $(5,020) | $(3,823) | $(5,817) | $(2,120) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | 438 | 117 | 220 | 184 |
| Issuance of common stock for services | 2 | -- | 20 | -- |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | (95) | (167) | 118 | 17 |
| Other current assets | 4 | (194) | 74 | (120) |
| Accounts payable | 189 | (7) | 297 | 43 |
| Accrued liabilities | (292) | 500 | 245 | 14 |
| Noncurrent liabilities | 28 | 28 | -- | -- |
| Net cash used in operating activities | (4,746) | (3,546) | (4,843) | (1,982) |
| | | | | |
| **Cash flows from investing activities** | | | | |
| Purchase of short-term investments | (12,024) | -- | (3,668) | -- |
| Maturities of short-term investments | 4,000 | 3,668 | -- | -- |
| Purchase of property and equipment, net of retirements | (1,489) | (1,077) | (253) | (145) |
| Other assets | -- | -- | (60) | -- |
| Net cash provided by (used in) investing activities | (9,513) | 2,591 | (3,981) | (145) |
| | | | | |
| **Cash flows from financing activities** | | | | |
| Issuance of preferred stock, net of repurchases | 16,091 | (14) | 11,372 | -- |
| Issuance of common stock, net of repurchases | 31 | 6 | (35) | 5 |
| Collection of subscription receivable | -- | -- | 80 | -- |
| Advances from Applied Biosystems, Inc. | -- | -- | 463 | 2,127 |
| Capital contributed for stock option | -- | -- | 285 | -- |
| Net cash provided by (used in) financing activities | 16,122 | (8) | 12,165 | 2,132 |
| | | | | |
| Net increase (decrease) in cash and cash equivalents | 1,863 | (963) | 3,341 | 5 |
| Cash and cash equivalents at beginning of period | 2,383 | 3,346 | 5 | -- |
| Cash and cash equivalents at end of period | $ 4,246 | $ 2,383 | $ 3,346 | $ 5 |
| | | | | |
| **Supplemental schedule of noncash financing activities** | | | | |
| Net assets transferred from Applied Biosystems, Inc. | $ -- | $ -- | $ -- | $ 57 |
| Accounts payable for construction-in-progress | $ (754) | $ 754 | $ -- | $ -- |

*See accompanying notes.*

Lynx Therapeutics, Inc. (and Predecessor)

Notes to Consolidated Financial Statements

December 31, 1994

### 1. Summary of Significant Accounting Policies and Basis of Presentation

**Ownership and Basis of Presentation**

Lynx Therapeutics, Inc. ("Lynx" or the "Company"), which was incorporated in February 1992 under the laws of the State of Delaware as a wholly owned subsidiary of Applied Biosystems, Inc. ("ABI"), is the successor to the therapeutics division of ABI (the "Predecessor"). Lynx was capitalized in June 1992 and, effective July 1, 1992, began operations.

On September 28, 1992, the board of directors of ABI approved the distribution of 4,825,205 shares of Lynx common stock and 7,018,480 shares of Lynx Series A preferred stock to the ABI shareholders of record on October 23, 1992. Each ABI shareholder received 0.33 shares of Lynx common stock and 0.48 shares of Lynx Series A preferred stock for each of share of ABI common stock held at the record date. During 1994, the Series A preferred stock converted into common stock (see Note 6). Lynx common shares are being distributed to holders of options to purchase ABI common stock as of the record date when such options are exercised. In this regard, Lynx has granted ABI an option to acquire up to 2,159,000 shares of Lynx common stock at $.01 per share to be distributed as such options to purchase ABI common stock are exercised. As of December 31, 1994, 635,000 shares of Lynx common stock have been issued to ABI under this option.

Lynx is engaged in the research and development of potential oligonucleotide-based therapeutics directed at leukemia, cancer, cardiovascular and fibrotic diseases, and viral infections. Through December 31, 1993, the Company was considered to be in the development stage.

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, LYNXNebraska and Spectragen, Inc., and the Predecessor. All significant intercompany balances and transactions have been eliminated. References to Lynx include the Predecessor as applicable. Certain expenses through June 30, 1992 were recorded based on ABI's general expenses, allocated primarily on headcount and specifically identified costs. Management believes that the allocation methods used are reasonable.

# Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 1. Summary of Significant Accounting Policies and Basis of Presentation (continued)

#### Change in Fiscal Year End

The Company changed its fiscal year end from a year ending June 30 to a calendar year in 1993. As a result, operating results for the six-month period ended December 31, 1993 are shown separately.

The Company's unaudited results of operations for the comparative year ended December 31, 1993 reflected grant and product revenue of $23,000 and $183,000, respectively, which approximated costs incurred in the production of the revenue, loss from operations of $8,620,000 and a net loss of $8,409,000 or $(1.26) per share.

#### Cash Equivalents and Short-Term Investments

The Company considers all investments with an original maturity of 90 days or less as cash equivalents. Investments with original maturities beyond 90 days but less than one year are considered to be short-term investments. The Company's investment policy stipulates that the investment portfolio be maintained with the objectives of preserving principal, maintaining liquidity and maximizing return.

Effective January 1, 1994, the Company adopted Statement of Financial Accounting Standards No. 115 ("Statement 115"), "Accounting for Certain Investments in Debt and Equity Securities." Statement 115 addresses the accounting and reporting for investments in marketable equity securities that have readily determinable fair values and for all investments in debt securities. Prior to adopting the new standard, investments were reported at amortized cost, which approximated fair value. The effect of the adoption of Statement 115 on stockholders' equity at January 1, 1994 was immaterial and there was no effect on the 1994 results of operations. The Company has not incurred losses on its investments.

F-8

# Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 1. Summary of Significant Accounting Policies and Basis of Presentation (continued)

#### Accounting for Certain Investments in Debt and Equity Securities (continued)

The Company determines the appropriate classification of debt securities at the time of purchase and reevaluates such designation as of each balance sheet date. As of December 31, 1994, the Company has classified its entire investment portfolio as available-for-sale. Available-for-sale securities are carried at fair value, with the unrealized gains and losses reported as a separate component of stockholders' equity. The amortized cost of debt securities in this category is adjusted for amortization of premiums and accretion of discounts to maturity, which are included in interest income. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income or expense. The cost of securities sold is based on the specific identification method.

#### Property and Equipment

Property and equipment are stated at original cost and are depreciated using the straight-line method over the estimated useful lives of the assets, which is generally three years. Leasehold improvements are amortized over the term of the facilities lease, which is ten years.

#### Revenue Recognition

Payments under collaborative arrangements are recognized as revenue when earned as defined under the terms of the respective agreements. Payments received which are related to future performance are deferred until earned. License fees are generally recorded as revenue upon execution of the agreement. Revenues from the sales of products are recognized upon shipment.

#### Net Loss Per Share

Net loss per share is calculated based on the weighted average number of common shares outstanding during the period. Common equivalent shares from stock options, warrants and convertible preferred stock are excluded from the computation as their effect is antidilutive.

F-9

# Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 2. Investments

The following is a summary of available-for-sale securities:

| | Available-for-Sale Securities | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | *(In thousands)* | | | |
| **December 31, 1994** | | | | |
| Money market funds | $ 2,147 | $ -- | $ -- | $ 2,147 |
| Commercial paper | 5,076 | -- | (15) | 5,061 |
| U.S. treasury bills | 4,911 | -- | (9) | 4,902 |
| | $12,134 | $ -- | $(24) | $12,110 |

Marketable investments include $4,110 of cash equivalents.

During the year ended December 31, 1994, the Company did not sell any securities. As of December 31, 1994, the average remaining maturity of the portfolio was approximately five months and no individual contractual maturity exceeded one year. Expected maturities may differ from contractual maturities because the issuers of the securities may have the right to prepay obligations without prepayment penalties.

### 3. Collaborative Arrangements

On August 4, 1994, Lynx entered into an agreement with The Wellcome Foundation Limited ("Wellcome") which gives Wellcome the right to develop and market worldwide a synthetic antisense oligonucleotide developed by the Company for the treatment of restenosis. Under the terms of the agreement, the Company may receive license fees and drug development milestone payments of up to $30 million and royalties on future product sales. Lynx retained the manufacturing rights to this product, while Wellcome assumed the responsibility of managing and funding its clinical testing. Through December 31, 1994, Lynx had received and recognized as income $4,000,000 in license fees from Wellcome under this arrangement. In addition, $600,000 had been received for clinical trial expenses to be paid by the Company on Wellcome's behalf, of which $325,000 remained outstanding at December 31, 1994.

## Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 3. Collaborative Arrangements (continued)

The parties also entered into a supply agreement under which Lynx agreed to supply Wellcome with all the required clinical trial material to complete the product testing. Such sales are at fully burdened manufacturing cost plus applicable royalties due third parties, as defined in the agreement, and are included in product sales in the accompanying consolidated statements of operations.

In the event the Company completes an initial underwritten public offering in the period after April 1, 1996 and before March 31, 1998, Wellcome also committed to make an equity investment in the Company of the lesser of $4,000,000 or a 5% interest in the Company on a fully diluted basis.

In October 1992, Lynx entered into a collaborative research and development agreement with Chiron Corporation ("Chiron") to develop therapeutic antisense products directed at certain targeted viruses. In exchange for the rights received under the terms of the collaboration, Chiron paid Lynx a nonrefundable license fee of $1,000,000 and an additional payment of $500,000 for research. Concurrent with entering into the collaborative agreement, Chiron also purchased 1,500,000 shares of Series A preferred stock at $1 per share, which automatically converted to common stock in September 1994 (see Note 6), and received an option to purchase 1,500,000 shares of common stock at $0.01 per share which was exercised in September 1994. As part of the accounting for this transaction, $285,000 of the amount received by Lynx was allocated to the option and credited to common stock. The remainder of the license fee and the research payments were recognized as revenue in the accompanying consolidated statements of operations for the year ended June 30, 1993.

### 4. License Agreements

#### University of Nebraska

In June 1992, Lynx entered into an agreement with the University of Nebraska under which the University agreed to fund most aspects of certain clinical trials and grant licenses to certain technology to Lynx. In exchange Lynx issued 100,000 shares of its common stock in March 1993 and agreed to issue an additional 100,000 shares upon the achievement of certain clinical trial milestones. As of December 31, 1994, none of these milestones have been achieved. The common stock was recorded at its deemed fair market value at the date of issuance with the related charge included in research and development expense.

## Lynx Therapeutics, Inc.

### Notes to Consolidated Financial Statements (continued)

**5. Transactions with ABI (continued)**

The Corporate Services Agreement was entered into to facilitate Lynx's transition to an independent company. Under the terms of this agreement, ABI subleased a portion of its facilities to Lynx through February 1994 and agreed to provide Lynx with general, corporate and administrative support services for up to three years. The agreement also gave Lynx the right to procure ABI instruments and related software (through June 30, 1993) and certain consumables manufactured by ABI (through June 30, 1995). Rent was charged based upon the percentage of total square feet occupied by Lynx. Costs incurred in providing administrative support services to Lynx were reimbursed to ABI based upon ABI's fully burdened cost. The agreement allowed Lynx to purchase any of ABI's instruments, related software and consumables at ABI's fully burdened cost. Equipment and consumables are provided to Lynx solely for internal use as reasonably required.

During the year ended December 31, 1994, Lynx paid a total of approximately $457,000 to ABI for costs incurred in connection with the above agreements and with the Company's standard operations ($501,000 and $1.4 million in the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively), including approximately $24,000 for property and equipment ($29,000 and $400,000 in the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively). As of December 31, 1994, no amounts were owed to ABI and its parent in connection with these transactions ($80,000 as of December 31, 1993).

**6. Stockholders' Equity**

**Advances From ABI**

Advances from ABI were used to fund operating losses from inception through June 30, 1992. Concurrent with the purchase of the Series A preferred stock by ABI, the net advances were credited to common stock.

**Lynx Therapeutics, Inc.**

Notes to Consolidated Financial Statements (continued)

### 6. Stockholders' Equity (continued)

**Preferred Stock**

In September 1994, each share of the Company's Series A preferred stock outstanding at that time (11,358,640 shares) automatically converted into one share of the Company's common stock in accordance with the Company's certificate of incorporation. Had this conversion occurred on January 1, 1994, net loss per share for the year ended December 31, 1994 would have been $(0.27) per share.

Each share of Series B preferred stock is convertible into ten shares of common stock at the option of the holder (subject to adjustment for certain changes in the effective conversion price). The Series B preferred shares have voting rights equal to the voting rights of the common shares issuable upon conversion. Conversion is automatic upon the earlier of (i) the closing of an underwritten public offering of common stock under the Securities Act of 1933 in which the Company receives at least $15,000,000 in gross proceeds and a price per share of at least S1.50 per share (subject to adjustment for stock splits or similar events), or (ii) the vote or written consent of the holders of a majority of the outstanding Series B convertible preferred stock.

Series B stockholders are entitled to receive noncumulative dividends, if and when declared by the board of directors. In addition, no dividend other than a stock dividend shall be paid on common stock unless a dividend in an equal amount per share (based on the then-current conversion rate) is first declared and paid on the Series B preferred stock.

In the event of liquidation, holders of Series B preferred stock shall be entitled to receive an amount equal to $5.00 per share (subject to adjustment), plus all declared but unpaid dividends, before any payments are made to holders of common stock.

**Common Stock**

Lynx has issued 1,400,000 shares of common stock to employees of and consultants to the Company. These shares are subject to repurchase rights which expire ratably over a five-year period from the date of issuance. Lynx has recorded deferred compensation expense for the difference between the purchase price and the deemed value of certain of these shares for financial statement purposes. At December 31, 1994, approximately 592,500 shares were subject to repurchase for an aggregate amount of $5,925.

## Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 6. Stockholders' Equity (continued)

### Common Stock (continued)

At December 31, 1994, Lynx has reserved 47,124,000 shares of common stock for issuance upon conversion of the Series B preferred stock, upon the achievement of certain established milestones by a research collaborator, upon conversion of outstanding warrants and upon exercise of outstanding employee and nonemployee stock options. Both ABI and Chiron Corporation have certain registration rights with respect to common stock issued to them upon conversion of Series A preferred stock in September 1994.

In December 1994, the board of directors adopted and, in January 1995, the stockholders approved an amendment to the articles of incorporation to increase the number of common shares authorized for issuance to 120,000,000.

### 1992 Stock Option Plan

In July 1992, Lynx adopted the 1992 Stock Option Plan ("the Plan") under which incentive or nonqualified stock options to purchase shares of common stock may be granted to employees and officers of, and consultants to, the Company. In February 1994, the board of directors adopted and, in January 1995, the stockholders approved amendments to the Plan to increase the number of shares reserved for issuance under the Plan to 14,000,000. The number of shares available for option grants is reduced by the 1,400,000 shares of common stock remaining outstanding which were issued to employees and consultants subject to repurchase rights.

Under the Plan, the exercise price of incentive options granted may not be less than 100% (110% in the case of options granted to a person who owns more than 10% of the total combined voting power of all classes of stock of the Company) of the fair value of common stock at the date of grant. Nonqualified options may be granted at not less than 85% of fair market value at the date of grant. Options generally vest over a five-year period from the date of grant and have a term of ten years (five years in the case of options granted to a person who owns more than 10% of the total combined voting power of all classes of stock of the Company).

## Lynx Therapeutics, Inc.

### Notes to Consolidated Financial Statements (continued)

**6. Stockholders' Equity (continued)**

**1992 Stock Option Plan (continued)**

The stock option activity under the Plan was as follows:

| | Number of Shares Subject to Options | Option Price Per Share |
|---|---|---|
| Options granted | 922,000 | $0.01-$0.20 |
| Options exercised | (766) | $0.01 |
| Options canceled | (5,234) | $0.01 |
| Balance at June 30, 1993 | 916,000 | $0.01-$0.20 |
| Options granted | 270,000 | $0.20 |
| Options exercised | (155,611) | $0.01-$0.20 |
| Options canceled | (1,767) | $0.20 |
| Balance at December 31, 1993 | 1,028,622 | $0.01-$0.20 |
| Options granted | **3,695,000** | **$0.10-$0.20** |
| Options exercised | **(185,227)** | **$0.01-$0.20** |
| Options canceled | **(91,584)** | **$0.10-$0.20** |
| Balance at December 31, 1994 | **4,446,811** | **$0.01-$0.20** |

To date, all options granted under the Plan are nonqualified options. At December 31, 1994, 7,811,585 shares of common stock reserved under the Plan were available for the granting of additional options. Options to purchase a total of 610,190 shares were exercisable under the Plan at December 31, 1994 (82,995 shares at December 31, 1993).

**Warrants**

As of December 31, 1994, warrants to purchase 63,000 shares of common stock were outstanding at an exercise price of $1.25 per share. The warrants are exercisable at the option of the holder through February 14, 1997.

F-15

## Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 7. Income Taxes

The Company accounts for income taxes under Statement Financial Accounting Standards No. 109, "Accounting for Income Taxes." Because of the Company's history of losses, no income tax provisions or benefits have been recorded. Lynx's losses through November 20, 1992 were included in the consolidated income tax returns of ABI or ABI's parent. As a result, Lynx's net operating loss carryforwards available to offset future taxable income consist only of losses incurred after November 20, 1992.

As of December 31, 1994, the Company has federal and state loss carryforwards of approximately $12,000,000 and $300,000, respectively. The Company also has federal and state research and development tax credit carryforwards of approximately $250,000 and $150,000, respectively. The federal net operating loss and federal and state credit carryforwards will expire at various dates beginning in the years 2007 through 2009, if not utilized. The state net operating loss will expire at various dates beginning in the years 1997 through 1999, if not utilized.

Utilization of the net operating losses and credits may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986 and similar state provisions. The annual limitation may result in the expiration of net operating losses and credits before utilization.

The federal net operating loss carryforwards differ from the accumulated deficit principally due to losses incurred while the Company was a division of ABI and timing differences in the recognition of certain expense items for financial and federal tax reporting purposes, consisting primarily of certain accrued expenses that are not currently deductible for income tax purposes.

Deferred income taxes reflect the tax effects of net operating loss and credit carryforwards and of temporary differences between the carrying amounts of assets and liabilities for financial reporting and the amount used for income tax purposes.

F-16

# Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 7. Income Taxes (continued)

Significant components of the Company's deferred tax assets for federal and state income taxes as of December 31 are as follows:

|  | 1994 | 1993 |
|---|---|---|
|  | *(In thousands)* | |
| Deferred tax assets: | | |
| Net operating losses | **$ 4,200** | $ 2,600 |
| Research and development credit carryforwards | **350** | 450 |
| Capitalized research and development expenditures | **700** | – |
| Other | **300** | 200 |
| Valuation allowance | **(5,550)** | (3,250) |
|  | $ – | $ – |

The valuation allowance for deferred tax assets was $1,850,000 at June 30, 1993.

### 8. Obligations Under Operating Leases

In June 1993, the Company entered into a noncancelable operating lease line under which the Company can lease equipment up to an aggregate cost of $1,568,000 through December 31, 1994. As of the expiration date, approximately $859,000 was unused. The Company entered into a noncancelable operating lease for facilities which commenced on August 1, 1993 and expires on July 30, 2003. Under the terms of the lease, rental payments commenced in the third month of the lease and increase on a graduated scale beginning with the second year of the lease as the Company occupies additional space. The Company is recognizing rent expense on a straight-line method over the lease period. The Company has the option to extend the lease for two additional periods of five years each, with payments to be determined when the option is exercised.

## Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

**8. Obligations Under Operating Leases (continued)**

Minimum annual rental commitments under operating leases are as follows:

|  | *(in thousands)* |
|---|---|
| Years ending December 31: |  |
| 1995 | $ 638 |
| 1996 | 660 |
| 1997 | 571 |
| 1998 | 497 |
| 1999 | 511 |
| Thereafter | 1,913 |
|  | $4,790 |

Rent expense for facilities and equipment under operating leases was $424,000, $255,000 and $277,000 for the year ended December 31, 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively. Rent expense for 1992 was allocated from ABI.

**9. Subsequent Event**

In March 1995, the Company issued 1,023,000 shares of Series C convertible preferred stock at $5.00 per share for gross cash proceeds of approximately $5.1 million. Each share of Series C preferred stock is convertible into 10 shares of common stock (subject to adjustment for certain changes in the effective conversion price). Holders of the Series C preferred stock have rights and privileges similar to those of the holders of the Series B preferred stock.

## Lynx Therapeutics, Inc.

## Notes to Consolidated Financial Statements (continued)

### 4. License Agreements (continued)

#### Raggio-Italgene S.p.A. Settlement

Lynx has licensed certain technology from Temple University. Such technology was also the subject of a disputed license between Temple University and Raggio-Italgene S.p.A. ("Raggio"). Pursuant to the 1993 settlement agreement, Lynx paid Raggio a settlement fee and agreed to pay a royalty to Raggio on future product sales incorporating the technology, as defined. The settlement agreement granted Raggio the right to require Lynx to pay up to a maximum of $1,500,000 on three established adjustment dates to reduce the royalty percentage. As of December 31, 1994, Raggio has exercised its right to require Lynx to pay $1,000,000 under this agreement. This amount ($500,000 for the year ended December 31, 1994 and $500,000 for the six-month period ended December 31, 1993) has been charged to research and development expense.

#### Other

Lynx or its predecessor has entered into various other license agreements with other companies and academic institutions. Such agreements generally require Lynx to pay annual or semiannual license fees and are generally cancelable upon 60 to 120 days' notice.

### 5. Transactions with ABI

Effective June 30, 1992, in connection with the formation of the Company, Lynx and ABI entered into a Bill of Sale agreement, a Corporate Services Agreement and an Agreement of Assignment and License of Intellectual Property Rights. Under the terms of the Bill of Sale, ABI contributed to Lynx its rights, title and interest in certain inventory, equipment and other physical assets. The Agreement of Assignment and License of Intellectual Property Rights granted to Lynx certain royalty-free licenses relating to ABI's manufacturing and related technology and transferred to Lynx all of ABI's rights and obligations under certain specified license agreements and patents in order to allow Lynx to pursue the oligonucleotide therapeutics business previously conducted by ABI. Under this agreement, Lynx also granted ABI royalty-free licenses under certain Lynx patent rights and other technology, and options to obtain royalty bearing licenses under certain other Lynx patent rights, to manufacture, use and sell products outside of the field of human therapeutics.

# Exhibit Index

| **Exhibit Number** | **Description** |
| --- | --- |
| 3.4 | Certificate of Amendment of Certificate of the Amended and Restated Certificate of Incorporation of the Company. |
| 21.1 | Subsidiaries of the Company |
| 23.1 | Consent of Ernst & Young LLP, Independent Auditors |

PAGE 1

*State of Delaware*

## *Office of the Secretary of State*

Exhibit 3.4

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF "LYNX THERAPEUTICS,
INC.", FILED IN THIS OFFICE ON THE TENTH DAY OF FEBRUARY, A.D.
1995, AT 9 O'CLOCK A.M.

*Edward J. Freel, Secretary of State*

2288335    8100

950036364

AUTHENTICATION:    7411494

DATE:    02-16-95

# CERTIFICATE OF AMENDMENT
## OF THE
## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## LYNX THERAPEUTICS, INC.

**LYNX THERAPEUTICS, INC.**, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify that the original Certificate of Incorporation of Corporation was filed with the Delaware Secretary of State on February 18, 1992. The Corporation further hereby certifies that:

I.      The Board of Directors of the Corporation adopted resolutions to amend paragraph A of Article 4 of the Restated Certificate of Incorporation of the Corporation to read in its entirety as follows:

"4.

A.      This Corporation is authorized to issue two classes of shares to be designated, respectively, "Preferred Stock" and "Common Stock." The total number of shares which the Corporation is authorized to issue is one hundred forty-five million (145,000,000) shares. One hundred twenty million (120,000,000) shares shall be Common Stock, par value one-tenth of one cent ($.001) per share (the "Common Stock") and twenty-five million (25,000,000) shares shall be Preferred Stock, par value one-tenth of one cent ($.001) per share (the "Preferred Stock")."

II.     Thereafter at the Corporation's Annual Meeting of Stockholders, held January 24, 1995, the necessary number of shares as required by statute were voted in favor of the amendment.

III.    The aforesaid amendment was duly adopted in accordance with the applicable provisions of Section 242 of the Delaware General Incorporation Law.

**IN WITNESS WHEREOF**, the Corporation has caused this Certificate of Amendment of the Restated Certificate of Incorporation to be signed by Sam Eletr, Chief Executive Officer, and by James C. Kitch, Secretary, this 31st day of January, 1995.

Sam Eletr
Chief Executive Officer

ATTEST:

James C. Kitch,
Secretary

20849664
020195

**Exhibit 21.1**

# Subsidiaries of the Company

LYNXNebraska, Inc.
412 South Saddle Creek Road
Omaha, NE  68131-3707
(402) 595-2468


Spectragen, Inc.
3832 Bay Center Place
Hayward, CA 94545
(510) 670-9300

Exhibit 23.1

Consent of Ernst & Young LLP, Independent Auditors

We consent to the incorporation by reference in the Registration Statement (Form S-8 No. 33-86634) pertaining to the 1992 Stock Option Plan of Lynx Therapeutics, Inc. of our report dated February 1, 1995, except for Note 9 as to which the date is March 28, 1995, with respect to the financial statements of Lynx Therapeutics, Inc. included in the Annual Report (Form 10-K) for the year ended December 31, 1994.

*Ernst & Young LLP*

Palo Alto, California
March 28, 1995