UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

APPLERA CORPORATION - APPLIED
BIOSYSTEMS GROUP, a Delaware
corporation,

       Plaintiff,

vs.                    No. 07-CV-02845 WHA

ILLUMINA, INC., a Delaware
corporation, SOLEXA, INC.,
a Delaware corporation, and
STEPHEN C. MACEVICZ, an
individual,

       Defendants.
_____/


Deposition of

STEPHEN C. MACEVICZ

November 28, 2007


Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
License No. 5735


SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California 94010
Tel:  (650) 692-8900

25

```
 1                    I N D E X

 2                                        Page Number

 3  EXAMINATION BY

 4       Mr. Wilson                        6, 177

 5       Dr. Flowers                       175

 6

 7

 8                    E X H I B I T S

 9  Plaintiff's

10  20    Letter to Mr. Hunkapiller from
          Dr. Macevicz dated 6 June 1995        20
11
    21    Memorandum to Mr. Santos from
12        Dr. Macevicz dated 27 June 1995       36

13  22    Letter to Dr. Macevicz from
          Ms. Preston dated March 17, 1992      44
14
    23    Resume of Stephen C. Macevicz         45
15
    24    Photocopy of a Computation Notebook   57
16
    25    Agreement of Assignment and License
17        of Intellectual Property Rights
          dated June 30, 1992                   72
18
    26    Document entitled Invention Data
19        dated Monday March 05, 2007           76

20  27    Performance Review Form of
          Dr. Macevicz                         115
21
    28    Two pages from the file history
22        of patent application Serial
          08/424663                            115
23
    29    Three pages from a file history
24        Application 08242633                 116

25
```

1  30    Memorandum to Mr. Siegel from
          Dr. Macevicz dated 25 May 1995
2         With attached agreement                        117

3  31    Memorandum to Dr. Macevicz from
          Mr. Van Camp, Mr. Powell and
4         Mr. Andrus dated June 19, 1995                  118

5  32    Perkin-Elmer Applied Biosystems
          Division Supervisor's Exit
6         Checklist dated 8/7/95                          121

7  33    Letter to Dr. Hunkapiller from
          Dr. Macevicz dated 4 February 1997              137
8
     34   United States Patent 5,624,800                  154
9
     35   United States Patent 5,654,442                  160
10
     36   Document entitled Nonstatutory
11        Stock Option                                    175

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT REMEMBERED THAT, pursuant to the laws

2 pertaining to the taking and use of depositions, and

3 on November 28, 2007, commencing at the hour of

4 12:47 p.m. thereof, at the offices of Morrison &

5 Foerster LLP, 755 Page Mill Road, Palo Alto,

6 California, before me, KELLIE A. ZOLLARS, CSR

7 No. 5735, a Certified Shorthand Reporter in and for

8 the State of California, personally appeared

9

10               STEPHEN C. MACEVICZ

11

12 being called as a witness by the Plaintiff, who,

13 having been by me first duly sworn, was thereupon

14 examined and interrogated as hereinafter set forth.

15               -oOo-

16     MORRISON & FOERSTER LLP, represented by Bryan

17 Wilson and Dara Tabesh, Attorneys at Law, 755 Page

18 Mill Road, Palo Alto, California 94304-1018, appeared

19 as counsel on behalf of Plaintiff.

20     MARSHALL, GERSTEIN & BORUN LLP, represented by

21 Kevin M. Flowers, Attorney at Law, 233 South Wacker

22 Drive, 6300 Sears Tower, Chicago, Illinois

23 60606-6357, appeared as counsel on behalf of

24 Defendants Illumina, Inc.; Solexa, Inc.; and Stephen

25 Macevicz.

4

1    TECHNOLOGY & INTELLECTUAL PROPERTY STRATEGIES

2 GROUP PC, represented by Basil P. Fthenakis, Attorney

3 at Law, 1000 Elwell Court, Suite 150, Palo Alto,

4 California 94303-4318, appeared as counsel on behalf

5 of the witness, Stephen Macevicz.

6    ALSO PRESENT:  Adam Tschop, Applied Biosystems

7                Joseph Mourgos, Videographer

8

9                    -oOo-

10    THE VIDEOGRAPHER:  Here begins Videotape 1 of      12:46

11 Volume 1 in the deposition of Stephen C. Macevicz in

12 the matter of Applera Corporation versus Illumina,

13 Incorporated, in the United States District Court,

14 Northern District of California, San Francisco

15 Division.  The case number is 07 CV 02845 WHA.      12:46

16 Today's date is November 28th, 2007, the time on the

17 video monitor is 12:47 p.m.  The video operator today

18 is Joseph Mourgos, contracted by Eureka Street Legal

19 Video, 511 Eureka Street, San Francisco, California,

20 (415) 643-9190.                        12:47

21      This video deposition is taking place at

22 755 Page Mill Road, Palo Alto, California, and was

23 noticed by Morrison & Foerster.

24      Counsel, please voice identify yourselves and

25 state whom you represent.                12:47

1     MR. WILSON:  Bryan Wilson, representing Applied

2 Biosystems.  With me is Dara Tabesh with our office

3 and Adam Tschop from Applied Biosystems.

4     DR. FLOWERS:  Kevin Flowers from Marshall,

5 Gerstein & Borun in Chicago, representing Illumina,      12:47

6 Solexa, and the witness.

7     MR. FTHENAKIS:  Basil Fthenakis for Defendant

8 Stephen Macevicz.

9     THE VIDEOGRAPHER:  Would the reporter please

10 administer the oath.                                     12:48

11    (Witness sworn.)

12                      -oOo-

13                    EXAMINATION

14    BY MR. WILSON:

15    Q.  Good afternoon, Dr. Macevicz.  You've been       12:48

16 deposed a number of times before so I will dispense

17 with most of the preliminaries.  I will remind you of

18 a couple of things.  You're obviously sworn to tell

19 the truth.  I assume that you will tell the truth.

20 Is that a fair assumption for me to make?               12:48

21    A.  That's a fair assumption.

22    Q.  I will also assume that you understand a

23 question unless you tell me you don't.  Is that a

24 fair assumption?

25    A.  Yes.  Yes.                                        12:48

6

1     Q.  I tend to go fast.  If I'm going too fast,

2 let me know; I'll be happy to slow down.  If I ask

3 you a question that for any reason doesn't make any

4 sense -- because I left out a word, because I went

5 too fast, because I mumbled, or any reason at all --          12:48

6 let me know.  I won't be offended, and I will get it

7 corrected.  It is important that you understand every

8 question that I ask.  Fair enough?

9     A.  Fair enough.

10    Q.  Do you have any questions about the procedure      12:49

11 before we go ahead and get started?

12    A.  No, I do not.

13    Q.  Just as a preliminary matter we had asked

14 your counsel a few days ago if you had in your

15 possession copies of three patent applications that      12:49

16 we were unable to obtain.  They're the three

17 applications numbered 08/091603, 08/436084 and

18 08/436528.  And I understood that you looked for

19 those applications and were unable to find them; is

20 that correct?                                            12:49

21    A.  That's correct.

22    Q.  Do you know if you had them at one point and

23 disposed of them, or have you turned them over to

24 somebody else?

25    A.  I had difficulty identifying what the             12:49

7

1 application was from the number alone, so I looked at

2 the assignment document that -- in which I assigned

3 patent applications to Lynx Therapeutics some time

4 ago.  And when I did that I transferred all the

5 documents related to those applications to Lynx.          12:50

6    Q.  And the document you're referring to as the

7 assignment document is Exhibit 8 from Kathy San

8 Roman's deposition, correct?  And I'll hand you a

9 copy of it.

10    A.  Yes, this appears to be a copy of the           12:50

11 document.

12    Q.  So we will come back to that.

13        I understand that you are represented today

14 by Mr. Flowers; is that correct?

15    A.  It's partially correct.  I'm represented by     12:50

16 Mr. Flowers and Mr. Fthenakis.

17    Q.  How long have you been represented by

18 Mr. Flowers or anybody else in his office?

19    A.  I'm not sure how to answer that question.

20 Today is my -- I'm allowing -- or Mr. Flowers is       12:50

21 here, and I'm very happy with that so.

22    Q.  At some point did -- well, step back a little

23 bit.  When we met I think it was a little over a year

24 ago last summer, was Mr. Flowers representing you at

25 that point?                                             12:51

1     A.  No, he was not.

2     Q.  So sometime between then, which I believe was

3 June '06, and now, the Marshall, Gerstein firm has

4 come to represent you; is that right?

5     A.  There's no formal representation that I know     12:51

6 of.  He just mentioned a second ago that he was

7 representing the witness.

8     Q.  Is that the first time that you heard that

9 the Marshall, Gerstein firm would be representing

10 you?                                                    12:51

11    A.  Yes.

12    Q.  Do you agree to that representation?

13    A.  I can't answer that without talking to my

14 counsel.

15    Q.  Is it your understanding that Mr. Flowers is     12:51

16 here acting as your attorney for purposes of this

17 case?

18    A.  I can't answer that without talking to my

19 counsel.

20    Q.  That would be Mr. Fthenakis?                      12:52

21    A.  Mr. Fthenakis, yes.

22    Q.  Do you believe communications between you and

23 Mr. Flowers are attorney-client privileged

24 communications?

25    A.  Yes, I do.                                        12:52

1    Q.  Starting when?

2    A.  I'm not sure the precise time.

3    Q.  Are there any communications that you've had

4 with Mr. Flowers or anybody else at the Marshall,

5 Gerstein firm that you would not consider to be          12:52

6 privileged communications?

7    A.  I can't answer that question.  I don't know.

8    Q.  Well, we'll go through some of those

9 communications today so we can talk about it then.

10 Do you have any kind of an engagement letter with the     12:52

11 Marshall, Gerstein firm?

12    A.  No, I do not.

13    Q.  Do you have any kind of indemnification

14 agreement with Illumina?

15    A.  I have an indemnification agreement with Lynx     12:52

16 Therapeutics.

17    Q.  What is that indemnification agreement that

18 you've got with Lynx Therapeutics?

19    A.  I'd have to see the document to identify it

20 further.  I'm not sure how I answer your question.       12:53

21    Q.  What is the approximate date of that

22 indemnity agreement?

23    A.  I believe it's dated in 1995.

24    Q.  All right.  So it's not something more recent

25 than 1995, in other words?                               12:53

1    A.  No, it isn't.

2    Q.  Are you paying legal fees to the Marshall,

3 Gerstein firm?

4    A.  No, I am not.

5    Q.  Is somebody else paying legal fees to the          12:53

6 Marshall, Gerstein firm on your behalf?

7    A.  I do not know.

8    Q.  Now, you're also -- have you received any

9 legal bills, any bills for legal fees from the

10 Marshall, Gerstein firm?                                 12:53

11   A.  No, I have not.

12   Q.  And Mr. Fthenakis is representing you as well

13 today; is that correct?

14   A.  That's correct.

15   Q.  And he's represented you since the inception      12:53

16 of this action?

17   A.  I believe so, yes.

18   Q.  Have you been paying Mr. Fthenakis's legal

19 fees?

20   A.  Yes.                                               12:53

21   Q.  Is anybody indemnifying you for those legal

22 fees?

23   A.  Yes.

24   Q.  Who's indemnifying you for those legal fees?

25   A.  As far as I know, it's Lynx Therapeutics or       12:54

11

1  Illumina.

2      Q.  And when did you come to learn that Lynx

3  would be indemnifying you for your legal fees?

4      A.  I believe it was in the early 2007 when

5  searching for documents in response to a document        12:54

6  request.

7      Q.  So you were searching for documents?

8      A.  I believe so.  That's the event that caused

9  me to find it.

10     Q.  To find what?                                     12:54

11     A.  The indemnity agreement.

12     Q.  And then what happened next?  How did that

13  lead to the indemnification of your legal fees?

14     A.  I gave the document to Mr. Fthenakis, and we

15  discussed it.  And I believe that he presented it to      12:54

16  the Illumina attorneys.

17     Q.  And you believe that was early 2007?

18     A.  I believe so, yes.

19     Q.  Did you have any communications with the

20  Illumina attorneys at that time?                          12:55

21     A.  No, I did not.

22     Q.  Have you had any communications in writing

23  with the Illumina attorneys about the indemnification

24  of legal fees?

25     A.  No, I have not.                                    12:55

                                                                12

1     Q.  By the way, in this deposition if I refer to

2  Illumina, is it fair to use that to refer to

3  Illumina, Solexa, and Lynx since they're all one

4  company?

5     A.  Sure, that would be fine.                          12:55

6     Q.  If it would make more sense to separate them

7  out at any point, please let me know; and we'll do

8  that.

9         Do you have any kind of a written agreement

10 with Illumina to indemnify you for legal fees other     12:55

11 than the 1995 indemnity agreement to which you

12 referred?

13    A.  No, I do not.

14    Q.  Do you know approximately the amount of legal

15 fees that Illumina has paid to date on your behalf?     12:55

16    A.  I'm not sure.

17    Q.  Do you have any kind of a ballpark estimate?

18    A.  I can only guess.  Mr. Fthenakis has been

19 good to copy me in on the bills, but I confess I

20 haven't paid close attention to them.                   12:56

21    Q.  So Mr. Fthenakis has sent the bills to

22 Illumina as far as you know?

23    A.  As far as I know.

24    Q.  Have you had communications with anybody at

25 Illumina about this case or about this dispute more     12:56

13

1 generally?

2     A.   No, I have not.

3     Q.   Have you spoken with Sam Eletr about this

4 case?

5     A.   Only very briefly.                              12:56

6     Q.   And when was that?

7     A.   Sometime last summer.

8     Q.   What communication did you have with

9 Dr. Eletr?

10     A.   He called me by telephone.  Apparently he was     12:56

11 contacted by some party that's involved in this

12 dispute, and he just asked me what was going on.  And

13 you know, I told him that I couldn't talk about it;

14 that, you know, he'll just have to, you know,

15 communicate with the parties as he saw fit.              12:57

16     Q.   Did you have any further conversation about

17 the substance of the dispute?

18     A.   No.

19     Q.   Did you have any further conversation about

20 any of the inventions you had worked on when you were     12:57

21 at either Lynx or AB?

22     A.   No, we didn't go into that.  It was a very

23 short conversation.

24     Q.   Another bit of shorthand, by the way, is I'll

25 refer to Applied Biosystems as AB.  Is that fair?         12:57

                                                          14

1     A.  Yeah, that's fair.

2     Q.  Let me show you a copy of what was previously

3 marked -- better yet, let's pull it from the official

4 exhibits.  I want to pull out a copy of Exhibit 16 to

5 the deposition of Kathy San Roman.                    12:57

6     BY MR. WILSON:

7     Q.  You have before you Exhibit 16 from the

8 deposition -- actually, the corporate designee of

9 Illumina, who happened to be Kathy San Roman.  It's

10 an indemnity agreement between you and Lynx dated      12:58

11 first day of May, 1995, correct?

12     A.  Yes, it seems to be that it's May 1st, 1995,

13 indemnity agreement.

14     Q.  Is this the indemnity agreement you were

15 referring to a moment ago?                            12:59

16     A.  Yes, I believe it is.

17     Q.  And you've said that you found this in your

18 files and then that caused you to request indemnity

19 for your legal fees in this action from Illumina?

20     A.  I found this in my files, and I gave it        12:59

21 immediately to Mr. Fthenakis.

22     Q.  Where was it in your files?  Among what other

23 files?

24     A.  I had a collection of documents from my time

25 at Lynx, and it was among those files.                12:59

1     Q.  And that's your signature on the last page of

2 the agreement?

3     A.  Yes, that's my signature.

4     Q.  And it's Dr. Eletr's signature on the

5 agreement?                                        01:00

6     A.  Yes, that appears to be Dr. Eletr's

7 signature.

8     Q.  Was it signed on May 1st, 1995?

9     A.  I don't recall the actual date that it was

10 signed on.                                       01:00

11     Q.  Do you think it was within a few days of

12 May 1st, 1995?

13     A.  I think it was, yes.  But I'm not positive.

14 I don't have specific recollection.

15     Q.  In May of 1995 you were still working at AB,     01:00

16 weren't you?

17     A.  That's correct, yes.

18     Q.  You were the senior patent counsel at AB?

19     A.  Yes, I was a patent counsel at AB.

20     Q.  You were the highest ranking legal officer at     01:00

21 AB other than the general counsel at Perkin Elmer?

22     A.  Well, I'm not sure I can answer that.  I was

23 one of two attorneys at AB.  I was the only patent

24 attorney.  There was another general attorney, and

25 then there was a patent agent.                    01:01

16

1    Q.  Who was the other attorney?

2    A.  He's never going to forgive me for forgetting

3 his name.  Rick Weisberg maybe.  I'm not positive of

4 the name.  Rick Weisberg.

5    Q.  Who was the patent agent?                        01:01

6    A.  The patent agent was Paul Grossman.

7    Q.  Were you an officer of Lynx in May of 1995?

8    A.  I don't believe I was an officer of Lynx.

9    Q.  Were you ever an officer of Lynx?

10   A.  Yes, I became an officer of Lynx when I          01:01

11 started working there.

12   Q.  And when was that?

13   A.  I started working at Lynx sometime in

14 September of 1995.

15   Q.  Why did you sign an indemnity agreement with     01:01

16 Lynx in May of 1995 when you were still working for

17 AB?

18   A.  I don't have any precise recollection of why

19 we signed that at that particular time.  It was my

20 intention to leave AB and go to Lynx, and there was a  01:02

21 delay in my termination at AB because of the vesting

22 of some stock options I had, and so the difference in

23 time between when I signed this and when I actually

24 started at Lynx may have been caused by that.

25   Q.  Let's see if we can help pin down a few of        01:02

                                                          17

1 these dates.  Is it your recollection that you signed

2 this indemnity agreement after you had made the

3 decision to leave AB and go to work for Lynx?

4    A.  I don't have a specific recollection of that.

5    Q.  Is that generally how you remember the          01:03

6 sequence of events?

7    A.  I generally remember that in the spring of

8 1995 I had decided to leave AB.  I don't remember the

9 precise date when that occurred.

10    Q.  Had you told people at AB that you intended     01:03

11 to leave?

12    A.  I have no specific recollection of that.

13    Q.  Do you know or did you tell anybody at AB

14 that you were signing this indemnity agreement with

15 Lynx in May of 1995?                                   01:03

16    A.  I don't recall talking to anybody about this

17 indemnity agreement at AB.

18    Q.  So you don't think that you told Paul

19 Grossman, for example, that you signed an indemnity

20 agreement with AB?                                     01:03

21    A.  I just have no specific recollection.

22    Q.  To whom did you report at AB in May of 1995?

23    A.  I believe I reported to Mike Hunkapiller.

24    Q.  Did you tell Dr. Hunkapiller that you had

25 signed an indemnity agreement with Lynx in May of     01:03

18

1 1995?

2    A.  I have no recollection of telling Mike

3 Hunkapiller that I had signed an indemnity agreement.

4    Q.  Did you think there was any conflict or

5 potential conflict with AB that might result from    01:04

6 signing an indemnity agreement with Lynx when you

7 were still working for AB?

8    A.  I have no recollection of thinking of any

9 conflict that would arise out of this indemnity

10 agreement.    01:04

11    Q.  That's not something you thought about at the

12 time?

13    A.  I think it's fair to say that I didn't think

14 about it at the time.

15    Q.  Let me -- can we pull out Exhibit 6 to the    01:04

16 last deposition.

17    Exhibit 6 is your job offer letter from Lynx,

18 and it's dated June 1, 1995.

19    Does this help you remember one way or the

20 other whether you had accepted a job offer from Lynx    01:04

21 when you signed the indemnity agreement with Lynx?

22    A.  I don't have a specific recollection.

23    Q.  And then -- let's mark a new exhibit.  This

24 will be Exhibit 20.  We'll pick up from where we were

25 before.    01:05

1     (Exhibit No. 20 was marked for identification.)

2     BY MR. WILSON:

3     Q.  Do you recognize Exhibit 20 to be your letter

4 of resignation from Perkin-Elmer, which was the owner

5 of AB at the time?                                    01:05

6     A.  Yes, this appears to be a letter that I

7 wrote.

8     Q.  And it was on or about June 6, 1995, that you

9 gave it to Mr. Hunkapiller?  Dr. Hunkapiller.

10    A.  Yes.  It appears that's the case.            01:06

11    Q.  Does seeing that you gave notice on June 6,

12 1995, help refresh your recollection one way or the

13 other as to whether you signed the indemnity

14 agreement with Lynx before you gave notice that you

15 were leaving AB?                                     01:06

16    A.  No, it doesn't refresh my recollection in

17 that regard.

18    Q.  It appears to be the case -- excuse me.  It

19 appears to be the case from the documents that you

20 accepted or received a job offer from Lynx on --      01:06

21 excuse me.  Let me start over.

22        There was one more preliminary thing I wanted

23 to say.  Well, I just interrupted you.  And if I do

24 that, it's unintentional, and you should tell me; and

25 I'll be happy to stop talking.                       01:07

1    A.  Okay.

2    Q.  Because I tend to go too quickly, but I'm not

3 intending to interrupt you so let me know if I do

4 that.  It appears from the documents that you signed

5 an indemnity agreement with Lynx on May 1, '95, 1995,          01:07

6 and then gave notice about six weeks later that you

7 would be leaving AB.  Does that time frame sound

8 right?

9    DR. FLOWERS:  Objection to form.

10    MR. FTHENAKIS:  Join.                                      01:07

11    THE WITNESS:  I'm not sure that the letter is --

12 the date of the letter is the date I gave notice.  It

13 may have been something that followed a conversation;

14 so I'm not sure what the precise date is when I gave

15 notice.                                                        01:07

16    BY MR. WILSON:

17    Q.  Do you think it was within a few days of

18 June 6, 1995?

19    A.  I just don't have any recollection of that.

20    Q.  Did you tell -- first of all, do you remember     01:07

21 who orally you gave notice to?

22    A.  I believe it was Mike Hunkapiller.

23    Q.  Did you tell Dr. Hunkapiller that you would

24 be leaving to go to work for Lynx?

25    A.  I don't recall the details of the               01:08

21

1 conversation.

2    Q.  Do you recall when you told Dr. Hunkapiller

3 that Lynx would be the next place you would go to

4 work after leaving AB?

5    A.  I don't recall precisely talking about that        01:08

6 with him.

7    Q.  In the letter informing Dr. Hunkapiller that

8 you'd be leaving, you said you'd be leaving to pursue

9 other opportunities.  Do you know why you chose that

10 language?                                                01:08

11    A.  I have no recollection of why I chose that

12 language.

13    Q.  Is there any reason you didn't say you'd be

14 leaving Perkin-Elmer to go work for Lynx?

15    A.  I have no recollection one way or the other        01:08

16 why I colored it that way.

17    Q.  Did you speak with anybody else other than

18 Dr. Eletr about the indemnity agreement that you

19 signed with Lynx?

20    A.  I don't recall speaking to anybody.  Other         01:09

21 than Dr. Eletr.

22    Q.  Did Dr. Eletr give you the form?

23    A.  I don't recall who gave me the form.

24    Q.  Do you recall where you got it from?

25    A.  No, I don't recall.  It may have been given         01:09

22

1 to me on a visit to Lynx.  I don't know.

2     Q.  Did you tell Dr. Eletr that you had any

3 problem signing this indemnity agreement since you

4 were not an officer of the corporation at the time?

5     A.  I just had no thought about that one way or          01:09

6 the other.  I thought it was a nice generous thing

7 for him to do and so I signed it.

8     Q.  Did you understand that as senior patent

9 counsel for AB, that you owed fiduciary duties to AB?

10     A.  I understand that.                                    01:09

11     Q.  And was there any question in your mind when

12 you were working for AB that you owed the company

13 fiduciary duties?

14     A.  No, there was no question that I owed AB

15 fiduciary duties.                                             01:10

16     Q.  What are fiduciary duties?  Or what was your

17 understanding of fiduciary duties?

18     A.  My understanding is that you're in a position

19 of trust and that you don't self deal, things like

20 that.  If you have a relative that has a business,            01:10

21 that you don't favor the relative.  There's a whole

22 series of things.  Mainly it's to avoid conflicts of

23 interest, things like that.

24     Q.  When you signed the indemnity agreement with

25 Lynx on May 1, 1995, did you give any thought to             01:10

23

1 whether that was consistent with your fiduciary

2 duties to AB, who was your employer at the time?

3     A.  I don't recall considering that in that

4 specific light.  From my viewpoint now, I don't see

5 that there was any inconsistency with my fiduciary          01:11

6 duty to Lynx and the indemnity agreement.

7     Q.  Did you misspeak?  You meant your fiduciary

8 duties to AB?

9     A.  Yes, my fiduciary duty.  If I misspoke, I'm

10 sorry.                                                     01:11

11     Q.  And how is that?  How is that consistent with

12 your fiduciary duties to AB to be signing an

13 indemnity agreement with another company?  Which I

14 believe at the time was a competitor, was it not?

15     A.  Well, I'm not sure I agree with the premise     01:11

16 of your question.  As you know, I was carrying out

17 patent services for Lynx for some time before I left

18 AB and joined Lynx itself.  And that was well known

19 to AB, and there was no issue of fiduciary

20 responsibilities being compromised in any sense.        01:12

21         So when it became apparent that I was going

22 to be leaving AB and go to Lynx full time, it didn't

23 strike me as anything unusual to start the process of

24 the paperwork that's involved with becoming an

25 employee of Lynx.                                        01:12

1    Q.  Was -- zooming back to the future.  Was the

2  request you made to Illumina relatively recently to

3  indemnify you for your legal fees under this

4  agreement, was that the first time you had made any

5  demands for indemnity under this agreement to Lynx?        01:12

6    A.  Yes, it is.  Because I wasn't aware of the

7  agreement until just recently, relatively recently.

8    Q.  And what is it your understanding is the

9  basis for Illumina's agreement to indemnify you for

10  your fees?                                                01:13

11    DR. FLOWERS:  Just instruct the witness to

12  exclude from your answer information obtained through

13  attorney-client communications.

14    THE WITNESS:  Yes.

15        My understanding of the indemnity               01:13

16  agreement -- well, before I go on, could you please

17  repeat your question.

18    BY MR. WILSON:

19    Q.  Sure.  I can probably ask it more clearly.

20  Is it your understanding that you were being            01:13

21  indemnified pursuant to this indemnity agreement for

22  actions occurring on and after May 1st, 1995, in the

23  course of your work for Lynx?

24    DR. FLOWERS:  Same instruction, Dr. Macevicz.

25    THE WITNESS:  My understanding of the indemnity     01:13

                                                          25

1 agreement is that, in my capacity as an agent for

2 Lynx, that if certain claims were put against me,

3 then Lynx would pay for the defense of those claims.

4    BY MR. WILSON:

5    Q.  Does that cover any specific time period?  Or    01:14

6 is it the entire time period for which the indemnity

7 agreement was in effect?

8    A.  I would have to look at the agreement again.

9 I could not tell you off the top of my head.

10    Q.  Have you had any discussions with Illumina    01:14

11 one way or the other about what time period might be

12 covered?

13    A.  I have not discussed the indemnity agreement

14 myself with Illumina.

15    Q.  The agreement is dated, obviously, as we said    01:14

16 many times, the first day of May 1995, correct?

17    A.  Yes, that's correct.

18    Q.  So is that your understanding of when the

19 indemnity provisions went into effect?

20    A.  Again, I can't tell you that without reading    01:14

21 the agreement.  It may have been retroactive.  I

22 don't know.

23    Q.  Do you have any reason to think that it would

24 have not included any activities -- that's garbled.

25    Are there any activities that took place to    01:15

26

1 your knowledge after May 1, 1995, that would not fall

2 within the scope of the indemnity agreement?

3     A.  I can think of no such activities.

4     Q.  Does the indemnity that Illumina has agreed

5 to provide to you, to your knowledge, include         01:15

6 indemnity for liabilities associated with the

7 assignment of your patent applications to Lynx?

8     A.  I couldn't answer that without further study

9 of the document.

10     Q.  Is it something you've thought about at all?     01:15

11     A.  I haven't thought about it specifically, no.

12     Q.  How about divorcing it from the date a little

13 bit?  Is it your understanding that Illumina is

14 indemnifying you for any liabilities incurred in

15 connection with the matters raised in this lawsuit?     01:16

16     A.  It's my understanding that Illumina is

17 indemnifying me against damages incurred in

18 connection with this lawsuit.

19     Q.  Does their agreement to indemnify you for

20 activities in connection with or that are raised in     01:16

21 this lawsuit include both legal fees and liabilities?

22     A.  Again, I'd have to look at the agreement and

23 try to understand it to answer that question.

24     Q.  Is it something you've discussed with

25 Illumina at all?                                        01:16

27

1    A.  No, I have not discussed that.

2    Q.  Just so we're clear on it, though, because I

3 may not have been completely clear.  As far as you

4 understand it today, Illumina is indemnifying you for

5 legal fees and liabilities associated with the                 01:16

6 matters raised in this action; is that correct?

7    A.  Yes, that's my understanding.

8    Q.  Before Illumina agreed to indemnify you from

9 your fees, did anybody from Illumina interview you?

10   A.  Yes.  There was the interview December, about    01:17

11 one year ago, that we had at Mr. Fthenakis's office.

12   Q.  That's the one that I attended as well?

13   A.  That's correct.

14   Q.  Other than that, have you had any

15 conversations with anybody from Illumina?                      01:17

16   A.  Can you be more precise.

17   Q.  Other than Dr. Eletr, the conversation you

18 mentioned with Eletr, and other than the meeting that

19 we had at Mr. Fthenakis's office, have you had any

20 conversations with anybody at Illumina about matters     01:17

21 raised in this lawsuit?

22   A.  There was a meeting with Kevin Cochran before

23 the meeting that we had at Mr. Fthenakis's office.

24 And then there was a meeting with you last summer a

25 year ago.                                                      01:18

28

1    Q.  And other than those meetings, are there any

2 other meetings that you've had with Illumina?

3    A.  The only other meeting is with Mr. Flowers in

4 regard to his deposition.

5    MR. WILSON:  Let's take a look at Exhibit 19 from        01:18

6 the last deposition of Illumina.

7        The last one.

8    THE REPORTER:  I'm sorry.

9    MR. WILSON:  I realize they may be out of order.

10    Q.  There are -- this is a privilege log that was       01:19

11 produced in this action so it's a log of privileged

12 communications, as it sounds like.  And there are a

13 series of communications, they're items 11 to 94,

14 that list communications between you and Kevin

15 Flowers or other people at his firm, Mr. Fthenakis        01:19

16 and other people at Kevin Flowers' office and so on.

17 We're not going to go through those you'll be happy

18 to know.  But what I do want to know is do you

19 understand, and I think you said this earlier, that

20 you have an attorney-client relationship with          01:19

21 Mr. Flowers and his firm; is that correct?

22    A.  I believe that exists, yes.

23    Q.  And so you consider the conversations with, I

24 guess, Dr. Flowers or his firm to be privileged

25 communications --                                      01:19

1     A.  Yes, I would.

2     Q.  -- is that correct?

3         Do you have some kind of a joint defense

4 agreement with Dr. Flowers and the Marshall, Gerstein

5 firm as well?                                          01:19

6     DR. FLOWERS:  Objection as to form.

7     THE WITNESS:  It is my understanding that such an

8 agreement exists.

9     BY MR. WILSON:

10    Q.  But it's not one that you've seen?             01:19

11    A.  I don't recall seeing it.  I've been told

12 that it exists.

13    Q.  Do you consider communications between

14 yourself and Dr. Flowers or other attorneys at his

15 firm to be privileged?                                01:20

16    A.  Yes, I do.

17    Q.  Have you considered those communications to

18 be privileged since your first communication with

19 anybody at that firm, which according to this log,

20 would have been June 6, 19- -- 2006?                  01:20

21    MR. FTHENAKIS:  Object as to form.

22    MR. WILSON:  That's a fair objection.  I think I

23 might have mixed up the question.

24    Q.  If you look at item 11 on the privilege log,

25 there is a conversation between you and Dr. Flowers   01:20

1 dated June 6, 2006.  Do you see that communication on

2 page 4?

3        On June 6, 2006, did you consider yourself to

4 have an attorney-client relationship with Dr. Flowers

5 and his firm?                                          01:21

6    A.  I don't recall the conversation so I guess my

7 answer would have to be no.

8    Q.  Without recalling the specific conversation

9 do you believe you had an attorney-client

10 relationship such that the privilege would apply in    01:21

11 June of 2006 with the Marshall, Gerstein firm?

12    DR. FLOWERS:  Objection as to form.

13    MR. FTHENAKIS:  Join.

14    THE WITNESS:  I don't know how to answer that

15 question.                                              01:21

16    BY MR. WILSON:

17    Q.  Maybe I can ask it more clearly.  There are a

18 number of communications here going back to June of

19 2006 between you and Dr. Flowers and various

20 attorneys at his firm.  And my question is do you      01:21

21 consider all your communications with Dr. Flowers or

22 his firm going back to June 2006 to be within the

23 context of an attorney-client relationship?

24    MR. FTHENAKIS:  Objection as to form.

25    DR. FLOWERS:  Join.                                 01:21

                                                     31

1      THE WITNESS:  Again, I don't know how to answer

2  that question.  I don't recall these conversations so

3  I don't recall the content.

4      BY MR. WILSON:

5      Q.  Do you have any reason to think that          01:22

6  communications you had starting in June 2006 with

7  Dr. Flowers or his firm were not attorney-client

8  privileged communications?

9      DR. FLOWERS:  Objection as to form.

10     MR. FTHENAKIS:  Join.                              01:22

11     THE WITNESS:  Again, I don't know how to answer

12 that question.

13     BY MR. WILSON:

14     Q.  When is the first communication that you

15 recall having with Dr. Flowers?                        01:22

16     A.  I recall receiving a voicemail message from

17 him that I didn't respond to.  Then the next

18 communication with Dr. Flowers that I can

19 specifically remember is the interview in December of

20 2006.                                                  01:22

21     Q.  You notice on the log for items 11 through

22 94, they're e-mails.  They're identified -- these

23 communications are identified as e-mails, they're not

24 oral communications.

25     A.  Yeah.                                          01:23

                                                          32

1    Q.  Did you have e-mail correspondence with

2 Dr. Flowers?

3    A.  He may have sent me an e-mail; but, again, I

4 don't believe I responded to it.  Or if I did respond

5 to it, it was not substantive.  It was just an          01:23

6 acknowledgment.

7    Q.  This is a privilege log that was prepared by

8 the Cooley Godward law firm.

9    A.  Uh-huh.

10    Q.  Do you know why they would have been -- why     01:23

11 they were included on communications between you and

12 Dr. Flowers?

13    A.  I don't know.

14    Q.  Do you -- the Cooley Godward firm has claimed

15 an attorney-client privilege over these e-mails.        01:23

16    A.  Uh-huh.

17    Q.  Do you have any reason to think that claim of

18 privilege is incorrect?

19    DR. FLOWERS:  Object as to form.

20    MR. FTHENAKIS:  Join.                                01:23

21    THE WITNESS:  Again, I don't know how to answer

22 that because I can't remember the content.

23    BY MR. WILSON:

24    Q.  Do you disagree with that claim of privilege?

25    DR. FLOWERS:  Objection.                             01:23

33

1    MR. FTHENAKIS:  Join.

2    THE WITNESS:  I neither agree nor disagree with

3 it because I don't understand what the issues are.

4    BY MR. WILSON:

5    Q.  When you were looking for documents to          01:24

6 produce in this litigation pursuant to various

7 document requests, did you find e-mail correspondence

8 between you and Dr. Flowers?

9    A.  No.  I wasn't looking for e-mail, I was

10 looking for documents responsive to the request from   01:24

11 your firm, I believe.  And I didn't look at the

12 e-mail.  I didn't think that was relevant to the --

13    Q.  When you were looking for documents

14 responsive to our request, did you look through your

15 e-mail to see if there were responsive documents in    01:24

16 your e-mail?

17    A.  No.  Because I was looking for the documents

18 for the era that I worked at AB.

19    Q.  All right.  Do you have any objection to

20 going back and looking in your e-mail to see if there   01:24

21 are documents that might be responsive to the

22 requests that we made?

23    A.  I'm happy to look.

24    DR. FLOWERS:  Just for the record, any e-mails

25 originating with our firm or received, Dr. Macevicz,    01:25

34

1 I'm not sure there are any, would be listed on this

2 log.  That's our understanding.

3    MR. WILSON:  Okay.

4    DR. FLOWERS:  So I don't believe there is

5 anything that Dr. Macevicz would find in his search,    01:25

6 I believe it would be cumulative.

7    MR. WILSON:  And you would be asserting a claim

8 of privilege over them consistent with these

9 objections, I assume?

10    DR. FLOWERS:  Yes.    01:25

11    MR. WILSON:  All right.  Because it's not really

12 fair to ask Dr. Macevicz to remember these e-mails.

13 So that's all I'm getting at.  If it's your position

14 as counsel for Dr. Macevicz that these communications

15 in items 11 through 94 are privileged, I think that    01:25

16 that serves the purpose.

17    DR. FLOWERS:  Yes, I think the purpose is served.

18    MR. WILSON:  Okay.  So that is the case, then you

19 agree with the assertion of privilege?

20    DR. FLOWERS:  Yes.    01:25

21    BY MR. WILSON:

22    Q.  If you can look at the last document on the

23 privilege log.  It's 157.  There is a letter dated

24 July 10, 1995, from you to Dr. Eletr.  And it's

25 described as reflecting attorney-client communication    01:26

35

1 and attorney work product.  Do you know what that

2 document is?

3     A.  I have no idea.

4     Q.  This was at a time, in July 1995, when you

5 were still working for AB, right?                    01:26

6     A.  I'm not sure what the precise date was when I

7 terminated from AB.

8     MR. WILSON:  Let's mark this as Exhibit 21.

9     (Exhibit No. 21 was marked for identification.)

10    BY MR. WILSON:                                   01:27

11    Q.  Exhibit 21 is a memo from you to Hugo Santos

12 dated 27 June 1995 regarding extension of termination

13 date to 1 August.

14    A.  Yes.

15    Q.  Does this refresh your recollection about the   01:27

16 date on which you left AB?

17    A.  Okay.  So this document refreshes my memory

18 as to when my termination date was.  It appears that

19 the termination date was August 1st, 1995.

20        I still don't know what that communication      01:27

21 was that you were referring to on the log.

22    Q.  Is there -- do you have any recollections of

23 providing confidential legal advice to Dr. Eletr at

24 Lynx before you left the employ of AB?

25    A.  I don't have any recollection of that.         01:28

1   Q.  Is it consistent with your recollection of

2 the work you were doing at AB that you would have

3 been providing confidential legal advice to Dr. Eletr

4 when you were still working for AB?

5   A.  Well, as we've discussed before, I was          01:28

6 working for Lynx all along during my tenure at AB,

7 and all during that time Dr. Eletr, I believe, was

8 the CEO of Lynx.  The nature of my work was primarily

9 patent work.  And so to the extent that giving advice

10 about patent positions is legal advice, then yes, I      01:29

11 did provide advice.

12   Q.  Would that be confidential as against AB?

13   A.  Uhm --

14   DR. FLOWERS:  Objection as to form.

15   THE WITNESS:  I would say that it was          01:29

16 confidential as to AB once Lynx spun out as an

17 independent company.  There would be no reason why I

18 would share it with other people at AB because it

19 didn't deal with AB's business.

20   BY MR. WILSON:                                     01:29

21   Q.  And you didn't see any consistency -- any

22 inconsistency with your position as AB's patent

23 counsel to be giving confidential legal advice to

24 Lynx when you were still employed by AB?

25   A.  Well, I can ask you the same question.  When     01:29

37

1 you have more than one client, do you find any

2 inconsistencies?

3      Q.  Well, you asked a pertinent question, which

4 is when you were working for AB and were doing patent

5 work for Lynx, in your view did you have more than          01:29

6 one client?

7      A.  I viewed Lynx as a client, yes.

8      Q.  Did you view AB as a client as well?

9      A.  Yes, I did.

10     Q.  Did you view them as separate clients?          01:30

11     A.  Yes, I did.

12     Q.  Did you think that there were potential

13 conflicts between the two clients, AB on the one hand

14 and Lynx on the other?

15     A.  Not in what I did.  I didn't see that there          01:30

16 was a conflict.

17     Q.  Did you think that there was a potential for

18 conflict?

19     A.  I don't know.  I didn't think about it at the

20 time because it never arose for me.          01:30

21     Q.  Did you advise either Lynx or AB at the time

22 you were doing legal work for both of the companies

23 that there was a potential for conflict between the

24 two companies?

25     A.  Well, there were -- I can't recall talking to          01:30

38

1 anybody about any potential conflict, and I can't

2 remember thinking that there was a conflict in the

3 work that I was performing for Lynx.

4    Q.  And you're talking about actual conflicts,

5 right?                                                      01:30

6    A.  Actual conflicts, yes.  Like a decision

7 favorable to Lynx would be negative automatically to

8 AB for example.

9    Q.  Did you understand that there was a potential

10 for conflicts, even if you saw no actual conflicts?        01:30

11    A.  I'm not sure how to answer your question.  I

12 mean, there could always be a potential for a

13 conflict; but there were no conflicts that I could

14 discern in the work that I was performing for Lynx.

15    Q.  Did you advise AB that there was a potential     01:31

16 conflict because of the fact you were doing legal

17 work for both AB and for Lynx?

18    A.  The answer's the same.  There was -- I was

19 working for Lynx as a part -- originally as a part of

20 my duties at AB.  So if there were potential            01:31

21 conflicts, my assumption -- I speculate it was that

22 it had been thought through and it was acceptable to

23 AB.  Although, personally, as I said before, I didn't

24 see any conflicts in what I was doing for Lynx and

25 doing for AB.                                           01:32

1    Q.  But did you ever tell anybody at AB that

2 there was a potential for conflict arising out of the

3 fact that you were representing both AB and Lynx?

4    A.  I don't recall talking to anybody about that

5 topic.                                              01:32

6    Q.  Did you ever tell anybody from Lynx that

7 there was a potential for conflict because you were

8 doing legal work for both Lynx and AB while you were

9 still working at AB?

10    A.  For the same reason.  I never talked -- I    01:32

11 don't recall talking to anybody about that topic.

12    Q.  And can I further assume that you didn't get

13 a written waiver of conflicts from either AB or from

14 Lynx when you were doing legal work for both of the

15 companies during your employment by AB?             01:32

16    A.  I have no recollection of obtaining written

17 waivers of conflicts.

18        I need to take a break if it's all right.

19    MR. WILSON:  Oh, sure.

20    THE VIDEOGRAPHER:  Going off the record.  The    01:33

21 time is 1:33 p.m.

22    (Recess taken.)

23    THE VIDEOGRAPHER:  We are back on the record.

24 The time is 1:41 p.m.

25    BY MR. WILSON:                                   01:41

                                                        40

1    Q.  All right.  Just a couple of things I wanted

2 to clarify before we move on to something else.  You

3 said that you had been doing patent work for Lynx

4 when you were -- during your time with AB; is that

5 right?                                                   01:41

6    A.  That's correct.

7    Q.  But is it correct that when you were doing

8 work for Lynx, you were always doing it still as an

9 employee for AB?

10        Employee of AB.  I got the wrong preposition.   01:42

11        Before you left AB is it correct that you

12 were doing some patent work for Lynx?

13   A.  That is correct.

14   Q.  And you were doing that in your capacity as

15 an employee of AB?                                       01:42

16   A.  Yes, I was an employee of AB at the time.

17   Q.  Was Lynx paying for your services when you

18 were doing work for Lynx?

19   A.  That was my belief at the time.

20   Q.  Is it your belief now?                            01:42

21   A.  I've learned nothing to change that belief.

22   Q.  We also talked -- or I talked -- I asked

23 about whether Lynx was a competitor of AB, and you

24 said they weren't.  Was -- are you familiar with a

25 company called Spectragen?                               01:42

1    A.  Yes, I am.

2    Q.  Was Spectragen ever a competitor of AB?

3    A.  I don't believe so.

4    Q.  What have you done in the way of preparation

5 for today's deposition?  Did you review any                01:42

6 documents?

7    A.  Yes, I looked at documents.

8    Q.  Which documents did you look at?

9    DR. FLOWERS:  Instruct the witness not to answer.

10 That calls for disclosure of work product.                 01:43

11    BY MR. WILSON:

12    Q.  Who provided the documents to you?

13    A.  In some cases Mr. Flowers, in some cases

14 Mr. Fthenakis.

15    Q.  When did they provide the documents to you?       01:43

16    A.  Yesterday.  And today.

17    Q.  So did you meet with them yesterday in

18 preparation for the deposition?

19    A.  Yes, I did.

20    Q.  How long did you meet with them yesterday?        01:43

21    A.  I would estimate a couple of hours.

22    Q.  Did you meet at the Fthenakis office?

23    A.  That's correct, yes, I did.

24    Q.  Who was present besides Mr. Fthenakis and

25 Dr. Flowers?                                                01:43

1      A.  There was nobody there besides Mr. Fthenakis

2 and Dr. Flowers.

3      Q.  Did you meet with them again today?

4      A.  Yes, I did.

5      Q.  Who was present today?  Anybody besides the          01:44

6 three of you?

7      A.  The three of us were present at

8 Mr. Fthenakis's office.

9      Q.  Did anybody join you by phone in either

10 today's meeting or yesterday's meeting?                       01:44

11     A.  Yes.

12     Q.  Who joined you by phone?

13     A.  Another attorney from Mr. Flowers' office.

14     Q.  Was that John Labbe?

15     A.  Yes, I recognize that name.                           01:44

16     Q.  And so you reviewed some documents.  Did you

17 read the deposition transcript of Kathy San Roman?

18     A.  No, I did not.

19     Q.  Did you review any deposition transcripts

20 from depositions that you've given in the past?              01:44

21     A.  No, I did not.

22     Q.  Did any of the documents that you reviewed in

23 the course of your preparation refresh your

24 recollection about any of the events in this case?

25     A.  The documents are documents that I had seen          01:44

1 before so I had no further recollection in response

2 to seeing them either today or yesterday.

3     Q.  So you mean you had seen them before ten

4 years ago, or you had seen them before more recently

5 than that?                                              01:45

6     A.  I can't recall.  It may have been both so --

7 there are documents that I was familiar with, I had

8 seen before.

9     MR. WILSON:  One thing I'm noticing on the camera

10 is the visitor tag is showing up.  So you could take    01:45

11 that off.  We don't need to -- despite our rigorous

12 security procedures at the front desk, I don't think

13 we need that on the video necessarily.

14     THE WITNESS:  Okay.

15     MR. WILSON:  Unless it makes you happy to have it   01:45

16 on.  In which case you're certainly welcome to

17 continue.

18         Let's go back and firm up a couple of other

19 dates.

20         Let's mark this as Exhibit 22.                  01:45

21     (Exhibit No. 22 was marked for identification.)

22     BY MR. WILSON:

23     Q.  Do you recognize Exhibit 22 to be a copy of

24 the job offer letter that was made to you by AB?

25     A.  I don't recall this letter, but it appears to   01:46

1 be authentic.

2    Q.  That's your signature on the second page of

3 the letter?

4    A.  Yes, that's my signature.

5    Q.  And March of 1992 is consistent with when you    01:46

6 recall receiving a job offer from AB initially?

7    A.  That seems about the right time frame.

8    MR. WILSON:  Let's mark as Exhibit 23 a copy of

9 your resume.

10    (Exhibit No. 23 was marked for identification.)    01:47

11    BY MR. WILSON:

12    Q.  Is Exhibit 23 a copy of your resume?

13    A.  Yes, this appears to be my resume.

14    Q.  It lists as your second position -- second

15 position going from the top, senior patent attorney    01:47

16 at Perkin-Elmer, Applied Biosystems.  That's the job

17 you had at AB; is that right?

18    A.  Yes, it is.

19    Q.  From 1992 to 1995?

20    And when did you prepare this resume?    01:47

21    A.  I can't recall from the information that's on

22 here.

23    Q.  But in any event it's sometime after 1995

24 because it lists Lynx, correct?

25    A.  That's safe to assume.    01:48

1    Q.  And it provides a description of the work

2 that you did at AB.  Is the description in here

3 accurate?

4    A.  It looks accurate.

5    Q.  The first item you list is "managed and          01:48

6 expand patent portfolio in genetic analysis field."

7 Can you tell me a little bit more what you mean by

8 that?

9    A.  I think the document describes that itself.

10 It's instrumentation improvements, fluorescent dyes,     01:48

11 diagnostics and genotyping applications of those

12 instruments.

13    Q.  What do you mean when you say you were

14 responsible for managing and expanding the patent

15 portfolio?                                              01:49

16    DR. FLOWERS:  Objection as to form.

17    THE WITNESS:  So, could you ask -- restate the

18 question.

19    BY MR. WILSON:

20    Q.  Were you responsible for managing and           01:49

21 expanding the patent portfolio at AB?

22    A.  My primary duty was patent prosecution.  And,

23 so, in that sense I was responsible for writing new

24 patent applications and communicating with outside

25 attorneys handling patent applications that already     01:49

46

1 existed or were prepared outside.

2     Q.  What do you mean by expand patent portfolio?

3     A.  I think I mean writing new patent

4 applications.

5     Q.  Do you mean expanding the scope of the patent          01:49

6 portfolio in terms of the subject matter coverage or

7 just expanding the number of patents, or both?

8     A.  I would say it would be preparing patent

9 applications in response to requests from inventors

10 at ABI.                                                        01:50

11     Q.  Under interests you list analytical

12 technologies and biotechnology and genomics fields.

13 What were you referring to there?

14     A.  I think I was referring to a longstanding

15 interest that I've had in those sorts of                       01:50

16 technologies.

17     Q.  Is one of the interests that you had before

18 you came to work for AB sequencing by hybridization?

19     A.  Yes, that's correct.

20     Q.  Have you done work in sequencing by                    01:50

21 hybridization before you went to work for AB?

22     A.  Yes, I had.

23     Q.  What was the work you had done?

24     A.  I prepared a patent application describing an

25 invention.                                                     01:50

47

```
 1    Q.  Did you file that on your own behalf?

 2    A.  Yes, I did.

 3    Q.  Was it ever issued as a patent?

 4    A.  Yes, it was.

 5    Q.  So it led to an issued patent?              01:51

 6    A.  That's correct.

 7    Q.  Do you assign that patent to anybody?

 8    A.  I think eventually I assigned it to another

 9 party.

10    Q.  Do you know which party?                    01:51

11    A.  I believe it was HySeq.

12    Q.  Do you recall when you assigned it to HySeq?

13    A.  I can't remember the precise time.  It was --

14 I can guess perhaps, but I don't know the precise

15 date.                                             01:51

16    Q.  Do you know if the patent was issued when you

17 were working for AB?

18    A.  That I can't recall.

19    Q.  Do you know if you assigned it to HySeq after

20 you were working for AB?                          01:51

21    A.  I believe that was the case.

22    Q.  So you think it was -- I think I misspoke.

23        Did you assign it to HySeq after you were

24 working for AB or while you were still working for

25 AB?                                               01:51
```

1    A.  I can't recall the precise date.  The best I

2 can recall was that I did assign it to HySeq while I

3 was still working at AB.

4    Q.  Did you ever offer that patent to AB?

5    A.  Uhm, I don't have a specific recollection,        01:52

6 but I do have general recollections of discussing

7 that technology with people at AB.

8    Q.  Sequence by hybridization work?

9    A.  Yes.

10    Q.  What were the discussions that you recall        01:52

11 generally?

12    A.  Just the nature of the approach to

13 sequencing.  So, there -- to the best of my

14 recollection they were primarily technical

15 discussions.                                            01:52

16    Q.  Do you recall who any of those discussions

17 were with?

18    A.  Not directly.  But I believe Mike Hunkapiller

19 saw it, a description of it.  A written description

20 of it.                                                  01:53

21    Q.  Did you offer to license any sequencing by

22 hybridization technology to AB?

23    A.  I may have done that.  I don't recall

24 specifically.

25    Q.  Do you consider this sequencing by             01:53

49

1 hybridization technology you discussed with

2 Dr. Hunkapiller to be part of your work for AB or

3 outside of your work for AB?

4     A.  I considered it to be totally outside of AB.

5     Q.  Why was that?                                    01:53

6     A.  Well, because, first off, none of the work

7 was done while at AB.  The work was primarily done

8 before I came to AB.  And it really wasn't related to

9 what AB was doing commercially.

10    Q.  Do you recall doing any work in sequencing by    01:53

11 hybridization or relating to sequencing by

12 hybridization when you were at AB?

13    A.  I don't recall specifically.

14    Q.  Let me show you what was marked as Exhibit 1

15 to the deposition of Kathy San Roman's deposition a    01:54

16 couple weeks ago.

17         And this says Job Description Patent

18 Attorney.  Which matches -- actually, let me start

19 over.  It says "Job Description, Senior Patent

20 Attorney," which matches the position that you said    01:54

21 you held at AB on your resume of senior patent

22 attorney.  Does this job description describe the job

23 that you had at AB?

24    A.  I think it describes some elements of the

25 job, but I think it goes beyond what I was actually    01:55

1 doing there in reality.

2    Q.  Where do you think it goes beyond what you

3 were doing in reality?

4    A.  Well, for one thing, in No. 4, there was no

5 invention disclosure system.  And there was no audits      01:55

6 of AB practices and health and safety or no

7 intellectual property that I was aware of at the

8 time.  And my role in licensing matters was very

9 limited at first, and it expanded as my tenure

10 continued there.  But it was not the predominant job      01:56

11 that I did there.  And there was little or no FDA

12 submissions when I was there.

13    Q.  Is No. 1 accurate?  Or to be more specific,

14 is it accurate that part of your job was to "make

15 suggestions as to what research is required to      01:56

16 provide requisite" --

17    (Interruption by the reporter.)

18    MR. WILSON:  -- (continuing) "experimental

19 evidence to attain the broadest possible patent

20 coverage"?      01:57

21    Q.  Let me break that down a little bit.  Was one

22 of the things you were responsible for was obtaining

23 the broadest possible patent coverage for AB?

24    A.  Well, as my job as a patent attorney, that

25 was part of the job when I was given an invention      01:57

51

1 disclosure to describe it in a way that provided

2 maximal coverage.

3     Q.  And so much more simply, then, you didn't say

4 there was anything about 1, 2, and 3 on the senior

5 patent attorney job description that you thought was          01:57

6 inaccurate?

7     A.  Well, I didn't say that it was accurate

8 either.

9     Q.  Okay.  Well, that's my next question.  Is it

10 accurate?                                                    01:57

11        Maybe a better way to put it is is it

12 complete?  Is there anything that you did in the

13 course of your job responsibilities for AB that is

14 not included in this job description?

15     A.  Well, my primary job was doing patent          01:57

16 prosecution and preparing patents.  There was some

17 agreement work that usually had an intellectual

18 property component.  There was other duties that were

19 typical of an in-house patent attorney, like giving

20 talks to the staff occasionally.  But the workload      01:58

21 was quite high there per capita so there wasn't a

22 luxury, as I recall, to have a formal, like,

23 invention disclosure system.  There was nothing there

24 when I got there, and there literally wasn't enough

25 time to put into place such structures.                  01:58

52

1    Q.  So you were really focused on the patent

2 prosecution side of things?

3    A.  That's correct.

4    Q.  And your mission was to get the broadest

5 possible patent coverage that you could for AB?          01:58

6    DR. FLOWERS:  Objection as to form.

7    MR. FTHENAKIS:  Join.

8    THE WITNESS:  When I was given a patent

9 application -- a patent disclosure, invention

10 disclosure, the job of a patent attorney is to do          01:58

11 that.  And that's what I did.

12    BY MR. WILSON:

13    Q.  Did you use your independent judgment to make

14 decisions about the scope of patent protection that

15 you would seek?          01:59

16    A.  Well, it would depend greatly on the

17 invention.  If the invention was very simple, I would

18 say yes.  If the invention was more complex, like an

19 organic dye or something, I would rely much more on

20 the chemists that were the inventors.          01:59

21    Q.  Did you exercise independent judgment about

22 which inventions might be suitable for patent

23 applications and which inventions might not be

24 suitable for patent applications?

25    A.  I mostly recall filing on everything.          01:59

53

1    Q.  On everything being what?

2    A.  Well, when somebody would come with an

3 invention disclosure, likely we would file on it.  I

4 don't have any specific recollection of turning

5 somebody down.                                          01:59

6    Q.  Why was that the case that you would likely

7 file on anything that an inventor came to you with?

8    A.  I think the inventors at AB that I dealt with

9 were reasonably sophisticated.  I find that people in

10 the chemistry profession tend to have a fairer         02:00

11 knowledge of what it takes to get a patent and when

12 is something patentable or not.  And my recollection

13 is that I either dealt with chemists or engineers

14 primarily, so both those professions made life very

15 easy.  They came with things that usually were unique  02:00

16 and patentable.

17    Q.  Do you recall ever deciding not to pursue a

18 patent application for something because you thought

19 it was outside of the scope of AB's business?

20    A.  I don't recall anything like that.             02:00

21    Q.  What was the scope of AB's business?

22    DR. FLOWERS:  Objection as to form.

23    MR. FTHENAKIS:  Join.

24    THE WITNESS:  So, my recollection of AB's

25 business was that they prepared instrumentation and    02:01

54

1 reagents to carry out various analytical processes in

2 the life science area; and typically they would not

3 develop the process itself, they would license it in.

4 Like their DNA sequencing, their protein sequencing,

5 their DNA synthesis are examples of technologies that          02:01

6 they licensed in and then made into a very successful

7 product.

8      BY MR. WILSON:

9      Q.  Was the company involved in basic research

10 and development activities as well as product                  02:01

11 development?

12      DR. FLOWERS:  Objection as to form.

13      MR. FTHENAKIS:  Object as to form.

14      THE WITNESS:  I would say the predominant

15 research there was directed towards improving                  02:01

16 processes that they licensed in.

17      BY MR. WILSON:

18      Q.  Did any of the research concern or relate to

19 methods of DNA sequencing?

20      MR. FTHENAKIS:  Objection as to form.                     02:02

21      THE WITNESS:  It depends on what you mean by

22 relate.  Many of the inventions I would characterize

23 as improvements to existing DNA sequencing

24 methodologies.  In the case of ABI, that would be the

25 Sanger base sequencing methodology.                            02:02

1    BY MR. WILSON:

2    Q.  Was ABI interested in developing new methods

3 of DNA sequencing?

4    DR. FLOWERS:  Objection as to form.

5    THE WITNESS:  First off, there weren't many        02:02

6 alternatives to the DNA sequencing method developed

7 by Dr. Sanger.  I would say that ABI was not

8 interested in developing unproven technologies,

9 whether it's sequencing or otherwise.

10    BY MR. WILSON:                                      02:03

11    Q.  What's your basis for saying that?

12    A.  My basis is my experience being at AB and

13 observing the technologies that they did invest their

14 money in.  Almost --

15    Q.  Did --                                          02:03

16    A.  -- always they were technologies that were

17 licensed in from institutions like Cal Tech; or in

18 the case of the DNA synthesis technology, it was, I

19 think, university patents.  They didn't develop those

20 basic techniques themselves.                          02:03

21    Q.  Did you ever prosecute patents on behalf of

22 any AB scientists on technologies you considered to

23 be unproven technologies?

24    A.  I don't recall doing so.

25    MR. WILSON:  Let's take a look at your lab          02:04

1 notebooks.  Which have not been previously marked, so

2 let's mark them as Exhibit 23, I think.

3     THE REPORTER:  It's actually 24.

4     (Exhibit No. 24 was marked for identification.)

5     BY MR. WILSON:                                    02:04

6     Q.  Exhibit 24 is a document with a front cover

7 "Computation Notebook" and it's Bates numbered MAC 26

8 through 7.  Is this a document that you recognize,

9 Dr. Macevicz?

10    A.  Yes, it looks like an excerpt from my         02:05

11 personal notebook.

12    Q.  On the first page -- what do you mean your

13 personal notebook?  Let's start with that.  What do

14 you mean your personal notebook?

15    A.  As I mentioned before, I have a longstanding   02:05

16 interest in analytical technologies in the

17 biotechnology field; and so when I'd have ideas, I'd

18 jot them down in a notebook that I kept at home.

19    Q.  And this was one of those notebooks?

20    A.  Yes.                                           02:06

21    Q.  Do you have a series of notebooks or is this

22 the only one?

23    A.  This is the only one from this era.

24    Q.  Did you take this with you from job to job?

25    MR. FTHENAKIS:  Objection as to form.             02:06

                                                        57

1    DR. FLOWERS:  Join.

2    MR. WILSON:  That's a fair objection.

3    Q.  So this is a -- did you start a new notebook

4 when you started at a different job time period?  I

5 guess what I'm really asking, do you have any system          02:06

6 when you started a new notebook or would you just go

7 to the end and start new?

8    A.  Well, I started in the beginning, first page,

9 until I filled it up, and then I'd get another one.

10    Q.  Did this particular notebook have anything in      02:06

11 it relating to your work at AB?

12    A.  I would say absolutely no.

13    Q.  And why would you say that?

14    A.  Because I didn't do any work -- AB work or

15 related work in this notebook.  These were things            02:06

16 that I did outside of work on my own.

17    Q.  Were you careful to keep the work that you

18 were doing outside of work on your own separate from

19 the work you were doing at AB?

20    A.  Yes.                                                 02:07

21    Q.  One of the ways you did it was by keeping a

22 separate notebook; is that correct?

23    A.  Yes.  Yes.

24    Q.  Did you ever work on this notebook while at

25 work at AB?                                                  02:07

                                                        58

1    A.  No, I have no recollection of ever bringing

2 it into AB except for the few times that I had

3 colleagues sign certain pages of it.

4    Q.  Which we'll come to shortly.

5        There's an entry on the first page "1        02:07

6 February 1991."  That's before you're working at AB,

7 right?  It's on page 27.  MAC 27.

8    A.  Yes, it is.

9    Q.  What is that referring to?  It says "hybrid

10 seq"?  Is that hybridization sequence?  What is that    02:07

11 referring to there?

12    A.  Well, I might be able to decipher parts of

13 it.

14    Q.  All right.  If you're not sure, let's skip to

15 another entry.                                          02:08

16        4 February 1991 on MAC 29.  Does that say

17 "Hybridization Sequencing with PCR"?

18    A.  Yes.

19    Q.  So is this describing a method for sequencing

20 by hybridization?                                       02:08

21    A.  I would say so.

22    Q.  And 4 February 1991 was before you were

23 working for AB, correct?

24    A.  That's correct.

25    Q.  And then on page MAC 31, there's an entry    02:09

1 dated 19 July 1992.  And this is saying further ideas

2 on hybridization sequencing.  Is that a continuation

3 of the entry or the thoughts that are documented in

4 the entry dated February 4th, 1991, or is it

5 something different?                                    02:09

6      A.  It looks like they're related.

7      Q.  Related in what sense?

8      A.  Related in that they both seem to be a

9 variant of sequencing hybridization.  Sequencing by

10 hybridization that involves PCR in some way.            02:10

11      Q.  And it looks like what you've described in

12 here is a ten-step process continuing up to

13 page MAC 35; is that correct?

14      A.  Well, I don't know if this would be a

15 ten-step process, but I divided its description into    02:10

16 ten pieces.

17      Q.  That's a better way of expressing it.

18      A.  Okay.

19      Q.  So it's a -- is it a description of a process

20 for sequencing by hybridization about which you made    02:11

21 10 points which you've written out on pages MAC 31

22 through MAC 36?  Excuse me, MAC 35.

23          Well, in fact, let's go back.  Let's go back

24 a minute.  On MAC 36 there's what appears to be a

25 No. 11; is that right?  So is that a continuation of    02:11

60

1 the 10 points?

2      A.  I can't recall; but it looks like, again,

3 it's related to the same topic in some sense.

4      Q.  All right.  And this is -- by July of 1992

5 you're now working at AB, correct?                     02:11

6      A.  Yes, I believe that's correct.

7      Q.  But this work, is it your testimony, did not

8 have anything to do with the work you were doing at

9 AB?

10     DR. FLOWERS:  Objection as to form.             02:11

11     MR. FTHENAKIS:  Join.

12     BY MR. WILSON:

13     Q.  Did this work that's described on pages

14 MAC 31 through MAC 35 of your notebook have anything

15 to do with the work that you were doing at AB?        02:12

16     A.  Well, this work is a -- a hobby invention, my

17 work at AB was being a patent attorney.  So I would

18 say it didn't have anything to do with my work at AB.

19     Q.  Was there any overlap of the subject matter

20 between the hobby invention you're describing on      02:12

21 pages MAC 31 through 35 and the work you were doing

22 at AB?

23     A.  So, overlap in what sense?

24     Q.  Subject matter.

25     DR. FLOWERS:  Objection as to form.             02:12

1      THE WITNESS:  There's many pieces of subject

2 matter.  For example, this variant of sequencing by

3 hybridization appears to use a polymerase chain

4 reaction as an element.  And certainly that was

5 something that AB was interested in.  But other than          02:12

6 that, it's not related to anything that they were

7 doing.

8      BY MR. WILSON:

9      Q.  Was AB interested in seeking methods of

10 sequencing by hybridization?                                  02:13

11     A.  As far as I know, they were not.

12     Q.  There's a signature down in the bottom of

13 pages MAC 31, 32, 33, 34, and 35.  Whose signature is

14 that?

15     A.  I believe it's a signature of Steve Fung.            02:13

16     Q.  Was he a scientist at AB?

17     A.  That's correct.

18     Q.  What was his position?

19     A.  I believe he was a chemist.

20     Q.  Did he report to you?                                02:13

21     A.  No, he didn't.

22     Q.  Did he work with you?

23     A.  No, he was not connected with the legal

24 department.

25     Q.  Why did you have Dr. Fung sign these pages?          02:13

1     A.  I knew Steve Fung.

2     Q.  So why did you ask him to sign these pages?

3 Because he's somebody you happened to know?

4     A.  I happened to know he was technically

5 inclined so I thought he would understand these pages     02:13

6 with my description of them.

7     Q.  What was the purpose of having him sign these

8 pages?

9     A.  To have somebody witness the conception date

10 of the idea.                                              02:14

11     Q.  Why did you want him to do that?

12     A.  Because I believe this was the subject matter

13 of patent applications I filed.

14     Q.  Did you eventually file a patent application

15 on this method of sequencing by hybridization?           02:14

16     A.  I believe I did.

17     Q.  And did you assign that patent application to

18 Lynx eventually?

19     A.  I believe it was one of those, yes.

20     Q.  One of the four patent applications you        02:14

21 assigned to Lynx?

22     A.  Yes, I believe so.

23     Q.  If we go back and look at the assignment for

24 a moment.  Which I don't think you have in front of

25 you yet.  Do you?                                        02:14

1          We didn't pull that out yet, did we?

2     A.  I have to dig through there.

3     Q.  I'll do the digging.  That's why I get the

4 big bucks.

5          Since I can't find it, maybe I won't get the          02:15

6 big bucks.

7     DR. FLOWERS:  It was in front of him.

8     MR. WILSON:  Did we put it in front of you?

9     DR. FLOWERS:  The list of the four ap- --

10    MR. WILSON:  I couldn't remember if we actually          02:15

11 pulled it out or just talked about it.

12    Q.  All right.  If we look at Exhibit 8, which I

13 think you're about to get to.  If you -- oh, we put

14 it back.  That's why.  Okay.

15    (Discussion off the record.)          02:15

16    BY MR. WILSON:

17    Q.  So to get ourselves being clear again, is

18 this sequencing by hybridization method that's

19 described in your notebook at pages MAC 31 through

20 MAC 35 the subject of one of the patent applications          02:15

21 that you assigned to Lynx?  And I'll ask you that

22 with reference to the assignment that we've marked as

23 Exhibit 8 previously.

24    A.  Yes, I believe it corresponds to one or more

25 of those patent applications.          02:16

1    Q.  Which one or more patent applications do you

2 think it applies to?  Corresponds to I should say.

3    A.  I would say that the ideas described in the

4 first three inventions on the list correspond to the

5 entries that we've been discussing in the lab          02:16

6 notebook.

7    Q.  Did you tell Dr. Fung that you would be

8 applying for patents on these inventions that you had

9 him witness?

10    A.  I don't recall what I discussed with          02:16

11 Dr. Fung.

12    Q.  Where did you ask Dr. Fung to sign these

13 notebooks?  Was it at AB?

14    A.  I don't recall.

15    Q.  Did you ever have any interactions with       02:16

16 Dr. Fung outside of the course of your work at AB?

17    DR. FLOWERS:  Objection as to form.

18    THE WITNESS:  I don't recall any.

19    BY MR. WILSON:

20    Q.  Do you have any reason to think that you      02:17

21 asked Dr. Fung to witness these lab notebooks

22 anyplace other than at work at AB?

23    A.  I think that I could have asked him to

24 witness the lab notebooks in Foster City.  We may

25 have had coffee if it was before my tenure at AB.  Or  02:17

1 it could have been afterwards too.

2    Q.  So the date here is July 19th, 1992, if I'm

3 reading that correctly; and by then you were working

4 at AB, weren't you?

5    A.  Yes.  So then it's a good chance we were at        02:17

6 AB.

7    Q.  Did you tell Dr. Fung that these were patent

8 applications that you were not planning on assigning

9 to AB?

10    A.  I don't recall what our conversation was         02:17

11 about these patent applications.

12    Q.  Do you have any reason to think that Dr. Fung

13 would have understood that these were applications

14 that you did not intend to assign to AB?

15    A.  I don't specifically recall telling him that,    02:18

16 but my general recollection is that was the

17 understanding.

18    Q.  Why is that your general recollection?

19    A.  Because it was in my notebook that I kept

20 outside of work.  And he was also aware of earlier     02:18

21 work I had done on sequencing by hybridization, I

22 believe.

23    Q.  Did you tell Dr. Fung this was a notebook

24 that you kept outside of your work at AB?

25    A.  I don't have a specific recollection of that,    02:18

66

1 but it was certainly -- I don't believe there was any

2 indication on the notebook that it was an AB

3 notebook.  It was a different color, it had a

4 flexible cover.  It was just different.

5    Q.  Did Dr. Fung contribute anything to this          02:18

6 invention?

7    A.  No.  I think I approached Dr. Fung after the

8 fact.

9    Q.  Do you recall anything more that you told

10 Dr. Fung about this invention?                            02:18

11    A.  I don't recall talking to him about this

12 invention specifically at all.

13    Q.  When was the last time you spoke with

14 Dr. Fung?

15    A.  I can't recall precisely, but probably be on     02:19

16 the order of years.

17    Q.  Is Dr. Fung somebody you consider to be

18 honest?

19    A.  Yes, I think Dr. Fung's a very fine person.

20    Q.  Somebody I take it for whom you have             02:19

21 professional respect?

22    A.  Yes, that's true.

23    Q.  If Dr. Fung's testimony was that he

24 understood this disclosure to be in connection with

25 the work you were doing for AB, would you have any      02:19

67

1 reason to think that was not true testimony on his

2 part?

3     DR. FLOWERS:  Objection as to form.

4     MR. FTHENAKIS:  Objection as to form.

5     THE WITNESS:  I can't say.                    02:19

6     BY MR. WILSON:

7     Q.  If Dr. Fung's testimony was that you never

8 told him anything to lead him to think that this was

9 outside of your work for AB, would you have any

10 reason to doubt the accuracy of that testimony?      02:19

11     DR. FLOWERS:  Objection to form.

12     MR. FTHENAKIS:  Objection as to form.

13     THE WITNESS:  Yeah, I can't answer that.

14     BY MR. WILSON:

15     Q.  On page MAC 52 there's a note that says "Took    02:20

16 8-9 hours to run on IBM-PC" then in parentheses

17 "(8086)."  Is that your handwriting?

18     MR. FTHENAKIS:  Excuse me.  What page?

19     MR. WILSON:  52.

20     MR. FTHENAKIS:  Thank you.                    02:20

21     THE WITNESS:  Yes, it looks like my writing.

22     BY MR. WILSON:

23     Q.  Where do you do that?  Where do you run that

24 computer program?  Was that at home or at work?

25     A.  At home.                                 02:21

1    Q.  You had the necessary databases and the

2 software at home?

3    A.  I had the necessary software.  I'm not sure

4 what you mean by databases.

5    Q.  Let me show you or ask you to take out          02:21

6 Exhibit 3 to Ms. San Roman's deposition.  Do you

7 recognize this to be your employee invention

8 agreement with AB?

9    A.  Yes, it appears to be that document.

10    Q.  And you signed this as a condition of your       02:22

11 employment with AB?

12    A.  Well, it wasn't negotiated as a condition of

13 my employment; it was a part of a package that was

14 given to me that I had to sign along with my bank

15 deposit stuff.                                          02:22

16    Q.  Did you understand that if you didn't sign

17 this employee invention agreement, you would not be

18 able to work for AB?

19    A.  That wasn't discussed; but it was my

20 understanding that with a company like AB, that this    02:22

21 is a routine procedure.

22    Q.  And you had no objection to signing it, did

23 you?

24    A.  No, I did not.

25    Q.  Did you understand that this was a standard      02:23

1 AB form that was used with all employees?

2     A.   Yeah, I had no reason to believe that I was

3 singled out in any way.

4     Q.   Do you know who prepared this form?

5     A.   No, I do not.                              02:23

6     Q.   As far as you know, was it prepared by

7 outside counsel?

8     DR. FLOWERS:  Objection to the form.

9     THE WITNESS:  It could have been.

10    BY MR. WILSON:                                  02:23

11        Q.   Did you sign a similar invention agreement

12 when you went to work for Lynx?

13    A.   Well, it depends on what you mean by similar.

14 I assume I signed an invention -- employee invention

15 agreement at Lynx.  I don't know how similar it was    02:23

16 without actually seeing the document.

17    Q.   All right.  We'll come back to that later.

18        Let me ask you to take a look at a sentence

19 in paragraph 3 of this agreement.  It says, "I have

20 attached hereto a list describing all inventions made   02:23

21 by me prior to my employment with the company

22 belonging to me, relating to the company's proposed

23 business and products and not assigned to the

24 company, or, if no such list is attached, I represent

25 that there are no such inventions."  Did you attach a   02:24

1 list of all inventions made by you prior to your

2 employment with the company when you signed this

3 agreement?

4    A.  I had no recollection of attaching a list;

5 but then none of my inventions related to ABI's          02:24

6 business so.

7    Q.  And you had gone through your files, right,

8 in looking for documents to produce in this case and

9 you found no such list?

10    A.  None whatsoever.                                  02:24

11    MR. WILSON:  Ask you to take a look at Exhibit 2

12 of Kathy San Roman's deposition, which is right on

13 top of the pile conveniently.

14    Q.  Do you recognize this to be Applied

15 Biosystems Code Of Business Ethics Policy?              02:25

16    A.  Yes.

17    Q.  Was it part of your job to make sure that

18 employees abided by this policy?

19    A.  I'm not sure I understand the duty you're

20 suggesting that I should have had.                      02:25

21    Q.  Do you recall ever discussing this policy

22 with any employees of AB?

23    A.  No, I do not.

24    Q.  Do you have any objection to complying with

25 this policy?                                            02:26

                                                              71

1    A.  No.  I believe I did.

2    MR. WILSON:  Let's mark this as 25.

3    (Exhibit No. 25 was marked for identification.)

4    BY MR. WILSON:

5    Q.  Exhibit 25 is a document entitled Agreement      02:26

6 of Assignment and License of Intellectual Property

7 Rights.  And it's between AB and Lynx.  Is this a

8 document that you recognize?

9    A.  Yes.

10    Q.  Were you involved in the negotiation of this      02:27

11 agreement?

12    A.  No, I wasn't.

13    Q.  Were you involved in the drafting of this

14 agreement?

15    A.  No, I wasn't.                                     02:27

16    Q.  How did you learn of the terms of this

17 agreement?

18    A.  I believe I first saw this agreement after I

19 had gone to work for Lynx.

20    MR. WILSON:  Let's mark -- no, it's already          02:28

21 marked.

22    DR. FLOWERS:  Exhibit 25, on page 5, there's some

23 underlining and highlighting.  Is that from the

24 original?

25    MR. WILSON:  On page 5?                              02:28

1     DR. FLOWERS:  Yeah, of Exhibit 25.

2     MR. WILSON:  I'm looking at the wrong one.

3         I believe that it is, but let me make sure.

4         Yes.

5         And I think we'll come to an exhibit that          02:28

6  will clarify that in a few minutes.

7         Let me ask you to take a look at Exhibit 4.

8         Did I already say that?  From Kathy

9  San Roman's deposition.  It's a blank page on the

10 front, which is -- there it is.                          02:28

11     Q.  Exhibit 4 to Ms. San Roman's deposition is a

12 corporate services agreement between AB and Lynx.  Is

13 this a document with which you're familiar?

14     A.  I don't know the document in detail, no.

15     Q.  Are you aware that there was a corporate          02:29

16 services agreement between AB and Lynx?

17     A.  I was told -- I recall being told that there

18 was such an agreement, but I had never seen it myself

19 at the time I was working at Lynx or --

20     Q.  Okay.                                             02:29

21     A.  -- AB.

22     Q.  Let me ask you to take a look at Exhibit 5 to

23 Kathy San Roman's deposition, which may be a little

24 more clear on this.  It looks like this (indicating).

25     (Discussion off the record.)                         02:29

1     BY MR. WILSON:

2     Q.  Exhibit 5 is a memo from David Bunker to Mike

3  Anderson, Jim Lindsay, Mark Litherland, and Esmond

4  Rudolph re: Support to Therapeutics Group.  Do you

5  know who those gentlemen are?                              02:30

6     A.  I don't recognize the names.

7     Q.  Do you understand any of them to be

8  accounting staff at Lynx?

9          Excuse me.  At AB?

10    A.  I just don't know.                                  02:30

11    Q.  Is this memo familiar to you at all?

12    A.  No, it isn't.

13    Q.  On page 2 there's a section headed "Legal."

14  And it says, "Invoices and accruals for outside

15  services on behalf of Lynx will be charged directly       02:30

16  to the appropriate department.  The two attorneys

17  will track time worked on behalf of Lynx."  Does that

18  refresh your recollection at all about the

19  arrangement by which you provided legal services to

20  Lynx?                                                      02:30

21    A.  No, it does not.

22    Q.  Was it your understanding that you were

23  providing legal services to Lynx in your capacity as

24  an AB employee?

25    MR. FTHENAKIS:  Objection as to form.                   02:30

                                                              74

1    THE WITNESS:  Well, I understood that, that I was

2 an AB employee and providing legal services to Lynx.

3    BY MR. WILSON:

4    Q.  And did you have any understanding as to

5 whether Lynx would be paying or reimbursing AB for        02:30

6 those services?

7    A.  That was my understanding, but I didn't know

8 the precise details of the arrangement.

9    Q.  So you weren't involved in the bookkeeping or

10 the accounting for that?                                 02:31

11    A.  That's correct.

12    Q.  Do you know what rate they were being

13 charged -- do you know what rate Lynx would be paying

14 for your services?

15    A.  I didn't know what the rate was that Lynx was    02:31

16 charged for my services.

17    Q.  Were you keeping track of the amount of time

18 that you were spending on Lynx matters?

19    A.  No, I didn't keep track of the time.

20    Q.  Did you report to anybody about the work that    02:31

21 you were doing for Lynx?

22    A.  I don't recall any formal reporting about the

23 work.  I believe I would discuss what I was doing

24 with Joe Smith periodically along with other things

25 that I was doing for AB.                                 02:31

1    Q.  But beyond that you don't have any further

2  recollection of how Lynx may have been reimbursing AB

3  for your services?

4    A.  That's correct.  I do not have any further

5  recollection about that subject.                        02:32

6    (Exhibit No. 26 was marked for identification.)

7    BY MR. WILSON:

8    Q.  We've marked as Exhibit 26 a document

9  entitled -- well, it says "Invention Data" at the

10 beginning and then there are several pages             02:32

11 afterwards.  It's a six-page document in all.

12       Is this a document that you recognize,

13 Dr. Macevicz?

14   A.  Yes, I recognize this.

15   Q.  What is it?                                       02:33

16   A.  It's a disclosure of an invention related to

17 some work that Eric Shulse was doing.

18   Q.  Does it reflect work that you were doing too?

19   A.  No.

20   Q.  If you look at the second page of the form,       02:33

21 under point 2 it says "suggested inventor."  And

22 that's your name there, correct?

23   A.  Yes.

24   Q.  Why is your name there if it's not related to

25 work that you were doing?                               02:33

76

1      A.  Well, the work that I was doing was preparing

2  patent applications.  One of the -- one of the groups

3  that I would service was Eric Shulse's group.  And

4  they were working on a technology -- or people in his

5  group were working on a technology that involved         02:34

6  amplifying these objects called short terminal

7  repeats.  And that's described in this prior art page

8  3 of 5.

9          And in attending a discussion, I believe,

10  with his group where this technology was described      02:34

11  they explained what it was, the purpose of the steps

12  of the technique were; and I believe on the spot I

13  asked a question why couldn't you do this?  And it

14  turned out that it was something that they had not

15  thought about, even though I considered it a            02:35

16  straightforward question that a patent attorney would

17  ask an inventor or a group working in a technical

18  area.  And so we decided that I'd file an invention

19  disclosure on it.

20      Q.  Because it was a new idea that you had come      02:35

21  up with?

22      A.  It was an idea related to the work that Eric

23  Shulse's group was working on.

24      Q.  Was it a new idea that you came up with?

25      DR. FLOWERS:  Objection as to form.              02:35

77

1     THE WITNESS:  I actually don't know if it was a

2 new idea.  I don't know if a patent application was

3 actually filed and prosecuted on it.

4     BY MR. WILSON:

5     Q.  All of the writing on these -- the five          02:35

6 pages, is all the writing yours on the invention

7 disclosure form?

8     A.  Yes, it appears to be.

9     Q.  Is this your idea?

10     DR. FLOWERS:  Objection as to form.                 02:36

11     THE WITNESS:  I believed it to be, yes.

12     BY MR. WILSON:

13     Q.  And that's why you listed yourself as the

14 suggested inventor?

15     A.  That's correct.                                 02:36

16     Q.  What was this form used for generically?  Not

17 the specific one you filled out here, but the form

18 entitled Invention Disclosure Form?

19     A.  It was a form that when people had an

20 invention or thought they had an invention they could   02:36

21 fill out information related to the invention and

22 bring it to the legal group.  And then the typical

23 process would be to do a prior art search to see

24 whether it was identically -- first off, if it was

25 identically described in the literature.  Typically     02:36

78

1 the inventor would help you in that regard.  And then

2 if it looked like it was something related to ABI's

3 business, we'd file a patent application on it.

4    Q.  And the legal department being you and the

5 people who reported to you?  Is that correct?    02:37

6    A.  Yes.  Or Joe Smith.  It depends on my --

7    Q.  And you're listed as one of the contacts,

8 right?  If people have questions about the form?

9    It says do not hesitate to contact Steve

10 Macevicz or Paul Grossman for assistance in filling    02:37

11 out.

12    A.  I don't recognize this cover sheet, so.

13    Q.  Is it consistent with your recollection of

14 the work you were doing at AB that if inventor -- if

15 scientists had questions about an invention    02:37

16 disclosure, they should call you?

17    A.  Yes, I encouraged them to call me if they had

18 questions about invention disclosures.

19    Q.  And you discussed the invention and whether

20 it might be patentable?    02:37

21    A.  I don't have specific recollections of doing

22 that, but generally that's what I would do with them.

23    Q.  Did you ever fill out any other invention

24 disclosure forms besides this that you recall?

25    DR. FLOWERS:  Objection as to form.    02:38

1    THE WITNESS:  Not that I recall.

2    BY MR. WILSON:

3    Q.  Did you ever fill out any invention

4 disclosures on any of your work on sequencing by

5 hybridization?                                      02:38

6    A.  I don't believe so.

7    Q.  Can you pull out Exhibit 10 from the Kathy

8 San Roman exhibits.

9        This document has an MAC Bates number, which

10 indicates that it was produced by you in this case.   02:38

11    A.  Uh-huh.

12    Q.  Why is it that you had a copy of the

13 development agreement between Lynx and Dr. Sidney

14 Brenner in your files?

15    A.  My recollection is that when I was discussing   02:38

16 the possibility of working at Lynx with Lynx that the

17 subject of my outside inventions came up.  Which were

18 quite similar to Sidney Brenner's inventions.  And so

19 I recall telling Sam Eletr that I wasn't going to

20 pursue these inventions on my own, that I'd be happy   02:39

21 to assign them to Lynx if they would find it useful.

22    Q.  Which inventions were you referring to?

23    A.  Primarily the sequencing by ligation

24 invention, but also the others.

25    Q.  So sequencing by ligation and sequencing by   02:39

80

1 hybridization as well?

2    A.  Correct.

3    Q.  When did you have this conversation, do you

4 recall?  Or series of conversations?

5    A.  I don't recall the precise date.              02:40

6    Q.  And how does that relate, then, to having

7 this development agreement in your files?

8    A.  Well, the subject of how I could be

9 compensated for assigning the inventions to Lynx was

10 discussed.  And I believe Sam suggested that we could    02:40

11 do something similar to Sidney; you know, with

12 appropriate adjustments of the values to reflect, you

13 know, how they perceived the invention.

14    Q.  So did he give you a copy of this Exhibit 10

15 as a -- so that you would understand the relationship    02:40

16 that Lynx had with Sidney Brenner?

17    A.  That's what I believe, yes.

18    Q.  Did you specifically discuss with

19 Dr. Eletr -- yeah, with Dr. Eletr that the inventions

20 that you had that you might be interested in            02:41

21 providing to Lynx were in sequencing by hybridization

22 and sequencing by ligation?

23    A.  I don't recall specific discussions of the

24 inventions with Dr. Eletr.  Generally I recall

25 discussing the inventions with him, but not the         02:41

81

1 details of the discussion.

2    Q.  How long did you continue -- well, let's mark

3 this the next exhibit.  This will be 26?

4    THE REPORTER:  No.  Twenty-seven.

5    MR. WILSON:  That's what I thought.                    02:41

6    DR. FLOWERS:  You continue to test her.

7    (Exhibit No. 27 was marked for identification.)

8    BY MR. WILSON:

9    Q.  Exhibit 27 is a document entitled Performance

10 Review Form.  Can you turn to the last page of the      02:42

11 form, and tell me if that's your signature under

12 "employee signature."

13    A.  Yes, it looks like my signature.

14    Q.  And it's dated May 19, 1994?

15    A.  Yes.                                              02:42

16    Q.  And below that, is that Joe Smith's

17 signature?

18    A.  I couldn't say it.  I have no reason to

19 believe it's not.

20    Q.  And the last signature I'm quite sure you        02:42

21 won't be able to recognize, but I'll ask anyway.  Can

22 you recognize that bottom signature?

23    A.  I can't recognize it.

24    Q.  What is this performance review form?

25    A.  I have -- I don't recall it at all.              02:42

1    Q.  There's what appears to be a Post-It on the

2  front page.  "This review was totally prepared by

3  Steve Macevicz" signed by Martha.  Do you know who

4  Martha was?

5    A.  I'm not positive.  I would guess she was the          02:43

6  head of the Human Resources Department.

7    Q.  And it has as employee's name Stephen

8  Macevicz, job title senior patent attorney.  And that

9  was your job title in 1994, right?

10    A.  Yes, I believe so.                                    02:43

11    Q.  And if you turn to the third page of the

12  document.  Do you see there are two columns, "Major

13  Goals" and "Results Achieved"?

14    A.  Uh-huh.

15    Q.  And you see the number one major goal is             02:43

16  "oversee preparation and prosecution of ABD patent

17  applications and of licensed patent applications;

18  analysis of invention disclosures"?

19    A.  Okay.

20    Q.  Does this refresh your recollection that you         02:43

21  wrote up this description of your major goals?

22    A.  Yeah, it appears to be something I prepared.

23  I just don't remember it.

24    Q.  Is that consistent with your understanding of

25  what the major goals were?                                  02:44

                                                        83

1    A.  Yeah, it looks about right.

2    Q.  Under "Results Achieved" there's a column

3 with a number of bullet points.  Did you write those

4 bullet points to summarize the results that you had

5 achieved?                                              02:44

6    A.  Well, again, I don't recall the specifics of

7 preparing this form, but I may have, yes.

8    Q.  The first bullet, "Oversight responsibility

9 for 43 of the 70+ patent families owned by ABD;

10 direct responsibility for 15 families."  Does that     02:44

11 refresh your recollection that that was some of the

12 results you achieved in the 1994 time frame?

13    A.  Well, I'm having trouble understanding what

14 that means.  How does -- from the sentence, the

15 bullet point, it states a function that I provided     02:45

16 the company.  So I'm just having a hard time

17 understanding why I might have thought that that was

18 a result achieved.

19          Now, it may be, you know, the previous year

20 there was only 25 patent families owned by AB.  Then   02:45

21 I could see how the result achieved would be

22 increasing the number.  But in any case, I do see it

23 so.

24    Q.  So you're not necessarily following the logic

25 now, but you agree this is something you did write?    02:46

84

1    A.  It appears to be, yes.

2    Q.  What were the patent families owned by ABD?

3 Do you understand what that's a reference to at this

4 point?

5    A.  At this point I'm not sure whether they were          02:46

6 actually owned or licensed in.  There was a large

7 amount of -- I think I recall us doing a fair amount

8 of prosecution on patents that were licensed in, for

9 example, some of the Cal Tech technology that was

10 licensed in, we seemed to be doing quite a bit of the     02:46

11 prosecution on it.  So I'm not sure whether those 43

12 or 70 were things that were actually owned or owned

13 or licensed.

14    Q.  The fourth bullet point says "Provided Lynx

15 with patent services until December 1993.  Found        02:46

16 outside law firm to take over Lynx patent work."  Did

17 you, in fact, provide Lynx with patent services until

18 December 1993?

19    A.  I don't recall if that was actually achieved

20 or something that I wanted to do.                        02:47

21    Q.  Did you find an outside law firm to take over

22 Lynx's patent work, do you recall?

23    A.  I believe the Dellenger firm took over quite

24 a bit of the work at some point in my tenure.

25    Q.  Why?  Do you know?                                02:47

1    A.  Again, the workload was fairly high.

2    Q.  So you just couldn't keep up with it?

3    A.  Yeah, it was hard to keep up with everything.

4 And they were increasing their patents, and AB was

5 increasing theirs so.                                02:47

6    Q.  So you think you had the Dellenger law firm

7 take over providing patent services after December

8 1993?

9    A.  I don't recall the precise details, but I do

10 believe at some point the Dellenger law firm did     02:47

11 assume some of the work.  I don't know if it was all

12 of the work or part of it or what.

13    Q.  Do you recall providing Lynx with any patent

14 services after December 1993?

15    A.  I don't have specific recollections of it.     02:48

16    Q.  The fourth bullet point corresponding to

17 No. 2 says "analyzed patent positions relating to

18 sequencing by hybridization."  Do you know what

19 that's referring to?

20    A.  No, I don't.                                   02:48

21    Q.  Do you have any recollection about analyzing

22 patent positions relating to sequencing by

23 hybridization?

24    A.  I'm just not sure.

25    Q.  Do you have any reason to believe you didn't   02:48

86

1 have any patents relating to sequencing by

2 hybridization?

3     DR. FLOWERS:  Objection to form.

4     MR. WILSON:  That's fair.

5     Q.  Is it fair for me to assume anything you          02:48

6 would have written in a performance review form would

7 be true to the best of your knowledge?

8     A.  Well, I think it would be true; but the

9 problem is interpreting what it meant from our

10 vantage point now.                                       02:48

11    Q.  Is it fair for me to assume that if you put

12 in your performance review form that one of the

13 things -- one of the results you achieved in 1994 was

14 to analyze patent positions relating to sequencing by

15 hybridization, that that is, in fact, one of the         02:49

16 results that you did achieve around 1994 in the

17 course of your work for AB?

18    DR. FLOWERS:  Objection as to form.

19    THE WITNESS:  I'm not sure because I'm not sure

20 what that statement analyzing positions relating to      02:49

21 sequencing by hybridization.

22    BY MR. WILSON:

23    Q.  So you're not sure -- sorry.  I interrupted.

24        Is it that you're not sure if it's fair for

25 me to assume that you did, in fact, analyze patent       02:49

87

1 applications relating to sequencing by hybridization?

2     A.  So, I'm trying to understand your question.

3     Q.  Well, it may be more simple than you think.

4 All I'm saying is you wrote a statement in your

5 performance review form that says one of the results      02:49

6 achieved was analyze patent positions relating to

7 sequencing by hybridization?

8     A.  Uh-huh.

9     Q.  My only question is is it fair to conclude

10 from reviewing this performance review form that one      02:49

11 of the things you did around the 1994 time frame for

12 AB was to analyze patent positions relating to

13 sequencing by hybridization?

14     A.  Yeah, maybe I'm suffering from they're too

15 close to the forest that I -- or too close to the      02:50

16 trees that I can't see the forest.

17         In that era there's a lot of -- there was, I

18 believe, an interference going on with my patent, and

19 it may have related to that.

20     Q.  With which patent?      02:50

21     A.  The patent I received for sequencing by

22 hybridization.

23     Q.  Which you believe to be outside of the scope

24 of AB's business?

25     A.  That's correct.      02:50

88

1    Q.  Why would you list that on a performance

2 review form for AB?

3    A.  Well, I'm not sure.  I'm trying to -- I'm

4 struggling to understand what it relates to.  Because

5 there was a point where I did ask for assistance from        02:50

6 an outside attorney that handled AB interference

7 matters, and Joe Smith and Mike Hunkapiller saw no

8 problem with me asking advice from this outside

9 attorney.  So I don't know if it relates to that

10 matter or whether it was something else entirely.           02:51

11    Q.  The purpose of the performance review form is

12 to evaluate the performance of your job duties for

13 AB, right?

14    A.  I believe so.  Or just let people know what I

15 was doing.                                                  02:51

16    Q.  Is there any reason that you can think of

17 that on your performance review form for AB you would

18 list activities that were not done in the course of

19 your work for AB?

20    A.  No, I wouldn't do that.  It's, again,              02:51

21 interpreting what the words mean that are put on the

22 paper.  Because AB was not interested in getting into

23 sequencing by hybridization as a method of doing

24 sequencing.  They may have been interested in aspects

25 of the technique to the extent it might have blocked       02:52

89

1  them from doing something else, like getting into

2  microarrays or something like that.  I can speculate

3  on all sorts of things like that, but I don't have

4  any specific recollection of what that work

5  represented there.                                    02:52

6      Q.  You wouldn't have listed this work if it

7  wasn't part of your duties that you performed for AB,

8  would you?

9      A.  Well, I listed analyzing patent positions as

10  part of my work for AB.                               02:52

11      Q.  Was the performance review used for

12  determining bonuses and raises and things of that

13  nature?

14      A.  Frankly, I don't know how they were used.

15      Q.  The supervisor's comments indicate "I confirm  02:52

16  that the completed and ongoing projects listed in the

17  materials are accurately described and assessed."  Do

18  you think that's Joe Smith's comments?

19      A.  Where is that again?

20      Q.  The very last page.  Sorry.                   02:53

21          The typed comments.

22      A.  We must have different copies.  Second to the

23  last.

24      Q.  One page too far.  Sorry, not the last page.

25      A.  So, what's the question again?                02:53

90

1    Q.  Is that Joe Smith's comments as far as you

2 know?

3    A.  As far as I know, they're his comments.  I

4 may have written them in there, but they're his

5 comments.                                                02:53

6    Q.  And you agree that this is your performance

7 review form, that you filled it out, and that you

8 signed it, correct?

9    MR. FTHENAKIS:  Objection as to form.

10    THE WITNESS:  It appears to be, yes.              02:53

11    MR. WILSON:  All right.  We're out of tape so

12 that's probably a good place to stop.

13    THE VIDEOGRAPHER:  This marks the end of tape 1

14 in the deposition of Stephen Macevicz.  Going off the

15 record.  The time is 2:54 p.m.                        02:54

16    (Recess taken.)

17    THE VIDEOGRAPHER:  We are back on the record.

18 This is the beginning of tape 2 in the deposition of

19 Stephen C. Macevicz.  The time is 3:04 p.m.

20    BY MR. WILSON:                                     03:04

21    Q.  If you take a look at Exhibit 11 of Kathy

22 San Roman's deposition.  Exhibit 11.  What is

23 Exhibit 11 in Kathy San Roman's deposition?

24    A.  Exhibit 11 appears to be a fax communication

25 from me to Sam Eletr.                                  03:04

1    Q.  What was the purpose of this communication?

2    A.  My recollection of the purpose was to

3 determine a possible way to get compensated for the

4 patent applications that I was going to assign to

5 Lynx.                                              03:05

6    Q.  One of the patent applications is listed here

7 in the second "WHEREAS" clause on page MAC 945.  It's

8 application Serial No. 08/091,603.  Is that one of

9 the sequencing by hybridization applications?

10    A.  I believe it corresponds to one of the       03:05

11 applications I assigned to Lynx, yes.

12    Q.  Who initiated conversations about how you

13 might get compensated for assigning this patent to

14 Lynx?  This application to Lynx I should say.

15    A.  I can't remember the details of this          03:05

16 conversation.  I know there was a discussion, but I

17 don't know how it got initiated.

18    Q.  Who was involved in the discussion?

19    A.  To the best of my recollection it was Sam

20 Eletr and myself.                                  03:06

21    Q.  And it was around November 1994?

22    A.  I think that was -- it started around then,

23 yes.

24    Q.  Was the idea for you to assign these patents

25 to Lynx?  These applications to Lynx?              03:06

1    A.  My recollection is that I offered to assign

2 them because I wasn't going to pursue them and they

3 were somewhat related to Sidney Brenner's invention.

4    Q.  And you knew that Lynx was working on

5 something that would be using Sidney Brenner's              03:06

6 inventions?

7    A.  Say that again.

8    Q.  And you knew that Lynx was working on some

9 kind of a project that would be developing

10 Dr. Brenner's inventions; is that the case?              03:06

11    A.  Yes, it is.

12    Q.  Did you offer to assign these applications to

13 AB?

14    A.  I don't have any recollection of that.

15    Q.  Did Dr. Eletr ask you if you had offered to      03:07

16 assign these patents -- patent applications to AB?

17    A.  I don't have any recollection of that.

18    Q.  Was there any reason that you didn't offer to

19 assign these patent applications to AB?

20    MR. FTHENAKIS:  Objection as to form.               03:07

21    DR. FLOWERS:  Join.

22    THE WITNESS:  Well, I don't recall thinking about

23 it; but as I stated earlier, I didn't consider them

24 to be related to AB's business.

25    BY MR. WILSON:                                        03:07

                                                        93

1     Q.   Did you ever ask anybody at AB whether any of

2 the applications were related to AB's business?

3     A.   I don't recall talking about that subject

4 matter.

5     Q.   Did Dr. Eletr ever ask you if any of these          03:07

6 applications were related to AB's business?

7     A.   I don't recall conversation like that.

8     Q.   Did you and Dr. Eletr discuss whether these

9 patents would be licensed back to AB under the

10 cross-license between AB and Lynx if you assigned          03:07

11 them to Lynx?

12     A.   Certainly when the initial discussions were

13 going on, as reflected in this facsimile, that wasn't

14 a consideration that I can recall.

15     Q.   Did it come up later on?                           03:08

16     A.   No, it did not come up later on.  But the

17 interpretation of that agreement was an item of

18 contention between Lynx and AB later on because of

19 assertions that people from -- employees from AB were

20 alleged to have made regarding the effect of that          03:08

21 agreement on Dr. Brenner's technology.

22     Q.   When that came up -- and we'll come to some

23 of those documents later on -- did you have

24 discussions with Dr. Eletr about how that might

25 affect your patent applications you were thinking of       03:08

94

1 assigning to Lynx?

2    A.  No.  I don't have any recollections of it in

3 either case; but the discussions around the time of

4 this -- the date of this fax that we're -- that you

5 showed me just now didn't involve AB at all.  That I        03:09

6 can recall.

7    Q.  Okay.

8       What amount of compensation were you talking

9 about with Dr. Eletr for assigning these applications

10 to Lynx?                                                    03:09

11    A.  Well, we were struggling with how to come up

12 at a figure that would be satisfactory.  So I never

13 remembered discussing dollar and cents amounts.  The

14 closest that I can recall after seeing this document

15 is relating it in some sense to what Sidney Brenner        03:09

16 had done.

17    Q.  There's writing in the margins of this

18 document.  Is that your writing?

19    A.  Yes, it looks like my writing.

20    Q.  The fax cover sheet, is that a standard           03:10

21 Perkin-Elmer fax cover sheet that you used your home

22 address on in place of the Perkin-Elmer logo?

23    A.  I have no idea.

24    Q.  (408) 252-4140 was that your home phone

25 number at the time?                                        03:10

95

1     A.  That's correct.

2     Q.  And (415) 638-5552, was that your work number

3 at the time?

4     A.  I can't recall, but it may have been, yes.

5     Q.  638 was a Perkin Elmer prefix, wasn't it?        03:10

6     A.  I don't recall.

7     Q.  Or AB, I should say.

8     A.  It may have been.

9     Q.  And then there's a return phone and fax

10 number listed.  There's a (415) 638-5552 number.        03:10

11 That's again the same number, right?  Does that

12 refresh your recollection that that is your -- was

13 your work phone number at AB?

14     A.  Yes, it appears to be.  Yes.

15     Q.  And the fax number (415) 638-6071, is that an      03:11

16 AB fax number?

17     A.  I can't say for sure it is, but probably.

18     Q.  It's not your home fax number?

19     A.  I don't -- I probably didn't have a home fax.

20 That's why I was using the work fax.                    03:11

21     Q.  So probably you did send this fax to

22 Dr. Eletr from work at AB?

23     A.  I may have, yes.

24     Q.  Is there any doubt that you did?

25     A.  Only in that I can't remember when I obtained      03:11

96

1 a home fax.

2     Q.  Would you agree that from the face of the fax

3 it appears that you did send it from AB and used your

4 AB return phone and fax numbers on the cover sheet?

5     A.  Well, it could have been, yes.                    03:11

6     Q.  Is there any doubt that that's what happened

7 in your mind?

8     DR. FLOWERS:  Objection as to form.

9     MR. FTHENAKIS:  Join.

10    BY MR. WILSON:                                         03:12

11    Q.  Is there any doubt in your mind that that's

12 what happened?

13    A.  Well, if there is, it isn't a large doubt.

14    Q.  This patent application was filed on July 13,

15 1993, right?                                              03:12

16    DR. FLOWERS:  Objection as to form.

17    BY MR. WILSON:

18    Q.  The patent application that's referred to in

19 the agreement was filed on July 13, 1993, right?

20    A.  You're referring to the one in the second       03:12

21 "WHEREAS" clause?

22    Q.  Right.

23        Did anyone ever disclose that patent

24 application to AB?

25    A.  I just don't recall.                             03:12

97

1    Q.  And you never offered to assign that patent

2 application to AB?

3    A.  I don't recall ever having a discussion like

4 that because, again, I didn't consider those

5 inventions related to my -- related to AB's business.     03:12

6 And as for disclosing to AB, I think the invention

7 corresponds to the one that Dr. Fung initialed my

8 notebook on.

9    Q.  So it's the invention on the subject of

10 sequencing by hybridization?                              03:13

11    A.  I would say it's a variant of it, yes.

12    Q.  So in November of 1994 you were proposing to

13 assign to Lynx a patent in the subject area of

14 sequencing by hybridization?

15    A.  Along with other things, yes.                      03:13

16    Q.  The other things being what?

17    A.  The sequencing by ligation patent.

18    Q.  Is that mentioned in this agreement?

19    A.  I don't believe so.

20    Q.  That was something you thought of adding          03:13

21 later?

22    A.  No, I don't recall the specifics of why

23 things were included or not included.  It may be that

24 the one that's included was the only one that was

25 actually on file at the time.                             03:14

98

1     Q.   So what was on file at the time was a patent

2 covering a method or methods of sequencing by

3 ligation -- excuse me, sequencing by hybridization,

4 and that's what you were offering to assign to Lynx

5 at the time --                                        03:14

6     A.   Yes.  It was a variant of it, yes.

7     Q.   Did you tell anybody at AB that you were

8 making this offer to Lynx?

9     A.   I don't recall discussing it with anybody.

10     Q.   Not with Mr. Smith or Dr. Hunkapiller?      03:14

11     A.   I don't recall specific discussions with

12 them.

13     Q.   Do you consider Mr. Smith to be somebody

14 who's honest?

15     A.   Yeah.                                        03:14

16     Q.   And do you consider Dr. Hunkapiller to be

17 someone who is honest?

18     A.   Yes.

19     Q.   Would it be -- would it surprise you in any

20 way to learn that Mr. Smith thinks that the patent    03:14

21 applications that you filed on methods of sequencing

22 by ligation and sequencing by hybridization fall

23 squarely within the scope of AB's business?

24     DR. FLOWERS:  Objection as to form.

25     MR. FTHENAKIS:  Join.                             03:15

99

1     THE WITNESS:  Well, I can't vouch for what Joe

2 thinks about those items.

3     BY MR. WILSON:

4     Q.  So would --

5     A.  I mean, we disagree.                          03:15

6     Q.  Would it surprise you or not, one way or the

7 other?

8     DR. FLOWERS:  Objection as to form.

9     MR. FTHENAKIS:  Join.

10     THE WITNESS:  I just don't know.  I've never      03:15

11 discussed those topics with Joe so it's not clear to

12 me what his understanding of the material was.  And

13 it's just speculative as to how he conceived the

14 business.

15     BY MR. WILSON:                                    03:15

16     Q.  Would it surprise you to learn that

17 Dr. Hunkapiller considers your patent applications --

18 the patent application for a method of sequencing by

19 ligation to be squarely within the business of AB?

20     DR. FLOWERS:  Objection to form.                  03:15

21     THE WITNESS:  Yeah, it would surprise me.

22     BY MR. WILSON:

23     Q.  Why?

24     A.  Because when I invented my variant of

25 sequencing by hybridization, I brought it to AB to     03:16

100

1 see if they were interested in it.

2     Q.  When was that?

3     A.  I'm not sure when the date was.  It was

4 before my tenure at AB.

5     Q.  Who did you bring it to?                          03:16

6     A.  I may have given it -- I don't remember for

7 sure.

8     Q.  Do you remember what form you presented it

9 in?  Was it in writing?  Orally?

10     A.  It may have been like a patent application.     03:16

11     Q.  But you don't remember for sure?

12     A.  I remember giving them some document.  It was

13 either a patent application or some other written

14 description of the invention that I had in that area.

15 I didn't give it to Dr. Hunkapiller directly, I gave    03:16

16 it to somebody else who took it back.  And when I

17 talked to that person again, they mentioned that Mike

18 Hunkapiller had looked at it and dismissed it.

19     Q.  Do you remember who that was?

20     A.  I can't remember for sure.                       03:17

21     Q.  And this is all before you were working for

22 AB?

23     A.  That's correct.

24     Q.  Did he ever revisit the issue after you went

25 to work for AB?                                          03:17

1    A.  I don't recall doing that.

2    Q.  Speaking of sequencing by ligation, could you

3 take a look at another page of your lab notebook.

4 It's MAC 79.  And really it's MAC 79 through 83 that

5 I'd like you to take a look at.                        03:17

6        Do these pages describe a method for

7 sequencing by ligation that you invented?

8    A.  You're saying 79 through 83?

9    Q.  I think that's right, but I may be off on the

10 page numbers.                                         03:17

11    DR. FLOWERS:  Objection as to form.

12    MR. WILSON:  That's fair.

13    Q.  What is described on pages MAC 79 through

14 MAC 83?

15    A.  I would say there's a collection of          03:18

16 particular embodiments of several inventions.

17    Q.  What are the inventions?

18    A.  They appear to be -- one of them is a

19 particular embodiment of the sequencing by ligation;

20 another one seems to be something entitled           03:18

21 Evolutionary Selection of Oligonucleotide Probes.

22        Another one has something to do with beads

23 with solid support -- used as solid supports, but I

24 can't identify it in particular by looking at it so

25 quickly and not thinking about it.                   03:19

1    Q.  And you asked Paul Grossman to sign these lab

2 notebook pages?

3    A.  Yes, it appears to be the case.

4    Q.  Did Paul -- who was Paul Grossman?

5    A.  Paul Grossman was the patent agent that          03:19

6 worked in the legal group.

7    Q.  So he reported to you at the time, right?

8    A.  I believe so, yes.

9    Q.  You were his supervisor?

10    A.  If he reported to me, then I was his          03:19

11 supervisor.

12    Q.  Did you bring this lab notebook into work for

13 Dr. Grossman to sign?

14    A.  Yes, I brought it in specifically for him to

15 look at these diagrams and sign.          03:19

16    Q.  Did you explain to him that it was something

17 you were working on outside of the scope of your work

18 for AB?

19    A.  I don't have a specific recollection, but I

20 believe there was a general discussion of that          03:19

21 nature.  Because the reason I brought it in was to

22 establish a date of conception.  Corroborate a date

23 of conception.

24    Q.  What do you mean a general discussion of that

25 nature?          03:20

1    A.   Well, I can't imagine giving him a notebook

2 and asking him to sign it without explaining the

3 reason why I wanted to have him sign it.  Or that I

4 would ask him to sign it for me.

5    Q.   The reason being that it was -- you wanted to        03:20

6 corroborate the date of conception, right?

7    A.   Yes.

8    Q.   Do you also think that you explained to him

9 that this was something you were doing outside of the

10 scope of your work for AB?                                  03:20

11    A.   Yes.

12    Q.   Do you think you explained to him that you

13 were not planning on assigning this invention to AB?

14    A.   I don't recall specifically or generally that

15 sort of discussion.                                         03:20

16    Q.   Do you recall specifically telling him that

17 this was outside of the scope of your work for AB?

18    A.   I don't have a specific recollection of me

19 saying those words 12 years ago, but I think it was

20 clear from the fact that I brought the notebook from       03:21

21 home and that he was aware that I had this hobby of

22 working on analytical technologies as a pastime, that

23 that was the understanding.

24    Q.   Did you disclose this invention to your

25 supervisor, Joe Smith, at the time?                         03:21

104

1    A.  I don't believe I did.

2    Q.  Did you discuss these inventions with Joe

3 Smith, your supervisor?

4    A.  I don't recall discussing it with him.

5    Q.  Did you disclose these inventions to          03:21

6 Dr. Hunkapiller?

7    A.  I don't recall disclosing them to him either.

8    Q.  Did you discuss any of these inventions with

9 Dr. Hunkapiller?

10    A.  I don't have a specific recollection, but     03:21

11 these types of inventions are things that would be

12 discussed that -- you know, I wasn't hiding anything.

13 I would discuss them with people in the hallways or

14 at the lunch table.  I just don't have a specific

15 recollection of sitting down, drawing things, and     03:21

16 relating it to this invention.

17    Q.  By the hallways you mean the hallways at

18 work?

19    A.  That's correct.

20    Q.  And by the lunch area you mean the lunch --    03:22

21    A.  Cafeteria.

22    Q.  -- cafeteria at work?

23    A.  Yeah.

24    Q.  Did you ever disclose these inventions on

25 pages MAC 79 through 83 in writing to anybody at AB,    03:22

1 particularly to any supervisor at AB?

2    MR. FTHENAKIS:  Objection to the form.

3    DR. FLOWERS:  Join.

4    MR. WILSON:  That's fair.

5    Q.  Let's go back to the beginning.  Did you ever    03:22

6 disclose any of the inventions on pages MAC 31

7 through 35 of your lab notebook in writing to any

8 supervisor of yours at AB?

9    A.  What were the pages again?

10    Q.  31 to 35.    03:22

11    A.  I don't have a specific recollection of that.

12    Q.  Do you have any reason to think that you did?

13    A.  I have no reason to think that I did because

14 I considered them totally separate from my work at

15 AB.    03:23

16    Q.  Did you ever ask for consent from any of your

17 supervisors at AB to apply for patent applications on

18 the inventions you describe in pages MAC 31 through

19 MAC 35 of your notebook?

20    A.  So, why would I ask for consent for something    03:23

21 that's outside the scope of the work?

22    Q.  Did you -- so is it your understanding, your

23 recollection, that you did not ask for consent to

24 apply for patents on these inventions?

25    A.  I don't recall asking for consent to file on    03:23

1 these inventions.

2    Q.  And you believe that you had no duty to

3 disclose these inventions to your managers at AB,

4 right?  Your supervisor at AB?

5    A.  Well, I understand -- I understand my duty      03:23

6 under the employee invention agreement if that's what

7 you're getting at.  I didn't consider these

8 inventions to be a part of the AB business.

9        And I wasn't trying to hide them.  I have a

10 general recollection of talking about these          03:24

11 inventions with the people at AB as exemplified by

12 the signatures of Dr. Fung and Dr. Grossman.  But I

13 didn't -- I don't have any recollection of going to

14 my supervisors and showing them and talking about

15 them.                                                03:24

16    Q.  And that goes for the inventions described at

17 MAC 31 to 35 as well as the inventions described in

18 MAC 79 through 83, correct?

19    A.  73?

20    Q.  83.  I might have misspoken.  79 to 83.        03:25

21    A.  I believe that's the case.  I don't have any

22 specific recollection of discussing these with

23 supervisors.

24    Q.  Am I understanding you correctly that you're

25 not saying that you satisfied obligations under the  03:25

1  employee invention agreement by discussing this with

2  Dr. Fung and Dr. Grossman, you're just saying you

3  didn't have a duty to disclose it as far as you

4  understood it?

5      DR. FLOWERS:  Objection as to form.                    03:25

6      THE WITNESS:  No.  I'm saying it just wasn't in

7  my mind one way or the other.

8      BY MR. WILSON:

9      Q.  It wasn't in your mind to disclose either of

10 these inventions to management or your supervisors?       03:25

11     A.  That's correct.

12     Q.  And it wasn't in your mind that there might

13 be some duty to assign the applications to AB,

14 correct?

15     A.  I don't recall considering that there was any    03:25

16 duty to assign such inventions.

17     Q.  Can we go back to Exhibit 11 just for a

18 moment.  It's that one.  I just want to make sure

19 that this was clear.  As far as you know, as far as

20 you recall, did you ever discuss this proposed          03:26

21 assignment agreement with any of your managers or

22 supervisors at AB?

23         That's compound.  I'll object to my own

24 question.

25         As far as you recall, did you discuss this      03:26

108

1 proposal in Exhibit 11 with any of your supervisors

2 at AB?

3    A.  No.

4    Q.  As far as you know, did any of your

5 supervisors at AB have any knowledge that you had          03:26

6 made this proposal in November of 1994 to Lynx?

7    A.  I have no knowledge of that.

8    Q.  At any point before you left AB did you ever

9 tell anybody at AB -- supervisors, managers,

10 management, anybody -- that you intended to assign         03:27

11 certain patent applications or patents to Lynx?

12    A.  I don't recall specific conversations like

13 that.

14    Q.  Can you pull out Exhibit 15 from the Kathy

15 San Roman exhibits.                                         03:27

16        A moment ago you alluded to some discussions

17 between Lynx and AB regarding the companies'

18 respective rights.  Is this correspondence a part of

19 those discussions that you were referring to?

20    A.  So could you repeat your question, please.          03:28

21    Q.  Yeah.  I can probably make it a whole lot

22 shorter.  Is this a letter you recognize?

23    A.  No, actually, I do not recognize it.

24    Q.  It's from San -- I'm sorry.

25    A.  The date seems to be incorrect.                     03:28

1    Q.  What seems to be incorrect about the date?

2    A.  I remember being involved in a letter like

3 this, but it was well after my tenure started at AB.

4 And that's what I was referring to.  This letter is

5 dated before my -- I mean my tenure at Lynx.  This          03:28

6 letter is dated before my tenure at Lynx so.

7    Q.  Okay.  We'll come --

8    A.  I'm not sure.  It's the same subject but...

9    Q.  All right.

10       Joe Smith was your supervisor, of course, at          03:29

11 AB, right?

12   A.  That's correct.

13   Q.  In the normal course of business would Joe

14 Smith have referred letters about legal issues to you

15 to handle?                                                  03:29

16   A.  On occasion.  But I don't recall seeing this

17 one.

18   Q.  The first sentence says, "Dear Joe," and it's

19 a letter from Sam Eletr to Joe Smith.  It says, Dear

20 Joe, I have heard that some Applied Biosystems              03:29

21 managers and employees have made remarks regarding

22 purported Applied Biosystems' rights in Lynx

23 technology that are not consistent with the agreement

24 between our companies.

25       Does that refresh your recollection about             03:29

1 some dispute about the rights that apply -- that AB

2 and Lynx had under the agreement?

3    A.  Yes.

4    Q.  What was the dispute?

5    A.  Again, my understanding of the dispute was        03:29

6 the interpretation of certain clauses of the

7 agreement that AB had with Lynx when it spun out,

8 allocating certain patent rights and perhaps other

9 rights that were necessary for Lynx's business.

10   Q.  Who was making the remarks, do you know?        03:30

11   A.  It was never clear to me when I was involved

12 in it.

13   Q.  How did you know about this dispute?

14   A.  People would go to meetings of various sorts.

15 This is when I was at Lynx.  I don't recall the        03:30

16 specific meetings, I don't now if they're business

17 oriented or technical meetings.  And I don't recall

18 who the people were.  But they would make statements

19 about what ABI participants in the meeting were

20 saying about the Lynx technology or Brenner's        03:30

21 technology.

22   Q.  Do you recall any discussions about this

23 dispute while you were still at AB?

24   A.  No, I do not.

25       I am going to have to break again.        03:31

                                                       111

1      MR. WILSON:  Oh.  Sure.

2      THE VIDEOGRAPHER:  Don't forget your microphone.

3         Going off the record.  The time is 3:31 p.m.

4      (Recess taken.)

5      THE VIDEOGRAPHER:  We're back on the record.  The        03:40

6 time is 3:40 p.m.

7      BY MR. WILSON:

8      Q.  Are you familiar with Section 2870 of the

9 California Labor Code?

10     A.  I'd have to confirm --                              03:40

11     Q.  Yeah.  I was hoping to do it without an

12 exhibit; so let's pull out Exhibit 3, which I think

13 recites Section 2870 of the Labor Code.

14        Employee invention disclosure agreement.

15 Excuse me.  Employee Invention Agreement.               03:40

16        Maybe we can do it without the number.  Are

17 you aware there's a section of the Labor Code and an

18 exception to your Employee Invention Agreement with

19 AB that says essentially if an invention is outside

20 of the line of business of the company, you can keep      03:41

21 it for yourself?

22     DR. FLOWERS:  Objection as to form.

23     MR. WILSON:  Paraphrased.

24     THE WITNESS:  Yes.

25     BY MR. WILSON:                                         03:41

1    Q.  Let me ask you to explain.  You felt that the

2 sequencing by hybridization and sequencing by

3 ligation inventions were not something you had to

4 disclose or assign to AB, right?

5    DR. FLOWERS:  Objection as to form.                03:41

6    THE WITNESS:  I believe that was the case, yes.

7    BY MR. WILSON:

8    Q.  Why was that?  Why did you have that belief?

9    A.  Because they were inventions that I thought

10 up on my own time, they were developed using my own   03:41

11 resources at home, and I didn't believe they related

12 to AB's business.

13    Q.  And therefore you believed that you didn't

14 have to assign them to AB?

15    A.  That's correct.  I didn't think I had an       03:41

16 obligation to assign inventions that they had nothing

17 to do with to AB.

18    Q.  And you also thought that you had no

19 obligation to disclose any such invention to AB; is

20 that right?                                           03:42

21    A.  Well, I understand the agreement; and that it

22 requested that if you thought you had inventions that

23 were disclosed -- or that were outside the scope of

24 the agreement, that you disclose it to AB.  I can say

25 that I believe I did disclose it through my general    03:42

113

1 discussions.  I had -- I didn't try to hide the

2 inventions at all.

3          So does that answer your question?

4     Q.  Do you believe that you -- your discussions

5 with Steve Fung and Paul Grossman satisfied your duty          03:43

6 to disclose the inventions to AB under your Employee

7 Invention Agreement?

8     A.  I don't know if it satisfied it.  I believe

9 it did at the time.

10     Q.  You believe it did at the time or you didn't          03:43

11 believe it did at the time?  I'm a little confused.

12     A.  Well, the -- it just wasn't an issue in my

13 mind.  I didn't think of the agreement, for example,

14 when I was asking Paul to initial my notebook or

15 Dr. Fung.  What was in my mind was establishing a          03:43

16 conception date, corroboration of a conception date.

17     Q.  It wasn't your intention to be disclosing it

18 to AB under the agreement; you were just, as you

19 said, trying to establish the date?

20     A.  I would say that what was primarily in my          03:44

21 mind was establishing a conception date.

22     Q.  It wasn't in your mind that you were

23 disclosing this pursuant to your Employee Invention

24 Agreement; is that right?

25     A.  Well --          03:44

1    MR. FTHENAKIS:  Objection as to form.

2    THE WITNESS:  I'm not saying one way or the

3 other.  It just was not something that I can recall

4 thinking of at the time of that event.

5    MR. WILSON:  Let's take a look at another          03:44

6 exhibit, which will be 28.

7    (Exhibit No. 28 was marked for identification.)

8    BY MR. WILSON:

9    Q.  We've marked as Exhibit 28 two pages from the

10 file history of Patent Application Serial 08/424663,    03:45

11 which became U.S. Patent 570341.  Do you recognize

12 these pages from the file history?

13    A.  No, I do not.

14    Q.  More specifically, let's take a look at

15 page 2 of this exhibit.  And you see there's a letter   03:45

16 from you to the patent office?

17    DR. FLOWERS:  Objection as to form.

18    THE WITNESS:  Yes.

19    BY MR. WILSON:

20    Q.  And that's your signature on the letter,        03:45

21 right?

22    A.  It appears to be, yes.

23    Q.  And this is something you filed with the

24 patent office in connection with your patent

25 application?                                            03:45

1     A.  Yeah, it looks to be, yes.

2     Q.  And there's a phone number on there.  Right?

3         (415) 638-5552.  Do you see that?

4     A.  Yes.

5     Q.  That's an AB phone number, isn't it?          03:46

6     A.  I believe it to be, yes.

7     Q.  And more specifically, that's your office

8 number at AB when you were working there, right?

9     A.  It well could be.  I have to confirm that.

10        Yes.                                           03:46

11    (Exhibit No. 29 was marked for identification.)

12    BY MR. WILSON:

13    Q.  Exhibit 29 is, again, pages from a file

14 history application 08422633 -- I said that right, it

15 will look fine in the transcript, but it didn't sound   03:47

16 right.  It's Application 08424633.  And, again, on

17 the last page there you see there's something you

18 signed as the sole or first inventor on April 17,

19 1995?

20    A.  Yes.                                           03:47

21    Q.  And that's, again, the application that

22 became the '341 patent as well as a couple of other

23 patents, right?

24    A.  It appears to be, yes.

25    Q.  And the address you gave for directing phone   03:47

1 calls is again your office number?  And is it correct

2 that the phone number you gave for directing phone

3 calls to is one of the numbers -- in any event is

4 your office number at AB, 638-5552?

5    A.  Yes.  One is my home number, one is the          03:47

6 office number, and one is my home address.

7       Q.  Did you mail the patent application into the

8 office, into the patent office, as far as you know,

9 from AB?

10    A.  I don't have any specific recollection about     03:48

11 where I mailed it from.  If it was Express Mail, I

12 probably took it to the patent office -- or to the

13 post office myself.

14    (Discussion off the record about exhibit.)

15    (Exhibit No. 30 was marked for identification.)      03:49

16    MR. WILSON:  We've marked as Exhibit 30 a

17 memorandum titled PE/ABD Obligations under the

18 Lynx-ABI Agreement.  And it's from Stephen Macevicz

19 to Brock Siegel.  First of all, we've seen ABI and

20 ABD along the way.  Those are both just other          03:49

21 acronyms for Applied Biosystems, right?

22    A.  That's fine.

23       Q.  AB and ABD and ABI are all the same, as far

24 as you know?

25    A.  As far as I know.                                03:49

                                                117

1    Q.  This is a memorandum you wrote, right?

2    A.  I don't recall specifically; but it appears

3 to be, yes.

4    Q.  Who is Brock Siegel?

5    A.  I believe Brock Siegel was a person that          03:49

6 worked at Perkin-Elmer.

7    Q.  Why did you write this memorandum?

8    A.  I don't have a recollection.

9    Q.  Does this refresh your recollection that

10 there was some sort of a dispute about the scope of     03:49

11 the respective companies' rights under the AB-Lynx

12 agreement?

13    A.  I don't have any recollection of what was

14 going on here.

15    (Exhibit No. 31 was marked for identification.)    03:50

16    BY MR. WILSON:

17    Q.  We've marked as Exhibit 31 an interoffice

18 memorandum from Steve Macevicz to John Van de Camp,

19 Glen Powell, and Alex Andrus regarding Lynx

20 technology disclosure agreement.  Do you recall this    03:51

21 document?

22    A.  No, I don't.  But give me a minute to look at

23 it.

24    Q.  Sure.

25    A.  Yeah, I have no specific recollection of         03:52

118

1 these documents.

2    Q.  In that memo we've marked as Exhibit 30 to

3 Brock Siegel were you providing legal advice to Brock

4 Siegel in this memorandum?

5        Let me rephrase that maybe in a way that it's       03:52

6 more clear.  Were you writing this to Brock Siegel in

7 your capacity as senior patent counsel for AB?

8    A.  I don't have a specific recollection.

9    Q.  Is there any other capacity you would have

10 written this memo other than as an attorney for AB?       03:53

11   A.  I would concur, yeah.

12   Q.  Did you write Exhibit 31 in your capacity as

13 an attorney for AB?

14   MR. FTHENAKIS:  Objection as to form.

15   THE WITNESS:  Ask the question again, please.          03:53

16   BY MR. WILSON:

17   Q.  Did you write -- first of all, did you write

18 Exhibit 31?

19   A.  I don't recall writing anything like this.

20   Q.  Do you have any reason to think you didn't        03:53

21 since your name is on it?

22   A.  Well, it says "to" Steve Macevicz.

23   Q.  Oh, you are correct.

24       Do you have any recollection of receiving

25 this memorandum?                                          03:53

                                                    119

1    A.  No, I do not.

2    Q.  Who were John Van Camp, Glen Powell, and Alex

3 Andrus?

4    A.  The only name I recognize on that list is

5 Alex Andrus, and he was a nucleic acid chemist at AB.    03:53

6    Q.  Did you understand them to be asking your

7 advice as counsel for AB?

8    A.  I don't have a recollection of that -- this

9 event.  Do you want me to read the document and

10 then --                                                 03:54

11   Q.  Sure.  Let's do that and see if it refreshes

12 your recollection at all.

13   A.  Okay.  So what was your question about this

14 document 31 again?

15   Q.  Were they asking your advice in your capacity   03:55

16 as legal counsel for AB?

17   A.  I'm not sure.

18   DR. FLOWERS:  Objection as to form.

19   MR. FTHENAKIS:  Join.

20   BY MR. WILSON:                                       03:55

21   Q.  Did you ever disclose to Mr. Siegel or

22 Mr. Van de Camp or Mr. Powell or Mr. Andrus or

23 Mr. Hunkapiller or Mr. Smith that you had signed an

24 indemnity agreement with Lynx on May 1, 1995?

25   A.  I have no specific recollection of that.         03:55

1     Q.  Did you ever tell any of your supervisors at

2 AB that you had signed an indemnity agreement with

3 Lynx before you left AB?

4     A.  I don't recall any discussions like that.

5     Q.  Did you ever ask for any consent from any of          03:55

6 your supervisors at AB whether -- let me save that.

7         Did you ever ask any of your supervisors at

8 AB whether it would be acceptable for you to sign an

9 indemnity agreement with Lynx before you left AB?

10    A.  I don't have any specific recollections of          03:56

11 discussions like that.

12    (Exhibit No. 32 was marked for identification.)

13    BY MR. WILSON:

14    Q.  This is fast.  Do you recognize Exhibit 32?

15 It's an exit checklist.                                        03:56

16    A.  Okay.  Yes.

17    Q.  That's signed by you.

18    A.  Yes.  I think it is, yes.

19    Q.  Is that your writing in the lines next to

20 "returned to supervisor"?                                      03:56

21    A.  I'm not sure.  It could be.  Or maybe

22 somebody is transcribing what I said.  I don't have

23 any specific recollection of this exit interview.

24    Q.  But do you agree that that's your signature

25 on it?                                                         03:57

1     A.  It is close enough.  It appears to be, yes.

2     Q.  Do you have any reason to think that the

3 content reflected in the exit interview checklist is

4 not correct?

5     A.  I have no opinion one way or the other about     03:57

6 this.  I just don't recall anything about it.

7     Q.  Let's go back to Exhibit 8 from the Kathy

8 San Roman deposition.  It's the assignment to Lynx.

9         It's probably the very bottom document in the

10 pile.  It's the first thing we looked at.     03:58

11        There you go.

12        Did you prepare this form?

13     A.  I don't specifically recall, but I have no

14 reason to think that I didn't.

15     Q.  It says, "For good and valuable consideration     03:59

16 paid to me...receipt of which is hereby

17 acknowledged."  Did you receive consideration for the

18 assignment of these patents?  Patent applications?

19     A.  I believe I did.

20     Q.  What did you receive?     03:59

21     A.  I received a stock option.

22     Q.  How many stock options?

23     A.  I believe it was 20,000 in Spectragen.

24     Q.  In Spectragen?

25     A.  Yes.     03:59

1    Q.  Now, you were assigning the patent

2 applications to Lynx; right?

3    A.  Correct.

4    Q.  Why was it you were receiving stock options

5 in Spectragen when you were assigning the patent          03:59

6 applications to Lynx?

7    A.  It was my understanding that Spectragen was a

8 subsidiary of Lynx that was involved with developing

9 Sidney Brenner's sequencing technology.

10    Q.  Did you want your patent applications to be      04:00

11 assigned to Lynx or to Spectragen?

12    A.  Well, I have no thoughts on that.  It wasn't

13 material to me.  I assumed that the company, if they

14 were going to use the inventions, they would use it

15 in connection with Sidney Brenner's technology.          04:00

16    Q.  How was the number of options arrived at that

17 you would receive for the patent?

18    A.  I have no recollection of how we arrived at

19 that number.

20    Q.  Who arrived at it?                                04:00

21    A.  I don't know specifically.  Sam was the

22 person that I discussed these issues with.  I don't

23 recall when I first saw the offer.  It may have been

24 when I first started at Lynx.  I just can't recall.

25    Q.  Sam Eletr is who you're referring to?            04:00

123

1      A.  Yes.

2      Q.  Did you ever have any discussions with

3  anybody else at Lynx other than Dr. Eletr about

4  receiving options for the assignment of these patent

5  applications?                                        04:01

6      A.  I don't have any specific recollection.

7      Q.  Is there anything in writing that you're

8  aware of that reflects the grant of stock options in

9  Spectragen for the assignment of these patent

10  applications to Lynx?                                04:01

11     A.  I can't recall anything in writing

12  specifically.

13     Q.  How were the options conveyed to you?

14     A.  I'm not sure I understand.  The document was

15  given to me, and then I believe Lynx had an outside   04:01

16  party that would actually handle the exercise and

17  sale of the stock if you so desired to do that.

18     Q.  What was the document that was given to you?

19     A.  It was a very conventional looking stock

20  option grant.                                        04:01

21     Q.  And who gave it to you?  Dr. Eletr?

22     A.  As I said, I can't recall.

23     Q.  Could it have been one of the attorneys for

24  Lynx?

25     A.  I'm not sure --                              04:02

                                                  124

1     DR. FLOWERS:  Objection.

2     THE WITNESS:  -- who you're referring to.

3     BY MR. WILSON:

4     Q.  Did Lynx have outside counsel at the time you

5 went to work for Lynx?                                      04:02

6     A.  I believe they did, but...

7     Q.  Does Cooley Godward sound familiar?

8     A.  That sounds familiar.

9     Q.  Had you worked with Cooley Godward attorneys

10 when you were at AB?                                        04:02

11    A.  I don't recall doing it, no.

12    Q.  Did you work with Cooley Godward attorneys

13 when you were at Lynx?  When you went to Lynx.

14    A.  I believe so, yes.

15    Q.  What did they do for Lynx?                           04:02

16    A.  They seemed to provide advice on large

17 business transactions.  That was my knowledge of

18 their connection with Lynx.

19    Q.  Did they provide patent prosecution services

20 to Lynx?                                                    04:02

21    A.  They may have at some time, yeah.

22    Q.  Did they provide corporate counsel to Lynx?

23    A.  I assume so, yes.

24    Q.  Did they provide employment counsel for Lynx?

25    A.  That, I don't know.                                  04:02

1    Q.  Did you ever have any discussions with any of

2 the attorneys at Cooley Godward about the stock

3 options that you were receiving in Spectragen?

4    A.  I don't recall any discussions like that.

5    Q.  Did you ever have any discussions with          04:03

6 anybody at Cooley Godward about the assignment of the

7 patent applications?

8    A.  I don't recall any discussions about that.

9    Q.  Did Dr. Eletr, in the course of your

10 discussions about the assignment of these              04:03

11 applications, ever ask you if you had rights to

12 assign these applications to Lynx?

13    A.  I don't recall any questions like that.

14    Q.  Did he ever ask you when you had come up with

15 the ideas that were reflected in these patent          04:03

16 applications?

17    A.  I don't recall any discussions like that.

18    Q.  Did he ever ask you who you had disclosed

19 these patent applications to at AB?

20    A.  Again, I don't recall our discussions being    04:03

21 of that nature.

22    Q.  About how much time would you say you spent

23 discussing the assignment of these patents with

24 Dr. Eletr?

25    A.  I don't recall it being a large amount of      04:03

126

1 time.  Maybe a telephone call here or there.  Not

2 a -- not long discussions like on the order of hours

3 or anything like that.

4     Q.  Did -- to your knowledge did any -- did the

5 board of directors of Lynx approve the grant of stock          04:04

6 options to you in return for your assignment of the

7 patents?

8     A.  Well, I didn't have any knowledge of that.

9     Q.  Did you ever have any discussions with

10 anybody on Lynx's board of directors about assigning          04:04

11 these patent applications to Lynx?

12     A.  Just Sam Eletr.

13     Q.  You're sure there was nobody else that you

14 discussed this with?

15     A.  Not that I can recall.                               04:04

16     Q.  Did you ever discuss with attorneys from

17 Cooley Godward anything about these patents at all --

18 or patent applications -- at the time?

19     A.  I don't recall any discussions like that with

20 them.                                                        04:05

21     Q.  After you went to Lynx -- well, before you

22 went to Lynx -- after you accepted the job offer but

23 before you started work there, did you have any

24 discussions with Dr. Eletr about disputes between AB

25 and Lynx over the rights of their respective parties          04:05

1 to various inventions under the cross-license they

2 had entered?

3     A.  Now, when is this time frame again?

4     Q.  Well, did you ever have any discussions with

5 Dr. Eletr about the respective rights that AB and          04:05

6 Lynx had under the cross-license between the two

7 companies?

8     A.  I recall discussions.  Now, I don't remember

9 if it was specifically with Sam Eletr or with Dave

10 Martin or with somebody else.  But after I started     04:05

11 working at Lynx this issue came up and I remember

12 discussing it with people.  But I don't remember

13 specifically who.

14     Q.  How long after you started working at Lynx

15 did the issue come up?                                  04:06

16     A.  I can't remember for sure.

17     Q.  Who's Dave Martin?

18     A.  Dave Martin was the president of Lynx for

19 about one year.

20     Q.  What do you remember coming up?                04:06

21     A.  Say that again, please.

22     Q.  What issues do you remember coming up?

23     A.  They were as I described before.  Somebody

24 was complaining that -- either employees or somebody

25 from ABI was stating at meetings that they owned       04:06

128

1 rights to the Sidney Brenner technology under this

2 agreement between the companies.

3    Q.  Do you know who it was that was saying that?

4    A.  No, it was -- you mean who from?

5    Q.  Well, who from Lynx was telling you this,    04:06

6 first of all?

7    A.  That's one of the things I can't recall.

8    Q.  Whether it was Martin or Eletr or somebody

9 else?

10    A.  Well, yeah, I don't have any idea who it was.    04:06

11 Somebody who went to meetings obviously.

12    Q.  Do you know who they said it was that was

13 saying these things in these meetings?

14    A.  I don't recall specific names or if they gave

15 a specific name.  It was somebody I didn't recognize.    04:07

16    Q.  Did they say how long this had been going on?

17    A.  I got the impression that it was a repetitive

18 event.  That this wasn't an isolated occurrence, that

19 the issue was raised because, you know, it was

20 affecting how people perceived Lynx and the    04:07

21 technology that they owned.

22    Q.  So you mean third parties?

23    A.  Third parties like investors, potential

24 investors.  That was my impression.

25    Q.  Did this come up fairly shortly after you    04:07

1 began work at Lynx?

2    A.  Again, I don't recall the precise time my

3 involvement in this discussion took place.

4    Q.  Was it an important issue to Lynx?

5    A.  That's hard for me to assess.  I think it was      04:08

6 important because Lynx was a company that wasn't

7 producing a product and so they -- their existence

8 depended on investors.  And if an investor was

9 investing because they saw the promise of Sidney

10 Brenner's sequencing technology, I think they would      04:08

11 want to know that Lynx had exclusive rights to it.

12 And if they heard that AB said that they also had

13 rights to it, then I think that would discourage an

14 investor from investing in Lynx.

15    Q.  So the dispute was over rights to some of the      04:08

16 fundamental technology that Lynx believed that it

17 owned?  Is that an accurate way to characterize it?

18    A.  Specifically the Sidney Brenner technology.

19    Q.  You said it was -- this may be not the right

20 word, but I think you said it was a recurring      04:09

21 issue -- or "repetitive issue" I think is the word

22 that you used.  How often did this come up?

23    A.  So, I said that because the one time I was

24 involved in it it was my impression that the person

25 making the complaint was complaining that -- was      04:09

130

1 complaining that people from ABI had made these

2 claims more than once.  So that's what I meant by a

3 repetitive event.

4     Q.  Do you know over what period of time ABI had

5 been raising these complaints?                          04:09

6     A.  No, I do not.

7     Q.  We looked at a couple of exhibits earlier,

8 Exhibit 30 and Exhibit 15, from Kathy San Roman's

9 deposition.  That's 30.  And then 15 was hard to

10 find.  So I'll put these two exhibits in front of      04:10

11 you, 30 and 15.  The issues that you've just

12 described that you heard came up after -- or at least

13 the issues that you just described that you heard

14 about after you started work at Lynx, do you know if

15 they related to the issues that are discussed in      04:10

16 Exhibit 15 to Kathy San Roman's deposition and

17 Exhibit 30 that we marked here earlier?  Do you know

18 if it was the same kind of issues that were still

19 coming up?

20     MR. FTHENAKIS:  Objection --                        04:10

21     DR. FLOWERS:  Objection to form.

22     MR. FTHENAKIS:  -- as to the form.

23     BY MR. WILSON:

24     Q.  Well, let me be more specific.  Exhibit 15

25 from Kathy San Roman's deposition is the letter that    04:10

131

1 starts, "I have heard that some Applied Biosystems

2 managers and employees have made remarks regarding

3 purported Applied Biosystems' rights in Lynx

4 technology that are not consistent with the agreement

5 between our companies."  That's a December 16, 1994,     04:11

6 letter from Sam Eletr to Joseph Smith.

7       And my question is, the issues that you've

8 just described you heard about when you got to Lynx,

9 are they the same issues that are described in this

10 letter?     04:11

11     DR. FLOWERS:  Objection as to form.

12     MR. FTHENAKIS:  Objection as to form.

13     THE WITNESS:  So, reading the first paragraph of

14 this letter, it seems that the concern expressed by

15 Dr. Eletr was that had to do with the financing of     04:11

16 the new company to develop commercial products based

17 on the inventions of Dr. Brenner.  So that is the

18 same issue that I recall hearing about when I --

19 after I got to Lynx also.

20     Q.  Is it consistent with what you recall that     04:11

21 when you arrived at Lynx in late 1995 that they told

22 you about this issue that had been going back to

23 December 1994 at least?

24     DR. FLOWERS:  Objection as to form.

25     MR. FTHENAKIS:  Join.     04:12

1    THE WITNESS:  I don't recall discussions like

2 that.

3    BY MR. WILSON:

4    Q.  That's because I asked the question poorly.

5        Is it consistent with the discussions that        04:12

6 you had when you arrived at Lynx that there had been

7 a dispute over rights under the cross-license

8 agreement going back several months at least and

9 perhaps as early as December of 1994.

10   DR. FLOWERS:  Same objections as to form.          04:12

11   MR. FTHENAKIS:  Join.

12   THE WITNESS:  So what is consistent or

13 inconsistent that you're trying to get me to comment

14 on?

15   MR. WILSON:  That's a fair question.             04:12

16       You know, let's move on to something else.

17   Q.  Can you take a look at Exhibit 9 from Kathy

18 San Roman.  Do you recognize Exhibit 9?

19   A.  Yes, I do.

20   Q.  What is it?                                    04:13

21   A.  It's a Notice of Recordation of Assignment

22 document.

23   Q.  And is this a form that you filled out and

24 filed on behalf of Lynx?

25   A.  The document attached to it looks like a form   04:14

133

1 I filled out.

2    Q.  Do you know where you got that form from?

3    A.  No, I don't recall.  It looks like it was

4 made on a word processor.

5    Q.  Why did you record this document with the        04:14

6 PTR?

7    A.  That's standard procedure for when somebody

8 assigns an invention.

9    Q.  Your standard procedure?

10   A.  Yes.                                              04:14

11   Q.  Why?

12   A.  Because it, I believe, is constructive -- or

13 it's notice of ownership of the patent.  Or the

14 properties, whatever they may be.

15   Q.  Okay.  Ask you to take a look at Exhibit 7        04:15

16 from Kathy San Roman's deposition transcript.

17   DR. FLOWERS:  I want to note for the record, I

18 believe we've gone past the three hour stipulation

19 for this deposition.

20   BY MR. WILSON:                                        04:15

21   Q.  Is Exhibit 7 the Employee Invention Agreement

22 that you signed with Lynx Therapeutics?

23   A.  It looks to be, yes.

24   Q.  Do you recognize -- do you know who gave you

25 this form?                                              04:16

134

1     A.  I don't recall specifically.

2     Q.  Do you know generally where it came from?

3     A.  I would assume that it was in a packet of

4 materials that Lynx's HR gave me.

5     Q.  Do you know who drafted the form?              04:16

6     A.  No, I do not specifically.

7     Q.  Do you recognize it to be the exact same text

8 of the form -- as the form that you signed when you

9 went to work for AB?

10    DR. FLOWERS:  Objection as to form.              04:16

11    THE WITNESS:  Yeah, I don't know if it's exact;

12 but it does look similar.

13    BY MR. WILSON:

14    Q.  Do you know if the Cooley Godward firm

15 prepared this invention assignment, this Employee       04:16

16 Invention Agreement?

17    A.  I don't know.

18    Q.  Paragraph 3 has the same proviso as the AB

19 agreement.  "I have attached a list of all inventions

20 made by me," et cetera.  Do you know if there was a     04:17

21 list attached to this agreement?

22    A.  I don't recall.

23    Q.  Can you pull out Exhibit 6 from Kathy

24 San Roman's deposition.

25        It's the offer letter from Lynx.             04:17

1          So Exhibit 6 is the offer letter, job offer

2 letter from Lynx, correct?

3      A.  It looks to be the case, yes.

4      Q.  Now, this letter doesn't make any mention of

5 assigning any patent applications or patents.  Do you          04:18

6 know why that is?

7      A.  It was my understanding that this was

8 proposed compensation for my employment, and that the

9 assignment of the patents was something separate.

10     Q.  When you were looking for documents to be          04:19

11 produced in response to the request for production of

12 documents in this case, did you look for documents

13 reflecting anything paid by Lynx to you in

14 consideration for the assignment of those patents?

15     A.  I looked for all documents.          04:19

16     Q.  So you went through all your documents and

17 you didn't find any that reflected the amount of

18 stock in return for assigning those patent

19 applications to Lynx?

20     A.  Actually, I can't recall precisely what I          04:19

21 found.  Whatever I found was of record so...

22     Q.  Meaning you gave us anything you found?

23     A.  Well --

24     Q.  Or turned over to the --

25     A.  I turned over to Basil -- Mr. Fthenakis.  I          04:19

1 had nothing else.  So whatever you have is what I

2 have.

3    Q.  And if we don't have any documents that refer

4 in any way to any grant of stock options in return

5 for the assignment of the patent applications, then          04:20

6 it's fair to assume that there are no such documents

7 in existence?

8    A.  Well --

9    DR. FLOWERS:  Objection as to form.

10    MR. FTHENAKIS:  Objection as to form.          04:20

11    THE WITNESS:  In my files.

12    MR. WILSON:  In your files, obviously.  I can't

13 ask you to speak to anyone else's files.

14    Q.  Is it fair for me to assume that you've been

15 through your files thoroughly and have not located          04:20

16 any documents that refer to a grant of stock options

17 to you by Lynx in return for you assigning patent

18 applications to Lynx.

19    A.  Yes.  Everything that I have related to that

20 era of my employment, to the best of my knowledge,          04:20

21 I've recovered and have either given them to you or

22 Mr. Fthenakis or both.

23    (Exhibit No. 33 was marked for identification.)

24    BY MR. WILSON:

25    Q.  Exhibit 33 is a February 4, 1997, letter from          04:21

137

1 Dr. Macevicz to Mike Hunkapiller.  Is this a letter

2 that you wrote?

3     A.  Yes, it appears to be.

4     Q.  And do you agree that the information that's

5 listed in this letter is proprietary and confidential      04:22

6 information of Lynx's?

7     A.  I believe -- now or then or -- are these

8 categories?  It looks like a listing of categories of

9 information.  So the names of the categories don't

10 strike me as being something that's confidential.          04:22

11     Q.  Right.  But the information -- the

12 substantive information that's described in those

13 categories, would you consider that to be

14 confidential?

15     A.  I would think so.                                  04:22

16     Q.  And would the same categories of information

17 belonging to AB be confidential as well as against

18 Lynx?

19     DR. FLOWERS:  Objection as to form.

20     THE WITNESS:  I have no idea.  I would assume so.      04:22

21 But again, it doesn't mean much unless you know what

22 the substance is behind those categories.

23     BY MR. WILSON:

24     Q.  Have you asked anybody outside of -- well,

25 have you asked anybody at Illumina or anywhere else        04:23

138

1 if they had any documents that could show or would

2 show what stock you received for assigning your

3 patent applications to Lynx?

4     A.  So, I haven't asked anybody at Illumina or

5 otherwise anything about that subject matter.          04:24

6     Q.  That was really my question, is if you had

7 done that.

8         When -- after you went to work for Lynx were

9 you involved at all in the granting of stock options

10 to employees?                                          04:24

11     A.  No, I was not.

12     Q.  Did you have any understanding as to whether

13 Dr. Eletr had the unilateral authority to grant stock

14 options?

15     A.  I have no knowledge of that.                   04:24

16     Q.  And you didn't know at the time?

17     A.  Pardon me?

18     Q.  And you didn't have any such knowledge at the

19 time?

20     A.  That's correct.                               04:24

21     MR. WILSON:  Okay.  I want to take a short break.

22         I want to take a break.

23     THE VIDEOGRAPHER:  Going off the record.  The

24 time is 4:25 p.m.

25     (Recess taken.)                                    04:25

139

1    THE VIDEOGRAPHER:  We are back on the record.

2 The time is 4:45 p.m.

3    BY MR. WILSON:

4    Q.  I want to cover just a few things which,

5 unfortunately, will be a little bit disconnected; but        04:45

6 we'll do the best we can.  You said earlier you

7 offered your sequencing by hybridization inventions

8 to AB before you went to work there.  Do you recall

9 that?

10    A.  I'm not sure what you mean by offered.        04:46

11    Q.  Did you -- what did you do?  What

12 communications did you have with anybody at AB

13 regarding your sequencing by hybridization inventions

14 before you went to work for AB?

15    A.  To the best I can recall, there was some        04:46

16 individual that I had contact with at AB, it may have

17 been Steve Fung, it may have been somebody else, I

18 can't recall.  And I told him about this invention,

19 and I think I asked him if ABI would be interested in

20 it.  And they took a copy of this document that I had        04:46

21 prepared.  Either it was a patent application or some

22 other description of it in writing.

23       And then, when I talked to the person again,

24 they told me that ABI was not interested; and that

25 Mike Hunkapiller had looked at it; and he had a list        04:46

1 of, you know, critiques of it or something.

2    Q.  Did you think that ABI might be interested in

3 it?  Is that why you brought it up with whoever you

4 brought it up with?

5    A.  I wasn't sure if they would be interested in        04:47

6 it or not.

7    Q.  Why did you think to offer it to them?  Did

8 you think there was a possibility they might be?

9    A.  There could have been a possibility.

10    Q.  Was that because -- why was that?                  04:47

11        I mean, why did you think there was a

12 possibility?

13    A.  In part I was interested in getting -- in

14 hearing the opinions of people that were familiar

15 with the DNA sequencing field and what they thought     04:47

16 about it.

17    Q.  So you wanted to get their feedback on these

18 particular technologies?

19    A.  It could have been that, yes.

20    Q.  Did you think that the people at AB would be       04:47

21 good people to give you feedback because they were

22 knowledgeable in this area?

23    A.  I think they were as knowledgeable as anybody

24 I knew.

25    Q.  Did you think that AB might be interested in        04:47

1 pursuing sequencing by hybridization products?

2     A.  I don't recall thinking that because I

3 understood the technology to be quite new, very

4 different from anything that was being

5 commercialized; so it was just an unknown.          04:48

6     Q.  In the time that you were working for AB was

7 AB interested in new technology?

8     A.  I think they looked at technologies coming

9 out of universities.  So they had several products --

10 for example, DNA sequencing.  So if some university    04:48

11 person developed a new dye, they would be interested

12 in that.  Or they had products -- one that I can

13 recall specifically, there was a gentleman at Johns

14 Hopkins who had a special technique for assisting in

15 sequencing very large DNA fragments, and so I believe  04:49

16 ABI supported his work for a while in exchange for an

17 option for a license or something.

18     Q.  Did AB have any interest in developing

19 improved DNA sequencing technologies on its own

20 internally?                                          04:49

21     A.  I think they had an interest in making

22 improvements to the existing Sanger sequencing

23 technology, but I never knew them to scour what was

24 out in the -- available in terms of brand-new

25 sequencing technologies.                             04:49

                                        142

1    Q.  Was there anybody at AB who was working on

2 brand-new sequencing technologies?

3    A.  Not to my knowledge.

4    Q.  Was there anybody at AB to your knowledge who

5 you think would have been interested in developing        04:50

6 brand-new sequencing technologies?

7    A.  I think there was people there that would be

8 interested in it, but I don't know that they'd be

9 interested in developing it.  That's a different

10 question.                                                 04:50

11    Q.  What's different about it?

12    A.  Well, one question requires the spending of

13 company resources --

14    Q.  On research and development?

15    A.  -- on development.  And research too.             04:50

16    Q.  What percentage of its budget did AB spend on

17 research and development over the course of the years

18 that you were there?

19    A.  I don't precisely know.

20    Q.  Does 12 percent sound about right for            04:50

21 research and development?

22    A.  I don't have specific recollection; but that

23 might be in the ballpark, I suppose.

24    Q.  And that's millions of dollars annually,

25 isn't it, that AB was spending on research and          04:50

143

1 development?

2     A.  I'll take your word for it.  But I would say

3 that what their definition of research and

4 development is is important to take into

5 consideration when you put forth those values.          04:50

6     Q.  When you were at AB did AB ever license any

7 improved DNA sequencing technologies you're aware of?

8     A.  Not that I'm aware of.

9     Q.  Did they, in the three years -- the several

10 years that you were working for AB, did AB improve     04:51

11 its DNA sequencing products?

12     A.  I believe they did.  For example, the

13 separation gels.  They were interested in making a

14 gel that would be very easy to load and remove from a

15 capillary tube to improve the performance of their     04:51

16 machines.  And I think they finally succeeded in

17 doing that.

18     Q.  In the years that you were working at AB did

19 AB ever develop any products that were for DNA

20 sequencing that were not based on the Sanger method?   04:51

21     A.  Not that I know of.

22     Q.  In your years working at AB did anybody at AB

23 ever express any interest in developing any kind of

24 sequencing technology other than the Sanger method

25 and variations on the Sanger method?                   04:52

1    A.  Not that I recall talking with.

2    Q.  Was it your expectation that that's all that

3 AB would ever do, was the Sanger method of DNA

4 sequencing?

5    A.  Well, I don't know what I thought at the          04:52

6 time, but I didn't foresee them doing anything

7 different.  At least in-house.

8    Q.  When you were talking to research scientists

9 at AB, did anybody ever say that they were interested

10 in developing new sequencing technologies beyond the   04:52

11 Sanger method?

12   A.  Not that I recall.

13   Q.  When -- did you ever prosecute for any -- any

14 AB scientists any patents outside -- for DNA

15 sequencing methods outside of the Sanger method?       04:52

16   A.  Not that I recall.

17   Q.  Did you participate in developing AB's

18 research and development plans?

19   A.  No.  Not -- I never recall par- -- you mean

20 an organized procedure to determine what they should   04:53

21 spend their research --

22   Q.  Right.

23   A.  No, I did not.

24   Q.  Did you participate in management discussions

25 regarding the directions that research and             04:53

1 development should take?

2    A.  I don't recall doing that.

3    Q.  Did you provide advice to management about

4 what directions research and development should take?

5    A.  No, I don't recall doing that.                04:53

6    Q.  Did you -- were you ever told by anybody in

7 management at AB that AB was not interested in

8 developing DNA sequencing technologies outside of the

9 Sanger method?

10    A.  So, was I not told?                           04:53

11    Q.  Did anybody ever tell you -- anybody ever --

12 did anybody in AB management ever tell you that AB

13 was not interested in developing sequencing

14 technologies outside of the Sanger method?

15    A.  I don't recall anybody expressly telling me   04:54

16 that they weren't interested in developing DNA

17 sequencing technology outside of the Sanger method.

18    Q.  Did anybody ever implicitly tell you that?

19    A.  I have no recollection.

20    Q.  Is there anything you can recall anybody in   04:54

21 management ever saying to you that led you to believe

22 that AB was interested in only the Sanger method of

23 DNA sequencing and nothing further?

24    A.  I don't -- well, it's hard to describe a

25 negative like that.  I would say in the decisions     04:54

1 that what they determine to -- their decisions on

2 what to invest in and what to -- what sort of

3 technologies to bring in through collaborations

4 indicated to me that they were interested in making

5 improvements to the Sanger sequencing technology          04:55

6 solely.

7     Q.  But nobody said that to you directly?

8     A.  No.

9     Q.  If --

10    A.  Not that I can recall.                             04:55

11    Q.  If AB had the opportunity to license or

12 develop internally a better method of DNA sequencing

13 because it was faster or cheaper or otherwise

14 advantageous over the Sanger method, do you have any

15 reason to think they would not have been interested    04:55

16 in pursuing that during the time you worked for AB?

17    A.  Well, again, that's a difficult question.

18 How much money would they have to spend to bring it

19 to market?  That's the key question.

20    Q.  So without knowing that question, you           04:55

21 can't -- without knowing the answer to that question

22 you can't tell me whether or not AB would have been

23 interested in faster, better, or cheaper methods of

24 DNA sequencing as compared to the Sanger method when

25 you were working at AB?                                 04:56

1    A.  State the question again.

2    Q.  Yeah.

3        Without knowing how much it would have cost

4 to develop other methods, you can't tell me whether

5 AB would have been interested in better, faster, or          04:56

6 cheaper methods of DNA sequencing other than the

7 Sanger method when you were working there?

8    DR. FLOWERS:  Objection as to form.

9    MR. FTHENAKIS:  Join.

10   THE WITNESS:  Yes.  I'm still struggling with the         04:56

11 question.  And there were even some people that would

12 say that AB, because they had such a large investment

13 in the Sanger sequencing, particularly in the way of

14 reagent streams, that they might even suppress a new

15 sequencing technology.                                       04:56

16   BY MR. WILSON:

17   Q.  Was there anybody out there who was

18 advocating that?  A newer sequencing technology?

19   DR. FLOWERS:  Objection as to form.

20   THE WITNESS:  Do you mean were there other            04:56

21 sequencing technologies available?

22   BY MR. WILSON:

23   Q.  Anybody at AB.  Was there anybody at AB who

24 advocated exploring sequencing technologies other

25 than the Sanger method when you were there at AB?        04:56

1    A.   Not to my knowledge.

2    Q.   Never heard that expressed ever?  Not once?

3    A.   Well, I just don't know.

4    Q.   Is it something you explored before you

5 made -- before you made the decision to assign your          04:57

6 patent applications to Lynx?

7    A.   I don't recall.

8    Q.   If AB had been offered a licensing

9 opportunity for a better or faster or cheaper

10 sequencing method that wasn't the Sanger method, is          04:57

11 that something you think AB would have been

12 interested in?

13    MR. FTHENAKIS:  Objection as to form.

14    DR. FLOWERS:  Objection as to form.

15    THE WITNESS:  I can only speculate for the                04:57

16 reasons I told you before.

17    MR. WILSON:  Okay.

18    Q.   One of your jobs at AB was to evaluate

19 technologies, correct?

20    A.   In some cases, yes.  Usually the intellectual        04:57

21 property aspects of the technology.

22    Q.   In that capacity in the course of your

23 business as an AB senior patent counsel, if you had

24 become aware of the possibility of licensing an

25 improved sequencing method over Sanger, is that             04:58

1 something you would have thought it was your

2 obligation to pursue?

3      A.  Please repeat the question.

4      Q.  Yeah.  In your capacity as senior patent

5 counsel for AB, if you had become aware of a                04:58

6 licensing opportunity for an improved DNA sequencing

7 method, is that something you think you would have

8 been interested in pursuing as AB's senior patent

9 counsel?

10     A.  Well, it doesn't sound like something that     04:58

11 was in my normal course of work.  That sounds more

12 like a business development function.

13     Q.  And you're not qualified to make that

14 decision?

15     A.  Well, if I became aware of something, there    04:58

16 is a possibility I'd discuss it with people.  For

17 example, at these cafeteria meetings.  But I didn't

18 have a forum, like participation in a research

19 planning group or something, to communicate with the

20 rest of the company.                                    04:59

21     Q.  So was it not your job to seek out new

22 technologies?

23     A.  I would say my job was a patent attorney.  It

24 wasn't to seek out new technologies.

25     Q.  Was it your job to decide which technologies   04:59

1 AB would pursue?

2    A.  No, it was not my job.

3    Q.  Was it your job to decide how AB would

4 allocate its research and development dollars?

5    A.  No.  Obviously, my job was a patent attorney.    04:59

6 So I may have an influence on both of those items if

7 I was asked to evaluate the patent position related

8 to some prospect.

9    Q.  But you wouldn't make the ultimate decision?

10   A.  No.  My understanding is I would not be    04:59

11 making those sorts of decisions.

12   Q.  Was it your job responsibility to decide

13 which technologies to license?

14   A.  I would say it's the same answer.  That's --

15 it's just outside of my realm of responsibility.    05:00

16   Q.  So other people would make the decision about

17 what technology AB should license for itself?

18   A.  Again, I think the ultimate decision would be

19 made by other people.  I wasn't a manager at that

20 company.    05:00

21   Q.  Now, we can agree, can't we, that one of the

22 business lines that AB had was DNA sequencing

23 products, right?

24   A.  DNA sequencing products.  Yes, they had

25 instruments and reagents that went along with the    05:00

151

1 instruments.

2    Q.  And they also developed methods for DNA

3 sequencing, right?

4    A.  No.  I would say they developed improvements

5 to the methods.                                              05:00

6    Q.  So they would -- in your view, then, they

7 would license basic methods and then develop

8 improvements to those methods?

9    A.  Yes.  To the extent they did research and

10 development, that's a fair characterization.                05:00

11    Q.  And it was not within your job duties to

12 decide which methods to license and which

13 improvements to develop; is that correct?

14    DR. FLOWERS:  Objection as to form.

15    BY MR. WILSON:                                           05:01

16    Q.  Was it within your job duties to decide which

17 methods to license and what improvements to explore?

18    A.  Only to the extent that I would make a

19 contribution from time to time by analyzing patents

20 related to those prospects.                                 05:01

21    Q.  But somebody else would have the job of

22 deciding which methods to license?

23    A.  Sure.

24    Q.  And somebody else would have the job of

25 deciding which improvements to pursue?                      05:01

1    A.  That's my understanding.

2    Q.  And before you made the decision to license

3 your patent applications to Lynx you didn't talk with

4 any of those people about the inventions in those

5 patent applications that you were licensing, right?        05:01

6    DR. FLOWERS:  Objection as to form.

7    THE WITNESS:  Well, I'm not even sure who those

8 people were, first off.

9        I talked to many of the people that could

10 have been those people at lunchtime talks and in        05:01

11 forums like that.  So if in the course of one of

12 those discussions there's an interest expressed in

13 whatever ideas I put forth, I'm sure I would have

14 heard about it.

15    Q.  Did you ever go to anybody in management at        05:02

16 AB and say "I'm thinking of licensing these patents

17 and patent applications to Lynx.  Are you interested

18 in licensing them instead"?

19    A.  Could you please state the question again.

20    Q.  Yeah.                                              05:02

21        Did you ever -- more generally, you licensed

22 four patent applications to Lynx.  I think we're

23 agreed on that, right?

24    A.  Assigned.

25    Q.  Assigned.  Right.                                   05:02

1        Did you ever offer to license or assign any

2 of those applications to AB?

3     A.  I don't recall ever doing that.

4     THE REPORTER:  34.

5     (Exhibit No. 34 was marked for identification.)    05:03

6     BY MR. WILSON:

7     Q.  Do you recognize Exhibit 34?

8     A.  Yes.

9     Q.  Exhibit 34 is a patent application that you

10 prosecuted on behalf of AB, right?                      05:03

11     A.  I believe so.  Or at least partially.

12     Q.  And it's a patent application -- or a patent,

13 I should say, that relates to a method of DNA

14 sequencing --

15     DR. FLOWERS:  Objection as to form.              05:03

16     BY MR. WILSON:

17     Q.  -- is that correct?

18        Is this patent 5,624,800 relating to a method

19 of DNA sequencing?

20     A.  Yes.  That appears to be what the title says.  05:04

21     Q.  And is this something in which you thought AB

22 was interested?

23     A.  I don't have any knowledge of that.

24     Q.  The inventors are Steven Fung -- right?  He's

25 the person who signed your lab notebooks, right?       05:04

                                                    154

1    A.  Yes.

2    Q.  And Paul Grossman, he's another person who

3 signed your lab notebooks?

4    A.  Yes.

5    Q.  Do you recall any conversations you had with          05:04

6 them about these inventions?

7    A.  Oh.  I don't recall specific discussions with

8 them.

9        This -- there was a whole series of

10 inventions related to this one referred to as the          05:04

11 drag shoot inventions.  Perhaps you're familiar with

12 that term.  There must be 6, 8 -- maybe there's 10

13 patents now.  And one of the things that we were

14 doing in the patent department was -- first off,

15 since Paul was -- that is, Dr. Grossman was becoming          05:05

16 a patent attorney.  A good learning tool was to

17 actually work on the patent applications in which he

18 was an inventor.  And so I suspect that's why his

19 name is on this one, is that this is one of the first

20 patent applications he prepared.                              05:05

21        And in this line of cases there were many

22 concepts, and I think Paul went through the

23 application and listed these concepts.  And one of

24 them was a theoretical way of using this technology

25 for sequencing.  And that's what resulted in this            05:05

155

1 patent application.

2     Q.   Is this a -- is this patent that issued or

3 series of patents, are they variations on the Sanger

4 method of sequencing?  Or are they a new method of

5 sequencing?                                           05:06

6     A.   I would actually have to look at the patent.

7 It's been so long.

8     Q.   Is that something you could do now or would

9 it take too long to do that?

10     DR. FLOWERS:  Given that we're already a half an   05:06

11 hour over the agreed time limit for this deposition.

12     MR. WILSON:  Well, given that he prosecuted the

13 patent.  The answer may be no.  I'm just asking the

14 question.

15     Q.   Do you know if this is a -- if this is a      05:06

16 patent on a version of the Sanger method of

17 sequencing, or is it related to the Sanger method of

18 sequencing?

19     A.   I don't know.

20     Q.   Is this patent that -- does it cover anything  05:06

21 that AB was doing in any of its products, do you

22 know?

23     A.   Not the specific sequencing product, but they

24 have a -- they had a group that was working on a

25 ligation based method of detecting genetic            05:07

                                                      156

1 differences.

2     Q.  So what do you mean by that?  That it wasn't

3 used in a sequencing product?

4     A.  Well, it didn't have any -- at least to my

5 knowledge they didn't have any sequencing products          05:07

6 other than the Sanger based method of sequencing.

7     Q.  All right.  So if you look at Claim 1, it

8 starts saying the method -- "in the method of

9 determining the nucleotide sequence of a target

10 nucleic acid" -- that's DNA sequencing, isn't it?          05:07

11     A.  Yes, I would say so.

12     Q.  And all of these claims have to do with a

13 method of doing DNA sequencing, right?

14     A.  That appears to be the case.

15     Q.  And they aren't the Sanger method, right?          05:07

16 They're something different?

17     DR. FLOWERS:  Objection to form.

18     THE WITNESS:  Well, again, I'd have to look

19 through the application.  I don't recall just by

20 paging through it cursorily.                                05:08

21     BY MR. WILSON:

22     Q.  Do you agree, though, that AB, when you were

23 there, was not doing DNA sequencing by the methods

24 that are described in the Claims 1 through 5 on this

25 patent that you prosecuted?                                 05:08

1    A.  It was my understanding that they were not.

2    Q.  Did you suggest to any of the inventors,

3 Dr. Grossman or Dr. Fung or any of the others, that

4 maybe they didn't need to assign this to AB because

5 it was not something that AB was doing?                    05:08

6    A.  No, I didn't suggest that to them that I can

7 recall.

8    Q.  Did you suggest to them maybe it wasn't

9 something they needed to assign to AB because it

10 wasn't the Sanger method?                                 05:08

11    A.  Well, as I say, this invention grew out of a

12 technique, the basic invention of which had nothing

13 to do with DNA sequencing.  So, what's in this

14 application is related to a technique that AB had an

15 interest in and was developing a product, but it just    05:09

16 didn't happen to be sequencing.

17    Q.  So this is an example, at least, of one

18 patent that AB pursued that had to do with DNA

19 sequencing since it's called a method of DNA

20 sequencing, other than the Sanger method of             05:09

21 sequencing?

22    THE WITNESS:  Well --

23    DR. FLOWERS:  Objection to form.

24    MR. FTHENAKIS:  Objection to form.

25    THE WITNESS:  I would say there is a difference      05:09

1 in pursuing a technology and pursuing a patent.

2    BY MR. WILSON:

3    Q.  The patent applications that you assigned to

4 Lynx had to do with two different kinds of

5 technology, sequencing by ligation and sequencing by          05:09

6 hybridization, right?

7    A.  Yeah.

8    Q.  Did you make -- when you were thinking about

9 whether to disclose or assign these to AB, did you

10 make any distinction in your mind between the patent          05:09

11 applications versus the technology?  Or was it all

12 one in the same to you?

13    A.  Well, the premise of your question, perhaps

14 you should restate it.  I don't recall thinking about

15 whether or not to assign these inventions to AB.  It          05:10

16 just didn't occur to me because I didn't consider

17 them related to the business.

18    Q.  Did it make a difference to you whether it

19 was the technology or the specific patents that you

20 were thinking about and patent applications?                  05:10

21    DR. FLOWERS:  Objection as to form.

22    MR. FTHENAKIS:  Join.

23    THE WITNESS:  I tend to think of it as the

24 technology, but it is easy to get into the habit of

25 discussing patents rather than technology.                    05:10

1    THE REPORTER:  35.

2    (Exhibit No. 35 was marked for identification.)

3    BY MR. WILSON:

4    Q.  Exhibit 35 is U.S. Patent 5,564,442

5 prosecuted by Dr. Macevicz, and Steven Fung is one of      05:11

6 the authors.  This is a patent you prosecuted, isn't

7 it?

8    A.  It looks like I prosecuted at least part of

9 it.

10    Q.  Do you have any better recollection of this      05:11

11 patent than the other one?

12    A.  No, I don't have specific recollections.

13 Just generally I do recall working on dye patents for

14 AB.  And I recognize the inventor, Steve, mentioned.

15    Q.  Do you know who Kevin Corcoran is?      05:12

16    A.  Yes, I do.

17    Q.  He was -- who was he?  Or is he, if he's

18 still with us.

19    A.  I first met Kevin at Lynx Therapeutics.  He

20 was a software programmer.      05:12

21    Q.  Do you recall telling Kevin that, in

22 retrospect, you probably should have assigned these

23 patent applications to AB?

24    A.  I don't recall that specifically.

25    Q.  Do you think that it's something that you did      05:12

1 tell Kevin?

2     A.  No.  Because I didn't feel I did anything

3 incorrectly in that whole episode.  And I think I

4 stated that to you in our interview in December of

5 2006.                                          05:12

6     Q.  Did AB have a policy on moonlighting, doing

7 jobs other than your jobs for AB?

8     DR. FLOWERS:  Objection as to form.

9     THE WITNESS:  What do you mean by policy?

10    BY MR. WILSON:                              05:13

11    Q.  Any kind of a written or oral policy that you

12 were aware of.

13    A.  Well, it was permitted to work on outside

14 work with outside clients in the legal group.

15    Q.  In what areas of business could you work with    05:13

16 outside clients?

17    A.  Typically it was doing outside patent work.

18 That's my understanding.

19    Q.  Did you do any of that work on your own?

20    A.  Only my own patents.                     05:13

21    Q.  So you didn't work for any other clients

22 other than Lynx?

23    A.  That's correct.

24    Q.  All right.  Going back to Lynx for --

25    A.  Or do you mean AB?                        05:13

1    Q.  Well, for -- I think you said at one point --

2 let me clarify this.  You were clearly working for

3 AB, right, obviously, as senior patent counsel; and

4 during the time that you were working for AB you were

5 also performing some service for Lynx, right?        05:14

6    A.  Correct.

7    Q.  That was, as you understood it, under some

8 arrangement where Lynx would pay AB for your time,

9 right?

10    A.  That's correct.                              05:14

11    Q.  Did the indemnity agreement that you signed

12 with Lynx in May of 1995 relate in any way to the

13 work that you were doing for Lynx?

14    A.  Could we go back and clarify what we were

15 talking about one question ago?                      05:14

16    Q.  Sure.

17    A.  So, you were asking whether there was a

18 policy at Lynx or ABI?

19    Q.  At ABI.

20    A.  Okay.  So, I just wanted to clarify that this  05:14

21 is at ABI there was a -- I understood it to be

22 condoned that you could work on the outside.  I

23 didn't do it, but it wasn't frowned upon if you had

24 outside clients.

25       Okay.  So what was your question?              05:14

1    Q.  Going back to the indemnity agreement that

2 you signed with Lynx in May of 1995, was that related

3 to the patent prosecution work you were doing for

4 Lynx?  Or was it connected to the expectation that

5 you would be working for Lynx in the next few months?    05:15

6    A.  It was my understanding that it was in the

7 expectation that I'd be working for Lynx.

8    Q.  Did you have any discussions with Dr. Eletr

9 or anybody else why you might need the indemnity

10 agreement in place while you were still working for    05:15

11 AB?

12    A.  No, there was no discussion whatsoever.

13    Q.  Did you have any understanding of whether you

14 were indemnified by AB or not when you were an

15 employee of AB?                                         05:15

16    A.  I had no knowledge of that.

17    Q.  And is it your understanding then -- well, do

18 you have any kind of an engagement letter with the

19 Marshall Gerstein firm?

20    A.  As I told you before, no.                        05:15

21    Q.  Sorry, I forgot that I had asked that

22 question.

23        Whose idea was it for Lynx to indemnify you

24 for your legal fees in the course of this action?

25    DR. FLOWERS:  Objection as to form.                  05:16

1     MR. FTHENAKIS:  Join.

2     THE WITNESS:  I have no idea where the

3 document -- the idea for the document originated

4 from.

5     BY MR. WILSON:                                    05:16

6     Q.  Okay.  I'm not talking about the actual

7 document itself; but then you say you found the

8 document, passed it on to your attorney,

9 Mr. Fthenakis, as I understand it, right?

10    A.  Correct.                                      05:16

11    Q.  And then whose idea was it then to tender

12 that to Lynx?  Or to Illumina I suppose it was at the

13 time.

14    MR. FTHENAKIS:  I'm going to caution you not to

15 disclose your discussions with counsel.             05:16

16    THE WITNESS:  Right.  I was just going to bring

17 that up.

18    BY MR. WILSON:

19    Q.  So you can't answer that without then

20 disclosing attorney-client information?             05:16

21    A.  That's my belief.

22    Q.  Do you know if Illumina has made any

23 reservation of rights with respect to the indemnity

24 they're providing you?

25    DR. FLOWERS:  Same instruction.  You should     05:16

1 exclude from your answer any information obtained

2 from privileged communications.

3     BY MR. WILSON:

4     Q.  So you can't answer that without disclosing

5 attorney-client communications?                          05:17

6     A.  That's correct.

7     Q.  And Exhibit 8 is the assignment of the --

8 your patents to Lynx.  Does the indemnity that you're

9 receiving from Illumina include everything related to

10 the assignment of your patents to Lynx?                  05:17

11     A.  That would require a lot of thought to answer

12 that question.

13     Q.  What's your understanding?  Do you have an

14 understanding one way or the other?

15     A.  I'm not sure, first off, what the indemnity    05:17

16 would be for in the context of your question.

17     Q.  Well, you understand that Illumina is paying

18 your legal fees, right?  That much I think we're

19 agreed on.

20     A.  Yes.                                            05:18

21     Q.  Has anybody from Illumina said we'll pay your

22 legal fees, say, from a particular date or in

23 connection with particular activities?

24     A.  I'm not aware of that kind of discussion.

25     Q.  They've just said they'll pay your legal       05:18

165

1 fees, right?

2     A.  I haven't been in direct contact with them.

3 I communicated to them through Mr. Fthenakis.

4     Q.  And we do know that many of the activities

5 that are relevant to this case took place while you          05:18

6 were an AB employee.  Are we in agreement on that?

7     A.  I'm not sure what you mean by activities.

8     Q.  Applying for the patent on April 17, 1995,

9 that became the '341 --

10     A.  Yes.                                                 05:18

11     Q.  -- '119 and '557 patents?

12     A.  Okay.

13     Q.  Do you understand that to be the case?

14     A.  The dates you give are correct.

15     Q.  And do you understand Illumina to be             05:18

16 indemnifying you for any legal fees and liabilities

17 you incur in connection with having filed that patent

18 application on March -- on April 17, 1995?

19     DR. FLOWERS:  Objection as to form.

20     THE WITNESS:  I don't have any specific knowledge   05:19

21 of discussions like that.

22     BY MR. WILSON:

23     Q.  So, as far as you know, you're being

24 indemnified for everything related to the action?

25     DR. FLOWERS:  Objection as to form.                 05:19

1    MR. FTHENAKIS:  Join.

2    THE WITNESS:  That's my understanding, yes.

3    BY MR. WILSON:

4    Q.  Now, as you mentioned, we had a meeting

5 several months ago that was attended by Mr. Fthenakis    05:19

6 and Dr. Flowers and a few other attorneys of

7 Mr. Fthenakis's office.  Do you recall that meeting?

8    A.  Yes.

9    Q.  At that meeting you did not disclose to me

10 that you were being represented or indemnified by    05:19

11 Illumina, did you?

12    A.  I don't believe I did disclose that.

13    Q.  And you recall it also was attended by Kurtis

14 McFerrin, who was a in-house counsel at AB.  I think

15 you know him, right?    05:20

16    A.  I believe, yes.

17    Q.  Did you disclose to him at this meeting that

18 you were being indemnified and represented by

19 Illumina and its counsel?

20    DR. FLOWERS:  Objection as to form.    05:20

21    THE WITNESS:  Well, you're asking more now.  The

22 fact is I didn't know I had the indemnity until after

23 that meeting.  So that's why I didn't disclose it.

24    BY MR. WILSON:

25    Q.  Did you disclose that you were being    05:20

167

1 represented -- disclose to Mr. McFerrin that you were

2 being represented by the Marshall, Gerstein law firm

3 at that meeting?

4    A.  No, I did not represent that.

5    Q.  And did you disclose that?  You said you did       05:20

6 not represent.  I don't know if you misspoke or -- at

7 the meeting we had at Mr. Fthenakis's office, did you

8 disclose that you were being represented by the

9 Marshall, Gerstein firm?

10    A.  No, I did not disclose that.                       05:20

11    Q.  Did you disclose that you had

12 conversations -- you had had conversations with the

13 Marshall, Gerstein firm that you considered to be

14 confidential?

15    A.  I wasn't asked, and I didn't disclose.            05:20

16    Q.  Have you ever been advised by the Cooley

17 Godward firm in connection with this lawsuit?

18    A.  No.

19    MR. WILSON:  All right.  I need to go get

20 something from my office, so let's take a short          05:21

21 break.  And then I think we can wrap up pretty

22 quickly.

23    THE VIDEOGRAPHER:  Going off the record.  The

24 time is 5:21.

25    (Recess taken.)                                        05:21

1    THE VIDEOGRAPHER:  We are back on the record.

2 The time is 5:30 p.m.

3    BY MR. WILSON:

4    Q.  About how much time do you think you spent

5 writing up the applications for the three patents you        05:30

6 assigned to Lynx?

7    A.  I'm not sure how long it took.  I would say

8 on the order of hours maybe.

9    Q.  Are you talking dozens of hours or tens of

10 hours?                                                       05:30

11    A.  No, I would say it was less than that.

12    Q.  Where did you start?  Did you start writing

13 it from scratch?

14    A.  My usual procedure is to start with the

15 claims or the drawings and then start to fill in a          05:30

16 structure of a patent application.

17    Q.  Did you take any of the facts for the

18 background section or anything else from the

19 applications you had worked on for AB?

20    A.  I don't recall.                                      05:30

21    Q.  Can you rule out having done that?

22    A.  Pardon me?

23    Q.  Can you rule out having done that?

24    A.  I can't rule out, right, given my knowledge

25 now.                                                        05:31

1     Q.  Is it possible that you did take some of the

2 background sections from patents you had written for

3 AB?

4     A.  Previous, yes.

5     Q.  Is it possible that you took the background          05:31

6 sections from patent applications you had written for

7 AB and used those in your patent application that you

8 assigned to Lynx?

9     DR. FLOWERS:  Objection as to form.

10     MR. FTHENAKIS:  Join.                                   05:31

11     THE WITNESS:  Yes.  I just don't recall.

12     BY MR. WILSON:

13     Q.  But it's not something you can rule out

14 having done?

15     A.  I would agree, yes.                                 05:31

16     Q.  It is something you did completely in your

17 spare time?

18     A.  Yes.  I prepared those applications in my

19 spare time.

20     Q.  Did you have set hours at AB?                       05:31

21     A.  Well, only in that, you know, I was expected

22 to be there during the day time.

23     Q.  So you worked as much as you needed to get

24 the job done, though?  You didn't punch in and out at

25 certain hours?                                              05:31

1     A.  Well, I generally worked regular hours, and

2 tried to get everything done within that time.

3     Q.  Then you supervised employees, I think you

4 said, right?

5     A.  From time to time I did, yes.                    05:32

6     Q.  And you were salaried rather than paid on an

7 hourly basis?

8     A.  That's correct.

9     Q.  You said that you had some discussions

10 occasionally with scientists at AB about your various     05:32

11 inventions.  Do you consider that to be off work

12 time?

13     DR. FLOWERS:  Objection as to form.

14     THE WITNESS:  Well, I'm not sure what the context

15 is.  So, ideas were discussed in the cafeteria, for       05:32

16 example.  I didn't consider that on-the-job time.  I

17 wasn't doing my general -- my usual function.  It

18 could have been at the cafeteria on the ABI site or

19 it could have been at a cafeteria, at a nearby

20 restaurant.                                               05:33

21     BY MR. WILSON:

22     Q.  But if you weren't writing patent

23 applications, then you consider that to be outside of

24 your normal job responsibilities?

25     MR. FTHENAKIS:  Objection as to form.                05:33

171

1     THE WITNESS:  Well, patent applications were one

2 part of my normal job function.  In some cases it was

3 agreement writing, in some cases it was attending

4 meetings to see if there were inventions that needed

5 to be discussed with the scientists or engineers.        05:33

6     BY MR. WILSON:

7     Q.  Did you ever consult with anyone about

8 whether AB might be interested in the subject matter

9 of the patent applications that you assigned to Lynx?

10    A.  Well, it depends on what you mean by subject     05:33

11 matter.  You mean generally DNA sequencing?  Or

12 specifically sequencing by ligation or sequencing by

13 hybridization?

14    Q.  Well, let's start with the latter.  Did you

15 ever ask anybody at AB if they would be interested in   05:34

16 pursuing technology related to sequencing by

17 hybridization?

18    DR. FLOWERS:  Objection as to form.

19    THE WITNESS:  I don't recall specifically.  In

20 the case of sequencing by hybridization I do recall     05:34

21 submitting that document, whatever it was, to

22 somebody at AB.

23    BY MR. WILSON:

24    Q.  So that was prior to the time you were

25 working at AB?                                          05:34

1    A.  That's correct.

2    Q.  But after you were working at AB and after

3 you filed the patent application --

4    A.  Yes.

5    Q.  -- covering -- or at least relating to          05:34

6 sequencing by hybridization, you never again asked AB

7 if -- anybody at AB if they might be interested in

8 pursuing that technology?

9    A.  I don't recall any discussions like that.

10   Q.  After you filed your patent application          05:34

11 relating to sequencing by ligation did you ever ask

12 anybody at AB if they would be interested -- if AB

13 would be interested in pursuing technology related to

14 sequencing by ligation?

15   A.  I don't recall specifically asking people if    05:34

16 they would be interested in pursuing sequencing by

17 ligation.

18   Q.  You reached the conclusion, based on your own

19 knowledge about AB, that they wouldn't be interested

20 in pursuing sequencing by ligation or sequencing by    05:35

21 hybridization; is that correct?

22   A.  By my own knowledge, you mean knowledge of

23 what they were pursuing commercially and my knowledge

24 of responses, say, in these cafeteria discussions?

25 Is that what you mean?                                 05:35

                                                173

1    Q.  That's right.

2    A.  Then I don't have any specific recollection

3 of disclosing or asking whether they'd be interested

4 in pursuing it commercially.

5    Q.  Switching to an entirely different topic, are        05:35

6 you being compensated by anybody for your time here

7 today in deposition?

8    A.  Not unless you're offering.

9    Q.  Are you -- has anybody offered you any

10 compensation in any form based on the outcome of this      05:35

11 litigation?

12    A.  No, not -- no.  Nothing.

13    MR. WILSON:  All right.  That's all I've got.

14    THE WITNESS:  No.  I'm just asking to be left

15 alone.                                                     05:36

16    MR. WILSON:  I appreciate your time today, and

17 we'll see you next time.

18    THE WITNESS:  Okay.

19    DR. FLOWERS:  I have a couple questions.

20    MR. WILSON:  Certainly.  But we have to change          05:36

21 the tape.

22    DR. FLOWERS:  I may be able to get -- change the

23 tape.  Yeah.

24    MR. WILSON:  It's not my decision to make.

25    THE VIDEOGRAPHER:  This marks the end of Tape 2         05:36

                                                           174

1  in the deposition of Stephen Macevicz.  Going off the

2  record, the time is 5:36 p.m.

3      (Recess taken.)

4      (Exhibit No. 36 was marked for identification.)

5      THE VIDEOGRAPHER:  Back on the record.  Here          05:37

6  marks the beginning of Tape 3 in the deposition of

7  Stephen C. Macevicz.  The time is 5:38 p.m.

8                      -oOo-

9                   EXAMINATION

10     BY DR. FLOWERS:                                        05:38

11     Q.  Dr. Macevicz, do you have in front of you

12 what has been marked Exhibit 36?

13     A.  Yes, I do.

14     Q.  Do you recognize that document?

15     A.  Yes.  It's a stock option.                         05:38

16     Q.  Did you sign this document?

17     A.  Yes, I see my signature on it.

18     Q.  On the last page, is that your signature?

19     A.  Yes, that's correct.

20     Q.  And did you receive this grant of a stock          05:38

21 option?

22     A.  Yes, I did.

23     Q.  And from whom did you receive this grant of a

24 stock option?

25     A.  From Lynx or Spectragen.                           05:38

1    Q.  And what is this a grant of?  I know it's a

2 stock option grant, but what is it in particular a

3 grant of?

4    A.  It's a grant of an option to purchase 20,000

5 shares of Spectragen common stock.                    05:39

6    Q.  Do you recall when you received this grant of

7 the stock option of Spectragen stock?

8    A.  Yes.  I received it sometime in September.  I

9 don't recall precisely the date.

10   Q.  Okay.  And why did you receive this grant of   05:39

11 a stock option for 20,000 shares of Spectragen stock

12 in September of 1995?

13   A.  It was my understanding that it was

14 compensation for the patents that I assigned to Lynx.

15   Q.  Are those the four patent applications you've  05:39

16 been discussing with Mr. Wilson that you assigned to

17 Lynx in 1995?

18   A.  That's correct.

19   Q.  Did these -- did this stock option or grant

20 of stock options have a vesting schedule?            05:39

21   A.  No, they vested immediately.

22   Q.  Do you know why it was set up so that these

23 stock options would vest immediately?

24   A.  It was my understanding that it was set up

25 that way so I'd have immediate access to the shares.  05:40

1    Q.  Okay.

2        Was this -- or did you understand this to be

3 compensation or consideration for anything other than

4 the assignment of your patent applications to Lynx in

5 1995?                                              05:40

6    A.  No, it was my understanding that it was

7 solely for the assignment of the patent applications

8 that we have been discussing.

9    DR. FLOWERS:  That's it.  I have no further

10 questions.                                         05:40

11    MR. WILSON:  I have a couple.  I just need a

12 minute to look at this.

13                      -oOo-

14                 FURTHER EXAMINATION

15 BY MR. WILSON:                                     05:41

16    Q.  What's the basis for your understanding that

17 this grant of stock options was for your patent

18 applications?

19    A.  My understanding is based on my discussions

20 with Dr. Eletr regarding the patent applications and   05:41

21 how I might be compensated for them.  In the course

22 of the discussions it was suggested that maybe the

23 best way to proceed would be to just grant shares in

24 the company rather than a more complex agreement as

25 was faxed to him, for example, in December of 1994     05:42

                                                177

1 that we discussed earlier.  And so that's the basis

2 of my understanding, is there was a solution for how

3 I was to be compensated for the patents that I was

4 assigned.

5     Q.  Is there something about this document that          05:42

6 makes you think that it was compensation for the

7 patents that you assigned?

8     A.  I confess I haven't looked at it in detail,

9 but at least on its face I don't see any mention of

10 the patents themselves.                                    05:42

11    Q.  When was the last time you looked at this

12 document?

13    A.  I would say I looked at it without reading it

14 yesterday.

15    Q.  When was the last time you looked at it with         05:43

16 reading it?

17    A.  I can't recall specifically.  I assume -- I

18 can only assume that I read it when I received it.

19 But I don't recall specifically.

20    Q.  Do you recall Dr. Eletr giving you this              05:43

21 document?

22    A.  I don't recall who in particular gave me the

23 document.

24    Q.  Do you recall signing this document?

25    A.  I don't specifically recall signing it, but I       05:43

1 do recognize my signature there and I --

2    Q.  Do you --

3    A.  -- generally recall receiving options in

4 exchange for the assignment of the patents.

5    Q.  Do you recall anybody saying anything to you          05:43

6 that connected this particular document, Exhibit 37,

7 to the granting of stocks -- stock options in

8 connection with the assignment of your patents?

9    DR. FLOWERS:  Objection as to form.

10    THE WITNESS:  I don't recall specific          05:44

11 discussions, but my general recollection is that when

12 this was discussed with Dr. Eletr that this was

13 compensation for the patents that I assigned.

14    BY MR. WILSON:

15    Q.  "This" meaning this particular document, or          05:44

16 just being generally the grant of stock options?

17    A.  The grant of stock options represented by

18 this document.

19    Q.  So the testimony that you've given a few

20 moments ago was given without the benefit of having          05:44

21 read the document or remembering any specific

22 conversations or discussions about the document,

23 right?

24    DR. FLOWERS:  Objection as to form.

25    THE WITNESS:  The testimony I gave before was my          05:44

1 understanding of what the purpose of this document

2 was.

3    BY MR. WILSON:

4    Q.  And you gave that testimony without having

5 read the document, right?                                05:44

6        Aren't you testifying generally from your

7 recollection of the events that transpired rather

8 than from knowledge of this document?

9    A.  Not recent knowledge of this document.

10    Q.  When you gave the testimony a few moments ago    05:44

11 about the purpose of this document or your

12 understanding of this document, did you have any

13 recollection of what was in the actual document?

14    A.  Yes.  Certainly on the cover sheet I recalled

15 Spectragen and the number of shares and the reason      05:45

16 why I received the stock option.

17    Q.  Do you have in mind anything specific about

18 this document when you were asking those questions --

19 answering those questions from your counsel?

20    A.  I'm sorry, I don't understand your question.     05:45

21    Q.  Did you have in mind anything specific about

22 this particular document when you were answering your

23 counsel's question about the purpose of this

24 document?

25    A.  What question was that?  You mean when the --     05:45

180

1 could you repeat the question.

2    Q.  Yeah.

3       You described your understanding of what this

4 document -- of why this document was given to you.

5    A.  Yes.                                                05:45

6    Q.  My question is did you have anything in mind

7 about this document, which you said you hadn't read,

8 when you were answering those questions?

9    DR. FLOWERS:  Objection as to form.

10    THE WITNESS:  Okay.  I had in mind that I              05:45

11 received 20,000 shares of Spectragen stock.  I recall

12 that event.  And as to not reading the document, I

13 didn't read it recently, and I don't have specific

14 recollection of reading it 12 years ago; but I just

15 can't say whether I read it or not or whether           05:46

16 anything after the first page was relevant to the

17 compensation I received for assigning the patents.

18    Q.  The signature line is followed by the

19 sentence "duly authorized on behalf of the board of

20 directors."  Is that your understanding, that          05:46

21 Dr. Eletr was authorized by the board of directors to

22 grant these stock options to you?

23    A.  That would be my understanding, yes.

24    Q.  And do you understand that one of the members

25 of the board of directors was Jim Kitch of the Cooley  05:46

1 Godward firm?

2    A.  Now that you mention it, yes, I do.

3    Q.  Do you understand that he, Jim Kitch, had

4 previously performed legal services for AB?

5    A.  I don't have specific knowledge of that, but        05:47

6 I assume that that was the case.

7    Q.  Did you ever talk with Sam Eletr whether he

8 had discussed this grant of stock options with the

9 board in particular or with -- with the board in

10 general or with Jim Kitch in particular?                   05:47

11    A.  No, I don't have any recollection of that.

12    MR. WILSON:  All right.  I don't have anything

13 further.

14    DR. FLOWERS:  Nothing further.  I think we're

15 done.                                                       05:47

16    THE WITNESS:  Excellent.

17    THE VIDEOGRAPHER:  Here marks the end of

18 Videotape 3 in the deposition of Stephen C. Macevicz.

19 The original videotapes will be retained by Eureka

20 Street Legal Video, San Francisco, California.  The        05:47

21 time is 5:47 p.m.

22          (At 5:47 p.m. the deposition

23           proceedings concluded.)

24                          -oOo-

25

1

2

3                          STEPHEN C. MACEVICZ

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 STATE OF CALIFORNIA)

2 COUNTY OF SAN MATEO)

3        I hereby certify that the witness in the

4 foregoing deposition, STEPHEN C. MACEVICZ, was by me

5 duly sworn to testify to the truth, the whole truth,

6 and nothing but the truth, in the within-entitled

7 cause; that said deposition was taken at the time and

8 place herein named; that the deposition is a true

9 record of the witness's testimony as reported by me,

10 a duly certified shorthand reporter and a

11 disinterested person, and was thereafter transcribed

12 into typewriting by computer.

13        I further certify that I am not interested in

14 the outcome of the said action, nor connected with,

15 nor related to any of the parties in said action, nor

16 to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my

18 hand this 11th day of December, 2007.

19

20

21        _____

22              KELLIE A. ZOLLARS, CSR

23              STATE OF CALIFORNIA

24

25