Exhibit K

EDGAR pro
by EDGAR Online®

# ILLUMINA INC

# FORM 10-K
### (Annual Report)

## Filed 02/28/07 for the Period Ending 12/31/06

| | |
|---|---|
| Address | 9885 TOWNE CENTRE DRIVE |
| | . |
| | SAN DIEGO, CA 92121 |
| Telephone | 8582024500 |
| CIK | 0001110803 |
| Symbol | ILMN |
| SIC Code | 3826 - Laboratory Analytical Instruments |
| Industry | Scientific & Technical Instr. |
| Sector | Technology |
| Fiscal Year | 01/01 |

http://access.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# Form 10-K

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2006

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from        to        .

### Commission file number: 000-30361

# Illumina, Inc.
*(Exact name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **33-0804655** |
| *(State or other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **9885 Towne Centre Drive,** | |
| **San Diego, California** | **92121** |
| *(Address of Principal Executive Offices)* | *(zip code)* |

### Registrant's telephone number, including area code:
### (858) 202-4500

### Securities registered pursuant to Section 12(b) of the Act:
### None

### Securities registered pursuant to Section 12(g) of the Act:
### Common Stock, $0.01 par value
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act   Yes ☑      No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐      No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑      Accelerated filer ☐      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐      No ☑

As of February 1, 2007, there were 60,049,268 shares of the Registrant's Common Stock outstanding. The aggregate market value of the Common Stock held by non-affiliates of the Registrant as of June 30, 2006 (the last business day of the Registrant's most recently completed second fiscal quarter), based on the closing price for the Common Stock on the NASDAQ Global Market on that date, was $1,289,642,486. This amount excludes an aggregate of 2,471,651 shares of Common Stock held by officers and directors and each person known by the Registrant to own 10% or more of the outstanding Common Stock. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, directly or indirectly, to direct or cause the direction of the management or policies of the Registrant, or that the Registrant is controlled by or under common control with such person.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive proxy statement for the annual meeting of stockholders expected to be held

on June 1, 2007 are incorporated by reference into Items 10 through 14 of this Annual Report.

**ILLUMINA, INC.**

**FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 2 |
| Item 1A | Risk Factors | 18 |
| Item 1B | Unresolved Staff Comments | 25 |
| Item 2 | Properties | 25 |
| Item 3 | Legal Proceedings | 26 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 27 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6 | Selected Financial Data | 29 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operation | 30 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 46 |
| Item 8 | Financial Statements and Supplementary Data | 47 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 47 |
| Item 9A | Controls and Procedures | 47 |
| Item 9B | Other Information | 50 |
| **PART III** | | |
| Item 10 | Directors and Executive Officers of the Registrant | 50 |
| Item 11 | Executive Compensation | 50 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 50 |
| Item 13 | Certain Relationships and Related Transactions | 51 |
| Item 14 | Principal Accounting Fees and Services | 51 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedule | 52 |
| Signatures | | 56 |
| Financial Statements | | F-1 |
| EXHIBIT 10.40 | | |
| EXHIBIT 21.1 | | |
| EXHIBIT 23.1 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |

# PART I

## ITEM 1.   *Business.*

This Annual Report on Form 10-K may contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. These statements relate to future events or our future financial performance. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should" or "will" or the negative of these terms or other comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks outlined under "Item 1A. Risk Factors" in this Annual Report, that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels or activity, performance or achievements expressed or implied by these forward-looking statements. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Accordingly, you should not unduly rely on these forward-looking statements, which speak only as of the date of this Annual Report. We are not under any duty to update any of the forward-looking statements after the date we file this Annual Report on Form 10-K or to conform these statements to actual results, unless required by law. You should, however, review the factors and risks we describe in the reports we file from time to time with the Securities and Exchange Commission.

Illumina ®, Array of Arrays ™, BeadArray ™, BeadXpress ™, CSPro ™, DASL ®, GoldenGate ®, Infinium ®, IntelliHyb ™, iSelect ™, Making Sense Out of Life ®, Oligator ®, Sentrix ®, VeraCode ™, Solexa ®, MPSS ™ are our trademarks. This report also contains brand names, trademarks or service marks of companies other than Illumina, and these brand names, trademarks and service marks are the property of their respective holders.

### Available Information

Our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports are available free of charge on our website, www.illumina.com. The information on our website is not incorporated by reference into this report. Such reports are made available as soon as reasonably practicable after filing with, or furnishing to, the Securities and Exchange Commission. The SEC also maintains an Internet site at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that electronically file with the SEC.

### Overview

We are a leading developer, manufacturer and marketer of next-generation life science tools and integrated systems for the large scale analysis of genetic variation and biological function. Using our proprietary technologies, we provide a comprehensive line of products and services that currently serve the sequencing, genotyping and gene expression markets, and we expect to enter the market for molecular diagnostics. Our customers include leading genomic research centers, pharmaceutical companies, academic institutions, clinical research organizations and biotechnology companies. Our tools provide researchers around the world with the performance, throughput, cost effectiveness and flexibility necessary to perform the billions of genetic tests needed to extract valuable medical information from advances in genomics and proteomics. We believe this information will enable researchers to correlate genetic variation and biological function, which will enhance drug discovery and clinical research, allow diseases to be detected earlier and permit better choices of drugs for individual patients.

2

On January 26, 2007, we completed the acquisition of Solexa, Inc. (Solexa) for approximately 13.1 million shares of our common stock. Solexa develops and commercializes genetic analysis technologies used to perform a range of analyses, including whole genome resequencing, gene expression analysis and small RNA analysis. We believe our combined company is the only company with genome-scale technology for genotyping, gene expression and sequencing, the three cornerstones of modern genetic analysis.

We were incorporated in California in April 1998. We reincorporated in Delaware in July 2000. Our principal executive offices are located at 9885 Towne Centre Drive, San Diego, California 92121. Our telephone number is (858) 202-4500.

**Industry Background**

### Genetic Variation and Biological Function

Every person inherits two copies of each gene, one from each parent. The two copies of each gene may be identical, or they may be different. These differences are referred to as genetic variation. Examples of the physical consequences of genetic variation include differences in eye and hair color. Genetic variation can also have important medical consequences. Genetic variation affects disease susceptibility, including predisposition to cancer, diabetes, cardiovascular disease and Alzheimer's disease. In addition, genetic variation may cause people to respond differently to the same drug treatment. Some people may respond well, others may not respond at all, and still others may experience adverse side effects. A common form of genetic variation is a single-nucleotide polymorphism, or SNP. A SNP is a variation in a single position in a DNA sequence. It is estimated that the human genome contains over nine million SNPs.

While in some cases a single SNP will be responsible for medically important effects, it is now believed that combinations of SNPs may contribute to the development of most major diseases. Since there are millions of SNPs, it is important to investigate many representative, well-chosen SNPs simultaneously in order to discover medically valuable information.

Another contributor to disease and dysfunction is the over- or under-expression of genes within an organism's cells. A very complex network of genes interacts to maintain health in complex organisms. The challenge for scientists is to delineate the associated genes' expression patterns and their relationship to disease. Until recently, this problem was addressed by investigating effects on a gene-by-gene basis. This is time consuming, and difficulties exist when several pathways cannot be observed or "controlled" at the same time. With the advent of microarray technology, thousands of genes can now be tested at the same time.

### SNP Genotyping

SNP genotyping is the process of determining which base (A, C, G or T) is present at a particular site in the genome within an individual or other organism. The use of SNP genotyping to obtain meaningful statistics on the effect of an individual SNP or a collection of SNPs, and to apply that information to clinical trials and diagnostic testing, requires the analysis of millions of SNP genotypes and the testing of large populations for each disease. For example, a single large clinical trial could involve genotyping 300,000 SNPs per patient in 1,000 patients, thus requiring 300 million assays. Using previously available technologies, this scale of SNP genotyping was both impractical and prohibitively expensive.

Large-scale SNP genotyping can be used in a variety of ways, including studies designed to understand the genetic contributions to disease (disease association studies), genomics-based drug development, clinical trial analysis, disease predisposition testing, and disease diagnosis. SNP genotyping can also be used outside of healthcare, for example in the development of plants and animals with desirable commercial characteristics. These markets will require billions of SNP genotyping assays annually.

3

### Gene Expression Profiling

Gene expression profiling is the process of determining which genes are active in a specific cell or group of cells and is accomplished by measuring mRNA, the intermediary messenger between genes (DNA) and proteins. Variation in gene expression can cause disease, or act as an important indicator of disease or predisposition to disease. By comparing gene expression patterns between cells from different environments, such as normal tissue compared to diseased tissue or in the presence or absence of a drug, specific genes or groups of genes that play a role in these processes can be identified. Studies of this type, often used in drug discovery, require monitoring thousands, and preferably tens of thousands, of mRNAs in large numbers of samples. Once a smaller set of genes of interest has been identified, researchers can then examine how these genes are expressed or suppressed across numerous samples, for example, within a clinical trial.

As gene expression patterns are correlated to specific diseases, gene expression profiling is becoming an increasingly important diagnostic tool. Diagnostic use of expression profiling tools is anticipated to grow rapidly with the combination of the sequencing of various genomes and the availability of more cost-effective technologies.

### Sequencing

DNA sequencing is the process of determining the order of bases (A, C, G or T) in a DNA sample, which can be further divided into de novo sequencing, re-sequencing, and tag sequencing. In de novo sequencing, the goal is to determine the sequence of a representative individual from a species never before sequenced. Understanding the similarities and differences in DNA sequence between many species can help to improve our understanding of the function of the structures found in the DNA.

In re-sequencing, one determines the sequences of many individuals from the same species, generally comparing each to a standard or reference sequence. This is an extremely comprehensive form of genotyping, in which every single base is characterized for possible mutations. Mutations tend to fall in two categories: those which occur fairly frequently at a tiny fraction of bases (e.g. at about 0.1% of bases in humans), and those which occur much less frequently but at a large number of locations. Both types can contribute to diseases. Genotyping can subsequently be used to characterize the former, but re-sequencing is used to assay the latter. With the merger of Illumina and Solexa, we will have state-of-the-art technologies for both.

In tag sequencing, short sequences, each representative of a larger molecule or genomic location, are detected and counted. In these applications, the number of times that each tag is seen provides quantification of an underlying biological process. As an example, in digital gene expression, one tag sequence may exist for each gene, and the number of copies of this tag which are detected in an experiment is a measure of how actively that gene is being expressed in the tissue sample being analyzed.

4

**Our Technologies**

*BeadArray Technology*

We have developed a proprietary array technology that enables the large-scale analysis of genetic variation and biological function. Our BeadArray technology combines microscopic beads and a substrate in a simple proprietary manufacturing process to produce arrays that can perform many assays simultaneously. Our BeadArray technology provides a unique combination of high throughput, cost effectiveness, and flexibility. We achieve high throughput with a high density of test sites per array and we are able to format arrays either in a pattern arranged to match the wells of standard microtiter plates or in various configurations in the format of standard microscope slides. We seek to maximize cost effectiveness by reducing consumption of expensive reagents and valuable samples, and through the low manufacturing costs associated with our technologies. Our ability to vary the size, shape and format of the well patterns and to create specific bead pools, or sensors, for different applications provides the flexibility to address multiple markets and market segments. We believe that these features have enabled our BeadArray technology to become a leading platform for the emerging high-growth market of SNP genotyping and expect they will enable us to become a key player in the gene expression market.

Our proprietary BeadArray technology combines microwells etched into a substrate and specially prepared beads that self-assemble into an array. We have deployed our BeadArray technology in two different array formats, the Array Matrix and the BeadChip. Our first bead-based product was the Array Matrix which incorporates fiber optic bundles. The fiber optic bundles, which we cut into lengths of less than one inch, are manufactured to our specifications. Each bundle is comprised of approximately 50,000 individual fibers and 96 of these bundles are placed into an aluminum plate, which forms an Array Matrix. BeadChips are fabricated in microscope slide-shaped sizes with varying numbers of sample sites per slide. Both formats are chemically etched to create tens to hundreds of thousands of wells for each sample site.

In a separate process, we create sensors by affixing a specific type of molecule to each of the billions of microscopic beads in a batch. We make different batches of beads, with the beads in a given batch coated with one particular type of molecule. The particular molecules on a bead define that bead's function as a sensor. For example, we create a batch of SNP sensors by attaching a particular DNA sequence, or oligo, to each bead in the batch. We combine batches of coated beads to form a pool specific to the type of array we intend to create. A bead pool one milliliter in volume contains sufficient beads to produce thousands of arrays.

To form an array, a pool of coated beads is brought into contact with the array surface where they are randomly drawn into the wells, one bead per well. The tens of thousands of beads in the wells comprise our individual arrays. Because the beads assemble randomly into the wells, we perform a final procedure called 'decoding' in order to determine which bead type occupies which well in the array. We employ several proprietary methods for decoding, a process that requires only a few steps to identify all the beads in the array. One beneficial by-product of the decoding process is a validation of each bead in the array. This quality control test characterizes the performance of each bead and can identify and eliminate use of any empty wells. We ensure that each bead type on the array is sufficiently represented by including multiple copies of each bead type. Multiple bead type copies improve the reliability and accuracy of the resulting data by allowing statistical processing of the results of identical beads. We believe we are the only microarray company to provide this level of quality control in the industry.

5

An experiment is performed by preparing a sample, such as DNA from a patient, and introducing it to the array. The design features of our Array Matrix allow it to be simply dipped into a solution containing the sample, whereas our BeadChip allows processing of samples on a slide-sized platform. The molecules in the sample bind to their matching molecules on the coated bead. These molecules in either the sample or on the bead are labeled with a fluorescent dye either before or after the binding. The BeadArray Reader detects the fluorescent dye by shining a laser on the fiber optic bundle or on the BeadChip. This allows the detection of the molecules resulting in a quantitative analysis of the sample.

### VeraCode Technology

The BeadArray technology is most effective in applications which require mid- to high levels of multiplexing from low to high levels of throughput. Multiplexing refers to the number of individual pieces of information that are simultaneously extracted from one sample. We believe the molecular diagnostics market will require systems which are extremely high throughput and cost effective in the mid- to low-multiplex range. To address this market, we acquired the VeraCode technology through our acquisition of CyVera Corporation in April 2005. Based on digitally encoded microbeads, VeraCode enables low-cost multiplexing from 1 to 384-plex in a single well. We plan to implement the VeraCode technology using our newly designed BeadXpress system and our existing assays. We believe that this system will enable lower multiplex genotyping, gene expression and protein based assays. In the research market, we expect our customers to utilize our BeadArray technology for their higher multiplex projects and then move to our BeadXpress system for their lower multiplex projects utilizing the same assays. Additionally, we believe that the cost and multiplex advantages of the BeadXpress system using our VeraCode technology will be welcomed in the molecular diagnostics market. We expect to launch the BeadXpress system during the first quarter of 2007, along with several assays for the system.

### Oligator Technology

Genomic applications require many different short pieces of DNA that can be made synthetically, called oligos. We have developed our proprietary Oligator technology for the parallel synthesis of many different oligos to meet the requirements of large-scale genomics applications. We believe that our Oligator technology is substantially more cost effective and provides significantly higher throughput than available commercial alternatives. Our synthesis machines are computer controlled and utilize many robotic processes to minimize the amount of labor used in the manufacturing process. In 2005, we implemented our fourth-generation Oligator technology, which is capable of manufacturing over 13,000 different oligos per run. This is an improvement over prior generations of technology where we could only manufacture approximately 3,000 oligos per run. This increase in scale was necessary to enable us to support the manufacture of oligos under our collaboration with Invitrogen as well as to support our increased internal need for oligos, a critical component of our BeadArray technology, for product sales and new product development.

### Sequencing Technology

Our DNA sequencing technology, acquired as part of the Solexa merger which was completed on January 26, 2007, is based on use of our sequencing-by-synthesis (SBS) biochemistry. In SBS, single stranded DNA is extended from a priming site, one base at a time, using reversible terminator nucleotides. These are DNA bases which can be added to a growing second strand, but which initially cannot be further extended. This means that at each cycle of the chemistry, only one base can be added. Each base which is added includes a fluorescent label which is specific to the particular base. Thus following incorporation, the fluorescence can be imaged, its color determined, and the base itself can be inferred. Once this is done, an additional step removes both the fluorescence and the block that had prevented further extension of the second strand. This allows another base to be added, and the cycle can be repeated. We have shown data in which this cycle is repeated up to 50 times, thus determining DNA sequences which are up to 50 bases long. This may well increase in the future as we further develop this technology. The reversible terminator bases which we use are novel synthetic molecules which we manufacture. They are not well incorporated by naturally occurring polymerases, so we have also developed proprietary enzymes for this purpose. Both the nucleotides and enzymes are the subject of significant intellectual property.

In our DNA sequencing systems, we apply the SBS biochemistry on microscopic islands of DNA. These are called DNA clusters. Each cluster starts as a single DNA molecule, typically a few hundred bases long, attached to the inside surface of a flow cell. We then use a proprietary amplification biochemistry to create copies of each starting molecule. As the copies are made, they are covalently linked to the surface, so they cannot diffuse away. After a number of cycles of amplification, each cluster might have 500 to 1,000 copies of the original starting molecule, but still be only about a micron (one-millionth of a meter) in diameter. By making so many copies, the fluorescent signal from each cluster is significantly increased. Because the clusters are so small though, tens of millions of clusters can be independently formed inside a single flow cell. This large number of clusters can then be sequenced simultaneously, by alternate cycles of SBS biochemistry and electronic imaging.

### Key Advantages of Our Technology

We believe that our technology provides distinct advantages, in a variety of applications, over competing technologies, by creating cost-effective, highly miniaturized arrays with the following characteristics:

*High Throughput.* The miniaturization of our BeadArray technology provides very high information content per unit area. To increase sample throughput, we have formatted our array matrix in a pattern arranged to match the wells of standard microtiter plates, allowing throughput levels of up to nearly 150,000 unique assays per microtiter plate, and we use laboratory robotics to speed process time. Similarly, we have patterned our whole-genome expression BeadChips to support up to 48,000 gene expression assays for six samples with each BeadChip, and our whole-genome genotyping BeadChips to support up to 650,000 genotypes with each BeadChip. Our Infinium and GoldenGate assays are supported by full automation and LIMS to address high throughput laboratories. Our Illumina Genome Analyzer can analyze the DNA sequences of tens of millions of clusters at one time.

*Cost Effectiveness.* Our array products substantially reduce the cost of our customers' experiments as a result of our proprietary manufacturing process and our ability to capitalize on cost reductions generated by advances in fiber optics, plasma etching processes, digital imaging and bead chemistry. In addition, our products require smaller reagent volumes than other array technologies, thereby reducing reagent costs for our customers. Our Oligator technology further reduces reagent costs, as well as reducing our cost of coating beads used in our BeadArray and VeraCode technologies. We expect the Illumina Genome Analyzer to allow DNA sequencing at 1/100th of the cost of conventional capillary instruments.

*Flexibility.*   We are able to offer flexible solutions to our customers based on our ability to attach different kinds of molecules, including DNA, RNA, proteins and other chemicals, to our beads. In addition, we can have BeadChips manufactured in multiple shapes and sizes with wells organized in various arrangements to optimize them for different markets and market segments. In combination, the use of beads and etched wells provides the flexibility and scalability for our BeadArray technology to be tailored to perform many applications in many different market segments, from drug discovery to diagnostics. Our Oligator technology allows us to manufacture a wide diversity of lengths and quantities of oligos. DNA sequences determined with our Illumina Genome Analyzer can also be used to identify larger DNA or RNA molecules from which the sequences have been derived, which leads to a series of applications based on tag sequencing, including digital gene expression analysis and microRNA discovery and quantification.

*Quality and Reproducibility.*   The quality of our products is dependent upon each element in the system — the array, the assay used to perform the experiment and the instrumentation and software used to capture the results. Each array is manufactured with a high density of beads, which enables us to have multiple copies of each individual bead type. We measure the copies simultaneously and combine them into one data point. This allows us to make a comparison of each bead against its own population of identical beads, which permits the statistical calculation of a more reliable and accurate value for each data point. Finally, the manufacture of the array includes a proprietary decoding step that also functions as a quality control test of every bead on every array, improving the overall quality of the data. When we develop the assays used with our products, we focus on performance, cost and ease of use. By developing assays that are easy to use, we can reduce the potential for the introduction of error into the experiment. We believe that this enables researchers to obtain high quality and reproducible data from their experiments. Additionally, we manufacture substantially all of the reagents used in our assays, allowing us to control the quality of the product delivered to the customer.

## Our Strategy

Our goal is to make our BeadArray, BeadXpress and Illumina Genome Analyzer platforms the industry standard for products and services addressing the genetic analysis markets. We plan to achieve this by:

- focusing on emerging high-growth markets;

- rapidly commercializing our BeadLab, BeadStation, BeadXpress, Illumina Genome Analyzer, Array Matrix and BeadChip products;

- expanding our technologies into multiple product lines, applications and market segments; and

- strengthening our technological leadership.

## Products and Services

The first implementation of our BeadArray technology, the Array Matrix, is a disposable matrix with 96 fiber optic bundles arranged in a pattern that matches the standard 96-well microtiter plate. Each fiber optic bundle performs more than 1,500 unique assays. The BeadChip, introduced in 2003, is fabricated in multiple configurations to support multiple applications and scanning technologies.

We have provided genotyping services using our proprietary BeadArray technology since 2001. In addition, we have developed our first genotyping and gene expression products based on this technology. These products include disposable Array Matrices and BeadChips, GoldenGate and Infinium reagent kits for SNP genotyping, BeadArray Reader scanning instruments and an evolving portfolio of custom and standard gene expression products.

### SNP Genotyping

In 2001, we introduced the first commercial application of our BeadArray technology by launching our SNP genotyping services product line. Since this launch, we have had peak days in which we operated at over 60 million genotypes per day. To our knowledge, no other genotyping platform can achieve comparable levels of throughput while delivering such high accuracy and low cost.

We designed our first consumable BeadArray product, the Array Matrix, for SNP genotyping. The Array Matrix uses a universal format that allows it to analyze any set of SNPs. We have also developed reagent kits based on GoldenGate assay protocols and the BeadArray Reader, a laser scanner, which is used to read our array products.

Depending on throughput and automation requirements, our customers can select the system configuration to best meet their needs. For production-scale throughput, our BeadLab would be appropriate, and for moderate-scale throughput, our BeadStation would be selected. Our BeadLab includes our BeadArray Reader, combined with LIMS, standard operating procedures and analytical software and fluid handling robotics. This production-scale system was commercialized in late 2002 and when installed, this system can routinely produce millions of genotypes per day.

The BeadStation, a system for performing moderate-scale genotyping designed to match the throughput requirements of individual research groups and core labs, was commercialized in late 2003. The BeadStation includes our BeadArray Reader and genotyping and/or gene expression analysis software. Multiple BeadStations can be configured to achieve different levels of desired throughput and are fully upgradeable to a full BeadLab through various steps that add automation, sample preparation equipment and LIMS capability.

In 2003, we announced the availability of an assay set for genetic linkage analysis. This standard product has been deployed in our genotyping services operation and is also sold to customers who use our SNP genotyping systems. Genetic linkage analysis can help identify chromosomal regions with potential disease associations across a related set of samples.

In 2005, we announced the introduction of the Major Histocompatability Complex (MHC) Panel Set, which allows the interrogation of a difficult-to-assay area of the genome, often associated with autoimmune diseases. In addition, we announced the introduction of Mouse-6 and MouseRef-8 Gene Expression BeadChip allowing the study of the levels of gene expression in mouse model.

In 2005, we commenced shipping the Sentrix Human-1 Genotyping BeadChip for whole-genome genotyping. This BeadChip provides to scientists the ability to interrogate over 100,000 SNPs located in high-value genetic regions of the human genome. Also, in the fourth quarter of 2005, we began shipping the new Sentrix HumanHap300 Genotyping BeadChip to customers around the world. Using the Infinium assay, which enables us to select virtually any SNP in the genome, the HumanHap300 BeadChip allows analysis of more than 317,000 SNPs. We selected the SNPs for inclusion on the chip in collaboration with a consortium of scientists that are leaders in the genotyping field. We believe this product's quality and performance support our expectation that it will become an important discovery tool for researchers seeking to understand the genetic basis of common yet complex diseases.

In 2006, we introduced several new SNP genotyping products, including:

- *Sentrix HumanHap240S BeadChip.*  The HumanHap240S BeadChip is a companion to our Sentrix HumanHap300 BeadChip for genome-wide disease association studies that enables researchers to interrogate an additional 240,000 SNPs utilizing our Infinium assay. We began shipment of this product in the first quarter of 2006.

- *Sentrix HumanHap550 BeadChip.*  The HumanHap550 BeadChip contains over 550,000 SNPs on a single microarray. We began shipment of this product in the second quarter of 2006.

9

- *Sentrix HumanHap650Y BeadChip.* The HumanHap650Y BeadChip contains over 650,000 SNP markers on a single microarray, which we believe provides the most comprehensive genomic coverage and highest data quality of any whole-genome genotyping product currently available. We began shipment of this product in the third quarter of 2006.

- *Sentrix HumanHap550+ BeadChip.* The HumanHap550+ BeadChip allows customers to add up to 120,000 custom SNP markers to supplement the standard content provided on the existing Sentrix HumanHap550 BeadChip, yielding up to 670,000 markers for association studies.

- *iSelect Infinium genotyping products.* The iSelect Infinium genotyping product line is used for focused content applications. Customers can create a custom array of up to 60,000 SNP markers per sample with 12 samples per chip. We began shipment of these products in the third quarter of 2006.

- *HumanHap300-Duo and the Human Hap300-Duo+ Genotyping BeadChips.* The HumanHap300-Duo allows researchers to analyze two samples simultaneously, with over 634,000 total tag SNPs on a single BeadChip. The HumanHap300-Duo+ allows for the addition of 60,000 custom SNP loci to the base product, enabling researchers to enrich that product with SNPs of interest in any genomic region. We began shipment of the HumanHap300-Duo in the fourth quarter of 2006.

- *RatRef-12 Expression BeadChip.* The RatRef-12 Expression BeadChip enables analysis of 12 samples in parallel on a single BeadChip. Content for this BeadChip is derived from the NCBI RefSeq database (Release 16), with over 22,000 rat transcripts represented. We began shipment of this product in the fourth quarter of 2006.

Through an application called Copy Number Polymorphisms, the HumanHap family of BeadChips also provides high-resolution information on amplifications, deletions and loss of heterozygosity throughout the genome, abnormalities common in cancers and congenital diseases. In addition, we announced additional standard panels in the first quarter of 2006, including mouse linkage and cancer panels.

### Gene Expression Profiling

With the addition of application specific accessory kits, our production-scale BeadLabs and BeadStations are capable of performing a growing number of applications, including gene expression profiling.

In 2003, we introduced our focused set gene expression products on both the Array Matrix and BeadChip platforms. Our system includes a BeadArray Reader for imaging Array Matrices and BeadChips, a hybridization chamber and software for data extraction. In addition, we have developed standard gene expression products for each of the human, mouse and arabidopsis genomes with an additional panel that focuses on human toxicology.

In 2005, we began shipment of the Human-6 and HumanRef-8 Expression BeadChip products. Both products allow large-scale expression profiling of multiple samples on a single chip and are imaged using our BeadArray Reader. The Human-6 BeadChip is designed to analyze six discrete whole-human-genome samples on one chip, interrogating in each sample approximately 48,000 transcripts from the estimated 30,000 genes in the human genome. The HumanRef-8 BeadChip product analyzes eight samples in parallel against 24,000 transcripts from the roughly 22,000 genes represented in the consensus RefSeq database, a well-characterized whole-genome subset used broadly in genetic analysis. We expect that these gene expression BeadChips will dramatically reduce the cost of whole-genome expression analysis, allowing researchers to expand the scale and reproducibility of large-scale biological experimentation. In 2006, we began shipment of the RatRef-12, which analyzes twelve samples in parallel against 22,226 transcripts from the roughly 21,910 genes represented in the RefSeq database, release 16.

10

### Scanning Instrumentation

The BeadArray Reader, an instrument we developed, is a key component of both our BeadLab and our benchtop BeadStation. This scanning equipment uses a laser to read the results of experiments that are captured on our arrays and was designed to be used in all areas of genetic analysis that use our Array Matrices and BeadChips. In the second quarter of 2006, we began shipment of the AutoLoader, which automates BeadChip loading and scanning and increases lab throughput. The Autoloader is designed to support up to two BeadArray Readers simultaneously for unattended operation.

### High-Throughput Oligo Synthesis

We have put in place a state-of-the-art oligo manufacturing facility. This facility serves both the commercial needs under our collaboration with Invitrogen and our internal needs. In addition to their use to coat beads, these oligos are components of the reagent kits for our BeadArray products and are used for assay development. We manufacture oligos in a wide range of lengths and in several scales, with the ability to add many types of modifications. We offer a range of quality control options and have implemented a laboratory information management system to control much of the manufacturing process. In 2005, we stopped selling oligos directly into the market and began shipping oligos under our collaboration with Invitrogen.

## Our Collaborative Partners

### Invitrogen Corporation

In December 2004, we entered into a strategic collaboration with Invitrogen. The goal of the collaboration is to combine our expertise in oligo manufacturing with the sales, marketing and distribution capabilities of Invitrogen. In connection with the collaboration, we have developed the next generation Oligator DNA synthesis technology. This technology includes both plate-and tube-based capabilities. Under the terms of the agreement, Invitrogen paid us an upfront non-refundable collaboration payment of $2.3 million in the first quarter of 2005. Additionally, upon the achievement of a certain milestone, Invitrogen was obligated to make a milestone payment of $1.1 million to us. During 2005, this milestone was achieved and the milestone payment was received. We used these funds to invest in our San Diego facility to enable the development and implementation of fourth-generation Oligator technology and to extend the technology into the larger market for tube-based oligo products. We began manufacturing and shipping the plate-based and certain tube-based oligo products under the collaboration in the third quarter of 2005. In addition, the agreement provides for the transfer of our Oligator technology into two Invitrogen facilities outside North America. Collaboration profit from the sale of collaboration products is divided equally between the two companies.

11

### deCODE genetics

In May 2006, we executed a Joint Development and Licensing Agreement (the Development Agreement) with deCODE genetics, ehf. (deCODE). Pursuant to the Development Agreement, the parties agreed to collaborate exclusively to develop, validate and commercialize specific diagnostic tests for variants in genes involved in three disease-related pathways: the gene-encoding leukotriene A4 hydrolase, linked to heart attack; the gene-encoding transcription factor 7-like 2 (TCF7L2), linked to type 2 diabetes; and the gene-encoding BARD1, linked to breast cancer. With deCODE, we are developing diagnostic tests based on these variants for use on our BeadXpress system. Under the agreement, we will be responsible for the manufacturing, marketing and selling of the diagnostic products. The companies will share the development costs of these products and split the profits from sales of the diagnostics tests. The Development Agreement may be terminated as to a particular product under development if one party decides to discontinue funding the development of that product, and may be terminated in whole by either party if the other party commits an uncured material breach, files for bankruptcy or becomes insolvent. Under a separate supply agreement, we installed instrumentation at deCODE that will enable deCODE to perform whole genome association studies on up to 100,000 samples using the our Sentrix HumanHap300 BeadChips and associated reagents.

## Intellectual Property

We have an extensive patent portfolio, including, as of February 1, 2007, ownership of, or exclusive licenses to, 106 issued U.S. patents and 149 pending U.S. patent applications, including five allowed applications that have not yet issued as patents, some of which derive from a common parent application. This portfolio includes patents acquired as part of the Solexa merger on January 26, 2007. Our issued patents, which are directed at various aspects of our array, assay, oligo synthesis, instrument and chemical detection technologies, expire between 2011 and 2024. We are seeking to extend the patents directed at the full range of our technologies. We have received or filed counterparts for many of these patents and applications in one or more foreign countries.

We also rely upon trade secrets, know-how, copyright and trademark protection, as well as continuing technological innovation and licensing opportunities to develop and maintain our competitive position. Our success will depend in part on our ability to obtain patent protection for our products and processes, to preserve our copyrights and trade secrets, to operate without infringing the proprietary rights of third parties and to acquire licenses related to enabling technology or products.

We are party to various exclusive and non-exclusive license agreements with third parties, which grant us rights to use key aspects of our array and sequencing technologies, assay methods, chemical detection methods, reagent kits and scanning equipment. We have exclusive licenses from Tufts University to patents that are directed at our use of BeadArray technology. These patents were filed by Dr. David Walt, a member of our board of directors, the Chairman of our Scientific Advisory Board and one of our founders. Our exclusive licenses expire with the termination of the underlying patents, which will occur between 2010 and 2020. We also have additional nonexclusive licenses from various third parties for other components of our products. In all cases, the agreements remain in effect over the term of the underlying patents, may be terminated at our request without further obligation and require that we pay customary royalties while the agreement is in effect.

## Research and Development

We have made substantial investments in research and development since our inception. We have assembled a team of skilled engineers and scientists who are specialists in biology, chemistry, informatics, instrumentation, optical systems, software, manufacturing and other related areas required to complete the development of our products. Our research and development efforts have focused primarily on the tasks required to optimize our BeadArray and Oligator technologies and to support commercialization of the products and services derived from these technologies. As of December 31, 2006, we had a total of 144 employees engaged in research and development activities.

Our research and development expenses for 2006, 2005 and 2004 (inclusive of charges relating to stock-based compensation of $3.9 million, $0.1 million, and $0.3 million, respectively) were $33.4 million, $27.8 million and $21.5 million, respectively. Compared to 2006, we expect research and development expense to increase in absolute dollars and as a percentage of overall revenue during 2007 as we continue to expand our research and product development efforts, including research and development projects associated with our acquisition of Solexa.

**Marketing and Distribution**

Our current products address the genetic analysis portion of the life sciences market, in particular, experiments involving sequencing, SNP genotyping and gene expression profiling. These experiments may be involved in many areas of biologic research, including basic human disease research, pharmaceutical drug discovery and development, pharmacogenomics, toxicogenomics and agricultural research. Our potential customers include pharmaceutical, biotechnology, agrichemical, diagnostics and consumer products companies, as well as academic or private research centers. The genetic analysis market is relatively new and emerging and its size and speed of development will be ultimately driven by, among other items:

- the ability of the research community to extract medically valuable information from genomics and to apply that knowledge to multiple areas of disease-related research and treatment;

- the availability of sufficiently low cost, high-throughput research tools to enable the large amount of experimentation required to study genetic variation and biological function; and

- the availability of government and private industry funding to perform the research required to extract medically relevant information from genomic analysis.

We market and distribute our products directly to customers in North America, major European markets, Japan and Singapore. In each of these areas, we have dedicated sales, service and application support personnel responsible for expanding and managing their respective customer bases. In smaller markets in the Pacific Rim countries and Europe, we sell our products and provide services to customers through distributors that specialize in life science products. We expect to significantly increase our sales and distribution resources during 2007 and beyond as we launch a number of new products and expand the number of customers that can use our products.

**Manufacturing**

We manufacture our array platforms, reagent kits, scanning equipment and oligos in-house. Our manufacturing capacity for BeadChips has increased approximately fourfold over the level as of January 1, 2006. We intend to continue to increase capacity as needed to manufacture our products in sufficient quantity to meet our business plan for 2007. We are focused on continuing to enhance the quality and manufacturing yield of our Array Matrices and BeadChips and are exploring ways to continue increasing the level of automation in the manufacturing process. In addition, we have implemented information management systems for many of our manufacturing and services operations to manage all aspects of material and sample use. We adhere to access and safety standards required by federal, state and local health ordinances, such as standards for the use, handling and disposal of hazardous substances.

We intend to add capacity to manufacture Array Matrices and BeadChips throughout 2007. We currently depend upon outside suppliers for materials used in the manufacture of our products. We intend to continue, and may extend, the outsourcing of portions of our manufacturing process to subcontractors where we determine it is in our best commercial interests.

## Competition

Although we expect that our BeadArray products and services will provide significant advantages over currently available products and services, we expect to encounter intense competition from other companies that offer products and services for the SNP genotyping, gene expression and sequencing markets. These include companies such as Affymetrix, Agilent, Amersham Biosciences (acquired by GE Corp. and now named GE Healthcare), Applera Corporation, Applied Biosystems, Beckman Coulter, Caliper Technologies, Luminex, Monogram Biosciences, NimbleGen, Perlegen Sciences, Roche Diagnostics in partnership with 454 Life Sciences, Sequenom and Third Wave Technologies. Some of these companies have or will have substantially greater financial, technical, research, and other resources and larger, more established marketing, sales, distribution and service organizations than we do. In addition, they may have greater name recognition than we do in the markets we need to address and in some cases a large installed base of systems. Each of these markets is very competitive and we expect new competitors to emerge and the intensity of competition to increase in the future. In order to effectively compete with these companies, we will need to demonstrate that our products have superior throughput, cost and accuracy advantages over the existing products. Rapid technological development may result in our products or technologies becoming obsolete. Products offered by us could be made obsolete either by less expensive or more effective products based on similar or other technologies. Although we believe that our technology and products will offer advantages that will enable us to compete effectively with these companies, we cannot assure you that we will be successful.

## Segment and Geographic Information

We operate in one business segment, for the development, manufacture and commercialization of tools for genetic analysis. Our operations are treated as one segment as we only report operating results on an aggregate basis to our chief operating decision maker, our Chief Executive Officer.

During 2006, $81.5 million, or 44%, of our total revenue came from shipments to customers outside the United States, compared to $28.0 million, or 38%, in 2005. Sales to territories outside of the United States are generally denominated in U.S. dollars. We expect that sales to international customers will continue to be an important and growing source of revenue. We have sales support resources in Western Europe and direct sales offices in Japan, Singapore and China. In addition, we have distributor relationships in various countries in the Pacific Rim region and Europe.

## Seasonality

Historically, customer purchasing patterns have not shown significant seasonal variation, although demand for our products is usually lowest in the first quarter of the calendar year and highest in the third quarter of the calendar year as academic customers spend unused budget allocations before the end of the government's fiscal year.

## Environmental Matters

We are dedicated to the protection of our employees and the environment. Our operations require the use of hazardous materials which subject us to a variety of federal, state and local environmental and safety laws and regulations. We believe we are in material compliance with current applicable laws and regulations; however, we could be held liable for damages and fines should contamination of the environment or individual exposures to hazardous substances occur. In addition, we cannot predict how changes in these laws and regulations, or the development of new laws and regulations, will affect our business operations or the cost of compliance.

## Employees

As of December 31, 2006, we had a total of 596 employees, 73 of whom hold Ph.D. degrees. 43 of our employees with Ph.D. degrees are engaged in full-time research and development activities. None of our employees are represented by a labor union. We consider our employee relations to be positive.

## Executive Officers

Our executive officers as of February 1, 2007, are as follows:

| Name | Age | Position |
|---|---|---|
| Jay T. Flatley | 54 | President, Chief Executive Officer and Director |
| Christian O. Henry | 38 | Senior Vice President and Chief Financial Officer |
| Christian G. Cabou | 58 | Senior Vice President, General Counsel and Secretary |
| Arthur L. Holden | 54 | Senior Vice President of Corporate and Market Development |
| Tristan B. Orpin | 40 | Senior Vice President of Commercial Operations |
| John R. Stuelpnagel, DVM | 49 | Co-Founder, Senior Vice President and General Manager, Microarray Business, Chief Operating Officer and Director |
| John West | 50 | Senior Vice President and General Manager of DNA Sequencing |

*Jay Flatley* is President and Chief Executive Officer of Illumina. Prior to his appointment in 1999, Mr. Flatley was the President and Chief Executive Officer of Molecular Dynamics, later acquired by Amersham Pharmacia Biotech in 1998 and now a part of GE Healthcare. Mr. Flatley, who was a founder and member of the board of directors for Molecular Dynamics, lead the company to its initial public offering (IPO) in 1993, in addition to helping the company develop and launch over 15 major instrumentation systems, including the world's first capillary-based DNA sequencer. Prior to joining Molecular Dynamics, Mr. Flatley was Vice President of Engineering and Strategic Planning for Plexus Computers, a manufacturer of high-performance Unix super-microcomputers. Before his career at Plexus, Mr. Flatley was Executive Vice President for Manning Technologies and held various manufacturing positions while working for the Autolab division of Spectra Physics. Mr. Flatley received a bachelor of arts degree in economics from Claremont McKenna College (Claremont, CA) and a bachelor of science and master of science (summa cum laude) in industrial engineering from Stanford University (Stanford, CA). Currently, he serves as a member of the board of directors of both Illumina and GenVault Corporation.

*Christian Henry* is Senior Vice President and Chief Financial Officer of Illumina. Mr. Henry joined Illumina in June 2005 and is responsible for worldwide financial operations, controllership functions and facilities management. Mr. Henry served previously as the Chief Financial Officer for Tickets.com, a publicly traded, online ticket provider that was recently acquired by Major League Baseball Advanced Media, LP. Prior to that, Mr. Henry was Vice President, Finance and Corporate Controller of Affymetrix, Inc., a publicly traded life sciences company, where he oversaw accounting, planning, SEC and management reporting, and treasury and risk management. He previously held a similar position at Nektar Therapeutics (formerly Inhale Therapeutic Systems, Inc.). Mr. Henry received a bachelor of administration degree in biochemistry and cell biology from the University of California, San Diego, and a master of business administration degree from the University of California, Irvine. He is a certified public accountant.

15

*Christian Cabou* is Senior Vice President, General Counsel and Secretary of Illumina. Mr. Cabou joined Illumina in May 2006 and has worldwide responsibility for all legal and intellectual property matters, in addition to being responsible for the Company's human resources function. Mr. Cabou is also Illumina's Code of Ethics Compliance Officer. Before joining Illumina, Mr. Cabou spent five years as General Counsel for GE Global Research and, before that, was Senior Counsel of Global Intellectual Property for GE Medical Systems. Prior to his position at GE, Mr. Cabou spent seven years with the law firm Foley & Lardner where he was a partner. He had twenty years of experience in engineering design and management prior to his career in law and intellectual property. Mr. Cabou received a J.D. from Northwestern University's School of Law (Chicago, IL.) in addition to a master of engineering management degree from Northwestern University. Mr. Cabou was awarded a MSEE (equivalent) degree from the Conservatoire National des Arts et Métiers (Paris, France) and a bachelor of science (equivalent) degree from the Lycée Technique d'Etat (Armentières, France).

*Arthur Holden* is the Senior Vice President of Corporate and Business Development for Illumina. Mr. Holden joined Illumina in April 2006 and is responsible for leading business development and the development of relationships and partnerships with pharmaceutical firms, large-scale research consortia, and governmental bodies such as the National Institute of Health (NIH) and the Food and Drug Administration (FDA). Mr. Holden was most recently the principal founder, chairman and chief executive officer for First Genetic Trust. Prior to this he was Chairman and Chief Executive Officer of the SNP Consortium, Ltd. and Chief Executive Officer and Director of Celsis International, PLC. From 1983 to 1994 Mr. Holden held various executive positions at Baxter International. A winner of multiple awards, including the Laura Jackson Achievement Award for outstanding leadership in the healthcare industry, the Illinois Technology Innovation & Entrepreneurship award and the STRIVE Entrepreneurial award, Mr. Holden currently serves on a number of commercial and non-profit boards. He is chairman of the Pharmaceutical Biomedical Research and the Serious Adverse Event Consortia. In addition, he is Chairman of the Advisory Board for the Biotechnology Management Program at the J.L. Kellogg Graduate School of Management. He is a director of iBIO and the Illinois Technology Development Alliance. Mr. Holden earned a master of business administration degree from Northwestern University's Kellogg School of Management (Chicago, IL) and a bachelor of science degree from Union College (Schenectady, NY).

*Tristan Orpin* joined Illumina in December of 2002 in the role of Vice President of Worldwide Sales, and in January of 2007 was promoted to the position of Senior Vice President of Commercial Operations. Before joining Illumina, Mr. Orpin was Director of Sales and Marketing for Sequenom from September 1999 to August 2001. Later Mr. Orpin was elected Vice President of Sales and Marketing and held this position from August 2001 to November 2002. Prior to 2001, Mr. Orpin served in several senior sales and marketing positions at Bio-Rad Laboratories. Mr. Orpin received a bachelor of science in genetics and biochemistry with first class honors from the University of Melbourne (Melbourne, Australia).

*John Stuelpnagel, D.V.M* ., one of Illumina's co-founders, is General Manager for Illumina's Microarray business and Chief Operating Officer. He has served as the Company's Chief Operating Officer since January 2005 and a Director since April 1998. From April 1998 to October 1999, he served as acting President and Chief Executive Officer and from April 1998 to April 2000 as acting Chief Financial Officer. Between October 1999 and January 2005, Dr. Stuelpnagel was Vice President of Business Development and later as Senior Vice President of Operations. While founding Illumina, Dr. Stuelpnagel was an associate with CW Group, a venture capital firm. Dr. Stuelpnagel received both a bachelor of science degree in biochemistry and a doctorate degree in veterinary medicine from the University of California (Davis, CA), and went on to receive a master of business administration degree from the University of California, Los Angeles.

16

*John West* is Senior Vice President and General Manager for Illumina's DNA Sequencing business. Mr. West joined Illumina from Solexa, where he was Chief Executive Officer. Before Solexa, he was Vice President of DNA Platforms for Applied Biosystems, Inc. (AB) and was responsible for the company's instrument and reagent products for DNA sequencing, gene expression, genotyping, PCR, and DNA synthesis. His group developed and launched the instruments that now populate virtually all genome sequencing centers worldwide. He also had business responsibility for AB's first gene expression array system, for its real-time PCR instruments, and for its microfluidic PCR products. Previously, Mr. West held a number of senior positions, including President of Princeton Instruments, Inc., President and Founder of BioAutomation, Inc. and Marketing Director for Microfluidics at Microcosm Technologies, Inc. During Mr. West's term at Princeton Instruments, the company introduced the first low light imaging system for single molecule fluorescence — and Solexa, at that time a startup, bought one of the first units. Mr. West received both bachelor of science and master of science degrees in engineering from MIT, and a master of business administration in finance from the Wharton School of Business at the University of Pennsylvania.

## ITEM 1A.  *Risk Factors.*

Our business is subject to various risks, including those described below. In addition to the other information included in this Form 10-K, the following issues could adversely affect our operating results or our stock price.

### *Litigation or other proceedings or third party claims of intellectual property infringement could require us to spend significant time and money and could prevent us from selling our products or services or impact our stock price.*

Our commercial success depends in part on our non-infringement of the patents or proprietary rights of third parties and on our ability to protect our own intellectual property. As we have previously disclosed, Affymetrix, Inc. filed a complaint against us in July 2004, alleging infringement of six of its patents.

On June 30, 2006, the court dismissed a patent Affymetrix had sought to withdraw from its suit leaving five patents being asserted against us. On August 16, 2006, the court issued a ruling on the claim construction hearing that it had held on April 20, 2006 as part of this litigation. We believe the court's mixed ruling interpreted certain claim terms in our favor, and did not adversely impact our defenses and counterclaims which are still pending. At the request of both parties, trial has been rescheduled to March 5, 2007 from October 16, 2006. A pre-trial conference was held on February 8, 2007 during which the court established a multi-phase trial structure with the first phase of the trial to begin on March 5, 2007, and addressed related issues. Any adverse ruling or perception of an adverse ruling throughout these proceedings may have an adverse impact on our stock price, and such impact may be disproportionate to the actual import of the ruling itself.

17

Table of Contents

Third parties, including Affymetrix, have asserted or may assert that we are employing their proprietary technology without authorization. As we enter new markets, we expect that competitors will likely assert that our products infringe their intellectual property rights as part of a business strategy to impede our successful entry into those markets. In addition, third parties may have obtained and may in the future obtain patents allowing them to claim that the use of our technologies infringes these patents. We could incur substantial costs and divert the attention of our management and technical personnel in defending ourselves against any of these claims. Furthermore, parties making claims against us may be able to obtain injunctive or other relief, which effectively could block our ability to develop further, commercialize and sell products, and could result in the award of substantial damages against us. In the event of a successful claim of infringement against us, we may be required to pay damages and obtain one or more licenses from third parties, or be prohibited from selling certain products. We may not be able to obtain these licenses at a reasonable cost, if at all. We could therefore incur substantial costs related to royalty payments for licenses obtained from third parties, which could negatively affect our gross margins. In addition, we could encounter delays in product introductions while we attempt to develop alternative methods or products. Defense of any lawsuit or failure to obtain any of these licenses on favorable terms could prevent us from commercializing products, and the prohibition of sale of any of our products could materially affect our ability to grow and maintain profitability.

***We expect intense competition in our target markets, which could render our products obsolete, result in significant price reductions or substantially limit the volume of products that we sell. This would limit our ability to compete and maintain profitability. If we cannot continuously develop and commercialize new products, our revenue may not grow as intended.***

We compete with life sciences companies that design, manufacture and market instruments for analysis of genetic variation and biological function and other applications using technologies such as two-dimensional electrophoresis, capillary electrophoresis, mass spectrometry, flow cytometry, microfluidics, nanotechnology, next-generation DNA sequencing and mechanically deposited, inkjet and photolithographic arrays. We anticipate that we will face increased competition in the future as existing companies develop new or improved products and as new companies enter the market with new technologies. The markets for our products are characterized by rapidly changing technology, evolving industry standards, changes in customer needs, emerging competition, new product introductions and strong price competition. For example, prices per data point for genotyping have fallen significantly over the last two years and we anticipate that prices will continue to fall. One or more of our competitors may render our technology obsolete or uneconomical. Some of our competitors have greater financial and personnel resources, broader product lines, a more established customer base and more experience in research and development than we do. Furthermore, life sciences and pharmaceutical companies, which are our potential customers and strategic partners, could develop competing products. If we are unable to develop enhancements to our technology and rapidly deploy new product offerings, our business, financial condition and results of operations will suffer.

***Any inability to adequately protect our proprietary technologies could harm our competitive position.***

Our success will depend in part on our ability to obtain patents and maintain adequate protection of our intellectual property in the United States and other countries. If we do not protect our intellectual property adequately, competitors may be able to use our technologies and thereby erode our competitive advantage. The laws of some foreign countries do not protect proprietary rights to the same extent as the laws of the United States, and many companies have encountered significant challenges in protecting their proprietary rights abroad. These challenges can be caused by the absence of rules and methods for the establishment and enforcement of intellectual property rights abroad.

The patent positions of companies developing tools for the life sciences and pharmaceutical industries, including our patent position, generally are uncertain and involve complex legal and factual questions. We will be able to protect our proprietary rights from unauthorized use by third parties only to the extent that our proprietary technologies are covered by valid and enforceable patents or are effectively maintained as trade secrets. We intend to apply for patents covering our technologies and products, as we deem appropriate. However, our patent applications may be challenged and may not result in issued patents or may be invalidated or narrowed in scope after they are issued. Questions as to inventorship may also arise. For example, in June 2005, a former employee filed a complaint against us, claiming he is entitled to be named as joint inventor of certain of our U.S. patents and pending U.S. and foreign patent applications, and seeking a judgment that the related patents and applications are unenforceable. Any finding that our patents and applications are unenforceable could harm our ability to prevent others from practicing the related technology, and a finding that others have inventorship rights to our patents and applications could require us to obtain certain rights to practice related technologies, which may not be available on favorable terms, if at all.

In addition, our existing patents and any future patents we obtain may not be sufficiently broad to prevent others from practicing our technologies or from developing competing products. There also is risk that others may independently develop similar or alternative technologies or design around our patented technologies. Also, our patents may fail to provide us with any competitive advantage. We may need to initiate additional lawsuits to protect or enforce our patents, or litigate against third party claims, which would be expensive and, if we lose, may cause us to lose some of our intellectual property rights and reduce our ability to compete in the marketplace. Furthermore, these lawsuits may divert the attention of our management and technical personnel.

We also rely upon trade secret protection for our confidential and proprietary information. We have taken security measures to protect our confidential information. These measures, however, may not provide adequate protection for our trade secrets or other confidential information. Among other things, we seek to protect our trade secrets and confidential information by entering into confidentiality agreements with employees, collaborators and consultants. Nevertheless, employees, collaborators or consultants may still disclose our confidential information, and we may not otherwise be able to effectively protect our trade secrets. Accordingly, others may gain access to our confidential information, or may independently develop substantially equivalent information or techniques.

### *If we are unable to develop and maintain operation of our manufacturing capability, we may not be able to launch or support our products in a timely manner, or at all.*

We currently possess limited facilities capable of manufacturing our principle products and services for both sale to our customers and internal use. If a natural disaster were to significantly damage our facility or if other events were to cause our operations to fail, these events could prevent us from developing and manufacturing our products and services. Also, many of our manufacturing processes are automated and are controlled by our custom-designed Laboratory Information Management System (LIMS). Additionally, as part of the decoding step in our array manufacturing process, we record several images of each array to identify what bead is in each location on the array and to validate each bead in the array. This requires significant network and storage infrastructure. If either our LIMS system or our networks or storage infrastructure were to fail for an extended period of time, it would adversely impact our ability to manufacture our products on a timely basis and may prevent us from achieving our expected shipments in any given period.

19

### *Our manufacturing capacity may limit our ability to sell our products.*

We continue to ramp up our capacity to meet our anticipated demand for our products. Although we have significantly increased our manufacturing capacity and we believe that we have sufficient plans in place to ensure we have adequate capacity to meet our business plan in 2007 and 2008, there are uncertainties inherent in expanding our manufacturing capabilities and we may not be able to increase our capacity in a timely manner. For example, manufacturing and product quality issues may arise as we increase production rates at our manufacturing facility and launch new products. As a result, we may experience difficulties in meeting customer, collaborator and internal demand, in which case we could lose customers or be required to delay new product introductions, and demand for our products could decline. Additionally, in the past, we have experienced variations in manufacturing conditions that have temporarily reduced production yields. Due to the intricate nature of manufacturing products that contain DNA, we may encounter similar or previously unknown manufacturing difficulties in the future that could significantly reduce production yields, impact our ability to launch or sell these products, or to produce them economically, prevent us from achieving expected performance levels or cause us to set prices that hinder wide adoption by customers.

### *If we are unable to find third-party manufacturers to manufacture components of our products, we may not be able to launch or support our products in a timely manner, or at all.*

The nature of our products requires customized components that currently are available from a limited number of sources. For example, we currently obtain the fiber optic bundles and BeadChip slides included in our products from single vendors. If we are unable to secure a sufficient supply of those or other product components, we will be unable to meet demand for our products. We may need to enter into contractual relationships with manufacturers for commercial-scale production of some of our products, or develop these capabilities internally, and we cannot assure you that we will be able to do this on a timely basis, for sufficient quantities or on commercially reasonable terms. Accordingly, we may not be able to establish or maintain reliable, high-volume manufacturing at commercially reasonable costs.

### *We may encounter difficulties in integrating acquisitions that could adversely affect our business.*

We acquired Solexa in January 2007 and CyVera Corporation in April 2005 and we may in the future acquire technology, products or businesses related to our current or future business. We have limited experience in acquisition activities and may have to devote substantial time and resources in order to complete acquisitions. Further, these potential acquisitions entail risks, uncertainties and potential disruptions to our business. For example, we may not be able to successfully integrate a company's operations, technologies, products and services, information systems and personnel into our business. An acquisition may further strain our existing financial and managerial resources, and divert management's attention away from our other business concerns. In connection with these acquisitions, we assumed certain liabilities and hired certain employees, which is expected to continue to result in an increase in our research and development expenses and capital expenditures. There may also be unanticipated costs and liabilities associated with an acquisition that could adversely affect our operating results. To finance any acquisitions, we may choose to issue shares of our common stock as consideration, which would result in dilution to our stockholders. Additionally, an acquisition may have a substantial negative impact on near-term expected financial results.

The success of the Solexa merger will depend, in part, on our ability to realize the anticipated synergies, growth opportunities and cost savings from integrating Solexa's businesses with our businesses. Our success in realizing these benefits and the timing of this realization depend upon the successful integration of the operations of Solexa. The integration of two independent companies is a complex, costly and time-consuming process. The difficulties of combining the operations of the companies include, among other factors:

- lost sales and customers as a result of certain customers of either of the two companies deciding not to do business with the combined company;

- complexities associated with managing the combined businesses;

- integrating personnel from diverse corporate cultures while maintaining focus on providing consistent, high quality products and customer service;

- coordinating geographically separated organizations, systems and facilities;

- potential unknown liabilities and unforeseen increased expenses or delays associated with the merger; and

- performance shortfalls at one or both of the companies as a result of the diversion of management's attention to the merger.

If we are unable to successfully combine the businesses in a manner that permits the combined company to achieve the cost savings and operating synergies anticipated to result from the merger, such anticipated benefits of the merger may not be realized fully or at all or may take longer to realize than expected. In addition, we and Solexa have operated and will continue to operate independently. It is possible that the integration process could result in the loss of key employees, diversion of each company's management's attention, the disruption or interruption of, or the loss of momentum in, each company's ongoing businesses or inconsistencies in standards, controls, procedures and policies, any of which could adversely affect our ability to maintain relationships with customers and employees or our ability to achieve the anticipated benefits of the merger, or could reduce our earnings or otherwise adversely affect the business and financial results of the combined company.

### *The combined company may fail to realize the anticipated benefits of the merger as a result of our failure to achieve anticipated revenue growth following the merger.*

Solexa's business faces significant risks. These risks include the fact that Solexa's technology is at the development stage and, although Solexa has accepted orders for its Genome Analyzer and has shipped and installed those systems, Solexa has not completed performance specifications for those systems and has not invoiced customers for them. There can be no assurance it will be able to do so. These risks also include those described under the caption "Risk Factors" of Solexa's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission for the quarterly period ended September 30, 2006, and may include additional risks of which we are not currently aware or which we currently do not believe are material. If any of the events or circumstances underlying these risks actually occur, Solexa's business, financial condition or results of operations could be harmed and, as a result, Solexa may, among other things, fail to achieve the anticipated revenue growth following the merger.

### *The merger will cause dilution of Illumina's earnings per share.*

The merger and the transactions contemplated by the merger agreement are expected to have a dilutive effect on our earnings per share at least through 2007 due to losses of Solexa, the additional shares of Illumina common stock that were issued in the merger, the transaction and integration-related costs and other factors such as the potential failure to realize any benefit from synergies anticipated in the merger. These factors could adversely affect the market price of our common stock.

***Solexa had a material weakness in its internal controls over financial reporting as of December 31, 2005. If additional material weaknesses are identified in the future, current and potential stockholders could lose confidence in our consolidated financial reporting, which could harm our business and the trading of our common stock.***

As of December 31, 2005, Solexa did not maintain effective control over the application of GAAP related to the financial reporting process. This control deficiency resulted in numerous adjustments being required to bring Solexa's financial statements into compliance with GAAP. Additionally, this deficiency could have resulted in material misstatement of the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, Solexa's management determined that this control deficiency constituted a material weakness. Because of this material weakness, Solexa's management concluded that, as of December 31, 2005, it did not maintain effective internal control over financial reporting based on those criteria. Should we, or our independent registered public accounting firm, determine in future fiscal periods that there are material weaknesses in our consolidated internal controls over financial reporting (including Solexa), the reliability of our financial reports may be impacted, and our results of operations or financial condition may be harmed and the price of our common stock may decline.

***We expect that our results of operations will fluctuate. This fluctuation could cause our stock price to decline.***

Our revenue is subject to fluctuations due to the timing of sales of high-value products and services projects, the impact of seasonal spending patterns, the timing and size of research projects our customers perform, changes in overall spending levels in the life sciences industry, and other unpredictable factors that may affect customer ordering patterns. Given the difficulty in predicting the timing and magnitude of sales for our products and services, we may experience quarter-to-quarter fluctuations in revenue resulting in the potential for a sequential decline in quarterly revenue. A large portion of our expenses are relatively fixed, including expenses for facilities, equipment and personnel. In addition, we expect operating expenses to continue to increase significantly. Accordingly, if revenue does not grow as anticipated, we may not be able to maintain annual profitability. Any significant delays in the commercial launch of our products, unfavorable sales trends in our existing product lines, or impacts from the other factors mentioned above, could adversely affect our future revenue growth or cause a sequential decline in quarterly revenue. Due to the possibility of fluctuations in our revenue and expenses, we believe that quarterly comparisons of our operating results are not a good indication of our future performance. If our operating results fluctuate or do not meet the expectations of stock market analysts and investors, our stock price could decline.

***We have a limited history of commercial sales of systems and consumable products, and our success depends on our ability to develop commercially successful products and on market acceptance of our new and relatively unproven technologies.***

We may not possess all of the resources, capability and intellectual property necessary to develop and commercialize all the products or services that may result from our technologies. Sales of our genotyping and gene expression systems only began in 2003, and some of our other technologies are in the early stages of commercialization or are still in development. You should evaluate us in light of the uncertainties and complexities affecting similarly situated companies developing tools for the life sciences and pharmaceutical industries. We must conduct a substantial amount of additional research and development before some of our products will be ready for sale, and we currently have fewer resources available for research and development activities than some of our competitors. We may not be able to develop or launch new products in a timely manner, or at all, or they may not meet customer requirements or be of sufficient quality or at a price that enables us to compete effectively in the marketplace. Problems frequently encountered in connection with the development or early commercialization of products and services using new and relatively unproven technologies might limit our ability to develop and successfully commercialize these products and services. In addition, we may need to enter into agreements to obtain intellectual property necessary to commercialize some of our products or services, which may not be available on favorable terms, or at all.

22

Historically, life sciences and pharmaceutical companies have analyzed genetic variation and biological function using a variety of technologies. In order to be successful, our products must meet the commercial requirements of the life sciences and pharmaceutical industries as tools for the large-scale analysis of genetic variation and biological function.

Market acceptance will depend on many factors, including:

- our ability to demonstrate to potential customers the benefits and cost effectiveness of our products and services relative to others available in the market;

- the extent and effectiveness of our efforts to market, sell and distribute our products;

- our ability to manufacture products in sufficient quantities with acceptable quality and reliability and at an acceptable cost;

- the willingness and ability of customers to adopt new technologies requiring capital investments; and

- the extended time lag and sales expenses involved between the time a potential customer is contacted on a possible sale of our products and services and the time the sale is consummated or rejected by the customer.

### Our sales, marketing and technical support organization may limit our ability to sell our products.

We currently have fewer resources available for sales and marketing and technical support services compared to some of our primary competitors. In order to effectively commercialize our sequencing, genotyping and gene expression systems and other products to follow, we will need to expand our sales, marketing and technical support staff both domestically and internationally. We may not be successful in establishing or maintaining either a direct sales force or distribution arrangements to market our products and services. In addition, we compete primarily with much larger companies that have larger sales and distribution staffs and a significant installed base of products in place, and the efforts from a limited sales and marketing force may not be sufficient to build the market acceptance of our products required to support continued growth of our business.

### We have only recently achieved annual operating profitability.

Prior to 2006, we had incurred net losses each year since our inception. As of December 31, 2006, our accumulated deficit was $104.6 million. Our ability to sustain annual profitability will depend, in part, on the rate of growth, if any, of our revenue and on the level of our expenses. SFAS No. 123R is also likely to adversely affect our future profitability. We expect to continue incurring significant expenses related to research and development, sales and marketing efforts to commercialize our products and the continued development of our manufacturing capabilities. In addition, we expect that our research and development and selling and marketing expenses will increase at a higher rate in the future as a result of the development and launch of new products. Even if we maintain profitability, we may not be able to increase profitability on a quarterly basis.

### We may encounter difficulties in managing our growth. These difficulties could impair our profitability.

We have experienced, and we may expect to continue to experience rapid and substantial growth in order to achieve our operating plans, which will place a strain on our human and capital resources. If we are unable to manage this growth effectively, our profitability could suffer. Our ability to manage our operations and growth effectively requires us to continue to expend funds to enhance our operational, financial and management controls, reporting systems and procedures and to attract and retain sufficient numbers of talented employees. If we are unable to scale up and implement improvements to our manufacturing process and control systems in an efficient or timely manner, or if we encounter deficiencies in existing systems and controls, then we will not be able to make available the products required to successfully commercialize our technology. Failure to attract and retain sufficient numbers of talented employees will further strain our human resources and could impede our growth.

*Our effective tax rate may vary significantly.*

Our future effective tax rates could be adversely affected by various internal and external factors. These factors, include but are not limited to, earnings being lower than anticipated in countries where we have lower statutory rates and higher than anticipated in countries where we have higher statutory rates; changes in the valuation of our deferred tax assets and liabilities; or changes in tax laws or interpretations thereof; changes in tax rates, future levels of research and development spending, and changes in overall levels of pretax earnings. Any new interpretative guidance relating to accounting for uncertain tax positions could adversely affect our tax provision.

*If we lose our key personnel or are unable to attract and retain additional personnel, we may be unable to achieve our goals.*

We are highly dependent on our management and scientific personnel, including Jay Flatley, our president and chief executive officer, John Stuelpnagel, our senior vice president and chief operating officer and John West, our senior vice president and general manager of DNA sequencing . The loss of their services could adversely impact our ability to achieve our business objectives. We will need to hire additional qualified personnel with expertise in molecular biology, chemistry, biological information processing, sales, marketing and technical support. We compete for qualified management and scientific personnel with other life science companies, universities and research institutions, particularly those focusing on genomics. Competition for these individuals, particularly in the San Diego area, is intense, and the turnover rate can be high. Failure to attract and retain management and scientific personnel would prevent us from pursuing collaborations or developing our products or technologies.

Our planned activities will require additional expertise in specific industries and areas applicable to the products developed through our technologies, including the life sciences and healthcare industries. Thus, we will need to add new personnel, including management, and develop the expertise of existing management. The failure to do so could impair the growth of our business.

*A significant portion of our sales are to international customers.*

Approximately 44% and 38% of our revenue for the years ended December 31, 2006 and January 1, 2006, respectively, was derived from shipments to customers outside the United States. We intend to continue to expand our international presence and export sales to international customers and we expect the total amount of non-U.S. sales to continue to grow. Export sales entail a variety of risks, including:

- currency exchange fluctuations;
- unexpected changes in legislative or regulatory requirements of foreign countries into which we import our products;
- difficulties in obtaining export licenses or in overcoming other trade barriers and restrictions resulting in delivery delays; and
- significant taxes or other burdens of complying with a variety of foreign laws.

In addition, sales to international customers typically result in longer payment cycles and greater difficulty in accounts receivable collection. We are also subject to general geopolitical risks, such as political, social and economic instability and changes in diplomatic and trade relations. One or more of these factors could have a material adverse effect on our business, financial condition and operating results.

*Our success depends upon the continued emergence and growth of markets for analysis of genetic variation and biological function.*

We design our products primarily for applications in the life sciences and pharmaceutical industries. The usefulness of our technology depends in part upon the availability of genetic data and its usefulness in identifying or treating disease. We are initially focusing on markets for analysis of genetic variation and biological function, namely SNP genotyping and gene expression profiling. Both of these markets are new and emerging, and they may not develop as quickly as we anticipate, or reach their full potential. Other methods of analysis of genetic variation and biological function may emerge and displace the methods we are developing. Also, researchers may not seek or be able to convert raw genetic data into medically valuable information through the analysis of genetic variation and biological function. In addition, factors affecting research and development spending generally, such as changes in the regulatory environment affecting life sciences and pharmaceutical companies, and changes in government programs that provide funding to companies and research institutions, could harm our business. If useful genetic data is not available or if our target markets do not develop in a timely manner, demand for our products may grow at a slower rate than we expect, and we may not be able to achieve or sustain annual profitability.

**Item 1B.  *Unresolved Staff Comments.***

None.

**Item 2.  *Properties.***

The following chart indicates the facilities that we lease, the location and size of each such facility and their designated use. We anticipate needing to expand our facilities over the next several years as we continue to expand our worldwide commercial operations and our manufacturing capabilities.

| Location | Approximate Square Feet | Operation | Lease Expiration |
|---|---|---|---|
| San Diego, CA | 116,000 sq. ft. | R&D, Manufacturing, Administrative | 2023 |
| | 17,300 sq. ft. | Administrative | 2009 |
| | 9,000 sq. ft. | Storage and Distribution | 2011 |
| Wallingford, CT | 14,500 sq. ft. | R&D | 2008 |
| Netherlands | 4,100 sq. ft. | Administrative and Distribution | 2011 |
| Tokyo, Japan | 3,300 sq. ft. | Administrative | 2009 |
| Singapore | 1,600 sq. ft. | Administrative | 2009 |
| Beijing, China | 200 sq. ft. | Administrative | 2007 |

As part of our acquisition of Solexa on January 26, 2007, we assumed a non-cancelable operating lease for facilities space of approximately 147,000 square feet in two buildings in Hayward, California. One of the buildings is utilized for administrative operations, research and development, genomics services production and instrument production. The remaining space may be developed and occupied in phases, depending on growth. The Hayward lease runs through December 2008. We have an option to extend the lease for an additional five-year period, subject to certain conditions. We also lease approximately 23,000 square feet in Little Chesterford, United Kingdom, which is occupied by Solexa Limited, our wholly-owned subsidiary. The Chesterford lease expires in July 2008.

25

On February 14, 2007, we entered into a lease agreement with BioMed Realty Trust, Inc. (BioMed) to expand into a new office building BioMed will build in San Diego, California. The new building will be used for research and development, manufacturing and administrative purposes. The lease covers approximately 84,000 square feet, which is to be occupied in three phases, the first of which is expected to be occupied by October 1, 2008. The lease expires 15 years from the date the first phase is occupied, subject to our right to extend the term for up to three additional five-year periods.

## Item 3.  *Legal Proceedings.*

We have incurred substantial costs in defending ourselves against patent infringement claims, and expect to devote substantial financial and managerial resources to protect our intellectual property and to defend against the claims described below as well as any future claims asserted against us.

### Affymetrix Litigation

On July 26, 2004, Affymetrix, Inc. (Affymetrix) filed a complaint in the U.S. District Court for the District of Delaware alleging that the use, manufacture and sale of our BeadArray products and services, including our Array Matrix and BeadChip products, infringe six Affymetrix patents. Affymetrix seeks an injunction against the sale of products, if any, that are determined to infringe these patents, unspecified monetary damages, interest and attorneys' fees. On September 15, 2004, we filed our answer to Affymetrix' complaint, seeking declaratory judgments from the court that we do not infringe the Affymetrix patents and that such patents are invalid. We also filed counterclaims against Affymetrix for unfair competition and interference with actual and prospective economic advantage.

On February 15, 2006, the court allowed us to file our first amended answer and counterclaims, adding allegations of inequitable conduct with respect to all six asserted Affymetrix patents, violation of Section 2 of the Sherman Act, and unclean hands. In March 2006, Affymetrix notified us of its decision to drop one of the six patents from the suit and of its intention to assert infringement of certain additional claims of the remaining five patents. We have filed a motion to preclude Affymetrix from asserting infringement of those additional claims. That motion is still pending at this time. On June 30, 2006, the court dismissed the patent Affymetrix had sought to withdraw from the suit. Both parties filed summary judgment motions by the July 14, 2006 deadline established by the court. On August 16, 2006, the court issued a ruling on the claim construction hearing that it had held on April 20, 2006. We believe the court's opinion construed several key claim terms in our favor, and did not adversely impact our defenses and pending counterclaims in any material respect. Trial has been rescheduled to March 5, 2007 from October 16, 2006 at the request of both parties. A pre-trial conference was held on February 8, 2007 during which the court established a multi-phase trial structure with the first phase of the trial to begin on March 5, 2007, and addressed related issues. We believe we have meritorious defenses against each of the infringement claims alleged by Affymetrix, and intend to defend vigorously against this suit. However, we cannot be sure that we will prevail in this matter. Any unfavorable determination, and in particular, any significant cash amounts required to be paid by us or prohibition of the sale of our products and services, could result in a material adverse effect on our business, financial condition and results of operations.

26

**Dr. Anthony W. Czarnik v. Illumina, Inc.**

On June 15, 2005, Dr. Anthony Czarnik, a former employee, filed suit against us in the U.S. District Court for the District of Delaware seeking correction of inventorship of certain of our patents and patent applications and alleging that we committed inequitable conduct and fraud in not naming him as an inventor. Dr. Czarnik seeks an order requiring us and the U.S. Patent and Trademark Office to correct the inventorship of certain of our patents and patent applications by adding Dr. Czarnik as an inventor, a judgment declaring certain of our patents and patent applications unenforceable, unspecified monetary damages and attorney's fees. On August 4, 2005, we filed a motion to dismiss the complaint for lack of standing and failure to state a claim. While this motion was pending, Dr. Czarnik filed an amended complaint on September 23, 2005. On October 7, 2005, we filed a motion to dismiss the amended complaint for lack of standing and failure to state a claim. On July 13, 2006, the court granted our motion to dismiss the counts of Dr. Czarnik's complaint dealing with correction of inventorship in pending applications and inequitable conduct. On July 27, 2006, we filed an answer to the two remaining counts of the amended complaint (correction of inventorship in issued patents and fraud). There has been no trial date set for this case. We believe we have meritorious defenses against these claims.

**Applied Biosystems Litigation**

On December 26, 2006, the Applied Biosystems Group of Applera Corporation filed suit against Solexa, which we acquired in a stock-for-stock merger on January 26, 2007. Applied Biosystems' action against Solexa, which was filed in California state court in Santa Clara County, seeks ownership of patents covering Sequencing-by-Ligation technologies. We filed our answer to the complaint by the required deadline. The patents at issue were assigned in 1995 to Solexa's predecessor company (Lynx Therapeutics) by a former employee, Dr. Stephen Macevicz, who is named as a co-defendant in the suit. Lynx, which was originally a unit of Applied Biosystems, was spun out of Applied Biosystems in 1992. The patents at issue in the suit relate to methods for sequencing DNA using successive rounds of oligonucleotide probe ligation (Sequencing-by-Ligation). Our new Illumina Genome Analyzer system uses a different technology, DNA Sequencing-by-Synthesis (SBS), which we believe is not covered by any of the patents at issue in the suit. We also believe the MPSS technology used by Lynx did not use the methods covered by these patents, and in any event our subsidiary no longer uses the MPSS technologies. We believe that the suit is not material to our current or future business, and we have no plans to use any of the Sequencing-by-Ligation technologies covered by the patents at issue in the suit. Applied Biosystems does not assert any claim for patent infringement in the suit.

**Termination-of-Employment Lawsuit**

In March 2001, a complaint seeking damages of an unspecified amount was filed against us by Dr. Czarnik in the Superior Court of the State of California in connection with the employee's termination of employment with Illumina. In June 2002, a California Superior Court judgment was rendered against us and we recorded a $7.7 million charge in our financial results for the second quarter of 2002 to cover total damages and remaining expenses. We appealed the decision, and in December 2004, the Fourth Appellate District Court of Appeal, in San Diego, California, reduced the amount of the award. We recorded interest expense on the $7.7 million during the appeal based on the statutory rate. As a result of the revised judgment, we reduced the $9.2 million liability on our balance sheet to $5.9 million and recorded a gain of $3.3 million as a litigation judgment in the fourth quarter of 2004. In January 2005, we paid the $5.9 million and removed the liability from our balance sheet.

**Item 4.  *Submission of Matters to a Vote of Security Holders.***

No matters were submitted to a vote of security holders during the fourth quarter of 2006.

**PART II**

**Item 5.** ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.***

Our common stock has been quoted on the NASDAQ Global Market under the symbol "ILMN" since July 28, 2000. Prior to that time, there was no public market for our common stock. The following table sets forth, for the periods indicated, the quarterly high and low sales prices per share of our common stock as reported on the NASDAQ Global Market. Our present policy is to retain earnings, if any, to finance future growth. We have never paid cash dividends and have no present intention to pay cash dividends in the foreseeable future. In addition, the indenture for our convertible senior notes due 2014, which are convertible into cash and, in certain circumstances, shares of our common stock, requires us to increase the conversion rate applicable to the notes if we pay any cash dividends.

|  | 2006 | |
| --- | --- | --- |
|  | High | Low |
| First Quarter | $27.98 | $16.10 |
| Second Quarter | 32.00 | 21.60 |
| Third Quarter | 40.00 | 27.02 |
| Fourth Quarter | 45.87 | 32.20 |

|  | 2005 | |
| --- | --- | --- |
|  | High | Low |
| First Quarter | $11.35 | $ 6.72 |
| Second Quarter | 12.95 | 7.90 |
| Third Quarter | 14.83 | 10.82 |
| Fourth Quarter | 16.80 | 12.76 |

At February 1, 2007, there were approximately 1,500 stockholders of record, and the closing price per share of our common stock, as reported on the NASDAQ Global Market on such date, was $41.56.

**Sales of Unregistered Securities**

None during fiscal 2006.

**Issuer Purchases of Equity Securities**

None during fiscal 2006.

**Use of Proceeds**

We completed our initial public offering of common stock in July 2000, resulting in net proceeds of $101.3 million. Through December 31, 2006, we used approximately $46.0 million to purchase property, plant and equipment, approximately $2.4 million for the acquisition of CyVera, and approximately $52.9 million to fund general operating expenses.

28

**Item 6.  *Selected Financial Data.***

The following selected historical consolidated financial data has been derived from our audited consolidated financial statements. The balance sheet data as of December 31, 2006 and January 1, 2006 and statement of operations data for each of the three years in the period ended December 31, 2006 are derived from audited consolidated financial statements included in this Annual Report on Form 10-K. The balance sheet data as of January 2, 2005, December 28, 2003, and December 29, 2002 and statement of operations data for each of the two years in the period ended December 28, 2003 are derived from our audited consolidated financial statements that are not included in this Annual Report on Form 10-K. The Company's fiscal year is 52 or 53 weeks ending the Sunday closest to December 31, with quarters of 13 or 14 weeks ending the Sunday closest to March 31, June 30, and September 30. The years ended December 31, 2006 and January 1, 2006 were both 52 weeks. The year ended January 2, 2005 was 53 weeks. You should read this table in conjunction with Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Item 8, "Financial Statements and Supplementary Data."

## Statement of Operations Data

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Year Ended December 28, 2003 | Year Ended December 29, 2002 |
|---|---|---|---|---|---|
| | (In thousands, except per share data) | | | | |
| Revenue: | | | | | |
| Product revenue | $ 155,811 | $ 57,752 | $ 40,497 | $ 18,378 | $ 4,103 |
| Service and other revenue | 27,486 | 13,935 | 8,075 | 6,496 | 3,305 |
| Research revenue | 1,289 | 1,814 | 2,011 | 3,161 | 2,632 |
| Total revenue | 184,586 | 73,501 | 50,583 | 28,035 | 10,040 |
| Costs and expenses: | | | | | |
| Cost of product revenue (including non-cash stock compensation expense of $1,289, $0, $0, $0 and $0, respectively) | 51,271 | 19,920 | 11,572 | 7,437 | 1,815 |
| Cost of service and other revenue (including non-cash stock compensation expense of $235, $0, $0, $0 and $0, respectively) | 8,073 | 3,261 | 1,687 | 2,600 | 1,721 |
| Research and development (including non-cash stock compensation expense of $3,891, $84, $348, $1,289 and $2,399, respectively) | 33,373 | 27,809 | 21,462 | 23,800 | 29,247 |
| Selling, general and administrative (including non-cash stock compensation expense of $8,889, $186, $496, $1,165 and $1,961, respectively) | 54,057 | 28,158 | 25,576 | 20,064 | 11,060 |
| Acquired in-process research and development | — | 15,800 | — | — | — |
| Litigation judgment (settlement), net | — | — | (4,201) | 756 | 8,052 |
| Total costs and expenses | 146,774 | 94,948 | 56,096 | 54,657 | 51,895 |
| Income (loss) from operations | 37,812 | (21,447) | (5,513) | (26,622) | (41,855) |
| Interest income | 5,368 | 1,404 | 941 | 1,821 | 3,805 |
| Interest and other expense, net | (560) | (668) | (1,518) | (2,262) | (2,281) |
| Income (loss) before income taxes | 42,620 | (20,711) | (6,090) | (27,063) | (40,331) |
| Provision for income taxes | 2,652 | 163 | 135 | — | — |
| Net income (loss) | $ 39,968 | $ (20,874) | $ (6,225) | $ (27,063) | $ (40,331) |
| Net income (loss) per basic share | $ 0.90 | $ (0.52) | $ (0.17) | $ (0.85) | $ (1.31) |
| Net income (loss) per diluted share | $ 0.82 | $ (0.52) | $ (0.17) | $ (0.85) | $ (1.31) |
| Shares used in calculating basic net income (loss) per share | 44,501 | 40,147 | 35,845 | 31,925 | 30,890 |
| Shares used in calculating diluted net income (loss) per share | 48,754 | 40,147 | 35,845 | 31,925 | 30,890 |

See Note 1 to the consolidated financial statements for an explanation of the determination of the number of shares used to compute basic and diluted net income (loss) per share.

**Balance Sheet Data**

| | December 31, 2006 | January 1, 2006 | January 2, 2005 | December 28, 2003 | December 29, 2002 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Cash, cash equivalents and short-term investments | $   130,804 | $   50,822 | $   66,994 | $   33,882 | $   66,294 |
| Working capital | 159,950 | 57,992 | 64,643 | 32,229 | 58,522 |
| Total assets | 300,584 | 100,610 | 94,907 | 99,234 | 121,906 |
| Long-term debt, less current portion | — | 54 | — | 24,999 | 25,620 |
| Accumulated deficit | (104,618) | (144,586) | (123,712) | (117,487) | (90,424) |
| Total stockholders' equity | 247,342 | 72,497 | 72,262 | 47,388 | 71,744 |

**Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operation.***

The following discussion and analysis should be read with "Item 6. Selected Financial Data" and our consolidated financial statements and notes thereto included elsewhere in this Annual Report on Form 10-K. The discussion and analysis in this Annual Report on Form 10-K contains forward-looking statements that involve risks and uncertainties, such as statements of our plans, objectives, expectations and intentions. Words such as "anticipate," "believe," "continue," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project" or similar words or phrases, or the negatives of these words, may identify forward-looking statements, but the absence of these words does not necessarily mean that a statement is not forward looking. Examples of forward-looking statements include, among others, statements regarding the integration of Solexa's and CyVera's technology with our existing technology, the commercial launch of new products, including products based on Solexa's and CyVera's technology, and the duration which our existing cash and other resources is expected to fund our operating activities.

Forward-looking statements are subject to known and unknown risks and uncertainties and are based on potentially inaccurate assumptions that could cause actual results to differ materially from those expected or implied by the forward looking statements. Factors that could cause or contribute to these differences include those discussed in "Item 1A. Risk Factors" as well as those discussed elsewhere. The risk factors and other cautionary statements made in this Annual Report on Form 10-K should be read as applying to all related forward-looking statements wherever they appear in this Annual Report on Form 10-K.

**Overview**

We are a leading developer, manufacturer and marketer of next-generation life science tools and integrated systems for the large scale analysis of genetic variation and biological function. Using our proprietary technologies, we provide a comprehensive line of products and services that currently serve the sequencing, genotyping and gene expression markets, and we expect to enter the market for molecular diagnostics. Our customers include leading genomic research centers, pharmaceutical companies, academic institutions, clinical research organizations and biotechnology companies. Our tools provide researchers around the world with the performance, throughput, cost effectiveness and flexibility necessary to perform the billions of genetic tests needed to extract valuable medical information from advances in genomics and proteomics. We believe this information will enable researchers to correlate genetic variation and biological function, which will enhance drug discovery and clinical research, allow diseases to be detected earlier and permit better choices of drugs for individual patients.

30

On January 26, 2007, we completed the acquisition of Solexa for approximately 13.1 million shares of our common stock. Solexa develops and commercializes genetic analysis technologies used to perform a range of analyses including whole genome resequencing, gene expressing analysis and small RNA analysis. We believe our combined company is the only company with genome-scale technology for genotyping, gene expression and sequencing, the three cornerstones of modern genetic analysis.

Our revenue is subject to fluctuations due to the timing of sales of high-value products and service projects, the impact of seasonal spending patterns, the timing and size of research projects our customers perform, changes in overall spending levels in the life science industry and other unpredictable factors that may affect our customer ordering patterns. Any significant delays in the commercial launch or any lack or delay of commercial acceptance of new products, unfavorable sales trends in our existing product lines, or impacts from the other factors mentioned above, could adversely affect our revenue growth or cause a sequential decline in quarterly revenue. Due to the possibility of fluctuations in our revenue and net income or loss, we believe quarterly comparisons of our operating results are not a good indication of our future performance.

Prior to 2006, we incurred substantial operating losses. As of December 31, 2006, our accumulated deficit was $104.6 million and total stockholders' equity was $247.3 million. Losses prior to 2006 have principally occurred as a result of the substantial resources required for the research, development and manufacturing scale-up effort required to commercialize our products and services, an acquired research and development charge of $15.8 million related to our acquisition of CyVera in 2005 and a charge of $5.9 million in 2004 related to a termination-of-employment lawsuit. We expect to continue to incur substantial costs for research, development and manufacturing scale-up activities over the next several years. We will also need to increase our selling, general and administrative costs as we build up our sales and marketing infrastructure to expand and support the sale of systems, other products and services.

## Critical Accounting Policies and Estimates

### General

Our discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of financial statements requires that management make estimates, assumptions and judgments with respect to the application of accounting policies that affect the reported amounts of assets, liabilities, revenue and expenses, and the disclosures of contingent assets and liabilities. Actual results could differ from those estimates.

Our significant accounting policies are described in Note 1 to our consolidated financial statements. Certain accounting policies are deemed critical if 1) they require an accounting estimate to be made based on assumptions that were highly uncertain at the time the estimate was made, and 2) changes in the estimate that are reasonably likely to occur, or different estimates that we reasonably could have used would have a material effect on our consolidated financial statements.

Management has discussed the development and selection of these critical accounting policies with the Audit Committee of our Board of Directors, and the Audit Committee has reviewed the disclosure. In addition, there are other items within our financial statements that require estimation, but are not deemed critical as defined above.

We believe the following critical accounting policies reflect our more significant estimates and assumptions used in the preparation of the consolidated financial statements.

31

### Revenue Recognition

Our revenue is generated primarily from the sale of products and services. Product revenue consists of sales of arrays, reagents, instrumentation and oligos. Service and other revenue consists of revenue received for performing genotyping services, extended warranty sales and revenue earned from milestone payments.

We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price to the customer is fixed or determinable and collectibility is reasonably assured. In instances where final acceptance of the product or system is required, revenue is deferred until all the acceptance criteria have been met. All revenue is recorded net of any applicable allowances for returns or discounts.

Revenue for product sales is recognized generally upon shipment and transfer of title to the customer, provided no significant obligations remain and collection of the receivables is reasonably assured. Revenue from the sale of instrumentation is recognized when earned, which is generally upon shipment. However, in the case of BeadLabs, revenue is recognized upon the completion of installation, training and customer acceptance. Revenue for genotyping services is recognized when earned, which is generally at the time the genotyping analysis data is delivered to the customer or as specific milestones are achieved.

In order to assess whether the price is fixed and determinable, we ensure there are no refund rights. If payment terms are based on future performance or a right of return exists, we defer revenue recognition until the price becomes fixed and determinable. We assess collectibility based on a number of factors, including past transaction history with the customer and the creditworthiness of the customer. If we determine that collection of a payment is not reasonably assured, revenue recognition is deferred until the time collection becomes reasonably assured, which is generally upon receipt of payment.

Sales of instrumentation generally include a standard one-year warranty. We also sell separately priced maintenance (extended warranty) contracts, which are generally for one or two years, upon the expiration of the initial warranty. Revenue for extended warranty sales is recognized ratably over the term of the extended warranty period. Reserves are provided for estimated product warranty expenses at the time the associated revenue is recognized. If we were to experience an increase in warranty claims or if costs of servicing our warrantied products were greater than our estimates, gross margins could be adversely affected.

While the majority of our sales agreements contain standard terms and conditions, we do enter into agreements that contain multiple elements or non-standard terms and conditions. Emerging Issues Task Force (EITF) No. 00-21, *Revenue Arrangements with Multiple Deliverables,* provides guidance on accounting for arrangements that involve the delivery or performance of multiple products, services, or rights to use assets within contractually binding arrangements. Significant contract interpretation is sometimes required to determine the appropriate accounting, including whether the deliverables specified in a multiple element arrangement should be treated as separate units of accounting for revenue recognition purposes, and if so, how the price should be allocated among the deliverable elements, when to recognize revenue for each element, and the period over which revenue should be recognized. We recognize revenue for delivered elements only when we determine that the fair values of undelivered elements are known and there are no uncertainties regarding customer acceptance.

32

Some of our agreements contain multiple elements that include milestone payments. Revenue from a milestone achievement is recognized when earned, as evidenced by acknowledgement from our collaborator, provided that (i) the milestone event is substantive and its achievability was not reasonably assured at the inception of the agreement, (ii) the milestone represents the culmination of an earnings process, (iii) the milestone payment is non-refundable and (iv) the performance obligations for both us and our collaborators after the milestone achievement will continue at a level comparable to the level before the milestone achievement. If all of these criteria are not met, the milestone achievement is recognized over the remaining minimum period of our performance obligations under the agreement. We defer non-refundable upfront fees received under our collaborations and recognize them over the period the related services are provided or over the estimated collaboration term using various factors specific to the collaboration. Advance payments received in excess of amounts earned are classified as deferred revenue until earned.

Research revenue consists of amounts earned under research agreements with government grants, which is recognized in the period during which the related costs are incurred.

### Allowance for Doubtful Accounts

We maintain an allowance for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. We evaluate the collectibility of our accounts receivable based on a combination of factors. We regularly analyze customer accounts, review the length of time receivables are outstanding and review historical loss rates. If the financial condition of our customers were to deteriorate, additional allowances could be required.

### Inventory Valuation

We record adjustments to inventory for potentially excess, obsolete or impaired goods in order to state inventory at net realizable value. We must make assumptions about future demand, market conditions and the release of new products that will supercede old ones. We regularly review inventory for excess and obsolete products and components, taking into account product life cycle and development plans, product expiration and quality issues, historical experience and our current inventory levels. If actual market conditions are less favorable than anticipated, additional inventory adjustments could be required.

### Contingencies

We are subject to legal proceedings primarily related to intellectual property matters. Based on the information available at the balance sheet dates and through consultation with our legal counsel, we assess the likelihood of any adverse judgments or outcomes of these matters, as well as the potential ranges of probable losses. If losses are probable and reasonably estimable, we will record a liability in accordance with Statement of Financial Accounting Standards (SFAS) No. 5, *Accounting for Contingencies.* Currently, we have no such liabilities recorded. This may change in the future depending upon new developments.

### Income Taxes

In accordance with SFAS No. 109, *Accounting for Income Taxes* , the provision for income taxes is computed using the asset and liability method, under which deferred tax assets and liabilities are recognized for the expected future tax consequences of temporary differences between the financial reporting and tax bases of assets and liabilities, and for the expected future tax benefit to be derived from tax loss and credit carryforwards. Deferred tax assets and liabilities are determined using the enacted tax rates in effect for the years in which those tax assets are expected to be realized. A valuation allowance is established when it is more likely than not that future realization of all or some of the deferred tax assets will not be achieved. The evaluation of the need for a valuation allowance is performed on a jurisdiction by jurisdiction basis, and includes a review of all available positive and negative evidence.

33

Due to the adoption of SFAS No. 123 (revised 2004), Share-Based Payment, we recognize excess tax benefits associated with share-based compensation to stockholders' equity only when realized. When assessing whether excess tax benefits relating to share-based compensation have been realized, we follow the with-and-without approach excluding any indirect effects of the excess tax deductions. Under this approach, excess tax benefits related to share-based compensation are not deemed to be realized until after the utilization of all other tax benefits available to us.

### Goodwill and Intangible Asset Valuation

The purchase method of accounting for acquisitions requires extensive use of accounting estimates and judgments to allocate the purchase price to the fair value of the net tangible and intangible assets acquired, including in-process research and development (IPR&D). Goodwill and intangible assets deemed to have indefinite lives are not amortized, but are subject to at least annual impairment tests. The amounts and useful lives assigned to other acquired intangible assets impact future amortization, and the amount assigned to IPR&D is expensed immediately. Determining the fair values and useful lives of intangible assets especially requires the exercise of judgment. While there are a number of different acceptable generally accepted valuation methods to estimate the value of intangible assets acquired, we primarily use the discounted cash flow method. This method requires significant management judgment to forecast the future operating results used in the analysis. In addition, other significant estimates are required such as residual growth rates and discount factors. The estimates we use to value and amortize intangible assets are consistent with the plans and estimates that we use to manage our business and are based on available historical information and industry estimates and averages. These judgments can significantly affect our net operating results.

SFAS No. 142, Goodwill and Other Intangible Assets. SFAS No. 142 requires that goodwill and certain intangible assets be assessed for impairment using fair value measurement techniques. If the carrying amount of a reporting unit exceeds its fair value, then a goodwill impairment test is performed to measure the amount of the impairment loss, if any. The goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as in a business combination. Determining the fair value of the implied goodwill is judgmental in nature and often involves the use of significant estimates and assumptions. These estimates and assumptions could have a significant impact on whether or not an impairment charge is recognized and also the magnitude of any such charge. Estimates of fair value are primarily determined using discounted cash flows and market comparisons. These approaches use significant estimates and assumptions, including projection and timing of future cash flows, discount rates reflecting the risk inherent in future cash flows, perpetual growth rates, determination of appropriate market comparables, and determination of whether a premium or discount should be applied to comparables. It is reasonably possible that the plans and estimates used to value these assets may be incorrect. If our actual results, or the plans and estimates used in future impairment analyses, are lower than the original estimates used to assess the recoverability of these assets, we could incur additional impairment charges. As of December 31, 2006, we had $2.1 million of goodwill. This goodwill is reported as a separate line item in the balance sheet. We have performed our annual test of goodwill as of May 1, 2006 and have determined there has been no impairment of goodwill as of December 31, 2006.

### Stock-Based Compensation

We account for stock-based compensation in accordance with SFAS No. 123R, Share-Based Payment. Under the provisions of SFAS No. 123R, stock-based compensation cost is estimated at the grant date based on the award's fair-value as calculated by the Black-Scholes-Merton (BSM) option-pricing model and is recognized as expense over the requisite service period. The BSM model requires various highly judgmental assumptions including volatility, forfeiture rates, and expected option life. If any of these assumptions used in the BSM model change significantly, stock-based compensation expense may differ materially in the future from that recorded in the current period.

## Results of Operations

To enhance comparability, the following table sets forth audited consolidated statement of operations data for the years ended December 31, 2006, January 1, 2006, and January 2, 2005 stated as a percentage of total revenue.

|  | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2 2005 |
|---|---|---|---|
| Revenue |  |  |  |
| Product revenue | 84% | 79% | 80% |
| Service and other revenue | 15 | 19 | 16 |
| Research revenue | 1 | 2 | 4 |
| Total revenue | 100 | 100 | 100 |
| Costs and expenses: |  |  |  |
| Cost of product revenue | 28 | 27 | 23 |
| Cost of service and other revenue | 5 | 4 | 3 |
| Research and development | 18 | 38 | 42 |
| Selling, general and administrative | 29 | 38 | 51 |
| Acquired in-process research and development | — | 22 | — |
| Litigation judgment (settlement), net | — | — | (8) |
| Total costs and expenses | 80 | 129 | 111 |
| Income (loss) from operations | 20 | (29) | (11) |
| Interest income | 3 | 2 | 2 |
| Interest and other expense, net | — | (1) | (3) |
| Income (loss) before income taxes | 23 | (28) | (12) |
| Provision for income taxes | 1 | — | — |
| Net income (loss) | 22% | (28%) | (12%) |

## Comparison of Years Ended December 31, 2006 and January 1, 2006

Our fiscal year is 52 or 53 weeks ending the Sunday closest to December 31, with quarters of 13 or 14 weeks ending the Sunday closest to March 31, June 30, and September 30. The years ended December 31, 2006 and January 1, 2006 were both 52 weeks.

### Revenue

|  | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Percentage Change |
|---|---|---|---|
|  | (In thousands) |  |  |
| Product revenue | $ 155,811 | $ 57,752 | 170% |
| Service and other revenue | 27,486 | 13,935 | 97 |
| Research revenue | 1,289 | 1,814 | (29) |
| Total revenue | $ 184,586 | $ 73,501 | 151% |

Total revenue for the years ended December 31, 2006 and January 1, 2006 was $184.6 million and $73.5 million, respectively. This represents an increase of $111.1 million for 2006, or 151%, compared to 2005.

35

Product revenue increased to $155.8 million for the year ended December 31, 2006 from $57.8 million for the year ended January 1, 2006. The increase in 2006 resulted primarily from higher consumable and BeadStation sales. Growth in consumable revenue was primarily attributable to the launch and shipment of our whole genome genotyping products, the HumanHap300 and HumanHap550 BeadChips. In addition, growth in consumable revenue can be attributed to the growth in our installed base of BeadArray Readers, which has nearly doubled since January 1, 2006. Consumable products constituted 66% of product revenue for year ended December 31, 2006, compared to 47% in the year ended January 1, 2006. We expect to see continued growth in product revenue, which can be partially attributed to the launch of several new products, as well as the growth of our installed base of instruments.

Service and other revenue increased to $27.5 million for the year ended December 31, 2006 from $13.9 million for the year ended January 1, 2006. The increase in service and other revenue is primarily due to the completion of several significant Infinium and GoldenGate SNP genotyping service contracts. We introduced our Infinium services in early 2006. We expect sales from SNP genotyping services contracts to fluctuate on a yearly and quarterly basis, depending on the mix and number of contracts that are completed. The timing of completion of a SNP genotyping services contract is highly dependent on the customer's schedule for delivering the SNPs and samples to us.

Government grants and other research funding decreased to $1.3 million for the year ended December 31, 2006 from $1.8 million for the year ended January 1, 2006, due primarily to the completion of several projects funded by grants from the National Institutes of Health. We do not expect research revenue to be a material component of our revenue going forward.

*Cost of Product and Service and Other Revenue*

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Cost of product revenue | $ 51,271 | $ 19,920 | 157% |
| Cost of service and other revenue | 8,073 | 3,261 | 148 |
| Total cost of product and service and other revenue | $ 59,344 | $ 23,181 | 156% |

Cost of product and service and other revenue represents manufacturing costs incurred in the production process, including component materials, assembly labor and overhead, installation, warranty, packaging and delivery costs, as well as costs associated with performing genotyping services on behalf of our customers. Costs related to research revenue are included in research and development expense. Cost of product revenue increased to $51.3 million for the year ended December 31, 2006, compared to $19.9 million for the year ended January 1, 2006, primarily driven by higher consumable and instrument sales. Cost of product revenue for the year ended December 31, 2006 included stock-based compensation expenses resulting from the adoption of SFAS No. 123R totaling $1.3 million. Gross margin on product revenue increased to 67.1% for the year ended December 31, 2006, compared to 65.5% for the year ended January 1, 2006. The increase in gross margin percentage is primarily due to the impact of favorable product mix, as well as decreased manufacturing costs. A higher percentage of our revenue in 2006 was generated from the sale of consumables, which generally have a more favorable gross margin than other products. The decrease in manufacturing costs is primarily due to reduced raw material costs as a result of more favorable negotiated contracts with our vendors and improvements in our manufacturing processes. This increase in gross margin was offset, in part, by the impact of stock-based compensation charges, which decreased our gross margin by 83 basis points in 2006 compared to 2005.

Cost of service and other revenue increased to $8.1 million for the year ended December 31, 2006, compared to $3.3 million for the year ended January 1, 2006, primarily due to higher service revenue. Cost of service and other revenue for the year ended December 31, 2006 included stock-based

compensation expenses resulting from the adoption of SFAS No. 123R totaling $0.2 million. Gross margin on service and other revenue decreased to 70.6% for the year ended December 31, 2006, compared to 76.6% for the year ended January 1, 2006. The decrease is due primarily to a change in the mix of projects, as well as the impact of stock-based compensation charges, the latter having decreased our service and other revenue gross margin by 85 basis points in 2006 compared to 2005.

We expect product mix to continue to affect our future gross margins. However, we expect our market to become increasingly price competitive and our margins may fluctuate from year to year and quarter to quarter.

*Research and Development Expenses*

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Research and development | $    33,373 | $    27,809 | 20% |

Our research and development expenses consist primarily of salaries and other personnel-related expenses, laboratory supplies and other expenses related to the design, development, testing and enhancement of our products. We expense our research and development expenses as they are incurred.

Research and development expenses increased to $33.4 million for the year ended December 31, 2006, compared to $27.8 million for the year ended January 1, 2006. Research and development expenses for the years ended December 31, 2006 and January 1, 2006 included stock-based compensation expenses primarily resulting from the adoption of SFAS No. 123R totaling $3.9 million and $0.1 million, respectively. Exclusive of these stock-based compensation charges, the increase in research and development expenses for the year ended December 31, 2006 is primarily due to the development of our recently-acquired VeraCode technology purchased in conjunction with our acquisition of CyVera in April 2005. The Company plans to launch its first products resulting from this acquisition during the first quarter of 2007. Research and development expenses related to the VeraCode technology increased $2.7 million for the year ended December 31, 2006, compared to the year ended January 1, 2006. In addition, costs to support our Oligator technology platform and BeadArray research activities decreased $1.0 million for the year ended December 31, 2006, compared to the year ended January 1, 2006.

We believe a substantial investment in research and development is essential to remaining competitive and expanding into additional markets. Accordingly, we expect our research and development expenses to increase in absolute dollars as we expand our product base and integrate the operations of Solexa into our business.

*Selling, General and Administrative Expenses*

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Selling, general and administrative | $    54,057 | $    28,158 | 92% |

Our selling, general and administrative expenses consist primarily of personnel costs for sales and marketing, finance, human resources, business development, legal and general management, as well as professional fees, such as expenses for legal and accounting services. Selling, general and administrative expenses increased to $54.1 million for the year ended December 31, 2006, compared to $28.2 million for the year ended January 1, 2006. Selling, general and administrative expenses for the years ended December 31, 2006 and January 1, 2006 included stock-based compensation expenses primarily resulting from the adoption of SFAS No. 123R totaling $8.9 million and $0.2 million, respectively.

Sales and marketing expenses increased $10.6 million during the year ended December 31, 2006, compared to the year ended January 1, 2006. The increase is primarily due to increases of $6.5 million attributable to personnel-related expenses, $3.2 million of stock-based compensation expense and

$0.9 million attributable to other non-personnel-related costs, mainly sales and marketing activities for our existing and new products. General and administrative expenses increased $15.3 million during the year ended December 31, 2006, compared to the year ended January 1, 2006, due to increases of $5.5 million of stock-based compensation expense, $5.3 million in outside legal costs related to the Affymetrix litigation, $3.1 million in personnel-related expenses associated with the growth of our business and $1.4 million in outside consulting costs. Outside consulting costs primarily include tax and audit fees and general legal expenses not associated with the Affymetrix litigation.

We expect our selling, general and administrative expenses to increase in absolute dollars as we expand our staff, add sales and marketing infrastructure, incur increased litigation costs and incur additional costs to support the growth in our business.

*Interest Income*

|  | Year Ended December 31, 2006 | | Year Ended January 1, 2006 | | Percentage Change |
|---|---|---|---|---|---|
|  | (In thousands) | | | | |
| Interest income | $ | 5,368 | $ | 1,404 | 282% |

Interest income on our cash and cash equivalents and investments was $5.4 million and $1.4 million for the years ended December 31, 2006 and January 1, 2006, respectively. The increase was due to higher average cash balances and higher effective interest rates compared to the prior year.

*Interest and Other Expense, Net*

|  | Year Ended December 31, 2006 | | Year Ended January 1, 2006 | | Percentage Change |
|---|---|---|---|---|---|
|  | (In thousands) | | | | |
| Interest and other expense, net | $ | (560) | $ | (668) | (16%) |

Interest and other expense, net, consists of interest expense, other income and expenses related to foreign exchange transaction costs and gains and losses on disposals of assets. Interest and other expense, net, decreased to $0.6 million for the year ended January 1, 2006, compared to $0.7 million for the year ended January 2, 2005.

Interest expense was $11,000 for the year ended December 31, 2006, compared to $7,000 for the year ended January 1, 2006. For the years ended December 31, 2006 and January 1, 2006, we recorded approximately $0.4 million in losses due to foreign currency transactions. In addition in 2006, we recorded $0.1 million related to losses on disposal of assets, compared to $0.3 million of losses in 2005.

*Provision for Income Taxes*

|  | Year Ended December 31, 2006 | | Year Ended January 1, 2006 | | Percentage Change |
|---|---|---|---|---|---|
|  | (In thousands) | | | | |
| Provision for income taxes | $ | 2,652 | $ | 163 | 1,527% |

The provision for income taxes was approximately $2.7 million in 2006, up from $0.2 million in 2005. In 2006, the provision principally consists of federal and state alternative minimum tax and income tax expense related to foreign operations. In 2005, the provision for income taxes consisted of income tax expense related to foreign operations.

38

During the year ended December 31, 2006, we utilized approximately $25.9 million and $16.6 million of our federal and state net operating loss carryforwards, respectively, to reduce our federal and state income taxes. As of December 31, 2006, we had net operating loss carryforwards for federal and state tax purposes of approximately $76.4 million and $39.1 million, respectively; which begin to expire in 2022 and 2013, respectively, unless previously utilized. In addition, we also had U.S. federal and state research and development tax credit carryforwards of approximately $6.4 million and $6.3 million respectively; which begin to expire in 2018 and 2019 respectively, unless previously utilized.

Pursuant to Section 382 and 383 of the Internal Revenue Code, utilization of our net operating losses and credits may be subject to annual limitations in the event of any significant future changes in our ownership structure. These annual limitations may result in the expiration of net operating losses and credits prior to utilization. Previous limitations due to Section 382 and 383 have been reflected in the deferred tax assets as of December 31, 2006.

Based upon the available evidence as of December 31, 2006, we are not able to conclude it is more likely than not the remaining deferred tax assets in the U.S. will be realized. Therefore, we have recorded a full valuation allowance against the U.S. deferred tax assets of approximately $36.5 million.

### Comparison of Years Ended January 1, 2006 and January 2, 2005

Our fiscal year is 52 or 53 weeks ending the Sunday closest to December 31, with quarters of 13 or 14 weeks ending the Sunday closest to March 31, June 30, and September 30. The years ended January 1, 2006 and January 2, 2005 were 52 and 53 weeks, respectively.

*Revenue*

|  | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
|  | (In thousands) | | |
| Product revenue | $ 57,752 | $ 40,497 | 43% |
| Service and other revenue | 13,935 | 8,075 | 73 |
| Research revenue | 1,814 | 2,011 | (10) |
| Total revenue | $ 73,501 | $ 50,583 | 45% |

Total revenue for the years ended January 1, 2006 and January 2, 2005 was $73.5 million and $50.6 million, respectively. This represents an increase of $22.9 million for 2005, or 45%, compared to 2004.

Product revenue increased to $57.8 million for the year ended January 1, 2006 from $40.5 million for the year ended January 2, 2005. The increase in 2005 was primarily due to higher BeadStation, consumable and, to a lesser extent, oligo sales. Growth in consumable sales was due to the launch of several new products, as well as the growth in our installed base of BeadStations. As of January 1, 2006, we had shipped a total of 126 BeadArray Readers.

Service and other revenue increased to $13.9 million in 2005 from $8.1 million in 2004. The increase in service and other revenue was primarily due to higher demand for third-party SNP genotyping service contracts during the 2005 period. In addition, due to the achievement of a milestone associated with our collaboration agreement with Invitrogen, we recognized revenue of $1.1 million in the fourth quarter of 2005. These increases were partially offset by decreased revenue related to the International HapMap Project. We completed all revenue-generating genotyping services for the International HapMap project early in the first quarter of 2005. We expect sales from third-party SNP genotyping services contracts to fluctuate on a yearly and quarterly basis, depending on the mix and number of contracts that are completed. The timing of completion of a SNP genotyping services contract is highly dependent on the customer's schedule for delivering the SNPs and samples to us.

Government grants and other research funding decreased to $1.8 million for the year ended January 1, 2006 from $2.0 million for the year ended January 2, 2005, due primarily to a decrease in internal research spending for our grants from the National Institutes of Health.

*Cost of Product and Service and Other Revenue*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Cost of product revenue | $ 19,920 | $ 11,572 | 72% |
| Cost of service and other revenue | 3,261 | 1,687 | 93 |
| Total cost of product and service and other revenue | $ 23,181 | $ 13,259 | 75% |

Cost of product and service and other revenue represents manufacturing costs incurred in the production process, including component materials, assembly labor and overhead, installation, warranty, packaging and delivery costs, as well as costs associated with performing genotyping services on behalf of our customers. Costs related to research revenue are included in research and development expense. Cost of product and service and other revenue increased to $23.2 million for the year ended January 1, 2006, compared to $13.3 million for the year ended January 2, 2005 due primarily to the significant increase in product revenue. Gross margin on product and service and other revenue was 68% for 2005, compared to 73% for 2004.

Cost of product revenue increased to $19.9 million for the year ended January 1, 2006, compared to $11.6 million for the year ended January 2, 2005, due to the significant increase in product revenue. Gross margin on product revenue decreased to 66% for the year ended January 1, 2006, compared to 71% for the year ended January 2, 2005. The decrease in gross margin percentage is primarily due to the impact of product mix. A higher percentage of our revenue in 2005 was generated from the sale of instrumentation, which generally has a lower gross margin than other products. Other factors contributing to the decrease include decreased gross margins related to our consumable and oligo sales. Lower consumable margins can be primarily attributed to lower average selling prices on consumable sales in 2005, compared to 2004, which were partially offset by decreased manufacturing costs. In addition, the gross margin associated with oligo products sold as a part of the Invitrogen collaboration was lower when compared to the prior year. The change in oligo gross margin was due to the fact that, under the Invitrogen collaboration, we no longer sell oligos directly. As a result, the gross margin related to this product line decreased; however, the net margin has increased due to the fact that most of the sales and marketing expenses surrounding the oligo business have shifted to our collaboration partner, Invitrogen.

Cost of service and other revenue increased to $3.3 million for the year ended January 1, 2006, compared to $1.7 million for the year ended January 2, 2005. Gross margin on service and other revenue decreased to 77% for the year ended January 1, 2006 from 79% in the year ended January 2, 2005. The decrease is due primarily to a change in the mix of projects and decreased average selling prices.

We expect product mix to continue to affect our future gross margins. However, we expect our market to become increasingly price competitive and our margins may fluctuate from year to year and quarter to quarter.

*Research and Development Expenses*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Research and development | $ 27,809 | $ 21,462 | 30% |

Our research and development expenses consist primarily of salaries and other personnel-related expenses, laboratory supplies and other expenses related to the design, development, testing and enhancement of our products. We expense our research and development expenses as they are incurred.

Research and development expenses increased to $27.8 million for the year ended January 1, 2006, compared to $21.5 million for the year ended January 2, 2005. Research and development expenses for the years ended January 1, 2006 and January 2, 2005 included stock-based compensation expense of approximately $0.1 million and $0.3 million, respectively. Exclusive of these stock-based compensation charges, the increase in research and development expenses is primarily due to the development expenses incurred to develop our newly-acquired Microbead technology purchased in conjunction with our acquisition of CyVera in April 2005. Research and development expenses related to the VeraCode technology totaled approximately $3.2 million in 2005. Additional factors contributing to the increased research and development expenses during 2005 relate to increased costs of $2.1 million associated with the cost of BeadArray research activities and $1.3 million related to research costs to support our Oligator technology platform. We believe a substantial investment in research and development is essential to remaining competitive and expanding into additional markets. Accordingly, we expect our research and development expenses to increase as we expand our product base and integrate the operations of Solexa into our business.

*Selling, General and Administrative Expenses*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Selling, general and administrative | $ 28,158 | $ 25,576 | 10% |

Our selling, general and administrative expenses consist primarily of personnel costs for sales and marketing, finance, human resources, business development, legal and general management, as well as professional fees, such as expenses for legal and accounting services.

Selling, general and administrative expenses increased to $28.2 million for the year ended January 1, 2006, compared to $25.6 million for the year ended January 2, 2005. Selling, general and administrative expenses for the years ended January 1, 2006 and January 2, 2005 included stock-based compensation expense of approximately $0.2 million and $0.5 million, respectively. Sales and marketing expenses increased $3.6 million, of which $2.7 million was attributable to personnel related expenses for the build-out of our sales force and customer support staff, and $0.9 million is attributable to other non-personnel-related costs, including sales and marketing activities for our existing and new products. General and administrative expenses decreased by $1.0 million in 2005, compared to 2004, due primarily to a $2.5 million decrease in litigation expenses and a $0.3 million decrease in stock-based compensation expense, partially offset by a $1.5 million increase in personnel-related expenses.

We expect our selling, general and administrative expenses to accelerate as we expand our staff, add sales and marketing infrastructure and incur increased litigation costs and additional costs to support the growth in our business.

During 2005, we recorded non-cash compensation expense for accelerated vesting of options for certain employees totaling approximately $0.1 million. This compensation was provided as incentive to continue to work as key members of the sales team associated with the Invitrogen collaboration.

*Acquired In-Process Research and Development*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Acquired in-process research and development | $ 15,800 | $ — | N/A |

41

During the year ended January 1, 2006, we recorded $15.8 million of acquired in-process research and development (IPR&D) resulting from the CyVera acquisition. These amounts were expensed on the acquisition dates because the acquired technology had not yet reached technological feasibility and had no alternative future uses. At the acquisition date, CyVera's ongoing research and development initiatives were primarily the development of its VeraCode technology and the BeadXpress Reader. The IPR&D charge related to the CyVera acquisition was made up of two projects that were approximately 50% and 25% complete at the date of acquisition. The discount rate applied to calculate the IPR&D charge was 30%. Acquisitions of businesses, products or technologies by us in the future may result in substantial charges for acquired IPR&D that may cause fluctuations in our interim or annual operating results. There were no charges resulting from any acquisitions during the same period in 2006 or 2004.

*Litigation Judgment (Settlement), net*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Litigation judgment (settlement), net | $    — | $   (4,201) | (100%) |

We recorded a $7.7 million charge in June 2002 to cover total damages and estimated expenses related to a jury verdict in a termination-of-employment lawsuit. We appealed the decision, and in December 2004, the Fourth Appellate District Court of Appeal, in San Diego, California, reduced the amount of the award. During the appeal process, the court required us to incur interest charges on the judgment amount at statutory rates until the case was resolved. During the years ended January 2, 2005 and December 28, 2003, we recorded $0.6 million and $0.8 million, respectively, of such interest charges as litigation expense. As a result of the revised judgment, we reduced the $9.2 million liability on our balance sheet to $5.9 million and recorded a gain of $3.3 million as a litigation judgment in the fourth quarter of 2004. In addition, in August 2004, we recorded a $1.5 million gain as a result of a settlement with Applera.

*Interest Income*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Interest income | $   1,404 | $   941 | 49% |

Interest income on our cash and cash equivalents and investments was $1.4 million and $0.9 million for the years ended January 1, 2006 and January 2, 2005, respectively. The increase was due to higher average cash balances and higher effective interest rates compared to the prior year.

*Interest and Other Expense, Net*

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
| | (In thousands) | | |
| Interest and other expense, net | $   (668) | $   (1,518) | (56%) |

Interest and other expense, net consists of interest expense, expenses related to foreign exchange transaction costs and gains and losses on disposals of assets. Interest and other expense, net, decreased to $0.7 million for the year ended January 1, 2006, compared to $1.5 million for the year ended January 2, 2005.

Interest expense was $7,000 for the year ended January 1, 2006, compared to $1.4 million for the year ended January 2, 2005. Interest expense in the 2004 period relates primarily to a $26.0 million fixed rate loan that was paid off in August 2004 in connection with the sale/lease-back of our San Diego facilities.

In the year ended January 1, 2006, we recorded approximately $0.4 million in losses due to foreign currency transactions compared to $0.2 million in foreign currency transaction losses for the year ended January 2, 2005. In addition in 2005, we recorded $0.3 million related to losses on disposal of assets. There were no gains or losses on disposals in 2004.

*Provision for Income Taxes*

|  | Year Ended January 1, 2006 | Year Ended January 2, 2005 | Percentage Change |
|---|---|---|---|
|  | (In thousands) | | |
| Provision for income taxes | $ 163 | $ 135 | 21% |

The Company's provision for income taxes for the years ended January 1, 2006 and January 2, 2005 consisted of $163,000 and $135,000, respectively, for income tax expense related to its foreign operations.

We incurred net operating losses for the years ended January 1, 2006 and January 2, 2005 and, accordingly, we did not pay any U.S. federal or state income taxes. We have recorded a valuation allowance for the full amount of the resulting net deferred tax asset, as the future realization of the tax benefit is uncertain. As of January 1, 2006, we had net operating loss carryforwards for federal and California tax purposes of approximately $103.7 million and $40.1 million, respectively, which begin to expire in 2018 and 2006, respectively, unless previously utilized.

As of January 1, 2006, we also had U.S. federal and California research and development tax credit carryforwards of approximately $4.1 million and $3.8 million, respectively. The federal tax credit carryforwards will begin to expire in 2018 and the California carryforwards have no expiration.

Our utilization of the net operating losses and credits may be subject to substantial annual limitations pursuant to Section 382 and 383 of the Internal Revenue Code, and similar state provisions, as a result of changes in our ownership structure. CyVera Corporation had an ownership change upon our acquisition during 2005 and, accordingly, its net operating loss and tax credit carryforwards are subject to annual limitation. These annual limitations may result in the expiration of net operating losses and credits prior to utilization.

## Liquidity and Capital Resources

### *Cashflow*

|  | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
|  | | (In thousands) | |
| Net cash provided (used in) operating activities | $ 39,000 | $ (9,008) | $ (19,574) |
| Net cash provided by (used in) investing activities | (160,735) | (1,535) | 57,022 |
| Net cash provided by financing activities | 109,296 | 5,963 | 4,875 |
| Effect of foreign currency translation | 3 | 613 | 1 |
| Net increase (decrease) in cash and cash equivalents | $ (12,436) | $ (3,967) | $ 42,324 |

As of December 31, 2006, we had cash, cash equivalents and short-term investments of approximately $130.8 million. We currently invest our funds in U.S. dollar-based, short-term money market mutual funds, corporate bonds, commercial paper, auction rate certificates and treasury notes.

43

Our operating activities generated cash of $39.0 million in the year ended December 31, 2006, compared to using cash of $9.0 million in the year ended January 1, 2006. Net cash provided by operating activities in the year ended December 31, 2006 was primarily the result of the following: net income of $40.0 million; $14.3 million related to non-cash stock compensation expense resulting from the adoption of SFAS No. 123R; an $11.5 million increase in accounts payable and accrued liabilities driven by increases in general business activity associated with our sales growth, as well as expenses associated with the expansion of our corporate infrastructure to accommodate this growth; non-cash charges of $6.1 million for depreciation and amortization; a $5.9 million increase in other long-term liabilities primarily due to deferred revenue associated with the agreement with Genizon Biosciences and the deCODE genetics collaboration; and a $1.8 million increase in income taxes payable. These sources were partially offset by a $21.7 million increase in accounts receivable and a $9.7 million increase in inventory primarily due to our significant sales growth of 151% during the year ended December 31, 2006, compared to the year ended January 1, 2006, which resulted from increased customer demand and introduction of our new products and services into the market; a $5.3 million increase in other assets primarily due to increased long-term cost of sales associated with Genizon and deCODE and capitalized costs associated with the Solexa acquisition; a $1.6 million increase in prepaid expenses and other current assets primarily associated with increased prepaid software licenses and insurance, as well as an increase in interest receivable, $1.4 million for an incremental tax benefit related to stock option exercises and an increase of $0.6 million in deferred income taxes. Net cash used in operating activities in the year ended January 1, 2006 was primarily the result of a net loss from operations of $20.9 million, a $6.0 million payment for a litigation judgment, a $7.0 million increase in accounts receivable and a $6.5 million increase in inventory, reduced by a $7.4 million increase in accounts payable and accrued liabilities, a $3.2 million increase in long-term liabilities primarily related to payments received from Invitrogen recorded as deferred revenue, non-cash charges of $4.1 million for depreciation and amortization and a non-cash acquired IPR&D charge of $15.8 million related to the CyVera acquisition.

Our investing activities used cash of $160.7 million in the year ended December 31, 2006, compared to using cash of $1.5 million in the year ended January 1, 2006. Cash used in investing activities in the year ended December 31, 2006 was primarily due to the purchase of available-for-sale securities totaling $236.3 million, a $50.0 million investment in Solexa, and the purchase of a $3.0 million secured convertible debenture in Genizon. Further, $15.1 million was used for the purchase of property and equipment primarily related to the expansion of our manufacturing capacity. Our manufacturing capacity for BeadChips has increased approximately fourfold over the level as of January 1, 2006. These uses of cash were partially offset by $143.8 million provided by sales and maturities of available-for-sale securities. Cash used by investing activities in the year ended January 1, 2006 was due to $11.4 million used for the purchase of property and equipment and $2.4 million paid for the acquisition of CyVera, reduced by $12.2 million from the sale or maturity of investment securities used to provide operating funds for our business.

Our financing activities provided $109.3 million in the in the year ended December 31, 2006, compared to $6.0 million in the year ended January 1, 2006. Cash provided by financing activities in the year ended December 31, 2006 was primarily due to $96.5 million in net proceeds from a public stock offering completed in May 2006, as well as proceeds from the issuance of common stock from option exercises and employee stock purchase plan purchases totaling $11.4 million. Cash provided from financing activities in the year ended January 1, 2006 was primarily proceeds from the issuance of common stock from option exercises.

44

In February 2007, we issued $400 million principal amount of 0.625% Convertible Senior Notes due 2014. The net proceeds from the offering, after deducting the initial purchasers' discount and offering expenses, were approximately $390.3 million. We used approximately $202 million of the net proceeds to purchase shares of our common stock in privately negotiated transactions concurrently with the offering. We used $46.6 million of the net proceeds of this offering to pay the cost of convertible note hedge and warrant transactions, which are designed to reduce the potential dilution upon conversion of the notes. We intend to use the balance of the net proceeds for other general corporate purposes, which may include acquisitions and additional purchases of our common stock. The notes mature on February 15, 2014 and bear interest semi-annually at a rate of 0.625% per year, payable on February 15 and August 15 of each year, beginning on August 15, 2007. In addition, we may in certain circumstances be obligated to pay additional interest. If a "designated event," as defined in the indenture for the notes, occurs, holders of the notes may require us to repurchase all or a portion of their notes for cash at a repurchase price equal to the principal amount of the notes to be repurchased, plus accrued and unpaid interest. In addition, upon conversion of the notes, we must pay the principal portion in cash. The notes will become convertible only in certain circumstances based on conditions relating to the trading price of the notes and our common stock or upon the occurrence of specified corporate events. However, the notes will be convertible at any time from, and including, November 15, 2013 through the third scheduled trading day immediately preceding February 15, 2014.

We anticipate that our current cash and cash equivalents and income from operations will be sufficient to fund our operating needs for at least the next twelve months. Operating needs include the planned costs to operate our business, including amounts required to fund working capital and capital expenditures. At the present time, we have no material commitments for capital expenditures. However, our future capital requirements and the adequacy of our available funds will depend on many factors, including the successful resolution of our legal proceedings with Affymetrix, our ability to successfully commercialize our sequencing systems and to expand our SNP genotyping services product lines, scientific progress in our research and development programs, the magnitude of those programs, competing technological and market developments and the need to enter into collaborations with other companies or acquire other companies or technologies to enhance or complement our product and service offerings. Therefore, we may require additional funding in the future.

### Off-Balance Sheet Arrangements and Contractual Obligations

We do not participate in any transactions that generate relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities (SPEs), which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As of December 31, 2006, we were not involved in any SPE transactions.

In January 2002, we purchased two newly constructed buildings and assumed a $26.0 million, ten-year mortgage on the property at a fixed interest rate of 8.36%. In June 2004, we entered into a conditional agreement to sell our land and buildings for $42.0 million and to lease back such property for an initial term of ten years. The sale was completed in August 2004 at which time the lease was signed. After the repayment of the remaining $25.2 million debt and other related transaction expenses, we received $15.5 million in net cash proceeds. We removed the land and net book value of the buildings of $36.9 million from our balance sheet and are recording the resulting $3.7 million gain on the sale of the property over the lease term in accordance with SFAS No. 13, *Accounting for Leases.* Under the terms of the lease, we made a $1.9 million security deposit, with monthly rental payments of $318,643 for the first year with an annual increase of 3% in each subsequent year through 2014. The current monthly rent under this lease is $338,048. On February 14, 2007, we extended this lease. The terms of the new lease provide for monthly rent increases each year to a maximum of $504,710 per month during the last year of the lease, which is now 2023. We have the option to extend the term of the lease for three additional five-year periods.

As of December 31, 2006, we also leased an office and laboratory facility in Connecticut, additional office, distribution and storage facilities in San Diego, and four foreign facilities located in Japan, Singapore, China and the Netherlands under non-cancelable operating leases that expire at various times through July 2011. These leases contain renewal options ranging from one to five years.

As of December 31, 2006, our contractual obligations were (in thousands):

| Contractual Obligation | Total | Payments Due by Period | | | |
| | | Less Than 1 Year | 1 – 3 Years | 1 – 5 Years | More Than 5 Years |
|---|---|---|---|---|---|
| Operating leases | $37,899 | $  5,320 | $  10,410 | $  9,371 | $ 12,798 |
| Total | $37,899 | $  5,320 | $  10,410 | $  9,371 | $ 12,798 |

The above table does not include orders for goods and services entered into in the normal course of business that are not enforceable or legally binding.

**Item 7A.  *Quantitative and Qualitative Disclosures About Market Risk.***

### Interest Rate Sensitivity

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The fair market value of fixed rate securities may be adversely impacted by fluctuations in interest rates while income earned on floating rate securities may decline as a result of decreases in interest rates. Under our current policies, we do not use interest rate derivative instruments to manage exposure to interest rate changes. We attempt to ensure the safety and preservation of our invested principal funds by limiting default risk, market risk and reinvestment risk. We mitigate default risk by investing in investment grade securities. We have historically maintained a relatively short average maturity for our investment portfolio, and we believe a hypothetical 100 basis point adverse move in interest rates along the entire interest rate yield curve would not materially affect the fair value of our interest sensitive financial instruments.

### Foreign Currency Exchange Risk

Although most of our revenue is realized in U.S. dollars, some portions of our revenue are realized in foreign currencies. As a result, our financial results could be affected by factors such as changes in foreign currency exchange rates or weak economic conditions in foreign markets. The functional currencies of our subsidiaries are their respective local currencies. Accordingly, the accounts of these operations are translated from the local currency to the U.S. dollar using the current exchange rate in effect at the balance sheet date for the balance sheet accounts, and using the average exchange rate during the period for revenue and expense accounts. The effects of translation are recorded in accumulated other comprehensive income as a separate component of stockholders' equity.

46

Periodically, we hedge significant foreign currency firm sales commitments and accounts receivable with forward contracts. We only use derivative financial instruments to reduce foreign currency exchange rate risks; we do not hold any derivative financial instruments for trading or speculative purposes. We primarily use forward exchange contracts to hedge foreign currency exposures and they generally have terms of one year or less. These contracts have been designated as cash flow hedges and accordingly, to the extent effective, any unrealized gains or losses on these foreign currency forward contracts are reported in other comprehensive income. Realized gains and losses for the effective portion are recognized with the underlying hedge transaction. As of December 31, 2006, we had no foreign currency forward contracts outstanding. The notional settlement amount of the foreign currency forward contracts outstanding at December 31, 2006 and January 1, 2006 were $0 and $0.1 million, respectively. As of January 1, 2006, we had one outstanding contract with an immaterial fair value, representing an unrealized gain, which was included in other current assets at January 1, 2006. We settled foreign exchange contracts of $0.1 million and $5.2 million for the years ended December 31, 2006 and January 1, 2006, respectively. We did not hold any derivative financial instruments prior to fiscal 2004.

## Item 8. *Financial Statements and Supplementary Data.*

The Report of Independent Registered Public Accounting Firm, Financial Statements and Notes to Financial Statements begin on page F-1 immediately following the signature page and are incorporated herein by reference.

Our fiscal year is 52 or 53 weeks ending on the Sunday closest to December 31, with quarters of 13 or 14 weeks ending on the Sunday closest to March 31, June 30 and September 30. The years ended December 31, 2006 and January 1, 2006 were both 52 weeks. The year ended January 2, 2005 was 53 weeks.

## Item 9. *Changes In and Disagreements With Accountants on Accounting and Financial Disclosure.*

None.

## Item 9A. *Controls and Procedures.*

We design our internal controls to provide reasonable assurance that (1) our transactions are properly authorized; (2) our assets are safeguarded against unauthorized or improper use; and (3) our transactions are properly recorded and reported in conformity with U.S. generally accepted accounting principles. We also maintain internal controls and procedures to ensure that we comply with applicable laws and our established financial policies.

47

We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Securities Exchange Act), as of December 31, 2006. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of December 31, 2006, our disclosure controls and procedures are effective to ensure that (a) the information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officers, or persons performing similar functons, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management have concluded that the disclosure controls and procedures are effective at the reasonable assurance level. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected.

An evaluation was also performed under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of any change in our internal control over financial reporting that occurred during the fourth quarter of 2006 and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any such change.

## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework in Internal Control — Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2006.

Ernst & Young LLP, the independent registered public accounting firm that audited the consolidated financial statements included in this Annual Report on Form 10-K, has issued an attestation report on management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006. This report, which expresses an unqualified opinion on management's assessment of and the effectiveness of our internal controls over financial reporting as of December 31, 2006, is included herein.

48

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL
CONTROL OVER FINANCIAL REPORTING**

To The Board of Directors and Stockholders of
Illumina, Inc.

We have audited management's assessment, included in the accompanying Management's Report on
Internal Control Over Financial Reporting, that Illumina, Inc. maintained effective internal control over
financial reporting as of December 31, 2006, based on criteria established in Internal Control — Integrated
Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the
COSO criteria). Illumina, Inc.'s management is responsible for maintaining effective internal control over
financial reporting and for its assessment of the effectiveness of internal control over financial reporting.
Our responsibility is to express an opinion on management's assessment and an opinion on the
effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting
Oversight Board (United States). Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether effective internal control over financial reporting was maintained in
all material respects. Our audit included obtaining an understanding of internal control over financial
reporting, evaluating management's assessment, testing and evaluating the design and operating
effectiveness of internal control, and performing such other procedures as we considered necessary in the
circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable
assurance regarding the reliability of financial reporting and the preparation of financial statements for
external purposes in accordance with generally accepted accounting principles. A company's internal
control over financial reporting includes those policies and procedures that (1) pertain to the maintenance
of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the
assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to
permit preparation of financial statements in accordance with generally accepted accounting principles,
and that receipts and expenditures of the company are being made only in accordance with authorizations
of management and directors of the company; and (3) provide reasonable assurance regarding prevention
or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have
a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect
misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk
that controls may become inadequate because of changes in conditions, or that the degree of compliance
with the policies or procedures may deteriorate.

In our opinion, management's assessment that Illumina, Inc. maintained effective internal control over
financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the COSO
criteria. Also, in our opinion, Illumina, Inc., maintained, in all material respects, effective internal control
over financial reporting as of December 31, 2006, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight
Board (United States), the consolidated balance sheets as of December 31, 2006 and January 1, 2006,
and the related consolidated statements of operations, shareholders' equity, and cash flows for each of
the three years in the period ended December 31, 2006 of Illumina, Inc. and our report dated February 23,
2007 expressed an unqualified opinion thereon.

/s/  ERNST & YOUNG LLP

San Diego, California
February 23, 2007

**Item 9B.**  *Other Information.*

None.

# PART III

**Item 10.**  *Directors and Executive Officers of the Registrant.*

(a) Identification of Directors. Information concerning our directors is incorporated by reference from the section entitled "Proposal One: Election of Directors" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

(b) Identification of Executive Officers. Information concerning our executive officers is set forth under "Executive Officers" in Part I of this Annual Report on Form 10-K and is incorporated herein by reference.

(c) Compliance with Section 16(a) of the Exchange Act. Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 is incorporated by reference from the section entitled "Compliance with Section 16(a) of the Securities Exchange Act" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

(d) Information concerning the audit committee financial expert as defined by the SEC rules adopted pursuant to the Sarbanes-Oxley Act of 2002 is incorporated by reference from our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

## Code of Ethics

We have adopted a code of ethics for our directors, officers and employees, which is available on our website at www.illumina.com in the Investor Information section under "Corporate." The information on our website is not incorporated by reference into this report.

**Item 11.**  *Executive Compensation.*

Information concerning executive compensation is incorporated by reference from the sections entitled "Executive Compensation and Other Information" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

**Item 12.**  *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.*

Information concerning the security ownership of certain beneficial owners and management is incorporated by reference from the section entitled "Ownership of Securities" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

**Equity Compensation Plan Information**

The following table presents information about our common stock that may be issued upon the exercise of options, warrants and rights under all our existing equity compensation plans as of December 31, 2006. We currently have two active equity compensation plans, the 2000 employee stock purchase plan and the 2005 stock incentive plan, which replaced the 2000 stock plan. Prior to our initial public offering, we granted options under our 1998 stock incentive plan. All of these plans have been approved by our stockholders. Options outstanding include options granted under the 1998 stock incentive plan, the 2000 stock plan and the 2005 stock incentive plan.

| Plan Category | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options | (b) Weighted-Average Exercise Price of Outstanding Options | (c) Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 8,359,120 | $ 13.94 | 5,527,502(1)(2) |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 8,359,120 | $ 13.94 | 5,527,502 |

Please refer to Note 6 to the consolidated financial statements included in this Annual Report on Form 10-K for a description of our equity compensation plans.

_____

(1) Includes 2,764,566 available for grant under our 2005 stock incentive plan. The 2005 stock incentive plan provides for an automatic annual increase in the shares reserved for issuance by the lesser of (1) five percent of outstanding shares of our common stock on the last day of the immediately preceding fiscal year, (2) 1,200,000 shares or (3) a lesser amount as determined by our Board of Directors.

(2) Includes 2,762,936 shares available for grant under our 2000 employee stock purchase plan. The 2000 employee stock purchase plan provides for an automatic annual increase in the shares reserved for issuance by the lesser of (1) three percent of outstanding shares of our common stock on the last day of the immediately preceding fiscal year or (2) 1,500,000 shares.

### Item 13.   *Certain Relationships and Related Transactions.*

Information concerning certain relationships and related transactions is incorporated by reference from the sections entitled "Proposal One: Election of Directors," "Executive Compensation and Other Information" and "Certain Transactions" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

### Item 14.   *Principal Accounting Fees and Services.*

Information concerning principal accounting fees and services is incorporated by reference from the sections entitled "Proposal Two: Ratification of Independent Auditors" contained in our definitive Proxy Statement with respect to our 2007 Annual Meeting of Stockholders to be filed with the SEC no later than April 30, 2007.

**PART IV**

**Item 15.** ***Exhibits, Financial Statement Schedules.***

(a) The following documents are filed as a part of this report:

(1) *Consolidated Financial Statements:*

| | Page |
|---|---|
| Index to Consolidated Financial Statements | F-1 |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2006 and January 1, 2006 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2006, January 1, 2006, and January 2, 2005 | F-4 |
| Consolidated Statements of Stockholders' Equity for the period from December 28, 2003 to December 31, 2006 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2006, January 1, 2006 and January 2, 2005 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

(2) *Financial Statement Schedule:*

| | |
|---|---|
| Valuation and Qualifying Account and Reserves for the three years ended December 31, 2006 | F-37 |

(3) *Exhibits:*

| Exhibit Number | Description of Document |
|---|---|
| 2.1(16) | Agreement and Plan of Merger, dated as of November 12, 2006, among Solexa, Inc., Callisto Acquisition Corp. and the Registrant. |
| 3.1(2) | Corrected Amended and Restated Certificate of Incorporation. |
| 3.2(30) | Amended Bylaws. |
| 3.3(5) | Certificate of Designation for Series A Junior Participating Preferred Stock (included as an exhibit to exhibit 4.3). |
| 4.1(1) | Specimen Common Stock Certificate. |
| 4.2(1) | Second Amended and Restated Stockholders Rights Agreement, dated November 5, 1999, by and among the Registrant and certain stockholders of the Registrant. |
| 4.3(5) | Rights Agreement, dated as of May 3, 2001, between the Registrant and Equiserve Trust Company, N.A. |
| 4.4(35) | Indenture related to the 0.625% Convertible Senior Notes due 2014, dated as of February 16, 2007, between the Registrant and the Bank of New York, as trustee. |
| 4.5(36) | Registration Rights Agreement, dated as of February 16, 2007, between the Registrant and the Purchasers named therein. |
| +10.1(1) | Form of Indemnification Agreement between the Registrant and each of its directors and officers. |
| +10.2(1) | 1998 Incentive Stock Plan. |
| +10.3(33) | Amended 2000 Employee Stock Purchase Plan. |
| 10.4(1) | Sublease Agreement dated August 1998 between Registrant and Gensia Sicor Inc. for the Registrant's principal offices. |
| 10.5(1) | License Agreement dated May 1998 between Tufts and Registrant (with certain confidential portions omitted). |
| 10.6(1) | Master Loan and Security Agreement, dated March 6, 2000, by and between Registrant and FINOVA Capital Corporation. |
| +10.7(1) | 2000 Stock Plan. |
| 10.8(1) | Eastgate Pointe Lease, dated July 6, 2000, between Diversified Eastgate Venture and Registrant. |

52

| Exhibit Number | Description of Document |
|---|---|
| 10.9(1) | Option Agreement and Joint Escrow Instructions, dated July 6, 2000, between Diversified Eastgate Venture and Registrant. |
| 10.10(4) | First Amendment to Joint Development Agreement dated March 27, 2001 between Registrant and PE Corporation, now known as Applied Biosystems Group (with certain confidential portions omitted). |
| 10.11(6) | First Amendment to Option Agreement and Escrow Instructions dated May 25, 2001 between Diversified Eastgate Venture and Registrant. |
| 10.12(13) | Second Amendment to Option Agreement and Escrow Instructions dated July 18, 2001 between Diversified Eastgate Venture and Registrant. |
| 10.13(14) | Third Amendment to Option Agreement and Escrow Instructions dated September 27, 2001 between Diversified Eastgate Venture and Registrant. |
| 10.14(15) | First Amendment to Eastgate Pointe Lease dated September 27, 2001 between Diversified Eastgate Venture and Registrant. |
| 10.15(8) | Replacement Reserve Agreement, dated as of January 10, 2002, between the Registrant and BNY Western Trust Company as Trustee for Washington Capital Joint Master Trust Mortgage Income Fund. |
| 10.16(17) | Loan Assumption and Modification Agreement, dated as of January 10, 2002, between the Registrant, Diversified Eastgate Venture and BNY Western Trust Company as Trustee for Washington Capital Joint Master Trust Mortgage Income Fund. |
| 10.17(18) | Tenant Improvement and Leasing Commission Reserve Agreement, dated as of January 10, 2002, between the Registrant and BNY Western Trust Company as Trustee for Washington Capital Joint Master Trust Mortgage Income Fund. |
| +10.18(32) | 2000 Employee Stock Purchase Plan as amended and restated through July 20, 2006. |
| +10.19(20) | 2000 Stock Plan as amended and restated through March 21, 2002. |
| 10.20(21) | Non-exclusive License Agreement dated January 2002 between Amersham Biosciences Corp. and Registrant (with certain confidential portions omitted). |
| 10.21(22) | License Agreement dated June 2002 between Dade Behring Marburg GmbH and Registrant (with certain confidential portions omitted). |
| 10.22(23) | Purchase and Sale Agreement and Escrow Instructions dated June 18, 2004 between Bernardo Property Advisors, Inc. and Registrant. |
| 10.23(24) | Single Tenant Lease dated August 18, 2004 between BioMed Realty Trust Inc. and Registrant. |
| 10.24(25) | Settlement and Cross License Agreement dated August 18, 2004 between Applera Corporation and Registrant (with certain confidential portions omitted). |
| 10.28(26) | Collaboration Agreement dated December 17, 2004 between Invitrogen Incorporated and Registrant (with certain confidential portions omitted). |
| 10.29(27) | Offer letter for Christian O. Henry dated April 26, 2005. |
| 10.30(28) | Forms of Stock Option Agreement under 2000 Stock Plan. |
| 10.31(29) | Secured Convertible Debenture Indenture between Genizon BioSciences Inc., Computershare Trust Company of Canada and the Registrant, dated March 24, 2006. |
| 10.32(30) | Joint Development and Licensing Agreement dated May 15, 2006 between deCODE genetics, ehf. and Registrant (with certain confidential portions omitted). |
| 10.33(31) | Form of Change in Control Severance Agreement between the Registrant and Jay T. Flatley. |
| 10.34(31) | Form of Change in Control Severance Agreement between the Registrant and Christian O. Henry. |
| 10.35(31) | Form of Change in Control Severance Agreement between the Registrant and Tristan B. Orpin. |
| 10.36(31) | Form of Change in Control Severance Agreement between the Registrant and John R. Stuelpnagel. |
| 10.37(31) | Form of Change in Control Severance Agreement between the Registrant and Arthur L. Holden. |
| 10.38(31) | Form of Change in Control Severance Agreement between the Registrant and Christian G. Cabou. |

| Exhibit Number | Description of Document |
|---|---|
| 10.39(34) | Securities Purchase Agreement, dated as of November 12, 2006, between Solexa, Inc. and the Registrant. |
| 10.40 | Lease between The Irvine Company LLC and the Registrant, dated September 29, 2006. |
| 14(10) | Code of Ethics. |
| 21.1 | Subsidiaries of the Registrant. |
| 23.1 | Consent of Independent Registered Public Accounting Firm. |
| 24.1 | Power of Attorney (included on the signature page). |
| 31.1 | Certification of Jay T. Flatley pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Christian O. Henry pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Jay T. Flatley pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Christian O. Henry pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

+ Management contract or corporate plan or arrangement

(1) Incorporated by reference to the same numbered exhibit filed with our Registration Statement on Form S-1 (333-33922) filed April 3, 2000, as amended.

(2) Incorporated by reference to the same numbered exhibit filed with our Annual Report on Form 10-K (File No. 000-30361) for the year ended December 31, 2000 filed March 29, 2001.

(3) [reserved]

(4) Incorporated by reference to exhibit 10.13 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2001 filed May 8, 2001.

(5) Incorporated by reference to the same numbered exhibit filed with our Registration Statement on Form 8-A (File No. 000-30361) filed May 14, 2001.

(6) Incorporated by reference to exhibit 10.15 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended June 30, 2001 filed August 13, 2001.

(7) Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended September 30, 2001 filed November 14, 2001.

(8) Incorporated by reference to exhibit 10.18 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2002 filed May 13, 2002.

(9) Incorporated by reference to the same numbered exhibit filed with Amendment No. 1 to our Registration Statement on Form S-3 (File No. 333-111496) filed March 2, 2004.

(10) Incorporated by reference to the same numbered exhibit filed with our Annual Report on Form 10-K (File No. 000-30361) for the year ended December 28, 2003 filed March 12, 2004.

(11) Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended June 27, 2004 filed August 6, 2004.

(12) Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended October 3, 2004 filed November 12, 2004.

(13) Incorporated by reference to exhibit 10.16 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended September 30, 2001 filed November 14, 2001.

(14) Incorporated by reference to exhibit 10.17 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended September 30, 2001 filed November 14, 2001.

(15) Incorporated by reference to exhibit 10.18 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended September 30, 2001 filed November 14, 2001.

(16) Incorporated by reference to exhibit 2.1 filed with our Form 8-K (File No. 000-30361) filed November 13, 2006.

Table of Contents

(17)  Incorporated by reference to exhibit 10.19 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2002 filed May 13, 2002.

(18)  Incorporated by reference to the exhibit 10.20 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2002 filed May 13, 2002.

(19)  Incorporated by reference to the exhibit 10.21 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2002 filed May 13, 2002.

(20)  Incorporated by reference to the exhibit 10.22 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended March 31, 2002 filed May 13, 2002.

(21)  Incorporated by reference to exhibit 10.24 filed with Amendment No. 1 to our Registration Statement on Form S-3 (File No. 333-111496) filed March 2, 2004.

(22)  Incorporated by reference to exhibit 10.23 filed with our Amendment No. 1 to our Registration Statement on Form S-3 (File No. 333-111496) filed March 2, 2004.

(23)  Incorporated by reference to exhibit 10.25 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended June 27, 2004 filed August 6, 2004.

(24)  Incorporated by reference to exhibit 10.26 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended October 3, 2004 filed November 12, 2004.

(25)  Incorporated by reference to exhibit 10.27 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended October 3, 2004 filed November 12, 2004.

(26)  Incorporated by reference to exhibit 10.28 filed with our Form 10-K (File No. 000-30361) for the year ended January 2, 2005 filed March 8, 2005.

(27)  Incorporated by reference to exhibit 10.33 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended July 3, 2005 filed August 8, 2005.

(28)  Incorporated by reference to exhibit 10.29 filed with our Form 10-K (File No. 000-30361) for the year ended January 2, 2005 filed March 8, 2005.

(29)  Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended April 2, 2006 filed May 8, 2006.

(30)  Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended July 2, 2006 filed August 2, 2006.

(31)  Incorporated by reference to the same numbered exhibit filed with our Form 8-K (File No. 000-30361) filed August 23, 2006.

(32)  Incorporated by reference to exhibit 10.13 filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended October 1, 2006 filed October 30, 2006.

(33)  Incorporated by reference to the same numbered exhibit filed with our Form 10-Q (File No. 000-30361) for the quarterly period ended October 1, 2006, filed October 30, 2006.

(34)  Incorporated by reference to exhibit 10.1 filed with our Form 8-K (File No. 000-30361) filed November 13, 2006.

(35)  Incorporated by reference to exhibit 4.1 filed with our Form 8-K (File No. 000-30361) filed February 16,2007.

(36)  Incorporated by reference to exhibit 4.2 filed with our Form 8-K (File No. 000-30361) filed February 16, 2007.

## Supplemental Information

No Annual Report to stockholders or proxy materials has been sent to stockholders as of the date of this report. The Annual Report to stockholders and proxy material will be furnished to our stockholders subsequent to the filing of this Annual Report on Form 10-K and we will furnish such material to the SEC at that time.

**SIGNATURES**

Pursuant to the requirements of the Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 28, 2007.

ILLUMINA, INC .

|  |  |
|---|---|
| By | /s/  JAY T. FLATLEY |
|  | Jay T. Flatley |
|  | *President and Chief Executive Officer* |

February 28, 2007

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENT, that each person whose signature appears below constitutes and appoints Jay T. Flatley and Christian O. Henry, and each or any one of them, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | | |
|---|---|---|
| /s/  JAY T. FLATLEY<br>Jay T. Flatley | President, Chief Executive Officer and Director (Principal Executive Officer) | February 28, 2007 |
| /s/  CHRISTIAN O. HENRY<br>Christian O. Henry | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | February 28, 2007 |
| /s/  JOHN R. STUELPNAGEL<br>John R. Stuelpnagel | Senior Vice President, Chief Operating Officer and Director | February 28, 2007 |
| /s/  WILLIAM H. RASTETTER<br>William H. Rastetter | Chairman of the Board of Directors | February 28, 2007 |
| /s/  DANIEL M. BRADBURY<br>Daniel M. Bradbury | Director | February 28, 2007 |
| /s/  KARIN EASTHAM<br>Karin Eastham | Director | February 28, 2007 |

56

| /s/   PAUL GRINT | Director | February 28, 2007 |
| --- | --- | --- |
| Paul Grint | | |
| /s/   DAVID R. WALT | Director | February 28, 2007 |
| David R. Walt | | |
| /s/   JACK GOLDSTEIN | Director | February 28, 2007 |
| Jack Goldstein | | |
| /s/   A. BLAINE BOWMAN | Director | February 28, 2007 |
| A. Blaine Bowman | | |
| | Director | February 28, 2007 |
| Roy Whitfield | | |

57

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2006 and January 1, 2006 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2006, January 1, 2006, and January 2, 2005 | F-4 |
| Consolidated Statements of Stockholders' Equity for the period from December 28, 2003 to December 31, 2006 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2006, January 1, 2006, and January 2, 2005 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of
Illumina, Inc.

We have audited the accompanying consolidated balance sheets of Illumina, Inc. as of December 31, 2006 and January 1, 2006, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2006. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Illumina, Inc., at December 31, 2006 and January 1, 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2006, Illumina, Inc. changed its method of accounting for share-based payments in accordance with Statement of Financial Accounting Standards No. 123R, Share-Based Payment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Illumina, Inc.'s internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 23, 2007 expressed an unqualified opinion thereon.

/s/  ERNST & YOUNG LLP

San Diego, California
February 23, 2007

F-2

## ILLUMINA, INC.

## CONSOLIDATED BALANCE SHEETS

| | December 31, 2006 | January 1, 2006 |
|---|---|---|
| | (In thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 38,386 | $ 50,822 |
| Short-term investments | 92,418 | — |
| Accounts receivable, net | 39,984 | 17,620 |
| Inventory, net | 20,169 | 10,309 |
| Prepaid expenses and other current assets | 2,769 | 959 |
| Total current assets | 193,726 | 79,710 |
| Property and equipment, net | 25,634 | 16,131 |
| Investment in Solexa | 67,784 | — |
| Goodwill | 2,125 | 2,125 |
| Intangible and other assets, net | 11,315 | 2,644 |
| Total assets | $ 300,584 | $ 100,610 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 9,853 | $ 7,390 |
| Accrued liabilities | 23,860 | 14,210 |
| Current portion of long-term debt | 63 | 118 |
| Total current liabilities | 33,776 | 21,718 |
| Long-term debt, less current portion | — | 54 |
| Deferred gain on sale of land and building | 2,468 | 2,843 |
| Deferred income tax liabilities | 6,987 | — |
| Other long-term liabilities | 10,011 | 3,498 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value, 10,000,000 shares authorized, no shares issued and outstanding at December 31, 2006 and January 1, 2006 | — | — |
| Common stock, $0.01 par value, 120,000,000 shares authorized, 46,857,512 shares issued and outstanding at December 31, 2006, 41,294,003 shares issued and outstanding at January 1, 2006 | 469 | 413 |
| Additional paid-in capital | 340,197 | 216,766 |
| Deferred compensation | — | (354) |
| Accumulated other comprehensive income | 11,294 | 258 |
| Accumulated deficit | (104,618) | (144,586) |
| Total stockholders' equity | 247,342 | 72,497 |
| Total liabilities and stockholders' equity | $ 300,584 | $ 100,610 |

See accompanying notes to the consolidated financial statements

F-3

**ILLUMINA, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| | (In thousands, except per share amounts) | | |
| Revenue | | | |
| Product revenue | $ 155,811 | $ 57,752 | $ 40,497 |
| Service and other revenue | 27,486 | 13,935 | 8,075 |
| Research revenue | 1,289 | 1,814 | 2,011 |
| Total revenue | 184,586 | 73,501 | 50,583 |
| Costs and expenses: | | | |
| Cost of product revenue (including non-cash stock compensation expense of $1,289, $0, and $0, respectively) | 51,271 | 19,920 | 11,572 |
| Cost of service and other revenue (including non-cash stock compensation expense of $235, $0, and $0, respectively) | 8,073 | 3,261 | 1,687 |
| Research and development (including non-cash stock compensation expense of $3,891, $84, and $348, respectively) | 33,373 | 27,809 | 21,462 |
| Selling, general and administrative (including non-cash stock compensation expense of $8,889, $186, and $496, respectively) | 54,057 | 28,158 | 25,576 |
| Acquired in-process research and development | — | 15,800 | — |
| Litigation judgment (settlement), net | — | — | (4,201) |
| Total costs and expenses | 146,774 | 94,948 | 56,096 |
| Income (loss) from operations | 37,812 | (21,447) | (5,513) |
| Interest income | 5,368 | 1,404 | 941 |
| Interest and other expense, net | (560) | (668) | (1,518) |
| Income (loss) before income taxes | 42,620 | (20,711) | (6,090) |
| Provision for income taxes | 2,652 | 163 | 135 |
| Net income (loss) | $ 39,968 | $ (20,874) | $ (6,225) |
| Net income (loss) per basic share | $ 0.90 | $ (0.52) | $ (0.17) |
| Net income (loss) per diluted share | $ 0.82 | $ (0.52) | $ (0.17) |
| Shares used in calculating basic net income (loss) per share | 44,501 | 40,147 | 35,845 |
| Shares used in calculating diluted net income (loss) per share | 48,754 | 40,147 | 35,845 |

See accompanying notes to the consolidated financial statements

F-4

## ILLUMINA, INC.

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock Shares | Amount | Additional Paid-In Capital | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Balance as of December 28, 2003 | 32,887 | $ 329 | $ 165,314 | $ (1,103) | $ 335 | $ (117,487) | $ 47,388 |
| Issuance of common stock for cash | 5,278 | 53 | 30,454 | — | — | — | 30,507 |
| Repurchase of restricted common stock | (44) | (1) | (12) | — | — | — | (13) |
| Amortization of deferred compensation | — | — | — | 844 | — | — | 844 |
| Reversal of deferred compensation related to unvested stock options and restricted stock of terminated employees | — | — | (103) | 103 | — | — | — |
| Comprehensive loss: | | | | | | | |
| Unrealized loss on available-for sale securities | — | — | — | — | (305) | — | (305) |
| Unrealized loss on hedging contracts | — | — | — | — | (46) | — | (46) |
| Foreign currency translation adjustment | — | — | — | — | 112 | — | 112 |
| Net loss | — | — | — | — | — | (6,225) | (6,225) |
| Comprehensive loss | | | | | | | (6,464) |
| Balance as of January 2, 2005 | 38,121 | 381 | 195,653 | (156) | 96 | (123,712) | 72,262 |
| Issuance of common stock for cash | 1,592 | 16 | 6,030 | — | — | — | 6,046 |
| Issuance of common stock in conjunction with an acquisition | 1,580 | 16 | 14,812 | — | — | — | 14,828 |
| Deferred compensation related to unvested CyVera stock options assumed | — | — | — | (197) | — | — | (197) |
| Compensation expense related to acceleration of options for terminated employees | — | — | 79 | — | — | — | 79 |
| Deferred compensation related to a restricted stock award | 1 | — | 192 | (192) | — | — | — |
| Amortization of deferred compensation | — | — | — | 191 | — | — | 191 |
| Comprehensive income (loss): | | | | | | | |
| Unrealized gain on available-for-sale securities | — | — | — | — | 29 | — | 29 |
| Unrealized gain on hedging contracts | — | — | — | — | 56 | — | 56 |
| Foreign currency translation adjustment | — | — | — | — | 77 | — | 77 |
| Net loss | — | — | — | — | — | (20,874) | (20,874) |
| Comprehensive loss | | | | | | | (20,712) |
| Balance as of January 1, 2006 | 41,294 | 413 | 216,766 | (354) | 258 | (144,586) | 72,497 |
| Issuance of common stock for cash | 5,559 | 56 | 114,440 | — | — | — | 114,496 |
| May 2006 offering costs | — | — | (6,530) | — | — | — | (6,530) |
| Deferred compensation related to a restricted stock award | 4 | — | — | — | — | — | — |
| Stock-based compensation expense | — | — | 14,082 | 354 | — | — | 14,436 |
| Incremental tax benefit related to stock options exercised | — | — | 1,439 | — | — | — | 1,439 |
| Comprehensive income (loss): | | | | | | | |
| Unrealized gain on available-for-sale securities, net of deferred tax | — | — | — | — | 10,693 | — | 10,693 |
| Unrealized gain on hedging contracts | — | — | — | — | (10) | — | (10) |
| Foreign currency translation adjustment | — | — | — | — | 353 | — | 353 |
| Net income | — | — | — | — | — | 39,968 | 39,968 |
| Comprehensive income | | | | | | | 51,004 |
| Balance as of December 31, 2006 | 46,857 | $ 469 | $ 340,197 | $ — | $ 11,294 | $ (104,618) | $ 247,342 |

See accompanying notes to the consolidated financial statements

F-5

**ILLUMINA, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| | | (In thousands) | |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 39,968 | $ (20,874) | $ (6,225) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | | |
| Acquired in-process research and development | — | 15,800 | — |
| Depreciation and amortization | 6,083 | 4,116 | 3,956 |
| Loss on disposal of property and equipment | 116 | 293 | — |
| Amortization of premium on investments | — | (14) | 354 |
| Non-cash stock-based compensation expense | 14,304 | 270 | 844 |
| Incremental tax benefit related to stock options exercised | (1,439) | — | — |
| Amortization of gain on sale of land and building | (375) | (375) | (156) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (21,733) | (7,039) | (7,202) |
| Inventory | (9,728) | (6,502) | (1,785) |
| Prepaid expenses and other current assets | (1,591) | 290 | (29) |
| Deferred income taxes | (548) | — | — |
| Other assets | (5,263) | 395 | (2,041) |
| Accounts payable | 2,438 | 3,193 | 697 |
| Accrued income taxes | 1,809 | 144 | 84 |
| Accrued liabilities | 9,066 | 4,070 | 1,874 |
| Litigation judgment | — | (5,957) | 567 |
| Other long-term liabilities | 5,893 | 3,182 | (512) |
| Advance payment from former collaborator | — | — | (10,000) |
| Net cash provided by (used in) operating activities | 39,000 | (9,008) | (19,574) |
| Cash flows from investing activities: | | | |
| Cash paid for acquisition, net of cash acquired | — | (2,388) | — |
| Investment in secured convertible debentures | (3,036) | — | — |
| Investment in Solexa | (50,000) | — | — |
| Purchases of available-for-sale securities | (236,331) | — | (6,603) |
| Sales and maturities of available-for-sale securities | 143,846 | 12,248 | 26,348 |
| Proceeds from sale of land and building, net of fees | — | — | 40,667 |
| Purchase of property and equipment | (15,114) | (11,395) | (3,355) |
| Acquisition of intangible assets | (100) | — | (35) |
| Net cash provided by (used in) investing activities | (160,735) | (1,535) | 57,022 |
| Cash flows from financing activities: | | | |
| Payments on long-term debt | (109) | (83) | (25,387) |
| Payments on equipment financing | — | — | (232) |
| Proceeds from issuance of common stock | 107,966 | 6,046 | 30,507 |
| Incremental tax benefit related to stock options exercised | 1,439 | — | — |
| Repurchase of common stock | — | — | (13) |
| Net cash provided by financing activities | 109,296 | 5,963 | 4,875 |
| Effect of foreign currency translation on cash and cash equivalents | 3 | 613 | 1 |
| Net increase (decrease) in cash and cash equivalents | (12,436) | (3,967) | 42,324 |
| Cash and cash equivalents at beginning of the year | 50,822 | 54,789 | 12,465 |
| Cash and cash equivalents at end of the year | $ 38,386 | $ 50,822 | $ 54,789 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid during the year for interest | $ 11 | $ 15 | $ 1,368 |

See accompanying notes to the consolidated financial statements

F-6

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.  Organization and Summary of Significant Accounting Policies**

*Organization and Business*

Illumina, Inc. (the Company) was incorporated on April 28, 1998. The Company is a leading developer, manufacturer and marketer of next-generation life-science tools and integrated systems for the large-scale analysis of genetic variation and biological function. Using the Company's proprietary technologies, the Company provides a comprehensive line of products and services that currently serve the sequencing, genotyping and gene expression markets, and the Company expects to enter the market for molecular diagnostics. The Company's tools provide researchers around the world with the performance, throughput, cost effectiveness and flexibility necessary to perform the billions of genetic tests needed to extract valuable medical information from advances in genomics and proteomics. The Company believes this information will enable researchers to correlate genetic variation and biological function, which will enhance drug discovery and clinical research, allow diseases to be detected earlier and permit better choices of drugs for individual patients.

*Basis of Presentation*

The consolidated financial statements of the Company have been prepared in conformity with U.S. generally accepted accounting principles and include the accounts of the Company and its wholly-owned subsidiaries. All intercompany transactions and balances have been eliminated in consolidation.

*Fiscal Year*

The Company's fiscal year is 52 or 53 weeks ending the Sunday closest to December 31, with quarters of 13 or 14 weeks ending the Sunday closest to March 31, June 30, and September 30. The years ended December 31, 2006 and January 1, 2006 were both 52 weeks.

*Reclassifications*

Certain prior year amounts have been reclassified to conform to current year presentation.

*Use of Estimates*

The preparation of financial statements requires that management make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses, goodwill and related disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and cash equivalents are comprised of short-term, highly liquid investments primarily in money market-type funds.

F-7

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Investments*

The Company applies Statement of Financial Accounting Standards (SFAS) No. 115, *Accounting for Certain Investments in Debt and Equity Securities* , to its investments. Under SFAS No. 115, the Company classifies its investments as "available-for-sale" and records such assets at estimated fair value in the balance sheet, with unrealized gains and losses, if any, reported in stockholders' equity. As of December 31, 2006, the Company's excess cash balances were primarily invested in marketable debt securities, including commercial paper, auction rate certificates and corporate bonds and notes, with strong credit ratings or short maturity mutual funds providing similar financial returns. The Company limits the amount of investment exposure as to institutions, maturity and investment type. The cost of securities sold is determined based on the specific identification method. The Company did not record any gross realized gains for the years ended December 31, 2006 or January 1, 2006. For the year ended January 2, 2005, gross realized gains totaled $453,750. Gross realized losses totaled approximately $35,000, $0, and $0 for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively. Further, there were no investments that have been in a continuous unrealized loss position for greater than twelve months as of December 31, 2006.

*Restricted Cash*

As of December 31, 2006, restricted cash, included in cash and cash equivalents, consisted of bank guarantees totaling approximately $250,000 associated with two sales contracts during 2006. Both guarantees are scheduled to be released during 2007. There was no restricted cash as of January 1, 2006.

*Fair Value of Financial Instruments*

The carrying amounts of certain of the Company's financial instruments, including cash and cash equivalents, accounts and notes receivable, accounts payable and accrued liabilities, approximate fair value.

*Accounts and Notes Receivable*

Trade accounts receivable are recorded at net invoice value and notes receivable are recorded at contractual value plus earned interest. Interest income on notes receivable is recognized according to the terms of each related agreement. The Company considers receivables past due based on the contractual payment terms. The Company reviews its exposure to amounts receivable and reserves specific amounts if collectibility is no longer reasonably assured. The Company also reserves a percentage of its trade receivable balance based on collection history. The Company re-evaluates such reserves on a regular basis and adjusts its reserves as needed.

*Concentrations of Risk*

Cash equivalents, investments and accounts receivable are financial instruments that potentially subject the Company to concentrations of credit risk. Most of the Company's cash and cash equivalents as of December 31, 2006 were deposited with financial institutions in the United States and the Company's investment policy restricts the amount of credit exposure to any one issuer and to any one type of investment, other than securities issued by the U.S. Government. The Company has historically not experienced significant credit losses from accounts receivable. The Company performs a regular review of customer activity and associated credit risks and generally does not require collateral. The Company maintains an allowance for doubtful accounts based upon a percentage of its trade receivable balance based on collection history and re-evaluates such reserves on a regular basis.

F-8

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The Company's products require customized components that currently are available from a limited number of sources. The Company obtains certain key components included in its products from single vendors. No assurance can be given that these or other product components will be available in sufficient quantities at acceptable costs in the future.

Approximately 44%, 38% and 52% of the Company's revenue for the years ended December 31, 2006, January 1, 2006 and January 2, 2005 was derived from shipments to customers outside the United States. Approximately 39% and 48% of the Company's net accounts receivable balance as of December 31, 2006 and January 1, 2006, respectively, was related to customers outside the United States. Sales to territories outside of the United States are generally denominated in U.S. dollars. International sales entail a variety of risks, including currency exchange fluctuations, longer payment cycles and greater difficulty in accounts receivable collection. The Company is also subject to general geopolitical risks, such as political, social and economic instability and changes in diplomatic and trade relations. The risks of international sales are mitigated in part by the extent to which sales are geographically distributed.

**Inventories**

Inventories are stated at the lower of standard cost (which approximates actual cost) or market. Inventory includes raw materials and finished goods that may be used in the research and development process and such items are expensed as consumed. Provisions for slow moving, excess and obsolete inventories are provided based on product life cycle and development plans, product expiration and quality issues, historical experience and inventory levels.

**Property and Equipment**

Property and equipment are stated at cost, subject to review of impairment, and depreciated over the estimated useful lives of the assets (generally three to seven years) using the straight-line method. Amortization of leasehold improvements is computed over the shorter of the lease term or the estimated useful life of the related assets.

**Intangible Assets**

Intangible assets consist of license agreements and acquired technology. The cost of the Company's license agreements was $944,450 and the Company has amortized $836,450 through December 31, 2006. Amortization expense related to license agreements for the years ending December 31, 2006, January 1, 2006 and January 2, 2005 was $51,083, $292,033 and $300,000, respectively. The licenses will be fully amortized by 2010.

**Long-Lived Assets**

In accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* if indicators of impairment exist, the Company assesses the recoverability of the affected long-lived assets by determining whether the carrying value of such assets can be recovered through undiscounted future operating cash flows. If impairment is indicated, the Company measures the future discounted cash flows associated with the use of the asset and adjusts the value of the asset accordingly. While the Company's historical operating and cash flow losses are indicators of impairment, the Company believes the current and future cash flows to be received from the long-lived assets recorded at December 31, 2006 will exceed the assets' carrying value, and accordingly the Company has not recognized any impairment losses through December 31, 2006.

F-9

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Reserve for Product Warranties

The Company generally provides a one-year warranty on instrumentation. At the time revenue is recognized, the Company establishes an accrual for estimated warranty expenses associated with system sales. This expense is recorded as a component of cost of revenue.

### Revenue Recognition

The Company's revenue is generated primarily from the sale of products and services. Product revenue consists of sales of arrays, reagents, instrumentation, and oligos. Service and other revenue consists of revenue received for performing genotyping services, extended warranty sales and revenue earned from milestone payments.

The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price to the buyer is fixed or determinable and collectibility is reasonably assured. In instances where final acceptance of the product or system is required, revenue is deferred until all the acceptance criteria have been met. All revenue is recorded net of any applicable allowances for returns or discounts.

Revenue for product sales is recognized generally upon shipment and transfer of title to the customer, provided no significant obligations remain and collection of the receivables is reasonably assured. Revenue from the sale of instrumentation is recognized when earned, which is generally upon shipment. However, in the case of BeadLabs, revenue is recognized upon the completion of installation, training and the receipt of customer acceptance. Revenue for genotyping services is recognized when earned, which is generally at the time the genotyping analysis data is delivered to the customer or as specific milestones are achieved.

In order to assess whether the price is fixed and determinable, the Company ensures there are no refund rights. If payment terms are based on future performance, the Company defers revenue recognition until the price becomes fixed and determinable. The Company assesses collectibility based on a number of factors, including past transaction history with the customer and the creditworthiness of the customer. If the Company determines that collection of a payment is not reasonably assured, revenue recognition is deferred until the time collection becomes reasonably assured, which is generally upon receipt of payment.

Sales of instrumentation generally include a standard one-year warranty. The Company also sells separately priced maintenance (extended warranty) contracts, which are generally for one or two years, upon the expiration of the initial warranty. Revenue for extended warranty sales is recognized ratably over the term of the extended warranty period. Reserves are provided for estimated product warranty expenses at the time the associated revenue is recognized. If the Company were to experience an increase in warranty claims or if costs of servicing its warrantied products were greater than its estimates, gross margins could be adversely affected.

F-10

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

While the majority of its sales agreements contain standard terms and conditions, the Company does enter into agreements that contain multiple elements or non-standard terms and conditions. Emerging Issues Task Force (EITF) No. 00-21, *Revenue Arrangements with Multiple Deliverables,* provides guidance on accounting for arrangements that involve the delivery or performance of multiple products, services, or rights to use assets within contractually binding arrangements. Significant contract interpretation is sometimes required to determine the appropriate accounting, including whether the deliverables specified in a multiple element arrangement should be treated as separate units of accounting for revenue recognition purposes, and if so, how the price should be allocated among the deliverable elements, when to recognize revenue for each element, and the period over which revenue should be recognized. The Company recognizes revenue for delivered elements only when it determines that the fair values of undelivered elements are known and there are no uncertainties regarding customer acceptance.

Some of the Company's agreements contain multiple elements that include milestone payments. Revenue from a milestone achievement is recognized when earned, as evidenced by acknowledgement from the Company's collaborator, provided that (i) the milestone event is substantive and its achievability was not reasonably assured at the inception of the agreement, (ii) the milestone represents the culmination of an earnings process, (iii) the milestone payment is non-refundable and (iv) the performance obligations for both the Company and its collaborators after the milestone achievement will continue at a level comparable to the level before the milestone achievement. If all of these criteria are not met, the milestone achievement is recognized over the remaining minimum period of the Company's performance obligations under the agreement. The Company defers non-refundable upfront fees received under its collaborations and recognizes them over the period the related services are provided or over the estimated collaboration term using various factors specific to the collaboration. Advance payments received in excess of amounts earned are classified as deferred revenue until earned.

A third source of revenue, research revenue, consists of amounts earned under research agreements with government grants, which is recognized in the period during which the related costs are incurred. All revenue is recorded net of any applicable allowances for returns or discounts.

### Shipping and Handling Expenses

Shipping and handling expenses are included in cost of product revenue and totaled $1.8 million, $1.3 million and $0.5 million for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively.

### Research and Development

Research and development expenses consist of costs incurred for internal and grant-sponsored research and development. Research and development expenses include salaries, contractor fees, facilities costs, utilities and allocations of benefits. Expenditures relating to research and development are expensed in the period incurred.

### Advertising Costs

The Company expenses advertising costs as incurred. Advertising costs were $1.9 million, $1.2 million and $0.8 million for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Income Taxes*

In accordance with SFAS No. 109, *Accounting for Income Taxes* , the provision for income taxes is computed using the asset and liability method, under which deferred tax assets and liabilities are recognized for the expected future tax consequences of temporary differences between the financial reporting and tax bases of assets and liabilities, and for the expected future tax benefit to be derived from tax loss and credit carryforwards. Deferred tax assets and liabilities are determined using the enacted tax rates in effect for the years in which those tax assets are expected to be realized. A valuation allowance is established when it is more likely than not the future realization of all or some of the deferred tax assets will not be achieved. The evaluation of the need for a valuation allowance is performed on a jurisdiction by jurisdiction basis, and includes a review of all available positive and negative evidence.

Due to the adoption of SFAS No. 123 (revised 2004), Share-Based Payment, the Company recognizes excess tax benefits associated with share-based compensation to stockholders' equity only when realized. When assessing whether excess tax benefits relating to share-based compensation have been realized, the Company follows the with-and-without approach excluding any indirect effects of the excess tax deductions. Under this approach, excess tax benefits related to share-based compensation are not deemed to be realized until after the utilization of all other tax benefits available to the Company.

*Foreign Currency Translation*

The functional currencies of the Company's wholly-owned subsidiaries are their respective local currencies. Accordingly, all balance sheet accounts of these operations are translated to U.S. dollars using the exchange rates in effect at the balance sheet date, and revenues and expenses are translated using the average exchange rates in effect during the period. The gains and losses from foreign currency translation of these subsidiaries' financial statements are recorded as a separate component of stockholders' equity under the caption "accumulated other comprehensive income (loss)."

F-12

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Stock-Based Compensation*

On January 2, 2006, the Company adopted SFAS No. 123 (revised 2004), *Share-Based Payment* , which addresses the accounting for stock-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. In January 2005, the SEC issued SAB No. 107, which provides supplemental implementation guidance for SFAS No. 123R. SFAS No. 123R eliminates the ability to account for stock-based compensation transactions using the intrinsic value method under Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees* , and instead generally requires that such transactions be accounted for using a fair-value-based method. The Company uses the Black-Scholes-Merton option-pricing model to determine the fair-value of stock-based awards under SFAS No. 123R, consistent with that used for pro forma disclosures under SFAS No. 123, *Accounting for Stock-Based Compensation* , in prior periods. The Company has elected to use the modified prospective transition method as permitted by SFAS No. 123R and, accordingly, prior periods have not been restated to reflect the impact of SFAS No. 123R. The modified prospective transition method requires that stock-based compensation expense be recorded for all new and unvested stock options, restricted stock and employee stock purchase plan (ESPP) shares that are ultimately expected to vest as the requisite service is rendered. Stock-based compensation expense for awards granted prior to January 2, 2006 is based on the grant date fair-value as determined under APB No. 25. For the year ended December 31, 2006, the Company has recorded an incremental $14.3 million, respectively, of stock-based compensation expense as a result of the adoption of SFAS No. 123R. Net income per diluted share was reduced by $0.29 for the year ended December 31, 2006 as a result of the adoption of SFAS No. 123R. Stock-based compensation expense capitalized as part of inventory as of December 31, 2006 was approximately $0.1 million. As of December 31, 2006, approximately $46.8 million of total unrecognized compensation cost related to stock options, restricted stock and ESPP shares are expected to be recognized over a weighted-average period of approximately two years.

Prior to the adoption of SFAS No. 123R, the Company measured compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by APB Opinion No. 25. The Company applied the disclosure provisions of SFAS No. 123, as amended by SFAS No. 148, *Accounting for Stock-Based Compensation — Transition and Disclosure* , as if the fair-value-based method had been applied in measuring stock-based compensation expense. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options was not less than the market price of the underlying stock on the date of the grant, no compensation expense was recognized.

F-13

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table illustrates the effect on net loss and basic and diluted net loss per share as if the Company had applied the fair value recognition provisions of SFAS No. 123 to stock-based compensation during the specified reporting periods (in thousands, except per share data):

| | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|
| Net loss as reported | $ (20,874) | $ (6,225) |
| Add: Stock-based compensation expense recorded | 270 | 844 |
| Less: Assumed stock-based compensation expense | (8,393) | (10,302) |
| Pro forma net loss | $ (28,997) | $ (15,683) |
| Basic and diluted net loss per share: | | |
| As reported | $ (0.52) | $ (0.17) |
| Pro forma | $ (0.72) | $ (0.44) |

SFAS No. 123R requires the use of a valuation model to calculate the fair-value of stock-based awards. The Company has elected to use the Black-Scholes-Merton option-pricing model, which incorporates various assumptions including volatility, expected life, and interest rates. The expected volatility is based on the historical volatility of the Company's common stock over the most recent period generally commensurate with the estimated expected life of the Company's stock options, adjusted for the impact of unusual fluctuations not reasonably expected to recur and other relevant factors. The expected life of an award is based on historical experience and on the terms and conditions of the stock awards granted to employees.

The assumptions used for the specified reporting periods and the resulting estimates of weighted-average fair value per share of options granted and for stock purchases under the ESPP during those periods are as follows:

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| Interest rate — stock options | 4.73% | 4.08% | 3.25% |
| Interest rate — stock purchases | 4.08 - 4.85% | 3.25 - 4.08% | 3.25 - 3.31% |
| Volatility — stock options | 76% | 90% | 97% |
| Volatility — stock purchases | 76 - 90% | 90 - 103% | 97 - 103% |
| Expected life — stock options | 6 years | 5 years | 5 years |
| Expected life — stock purchases | 6 - 12 months | 6 - 24 months | 6 - 12 months |
| Expected dividend yield | 0% | 0% | 0% |
| Weighted average fair value per share of options granted | $18.88 | $7.38 | $5.25 |
| Weighted average fair value per share of employee stock purchases | $4.76 | $1.81 | $1.36 |

F-14

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### *Net Income ( Loss) per Share*

Basic and diluted net income (loss) per common share is presented in conformity with SFAS No. 128, *Earnings per Share,* for all periods presented. In accordance with SFAS No. 128, basic net income (loss) per share is computed using the weighted-average number of shares of common stock outstanding during the period, less shares subject to repurchase. Diluted net income (loss) per share is typically computed using the weighted average number of common and dilutive common equivalent shares from stock options using the treasury stock method. The following table presents the calculation of weighted-average shares used to calculate basic and diluted net income (loss) per share (in thousands):

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| Weighted-average shares outstanding | 44,537 | 40,199 | 36,165 |
| Less: Weighted-average shares of common stock subject to repurchase | (36) | (52) | (320) |
| Weighted-average shares used in calculating basic net income (loss) per share | 44,501 | 40,147 | 35,845 |
| Plus: Effect of dilutive potential common shares | 4,253 | — | — |
| Weighted-average shares used in calculating diluted net income (loss) per share | 48,754 | 40,147 | 35,845 |

The total number of shares excluded from the calculation of diluted net loss per share, prior to application of the treasury stock method for options and shares of restricted stock, was 7,368,181 and 6,360,023 for the years ended January 1, 2006, and January 2, 2005, respectively, as their effect was antidilutive.

### *Comprehensive Income*

Comprehensive income is comprised of net income and other comprehensive income. Other comprehensive income includes unrealized gains and losses on the Company's available-for-sale securities that are excluded from net income, changes in the fair value of derivatives designated as effective as cash flow hedges, and foreign currency translation adjustments. The Company has disclosed comprehensive income as a component of stockholders' equity.

The components of accumulated other comprehensive income are as follows (in thousands):

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 |
|---|---|---|
| Foreign currency translation adjustments | 601 | 248 |
| Unrealized gain on available-for-sale securities, net of deferred tax | 10,693 | — |
| Unrealized gain on cash flow hedges | — | 10 |
| Total other comprehensive income | $ 11,294 | $ 258 |

F-15

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Acquisition of CyVera Corporation**

On April 8, 2005, the Company completed its acquisition of 100% of the voting equity interests of CyVera Corporation (CyVera). Pursuant to an Agreement and Plan of Merger, dated as of February 22, 2005 (the Merger Agreement), by and among Illumina, Semaphore Acquisition Sub, Inc., a Delaware corporation and wholly owned subsidiary of Illumina (Merger Sub), and CyVera, Merger Sub merged with and into CyVera, with CyVera surviving as a wholly owned subsidiary of Illumina. The results of CyVera's operations have been included in the Company's consolidated financial statements since the acquisition date of April 8, 2005.

CyVera was created in October 2003 to commercialize its technology and optical instrumentation/reader concepts (BeadXpress Reader). The Company believes that the CyVera technology, branded VeraCode, is highly complementary to the Company's own portfolio of products and services and will enhance the Company's capabilities to service its existing customers as well as accelerate the development of additional technologies, products and services. The Company believes that integrating CyVera's capabilities with the Company's technologies will better position the Company to address the emerging biomarker research and development and in-vitro and molecular diagnostic markets. The Company plans to begin shipments of its first products resulting from this acquisition during the first quarter of 2007.

Pursuant to the Merger Agreement, the Company issued 1.6 million shares (the Shares) of Illumina common stock, paid $2.3 million in cash and assumed the net liabilities of CyVera. In addition, the Company assumed the outstanding stock options of CyVera. Approximately 250,000 of the Shares were deposited into an escrow account with a bank to satisfy any claims for indemnification made by the Company or CyVera pursuant to the Merger Agreement. No claims for indemnification were made and the escrow agent released the shares from escrow during the second quarter of 2006.

The results of CyVera's operations have been included in the accompanying consolidated financial statements from the date of the acquisition. The total cost of the acquisition is as follows (in thousands):

| | |
|---|---|
| Fair market value of securities issued, net | $ 14,433 |
| Cash paid | 2,291 |
| Transaction costs | 681 |
| Fair market value of options assumed | 394 |
|    Total purchase price | $ 17,799 |

F-16

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The fair value of the Shares was determined based on the average closing price of the Company's common stock for five trading days preceding, and following, February 22, 2005 (the date the transaction was announced). The Company believes that this time period gives proper consideration to matters such as price fluctuations and quantities traded and represents a reasonable period before and after the date on which the terms of the acquisition were agreed. Based on these closing prices, the Company estimated the fair value of its common stock to be $9.167 per share, which equates to a total fair value of $14.4 million.

The final purchase price allocation is shown below (in thousands):

| | |
|---|---:|
| Cash | $ 4 |
| Prepaid expenses | 12 |
| Fixed assets | 349 |
| Deferred compensation on unvested stock options assumed | 196 |
| Accounts payable and accrued liabilities | (432) |
| Debt assumed | (255) |
| Net book value of net liabilities assumed | (126) |
| In-process research and development | 15,800 |
| Goodwill | 2,125 |
| | $17,799 |

F-17

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets,* the goodwill is not amortized, but will be subject to a periodic assessment for impairment by applying a fair-value-based test. None of this goodwill is expected to be deductible for tax purposes. The Company performs its annual test for impairment of goodwill in May of each year. The Company is required to perform a periodic assessment between annual tests in certain circumstances. The Company has performed its annual test of goodwill as of May 1, 2006 and has determined there was no impairment of goodwill during 2006.

The Company allocated $15.8 million of the purchase price to in-process research and development projects. In-process research and development (IPR&D) represents the valuation of acquired, to-be-completed research projects. At the acquisition date, CyVera's ongoing research and development initiatives were primarily involved with the development of its VeraCode technology and the BeadXpress Reader. These two projects were approximately 50% and 25% complete at the date of acquisition, respectively. As of December 31, 2006, these two projects were approximately 90% and 80% complete, respectively.

The value assigned to purchased IPR&D was determined by estimating the costs to develop the acquired technology into commercially viable products, estimating the resulting net cash flows from the projects, and discounting the net cash flows to their present value. The revenue projections used to value the IPR&D were, in some cases, reduced based on the probability of developing a new technology, and considered the relevant market sizes and growth factors, expected trends in technology, and the nature and expected timing of new product introductions by the Company and its competitors. The resulting net cash flows from such projects are based on the Company's estimates of cost of sales, operating expenses, and income taxes from such projects. The rates utilized to discount the net cash flows to their present value were based on estimated cost of capital calculations. Due to the nature of the forecast and the risks associated with the projected growth and profitability of the developmental projects, discount rates of 30% were considered appropriate for the IPR&D. The Company believes that these discount rates were commensurate with the projects' stage of development and the uncertainties in the economic estimates described above.

If these projects are not successfully developed, the sales and profitability of the combined company may be adversely affected in future periods. The Company believes that the foregoing assumptions used in the IPR&D analysis were reasonable at the time of the acquisition. No assurance can be given, however, that the underlying assumptions used to estimate expected project sales, development costs or profitability, or the events associated with such projects, will transpire as estimated. At the date of acquisition, the development of these projects had not yet reached technological feasibility, and the research and development in progress had no alternative future uses. Accordingly, these costs were charged to expense in the second quarter of 2005.

The following unaudited pro forma information shows the results of the Company's operations for the years ended January 1, 2006 and January 2, 2005 as though the acquisition had occurred as of the beginning of the periods presented (in thousands, except per share data):

|  | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|
| Revenue | $   73,501 | $   50,583 |
| Net loss | (6,234) | (9,965) |
| Net loss per share, basic and diluted | (0.15) | (0.27) |

F-18

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The pro forma results have been prepared for comparative purposes only and are not necessarily indicative of the actual results of operations had the acquisition taken place as of the beginning of the periods presented, or the results that may occur in the future. The pro forma results exclude the non- cash acquired IPR&D charge recorded upon the closing of the acquisition during the second quarter of 2005.

**Recent Accounting Pronouncements**

In July 2006, the Financial Accounting Standards Board (FASB) issued FASB Interpretation (FIN) No. 48, *Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109* , which clarifies the accounting for uncertainty in tax positions. FIN No. 48 requires that the Company recognize the impact of a tax position in its financial statements if that position is more likely than not of being sustained on audit, based on the technical merits of the position. The provisions of FIN No. 48 are effective as of the beginning of the Company's 2007 fiscal year, with the cumulative effect of the change in accounting principle recorded as an adjustment to opening retained earnings. The Company does not expect the adoption of FIN No. 48 to have a material impact on its consolidated results of operations and financial position, and the Company is continuing to evaluate the impact, if any, the adoption of FIN No. 48 will have on its disclosure requirements.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements.* SFAS No. 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. This Statement applies only to fair value measurements that are already required or permitted by other accounting standards. Accordingly, this Statement does not require any new fair value measurements. SFAS No. 157 is effective for fiscal years beginning after December 15, 2007. The Company is currently evaluating the impact, if any, the adoption of SFAS No. 157 will have on its consolidated results of operations and financial position.

**2. Balance Sheet Account Details**

The following is a summary of short-term investments as of December 31, 2006 (in thousands):

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| U.S. Treasury securities and obligations of U.S. government agencies | $ 9,498 | $ 5 | $ (9) | $ 9,494 |
| Debt securities issued by the states of the United States and political subdivisions of the states | 17,200 | — | — | 17,200 |
| Corporate debt securities | 65,787 | 7 | (70) | 65,724 |
| Total | $ 92,485 | $ 12 | $ (79) | $ 92,418 |

F-19

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Gross realized losses on sales of available-for-sale securities totaled approximately $35,000, $0 and $0 for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively. As of December 31, 2006, all of the Company's investments in a gross unrealized loss position had been in such position for less than 12 months.

The Company also recorded an unrealized gain, net of tax, of $10.8 million as of December 31, 2006, related to the investment in common stock of Solexa (see Note 10). The net unrealized gain is classified as a part of accumulated other comprehensive income in the stockholders' equity section of the consolidated balance sheet.

Contractual maturities of short-term investments at December 31, 2006 were as follows (in thousands):

|  | Estimated Fair Value |
| --- | --- |
| Due within one year | $ 20,250 |
| After one but within five years | 72,168 |
| Total | $ 92,418 |

Accounts receivable consist of the following (in thousands):

|  | December 31, 2006 | January 1, 2006 |
| --- | --- | --- |
| Accounts receivable from product and service sales | $ 39,627 | $ 17,055 |
| Notes receivable from product sales | 112 | 441 |
| Accounts receivable from government grants | 167 | 180 |
| Other receivables | 416 | 257 |
|  | 40,322 | 17,933 |
| Allowance for doubtful accounts | (338) | (313) |
| Total | $ 39,984 | $ 17,620 |

Inventory, net, consists of the following (in thousands):

|  | December 31, 2006 | January 1, 2006 |
| --- | --- | --- |
| Raw materials | $ 8,365 | $ 4,575 |
| Work in process | 8,907 | 4,546 |
| Finished goods | 2,897 | 1,188 |
| Total | $ 20,169 | $ 10,309 |

F-20

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Property and equipment consist of the following (in thousands):

| | December 31, 2006 | January 1, 2006 |
|---|---|---|
| Leasehold improvements | $ 1,760 | $ 819 |
| Manufacturing and laboratory equipment | 30,523 | 19,430 |
| Computer equipment and software | 10,383 | 8,121 |
| Furniture and fixtures | 3,114 | 2,139 |
| | 45,780 | 30,509 |
| Accumulated depreciation and amortization | (20,146) | (14,378) |
| Total | $ 25,634 | $ 16,131 |

Depreciation expense was $6.1 million, $3.8 million and $3.7 million for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively.

Accrued liabilities consist of the following (in thousands):

| | December 31, 2006 | January 1, 2006 |
|---|---|---|
| Compensation | $ 8,239 | $ 4,922 |
| Legal and other professional fees | 3,831 | 2,311 |
| Taxes | 1,804 | 939 |
| Reserve for product warranties | 996 | 751 |
| Customer deposits | 3,703 | 1,361 |
| Short-term deferred revenue | 3,382 | 1,937 |
| Short-term deferred gain on sale of building | 375 | 375 |
| Other | 1,530 | 1,614 |
| Total | $ 23,860 | $ 14,210 |

## 3.  Derivative Financial Instruments

SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities,* requires that all derivatives be recognized on the balance sheet at their fair value. Changes in the fair value of derivatives are recorded each period in current earnings or other comprehensive income, depending on whether a derivative is designated as part of a hedge transaction and, if it is, the type of hedge transaction. The Company assesses, both at its inception and on an on-going basis, whether the derivatives that are used in hedging transactions are highly effective in offsetting the changes in cash flows of hedged items. The Company also assesses hedge ineffectiveness on a quarterly basis and records the gain or loss related to the ineffective portion to current earnings to the extent significant.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Periodically, the Company hedges significant foreign currency firm sales commitments and accounts receivable with forward contracts. The Company only uses derivative financial instruments to reduce foreign currency exchange rate risks; the Company does not hold any derivative financial instruments for trading or speculative purposes. The Company primarily uses forward exchange contracts to hedge foreign currency exposures and they generally have terms of one year or less. These contracts have been designated as cash flow hedges and accordingly, to the extent effective, any unrealized gains or losses on these foreign currency forward contracts are reported in other comprehensive income. Realized gains and losses for the effective portion are recognized with the underlying hedge transaction. As of December 31, 2006, the Company had no foreign currency forward contracts outstanding. The notional settlement amount of the foreign currency forward contracts outstanding at December 31, 2006 and January 1, 2006 were $0 and $0.1 million, respectively. As of January 1, 2006, the Company had one outstanding contract with an immaterial fair value, representing an unrealized gain, and was included in other current assets at January 1, 2006. The Company settled foreign exchange contracts of $0.1 million and $5.2 million for the years ended December 31, 2006 and January 1, 2006, respectively. The Company did not hold any derivative financial instruments prior to fiscal 2004.

On February 16, 2007, the Company issued $400 million principal amount of 0.625% Convertible Senior Notes due 2014 (the Notes), which included the exercise of the initial purchasers' option to purchase up to an additional $50 million aggregate principal amount of Notes. In connection with the offering of the notes, the Company entered into convertible note hedge transactions with the initial purchasers and/or their affiliates (the counterparties) entitling the Company to purchase shares of the Company's common stock at an initial strike price of $43.66 per share, subject to adjustment. In addition, the Company sold to these counterparties warrants to acquire shares of the Company's common stock at an initial strike price of $62.87 per share, subject to adjustment. See Note 15 for further discussion of these transactions.

## 4. Warranties and Maintenance Contracts

The Company generally provides a one-year warranty on genotyping and gene expression systems. At the time revenue is recognized, the Company establishes an accrual for estimated warranty expenses associated with system sales. This expense is recorded as a component of cost of product revenue. Estimated warranty expenses associated with extended maintenance contracts are recorded as cost of revenue ratably over the term of the maintenance contract.

Changes in the Company's warranty liability during the three years ended December 31, 2006 are as follows (in thousands):

| | |
|---|---:|
| Balance as of December 28, 2003 | $ 230 |
| Additions charged to cost of revenue | 603 |
| Repairs and replacements | (446) |
| Balance as of January 2, 2005 | 387 |
| Additions charged to cost of revenue | 1,094 |
| Repairs and replacements | (730) |
| Balance as of January 1, 2006 | 751 |
| Additions charged to cost of revenue | 1,379 |
| Repairs and replacements | (1,134) |
| Balance as of December 31, 2006 | $ 996 |

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**5. Commitments and Long-term Debt**

*Building Loan*

In July 2000, the Company entered into a 10-year lease to rent space in two newly constructed buildings in San Diego that are now occupied by the Company. That lease contained an option to purchase the buildings together with certain adjacent land that has been approved for construction of an additional building. The Company exercised that option and purchased the properties in January 2002 and assumed a $26.0 million, 10-year mortgage on the property at a fixed interest rate of 8.36%. The Company made monthly payments of $208,974, representing interest and principal, through August 2004. The Company did not record interest expense related to this loan for the years ended December 31, 2006 or January 1, 2006. Interest expense related to this loan was $1.4 million for the year ended January 2, 2005.

In June 2004, the Company entered into a conditional agreement to sell its land and buildings for $42.0 million and to lease back such property for an initial term of ten years. The sale was completed in August 2004 at which time the lease was signed. After the repayment of the remaining $25.2 million debt and other related transaction expenses, the Company received $15.5 million in net cash proceeds. The Company removed the land and net book value of the buildings of $36.9 million from its balance sheet, deferred the resulting $3.7 million gain on the sale of the property, and is amortizing the deferred gain over the lease term in accordance with SFAS No. 13, *Accounting for Leases.*

The Company leased a portion of the space to a tenant under a lease which expired in June 2004. Rental income was recorded as an offset to the Company's facility costs. There was no rental income for the years ended December 31, 2006 and January 1, 2006. For the year ended January 2, 2005, rental income was $409,517.

*Capital Leases*

In April 2000, the Company entered into a $3,000,000 loan arrangement to be used at its discretion to finance purchases of capital equipment. The loan was secured by the capital equipment financed. As of January 1, 2005, all loan payments were made, the underlying equipment was purchased and the loan arrangement was closed. Depreciation of equipment under capital leases was included in depreciation expense. Interest expense related to capital leases was $10,500 for the year ended January 2, 2005. The Company did not have any capital leases during the years ended December 31, 2006 and January 1, 2006.

*Operating Leases*

In August 2004, the Company entered into a ten-year lease for its San Diego facility after the land and building were sold (as discussed above). Under the terms of the lease, the Company paid a $1.9 million security deposit and is paying monthly rent of $318,643 for the first year with an annual increase of 3% in each subsequent year through 2014. The current monthly rent under this lease is $338,048. On February 14, 2007, the Company extended this lease. The terms of the new lease provide for monthly rent increases each year to a maximum of $504,710 per month during the last year of the lease, which is now 2023. The Company has the option to extend the term of the lease for three additional five-year periods. In accordance with SFAS No. 13, the Company records rent expense on a straight-line basis and the resulting deferred rent is included in other long-term liabilities in the accompanying consolidated balance sheet.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As of December 31, 2006, the Company also leased an office and laboratory facility in Connecticut, additional office, distribution and storage facilities in San Diego, and four foreign facilities located in Japan, Singapore, China and the Netherlands under non-cancelable operating leases that expire at various times through June 2011. These leases contain renewal options ranging from one to five years.

As of December 31, 2006, annual future minimum payments under these operating leases were as follows (in thousands):

| | |
|---|---:|
| 2007 | 5,320 |
| 2008 | 5,335 |
| 2009 | 5,075 |
| 2010 | 4,659 |
| 2011 | 4,712 |
| 2012 and thereafter | 12,798 |
| Total | $ 37,899 |

Rent expense, net of amortization of the deferred gain on sale of property, was $4,723,041, $4,737,218, and $1,794,234 for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively.

## 6. Stockholders' Equity

### Common stock

As of December 31, 2006, the Company had 46,857,512 shares of common stock outstanding, of which 4,814,744 shares were sold to employees and consultants subject to restricted stock agreements. The restricted common shares vest in accordance with the provisions of the agreements, generally over five years. All unvested shares are subject to repurchase by the Company at the original purchase price. As of December 31, 2006, 36,000 shares of common stock were subject to repurchase. In addition, the Company also issued 12,000 shares for a restricted stock award to an employee under the Company's new 2005 Stock and Incentive Plan based on service performance. These shares vest monthly over a three-year period.

### Stock Options

*2005 Stock and Incentive Plan*

In June 2005, the stockholders of the Company approved the 2005 Stock and Incentive Plan (the 2005 Stock Plan). Upon adoption of the 2005 Stock Plan, issuance of options under the Company's existing 2000 Stock Plan ceased. The 2005 Stock Plan provides that an aggregate of up to 11,542,358 shares of the Company's common stock be reserved and available to be issued. In addition, the 2005 Stock Plan provides for an automatic annual increase in the shares reserved for issuance by the lesser of 5% of outstanding shares of the Company's common stock on the last day of the immediately preceding fiscal year, 1,200,000 shares or such lesser amount as determined by the Company's board of directors.

F-24

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The Company's stock option activity under all stock option plans from December 28, 2003 through December 31, 2006 is as follows:

|  | Options | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 28, 2003 | 5,228,874 | $ | 6.95 |
| Granted | 1,453,400 | $ | 7.08 |
| Exercised | (139,768) | $ | 1.98 |
| Cancelled | (337,486) | $ | 8.80 |
| Outstanding at January 2, 2005 | 6,205,020 | $ | 6.99 |
| Granted | 2,992,300 | $ | 10.02 |
| Exercised | (869,925) | $ | 4.66 |
| Cancelled | (1,001,964) | $ | 11.00 |
| Outstanding at January 1, 2006 | 7,325,431 | $ | 7.96 |
| Granted | 2,621,050 | $ | 27.24 |
| Exercised | (1,273,119) | $ | 7.28 |
| Cancelled | (314,242) | $ | 12.44 |
| Outstanding at December 31, 2006 | 8,359,120 | $ | 13.94 |

At December 31, 2006, options to purchase approximately 2,901,704 shares were exercisable and 2,764,566 shares remain available for future grant.

Following is a further breakdown of the options outstanding as of December 31, 2006:

| Range of Exercise Prices | Options Outstanding | Weighted Average Remaining Life in Years | Weighted Average Exercise Price | | Options Exercisable | Weighted Average Exercise Price of Options Exercisable | |
|---|---|---|---|---|---|---|---|
| $0.03 - 5.75 | 1,475,729 | 6.22 | $ | 3.85 | 964,006 | $ | 3.65 |
| $5.99 - 8.30 | 1,455,333 | 6.04 | $ | 7.00 | 686,164 | $ | 7.32 |
| $8.35 - 9.40 | 1,465,961 | 7.75 | $ | 8.67 | 451,603 | $ | 8.78 |
| $9.44 - 20.03 | 1,408,012 | 7.55 | $ | 12.67 | 589,545 | $ | 12.23 |
| $20.97 - 26.92 | 1,417,584 | 9.01 | $ | 22.18 | 175,329 | $ | 21.30 |
| $26.94 - 45.69 | 1,136,501 | 9.58 | $ | 34.00 | 35,057 | $ | 35.18 |
| $ 0.03 - 45.69 | 8,359,120 | 7.61 | $ | 13.94 | 2,901,704 | $ | 8.51 |

F-25

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The aggregate intrinsic value of options outstanding and options exercisable as of December 31, 2006 was $212.3 million and $89.4 million, respectively. Aggregate intrinsic value represents the difference between the Company's closing stock price on the last trading day of the fiscal period, which was $39.31 as of December 29, 2006, and the exercise price multiplied by the number of options outstanding. Total intrinsic value of options exercised was $34.0 million for the year ended December 31, 2006.

*2000 Employee Stock Purchase Plan*

In February 2000, the board of directors and stockholders adopted the 2000 Employee Stock Purchase Plan (the Purchase Plan). A total of 4,827,988 shares of the Company's common stock have been reserved for issuance under the Purchase Plan. The Purchase Plan permits eligible employees to purchase common stock at a discount, but only through payroll deductions, during defined offering periods.

The price at which stock is purchased under the Purchase Plan is equal to 85% of the fair market value of the common stock on the first or last day of the offering period, whichever is lower. The initial offering period commenced in July 2000. In addition, beginning with fiscal 2001, the Purchase Plan provides for annual increases of shares available for issuance by the lesser of 3% of the number of outstanding shares of the Company's common stock on the last day of the immediately preceding fiscal year, 1,500,000 shares or such lesser amount as determined by the Company's board of directors. 266,394, 717,164 and 585,855 shares were issued under the 2000 Employee Stock Purchase Plan during fiscal 2006, 2005 and 2004, respectively. As of December 31, 2006, there were 2,762,936 shares available for issuance under the Purchase Plan.

**Stockholder Rights Plan**

On May 3, 2001, the Board of Directors of the Company declared a dividend of one preferred share purchase right (a Right) for each outstanding share of common stock of the Company. The dividend was payable on May 14, 2001 (the Record Date) to the stockholders of record on that date. Each Right entitles the registered holder to purchase from the Company one unit consisting of one-thousandth of a share of its Series A Junior Participating Preferred Stock at a price of $100 per unit. The Rights will be exercisable if a person or group hereafter acquires beneficial ownership of 15% or more of the outstanding common stock of the Company or announces an offer for 15% or more of the outstanding common stock. If a person or group acquires 15% or more of the outstanding common stock of the Company, each Right will entitle its holder to purchase, at the exercise price of the right, a number of shares of common stock having a market value of two times the exercise price of the right. If the Company is acquired in a merger or other business combination transaction after a person acquires 15% or more of the Company's common stock, each Right will entitle its holder to purchase, at the Right's then-current exercise price, a number of common shares of the acquiring company which at the time of such transaction have a market value of two times the exercise price of the right. The Board of Directors will be entitled to redeem the Rights at a price of $0.01 per Right at any time before any such person acquires beneficial ownership of 15% or more of the outstanding common stock. The rights expire on May 14, 2011 unless such date is extended or the rights are earlier redeemed or exchanged by the Company.

**7.  Legal Proceedings**

The Company has incurred substantial costs in defending itself against patent infringement claims, and expects to devote substantial financial and managerial resources to protect its intellectual property and to defend against the claims described below as well as any future claims asserted against it.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Affymetrix Litigation*

On July 26, 2004, Affymetrix, Inc. (Affymetrix) filed a complaint in the U.S. District Court for the District of Delaware alleging that the use, manufacture and sale of the Company's BeadArray products and services, including the Company's Array Matrix and BeadChip products, infringe six Affymetrix patents. Affymetrix seeks an injunction against the sale of products, if any, that are determined to be infringing these patents, unspecified monetary damages, interest and attorneys' fees. On September 15, 2004, the Company filed its answer to Affymetrix' complaint, seeking declaratory judgments from the court that it does not infringe the Affymetrix patents and that such patents are invalid, and the Company filed counterclaims against Affymetrix for unfair competition and interference with actual and prospective economic advantage.

On February 15, 2006, the court allowed the Company to file its first amended answer and counterclaims, adding allegations of inequitable conduct with respect to all six asserted Affymetrix patents, violation of Section 2 of the Sherman Act, and unclean hands. In March 2006, Affymetrix notified the Company of its decision to drop one of the six patents from the suit, and of its intention to assert infringement of certain additional claims of the remaining five patents. The Company has filed a motion to preclude Affymetrix from asserting infringement of those additional claims. That motion is still pending at this time. On June 30, 2006, the court dismissed the patent Affymetrix had sought to withdraw from the suit. Affymetrix and the Company filed summary judgment motions by the July 14, 2006 court-established deadline. On August 16, 2006, the court issued a ruling on the Markman (claim construction) hearing it had held on April 20, 2006. The Company believes the court's Markman opinion construed several key claim terms in favor of the Company and did not adversely affect the Company's defenses and pending counterclaims in any material respect. At the request of the parties, trial has been rescheduled to March 5, 2007 from October 16, 2006. A pre-trial conference was held on February 8, 2007 during which the court established a multi-phase trial structure with the first phase of the trial to begin on March 5, 2007, and addressed related issues. The Company believes it has meritorious defenses against each of the infringement claims alleged by Affymetrix and intends to defend vigorously against this suit. However, the Company cannot be sure that it will prevail in this matter. Any unfavorable determination, and in particular, any significant cash amounts required to be paid by the Company or prohibition of the sale of its products and services, could result in a material adverse effect on its business, financial condition and results of operations.

*Dr. Anthony W. Czarnik v. Illumina, Inc.*

On June 15, 2005, Dr. Anthony Czarnik, a former employee, filed suit against the Company in the U.S. District Court for the District of Delaware seeking correction of inventorship of certain of the Company's patents and patent applications, and alleging that the Company committed inequitable conduct and fraud in not naming him as an inventor. Dr. Czarnik seeks an order requiring the Company and the U.S. Patent and Trademark Office to correct the inventorship of certain of the Company's patents and patent applications by adding Dr. Czarnik as an inventor, a judgment declaring certain of the Company's patents and patent applications unenforceable, unspecified monetary damages and attorney's fees. On August 4, 2005, the Company filed a motion to dismiss the complaint for lack of standing and failure to state a claim. While this motion was pending, Dr. Czarnik filed an amended complaint on September 23, 2005. On October 7, 2005, the Company filed a motion to dismiss the amended complaint for lack of standing and failure to state a claim. On July 13, 2006, the court granted the Company's motion to dismiss the counts of Dr. Czarnik's complaint dealing with correction of inventorship in pending applications and inequitable conduct. On July 27, 2006, the Company filed its answer to the two remaining counts of the amended complaint (correction of inventorship in issued patents, and fraud). There has been no trial date set for this case. The Company believes it has meritorious defenses against these claims.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Applied Biosystems Litigation

On December 26, 2006, the Applied Biosystems Group of Applera Corporation filed suit against Solexa, which the Company acquired in a stock-for-stock merger on January 26, 2007. Applied Biosystems' action against Solexa, which was filed in California state court in Santa Clara County, seeks ownership of patents covering Sequencing-by-Ligation technologies. Solexa filed its answer to the complaint by the required deadline. The patents at issue were assigned in 1995 to Solexa's predecessor company (Lynx Therapeutics) by a former employee, Dr. Stephen Macevicz, who is named as a co-defendant in the suit. Lynx, which was originally a unit of Applied Biosystems, was spun out of Applied Biosystems in 1992. The patents at issue in the suit relate to methods for sequencing DNA using successive rounds of oligonucleotide probe ligation (Sequencing-by-Ligation). The Company's new Illumina Genome Analyzer system uses a different technology, DNA Sequencing-by-Synthesis (SBS), which the Company believes is not covered by any of the patents at issue in the suit. The Company also believes that the MPSS technology used by Lynx did not use the methods covered by these patents, and in any event Solexa no longer uses the MPSS technologies. The Company believes the suit is not material to its current or future business, and the Company has no plans to use any of the Sequencing-by-Ligation technologies covered by the patents at issue in the suit. Applied Biosystems does not assert any claim for patent infringement in the suit.

### Termination-of-Employment Lawsuit

In March 2001, a complaint seeking damages of an unspecified amount was filed against the Company by Dr. Anthony W. Czarnik, a former employee, in the Superior Court of the State of California in connection with the employee's termination of employment with the Company. In June 2002, a California Superior Court judgment was rendered against the Company and the Company recorded a $7.7 million charge in its financial results for the second quarter of 2002 to cover total damages and remaining expenses. The Company appealed the decision, and in December 2004, the Fourth Appellate District Court of Appeal, in San Diego, California, reduced the amount of the award. The Company recorded interest expense on the $7.7 million during the appeal based on the statutory rate. As a result of the revised judgment, the Company reduced the $9.2 million liability on its balance sheet to $5.9 million and recorded a gain of $3.3 million as a litigation judgment in the fourth quarter of 2004. In January 2005, the Company paid the $5.9 million and removed the liability from its balance sheet.

### Litigation with Applera Corporation's Applied Biosystems Group

In 1999, the Company entered into a joint development agreement with Applied Biosystems Group, an operating group of Applera Corporation, under which the companies agreed to jointly develop a SNP genotyping system that would combine the Company's BeadArray technology with Applied Biosystems' assay chemistry and scanner technology. In conjunction with the agreement, Applied Biosystems agreed to provide the Company with non-refundable research and development support of $10.0 million, all of which was paid by December 2001 and recorded as a liability on the Company's balance sheet as of January 2, 2005. In December 2002, Applied Biosystems initiated a patent infringement suit and sought to compel arbitration of an alleged breach of the joint development agreement. The Company initiated a suit in state court seeking to enjoin the arbitration and alleged that Applied Biosystems had breached the joint development agreement. In August 2004, the Company entered into a settlement and cross-license agreement with Applera. As a result of the settlement, the Company removed the $10.0 million liability from its balance sheet, made a payment of $8.5 million to Applera and recorded a gain of $1.5 million as a litigation settlement.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### 8.  Collaborative Agreements

#### *Invitrogen Corporation*

In December 2004, the Company entered into a strategic collaboration with Invitrogen Corporation (Invitrogen). The goal of the collaboration is to combine the Company's expertise in oligonucleotide manufacturing with the sales, marketing and distribution capabilities of Invitrogen. In connection with the collaboration, the Company has developed the next generation Oligator DNA synthesis technology. This technology includes both plate- and tube-based capabilities. Under the terms of the agreement, Invitrogen paid the Company an upfront non-refundable collaboration payment of $2.3 million during the first quarter of 2005. Additionally, Invitrogen made a milestone payment of $1.1 million to the Company in November 2005 upon achievement of a milestone event under the terms of the collaboration.

The Company began manufacturing and shipping the plate-based and certain tube-based oligo products under the collaboration in the third quarter of 2005 and, therefore, has begun to amortize the upfront collaboration payment of $2.3 million as product revenue over the life of the agreement on a straight-line basis. The unamortized portion of the collaboration payment has been recorded as short- and long-term deferred revenue. The Company recorded the $1.1 million milestone payment in service and other revenue upon achievement of the milestone during the fourth quarter of 2005. The Company recorded revenue related to this milestone payment upon its achievement, as evidenced by acknowledgment from Invitrogen and due to the fact that (i) the milestone event is substantive and its achievability was not reasonably assured at the inception of the agreement, (ii) the milestone represents the culmination of an earnings process, (iii) the milestone payment is non-refundable and (iv) the performance obligations for both the Company and Invitrogen after the milestone achievement will continue at a level comparable to the level before the milestone achievement. In addition, the agreement provides for the transfer of the Company's Oligator technology into two Invitrogen facilities outside North America. The Company recognizes product revenue upon shipment of collaboration products based on the Company's actual manufacturing cost. Collaboration profit, as defined in the collaboration agreement, from the sale of collaboration products is divided equally between the two companies and is recorded as product revenue.

#### *deCODE genetics*

In May 2006, the Company and deCODE genetics, ehf. (deCODE) executed a Joint Development and Licensing Agreement (the Development Agreement). Pursuant to the Development Agreement, the parties agreed to collaborate exclusively to develop, validate and commercialize specific diagnostic tests for variants in genes involved in three disease-related pathways: the gene-encoding leukotriene A4 hydrolase, linked to heart attack; the gene-encoding transcription factor 7-like 2 (TCF7L2), linked to type 2 diabetes; and the gene-encoding BARD1, linked to breast cancer. The Company and deCODE are developing diagnostic tests based on these variants for use on the Company's BeadXpress system.

F-29

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Under the agreement, the Company will be responsible for the manufacturing, marketing and selling of the diagnostic products. The companies will share the development costs of these products and split the profits from sales of the diagnostics tests. The Development Agreement may be terminated as to a particular product under development if one party decides to discontinue funding the development of that product, and may be terminated in whole by either party if the other party commits an uncured material breach, files for bankruptcy or becomes insolvent. Under a separate supply agreement, the Company installed instrumentation at deCODE that will enable deCODE to perform whole genome association studies on up to 100,000 samples using the Company's Sentrix HumanHap300 BeadChips and associated reagents. The Company has deferred approximately $2.0 million of revenue for instruments installed during the third quarter of 2006 under guidance provided by SFAS No. 48, *Revenue Recognition When Right of Return Exists.* This amount is classified as a long-term liability as of December 31, 2006. The Company has also deferred approximately $1.3 million of costs related to product shipments to deCODE, which are classified as a long-term asset as of December 31, 2006.

### *International HapMap Project*

The Company was the recipient of a grant from the National Institutes of Health covering its participation in the first phase of the International HapMap Project, which is a $100 million, internationally funded successor project to the Human Genome Project that will help identify a map of genetic variations that may be used to perform disease-related research. The Company was awarded a $9.1 million grant from the National Institutes of Health in September 2002 to perform genotyping services in connection with the first phase of the International HapMap Project that covered basic research activities, the development of SNP assays and the genotyping performed on those assays. For the year ending December 31, 2006, the Company did not record any revenue related to this project. For the years ending January 1, 2006 and January 2, 2005, the Company recorded revenue related to this project totaling $0.8 million and $4.6 million, respectively.

F-30

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**9.  Investment in Genizon BioSciences Inc.**

In January 2006, Genizon BioSciences Inc. (Genizon), a Canadian company focused on gene discovery, purchased from the Company approximately $1.9 million in equipment and committed to purchase an additional $4.3 million in consumables. The Company understands that Genizon is using the Company's HumanHap300 BeadChip along with the Infinium assay to perform whole-genome association studies involving thousands of members of the Quebec Founder Population. The goal of the studies is to provide understanding of the genetic origins and mechanisms of common diseases which may then lead to possible drug targets.

In March 2006, the Company entered into a Subscription Agreement for Secured Convertible Debentures with Genizon. Pursuant to the agreement, the Company purchased a secured convertible debenture (the debenture) of Genizon and certain warrants for CDN$3.5 million (approximately U.S. $3.0 million).

The debenture is convertible, automatically upon the occurrence of a "liquidity event," as defined in the debenture, into Class H Preferred Shares of Genizon. Upon the occurrence of certain events, Illumina may be entitled to receive additional shares of Genizon's Class H Preferred Shares. The debenture matures two years from issuance and bears interest, payable semiannually, at a rate of 5% per annum for the first year and 12.5% per annum for the second year. Unless the debenture is converted before maturity, 112.5% of the principal amount of the debenture is due upon maturity. The Company also received warrants to purchase 226,721 shares of Genizon Class H Preferred Shares at an exercise price of $1.5437 per share.

As of December 31, 2006, the debenture was recorded at face value, which is the fair value, and is classified in accordance with SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities* , as an available-for-sale security.

The Company has concluded that the purchase of the debenture and the concurrent purchase by Genizon of the Company's products are "linked" transactions under guidance contained in EITF Since the transactions are considered "linked," the Company has deferred approximately $3.0 million of revenue (the face value of the Debentures) as of December 31, 2006, related to the Genizon product shipments. The deferred revenue is classified as a long-term liability as of December 31, 2006. This amount is expected to remain in deferred revenue until Genizon settles the Debenture in cash or when a liquidity event occurs that generates cash or a security that is readily convertible into cash. The Company has also deferred approximately $1.1 million of costs related to product shipments to Genizon as a long-term asset as of December 31, 2006. All Genizon shipments that generate revenue over the face value of the debenture will be evaluated under the Company's revenue recognition policy, which is outlined in Note 1.

**10.  Investment in Solexa**

On November 12, 2006, the Company entered into a definitive securities purchase agreement with Solexa in which the Company invested approximately $50 million in Solexa in exchange for 5,154,639 newly issued shares of Solexa common stock in conjunction with the merger of the two companies, completed on January 26, 2007. This investment was valued at $67.8 million as of December 31, 2006, which represented a market value of $13.15 per share of Solexa common stock.

F-31

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**11.  Income Taxes**

The provision for income taxes consists of the following (in thousands):

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 1,125 | $ — | $ — |
| State | 1,177 | — | — |
| Foreign | 903 | 105 | 135 |
| Total current provision | 3,205 | 105 | 135 |
| Deferred: | | | |
| Federal | — | — | — |
| State | — | — | — |
| Foreign | (553) | 58 | — |
| Total deferred provision | (553) | 58 | — |
| Total tax provision | $ 2,652 | $ 163 | $ 135 |

The provision for income taxes reconciles to the amount computed by applying the federal statutory rate to income before taxes as follows (in thousands):

| | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| Tax at federal statutory rate | $ 14,945 | $ (7,043) | $ (2,179) |
| State, net of federal benefit | 767 | 633 | (336) |
| Alternative minimum tax | 1,125 | — | — |
| Research and other credits | (1,900) | (1,239) | 34 |
| Acquired in-process research & development | — | 5,372 | — |
| Adjustments to deferred tax balances | (3,509) | 2,952 | — |
| Change in valuation allowance | (10,038) | (1,138) | 2,330 |
| Permanent differences | 818 | (226) | (264) |
| Other | 444 | 852 | 550 |
| Total tax provision | $ 2,652 | $ 163 | $ 135 |

F-32

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | December 31, 2006 | January 1, 2006 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating losses | $ 13,728 | $ 37,801 |
| Tax credits | 10,831 | 6,634 |
| Deferred revenue | 2,859 | 1,037 |
| Capitalized research and development costs | 1,290 | 1,523 |
| Accruals and reserves | 2,491 | 1,729 |
| Stock compensation | 4,736 | — |
| Other | 2,592 | 1,952 |
| Total deferred tax assets | 38,527 | 50,676 |
| Valuation allowance on deferred tax assets | (36,458) | (49,542) |
| Net deferred tax assets | 2,069 | 1,134 |
| Deferred tax liabilities: | | |
| Property and equipment | (1,516) | (1,134) |
| Net unrealized gain on investments | (6,987) | — |
| Total deferred tax liabilities | (8,503) | (1,134) |
| Net deferred tax liabilities | $ (6,434) | $ — |

F-33

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

A valuation allowance is established when it is more likely than not the future realization of all or some of the deferred tax assets will not be achieved. The evaluation of the need for a valuation allowance is performed on a jurisdiction by jurisdiction basis, and includes a review of all available positive and negative evidence. Based upon the available evidence as of December 31, 2006, the Company is not able to conclude it is more likely than not the remaining deferred tax assets in the U.S. will be realized. Therefore, the Company has recorded a full valuation allowance against the U.S. deferred tax assets of approximately $36.5 million.

A deferred tax liability of approximately $7.0 million has been recorded against the unrealized gain on the investment in Solexa, which is included in accumulated other comprehensive income, as of December 31, 2006.

As of December 31, 2006, the Company had net operating loss carryforwards for federal and state tax purposes of approximately $76.4 million and $39.1 million respectively; which begin to expire in 2022 and 2013 respectively, unless previously utilized. In addition, the Company also had U.S. federal and state research and development tax credit carryforwards of approximately $6.4 million and $6.3 million respectively; which begin to expire in 2018 and 2019 respectively, unless previously utilized.

Pursuant to Section 382 and 383 of the Internal Revenue Code, utilization of the Company's net operating losses and credits may be subject to annual limitations in the event of any significant future changes in it's ownership structure. These annual limitations may result in the expiration of net operating losses and credits prior to utilization. Previous limitations due to Section 382 and 383 have been reflected in the deferred tax assets as of December 31, 2006.

Included in the deferred tax assets as of December 31, 2006 are approximately $2.7 million of pre-acquisition deferred tax assets of CyVera Corporation. To the extent these assets are recognized, the adjustment will be applied first to reduce to zero any goodwill related to the acquisition, and then as a reduction to the income tax provision.

Not included in the deferred tax assets as of December 31, 2006 is approximately $14.7 million of tax benefits related to employee stock plans. When realized, the tax benefit of these assets will be accounted for as a credit to additional paid-in capital, rather than a reduction of the income tax provision.

Residual United States income taxes have not been provided on approximately $0.8 million of undistributed earnings of foreign subsidiaries as of December 31, 2006 since the earnings are considered to be permanently invested in the operations of such subsidiaries.

In July 2006, FASB issued FIN No. 48, *Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109* , which clarifies the accounting for uncertainty in tax positions. FIN No. 48 requires that the Company recognize the impact of a tax position in its financial statements if that position is more likely than not of being sustained on audit, based on the technical merits of the position. The provisions of FIN No. 48 are effective as of the beginning of the Company's 2007 fiscal year, with the cumulative effect of the change in accounting principle recorded as an adjustment to opening retained earnings. The Company does not expect the adoption of FIN No. 48 to have a material impact on its consolidated results of operations and financial position, and the Company is continuing to evaluate the impact, if any, the adoption of FIN No. 48 will have on its disclosure requirements.

## 12.   Retirement Plan

The Company has a 401(k) savings plan covering substantially all of its employees. Company contributions to the plan are discretionary. During the year ended December 31, 2006, the Company made matching contributions of $0.4 million. No contributions were made during the years ended January 1, 2006 and January 2, 2005.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### 13.  Segment Information, Geographic Data and Significant Customers

The Company has determined that, in accordance with SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information* , it operates in one segment as it only reports operating results on an aggregate basis to the chief operating decision maker of the Company, our chief executive officer. The Company had revenue in the following regions for the years ended December 31, 2006, January 1, 2006 and January 2, 2005 (in thousands):

|  | Year Ended December 31, 2006 | Year Ended January 1, 2006 | Year Ended January 2, 2005 |
|---|---|---|---|
| United States | $ 103,043 | $ 45,480 | $ 24,166 |
| Europe | 55,440 | 17,551 | 12,528 |
| Asia | 15,070 | 6,850 | 9,703 |
| Other | 11,033 | 3,620 | 4,186 |
| Total | $ 184,586 | $ 73,501 | $ 50,583 |

The Company had no customer that provided more than 10% of total revenue in the years ended December 31, 2006 and January 1, 2006 and one customer that provided approximately 14% of total revenue in the year ended January 2, 2005 (exclusive of revenue recorded from the National Institutes of Health). Revenue from the National Institutes of Health accounted for approximately 1%, 1% and 13% of total revenue for the years ended December 31, 2006, January 1, 2006 and January 2, 2005, respectively.

### 14.  Quarterly Financial Information (unaudited)

The following financial information reflects all normal recurring adjustments, except as noted below, which are, in the opinion of management, necessary for a fair statement of the results of interim periods. Summarized quarterly data for fiscal 2006 and 2005 are as follows (in thousands except per share data):

|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **2006:** |  |  |  |  |
| Total revenue | $ 29,102 | $ 41,577 | $ 53,472 | $ 60,435 |
| Total cost of revenue | 9,293 | 13,576 | 16,356 | 20,119 |
| Net income (loss) | (104) | 6,768 | 16,162 | 17,142 |
| Historical net income (loss) per share, basic | (0.00) | 0.16 | 0.35 | 0.37 |
| Historical net income (loss) per share, diluted | (0.00) | 0.14 | 0.32 | 0.34 |
| **2005:** |  |  |  |  |
| Total revenue | $ 15,148 | $ 15,824 | $ 19,516 | $ 23,013 |
| Total cost of revenue | 4,599 | 4,734 | 6,599 | 7,249 |
| Net income (loss) | (1,235) | (18,539)(1) | (1,426) | 326 |
| Historical net income (loss) per share, basic | (0.03) | (0.46) | (0.03) | 0.01 |
| Historical net income (loss) per share, diluted | (0.03) | (0.46) | (0.03) | 0.01 |

The sum of the net income (loss) per share for each of the four quarters within each fiscal year presented may not equate to the net income (loss) per share reported for the full fiscal year because different numbers of shares were outstanding during the years presented.

 (1)  During the second quarter of 2005, the Company recorded a $15.8 million charge related to acquired in-process research and development from the CyVera acquisition.

**ILLUMINA, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**15.  Subsequent Events**

*Acquisition of Solexa, Inc.*

On January 26, 2007, the Company completed a merger with Solexa, Inc. (Solexa), a Delaware corporation, in a stock-for-stock merger transaction. In connection with the merger, Solexa shareholders received 0.344 of a share of the Company's common stock in exchange for each share of Solexa common stock held. The Company issued approximately 13.1 million shares of its common stock as consideration for this merger. As a result of the merger, Solexa became a direct, wholly-owned subsidiary of the Company.

*Convertible Senior Notes*

On February 16, 2007, the Company issued $400 million principal amount of 0.625% Convertible Senior Notes due 2014 (the Notes), which included the exercise of the initial purchasers' option to purchase up to an additional $50 million aggregate principal amount of Notes. The net proceeds from the offering, after deducting the initial purchasers' discount and offering expenses, were approximately $390.3 million. The Company will pay 0.625% interest per annum on the principal amount of the Notes, payable semi-annually in arrears in cash on February 15 and August 15 of each year, starting on August 15, 2007. The Company used approximately $202 million of the net proceeds to purchase shares of its common stock in privately negotiated transactions concurrently with the offering.

The Notes will be convertible into cash and, if applicable, shares of the Company's common stock, $0.01 par value per share, based on an initial conversion rate, subject to adjustment, of 22.9029 shares per $1,000 principal amount of Notes (which represents an initial conversion price of approximately $43.66 per share), only in the following circumstances and to the following extent: (1) during the five business-day period after any five consecutive trading period (the measurement period) in which the trading price per note for each day of such measurement period was less than 97% of the product of the last reported sale price of the Company's common stock and the conversion rate on each such day; (2) during any calendar quarter after the calendar quarter ending March 31, 2007, if the last reported sale price of the Company's common stock for 20 or more trading days in a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter exceeds 130% of the applicable conversion price in effect on the last trading day of the immediately preceding calendar quarter; (3) upon the occurrence of specified events; and (4) the notes will be convertible at any time on or after November 15, 2013 through the third scheduled trading day immediately preceding the maturity date.

In connection with the offering of the notes, the Company entered into convertible note hedge transactions with the initial purchasers and/or their affiliates (the counterparties) entitling the Company to purchase shares of the Company's common stock at an initial strike price of $43.66 per share, subject to adjustment. In addition, the Company sold to these counterparties warrants to acquire shares of the Company's common stock at an initial strike price of $62.87 per share, subject to adjustment. The note hedge transactions and the warrants each cover a number of shares that is generally equal to the maximum number of shares that are issuable upon conversion of the notes. The cost of the convertible note hedge transactions that was not covered by the proceeds from the sale of the warrants was approximately $46.6 million. These transactions are expected to reduce the potential equity dilution upon conversion of the notes if the daily volume-weighted average price per share of the Company's common stock exceeds the strike price of the convertible note hedge transactions. The warrant transactions could have a dilutive effect on the Company's earnings per share to the extent that the price of the Company's common stock during the measurement period at maturity of the warrants exceeds the strike price of the warrants.

F-36

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
**FOR THE THREE YEARS ENDED DECEMBER 31, 2006**

| | Allowance for Doubtful Accounts | Reserve for Inventory |
|---|---|---|
| | (In thousands) | |
| Balance as of December 28, 2003 | $ 178 | $ 630 |
| Charged to expense | 49 | 946 |
| Utilizations | (81) | (538) |
| Balance as of January 2, 2005 | 146 | 1,038 |
| Charged to expense | 167 | 304 |
| Utilizations | — | (247) |
| Balance as of January 1, 2006 | 313 | 1,095 |
| Charged to expense | 179 | 127 |
| Utilizations | (154) | (372) |
| Balance as of December 31, 2006 | $ 338 | $ 850 |

F-37

EXHIBIT 10.40

**LEASE**
**(Multi-Tenant; Net)**

**BETWEEN**

**THE IRVINE COMPANY LLC**

**AND**

**ILLUMINA, INC.**

## INDEX TO LEASE

ARTICLE I. BASIC LEASE PROVISIONS                                                               1

ARTICLE II. PREMISES                                                                            3
    **SECTION 2.1. LEASED PREMISES**                                         **3**
    **SECTION 2.2. ACCEPTANCE OF PREMISES**                                  **3**
    **SECTION 2.3. BUILDING NAME AND ADDRESS**                               **3**

ARTICLE III. TERM                                                                               3
    **SECTION 3.1. GENERAL**                                                 **3**
    **SECTION 3.2. EARLY OCCUPANCY**                                         **3**
    **SECTION 3.3. TENANT'S RIGHT TO TERMINATE**                             **4**

ARTICLE IV. RENT AND OPERATING EXPENSES                                                         4
    **SECTION 4.1. BASIC RENT**                                              **4**
    **SECTION 4.2. OPERATING EXPENSES**                                      **4**
    **SECTION 4.3. SECURITY DEPOSIT**                                        **7**

ARTICLE V. USES                                                                                 8
    **SECTION 5.1. USE**                                                     **8**
    **SECTION 5.2. SIGNS**                                                   **8**
    **SECTION 5.3. HAZARDOUS MATERIALS**                                     **8**

ARTICLE VI. COMMON AREAS; SERVICES                                                             10
    **SECTION 6.1. UTILITIES AND SERVICES**                                  **10**
    **SECTION 6.2. OPERATION AND MAINTENANCE OF COMMON AREAS**               **10**
    **SECTION 6.3. USE OF COMMON AREAS**                                     **10**
    **SECTION 6.4. PARKING**                                                 **11**
    **SECTION 6.5. CHANGES AND ADDITIONS BY LANDLORD**                       **11**

ARTICLE VII. MAINTAINING THE PREMISES                                                          11
    **SECTION 7.1. TENANT'S MAINTENANCE AND REPAIR**                         **11**
    **SECTION 7.2. LANDLORD'S MAINTENANCE AND REPAIR**                       **12**
    **SECTION 7.3. ALTERATIONS**                                             **12**
    **SECTION 7.4. MECHANIC'S LIENS**                                        **13**
    **SECTION 7.5. ENTRY AND INSPECTION**                                    **13**
    **SECTION 7.6. COMMUNICATIONS EQUIPMENT**                                **13**

ARTICLE VIII. TAXES AND ASSESSMENTS ON TENANT'S PROPERTY                                       14

ARTICLE IX. ASSIGNMENT AND SUBLETTING                                                          14
    **SECTION 9.1. RIGHTS OF PARTIES**                                       **14**
    **SECTION 9.2. EFFECT OF TRANSFER**                                      **16**
    **SECTION 9.3. SUBLEASE REQUIREMENTS**                                   **16**
    **SECTION 9.4. CERTAIN TRANSFERS**                                       **16**

ARTICLE X. INSURANCE AND INDEMNITY                                                             17
    **SECTION 10.1. TENANT'S INSURANCE**                                     **17**
    **SECTION 10.2. LANDLORD'S INSURANCE**                                   **17**
    **SECTION 10.3. TENANT'S INDEMNITY**                                     **17**
    **SECTION 10.4. LANDLORD'S NONLIABILITY**                                **17**
    **SECTION 10.5. WAIVER OF SUBROGATION**                                  **17**

ARTICLE XI. DAMAGE OR DESTRUCTION                                                              18
    **SECTION 11.1. RESTORATION**                                            **18**
    **SECTION 11.2. LEASE GOVERNS**                                          **19**

ARTICLE XII. EMINENT DOMAIN                                                                    19
    **SECTION 12.1. TOTAL OR PARTIAL TAKING**                                **19**
    **SECTION 12.2. TEMPORARY TAKING**                                       **19**
    **SECTION 12.3. TAKING OF PARKING AREA**                                 **19**

ARTICLE XIII. SUBORDINATION; ESTOPPEL CERTIFICATE; FINANCIALS                                  19
    **SECTION 13.1. SUBORDINATION**                                          **19**

**SECTION 13.2. ESTOPPEL CERTIFICATE**                                                                    **19**
**SECTION 13.3. FINANCIALS**                                                                               **20**

ARTICLE XIV. EVENTS OF DEFAULT AND REMEDIES                                                                 20
    **SECTION 14.1. TENANT'S DEFAULTS**                                                                   **20**
    **SECTION 14.2. LANDLORD'S REMEDIES**                                                                 **21**

**SECTION 14.3. LATE PAYMENTS**   **22**
**SECTION 14.4. RIGHT OF LANDLORD TO PERFORM**   **22**
**SECTION 14.5. DEFAULT BY LANDLORD**   **22**
**SECTION 14.6. EXPENSES AND LEGAL FEES**   **22**
**SECTION 14.7. WAIVER OF JURY TRIAL/JUDICIAL REFERENCE**   **22**
**SECTION 14.8. SATISFACTION OF JUDGMENT**   **24**

ARTICLE XV. END OF TERM   24
   **SECTION 15.1. HOLDING OVER**   **24**
   **SECTION 15.2. MERGER ON TERMINATION**   **24**
   **SECTION 15.3. SURRENDER OF PREMISES; REMOVAL OF PROPERTY**   **24**

ARTICLE XVI. PAYMENTS AND NOTICES   24

ARTICLE XVII. RULES AND REGULATIONS   25

ARTICLE XVIII. BROKER'S COMMISSION   25

ARTICLE XIX. TRANSFER OF LANDLORD'S INTEREST   25

ARTICLE XX. INTERPRETATION   25
   **SECTION 20.1. GENDER AND NUMBER**   **25**
   **SECTION 20.2. HEADINGS**   **25**
   **SECTION 20.3. JOINT AND SEVERAL LIABILITY**   **25**
   **SECTION 20.4. SUCCESSORS**   **25**
   **SECTION 20.5. TIME OF ESSENCE**   **25**
   **SECTION 20.6. CONTROLLING LAW/VENUE**   **25**
   **SECTION 20.7. SEVERABILITY**   **25**
   **SECTION 20.8. WAIVER AND CUMULATIVE REMEDIES**   **25**
   **SECTION 20.9. INABILITY TO PERFORM**   **26**
   **SECTION 20.10. ENTIRE AGREEMENT**   **26**
   **SECTION 20.11. QUIET ENJOYMENT**   **26**
   **SECTION 20.12. SURVIVAL**   **26**
   **SECTION 20.13. INTERPRETATION**   **26**

ARTICLE XXI. EXECUTION AND RECORDING   26
   **SECTION 21.1. COUNTERPARTS**   **26**
   **SECTION 21.2. CORPORATE, LIMITED LIABILITY COMPANY AND PARTNERSHIP AUTHORITY**   **26**
   **SECTION 21.3. EXECUTION OF LEASE; NO OPTION OR OFFER**   **26**
   **SECTION 21.4. RECORDING**   **26**
   **SECTION 21.5. AMENDMENTS**   **26**
   **SECTION 21.6. EXECUTED COPY**   **26**
   **SECTION 21.7. ATTACHMENTS**   **26**

ARTICLE XXII. MISCELLANEOUS   27
   **SECTION 22.1. NONDISCLOSURE OF LEASE TERMS**   **27**
   **SECTION 22.2. GUARANTEE**   **27**
   **SECTION 22.3. CHANGES REQUESTED BY LENDER**   **27**
   **SECTION 22.4. MORTGAGEE PROTECTION**   **27**
   **SECTION 22.5. COVENANTS AND CONDITIONS**   **27**
   **SECTION 22.6. SECURITY MEASURES**   **27**
**EXHIBITS**

**Exhibit A**     **Description of Premises**
**Exhibit B**     **Environmental Questionnaire**
**Exhibit C**     **Landlord's Disclosures**
**Exhibit D**     **Insurance Requirements**
**Exhibit E**     **Rules and Regulations**
**Exhibit X**     **Work Letter**
**Exhibit Y**     **Project Site Plan**

# LEASE
### (Multi-Tenant; Net)

THIS LEASE is made as of the 29th day of September, 2006 by and between THE IRVINE COMPANY LLC, a Delaware limited liability company hereafter called " **Landlord** ," and ILLUMINA, INC., a Delaware corporation, hereinafter called " **Tenant** ."

## ARTICLE I. BASIC LEASE PROVISIONS

Each reference in this Lease to the " **Basic Lease Provisions** " shall mean and refer to the following collective terms, the application of which shall be governed by the provisions in the remaining Articles of this Lease.

1. Premises: Suite No. 200 (the Premises are more particularly described in Section 2.1).

   Address of Building: 9530 Towne Center Drive, San Diego, CA

2. Project Description (if applicable): Eastgate Technology Park

3. Use of Premises: General office, research & development, and all uses permitted by zoning restrictions.

4. Commencement Date: January 15, 2007

5. Term: Thirty Six (36) months, plus such additional days as may be required to cause this Lease to terminate on the final day of the calendar month.

6. Basic Rent: Commencing on the Commencement Date, the Basic Rent shall be Thirty Six Thousand Three Hundred Forty-Three Dollars ($36,343.00) per month, based on $2.10 per rentable square foot.

   Basic Rent is subject to adjustment as follows:

   Commencing twelve (12) months following the Commencement Date, the Basic Rent shall be Thirty Seven Thousand Five Hundred Fifty-Four Dollars ($37,554.00) per month, based on $2.17 per rentable square foot.

   Commencing twenty-four (24) months following the Commencement Date, the Basic Rent shall be Thirty Eight Thousand Nine Hundred Thirty-Nine Dollars ($38,939.00) per month, based on $2.25 per rentable square foot.

7. Guarantor(s): None

8. Floor Area: Approximately 17,306 rentable square feet

9. Security Deposit: $42,824.00

10. Broker(s): " **Landlord's Broker** ": Irvine Realty Company " **Tenant's Broker** ": Real Estate Advisors, Inc.

11. Additional Insureds: None

12. Address for Notices:

| **LANDLORD** | **TENANT** |
|---|---|
| THE IRVINE COMPANY LLC<br>550 Newport Center Drive<br>Newport Beach, CA 92660<br>Attn: Senior Vice President, Operations<br>  Irvine Office Properties | ILLUMINA, INC.<br>9530 Towne Center Drive, Suite 200<br>San Diego, CA 92121 |
| THE IRVINE COMPANY LLC<br>550 Newport Center Drive<br>Newport Beach, CA 92660<br>Attn: Vice President, Operations<br>  Irvine Office Properties, Technology Portfolio | |

13. Address for Payments: All payments due under this Lease shall be made to the address shown on the invoice for the payment due, or if no address is shown, to Landlord's notice address above.

14. Tenant's Liability Insurance Requirement: $2,000,000.00

15. Vehicle Parking Spaces: Sixty Nine (69)

## ARTICLE II. PREMISES

**SECTION 2.1. LEASED PREMISES** . Landlord leases to Tenant and Tenant leases from Landlord the premises shown in Exhibit A (the " **Premises** "), containing approximately the rentable square footage set forth as the " **Floor Area** " in Item 8 of the Basic Lease Provisions and known by the suite number identified in Item 1 of the Basic Lease Provisions. The Premises are located in the building identified in Item 1 of the Basic Lease Provisions (the Premises together with such building and the underlying real property, are called the " **Building** "), and is a portion of the project identified in Item 2 of the Basic Lease Provisions and shown on Exhibit Y , if any (the " **Project** "). If the Project is not already completed, Landlord makes no representation that the Project, if any, as shown on Exhibit Y , (a) will be completed or that it will be constructed as shown on Exhibit Y without change, or (b) to the extent the Project is constructed, it will not be changed from the Project as shown on Exhibit Y . All references to "Floor Area" in this Lease shall mean the rentable square footage set forth in Item 8 of the Basic Lease Provisions. The rentable square footage set forth in Item 8 may include or have been adjusted by various factors, including, without limitation, a load factor to allocate a proportionate share of any vertical penetrations, stairwells, common lobby or common features or areas of the Building. Tenant agrees that the Floor Area set forth in Item 8 shall be binding on Landlord and Tenant for purposes of this Lease regardless of whether any future or differing measurements of the Premises or the Building are consistent or inconsistent with the Floor Area set forth in Item 8.

**SECTION 2.2. ACCEPTANCE OF PREMISES** . Tenant acknowledges that neither Landlord nor any representative of Landlord has made any representation or warranty with respect to the Premises, the Building or the Project or their respective suitability or fitness for any purpose, including without limitation any representations or warranties regarding the compliance of Tenant's use of the Premises with the applicable zoning or regarding any other land use matters, and Tenant shall be solely responsible as to such matters. Further, neither Landlord nor any representative of Landlord has made any representations or warranties regarding (i) what other tenants or uses may be permitted or intended in the Building or the Project, (ii) any exclusivity of use by Tenant with respect to its permitted use of the Premises as set forth in Item 3 of the Basic Lease Provisions, or (iii) any construction of portions of the Project not yet completed. Tenant further acknowledges that neither Landlord nor any representative of Landlord has agreed to undertake any alterations or additions or to construct any improvements to the Premises except as expressly provided in this Lease, and that the flooring materials which may be installed within portions of the Premises located on the ground floor of the Building may be limited by the moisture content of the Building slab and underlying soils. Subject to the provisions of Section 3.2 below, from and after the full execution and delivery of this Lease, Tenant shall be permitted to enter upon the Premises (the " **Early Occupancy Date** ") for the construction of those certain tenant improvements (the " **Tenant Improvements** ") pursuant to the terms and conditions of the Work Letter attached as Exhibit X hereto (the " **Work Letter** "). Subject to the provisions of Section 2.4 below, as of the Early Occupancy Date, Tenant shall be conclusively deemed to have accepted the Premises and those portions of the Building and Project in which Tenant has any rights under this Lease, which acceptance shall mean that it is conclusively established that the Premises and those portions of the Building and Project in which Tenant has any rights under this Lease were in satisfactory condition and in conformity with the provisions of this Lease. Nothing contained in this Section 2.2 shall affect the commencement of the Term or the obligation of Tenant to pay rent.

**SECTION 2.3. BUILDING NAME AND ADDRESS** . Tenant shall not utilize any name selected by Landlord from time to time for the Building and/or the Project as any part of Tenant's corporate or trade name. Landlord shall have the right to change the name, address, number or designation of the Building or Project without liability to Tenant.

**SECTION 2.4. LANDLORD'S RESPONSIBILITIES.** Landlord warrants to Tenant that the fire sprinkler system, lighting, heating, ventilation and air conditioning systems and electrical systems serving the Premises shall be in good operating condition on the Commencement Date of this Lease. Provided that Tenant shall notify Landlord of a non-compliance with the foregoing warranty not later than thirty (30) days following the Commencement Date, then Landlord shall, except as otherwise provided in this Lease, promptly after receipt of written notice from Tenant setting forth the nature and extent of such non-compliance, rectify same at Landlord's sole cost and expense (and not as a Project Cost).

## ARTICLE III. TERM

**SECTION 3.1. GENERAL** . The term of this Lease ( **"Term"** ) shall be for the period shown in Item 5 of the Basic Lease Provisions, and shall commence on that date ( **"Commencement Date"** ) which is the earlier of (a) the date Tenant commences its business operations from the Premises, or (b) the date set forth in Item 4 of the Basic Lease Provisions. The date on which this Lease is scheduled to terminate is referred to as the " **Expiration Date** ." The parties shall memorialize on a form provided by Landlord (the " **Commencement Date Memorandum** ") the actual Commencement Date and the Expiration Date of this Lease. Should Tenant fail to execute and return the Commencement Date Memorandum to Landlord within five (5) business days (or provide specific written objections thereto within that period), then Landlord's determination of the Commencement and Expiration Dates as set forth in the Commencement Date Memorandum shall be conclusive.

**SECTION 3.2. EARLY OCCUPANCY.** . Tenant's occupancy of the Premises prior to the Commencement Date for purposes of construction of the Tenant Improvements shall be subject to the following terms and conditions: (a) concurrently with the execution and delivery of this Lease, and prior to any such early occupancy by Tenant, Tenant shall deliver to Landlord (i) the first installment of Basic Rent and Operating Expenses due under the Lease (ii) the Security Deposit set forth in Item 9 of the Basic Lease Provisions, and (iii) the

required certificate(s) of insurance and a completed Hazardous Material Survey Form (see <u>Exhibit C</u> attached hereto); and (b) Tenant's occupancy of the Premises during the Early Occupancy Period shall be subject to all of the covenants and conditions on Tenant's part contained in this Lease (including, without limitation, the covenants contained in Sections 5.3, 6.1, 7.1, 7.3, 7.4, 10.1 and 10.3 of the Lease), except for the obligation to pay Basic Rent and Operating Expenses.

   **SECTION 3.3. TENANT'S RIGHT TO TERMINATE.** Provided that no Event of Default has occurred under any provision of this Lease beyond any applicable notice and cure period, either at the time of Tenant's election of its right to terminate granted herein or as of the effective Termination Date, Tenant shall have the one-time right to terminate this Lease effective as of the expiration of the twenty-fourth (24 th ) month of the initial Term of this Lease (the " **Termination Date** "), provided Tenant has delivered its irrevocable written notice of such election to terminate (the " **Termination Notice** ") to Landlord not later than twelve (12) months prior to the Termination Date. All rental and other costs due under this Lease for the Premises shall be due and payable by Tenant to Landlord through the Termination Date. In addition to the foregoing, Tenant shall pay to Landlord, concurrently with its delivery of the Termination Notice, a separate termination fee in the amount of One Hundred Ninety One Thousand One Hundred Twenty-Two Dollars ($191,122.00). Any such termination by Tenant shall not abrogate any obligation existing under the Lease as of the Termination Date or otherwise attributable to Tenant's occupancy thereof.

## ARTICLE IV. RENT AND OPERATING EXPENSES

   **SECTION 4.1. BASIC RENT.** From and after the Commencement Date, Tenant shall pay to Landlord without deduction or offset, the rental amount for the Premises shown in Item 6 of the Basic Lease Provisions (the " **Basic Rent** "), including subsequent adjustments, if any. If the Commencement Date is other than the first day of the calendar month, any rental adjustments shown in Item 6 occurring with reference to the monthly anniversary of the Commencement Date, shall be deemed to occur on the first day of the next calendar month following the specified monthly anniversary of the Commencement Date. The rent shall be due and payable in advance commencing on the Commencement Date (as prorated for any partial month) and continuing thereafter on the first day of each successive calendar month of the Term. No demand, notice or invoice shall be required for the payment of Basic Rent. An installment of rent in the amount of one (1) full month's Basic Rent at the initial rate specified in Item 6 of the Basic Lease Provisions and one (1) month's estimated Tenant's Share of Operating Expenses (as defined in Section 4.2) shall be delivered to Landlord concurrently with Tenant's execution of this Lease and shall be applied against the Basic Rent and Operating Expenses first due hereunder.

   **SECTION 4.2. OPERATING EXPENSES.**

   (a) From and after Commencement Date, Tenant shall pay to Landlord, as additional rent, Tenant's Share of all Operating Expenses, as defined in Section 4.2(f), incurred by Landlord in the operation of the Building and the Project. The term " **Tenant's Share** " means that portion of any Operating Expenses determined by multiplying the cost of such item by a fraction, the numerator of which is the Floor Area and the denominator of which is the total rentable square footage, as determined from time to time by Landlord, of (i) the Building, for expenses determined by Landlord to benefit or relate substantially to the Building rather than the entire Project, (ii) all or some of the buildings in the Project, for expenses determined by Landlord to benefit or relate substantially to all or some of the buildings in the Project rather than any specific building, or (iii) all or some of the buildings within the Project as well as all or a portion of other property owned by Landlord and/or its affiliates, for expenses determined by Landlord to benefit or relate substantially to such buildings within the Project and such other property. Landlord reserves the right to allocate to the entire Project any Operating Expenses which may benefit or substantially relate to a particular building within the Project in order to maintain greater consistency of Operating Expenses among buildings within the Project. In the event that Landlord determines in its sole and absolute discretion that the Premises or the Building incur a non-proportional benefit from any expense, or is the non-proportional cause of any such expense, Landlord may allocate a greater percentage of such Operating Expense to the Premises or the Building. In the event that any management and/or overhead fee payable or imposed by Landlord for the management of Tenant's Premises is calculated as a percentage of the rent payable by Tenant and other tenants of Landlord, then the full amount of such management and/or overhead fee which is attributable to the rent paid by Tenant shall be additional rent payable by Tenant, in full, provided, however, that Landlord may elect to include such full amount as part of Tenant's Share of Operating Expenses.

   (b) Prior to the start of each full Expense Recovery Period (as defined in this Section 4.2), Landlord shall give Tenant a written estimate of the amount of Tenant's Share of Operating Expenses for the applicable Expense Recovery Period. Any delay or failure by Landlord in providing such estimate shall not relieve Tenant from its obligation to pay Tenant's Share of Operating Expenses or estimated amounts thereof, if and when Landlord provides such estimate or final payment amount. Tenant shall pay the estimated amounts to Landlord in equal monthly installments, in advance concurrently with payments of Basic Rent. If Landlord has not furnished its written estimate for any Expense Recovery Period by the time set forth above, Tenant shall continue to pay monthly the estimated Tenant's Share of Operating Expenses in effect during the prior Expense Recovery Period; provided that when the new estimate is delivered to Tenant, Tenant shall, at the next monthly payment date, pay any accrued estimated Tenant's Share of Operating Expenses based upon the new estimate. For purposes hereof, " **Expense Recovery Period** " shall mean every twelve month period during the Term (or portion thereof for the first and last lease years) commencing July 1 and ending June 30, provided that Landlord shall have the right to change the date on which an Expense Recovery Period commences in which event appropriate reasonable adjustments shall be made to Tenant's Share of Operating Expenses so that the amount payable by Tenant shall not materially vary as a result of such change.

(c) Within one hundred twenty (120) days after the end of each Expense Recovery Period, Landlord shall furnish to Tenant a statement (a " **Reconciliation Statement** ") showing in reasonable detail the actual or prorated Tenant's Share of Operating Expenses incurred by Landlord during such Expense Recovery Period, and the parties shall within thirty (30) days thereafter make any payment or allowance necessary to adjust Tenant's estimated payments of Tenant's Share of Operating Expenses, if any, to the actual Tenant's Share of Operating Expenses as shown by the Reconciliation Statement. Any delay or failure by Landlord in delivering any Reconciliation Statement shall not constitute a waiver of Landlord's right to require Tenant to pay Tenant's Share of Operating Expenses pursuant hereto. Any amount due Tenant shall be credited against installments next coming due under this Section 4.2, and any deficiency shall be paid by Tenant together with the next installment. Should Tenant fail to object in writing to Landlord's determination of Tenant's Share of Operating Expenses, or fail to give written notice of its intent to audit Landlord's Operating Expenses pursuant to the provisions of the next succeeding paragraph, within sixty (60) days following delivery of Landlord's Reconciliation Statement, Landlord's determination of Tenant's Share of Operating Expenses for the applicable Expense Recovery Period shall be conclusive and binding on the parties for all purposes and any future claims to the contrary shall be barred.

Provided no Event of Default has occurred, Tenant shall have the right to cause a certified public accountant, engaged on a non-contingency fee basis, to audit Operating Expenses by inspecting Landlord's general ledger of expenses not more than once during any Expense Recovery Period. However, to the extent that insurance premiums or any other component of Operating Expenses is determined by Landlord on the basis of an internal allocation of costs utilizing information Landlord in good faith deems proprietary, such expense component shall not be subject to audit so long as it does not exceed the amount per square foot typically imposed by landlords of other first class business parks in San Diego County, California. Tenant shall give notice to Landlord of Tenant's intent to audit within sixty (60) days after Tenant's receipt of Landlord's expense statement which sets forth Tenant's Share of Landlord's actual Operating Expenses. Such audit shall be conducted at a mutually agreeable time during normal business hours at the office of Landlord or its management agent where such accounts are maintained. If Tenant's audit determines that actual Operating Expenses have been overstated by more than five percent (5%), then subject to Landlord's right to review and/or contest the audit results, Landlord shall reimburse Tenant for the reasonable out-of-pocket costs of such audit. Tenant's rent shall be appropriately adjusted to reflect any overstatement in Operating Expenses. All of the information obtained by Tenant and/or its auditor in connection with such audit, as well as any compromise, settlement, or adjustment reached between Landlord and Tenant as a result thereof, shall be held in strict confidence and, except as may be required pursuant to litigation, shall not be disclosed to any third party, directly or indirectly, by Tenant or its auditor or any of their officers, agents or employees. Landlord may require Tenant's auditor to execute a separate confidentiality agreement affirming the foregoing as a condition precedent to any audit. In the event of a violation of this confidentiality covenant in connection with any audit, then in addition to any other legal or equitable remedy available to Landlord, Tenant shall forfeit its right to any reconciliation or cost reimbursement payment from Landlord due to said audit (and any such payment theretofore made by Landlord shall be promptly returned by Tenant), and Tenant shall have no further audit rights under this Lease. Notwithstanding the foregoing, Tenant shall have no right of audit with respect to any Expense Recovery Period unless the total Operating Expenses per square foot for such Expense Recovery Period, as set forth in Landlord's annual expense reconciliation, exceed the total Operating Expenses per square foot during the initial Expense Recovery Period during the Term, as increased by the percentage change in the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index for all Urban Consumers, Los Angeles – Riverside – Orange County Area Average, all items (1982-84 = 100) (the " **Index** "), which change in the Index shall be measured by comparing the Index published for January of the initial Expense Recovery Period during the Term with the Index published for January of the applicable Expense Recovery Period.

(d) Even though this Lease has terminated and the Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Operating Expenses for the Expense Recovery Period in which this Lease terminates, Tenant shall within thirty (30) days of written notice pay the entire increase over the estimated Tenant's Share of Operating Expenses already paid. Conversely, any overpayment by Tenant shall be rebated by Landlord to Tenant not later than thirty (30) days after such final determination.

(e) If, at any time during any Expense Recovery Period, any one or more of the Operating Expenses are increased to a rate(s) or amount(s) in excess of the rate(s) or amount(s) used in calculating the estimated Tenant's Share of Operating Expenses for the year, then the estimate of Tenant's Share of Operating Expenses may be increased by written notice from Landlord for the month in which such rate(s) or amount(s) becomes effective and for all succeeding months by an amount equal to the estimated amount of Tenant's Share of the increase. If Landlord gives Tenant written notice of the amount or estimated amount of the increase and the month in which the increase will or has become effective, then Tenant shall pay the increase to Landlord as a part of Tenant's monthly payments of the estimated Tenant's Share of Operating Expenses as provided in Section 4.2(b), commencing with the month following Tenant's receipt of Landlord's notice. In addition, Tenant shall pay upon written request any such increases which were incurred prior to the Tenant commencing to pay such monthly increase.

(f) The term " **Operating Expenses** " shall mean and include all Project Costs, as defined in subsection (g), and Property Taxes, as defined in subsection (h).

(g) The term " **Project Costs** " shall include all expenses of operation, management, repair, replacement and maintenance of the Building and the Project, including without limitation all appurtenant Common Areas (as defined in Section 6.2), and shall include the following charges by way of illustration but not limitation: water and sewer charges; insurance premiums and deductibles and/or reasonable premium and deductible equivalents should Landlord elect to self-insure all or any portion of any risk that Landlord is authorized to insure hereunder; license, permit, and inspection fees; light; power; window washing; trash pickup; janitorial services to any interior Common Areas; heating, ventilating and air conditioning; supplies; materials; equipment; tools; the cost of any environmental, insurance, tax, legal or other consultant utilized by Landlord in connection with the Building and/or Project; establishment of reasonable reserves for replacements and/or repairs; costs incurred in connection

with compliance with any laws or changes in laws applicable to the Building or the Project; the cost of any capital improvements or replacements (other than tenant improvements for specific tenants) to the extent of the amortized amount thereof over the useful life of such capital improvements or replacements (or, if such capital improvements or replacements are anticipated to achieve a cost savings as to the Operating Expenses, any shorter estimated period of time over which the cost of the capital improvements or replacements would be recovered from the estimated cost savings) calculated at a market cost of funds, all as determined by Landlord, for each year of useful life or shorter recovery period of such capital expenditure whether such capital expenditure occurs during or prior to the Term; costs associated with the maintenance of an air conditioning, heating and ventilation service agreement, and maintenance of an intrabuilding network cable service agreement for any intrabuilding network cable telecommunications lines within the Project, and any other maintenance, repair and replacement costs associated with such lines; capital costs associated with a requirement related to demands on utilities by Project tenants, including without limitation the cost to obtain additional phone connections; labor; reasonably allocated wages and salaries, fringe benefits, and payroll taxes for administrative and other personnel directly applicable to the Building and/or Project, including both Landlord's personnel and outside personnel; any expense incurred pursuant to Sections 6.1, 6.2, 6.4, 7.2, and 10.2; and reasonable overhead and/or management fees for the professional operation of the Project. It is understood and agreed that Project Costs may include competitive charges for direct services (including, without limitation, management and/or operations services) provided by any subsidiary, division or affiliate of Landlord.

(h) The term " **Property Taxes** " as used herein shall include any form of federal, state, county or local government or municipal taxes, fees, charges or other impositions of every kind (whether general, special, ordinary or extraordinary) related to the ownership, leasing or operation of the Premises, Building or Project, including without limitation, the following: (i) all real estate taxes or personal property taxes, as such property taxes may be reassessed from time to time; and (ii) other taxes, charges and assessments which are levied with respect to this Lease or to the Building and/or the Project, and any improvements, fixtures and equipment and other property of Landlord located in the Building and/or the Project, (iii) all assessments and fees for public improvements, services, and facilities and impacts thereon, including without limitation arising out of any Community Facilities Districts, "Mello Roos" districts, similar assessment districts, and any traffic impact mitigation assessments or fees; (iv) any tax, surcharge or assessment which shall be levied in addition to or in lieu of real estate or personal property taxes, other than taxes covered by Article VIII; and (v) taxes based on the receipt of rent (including gross receipts or sales taxes applicable to the receipt of rent), and (vi) costs and expenses incurred in contesting the amount or validity of any Property Tax by appropriate proceedings. Notwithstanding the foregoing, general net income or franchise taxes imposed against Landlord shall be excluded.

(i)   Notwithstanding anything to the contrary contained in this Section 4.2, "Operating Expenses" shall not include any of the following:

(1)   Any ground lease rental;

(2)   Except to the extent provided in Section 4.2(g) above, costs of items considered capital repairs, replacements, improvements and equipment ("Capital Items");

(3)   Costs incurred by Landlord for the repair of damage to the Building, to the extent that Landlord is actually reimbursed by insurance proceeds, and costs of earthquake repairs in excess of twenty-five thousand dollars ($25,000) per earthquake (for this purpose, an earthquake is defined collectively as the initial earthquake and the aftershocks that relate to such initial earthquake);

(4)   Costs, including permit, license and inspection costs, incurred with respect to the installation of tenants' or other occupants' improvements in the Project or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Project;

(5)   Marketing costs, including without limitation, leasing commissions, attorneys' fees in connection with the negotiation and preparation of letters, deal memos, letters of intent, leases, subleases and/or assignments, space planning costs and other costs and expenses incurred in connection with lese, sublease and/or assignment negotiations and transactions with present or prospective tenants or other occupants of the Project;

(6)   Expenses in connection with services or other benefits that are not made available to Tenant or for which Tenant is charged directly but which are provided to other tenants or occupants of the Project;

(7)   Overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and/or services in the Project to the extent the same exceeds the costs of such goods and/or services rendered by unaffiliated third parties;

(8)   Interest, principal, points and fees on non-operating debts or amortization on any mortgage or mortgages or any other debt instrument encumbering the Project or the real property underlying the Project;

(9)   Landlord's general corporate overhead and general and administrative expenses associated with the operation of the entity which constitutes Landlord, as the same are distinguished from the costs of the operation, management, repair, replacement and maintenance of the Project;

(10) Any compensation paid to clerks, attendants or other persons engaged in commercial concessions operated by Landlord (other than compensation paid to any parking facility operator);

(11) Advertising and promotional expenditures and costs of signs in or on the Project identifying other tenants;

(12) Tax penalties incurred as a result of Landlord's negligence, inability or unwillingness to made payments and/or to file any tax or informational returns when due;

(13) Except to the extent provided in Section 5.3 of this Lease, costs incurred to remove, remediate or take other action with respect to Hazardous Materials;

(14) Costs arising from Landlord's charitable or political contributions;

(15) Costs arising during the contractual warranty period from construction defects in the base, shell or core of the Building;

(16) Acquisition costs (not including those incurred in ordinary maintenance and repair) for sculpture, paintings, fountains or other objects of art;

(17) Costs of defending any lawsuits with any mortgagee (except as the actions of Tenant may be in issue), and costs incurred in connection with any disputes between Landlord and its employees, between Landlord and Project management, or between Landlord and other tenants or occupants (except as the actions of Tenant may be in issue);

(18) Costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Project (but excluding any increased Property Taxes resulting from any such sale or other transactions);

(19) Costs of any "tap fees" or any sewer or water connection fees for the benefit of any particular tenant in the Project;

(20) Any expenses incurred by Landlord for use of any portions of the Project to accommodate special events for particular tenants, including, but not limited to shows, promotions, kiosks, displays, filming, photography, private events or parties, ceremonies and advertising beyond the normal expenses otherwise attributable to providing Project services, such as lighting and HVAC to such public portions of the Building in normal operations during standard Building hours of operation;

(21) Any entertainment, dining or travel expenses of Landlord for any purpose;

(22) Any flowers, gifts, balloons or other gifts provided to any entity whatsoever, including, but not limited to, Tenant, other tenants, employees, vendors, contractors, prospective tenants and agents;

(23) Any "validated" parking for any entity;

(24) The cost of any "tenant relations" parties, events or promotion not consented to by an authorized representative of Tenant in writing; and

(25) "In-house" legal and/or accounting fees.

To the extent that an expense included in Operating Expenses includes an expense related to the Project and not the Building, then the word "Building" utilized in these exclusions shall mean, and be extended to include the Project.

**SECTION 4.3. SECURITY DEPOSIT.** Concurrently with Tenant's delivery of this Lease, Tenant shall deposit with Landlord the sum, if any, stated in Item 9 of the Basic Lease Provisions, to be held by Landlord as security for the full and faithful performance of all of Tenant's obligations under this Lease (the " **Security Deposit** "). Landlord shall not be required to keep this Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. Subject to the last sentence of this Section, the Security Deposit shall be understood and agreed to be the property of Landlord upon Landlord's receipt thereof, and may be utilized by Landlord in its sole and absolute discretion towards the payment of all expenses by Landlord for which Tenant would be required to reimburse Landlord under this Lease, including without limitation brokerage commissions and Tenant Improvement costs. Upon any Event of Default beyond any applicable notice and cure period by Tenant (as defined in Section 14.1), Landlord may, in its sole and absolute discretion and notwithstanding any contrary provision of Civil Code Section 1950.7, retain, use or apply the whole or any part of the Security Deposit to pay any sum which Tenant is obligated to pay under this Lease including, without limitation, amounts estimated by Landlord as the amounts due it for prospective rent and for damages pursuant to Section 14.2(a)(i) of this Lease and/or Civil Code Section 1951.2, sums that Landlord may expend or be required to expend by reason of the Event of Default by Tenant or any loss or damage that Landlord may suffer by reason of the Event of Default, or costs incurred by Landlord in connection with the repair or restoration of the Premises pursuant to Section 15.3 of this Lease upon expiration or earlier termination of this Lease. In no event shall Landlord be obligated to apply the Security Deposit upon an Event of Default and Landlord's rights and remedies resulting from an Event of Default, including without limitation, Tenant's failure to pay Basic Rent, Tenant's Share of Operating Expenses or any other amount due to Landlord pursuant to this Lease, shall not be diminished or altered in any respect due to the fact that

Landlord is holding the Security Deposit. If any portion of the Security Deposit is applied by Landlord as permitted by this Section, Tenant shall within five (5) days after written demand by Landlord deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. If Tenant fully performs its obligations under this Lease, the Security Deposit shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest in this Lease) within thirty (30) days after the expiration of the Term, provided that Tenant agrees that Landlord may retain the Security Deposit to the extent and until such time as all amounts due from Tenant in accordance with this Lease have been determined and paid in full and Tenant agrees that Tenant shall have no claim against Landlord for Landlord's retaining such Security Deposit to the extent provided in this Section.

## ARTICLE V. USES

**SECTION 5.1. USE.** Tenant shall use the Premises only for the purposes stated in Item 3 of the Basic Lease Provisions, all in accordance with applicable laws and restrictions and pursuant to approvals to be obtained by Tenant from all relevant and required governmental agencies and authorities. The Parties agree that any contrary use shall be deemed to cause material and irreparable harm to Landlord and shall entitle Landlord to injunctive relief in addition to any other available remedy. Tenant, at its expense, shall procure, maintain and make available for Landlord's inspection throughout the Term, all governmental approvals, licenses and permits required for the proper and lawful conduct of Tenant's permitted use of the Premises. Tenant shall not do or permit anything to be done in or about the Premises which will in any way interfere with the rights of other occupants of the Building or the Project, or use or allow the Premises to be used for any unlawful purpose, nor shall Tenant permit any nuisance or commit any waste in the Premises or the Project. Tenant shall not perform any work or conduct any business whatsoever in the Project other than inside the Premises. Tenant shall not do or permit to be done anything which will invalidate or increase the cost of any insurance policy(ies) covering the Building, the Project and/or their contents, and shall comply with all applicable insurance underwriters rules. Tenant shall comply at its expense with all present and future laws, ordinances, restrictions, regulations, orders, rules and requirements of all governmental authorities that pertain to Tenant or its use of the Premises, including without limitation all federal and state occupational health and safety requirements, whether or not Tenant's compliance will necessitate expenditures or interfere with its use and enjoyment of the Premises. Tenant shall comply at its expense with all present and future covenants, conditions, easements or restrictions now or hereafter affecting or encumbering the Building and/or Project, and any amendments or modifications thereto, including without limitation the payment by Tenant of any periodic or special dues or assessments charged against the Premises or Tenant which may be allocated to the Premises or Tenant in accordance with the provisions thereof. Tenant shall promptly upon demand reimburse Landlord for any additional insurance premium charged by reason of Tenant's failure to comply with the provisions of this Section, and shall indemnify Landlord from any liability and/or expense resulting from Tenant's noncompliance.

**SECTION 5.2. SIGNS.** Provided Tenant continues to occupy the entire Premises, Tenant shall have the non-exclusive right to one (1) exterior "building top" sign on the Building for Tenant's name and graphics in a location designated by Landlord, subject to Landlord's right of prior approval that such exterior signage is in compliance with the Signage Criteria (defined below). Except as provided in the foregoing, and except for Landlord's standard suite signage identifying Tenant's name and/or logo and installed at a location designated by Landlord, and except for any additional signage expressly specified in this Section 5.2, Tenant shall have no right to maintain signs in any location in, on or about the Premises, the Building or the Project and shall not place or erect any signs that are visible from the exterior of the Building. The size, design, graphics, material, style, color and other physical aspects of any permitted sign shall be subject to Landlord's written determination, as determined solely by Landlord, prior to installation, that signage is in compliance with any covenants, conditions or restrictions encumbering the Premises and Landlord's signage program for the Project, as in effect from time to time and approved by the City in which the Premises are located (" **Signage Criteria** "). Prior to placing or erecting any such signs, Tenant shall obtain and deliver to Landlord a copy of any applicable municipal or other governmental permits and approvals and comply with any applicable insurance requirements for such signage. Tenant shall be responsible for all costs of any permitted sign, including, without limitation, the fabrication, installation, maintenance and removal thereof and the cost of any permits therefor. If Tenant fails to maintain its sign in good condition, or if Tenant fails to remove same upon termination of this Lease and repair and restore any damage caused by the sign or its removal, Landlord may do so at Tenant's expense. Landlord shall have the right to temporarily remove any signs in connection with any repairs or maintenance in or upon the Building. The term "sign" as used in this Section shall include all signs, designs, monuments, displays, advertising materials, logos, banners, projected images, pennants, decals, pictures, notices, lettering, numerals or graphics. Tenant's exterior signage rights under this Section 5.2 belong solely to Illumina, Inc., a Delaware corporation, and any attempted assignment or transfer of such rights shall be void and of no force and effect.

**SECTION 5.3. HAZARDOUS MATERIALS.**

(a) For purposes of this Lease, the term " **Hazardous Materials** " includes (i) any "hazardous material" as defined in Section 25501(o) of the California Health and Safety Code, (ii) hydrocarbons, polychlorinated biphenyls or asbestos, (iii) any toxic or hazardous materials, substances, wastes or materials as defined pursuant to any other applicable state, federal or local law or regulation, and (iv) any other substance or matter which may result in liability to any person or entity as a result of such person's possession, use, storage, release or distribution of such substance or matter under any statutory or common law theory.

(b) Tenant shall not cause or permit any Hazardous Materials to be brought upon, stored, used, generated, released or disposed of on, under, from or about the Premises (including without limitation the soil and groundwater thereunder) without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole and absolute discretion. Notwithstanding the foregoing, Tenant shall have the right, without obtaining prior written consent of Landlord, to utilize within the Premises a reasonable quantity of standard office

products that may contain Hazardous Materials (such as photocopy toner, "White Out", and the like), provided however , that (i) Tenant shall maintain such products in their original retail packaging, shall follow all instructions on such packaging with respect to the storage, use and disposal of such products, and shall otherwise comply with all applicable laws with respect to such products, and (ii) all of the other terms and provisions of this Section 5.3 shall apply with respect to Tenant's storage, use and disposal of all such products. Landlord may, in its sole and absolute discretion, place such conditions as Landlord deems appropriate with respect to Tenant's use, storage and/or disposal of any Hazardous Materials requiring Landlord's consent. Tenant understands that Landlord may utilize an environmental consultant to assist in determining conditions of approval in connection with the storage, use, release, and/or disposal of Hazardous Materials by Tenant on or about the Premises, and/or to conduct periodic inspections of the storage, generation, use, release and/or disposal of such Hazardous Materials by Tenant on and from the Premises, and Tenant agrees that any costs incurred by Landlord in connection therewith shall be reimbursed by Tenant to Landlord as additional rent hereunder upon demand.

(c) Prior to the execution of this Lease, Tenant shall complete, execute and deliver to Landlord an Environmental Questionnaire and Disclosure Statement (the " **Environmental Questionnaire** ") in the form of Exhibit B attached hereto. The completed Environmental Questionnaire shall be deemed incorporated into this Lease for all purposes, and Landlord shall be entitled to rely fully on the information contained therein. On each anniversary of the Commencement Date until the expiration or sooner termination of this Lease, Tenant shall disclose to Landlord in writing the names and amounts of all Hazardous Materials which were stored, generated, used, released and/or disposed of on, under or about the Premises for the twelve-month period prior thereto, and which Tenant desires to store, generate, use, release and/or dispose of on, under or about the Premises for the succeeding twelve-month period. In addition, to the extent Tenant is permitted to utilize Hazardous Materials upon the Premises, Tenant shall promptly provide Landlord with complete and legible copies of all the following environmental documents relating thereto: reports filed pursuant to any self-reporting requirements; permit applications, permits, monitoring reports, emergency response or action plans, workplace exposure and community exposure warnings or notices and all other reports, disclosures, plans or documents (even those which may be characterized as confidential) relating to water discharges, air pollution, waste generation or disposal, and underground storage tanks for Hazardous Materials; orders, reports, notices, listings and correspondence (even those which may be considered confidential) of or concerning the release, investigation, compliance, cleanup, remedial and corrective actions, and abatement of Hazardous Materials; and all complaints, pleadings and other legal documents filed by or against Tenant related to Tenant's storage, generation, use, release and/or disposal of Hazardous Materials.

(d) Landlord and its agents shall have the right, but not the obligation, to inspect, sample and/or monitor the Premises and/or the soil or groundwater thereunder at any time to determine whether Tenant is complying with the terms of this Section 5.3, and in connection therewith Tenant shall provide Landlord with full access to all facilities, records and personnel related thereto. If Tenant is not in compliance with any of the provisions of this Section 5.3, or in the event of a release of any Hazardous Material on, under, from or about the Premises caused or permitted by Tenant, its agents, employees, contractors, licensees or invitees, Landlord and its agents shall have the right, but not the obligation, without limitation upon any of Landlord's other rights and remedies under this Lease, to immediately enter upon the Premises without notice and to discharge Tenant's obligations under this Section 5.3 at Tenant's expense, including without limitation the taking of emergency or long-term remedial action. Landlord and its agents shall endeavor to minimize interference with Tenant's business in connection therewith, but shall not be liable for any such interference. In addition, Landlord, at Tenant's expense, shall have the right, but not the obligation, to join and participate in any legal proceedings or actions initiated in connection with any claims arising out of the storage, generation, use, release and/or disposal by Tenant or its agents, employees, contractors, licensees or invitees of Hazardous Materials on, under, from or about the Premises.

(e) If the presence of any Hazardous Materials on, under, from or about the Premises or the Project caused or permitted by Tenant or its agents, employees, contractors, licensees or invitees results in (i) injury to any person, (ii) injury to or any contamination of the Premises or the Project, or (iii) injury to or contamination of any real or personal property wherever situated, Tenant, at its expense, shall promptly take all actions necessary to return the Premises and the Project and any other affected real or personal property owned by Landlord to the condition existing prior to the introduction of such Hazardous Materials and to remedy or repair any such injury or contamination, including without limitation, any cleanup, remediation, removal, disposal, neutralization or other treatment of any such Hazardous Materials. Notwithstanding the foregoing, Tenant shall not, without Landlord's prior written consent, which consent may be given or withheld in Landlord's sole and absolute discretion, take any remedial action in response to the presence of any Hazardous Materials on, under, from or about the Premises or the Project or any other affected real or personal property owned by Landlord or enter into any similar agreement, consent, decree or other compromise with any governmental agency with respect to any Hazardous Materials claims; provided however, Landlord's prior written consent shall not be necessary in the event that the presence of Hazardous Materials on, under, from or about the Premises or the Project or any other affected real or personal property owned by Landlord (i) imposes an immediate threat to the health, safety or welfare of any individual and (ii) is of such a nature that an immediate remedial response is necessary and it is not possible to obtain Landlord's consent before taking such action. To the fullest extent permitted by law, Tenant shall indemnify, hold harmless, protect and defend (with attorneys acceptable to Landlord) Landlord and any successors to all or any portion of Landlord's interest in the Premises and the Project and any other real or personal property owned by Landlord from and against any and all liabilities, losses, damages, diminution in value, judgments, fines, demands, claims, recoveries, deficiencies, costs and expenses (including without limitation attorneys' fees, court costs and other professional expenses), whether foreseeable or unforeseeable, arising directly or indirectly out of the use, generation, storage, treatment, release, on- or off-site disposal or transportation of Hazardous Materials (A) on, into, from, under or about the Premises during the Term regardless of the source of such Hazardous Materials unless caused solely by Landlord or (B) on, into, from, under or about the Premises, the Building or the Project and any other real or personal property owned by Landlord caused or permitted by Tenant, its agents, employees, contractors, licensees or invitees. Such indemnity obligation shall specifically include, without limitation, the cost

of any required or necessary repair, restoration, cleanup or detoxification of the Premises, the Building and the Project and any other real or personal property owned by Landlord, the preparation of any closure or other required plans, whether such action is required or necessary during the Term or after the expiration of this Lease and any loss of rental due to the inability to lease the Premises or any portion of the Building or Project as a result of such Hazardous Materials, the remediation thereof or any repair, restoration or cleanup related thereto. If it is at any time discovered that Hazardous Materials have been released on, into, from, under or about the Premises during the Term, or that Tenant or its agents, employees, contractors, licensees or invitees may have caused or permitted the release of any Hazardous Materials on, under, from or about the Premises, the Building or the Project or any other real or personal property owned by Landlord, Tenant shall, at Landlord's request, immediately prepare and submit to Landlord a comprehensive plan, subject to Landlord's approval, specifying the actions to be taken by Tenant to return the Premises, the Building or the Project or any other real or personal property owned by Landlord to the condition existing prior to the introduction of such Hazardous Materials. Upon Landlord's approval of such plan, Tenant shall, at its expense, and without limitation of any rights and remedies of Landlord under this Lease or at law or in equity, immediately implement such plan and proceed to cleanup, remediate and/or remove all such Hazardous Materials in accordance with all applicable laws and as required by such plan and this Lease. The provisions of this Section 5.3(e) shall expressly survive the expiration or sooner termination of this Lease.

(f) Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, certain facts relating to Hazardous Materials at the Project known by Landlord to exist as of the date of this Lease, as more particularly described in Exhibit C attached hereto. Tenant shall have no liability or responsibility with respect to the Hazardous Materials facts described in Exhibit C , nor with respect to any Hazardous Materials which Tenant proves were neither released on the Premises during the Term nor caused or permitted by Tenant, its agents, employees, contractors, licensees or invitees. Notwithstanding the preceding two sentences, Tenant agrees to notify its agents, employees, contractors, licensees, and invitees of any exposure or potential exposure to Hazardous Materials at the Premises that Landlord brings to Tenant's attention. Tenant hereby acknowledges that this disclosure satisfies any obligation of Landlord to Tenant pursuant to California Health & Safety Code Section 25359.7, or any amendment or substitute thereto or any other disclosure obligations of Landlord.

## ARTICLE VI. COMMON AREAS; SERVICES

**SECTION 6.1. UTILITIES AND SERVICES.** Tenant shall be responsible for and shall pay promptly, directly to the appropriate supplier, all charges for water, gas, electricity, sewer, heat, light, power, telephone, telecommunications service, refuse pickup, janitorial service, interior landscape maintenance and all other utilities, materials and services furnished directly to Tenant or the Premises or used by Tenant in, on or about the Premises during the Term, together with any taxes thereon. If any utilities or services are not separately metered or assessed to Tenant, Landlord shall make a reasonable determination of Tenant's proportionate share of the cost of such utilities and services, and Tenant shall pay such amount to Landlord, as an item of additional rent, within ten (10) days after receipt of Landlord's statement or invoice therefor. Alternatively, Landlord may elect to include such cost in the definition of Project Costs in which event Tenant shall pay Tenant's proportionate share of such costs in the manner set forth in Section 4.2. Tenant shall also pay to Landlord as an item of additional rent, within ten (10) days after receipt of Landlord's statement or invoice therefor, Landlord's "standard charges" (as hereinafter defined, which shall be in addition to the electricity charge paid to the utility provider) for "after hours" usage by Tenant of each HVAC unit servicing the Premises. If the HVAC unit(s) servicing the Premises also serve other leased premises in the Building, "after hours" shall mean usage of said unit(s) before 6:00 A.M. or after 6:00 P.M. on Mondays through Fridays, and before 9:00 A.M. or after 1:00 P.M. on Saturdays, subject to reasonable adjustment of said hours by Landlord. If the HVAC unit(s) serve only the Premises, "after hours" shall mean more than sixty-six (66) hours of usage during any week during the Term. "After hours" usage shall be determined based upon the operation of the applicable HVAC unit during each of the foregoing periods on a "non-cumulative" basis (that is, without regard to Tenant's usage or nonusage of other unit(s) serving the Premises, or of the applicable unit during other periods of the Term). As used herein, "standard charges" shall mean the following charges for each hour of "after hours" use (in addition to the applicable electricity charges paid to the utility provider) of the following described HVAC units: (i) $5.00 per hour for 1-5 ton HVAC units, (ii) $7.50 per hour for 6-30 ton HVAC units and (iii) $10.00 per hour for HVAC units of greater than 30 tons. Landlord shall not be liable for damages or otherwise for any failure or interruption of any utility or other service furnished to the Premises, and no such failure or interruption shall be deemed an eviction or entitle Tenant to terminate this Lease or withhold or abate any rent due hereunder. Landlord shall at all reasonable times have free access to the Building and Premises to install, maintain, repair, replace or remove all electrical and mechanical installations of Landlord. Tenant acknowledges that the costs incurred by Landlord related to providing above-standard utilities and services to Tenant, including, without limitation, telephone lines, may be charged to Tenant.

**SECTION 6.2. OPERATION AND MAINTENANCE OF COMMON AREAS.** During the Term, Landlord shall operate and maintain all Common Areas within the Building and the Project in the manner Landlord may reasonably determine to be appropriate. All costs incurred by Landlord for the maintenance and operation of the Common Areas shall be included in Project Costs except to the extent any particular cost incurred is related to or associated with a specific tenant and can be charged to such tenant of the Project. The term " **Common Areas** " shall mean all areas within the exterior boundaries of the Building and other buildings in the Project which are not held for exclusive use by persons entitled to occupy space, and all other appurtenant areas and improvements within the Project provided by Landlord for the common use of Landlord and tenants and their respective employees and invitees, including without limitation parking areas and structures, driveways, sidewalks, landscaped and planted areas, hallways and interior stairwells not located within the premises of any tenant, common electrical rooms and roof access entries, common entrances and lobbies, elevators, and restrooms not located within the premises of any tenant.

**SECTION 6.3. USE OF COMMON AREAS.** The occupancy by Tenant of the Premises shall include the use of the Common Areas in common with Landlord and with all others for whose convenience and use the Common Areas may be provided by Landlord, subject, however, to compliance with all rules and regulations as are prescribed from time to time by Landlord. Landlord shall at all times during the Term have exclusive control of the Common Areas, and may restrain or permit any use or occupancy, except as authorized by Landlord's rules and regulations. Tenant shall keep the Common Areas clear of any obstruction or unauthorized use related to Tenant's operations or use of Premises, including without limitation, planters and furniture. Except to the extent caused solely by the active negligence or willful misconduct of Landlord, nothing in this Lease shall be deemed to impose liability upon Landlord for any damage to or loss of the property of, or for any injury to, Tenant, its invitees or employees. Landlord may temporarily close any portion of the Common Areas for repairs, remodeling and/or alterations, to prevent a public dedication or the accrual of prescriptive rights, or for any other reason deemed sufficient by Landlord, without liability to Tenant. Landlord's temporary closure of any portion of the Common Areas for such purposes shall not deprive Tenant of reasonable access to the Premises.

**SECTION 6.4. PARKING.** Tenant shall be entitled to the number of vehicle parking spaces set forth in Item 15 of the Basic Lease Provisions, which spaces shall be unreserved and unassigned, on those portions of the Common Areas designated by Landlord for parking. Tenant shall not use more parking spaces than such number. All parking spaces shall be used only for parking of vehicles no larger than full size passenger automobiles, sport utility vehicles or pickup trucks. Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers or invitees to be loaded, unloaded or parked in areas other than those designated by Landlord for such activities. If Tenant permits or allows any of the prohibited activities described above, then Landlord shall have the right, without notice, in addition to such other rights and remedies that Landlord may have, to remove or tow away the vehicle involved and charge the costs to Tenant. Parking within the Common Areas shall be limited to striped parking stalls, and no parking shall be permitted in any driveways, access ways or in any area which would prohibit or impede the free flow of traffic within the Common Areas. There shall be no parking of any vehicles for longer than a forty-eight (48) hour period unless otherwise authorized by Landlord, and vehicles which have been abandoned or parked in violation of the terms hereof may be towed away at the owner's expense. Nothing contained in this Lease shall be deemed to create liability upon Landlord for any damage to motor vehicles of visitors or employees, for any loss of property from within those motor vehicles, or for any injury to Tenant, its visitors or employees, unless ultimately determined to be caused by the sole active negligence or willful misconduct of Landlord. Landlord shall have the right to establish, and from time to time amend, and to enforce against all users all reasonable rules and regulations (including the designation of areas for employee parking) that Landlord may deem necessary and advisable for the proper and efficient operation and maintenance of parking within the Common Areas. Landlord shall have the right to construct, maintain and operate lighting facilities within the parking areas; to change the area, level, location and arrangement of the parking areas and improvements therein; to restrict parking by tenants, their officers, agents and employees to employee parking areas; after the expiration of the initial 36-month Term of this Lease, to enforce parking charges (by operation of meters or otherwise); and to do and perform such other acts in and to the parking areas and improvements therein as, in the use of good business judgment, Landlord shall determine to be advisable. Any person using the parking area shall observe all directional signs and arrows and any posted speed limits. In no event shall Tenant interfere with the use and enjoyment of the parking area by other tenants of the Project or their employees or invitees. Parking areas shall be used only for parking vehicles. Washing, waxing, cleaning or servicing of vehicles, or the storage of vehicles for longer than 48-hours, is prohibited unless otherwise authorized by Landlord. Tenant shall be liable for any damage to the parking areas caused by Tenant or Tenant's employees, suppliers, shippers, customers or invitees, including without limitation damage from excess oil leakage. Tenant shall have no right to install any fixtures, equipment or personal property in the parking area.

**SECTION 6.5. CHANGES AND ADDITIONS BY LANDLORD.** Landlord reserves the right to make alterations or additions to the Building or the Project, or to the attendant fixtures, equipment and Common Areas. Landlord may at any time relocate or remove any of the various buildings, parking areas, and other Common Areas, and may add buildings and areas to the Project from time to time. No change shall entitle Tenant to any abatement of rent or other claim against Landlord. No such change shall deprive Tenant of reasonable access to or use of the Premises.

## ARTICLE VII. MAINTAINING THE PREMISES

**SECTION 7.1. TENANT'S MAINTENANCE AND REPAIR.** Tenant at its sole expense shall maintain and make all repairs and replacements necessary to keep the Premises in the condition as existed on the Commencement Date (or on any later date that the improvements may have been installed), excepting ordinary wear and tear and damage by casualty, including without limitation all interior glass, doors, door closures, hardware, fixtures, electrical, plumbing, fire extinguisher equipment and other equipment installed in the Premises and all Alterations constructed by Tenant pursuant to Section 7.3 below. Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices by Tenant. As part of its maintenance obligations hereunder, Tenant shall assure that the Premises remain free of moisture conditions which could cause mold and promptly repair any moisture conditions occurring within the Premises, and Tenant shall, at Landlord's request, provide Landlord with copies of all maintenance schedules, reports and notices prepared by, for or on behalf of Tenant. All repairs and replacements shall be at least equal in quality to the original work, shall be made only by a licensed contractor approved in writing in advance by Landlord and shall be made only at the time or times approved by Landlord. Any contractor utilized by Tenant shall be subject to Landlord's standard requirements for contractors, as modified from time to time. Landlord may impose reasonable restrictions and requirements with respect to repairs and replacements, as provided in Section 7.3, and the provisions of Section 7.4 shall apply to all repairs and replacements. Alternatively, Landlord may elect to perform any repair or maintenance of the electrical and mechanical systems and any air conditioning, ventilating or heating equipment serving the Premises and include the cost thereof as part of Tenant's Share of Operating Expenses. If Tenant fails to properly maintain and/or repair the Premises as herein provided following Landlord's notice and the expiration of the applicable cure period (or earlier if Landlord determines that such work must be performed prior to such time in order to avoid damage to the Premises or Building or other detriment), then Landlord may elect, but shall have no obligation, to perform any repair or maintenance required hereunder on behalf of Tenant and at Tenant's expense, and Tenant shall reimburse Landlord upon demand for all costs incurred.

**SECTION 7.2. LANDLORD'S MAINTENANCE AND REPAIR.** Subject to Section 7.1 and Article XI, Landlord shall provide service, maintenance and repair with respect to any air conditioning, ventilating or heating equipment which serves the Premises (exclusive, however, of supplemental HVAC equipment serving only the Premises), and shall maintain in good repair the roof, foundations, footings, the exterior surfaces of the exterior walls of the Building (including exterior glass), the structural, electrical and mechanical systems (including elevators, if any, serving the Building), except that Tenant at its expense shall make all repairs which Landlord deems reasonably necessary as a result of the act or negligence of Tenant, its agents, employees, invitees, subtenants or contractors. Landlord shall have the right to employ or designate any reputable person or firm, including any employee or agent of Landlord or any of Landlord's affiliates or divisions, to perform any service, repair or maintenance function. Landlord need not make any other improvements or repairs except as specifically required under this Lease, and nothing contained in this Section shall limit Landlord's right to reimbursement from Tenant for maintenance, repair costs and replacement costs as provided elsewhere in this Lease. Tenant understands that it shall not perform any maintenance or make any repairs or replacements at Landlord's expense and shall have no right to any rental offset for any maintenance, repairs or replacements performed by Tenant. Tenant further understands that Landlord shall not be required to make any repairs to the roof, foundations, footings, the exterior surfaces of the exterior walls of the Building (excluding exterior glass), or structural, electrical or mechanical systems unless and until Tenant has notified Landlord in writing of the need for such repair, and Landlord shall have a reasonable period of time thereafter to commence and complete said repair, if warranted. All costs of any maintenance, repairs and replacements on the part of Landlord provided hereunder shall be considered part of Project Costs.

**SECTION 7.3. ALTERATIONS.** Except as otherwise provided in this Section, Tenant shall make no alterations, additions, fixtures or improvements (" **Alterations** ") to the Premises or the Building without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole and absolute discretion. In the event that any requested Alteration would result in a change from Landlord's building standard materials and specifications for the Project (" **Standard Improvements** "), Landlord may withhold consent to such Alteration in its sole and absolute discretion. In the event Landlord so consents to a change from the Standard Improvements (such change being referred to as a " **Non-Standard Improvement** "), Tenant shall be responsible for the cost of replacing such Non-Standard Improvement with the applicable Standard Improvement (" **Replacements** "), which Replacements shall be completed prior to the Expiration Date or earlier termination of this Lease. Landlord shall not unreasonably withhold its consent to any Alterations which cost less than Two Dollar ($2.00) per square foot of the improved portions of the Premises (excluding warehouse square footage) and do not (i) affect the exterior of the Building or outside areas (or be visible from adjoining sites), or (ii) affect or penetrate any of the structural portions of the Building, including but not limited to the roof, or (iii) require any change to the basic floor plan of the Premises (including, without limitation, the adding of any additional "office" square footage) or any change to any structural or mechanical systems of the Premises, or (iv) fail to comply with any applicable governmental requirements or require any governmental permit as a prerequisite to the construction thereof, or (v) result in the Premises requiring building services beyond the level normally provided to other tenants, or (vi) interfere in any manner with the proper functioning of, or Landlord's access to, any mechanical, electrical, plumbing, elevator or HVAC systems, facilities or equipment located in or serving the Building, or (vii) diminish the value of the Premises including, without limitation, using lesser quality materials than those existing in the Premises, or (viii) alter or replace Standard Improvements. Landlord may impose any condition to its consent, including but not limited to a requirement that the installation and/or removal of all Alterations and Replacements be covered by a lien and completion bond satisfactory to Landlord in its sole and absolute discretion and requirements as to the manner and time of performance of such work. Landlord shall in all events, whether or not Landlord's consent is required, have the right to approve prior to the commencement of any work the contractor performing the installation and removal of Alterations and Replacements and Tenant shall not permit any contractor not approved by Landlord to perform any work on the Premises or on the Building. Tenant shall obtain all required permits for the installation and removal of Alterations and Replacements and shall perform the installation and removal of Alterations and Replacements in compliance with all applicable laws, regulations and ordinances, including without limitation the Americans with Disabilities Act, all covenants, conditions and restrictions affecting the Project, and the Rules and Regulations as described in Article XVII. Tenant understands and agrees that Landlord shall be entitled to a supervision fee in the amount of five percent (5%) of the cost of such Alterations either requiring a permit from the City of San Diego or affecting any mechanical, electrical, plumbing or HVAC systems, facilities or equipment located in or serving the Building. Under no circumstances shall Tenant make any Alterations or Replacements which incorporate any Hazardous Materials, including without limitation asbestos-containing construction materials into the Premises, the Building or the Common Area. In no event shall Tenant prosecute any Alterations that result in picketing or labor demonstrations in or about the Building or Project. If any governmental entity requires, as a condition to any proposed Alterations or Replacements by Tenant, that improvements be made to the Common Areas, and if Landlord consents to such improvements to the Common Areas (which consent may be withheld in the sole and absolute discretion of Landlord), then Tenant shall, at Tenant's sole expense, make such required improvements to the Common Areas in such manner, utilizing such materials, and with such contractors, architects and engineers as Landlord may require in its sole and absolute discretion. Landlord shall have the right, but not the obligation, to elect to make any such improvements to be made to the Common Areas at Tenant's expense, in which case Tenant shall reimburse Landlord upon demand for all costs incurred in making such improvements. Any request for Landlord's consent to any proposed Alterations shall be made in writing and shall contain architectural plans describing the work in detail reasonably satisfactory to Landlord. Landlord may elect to cause its architect to review Tenant's architectural plans, and the reasonable cost of that review shall be reimbursed by Tenant. Should the work proposed by Tenant and consented to by Landlord modify the basic floor plan of the Premises, then Tenant shall, at its expense, furnish Landlord with as-built drawings and CAD disks compatible with Landlord's systems and standards. Unless Landlord otherwise agrees in writing, all Alterations made or affixed to the Premises, the Building or to the Common Area (excluding moveable trade fixtures and furniture), including without limitation all

Tenant Improvements constructed pursuant to the Work Letter (except as otherwise provided in the Work Letter) and all telephone and data cabling, shall become the property of Landlord and shall be surrendered with the Premises at the end of the Term; except that Landlord may, as provided in the next succeeding paragraph of this Section 7.3, require Tenant to remove by the Expiration Date or sooner termination date of this Lease, all or any of the Alterations installed either by Tenant or by Landlord at Tenant's request, including without limitation all Tenant Improvements constructed pursuant to the Work Letter (except as otherwise provided in the Work Letter) and all telephone and data cabling, and to repair any damage to the Premises, the Building or the Common Area arising from that removal and restore the Premises to their condition prior to making such Alterations.

As of the Expiration Date or earlier termination date of this Lease, Landlord shall have the right to require Tenant to remove any Alterations made by Tenant to the Premises and to replace same with the applicable Replacements, whether or not Landlord's consent was required. Notwithstanding the foregoing, if at the time of requesting Landlord's consent to any such Alterations, Tenant shall request in writing whether or not Landlord shall require such Alterations to be removed and replaced as of the Expiration Date or earlier termination date of this Lease, then Landlord's right to require Tenant to remove and replace such Alterations shall be exercised, if at all, at the time of Landlord's consent thereto.

**SECTION 7.4. MECHANIC'S LIENS.** Tenant shall keep the Premises free from any liens arising out of any services or work performed, materials furnished, or obligations incurred by or for Tenant. Upon request by Landlord, Tenant shall promptly (but in no event later than ten (10) business days following such request) cause any such lien to be released by posting a bond in accordance with California Civil Code Section 3143 or any successor statute. In the event that Tenant shall not, within thirty (30) days following the imposition of any lien, cause the lien to be released of record by payment or posting of a proper bond, Landlord shall have, in addition to all other available remedies, the right to cause the lien to be released by any means it deems proper, including payment of or defense against the claim giving rise to the lien. All expenses so incurred by Landlord, including Landlord's attorneys' fees, and any other damages incurred by Landlord arising out of such lien, shall be reimbursed by Tenant upon demand, together with interest from the date of payment by Landlord at the maximum rate permitted by law until paid. Tenant shall give Landlord no less than twenty (20) days' prior notice in writing before commencing construction of any kind on the Premises or Common Area and shall again notify Landlord that construction has commenced, such notice to be given on the actual date on which construction commences, so that Landlord may post and maintain notices of nonresponsibility on the Premises or Common Area, as applicable, which notices Landlord shall have the right to post and which Tenant agrees it shall not disturb. Tenant shall also provide Landlord notice in writing within ten (10) days following the date on which such work is substantially completed. The provisions of this Section shall expressly survive the expiration or sooner termination of this Lease.

**SECTION 7.5. ENTRY AND INSPECTION.** Landlord shall at all reasonable times, upon at least 24 hours prior written or oral notice (except in emergencies, when no notice shall be required) have the right to enter the Premises to inspect them, to supply services in accordance with this Lease, to perform any work required or permitted to be performed by Landlord within the Premises, to have access to install, repair, maintain, replace or remove all electrical and mechanical installations of Landlord and to protect the interests of Landlord in the Premises, and to submit the Premises to prospective or actual purchasers or encumbrance holders (or, during the last one hundred and eighty (180) days of the Term or when an Event of Default exists, to prospective tenants), all without being deemed to have caused an eviction of Tenant and without abatement of rent except as provided elsewhere in this Lease. Landlord shall have the right, if desired, to retain a key which unlocks all of the doors in the Premises, excluding Tenant's vaults and safes, and Landlord shall have the right to use any and all means which Landlord may deem proper to open the doors in an emergency in order to obtain entry to the Premises, and any entry to the Premises obtained by Landlord as provided in this Section 7.5 shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or any eviction of Tenant from the Premises.

**SECTION 7.6. COMMUNICATIONS EQUIPMENT** . Landlord hereby grants to Tenant a non-exclusive license (the " **License** ") to install, maintain and operate on the roof of the Building a single antenna or satellite dish not exceeding forty-eight inches (48") in height or thirty-six inches (36") in diameter (the " **Antenna** ") in accordance with and subject to the terms and conditions set forth below. The Antenna shall be installed at a location designated by Landlord and reasonably acceptable to Tenant (" **Licensed Area** "). The Licensed Area shall be considered to be a part of the Premises for all purposes under the Lease, and except as otherwise expressly provided in this Section 7.6 all provisions applicable to the use of the Premises under the Lease shall apply to the Licensed Area and its use by Tenant.

(1) The Term of the License shall be coterminous with this Lease;

(2) Tenant shall not be obligated to pay any license fee for the use of the Licensed Area pursuant to this Section 7.6 during the Term of this Lease.

(3) Tenant shall use the Licensed Area only for the installation, operation, repair, replacement and maintenance of the Antenna and the necessary mechanical and electrical equipment to service said Antenna and for no other use or purpose. The installation of the Antenna and all equipment and facilities related thereto, including any required conduit from the Premises to the Antenna, shall be deemed to constitute an alteration subject to the provisions of Section 7.3 of the Lease, provided that Landlord shall not unreasonably withhold its approval of the same. Landlord may require appropriate screening for the Antenna as a condition of Landlord's approval of the installation of the Antenna. Tenant may have access to the Licensed Area for such uses during normal business hours and at times upon reasonably prior notice to Landlord and shall reimburse Landlord for any reasonably out-of-pocket expenses incurred by Landlord in connection therewith;

(4) The Antenna shall be used only for transmitting and/or receiving data, audio and/or video signals to and from Tenant's facilities within the Premises for Tenant's use, and shall not be used or permitted to be used by Tenant for purposes of broadcasting signals to the public or to provide telecommunications or other communications transmitting or receiving services to any third parties;

(5) Landlord reserves the right upon reasonable prior written notice to Tenant to require either (a) the relocation of all equipment installed by Tenant to another location on the roof of the Building reasonably designated by Landlord, or (b) the removal of any and all of such equipment should Landlord reasonably determine that its presence results in material damage to the Building unless Tenant makes satisfactory arrangements to protect Landlord therefrom;

(6) Tenant shall require its employees, when using the Licensed Area, to stay within the immediate vicinity thereof. In addition, in the event any communications system or broadcast or receiving facilities are operating in the area, Tenant shall at all times during the term of the License conduct its operations so as to ensure that such system or facilities shall not be subjected to harmful interference as a result of such operations by Tenant. Upon notification from Landlord of any such interference, Tenant agrees to immediately take the necessary steps to correct such situation, and Tenant's failure to do so shall be deemed a default under the terms of this Lease.

(7) During the term of the License, Tenant shall comply with any standards promulgated by applicable governmental authorities or otherwise reasonably established by Landlord regarding the generation of electromagnetic fields. Should Landlord determine in good faith at any time that the Antenna poses a health or safety hazard to occupants of the Building, Landlord may require Tenant to make arrangements satisfactory to Landlord to mitigate such hazard or, if Tenant either fails or is unable to make such satisfactory arrangements, to remove the Antenna. Any claim or liability resulting from the use of the Antenna or the Licensed Area shall be subject to the indemnification provisions of this Lease applicable to Tenant's use of the Premises;

(8) During the term of the License, Tenant shall pay all taxes attributable to the Antenna and other equipment owned and installed by Tenant, and Tenant shall assure and provide Landlord with evidence that the Licensed Area and Tenant's use thereof are subject to the insurance coverages otherwise required to be maintained by Tenant as to the Premises pursuant to Exhibit D;

(9) Upon the expiration or sooner termination of the Lease, Tenant shall remove the Antenna and all related equipment and facilities, including any conduit from the Premises to the Antenna, from the Licensed Area and any other portions of the Building within or upon which the same may be installed, and shall restore the Licensed Area and all other areas affected by such removal to their original condition, reasonable wear and tear excepted, all at its sole cost and expense; and

(10) Tenant's rights under this Section 7.6 belong solely to Illumina, Inc., a Delaware corporation, and any attempted assignment or transfer of such rights shall be void and of no force and effect.

## ARTICLE VIII. TAXES AND ASSESSMENTS ON TENANT'S PROPERTY

Tenant shall be liable for and shall pay, at least ten (10) days before delinquency, all taxes and assessments levied against all personal property of Tenant located in the Premises, and, if required by Landlord, against all Non-Standard Improvements to the Premises (as defined in Section 7.3) made by Landlord or Tenant, and against any Alterations (as defined in Section 7.3) made to the Premises or the Building by or on behalf of Tenant. If requested by Landlord, Tenant shall cause its personal property, Non-Standard Improvements and Alterations to be assessed and billed separately from the real property of which the Premises form a part. If any taxes required to be paid by Tenant on Tenant's personal property, Non-Standard Improvements and/or Alterations are levied against Landlord or Landlord's property and if Landlord pays the same, or if the assessed value of Landlord's property is increased by the inclusion of a value placed upon Tenant's personal property, Non-Standard Improvements and/or Alterations and if Landlord pays the taxes based upon the increased assessment, Landlord shall have the right to require that Tenant pay to Landlord the taxes so levied against Landlord or the proportion of the taxes resulting from the increase in the assessment. In calculating what portion of any tax bill which is assessed against Landlord separately, or Landlord and Tenant jointly, is attributable to Tenant's Non-Standard Improvements, Alterations and personal property, Landlord's reasonable determination shall be conclusive.

## ARTICLE IX. ASSIGNMENT AND SUBLETTING

### SECTION 9.1. RIGHTS OF PARTIES.

(a) Notwithstanding any provision of this Lease to the contrary, and except as to transfers expressly permitted without Landlord's consent pursuant to Section 9.4, Tenant will not, either voluntarily or by operation of law, assign, sublet, encumber, or otherwise transfer all or any part of Tenant's interest in this Lease or the Premises, or permit the Premises to be occupied by anyone other than Tenant, without Landlord's prior written consent, which consent shall not unreasonably be withheld in accordance with the provisions of Section 9.1(b). No assignment (whether voluntary, involuntary or by operation of law), subletting or other transfer shall be valid or effective without Landlord's prior written consent and, at Landlord's election, any such assignment, subletting or other transfer shall be void and of no force and effect and any such attempted assignment, subletting or other transfer shall constitute an Event of Default of this Lease. Landlord shall not be deemed to have given its consent to any assignment, subletting or other transfer by any course of action, including without limitation its acceptance of rent or any other payment due under this Lease from any person or entity other than Tenant or its acceptance of any name for listing in the Building directory, other than Landlord's written consent. To the extent not prohibited by

provisions of the Bankruptcy Code, 11 U.S.C. Section 101 et seq., (the **"Bankruptcy Code"** ), including Section 365(f)(1), Tenant on behalf of itself and its creditors, administrators and assigns waives the applicability of Section 365(e) of the Bankruptcy Code unless the proposed assignee of the Trustee for the estate of the bankrupt meets Landlord's standard for consent as set forth in Section 9.1(b) of this Lease. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations to be delivered in connection with the assignment shall be delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed to have assumed all of the obligations arising under this Lease on and after the date of the assignment, and shall upon demand execute and deliver to Landlord an instrument confirming that assumption.

(b) If Tenant desires to assign, sublease or otherwise transfer an interest in this Lease or the Premises, it shall first notify Landlord of its desire and shall submit in writing to Landlord: (i) the name and address of the proposed assignee, subtenant or transferee; (ii) the nature of any proposed assignee's, subtenant's or transferee's business to be carried on in the Premises; (iii) the terms and provisions of any proposed assignment, sublease or other transfer, including a copy of the proposed assignment, sublease or transfer form; (iv) evidence that the proposed assignee, subtenant or transferee will comply with the requirements of <u>Exhibit D</u> hereto; (v) a completed Environmental Questionnaire from the proposed assignee, subtenant or transferee; (vi) any other information requested by Landlord and reasonably related to the transfer and (vii) the fee described in Section 9.1(e). Except as provided in Section 9.1(c), Landlord shall not unreasonably withhold its consent, provided that the parties agree that it shall be reasonable for Landlord to withhold its consent if: (1) the use of the Premises will not be consistent with the provisions of this Lease or with Landlord's commitment to other tenants of the Building and Project; (2) the proposed assignee, subtenant or transferee has been required by any prior landlord, lender or governmental authority to take remedial action in connection with Hazardous Materials contaminating a property arising out of the proposed assignee's, subtenant's or transferee's actions or use of the property in question, or is subject to any enforcement order issued by any governmental authority in connection with the use, disposal or storage of a Hazardous Material; (3) insurance requirements of the proposed assignee or subtenant may not be brought into conformity with Landlord's then current leasing practice; (4) the proposed assignee, subtenant or transferee has not demonstrated to the reasonable satisfaction of Landlord that it is financially responsible or has failed to submit to Landlord all reasonable information as requested by Landlord concerning the proposed assignee, subtenant or transferee, including, but not limited to, current statements of income or profit and loss of the proposed assignee, subtenant or transferees; (5) the proposed subtenant, assignee or transferee is an existing tenant of the Building or Project with whom Landlord is negotiating to expand or relocate within the Building or Project, or a prospect with whom Landlord is negotiating to become a tenant at the Building or Project; or (6) the proposed assignment, sublease or transfer will impose additional burdens or adverse tax effects on Landlord. If Tenant has any exterior sign rights under this Lease, such rights are personal to Tenant and may not be assigned or transferred to any assignee of this Lease or subtenant of the Premises without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion.

If Landlord consents to the proposed transfer, Tenant may within ninety (90) days after the date of the consent effect the transfer upon the terms described in the information furnished to Landlord; provided that any material change in the terms shall be subject to Landlord's consent as set forth in this Section 9.1. Landlord shall approve or disapprove any requested transfer within thirty (30) days following receipt of Tenant's written request, the information set forth above, and the fee set forth below.

(c) Notwithstanding the provisions of Section 9.1(b) above, in lieu of consenting to a proposed assignment of this Lease or to a subletting of all or substantially all of the Floor Area of the Premises, Landlord may elect, within the thirty (30) day period permitted for Landlord to approve or disapprove a requested transfer, to (i) sublease the Premises (or the portion proposed to be so subleased), or take an assignment of Tenant's interest in this Lease, upon substantially the same terms as offered to the proposed subtenant or assignee (excluding terms relating to the purchase of personal property, the use of Tenant's name or the continuation of Tenant's business), respectively, or (ii) terminate this Lease as to the portion of the Premises proposed to be so subleased or assigned with a proportionate abatement in the rent payable under this Lease, and the sublease, assignment or termination elected by Landlord shall be effective thirty (30) days following written notice by Landlord of its election. Landlord may thereafter, at its option, assign, sublet or re-let any space so sublet, obtained by assignment or obtained by termination to any third party, including without limitation the proposed transferee of Tenant.

(d) In the event that Landlord approves the requested assignment, subletting or other transfer, Landlord shall be entitled to receive fifty percent (50%) of any amounts paid by the assignee or subtenant, however described, in excess of (i) the Basic Rent payable by Tenant hereunder, or in the case of a sublease of a portion of the Premises, in excess of the Basic Rent reasonably allocable to such portion as determined by Landlord, plus (ii) Tenant's direct out-of-pocket costs which Tenant certifies to Landlord have been paid to provide occupancy related services to such assignee or subtenant of a nature commonly provided by landlords of similar space, with such costs to be amortized on a straight-line basis over the then remaining term of this Lease or any shorter term of any sublease of the Premises or a portion thereof. The amounts due Landlord under this Section 9.1(d), shall be payable directly to Landlord by the assignee or subtenant concurrently with such assignee's or subtenant's payment(s) to Tenant, or, at Landlord's option, by Tenant within ten (10) days of Tenant's receipt thereof. Landlord shall have the right to review or audit the books and records of Tenant, or have such books and records reviewed or audited by an outside accountant, to confirm any such direct out-of-pocket costs. In the event that such direct out-of-pocket costs claimed by Tenant are overstated by more than five percent (5%), Tenant shall reimburse Landlord for any of Landlord's costs related to such review or audit. At Landlord's request, a written agreement shall be entered into by and among Tenant, Landlord and the proposed assignee or subtenant confirming the requirements of this Section 9.1(d).

(e) Tenant shall pay to Landlord a fee equal to the greater of (i) Landlord's actual and reasonable costs related to such assignment, subletting or other transfer or (ii) Five Hundred Dollars ($500.00), to process any request by Tenant for an assignment, subletting or other transfer under this Lease. Tenant shall pay Landlord the sum of Five Hundred Dollars ($500.00) concurrently with Tenant's request for consent to any assignment, subletting or other transfer, and Landlord shall have no obligation to consider such request unless accompanied by such payment. Tenant shall pay Landlord upon demand any costs in excess of such payment to the extent Landlord's actual and reasonable costs related to such request exceeds $500.00. Such fee is hereby acknowledged as a reasonable amount to reimburse Landlord for its costs of review and evaluation of a proposed transfer.

**SECTION 9.2. EFFECT OF TRANSFER.** No assignment, subletting or other transfer, even with the consent of Landlord, shall relieve Tenant of its obligation to pay rent and to perform all its other obligations under this Lease. Moreover, Tenant shall indemnify and hold Landlord harmless, as provided in Section 10.3, for any act or omission by an assignee, subtenant or transferee. Each assignee, other than Landlord, shall assume all obligations of Tenant under this Lease and shall be liable jointly and severally with Tenant for the payment of all rent, and for the due performance of all of Tenant's obligations, under this Lease. No assignment, subletting or transfer shall be effective or binding on Landlord unless documentation in form and substance satisfactory to Landlord in its reasonable discretion evidencing the transfer, and in the case of an assignment, the assignee's assumption of the obligations of Tenant under this Lease, is delivered to Landlord, and both the assignee/subtenant and Tenant deliver to Landlord an executed consent to transfer instrument prepared by Landlord and consistent with the requirements of this Article. Consent by Landlord to one or more transfers shall not operate as a waiver or estoppel to the future enforcement by Landlord of its rights under this Lease or as a consent to any subsequent transfer.

**SECTION 9.3. SUBLEASE REQUIREMENTS.** The following terms and conditions shall apply to any subletting by Tenant of all or any part of the Premises and shall be deemed included in each sublease:

(a) Each and every provision contained in this Lease (other than with respect to the payment of rent hereunder) is incorporated by reference into and made a part of such sublease, with " **Landlord** " hereunder meaning the sublandlord therein and " **Tenant** " hereunder meaning the subtenant therein.

(b) Tenant hereby irrevocably assigns to Landlord all of Tenant's interest in all rentals and income arising from any sublease of the Premises, and Landlord may collect such rent and income and apply the same toward Tenant's obligations under this Lease; provided, however, that until there is an Event of Default by Tenant, Tenant shall have the right to receive and collect the sublease rentals. Landlord shall not, by reason of this assignment or the collection of sublease rentals, be deemed liable to the subtenant for the performance of any of Tenant's obligations under the sublease. Tenant hereby irrevocably authorizes and directs any subtenant, upon receipt of a written notice from Landlord stating that an Event of Default exists in the performance of Tenant's obligations under this Lease, to pay to Landlord all sums then and thereafter due under the sublease. Tenant agrees that the subtenant may rely on that notice without any duty of further inquiry and notwithstanding any notice or claim by Tenant to the contrary. Tenant shall have no right or claim against the subtenant or Landlord for any rentals so paid to Landlord.

(c) In the event of the termination of this Lease for any reason, including without limitation as the result of an Event of Default by Tenant or by the mutual agreement of Landlord and Tenant, Landlord may, at its sole option, take over Tenant's entire interest in any sublease and, upon notice from Landlord, the subtenant shall attorn to Landlord. In no event, however, shall Landlord be liable for any previous act or omission by Tenant under the sublease or for the return of any advance rental payments or deposits under the sublease that have not been actually delivered to Landlord, nor shall Landlord be bound by any sublease modification executed without Landlord's consent or for any advance rental payment by the subtenant in excess of one month's rent. The provisions of this Lease (other than with respect to the payment of rent), including without limitation those pertaining to insurance and indemnification, shall be deemed incorporated by reference into the sublease despite the termination of this Lease. In the event Landlord does not elect to take over Tenant's interest in a sublease in the event of any such termination of this Lease, such sublease shall terminate concurrently with the termination of this Lease and such subtenant shall have no further rights under such sublease and Landlord shall have no obligations to such subtenant.

**SECTION 9.4. CERTAIN TRANSFERS.** The following shall be deemed to constitute an assignment of this Lease; (a) the sale of all or substantially all of Tenant's assets (other than bulk sales in the ordinary course of business), (b) if Tenant is a corporation, an unincorporated association, a limited liability company or a partnership, the transfer, assignment or hypothecation of any stock or interest in such corporation, association, limited liability company or partnership in the aggregate of twenty-five percent (25%) (except for publicly traded shares of stock constituting a transfer of twenty-five percent (25%) or more in the aggregate, so long as no change in the controlling interest of Tenant occurs as a result thereof), or (c) any other direct or indirect change of control of Tenant, including, without limitation, change of control of Tenant's parent company or a merger by Tenant or its parent company. Notwithstanding the foregoing, Landlord's consent shall not be required for the assignment of this Lease as a result of a merger by Tenant with or into another entity or a reorganization of Tenant, so long as (i) the net worth of the successor or reorganized entity after such merger is at least equal to the greater of the net worth of Tenant as of the execution of this Lease by Landlord or the net worth of Tenant immediately prior to the date of such merger or reorganization, evidence of which, satisfactory to Landlord, shall be presented to Landlord prior to such merger or reorganization, (ii) Tenant shall provide to Landlord, prior to such merger or reorganization, written notice of such merger or reorganization and such assignment documentation and other information as Landlord may require in connection therewith, and (iii) all of the terms and requirements of Section 9.2 and 9.3 shall apply with respect to such assignment.

## ARTICLE X. INSURANCE AND INDEMNITY

**SECTION 10.1. TENANT'S INSURANCE.** Tenant, at its sole cost and expense, shall provide and maintain in effect the insurance described in Exhibit D . Evidence of that insurance must be delivered to Landlord prior to the Early Occupancy Date or any earlier date on which Tenant may enter upon or take possession of the Premises for any reason whatsoever.

**SECTION 10.2. LANDLORD'S INSURANCE.** Landlord may, at its election, provide any or all of the following types of insurance, with or without deductible and in amounts and coverages as may be determined by Landlord in its sole and absolute discretion: property insurance, subject to standard exclusions, covering the Building and/or Project, and such other risks as Landlord or its mortgagees may from time to time deem appropriate, including coverage for the Tenant Improvements constructed by Landlord pursuant to the Work Letter (if any) attached hereto, and commercial general liability coverage. Landlord shall not be required to carry insurance of any kind on Tenant's Alterations or on Tenant's other property, including, without limitation, Tenant's trade fixtures, furnishings, equipment, signs and all other items of personal property, and Landlord shall not be obligated to repair or replace that property should damage occur. All proceeds of insurance maintained by Landlord upon the Building and/or Project shall be the property of Landlord, whether or not Landlord is obligated to or elects to make any repairs. At Landlord's option, Landlord may self-insure all or any portion of the risks for which Landlord may elect to provide insurance hereunder.

**SECTION 10.3. TENANT'S INDEMNITY.** To the fullest extent permitted by law, Tenant shall defend, indemnify, protect, save and hold harmless Landlord, its agents, and any and all affiliates of Landlord, including, without limitation, any corporations or other entities controlling, controlled by or under common control with Landlord, from and against any and all claims, demands, actions, losses, liabilities, costs or expenses arising either before or after the Early Occupancy Date from: Tenant's use or occupancy of the Premises, the Building or the Common Areas, including, without limitation, the use by Tenant, its agents, employees, invitees or licensees of any recreational facilities within the Common Areas; the conduct of Tenant's business; any activity, work, or thing done, permitted or suffered by Tenant or its agents, employees, invitees or licensees in or about the Premises, the Building or the Common Areas; any Event of Default in the performance of any obligation on Tenant's part to be performed under this Lease; or any act or negligence of Tenant or its agents, employees, visitors, patrons, guests, invitees or licensees. Landlord may, at its option, require Tenant to assume Landlord's defense in any claim, action or proceeding covered by this Section through counsel satisfactory to Landlord. The provisions of this Section shall expressly survive the expiration or sooner termination of this Lease. Tenant's obligations under this Section shall not apply in the event that the claim, demand, action, loss, liability, cost or expense is caused solely by the active negligence or willful misconduct of Landlord.

**SECTION 10.4. LANDLORD'S NONLIABILITY.** Landlord, its agents, and any and all affiliates of Landlord, shall not be liable to Tenant, its employees, agents and/or invitees, and Tenant hereby waives all claims against Landlord, its agents, and any and all affiliates of Landlord, for and knowingly assumes the risk of loss of or damage to any property, or loss or interruption of business or income, or any other loss, cost, damage, injury or liability whatsoever (including without limitation any consequential damages and lost profit or opportunity costs), resulting from, but not limited to, Acts of God, acts of civil disobedience or insurrection, acts or omissions of third parties and/or of other tenants within the Project or their agents, employees, contractors, guests or invitees, fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak or flow from or into any part of the Premises, mold, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning, electrical works, roof, windows or other fixtures in the Building (whether the damage or injury results from conditions arising in the Premises or in other portions of the Building), regardless of the negligence of Landlord, its agents or any and all affiliates of Landlord in connection with any of the foregoing. It is understood that any such condition may require the temporary evacuation or closure of all or a portion of the Building. Landlord shall have no liability whatsoever (including without limitation consequential damages and lost profit or opportunity costs) and, except as provided in Sections 11.1 and 12.1 below, there shall be no abatement of rent, by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements to any portion of the Building, including repairs to the Premises, nor shall any related activity by Landlord constitute an actual or constructive eviction. In making repairs, alterations or improvements, however, Landlord shall interfere as little as reasonably practicable with the conduct of Tenant's business in the Premises. Should Tenant elect to receive any service or products from a concessionaire, licensee or third party tenant of Landlord, Landlord shall have no liability for any services or products so provided or for any breach of contract by such third party provider. Neither Landlord nor its agents shall be liable for interference with light or other similar intangible interests. Tenant shall immediately notify Landlord in case of fire or accident in the Premises, the Building or the Project and of defects in any improvements or equipment.

**SECTION 10.5. WAIVER OF SUBROGATION.** Landlord and Tenant each hereby waives all rights of recovery against the other and the other's agents on account of loss and damage occasioned to the property of such waiving party to the extent that the waiving party is entitled to proceeds for such loss or damage under any property insurance policies carried or required to be carried by the provisions of this Lease; provided however, that the foregoing waiver shall not apply to the extent of Tenant's obligations to pay deductibles under any such policies and this Lease. By this waiver it is the intent of the parties that neither Landlord nor Tenant shall be liable to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage insured against under any property insurance policies contemplated by this Lease, even though such loss or damage might be occasioned by the negligence of such party, its agents, employees, contractors, guests or invitees.

## ARTICLE XI. DAMAGE OR DESTRUCTION

**SECTION 11.1. RESTORATION.**

(a) If the Premises or the Building or a part thereof are materially damaged by any fire, flood, earthquake or other casualty, Landlord shall have the right to terminate this Lease upon written notice to Tenant if: (i) Landlord reasonably determines that proceeds necessary to pay the full cost of repair are not available from Landlord's insurance, including without limitation earthquake insurance, plus such additional amounts Tenant elects, at its option, to contribute, excluding however the deductible (for which Tenant shall be responsible for Tenant's Share); (ii) Landlord reasonably determines that the Premises cannot, with reasonable diligence, be fully repaired by Landlord (or cannot be safely repaired because of the presence of hazardous factors, including without limitation Hazardous Materials, earthquake faults, and other similar dangers) within two hundred seventy (270) days after the date of the damage; (iii) an Event of Default by Tenant has occurred; or (iv) the material damage occurs during the final twelve (12) months of the Term. Landlord shall notify Tenant in writing (" **Landlord's Notice** ") within sixty (60) days after the damage occurs as to (A) whether Landlord is terminating this Lease as a result of such material damage and (B) if Landlord is not terminating this Lease, the number of days within which Landlord estimates that the Premises, with reasonable diligence, are likely to be fully repaired. In the event Landlord elects to terminate this Lease, this Lease shall terminate as of the date specified for termination by Landlord's Notice (which termination date shall in no event be later than sixty (60) days following the date of the damage, or, if no such date is specified, such termination shall be the date of Landlord's Notice).

(b) If Landlord has the right to terminate this Lease pursuant to Section 11.1(a) and does not elect to so terminate this Lease, and provided that at the time of Landlord's Notice neither an Event of Default exists nor has Landlord delivered to Tenant a notice of any failure by Tenant to fulfill an obligation under this Lease which, unless cured by Tenant within the applicable grace period, would constitute an Event of Default, then within ten (10) days following delivery of Landlord's Notice pursuant to Section 11.1(a), Tenant may elect to terminate this Lease by written notice to Landlord, but only if (i) Landlord's Notice specifies that Landlord has determined that the Premises cannot be repaired, with reasonable diligence, within two hundred seventy (270) days after the date of damage or (ii) the casualty has occurred within the final twelve (12) months of the Term and such material damage has a materially adverse impact on Tenant's continued use of the Premises. If Tenant fails to provide such termination notice within such ten (10) day period, Tenant shall be deemed to have waived any termination right under this Section ll.1(b) or any other applicable law.

(c) In the event that neither Landlord nor Tenant terminates this Lease pursuant to this Section 11.1 as a result of material damage to the Building or Premises resulting from a casualty, Landlord shall repair all material damage to the Premises or the Building as soon as reasonably possible and this Lease shall continue in effect for the remainder of the Term. Subject to any provision to the contrary in the Work Letter, such repair by Landlord shall include repair of material damage to the Tenant Improvements constructed pursuant to the Work Letter. Landlord's repair of material damage shall be at Landlord's sole cost and expense except for any insurance deductible (for which Tenant shall be responsible for Tenant's Share). Landlord shall have the right, but not the obligation, to repair or replace any other leasehold improvements made by Tenant or any Alterations (as defined in Section 7.3) constructed by Tenant as part of Landlord's repair of material damage, in which case Tenant shall make available to Landlord upon demand insurance proceeds from insurance required to be maintained by Tenant. If Landlord elects to repair or replace such leasehold improvements and/or Alterations, all insurance proceeds available for such repair or replacement shall be made available to Landlord. Landlord shall have no liability to Tenant in the event that the Premises or the Building has not been fully repaired within the time period specified by Landlord in Landlord's Notice to Tenant as described in Section 11.1(a). Notwithstanding the provisions of this Article XI, the repair of damage to the Premises to the extent such damage is not material shall be governed by Sections 7.1 and 7.2.

(d) Commencing on the date of such material damage to the Building, and ending on the sooner of the date the damage is repaired or the date this Lease is terminated, the rental to be paid under this Lease shall be abated in the same proportion that the Floor Area of the Premises that is rendered unusable by the damage from time to time bears to the total Floor Area of the Premises, as determined by Landlord, but only to the extent that Landlord is entitled to reimbursement from the proceeds of the business interruption insurance required to be maintained by Tenant pursuant to Exhibit D .

(e) Landlord shall not be required to repair or replace any improvements or fixtures that Tenant is obligated to repair or replace pursuant to Section 7.1 or any other provision of this Lease and Tenant shall continue to be obligated to so repair or replace any such improvements or fixtures, notwithstanding any provisions to the contrary in this Article XI. In addition, but subject to the provisions of Section 10.5, in the event the damage or destruction to the Premises or Building are due in substantial part to the fault or neglect of Tenant or its employees, subtenants, invitees or representatives, the costs of such repairs or replacement to the Premises or Building shall be borne by Tenant, and in addition, Tenant shall not be entitled to terminate this Lease as a result, notwithstanding the provisions of Section 11.1(b).

(f) Tenant shall fully cooperate with Landlord in removing Tenant's personal property and any debris from the Premises to facilitate all inspections of the Premises and the making of any repairs. Notwithstanding anything to the contrary contained in this Lease, if Landlord in good faith believes there is a risk of injury to persons or damage to property from entry into the Building or Premises following any damage or destruction thereto, Landlord may restrict entry into the Building or the Premises by Tenant, its employees, agents and contractors in a non-discriminatory manner, without being deemed to have violated Tenant's rights of quiet enjoyment to, or made an unlawful detainer of, or evicted Tenant from, the Premises. Upon request, Landlord shall consult with Tenant to determine if there are safe methods of entry into the Building or the Premises solely in order to allow Tenant to retrieve files, data in computers, and necessary inventory, subject however to all indemnities and waivers of liability from Tenant to Landlord contained in this Lease and any additional indemnities and waivers of liability which Landlord may require.

**SECTION 11.2. LEASE GOVERNS.** Tenant agrees that the provisions of this Lease, including without limitation Section 11.1, shall govern any damage or destruction and shall, accordingly, supersede any contrary statute or rule of law.

## ARTICLE XII. EMINENT DOMAIN

**SECTION 12.1. TOTAL OR PARTIAL TAKING.** If all or a material portion of the Premises is taken by any lawful authority by exercise of the right of eminent domain, or sold to prevent a taking, either Tenant or Landlord may terminate this Lease effective as of the date possession is required to be surrendered to the authority. In the event title to a portion of the Building or Project, whether or not including a portion of the Premises, is taken or sold to prevent a taking, and if Landlord elects to restore the Building in such a way as to alter the Premises materially, either party may terminate this Lease, by written notice to the other party, effective on the date of vesting of title. In the event neither party has elected to terminate this Lease as provided above, then Landlord shall promptly, after receipt of a sufficient condemnation award, proceed to restore the Premises to substantially their condition prior to the taking, and a proportionate allowance shall be made to Tenant for the rent corresponding to the time during which, and to the part of the Premises of which, Tenant is deprived on account of the taking and restoration. In the event of a taking, Landlord shall be entitled to the entire amount of the condemnation award without deduction for any estate or interest of Tenant; provided that nothing in this Section shall be deemed to give Landlord any interest in, or prevent Tenant from seeking any award against the taking authority for, the taking of personal property and fixtures belonging to Tenant or for relocation or business interruption expenses recoverable from the taking authority.

**SECTION 12.2. TEMPORARY TAKING.** No temporary taking of the Premises shall terminate this Lease or give Tenant any right to abatement of rent, and any award specifically attributable to a temporary taking of the Premises shall belong entirely to Tenant. A temporary taking shall be deemed to be a taking of the use or occupancy of the Premises for a period of not to exceed ninety (90) days.

**SECTION 12.3. TAKING OF PARKING AREA.** In the event there shall be a taking of the parking area such that Landlord can no longer provide sufficient parking to comply with this Lease, Landlord may substitute reasonably equivalent parking in a location reasonably close to the Building; provided that if Landlord fails to make that substitution within ninety (90) days following the taking and if the taking materially impairs Tenant's use and enjoyment of the Premises, Tenant may, at its option, terminate this Lease by written notice to Landlord. If this Lease is not so terminated by Tenant, there shall be no abatement of rent and this Lease shall continue in effect.

## ARTICLE XIII. SUBORDINATION; ESTOPPEL CERTIFICATE; FINANCIALS

**SECTION 13.1. SUBORDINATION.** At the option of Landlord or any lender of Landlord's that obtains a security interest in the Building, this Lease shall be either superior or subordinate to all ground or underlying leases, mortgages and deeds of trust, if any, which may hereafter affect the Building, and to all renewals, modifications, consolidations, replacements and extensions thereof; provided, that so long as no Event of Default exists under this Lease beyond any applicable notice and cure period, Tenant's possession and quiet enjoyment of the Premises shall not be disturbed and this Lease shall not terminate in the event of termination of any such ground or underlying lease, or the foreclosure of any such mortgage or deed of trust, to which this Lease has been subordinated pursuant to this Section. Tenant shall execute and deliver any documents or agreements requested by Landlord or such lessor or lender which provide Tenant with the non-disturbance protections set forth in this Section. In the event of a termination or foreclosure, Tenant shall become a tenant of and attorn to the successor-in-interest to Landlord upon the same terms and conditions as are contained in this Lease, and shall execute any instrument reasonably required by Landlord's successor for that purpose. Tenant shall also, upon written request of Landlord, execute and deliver all instruments as may be required from time to time to subordinate the rights of Tenant under this Lease to any ground or underlying lease or to the lien of any mortgage or deed of trust (provided that such instruments include the nondisturbance and attornment provisions set forth above), or, if requested by Landlord, to subordinate, in whole or in part, any ground or underlying lease or the lien of any mortgage or deed of trust to this Lease. Tenant agrees that any purchaser at a foreclosure sale or lender taking title under a deed-in-lieu of foreclosure shall not be responsible for any act or omission of a prior landlord, shall not be subject to any offsets or defenses Tenant may have against a prior landlord, and shall not be liable for the return of the security deposit to the extent it is not actually received by such purchaser or bound by any rent paid for more than the current month in which the foreclosure occurred.

**SECTION 13.2. ESTOPPEL CERTIFICATE.**

(a) Tenant shall within ten (10) days following written request from Landlord, execute, acknowledge and deliver to Landlord, in any form that Landlord may reasonably require, a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of the modification and certifying that this Lease, as modified, is in full force and effect) and the dates to which the rental, additional rent and other charges have been paid in advance, if any, and (ii) acknowledging that, to Tenant's knowledge, there are no uncured defaults on the part of Landlord, or specifying each default if any are claimed, and (iii) setting forth all further information that Landlord or any prospective purchaser or encumbrancer may reasonably require. Tenant's statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Building or Project.

(b) Notwithstanding any other rights and remedies of Landlord, Tenant's failure to deliver any estoppel statement within the provided time shall be conclusive upon Tenant that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) there are no uncured Events of Default in Landlord's performance, and (iii) not more than one month's rental has been paid in advance.

**SECTION 13.3. FINANCIALS.**

(a) Tenant shall deliver to Landlord, prior to the execution of this Lease and thereafter at any time and from time to time within ten (10) days following Landlord's written request, Tenant's current tax returns and financial statements, certified to be true, accurate and complete by the chief financial officer of Tenant, including a balance sheet and profit and loss statement for the most recent prior year, or, in the event Tenant is a publicly traded corporation on a nationally recognized stock exchange, Tenant's current financial reports filed with the Securities and Exchange Commission (collectively, the " **Statements** "), which Statements shall accurately and completely reflect the financial condition of Tenant. Landlord agrees that it will keep the Statements confidential, except that Landlord shall have the right to deliver the same to any proposed purchaser of the Building or Project, and to any encumbrancer or proposed encumbrancer of all or any portion of the Building or Project.

(b) Tenant acknowledges that Landlord is relying on the Statements in its determination to enter into this Lease, and Tenant represents to Landlord, which representation shall be deemed made on the date of this Lease and again on the Commencement Date, that no material change in the financial condition of Tenant, as reflected in the Statements, has occurred since the date Tenant delivered the Statements to Landlord. The Statements are represented and warranted by Tenant to be correct and to accurately and fully reflect Tenant's true financial condition as of the date of submission of any Statements to Landlord.

## ARTICLE XIV. EVENTS OF DEFAULT AND REMEDIES

**SECTION 14.1. TENANT'S DEFAULTS.** The occurrence of any one or more of the following events (following the expiration of any cure period set forth below, if any is provided) shall constitute an "Event of Default" by Tenant:

(a) The failure by Tenant to make any payment of Basic Rent or additional rent required to be made by Tenant, as and when due, where the failure continues for a period of five (5) days after written notice from Landlord to Tenant; provided, however, that any such notice shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 and 1161(a) as amended. For purposes of these Events of Default and remedies provisions, the term " **additional rent** " shall be deemed to include all amounts of any type whatsoever other than Basic Rent to be paid by Tenant pursuant to the terms of this Lease and the Work Letter.

(b) The assignment, sublease, encumbrance or other transfer of this Lease by Tenant, either voluntarily or by operation of law, whether by judgment, execution, transfer by intestacy or testacy, or other means, without the prior written consent of Landlord when consent is required by this Lease.

(c) The discovery by Landlord that any financial statement provided by Tenant, or by any affiliate, successor or guarantor of Tenant, was materially false.

(d) The failure of Tenant to timely and fully provide any subordination agreement, estoppel certificate or financial statements in accordance with the requirements of Article XIII.

(e) The abandonment of the Premises by Tenant.

(f) The failure or inability by Tenant to observe or perform any of the express or implied covenants or provisions of this Lease to be observed or performed by Tenant, other than as specified in this Section 14.1, where the failure continues for a period of thirty (30) days after written notice from Landlord to Tenant or such shorter period as is specified in any other provision of this Lease; provided, however, that such notice shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 and 1161(a) as amended. However, if the nature of the failure is such that more than thirty (30) days are reasonably required for its cure, then an Event of Default shall not be deemed to have occurred if Tenant commences the cure within thirty (30) days, and thereafter diligently pursues the cure to completion.

(g) (i) The making by Tenant of any general assignment for the benefit of creditors; (ii) the filing by or against Tenant of a petition to have Tenant adjudged a Chapter 7 debtor under the Bankruptcy Code, to have debts discharged or for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within thirty (30) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, if possession is not restored to Tenant within thirty (30) days; (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where the seizure is not discharged within thirty (30) days; (v) Tenant's convening of a meeting of its creditors for the purpose of effecting a moratorium upon or composition of its debts; or (vi) the failure of Tenant to pay its material obligations to creditors as and when they become due and payable, other than as a result of a good faith dispute by Tenant as to the amount due to such creditors. Landlord shall not be deemed to have knowledge of any event described in this Section 14.1(g) unless notification in writing is received by Landlord, nor shall there be any presumption attributable to Landlord of Tenant's insolvency. In the event that any provision of this Section 14.1(g) is contrary to applicable law, the provision shall be of no force or effect.

(h) Any other breach of this Lease which this Lease provides is an Event of Default.

**SECTION 14.2. LANDLORD'S REMEDIES.**

(a) If an Event of Default by Tenant occurs, then in addition to any other remedies available to Landlord, Landlord may exercise the following remedies:

(i) Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord. Such termination shall not affect any accrued obligations of Tenant under this Lease. Upon termination, Landlord shall have the right to reenter the Premises and remove all persons and property. Landlord shall also be entitled to recover from Tenant (and to retain, use or apply any Security Deposit held by Landlord towards amounts estimated by Landlord as):

(1) The worth at the time of award of the unpaid Basic Rent and additional rent which had been earned at the time of termination;

(2) The worth at the time of award of the amount by which the unpaid Basic Rent and additional rent which would have been earned after termination until the time of award exceeds the amount of such loss that Tenant proves could have been reasonably avoided;

(3) The worth at the time of award of the amount by which the unpaid Basic Rent and additional rent for the balance of the Term after the time of award exceeds the amount of such loss that Tenant proves could be reasonably avoided;

(4) Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result from Tenant's Event of Default, including, but not limited to, the cost of recovering possession of the Premises, refurbishment of the Premises, marketing costs, commissions and other expenses of reletting, including necessary repair, the unamortized portion of any tenant improvements and brokerage commissions funded by Landlord in connection with this Lease, reasonable attorneys' fees, and any other reasonable costs; and

(5) At Landlord's election, all other amounts in addition to or in lieu of the foregoing as may be permitted by law. The term "rent" as used in the Lease shall be deemed to mean the Basic Rent, Tenant's Share of Operating Expenses and any other sums required to be paid by Tenant to Landlord pursuant to the terms of this Lease whether or not designated as additional rent hereunder, including, without limitation, any sums that may be owing from Tenant pursuant to Section 4.3 of this Lease. Any sum, other than Basic Rent, shall be computed on the basis of the average monthly amount accruing during the twenty-four (24) month period immediately prior to the Event of Default, except that if it becomes necessary to compute such rental before the twenty-four (24) month period has occurred, then the computation shall be on the basis of the average monthly amount during the shorter period. As used in Sections 14.2(a)(i) (1) and (2) above, the "worth at the time of award" shall be computed by allowing interest at the rate of ten percent (10%) per annum. As used in Section 14.2(a)(i)(3) above, the "worth at the time of award" shall be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(ii) Landlord may elect not to terminate Tenant's right to possession of the Premises and to continue to enforce all of its rights and remedies under this Lease, including the right to collect all rent as it becomes due as provided in Civil Code Section 1951.4. Efforts by the Landlord to maintain, preserve or relet the Premises, or the appointment of a receiver to protect the Landlord's interests under this Lease, shall not constitute a termination of the Tenant's right to possession of the Premises. In the event that Landlord elects to avail itself of the remedy provided by this Section 14.2(a)(ii), Landlord shall not unreasonably withhold its consent to an assignment or subletting of the Premises subject to the reasonable standards for Landlord's consent as are contained in this Lease.

(b) Landlord shall be under no obligation to observe or perform any covenant of this Lease on its part to be observed or performed which accrues after the date of any Event of Default by Tenant unless and until the Event of Default is cured by Tenant, it being understood and agreed that the performance by Landlord of its obligations under this Lease are expressly conditioned upon Tenant's full and timely performance of its obligations under this Lease. The various rights and remedies reserved to Landlord in this Lease or otherwise shall be cumulative and, except as otherwise provided by California law, Landlord may pursue any or all of its rights and remedies at the same time.

(c) No delay or omission of Landlord to exercise any right or remedy shall be construed as a waiver of the right or remedy or of any breach or Event of Default by Tenant. The acceptance by Landlord of rent shall not be a (i) waiver of any preceding breach or Event of Default by Tenant of any provision of this Lease, other than the failure of Tenant to pay the particular rent accepted, regardless of Landlord's knowledge of the preceding breach or Event of Default at the time of acceptance of rent, or (ii) a waiver of Landlord's right to exercise any remedy available to Landlord by virtue of the breach or Event of Default. The acceptance of any payment from a debtor in possession, a trustee, a receiver or any other person acting on behalf of Tenant or Tenant's estate shall not waive or cure a breach or Event of Default under Section 14.1. No payment by Tenant or receipt by Landlord of a lesser amount than the rent required by this Lease shall be deemed to be other than a partial payment on account of the earliest due stipulated rent, nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction and Landlord shall accept the check or payment without prejudice to Landlord's right to recover the balance of the rent or pursue any other remedy available to it. No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender shall be valid unless in writing and signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys to the Premises prior to the termination of this Lease, and the delivery of the keys to any employee shall not operate as a termination of this Lease or a surrender of the Premises.

**SECTION 14.3. LATE PAYMENTS.**

(a) Any payment due to Landlord under this Lease, including without limitation Basic Rent, Tenant's Share of Operating Expenses or any other payment due to Landlord under this Lease whether or not designated as additional rent hereunder, that is not received by Landlord within five (5) days following the date due shall bear interest at the maximum rate permitted by law from the date due until fully paid. The payment of interest shall not cure any breach or Event of Default by Tenant under this Lease. In addition, Tenant acknowledges that the late payment by Tenant to Landlord of Basic Rent and Tenant's Share of Operating Expenses will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and impracticable to ascertain. Those costs may include, but are not limited to, administrative, processing and accounting charges, and late charges which may be imposed on Landlord by the terms of any ground lease, mortgage or trust deed covering the Premises. Accordingly, if any Basic Rent or Tenant's Share of Operating Expenses due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days following the date due, then Tenant shall pay to Landlord, in addition to the interest provided above, a late charge, which the Tenant agrees is reasonable, in a sum equal to the greater of five percent (5%) of the amount overdue or One Hundred Dollars ($100.00) for each delinquent payment. Acceptance of a late charge by Landlord shall not constitute a waiver of Tenant's breach or Event of Default with respect to the overdue amount, nor shall it prevent Landlord from exercising any of its other rights and remedies.

(b) Following each second installment of Basic Rent and/or the payment of Tenant's Share of Operating Expenses within any twelve (12) month period that is not paid within five (5) days following the date due, Landlord shall have the option (i) to require that beginning with the first payment of Basic Rent next due, Basic Rent and the Tenant's Share of Operating Expenses shall no longer be paid in monthly installments but shall be payable quarterly three (3) months in advance and/or (ii) to require that Tenant increase the amount, if any, of the Security Deposit by one hundred percent (100%). Should Tenant deliver to Landlord, at any time during the Term, two (2) or more insufficient checks, the Landlord may require that all monies then and thereafter due from Tenant be paid to Landlord by cashier's check. If any check for any payment to Landlord hereunder is returned by the bank for any reason, such payment shall not be deemed to have been received by Landlord and Tenant shall be responsible for any applicable late charge, interest payment and the charge to Landlord by its bank for such returned check. Nothing in this Section shall be construed to compel Landlord to accept Basic Rent, Tenant's Share of Operating Expenses or any other payment from Tenant if there exists an Event of Default unless such payment fully cures any and all such Events of Default. Any acceptance of any such payment shall not be deemed to waive any other right of Landlord under this Lease. Any payment by Tenant to Landlord may be applied by Landlord, in its sole and absolute discretion, in any order determined by Landlord to any amounts then due to Landlord.

**SECTION 14.4. RIGHT OF LANDLORD TO PERFORM.** All covenants and agreements to be performed by Tenant under this Lease shall be performed at Tenant's sole cost and expense and without any abatement of rent or right of set-off. If Tenant fails to pay any sum of money, other than rent payable to Landlord, or fails to perform any other act on its part to be performed under this Lease, and the failure continues beyond any applicable grace period set forth in Section 14.1, then in addition to any other available remedies, Landlord may, at its election make the payment or perform the other act on Tenant's part and Tenant hereby grants Landlord the right to enter onto the Premises in order to carry out such performance. Landlord's election to make the payment or perform the act on Tenant's part shall not give rise to any responsibility of Landlord to continue making the same or similar payments or performing the same or similar acts nor shall Landlord be responsible to Tenant for any damage caused to Tenant as the result of such performance by Landlord. Tenant shall, promptly upon demand by Landlord, reimburse Landlord for all sums paid by Landlord and all necessary incidental costs, together with interest at the maximum rate permitted by law from the date of the payment by Landlord.

**SECTION 14.5. DEFAULT BY LANDLORD.** Landlord shall not be deemed to be in default in the performance of any obligation under this Lease, and Tenant shall have no rights to take any action against Landlord, unless and until Landlord has failed to perform the obligation within thirty (30) days after written notice by Tenant to Landlord specifying in reasonable detail the nature and extent of the failure; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed to be in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion. In the event of Landlord's default under this Lease, Tenant's sole remedies shall be to seek damages or specific performance from Landlord, provided that any damages shall be limited to Tenant's actual out-of-pocket expenses and shall in no event include any consequential damages, lost profits or opportunity costs.

**SECTION 14.6. EXPENSES AND LEGAL FEES.** All sums reasonably incurred by Landlord in connection with any Event of Default by Tenant under this Lease or holding over of possession by Tenant after the expiration or earlier termination of this Lease, or any action related to a filing for bankruptcy or reorganization by Tenant, including without limitation all costs, expenses and actual accountants, appraisers, attorneys and other professional fees, and any collection agency or other collection charges, shall be due and payable to Landlord on demand, and shall bear interest at the rate of ten percent (10%) per annum. Should either Landlord or Tenant bring any action in connection with this Lease, the prevailing party shall be entitled to recover as a part of the action its reasonable attorneys' fees, and all other reasonable costs. The prevailing party for the purpose of this Section shall be determined by the trier of the facts.

SECTION 14.7. WAIVER OF JURY TRIAL/JUDICIAL REFERENCE.

(a) LANDLORD AND TENANT EACH ACKNOWLEDGES THAT IT IS AWARE OF AND HAS HAD THE ADVICE OF COUNSEL OF ITS CHOICE WITH RESPECT TO ITS RIGHTS TO TRIAL BY JURY, AND, TO THE EXTENT ENFORCEABLE UNDER CALIFORNIA LAW, EACH PARTY DOES HEREBY EXPRESSLY AND KNOWINGLY WAIVE AND RELEASE ALL SUCH RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER (AND/OR AGAINST ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE. FURTHERMORE, THIS WAIVER AND RELEASE OF ALL RIGHTS TO A JURY TRIAL IS DEEMED TO BE INDEPENDENT OF EACH AND EVERY OTHER PROVISION, COVENANT, AND/OR CONDITION SET FORTH IN THIS LEASE.

(b) IN THE EVENT THAT THE JURY WAIVER PROVISIONS OF SECTION 14. 7(a) ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW, THEN THE PROVISIONS OF THIS SECTION 14. 7(b) SHALL APPLY. IT IS THE DESIRE AND INTENTION OF THE PARTIES TO AGREE UPON A MECHANISM AND PROCEDURE UNDER WHICH CONTROVERSIES AND DISPUTES ARISING OUT OF THIS LEASE OR RELATED TO THE PREMISES WILL BE RESOLVED IN A PROMPT AND EXPEDITIOUS MANNER. ACCORDINGLY, EXCEPT WITH RESPECT TO ACTIONS FOR UNLAWFUL OR FORCIBLE DETAINER OR WITH RESPECT TO THE PREJUDGMENT REMEDY OF ATTACHMENT, ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER (AND/OR AGAINST ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR SUBSIDIARY OR AFFILIATED ENTITIES) ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE, SHALL BE HEARD AND RESOLVED BY A REFEREE UNDER THE PROVISIONS OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, SECTIONS 638 – 645.1, INCLUSIVE (AS SAME MAY BE AMENDED, OR ANY SUCCESSOR STATUTE(S) THERETO) (THE "REFEREE SECTIONS"). ANY FEE TO INITIATE THE JUDICIAL REFERENCE PROCEEDINGS SHALL BE PAID BY THE PARTY INITIATING SUCH PROCEDURE; PROVIDED HOWEVER, THAT THE COSTS AND FEES, INCLUDING ANY INITIATION FEE, OF SUCH PROCEEDING SHALL ULTIMATELY BE BORNE IN ACCORDANCE WITH SECTION 14.6 ABOVE. THE VENUE OF THE PROCEEDINGS SHALL BE IN THE COUNTY IN WHICH THE PREMISES ARE LOCATED. WITHIN TEN (10) DAYS OF RECEIPT BY ANY PARTY OF A WRITTEN REQUEST TO RESOLVE ANY DISPUTE OR CONTROVERSY PURSUANT TO THIS SECTION 14. 7 (b) , THE PARTIES SHALL AGREE UPON A SINGLE REFEREE WHO SHALL TRY ALL ISSUES, WHETHER OF FACT OR LAW, AND REPORT A FINDING AND JUDGMENT ON SUCH ISSUES AS REQUIRED BY THE REFEREE SECTIONS. IF THE PARTIES ARE UNABLE TO AGREE UPON A REFEREE WITHIN SUCH TEN (10) DAY PERIOD, THEN ANY PARTY MAY THEREAFTER FILE A LAWSUIT IN THE COUNTY IN WHICH THE PREMISES ARE LOCATED FOR THE PURPOSE OF APPOINTMENT OF A REFEREE UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640, AS SAME MAY BE AMENDED OF ANY SUCCESSOR STATUTE(S) THERETO. IF THE REFEREE IS APPOINTED BY THE COURT, THE REFEREE SHALL BE A NEUTRAL AND IMPARTIAL RETIRED JUDGE WITH SUBSTANTIAL EXPERIENCE IN THE RELEVANT MATTERS TO BE DETERMINED, FROM JAMS/ENDISPUTE, INC., THE AMERICAN ARBITRATION ASSOCIATION OR SIMILAR MEDIATION/ARBITRATION ENTITY. THE PROPOSED REFEREE MAY BE CHALLENGED BY ANY PARTY FOR ANY OF THE GROUNDS LISTED IN SECTION 641 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, AS SAME MAY BE AMENDED OR ANY SUCCESSOR STATUTE(S) THERETO. THE REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES OF FACT AND LAW AND REPORT HIS OR HER DECISION ON SUCH ISSUES, AND TO ISSUE ALL RECOGNIZED REMEDIES AVAILABLE AT LAW OR IN EQUITY FOR ANY CAUSE OF ACTION THAT IS BEFORE THE REFEREE, INCLUDING AN AWARD OF ATTORNEYS' FEES AND COSTS IN ACCORDANCE WITH CALIFORNIA LAW. THE REFEREE SHALL NOT, HOWEVER, HAVE THE POWER TO AWARD PUNITIVE DAMAGES, NOR ANY OTHER DAMAGES WHICH ARE NOT PERMITTED BY THE EXPRESS PROVISIONS OF THIS LEASE, AND THE PARTIES HEREBY WAIVE ANY RIGHT TO RECOVER ANY SUCH DAMAGES. THE PARTIES SHALL BE ENTITLED TO CONDUCT ALL DISCOVERY AS PROVIDED IN THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THE REFEREE SHALL OVERSEE DISCOVERY AND MAY ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE, WITH RIGHTS TO REGULATE DISCOVERY AND TO ISSUE AND ENFORCE SUBPOENAS, PROTECTIVE ORDERS AND OTHER LIMITATIONS ON DISCOVERY AVAILABLE UNDER CALIFORNIA LAW. THE REFERENCE PROCEEDING SHALL BE CONDUCTED IN ACCORDANCE WITH CALIFORNIA LAW (INCLUDING THE RULES OF EVIDENCE), AND IN ALL REGARDS, THE REFEREE SHALL FOLLOW CALIFORNIA LAW APPLICABLE AT THE TIME OF THE REFERENCE PROCEEDING. IN ACCORDANCE WITH SECTION 644 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE, THE DECISION OF THE REFEREE UPON THE WHOLE ISSUE MUST STAND AS THE DECISION OF THE COURT, AND UPON THE FILING OF THE STATEMENT OF DECISION WITH THE CLERK OF THE COURT, OR WITH THE JUDGE IF THERE IS NO CLERK, JUDGMENT MAY BE ENTERED THEREON IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE PARTIES SHALL PROMPTLY AND DILIGENTLY COOPERATE WITH ONE ANOTHER AND THE REFEREE, AND SHALL PERFORM SUCH ACTS AS MAY BE NECESSARY TO OBTAIN A PROMPT AND EXPEDITIOUS RESOLUTION OF THE DISPUTE OR CONTROVERSY IN ACCORDANCE WITH THE TERMS OF THIS SECTION 14. 7(b) . TO THE EXTENT THAT NO PENDING LAWSUIT HAS BEEN FILED TO OBTAIN THE APPOINTMENT OF A REFEREE, ANY PARTY, AFTER THE ISSUANCE OF THE DECISION OF THE REFEREE, MAY APPLY TO THE COURT OF THE COUNTY IN WHICH THE PREMISES ARE LOCATED FOR CONFIRMATION BY THE COURT OF THE DECISION OF THE REFEREE IN THE SAME MANNER AS A PETITION FOR CONFIRMATION OF AN ARBITRATION AWARD PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1285 ET SEQ. (AS SAME MAY BE AMENDED OR ANY SUCCESSOR STATUTE(S) THERETO).

**SECTION 14.8. SATISFACTION OF JUDGMENT.** The obligations of Landlord do not constitute the personal obligations of the individual partners, trustees, directors, officers, members or shareholders of Landlord or its constituent partners or members. Should Tenant recover a money judgment against Landlord, such judgment shall be satisfied only from the interest of Landlord in the Project and out of the rent or other income from such property receivable by Landlord or out of consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title or interest in the Project, and no action for any deficiency may be sought or obtained by Tenant.

**ARTICLE XV. END OF TERM**

**SECTION 15.1. HOLDING OVER.** This Lease shall terminate without further notice upon the expiration of the Term, and any holding over by Tenant after the expiration shall not constitute a renewal or extension of this Lease, or give Tenant any rights under this Lease, except when in writing signed by both parties. Any period of time following the Expiration Date or earlier termination of this Lease required for Tenant to remove its property or to place the Premises in the condition required pursuant to Section 15.3 (or for Landlord to do so if Tenant fails to do so) shall be deemed a holding over by Tenant. If Tenant holds over for any period after the Expiration Date (or earlier termination) of the Term without the prior written consent of Landlord, such possession shall constitute a tenancy at sufferance only and an Event of Default under this Lease; such holding over with the prior written consent of Landlord shall constitute a month-to-month tenancy commencing on the first (1st) day following the termination of this Lease and terminating thirty (30) days following delivery of written notice of termination by either Landlord or Tenant to the other. In either of such events, possession shall be subject to all of the terms of this Lease, except that the monthly Basic Rent shall be the greater of (a) one hundred fifty percent (150%) of the Basic Rent for the month immediately preceding the date of termination or (b) the then currently scheduled Basic Rent for comparable space in the Project. The acceptance by Landlord of monthly holdover rental in a lesser amount shall not constitute a waiver of Landlord's right to recover the full amount due for any holdover by Tenant, unless otherwise agreed in writing by Landlord. If Tenant fails to surrender the Premises upon the expiration of this Lease despite demand to do so by Landlord, Tenant shall indemnify and hold Landlord harmless from all loss or liability, including without limitation, any claims made by any succeeding tenant relating to such failure to surrender. The foregoing provisions of this Section are in addition to and do not affect Landlord's right of re-entry or any other rights of Landlord under this Lease or at law.

**SECTION 15.2. MERGER ON TERMINATION.** The voluntary or other surrender of this Lease by Tenant, or a mutual termination of this Lease, shall terminate any or all existing subleases unless Landlord, at its option, elects in writing to treat the surrender or termination as an assignment to it of any or all subleases affecting the Premises.

**SECTION 15.3. SURRENDER OF PREMISES; REMOVAL OF PROPERTY.** Subject to the provisions of Section 7.3 of this Lease and of the Work Letter, if any, attached hereto, upon the Expiration Date or upon any earlier termination of this Lease, Tenant shall quit and surrender possession of the Premises to Landlord in as good order, condition and repair as when received or as hereafter may be improved by Landlord or Tenant, reasonable wear and tear, damage by casualty, and repairs which are Landlord's obligation excepted, and shall, without expense to Landlord, remove or cause to be removed from the Premises all personal property, removable trade fixtures, and equipment and debris and perform all work required under Section 7.3 of this Lease and/or the Work Letter, if any, attached hereto, as to Replacements of Non-Standard Improvements and removal of Alterations, except for any items that Landlord may by written authorization allow to remain. Tenant shall repair all damage to the Premises resulting from the removal, which repair shall include the patching and filling of holes and repair of structural damage, provided that Landlord may instead elect to repair any structural damage at Tenant's expense. If Tenant shall fail to comply with the provisions of this Section, Landlord may effect the removal and/or make any repairs, and the cost to Landlord shall be additional rent payable by Tenant upon demand. If Tenant fails to remove Tenant's personal property from the Premises upon the expiration of the Term, Landlord may remove, store, dispose of and/or retain such personal property, at Landlord's option, in accordance with then applicable laws, all at the expense of Tenant. If requested by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an instrument in writing releasing and quitclaiming to Landlord all right, title and interest of Tenant in the Premises.

**ARTICLE XVI. PAYMENTS AND NOTICES**

All sums payable by Tenant to Landlord shall be deemed to be rent under this Lease and shall be paid, without deduction or offset, in lawful money of the United States to Landlord at the address specified in Item 13 of the Basic Lease Provisions, or at any other place as Landlord may designate in writing. Unless this Lease expressly provides otherwise, as for example in the payment of Basic Rent and the Tenant's Share of Operating Costs pursuant to Sections 4.1 and 4.2, all payments shall be due and payable within five (5) days after demand. All payments requiring proration shall be prorated on the basis of the number of days in the pertinent calendar month or year, as applicable. Any notice, election, demand, consent, approval or other communication to be given or other document to be delivered by either party to the other may be delivered in person or by courier or overnight delivery service to the other party, or may be deposited in the United States mail, duly registered or certified, postage prepaid, return receipt requested, and addressed to the other party at the address set forth in Item 12 of the Basic Lease Provisions, or if to Tenant, at that address or, from and after the Commencement Date, at the Premises (whether or not Tenant has departed from, abandoned or vacated the Premises). Either party may, by written notice to the other, served in the manner provided in this Article, designate a different address. If any notice or other document is sent by mail, duly registered or certified, it shall be deemed served or delivered seventy-two (72) hours after mailing. If more than one person or entity is named as Tenant under this Lease, service of any notice upon any one of them shall be deemed as service upon all of them.

## ARTICLE XVII. RULES AND REGULATIONS

Tenant agrees to observe faithfully and comply strictly with the Rules and Regulations, attached as <u>Exhibit E</u>, and any reasonable and nondiscriminatory amendments, modifications and/or additions as may be adopted and published by written notice to tenants by Landlord for the safety, care, security, good order, or cleanliness of the Premises, Building, Project and Common Areas. Landlord shall not be liable to Tenant for any violation of the Rules and Regulations or the breach of any covenant or condition in any lease by any other tenant or such tenant's agents, employees, contractors, guests or invitees. One or more waivers by Landlord of any breach of the Rules and Regulations by Tenant or by any other tenant(s) shall not be a waiver of any subsequent breach of that rule or any other. Tenant's failure to keep and observe the Rules and Regulations shall constitute a breach of this Lease. In the case of any conflict between the Rules and Regulations and this Lease, this Lease shall be controlling.

## ARTICLE XVIII. BROKER'S COMMISSION

The parties recognize as the broker(s) who negotiated this Lease the firm(s), whose name(s) is (are) stated in Item 10 of the Basic Lease Provisions, and agree that Landlord shall be responsible for the payment of brokerage commissions to those broker(s) unless otherwise provided in this Lease. It is understood and agreed that Landlord's Broker represents only Landlord in this transaction and that Tenant's Broker (if any) represents only Tenant. Each party warrants that it has had no dealings with any other real estate broker or agent in connection with the negotiation of this Lease, and agrees to indemnify and hold the other party harmless from any cost, expense or liability (including reasonable attorneys' fees) for any compensation, commissions or charges claimed by any other real estate broker or agent employed by the indemnifying party in connection with the negotiation of this Lease. The foregoing agreement shall survive the termination of this Lease.

## ARTICLE XIX. TRANSFER OF LANDLORD'S INTEREST

In the event of any transfer of Landlord's interest in the Premises, the transferor shall be automatically relieved of all further obligations on the part of Landlord, and the transferor shall be relieved of any obligation to pay any funds in which Tenant has an interest to the extent that such funds have been turned over, subject to that interest, to the transferee and Tenant is notified of the transfer as required by law. No beneficiary of a deed of trust to which this Lease is or may be subordinate, and no landlord under a so-called sale-leaseback, shall be responsible in connection with the Security Deposit, unless the mortgagee or beneficiary under the deed of trust or the landlord actually receives the Security Deposit. It is intended that the covenants and obligations contained in this Lease on the part of Landlord shall, subject to the foregoing, be binding on Landlord, its successors and assigns, only during and in respect to their respective successive periods of ownership.

## ARTICLE XX. INTERPRETATION

**SECTION 20.1. GENDER AND NUMBER.** Whenever the context of this Lease requires, the words " **Landlord** " and " **Tenant** " shall include the plural as well as the singular, and words used in neuter, masculine or feminine genders shall include the others.

**SECTION 20.2. HEADINGS.** The captions and headings of the articles and sections of this Lease are for convenience only, are not a part of this Lease and shall have no effect upon its construction or interpretation.

**SECTION 20.3. JOINT AND SEVERAL LIABILITY.** If more than one person or entity is named as Tenant, the obligations imposed upon each shall be joint and several and the act of or notice from, or notice or refund to, or the signature of, any one or more of them shall be binding on all of them with respect to the tenancy of this Lease, including, but not limited to, any renewal, extension, termination or modification of this Lease.

**SECTION 20.4. SUCCESSORS.** Subject to Articles IX and XIX, all rights and liabilities given to or imposed upon Landlord and Tenant shall extend to and bind their respective heirs, executors, administrators, successors and assigns. Nothing contained in this Section is intended, or shall be construed, to grant to any person other than Landlord and Tenant and their successors and assigns any rights or remedies under this Lease.

**SECTION 20.5. TIME OF ESSENCE.** Time is of the essence with respect to the performance of every provision of this Lease.

**SECTION 20.6. CONTROLLING LAW/VENUE.** This Lease shall be governed by and interpreted in accordance with the laws of the State of California. Any litigation commenced concerning any matters whatsoever arising out of or in any way connected to this Lease shall be initiated in the Superior Court of the county in which the Project is located.

**SECTION 20.7. SEVERABILITY.** If any term or provision of this Lease, the deletion of which would not adversely affect the receipt of any material benefit by either party or the deletion of which is consented to by the party adversely affected, shall be held invalid or unenforceable to any extent, the remainder of this Lease shall not be affected and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**SECTION 20.8. WAIVER AND CUMULATIVE REMEDIES.** One or more waivers by Landlord or Tenant of any breach of any term, covenant or condition contained in this Lease shall not be a waiver of any

subsequent breach of the same or any other term, covenant or condition. Consent to any act by one of the parties shall not be deemed to render unnecessary the obtaining of that party's consent to any subsequent act. No breach by Tenant of this Lease shall be deemed to have been waived by Landlord unless the waiver is in a writing signed by Landlord. The rights and remedies of Landlord under this Lease shall be cumulative and in addition to any and all other rights and remedies which Landlord may have.

**SECTION 20.9. INABILITY TO PERFORM.** In the event that either party shall be delayed or hindered in or prevented from the performance of any work or in performing any act required under this Lease by reason of any cause beyond the reasonable control of that party, other than financial inability, then the performance of the work or the doing of the act shall be excused for the period of the delay and the time for performance shall be extended for a period equivalent to the period of the delay. The provisions of this Section shall not operate to excuse Tenant from the prompt payment of rent, nor excuse Landlord or Tenant from the timely performance of any of their respective obligations under this Lease within such party's reasonable control.

**SECTION 20.10. ENTIRE AGREEMENT.** This Lease and its exhibits and other attachments cover in full each and every agreement of every kind between the parties concerning the Premises, the Building, and the Project, and all preliminary negotiations, oral agreements, understandings and/or practices, except those contained in this Lease, are superseded and of no further effect. Tenant waives its rights to rely on any representations or promises made by Landlord or others which are not contained in this Lease. No verbal agreement or implied covenant shall be held to modify the provisions of this Lease, any statute, law, or custom to the contrary notwithstanding.

**SECTION 20.11. QUIET ENJOYMENT.** Upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, and subject to the other provisions of this Lease, Tenant shall have the right of quiet enjoyment and use of the Premises for the Term without hindrance or interruption by Landlord or any other person claiming by or through Landlord.

**SECTION 20.12. SURVIVAL.** All covenants of Landlord or Tenant which reasonably would be intended to survive the expiration or sooner termination of this Lease, including without limitation any warranty or indemnity hereunder, shall so survive and continue to be binding upon and inure to the benefit of the respective parties and their successors and assigns.

**SECTION 20.13. INTERPRETATION.** This Lease shall not be construed in favor of or against either party, but shall be construed as if both parties prepared this Lease.

## ARTICLE XXI. EXECUTION AND RECORDING

**SECTION 21.1. COUNTERPARTS.** This Lease may be executed in one or more counterparts, each of which shall constitute an original and all of which shall be one and the same agreement.

**SECTION 21.2. CORPORATE, LIMITED LIABILITY COMPANY AND PARTNERSHIP AUTHORITY.** If Tenant is a corporation, limited liability company or partnership, each individual executing this Lease on behalf of the corporation, limited liability company or partnership represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the corporation, limited liability company or partnership, and that this Lease is binding upon the corporation, limited liability company or partnership in accordance with its terms. Tenant shall, at Landlord's request, deliver a certified copy of its board of directors' resolution, operating agreement or partnership agreement or certificate authorizing or evidencing the execution of this Lease.

**SECTION 21.3. EXECUTION OF LEASE; NO OPTION OR OFFER.** The submission of this Lease to Tenant shall be for examination purposes only, and shall not constitute an offer to or option for Tenant to lease the Premises. Execution of this Lease by Tenant and its return to Landlord shall not be binding upon Landlord, notwithstanding any time interval, until Landlord has in fact executed and delivered this Lease to Tenant, it being intended that this Lease shall only become effective upon execution by Landlord and delivery of a fully executed counterpart to Tenant.

**SECTION 21.4. RECORDING.** Tenant shall not record this Lease without the prior written consent of Landlord. Tenant, upon the request of Landlord, shall execute and acknowledge a " **short form** " memorandum of this Lease for recording purposes.

**SECTION 21.5. AMENDMENTS.** No amendment or termination of this Lease shall be effective unless in writing signed by authorized signatories of Tenant and Landlord, or by their respective successors in interest. No actions, policies, oral or informal arrangements, business dealings or other course of conduct by or between the parties shall be deemed to modify this Lease in any respect.

**SECTION 21.6. EXECUTED COPY.** Any fully executed photocopy or similar reproduction of this Lease shall be deemed an original for all purposes.

**SECTION 21.7. ATTACHMENTS.** All exhibits, amendments, riders and addenda attached to this Lease are hereby incorporated into and made a part of this Lease.

## ARTICLE XXII. MISCELLANEOUS

**SECTION 22.1. NONDISCLOSURE OF LEASE TERMS.** Tenant acknowledges and agrees that the terms of this Lease are confidential and constitute proprietary information of Landlord. Disclosure of the terms could adversely affect the ability of Landlord to negotiate other leases and impair Landlord's relationship with other tenants. Accordingly, Tenant agrees that it, and its partners, members, shareholders, officers, directors, employees and attorneys, shall not intentionally and voluntarily disclose, by public filings or otherwise, the terms and conditions of this Lease ("Confidential Information") to any third party, either directly or indirectly, without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole and absolute discretion. The foregoing restriction shall not apply if either: (i) Tenant is required to disclose the Confidential Information in response to a subpoena or other regulatory, administrative or court order, (ii) independent legal counsel to Tenant delivers a written opinion to Landlord that Tenant is required to disclose the Confidential Information to, or file a copy of this Lease with, any governmental agency or any stock exchange; provided however, that in such event, Tenant shall, before making any such disclosure of Confidential Information (A) provide Landlord with prompt written notice of such required disclosure, (B) at Tenant's sole cost, take all reasonable legally available steps to resist or narrow such requirement, including without limitation preparing and filing a request for confidential treatment of the Confidential Information and (C) if disclosure of the Confidential Information is required by subpoena or other regulatory, administrative or court order, Tenant shall provide Landlord with as much advance notice of the possibility of such disclosure as practical so that Landlord may attempt to stop such disclosure or obtain an order concerning such disclosure. The form and content of a request by Tenant for confidential treatment of the Confidential Information shall be provided to Landlord at least five (5) business days before its submission to the applicable governmental agency or stock exchange and is subject to the prior written approval of Landlord. In addition, Tenant may disclose the terms of this Lease to prospective assignees of this Lease and prospective subtenants under this Lease with whom Tenant is actively negotiating such an assignment or sublease.

**SECTION 22.2. GUARANTEE. [INTENTIONALLY DELETED]**

**SECTION 22.3. CHANGES REQUESTED BY LENDER.** If, in connection with obtaining financing for the Project, the lender shall request reasonable modifications in this Lease as a condition to the financing, Tenant will not unreasonably withhold or delay its consent, provided that the modifications do not materially increase the obligations of Tenant or materially and adversely affect the leasehold interest created by this Lease.

**SECTION 22.4. MORTGAGEE PROTECTION** . No act or failure to act on the part of Landlord which would otherwise entitle Tenant to be relieved of its obligations hereunder shall result in such a release or termination unless (a) Tenant has given notice by registered or certified mail to any beneficiary of a deed of trust or mortgage covering the Building whose address has been furnished to Tenant and (b) such beneficiary is afforded a reasonable opportunity to cure the default by Landlord (which in no event shall be less than sixty (60) days), including, if necessary to effect the cure, time to obtain possession of the Building by power of sale or judicial foreclosure provided that such foreclosure remedy is diligently pursued. Tenant agrees that each beneficiary of a deed of trust or mortgage covering the Building is an express third party beneficiary hereof, Tenant shall have no right or claim for the collection of any deposit from such beneficiary or from any purchaser at a foreclosure sale unless such beneficiary or purchaser shall have actually received and not refunded the deposit, and Tenant shall comply with any written directions by any beneficiary to pay rent due hereunder directly to such beneficiary without determining whether a default exists under such beneficiary's deed of trust.

**SECTION 22.5. COVENANTS AND CONDITIONS.** All of the provisions of this Lease shall be construed to be conditions as well as covenants as though the words specifically expressing or imparting covenants and conditions were used in each separate provision.

**SECTION 22.6. SECURITY MEASURES.** Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Project. Tenant assumes all responsibility for the protection of Tenant, its employees, agents, invitees and property from acts of third parties. Nothing herein contained shall prevent Landlord, at its sole option, from providing security protection for the Project or any part thereof, in which event the cost thereof shall be included within the definition of Project Costs.

**LANDLORD:**                                    **TENANT:**

**THE IRVINE COMPANY LLC,**                **ILLUMINA, INC.,**
a Delaware limited liability company           a Delaware corporation

By: /s/ Steven M. Case                       By: /s/ Christian O. Henry
     Steven M. Case, Senior Vice President         Name (Print): Christian O. Henry
     Leasing, Office Properties                Title (Print): Vice President, Chief Financial Officer

By: /s/ Christopher J. Popma                  By:
     Christopher J. Popma, Vice President         Name:
     Operations, Office Properties                Title:

**EXHIBIT B**

THE IRVINE COMPANY – INVESTMENT PROPERTIES GROUP

HAZARDOUS MATERIAL SURVEY FORM

The purpose of this form is to obtain information regarding the use of hazardous substances on Investment Properties Group ("IPG") property. Prospective tenants and contractors should answer the questions in light of their proposed activities on the premises. Existing tenants and contractors should answer the questions as they relate to ongoing activities on the premises and should update any information previously submitted.

If additional space is needed to answer the questions, you may attach separate sheets of paper to this form. When completed, the form should be sent to the following address:

THE IRVINE COMPANY MANAGEMENT OFFICE
111 Innovation Drive
Irvine, CA 92617

Your cooperation in this matter is appreciated. If you have any questions, please call your property manager at (949) 720-4400 for assistance.

1. <u>GENERAL INFORMATION</u> .

   Name of Responding Company: _____

   Check all that apply:        Tenant                    ( )      Contractor          ( )
                                Prospective               ( )      Existing            ( )

   Mailing Address: _____

   Contact person & Title: _____

   Telephone Number: ( )_____

   <u>Current TIC Tenant(s):</u>

   Address of Lease Premises: _____

   Length of Lease or Contract Term: _____

   <u>Prospective TIC Tenant(s):</u>

   Address of Leased Premises: _____

   Address of Current Operations: _____

   Describe the proposed operations to take place on the property, including principal products manufactured or services to be conducted. Existing tenants and contractors should describe any proposed changes to ongoing operations.

   _____

   _____

2. <u>HAZARDOUS MATERIALS</u> . For the purposes of this Survey Form, the term "hazardous material" means any raw material, product or agent considered hazardous under any state or federal law. The term does not include wastes which are intended to be discarded.

   2.1   Will any hazardous materials be used or stored on site?

   | | | | | |
   |---|---|---|---|---|
   | Chemical Products | Yes | ( ) | No | ( ) |
   | Biological Hazards/ | | | | |
   |    Infectious Wastes | Yes | ( ) | No | ( ) |
   | Radioactive Materials | Yes | ( ) | No | ( ) |
   | Petroleum Products | Yes | ( ) | No | ( ) |

2.2  List any hazardous materials to be used or stored, the quantities that will be on-site at any given time, and the location and method of storage (e.g., bottles in storage closet on the premises).

| Hazardous Materials | Location and Method of Storage | Quantity |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

2.3  Is any underground storage of hazardous materials proposed or currently conducted on the premises? Yes ( ) No ( )

If yes, describe the materials to be stored, and the size and construction of the tank. Attach copies of any permits obtained for the underground storage of such substances.

_____

_____

_____

3.  <u>HAZARDOUS WASTE</u> . For the purposes of this Survey Form, the term "hazardous waste" means any waste (including biological, infectious or radioactive waste) considered hazardous under any state or federal law, and which is intended to be discarded.

3.1  List any hazardous waste generated or to be generated on the premises, and indicate the quantity generated on a monthly basis.

| Hazardous Materials | Location and Method of Storage | Quantity |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

3.2  Describe the method(s) of disposal (including recycling) for each waste. Indicate where and how often disposal will take place.

| Hazardous Materials | Location and Method of Storage | Disposal Method |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

3.3  Is any treatment or processing of hazardous, infectious or radioactive wastes currently conducted or proposed to be conducted on the premise? Yes ( ) No ( )

If yes, please describe any existing or proposed treatment methods.

_____

_____

_____

3.4 Attach copies of any hazardous waste permits or licenses issued to your company with respect to its operations on the premises.

4.  <u>SPILLS</u>

4.1 During the past year, have any spills or releases of hazardous materials occurred on the premises? Yes ( ) No ( )

If so, please describe the spill and attach the results of any testing conducted to determine the extent of such spills.

_____

_____

_____

4.2 Were any agencies notified in connection with such spills? Yes ( ) No ( )

    If so, attach copies of any spill reports or other correspondence with regulatory agencies.

4.3 Were any clean-up actions undertaken in connection with the spills? Yes ( ) No ( )

    If so, briefly describe the actions taken. Attach copies of any clearance letters obtained from any regulatory agencies involved and the results of any final soil or groundwater sampling done upon completion of the clean-up work.

_____

_____

_____

5.       WASTEWATER TREATMENT/DISCHARGE

    5.1 Do you discharge industrial wastewater to:

    ___storm drain?                    ___sewer?

    ___surface water?             ___no industrial discharge

    5.2 Is your industrial wastewater treated before discharge? Yes ( ) No ( )

    If yes, describe the type of treatment conducted.

_____

_____

_____

    5.3 Attach copies of any wastewater discharge permits issued to your company with respect to its operations on the premises.

6.    AIR DISCHARGES .

    6.1    Do you have any air filtration systems or stacks that discharge into the air?
             Yes ( ) No ( )

    6.2    Do you operate any equipment that requires air emissions permits?
             Yes ( ) No ( )

    6.3    Attach copies of any air discharge permits pertaining to these operations.

7.    HAZARDOUS MATERIALS DISCLOSURES .

    7.1 Does your company handle an aggregate of at least 500 pounds, 55 gallons or 200 cubic feet of hazardous material at any given time? Yes ( ) No ( )

    7.2 Has your company prepared a Hazardous Materials Disclosure – Chemical Inventory and Business Emergency Plan or similar disclosure document pursuant to state or county requirements? Yes ( ) No ( )

    If so, attach a copy.

    7.3 Are any of the chemicals used in your operations regulated under Proposition 65?

    If so, describe the procedures followed to comply with these requirements.

_____

_____

_____

7.4  Is your company subject to OSHA Hazard Communication Standard Requirements? Yes ( ) No ( )

    If so, describe the procedures followed to comply with these requirements.

_____

_____

_____

8.    <u>ANIMAL TESTING</u> .

8.1 Does your company bring or intend to bring live animals onto the premises for research or development purposes? Yes ( ) No ( )

    If so, describe the activity.

_____

_____

_____

8.2 Does your company bring or intend to bring animal body parts or bodily fluids onto the premises for research or development purposes? Yes ( ) No ( )

    If so, describe the activity.

_____

_____

_____

9.    <u>ENFORCEMENT ACTIONS, COMPLAINTS</u> .

9.1 Has your company ever been subject to any agency enforcement actions, administrative orders, lawsuits, or consent orders/decrees regarding environmental compliance or health and safety? Yes ( ) No ( )

    If so, describe the actions and any continuing obligations imposed as a result of these actions.

_____

_____

_____

9.2 Has your company ever received any request for information, notice of violation or demand letter, complaint, or inquiry regarding environmental compliance or health and safety? Yes ( ) No ( )

9.3 Has an environmental audit ever been conducted which concerned operations or activities on premises occupied by you? Yes ( ) No ( )

9.4 If you answered "yes" to any questions in this section, describe the environmental action or complaint and any continuing compliance obligation imposed as a result of the same.

_____

_____

_____

_____

_____

_____

By: _____

Name: _____

Title: _____

Date: _____

**<u>EXHIBIT C</u>**

**LANDLORD'S DISCLOSURES**

Landlord's latest Phase I Environmental Site Assessment covering the leased Premises does not disclose any recognized environmental condition on the subject site, and reports that there appears to be a low potential for environmental impairment to the subject site due to current or past land usage or from surrounding properties.

## EXHIBIT D

## TENANT'S INSURANCE

The following requirements for Tenant's insurance shall be in effect at the Building, and Tenant shall also cause any subtenant to comply with these requirements. Landlord reserves the right to adopt reasonable nondiscriminatory modifications and additions to these insurance requirements. Tenant agrees to obtain and present evidence to Landlord that it has fully complied with the insurance requirements.

1. Tenant shall, at its sole cost and expense, commencing on the date Tenant is given access to the Premises for any purpose and during the entire Term, procure, pay for and keep in full force and effect: (i) commercial general liability insurance with respect to the Premises and the operations of or on behalf of Tenant in, on or about the Premises, including but not limited to coverage for personal injury, independent contractors, broad form property damage, fire and water legal liability, products liability (if a product is sold from the Premises), and liquor law liability (if alcoholic beverages are sold, served or consumed within the Premises), which policy(ies) shall be written on an "occurrence" basis and for not less than the amount set forth in Item 14 of the Basic Lease Provisions, with a combined single limit (with a $50,000 minimum limit on fire legal liability) per occurrence for bodily injury, death, and property damage liability, or the current limit of liability carried by Tenant, whichever is greater, and subject to such increases in amounts as Landlord may determine from time to time; (ii) workers' compensation insurance coverage as required by law, together with employers' liability insurance of at least One Million Dollars ($1,000,000.00); (iii) with respect to Alterations and the like required or permitted to be made by Tenant under this Lease, builder's risk insurance, in an amount equal to the replacement cost of the work; (iv) insurance against fire, vandalism, malicious mischief and such other additional perils as may be included in a standard "special form" policy, insuring Tenant's Alterations, trade fixtures, furnishings, equipment and items of personal property of Tenant located in the Premises, in an amount equal to not less than ninety percent (90%) of their actual replacement cost (with replacement cost endorsement); and (v) business interruption insurance in amounts satisfactory to cover one (1) year of loss. In no event shall the limits of any policy be considered as limiting the liability of Tenant under this Lease.

2. In the event Landlord consents to Tenant's use, generation or storage of Hazardous Materials on, under or about the Premises pursuant to Section 5.3 of this Lease, Landlord shall have the continuing right to require Tenant, at Tenant's sole cost and expense (provided the same is available for purchase upon commercially reasonable terms), to purchase insurance specified and approved by Landlord, with coverage not less than Five Million Dollars ($5,000,000.00), insuring (i) any Hazardous Materials shall be removed from the Premises, (ii) the Premises shall be restored to a clean, healthy, safe and sanitary condition, and (iii) any liability of Tenant, Landlord and Landlord's officers, directors, shareholders, agents, employees and representatives, arising from such Hazardous Materials.

3. All policies of insurance required to be carried by Tenant pursuant to this Exhibit D containing a deductible exceeding Ten Thousand Dollars ($10,000.00) per occurrence must be approved in writing by Landlord prior to the issuance of such policy. Tenant shall be solely responsible for the payment of all deductibles.

4. All policies of insurance required to be carried by Tenant pursuant to this Exhibit D shall be written by responsible insurance companies authorized to do business in the State of California and with a general policyholder rating of not less than "A-" and financial rating of not less than "VIII" in the most current Best's Insurance Report. Any insurance required of Tenant may be furnished by Tenant under any blanket policy carried by it or under a separate policy. A true and exact copy of each paid up policy evidencing the insurance (appropriately authenticated by the insurer) or a certificate of insurance, certifying that the policy has been issued, provides the coverage required by this Exhibit D and contains the required provisions, together with endorsements acceptable to Landlord evidencing the waiver of subrogation and additional insured provisions required below, shall be delivered to Landlord prior to the date Tenant is given the right of possession of the Premises. Proper evidence of the renewal of any insurance coverage shall also be delivered to Landlord not less than ten (10) business days prior to the expiration of the coverage. Landlord may at any time, and from time to time, inspect and/or copy any and all insurance policies required by this Lease.

5. Each policy evidencing insurance required to be carried by Tenant pursuant to this Exhibit D shall contain the following provisions and/or clauses satisfactory to Landlord: (i) with respect to Tenant's commercial general liability insurance, a provision that the policy and the coverage provided shall be primary and that any coverage carried by Landlord shall be noncontributory with respect to any policies carried by Tenant, together with a provision including Landlord, the Additional Insureds identified in Item 11 of the Basic Lease Provisions, and any other parties in interest designated by Landlord, as additional insureds; (ii) except with respect to Tenant's commercial general liability insurance, a waiver by the insurer of any right to subrogation against Landlord, its agents, employees, contractors and representatives which arises or might arise by reason of any payment under the policy or by reason of any act or omission of Landlord, its agents, employees, contractors or representatives; and (iii) a provision that the insurer will not cancel or change the coverage provided by the policy without first giving Landlord thirty (30) days prior written notice.

6. In the event that Tenant fails to procure, maintain and/or pay for, at the times and for the durations specified in this Exhibit D, any insurance required by this Exhibit D, or fails to carry insurance required by any governmental authority, Landlord may at its election procure that insurance and pay the premiums, in which event Tenant shall repay Landlord all sums paid by Landlord, together with interest at the maximum rate permitted by law and any related costs or expenses incurred by Landlord, within ten (10) days following Landlord's written demand to Tenant.

**NOTICE TO TENANT: IN ACCORDANCE WITH THE TERMS OF THIS LEASE, TENANT MUST PROVIDE EVIDENCE OF THE REQUIRED INSURANCE TO LANDLORD'S MANAGEMENT AGENT PRIOR TO BEING AFFORDED ACCESS TO THE PREMISES.**

**EXHIBIT E**

**RULES AND REGULATIONS**

This Exhibit sets forth the rules and regulations governing Tenant's use of the Premises leased to Tenant pursuant to the terms, covenants and conditions of the Lease to which this Exhibit is attached and therein made part thereof. In the event of any conflict or inconsistency between this Exhibit and the Lease, the Lease shall control.

1. Tenant shall not place anything or allow anything to be placed near the glass of any window, door, partition or wall, which may appear unsightly from outside the Premises.

2. The walls, walkways, sidewalks, entrance passages, elevators, stairwells, courts and vestibules shall not be obstructed or used for any purpose other than ingress and egress of pedestrian travel to and from the Premises, and shall not be used for smoking, loitering or gathering, or to display, store or place any merchandise, equipment or devices, or for any other purpose. The walkways, sidewalks, entrance passageways, courts, vestibules and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities. Smoking is permitted outside the building and within the project only in areas designated by Landlord. No tenant or employee or invitee or agent of any tenant shall be permitted upon the roof of the Building without prior written approval from Landlord.

3. No awnings or other projection shall be attached to the outside walls of the Building. No security bars or gates, curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises without the prior written consent of Landlord. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the express written consent of Landlord.

4. Tenant shall not mark, nail, paint, drill into, or in any way deface any part of the Premises or the Building except to affix standard pictures or other wall hangings on the interior walls of the premises so long as they are not visible from the exterior of the building. Tenant shall not lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by Landlord in writing. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by Tenant.

5. The toilet rooms, urinals, wash bowls and other plumbing apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. Any pipes or tubing used by Tenant to transmit water to an appliance or device in the Premises must be made of copper or stainless steel, and in no event shall plastic tubing be used for that purpose. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, caused it.

6. Landlord shall direct electricians as to the manner and location of any future telephone wiring. No boring or cutting for wires will be allowed without the prior consent of Landlord. The locations of the telephones, call boxes and other office equipment affixed to the Premises shall be subject to the prior written approval of Landlord.

7. The Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the permitted use of the Premises. No exterior storage shall be allowed at any time without the prior written approval of Landlord. The Premises shall not be used for cooking or washing clothes without the prior written consent of Landlord, or for lodging or sleeping or for any immoral or illegal purposes.

8. Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, phonograph, noise, or otherwise. Tenant shall not use, keep or permit to be used, or kept, any foul or obnoxious gas or substance in the Premises or permit or suffer the Premises to be used or occupied in any manner offensive or objectionable to Landlord or other occupants of this or neighboring buildings or premises by reason of any odors, fumes or gases.

9. No animals, except for seeing eye dogs, shall be permitted at any time within the Premises.

10. Tenant shall not use the name of the Building or the Project in connection with or in promoting or advertising the business of Tenant, except as Tenant's address, without the written consent of Landlord. Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Project or its desirability for its intended uses, and upon written notice from Landlord any Tenant shall refrain from or discontinue such advertising.

11. Canvassing, soliciting, peddling, parading, picketing, demonstrating or otherwise engaging in any conduct that unreasonably impairs the value or use of the Premises or the Project are prohibited and each Tenant shall cooperate to prevent the same. Landlord shall have full and absolute authority to regulate or prohibit the entrance to the Premises of any vendor, supplier, purveyor, petitioner, proselytizer or other similar person if, in the good faith judgment of Landlord, such person will be involved in general solicitation activities, or the proselytizing,

petitioning, or disturbance of other tenants or their customers or invitees, or engaged or likely to engage in conduct which may in Landlord's opinion distract from the use of the Premises for its intended purpose. Notwithstanding the foregoing, Landlord reserves the absolute right and discretion to limit or prevent access to the Buildings by any food or beverage vendor, whether or not invited by Tenant, and Landlord may condition such access upon the vendor's execution of an entry permit agreement which may contain provisions for insurance coverage and/or the payment of a fee to Landlord.

12. No equipment of any type shall be placed on the Premises which in Landlord's opinion exceeds the load limits of the floor or otherwise threatens the soundness of the structure or improvements of the Building.

13. Regular building hours of operation are from 6:00 AM to 6:00 PM Monday through Friday and 9:00 AM to 1:00 PM on Saturday. No air conditioning unit or other similar apparatus shall be installed or used by any Tenant without the prior written consent of Landlord.

14. The entire Premises, including vestibules, entrances, parking areas, doors, fixtures, windows and plate glass, shall at all times be maintained in a safe, neat and clean condition by Tenant. All trash, refuse and waste materials shall be regularly removed from the Premises by Tenant and placed in the containers at the locations designated by Landlord for refuse collection. All cardboard boxes must be "broken down" prior to being placed in the trash container. All styrofoam chips must be bagged or otherwise contained prior to placement in the trash container, so as not to constitute a nuisance. Pallets must be immediately disposed of by tenant and may not be disposed of in the Landlord provided trash container or enclosures. Pallets may be neatly stacked in an exterior location on a temporary basis (no longer than 5 days) so long as Landlord has provided prior written approval. The burning of trash, refuse or waste materials is prohibited.

15. Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require.

16. All keys for the Premises shall be provided to Tenant by Landlord and Tenant shall return to Landlord any of such keys so provided upon the termination of the Lease. Tenant shall not change locks or install other locks on doors of the Premises, without the prior written consent of Landlord. In the event of loss of any keys furnished by Landlord for Tenant, Tenant shall pay to Landlord the costs thereof. Upon the termination of its tenancy, Tenant shall deliver to Landlord all the keys to lobby(s), suite(s) and telephone & electrical room(s) which have been furnished to Tenant or which Tenant shall have had made.

17. No person shall enter or remain within the Project while intoxicated or under the influence of liquor or drugs. Landlord shall have the right to exclude or expel from the Project any person who, in the absolute discretion of Landlord, is under the influence of liquor or drugs.

18. The moving of large or heavy objects shall occur only between those hours as may be designated by, and only upon previous written notice to, Landlord, and the persons employed to move those objects in or out of the Building must be reasonably acceptable to Landlord. Without limiting the generality of the foregoing, no freight, furniture or bulky matter of any description shall be received into or moved out of the lobby of the Building or carried in the elevator.

19. Tenant shall not install equipment, such as but not limited to electronic tabulating or computer equipment, requiring electrical or air conditioning service in excess of that to be provided by Landlord under the Lease without prior written consent of Landlord.

20. Landlord may from time to time grant other tenants of the project individual and temporary variances from these Rules, provided that any variance does not have a material adverse effect on the use and enjoyment of the Premises by Tenant.

21. Landlord reserves the right to amend or supplement the foregoing Rules and Regulations and to adopt and promulgate additional rules and regulations applicable to the Premises. Notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to the Tenant.

EXHIBIT X

<u>WORK LETTER</u>
(Tenant Buildout with Landlord's Contribution)

I.    <u>TENANT IMPROVEMENTS</u>

The tenant improvement work ("Tenant Improvements") shall consist of the work required to complete certain improvements to the Premises pursuant to approved "Working Drawings and Specifications" (as defined below). Tenant shall employ a licensed architect reasonably acceptable to Landlord (the "Architect") for preparation of the Preliminary Plan and Working Drawings and Specifications (as hereinafter defined), and shall cause the Architect to inspect the Premises to become acquainted with all existing conditions. Tenant shall contract with a general contractor chosen as the result of a competitive bid process described below, to construct the Tenant Improvements at Tenant's sole const and expense. The Tenant Improvements work shall be undertaken and prosecuted in accordance with the following requirements:

A.    Tenant shall submit the following to Landlord: (i) a detailed preliminary space plan for the Tenant Improvements prepared by the Architect, which shall include interior partitions, ceilings, interior finishes, interior doors, suite entrance, floor coverings, window coverings, lighting, electrical and telephone outlets, plumbing connections, heavy floor loads and other special requirements ("Preliminary Plan"), (ii) working drawings and specifications prepared by the Architect based on the approved Preliminary Plan (the "Working Drawings and Specifications"), and (iii) any change proposed by Tenant to the approved Working Drawings and Specifications ("Change"). Within ten (10) business days following its submission to Landlord, Landlord shall approve (by signing a copy thereof) or shall disapprove the Preliminary Plan, the Working Drawings and Specifications and/or the Change. If Landlord disapproves the Preliminary Plan, Working Drawings and Specifications or Change, Landlord shall specify in detail the reasons for disapproval and Tenant shall cause the Architect to modify the Preliminary Plan, Working Drawings and Specifications or Change to incorporate Landlord's suggested revisions in a mutually satisfactory manner. Tenant agrees and acknowledges that Landlord will not check the Preliminary Plan, the Working Drawings and Specifications and/or any Change for building code compliance (or other federal, state or local law, ordinance or regulations compliance), and that Tenant and its Architect shall be solely responsible for such matters.

B.    It is understood that except as provided below, the Tenant Improvements shall only include actual improvements to the Premises approved by Landlord as provided above, and shall exclude (but not by way of limitation) Tenant's furniture, trade fixtures, partitions, equipment and signage improvements, if any. Further, the Tenant Improvements shall incorporate Landlord's building standard materials and specifications ("Standards"). No deviations from the Standards may be required by Tenant with respect to doors and frames, finish hardware, entry graphics, the ceiling system, light fixtures and switches, mechanical systems, life and safety systems, and/or window coverings; provided that Landlord may, in its sole discretion, authorize in writing one or more of such deviations, in which event Tenant shall be solely responsible for the cost of replacing same with the applicable Standard item (s) upon the expiration or termination of this Lease. All other non-standard items ("Non-Standard Improvements") shall be subject to the prior approval of Landlord, which may be withheld in Landlord's sole discretion. Landlord shall in no event be required to approve any Non-Standard Improvement if Landlord determines that such improvements (i) is of a lesser quality than the corresponding Standard, (ii) fails to conform to applicable governmental requirements, (iii) requires building services beyond the level Landlord has agreed to provide Tenant under this Lease, or (iv) would have an adverse aesthetic impact from the exterior of the Premises.

C.    Tenant shall submit the approved Working Drawings and Specifications to a competitive bidding process involving at least the following three (3) licensed general contractors approved by Landlord. Each general contractor shall solicit bids from at least three (3) subcontractors for each major trade. If required by Landlord, Tenant shall use the electrical, mechanical, plumbing and fire/life safety engineers and subcontractors designated by Landlord. All other subcontractors shall be subject to Landlord's reasonable approval, and Landlord may require that one or more designated subtrades be union contractors. Tenant shall provide copies of the bid responses to Landlord. Upon selection of the lowest qualified bidder (the "TI Contractor"), Tenant shall enter into a "lump sum" construction contract (the "TI Contract") with the TI Contractor for construction of the Tenant Improvements. If requested by Landlord, Tenant shall deliver a copy of the TI Contract to Landlord. Tenant shall cause the Tenant Improvements work to be constructed in a good and workmanlike manner in accordance with the approved Working Drawings and Specifications.

D.  Prior to commencement of construction of the Tenant Improvements, Tenant shall provide a payment and performance bond naming Landlord as insured, in an amount and issued by a licensed surety acceptable to Landlord, to insure the faithful performance of the Tenant Improvements work in accordance with the approved Working Drawings and Specifications.

E.  Prior to the commencement of the Tenant Improvements work, Tenant shall deliver to Landlord a copy of the final application for permit and issued permit for the work.

F.  The TI Contractor and each of its subcontractors shall comply with Landlord's requirements as generally imposed on third party contractors, including without limitation all insurance coverage requirements and the obligation to furnish appropriate certificates of insurance to Landlord, prior to commencement of construction or the Tenant Improvements work.

G.  A construction schedule shall be provided to Landlord prior to commencement of the construction of the Tenant Improvements work, and weekly updates shall be supplied during the progress of the work; provided however, that the completion of the Tenant Improvements shall not be a condition of, or affect, the Commencement Date of this Lease.

H.  Tenant shall give Landlord ten (10) days prior written notice of the commencement of construction of the Tenant Improvements work so that Landlord may cause an appropriate notice of non-responsibility to be posted.

I.  The Tenant Improvements work shall be subject to inspection at all times by Landlord and its construction manager, and Landlord and/or its construction manager shall be permitted to attend weekly job meetings with the TI Contractor.

J.  Tenant shall apply and pay for all utility services required for the Tenant Improvements work.

K.  Upon completion of the work, Tenant shall cause to be provided to Landlord (i) as-built drawings of the Tenant Improvements work signed by the Architect, (ii) CADD disks of the improved space compatible with Landlord's CADD system, (iii) a final punch list signed by Tenant, (iv) final and unconditional lien waivers from the TI Contractor and all subcontractors, (v) a duly recorded notice of completion of the improvement work, and (vi) a certificate of occupancy for the Premises (collectively, the "Close-Out Package").

L.  The Tenant Improvements work shall be prosecuted at all times in accordance with all state, federal and local laws, regulations and ordinances, including without limitation all OSHA and other safety laws, the Americans with Disabilities Act ("ADA") and all applicable governmental permit and code requirements.

M.  All of the provisions of this Lease (including, without limitation, the provisions of Sections 7.4, 10.1 and 10.3) shall apply to, and shall be binding on Tenant with respect to, the construction of the Tenant Improvements.

N.  Landlord shall permit Tenant and its contractors to enter the Premises prior to the Commencement Date of the Lease in order that Tenant may construct the Tenant Improvements in the Premises through Tenant's own contractors prior to the Commencement Date. The foregoing license to enter the Premises prior to the Commencement Date is, however, conditioned upon the compliance by Tenant's contractors with all requirements imposed by Landlord on third party contractors, including without limitation the maintenance by Tenant and its contractors and subcontractors of workers' compensation and public liability and property damage insurance in amounts and with companies and on forms satisfactory to Landlord, with certificates of such insurance being furnished to landlord prior to proceeding with any such entry. The entry shall be deemed to be under all of the provisions of the Lease except as to the covenants to pay rent. Landlord shall not be liable in any way for any injury, loss or damage which may occur to any such work being performed by Tenant, the same being solely at Tenant's risk.

O.  Tenant hereby designates Jeff Hughson, Telephone No. (858) 202-4500, as its representative, agent and attorney-in-fact for the purpose of receiving notices, approving submittals and issuing requests for Changes, and Landlord shall be entitled to rely upon authorizations and directives of such persons) as if given directly by Tenant. Tenant may amend the designation of its construction representative(s) at any time upon delivery of written notice to Landlord.

II.    COST OF THE TENANT IMPROVEMENTS WORK

    A.    Landlord shall provide to Tenant a tenant improvement allowance in the amount of Five Hundred Nineteen Thousand One Hundred Ninety Three Dollars ($519,193.00) (the "Landlord's Contribution") based on $34.37 per usable square foot of the Premises, with any excess cost of the Tenant Improvements in accordance with the approved Working Drawings and Specifications, to be borne solely by Tenant. It is further understood and agreed that Landlord's construction manager shall be entitled to a supervision/administrative fee equal to Nineteen Thousand Thirty Six Dollars ($19,036.00), which fee shall be paid from the Landlord's Contribution. The Landlord's Contribution shall be funded solely towards the cost of completing the approved Tenant Improvements in the Premises and no portion thereof shall be funded towards Tenant's personal property, fixtures and/or equipment installed in the Premises, provided that a portion of the Landlord's Contribution not to exceed the amount of Thirty Thousand Two Hundred Twelve Dollars ($30,212.00) may be funded, at Tenant's election, towards Tenant's "out of pocket" expenses reasonably incurred in connection with Tenant's move to the Premises, including, without limitation, moving and telephone and cabling relocation charges, upon the submission by Tenant of a reasonably-detailed invoice for such expenses and charges. Subject to the foregoing provisions for funding Tenant's moving expenses and charges, if the actual cost of completion of the Tenant Improvements is less than the maximum amount provided for the Landlord's Contribution, such savings shall inure to the benefit of Landlord and Tenant shall not be entitled to any credit or payment

    B.    One hundred percent (100%) of the Landlord's Contribution shall be paid to Tenant within thirty (30) days following substantial completion of the Tenant Improvements in accordance with this Work Letter and submission of the Close-Out Package to Landlord. Tenant shall utilize the Landlord's Contribution prior to October 1, 2007, and unless the Landlord's Contribution is paid to Tenant prior to such date, Landlord shall have no further obligation to fund the Landlord's Contribution.

III.    DISPUTE RESOLUTION

    A.    All claims or disputes between Landlord and Tenant arising out of, or relating to, this Work Letter shall be decided by the JAMS/ENDISPUTE ("JAMS"), or its successor, with such arbitration to be held in Orange County, California, unless the parties mutually agree otherwise. Within ten (10) business days following submission to JAMS, JAMS shall designate three arbitrators and each party may, within five (5) business days thereafter, veto one of the three persons so designated. If two different designated arbitrators have been vetoed, the third arbitrator shall hear and decide the matter. If less than two (2) arbitrators are timely vetoed, JAMS shall select a single arbitrator from the non-vetoed arbitrators originally designated by JAMS, who shall hear and decide the matter. Any arbitration pursuant to this section shall be decided within thirty (30) days of submission to JAMS. The decision of the arbitrator shall be final and binding on the parties. All costs associated with the arbitration shall be awarded to the prevailing party as determined by the arbitrator.

    B.    Notice of the demand for arbitration by either party to the Work Letter shall be filed in writing with the other party to the Work Letter and with JAMS and shall be made within a reasonable time after the dispute has arisen. The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to this Work Letter shall include, by consolidation, joinder or in any other manner, any person or entity not a party to the Work Letter unless (1) such person or entity is substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, or (3) the interest or responsibility of such person or entity in the matter is not insubstantial.

    C.    The agreement herein among the parties to arbitrate shall be specifically enforceable under prevailing law. The agreement to arbitrate hereunder shall apply only to disputes arising out of, or relating to, this Work Letter, and shall not apply to other matters of dispute under the Lease except as may be expressly provided in the Lease.

**EXHIBIT 21.1**

## SUBSIDIARIES OF THE COMPANY

| Name of Subsidiary | Jurisdiction | Doing Business As |
|---|---|---|
| Illumina UK, Limited | United Kingdom | Illumina UK, Limited |
| Illumina GmbH | Germany | Illumina GmbH |
| Illumina K.K. | Japan | Illumina K.K. |
| Illumina Singapore Pte. Ltd. | Singapore | Illumina Singapore Pte. Ltd |
| Illumina Canada | Canada | Illumina Canada |
| CyVera Corporation | Delaware | CyVera Corporation |
| Illumina Netherlands B.V. | Netherlands | Illumina Netherlands B.V. |
| Solexa, Inc. | Delaware | Solexa, Inc. |
| Solexa Ltd. | United Kingdom | Solexa Ltd. |
| Lynx Therapeutics, GmbH | Germany | Lynx Therapeutics, GmbH |

All listed subsidiaries are wholly-owned subsidiaries of Illumina, Inc.

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements on Form S-8 (No.'s 333-140416, 333-134399, 333-129611, 333-125133, 333-124074, 333-114633, 333-104190, 333-88808, 333-42866, and 333-69058), Form S-3 (No.'s 333-134012, 333-125100, and 333-111496) and Form S-4 (No. 333-139111), of our reports dated February 23, 2007, with respect to the consolidated financial statements and schedule of Illumina, Inc., management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting of Illumina, Inc. included in the Annual Report (Form 10-K) for the year ended December 31, 2006.

Ernst & Young LLP

San Diego, California
February 23, 2007

**EXHIBIT 31.1**

### CERTIFICATION OF JAY T. FLATLEY PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Jay T. Flatley, certify that:

1. I have reviewed this Annual Report on Form 10-K of Illumina, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 28, 2007

*/s/ JAY T. FLATLEY*
Jay T. Flatley
President and Chief Executive Officer

EXHIBIT 31.2

**CERTIFICATION OF CHRISTIAN O. HENRY PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Christian O. Henry, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Illumina, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 28, 2007

                              */s/ CHRISTIAN O. HENRY*
                              Christian O. Henry
                              Senior Vice President and Chief Financial Officer

EXHIBIT 32.1

### CERTIFICATION OF JAY T. FLATLEY PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Illumina, Inc. (the "Company") on Form 10-K for the year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jay T. Flatley, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 28, 2007

By:  */s/ JAY T. FLATLEY*
Jay T. Flatley
President and Chief Executive Officer

This certification accompanying the Report is not deemed filed with the Securities and Exchange Commission for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities such Section, and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before, on or after the date of the Report), irrespective of any general incorporation language contained in such filing.

EXHIBIT 32.2

**CERTIFICATION OF CHRISTIAN O. HENRY PURSUANT TO 18 U.S.C.
SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE
SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Illumina, Inc. (the "Company") on Form 10-K for the year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Christian O. Henry, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 28, 2007

                    By:    */s/ CHRISTIAN O. HENRY*
                             Christian O. Henry
                             Senior Vice President and Chief Financial Officer

This certification accompanying the Report is not deemed filed with the Securities and Exchange Commission for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities such Section, and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before, on or after the date of the Report), irrespective of any general incorporation language contained in such filing.