# Exhibit FF



Pll.'s/Deft.'s _____ Exhibit 15
Page 1 Of 2 Witness: San Roman
Date Of Proceeding: 11/08/07
By: Linda Frazeur, CSR#6697

December 16, 1994

Joseph Smith, Esq.
Applied Biosystems
850 Lincoln Centre Drive
Foster City, CA 94404

Dear Joe:

I have heard that some Applied Biosystems managers and employees have made remarks regarding purported Applied Biosystems' rights in Lynx technology that are not consistent with the agreement between our companies. It is obviously in our mutual interest to ensure that everybody shares the same accurate perception of the terms of our agreement to minimize the risk of disappointment and bad feelings downstream. This is especially important now that Lynx is trying to finance a new company to develop commercial products based on the inventions of Dr. Brenner. I do not want to respond directly to the comments that have been made as the reports I have heard may well be inaccurate or exaggerated. Still, I would like to state my understanding of the pertinent provisions of the Lynx/ABI agreement. Assuming we have the same understanding, we can then discuss what measures should be taken to correct any confusions that may exist.

The license agreement between Lynx and ABI provides for a grant by ABI to Lynx of a "royalty free, world wide, nonexclusive license (with the right to grant sublicenses) in the Therapeutics Field under any patent issued or issuing in respect of any invention reduced to practice by ABI at any time prior to June 30, 1995, to make, have made, use and sell oligonucleotides in the Therapeutics Field." (See Section 3.b.) Section 5.a contains a parallel grant by Lynx to ABI of "a royalty free, world wide license (with the right to grant sublicenses) under any patent issued or issuing on any invention reduced to practice by Lynx prior to June 30, 1995, to make, have made, use and sell products in and for the Research Field." In addition, Section 5.c gives ABI "the first right to negotiate for a license to any invention not otherwise licensed to ABI for use outside the Therapeutics Field."

Lynx has acquired _limited_ rights to certain inventions of Dr. Brenner. These inventions were reduced to practice by Dr. Brenner independently of Lynx and are embodied in patent applications naming him as the inventor. As you know, I brought these inventions to ABI's attention long before considering acquiring certain rights to them for Lynx, and ABI declined to pursue them on terms acceptable to Dr. Brenner. Nearly a year later, Lynx negotiated its agreement with Dr. Brenner. Under this agreement Lynx agreed to conduct an initial evaluation of the inventions with the objective of justifying independent financing of the project. At the conclusion of the Lynx study, the agreement calls for any developments Lynx may have made, as well as Dr. Brenner's inventions, to be assigned to a new company (subject to reservation of a license for use by Lynx solely in its own antisense drug development programs) that will seek

LYNX THERAPEUTICS INC. 3832 Bay Center Place. Hayward, CA 94545 U.S.A. Tel: (510) 670-9300 Fax: (510) 670-9302

MHUNK017659

financing for commercial development of the inventions. It was assumed that, after venture capital financing, Lynx would end up with a minority equity interest in the new company and a license to use the technology in its own antisense research. We are, at the moment, considering providing that financing directly from Lynx, so that Lynx may retain a majority of the equity (and its potential appreciation) for the benefit of its shareholders. Dr. Brenner's approval is necessary to this alternate pathway and is conditional on preserving intact the new company's control of his technology.

I believe the following statements are correct with respect to the application of our license agreement to the Brenner project:

1. Dr. Brenner's inventions are not covered by Section 5.a as they were not reduced to practice by Lynx. In any event, the purpose of the licenses in Sections 3.b and 5.a was to encourage the scientists of Lynx and Applied Biosystems to collaborate freely for a time, to further develop the technologies shared by the companies, by providing for appropriate cross licensing of their inventive work.

2. Section 5.c also does not apply to the inventions of Dr. Brenner as they are not "patentable inventions of Lynx."

The above notwithstanding, since funding from corporate partners will ultimately be important to the ability of the new company to complete its projects successfully, Lynx would certainly be happy to discuss such a funding relationship with AB/PE if they are interested.

Please give me a call once you have had a chance to review this so that we can discuss how to clarify matters for all concerned. I believe my statements are correct and am more concerned about any confusion than being wrong. Such confusion could make it more difficult for Lynx to retain a major equity stake in the new company. Hence my interest in clearing it up quickly. A protracted resolution of differences of opinion would, in fact, be moot as Dr. Brenner would not wait for it. I believe it would be contrary to the interests of both AB/PE and Lynx if, as a result of such confusion, Dr. Brenner exercises his prerogative to ask Lynx to seek VC financing, leaving to Lynx only a license to use his technology in its antisense drug development in return, as agreed, for its help to date in conducting the initial evaluations.

Very truly yours,

Sam Eletr, Ph.D.
Chief Executive Officer and
Chairman of the Board

SE/fgo

cc:    Michael Hunkapiller

MHUNK017660