Exhibit UU



96 06 9658

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

**[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** *[FEE REQUIRED]*

For the year ended _____ **December 31, 1995** _____

or

**[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** *[NO FEE REQUIRED]*

Commission file number 0-22570

RECD S.E.C.

APR 1 1996

FEE 014

**LYNX THERAPEUTICS, INC.**
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | 94-3161073 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**3832 Bay Center Place, Hayward, CA 94545**
(Address of principal executive offices, including zip code)

**(510) 670-9300**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: **None**

Securities registered pursuant to Section 12(g) of the Act:       **Common Stock, $.001 Par Value**


Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes _____   No _____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. _____

The number of shares of Common Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock outstanding as of February 29, 1996 was 2,334,524, 332,288, 123,299 and 40,000 respectively. The Series B, Series C and Series D Preferred Stock are convertible into Common Stock on a ten-for-one basis. Information regarding the aggregate market value of the Registrant's voting stock is not included because there is currently no public trading market for the Company's voting stock.

# PART I

**ITEM 1.**      **BUSINESS**

*Except for the historical information contained herein, the following discussion contains forward-looking statements that involve risks and uncertainties. The Company's actual results could differ materially from those discussed here. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this section, as well as in the section entitled "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations."*

Lynx Therapeutics, Inc. ("Lynx" or "the Company") is focused on exploiting novel, proprietary DNA sequencing and synthesis technologies to quantify the dynamics of gene expression in disease processes and address their aberrant forms. The Company expects thereby to identify and pursue novel therapeutic targets directly responsible for human disease process.

First among the Company's proprietary assets is a set of novel cloning and sequencing techniques, collectively dubbed "massively parallel signature sequencing" ("MPSS"), that the Company expects to use to identify and quantify, in a single analysis, a representative sampling of all the messenger ribonucleic acid ("mRNA") molecules present in a tissue sample. If successfully developed, the rapidity (days, instead of months or years) of this new analytical technique could allow, for the first time, the analyses of the changes in gene expression that occur during the progression of a disease, including the many different states that exist along the time course of a disease process. The Company believes that this access to the dynamics (*i.e.*, time-dependent properties) of gene expression will lead both to valuable information concerning specific disease processes and to the discovery of heretofore inaccessible or unappreciated therapeutic and/or diagnostic targets.

Lynx's second set of proprietary technologies is an outgrowth of the expertise on which Lynx was originally founded. This expertise relates to synthetic DNA ("oligodeoxynucleotide" or "ODN") chemistry and manufacturing and the use of synthetic ODN analogues as sequence-specific antagonists to mRNA, *i.e.*, as modulators of mRNA translation. Recent proprietary developments include a new ODN analogue potentially more effective at inhibiting mRNA translation than the current leading analogue (the "phosphorothioate" analogue, licensed to Lynx and others by the U.S. Public Health Service). Importantly, this new, proprietary analogue (the "phosphoramidate" analogue) appears to be capable of binding to double-stranded DNA at sequence-specific sites under physiological conditions. Thus, it could provide the Company with the proprietary means to interfere with unwanted transcription directly at the gene level, in addition to more effective inhibition on mRNA translation. These phosphoramidates are potential therapeutic agents as well as tools that may be used to validate discoveries of aberrant gene expression.

Lynx has planned its research and development around the promise of its technologies for drug discovery, but it recognizes that these technologies have potential applications beyond the few selected programs that the Company can support on its own. Accordingly, the Company plans to generate drug candidates that would have significant value to potential development and marketing partners. In addition, and in view of the broad applicability of its technologies, the Company also intends to sell access to its novel cloning and sequencing technologies to selected partners initially, and later to a broader audience. Finally, the Company will attempt to generate additional revenues from the sale of access to the dynamic gene expression databases it plans to accumulate if and when the MPSS technology is fully reduced to practice.

The Company will attempt to finance much of its future growth and acquisitions of complementary technologies through licensing and R&D agreements with larger companies. The Company's existing agreement with Hoechst AG and Hoechst Marion Roussel (collectively referred to as "Hoechst") illustrates this strategy. It provides financial support to Lynx to accelerate the development of the Company's new MPSS

technology and enrolls Hoechst as the first of several pharmaceutical and biotechnology companies Lynx expects to enlist as subscribers to databases generated by MPSS technologies.

**Business Risks**

*Early Stage of Development; Technological Uncertainty; Government Regulation*

Lynx is at an early stage of development. All of Lynx's products are in a research and development phase; no significant revenues have been generated from services or product sales. There is no assurance that Lynx's technologies will be successfully developed or, if they are, that they can be successfully marketed. Certain Lynx products depend on the continuance of outside collaborations and/or the development of in-house expertise to complement the efforts of such collaborators. There can be no assurance that Lynx will successfully maintain these collaborations or that it will be able to develop such in-house expertise. Moreover, Lynx's products in research or development may prove to have undesirable and unintended side effects or other characteristics that may prevent or limit their commercial use. Pharmaceutical or biotechnology based products, if any, resulting from Lynx's research and development programs are not expected to be commercially available for a number of years.

The Federal Drug and Administration ("FDA") and comparable agencies in foreign countries impose substantial pre-market approval requirements upon the introduction of therapeutic pharmaceutical products through lengthy and detailed pre-clinical and clinical testing procedures and other costly and time-consuming procedures. Satisfaction of these requirements, which includes demonstrating to the satisfaction of the FDA that the product is both safe and effective, typically takes several years or more, depending on the type, complexity and novelty of the product. There can be no assurance that FDA or other regulatory approval for any products developed by Lynx will be granted on a timely basis, if at all, or, if granted, that such approval will cover all clinical indications for which Lynx seeks approval or will not contain significant limitations on use. Further, additional government regulation from future legislation or administrative action may be established which could also prevent or delay regulatory approval of Lynx's products.

Lynx currently does not have extensive clinical testing or regulatory compliance experience. Lynx will need to hire additional personnel skilled in the clinical testing and regulatory compliance processes if it develops products with commercial potential. There can be no assurance that Lynx will be able to hire such personnel.

*Loss History; Uncertainty of Future Profitability; Need for Additional Funds*

Lynx had an accumulated deficit of $26.1 million through December 31, 1995 and may continue to incur substantial operating losses for at least the next several years. There can be no assurance that Lynx will ever be able to achieve or sustain profitability. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations."

Lynx's operations to date have consumed substantial amounts of cash. Negative cash flow from operations is expected to continue and to increase over the foreseeable future. Lynx anticipates that its existing capital resources, together with anticipated payments from corporate partners, will enable Lynx to maintain its current and planned operations through 1996. Lynx intends to seek additional funding through future equity or debt offerings in the public or private markets or through collaborative arrangements. Lynx's ability to obtain additional financing will depend on the progress in its research and development efforts, its financial condition and business prospects, and conditions prevailing in the relevant capital markets at the time financing is sought. There can be no assurance that any additional financing required by Lynx will be available or, if available, will be on terms favorable to Lynx. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources." Failure to obtain such additional funds would have a material adverse effect on the Company.

*Competition*

Lynx is subject to competition from many directions including complementary DNA ("cDNA") cloning and sequencing technologies, ODN chemistry and drug development, and the discovery and development of pharmaceutical and biotechnology drugs. Competition in the latter arena includes all of the world's pharmaceutical and biotechnology companies that have research programs pursuing the same general targets as Lynx, including cardiovascular diseases, cancers and leukemias and neurovascular diseases. There are several companies that are now actively engaged in technology developments and discovery programs pertaining to genomic elucidation and gene function determination. Key to these efforts are cDNA cloning and DNA sequencing techniques. Lynx's MPSS is not the only attempt to radically transcend conventional approaches. There can be no assurance that similarly efficient, or better, combinations of novel cloning and sequencing techniques will not be obtained elsewhere.

*Patents and Proprietary Rights*

Lynx's success will depend on its ability to obtain patent protection for its technologies and products both in the U.S. and other countries No assurance can be given that patents will issue from any of the pending applications or that, if patents do issue, the claims allowed will be sufficiently broad to protect Lynx's technology. In addition, no assurance can be given that any patents issued to or licensed by Lynx will not be challenged, invalidated, infringed or circumvented or that the rights granted thereunder will provide competitive advantages to Lynx. There can be no assurance that Lynx will be able to obtain a license to any third party technology that it may require to conduct its business or that, if obtainable, such technology can be licensed at a reasonable cost.

Litigation, which could result in substantial costs to Lynx, may also be necessary to enforce any patents issued to Lynx to determine the scope and validity of other parties' proprietary rights, or to determine the priority of inventions in an interference procedure determined by the U.S. Patent and Trade Office. If the outcome of any such litigation is adverse to Lynx, Lynx's business could be adversely affected.

Lynx also relies on trade secrets and proprietary know-how, which it seeks to protect in part by confidentiality agreements with its collaborators, employees and consultants. There can be no assurance that these agreements will not be breached, that Lynx would have adequate remedies for any breach or that its trade secrets will not otherwise become known or be independently developed by competitors. See "Business - Patent and Proprietary Rights."

*Need to Establish Collaborative Relationships; Dependence on Partners*

Lynx's business strategy includes entering into strategic alliances or licensing arrangements with corporate partners, primarily pharmaceutical and biotechnology companies, relating to the development and commercialization of certain of its potential technologies, databases and products. There can be no assurance that Lynx will be able to negotiate attractive collaborative arrangements or that such collaborations will be available to Lynx on acceptable terms so that any such relationships, once established, will be scientifically or commercially successful. In addition, there can be no assurance that the Company will be able to maintain its existing collaborations, or that the Company's partners will perform under such collaborations.

4.

*Attraction and Retention of Key Employees and Consultants*

Lynx is highly dependent on the principal members of its management and scientific staff, the loss of whose services could have a material adverse effect on Lynx. Furthermore, recruiting and retaining qualified scientific personnel to perform research and development work in the future will also be critical to Lynx's success. Lynx believes it will be successful in attracting and retaining skilled and experienced scientific personnel, although there can be no assurance that Lynx will be able to attract and retain such personnel on acceptable terms, given the competition among numerous pharmaceutical and health care companies, universities and non-profit research institutions for experienced scientists. See "Employees."

*Manufacturing Capability*

The manufacture of Lynx's products will be a time consuming and complex process and will be subject to good manufacturing practices ("GMP") requirements prescribed by the FDA or other standards prescribed by the appropriate regulatory agency in the country of use. There can be no assurance that Lynx will be able to manufacture products in a timely fashion at acceptable quality and cost and in sufficient quantities. See "Manufacturing."

*Absence of Sales and Marketing Experience; Product Liability Exposure and Insurance; Hazardous Materials*

Lynx has no experience in the sales, marketing or distribution of pharmaceutical products and does not expect to establish a direct sales capability for at least several years. To market any of its products directly, Lynx must develop a substantial sales and marketing force with technical expertise and with supporting distribution capability. There can be no assurance that Lynx will desire to or be able to build such a sales force or that its direct sales and marketing efforts will be successful.

The use of any of Lynx's products in clinical trials and the sale of any products may expose Lynx to liability claims resulting from the use of such products. These claims might be made directly by consumers, health care providers, pharmaceutical companies or others selling such products. Lynx intends to obtain product liability insurance coverage. No assurance can be given that Lynx will be able to obtain such insurance or, if obtainable, that such insurance can be acquired at reasonable cost or in sufficient amounts to protect Lynx against losses that could have a material adverse effect on Lynx.

Lynx's research and development may involve the controlled use of hazardous materials, chemicals, viruses and various radioactive compounds. In the event of such an accident, Lynx could be held liable for any damages that result, and any liability could exceed the resources of Lynx.

## LYNX TECHNOLOGIES

## MASSIVELY PARALLEL SIGNATURE SEQUENCING (MPSS)

### Background

A human consists of many trillions of cells, each containing the same set of genes. This full complement of genes that is present in each cell is referred to as the "genome." The difference between cells in a single human is not in their genomes, but in which subset of genes a particular cell's role causes to be transcribed and translated into the protein specific to that cell's needs and function. This process of converting the genetic information encoded in the double-stranded DNA of a gene into mRNA and subsequently into a protein molecule is referred as "gene expression." At any one time the transcribing machinery of any particular human cell will be reading (expressing) about 10,000 to 20,000 genes (out of 100,000 to 200,000 total genes in the human genome), and the cell will contain perhaps as many as one million mRNA molecules of 10,000 to 20,000 different types. Each mRNA type will be present at different levels of abundance depending upon the particular cell and its environmental conditions at that time. The regulation of gene expression is highly complex, differing not only

between the various cell types within the organism, but also differing from time to time during growth, development, and aging, as well as during the organism's response to various stimulation from the environment. Higher organisms, such as humans, have developed sophisticated, genetically programmed responses to environmental stimulation or insults in order to respond to the environment and to protect themselves from injury. These protective responses require biochemical sensors that are coupled to the cellular mechanisms controlling gene expression. Many if not most sensors regulate gene expression via their ability to affect the amounts of specific mRNA molecules within the cell.

The information in each gene, while expressed first as a specific mRNA molecule, ultimately is expressed in the form of a specific protein molecule, which then carries out a specific function for the cell. Proteins play a central role in nearly every aspect of human metabolism and physiology. Most human diseases result from the inappropriate production or performance of specific protein molecules.

Diseases generally have an initial cause, such as an environmental injury, infection, or stress; an internal dysfunction; or an inherited defective gene. Following initiation, a disease may simply resolve (with or without treatment) or a disease may progress into a complex disease process, involving increasingly destructive effects of misguided or exaggerated aspects of the host's protective response, the outcome being a chronic or recurrent disease with its associated morbidity or death.

To date, the molecular aspects of disease processes have generally not been well understood. This is in spite of the recent identification and sequencing of the genes involved in or causing many different inherited diseases. However, the delineation of the specific gene causing a specific inherited disease usually is not sufficient to enable the discovery of a drug to treat that disease. For example, Sickle Cell Disease, the first disease for which a molecular defect was discovered—50 years ago--and the first for which the specific gene defect was sequenced, is today without an effective treatment. While several major drugs on the market today do intervene at known molecular steps in disease processes, e.g. cholesterol synthesis, stomach acid production, erythropoeitin deficiency, insulin deficiency, none has been discovered as the result of mapping, identifying or sequencing the gene responsible for a related inherited disease. Some current successful therapeutic agents have targeted the initial causative event or agent (e.g. infectious microorganisms) or have empirically targeted a single step of the multi-step complex disease process. However, such an approach does not optimize the resources used in research and development activities.

Therapeutic intervention and, therefore drug discovery efforts, should be aimed at the molecular events of the disease process itself, rather than at the unknown, untraceable or perhaps no longer relevant cause.

The delineation and characterization of the molecular events responsible for the many complex processes of human disease have been hindered by technological limitations. Quantitative analysis of a disease process would require a thorough knowledge of the nature, intensity and time course of most, if not all, inappropriate gene expression in the diseased tissue or cells. Theoretically it would be possible to characterize the state of gene expression in a cell if one could at various times and under various conditions characterize qualitatively and quantitatively the level of all of the mRNA molecules present in the particular cell. Although mRNA molecules are not chemically stable, they can be converted in the laboratory into more stable, representative, complementary DNA or "cDNA" molecules, which contain the same genetic information as their template mRNA. Thus, one could characterize the gene expression state of a cell by biochemically converting at a point in time all of its mRNA molecules into cDNA molecules and then qualitatively and quantitatively analyzing all of these cDNA molecules.

Current technologies cannot practically accomplish such an extensive cDNA or mRNA analysis due to:

- The slow rate of cDNA sequencing, involving at most, hundreds of molecules at a time. Such a pace would require months or years to analyze the approximately one million mRNAs (as cDNAs) per cell.

- Poor quantitation and incomplete representation

- High cost per sequence, rendering the sequencing of all the cDNAs from a large number of cells required for a dynamic analysis of gene expression, just too expensive.

Lynx is in the final stages of developing a breakthrough process, involving high throughput cloning and sequencing technologies to address these issues and limitations of current approaches.

**MPSS**

Lynx's MPSS technology is based on two Lynx-owned inventions. The first is a means of quantitatively cloning, in parallel, in a single container and without a biologic step, as many as a million cDNA molecules. The second is a method for applying a new base-by-base sequencing chemistry, in parallel, to all the cloned cDNAs in order to obtain from each clone its relative abundance and at least 18-20 bases of sequence information, which is sufficient to identify each particular cDNA. The technologies have a number of advantages over currently available alternatives:

- Fast and cost-effective, massively parallel cloning and sequencing of cDNA

- Quantitative analyses and complete representations of up to a million cDNAs in days

- Reduced costs per sequence so as to encourage the extensive use of MPSS.

Since the combined operations are not expected to take more than a week (rather than months or years as current technologies would require), it is possible to envisage routine quantitative analysis of gene expression in as many samplings of cells or tissues as are required to characterize stages in the development of a disease, thereby revealing the molecular dynamics of a disease process. The high throughput is expected to enable real-time experimentation and analyses of pathologic modeling and sampling. This, in turn, would enable rapid, data-driven selection of molecular targets for either therapeutic intervention or diagnostic probing. Many diseases remain untreated at present because of our lack of understanding of what gene product(s) to target for optimal therapeutic intervention or even accurate diagnosis.

Because of the massively parallel nature of these new Lynx technologies, the acquisition cost of sequence data is expected to be much less than by the current labor- and instrument-intensive technologies.

**Drug Discovery**

The Company is in the process of establishing a drug discovery and early development program aimed at the narrow but medically important field of neurovascular diseases, to which the Company's gene sequencing and target discovery (MPSS) technologies are particularly well suited. This effort includes the ongoing recruitment of a group of recognized neuroscientists, some as Lynx employees and others as Lynx advisors. While ODNs represent a potential modality of therapeutic intervention, Lynx will not limit this drug discovery program (and future ones as well) to ODNs and expects to discover and develop other types of drug compounds as appropriate.

## Commercialization

Given the broad range of potential applications, the Company has decided to share this proprietary technology with selected partners in order to realize value from applications it could not afford to address on its own.

Lynx's strategy is to use the MPSS technology to:

- Generate revenue by selling access to MPSS
- Generate revenue by selling access to gene expression databases
- Discover therapeutic targets and out license them
- Discover diagnostic targets and out license them
- Discover therapeutic targets for its own drug discovery and development programs

## THERAPEUTIC PROGRAMS

### Background

There are several ways to interfere with gene expression. Traditional drugs do so by interfering either with the function of the protein that is the end-product of unwanted gene expression or with one of the many proteins necessary for the process that results in the unwanted gene expression. More recently, a number of techniques have been proposed that potentially enable the direct targeting of the gene (to interfere with transcription) or of the mRNA transcript itself (to interfere with translation). Since both double-stranded DNA (genes) and single-stranded mRNA (transcripts) are susceptible to sequence-specific binding and antagonism by single-stranded fragments of synthetic DNA (ODNs), highly specific ODN drugs are theoretically possible. In addition, because ODNs are relatively small molecules compared to larger therapeutic proteins, including monoclonal antibodies, they were expected, and have been demonstrated *in vitro* and *in vivo* in animals and humans, to penetrate both tissues and cells where diseases occur. As a result they have received considerable attention as both antigene and anti-mRNA (also known as antisense) drug candidates. Still, the conversion of their potential into reality is not without obstacles.

The development obstacles confronting antisense and antigene therapeutics have been many, and some are still outstanding. The first was the susceptibility of the natural form of single-stranded synthetic DNA fragments to degradation by the enzymes that have evolved to protect the organism against stray DNA. Accordingly, enzyme-resistant synthetic analogues of DNA have been developed. The analogue most widely used to date is known as phosphorothioate oligodeoxynucleotides which were co-developed for this use at the U.S. National Institutes of Health ("NIH"), by Lynx's current Vice President, Medicinal Chemistry, and co-exclusively licensed to Lynx. Other obstacles to the straightforward use of ODNs as effective drugs has to do with their relative difficulty to manufacture, their cost and the difficulty of delivering them in sufficient quantities to the interior of the target cell.

### Pharmacology of ODNs

The clinical and commercial success of antigene and anti-mRNA ODN therapeutics is dependent upon the ability to deliver ODN molecules into the appropriate compartments of the target cell, in most cases the nucleus. Thus, understanding and controlling the cellular pharmacology of ODNs is an important element of the Company's interests. It involves not only Lynx's growing expertise in molecular and cellular biology, but also that of several important extramural commercial and academic collaborators.

Lynx's own efforts have deployed molecular techniques to verify the hypothesized anti-mRNA mechanisms associated with different ODNs. These techniques are now being extended to studies on pre-clinical and clinical cellular materials used by Lynx's collaborators in order to verify that the same mechanisms also obtain *in vivo*. Lynx has also established formal research and development agreements with

8.

companies developing technologies that may be useful in the targeting, uptake and intracellular trafficking of nucleic acids and synthetic ODNs. These molecular and cellular studies will be an important part of Lynx's ongoing efforts to achieve both chemistry and biology leadership in the field of ODN therapeutics.

**ODN Drug Discovery**

Lynx's existing ODN drug discovery and development program encompasses several diseases, including adult leukemias, specific solid tumors and arterial restenosis, for which ODNs may be safe and effective. Many of the diseases under investigation have gene targets that are part of the Company's intellectual property portfolio.

**Phosphorothioate Oligodeoxynucleotides**

Phosphorothioate analogues are ODNs in which the natural sugar-phosphate backbone has been modified by the substitution of sulfur for one of the non-bridging oxygens at several or all phosphodiester linkages. These modified ODNs resist degradation by blood and cellular enzymes and are able to enter the cell's interior to bind mRNA. Phosphorothioate ODNs are currently the leading antisense DNA analogues since they are the only analogue for which clinical observations are in progress. Lynx shares a license to the NIH patents that has certain co-exclusive advantages not available to subsequent licensees covering all therapeutic applications of this phosphorothioate backbone chemistry.

Because of its expertise in synthetic DNA technologies and its early work as a licensee of the phosphorothioate chemistry, Lynx was able to develop economical large-scale synthesis and purification processes for the production of phosphorothioate ODNs ahead of others in the field. This manufacturing capability has been a key to the early success of Lynx and continues to be a differentiating factor between Lynx and other companies developing ODN therapeutics.

These large-scale ODN production processes have already made it possible for Lynx to produce sufficient quantities of compounds to study the pharmacokinetic and toxicological properties of several lead compounds, to demonstrate the first systemic *in vivo* antisense effects in several animal cancer models and to pursue several clinical trials. These ongoing *in vivo* studies support the proposition that phosphorothioate ODNs do make their way from the bloodstream into cells to exert selective modulation of gene expression and concomitant inhibition of cell function, without limiting side effects.

**Phosphoramidate Chemistry**

Phosphorothioate ODNs do not bind double-stranded DNA as they do single-stranded mRNA, and therefore they cannot be used as direct antigene drugs. However, Lynx's new DNA backbone analogue based on 3'N-phosphoramidate DNA linkages has been demonstrated to bind double-stranded DNA under physiologic conditions. Preliminary *in vitro* data with these ODNs have generated evidence of temperature-stable triplex structures of phosphoramidates bound to double-stranded DNA in a sequence-specific manner. They have also shown marked improvements in efficacy over phosphorothioates when used to target mRNA (often greater than 10-fold depending upon the targets and the cell systems used for testing). The Company has expanded its development effort in this program and is now testing, both *in vitro* and *in vivo*, a number of phosphoramidate drug candidates.

The potential utility of phosphoramidate ODNs as direct antigene drugs is especially promising since the number of copies of a target gene in a cell is usually two, not hundreds or thousands as for many target mRNA molecules and viruses. Thus, the effective intracellular concentration required of an "antigene" ODN may be many times lower than that of an "antisense" ODN drug. Antigene ODNs also have interesting implications for treating viral diseases that involve the viral genome integrating itself into the host genome once or a few times—as does HIV.

**Clinical Programs**

When Lynx was formed in 1992 as a "spin off" of Applied Biosystems, Inc. ("ABI"), now a division of Perkin Elmer Corporation, its charter was to pursue therapeutic applications of ODNs as potential modulators of gene expression. Because the Company did not then have access to gene-discovery technology, it developed its business around licensed targets and contracted with its academic licensors for the pharmacological and clinical validations of the ODNs. Lynx chose to concentrate on the development of manufacturing techniques for the synthesis of therapeutic grade ODNs since this expertise could best serve its clinical objectives. Preclinical and clinical investigations have advanced to the point where two of the Company's candidate ODN compounds received FDA approval for Phase I/II trials under three separate protocols submitted as physician-sponsored Investigational New Drug Applications ("INDs"). The INDs were based on targeting the expression of genes presumed to cause or be crucial in the respective disease processes. The first of these, targeting acute myelogenous leukemia ("AML") by systemic infusion of the candidate ODN, began in November 1992 and completed in February 1994. The second protocol, begun in September 1993, targeted the same disease AML with the same compound, but specified instead, *ex vivo* purging of bone marrow. The third protocol, begun also in September 1993, targeted chronic myelogenous leukemia ("CML") with another candidate compound, also using *ex vivo* bone marrow purging. In addition, the Company received in 1994 approval for a Lynx-sponsored IND for the treatment of CML by the systemic infusion of the candidate compound and an approval for a foreign trial of a fourth compound, targeting cardiovascular restenosis.

The first systemic AML safety trial was successfully completed, and the IND sponsorship was transferred to Lynx. Based on the lack of adequate new supporting preclinical and clinical pharmacological data, the Company decided not pursue further the AML indication. Both bone marrow purging trials are ongoing, as is the systemic CML trial. It is too early to draw any but safety results (there are no apparent safety concerns so far). The coronary restenosis trials have shown the candidate ODN to be safe. Evidence of efficacy must await phosphorothioate clinical trials that are currently planned to begin in 1996.

**Manufacturing**

The development of ODN-based drugs requires the ability to produce amounts of synthetic DNA far larger than those which can be obtained from research-oriented chemistries and DNA synthesizers. Few, if any, other sources can match the quantity and quality of compounds that Lynx's technology has made available for *in vitro*, *in vivo*, and now human, testing. This manufacturing technology traces its origins to the beginning of Lynx as a division of ABI. Lynx retains royalty-free licenses to ABI's DNA synthesis technologies and holds exclusive positions in the therapeutics field for some of them.

Lynx has concentrated significant research and development efforts to date on chemical processes and scale-up technology to produce and analyze phosphorothioate ODNs of the highest quality. Current facilities can support the manufacturing and analyses of quantities sufficient to meet the needs of preclinical and clinical investigations, toxicological evaluations and early commercialization. Lynx has focused on fundamental improvements to the complex synthetic chemistry and purification and the design and development of large-scale pilot production equipment uniquely suited to the demands of ODN synthesis on solid phase supports. These efforts have led to a number of issued and pending patents.

Lynx has established standard operating procedures and a documentation control system for manufacturing, process monitoring, and final product analysis that enable it to produce bulk pharmaceutical products for clinical investigations under GMP in compliance with FDA regulatory requirements. In October 1994, Lynx was granted a license to manufacture drugs in its new facility by the State of California, Department of Health Services, Food and Drug Branch.

10.

**Non-Corporate Collaborations/Sponsored Research**

Lynx's R&D strategy has been to leverage its chemistry and synthetic know-how with the pre-clinical and clinical expertise of extramural experts active in a variety of disease areas. By supplying its collaborators with large quantities of high quality ODNs unavailable from other sources, the Company has been able to sponsor many more investigations than it could have carried out on its own. When appropriate, the Company has provided financial support for its collaborators' work and, in most cases, has secured the full commercial rights for any resulting drugs and targets. The resulting research has thus drawn on resources and skills far greater than the Company could have assembled alone in its short history and with its limited finances. This strategy has allowed the Company to defer investing in expensive skills and technologies until it could ascertain their relevance to specific product developments.

Lynx has entered into a number of collaborations aimed at enhancing and extending its research and development activities. The following describes the Company's current academic collaborations:

- A Sponsored Research Agreement with the University of Pennsylvania is directed at Phase I/II study of *ex vivo* bone marrow purging of CML patients with a c-*myb* antisense phosphorothioate ODN and a Phase I/II trial of the same compound in a systemic delivery mode is also accruing patients.

- A Sponsored Research Agreement with The Jefferson Cancer Institute (Philadelphia) is directed at *in vivo* mouse experiments in CML and acute leukemias utilizing the Company's phosphoramidate ODNs. Basic research is also aimed at identifying mRNA targets that are products of nuclear proto-oncogenes and oncogenes, and at characterizing receptor-mediated mechanisms associated with signal transduction pathways in cancer.

- A Sponsored Research Agreement with the Interventional Cardiology Group at the Thomas Jefferson University Medical Center is focused on *in vitro* studies and *in vivo* experiments using pigs to develop anti-restenosis drugs based on ODNs. This study has progressed to clinical trials in Argentina and was covered in part by the Company's agreement with Glaxo Wellcome plc.

- A Sponsored Research Agreement with the Polish Academy of Sciences is aimed at developing chiral phosphorothioate synthesis technology.

- A Sponsored Research Agreement at the Thomas Jefferson Cancer Institute is directed at understanding the role of the IGF-1 receptor in the protection of the cancer cells from dying. ODN anti-mRNA compounds targeting the receptor are being optimized *in vitro* and *in vivo*.

- A Sponsored Research Agreement at the University of Texas M.D. Anderson Cancer Center to conduct research in the field of antisense oligonucleotides targeting certain growth factors and protooncogenes including but not limited to IGF-1 Receptor, EGF Receptor, c-myb and IL-8.

- A Cooperative Research And Development Agreement (CRADA) with NIH scientists is aimed at developing a strategy for antisense ODN therapy of Kaposi's Sarcoma, a malignancy seen most commonly in AIDS patients.

**Corporate Collaborations**

- The Company, in 1994, entered into a Licensing Agreement with The Wellcome Foundation to develop and market world-wide a synthetic ODN which is in human trials for the treatment of post-angioplasty coronary restenosis. As a result of budgetary constraints and reprioritization of its cardiovascular projects, the new company Glaxo Wellcome plc, which resulted from the 1995 merger of Glaxo and Burroughs Wellcome, advised us on December 18, 1995, that it desired to terminate the Licensing Agreement within the prescribed 90 days. Lynx has acknowledged the notification and is evaluating the opportunities for proceeding

with a modified pilot safety and dosing study with a new corporate partner or under its own auspices during 1996.

- In October 1995, Lynx entered into an agreement that allows Hoechst access to Lynx's MPSS technology. Under the terms of the agreement, Lynx received funds to accelerate the development of its MPSS technology plus an equity investment. In return, Lynx will clone and sequence cDNA libraries from samples of interest to Hoechst. The agreement also stipulates that not more than two additional companies may similarly access the MPSS technology before the end of 1997. The combined equity, R&D support payments, and subscription fees could reach $35 million by the end of 1998, depending upon the achievement of certain milestones and the quantity of samples submitted for analyses.

With proprietary technologies expected to span the spectrum from target identification and characterization to drug discovery, Lynx believes it will be well positioned to pursue valuable corporate partnerships. Lynx's strategic intent is to grow and to expand its technological base rapidly, all the while focusing on the need to become self-sustaining as quickly as possible.

**Research and Development Expenditures**

Lynx has devoted its efforts primarily to research and development. Research and development expenses were $11.0 million for the year ended December 31, 1995, $7.7 million for the year ended December 31, 1994, $7.3 million for the 12 months ended December 31, 1993 and $6.2 million for the fiscal year ended June 30, 1993.

**Scientific Advisors**

The following are Lynx's principal scientific advisors:

Sydney Brenner, M.B., D. Phil.   Honorary Professor of Genetic Medicine, University of Cambridge School of Clinical Medicine, Cambridge, England. Dr. Brenner is known for his work on the genetic code and information transfer from genes to proteins, and for his pioneering research on the genetics and development of the nematode. Dr. Brenner is a Fellow of the Royal Society (1955) and a Foreign Associate of the U.S. National Academy of Sciences (1977) and has received numerous awards of recognition, including the Albert Lasker Medical Research Award (1991), the Genetics Society of America Medal (1987), and the Kyoto Prize (1990).

Dennis Choi, M.D., Ph.D.   Chairman of the Department of Neurology and Director of the Center for the Study of Nervous System Injury at Washington University School of Medicine, St. Louis, Missouri. Dr. Choi is an internationally recognized leader in the area of cellular and molecular neuroscience with a specific focus on understanding the mechanisms of brain and nervous system injury.

Robert L. Letsinger, Ph.D.   Holds joint appointments in the Departments of Chemistry and Molecular Biology and is also Professor of Chemistry at the Northwestern University in Evanston, Illinois. Dr. Letsinger is known for his pioneering work in solid phase synthesis of DNA and the phosphite method for assembly of oligonucleotides. Dr. Letsinger's achievements in these areas laid much of the conceptual groundwork for current automated technologies to produce synthetic DNA.

Laszlo Patthy, Ph.D., D.Sc.   Director of the Institute of Enzymology, Hungarian Academy of Sciences, Budapest, Hungary. Dr. Patthy, a leading structural and evolutionary biologist, has made seminal discoveries in the area of modular protein evolution. Dr. Patthy has developed a sophisticated protein sequence informatics technology that is making unique contributions to the structural and functional aspects of proteins and their genes.

Peter H. Seeburg, Ph.D., D.Sc.   Professor, University of Heidelberg, Germany. Dr. Seeburg is an internationally recognized pioneer in molecular biology who developed several essential molecular biological techniques and was the sixth most cited scientific author of the 1980's. He was a principal scientist in the early

phase of Genentech, Inc. In recent years, Dr. Seeburg has made seminal discoveries in molecular neuroscience. In 1996, he will assume the directorship of the Max Planck Institute of Heidelberg.

Wojciech J. Stec, Ph.D. Professor and Head of the Department of Bioorganic Chemistry, Center of Molecular and Macromolecular Studies, Polish Academy of Sciences, in Lodz, Poland. Professor Stec is known for his contributions to organophosphorus chemistry and seminal work on stereochemistry including phosphorothiate analogs of DNA. Prof. Stec was recognized for Fogarty Scholar-in-Residence award (1992-1993) at the National Institutes of Health in Bethesda, Maryland.

Paul F. Worley, M.D. Associate Professor, Department of Neuroscience and Neurology at Johns Hopkins University Medical School. Dr. Worley, a neurologist and molecular biologist, is a pioneer in applying differential cloning techniques to understand the molecular basis of neuronal plasticity.

**Intellectual Property**

Lynx acquired significant technology from ABI, including the rights to patents and know-how, has developed a number of proprietary technologies of its own, and holds licenses to numerous additional intellectual properties.

**Government Regulation**

The FDA and comparable agencies in foreign countries impose substantial pre-market approval requirements upon the introduction of therapeutic pharmaceutical products through lengthy and detailed preclinical and clinical testing procedures and other costly and time-consuming procedures. Satisfaction of these requirements, which includes demonstrating to the satisfaction of the FDA that the product is both safe and effective, typically takes several years or more, depending on the type, complexity and novelty of the product. Government regulation also affects the manufacture and marketing of pharmaceutical products. The effect of government regulation may be to delay marketing of any new products for a considerable or indefinite periods of time, to impose costly compliance procedures and to diminish any competitive advantage that Lynx may attain. It will take years before marketing approvals are obtained, if at all. There can be no assurance that FDA or other regulatory approval for any products developed by Lynx will be granted on a timely basis, if at all, or, if granted, that such approval will cover all clinical indications for which Lynx seeks approval or will not contain significant limitations on use. Any delay in obtaining, or failure to obtain, such approvals would adversely affect Lynx's ability to generate product revenue.

Clinical trials will seek safety data as well as efficacy data and will require substantial time and significant funding. There can be no assurance that clinical trials can be started or completed successfully within any specified time period, if at all, with respect to any of Lynx's products. There can be no assurance that such testing will show any product to be safe or efficacious. Furthermore, Lynx or the FDA may suspend clinical trials at any time if it is felt that the subjects participating in such trials are being exposed to unacceptable health risks. There can be no assurance that Lynx will not encounter problems in clinical trials which will cause Lynx to delay or suspend clinical trials. Moreover, if regulatory approval of a product is granted, such approval may impose limitations on the indicated uses for which the product may be marketed. Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities are subject to continual review and periodic inspections; and later discovery of previously unknown problems with a product, manufacturer or facility may result in restrictions on such product or manufacturer, including withdrawal of the product from the market. Further, additional government regulation from future legislation or administrative action may be established which could also prevent or delay regulatory approval of Lynx's products.

Lynx currently does not have extensive clinical testing or regulatory compliance experience. Lynx will need to hire additional personnel skilled in the clinical testing and regulatory compliance processes if it develops products with commercial potential.

## Competition

Lynx is subject to competition from many directions including cDNA cloning and sequencing technologies, ODN chemistry and drug development and the discovery and development of pharmaceutical and biotechnology drugs. Competition in the latter arena includes all of the world's pharmaceutical and biotechnology companies that have research programs pursuing the same general targets as Lynx, including cardiovascular diseases, cancers and leukemias and neurovascular diseases. The competition for oligodeoxynucleotide-based therapeutics includes novel ODN backbones such as peptide nucleic acids, methylphosphonates and derivatized nucleobases attached to various backbones. A number of companies have active phosphorothioate antisense programs and are developing manufacturing capabilities that may be competitive with the Company. The Company is also aware of competition in the use of ODNs as antigene drugs. There are several companies that are now actively engaged in technology developments and discovery programs pertaining to genomic elucidation and gene function determination. Key to these efforts are cDNA cloning and DNA sequencing techniques. While most DNA sequencing techniques used in genomic research and discovery are conventional ones, or advances of the conventional ones, there is nevertheless considerable interest in novel sequencing technologies. Lynx's MPSS is not the only attempt to radically transcend conventional approaches. There can be no assurance that similarly efficient, or better, combinations of novel cloning and sequencing techniques will not be obtained elsewhere.

## Patents and Proprietary Rights

Lynx's success will depend in part on its ability to obtain patent protection for its products both in the U.S. and other countries. Lynx has filed and will continue to file applications, as appropriate, for patents covering both its products and processes and has licensed a number of patents and patent applications covering certain of its compounds. Some of the patent applications owned by Lynx have already issued, but no assurance can be given that patents will issue from any of the pending applications or that, if patents do issue, the claims allowed will be sufficiently broad to protect Lynx's technology. In addition, no assurance can be given that any patents issued to or licensed by Lynx will not be challenged, invalidated, infringed or circumvented, or that the rights granted thereunder will provide competitive advantages to Lynx.

The commercial success of Lynx will also depend in part on Lynx neither infringing patents issued to competitors and on others not breaching the technology licenses upon which Lynx's products might be based. There can be no assurance that Lynx will be able to obtain a license to any third party technology that it may require to conduct its business or that, if obtainable, such technology can be licensed at a reasonable cost. Failure by Lynx to obtain a license to any technology that it may require to commercialize its technologies or products may have a material adverse effect on Lynx.

Litigation, which could result in substantial costs to Lynx, may also be necessary to enforce any patents issued to Lynx or to determine the scope and validity of other parties' proprietary rights. If the outcome of any such litigation is adverse to Lynx, Lynx's business could be adversely affected. Lynx may have to participate in interference proceedings declared by the U.S. Patent and Trademark Office, which could result in substantial cost to Lynx to determine the priority of inventions. Furthermore, Lynx may have to participate at substantial cost in International Trade Commission proceedings to abate the importation of products which would compete unfairly with products of Lynx.

Lynx also relies on trade secrets and proprietary know-how, which it seeks to protect in part by confidentiality agreements with its collaborators, employees and consultants. There can be no assurance that these agreements will not be breached, that Lynx would have adequate remedies for any breach or that its trade secrets will not otherwise become known or be independently developed by competitors.

## Employees

As of December 31, 1995, Lynx employed 52 full-time employees, of which 41 were engaged in research and development and manufacturing activities and 11 in finance and administrative activities. Lynx believes

that it has been successful in attracting skilled and experienced scientific personnel; however, competition for such personnel is intense. None of Lynx's employees are covered by collective bargaining agreements, and management considers relations with its employees to be good.

## ITEM 2.       PROPERTIES

Lynx's corporate headquarters and principal research and development facilities are located in Hayward, California, in a building totaling approximately 43,000 square feet. The building is leased through July 2003, and the Company has options to renew the lease for two additional periods of five years each. Lynx believes it is positioned to obtain the space needed to accommodate its anticipated growth on a commercially reasonable terms.

## ITEM 3.       LEGAL PROCEEDINGS

The Company is not a party to any material legal proceedings.

## ITEM 4.       SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On December 22, 1995, the Company commenced the solicitation of proxies and written consents pursuant to Regulation 14 under the Securities Exchange Act of 1934. The stockholders of the Company voted by written consent on the following proposal: to approve an amendment to the Company's Restated Certificate of Incorporation to effect a reverse stock split of the Company's Common Stock and Preferred Stock, so that every ten shares of Common Stock would be converted into one share of Common Stock, and every ten shares of Preferred Stock would be converted into one share of the appropriate series of Preferred Stock. The foregoing proposal was approved in January 1996 by the Company's stockholders by a vote of 1,617,969 votes for and 14,678 votes against.

## PART II

## ITEM 5.       MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

There is currently no established public trading market for the Company's Common Stock. The Company's Common Stock was subject to certain restrictions on transfer as set forth in the Company's Bylaws, which restrictions expired on September 30, 1994. Although the Company's Common Stock has been registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company has not listed its Common Stock on any exchange or on the Nasdaq National Market.

The Company also has outstanding Series B, Series C and Series D Preferred Stock, the shares of which are convertible into Common Stock on a ten-for-one basis (i.e., ten shares of Common Stock for each share of Preferred Stock). The Company's Series B, Series C and Series D Preferred Stock has not been registered pursuant to the Exchange Act and has not been listed on any exchange or on the Nasdaq National Market. There is currently no established trading market for the Company's Preferred Stock.

As of February 29, 1996, there were approximately 3,100 stockholders on record of the Company's Common Stock, 22 stockholders on record of the Company's Series B Preferred Stock, 22 stockholders on record of the Company's Series C Preferred Stock and 1 stockholder on record of the Company's Series D Preferred Stock.

The Company has not paid any dividends on its Common Stock or Preferred Stock and does not anticipate the payment of dividends in the foreseeable future. The Company expects that any future earnings will be retained and applied toward the development of the Company's business.

**ITEM 6.**  **SELECTED FINANCIAL DATA**

| | Year Ended December 31, | | Six-Month Period Ended | Fiscal Year Ended June 30, | | |
| | | | | | Predecessor Division (1) | |
| Consolidated Statements of Operations *(in thousands, except net loss per share data)* | 1995 | 1994 | Dec. 31, 1993 (2) | 1993 | 1992 | 1991 |
|---|---|---|---|---|---|---|
| Revenues | $ 680 | $ 4,699 | $ 183 | $ 1,238 | $ 998 | $ 593 |
| Operating costs and expenses: | | | | | | |
|   Costs of product sales and other revenues | 265 | 742 | 110 | 2 | 644 | 295 |
|   Research and development | 11,036 | 7,715 | 3,321 | 6,194 | 2,004 | 801 |
|   Selling, general and administrative | 1,591 | 1,768 | 650 | 1,102 | 470 | 340 |
| Total operating costs and expenses | 12,892 | 10,225 | 4,081 | 7,298 | 3,118 | 1,436 |
| Loss from operations | (12,212) | (5,526) | (3,898) | (6,060) | (2,120) | (843) |
| Interest income | 744 | 506 | 75 | 243 | - | - |
| Net loss | $(11,468) | $(5,020) | $(3,823) | $(5,817) | $(2,120) | $ (843) |
| Net loss per share (3) | $ (5.00) | $ (4.83) | $ (5.60) | $ (8.23) | | |
| Shares used in per share computation (3) | 2,294 | 1,039 | 683 | 707 | | |

| | December 31, | | | June 30, | | |
| | | | | Predecessor Division (1) | | |
| Consolidated Balance Sheets *(in thousands)* | 1995 | 1994 | 1993 | 1993 | 1992 | 1991 |
|---|---|---|---|---|---|---|
| Cash, cash equivalents and short-term investments | $ 13,779 | $ 12,246 | $ 2,383 | $ 7,014 | $ 5 | $ - |
| Working capital | 12,735 | 11,702 | 891 | 6,408 | 133 | 82 |
| Total assets | 17,685 | 15,142 | 4,857 | 7,396 | 452 | 326 |
| Stockholders' equity | 13,742 | 14,044 | 2,930 | 6,744 | 342 | 273 |

(1) Consolidated Balance Sheet data as of June 30, 1992 and 1991, and Consolidated Statements of Operations data for each of the two years in the period ended June 30, 1992, are for the Company's predecessor, the Therapeutics Division of Applied Biosystems, Inc., (ABI is now a wholly-owned subsidiary of Perkin Elmer Corporation). Share and per share data prior to 1993 are not presented for the predecessor because the predecessor was a division and such information is not meaningful. (Note 1 of the Notes to Consolidated Financial Statements.)

(2)  In July 1993, the Company changed its fiscal year end from a year ending June 30 to a calendar year.  See Management's Discussion and Analysis of Financial Condition and Results of Operations for an analysis of the unaudited results of operations for the 12 months ended December 31, 1993.

(3)  In February 1996, the Company filed an amendment to its Certificate of Incorporation effecting a one-for-ten reverse stock split of all outstanding Common and Preferred Stock, warrants and options to purchase Common and Preferred Stock.  The reverse stock split was approved by the majority of its stockholders in January 1996.  The net loss per share computations and number of shares have been adjusted retro-actively to reflect the stock split fo all periods presented.

## ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Except for the historical information contained herein, the following discussion contains forward-looking statements that involve risks and uncertainties.  The Company's actual results could differ materially from those discussed here.  Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this section, as well as in the section entitled "Item 1  Business—Business Risks."*

### Overview

Since its inception in July 1989 (as a division of Applied Biosystems, Inc. "ABI"), Lynx Therapeutics, Inc. ("Lynx") has devoted its efforts toward research, drug discovery and development programs.  Lynx has been unprofitable since its inception and expects to incur substantial and increasing losses for the next several years, due primarily to the expansion of its research and development programs, including development of its MPSS technology and phosphoramidate chemistry, preclinical studies and clinical trials.  As of December 31, 1995, Lynx's accumulated deficit was approximately $26.1 million (the accumulated deficit  including Lynx's operations as a division of ABI as of December 31, 1995 was approximately $30.2 million).  Lynx may generate revenues from collaborative research agreements with Hoechst and other potential corporate partners as a result of its MPSS technology, however, there is no guarantee that it will be able to obtain such partners, or that its MPSS technology will be successful.  Lynx does not anticipate that it will generate significant revenues and profits, if any, from the commercial sale of its therapeutic products for several years at least.  There can be no assurance that Lynx will ever successfully develop and market any of its proposed products or that it will ever be able to achieve or sustain profitability.

Lynx's business is subject to significant risks, including the risks inherent in its research and development efforts, uncertainties associated with obtaining and enforcing patents, the lengthy and expensive regulatory approval process, and possible competition from other products.  Even if Lynx's products appear promising at an early stage of development, they may not reach the market for a number of reasons.  Such reasons include, but are not limited to, the possibilities that the drugs are found to be toxic or ineffective during clinical trials, the failure to receive necessary regulatory approvals, the difficulty to manufacture on a large scale or the inability to market the drug due to proprietary rights of third parties.

### Results of Operations

*Years Ended December 31, 1995 and 1994*

*Revenue*

Lynx had total revenues of $680,000 for the year ended December 31, 1995, including $375,000 of revenue earned under the collaborative agreement with Hoechst.  In addition, approximately $305,000 was generated from compound sales and grant revenue.  This compared to total revenues of $4.7 million for the year ended December 31, 1994 which consisted of a $4.0 million license fee received in connection with Lynx's collaborative

research and development agreement with Wellcome, approximately $600,000 in sales of compound relating to the Wellcome agreement and approximately $100,000 in grant revenue. During the year ended December 31, 1995, Wellcome and its parent company, the Burroughs Wellcome Co., merged with Glaxo plc and formed Glaxo Wellcome plc. Lynx was subsequently notified by Glaxo Wellcome of its intention to terminate Wellcome's agreement with Lynx effective in March 1996.

As discussed earlier, Lynx does not anticipate that it will generate profits and significant revenues from the commercial sale of its therapeutics products for several years. Lynx expects that if any revenues are generated during the next several years, most of those revenues will be of a research nature. In conjunction with the collaborative research agreement with Hoechst, milestone payments will be earned by Lynx, subject to Lynx attaining specified milestones. There can be no assurance that Lynx will ever achieve such milestone, or generate any significant product revenues or research collaboration revenues.

*Operating Expenses*

Costs of product sales and other revenue were $265,000 for the year ended December 31, 1995, compared to $742,000 for the year ended December 31, 1994. The decrease is due primarily to lower costs associated with lower sales of compounds and grant revenue.

Research and development expenses were $11.0 million for the year ended December 31, 1995 compared to $7.7 million for the year ended December 31, 1994. The increase was due primarily to higher spending for chemicals, supplies and prototype materials, increases in personnel costs, expanded funding to various laboratories under collaborative research agreements and higher patent and licensing expenses. Lynx expects its research and development expenses to continue to increase due to planned spending for ongoing research activities and new research applications.

General and administrative expenses were $1.6 million for the year ended December 31, 1995, compared to $1.8 million for the year ended December 31, 1994. The decrease in expenses was due primarily to a decrease in legal services for corporate general matters offset in part by increases in personnel, including the addition of the Company's President and Chief Executive Officer in May 1995 and increases in corporate development activities. General and administrative expenses are expected to increase to support growth in research and development efforts and anticipated corporate development activities.

*Other*

Interest income was $744,000 for the year ended December 31, 1995 compared to $506,000 for the year ended December 31, 1994. The increase was due primarily to higher interest rates during the year ended December 31, 1995 as compared to the prior fiscal year.

Lynx has incurred losses since inception and therefore has not recorded a provision for income taxes. Lynx's losses through November 20, 1992 are included in the consolidated income tax returns of Applied Biosystems, Inc. or Applied Biosystems' parent. Lynx's federal net operating loss carryforward as of December 31, 1995 of approximately $20.0 million, compared to approximately $12.0 million as of December 31, 1994, may be used to offset future taxable income. Utilization of the net operating loss carryforwards may be subject to a substantial annual limitation due to the ownership change provisions of the Internal Revenue Code of 1986.

*Earnings per Share*

The net loss per share for the year ending December 31, 1995 was $(5.00) as compared to $(4.83) for the year ended December 31, 1994. On September 30, 1994, 1,135,865 shares of Series A Preferred Stock were converted to Common Stock (Note 6 of Notes to Consolidated Financial Statements). The net loss per share for the year ending December 31, 1994 would have been $(2.66) if the Series A Preferred shares were converted to common shares on January 1, 1994.

*Years Ended December 31, 1994 and (unaudited) 1993*

*Revenue*

Lynx had total revenues of $4.7 million for the year ended December 31, 1994, which consisted of a $4.0 million license fee received in connection with Lynx's collaborative research and development agreement with Wellcome, approximately $600,000 in sales of compound relating to the Wellcome agreement and approximately $100,000 in grant revenue. This is compared to $207,000 for the year ended December 31, 1993, which consisted primarily of sales of compound to a third party.

*Operating Expenses*

Costs of product sales and other revenue were $742,000 for the year ended December 31, 1994, compared to $110,000 for the year ended December 31, 1993. The increase was due primarily to higher material and labor costs associated with increases in sales of compounds manufactured.

Research and development expenses were $7.7 million for the year ended December 31, 1994 compared to $7.3 million for the year ended December 31, 1993. The increase was due primarily to increases in personnel, funding to various laboratories under collaborative research agreements and patent and licensing expenses.

General and administrative expenses were $1.8 million for the year ended December 31, 1994, compared to $1.4 million for the year ended December 31, 1993. The increase was due primarily to increases in personnel, legal services for general corporate matters, insurance and corporate development activities.

*Other*

Interest income was $506,000 for the year ended December 31, 1994 compared to $221,000 for the year ended December 31, 1993. The increase in interest income was due primarily to higher average cash and investment balances during the year ended December 31, 1994 as compared to the year ended December 31, 1993.

Lynx's losses through November 20, 1992 are included in the consolidated income tax returns of Applied Biosystems, Inc. or Applied Biosystems' parent. Lynx's federal net operating loss carryforwards were approximately $12.0 million as of December 31, 1994, compared to approximately $7.6 million as of December 31, 1993.

*Earnings per Share*

The net loss per share for the year ended December 31, 1994 was $(4.83) as compared to $(12.55) for the year ended December 31, 1993. On September 30, 1994, 1,135,865 shares of Series A Preferred Stock were converted to Common Stock (Note 6 of Notes to Consolidated Financial Statements). The net loss per share for the year ending December 31, 1994 would have been $(2.66) if the Series A Preferred shares were converted to common shares on January 1, 1994.

**Liquidity and Capital Resources**

Since inception, Lynx has funded its operations through advances from ABI, sales of Preferred and Common Stock to venture capital investors and collaborative partners, revenues from collaborative research and development arrangements, product sales, government grants and interest income. Lynx may receive additional collaborative research payments and equity investments from Hoechst subject to Lynx achieving the milestone as specified in its agreement with Hoechst. No further advances will be received from ABI.

Net cash used in operating activities of $7.6 million for the year ended December 31, 1995 differs from the net loss for the same period for several reasons: receipt of an advance for collaborative research expenses

from Hoechst, depreciation and amortization expenses and changes in working capital. Net cash from investing activities of $6.1 million for the year ended December 31, 1995 was primarily due to the maturity of short-term investments, offset by the expansion of facilities and capital equipment purchases. Net cash provided by financing activities in 1995 consisted primarily of private placement offerings of the Company's Series C and Series D Preferred Stock in March and October 1995, respectively. The net proceeds of these offerings were approximately $11.1 million ($6.1 million and $5.0 million from Series C and Series D Preferred Stock, respectively). Cash and cash equivalents were $13.8 million at December 31, 1995.

Lynx is currently utilizing its available funds for supporting development of its MPSS technology, funding preclinical research and clinical trials, patent and technology license fees and the planned growth in Lynx's internal efforts toward research, drug discovery and development programs. Pending such uses as described above, Lynx intends to invest its excess cash in short-term, investment grade, interest-bearing securities or certificates of deposit.

The cost, timing and amount of funds required for specific uses by Lynx cannot be precisely determined at this time and will be based upon Lynx's progress in its research and development, the scope and results of preclinical research and clinical trials, the cost and timing of regulatory approvals, administrative and legal costs, the establishment of corporate partnerships and the availability of alternate methods of financing.

Lynx intends to seek additional financing as needed through debt or equity offerings and from collaborative research and development agreements with other corporate partners. The potential collaborations shall include seeking additional partners for the Company's MPSS technology as well as seeking a replacement partner for the clinical trial activities previously funded by Wellcome. These clinical trial activities cover the development and marketing of Lynx's antisense drug candidate for the prevention of coronary restenosis following coronary angioplasty, or balloon dilation. Lynx believes that its current capital resources and interest income thereon will enable it to maintain its current and planned operations through the end of 1996. There can be no assurance that any additional financing required by Lynx will be available or, if available, will be on terms favorable to Lynx.

Lynx Therapeutics, Inc.

Index to Consolidated Financial Statements

Report of Ernst & Young LLP, Independent Auditors ........................................................................ 22

Audited Consolidated Financial Statements:

Consolidated Balance Sheets ............................................................................................................ 23
Consolidated Statements of Operations ........................................................................................... 24
Consolidated Statement of Stockholders' Equity ............................................................................. 25
Consolidated Statements of Cash Flows .......................................................................................... 27
Notes to Consolidated Financial Statements .................................................................................... 28

## Report of Ernst & Young LLP, Independent Auditors

The Board of Directors and Stockholders
Lynx Therapeutics, Inc.

We have audited the accompanying consolidated balance sheets of Lynx Therapeutics, Inc. as of December 31, 1995 and 1994 and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended, the six-month period ended December 31, 1993, and the year ended June 30, 1993. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lynx Therapeutics, Inc. at December 31, 1995 and 1994 and the consolidated results of its operations and its cash flows for the years then ended, the six-month period ended December 31, 1993 and the year ended June 30, 1993, in conformity with generally accepted accounting principles.

*Ernst & Young LLP*

Palo Alto, California
February 2, 1996

22.

**ITEM 8.**     **FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

Lynx Therapeutics, Inc.

Consolidated Balance Sheets

*(In thousands, except share and per share amounts)*

| | December 31, | |
| --- | --- | --- |
| | 1995 | 1994 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 13,779 | $ 4,246 |
| Short-term investments | -- | 8,000 |
| Accounts receivable | 88 | 262 |
| Other current assets | 79 | 236 |
| Total current assets | 13,946 | 12,744 |
| Property and equipment: | | |
| Leasehold improvements | 2,501 | 2,248 |
| Laboratory and other equipment | 2,157 | 1,063 |
| | 4,658 | 3,311 |
| Less accumulated depreciation | (1,461) | (931) |
| Net property and equipment | 3,197 | 2,380 |
| Notes receivable from officers | 542 | 18 |
| | $ 17,685 | $ 15,142 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 693 | $ 359 |
| Accrued compensation | 206 | 148 |
| Accrued professional fees | 187 | 82 |
| Other accrued liabilities | 130 | 128 |
| Advance from collaborative partner | -- | 325 |
| Total current liabilities | 1,216 | 1,042 |
| Deferred revenue from related party | 2,625 | -- |
| Other noncurrent liabilities | 102 | 56 |
| Commitments | | |
| Stockholders' equity: | | |
| Preferred stock, issuable in series, $.001 par value; 25,000,000 shares authorized, all shares designated represent convertible preferred stock: | | |
| Series B, 4,000,000 shares designated; 332,288 shares issued and outstanding at December 31, 1995 and 1994;  aggregate liquidation value of $16,614 at December 31, 1995 and 1994; amount paid in | 16,091 | 16,091 |
| Series C, 1,450,000 shares designated; 123,299  shares issued and outstanding at December 31, 1995 (none at December 31, 1994); aggregate liquidation value of $6,165 at December 31, 1995; amount paid in | 6,109 | -- |
| Series D, 400,000 shares designated; 40,000 shares issued and outstanding at December 31, 1995 (none at December 31, 1994); aggregate liquidation value of $5,000 at December 31, 1995; amount paid in | 4,989 | — |
| Common stock, $.001 par value; 120,000,000 shares authorized, 2,334,524 and 2,010,329 shares issued and outstanding at December 31, 1995 and 1994, respectively; amount paid in | 13,394 | 12,723 |
| Notes receivable from stockholders | (660) | -- |
| Deferred compensation | (51) | (86) |
| Unrealized loss on marketable securities | (2) | (24) |
| Accumulated deficit | (26,128) | (14,660) |
| Total stockholders' equity | 13,742 | 14,044 |
| | $ 17,685 | $ 15,142 |

*See accompanying notes.*

Lynx Therapeutics, Inc.

Consolidated Statements of Operations

*(In thousands, except share and per share amounts)*

| | Year Ended December 31, | | Six-Month Period Ended December 31, | Year Ended June 30 |
| --- | --- | --- | --- | --- |
| | 1995 | 1994 | 1993 | 1993 |
| Net revenues: | | | | |
| License fees | $    – | $  4,000 | $    – | $    – |
| Revenues from collaborative arrangements with  related parties | 375 | – | – | 1,215 |
| Product sales and other revenues | 305 | 699 | 183 | 23 |
| Total revenues | 680 | 4,699 | 183 | 1,238 |
| | | | | |
| Operating costs and expenses: | | | | |
| Costs of product and other revenues | 265 | 742 | 110 | 2 |
| Research and development (includes amounts paid to related party (ABI) -  See Note 5) | 11,036 | 7,715 | 3,321 | 6,194 |
| Selling, general and administrative (includes amounts paid to related party (ABI) -  See Note 5) | 1,591 | 1,768 | 650 | 1,102 |
| Total operating costs and expenses | 12,892 | 10,225 | 4,081 | 7,298 |
| | | | | |
| Loss from operations | (12,212) | (5,526) | (3,898) | (6,060) |
| | | | | |
| Interest income | 744 | 506 | 75 | 243 |
| Net loss | $(11,468) | $ (5,020) | $(3,823) | $(5,817) |
| | | | | |
| Net loss per share | $  (5.00) | $  (4.83) | $  (5.60) | $  (8.23) |
| | | | | |
| Shares used in per share computation | 2,293,975 | 1,039,105 | 682,763 | 707,183 |

*See  accompanying  notes.*

Lyra Therapeutics, Inc.

Consolidated Statement of Stockholders' Equity

For the Year Ended June 30, 1993, the Six-Month Period Ended December 31, 1993 and the Years Ended December 31, 1994 and 1995

*(in thousands, except share numbers)*

| | Predecessor Divisional Equity of Applied Biosystems, Inc. | Preferred Stock Shares | Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Subscription Receivable | Notes Receivable from Officers | Deferred Compensation | Unrealized Loss on Marketable Securities | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at June 30, 1992 | $ 337 | — | $ — | 850,000 | $ 85 | $ (80) | — | $ — | $ — | $ — | $ 342 |
| Issuance of common stock to employee and consultants | — | — | — | 90,000 | 180 | — | — | (171) | — | — | 9 |
| Cash advances from ABI | 463 | — | — | — | — | — | — | — | — | — | 463 |
| Transfer of predecessor division equity to common stock | (800) | — | — | — | 800 | — | — | — | — | — | 80 |
| Collection of subscription receivable | — | — | — | — | — | 80 | — | — | — | — | 80 |
| Repurchase of common stock from ABI | — | — | — | (315,900) | (31) | — | — | — | — | — | (31) |
| Issuance of Series A preferred stock to ABI and Chiron | — | 1,150,000 | 11,500 | — | — | — | — | — | — | — | 11,500 |
| Capital contributed in connection with a stock option granted to Chiron | — | — | — | — | 285 | — | — | — | — | — | 285 |
| Exercise of stock options by ABI | — | — | — | 33,500 | 3 | — | — | — | — | — | 3 |
| Issuance of common stock for services | — | — | — | 10,000 | 20 | — | — | — | — | — | 20 |
| Repurchase of preferred and common stock | — | (12,763) | (128) | (8,775) | (17) | — | — | — | — | — | (145) |
| Exercise of employee stock options for cash | — | — | — | 76 | 1 | — | — | — | — | — | 1 |
| Amortization of deferred compensation | — | — | — | — | — | — | — | 34 | — | — | 34 |
| Net loss | — | — | — | — | — | — | — | — | — | (5,817) | (5,817) |
| Balance at June 30, 1993 | — | 1,137,237 | 11,372 | 658,901 | 1,326 | — | — | (187) | — | (5,817) | 6,744 |
| Repurchase of preferred and common stock | — | (1,372) | (14) | (945) | (2) | — | — | — | — | — | (16) |
| Exercise of stock options for cash | — | — | — | 30,000 | 3 | — | — | — | — | — | 3 |
| Exercise of employee stock options for cash | — | — | — | 15,535 | 5 | — | — | — | — | — | 5 |
| Amortization of deferred compensation | — | — | — | — | — | — | — | 17 | — | — | 17 |
| Net loss | — | — | — | — | — | — | — | — | — | (3,823) | (3,823) |
| Balance at December 31, 1993 (carried forward) | $ — | 1,135,865 | $11,358 | 703,513 | $ 1,332 | $ — | $ — | $(170) | $ — | $ (9,640) | $ 2,930 |

*See accompanying notes.*

Page 25 of 260

Lynx Therapeutics, Inc.

Consolidated Statement of Stockholders' Equity   (continued)

For the Year Ended June 30, 1993, the Six-Month Period Ended December 31, 1993 and the Years Ended December 31, 1994 and 1995

*(In thousands, except share numbers)*

| | Predecessor Divisional Equity of Applied Biosystems, Inc. | Preferred Stock Shares | Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Subscription Receivable | Notes Receivable From Officers | Deferred Compensation | Unrealized Loss on Marketable Securities | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 1993 (brought forward) | $ - | 1,135,865 | $11,358 | 703,513 | $ 1,332 | $ - | $ - | $(120) | $ - | $ (9,640) | $ 2,930 |
| Issuance of Series B preferred stock for cash, net of issuance costs of $524 | | 332,288 | 16,091 | | | | | | | | 16,091 |
| Conversion of Series A preferred stock to common stock in September 1994 | | (1,135,865) | (11,358) | 1,135,865 | 11,358 | | | | | | - |
| Exercise of Chiron option for cash | | | | 150,000 | 15 | | | | | | 15 |
| Exercise of employee stock options for cash | | | | 18,513 | 16 | | | | | | 16 |
| Issuance of common stock for services | | | | 2,438 | 2 | | | | | | 2 |
| Amortization of deferred compensation | | | | | | | | 34 | | | 34 |
| Net unrealized loss on securities available for sale | | | | | | | | | (24) | | (24) |
| Net loss | | | | | | | | | | (5,020) | (5,020) |
| Balance at December 31, 1994 | | 332,288 | 16,091 | 2,010,329 | 12,723 | | | (86) | (24) | (14,660) | 14,044 |
| Issuance of Series C preferred stock for cash, net of issuance costs of $96 | | 123,299 | 6,109 | | | | | | | | 6,109 |
| Issuance of Series D preferred stock for cash, net of issuance costs of $511 | | 40,000 | 4,989 | | | | | | | | 4,989 |
| Exercise of employee stock options for cash and note receivable | | | | 328,410 | 675 | | (660) | | | | 15 |
| Issuance of common stock for services | | | | 812 | 1 | | | | | | 1 |
| Cash paid in lieu of fractional shares for reverse stock split | | | | (1,027) | (5) | | | | | | (5) |
| Amortization of deferred compensation | | | | | | | | 35 | | | 35 |
| Net unrealized gain on securities available for sale | | | | | | | | | 22 | | 22 |
| Net loss | | | | | | | | | | (11,468) | (11,468) |
| Balance at December 31, 1995 | $ - | 495,587 | $27,189 | 2,334,524 | $13,394 | $ - | $ (660) | $ (51) | $(2) | $(26,128) | $13,742 |

*See accompanying notes.*

26.

Lynx Therapeutics, Inc.

Consolidated Statements of Cash Flows

Net increase (decrease) in cash and cash equivalents

*(In thousands)*

| | Year Ended December 31, | | Six-Month Period Ended December 31, | Year Ended June 30, |
|---|---|---|---|---|
| | 1995 | 1994 | 1993 | 1993 |
| **Cash flows from operating activities** | | | | |
| Net loss | $ (11,468) | $ (5,020) | $ (3,823) | $ (5,817) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | 642 | 438 | 117 | 220 |
| Loss on disposal of fixed assets | 6 | – | – | – |
| Issuance of common stock for services | 1 | 2 | – | 20 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | 174 | (95) | (167) | 118 |
| Other current assets | 157 | 4 | (194) | 74 |
| Accounts payable | 334 | 189 | (7) | 297 |
| Accrued liabilities | (160) | (292) | 500 | 245 |
| Deferred revenue from related party | 2,625 | – | – | – |
| Other noncurrent liabilities | 46 | 28 | 28 | – |
| Net cash used in operating activities | (7,643) | (4,746) | (3,546) | (4,843) |
| | | | | |
| **Cash flows from investing activities** | | | | |
| Purchases of short-term investments | -- | (12,024) | – | (3,668) |
| Maturities of short-term investments | 8,022 | 4,000 | 3,668 | -- |
| Purchases of property and equipment, net of retirements | (1,430) | (1,489) | (1,077) | (253) |
| Notes receivable from officers | (524) | – | – | – |
| Other assets | – | -- | – | (60) |
| Net cash provided by (used in) investing activities | 6,068 | (9,513) | 2,591 | (3,981) |
| | | | | |
| **Cash flows from financing activities** | | | | |
| Issuance of preferred stock, net of repurchases | 11,098 | 16,091 | (14) | 11,372 |
| Issuance of common stock, net of repurchases | 10 | 31 | 6 | (35) |
| Collection of subscription receivable | – | – | -- | 80 |
| Advances from Applied Biosystems, Inc. | – | – | -- | 463 |
| Capital contributed for stock option | – | – | – | 285 |
| Net cash provided by (used in) financing activities | 11,108 | 16,122 | (8) | 12,165 |
| | | | | |
| Net increase (decrease) in cash and cash equivalents | 9,533 | 1,863 | (963) | 3,341 |
| Cash and cash equivalents at beginning of period | 4,246 | 2,383 | 3,346 | 5 |
| Cash and cash equivalents at end of period | $ 13,779 | $ 4,246 | $ 2,383 | $ 3,346 |
| | | | | |
| **Supplemental schedule of non-cash financing activities** | | | | |
| Accounts payable for construction-in-progress | $ -- | $ (754) | $ 754 | $ – |

*See accompanying notes.*

27.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements**

**December 31, 1995**

1.    **Summary of Significant Accounting Policies and Basis of Presentation**

**Ownership and Basis of Presentation**

Lynx Therapeutics, Inc. ("Lynx" or the "Company"), which was incorporated in February 1992 under the laws of the State of Delaware as a wholly owned subsidiary of Applied Biosystems, Inc. ("ABI"), is the successor to the therapeutics division of ABI. Lynx was capitalized in June 1992 and, effective July 1, 1992, commenced operations.

Lynx is focused on the identification and measurement of inappropriate gene expression in human disease and on the discovery and development of therapeutics aimed at counteracting such gene expression. The Company possesses a number of proprietary technologies that it is using or developing for use in this effort.

On September 28, 1992, the Board of Directors of ABI approved the distribution of 482,520 shares of Lynx Common Stock and 701,848 shares of Lynx Series A Preferred Stock to the ABI shareholders of record on October 23, 1992. Each ABI shareholder received 0.03 shares of Lynx Common Stock and 0.05 shares of Lynx Series A Preferred Stock for each share of ABI Common Stock held at the record date. In September 1994, the Series A Preferred Stock converted into Common Stock (see Note 6). Lynx granted ABI an option to purchase up to 215,900 shares of Lynx Common Stock at $0.10 per share which, prior to October 1996, may only be exercised by ABI in connection with the distribution by ABI of Lynx stock to its option holders upon the exercise of ABI stock options outstanding as of the date of Distribution. Thereafter, through the termination of the option in September 1997, ABI may exercise such option provided that it promptly sells or otherwise disposes of any shares received upon such exercise. As of December 31, 1995, 63,500 shares of Lynx Common Stock have been issued to ABI under this option.

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, LYNXNebraska and Spectragen, Inc. ("Spectragen"). All significant intercompany balances and transactions have been eliminated.

The Company has sustained continuing operating losses and expects such losses to continue for at least the next several years. The Company plans to finance operations through equity offerings to existing and new investors and through arrangements with corporate partners. Should the financing plans contemplated by management not be consummated, the Company may have to seek alternative sources of capital or reevaluate its operating plans.

In February 1996, the Company filed an amendment to its Certificate of Incorporation effecting a one-for-ten reverse stock split of all outstanding Common and Preferred Stock, warrants and options to purchase Common and Preferred Stock . The reverse stock split was approved by the majority of its stockholders in January 1996. All references to the number of shares and share prices throughout this document reflect post-split activity.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements   (continued)**

1.      **Summary of Significant Accounting Policies and Basis of Presentation (continued)**

**Cash, Cash Equivalents and Short-Term Investments**

The Company considers all investments with a remaining maturity at the date of purchase of 90 days or less as cash equivalents. Investments with remaining maturities beyond 90 days but less than one year are considered to be short-term investments. The Company's investment policy stipulates that the investment portfolio be maintained with the objectives of preserving principal, maintaining liquidity and maximizing return.

Effective January 1, 1994, the Company adopted Statement of Financial Accounting Standards No. 115 ("Statement 115"), "Accounting for Certain Investments in Debt and Equity Securities." Statement 115 addresses the accounting and reporting for investments in marketable equity securities that have readily determinable fair values and for all investments in debt securities. Prior to adopting the new standard, investments were reported at amortized cost, which approximated fair value. The effect of the adoption of Statement 115 on stockholders' equity was immaterial. The Company has not incurred any realized losses on its investments.

The Company determines the appropriate classification of debt securities at the time of purchase and reevaluates such designation as of each balance sheet date. As of December 31, 1995 and 1994, the Company has classified its entire investment portfolio as available-for-sale. Available-for-sale securities are carried at fair value based on quoted market prices, with the unrealized gains and losses reported as a separate component of stockholders' equity. The amortized cost of debt securities in this category is adjusted for amortization of premiums and accretion of discounts to maturity, which are included in interest income. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income or expense. The cost of securities sold is based on the specific identification method.

**Property and Equipment**

Property and equipment are stated at original cost and are depreciated using the straight-line method over the estimated useful lives of the assets, which is generally three years. Leasehold improvements are amortized over the term of the facilities lease, which is ten years.

**Revenue Recognition**

Payments under collaborative arrangements are recognized as revenue when earned as defined under the terms of the respective agreements. Payments received which are related to future performance are deferred until earned. Non-refundable license fees are generally recorded as revenue upon execution of the agreement. Revenues from the sales of products are recognized upon shipment.

**Net Loss per Share**

Net loss per share is calculated based on the weighted average number of common shares outstanding during the period. Common equivalent shares from stock options, warrants and convertible Preferred Stock are excluded from the computation as their effect is antidilutive.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements  (continued)**

**1.    Summary of Significant Accounting Policies and Basis of Presentation (continued)**

**Stock-Based Compensation**

In October 1995, the Financial Accounting Standards Board issued Statement No. 123, "Accounting for Stock-based Compensation." The Statement is effective for fiscal years beginning after December 15, 1995. Under the Statement, stock-based compensation expense to employees is measured using either the intrinsic-value method as prescribed by Accounting Principles Board No. 25 or the fair-value method as described in Statement 123. Companies choosing the intrinsic-value method will be required to disclose the pro-forma impact of the fair-value method on net income and earnings per share. Lynx plans to comply with the standard in fiscal 1996 by continuing to use the intrinsic-value method for stock awards to employees. There will be no effect of adopting the standard on Lynx's financial position or results of operations.

**Change in Fiscal Year End**

The Company changed its fiscal year end from a year ending June 30 to a calendar year in 1993. As a result, operating results for the six-month period ended December 31, 1993 are shown separately.

The Company's unaudited results of operations for the comparative year ended December 31, 1993 reflected grant and product revenue of $23,000 and $183,000, respectively, which approximated costs incurred in the production of the revenue, loss from operations of $8,620,000 and a net loss of $8,409,000 or $(12.55) per share.

**2.    Investments**

The following is a summary of available-for-sale securities:

| | Available-for-Sale Securities | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | *(In thousands)* | | | |
| **December 31, 1995** | | | | |
| Money market mutual funds | $    4,362 | $   – | $      – | $    4,362 |
| Commercial paper | 9,478 | – | (2) | 9,476 |
| | $ 13,840 | $   – | $    (2) | $ 13,838 |
| | | | | |
| **December 31, 1994** | | | | |
| Money market mutual funds | $    2,147 | $   – | $      – | $    2,147 |
| Commercial paper | 5,076 | – | (15) | 5,061 |
| U.S. Treasury bills | 4,911 | – | (9) | 4,902 |
| | $ 12,134 | $   – | $  (24) | $ 12,110 |

During the year ended December 31, 1995 and 1994, the Company did not sell any securities. As of December 31, 1995, all marketable securities were classified as cash equivalents and the average remaining maturity of the portfolio was less than 90 days. As of December 31, 1994, $4.2 million of the marketable securities were classified as cash equivalents, and the balance of $8.0 million was classified as short term

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements (continued)**

2.    **Investments (continued)**

differ from contractual maturities because the issuers of the securities may have the right to prepay obligations without prepayment penalties.

3.    **Collaborative Arrangements**

In October 1995, Lynx entered into an agreement with Hoechst AG and Hoechst Marion Roussel (collectively referred to as "Hoechst"), which provides Hoechst with access to Lynx's massively parallel signature sequencing ("MPSS") technology. Under the terms of the agreement, Lynx will receive funding to accelerate the development of its MPSS technology, and in return, it will clone and sequence cDNA libraries from samples of interest to Hoechst as soon as the technology is reduced to practice. This agreement allows for no more than two additional companies to access this technology for a specified period. The agreement shall expire two years from the effective date if Lynx has not achieved a specific milestone as defined in the agreement.

In October 1995, Lynx received $3.0 million in development payments from Hoechst, of which $375,000 was recognized as revenue for the year ended December 31, 1995. In addition, the Company received $5.0 million in November 1995 relating to the closing of a private placement offering of 40,000 shares of its Series D Preferred Stock at $125.00 per share. The Company could receive up to an additional $27.0 million through the end of 1998 in the form of milestone payments, subscription fees and additional equity investments.

In August 1994, Lynx entered into an agreement with The Wellcome Foundation Ltd. ("Wellcome"), which gave Wellcome the right to develop and market worldwide a synthetic antisense oligonucleotide developed by the Company for the treatment of restenosis. In October 1994, Lynx received $4,600,000 from Wellcome, of which $4,000,000 was recognized as license fees in fiscal 1994; the remaining $600,000 was an advance for clinical trial expenses which Wellcome was funding under this arrangement. Through the end of December 31, 1995, clinical trial expenses incurred by the Company on Wellcome's behalf were $760,000, of which $36,000 remained outstanding from Wellcome at the end of the fiscal year.

In December 1995, the Company was notified by Glaxo Wellcome plc ("Glaxo Wellcome") of its intention to terminate the license agreement signed by Lynx and Wellcome prior to the merger of Glaxo plc and Wellcome. Glaxo Wellcome announced that this project did not fit into the expanded joint development portfolio with the merger of the two companies. The termination becomes effective 90 days from Glaxo Wellcome's notice.

In October 1992, Lynx entered into a collaborative research and development agreement with Chiron Corporation ("Chiron") to develop therapeutic antisense products directed at certain targeted viruses. In exchange for the rights received under the terms of the collaboration, Chiron paid Lynx a nonrefundable license fee of $1,000,000 and an additional payment of $500,000 for research. Concurrent with entering into the collaborative agreement, Chiron also purchased 150,000 shares of Series A Preferred Stock at $10.00 per share, which automatically converted to Common Stock in September 1994 (see Note 6), and received an option to purchase 150,000 shares of Common Stock at $0.10 per share which was exercised in September 1994. As part of the accounting for this transaction, $285,000 of the amount received by Lynx for the license fee and research was allocated to the option and credited to Common Stock. The remainder of the license fee and the research payments were recognized as revenue in the accompanying consolidated statements of operations for the year ended June 30, 1993. The license terminated in June 1995.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements  (continued)**

**4.    License Agreements**

**University of Nebraska**

In June 1992, Lynx entered into an agreement with the University of Nebraska under which the University agreed to fund most aspects of certain clinical trials and grant licenses to certain technology to Lynx. In exchange, Lynx issued 10,000 shares of its Common Stock in March 1993. The costs associated with the issuance of the Common Stock were included in research and development expense and are recorded at its deemed fair value at the date of issuance. Pursuant to the agreement, Lynx will also issue an additional 5,000 common shares as a result of the University achieving a clinical trial milestone.  In January 1996, this agreement was terminated.

**Raggio-Italgene S.p.A. Settlement**

Lynx licensed certain technology from Temple University.  Such technology was also the subject of a disputed license between Temple University and Raggio-Italgene S.p.A. ("Raggio"). Pursuant to the 1993 settlement agreement, Lynx paid Raggio a settlement fee and agreed to pay a royalty to Raggio on future product sales incorporating the technology, as defined. The settlement agreement granted Raggio the right to require Lynx to pay up to a maximum of $1,500,000 on three established adjustment dates to reduce the royalty percentages.  Raggio exercised its rights and Lynx paid $1,500,000 over a three year period ending December 1995, which also eliminated any future royalty obligations pursuant to this agreement.  All payments have been charged to research and development expense.

**Other**

Lynx or its predecessor, ABI, has entered into various other license agreements with other companies and academic institutions. Such agreements generally require Lynx to pay annual or semiannual license fees and are generally cancelable upon 60 to 120 days' notice.

**5.    Transactions with Related Parties**

**Applied Biosystems, Inc.**

Effective June 30, 1992, in connection with the formation of the Company, Lynx and ABI entered into a Bill of Sale agreement, a Corporate Services Agreement and an Agreement of Assignment and License of Intellectual Property Rights. Under the terms of the Bill of Sale, ABI contributed to Lynx its rights, title and interest in certain inventory, equipment and other physical assets. The Agreement of Assignment and License of Intellectual Property Rights granted to Lynx certain royalty-free licenses relating to ABI's manufacturing and related technology and transferred to Lynx all of ABI's rights and obligations under certain specified license agreements and patents in order to allow Lynx to pursue the oligonucleotide therapeutics business previously conducted by ABI. Under this agreement, Lynx also granted ABI royalty-free licenses under certain Lynx patent rights and other technology, and options to obtain royalty bearing licenses under certain other Lynx patent rights, to manufacture, use and sell products outside of the field of human therapeutics.

The Corporate Services Agreement was entered into to facilitate Lynx's transition to an independent company. Under the terms of this agreement, ABI subleased a portion of its facilities to Lynx through February 1994 and agreed to provide Lynx with general, corporate and administrative support services for up to three years. The agreement also gave Lynx the right to procure ABI instruments and related software (through June 30, 1993) and certain consumables manufactured by ABI (through June 30, 1995). Rent was charged based

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements  (continued)**

5.      **Transactions with Related Parties (continued)**

**Applied Biosystems, Inc. (continued)**

upon the percentage of total square feet occupied by Lynx. Costs incurred in providing administrative support services to Lynx were reimbursed to ABI based upon ABI's fully burdened cost. The agreement allowed Lynx to purchase any of ABI's instruments, related software and consumables at ABI's fully burdened cost. Equipment and consumables are provided to Lynx solely for internal use as reasonably required. The Corporate Services agreement terminated in June 1995.

During the year ended December 31, 1995, Lynx paid a total of approximately $309,000 to ABI for costs incurred in connection with the above agreements and with the Company's standard operations ($457,000, $501,000 and $1.4 million in the year ended December 31, 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively), including property and equipment purchases ($24,000, $29,000 and $400,000 in the year ended December 31, 1994, in the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively). As of December 31, 1995 and 1994, no amounts were owed to ABI and its parent in connection with the above agreements.

**Notes Receivable from Officers**

In May and June 1995, the Company entered into three separate loan agreements with an officer of the Company. The first loan of $450,000 was issued under a stock purchase agreement for the purchase 250,000 shares of common stock whereby all the shares issued under the agreement are pledged as collateral. Of the 250,000 shares, 225,000 shares are subject to the Company's right of repurchase which lapses ratably over five years. The outstanding principal amount is due and payable in full on April 30, 2000, subject to an obligation to prepay under specified circumstances. Interest is payable upon the expiration or termination of the Note and accrues at the rate of 7.12% per annum. The second loan of $450,000 is a promissory note secured by a second mortgage on real property currently for sale. The principal amount is due and payable upon the earlier of (i) the date of sale of the property, (ii) the date the officer ceases to be a full time employee of the Company, or (iii) February 8, 1999. Interest shall accrue from the date of the loan until paid, at the rate of 7.85% per annum on the principal balance remaining unpaid, compounded annually and is due and payable quarterly. The third loan is a line of credit agreement whereby the officer may borrow from the Company up to twenty-five thousand dollars ($25,000) per calendar quarter during the first two years of employment. The Board may allow the officer to borrow an additional twenty-five thousand ($25,000) per calendar quarter during the third year of employment. The maximum amount of the line of credit is three hundred thousand dollars ($300,000). The line is secured by shares of the Company stock owned by the officer, and the principal amount, plus accrued interest equal to the shares of the Company stock owned by the officer, and the principal amount, plus accrued interest equal to the prime rate, is due and payable in full on May 1, 2000. If the officer's employment terminates without cause prior to the due date, the amounts borrowed, plus accrued interest will be forgiven by the Company.

In October 1995, the Company entered into a loan agreement with another officer of the Company. The note receivable of $210,000 was issued under a stock purchase agreement for the purchase of 60,000 shares of common stock whereby all the shares issued under the agreement are pledged as collateral. The outstanding principal amount is due and payable in full on October 1, 2000, subject to an obligation to prepay under specified circumstances. Interest is payable upon the expiration or termination of the note and accrues at the rate of 6.38% per annum.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements (continued)**

6.      **Stockholders' Equity**

**Preferred Stock**

In September 1994, each share of the Company's Series A Preferred Stock outstanding at that time (1,135,865 shares) automatically converted into one share of the Company's Common Stock in accordance with the Company's Certificate of Incorporation. Had this conversion occurred on January 1, 1994, net loss per share for the year ended December 31, 1994 would have been $(2.66) per share.

Each share of Series B, Series C and Series D Preferred Stock is convertible into ten shares of Common Stock at the option of the holder (subject to adjustment for certain changes in the effective conversion price). The Series B, Series C and Series D preferred shares have voting rights equal to the voting rights of the common shares issuable upon conversion. Conversion is automatic upon the earlier of (i) the closing of an underwritten public offering of Common Stock under the Securities Act of 1933 in which the Company receives at least $15,000,000 in gross proceeds and a price per share of at least $15.00 per share (subject to adjustment for stock splits or similar events), or (ii) the vote or written consent of the holders of a majority of the outstanding Series B, Series C and Series D convertible Preferred Stock. Series B, Series C and Series D stockholders are entitled to receive noncumulative dividends, amounts to be determined if and when declared by the Board of Directors. In addition, no dividend other than a stock dividend shall be paid on Common Stock unless a dividend in an equal amount per share (based on the then-current conversion rate) is first declared and paid on the Series B, Series C and Series D Preferred Stock. In the event of liquidation, holders of Series B and Series C Preferred Stock shall be entitled to receive an amount equal to $50.00 per share, and Series D Preferred Stock, $125.00 per share (all of which are subject to adjustment), plus all declared but unpaid dividends before any payments are made to holders of Common Stock.

**Common Stock**

Lynx has issued approximately 140,000 shares of Common Stock to certain employees of and consultants to the Company. These shares are subject to repurchase rights which expire ratably over a five-year period from the date of issuance. Lynx has recorded deferred compensation expense for the difference between the purchase price and the deemed value of certain of these shares for financial statement purposes. At December 31, 1995, approximately 33,476 shares were subject to repurchase for an aggregate amount of $3,348.

At December 31, 1995, Lynx has reserved 6,021,022 shares of Common Stock for issuance upon conversion of the Series B, Series C and Series D Preferred Stock, upon the achievement of certain established milestones by a research collaborator, upon exercise of outstanding warrants and upon exercise of outstanding employee and nonemployee stock options. Both ABI and Chiron Corporation have certain registration rights with respect to Common Stock issued to them upon the conversion of Series A Preferred Stock which occurred September 1994.

**1992 Stock Option Plan**

In July 1992, Lynx adopted the 1992 Stock Option Plan ("the Plan") under which incentive or nonqualified stock options to purchase shares of Common Stock may be granted to employees and officers of, and consultants to, the Company. In February and December 1994, the Board of Directors adopted and, in January 1995, the stockholders approved amendments to the Plan to increase the number of shares reserved for issuance under the Plan to 1,400,000. The number of shares available for option grants has been reduced by the 140,000 shares of Common Stock which were issued to certain employees and consultants, as discussed above.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements (continued)**

**6.    Stockholders' Equity (continued)**

**1992 Stock Option Plan (continued)**

Under the Plan, the exercise price of incentive options granted may not be less than 100% (110% in the case of options granted to a person who owns more than 10% of the total combined voting power of all classes of stock of the Company) of the fair value of Common Stock at the date of grant. Nonqualified options may be granted at not less than 85% of fair market value at the date of grant. Options generally vest over a five-year period from the date of grant and have a term of ten years (five years in the case of options granted to a person who owns more than 10% of the total combined voting power of all classes of stock of the Company).

The stock option activity under the Plan was as follows:

| | Available for Grant | Number of Shares Subject to Options | Option Price per Share |
|---|---|---|---|
| Balance at June 30, 1992 | 260,000 | -- | -- |
| Options granted | (92,200) | 92,200 | $0.10-$2.00 |
| Options exercised | -- | (76) | $0.10 |
| Options canceled | 522 | (522) | $0.10 |
| Balance at June 30, 1993 | 168,322 | 91,602 | $0.10-$2.00 |
| Options granted | (27,000) | 27,000 | $2.00 |
| Options exercised | -- | (15,555) | $0.10-$2.00 |
| Options canceled | 176 | (176) | $2.00 |
| Balance at December 31, 1993 | 141,498 | 102,871 | $0.10-$2.00 |
| Options authorized | 1,000,000 | -- | -- |
| Options granted | (369,500) | 369,500 | $1.00-$2.00 |
| Options exercised | -- | (18,513) | $0.10-$2.00 |
| Options canceled | 9,157 | (9,157) | $0.10-$2.00 |
| Balance at December 31, 1994 | 781,155 | 444,701 | $0.10-$2.00 |
| Options granted | (682,370) | 682,370 | $1.00-$5.00 |
| Options exercised | -- | (324,410) | $1.00-$5.00 |
| Options canceled | 55,569 | (55,569) | $1.00-$2.00 |
| Balance at December 31, 1995 | 154,354 | 747,092 | $0.10-$5.00 |

To date, all options granted under the Plan are nonqualified options. Options to purchase a total of 172,720 shares were exercisable under the Plan at December 31, 1995. Certain officers of the Company were granted the right to exercise their options prior to vesting, subject to the Company's right of repurchase at the original issue price, which lapses ratably over five years. As of December 31, 1995, 634,084 shares underlying such options were subject to repurchase.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements (continued)**

6.    **Stockholders' Equity (continued)**

**Spectragen Stock Option Plan**

In March 1995, the Company's subsidiary, Spectragen, adopted a separate stock option plan, reserving 1,000,000 shares for issuance to key employees and consultants. In August 1995, the Company and Spectragen's common stockholders entered into an agreement whereby the Company may under certain circumstances acquire their minority stock ownership. In the event the Company does not make the acquisition, the common stockholders of Spectragen may, in certain circumstances, put their shares to the Company in exchange for Lynx Common Stock. If either of these events occur, further dilution of Lynx's current stockholders' equity will result.

**Warrants**

As of December 31, 1995, warrants to purchase 6,300 shares of Common Stock were outstanding at an exercise price of $12.50 per share. The warrants are exercisable at the option of the holder through February 14, 1997.

7.    **Income Taxes**

The Company accounts for income taxes under Statement Financial Accounting Standards No. 109, "Accounting for Income Taxes." Because of the Company's history of losses, no income tax provisions or benefits have been recorded. Lynx's losses through November 20, 1992 were included in the consolidated income tax returns of ABI or ABI's parent (Perkin Elmer Corporation). As a result, Lynx's net operating loss carryforwards available to offset future taxable income consist only of losses incurred after November 20, 1992.

As of December 31, 1995, the Company has federal and state loss carryforwards of approximately $20,000,000 and $600,000, respectively. The Company also has federal and state research and development tax credit carryforwards of approximately $520,000 and $225,000, respectively. The federal net operating loss and federal and state credit carryforwards will expire at various dates beginning in the years 2007 through 2010, if not utilized. The state net operating loss will expire at various dates beginning in the years 1997 through 2000, if not utilized.

Utilization of the net operating losses and credits may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986 and similar state provisions. The annual limitation may result in the expiration of net operating losses and credits before utilization.

The federal net operating loss carryforwards differ from the accumulated deficit principally due to losses incurred while the Company was a division of ABI, and timing differences in the recognition of certain expense items for financial and federal tax reporting purposes, consisting primarily of certain accrued expenses that are not currently deductible for income tax purposes.

Deferred income taxes reflect the tax effects of net operating loss and credit carryforwards and of temporary differences between the carrying amounts of assets and liabilities for financial reporting and the amount used for income tax purposes.

**Lynx Therapeutics, Inc.**
**Notes to Consolidated Financial Statements (continued)**

### 7.   Income Taxes (continued)

Significant components of the Company's deferred tax assets for federal and state income taxes as of December 31 are as follows:

| | 1995 | 1994 |
|---|---|---|
| | *(In thousands)* | |
| Deferred tax assets: | | |
| Net operating losses | $ 6,837 | $ 4,200 |
| Research and development credit carryforwards | 669 | 350 |
| Capitalized research and development expenditures | 1,197 | 700 |
| Other | 81 | 300 |
| Valuation allowance | (8,784) | (5,550) |
| | $ — | $ — |

The valuation allowance for deferred tax assets was $3,250,000 and $1,850,000 at December 31, 1993 and June 30, 1993, respectively.

### 8.   Obligations under Operating Leases

The Company entered into a noncancelable operating lease for facilities which commenced on August 1, 1993 and expires on July 31, 2003.  Under the terms of the lease, rental payments commenced in the third month of the lease and increase on a graduated scale beginning with the second year of the lease as the Company occupies additional space. The Company is recognizing rent expense on a straight-line method over the lease period. The Company has the option to extend the lease for two additional periods of five years each, with payments to be determined when the option is exercised.  The Company also leases equipment under various operating lease agreements subject to minimum annual lease payments.

Minimum annual rental commitments under operating leases are as follows:

| | *(in thousands)* |
|---|---|
| Years ending December 31: | |
| 1996 | $ 660 |
| 1997 | 557 |
| 1998 | 499 |
| 1999 | 512 |
| 2000 | 511 |
| Thereafter | 1,403 |
| | $ 4,142 |

Rent expense for facilities and equipment under operating leases was $637,000, $424,000, $255,000 and $277,000 for the years ended December 31, 1995 and 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993, respectively.

### ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

# PART III

**ITEM 10.**     **DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The Company's executive officers, directors and certain employees, and their ages as of December 31, 1995 are as follows:

| NAME | AGE | POSITION |
|------|-----|----------|
| Sam Eletr, Ph.D.(1) | 56 | Chairman of the Board |
| David W. Martin, Jr., M.D. | 54 | Chief Executive Officer, President and Director |
| Timothy G. Geiser, Ph.D. | 53 | Vice President, Manufacturing and Operations |
| Stephen C. Macevicz, Ph.D. | 46 | Vice President, Intellectual Property |
| Karoly Nikolich, Ph.D. | 47 | Vice President, Biological Research |
| Gerald Zon, Ph.D. | 50 | Vice President, Medicinal Chemistry |
| William K. Bowes, Jr.(2) | 69 | Director |
| Sydney Brenner, M.B., D. Phil. | 68 | Director |
| James C. Kitch(2) | 48 | Director |
| Kathleen D. La Porte(1) | 34 | Director |
| Craig C. Taylor(1) | 45 | Director and Acting Chief Financial Officer |

_____

(1)     Member of Compensation Committee
(2)     Member of Audit Committee

Dr. Eletr has served as Chairman of the Board of the Company since February 1992 and was Chief Executive Officer of the Company from February 1992 through January 1996. Dr. Eletr founded Applied Biosystems, Inc., ("ABI"), a manufacturer of instruments and consumables for life science research and related applications, now a wholly-owned subsidiary of Perkin-Elmer Corporation and served as Chairman of the Board of Directors and in various executive positions at ABI from its inception until March 1987. Dr. Eletr acted as a consultant to ABI from September 1990 until July 1992, during which time he undertook to assume the leadership of the Company.

Dr. Martin has served as Chief Executive Officer since January 1996, director of the Company since July 1995 and President of the Company since May 1995. He was President, Chiron Therapeutics and Senior Vice President, Chiron Corp. from January 1994 to May 1995. Prior executive responsibilities have included those of Executive Vice President, DuPont Merck Pharmaceutical Co. from 1991 through 1993 and Senior Vice President, Genentech Inc. from 1982 through 1990. Before joining the biotechnology industry, he was a Professor of Medicine and Professor of Biochemistry at the University of California, San Francisco. He currently serves on the Board of Directors of Varian Associates, Inc. and two private biotechnology companies.

Dr. Geiser has served as Vice President, Manufacturing and Operations of Lynx since July 1992. Prior to that time, he served as Senior Scientist of ABI from May 1981 to July 1992 where he had earlier directed DNA chemistry and peptide chemistry R&D activities and later joined with Dr. Zon in 1987 to co-direct the establishment of the DNA Therapeutics Group which led to the formation of Lynx Therapeutics, Inc. He received his Ph.D. in Organic Chemistry from Cornell University.

Dr. Macevicz joined the Company in September 1995, as Vice President, Intellectual Property. He was Senior Patent Attorney and chief patent counsel of ABI from 1992 to August 1995 and, prior to that, from 1986 to 1992, Patent Counsel of DNAX Research Institute of Molecular and Cellular Biology, a research subsidiary of Schering-Plough Corporation. He received his law degree from University of California, Berkeley (Boalt Hall) in 1984 and his Ph.D. in Biophysics from the University of California, Berkeley in 1979.

Dr. Nikolich joined Lynx in October 1995, as Vice President, Biological Research. He joined Genentech, Inc. in 1985 as Scientist and in 1989 became Senior Scientist and Head of the Neuroscience Research Program. Dr. Nikolich established the neuroscience program at Genentech and is a widely published and recognized expert in neurotropic factor research. After receiving his doctorate from Eotvos University of Budapest, he was a postdoctoral fellow in the laboratory of Professor Andrew Schally at Tulane University and prior to joining Genentech, a visiting scientist with Dr. J. Ramachandran at the Hormone Research Laboratory, University of California, San Francisco.

Dr. Zon has served as Vice President, Medicinal Chemistry and Regulatory Affairs of Lynx since January 1993. Prior to that time, he served as Senior Scientist at ABI from November 1986 to July 1992, and directed the Food and Drug Administration's Pharmacology Laboratory from 1981 to 1986. Dr. Zon received his Ph.D. in Organic Chemistry from Princeton University, and has over 200 publications in the areas of organic, medicinal and oligonucleotide chemistry.

Mr. Bowes has served as a director of the Company since March 1994. He has been a general partner of U.S. Venture Partners, a venture capital partnership, for more than five years. He currently serves as a director of Amgen, Inc., XOMA Corporation and a number of U.S. Venture Partners' privately owned portfolio companies.

Dr. Brenner has served as a director of the Company since October 1993. He is currently Honorary Professor of Genetic Medicine, University of Cambridge Clinical School and an independent consultant. From 1986 to his retirement in 1991, Dr. Brenner directed the Medical Research Council Unit of Molecular Genetics. From 1979 to 1986 he directed the Laboratory of Molecular Biology in Cambridge, England. He was a member of the Scripps Research Institute in La Jolla, California until December 1994.

Mr. Kitch has served as a director of the Company since February 1993 and Secretary of Lynx since February 1992. He was a director of ABI from August 1986 to February 1993. He has been a partner for more than ten years of Cooley Godward Castro Huddleson & Tatum, a law firm which has provided legal services to ABI and the Company.

Ms. La Porte has served as a director of the Company since March 1994. She is a general partner of the Sprout Group, the venture capital affiliate of Donaldson, Lufkin and Jenrette. From 1987 to 1993, Ms. La Porte was a principal at Asset Management Company. She currently serves as a director of Sequana Therapeutics, Inc., Fem Rx, Inc. and several private companies.

Mr. Taylor has served as a director of the Company since March 1994 and Acting Chief Financial Officer since July 1994. He has been active in venture capital since 1977 when he joined Asset Management Company. He is a general partner of AMC Partners 89 L.P., which serves as the general partner of Asset Management Associates 1989 L.P., a private venture capital partnership. He currently serves as a director of Telor Ophthalmic Pharmaceuticals, Inc., Metra BioSystems, Inc., Pharmacyclics, Inc. and several private companies.

Pursuant to the terms of the Shareholders Agreement between Lynx and ABI, ABI has the right to nominate one member of the Board of Directors of Lynx as long as ABI beneficially owns at least 200,000 shares of Lynx Stock. No nominee of ABI currently serves on the Board of Directors.

## Compliance with the Reporting Requirements of Section 16(a)

Section 16(a) of the Exchange Act requires the Company's directors and executive officers, and persons who own more than ten percent (10%) of a registered class of the Company's equity securities, to file with the Security and Exchange Commission ("SEC") initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Officers, directors and greater than ten percent (10%) stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company, during the calendar year ended December 31, 1995, all Section 16(a) filing requirements applicable to its officers, directors and greater than ten percent (10%) beneficial owners were complied with, except New York Life Insurance Company who filed a late Form 4 in February 1996, and did not file a Form 5, and Hoechst Marion Roussel who did not file a Form 3. Appropriate reports were filed promptly once said individuals and entities became aware of the requirements regarding such filings.

## ITEM 11.    EXECUTIVE COMPENSATION

The following table sets forth certain compensation paid by the Company during the calendar year ended December 31, 1995 to its Chief Executive Officer and each of the three other most highly compensated executive officers whose compensation exceeded $100,000 (the "Named Executive Officers"):*

### Summary Compensation Table

| Name and Principal Position | Year | Annual Salary($) | Long Term Compensation Awards Securities Underlying Options (#) | All Other Compensation($)(1) |
|---|---|---|---|---|
| Sam Eletr, Ph.D.(2) | 1995 | 170,484 | 105,000 | 0 |
| Chairman of the Board | 1994 | 160,990 | 80,000 | 0 |
| | 1993 | 163,060 | 0 | 0 |
| David W. Martin, Jr., M.D. (3) | 1995 | 133,713 | 250,000 | 0 |
| President and Chief | 1994 | 0 | 0 | 0 |
| Executive Officer | 1993 | 0 | 0 | 0 |
| Timothy G. Geiser, Ph.D. | 1995 | 142,674(3) | 60,000 | 750 |
| Vice President, Manufacturing | 1994 | 132,176(3) | 60,000 | 750 |
| and Operations | 1993 | 131,229(4) | 0 | 750 |
| Gerald Zon, Ph.D. | 1995 | 143,130(3) | 60,000 | 750 |
| Vice President, Medicinal Chemistry | 1994 | 132,468(3) | 60,000 | 750 |
| and Regulatory Affairs | 1993 | 131,348(5) | 0 | 750 |

(1)    Contributions made by the Company to the Company's 401(k) Plan on behalf of such employees.

(2)    Dr. Eletr was Chief Executive Officer from inception of the Company to January 1996.

(3)    Dr. Martin joined the Company in May 1995. In January 1996, Dr. Martin was elected Chief Executive Officer of the Company.

(4)    This amount includes compensation in the amount of $9,240 deferred pursuant to the Company's 401(k) Plan.

(5)    This amount includes compensation in the amount of $6,890 deferred pursuant to the Company's 401(k) Plan.

(6)     This amount includes compensation in the amount of $8,994 deferred pursuant to the Company's 401(k) Plan.

**In October 1995 Karoly Nikolich, Ph.D., joined the Company as Vice President, Biological Research. Dr. Nikolich receives an annual salary of $148,000; however , as Dr. Nikolich did not receive in excess of $100,000 in 1995, pursuant to the rules and regulations of the Securities and Exchange Commission he is not deemed to be a Named Executive Officer.

Except as disclosed above, no compensation characterized as long-term compensation, including restricted stock awards issued at a price below fair value or long-term incentive plan payouts, were paid by the Company during the year ended December 31, 1995 to any Named Executive Officers.

## 1992 Stock Option Plan

In June 1992, Lynx adopted the 1992 Stock Option Plan (the "1992 Plan"), under which 400,000 shares, less any shares of Lynx's Common Stock remaining outstanding which were originally issued to employees, officers of or consultants to Lynx pursuant to stock purchase agreements approved by Lynx's Board of Directors, were initially reserved for issuance upon exercise of options granted to employees and consultants of Lynx or its affiliates. In February and December 1994, the Board adopted, and in January 1995 the stockholders approved, amendments to the 1992 Plan, to increase the number of authorized shares for issuance under the 1992 Plan to 1,400,000 shares. In March 1996, the Board adopted amendments to the 1992 Plan to increase the authorized number of shares for issuance under the 1992 Plan to 2,100,000 shares and to extend the term of the 1992 Plan to March 2006, pending stockholder approval. The 1992 Plan provides for the grant of both incentive stock options intended to qualify as such under Section 422 of the Internal Revenue Code of 1986 (the "Code"), and supplemental stock options, which are options that do not qualify as incentive stock options.

The 1992 Plan is administered by the Board of Directors. Subject to the provision of the 1992 Plan, the Board has the authority to select the persons to whom grants are to be made, to designate the number of shares to be covered by each option, to determine whether an option is an incentive stock option or a supplemental stock option, to establish vesting schedules, to specify the type of consideration to be paid to Lynx upon exercise or purchase and, subject to certain restrictions, to specify other terms.

The maximum term of options granted under the 1992 Plan is ten years. The aggregate fair value of the stock with respect to which incentive stock options are first exercisable in any calendar year may not exceed $100,000. Options granted under the 1992 Plan generally are non-transferable and expire three months after the termination of any optionee's employment, directorship or consulting relationship with Lynx. However, in general, if such termination of employment is due to the optionee's permanent and total disability, such person's option may be exercised up to one year following such disability, and if such termination of employment is due to the optionee's death, such person's option may be exercised up to eighteen (18) months following such death.

The exercise price of incentive stock options must be at least the fair value of the Common Stock on the date of grant. The exercise price of supplemental stock options must be at least 85% of the fair value of the Common Stock on the date of grant. The exercise price of options granted to any person who at the time of grant owns stock possessing more than 10% of the total combined voting power of all classes of stock must be at least 110% of the fair value of such stock on the date of grant, and the term of these options cannot exceed five years. Shares covered by currently outstanding options under the 1992 Plan typically vest over a five-year period following the date of grant.

**Stock Option Grants and Exercises**

**Option Grants in the Year Ended December 31, 1995**

The following table sets forth, for each of the Named Executive Officers in the Summary Compensation Table, certain information regarding options granted during the year.

## OPTION GRANTS IN LAST FISCAL YEAR

| | | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(4) | |
|---|---|---|---|---|---|---|
| | Individual Grants | | | | | |
| Name | Number of Securities Underlying Options Granted (1) | % of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/sh)(3) | Expiration Date | 5%($) | 10%($) |
| Sam Eletr | 55,000 | 8.06% | 1.00 | 03/30/2005 | 34,589 | 87,656 |
| | 50,000 | 7.33% | 5.00 | 03/30/2005 | ** | ** |
| David W. Martin, Jr. | 200,000 | 29.31% | 1.00 | 04/30/2005 | 125,779 | 318,749 |
| | 50,000 | 7.33% | 5.00 | 04/30/2005 | ** | ** |
| Timothy G. Geiser | 30,000 | 4.39% | 1.00 | 03/30/2005 | 18,867 | 47,812 |
| | 30,000 | 4.39% | 5.00 | 03/30/2005 | ** | ** |
| Gerald Zon | 30,000 | 4.39% | 1.00 | 03/30/2005 | 18,867 | 47,812 |
| | 30,000 | 4.39% | 5.00 | 03/30/2005 | ** | ** |

(1)   Options granted generally vest over a five-year period. The term of the options is ten years.

(2)   Based on an aggregate of 682,370 options granted to employees of and consultants to the Company during the year ended December 31, 1995, including the Named Executive Officers.

(3)   The exercise price per share of each option is equal to the fair value as determined by the Board of Directors, except for grants at an exercise price of $5.00, for which the fair value on the date of grant was $1.00.

(4)   The potential realizable value is calculated based on the term of the option at its time of grant (ten years). It is calculated by assuming that the fair value of the stock as determined by the Board of Directors on the date of grant appreciated at the indicated annual rate compounded annually for the entire term of the option and that the option is exercised and sold on the last day of its term for the appreciated stock price. These amounts represent certain assumed rates of appreciation only, in accordance with the rules of the SEC, and do not reflect the Company's estimate or projection of future stock price performance. Actual gains, if any, are dependent on the actual future performance of the Company's Common Stock and no gain to the optionee is possible unless the stock price increases over the option term, which will benefit all stockholders.

**Due to the relationship of the exercise price of the option and the fair value of the Common Stock at the date of grant, there is zero potential realizable value at the assumed level of appreciation.

42.

## AGGREGATED OPTION EXERCISES IN THE YEAR ENDED
## DECEMBER 31, 1995 AND OPTION VALUES

The following table sets forth, for each of the Named Executive Officers in the Summary Compensation Table, the shares acquired and the value realized on each exercise of stock options during the year and number of unexercised options:

| Name | Shares Acquired on Exercise(#) | Value Realized($)(1) | Number of Unexercised Options at Year-End (Exercisable/ Unexercisable) | Value of Unexercised In-the-Money Options at Year-End ($)(1) (Exercisable/ Unexercisable) |
|---|---|---|---|---|
| Sam Eletr | 0 | 0 | 42,416/142,584 | 220,000/400,336 |
| David W. Martin, Jr. | 250,000(2) | 0 | 0/0 | 0/0 |
| Timothy G. Geiser | 0 | 0 | 27,750/95,750 | 116,375/285,275 |
| Gerald Zon | 0 | 0 | 35,000/95,750 | 127,400/285,275 |

(1) Based on the fair value of the Company's Common Stock at December 31, 1995 ($5.00) (as determined by the Board of Directors), minus the exercise price of the option, multiplied by the number of shares underlying the option.

(2) Shares exercised are subject to a Stock Purchase Agreement between the optionee and the Company. The shares are subject to repurchase by the Company at the original purchase price in the event of termination of employment. The shares will be released from the Company's repurchase option ratably over a five year period.

**401(k) Plan**

In October 1992, Lynx adopted a 401(k) Plan covering all of its employees. The 401(k) Plan is intended to qualify under Section 401 of the Code so that contributions by employees or by Lynx to the 401(k) Plan are not taxable to employees until withdrawn from the 401(k) Plan, and so that contributions by Lynx, if any, will be deductible by Lynx when made. Pursuant to the 401(k) Plan, employees may elect to reduce their current compensation by up to 15% (subject to an annual limit prescribed by the Code as described below) and have the amount of such reduction contributed to the 401(k) Plan. Under limitations imposed by the Code, the maximum amount of compensation reduction a participant could elect to have contributed to the 401(k) Plan for the 1995 calendar year was $9,240. This amount is subject to annual adjustments for increases in the cost of living, as determined under Internal Revenue Service regulations. The 401(k) Plan permits, but does not require, additional contributions to the 401(k) Plan by Lynx on behalf of all participants in the 401(k) Plan.

**Compensation of Directors**

Directors are not compensated by the Company for service as directors.

**Compensation Committee Interlocks and Insider Participation**

The Company's Compensation Committee was established in March 1994. The only officer and employee of the Company who participated in deliberations of the Company's Compensation Committee concerning executive officer compensation during the year ended December 31, 1995 was Dr. Eletr, the Company's Chairman of the Board.

**Limitations of Liability and Indemnification**

The Company's Bylaws provide that the Company will indemnify its directors and executive officers and may indemnify its other officers, employees and other agents to the fullest extent permitted by Delaware law. The Company is also empowered under its Bylaws to enter into indemnification agreements with its directors and officers and to purchase insurance on behalf of any person whom it is required or permitted to indemnify. Pursuant to this provision, the Company has entered into indemnity agreements with each of its directors and executive officers.

In addition, the Company's Certificate of Incorporation provides that, to the fullest extent permitted by Delaware law, the Company's directors will not be liable for monetary damages for breach of the directors' fiduciary duty of care to the Company and its stockholders. This provision in the Certificate of Incorporation does not eliminate the duty of care, and in appropriate circumstances, equitable remedies such as an injunction or other forms of nonmonetary relief would remain available under Delaware law. Each director will continue to be subject to liability for breach of the director's duty of loyalty to the Company, for acts or omissions not in good faith or involving intentional misconduct or knowing violations of law, for acts or omissions that the director believes to be contrary to the best interests of the Company or its stockholders, for any transaction from which the director derived an improper personal benefit, for acts or omissions involving a reckless disregard for the director's duty to the Company or its stockholders when the director was aware or should have been aware of a risk of serious injury to the Company or its stockholders, for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the Company or its stockholders, for improper transactions between the director and the Company and for improper distributions to stockholders and loans to directors and officers. This provision also does not affect a director's responsibilities under any other laws such as the federal securities laws or state or federal environmental laws.

No pending material litigation or proceeding involving a director, officer, employee or other agent of the Company as to which indemnification is being sought exists, and the Company is not aware of any pending or threatened material litigation that may result in claims for indemnification by any director, officer, employee or other agent.

44.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information regarding beneficial ownership of each class of the Company's voting stock as of February 29, 1996, by (i) each stockholder who is known by the Company to own beneficially more than 5% of the Common Stock; Series B Preferred Stock; Series C Preferred Stock and Series D Preferred Stock; (ii) each Named Executive Officer of the Company; (iii) each director of the Company; and (iv) all directors and executive officers of the Company as a group. All Series D Preferred Stock is held by Hoechst Marion Roussel as reflected in the common stock table and as noted in footnote (6).

| Name and Address of Beneficial Owners | Common Stock(1) | | Series B Preferred Stock(1) | | Series C Preferred Stock(1) | |
|---|---|---|---|---|---|---|
| | Number | Percent(2) | Number | Percent(2) | Number | Percent(2) |
| Entities affiliated with the Sprout Group(3)<br>3000 Sand Hill Road<br>Building 4, Suite 270<br>Menlo Park, CA 94025 | 729,980 | 23.8% | 49,999 | 15.0% | 22,999 | 18.7% |
| Entities affiliated with the U.S. Venture Partners IV, L.P.(4)<br>2180 Sand Hill Road<br>Suite 300<br>Menlo Park, CA 94025 | 730,000 | 23.8% | 50,000 | 15.0% | 23,000 | 18.7% |
| Cannon Street Fund Ltd.<br>c/o Meridian Venture Group<br>R.R. Box 272<br>Charlottesville, VA | 565,000 | 19.5% | 40,000 | 12.0% | 16,500 | 13.4% |
| Biotechnology Investments Limited<br>c/o Old Court Limited<br>P.O. Box 58<br>St. Julian's Court<br>St. Peter Port<br>Guernsey, Channel Islands | 545,000 | 18.9% | 40,000 | 12.0% | 14,500 | 11.8% |
| Applied Biosystems a Division of Perkin Elmer Corporation(5)<br>850 Lincoln Centre Drive<br>Foster City, CA 94404 | 379,453 | 16.3% | 0 | ** | 0 | ** |
| Singapore Bio-Innovations Pte, Ltd.<br>250 North Bridge Road<br>24-00 Raffles City Tower<br>Singapore 0617 | 420,000 | 15.2% | 42,000 | 12.6% | 0 | ** |
| Hoechst Marion Roussel(6)<br>9300 Ward Parkway<br>Kansas City, MO 64114 | 400,000 | 14.6% | 0 | ** | 0 | ** |
| Asset Management Associates 1989 L.P.(7)<br>2275 East Bayshore Rd., #150<br>Palo Alto, CA 94303 | 360,000 | 13.4% | 36,000 | 10.8% | 0 | ** |
| Chiron Corporation<br>4360 Horton Street<br>Emeryville, CA 94608 | 300,000 | 12.9% | 0 | ** | 0 | ** |

45.

| Name and Address of Beneficial Owners | Common Stock(1) | | Series B Preferred Stock(1) | | Series C Preferred Stock(1) | |
|---|---|---|---|---|---|---|
| | Number | Percent(2) | Number | Percent(2) | Number | Percent(2) |
| Entities affiliated with the Partech International(8) 101 California Ave., Suite 3150 San Francisco, CA 94111 | 300,000 | 11.4% | 15,000 | 4.5% | 15,000 | 12.2% |
| New York Life Insurance Company 51 Madison Avenue, Room 203 New York, NY 10010 | 270,000 | 10.4% | 20,000 | 6.0% | 7,000 | 5.7% |
| Becton Dickinson & Company One Becton Drive Franklin Lakes, NJ 07417 | 233,689 | 10.0% | 0 | ** | 0 | ** |
| European Medical Ventures c/o FINOVELEC 6, rue Ancelle 92521 Neuilly, Cedex, France | 140,000 | 5.7% | 0 | ** | 14,000 | 11.4% |
| Sam Eletr(9) | 119,259 | 5.0% | 0 | ** | 0 | ** |
| William K. Bowes, Jr.(10) | 747,720 | 24.4% | 50,000 | 15.0% | 23,000 | 18.7% |
| Sydney Brenner(11) | 3,375 | ** | 0 | ** | 0 | ** |
| Timothy G. Geiser(12) | 72,573 | 3.1% | 0 | ** | 0 | ** |
| James C. Kitch(13) | 11,984 | ** | 700 | ** | 300 | ** |
| Kathleen D. La Porte(14) | 729,980 | 23.8% | 49,999 | 15.0% | 22,999 | 18.7% |
| David W. Martin, Jr. | 250,000 | 10.7% | 0 | ** | 0 | ** |
| Craig C. Taylor(15) | 371,498 | 13.8% | 36,000 | 10.8% | 0 | ** |
| Gerald Zon(16) | 72,888 | 3.1% | 0 | ** | 0 | ** |
| All directors and officers as a group (11 persons) | 2,379,277 | 57.1% | 136,699 | 41.1% | 46,299 | 37.6% |

_____
**Less than one percent.

(1) Except as otherwise noted, and subject to community property laws where applicable, each person or entity named in the table has sole voting and investment power with respect to all shares shown as beneficially owned by him, her or it. Beneficial ownership of Common Stock reflects beneficial ownership of Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock as set forth in the table or, with respect to Hoechst Marion Roussel, as set forth in footnote (6).

(2) Percentage of beneficial ownership is based on 2,334,524 shares of the Company's Common Stock, 332,288 shares of the Company's Series B Preferred Stock, 123,299 shares of the Company's Series C Preferred Stock and 40,000 shares of the Company's Series D Preferred Stock outstanding as of February 29, 1996, except as otherwise noted in the footnotes. The Series B, Series C and Series D Preferred Stock is convertible into Common Stock on a ten-for-one basis.

(3) Includes 49,999 shares of Series B Preferred Stock and 22,999 shares of Series C Preferred Stock held by entities affiliated with Sprout Group. Ms. La Porte, a director of the Company, is a general partner of the Sprout Group, an entity affiliated with Sprout Capital VI, Sprout Capital VII and DLJ Capital. Ms. La Porte shares the power to vote and control the disposition of shares held by Sprout Capital VI, Sprout Capital VII and DLJ Capital and therefore may be deemed to be the beneficial owner of such

. 46.

shares. Ms. La Porte disclaims beneficial ownership of such shares, except to the extent of her prorata interest therein.

(4)  Includes 50,000 shares of Series B Preferred Stock and 23,300 shares of Series C Preferred Stock held by entities affiliated with U.S. Venture Partners IV, L.P. ("U.S.V.P. IV") Mr. Bowes, a director of the Company, is a general partner of Presidio Management Group IV, the general partner of U.S.V.P. IV. Mr. Bowes shares the power to vote and control the disposition of shares held by U.S.V.P. IV and therefore may be deemed to be the beneficial owner of such shares. Mr. Bowes disclaims beneficial ownership of such shares, except to the extent of his prorata interest therein.

(5)  Includes 152,400 shares of Common Stock issuable upon exercise of Lynx option held by Applied Biosystems that is exercisable within 60 days of February 29, 1996.

(6)  Consists solely of 40,000 shares of Series D Preferred Stock, which constitutes 100% of the shares of Series D Preferred Stock outstanding.

(7)  Includes 36,000 shares of Series B Preferred Stock held by Asset Management Associates 1989 L.P. ("Asset 1989 L.P."). Mr. Taylor, a director of the Company, is a general partner of AMC Partners 89, which is the general partner of Asset 1989 L.P. Mr. Taylor shares the power to vote and control the disposition of shares held by Asset 1989 L.P. and therefore may be deemed to be the beneficial owner of such shares. Mr. Taylor disclaims beneficial ownership of such shares, except to the extent of his prorata interest therein.

(8)  Includes 15,000 shares of Series B Preferred Stock and 15,000 shares Series C Preferred Stock held by entities affiliated with Partech International.

(9)  Includes 53,000 shares of Common Stock issuable upon exercise of Lynx stock options held by Dr. Eletr that are exercisable within 60 days of February 29, 1996.

(10)  See Note 4 above. Common Stock amount also includes 607 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Bowes that are exercisable within 60 days of February 29, 1996.

(11)  Includes 3,375 shares of Common Stock issuable upon exercise of Lynx stock options held by Sydney Brenner that are exercisable within 60 days of February 29, 1996.

(12)  Includes 35,750 shares of Common Stock issuable upon exercise of Lynx stock options held by Dr. Geiser that are exercisable within 60 days of February 29, 1996. Also includes 4 shares of Common Stock held of record by Dr. Geiser's wife, to which shares Dr. Geiser disclaims beneficial ownership.

(13)  Includes 7,000 shares of Series B Preferred Stock and 300 shares of Series C Preferred Stock held by GC&H Investments, an investment partnership of which Mr. Kitch is a general partner. Mr. Kitch shares the power to vote and control the disposition of such shares and therefore may be deemed to be the beneficial owner of such shares. Mr. Kitch disclaims beneficial ownership of such shares, except to the extent of his prorata interest therein. Common Stock amount also includes 607 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Kitch that are exercisable within 60 days of February 29, 1996.

(14)  See Note 3 above.

(15)  See Note 7 above. Common Stock amount also includes 607 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Mr. Taylor that are exercisable within 60 days of February 29, 1996.

(16) Includes 43,000 shares of Common Stock issuable upon exercise of Lynx stock options held by Dr. Zon that are exercisable within 60 days of February 29, 1996. Also includes 105 shares of Common Stock held of record by Dr. Zon's wife and 48 shares of Common Stock issuable upon exercise of Perkin Elmer Options held by Dr. Zon's wife that are exercisable within 60 days of February 29, 1996 as to which shares Dr. Zon disclaims beneficial ownership.

(17) Common Stock amount includes 136,994 shares of Common Stock issuable upon exercise of the Company's stock options and Perkin Elmer Options held by all directors and officers that are exercisable within 60 days of February 29, 1996. See Notes 9 through 16 above.

## ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Lynx was formed in February 1992 as a wholly-owned subsidiary of ABI (now a division and wholly-owned subsidiary of Perkin Elmer Corporation) to carry on the business previously being conducted by ABI's Therapeutics Group. In June 1992, Lynx sold to ABI 800,000 shares of Lynx Common Stock at a purchase price of $0.10 per share. On October 1, 1992, simultaneously with the transactions entered into between Lynx and Chiron Corporation ("Chiron") described below, Lynx sold to ABI 1,000,000 shares of Lynx Series A Preferred Stock at a purchase price of $10.00 per share, and ABI and Lynx rescinded the purchase of 315,900 of the 800,000 shares of Lynx Common Stock previously purchased from Lynx.

In November 1992, ABI distributed all but an aggregate of 1,600 shares of the Lynx Common Stock and 298,200 shares of the Lynx Series A Preferred Stock it held to its shareholders (the "Distribution"). The Series A Preferred shares were converted to Common shares on September 30, 1994. In connection with these transactions, Lynx granted ABI an option to purchase up to 215,900 shares of Lynx Common Stock at $0.10 per share which, prior to October 1996, may only be exercised by ABI in connection with the distribution by ABI of Lynx stock to its option holders upon the exercise of ABI stock options outstanding as of the date of the Distribution. Thereafter, through the termination of the option in September 1997, ABI may exercise such option provided that it promptly sells or otherwise disposes of any shares received upon such exercise. In connection with these transactions, Lynx also repaid approximately $975,000 that had been advanced by ABI to cover operational expenses after July 3, 1992. Under the terms of a Shareholders Agreement between ABI and Lynx, ABI has the right to nominate one member of the Board of Directors of Lynx as long as ABI beneficially owns at least 200,000 shares of Lynx Common Stock. There is currently no nominee of ABI on the Board of Directors.

In connection with the formation of Lynx, ABI and Lynx entered into a Corporate Services Agreement and an Agreement of Assignment and License of Intellectual Property Rights. The Corporate Services Agreement was intended to provide Lynx with certain general corporate and administrative support services, facilities and chemical supplies for Lynx's own use in the synthesis of oligonucleotides at ABI's full manufacturing cost and instruments and related software for Lynx's own use at ABI's full manufacturing cost (within specified limits), in order to satisfy Lynx's near-term needs and facilitate Lynx's transition to being an independent company. ABI's obligation to provide services and chemical supplies to Lynx terminated on June 30, 1995, while ABI's obligation to provide certain instruments and related software terminated on June 30, 1993.

Pursuant to the Agreement of Assignment and License of Intellectual Property Rights, (i) ABI assigned to Lynx its licenses from third parties for antisense and related technologies; (ii) ABI assigned certain patent applications related to the synthesis of oligonucleotides to Lynx; (iii) ABI granted to Lynx royalty-free, worldwide licenses related to its manufacturing and related technologies to make, have made, use and sell oligonucleotide-based drugs; and (iv) Lynx granted to ABI the license to make, use and sell products outside the field of human therapeutics under certain patent applications owned by Lynx and the inventions described therein.

On October 1, 1992, Lynx sold to Chiron 150,000 shares of Lynx Series A Convertible Preferred Stock at a purchase price of $10.00 per share. In addition, Lynx granted to Chiron an option to purchase 150,000 shares of Lynx Common Stock at a purchase price of $0.10 per share (the "Chiron Purchase Option"), which Chiron has exercised in full. In addition, Lynx and Chiron entered into a Collaborative Research and Development Agreement, pursuant to which Chiron paid Lynx $1,500,000 to fund Lynx's research efforts and to acquire marketing rights to any drugs developed under such agreement. As part of the accounting for this transaction, $285,000 of the amount received by Lynx for the license fee and research was allocated to the option and credited to Common Stock. The remainder of the license fee and the research payments were recognized as revenue in the accompanying consolidated statements of operations for the year ended June 30, 1993. The Collaborative Research and Development Agreement with Chiron was terminated in June, 1995.

On February 15, 1994, April 8, 1994 and September 1, 1994, the Company sold to a group of investors (the "Series B Investors") 332,288 shares of the Company's Series B Convertible Preferred Stock, par value $0.001 per share (the "Series B Preferred") pursuant to which the Company raised net proceeds of approximately $16.1 million (the "Series B Financing"). The Series B Investors include entities affiliated with Sprout Capital, New York Life Insurance Company, Cannon Street Fund Ltd., Old Court Limited, Asset Management Associates, U.S. Venture Partners IV, L.P. and Singapore Bio-Innovations Pte, Ltd.

On March 24, 1995, March 28, 1995 and April 7, 1995, the Company sold to a group of investors (the "Series C Investors") 123,299 shares of the Company's Series C Convertible Preferred Stock, par value $0.001 per share (the "Series C Preferred") pursuant to which the Company raised net proceeds of approximately $6.1 million. The Series C Investors include entities affiliated with Sprout Capital, entities affiliated with Partech International, New York Life Insurance Company, Cannon Street Fund Ltd., Old Court Limited, U.S. Venture Partners IV, L.P. and European Medical Ventures.

Also on March 24, 1995, the Company and Dr. Brenner entered into an Agreement Regarding Formation of Spectragen, Inc. ("Spectragen") pursuant to which the parties contributed their respective interests in the Massively Parallel Signature Sequencing ("MPSS") technology, which had been the subject of a collaboration between the parties, to Spectragen, a newly formed Delaware Corporation. Under this agreement, Lynx and Dr. Brenner were issued 1,800,000 shares and 200,000 shares of Common Stock of Spectragen, respectively. Lynx then purchased 2,000,000 shares of Series A Preferred Stock of Spectragen for $4,000,000, thereby providing the initial funding for Spectragen. Spectragen has also established a 1995 Stock Option Plan and reserved 1,000,000 shares thereunder for issuance to key employees and consultants. As of December 31, 1995, options covering 575,000 shares were outstanding at an exercise price of $0.20 per share, including an option for 100,000 shares granted to Dr. Eletr. On August 21, 1995, the Company and common stockholders of Spectragen entered into a Stockholders Agreement. Under this agreement, the Company may under certain circumstances acquire the minority ownership interest in Spectragen, and in the event the Company does not make such acquisition, the common stockholders of Spectragen may in certain circumstances put their shares to the Company in exchange for Lynx Common Stock. Due to the nature of the put and acquisition rights, Lynx may be required to record compensation charges in the future.

In October 1995, Lynx entered into an agreement with Hoechst Marion Roussel, Inc. which provides them access to Lynx's Massively Parallel Signature Sequencing ("MPSS") technology. This agreement allows for no more than two additional companies to access this technology for a specified period. Pursuant to the agreement, the Company received $5.0 million from Hoechst from the closing of private placement offering of 40,000 of its Series D Convertible Preferred Stock at $125.00 per share. Holders of the Series D Preferred Stock have rights and privileges similar to those of the holders of the Series B and C Preferred Stock holders. In addition, the Company could receive up to $27.0 million through the end of 1998 in the form of milestone payments, subscription fees and additional equity investments.

**Transactions with Directors and Executive Officers**

In May 1995, under the terms of his acceptance of employment with the Company, Dr. David W. Martin, Jr., President, current Chief Executive Officer and a director of the Company, borrowed $450,000 from

the Company pursuant to a promissory note secured by real property. The note bears interest at a rate of 7.85% per annum on the principal balance, compounded annually. The principal shall become due and payable upon the earlier of (i) the date of sale, exchange, conveyance, encumbrance, hypothecation or other transfer by Dr. Martin of the real property; (ii) the date Dr. Martin ceases to be a full-time employee of the Company or an affiliate thereof; or (iii) February 8, 1999. As of February 29, 1996, the outstanding principal and accrued interest under the note was $450,000.

The Company also agreed to provide Dr. Martin with a line of credit whereby he may borrow from the Company up to twenty-five thousand dollars ($25,000) per calendar quarter during the first two (2) years of employment. The Board may allow Dr. Martin to borrow from the Company up to twenty-five thousand dollars ($25,000) per calendar quarter during the third year of employment. The maximum amount of the line of credit is three hundred thousand dollars ($300,000). Dr. Martin has agreed to pledge any shares of the Company's Common Stock that is or may be owned by him as security for the amount owed the Company under the line of credit. The principal amount borrowed pursuant to the line of credit, plus interest equal to the prime rate, will be due and payable in full on May 1, 2000. If Dr. Martin's employment is terminated without cause, prior to May 1, 2000, the amount borrowed, plus accrued interest, will be forgiven by the Company. As of February 29, 1996, the outstanding principal and accrued interest under the note was $76,857.

In addition, in connection with the exercise of three stock options to purchase a total of 250,000 shares of the Company's Common Stock, Dr. Martin borrowed $450,000 from the Company pursuant to a promissory note. The note is secured by the shares so purchased and bears interest at a rate of 7.12% per annum, with accrued interest payable upon the expiration or termination of the note. The outstanding principal amount under the note shall be due and payable in full on April 30, 2000 subject to earlier repayment under certain circumstances. Of the 250,000 shares purchased with the proceeds of the note, 225,000 are subject to repurchase by the Company at the original purchase price in the event of termination of Dr. Martin's employment with the Company. The shares will be released from the Company's repurchase option over a five year period. As of February 29, 1996, the outstanding principal and accrued interest under the note was $474,030.

In October 1995, Dr. Karoly Nikolich, Ph.D., Vice President of the Company, exercised a stock option for 60,000 shares of the Company's Common Stock pursuant to a promissory note of $210,000. The note is secured by the shares so purchased and bears interest at a rate of 6.38% per annum, with accrued interest payable upon the expiration or termination of the Note. The outstanding principal amount under the note shall be due and payable in full on October 1, 2000 subject to earlier repayment under certain circumstances. The shares are subject to repurchase by the Company at the original purchase price in the event of termination of Dr. Nikolich's employment with the Company. The shares will be released from the Company's repurchase option over a five year period. As of February 29, 1996, the outstanding principal and accrued interest under the note was $215,508.

The Company currently has no other employment contracts with any Named Executive Officers, and the Company has no other compensatory plan or arrangement with Named Executive Officers where the amounts to be paid exceed $100,000 and which are activated upon resignation, termination or retirement of any such executive officer or upon a change in control of the Company.

For legal services rendered during the calendar year ended December 31, 1995, the Company paid approximately $509,476 to Cooley Godward Castro Huddleson & Tatum, the Company's counsel, of which Mr. Kitch, a director of the Company, is a partner.

**ITEM 14.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(a) (1) The following index, Report of Independent Auditors, Ernst & Young LLP and financial statements are set forth on pages 22 through 28 of this report:

    (i)    Report of Independent Auditors, Ernst & Young  LLP

    (ii)    Consolidated Balance Sheets as of December 31, 1995 and 1994.

    (iii)    Consolidated Statements of Operations for the years ended December 31, 1995 and 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993.

    (iv)    Consolidated Statement of Stockholders' Equity for the years ended December 31, 1995 and 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993.

    (v)    Consolidated Statements of Cash Flows for the years ended December 31, 1995 and 1994, the six-month period ended December 31, 1993 and the year ended June 30, 1993.

    (vi)    Notes to Consolidated Financial Statements

(2) All schedules are omitted because they are not required, are not applicable, or the information is included in the consolidated financial statement or notes thereto.

(3) The following documents are filed as Exhibits to this report:

| EXHIBIT NUMBER | DESCRIPTION OF DOCUMENT |
| --- | --- |
| 3.1.1 | Certificate of Amendment of Certificate of the Amended and Restated Certificate of Incorporation of the Company. |
| 3.2* | Bylaws of the Company, as amended. |
| 3.3** | Certificate of Designation of Preferences of Series B Convertible Preferred Stock of the Company. |
| 3.4**** | Certificate of Amendment of Certificate of Designation of Preferences of Series B Convertible Preferred Stock. |
| 3.5**** | Certificate of Designation of Preferences of Series C Convertible Preferred Stock. |
| 4.1* | Shareholders Agreement, dated as of October 1, 1992, by and among the Company, Applied Biosystems, Inc. ("ABI") and Chiron Corporation ("Chiron"). |
| 4.2* | Form of Common Stock Certificate. |
| 4.3* | Form of Series A Preferred Stock Certificate. |
| 4.4** | Form of Series B Preferred Stock Certificate. |
| 4.5 | Form of Series C Preferred Stock Certificate. |
| 4.6 | Form of Series D Preferred Stock Certificate |
| 10.1* | Preferred Stock Purchase Agreement, dated as of October 1, 1992, between the Company and ABI. |
| 10.2* | Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Timothy Geiser. |
| 10.3* | Stock Purchase Agreement, dated as of June 30, 1992, between the Company and Gerald Zon. |
| 10.4* | Stock Purchase Agreement, dated as of August 17, 1992, between the Company and Bruno Calabretta. |
| 10.5* | Stock Purchase Agreement, dated as of August 17, 1992, between the Company and Alan Gewirtz. |

| | |
|---|---|
| 10.6* | Stock Purchase Agreement, dated as of August 25, 1992, between the Company and Sam Eletr. |
| 10.7* | Form of Indemnity Agreement entered into between the Company and its directors and officers. |
| 10.8*† | The Company's 1992 Stock Option Plan (the "Stock Option Plan"). |
| 10.9*† | Form of Incentive Stock Option Grant under the Stock Option Plan. |
| 10.10*† | Form of Supplemental Stock Option Grant under the Stock Option Plan. |
| 10.11* | Agreement of Assignment and License of Intellectual Property Rights, dated June 30, 1992, between the Company and ABI. |
| 10.12* | Corporate Services Agreement, dated as of June 30, 1992, between the Company and ABI. |
| 10.13* | Collaborative Research and Development Agreement, dated as of October 1, 1992, between the Company and Chiron. |
| 10.14* | Lease, dated as of June 28, 1993, by and between the Company and Spieker-Singleton #87, Limited Partnership. |
| 10.15* | ABI Stock Rescission Agreement. |
| 10.16** | Series B Convertible Preferred Stock Purchase Agreement, dated as of February 15, 1994, between the Company and the Purchasers. |
| 10.17** | Investor Rights Agreement, dated as of February 15, 1994, between the Company and the Purchasers. |
| 10.18*** | Exclusive License Agreement dated as of August 4, 1994, by and among the Company and The Wellcome Foundation Limited. |
| 10.19**** | Series C Convertible Preferred Stock Purchase Agreement, dated as of March 24, 1995. |
| 10.20**** | Investors Rights Agreement, dated as of March 24, 1995. |
| 10.21 | Spectragen Formation Agreement, dated as of March 24, 1995. |
| 10.22† | Spectragen Stockholder's Agreement, dated as of August 21, 1995. |
| 10.23† | Employment Agreement, dated as of May 1, 1995 between the Company and David W. Martin, Jr., M.D. |
| 10.24† | Stock Purchase Agreement dated as of May 1, 1995, between the Company and David W. Martin, Jr. M.D. |
| 10.25† | Loan Agreement, dated as of May 1, 1995, between the Company and David W. Martin, Jr., M.D. |
| 10.26† | Promissory Note Secured by Mortgage, dated as of June 12, 1995, to the Company by David W. and Kathleen M. Martin Revocable Trust |
| 10.27† | Stock Purchase Agreement dated as of October 2, 1995, between the Company and Karoly Nikolich |
| 10.28 | Technology Development and Services Agreement, dated as of October 2, 1995, between the Company and Hoechst Aktiengesellschaft and its subsidiary, Hoechst Marion Roussel |
| 10.29 | Series D. Convertible Preferred Stock Purchase Agreement, dated as of October 2, 1995 |
| 10.30 | Amended and Restated Investor Rights Agreement, dated as of November 1, 1995 |
| 21.1 | Subsidiaries of the Company. |
| 23.1 | Consent of Ernst & Young LLP, Independent Auditors |
| 24.1 | Power of Attorney. Reference is made to page 54. |

| | |
|---|---|
| (*) | *Incorporated by reference to the indicated exhibit in the Company's Registration Statement on Form 10 (File No. 0-22570), as amended.* |
| (**) | *Incorporated by reference to the indicated exhibit in the Company's Report on Form 10-K for the Transition Period ended December 31, 1993.* |
| (***) | *Incorporated by reference to the indicated exhibit in the Company's Report on Form 10-Q for the quarter ended September 30, 1994.* |

(****)        *Incorporated by reference to the indicated exhibit in the Company's*
              *Report on Form 10-Q for the quarter ended March 31, 1995.*
(†)           *Management contract or compensatory plan or arrangement.*

(b)   Reports on Form 8-K
      N/A

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) Securities Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on the 29TH day of March, 1996.

LYNX THERAPEUTICS, INC.

By: _____
Sam Eletr
*Chairman of the Board*

## POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Sam Eletr and James C. Kitch his true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to the Registration Statement on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, each acting alone, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| Sam Eletr | Chairman of the Board | March 29, 1996 |
| David W. Martin, Jr. | President, Chief Executive Officer and Director (*Principal Executive Officer*) | March 29, 1996 |
| William K. Bowes, Jr. | Director | March ____, 1996 |
| Sydney Brenner | Director | March ____, 1996 |
| James C. Kitch | Director | March ____, 1996 |
| Kathleen D. La Porte | Director | March ____, 1996 |
| Craig C. Taylor | Director and Acting Chief Financial Officer (*Principal Financial and Accounting Officer*) Officer | March ____, 1996 |

Page 54 of 260

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) Securities Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on the _____ day of March, 1996.

**LYNX THERAPEUTICS, INC.**

By: _____

Sam Eletr
*Chairman of the Board*

## POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Sam Eletr and James C. Kitch his true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to the Registration Statement on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, each acting alone, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| _____<br>Sam Eletr | Chairman of the Board | March _____, 1996 |
| _____<br>David W. Martin, Jr. | President, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March _____, 1996 |
| _____<br>William K. Bowes, Jr. | Director | March 29___, 1996 |
| _____<br>Sydney Brenner | Director | March _____, 1996 |
| _____<br>James C. Kitch | Director | March _____, 1996 |
| _____<br>Kathleen D. La Porte | Director | March _____, 1996 |
| _____<br>Craig C. Taylor | Director and Acting Chief Financial Officer<br>*(Principal Financial and Accounting Officer)*<br>*Officer* | March _____, 1996 |

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) Securities Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on the _____ day of March, 1996.

### LYNX THERAPEUTICS, INC.

By: _____
          Sam Eletr
      *Chairman of the Board*

### POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Sam Eletr and James C. Kitch his true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to the Registration Statement on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, each acting alone, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| _____<br>Sam Eletr | Chairman of the Board | March _____, 1996 |
| _____<br>David W. Martin, Jr. | President, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March _____, 1996 |
| _____<br>William K. Bowes, Jr. | Director | March _____, 1996 |
| _____<br>Sydney Brenner | Director | March _____, 1996 |
| _____<br>James C. Kitch | Director | March _____, 1996 |
| _____<br>Kathleen D. La Porte | Director | March _29_, 1996 |
| _____<br>Craig C. Taylor | Director and Acting Chief Financial Officer<br>*(Principal Financial and Accounting Officer)*<br>Officer | March _____, 1996 |

Page 56 of 260

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) Securities Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on the _____ day of March, 1996.

### LYNX THERAPEUTICS, INC.

By: _____
      Sam Eletr
      *Chairman of the Board*

## POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Sam Eletr and James C. Kitch his true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to the Registration Statement on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, each acting alone, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| _____<br>Sam Eletr | Chairman of the Board | March _____, 1996 |
| _____<br>David W. Martin, Jr. | President, Chief Executive Officer<br>and Director<br>*(Principal Executive Officer)* | March _____, 1996 |
| _____<br>William K. Bowes, Jr. | Director | March _____, 1996 |
| _____<br>Sydney Brenner | Director | March _____, 1996 |
| _____<br>James C. Kitch | Director | March 29, 1996 |
| _____<br>Kathleen D. La Porte | Director | March _____, 1996 |
| _____<br>Craig C. Taylor | Director and Acting Chief Financial Officer<br>*(Principal Financial and Accounting Officer)*<br>Officer | March _____, 1996 |

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) Securities Act of 1934, the Registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on the _____ day of March, 1996.

LYNX THERAPEUTICS, INC.

By: _____
 Sam Eletr
 *Chairman of the Board*

## POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Sam Eletr and James C. Kitch his true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to the Registration Statement on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, each acting alone, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| _____<br>Sam Eletr | Chairman of the Board | March _____, 1996 |
| _____<br>David W. Martin, Jr. | President, Chief Executive Officer<br>and Director<br>*(Principal Executive Officer)* | March _____, 1996 |
| _____<br>William K. Bowes, Jr. | Director | March _____, 1996 |
| _____<br>Sydney Brenner | Director | March _____, 1996 |
| _____<br>James C. Kitch | Director | March _____, 1996 |
| _____<br>Kathleen D. La Porte | Director | March _____, 1996 |
| _____<br>Craig C. Taylor | Director and Acting Chief Financial Officer<br>*(Principal Financial and Accounting Officer)*<br>Officer | March _29_, 1996 |

54.

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# EXHIBITS
## to
## Form 10-K

REGISTRATION STATEMENT
Under
THE SECURITIES ACT OF 1934

# LYNX THERAPEUTICS, INC.

Exhibit 3.1.1

**Certificate of Amendment of Certificate
of the Amended and Restated
Certificate of Incorporation of the Company**

CERTIFICATE OF AMENDMENT
OF THE
AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
OF
LYNX THERAPEUTICS, INC.

LYNX THERAPEUTICS, INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify that the original Certificate of Incorporation of Corporation was filed with the Delaware Secretary of State on February 18, 1992. The Corporation further hereby certifies that:

I.     The Board of Directors of the Corporation adopted resolutions to amend paragraph A of Article 4 of the Restated Certificate of Incorporation of the Corporation to read in its entirety as follows:

"4.

A.     This Corporation is authorized to issue two classes of shares to be designated, respectively, "Preferred Stock" and "Common Stock." The total number of shares which the Corporation is authorized to issue is one hundred forty-five million (145,000,000) shares. One hundred twenty million (120,000,000) shares shall be Common Stock, par value one-tenth of one cent ($.001) per share (the "Common Stock") and twenty-five million (25,000,000) shares shall be Preferred Stock, par value one-tenth of one cent ($.001) per share (the "Preferred Stock")."

II.     Thereafter at the Corporation's Annual Meeting of Stockholders, held January 24, 1995, the necessary number of shares as required by statute were voted in favor of the amendment.

III.     The aforesaid amendment was duly adopted in accordance with the applicable provisions of Section 242 of the Delaware General Incorporation Law.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment of the Restated Certificate of Incorporation to be signed by Sam Eletr, Chief Executive Officer, and by James C. Kitch, Secretary, this 31st day of January, 1995.

_____
Sam Eletr
Chief Executive Officer

ATTEST:

_____
James C. Kitch,
Secretary

20849664
020195

Certificate of Correction of
Amended and Restated
Certificate of Incorporation

of

## LYNX THERAPEUTICS INCORPORATED

It is hereby certified that:

1. The name of the corporation (hereinafter called the "corporation") is Lynx Therapeutics Incorporated.

2. The Amended and Restated Certificate of Incorporation, which was filed by the Secretary of State of Delaware on October 1, 1992, is hereby corrected to reflect the change of the corporation's name, which was inadvertently omitted.

3. The inaccuracy to be corrected in said instrument is as follows: the name in the heading and Article 1. was set forth incorrectly.

4. The portion of the instrument in corrected form is as follows:

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
LYNX THERAPEUTICS, INC.

1. The name of this corporation is Lynx Therapeutics, Inc.

Signed and attested to on April 20, 1993.

_____
Chief Executive Officer

Attest:

_____
Secretary

20584167
040693

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## LYNX THERAPEUTICS INCORPORATED

LYNX THERAPEUTICS INCORPORATED, a corporation organized and existing under the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: The original Certificate of Incorporation of Lynx Therapeutics Incorporated (the "Corporation") was filed with the Secretary of State of the State of Delaware on February 18, 1992.

SECOND: The Amended and Restated Certificate of Incorporation in the form attached hereto as Exhibit A has been duly adopted in accordance with the provisions of Sections 141, 242 and 245 of the General Corporation Law of the State of Delaware by the Board of Directors of the Corporation.

THIRD: The Amended and Restated Certificate of Incorporation in the form attached hereto as Exhibit A has been duly adopted in accordance with the provisions of Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware by the stockholders of the Corporation, and notice was provided in accordance with said Section 228. The total number of outstanding shares entitled to vote was 9,400,000 shares of Common Stock. A majority of the outstanding shares of Common Stock voted in favor of this Amended and Restated Certificate of Incorporation.

FOURTH: The Amended and Restated Certificate of Incorporation so adopted reads in full as set forth in Exhibit A attached hereto and is hereby incorporated by reference.

IN WITNESS WHEREOF, Lynx Therapeutics Incorporated has caused this Certificate to be signed by the President and the Secretary in Foster City, California this 30th day of September, 1992.

LYNX THERAPEUTICS INCORPORATED

By _____
Sam Eletr, President

ATTEST:

By _____
James C. Kitch, Secretary

20508470
092992

1.

<u>EXHIBIT A</u>

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## LYNX THERAPEUTICS INCORPORATED

### 1.

The name of this corporation is Lynx Therapeutics Incorporated.

### 2.

The address of the registered office of this corporation in the State of Delaware is 32 Loockerman Square, Suite L-100, City of Dover, County of Kent. The name of this corporation's registered agent at said address is The Prentice-Hall Corporation System, Inc.

### 3.

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware.

### 4.

A.    This corporation is authorized to issue two classes of stock to be designated, respectively, "Preferred Stock" and "Common Stock." The total number of shares which the corporation is authorized to issue is seventy-five million (75,000,000) shares. Fifty million (50,000,000) shares shall be Common Stock, par value one-tenth of one cent ($.001) per share (the "Common Stock"), and twenty-five million (25,000,000) shares shall be Preferred Stock, par value one-tenth of one cent ($.001) per share (the "Preferred Stock").

B.    The Preferred Stock shall be divided into series. The first series shall consist of seventeen million (17,000,000) shares and is designated "Series A Preferred Stock."

C.    The remaining shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors of the corporation is expressly authorized to provide for the issue of all or any of the remaining shares of Preferred Stock in one or more series, and to fix the number of shares and to determine or alter for each such series, such voting powers, full or limited, or no voting powers, and such designations, preferences, and relative, participating, optional, or other rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issue of such shares and as may be permitted by the General Corporation Law of the State of Delaware. The Board of Directors is also expressly authorized to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any

series other than the Series A Preferred Stock subsequent to the issue of shares of that series. In case the number of shares of any such series shall be so decreased, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution originally fixing the number of shares of such series.

The rights of the Series A Preferred Stock hereinafter specified are subject to the power of the Board of Directors to create new classes or series of Preferred Stock; such new classes or series of Preferred Stock may have rights that are subordinate, superior or pari passu to the rights of the Series A Preferred Stock, as determined by the Board of Directors in its sole discretion and as specified in the designation creating the new classes or series of Preferred Stock.

D.     The powers, preferences, rights, restrictions and other matters relating to the Series A Preferred Stock are as follows:

1.     <u>Dividends</u>.

a.     The holders of the Series A Preferred Stock shall be entitled to receive, if, as and when declared by the Board of Directors, out of any assets legally available therefor, dividends at the rate determined by the Board of Directors. No dividend other than a stock dividend shall be paid on any share of Common Stock unless a dividend for each share of Series A Preferred Stock in an amount equal to the dividend for each share of Common Stock multiplied by the number of shares of Common Stock into which each share of Series A Preferred Stock is then convertible is first declared and paid (or set apart for payment) on the Series A Preferred Stock. Such dividends shall not be cumulative and no right to such dividends shall accrue to holders of Series A Preferred Stock unless declared by the Board of Directors.

2.     <u>Liquidation Preference</u>.

a.     In the event of any liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary, the holders of each share of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the corporation legally available for distribution to its stockholders, whether from capital, surplus or earnings, before any payment or setting apart for payment of any amount shall be made in respect of the Common Stock, an amount equal to $1.00 per share, adjusted for any combinations, consolidations, or stock distributions or stock dividends with respect to such shares (a "Recapitalization Event"), plus all declared but unpaid dividends thereon, if any, to the date fixed for distribution (the "Series A Preference Amount"). If upon any liquidation, dissolution or winding up of the corporation, the assets of the corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock their full Series A Preference Amount, then such holders shall share ratably in any distribution of assets in proportion to the respective amounts which would be payable on the shares held by them if the Series A Preference Amount were paid in full.

20508470
092992

2.

      b.    After payment has been made to the holders of the Series A Preferred Stock of their full Series A Preference Amount, any remaining assets or surplus funds of the corporation shall be shared by and distributed ratably to the holders of the Common Stock.

      c.    For purposes of this Section D.2., (i) a merger or consolidation of the corporation into or with another corporation (other than with a wholly-owned subsidiary of this corporation), or any other corporate reorganization in which the corporation shall not be the continuing or surviving entity of such merger, consolidation or reorganization, or (ii) a sale, transfer or other disposition of all or substantially all of the assets of the corporation, shall be deemed to be a liquidation, dissolution or winding up of the corporation.

    3.    <u>Voting Rights</u>.

      a.    Except as otherwise required by law, the holder of each share of Series A Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such share of Series A Preferred Stock could be converted on the record date for the vote or the date of the solicitation of any written consent of stockholders and shall have voting rights and powers equal to the voting rights and powers of the Common Stock. Fractional votes shall not be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Series A Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded up). The holder of each share of Series A Preferred Stock shall be entitled to notice of any stockholders meeting in accordance with the Bylaws of the Corporation and, except as otherwise required by law, shall vote with the holders of the Common Stock, as a single class, upon all matters submitted to a vote of stockholders.

    4.    <u>Conversion</u>.

    The holders of the Series A Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

      a.    <u>Right to Convert</u>.

      i.    Each share of Series A Preferred Stock shall be convertible, at the option of the holder, at any time after the date of issuance of such share, at the office of the corporation or any transfer agent for the Series A Preferred Stock, into one fully paid and nonassessable share of Common Stock. The number of shares of Common Stock into which one share of Series A Stock may be converted is hereinafter referred to as the "Conversion Rate."

      ii.    Each share of Series A Preferred Stock shall automatically be converted into shares of Common Stock at the then effective Conversion Rate upon the first to occur of (i) September 30, 1994, or (ii) the closing of an underwritten public offering of the corporation's Common Stock at an aggregate public offering price of at least $10,000,000 and a per share price equal to or greater than $2.00 (as appropriately adjusted for any

Recapitalization Event), or (iii) the vote or written consent of Chiron Corporation and Applied Biosystems, Inc. (the "Automatic Conversion Events").

   b.    Mechanics of Conversion.  Before any holder of Series A Preferred Stock shall be entitled to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates for such shares, duly endorsed, at the office of the corporation or of any transfer agent for the Series A Preferred Stock, or notify the corporation or its transfer agent that such Series A Preferred Stock certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the corporation to indemnify the corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the corporation at such office that such holder elects to convert the same and shall state in the notice the name or names in which such holder wishes the certificate or certificates for shares of Common Stock to be issued.  The corporation shall then, as soon as is practicable, issue and deliver at such office to such holder of Series A Preferred Stock, or to such holder's nominee or nominees, a certificate or certificates for the number of shares of Common Stock to which such holder shall be entitled.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Series A Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; provided, however, that in the event of automatic conversion pursuant to Section D.4.a.ii., such conversion shall be deemed to have been made upon the occurrence of the Automatic Conversion Event triggering such conversion without any further action by the holders of shares of Series A Preferred Stock, although the corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such automatic conversion unless the certificates evidencing such shares of Series A Preferred Stock are delivered to the corporation or its transfer agent as provided above, or the holder notifies the corporation or its transfer agent that such Series A Preferred Stock certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the corporation to indemnify the corporation from any loss incurred by it in connection with such certificates.

   c.    Adjustment for Combinations or Consolidations of Common Stock. In the event the Corporation at any time or from time to time after the date that a share of Series A Preferred Stock is first issued (hereinafter referred to as the "Original Issue Date") effects a subdivision or combination of its outstanding Common Stock into a greater or lesser number of shares, then and in each such event the Conversion Rate shall be increased or decreased proportionately.

   d.    Adjustment for Certain Dividends, Distributions and Common Stock Equivalents.  In the event the corporation at any time or from time to time after the Original Issue Date shall make, issue or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in additional shares of Common Stock or other securities or rights (hereinafter referred to as "Common Stock Equivalents") convertible into or entitling the holder to receive additional shares of Common Stock, without payment of any consideration by such holder for the additional shares of Common Stock or Common Stock Equivalents (including the additional shares of Common Stock issuable upon

conversion or exercise), then, and in each such event, the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for subsequent adjustment of such number) of Common Stock issuable in payment of such dividend or distribution or upon conversion or exercise of such Common Stock Equivalents shall be deemed to be issued and outstanding as of the time of such issuance or, in the event such record date shall have been fixed, as of the close of business on such record date. In each such event the Conversion Rate shall be increased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Rate by a fraction,

> i.    the numerator of which shall be the total number of shares of Common Stock issued and outstanding or deemed to be issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution or upon conversion or exercise of such Common Stock Equivalents; and

> ii.    the denominator of which shall be the total number of shares of Common Stock issued and outstanding or deemed to be issued and outstanding immediately prior to the time of such issuance or the close of business on such record date;

provided, however, (1) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed for such distribution, then the Conversion Rate shall be recomputed accordingly as of the close of business on such record date and the Conversion Rate shall be adjusted pursuant to this Section D.4.d. as of the time of actual payment of such dividends or distributions; (2) if such Common Stock Equivalents provide, with the passage of time or otherwise, for any decrease in the number of shares of Common Stock issuable upon conversion or exercise (or upon the occurrence of a record date with respect thereto), the Conversion Rate, and any subsequent adjustments based thereon, shall, upon any such decrease becoming effective, be recomputed to reflect such decrease insofar as it affects the rights of conversion or exercise of the Common Stock Equivalents then outstanding; (3) upon the expiration of any rights of conversion or exercise under any unexercised Common Stock Equivalents, the Conversion Rate computed upon the original issue (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if the only additional shares of Common Stock issued were the shares of such stock, if any, actually issued upon the conversion or exercise of such Common Stock Equivalents; and (4) in the case of Common Stock Equivalents that expire by their terms not more than sixty (60) days after the date of issuance, no adjustment of the Conversion Rate shall be made until the expiration or exercise of all such Common Stock Equivalents, whereupon such adjustment shall be made in the manner provided in clause (3).

> e.    Adjustments for Other Reclassifications, Dividends and Distributions. In the event the corporation at any time or from time to time after the Original Issue Date shall effect a reclassification of its Common Stock (other than one resulting in the issue of additional

shares of Common Stock) or shall make, issue, or fix a record date for the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in securities of the corporation other than shares of Common Stock, then, and in each such event, provision shall be made so that the holders of Series A Preferred Stock shall receive upon conversion of each share of Series A Preferred Stock the number of shares of stock or other securities to which a holder of the number of shares of Common Stock of the corporation deliverable upon conversion of such Series A Preferred Stock would have been entitled in such reclassification, dividend or distribution.

       f.   <u>No Impairment</u>.  The corporation will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section D.4. and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series A Preferred Stock against impairment.

       g.   <u>Certificate as to Adjustments</u>.  Upon the occurrence of each adjustment or readjustment of the Conversion Rate pursuant to this Section D.4., the corporation at its expense shall promptly compute such adjustments or readjustments in accordance with the terms hereof and furnish to each holder of Series A Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The corporation shall, upon the written request at any time of any holder of Series A Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such respective adjustments and readjustments, (ii) the Conversion Rate at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of such holder's shares of Series A Preferred Stock.

       h.   <u>Notices of Record Date</u>.  In the event of any taking by the corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend which is the same as cash dividends paid in previous quarters) or other distribution, the corporation shall mail to each holder of Series A Preferred Stock at least ten (10) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

       i.   <u>Common Stock Reserved</u>.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of Series A Preferred Stock, such number of shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock, and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation shall take such corporate

action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

       j.    Fractional Shares. No fractional share shall be issued upon the conversion of any share or shares (including fractional shares) of Series A Preferred Stock. All shares of Common Stock (including fractions) issuable upon conversion of shares of Series A Preferred Stock by a holder of such stock shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after aggregation, the conversion would result in the issuance of a fractional share of Common Stock, the corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board of Directors of the corporation).

       k.    Notices. Any notice required by the provisions of Section D.4. to be given to the holders of shares of Series A Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the corporation.

       5.    Amendment. Any of the rights specified in this Section D may be reduced, restricted, or eliminated (either generally or in a particular instance and either retroactively or prospectively) with the written consent of (a) the corporation and (b) holders of a majority of all Series A Preferred Stock then outstanding. All other amendments to this Certificate of Incorporation and any waiver of the observance of any term thereof, shall be made in accordance with the provisions of the General Corporation Law of the State of Delaware, as in effect from time to time. Any such reduction, restriction, elimination, amendment, or waiver so effected shall be binding upon the corporation and any holder of Series A Preferred Stock.

5.

    For the management of the business and for the conduct of the affairs of the corporation, and in further definition, limitation and regulation of the powers of the corporation, of its directors and of its stockholders or any class thereof, as the case may be, it is further provided that:

       a.    The management of the business and the conduct of the affairs of the corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed by the Board of Directors in the manner provided in the Bylaws.

       b.    The Board of Directors may from time to time make, amend, supplement or repeal the Bylaws.

       c.    The directors of the corporation need not be elected by written ballot unless the Bylaws so provide.

6.

To the fullest extent permitted by the General Corporation Law of Delaware, as the same exists or may hereafter be amended, a director of this corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

7.

The corporation is to have perpetual existence.

8.

The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this right.

20508470
092992

8.

Exhibit 4.5

**Form of Series C Preferred Stock Certificate**

.

.

.

.



THIS CERTIFIES THAT CANNON STREET FUND LTD. is the record holder of One Hundred Sixty Five Thousand (165,000) Shares of the Series C Convertible Preferred Stock of LYNX THERAPEUTICS, INC. transferable only on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed or assigned.

A statement of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes or series of shares of stock of the Corporation and upon the holders thereof as established by the Certificate of Incorporation or by any certificate of determination of preferences and the number of shares constituting each class or series and the designations thereof may be obtained by any stockholder upon request and without charge at the principal office of the Corporation.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers this 28th day of March 1995.

Secretary

Chief Executive Officer

No. C8

**Exhibit 4.6**

## Form of Series D Preferred Stock Certificate

.

.

.

.



SEE ADDITIONAL LEGENDS ON REVERSE SIDE OF CERTIFICATE

THIS CERTIFIES THAT Hoechst Marion Roussel, Inc. is the record holder of Four Hundred Thousand (400,000) Shares of the Series D Convertible Preferred Stock of LYNX THERAPEUTICS, INC. transferable only on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed or assigned.

A statement of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes or series of shares of stock of the Corporation and upon the holders thereof, as established by the Certificate of Incorporation or by any certificate of determination of preferences and the number of shares constituting each class or series and the designations thereof, may be obtained by any stockholder upon request and without charge at the principal office of the Corporation.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers this *1st* day of *November* 1995.

_____
Secretary

_____
Chief Executive Officer

No C6

Exhibit 10.21

# Spectragen Formation Agreement,
## dated as of March 24, 1995

.

.

# AGREEMENT REGARDING FORMATION OF SPECTRAGEN

THIS AGREEMENT REGARDING FORMATION OF SPECTRAGEN (the "Agreement") is made and entered into as of the 24th day of March, 1995 (the "Effective Date") by and among LYNX THERAPEUTICS, INC., a Delaware corporation ("Lynx"), SPECTRAGEN, INC., a Delaware corporation ("Spectragen"), and Dr. Sydney Brenner, an individual residing in Cambridge, England ("Brenner").

## RECITALS

WHEREAS, Brenner has developed certain inventions relating to improved methods for determining the sequence of DNA and other nucleotides and has filed patent applications covering such inventions;

WHEREAS, Lynx and Brenner entered into that certain Development Agreement, dated as of May 11, 1994 (the "Development Agreement"), pursuant to which Lynx undertook to conduct a research program in collaboration with Brenner directed to further evaluation and development of such inventions at a cost to Lynx of at least $1,000,000;

WHEREAS, the Development Agreement contemplated that upon completion of the research program Lynx and Brenner, after evaluating alternatives, would assign all rights in the Inventions, the Patents and the Program Technology to a new company that would seek independent financing to support commercial development of such patents and technology, subject only to the reservation of an option in favor of Lynx for a non-exclusive, royalty-free license solely for use by Lynx in the conduct of its own business;

WHEREAS, the research program contemplated by the Development Agreement has been partially completed, Lynx having expended approximately $1,000,000 thereon as of the Effective Date;

WHEREAS, Lynx has proposed, and Brenner has agreed, that the contemplated equity financing of the new company be provided by Lynx instead of by independent investors, subject to the terms and conditions set forth in this Agreement;

WHEREAS, the new company has been incorporated under the name "Spectragen, Inc." and is party to this Agreement; and

WHEREAS, on the Effective Date Lynx completed the first closing of its Series C Preferred Stock financing, a portion of the proceeds of which will be used to provide financing for Spectragen, as hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing premises and the covenants and promises contained in this Agreement, the parties agree as follows:

# ARTICLE 1.

## DEFINITIONS

Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in the Development Agreement.

# ARTICLE 2.

## ASSIGNMENT

**2.1    ASSIGNMENTS OF RIGHTS.**  Lynx and Brenner hereby assign to Spectragen all of their respective rights, title and interest in and to the Inventions, the Patents, the Program Technology and any enhancements or improvements thereto reduced to practice by Lynx and Brenner, respectively, at any time prior to December 31, 1997.  The parties agree to execute any and all assignments and other legal documents that may be necessary or appropriate to effect the foregoing assignments.

**2.2    CAPITAL CONTRIBUTION.**  On the Effective Date, Lynx shall contribute to the capital of Spectragen $ 1.1M   in cash, representing the remainder of its financial commitment to the Development Program as of the Effective Date.

**2.3    SERVICES AGREEMENT.**  For so long as Lynx owns at least 50% of the outstanding voting stock of Spectragen, Lynx agrees to provide at its cost such administrative, technical and operational support services as reasonably may be requested by Spectragen.

**2.4    ISSUANCE OF COMMON STOCK.**  In consideration of the foregoing, on the Effective Date Spectragen shall issue and deliver 1,800,000 shares of its Common Stock to Lynx and 200,000 shares of its Common Stock to Brenner (the "Founder Stock").

**2.5    ACCESS TO TECHNOLOGY; LICENSE.**  The parties acknowledge that the Program Technology and other technology to be developed or acquired by Spectragen may be useful to Lynx in the pursuit of its own research and development programs.  For so long as Lynx owns more than 50% of the outstanding voting stock of Spectragen, Lynx shall have access to Spectragen's technology on such terms and conditions and for such consideration as Lynx and Spectragen may from time to time agree, it being the parties' intent that Spectragen should be fairly compensated for any assistance it provides to Lynx.  At any time prior to completion of a transaction that results in Lynx owning 50% or less of the outstanding voting stock of Spectragen, Lynx may by written notice to Spectragen elect to enter into an agreement with Spectragen providing Lynx with access to Spectragen's technology following such transaction.  Such agreement will be reasonable in scope and fair under the circumstances to both parties, it being the parties' intent that Lynx should have ongoing access to Spectragen's technology on a basis that is consistent with Spectragen's arrangements with other companies and on terms and conditions that are no less favorable to Lynx than the terms and conditions of such other arrangements.

**2.6    SERIES A PREFERRED STOCK.**  On or as soon as practicable after the Effective Date, Lynx shall purchase 2,000,000 shares of the Series A Preferred Stock of Spectragen at a purchase price of $2.00 per share, payable in cash; *provided, however,* that any or all of such aggregate purchase price may be credited against funds expended by Lynx in excess of its funding commitment pursuant to the Development Agreement.

**2.7    CONSULTING AGREEMENTS.**  On the Effective Date, Brenner shall enter into separate consulting agreements with Lynx and Spectragen addressing consulting services to be provided by Brenner to each of the two companies in their respective areas of interest.  These agreements will replace the Consulting Agreement dated May 11, 1994, which hereby is terminated.

**2.8    DEVELOPMENT AGREEMENT.**  The Development Agreement is hereby terminated as of the Effective Date.

## ARTICLE 3.

### SPECTRAGEN COVENANTS

**3.1    DEVELOPMENT OBLIGATION.**  Spectragen hereby agrees to use commercially reasonable efforts to investigate and develop further the Inventions and the Program Technology and to commercially exploit the results thereof, all for the purpose of achieving the highest possible value for the Founder Stock.

**3.2    FUTURE LICENSES; AFFILIATES.**  To ensure that Brenner receives full value from his contributions to Spectragen, Spectragen hereby agrees that, for so long as Brenner and his successors and assigns collectively hold at least 100,000 shares of the Founder Stock, Spectragen shall not, without the unanimous approval of its Board of Directors, (a) grant any license or other right in any of its technology, including technology hereafter developed or acquired as well as the technology assigned to Spectragen pursuant to Article 2.1 hereof, except on an arms-length basis for full and fair value or as provided in Article 2.5 hereof or (b) enter into any transaction with any of its Affiliates that are not wholly-owned subsidiaries.

**3.3    INTELLECTUAL PROPERTY MATTERS.**  Spectragen shall undertake and shall have the sole and exclusive right, at its expense, to file any and all patent applications covering the Inventions and the Program Technology and to direct and control the prosecution of all such patent applications, using counsel selected by Spectragen.  Brenner and Lynx agree to provide their full cooperation and assistance to Spectragen and its counsel at no cost to them in prosecuting such patent applications.  Spectragen shall have sole discretion to determine the patent applications to be filed and how such applications shall be prosecuted.  Spectragen agrees to use reasonable diligence in prosecuting such applications as are filed.

**3.4    SERIES A PREFERRED STOCK.**  As soon as reasonably practicable after the Effective Date, Spectragen agrees to file with the Secretary of State of the State of Delaware an Amended and Restated Certificate of Incorporation substantially in the form attached hereto as

Exhibit A, increasing the number of authorized shares of Preferred Stock to four million (4,000,000) and designating two million (2,000,000) shares as Series A Preferred Stock.

## ARTICLE 4.

### REPRESENTATIONS AND WARRANTIES

**4.1    LYNX.**  Lynx hereby represents and warrants that it has full corporate power and authority to enter into this Agreement, that this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of Lynx, enforceable in accordance with its terms, and that it owns, and under this Agreement assigns and conveys to Spectragen, all right, title and interest (other than such as are held by Brenner) in and to the Inventions, the Patents and the Program Technology, free and clear of any lien, claim or encumbrance or any covenant, condition, restriction or license created by Lynx that is not expressly disclosed in this Agreement.

**4.2    BRENNER.**  Brenner hereby represents and warrants that this Agreement has been duly and validly executed and delivered by him and constitutes a legal, valid and binding obligation of his, enforceable in accordance with its terms, and that he has assigned and conveyed to Lynx pursuant to the Development Agreement and/or to Spectragen under this Agreement all of his right title and interest in and to the Inventions and the Patents, free and clear of any lien, claim or encumbrance or any covenant, condition, restriction or license created by Brenner that is not expressly disclosed in this Agreement.

**4.3    SPECTRAGEN.**  Spectragen hereby represents and warrants that it has full corporate power and authority to enter into this Agreement, that this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of Spectragen, enforceable in accordance with its terms.  Immediately prior to the Effective Date, Spectragen's authorized capital stock consists of four million (4,000,000) shares of Common Stock, none of which are issued and outstanding, and two million (2,000,000) shares of Preferred Stock, none of which are issued and outstanding.

**4.4    INVESTMENT REPRESENTATIONS.**  Lynx and Brenner understand that the Founder Stock has not been registered under the Securities Act of 1933, as amended (the "Act").  Each of Lynx and Brenner (for the purpose of this Section 4.4, each an "Investor") represents and warrants as follows:

(a)    Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to Spectragen so that it is capable of evaluating the merits and risks of its investment in Spectragen.  Investor acknowledges that it must bear the economic risk of its investment indefinitely unless the Founder Stock is registered under the Act or an exemption from registration is available.  Spectragen has no present intention of registering any of its Common Stock.

20842184
061295

4.

(b)     Investor is acquiring the Founder Stock for its own account for investment only and not with a view toward its distribution.

(c)     Investor represents that by reason of its (or its management's) business or financial experience, it has the capacity to protect its interests in connection with the transactions contemplated under this Agreement.  Investor is aware of no publication of any advertisement in connection herewith.

(d)     Investor represents that it is an accredited investor within the meaning of Regulation D under the Act.

(e)     Investor represents that it has had ample opportunity to obtain information of Spectragen and to ask questions of its management.

(f)     Investor has been advised or is aware of the provisions of Rule 144 promulgated under the Act, which permits limited resale of shares purchased in a private placement subject to satisfaction of certain conditions, including, among other things the availability of certain current public information about Spectragen; the resale occurring not less then two years after a party has purchased and paid for the security to be sold; the sale being through an unsolicited "brokers' transaction" or in transactions directly with a market maker (as that term is defined under the Securities Exchange Act of 1934, as amended) and the number of shares being sold during any three month period not exceeding specified limitations.

(g)     Brenner resides in England; Lynx is located at the address contained in Article 6.6.

## ARTICLE 5.

### SPECIAL BRENNER RIGHTS

**5.1     BOARD REPRESENTATION.**  For so long as Brenner and his successors and assigns collectively hold at least 100,000 shares of the Founder Stock, Lynx agrees to vote all shares of capital stock held by Lynx in favor of the election of Brenner to the Board of Directors of Spectragen.

**5.2     RIGHT OF RESCISSION.**  In addition to any other rights and remedies he may have under the circumstances, Brenner shall have the right to rescind this Agreement in the event of a breach of any of the representations, warranties and covenants of Lynx and Spectragen set forth in Articles 3.1, 3.2, 4.1 and 4.2, which remains uncured 60 days after written notice thereof from Brenner.  Upon exercise of this right by Brenner, (a) Brenner shall surrender to Spectragen for cancellation all of the Founder Stock issued to him pursuant to Article 2 hereof (together with any additional shares issued to him in respect to such stock as a result of stock splits, dividends or other similar changes in the capitalization of Spectragen) and (b) Spectragen shall assign and transfer to Brenner all right, title and interest in and to the intellectual property contributed to Spectragen by Investor pursuant to Article 2.1 of this Agreement.  This right is

**Exhibit 10.22**

**Spectragen Stockholder's Agreement,
dated as of August 21, 1995**

# STOCKHOLDERS AGREEMENT

**THIS STOCKHOLDERS AGREEMENT** (the "Agreement") is made and entered into as of August 21, 1995 by and among **LYNX THERAPEUTICS, INC.**, a Delaware corporation ("Lynx"), **SPECTRAGEN, INC.**, a Delaware corporation (the "Company"), and such additional persons signatory hereto or who become parties to this Agreement pursuant to the terms hereof (such persons are referred to collectively as the "Stockholders" and individually as a "Stockholder").

## RECITALS

**A.**    Lynx is presently the owner of a majority of the outstanding Common Stock and all of the outstanding Preferred Stock of the Company, representing a substantial majority of the outstanding capital stock of the Company.

**B.**    Each of the Stockholders is acquiring shares of Common Stock of the Company (the "Shares"), or is receiving options to acquire shares of Common Stock of the Company (the "Options").

**C.**    The parties wish to provide for certain purchase and put rights regarding the Company's securities.

**THE PARTIES AGREE AS FOLLOWS:**

1.    **Lynx's Purchase Right.**

    **1.1 Purchase Right.** Both Options and Shares held by the Stockholders are subject to a purchase right (the "Purchase Right") in favor of Lynx, exercisable at fair market value as hereinafter provided.

    **1.2 Exercise.** Subject to Section 2.2, Lynx may exercise the Purchase Right at any time on or after January 1, 1999 and prior to July 1, 1999 by delivering written notice to each Stockholder (the "Lynx Notice"). The fair market value of a Share shall be determined as of the date that Lynx delivers the Lynx Notice. Exercise by Lynx of the Purchase Right may, if appropriate under the circumstances, be conditioned upon approval by the stockholders of Lynx, and in such case, the fair market value of a Share shall be determined as of the date Lynx delivers the Lynx Notice, as conditioned. Any such conditional notice of exercise shall lapse and become null and void if stockholder approval has not been obtained within six months after the fair market value of a Share has been determined.

    **1.3 Substitution of Options and Shares.** As soon as administratively possible following the determination of the fair market value of a Share and, if applicable, approval by the stockholders of Lynx, Lynx shall substitute an option to acquire Common Stock of Lynx ("Lynx Common Stock") for each Option and shall

exchange shares of Lynx Common Stock for all outstanding Shares held by a Stockholder. The number of shares of Lynx Common Stock or options to acquire Lynx Common Stock received in exchange for a single Share or Option, as applicable, shall be determined by a ratio, the numerator of which is the fair market value of a Share and the denominator of which is the fair market value of a share of Lynx Common Stock. If the foregoing calculation results in an option to acquire shares of Lynx Common Stock being exercisable for a fraction of a share of Lynx Common Stock, then the number of shares of Lynx Common Stock subject to such option shall be rounded down to the nearest whole number of shares with no cash being payable for such fractional share. The fair market value of Lynx Common Stock shall be determined, (a) if Lynx Common Stock is then traded on a national exchange, based on the closing price of such stock on the last trading day preceding the date that Lynx delivers the Lynx Notice, and (b) if Lynx Common Stock is not then traded on a national exchange, as set forth in Section 3 hereof. Each option to acquire shares of Lynx Common Stock received upon exchange of an Option shall provide for an exercise price equal to the fair market value of Lynx Common Stock at the time of such exchange, less the "built in gain" of each such Option. For purposes of this Section 1.3, the "built in gain" with respect to an Option is the fair market value of the Shares at the time of the applicable exchange, less the exercise price applicable to such Option; *provided* that if this figure is negative, it shall be treated as zero . In the case of Options that are " incentive stock options " (as such term is defined in Section 422(b) of the Internal Revenue Code of 1986, as amended (the "Code")), Lynx shall use reasonable commercial efforts in light of the applicable circumstances to comply with the rules of Section 424(a) of the Code to qualify the options to acquire Lynx Common Stock as incentive stock options; *provided further,* that neither Lynx nor the Company makes any representations that any Options or any options to acquire Lynx Common Stock in exchange for Options pursuant to this Section 1.3 will qualify as incentive stock options.

**1.4   Waiver of Purchase Right; Assignment.**   Lynx may waive the Purchase Right in whole or in part, and may condition any such waiver in any way it deems appropriate. Lynx also may assign the Purchase Right in whole or in part.

**2.      The Stockholders' Put Rights.**

**2.1      Put Rights.**   Both Options and Shares held by Stockholders are subject to two put rights (collectively, the "Put Rights") in favor of the Stockholders, exercisable as hereinafter provided.

**2.2      Exercise of First Put Right.**   In the event that prior to January 1, 1999 Lynx makes a "qualified public offering" of Lynx Common Stock, then, at any time on or after the six-month anniversary and on or before the nine-month anniversary of such qualified public offering, the Stockholders may exercise a Put Right (the "First Put Right") by delivering written notice to Lynx (the "First Notice"). A "qualified public offering". means the sale in an underwritten public offering registered under the Securities Act of 1933, as amended (the "Act"), of

shares of Lynx Common Stock with aggregate proceeds (before deductions for expenses, underwriters' discounts and commissions) to Lynx of at least fifteen million dollars ($15,000,000).

2.3 **Exercise of Second Put Right.** In the event Lynx has not exercised its Purchase Right prior to July 1, 1999 and the Stockholders have not exercised the First Put Right, then, at any time on or after July 1, 1999 and on or before December 31, 1999, the Stockholders may exercise a Put Right (the "Second Put Right") by delivering written notice to Lynx (the "Second Notice"). As used herein, the term "Spectragen Notice" refers to the First Notice or Second Notice, as applicable.

2.4 **Lynx Actions Upon Second Notice.** Upon receipt of the Second Notice, Lynx shall be obligated to take all necessary actions to effect a registration under the Act of Common Stock of Spectragen, or otherwise to create a public trading market for such Common Stock (a "Spin-Off"). Within 30 days of receipt of the Second Notice, Lynx shall deliver written notice to Spectragen (the "Election Notice") of its intention either to (a) effect an exchange of Spectragen equity securities for Lynx equity securities (an "Exchange") or (b) to effect a Spinoff. If Lynx elects to effect an Exchange, Lynx shall be obligated, within 120 days of delivery of the Election Notice, to exchange all then outstanding Shares and Options for shares of Lynx Common Stock and options to acquire Lynx Common Stock, respectively, based on the fair market value of a Share on the date of the Election Notice. In the event of such an Exchange, the fair market value of a Share shall be determined as set forth in Section 3 hereof. If Lynx elects to effect a Spin-off, Lynx shall complete such Spin-off within 180 days of the Election Notice. If, after 180 days following delivery of the Election Notice, Lynx has effected neither an Exchange nor a Spin-off, Lynx then shall be obligated to effect an Exchange upon written request of holders of a majority of the outstanding Shares and Options.

2.5 **Stockholder Action.** A Put Right hereunder may be exercised upon the approval of holders of a majority of the Shares and Options then held by all Stockholders. The Stockholders shall follow the provisions of the Delaware General Corporation Law in order to determine the procedures by which approval of the Stockholders on this matter and other matters in this Agreement are requested. If the Stockholders have not exercised the First Put Right, or if Lynx has not exercised its Purchase Right prior to July 1, 1999, or, if earlier, Lynx delivers written notice to the Stockholders of its intention not to exercise the Purchase Right, then the Company promptly shall take appropriate action to request that the Stockholders determine whether or not to exercise the Second Put Right.

2.6 **Substitution of Options and Shares.** In the event that the Stockholders exercise either of their Put Rights, then without any further action on the part of any Stockholder, (a) each Share that is issued and outstanding and (b) each Option that is issued and outstanding on the date of delivery of the Spectragen Notice immediately will be converted into shares of Lynx Common Stock or options

to acquire Lynx Common Stock, respectively. The number of shares of Lynx Common Stock or options to acquire Lynx Common Stock received in exchange for a single Share or Option, as applicable, shall be determined by a ratio, the numerator of which is the fair market value of a Share and the denominator of which is the fair market value of a share of Lynx Common Stock. If the foregoing calculation results in an option to acquire shares of Lynx Common Stock being exercisable for a fraction of a share of Lynx Common Stock, then the number of shares of Lynx Common Stock subject to such option shall be rounded down to the nearest whole number of shares with no cash being payable for such fractional share. The fair market value of Lynx Common Stock shall be determined, (a) if Lynx Common Stock is then traded on a national exchange, based on the closing price of such stock on the last trading day preceding the date that Lynx delivers the Lynx Notice, and (b) if Lynx Common Stock is not then traded on a national exchange, as set forth in Section 3 hereof. Each option to acquire shares of Lynx Common Stock received upon exchange of an Option shall provide for an exercise price equal to the fair market value of Lynx Common Stock at the time of such exchange, less the "built in gain" of each such Option. For purposes of this Section 2.6, the "built in gain" with respect to an Option is the fair market value of the Shares at the time of the applicable exchange, less the exercise price applicable to such Option; *provided* that if this figure is negative, it shall be treated as zero. In the case of Options that are "incentive stock options" (as such term is defined in Section 422(b) of the Code), Lynx shall use reasonable commercial efforts in light of the applicable circumstances to comply with the rules of Section 424(a) of the Code to qualify the options to acquire Lynx Common Stock as incentive stock options; *provided further*, that neither Lynx nor the Company makes any representations that any Options or any options to acquire Lynx Common Stock in exchange for Options pursuant to this Section 2.6 will qualify as incentive stock options.

3. **Method for Establishing Independent Appraised Value of Shares.** For purposes of this Agreement, the fair market value of a Share shall be established by agreement among Lynx and Stockholders holding a majority of the Shares and Options held by all Stockholders. If no such agreement is reached within thirty (30) days after delivery of the Lynx Notice or the Spectragen Notice, as applicable, then such value shall be established as follows. First, Lynx, and Stockholders holding a majority of the Shares and Options then held by all Stockholders, each shall select one person experienced in the valuation of businesses (e.g., a business appraiser, investment banker, or venture capitalist) (the "Appraisers"). The Appraisers shall reach agreement on the fair market value of a Share and such agreement shall be binding on all parties to this Agreement. If the Appraisers are unable to reach agreement within thirty (30) days following the date the second Appraiser is selected, then the Appraisers shall select a third person experienced in the valuation of businesses and that person shall determine the fair market value of a Share, which determination shall be binding on all parties to this Agreement.

4. **Change in Control of Lynx.** If, for any reason, Lynx Common Stock is not traded on a national securities exchange or through the Nasdaq National Market

System, or Lynx no longer exists as a separate corporate entity, then upon exercise of the Purchase Right set forth in Section 1 hereof or either of the Put Rights set forth in Section 2 hereof, the successor entity shall issue to the Stockholders its common stock or comparable equity securities, and options to acquire such common stock or comparable securities; *provided, however,* that if securities of Lynx's successor are not publicly traded, the options and equity securities to be issued to the Stockholders shall be publicly traded securities of a parent corporation to Lynx's successor.

5.      **Legends on Shares.**  Certificates evidencing Shares subject to this Agreement, including Shares issuable upon exercise of Options, will bear such restrictive legends describing the rights of Lynx and the Stockholders hereunder as deemed appropriate by counsel to Lynx and the Company. The Stockholders agree to deliver to the Company certificates representing their Shares upon the Company's request, for the imposition of such legends.

6.      **Stockholder Action.**

(a) By execution hereof, such Stockholder (i) consents to the conduct, without a meeting and through written consents, of all business of the Company requiring a vote of stockholders, and (ii) waives any right to advance notice of stockholder action through written consent without a meeting.

(b) Each Stockholder agrees to vote all Shares and Options owned by him or her in accordance with the vote of holders of a majority of then outstanding Shares and Options with respect to each action for which a vote of stockholders is required by the Delaware General Corporation Law or the Company's Certificate of Incorporation.

7.      **Restrictions on Transfer or Encumbrance of Shares.**  No Shares held by a Stockholder shall be transferred while this Agreement is in force unless the transferee agrees to be bound by the terms of this Agreement and becomes a party to this Agreement. No Shares held by a Stockholder may be pledged, hypothecated, or otherwise encumbered unless the party in whose favor such encumbrance is imposed agrees to be bound by the terms of this Agreement and becomes a party to this Agreement in the event some or all of the Shares are transferred to such party. Transfers of the Shares shall not be entered on the books of the Company until an amended copy of this Agreement has been executed by the transferee. Failure or refusal to sign such an amended copy of this Agreement shall not relieve any transferee from any obligations under this Agreement. The Stockholder hereby acknowledges that the Shares are "restricted securities" within the meaning of Rule 144 promulgated pursuant to the Securities Act of 1933, as amended, and therefore, that the Shares may not be transferred without complying with the provisions of such rule or obtaining the concurrence of the Company that such transfer is exempt from the requirements of such rule.

**8.** **Escrow.** By execution hereof, each Stockholder acknowledges that the certificates representing Shares subject to this Agreement may not be transferred except as provided expressly in this Agreement and shall be delivered to the Secretary of the Company to be held in escrow pending their purchase by Lynx or their release. Each Stockholder shall be entitled to all voting and dividend rights with respect to his or her Shares so held in escrow. The Secretary of the Company shall deliver the certificates for any Shares as to which the Purchase Right and all other contractual restrictions have lapsed to the Stockholder who owns such Shares, or to the Company if any escrow agreement entered into between the Stockholder and the Company so requires. Execution by a Stockholder of this Agreement and the form of joint escrow instructions approved by the Company shall constitute such Stockholder's irrevocable escrow instructions to the Secretary of the Company.

**9.** **Remedies.** By execution hereof, Lynx and each Stockholder acknowledges and agrees that the breach of this Agreement by Lynx or any Stockholder could not be reasonably or adequately compensated by damages in an action at law and could cause irreparable harm to Lynx and the Stockholders, and that an appropriate remedy for any such breach or threat to commit a breach will be an injunction restraining Lynx or one or more Stockholders from committing such breach. If any legal action or proceeding is necessary to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which this party may be entitled.

**10.** **Governing Law.** This Agreement shall be governed by the laws of the State of Delaware applicable to contracts entered into and wholly to be performed within the State of Delaware by Delaware residents.

**11.** **Severability.** If any provision of this Agreement is held to be unenforceable for any reason, it shall, if possible, be interpreted in order to achieve the intent of the parties to the fullest extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the fullest extent possible.

**12.** **Spouse of Stockholder Not a Stockholder.** The spouse of a Stockholder is not a Stockholder or a stockholder of record of the Company's securities and shall not be entitled to exercise any of the rights of a Stockholder under this Agreement or under the Delaware General Corporation Law. The Stockholder agrees to execute and agrees to have his or her spouse execute the attached Waiver and Consent reflecting this understanding as part of this Agreement.

**13.** **Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if the signature to each counterpart were upon a single instrument. All counterparts shall be considered an original of this Agreement.

14. Amendments.

**14.1 Amendments to Add Stockholders.** This Agreement may be amended to add persons as "Stockholders which shall be effective upon execution of a counterpart signature page hereof by each such additional Stockholder. This Agreement shall be amended to show each additional Stockholder's name upon such person's execution of this Agreement and a current copy of the parties to this Agreement shall be maintained by the Secretary of the Company and shall be made available to any Stockholder upon request.

**14.2 Other Amendments.** Other amendments may be made to this Agreement by mutual agreement of Lynx and those Stockholders holding a majority of Shares and Options then held by all Stockholders. Any amendment so made shall be binding upon all of the Stockholders. The Stockholders shall follow the provisions of the Delaware General Corporation Law in determining the procedures by which approval of the Stockholders of any such amendment shall be requested.

**14.3 Stockholder Meetings.** The Company shall call a meeting of the Stockholders upon the request of Stockholders holding at least fifty percent (50%) of the Shares then held by all Stockholders or upon the request of Lynx.

For purposes of this Section 14, a Stockholder holding an Option will be deemed to own the number of Shares which may be exercised upon the complete exercise of his or her Option.

**15. Successors.** This Agreement shall be binding upon the successors and assigns of the parties hereto.

**16. Termination.** This Stockholders Agreement shall terminate (a) at such time as the Company is required to file reports pursuant to Section 13 of the Securities Exchange Act of 1934, as amended, (b) upon the completion of all transactions necessary to carry out Lynx's exercise of the Purchase Right, (c) if Lynx has not exercised the Purchase Right and the Stockholders have not exercised their Second Put Right, then on December 31, 2000, (d) upon the closing of a sale of substantially all of the Company's assets or at such time as Lynx owns less than 40% of the then outstanding capital stock of the Company, or (e) upon the dissolution or liquidation of the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders Agreement as of the date first set forth above.

LYNX THERAPEUTICS, INC.

By: _David W Martin, Jr_

Name: _David W. Martin, Jr._

Title: _president_

SPECTRAGEN, INC.

By: _Sam Eletr_

Name: _Sam Eletr_

Title: _President_

---------------------------------------------------------------

The undersigned Stockholder hereby enters into that Stockholders Agreement by and among Lynx Therapeutics, Inc., Spectragen, Inc., and certain stockholders of Spectragen, Inc. as set forth above, and hereby agrees to comply with and abide by the terms and provisions of such agreement.

_____

[Name of Stockholder]

[If the Stockholder executing this Agreement resides in California, or another community property jurisdiction, then the Stockholder's spouse must sign the following Waiver and Consent:]

## WAIVER AND CONSENT OF SPOUSE

I, the undersigned, am the spouse of the Stockholder in the attached Stockholders Agreement entered into by and among Lynx Therapeutics, Inc., Spectragen, Inc., my spouse, and certain other stockholders of Spectragen, Inc. I have read the attached agreement and understand that my spouse owns or has the right to acquire by exercise of options certain shares of Spectragen, Inc. which by this Agreement will be made subject to certain restrictions and limitations as provided in the Agreement, including but not limited to restricted transferability and the right of Lynx Therapeutics, Inc., to purchase such shares under certain circumstances. I acknowledge that the shares subject to this Agreement are so limited. I understand that I may have certain rights, duties, and interests in such shares incident to my marital relationship with the Stockholder, and with this understanding I independently agree to be bound by such restrictions and limitations. I further acknowledge and agree that only my spouse shall be considered a stockholder of Spectragen, Inc. with respect to such shares and options subject to this Agreement, and I hereby relinquish and release any claims and rights I may have as a stockholder with respect to such shares and options, except for the legal effect of this waiver and consent. This waiver and consent is not intended to, and I understand it does not confirm, waive, or modify any financial interest I may have with respect to such shares by reason of my marital relationship with the Stockholder, but rather clarifies that I shall not be considered a stockholder of record with the resulting stockholder rights, including but not limited to voting, inspection, reporting, management, and control with respect to such shares, and that I shall have no rights of a Stockholder under this Agreement, including but not limited to voting, entering into an action by written consent, or calling a meeting of the Stockholders (as such term is defined in this Agreement).

_____

[Name of Stockholder's Spouse]

**Exhibit 10.23**

## Employment Agreement, dated as of May 1, 1995 between the Company and David W. Martin, Jr. M.D.

# LYNX

April 3, 1995

David W. Martin, Jr., M.D.
1028 Lombard Street
San Francisco, CA 94109

Re: Employment Agreement

Dear Dr. Martin:

Lynx Therapeutics, Inc. (the "Company") is pleased to offer you a position with the Company as described in the letter agreement between you and the Company of even date herewith (the "Position Letter") and on the terms set forth in this Agreement, beginning on May 1, 1995 (the "Effective Date").

You will perform the duties described in the Position Letter and such other duties as may be assigned to you by the Company's Board of Directors (the "Board").   You agree to exercise the highest degree of professionalism and utilize your expertise and creative talents in performing your duties.

Your base salary will be two hundred thousand dollars ($200,000) per year less payroll deductions and withholdings.  The Company will review your base salary on an annual basis.  Adjustments to your base salary, if any, will be at the sole discretion of the Board.

The Company also will provide you with benefits consistent with Company practice for executive employees.   Details about these benefits are provided in the summary plan descriptions available for your review.  Of course, the Company reserves the right to modify its benefit programs from time to time, as it deems necessary.

You will also be granted an option to purchase one million seven hundred fifty thousand (1,750,000) shares of the Company's Common Stock at an exercise price of ten cents ($0.10) per share and another option to purchase five hundred thousand (500,000) shares of the Company's Common Stock at an exercise price of fifty cents ($0.50) per share under the Lynx Therapeutics, Inc. 1992 Stock Option Plan (the "Plan"). After the rights offering that is currently contemplated has been completed, the Board will grant you an option to purchase an additional number of shares of the Company's Common Stock at an exercise price of fifty cents ($0.50) per share, in order that the total number of shares of the Company's Common Stock you may purchase pursuant to the three (3) options described in this paragraph will equal approximately three percent (3%) of the capital stock of the Company taking into account the current capitalization of the Company plus the rights offering that is currently contemplated.  The first two (2) options will vest over a five (5) year period beginning as of the Effective Date; provided, however that if your employment is terminated without cause (as defined below) at any time prior to May 1, 1996 (the first anniversary of the Effective Date), you will be credited with service through that date for vesting purposes. The third option will vest over a five (5) year period beginning as of December 31, 1997.  You will be permitted to exercise all of these options prior to vesting and will have the right to pay

Page 93 of 260

the applicable exercise price with a promissory note, subject to the Company's right to repurchase shares not yet vested should you terminate employment with the Company before vesting.

In addition to the foregoing stock options, the Board will grant you a fourth option to purchase two hundred and fifty thousand (250,000) shares of Common Stock at an exercise price of ten cents ($0.10) per share. This option will be fully vested upon grant, and you will have the right to pay the exercise price with a promissory note.

The grant of the foregoing options and the exercise thereof shall be subject to compliance with all applicable federal and stale securities laws. Your options will expire as provided for in the Plan.

The Company agrees to provide you with a line of credit (the "Line of Credit") whereby you may borrow from the Company up to twenty-five thousand dollars ($25,000) per calendar quarter during your first two (2) years of employment. If the Board in good faith makes a reasonable determination that your personal situation warrants a continuation of the Line of Credit, you may borrow from the Company up to twenty-five thousand dollars ($25,000) per calendar quarter during your third year of employment. You agree to pledge any shares of the Company's Common Stock that are or may be owned by you as security for the amount owed the Company under the Line of Credit. The principal amount borrowed pursuant to the Line of Credit plus interest equal to the prime rate, will be due and payable in full on May 1, 2000. If your employment is terminated without cause (as defined below) prior to May 1, 2000, the amount borrowed pursuant to the Line of Credit, plus accrued interest, will be forgiven by the Company. If your employment with the Company is terminated for any other reason, the amount borrowed pursuant to the Line of Credit plus accrued interest, will be due and payable in full six (6) months following your termination. In the event you sell any of the Company's Common Stock, you agree to apply twenty-five percent (25%) of the pre-tax gain realized upon such sale to prepayment of the amount then outstanding under the Line of Credit. During the first quarter of the year 2000, the Board will consider extending the due date for the amount owed the Company under the Line of Credit if the Company's Common Stock is not readily saleable at such time.

The Company agrees to purchase, or to refinance on identical terms the four hundred fifty thousand dollar ($450,000) promissory note secured by a second deed of trust on your home in Pennsylvania that is currently held by Chiron Corporation, your current employer. The Company also agrees to pay the closing costs on the sale of your Pennsylvania home. In lieu of the foregoing sentence, if you purchase of a new home in the San Francisco Bay area within two (2) years of the Effective Date you may elect to have the Company pay the closing costs on such purchase. Closing costs shall not include brokerage fees, commissions, or any fees associated with establishing or repaying any loan.

In order to protect our mutual employment rights, either you or the Company may terminate your employment relationship at any time for any reason whatsoever, with or without cause or advance notice. This at-will employment relationship cannot be changed except in a writing signed by a duly authorized officer of the Company. If your employment is terminated without cause (as defined below) during your first year of employment, you will receive, as your severance, continued payment of your base

salary for twelve (12) months from the date of your termination. If your employment is terminated ant any time thereafter without cause, you will receive, as your severance, continued payment of your base salary for twelve (12) months from the date of your termination, reduced by any earned income you may receive from other sources. Other than the forgiveness of the amount borrowed pursuant to the Line of Credit (as described above) you will not be entitled to any additional compensation or benefits beyond what is expressly provided to you in this paragraph. If you resign or your employment is terminated for cause, all compensation and benefits shall cease as of the date of your termination.

For purposes of this Agreement, "Cause" shall mean misconduct, including (i) conviction of any felony or any crime involving moral turpitude or dishonesty; (ii) participation in a fraud or act of dishonesty against the Company; (iii) willful breach of the Company's policies; (iv) intentional damage to the Company's property; (v) material breach of this Agreement; or (vi) conduct by you which in the good faith and reasonable determination of the Board demonstrates gross unfitness to serve. Physical or mental disability shall not constitute "cause." For purposes of this Agreement, any material diminution in responsibilities, duties or compensation other than for cause will be treated, upon notice by you to the Company, as a termination without cause.

Throughout your employment, the Company will expect you to continue to abide by all of the Company's policies and procedures. As a condition of your employment, you also agree to sign and comply with the Company's Proprietary Information Agreement (attached hereto as Exhibit A).

You agree that for one year following the termination of your employment with the Company, you will not, either directly or through others, solicit or attempt to solicit any employee, consultant or independent contractor of the Company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or business entity.

To ensure rapid and economical resolution of any and all disputes directly or indirectly arising out of or in any way connected or related to your employment with the Company or the termination of that employment, with the sole exception of disputes which arise under your Proprietary Information Agreement (collectively, the "Arbitrable Claims"), the Company and you each agree that any and all such disputes, whether of law or fact of any nature whatsoever, shall, if such dispute cannot be resolved within thirty (30) days despite good faith negotiation, be resolved by final and binding arbitration by Judicial Arbitration and Mediation Services, Inc. ("JAMS"). The Arbitrable Claims include, but are not limited to: any and all such claims related to salary, bonuses, commissions, stock, stock options, or any other ownership interests in the Company, vacation pay, fringe benefits, expense reimbursements, severance benefits, or any other form of compensation; claims pursuant to any federal, state or local law or cause of action including, but not limited to, the Federal Civil Rights Act of 1964, as amended; the Federal Age Discrimination in Employment Act of 1967, as amended; the Federal Americans with Disabilities Act of 1990; the California Fair Employment and Housing Act, as amended; tort law; contract law; wrongful discharge; discrimination; fraud; defamation; emotional distress; and breach of the implied covenant of good faith and fair dealing. You and the Company acknowledge and agree

that any and all rights you may others have to resolve such Arbitrable Claims by jury trial, by a court, or in any forum other than the JAMS, are hereby expressly waived.

This Agreement, including your Proprietary Information Agreement and the Position Letter, constitutes the complete final exclusive embodiment of the entire agreement between you and the Company with respect to the terms and conditions of your employment. This Agreement is entered into without reliance upon any promise, warranty or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties, representations or agreements. It may not be amended or modified except by a written instrument signed by you and a duly authorized officer of the Company. If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement. This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

As required by law, this offer of employment is subject to satisfactory proof of your right to work in the United States.

To indicate your acceptance of our offer under the terms described above, please sign below and return this letter and your signed Proprietary Information Agreement to me. We look forward to your favorable reply, and to a productive and enjoyable work relationship.

Very truly yours,

Lynx Therapeutics, Inc.

Sam Eletr, Ph.D.
Chief Executive Officer and
Chairman of the Board

Accepted by: _____

Date: _____4/3/95_____

**Exhibit 10.24**

# Stock Purchase Agreement, dated as of May 1, 1995 between the Company and David W. Martin, Jr. M.D.

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT is made by and between LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), and DAVID W. MARTIN, JR., M.D. ("Purchaser").

## WITNESSETH:

WHEREAS, Purchaser holds three stock options to purchase shares of common stock of the Company pursuant to the Company's 1992 Stock Option Plan (the "Plan") which Purchaser desires to exercise;

WHEREAS, Purchaser wishes to take advantage of the early exercise provision of two of his options; and

WHEREAS, Purchaser also desires to exercise the option which is fully vested.

NOW, THEREFORE, IT IS AGREED between the parties as follows:

1.     Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of two million five hundred thousand (2,500,000) shares of the Company's common stock (the "Stock"), for an exercise price of Ten Cents ($0.10) per share on two million (2,000,000) shares (total exercise price:  Two Hundred Thousand Dollars ($200,000)) and an exercise price of Fifty Cents ($0.50) per share on five hundred thousand (500,000) shares (total exercise price:  Two Hundred Fifty Thousand Dollars ($250,000)) for a cumulative total exercise price of Four Hundred Fifty Thousand Dollars ($450,000), payable as follows:

| | |
|---|---|
| Cash at Closing | $  -0- |
| Promissory Note in the form of Exhibit E (the "Note") | $450,000 |
| Total Exercise Price | $450,000 |

The closing hereunder shall occur at the offices of the Company on the date of this Agreement or at such other time and place as the parties may mutually agree upon in writing.

At the closing, Purchaser shall deliver three (3) stock assignments in the form of Exhibit B, duly endorsed (with date and number of shares left blank), joint escrow instructions (the "Joint Escrow Instructions") in the form of Exhibit C, duly executed by Purchaser, and the total exercise price (including an executed Note in the form of Exhibit E if a portion of the total exercise price is to be paid by promissory note and an executed pledge agreement in the form

of Exhibit F (the "Pledge Agreement") under which all shares of the Stock acquired by Note shall be pledged as collateral security for the payment of the indebtedness represented by the Note).

At the closing or as soon thereafter as practicable, the Company shall deliver to the Escrow Agent (as defined in paragraph 8 below) share certificates for all of the Stock that is to be subject to the Purchase Option (as defined in paragraph 2 below), and shall deliver share certificates to Purchaser for all of the Stock, if any, that is not to be subject to the Purchase Option or the Pledge Agreement. The certificates for all of the Stock that is subject to the Pledge Agreement but not the Purchase Option shall be retained by the Company as security pursuant to the Pledge Agreement.

2.    In accordance with the provisions of Section 408(b) of the California General Corporation Law, two million two hundred fifty thousand (2,250,000) shares of the Stock to be purchased by Purchaser pursuant to this Agreement (including one million seven hundred fifty thousand (1,750,000) shares with an exercise price of Ten Cents ($0.10) per share and five hundred thousand (500,000) shares with an exercise price of Fifty Cents ($0.50) per share) shall be subject to the following option ("Purchase Option"):

(a)    Subject to the provisions of Exhibit A, in the event that Purchaser shall cease to be an employee of the Company for any reason (including his death), or no reason, with or without cause, the Purchase Option may be exercised. The Company shall have the right at any time within the ninety (90) day period after Purchaser's termination of service with the Company and all related companies or such longer period as may be agreed to by the Company and Purchaser (for example, for purposes of satisfying the requirements of Section 1202(c)(3) of the Internal Revenue Code) to purchase from Purchaser or his personal representative, as the case may be, at the price per share paid by Purchaser pursuant to this Agreement ("Option Price"), up to but not exceeding the number of shares of the Stock set forth on Exhibit A hereto which is incorporated herein by this reference.

(b)    In addition, and without limiting the foregoing Purchase Option, if at any time during the term of the Purchase Option, there occurs: (a) a dissolution or liquidation of the Company; (b) a merger or consolidation involving the Company in which the Company is not the surviving corporation; (c) a reverse merger in which the Company is the surviving corporation but the shares of the Company's common stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of other securities, cash or otherwise; or (d) any other capital reorganization in which more than fifty percent (50%) of the shares of the Company entitled to vote are exchanged, then: (i) if there is no successor to the Company, the Company shall have the right to exercise its Purchase Option as to all or any portion of the Stock then subject to the Purchase Option set forth above to the same extent as if Purchaser's employment by the Company had ceased on the date preceding the date of consummation of said event or transaction, or (ii) the Purchase Option may be assigned to any successor of the Company, and the Purchase Option shall apply if Purchaser shall cease for any reason to be an employee of such successor on the same basis as set forth

above. In that case, references herein to the "Company" shall be deemed to refer to such successor.

(c) The Company shall be entitled to pay for any shares purchased pursuant to its Purchase Option at the Company's option in cash, by offset against any indebtedness given in payment for the Stock, or a combination of both.

(d) As used herein, employment with the Company shall include employment with an affiliate of the Company.

(e) This Agreement is not an employment contract and nothing in this Agreement shall be deemed to create in any way whatsoever any obligation on the part of Purchaser to continue in the employ of the Company, or of the Company to continue Purchaser in the employ of the Company.

(f) In the event that the Stock's Fair Market Value (as defined in the Plan) is equal to or exceeds the Option Price on the date that the Purchaser ceases to be employed, the Company shall exercise its Purchase Option to the extent permitted by law.

3. The Purchase Option may be exercised by giving written notice of exercise delivered or mailed as provided in paragraph 14. Upon providing of such notice and payment or tender of the purchase price, the Company shall become the legal and beneficial owner of the Stock being purchased and all rights and interests therein or related thereto.

4. If from time to time during the term of the Purchase Option there is any stock dividend or liquidating dividend or distribution of cash and/or property, stock split or other change in the character or amount of any of the outstanding securities of the Company, then, in such event, any and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of his ownership of Stock will be immediately subject to the Purchase Option and be included in the word "Stock" for all purposes of the Purchase Option with the same force and effect as the shares of Stock then subject to the Purchase Option. While the total Option Price shall remain the same after each such event, the Option Price per share of Stock upon exercise of the Purchase Option shall be appropriately adjusted.

5. All certificates representing any shares of Stock of the Company subject to the provisions of this Agreement shall have endorsed thereon legends in substantially the following form:

(i) "The shares represented by this certificate are subject to an option set forth in an agreement between the corporation and the registered holder, or his predecessor in interest, a copy of which is on file at the principal office of this corporation. Any transfer or attempted transfer of any shares subject to such option is void without the prior express written consent of the issuer of these shares."

(ii)     Any legend required to be placed thereon by the California Commissioner of Corporations.

6.     As security for his faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Stock upon exercise of the Purchase Option herein provided for, Purchaser agrees, at the closing hereunder (or as soon thereafter as practicable), to deliver (or have the Company deliver on the Purchaser's behalf) to and deposit with the Secretary of the Company ("Escrow Agent"), as Escrow Agent in this transaction, three (3) stock assignments duly endorsed (with date and number of shares left blank) in the form attached hereto as Exhibit B, together with a certificate or certificates evidencing all of the Stock subject to the Purchase Option, said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in Exhibit C attached hereto and incorporated herein by this reference, which instructions shall also be delivered to the Escrow Agent at the closing hereunder (or as soon thereafter as practicable). If a portion of the total purchase price is paid by a promissory note, the Stock is also subject to the Pledge Agreement, and possession of the certificates and stock assignments by the Escrow Agent shall also constitute possession by the Company of such instruments pursuant to the Pledge Agreement.

7.     Purchaser shall not sell or transfer any of the Stock subject to the Purchase Option or any interest therein so long as such Stock is subject to the Purchase Option or the Pledge Agreement.

8.     The Company shall not be required (i) to transfer on its books any shares of Stock of the Company which shall have been sold or transferred in violation of any of the provisions set forth in this Agreement or (ii) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

9.     Subject to the provisions of paragraphs 7 and 8 above, Purchaser (but not any unapproved transferee) shall, during the term of this Agreement, exercise all rights and privileges of a stockholder of the Company with respect to the Stock.

10.     Purchaser acknowledges receipt of a copy of Section 260.141.11 of Title 10 of the California Administrative Code, attached hereto as Exhibit D.

11.     The parties agree to execute such further instruments and to take such further action as reasonably may be necessary to carry out the intent of this Agreement.

12.     Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in any United States Post Office Box, by registered or certified mail with postage and fees prepaid, addressed to the other party hereto at his address hereinafter shown below his signature or at such other address as such party may designate by ten (10) days' advance written notice to the other party hereto.

20901215
050495

4.

13.    This Agreement shall bind and inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, inure to the benefit of and be binding upon Purchaser, his heirs, executors, administrators, successors, and assigns. Without limiting the generality of the foregoing, the Purchase Option of the Company hereunder shall be assignable by the Company at any time or from time to time, in whole or in part. Should the right of repurchase be assigned by the Company, the assignee shall pay to the Company cash equal to the excess, if any, of the Stock's Fair Market Value (as defined in the Plan) over the Option Price.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the 1st day of May, 1995.

LYNX THERAPEUTICS, INC.

By_____

Address:    3832 Bay Center Place
            Hayward, CA 94545

PURCHASER_____

David W. Martin, Jr., M.D.

Address:    1028 Lombard Street
            San Francisco, CA 94109

ATTACHMENTS:

| | |
|---|---|
| Exhibit A | Vesting Schedule |
| Exhibit B | Assignment Separate from Certificate |
| Exhibit C | Joint Escrow Instructions |
| Exhibit D | Cal. Admin. Code, Title 10, Section 260.141.11 |
| Exhibit E | Promissory Note |
| Exhibit F | Pledge Agreement |

# EXHIBIT A

## VESTING SCHEDULE

| If Cessation of Employment Occurs: | Number of Shares Subject to Purchase Option: |
|---|---|
| On or before April 30, 1996 | 2,250,000 shares* |
| On or after May 1, 1996 but on or before May 31, 1996 | 1,800,000 shares |
| On or after the first day of every month but on or before the last day of such month | The prior month's amount less 37,500 shares |

\*      If the Company terminates Purchaser without "Cause" prior to May 1, 1996, only 1,800,000 shares shall be subject to repurchase by the Company.

For purposes of this Agreement, "Cause" shall mean misconduct by Purchaser, including (i) conviction of any felony or any crime involving moral turpitude or dishonesty; (ii) participation in a fraud or act of dishonesty against the Company; (iii) willful breach of the Company's policies; (iv) intentional damage to the Company's property; (v) material breach of the Employment Agreement between the Company and Purchaser dated April 3, 1995; or (vi) conduct by Purchaser which in the good faith and reasonable determination of the Board demonstrates gross unfitness to serve. Physical or mental disability shall not constitute "Cause." For purposes of this Agreement, any material diminution in responsibilities, duties or compensation other than for Cause will be treated, upon notice by Purchaser to the Company, as a termination without Cause.

20901225
050495

1.

EXHIBIT B

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, David W. Martin, Jr., M.D. hereby sells, assigns and transfers unto Lynx Therapeutics, Inc., a Delaware Corporation (the "Company"), pursuant to that certain Stock Purchase Agreement dated as of May 1, 1995 between the Company and undersigned (the "Agreement"), _One million seven hundred fifty thousand_ (1,750,000) shares of the Company's common stock, standing in the undersigned's name on the books of said corporation represented by Certificate No. 82422 herewith, and does hereby irrevocably constitute and appoint the Company's Secretary as attorney to transfer the said stock on the books of the said corporation with full power of substitution in the premises. This Assignment may be used only in accordance with and subject to the terms and conditions of the Agreement, in connection with the repurchase of shares of Common Stock issued to the undersigned pursuant to the Agreement, and only to the extent that such shares remain subject to the Company's Purchase Option under the Agreement.

Dated: _6/20/95_          Signature _Wm Martin Jr_

260.141.11: RESTRICTION ON TRANSFER. (a) The issuer of any security upon which a restriction on transfer has been imposed pursuant to Sections 260.102.6, 260.141.10 or 260.534 shall cause a copy of this section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b)  It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rules), except:

    (1)    to the issuer;

    (2)    pursuant to the order or process of any court;

    (3)    to any person described in subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;

    (4)    to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;

    (5)    to holders of securities of the same class of the same issuer;

    (6)    by way of gift or donation inter vivos or on death;

    (7)    by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities is not in violation of any securities law of the foreign state, territory or country concerned;

    (8)    to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or a member of an underwriting syndicate or selling group;

    (9)    if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;

    (10)    by way of a sale qualified under Sections 25111, 25112, 25113, or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

    (11)    by a corporation to a wholly owned subsidiary of such corporation, or by a wholly owned subsidiary of a corporation to such corporation;

    (12)    by way of an exchange qualified under Section 25111, 25112 or 25113 of the Code, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

    (13)    between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;

    (14)    to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state; or

    (15)    by the State Controller pursuant to the Unclaimed Property Law or by the administrator of the unclaimed property law of another state if, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule, (ii) delivers to each purchaser a copy of this rule, and (iii) advises the Commissioner of the name of each purchaser;

    (16)    by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities;

    (17)    by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c)    The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letters of not less than 10-point size, reading as follows:

      "IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."

# JOINT ESCROW INSTRUCTIONS

Secretary
Lynx Therapeutics, Inc.
3832 Bay Center Place
Hayward, CA 94545

Dear Sir:

As Escrow Agent for both Lynx Therapeutics, Inc., a Delaware corporation ("Corporation"), and the undersigned purchaser of stock of the Company ("Purchaser"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Stock Purchase Agreement ("Agreement") dated May 1, 1995, to which a copy of these Joint Escrow Instructions is attached as Exhibit C, in accordance with the following instructions:

1.    In the event the Company or an assignee shall elect to exercise the Purchase Option set forth in the Agreement, the Company or its assignee will give to Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company.  Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2.    At the closing you are directed (a) to date any stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver same, together with the certificate evidencing the shares of stock to be transferred, to the Company against the simultaneous delivery to you of the purchase price (which may include suitable acknowledgment of cancellation of indebtedness) of the number of shares of stock being purchased pursuant to the exercise of the Purchase Option.

3.    Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as specified in the Agreement.  Purchaser does hereby irrevocably constitute and appoint you as his attorney-in-fact and agent for the term of this escrow to execute with respect to such securities and other property all documents of assignment and/or transfer and all stock certificates necessary or appropriate to make all securities negotiable and complete any transaction herein contemplated.

4.    This escrow shall terminate upon expiration or exercise in full of the Purchase Option, whichever occurs first.

20901243
050295

1.

5.    If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to Purchaser, you shall deliver all of same to Purchaser and shall be discharged of all further obligations hereunder; *provided, however,* that if at the time of termination of this escrow you are advised by the Company that the property subject to this escrow is the subject of a pledge or other security agreement, you shall deliver all such property to the pledgeholder or other person designated by the Company.

6.    Except at otherwise provided in these Joint Escrow Instructions, your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.    You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties or their assignees. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.    You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law, and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree of any court, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

9.    You shall not be liable in any respect on account of the identity, authority or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

10.    You shall not be liable for the outlawing of any rights under any statute of limitations with respect to these Joint Escrow Instructions or any documents deposited with you.

11.    You shall be entitled to employ such legal counsel (including without limitation the firm of Cooley Godward Castro Huddleson & Tatum) and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

12.    Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be Secretary of the Company or if you shall resign by written notice to each party. In the event of any such termination, the Company may appoint any officer or assistant officer of the Company as successor Escrow Agent and Purchaser hereby confirms the appointment of such successor or successors as his attorney-in-fact and agent to the full extent of your appointment.

13.     If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

14.     It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities, you may (but are not obligated to) retain in your possession without liability to anyone all or any part of said securities until such dispute shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

15.     Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in any United States Post Box, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties hereunto entitled at the following addresses, or at such other addresses as a party may designate by ten days' written notice to each of the other parties hereto:

COMPANY:        Lynx Therapeutics, Inc.
                3832 Bay Center Place
                Hayward, CA  94545

PURCHASER:      David W. Martin, Jr., M.D.
                1028 Lombard Street
                San Francisco, CA  94109

SECRETARY:      Secretary
                Lynx Therapeutics, Inc.
                3832 Bay Center Place
                Hayward, CA  94545

16.     By signing these Joint Escrow Instructions you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

17.     This instrument shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  It is understood and agreed that references to "you" or "your" herein refer to the original Escrow Agent and to any and all successor Escrow Agents.  It is understood and agreed that the Company may at any time or from time to time assign its rights under the Agreement and these Joint Escrow Instructions in whole or in part.

Very truly yours,

LYNX THERAPEUTICS, INC.

By _____

PURCHASER:

_____
David W. Martin, Jr., M.D.

ESCROW AGENT:

_____
(Secretary
Lynx Therapeutics, Inc.

20901243
050295

4.

# PROMISSORY NOTE

$450,000.00

Hayward, California
May 1, 1995

FOR VALUE RECEIVED, the undersigned hereby unconditionally promises to pay to the order of LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), at 3882 Bay Center Place, Hayward, CA 94545, or at such other place as the holder hereof may designate in writing, in lawful money of the United States of America and in immediately available funds, the principal sum of Four Hundred Fifty Thousand Dollars ($450,000.00) together with interest accrued from the date hereof on the unpaid principal at the rate of 7.12% per annum, or the maximum rate permissible by law (which under the laws of the State of California shall be deemed to be the laws relating to permissible rates of interest on commercial loans), whichever is less, as follows:

> **Principal Repayment.** The outstanding principal amount hereunder shall be due and payable in full on April 30, 2000 subject to earlier repayment as follows: If the undersigned sells shares of stock subject to the Pledge Agreement of even date herewith between the undersigned and the Company, then within twenty (20) days of such sale, the undersigned shall pay as principal repayment, Fifty Cents ($0.50) per share for each share sold until the undersigned sells five hundred thousand (500,000) shares subject to the Pledge Agreement, and then Ten Cents ($0.10) per share for each share sold subject to the Pledge Agreement thereafter; and

> **Interest Payments.** Interest shall be payable upon the expiration or, termination of this Note and shall be calculated on the basis of a 360-day year for the actual number of days elapsed;

*provided, however,* that in the event that the undersigned's employment by or association with the Company is terminated for any reason prior to payment in full of this Note; this Note shall be accelerated and all remaining unpaid principal and interest hereunder shall become due and payable immediately after such termination.

If the undersigned fails to pay any of the principal hereunder when due, then the Company, at its sole option, shall have the right to accelerate this Note, in which event the entire principal balance and all accrued interest hereunder immediately shall become due and payable, and immediately collectible by the Company pursuant to applicable law.

This Note may be prepaid at any time without penalty. All money paid toward the satisfaction of this Note shall be applied first to the payment of interest as required hereunder and then to the retirement of the principal.

The full amount of this Note is secured by a pledge of shares of Common Stock of the Company, and is subject to all of the terms and provisions of the Stock Purchase Agreement and the Pledge Agreement, each of even date herewith between the undersigned and the Company.

The undersigned hereby represents and agrees that the amounts due under this Note are not consumer debt, and are not incurred primarily for personal, family or household purposes, but are for business and commercial purposes only.

The undersigned hereby waives presentment, protest and notice of protest, demand for payment, notice of dishonor and all other notices or demands in connection with the delivery, acceptance, performance, default or endorsement of this Note.

The holder hereof shall be entitled to recover, and the undersigned agrees to pay when incurred, all costs and expenses of collection of this Note, including without limitation, reasonable attorneys' fees.

This Note shall be governed by, and construed, enforced and interpreted in accordance with the laws of the State of California, as applied to contracts made and performed entirely within the State by its residents.

Signed _____

David W. Martin, Jr., M.D.

20901235
050995

2.

# PLEDGE AGREEMENT

     **1.**    As collateral security for the payment of that certain $450,000.00 promissory note issued this date to Lynx Therapeutics, Inc. ("Pledgee") by the undersigned (hereinafter called "indebtedness"), the undersigned hereby assigns, transfers to and pledges with the Pledgee the securities listed on Schedule 1 hereto which, on the date hereof, were delivered for deposit with Pledgee, together with any stock rights, rights to subscribe, dividends paid in cash or other property in connection with the complete or partial liquidation of Pledgee, stock dividends, dividends paid in stock, new securities or other property except cash dividends other than liquidating dividends to which the undersigned is or may hereafter become entitled to receive on account of such property, and in the event that the undersigned receives any such, the undersigned immediately will deliver it to Pledgee to be held by Pledgee hereunder in the same manner as the property originally pledged hereunder. All property assigned, transferred to and pledged with Pledgee under this paragraph is hereinafter called "collateral."

     **2.**    At any time, without notice, and at the expense of the undersigned, Pledgee in its name or in the name of its nominee or of the undersigned may, but shall not be obligated to: (a) collect by legal proceedings or otherwise all dividends (except cash dividends other than liquidating dividends), interest, principal payments and other sums now or hereafter payable upon or on account of said collateral; (b) enter into any extension, reorganization, deposit, merger, or consolidation agreement, or any agreement in any wise relating to or affecting the collateral, and in connection therewith may deposit or surrender control of such collateral thereunder, accept other property in exchange for such collateral and do and perform such acts and things as it may deem proper, and any money or property received in exchange for such collateral shall be applied to the indebtedness or thereafter held by it pursuant to the provisions hereof; (c) insure, process and preserve the collateral; (d) cause the collateral to be transferred to its name or to the name of its nominee; (e) exercise as to such collateral all the rights, powers, and remedies of an owner, except that so long as the indebtedness is not in default the undersigned shall retain all voting rights as to the collateral.

     **3.**    The undersigned agrees to pay prior to delinquency all taxes, charges, liens and assessments against the collateral, and upon the failure of the undersigned to do so, Pledgee at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

     **4.**    All advances, charges, costs and expenses, including reasonable attorneys' fees, incurred or paid by Pledgee in exercising any right, power or remedy conferred by this agreement, or in the enforcement thereof, shall become a part of the indebtedness secured hereunder and shall be paid to Pledgee by the undersigned immediately and without demand.

     **5.**    At the option of Pledgee and without necessity of demand or notice, all or any part of the indebtedness of the undersigned immediately shall become due and payable irrespective of any agreed maturity, upon the happening of any of the following events:

(a) failure to keep or perform any of the terms or provisions of this agreement; (b) default in the payment of principal or interest when due; (c) the levy of any attachment, execution or other process against the collateral; or (d) the insolvency, commission of an act of bankruptcy, general assignment for the benefit of creditors, filing of any petition in bankruptcy or for relief under the provisions of Title 11 of the United States Code of, by, or against the undersigned.

6.    In the event of the nonpayment of any indebtedness when due, whether by acceleration or otherwise, or upon the happening of any of the events specified in paragraph 5, Pledgee may then, or at any time thereafter, at its election, apply, set off, collect or sell in one or more sales, or take such steps as may be necessary to liquidate and reduce to cash in the hands of Pledgee in whole or in part, with or without any previous demands or demand of performance or notice or advertisement, the whole or any part of the collateral in such order as Pledgee may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere, or at any broker's board or securities exchange, either for cash or upon credit or for future delivery; *provided, however,* that if such disposition is at private sale, then the purchase price of the collateral shall be equal to the public market price then in effect, or, if at the time of sale no public market for the collateral exists, then, in recognition of the fact that the sale of the collateral would have to be registered under the Securities Act of 1933, as amended, and that the expenses of such registration are commercially unreasonable for the type and amount of collateral pledged hereunder, Pledgee and the undersigned hereby agree that such private sale shall be at a purchase price mutually agreed to by Pledgee and the undersigned or, if the parties cannot agree upon a purchase price, then at a purchase price established by a majority of three independent appraisers knowledgeable of the value of such collateral, one named by the undersigned within 10 days after written request by the Pledgee to do so, one named by Pledgee within such 10 day period, and the third named by the two appraisers so selected, with the appraisal to be rendered by such body within 30 days of the appointment of the third appraiser.  The cost of such appraisal, including all appraiser's fees, shall be charged against the proceeds of sale as an expense of such sale.  Pledgee may be the purchaser of any or all collateral so sold and hold the same thereafter in its own right free from any claim of the undersigned or right of redemption.  Demands of performance, notices of sale, advertisements and presence of property at sale are hereby waived, and Pledgee is hereby authorized to sell hereunder any evidence of debt pledged to it.  Any sale hereunder may be conducted by any officer or agent of Pledgee.

7.    The proceeds of the sale of any of the collateral and all sums received or collected by Pledgee from or on account of such collateral shall be applied by Pledgee to the payment of expenses incurred or paid by Pledgee in connection with any sale, transfer or delivery of the collateral, to the payment of any other costs, charges, attorneys' fees or expenses mentioned herein, and to the payment of the indebtedness or any part hereof, all in such order and manner as Pledgee in its discretion may determine.  Pledgee shall pay any balance to the undersigned.

8.    Pledgee shall be under no duty or obligation whatsoever to make or give any presentments, demands for performance, notices of non-performance, protests, notices of protest or notices of dishonor in connection with any obligations or evidences of indebtedness held by

Pledgee as collateral, or in connection with any obligations or evidences of indebtedness which constitute in whole or in part the indebtedness secured hereunder.

9.   Pledgee at any time may deliver the collateral or any part thereof to the undersigned and the receipt of the undersigned shall be a complete and full acquittance for the collateral so delivered, and Pledgee shall thereafter be discharged from any liability or responsibility therefor.

10.   Upon the transfer of all or any part of the indebtedness, Pledgee may transfer all or any part of the collateral and shall be fully discharged thereafter from all liability and responsibility with respect to such collateral so transferred, and the transferee shall be vested with all the rights and powers of Pledgee hereunder with respect to such collateral so transferred; but with respect to any collateral not so transferred Pledgee shall retain all rights and powers hereby given.

11.   Until all indebtedness shall have been paid in full, the power of sale and all other rights, powers and remedies granted to Pledgee hereunder shall continue to exist and may be exercised by Pledgee at any time and from time to time irrespective of the fact that the indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of the undersigned may have ceased.

12.   Pledgee agrees that so long as the indebtedness is not in default, shares of common stock of Pledgee held hereunder as collateral for the indebtedness shall be released from pledge as the indebtedness is paid, at the rate of one share for Fifty Cents ($0.50) of principal amount of indebtedness paid for the first Two Hundred Fifty Thousand Dollars ($250,000) of principal amount of indebtedness paid; thereafter, at the rate of one share for every Ten Cents ($0.10) of principal amount of indebtedness paid. Release from pledge, however, shall not result in release from the provisions of those certain Joint Escrow Instructions of even date herewith among the parties to this Pledge Agreement and the Escrow Agent named therein, from the Purchase Option of Pledgee, set forth in the Stock Purchase Agreement of even date herewith between the parties to this Pledge Agreement, or from the provisions of the Pledge Agreement between the parties to this Pledge Agreement with respect to the line of credit extended to the undersigned by the Pledgee.

13.   The rights, powers and remedies given to Pledgee by this Agreement shall be in addition to all rights, powers and remedies given to Pledgee by virtue of any statute or rule of law. Pledgee may exercise its Pledgee's lien or right of setoff with respect to the indebtedness in the same manner as if the indebtedness were unsecured. Any forbearance or failure or delay by Pledgee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy hereunder shall not preclude the further exercise thereof; and every right, power and

remedy of Pledgee shall continue in full force and effect until such right, power or remedy is specifically waived by an instrument in writing executed by Pledgee.

Dated: May 1, 1995

_____

David W. Martin, Jr., M.D.

**ATTACHMENT:**

Schedule 1

SCHEDULE 1
TO
PLEDGE AGREEMENT

Certificate No. B2422, dated May 1, 1995, representing 1,750,000 shares

Certificate No. B2582, dated May 1, 1995, representing 500,000 shares

Certificate No. B2423, dated May 1, 1995, representing 250,000 shares

20901218
050495

1.

**Exhibit 10.25**

**Loan Agreement, dated as of May 1, 1995 between the
Company and David W. Martin, Jr. M.D.**

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is entered into as of May 1, 1995 by and between LYNX THERAPEUTICS, INC., a Delaware corporation (the "Company"), and DAVID W. MARTIN, JR., M.D. ("Employee").

WHEREAS, Employee has been hired as President of the Company; and

WHEREAS, in consideration of Employee's employment with the Company, the Company has agreed to make available to Employee a line of credit.

NOW THEREFORE, the parties hereto agree as follows:

1. **Loan.**

(a)     The Company agrees to loan Employee up to Twenty-Five Thousand Dollars ($25,000) during each calendar quarter during the first two (2) years of this Agreement; *provided, however,* that the aggregate amount Employee may borrow under this Section 1(a) shall not exceed Two Hundred Thousand Dollars ($200,000); and *provided further,* that Employee may borrow a maximum of Forty Thousand Dollars ($40,000) in any one calendar quarter.

(b)     Prior to the second anniversary of this Agreement, the Board of Directors of the Company (the "Board") shall, in its sole discretion, determine whether to increase Employee's permissible borrowing hereunder by up to an additional Twenty-Five Thousand Dollars ($25,000) during each calendar quarter for an additional year, not to exceed an aggregate of One Hundred Thousand Dollars ($100,000).

(c)     Any principal amounts made available but not borrowed by Employee shall cumulate. Any principal amounts repaid by Employee may not be subsequently reborrowed.

The aggregate principal amount borrowed pursuant to subsections (a) and (b) is referred to herein as the "Loan."

2. **Interest.** The Loan shall bear interest from the date of each applicable advance until paid, at the rate of seven and eighty-five hundredths percent (7.85%) per annum or the maximum rate permitted by law (which under the laws of the State of California shall be deemed to be the laws relating to permissible rates of interest on commercial loans), whichever is less. All interest hereunder shall be computed for the actual number of days elapsed on the basis of a 360 day year.

3. **Promissory Note.** The Loan shall be made pursuant to a promissory note in the form attached hereto as Exhibit A (the "Note"). Employee shall execute the Note concurrently with the execution of this Agreement.

20899867
06/795

1.

4. **Advances.** Employee may request advances under this Agreement by providing written notice. The Company shall provide the requested funds, subject to the limitations of Section 1, within ten (10) business days of Employee's written request. Funds shall be paid by check from the Company to Employee, which check shall be separate from Employee's regular paycheck.

5. **Collateral and Pledge Agreement.** Employee hereby agrees to secure the Loan by a pledge of any and all shares of the Company's Common Stock (the "Stock") now owned or hereafter acquired by Employee, whether by purchase, exercise of stock options or otherwise, including, without limitation, two million five hundred thousand (2,500,000) shares of the Company's Common Stock issuable upon exercise of certain options held by Employee, pursuant to a Pledge Agreement in the form attached hereto as Exhibit B (the "Pledge Agreement"), which Employee, his spouse, and the Company shall execute concurrently herewith. Employee covenants and agrees to deliver to the Company any and all certificates evidencing the Stock and to execute and deliver all instruments, agreements or other documents as the Company shall reasonably require to obtain the full benefits of this Agreement.

6. **Repayment of Loan.**

(a) All principal and accrued interest on the Loan shall become due and payable, subject to subsections 6(b) and 6(c) below, immediately upon the earlier to occur of:

(1) April 30, 2000, *provided, however,* that if, prior to such date the Board has determined in good faith that the Company's Common Stock is not reasonably likely to be readily tradeable as of such date, the Board may extend the term of the Loan in its sole discretion; or

(2) Employee's insolvency, as evidenced by circumstances such as (without limitation) a bankruptcy or insolvency proceeding being instituted by or against Employee, a receiver being appointed for Employee's property, or Employee making an assignment for the benefit of creditors.

(b) Notwithstanding the foregoing, in the event of Employee's termination for Cause (as defined below) (the date of which is the "Termination Date"), all then outstanding principal and accrued interest on the Loan shall become due and payable upon the earlier to occur of the following:

(1) Six (6) months following Termination Date; or

(2) The date on which the Loan becomes due and payable in full pursuant to Section 6(a) hereof.

For purposes of this Agreement, "Cause" shall mean misconduct by Employee, including (i) conviction of any felony or any crime involving moral turpitude or dishonesty; (ii) participation in a fraud or act of dishonesty against the Company; (iii) willful breach of the Company's policies; (iv) intentional damage to the Company's property; (v) material breach of

the Employment Agreement between the Company and Employee dated April 3, 1995; or (vi) conduct by Employee which in the good faith and reasonable determination of the Board demonstrates gross unfitness to serve. Neither physical nor mental disability shall constitute Cause hereunder. For purposes of this Agreement, any material diminution in Employee's responsibilities, duties or compensation, other than for Cause, will be treated, upon prompt notice by Employee to the Company, as a termination without Cause.

(c)    Notwithstanding anything to the contrary, in the event the Company terminates Employee without Cause on or before April 30, 2000, all then outstanding principal and accrued interest on the Loan shall be forgiven and Employee shall have no further obligations under this Agreement.

7.    **Prepayment.** Employee may prepay the unpaid principal in whole or in part, without penalty, at any time, upon the payment of all unpaid interest accrued to the date of such prepayment.

8.    **Proceeds from Sale of Stock.** In the event that the Stock is tradeable under federal and state securities laws (including in compliance with Section 16 of the Securities Exchange Act of 1934, as applicable) and the Stock is free from any contractual market stand-off arrangement, Employee may request that Company release Company's security interest in some or all of the Stock, so that Employee may sell such Stock for cash; *provided, however,* that twenty-five percent (25%) of the pre-tax gain realized from any such sale shall be applied first to the outstanding accrued interest on the Loan and then to the outstanding principal balance of the Loan.

9.    **Non-Transferable.** The right of Employee to request and receive the Loan hereunder shall not be assignable or otherwise transferable by Employee.

10.    **General Provisions.**

(a)    This Agreement shall be governed by the laws of the State of California as applied to contracts made and performed entirely in the State by its residents.

(b)    This Agreement, together with its Exhibits, contains the entire agreement between Employee and the Company and is the complete, final, and exclusive embodiment of their agreement with regard to this subject matter. Employee and the Company each acknowledge and represent that this Agreement is entered without reliance on any promise or representation other than those expressly contained herein and that this Agreement cannot be modified except in a writing signed by both parties.

(c)    Except as otherwise specified herein, any notice, demand or request required or permitted to be given by either the Company or Employee pursuant to the terms of this Agreement shall be in writing and shall be deemed given when delivered personally, three days after being deposited in the U.S. Mail, registered mail, return receipt requested, postage prepaid, or one business day after delivery to an overnight carrier service and addressed to the

Company at its then current principal office and to Employee at the address listed for him on the Company's payroll.

(d)    Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party thereafter from enforcing each and every other provision of this Agreement.  The rights granted both parties herein are cumulative and shall not constitute a waiver of either party's right to assert all other legal remedies available to it under the circumstances.

(e)    Employee agrees upon request to execute any further documents or instruments necessary or desirable to carry out the purpose or intent of this Agreement.

(f)    In the event of any litigation concerning this Agreement, the Prevailing Party shall be entitled to a reasonable sum for attorneys' fees, costs, and litigation expenses, whether or not such action is prosecuted to judgment.  "Prevailing Party" includes, without limitation, a party who agrees to dismiss an action upon payment by the other party of sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief sought by that party.  In the event that the Company is the Prevailing Party, the Company also shall be entitled to reasonable costs associated with the collection of the Loan.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first set forth above.

LYNX THERAPEUTICS, INC.

By: _____

Title: _____ CEO

Address:   3832 Bay Center Place
              Hayward, CA 94545

_____
David W. Martin, Jr., M.D.

Address:   1028 Lombard Street
              San Francisco, CA 94109

### EXHIBIT A

### PROMISSORY NOTE

$300,000

Hayward, California
May 1, 1995

FOR VALUE RECEIVED, I promise to pay to Lynx Therapeutics, Inc., a Delaware corporation (the "Company"), at its principal office at 3832 Bay Center Place, Hayward, California 94545, or at such other place as the Company shall designate in writing, the lesser of (i) $300,000 and (ii) the aggregate principal amount of all advances made hereunder as set forth on **Schedule A** attached hereto and incorporated herein by reference, as the same from time to time may be amended, together with interest thereon at the rate of seven and eighty-five hundredths percent (7.85%) per annum or the maximum rate permitted by law (which under the laws of the State of California shall be deemed to be the laws relating to permissible rates of interest in commercial loans), whichever is less, payable at the times and in the manner set forth in that certain Loan Agreement dated as of May 1, 1995, by and between the undersigned and the Company (the "Loan Agreement"), the terms of which are incorporated herein by reference. The undersigned hereby authorizes the holder of this Note to note on **Schedule A** all advances made by the holder hereunder and all principal repayments by the undersigned, which notations shall, in the absence of manifest error, be conclusive; *provided, however,* that the failure to make a notation or the inaccuracy of the notation shall not limit or otherwise affect my obligation under this Note.

Principal and interest are payable in lawful money of the United States of America. **THE PRIVILEGE IS RESERVED TO PREPAY ANY PORTION OF THIS NOTE AT ANY TIME WITHOUT PENALTY, UPON THE PAYMENT OF ALL UNPAID INTEREST ACCRUED ON THE ENTIRE OUTSTANDING LOAN BALANCE.** All payments under this Note shall be credited first to accrued interest and then to principal.

I hereby waive presentment for payment, protest, notice of protest, and notice of non-payment of this Note.

This Note is secured by my pledge of all shares of the Company's Common Stock now or hereafter owned by me pursuant to the provisions of the Loan Agreement and the related Stock Pledge Agreement, each dated as of May 1, 1995, between the Company and me.

This Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California, as applied to contracts made and performed entirely within the State by its residents.

David W. Martin, Jr., M.D.

20899867
(590-595)

## SCHEDULE A

## TRANSACTIONS ON WITHIN NOTE

| Date | Interest Paid To | Interest Paid | Advances | Payments | Balance |
|------|------------------|---------------|----------|----------|---------|

EXHIBIT B

EXHIBIT B

## STOCK PLEDGE AGREEMENT

**THIS STOCK PLEDGE AGREEMENT** ("Pledge Agreement") is made by David W. Martin, Jr., M.D., an individual resident in the State of California ("Pledgor"), in favor of Lynx Therapeutics, Inc., a corporation with its principal place of business at 3832 Bay Center Place, Hayward, California 94545 ("Pledgee").

**WHEREAS,** Pledgor has concurrently herewith executed that certain Loan Agreement ("Loan Agreement") and Promissory Note (the "Note"), each dated as of May 1, 1995, in favor of Pledgee; and

**WHEREAS,** Pledgee is willing to make the Loan (as defined in the Loan Agreement) to Pledgor pursuant to the Loan Agreement, but only upon the condition, among others, that Pledgor shall have executed and delivered to Pledgee this Pledge Agreement and, at such time as any of the Collateral shall be owned by Pledgor, the Collateral (as defined below).

**NOW, THEREFORE,** in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, Pledgor hereby agrees as follows:

1.    As security for the full, prompt and complete payment and performance when due (whether by stated maturity, by acceleration or otherwise) of all indebtedness of Pledgor to Pledgee created under the Note, the Loan Agreement and any other notes executed by Pledgor in favor of Pledgee (all such indebtedness being the "Liabilities"), together with, without limitation, the prompt payment of all expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incidental to the collection of the Liabilities and the enforcement or protection of Pledgee's lien in and to the Collateral pledged hereunder, Pledgor hereby pledges to Pledgee, and grants to Pledgee, a first priority security interest in all of the following (collectively, the "Pledged Collateral"):  any and all shares of Common Stock of Pledgee, now owned or hereafter acquired by Pledgor, whether by purchase, exercise of stock options or otherwise, including, without limitation, two million five hundred thousand (2,500,000) shares of Common Stock of Pledgee issuable upon exercise of certain options held by Pledgor (which shares shall be the "Pledged Shares"), and the certificates representing such shares, and all dividends, cash, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares.  Pledgor covenants and agrees to deliver, or cause to be delivered, to Pledgee any certificates or other evidence of the Pledged Shares whenever such certificates may be issued.

The term "indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and Liabilities heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and whether due or not due, absolute or contingent,

20899867
760565

1.

liquidated or unliquidated, determined or undetermined, and whether recovery upon such indebtedness may be or hereafter becomes unenforceable.

2.    At any time, without notice, and at the expense of Pledgor, Pledgee in its name or in the name of its nominee or of Pledgor may, but shall not be obligated to:  (a) collect by legal proceedings or otherwise all dividends (except cash dividends other than liquidating dividends), interest, principal payments and other sums now or hereafter payable upon or on account of said Pledged Collateral; (b) enter into any extension, reorganization, deposit, merger or consolidation agreement, or any agreement in any wise relating to or affecting the Pledged Collateral, and in connection therewith may deposit or surrender control of such Pledged Collateral thereunder, accept other property in exchange for such Pledged Collateral and do and perform such acts and things as it may deem proper, and any money or property received in exchange for such Pledged Collateral shall be applied to the indebtedness or thereafter held by it pursuant to the provisions hereof; (c) insure, process and preserve the Pledged Collateral; (d) cause the Pledged Collateral to be transferred to its name or to the name of its nominee; (e) exercise as to such Pledged Collateral all the rights, powers and remedies of an owner, except that so long as no default exists under the Note, the Loan Agreement or hereunder Pledgor shall retain all voting rights as to the Pledged Shares.

3.    Pledgor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the Pledged Collateral, and upon the failure of Pledgor to do so, Pledgee at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same.

4.    At the option of Pledgee and without necessity of demand or notice, all or any part of the indebtedness of Pledgor shall immediately become due and payable irrespective of any agreed maturity, upon the happening of any of the following events:  (a) failure to keep or perform any of the terms or provisions of this Pledge Agreement; (b) failure to pay any installment of principal or interest on the Note when due; (c) the levy of any attachment, execution or other process against the Pledged Collateral; or (d) the insolvency, commission of an act of bankruptcy, general assignment for the benefit of creditors, filing of any petition in bankruptcy or for relief under the provisions of Title 11 of the United States Code of, by, or against Pledgor.

5.    In the event of the nonpayment of any Liabilities when due, whether by acceleration or otherwise, or upon the happening of any of the events specified in Paragraph 4, Pledgee may then, or at any time thereafter, at its election, apply, set off, collect or sell in one or more sales, or take such steps as may be necessary to liquidate and reduce to cash in the hands of Pledgee in whole or in part, with or without any previous demands or demand of performance or notice or advertisement, the whole or any part of the Pledged Collateral in such order as Pledgee may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere, or at any broker's board or securities exchange, either for cash or upon credit or for future delivery; *provided, however,* that if such disposition is at private sale, then the purchase price of the Pledged Collateral shall be equal to the public market price then in effect, or, if at the time of sale no public market for the Pledged Collateral exists, then, in recognition of the fact that the sale of the Pledged Collateral would have to be registered

under the Securities Act of 1933, as amended, and that the expenses of such registration are commercially unreasonable for the type and amount of collateral pledged hereunder, Pledgee and Pledgor hereby agree that such private sale shall be at a purchase price mutually agreed to by Pledgee and Pledgor or, if the parties cannot agree upon a purchase price, then at a purchase price established by a majority of three independent appraisers knowledgeable of the value of such collateral, one named by Pledgor within 10 days after written request by the Pledgee to do so, one named by Pledgee within such 10 day period, and the third named by the two appraisers so selected, with the appraisal to be rendered by such body within 30 days of the appointment of the third appraiser. The cost of such appraisal, including all appraiser's fees, shall be charged against the proceeds of sale as an expense of such sale. Pledgee may be the purchaser of any or all Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of Pledgor or right of redemption. Demands of performance are waived and Pledgee is hereby authorized to sell hereunder any evidence of debt pledged to it. Any sale hereunder may be conducted by any officer or agent of Pledgee.

6.     The proceeds of the sale of any of the Pledged Collateral and all sums received or collected by Pledgee from or on account of such Pledged Collateral shall be applied by Pledgee to the payment of expenses incurred or paid by Pledgee in connection with any sale, transfer or delivery of the Pledged Collateral, to the payment of any other costs, charges, attorneys' fees or expenses mentioned herein, and to the payment of the indebtedness or any part hereof, all in such order and manner as Pledgee in its discretion may determine. Pledgee shall then pay any balance to Pledgor.

7.     In the event that the Pledged Collateral is tradeable under federal and state securities laws (including compliance with Section 16 of the Securities Exchange Act of 1934, as applicable) and the Pledged Collateral is free from any contractual market stand-off arrangement, Pledgor may request that Pledgee release Pledgee's security interest in some or all of the Pledged Collateral so that Pledgor may sell such Pledged Collateral for cash; *provided, however,* that twenty-five percent (25%) of the pre-tax gain realized from such sale shall be applied first to the outstanding accrued interest on the Loan and then to the outstanding principal balance of the Loan.

8.     Upon the transfer of all or any part of the indebtedness, Pledgee may transfer all or any part of the Pledged Collateral and shall be fully discharged thereafter from all liability and responsibility with respect to such Pledged Collateral so transferred, and the transferee shall be vested with all the rights and powers of Pledgee hereunder with respect to such Pledged Collateral so transferred; but with respect to any Pledged Collateral not so transferred Pledgee shall retain all rights and powers hereby given.

9.     Until all indebtedness shall have been paid in full the power of sale and all other rights, powers and remedies granted to Pledgee hereunder shall continue to exist and may be exercised by Pledgee at any time and from time to time irrespective of the fact that the indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Pledgor may have ceased.

20899867
060595

3.

10.    Pledgee may at any time deliver the Pledged Collateral or any part thereof to Pledgor and the receipt of Pledgor shall be a complete and full acquittance for the Pledged Collateral so delivered, and Pledgee shall thereafter be discharged from any liability or responsibility therefor.

11.    The rights, powers and remedies given to Pledgee by this Pledge Agreement shall be in addition to all rights, powers and remedies given to Pledgee by virtue of any statute or rule of law.    Any forbearance or failure or delay by Pledgee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy hereunder shall not preclude the further exercise thereof; and every right, power and remedy of Pledgee shall continue in full force and effect until such right, power or remedy is specifically waived by an instrument in writing executed by Pledgee.

12.    If any provision of this Pledge Agreement is held to be unenforceable for any reason, it shall be adjusted, if possible, rather than voided in order to achieve the intent of the parties to the extent possible.    In any event, all other provisions of this Pledge Agreement shall be deemed valid and enforceable to the full extent possible.

13.    This Pledge Agreement shall be governed by, and construed in accordance with, the laws of the State of California as applied to contracts made and performed entirely within the State by its residents.

Dated: May 1, 1995

PLEDGOR

David W. Martin, Jr. M.D.

20899867
080 395

4.

## CONSENT OF SPOUSE OF PLEDGOR

I, Kathleen M. Martin, spouse of David W. Martin, Jr., M.D., acknowledge that I have read the Loan Agreement dated as of May 1, 1995, including the form of the promissory note attached as Exhibit A to the Loan Agreement and the form of Stock Pledge Agreement attached as Exhibit B to the Loan Agreement, and that I know its contents. I hereby consent to, and agree to be bound by, the terms, conditions and restrictions contained therein.

Dated as of this 1st day of May, 1995

_Kathleen M. Martin_
Kathleen M. Martin

20899867
060505

5.

**Exhibit 10.26**

# Promissory Note Secured by Mortgage, dated as of June 12, 1995 to the Company by David W. Martin, Jr. M.D. and Kathleen M. Martin Revocable Trust

**DO NOT DESTROY THIS NOTE: WHEN PAID,
THIS NOTE AND MORTGAGE SECURING SAME
MUST BE SURRENDERED BEFORE
RECONVEYANCE WILL BE MADE**

**PROMISSORY NOTE SECURED BY
MORTGAGE**

$450,000                                         Hayward, California
                                           Date: June 12 , 1995


FOR VALUE RECEIVED, the undersigned, David W. Martin, Jr. and Kathleen M. Martin, both in their individual capacities and as Trustees of the David W. and Kathleen M. Martin Revocable Trust dated June 19, 1987 (collectively hereinafter called "Maker"), hereby promise to pay to the order of Lynx Therapeutics Incorporated ("Payee"), at 3832 Bay Center Place, Hayward, CA 94545, or to such other place as the holder hereof may from time to time designate by written notice to Maker, in lawful money of the United States of America, the sum of Four Hundred Fifty Thousand Dollars ($450,000).


1.    The principal amount shall become due and payable upon the earlier of (i) the date of sale, exchange, conveyance, encumbrance, hypothecation or other transfer by Maker of real property located at 124 Marshall Bridge Road, Kennett Square, PA 19348; (ii) the date David W. Martin, Jr. ceases to be a full time employee of Lynx Therapeutics Incorporated or an affiliate thereof; or (iii) February 8, 1999.


2.    Interest shall accrue hereon from the date of this Note until paid, at the rate of 7.85% per annum on the principal balance remaining from time to time unpaid, compounded annually. Interest shall be due and payable in quarterly payments in lawful tender of the United States of America.


3.    The entire unpaid principal balance hereon at the election of Payee, becomes immediately due and payable upon the occurrence of any of the following:


(a)    Any failure on the part of the Maker to make any payment when the same is due and to cure such default within five (5) days after notice is given by Payee.


(b)    Any failure on the part of Maker (i) to perform or observe any of their obligations under any of the "Loan Documents" (hereinafter defined), and (ii) to commence and proceed diligently to cure such default within ten (10) days after written notice thereof is given by Payee, and in any event to cure such default within thirty (30) days after the date on which such notice is given.