1   KEVIN M. FLOWERS (admitted *pro hac vice*)
2   THOMAS I. ROSS (admitted *pro hac vice*)
    JEFFREY H. DEAN (admitted *pro hac vice*)
3   GREGORY E. STANTON (CA Bar No. 203495)
    JOHN R. LABBE (admitted *pro hac vice*)
4   MARSHALL, GERSTEIN & BORUN LLP
    6300 Sears Tower
5   233 South Wacker Drive
    Chicago, Illinois 60606-6357
6   (312) 474-6300 (telephone)
    (312) 474-0448 (facsimile)
7   E-Mail: kflowers@marshallip.com
8   E-Mail: tross@marshallip.com
    E-Mail: jdean@marshallip.com
9   E-Mail: gstanton@marshallip.com
    E-Mail: jlabbe@marshallip.com
10
11  Counsel for Defendant/Counterclaim Plaintiff
    SOLEXA, INC.
12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16

17  _____
                                    )
18  APPLERA CORPORATION—APPLIED      )   Case No. 07-CV-02845 WHA
    BIOSYSTEMS GROUP, a Delaware corpora- )
19  tion,                            )   District Judge William H. Alsup
                                     )   Courtroom 9, 19th Floor
20  Plaintiff,                       )
                                     )   **Opening Claim Construction Brief of**
21      - vs. -                      )   **Counterclaim Plaintiff Solexa, Inc.**
                                     )
22                                   )
                                     )   Tutorial:    January 30, 2008
23  ILLUMINA, INC., a Delaware corporation, )   Time:        1:30 P.M.
    SOLEXA, INC., a Delaware corporation, )
24  and STEPHEN C. MACEVICZ, an      )
    individual,                      )   Hearing:     February 13, 2008
25                                   )   Time:        1:30 P.M.
26  Defendants.                      )
27  _____)

28

1

**TABLE OF CONTENTS**

2

*Page*

3

I.      INTRODUCTION ................................................................................................. 1

4

II.     THE TECHNOLOGY ........................................................................................... 1

5

III.    CLAIM CONSTRUCTION PRINCIPLES ........................................................... 3

6

IV.     SOLEXA'S PROPOSED CONSTRUCTIONS
        FOR THE DISPUTED CLAIM TERMS ............................................................... 5

7

8

        A.    Background ................................................................................................. 5

9

        B.    "Initializing oligonucleotide probe" ......................................................... 7

10

        D.    "Extended oligonucleotide probe" ........................................................... 14

11

        E.    "Identifying" ............................................................................................. 17

        F.    "Just-ligated extension probe" ................................................................. 20

12

        G.    "Repeating steps (b), (c) and (d) until a sequence
              of nucleotides in the target polynucleotide is determined" ...................... 22

13

14

V.      PRECIS OF IMPACT ON SUMMARY JUDGMENT ........................................ 23

15

VI.     CONCLUSION .................................................................................................... 24

16

        Appendix 1 – Carbon positions on 2′-deoxyribose ............................................. A1

17

        Appendix 2 – Phosphodiester bonds link 5′ and 3′
                     carbon positions on adjacent nucleotides ....................................... A2

18

        Appendix 3 – Hydrogen bonds form between complementary DNA bases .................... A3

19

        Appendix 4 – Complementary, anti-parallel sequences can hybridize ........................... A4

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

*Cases*                                                                                    *Page(s)*

3

*ACTV, Inc. v. Walt Disney Co.*,

4

   346 F.3d 1082 (Fed. Cir. 2003)..................................................................................... 11

5

*All Dental Prodx v. Advantage Dental Prods.*,

6

   309 F.3d 774 (Fed. Cir. 2002)........................................................................................ 24

7

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,

   340 F.3d 1298 (Fed. Cir. 2003)..................................................................................... 19

8

*Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc.*,

9

   262 F.3d 1258 (Fed. Cir. 2001)..................................................................................... 16

10

*Budde v. Harley-Davidson, Inc.*,

   250 F.3d 1369 (Fed. Cir. 2001)..................................................................................... 12

11

*Cont'l Paper Bag Co. v. E. Paper Bag Co.*,

12

   210 U.S. 405 (1908)......................................................................................................... 3

13

*Demarini Sports, Inc. v. Worth, Inc.*,

14

   239 F.3d 1314 (Fed. Cir. 2001)....................................................................................... 3

15

*Embrex, Inc. v. Service Engineering Corp.*,

   216 F.3d 1343 (Fed. Cir. 2000)....................................................................................... 3

16

*Enercon GmbH v. Int'l Trade Comm'n*,

17

   151 F.3d 1376 (Fed. Cir. 1998)..................................................................................... 19

18

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,

19

   279 F.3d 1022 (Fed. Cir. 2002)..................................................................................... 13

20

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,

   265 F.3d 1311 (Fed. Cir. 2001)..................................................................................... 13

21

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,

22

   389 F.3d 1370 (Fed. Cir. 2004)..................................................................................... 12

23

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,

24

   183 F.3d 1369 (Fed. Cir. 1999)..................................................................................... 11

25

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,

   78 F.3d 1575 (Fed. Cir. 1996)....................................................................................... 13

26

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,

27

   493 F.3d 1358 (Fed. Cir. 2007)..................................................................................... 18

28

---

**OPENING CLAIM CONSTRUCTION BRIEF OF COUNTERCLAIM PLAINTIFF SOLEXA, INC.; CASE NO: 07-CV-02845 WHA**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Ingenio, Filiale de Loto-Quebec, Inc. v. GameLogic, Inc.*,
  445 F. Supp. 2d 443 (D. Del. 2006)........................................................................ 24

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111, 1115 (Fed. Cir. 2004)...................................................................... 3

*Interactive Gift Express v. CompuServe*,
  256 F.3d 1323 (Fed. Cir. 2001).......................................................................... 7, 10

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  327 F.3d 1364 (Fed. Cir. 2003)............................................................................. 16

*Markman v. Westview Instruments., Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)........................................................................ 3, 4, 14

*Pall Corp. v. Micron Separations, Inc.*,
  66 F.3d 1211 (Fed. Cir. 1995)............................................................................... 4

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..................................................................... 3, 4, 13

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998)............................................................................. 4

*Space Systems/Loral, Inc. v. Lockheed Martin Corp.*,
  2006 U.S. Dist. LEXIS 70712 (N.D. Cal. Sept. 19, 2006) ...................................... 12

*Stv Asia Ltd. v. PRN Corp.*,
  2006 U.S. Dist. LEXIS 95523 (N.D. Cal. Feb. 15, 2007)......................................... 13

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)...................................................................... passim

*White v. Dunbar*,
  119 U.S. 47 (1886).......................................................................................... 3

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006)........................................................................... 13

1

## I.     INTRODUCTION

2

3     Solexa, Inc. ("Solexa") alleges that Applera Corporation – Applied Biosystems Group

4     ("AB") infringes certain claims in U.S. Pat. Nos. 5,750,341 ("the '341 patent"), 5,969,119 ("the

5     '119 patent"), and 6,306,597 ("the '597 patent") (collectively the "patents-in-suit").[1] Pursuant to

6     the Court's Claim Construction Order[2] and the Patent Local Rules, Solexa herein provides its pro-

7     posed constructions for the six claim terms that the parties have selected for the Court to construe

8     at the *Markman* hearing scheduled for February 13, 2008.[3]

9

## II.     THE TECHNOLOGY

10     DNA is made of four basic building blocks called "nucleotides," which are conventionally

11     referred to by the letters C, G, T and A. All of the functions of DNA are determined by the order

12     of these nucleotides. The ordered identities of nucleotides constitute a DNA sequence. In a living

13     organism, DNA typically comprises two strands of nucleotides bonded or "hybridized" to each

14     other, with C in one strand always pairing with G (its complement) in the other strand, and T al-

15     ways pairing with A (its complement). Consequently, if one can determine the sequence of nu-

16     cleotides in one strand of a double-stranded DNA molecule, one can immediately deduce the se-

17

18     quence of nucleotides in the other strand.

19     The methods claimed in the patents-in-suit rely on the use of known polynucleotide se-

20     quences to learn about unknown sequences. In one embodiment of the invention, DNA fragments

21     having known sequences—called "oligonucleotide probes"—are brought into contact with a

22     DNA strand of partially or wholly unknown sequence (*see, e.g.,* '341 patent, p. 1, "Abstract").

23     Often, sets of these probes collectively comprise every possible sequence of a specific length (i.e.,

24

25     [1] The asserted claims are 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 of the '341 patent, and claim 1 of both the '119 and '597 Patents.

26     [2] Docket No. 39.

27     [3] Joint Claim Construction and Prehearing Statement, Docket No. 78 (hereinafter "Prehearing Statement").

28

**OPENING CLAIM CONSTRUCTION BRIEF OF COUNTERCLAIM PLAINTIFF SOLEXA, INC.; CASE NO: 07-CV-02845 WHA**

every possible combination of nucleotides complementary to the "unknown" DNA strand). How-ever, each probe is identifiable by a label corresponding to the identity of one or more "interrogat-ing" nucleotides located at the same known positions in each probe (*see, e.g., id.* at column 3, lines 7-9 and column 6, lines 34-46).[4] Under certain conditions, only an interrogating probe that is perfectly complementary along its entire length (including the interrogating nucleotide(s)) will stably hybridize to the "unknown" DNA strand (this is often achieved by using stringent tempera-ture and salt conditions) (*see, e.g., id.* at column 11, line 49 and column 12, line 20). The stability of hybridization is enhanced by providing an "unknown" DNA strand to which an "initializing oligonucleotide" has already been hybridized at a position adjacent to the hybridization position of the interrogating probe (*see, e.g.,* column 2, line 66—column 3, line 3). Upon hybridization of the interrogating probe, the two adjacent hybridized probes are ligated, forming a single, longer probe that is more stably hybridized to the "unknown" DNA than either of the separate probes had been (*see, e.g.,* column 3, lines 3-7).

Once the interrogating probe has stably hybridized to the DNA strand, all of the other probes (which do not contain the correct complementary nucleotide(s) at the "interrogating" posi-tion(s), and thus do not remain stably hybridized to the DNA strand) can be washed away. The previously "unknown" nucleotide(s) that corresponds to the stably hybridized probe's interrogat-ing nucleotide(s) are then identified by detecting which label is still associated with the DNA strand (*see, e.g.,* at col. 3, lines 7-9 and col. 5, lines 10-12).

If this process is repeated, the identity of some or all of the nucleotides in the previously "unknown" DNA strand can be determined (*see, e.g., id.* at Figs. 1-3, and at col. 4, line 58 to col. 5, line 9). For example, if the set of probes contains an interrogating nucleotide at the fifth posi-

---

[4] Unless otherwise indicated, all references to figures and column and line numbers in this brief refer to the '341 patent.

tion, then successive repetitions of the process can reveal the identity of every fifth nucleotide in the previously unknown DNA strand (e.g., at positions 5, 10, 15, etc.). By using different initializing oligonucleotides to shift registration, the position of the first interrogating, or extension oligonucleotide, probe is shifted by one or more nucleotides, allowing subsequent (or parallel) cycles of the method to reveal the identity of the nucleotides at positions 6, 11, 16, etc., and then at positions 7, 12, 17, etc., and so on. (*Id.*)

## III.  CLAIM CONSTRUCTION PRINCIPLES

It is a "'bedrock principle' of patent law that the 'claims of a patent define an invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman v. Westview Instruments., Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

The claim construction process serves to understand and explain, but not to change, the scope of the claims. *Demarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322-23 (Fed. Cir. 2001) (*citing Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)). Because the patentee is required to "define precisely what his invention is," it is "unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *White v. Dunbar*, 119 U.S. 47, 52 (1886); *see also Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 419 (1908) ("the claims measure the invention"). Thus, the starting point for any construction of a claim term is the language of the claim itself.

The words of a claim "are generally given their ordinary and customary meaning." *Phil-*

*lips*, 415 F.3d at 1312 (*quoting Vitronics*, 90 F.3d at 1582). However, "a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." *Id*. When a patentee has elected to be a lexicographer by providing an explicit definition in the specification for a claim term, the definition selected by the patentee controls. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Therefore, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582; *see also Markman,* 52 F.3d at 980-81.

To construe a claim, a court must consider the entire intrinsic record of the patent, which includes the patent specification and the prosecution history of the patent. *Vitronics*, 90 F.3d at 1581-82. In contrast to the intrinsic evidence on which the public is entitled to rely, extrinsic evidence consists of evidence external to the patent and its prosecution history, such as expert testimony, inventor testimony, dictionaries, treatises, and articles. *Markman*, 52 F.3d at 980.

In *Vitronics*, the Federal Circuit established the primacy of the intrinsic record in construing claims. The *Vitronics* court specifically noted that the intrinsic evidence is the "most significant source of the legally operative meaning of a disputed claim." 90 F.3d at 1582. The intrinsic record is typically sufficient to resolve any ambiguity of a patent claim term, and once such ambiguity is resolved, reliance on anything other than the intrinsic record is improper. *Id*. at 1583 (*citing Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995)). Extrinsic evidence may not be used to vary or contradict the claim language. *Markman*, 52 F.3d at 980. In *Phillips*, the Federal Circuit "reaffirm[ed] the approach to claim construction outlined in" *Vitronics*, noting that while extrinsic evidence may be useful to a court, it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence. 415 F.3d at 1324.

## IV.    SOLEXA'S PROPOSED CONSTRUCTIONS FOR THE DISPUTED CLAIM TERMS

The '341 patent has 19 claims. Claim 1 is an independent claim and claims 2-19 are ultimately dependent thereon, meaning that they have all of the limitations of claim 1 and at least one additional limitation. The six terms selected by the parties for construction by the Court appear in claim 1 of the '341 patent, which recites:

> 1. A method for determining a sequence of nucleotides in a target polynucleotide, the method comprising the steps of:
>
> (a) providing a probe-target duplex comprising an **initializing oligonucleotide probe** hybridized to a target polynucleotide, said probe having an extendable probe terminus;
>
> (b) **ligating an extension oligonucleotide probe to said extendable probe terminus**, to form an extended duplex containing an **extended oligonucleotide probe**;
>
> (c) **identifying**, in the extended duplex, at least one nucleotide in the target polynucleotide that is either (1) complementary to the **just-ligated extension probe** or (2) the nucleotide residue in the target polynucleotide which is immediately downstream of the extended oligonucleotide probe;
>
> (d) generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated; and
>
> (e) **repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined**.

In the following sections, we explain how Solexa's proposed constructions are supported by the intrinsic record and should be adopted by this Court, and why the constructions proposed by AB are not supported by the record and should not be adopted by this Court.

### A.    Background

The term "oligonucleotide" is expressly defined in the '341 specification as a "linear oligomer of nucleosides or analogs thereof," usually ranging "in size from a few monomeric units, e.g., 3-4, to several hundreds of monomeric units." (Col. 4, lines 4-8.) In DNA, the monomeric units are "nucleotides" composed of a deoxyribose sugar linked to both a phosphate group and

one of four nitrogenous bases: adenine, guanine, thymine, or cytosine (a sugar linked to only a base is called a "nucleoside"). By convention, bases and the nucleosides or nucleotides containing them are referred to by the first letter of the base's name: A, G, T, or C, respectively. (Col. 4, lines 12-14.) The deoxyribose sugar has 5 carbons, numbered 1′ through 5′, respectively, as shown in Appendix 1.

Because phosphodiester bonds link the 5′ and 3′ carbons of sugars in adjacent nucleosides in an oligonucleotide, one end of an oligonucleotide typically has a 5′ carbon with a free phosphate group and the other end typically has a 3′ carbon with a free hydroxyl group, as shown in Appendix 2. Nucleic acid sequences are conventionally written in the 5′ to 3′ direction. (Col. 4, lines 10-11).

Oligonucleotides can be "ligated"[5] (covalently joined together) by, for example, forming a phosphodiester bond between the free 5′ phosphate group of one oligonucleotide and the free 3′ hydroxyl group of the other; ligation can be accomplished either chemically or enzymatically using any of various DNA ligases. (Col. 7, line 52–col. 8, line 5.)

The methods claimed in the '341 patent involve hybridizing target polynucleotides and oligonucleotide probes in order to obtain DNA sequence information. Hybridization occurs as a result of hydrogen bonding, also known as "base pairing," between complementary bases in adjacent strands: "A" base-pairs with "T," and "C" base-pairs with "G," as shown in Appendix 3. An oligonucleotide can hybridize with a "complementary" strand of DNA when the strands are oriented such that they run in opposite, or "anti-parallel," directions. Thus, for example, the sequence 5′-ATGC-3′ in one strand will hybridize to the sequence 5′-GCAT-3′ in another strand, as

---

[5] At col. 4, lines 26-31, the '341 patent specification expressly defines "ligation" as a process "to form a covalent bond or linkage between the termini of two or more nucleic acids, e.g., oligonucleotides and/or polynucleotides, in a template-driven reaction. The nature of the bond or linkage may vary widely and the ligation may be carried out enzymatically or chemically."

1  shown in Appendix 4.

2      **B.      "Initializing oligonucleotide probe"**

3      The Court should construe "initializing oligonucleotide probe" to mean "the oligonucleo-

4  tide probe that hybridizes to a known sequence in a polynucleotide and establishes registration for

5  extension," as proposed by Solexa.[6] As discussed below, Solexa's proposed construction is sup-

6  ported by the intrinsic record.

7

8      First, Solexa's proposed construction for this term is supported by the claim language it-

9  self, which is where claim construction must begin.[7] According to step (a) of claim 1 of the '341

10  patent, an "initializing oligonucleotide probe" with an extendable probe terminus is hybridized to

11  a target polynucleotide to form a probe-target duplex. In step (b) of claim 1, this initializing oli-

12  gonucleotide is ligated to an extension oligonucleotide probe, forming an "extended oligonucleo-

13  tide probe," which can then be further extended by ligation of additional extension oligonucleo-

14  tide probes in subsequent rounds of the method's steps, in accordance with step (e) of claim 1.

15  Thus, the plain meaning of the claim language itself establishes that hybridization of the initializ-

16  ing oligonucleotide establishes registration, or a starting point, on the target polynucleotide for all

17  subsequent ligations in the claimed method that depend on the positioning of that particular ini-

18  tializing oligonucleotide.

19

20      The specifications of the patents-in-suit also support Solexa's proposed construction.[8] The

21  specifications teach that the "initializing oligonucleotide" hybridizes to a known sequence. For

22  example, Fig. 1 shows that multiple "initializing oligonucleotides" are hybridized to different por-

23

24

25      [6] Docket No. 78 at 12.

26      [7] *Interactive Gift Express v. CompuServe*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1582.

27      [8] "[T]he specification is always highly relevant to the claim construction analysis. Usually, it
28  is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1582.

tions of a structure labeled "40." The accompanying text explains that the initializing oligonu-cleotide "forms a perfectly matched duplex at a location in [the] binding region (40) . . . ." (Col. 4, lines 52-53) and that the binding region "has a known sequence." (Col. 5, line 13.) Thus, an "initializing oligonucleotide" is an oligonucleotide that binds to a known sequence in the target polynucleotide.

The specifications of the patents-in-suit also teach that the initializing oligonucleotide es-tablishes registration, or a starting point, for subsequent ligations on the target polynucleotide. As the patents describe, the claimed methods are:

> based on repeated cycles of duplex extension along a single stranded template. Preferably, such extension **starts** from a duplex formed between an initializing oligonucleotide and the template. The initializing oligonucleotide is extended in an **initial extension cycle** by ligating an oligonucleotide probe to its end to form an ex-tended duplex. The extended duplex is then repeatedly extended by subsequent cycles of ligation.[9]

The specification also teaches that different initializing oligonucleotides can be hybridized to separate aliquots of the template, such that:

> [e]ach initializing oligonucleotide forms a duplex with the template such that the end undergoing extension is one or more nucleotides out of **register**, or phase, with that of every other initializing oli-gonucleotide of the plurality. In other words, the starting nucleotide for extension is different by one or more nucleotides for each of the different initializing oligonucleotides.[10]

The specification describes this same aspect of the novel methods as using "a set of differ-ent initializing oligonucleotides, each hybridizing to the template to produce a different **starting point** for subsequent ligations."[11] Thus, the specification describes hybridization of the initializ-ing oligonucleotide to a known region as providing registration for the initial and all subsequent rounds of ligation, in accordance with Solexa's proposed construction.

---

[9] Col. 2, line 67–col. 3, line 7 (emphasis added).

[10] Col. 3, lines 18-24 (emphasis added).

[11] Col. 5, lines 23-26 (emphasis added).

AB's proposed construction for "initializing oligonucleotide" should be rejected because it fails to accord the term its proper scope when interpreted in light of the specification. AB proposes that this term be construed to mean "the oligonucleotide **to which the first extension oligonucleotide probe will be ligated**."[12] However, as shown in the following excerpt from Figure 1 of the patents-in-suit, and as explained in the accompanying text in the specification, the first extension oligonucleotide probe (designated "30") is ligated to **both** the initializing oligonucleotide (designated "$i_1$"), and the second extension probe (designated "31")[13]:



Moreover, AB's definition fails to capture the essential role of the initializing oligonucleotide in establishing registration for all ligations the extended oligonucleotide probe containing that initializing oligonucleotide. AB's proposed definition should be rejected for failing to distinguish between the initializing oligonucleotide and the second extension probe and for failing to provide a definition that comports with the full scope of the term that is apparent from the intrinsic record.

### C.    "Ligating an extension oligonucleotide probe to said extendable probe terminus"

The term "ligating an extension oligonucleotide probe to said extendable probe terminus" in step (b) of claim 1 of the '341 patent should be construed to mean "forming a covalent bond between an extension oligonucleotide probe and the extendable probe terminus of either an initializing oligonucleotide or an extended oligonucleotide probe while hybridized to a target polynucleotide," as proposed by Solexa.[14]

---

[12] Prehearing Statement at 6 (emphasis added).

[13] *See* Fig. 1, and accompanying text at col. 4, line 60 and col. 5, lines 1-4.

[14] Prehearing Statement at 12–13.

1

2    The parties' dispute regarding this claim phrase is actually quite narrow. AB expressly

3    agrees with Solexa's proposed construction of the term "ligating," which means "forming a cova-

4    lent bond between."[15] Nor is there any apparent dispute regarding the construction of "an exten-

5    sion oligonucleotide probe." Indeed, AB did not even offer a construction of this phrase in its

6    submissions under L.R. 4-2, despite having proposed this term for construction.[16]

7    The parties' disagreement as to the proper construction of "ligating an extension oligonu-

8    cleotide probe to said extendable probe terminus" reduces to a disagreement about the meaning of

9    a specific portion of the disputed phrase: "to said extendable probe terminus."[17] AB's construc-

10   tion limits the scope of this phrase to that suggested solely by the language of steps (a) and (b),

11   while Solexa's construction gives this phrase the broader meaning that is apparent from both the

12   claim language considered as a whole and from the specification.

13   As discussed in detail below, AB's position should be rejected because it is fatally flawed

14   in four ways: it impermissibly construes the phrase out of context, it is internally inconsistent, it

15   fails to construe the phrase in light of the specification, and it ignores the prosecution history.

16   First, AB's proposed construction should be rejected because it would impermissibly re-

17   quire the Court to ignore the rest of the claim language and thereby to construe the phrase out of

18   context. Proper claim construction begins with the words of the claims themselves,[18] and claim

---

[15] *Id.* at 6. The term "ligation" is expressly defined in the '341 patent specification as "to form a covalent bond or linkage between the termini of two or more nucleic acids, e.g., oligonucleo-tides and/or polynucleotides, in a template-driven reaction." (Col. 4, lines 26-31.)

[16] *Id.* at 6–7 (showing Solexa's proposed constructions in response to AB's request under L.R. 4-1 and no counter-proposal from AB); *compare* Exh. A at 2 *with* Exh. B at 3 (showing AB pro-posed that the term "extension oligonucleotide probe" be construed but provided no proposed construction).

[17] AB likewise failed to provide an independent construction for this term, despite having proposed it for construction in its L.R. 4-1 submission. *Id.*

[18] *Interactive Gift Express*, 256 F.3d at 1331.

terms must be interpreted in the context of the entire claim.[19] AB's proposed construction —

"forming a covalent bond between a short oligonucleotide probe and the extendable probe termi-

nus of the initializing oligonucleotide of step 1(a)" —impermissibly limits the meaning of "said

extendable probe terminus" to that implied solely by steps (a) and (b) of claim 1. Step (a) of claim

1 of the '341 patent recites, in relevant part, "an initializing oligonucleotide probe . . . having an

extendable probe terminus," while step (b) begins with the disputed phrase "ligating an extension

oligonucleotide probe **to said extendable probe terminus**." (emphasis added). Read in isolation,

as AB proposes, "said extendable probe terminus" in step (b) would refer only to the extendable

terminus on the initializing oligonucleotide of step (a), which provides one source of antecedent

basis for the term.

However, steps (a) and (b) are not recited in isolation, but rather in the context of the re-

maining steps, which must also be considered in order to properly construe the disputed phrase.

Specifically, AB's construction ignores steps (d) and (e) of claim 1, which recite:

> (d) **generating an extendable probe terminus on the extended
> probe**, if an extendable probe terminus is not already present, such
> that the terminus generated is different from the terminus to which
> the last extension probe was ligated; and
>
> (e) repeating steps (b), (c) and (d) until a sequence of nucleotides in
> the target polynucleotide is determined (emphasis added).

In the context of these additional steps, the proper construction of the claim phrase "ligat-

ing an extension oligonucleotide probe to said extendable probe terminus" is very different than

that proposed by AB.

Because step (d) provides that a new "extendable probe terminus" is either already present

---

[19] *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"); *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) (reversing district court's claim construction, and stating "[p]roper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation.").

OPENING CLAIM CONSTRUCTION BRIEF OF COUNTERCLAIM PLAINTIFF SOLEXA, INC.; CASE NO: 07-CV-02845 WHA

or is generated **on the extended probe** in each round of the method steps, the plain language of the claims, when read in context, requires that "ligating an extension oligonucleotide probe to said extendable probe terminus" be construed to allow **either** the initializing oligonucleotide or the extended probe to participate, in accordance with step (e), in any additional rounds of ligation and generation of an extendable terminus so as to determine a sequence of nucleotides in the target polynucleotide. Because AB's proposed construction limits this phrase to mean forming a covalent bond between only an extension probe and the extendable probe terminus of the initializing oligonucleotide, as in the first iteration of the method steps, it is incompatible with the plain meaning of the claim language and must be rejected.

Second, AB's construction must be rejected because it is internally inconsistent with its construction of step (d) of claim 1. Claim terms should be construed so as to avoid internal inconsistency.[20] Here, AB's construction of step (d) cannot be reconciled with its construction of step (b). AB construes "the terminus generated is different from the terminus to which the last extension probe was ligated," as recited in step (d), to mean "that the terminus generated, if any, on the extended oligonucleotide probe of step 1 (b) is in a **different location** than the extendable probe terminus of the initializing oligonucleotide of step 1(a)." Thus, while its construction of step (b) requires that the extension probes be ligated *only* to "the extendable probe terminus of the initializing oligonucleotide of step 1(a)," according to AB's proposed construction of step (d) this structure would *no longer exist*, because the extendable terminus of the initializing oligonucleotide probe would have been lost upon ligation of an extension oligonucleotide probe to form an ex-

---

[20] *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004) (rejecting challenge to district court's claim construction that would render claims terms internally inconsistent); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001); *Space Systems/Loral, Inc. v. Lockheed Martin Corp.*, 2006 U.S. Dist. LEXIS 70712, *11-*12 (N.D. Cal. Sept. 19, 2006) (revisiting earlier claim construction to resolve internal inconsistency between method steps).

tended oligonucleotide probe. AB's constructions of steps (b) and (d) are, therefore, internally inconsistent and should be rejected. Stated in the alternative, AB's construction requires that extension probes be ligated only to an initializing oligonucleotide, and, because such ligations are completed in the first iteration of steps (b)-(d) of the method, it becomes impossible to repeat those steps, as required by step (e). A claim construction that renders a claim inoperative is rarely correct and, where an alternative construction both comports more closely with the law of claim construction and renders the claimed subject matter operative, it cannot be correct.

Third, AB's construction is uniformly contradicted by the description of the recited method in the specification. The claims must be read in light of the specification, of which they are a part.[21] The presumption that a claim term has the same meaning wherever it is used can be overcome by evidence from the specification and prosecution history.[22] In addition, a construction that excludes a preferred embodiment of the invention "is rarely, if ever, correct and would require highly persuasive evidentiary support . . . ."[23]

The specification, including the preferred embodiments described therein, contradicts AB's proposed construction. Beginning with the Summary of the Invention, the specification teaches that following the "initial extension cycle," the "**extended duplex** is repeatedly extended by subsequent cycles of ligation" that require "regenerating an extendable terminus."[24] Continuing through the Detailed Description of the Invention and the examples, the specification consis-

---

[21] *Phillips,* 415 F.3d at 1315.

[22] *See, e.g., Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006); *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001); *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002); *Stv Asia Ltd. v. PRN Corp.*, 2006 U.S. Dist. LEXIS 95523, *40–*41 (N.D. Cal. Feb. 15, 2007) (citing *Fin Control* and concluding, based on the specification, that a disputed term had two meanings in the claims).

[23] *Vitronics,* 90 F.3d at 1583; *see also Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

[24] Col. 3, lines 5-15 (emphasis added).

tently teaches that the method involves repeated cycles of ligation, first between an extension probe and the initializing oligonucleotide, and thereafter between an extension probe and the extended oligonucleotide probe.[25]

AB's construction is contradicted by all of these examples and preferred embodiments. Indeed, AB cannot point to a single example in which the cycles of oligonucleotide ligation, nucleotide identification, and extendable probe terminus regeneration occur repeatedly and solely on the extendable terminus on the initializing oligonucleotide.

In contrast, Solexa's proposed construction, which encompasses ligation of extension probes to either the initializing oligonucleotide or the extended oligonucleotide probe, is completely consistent with, and supported by, the specification.

Finally, AB's construction is inconsistent with the prosecution history, which is intrinsic evidence that provides valuable guidance when construing claims.[26] During prosecution, the Examiner was told that, if needed, "a new extendable probe terminus on the extended probe is generated. The steps of ligation, identification, and (optional) regeneration are repeated until a sequence of nucleotides in the target is determined."[27] This explanation is fully consistent with the examples in the specification discussed above and supports Solexa's proposed construction.

### D.    "Extended oligonucleotide probe"

AB's proposed construction of "extended oligonucleotide probe" as "the extended product

---

[25] See Fig. 1 and col. 4, line 58 to col. 5, line 5 (explaining that the first extension probe is ligated to the initializing oligonucleotide and subsequently extension probes are ligated to the extended duplex); col. 5, line 66 to col. 6, line 2 (explaining that "oligonucleotide probes should be capable of being ligated to an initializing oligonucleotide or extended duplex to generate the extended duplex of the next extension cycle . . . ."); col. 7, lines 52-54 (same); see also Fig. 2 and col. 9, line 46-47; Fig. 3A and col. 10, lines 58-63; Fig. 3B and col. 11, lines 9-14; and Fig. 4 and col. 11, lines 41-43 (all describing repetition of method steps).

[26] See, e.g., Vitronics, 90 F.3d at 1581-82 and Markman, 52 F.3d at 979-80.

[27] Exh. C at 9.

of the ligation of the extension oligonucleotide probe of step 1(b) to the initializing oligonucleo-
tide of step 1(a)" perpetuates its error of reading claim terms out of context and ignoring a major-
ity of the intrinsic record in order to arrive at an impermissibly narrow claim construction.[28] For
the reasons discussed below, the Court should decline AB's invitation to engage in such error and
should instead construe "extended oligonucleotide probe" to mean "an initializing oligonucleotide
probe effectively extended by one or more nucleotides," as proposed by Solexa.[29]

First, AB's construction violates basic tenets of claim construction because it fails to take
into account the plain meaning of steps (d) and (e) of claim 1. Claim 1 describes a method for de-
termining the sequence of a target polynucleotide involving repeated steps of ligation and regen-
eration of an extendable terminus that can be used in the next iteration of the claim-recited steps.
Although the method of claim 1 begins with ligation of an extension probe to an initializing oli-
gonucleotide to form "an extended oligonucleotide probe," the plain meaning of the claim terms
does not require, as AB contends, that the succeeding cycle(s) repeatedly ligate an extension
probe to the initializing oligonucleotide. To the contrary, as shown in the examples discussed
above, the only reasonable construction of claim 1 is that a ***new*** extended oligonucleotide probe is
formed in each cycle of the method and then further extended in the next round.

Second, AB's position is also internally inconsistent with its construction of step (d), and
can be rejected on that basis alone. For the same reasons discussed above, the extended oligonu-
cleotide probe cannot be, as AB contends, the product of repeated cycles of ligation between "the
initializing oligonucleotide of step 1(a)" and an extension probe, if the "initializing oligonucleo-
tide of step 1(a)" no longer exists following one iteration of the claim-recited steps, as required by

---

[28] Although it is not a term that the parties have requested this Court to construe at the *Mark-man* hearing, AB's definition of "extended probe" as "the extended oligonucleotide probe of step 1(b)" suffers from the same deficiencies.

[29] Prehearing Statement at 13.

1    AB's proposed construction.

2         In contrast, Solexa's proposed construction is both internally consistent and supported by

3    the specification. The specification's references to the term "extended duplex" implicitly support

4    Solexa's proposed construction, and the law recognizes that a term may be defined explicitly or

5    by implication.[30] The specification states that the initializing oligonucleotide is "extended" by

6    ligation of an oligonucleotide probe to form an "extended duplex," which claim 1 refers to as "an

7    extended duplex containing an extended oligonucleotide probe." One would look to the specifica-

8    tion's description of "extended duplex" when determining the meaning of "extended oligonucleo-

9    tide probe" because these two terms are used interchangeably in referring to the structure that is

10   ligated to the extension probe in subsequent cycles of the method. For example, in light of the

11   specification's statement that "the oligonucleotide probes should be capable of being ligated to an

12   initializing oligonucleotide or extended duplex *to generate the extended duplex of the next exten-*

13   *sion cycle,*"[31] the phrase "extended oligonucleotide probe" cannot refer solely to the original ex-

14   tended duplex/extended oligonucleotide probe, but rather to all probes formed by effectively "ex-

15   tending" the initializing oligonucleotide, as proposed by Solexa.

16

17        Figures 2, 3A, 3B, and 4, along with their accompanying text in the specification, also

18   support Solexa's proposed construction. These figures describe multiple processing steps by

19   which nucleotides and/or other chemical moieties are added and/or removed from the extended

20   duplex.[32] Nevertheless, the specification refers to all of these different structures as an "extended

---

[30] *See, e.g.*, *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003) ("The applicant may also act as his own lexicographer and use the specification to implicitly or explicitly supply new meanings for terms"); *accord Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1582.

[31] Col. 5, line 66 to col. 6, line 2 (emphasis added).

[32] Examples of processing steps include hydrolyzing scissile bonds in the extension probe to regenerate an extendable terminus, capping, extension using polymerase, and phosphatase treatment.

duplex," there being no need to have separate names for each of them where one will suffice. This is consistent with and supports Solexa's proposed construction of "extended oligonucleotide probe" as being part of an extended duplex: once the first extension probe has been ligated to the initializing oligonucleotide, the resulting structure is called an "extended oligonucleotide probe," regardless of the subsequent addition, removal, or modification of parts of it as the cycles of the method are carried out.

### E.    "Identifying"

The Court should construe "identifying" to mean "obtaining information sufficient to distinguish," as proposed by Solexa.[33] AB's proposed construction for "identifying" as "within each cycle determining the identity of a base, as either A, T, G, or C, in the target polynucleotide" would require this Court to improperly narrow the scope of this term in a manner that is contrary to both the plain meaning of the term and express definitions in the specification. Consequently, AB's construction is incorrect as a matter of law and must be rejected.

First, AB's construction is incorrect because it limits the term "identifying" to mean the determination of the identity of only "a" single base. Thus, under AB's proposed definition, identifying more than one base might not fall within the literal scope of the claims. This construction is contrary to the plain language of the claims. Step (c) of claim 1 recites, in relevant part, "identifying, in the extended duplex, *at least one* nucleotide in the target polynucleotide." It would be error to limit "identifying" to mean "of a [single] base" when the claim language itself demands a broader construction. AB's construction can be rejected on that basis alone.

Second, AB's limitation of "identifying" to mean "of a [single] base" is contrary to the use of the term in the specification. For example, the specification states that "[d]uring each cycle, the identity of one *or more* nucleotides in the template is determined by a label on, or associ-

---

[33] Prehearing Statement at 14 and 17.

ated with, a successfully ligated oligonucleotide probe."[34]

Third, AB's construction would also improperly exclude preferred embodiments. Discussing one preferred embodiment of the invention, the specification states "[t]hus, the identity of the one **or more** terminal nucleotides would be correlated to a distinct color, or perhaps ratio of intensities at different wavelengths."[35] Because it excludes "identifying" more than one base, AB's construction is inconsistent with the term's use in the specification and must be rejected.

Fourth, AB's proposed construction would incorrectly limit the types of bases which may be "identified" as a result of the method to the standard bases found in DNA — A, T, G, and C — and thus would exclude analogs and modified bases expressly defined to fall within the scope of the claims. This would be error because "[w]hen a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term."[36] The specification defines the term "oligonucleotide" to include oligomers of "nucleosides **or analogs thereof**, including deoxyribonucleosides, ribonucleosides, and the like,"[37] including "the 2′-deoxy and 2′-hydroxyl forms" and "'[a]nalogs' in reference to nucleosides includes synthetic nucleosides having modified base moieties and/or modified sugar moieties . . . ."[38] Because AB's construction excludes "identifying" any base other than A, T, G, or C, it must be rejected.

Fifth, AB's construction is incorrect because it limits "identifying" to mean the express determination of a base's specific identity, contrary to the specification's much broader definition for this term:

---

[34] Col. 3, lines 7-10.

[35] Col. 14, lines 30-31.

[36] *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).

[37] Col. 4, lines 4-6.

[38] Col. 4, lines 18-20.

> As used herein, 'sequence determination,' 'determining a nucleotide sequence,' 'sequencing,' **and like terms**, in reference to polynucleotides includes determination of partial as well as full sequence information of the polynucleotide. That is, the term includes sequence comparisons, fingerprinting, and like levels of information about a target polynucleotide, **as well as the express identification** and ordering of each nucleoside of the test polynucleotide.[39]

When a specification uses terms interchangeably, definitions of one term apply equally to the other.[40] The specification uses "identifying" and "determining" interchangeably.[41] AB also uses the terms interchangeably.[42] The term "identifying" cannot be limited as proposed by AB in light of the broader scope afforded the term by the specification's definition.

Solexa proposes that "identifying" be construed as "obtaining information sufficient to distinguish." This construction incorporates the express definition of the term and its use in the specification. As the specification describes, while the recited method can be practiced to obtain express identification of the bases in a target polynucleotide, it need not be. The specification's definition of "identifying" encompasses obtaining a range of information. Solexa's proposed construction encompasses the proper breadth of this definition and thus the proper scope of claim 1, rather than improperly focusing, as AB does, on a single embodiment.

The specification routinely uses "identifying" in a manner consistent with the construction proposed by Solexa. For example, as pointed out above, the specification teaches that "identify-

---

[39] Col. 3, lines 53-60 (emphasis added).

[40] *See, e.g., Enercon GmbH v. Int'l Trade Comm'n,* 151 F.3d 1376, 1384-85 (Fed. Cir. 1998) (refusing to limit a term used "interchangeably" in the written description to only one of the uses of the term); *see also Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298, 1308 (Fed. Cir. 2003) ("Contrary to the district court's conclusion, varied use of a disputed term in the written description attests to the breadth of a term rather than providing a limiting definition.").

[41] *See, e.g.,* col. 1, lines 5-7 ("The invention relates generally to methods for **determining the nucleotide sequence of a polynucleotide**, and more particularly, to a **method of identifying nucleotides in a template** by stepwise extension of one or more primers by successive ligations of oligonucleotide blocks.") (emphasis added).

[42] Prehearing Statement at 7 ("'**identifying**' means within each cycle **determining the identity** of a base . . . .") (emphasis added).

ing" one or more bases of a target polynucleotide can be accomplished by reading a fluorescent signal emitted from a dye associated with an extension oligonucleotide probe. The specification describes multiple examples of obtaining information sufficient to distinguish nucleotides in this manner.[43] Solexa's proposed construction is consistent with and supported by the plain meaning of this claim term and its use throughout the specification, and should be adopted.

### F.    "Just-ligated extension probe"

The Court should construe "just-ligated extension probe" to mean "the extension oligonu-cleotide probe ligated to either the initializing oligonucleotide probe or an extended oligonucleo-tide probe in the present cycle of the method," as proposed by Solexa.[44] As discussed above, claim 1 recites a method for sequencing a target polynucleotide that involves repeating steps of ligation and regeneration of an extendable terminus. In the context of the entire claim, the term "just-ligated extension probe" refers to the extension probe ligated in any single cycle of the method.

Solexa's proposed construction is consistent with the plain meaning of the term and the context of the claim. Because the claim recites repeated cycles of ligation, in each cycle there will be a "just-ligated extension probe," which will have been ligated either to the initializing oligonu-cleotide (in the first cycle of the method) or to the extended oligonucleotide probe (in all subse-quent cycles). This construction is consistent with the implicit definition of this term in the speci-fication.[45]

---

[43] *See*, *e.g.*, col. 14, lines 30-32 ("Thus, the identity of the one or more terminal nucleotides would be correlated to a distinct color, or perhaps ratio of intensities at different wavelengths."; col. 16, l. 35-37 ("[T]he identity of the extended nucleotide is determined by illuminating each reaction mixture with standard wavelengths."); col. 18, lines 9-12 ("After ligation and washing, a nucleotide is identified by the fluorescent signal of the oligonucleotide probe.").

[44] Prehearing Statement at 14.

[45] *See*, *e.g.*, col. 3, lines 7-10 ("The initializing oligonucleotide is extended in an initial exten-sion cycle by ligating an oligonucleotide probe to its end to form an extended duplex. The ex-

Step (d) of claim 1 provides additional contextual support for this construction. Step (d) of claim 1 recites that the extendable terminus regenerated on the extended probe is "different from the terminus to which the *last* extension probe was ligated" (emphasis added), which requires a construction whereby multiple probes can be ligated, as Solexa proposes.

In contrast, AB's proposed construction of "just-ligated extension probe" is internally inconsistent, ignores the plain meaning of the terms, and ignores the specification, because it excludes the possibility of repeated rounds of extension as expressly required by step (e) of claim 1. AB construes this phrase to mean "the extension oligonucleotide probe of step 1(b) that was ligated within that cycle to the initializing oligonucleotide of step 1(a)." In other words, AB maintains that extension probes are repeatedly, and only, ligated to the initializing oligonucleotide of step 1(a). This definition must be rejected for several reasons.

First, AB's proposed construction is internally inconsistent. Although AB asks the Court to construe "just-ligated extension probe" as being ligated "to **the initializing oligonucleotide of step 1(a)**" in every cycle of the method, AB's construction of step (d) of claim 1 renders that impossible. If, in accordance with AB's construction of step (d), the extendable end generated in step (d) is "in a **different location** than the extendable probe terminus of the initializing oligonucleotide of step 1(a)," the initializing oligonucleotide of step 1(a) would no longer exist.

Second, AB's construction is irreconcilable with the claim language and the description of the method in the specification. As just discussed above, the method is invariably described as involving extension of *both* the initializing oligonucleotide and the extended duplex in subsequent cycles. AB's proposed construction unreasonably narrows the term "just-ligated extension probe" to only part of the meaning required by the claim language itself and the description of the

tended duplex is then repeatedly extended by subsequent cycles of ligation."); Fig. 1 and col. 4, line 58–col. 5, line 9 (illustrating the same); col. 5, line 58 to col. 6, line 2; col. 7, lines 52-55.

1    method in the specification, and should be rejected.

2          **G.**    **"Repeating steps (b), (c) and (d) until a sequence of nucleotides in the**
3                   **target polynucleotide is determined"**

4          The Court should construe "repeating steps (b), (c) and (d) until a sequence of nucleotides

5    in the target polynucleotide is determined" to mean "repeating steps (b), (c), and (d) until partial

6    or complete sequence information of the target polynucleotide is obtained, including, for exam-

7    ple, sequence comparisons, fingerprinting, and like levels of information, as well as the express

8    identification and ordering of nucleotides," as proposed by Solexa.[46]

9
10         Solexa's construction of this claim phrase follows necessarily from the plain meaning of

11   the claim language and the explicit definitions in the specification. The meaning of the phrase

12   "repeating steps (b), (c) and (d)" itself should not require a formal construction because the use of

13   "repeating" and related terms in the specification does not suggest this term carries other than its

14   ordinary meaning.[47] The Court should therefore apply the plain and ordinary meaning of "repeat-

15   ing steps (b), (c) and (d)," consistent with its use in the claims and the specification.

16
17         Solexa's construction of this claim phrase should also be adopted because it incorporates

18   the express definition of "determining a nucleotide sequence . . . and like terms" found in the

19   specification.[48] This definition encompasses the phrase "until a sequence of nucleotides in the

20   target polynucleotide is determined" and should be therefore be applied to the latter phrase.

21         AB's construction of this disputed phrase has no basis in the plain meaning of the terms

22   and no support in the specification. Under AB's construction — "completing, and then perform-

23   ing again, exactly what is described in steps (b), (c) and (d) until two or more nucleotides in the

24   _____

     [46] Prehearing Statement at 14.

25        [47] *See, e.g.*, usage of "repeating" and like terms at col. 2, line 66–col. 3, line 33 and in Figures
26   1-4 and accompanying text, including col. 4, line 58–col. 5, line 9; col. 8, lines 56-57; col. 9, lines
     9-47; col. 10, lines 34-63; col. 11, lines 1-13 & 18-43; *see also*, col. 16, lines 40-45 and col. 18,
27   16-17.

     [48] Col. 3, lines 53-60; full definition *supra* at n.39 and accompanying text.
28

1  unknown sequence that is targeted for analysis are identified" — "repeating" would seem to re-

2  quire futile repetition of the exact same steps on the exact same reactants. Such a construction is

3  not required by the plain meaning of "repeating." In addition, because AB defines "determined"

4  as "identified," its construction suffers from the same deficiencies discussed above with regard to

5  its construction of "identifying." In sum, AB would have the Court construe this disputed phrase

6  narrowly to require express identification of two or more bases as A, T, G, or C by determining a

7  single base at a time. That construction is wrong because it would require the Court to ignore the

8  express definitions of "determining a nucleotide sequence," "oligonucleotide," and "nucleoside,"

9  which encompass a broader scope of obtaining information sufficient to distinguish more than

10 one base or analog with regard to various categories of information, including sequence compari-

11 sons, fingerprinting, and like levels of information, as well as the express identification and order-

12 ing of nucleotides.

13 **V.    PRECIS OF IMPACT ON SUMMARY JUDGMENT**

14        Although AB's insistence that 32 terms[49] from the 12 asserted claims require construction

15 prevents a comprehensive resolution of the outstanding issues, Solexa believes that summary

16 judgment could be materially advanced in at least two areas by the Court's adoption of Solexa's

17 proposed claim constructions.

18        First, adopting Solexa's positions would permit the Court to render summary judgment

19 against several of AB's indefiniteness contentions. AB contends that the phrases "extended oli-

20 gonucleotide probe," "just-ligated extension probe," "said extendable probe terminus," and "a

21 sequence of nucleotides in the target polynucleotide" are indefinite.[50] Summary judgment is ap-

---

[49] This number includes two terms that AB proposed for construction, but unilaterally failed to independently construe in its submission to Solexa under L.R. 4-2.

[50] Exh. D at 10–12.

1   propriate if the Court arrives at a definite and clear construction of these terms.[51]

2       Second, because AB's non-enablement contentions against the '341 patent depend on its

3   construction of "repeating steps (b), (c), and (d) until a sequence of nucleotides in the target

4   polynucleotide is determined," summary judgment in favor of Solexa would be warranted if the

5   Court rejects AB's construction of this phrase in favor of Solexa's.[52]

6

7   **VI.    CONCLUSION**

8       For the reasons stated above, Solexa respectfully requests that the Court adopt its con-

9   structions of the disputed terms.

---

25   [51] *All Dental Prodx v. Advantage Dental Prods.*, 309 F.3d 774, 780 (Fed. Cir. 2002) (revers-
26   ing summary judgment of indefiniteness where district court's construction of term was clear).

     [52] *Ingenio, Filiale de Loto-Quebec, Inc. v. GameLogic*, Inc., 445 F. Supp. 2d 443, 458 (D.
27   Del. 2006) (granting summary judgment against non-enablement defense that depended on a
28   claim construction of the defendant that had been rejected by the court).

OPENING CLAIM CONSTRUCTION BRIEF OF COUNTERCLAIM PLAINTIFF SOLEXA, INC.; CASE NO: 07-CV-02845
WHA

1    Dated: January 4, 2008                    Respectfully submitted,

2

3
                                              /s/ John R. Labbe
4                                             KEVIN M. FLOWERS (admitted *pro hac vice*)
                                              THOMAS I. ROSS (admitted *pro hac vice*)
5                                             JEFFREY H. DEAN (admitted *pro hac vice*)
                                              GREGORY E. STANTON (CA Bar No. 203495)
6                                             JOHN R. LABBE (admitted *pro hac vice*)
                                              MARSHALL, GERSTEIN & BORUN LLP
7                                             6300 Sears Tower
                                              233 South Wacker Drive
8                                             Chicago, IL 60606-6357
                                              (312) 474-6300
9                                             (312) 474-0448 (facsimile)
                                              E-Mail: kflowers@marshallip.com
10                                            E-Mail: tross@marshallip.com
                                              E-Mail: jdean@marshallip.com
11                                            E-Mail: gstanton@marshallip.com
                                              E-Mail: jlabbe@marshallip.com
12

13

14                                            Counsel for Counterclaim Plaintiff
                                              SOLEXA, INC.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Appendix 1 – Carbon positions on 2′-deoxyribose**

2

3

4

5

6

7

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appendix 2 – Phosphodiester bonds link 5′ and 3′ carbon positions on adjacent nucleotides**



1

2          **Appendix 3 – Hydrogen bonds form between complementary DNA bases**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Appendix 4 – Complementary, anti-parallel sequences can hybridize**

3
4

5' A T G C 3'      5' G C A T 3'

5
6
7
8

5' A T G C 3'

9

3' T A C G 5'

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28