1  BRYAN WILSON (CA BAR NO. 138842)
   ERIC C. PAI (CA BAR NO. 247604)
2  MORRISON & FOERSTER LLP
   755 Page Mill Road
3  Palo Alto, California 94304-1018
   Telephone: 650.813.5600
4  Facsimile: 650.494.0792
   E-Mail: BWilson@mofo.com; EPai@mofo.com
5
   DAVID C. DOYLE (CA SBN 70690)
6  STEVEN E. COMER (CA SBN 154384)
   BRIAN M. KRAMER (CA SBN 212107)
7  MORRISON & FOERSTER LLP
   12531 High Bluff Drive, Suite 100
8  San Diego, California  92130-2040
   Telephone: 858.720.5100
9  Facsimile: 858.720.5125
   E-Mail: DDoyle@mofo.com; SComer@mofo.com;
10  BMKramer@mofo.com

11  Attorneys for Plaintiff
   APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP

12

13            UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA

15            SAN FRANCISCO DIVISION

16

| | |
|---|---|
| 17  APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP, a Delaware 18  corporation, | Case No.   C07 02845 WHA |
| 19          Plaintiff, | **APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP'S:** |
| 20     v. | **(1) OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE-LAW CAUSES OF ACTION FOR FAILURE TO COMPLY WITH THE STATUTES OF LIMITATIONS** |
| 21  ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and 22  STEPHEN C. MACEVICZ, an individual, | |
| 23         Defendants. | **(2) NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS** |
| 24 | |
| 25 | Date:    March 13, 2008 |
| 26 | Time:    8:00 a.m. Place:   Courtroom 9, 19th Floor |
| 27 | Judge:  William H. Alsup |
| 28 | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ........................................................................................ 2

        A.      Dr. Macevicz's Fiduciary And Contractual Duties To AB ........................ 3

        B.      Dr. Macevicz's Failure To Disclose ............................................................ 4

        C.      AB's Limited Patent Searches ..................................................................... 5

III.    ARGUMENT ............................................................................................................. 7

        A.      The Court Has Ruled That Whether The Patents Were Related To AB's
                Business Is A Disputed Issue Of Fact ........................................................ 7

        B.      AB Did Not Have Constructive Notice Of Its Claims Before 2006 ........... 8

                1.      Dr. Macevicz's Fiduciary Relationship With AB Tolled The Statute
                        Of Limitations And Substantially Reduced AB's Duty Of Diligence ....... 9

                2.      Constructive Notice Of The Existence Of The Patents Did Not
                        Provide AB With Constructive Notice Of Its Claims .............................. 12

                        a.      Defendants' Bright-Line Rule Of Constructive Notice
                                Misrepresents The Case Law On Statute Of Limitations ............. 12

                        b.      Defendants' Theory Of Constructive Notice Overstates The
                                Effect Of Patent Issuance ............................................................ 14

                3.      Defendants' Theory Of Constructive Notice Is Impractical And
                        Unreasonable ........................................................................................... 16

        C.      AB's Cross-Motion For Summary Judgment Should Be Granted ....................... 17

                1.      Dr. Macevicz's Fiduciary Relationship With AB Tolled The Statute
                        Of Limitations And Substantially Reduced AB's Duty Of Diligence ...... 17

                2.      AB Did Not Have Actual or Constructive Notice Of Its Claims
                        Until 2006 ................................................................................................ 19

IV.     CONCLUSION ........................................................................................................ 22

# TABLE OF AUTHORITIES

Page

# TABLE OF AUTHORITIES

## CASES

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993)............................................................................................ 8, 15

*Amen v. Merced County Title Co.*,
  58 Cal. 2d 528 (1962) ...................................................................................................... 9, 13, 17

*April Enters., Inc. v. KTTV*,
  195 Cal. Rptr. 421 (Ct. App. 1983)............................................................................ 8, 9, 10, 17

*Bennett v. Hibernia Bank*,
  47 Cal. 2d 540 (1956) ...................................................................................................... 9, 11, 17

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
  120 F.3d 1253 (Fed. Cir. 1997)............................................................................................... 15

*Cross v. Bonded Adj. Bureau*,
  55 Cal. Rptr. 2d 801 (Ct. App. 1996).................................................................................... 10

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006) .............................................................................................. 15

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992).................................................................................................................... 3

*Fenn v. Yale Univ.*,
  283 F. Supp. 2d 615 (D. Conn. 2003) ..................................................................................... 9

*Gen. Bedding Corp. v. Echevarria*,
  947 F.2d 1395 (9th Cir. 1991)................................................................................................. 14

*Gryczman v. 4550 Pico Partners, Ltd.*,
  131 Cal. Rptr. 2d 680 (Ct. App. 2003)............................................................................... 9, 11

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001).................................................................................................. 12

*Hobart v. Hobart Estate Co.*,
  26 Cal. 2d 412 (1945) ........................................................................................... 8, 9, 17, 18, 19

*IBM Corp. v. Zachariades*,
  No. 94-15388, 1995 WL 697210 (9th Cir. Nov. 22, 1995) ................................................... 12

*IBM Corp. v. Zachariades*,
  No. C 91-20419-JW, 1993 WL 443409 (N.D. Cal. Oct. 27, 1993) ............................... 8, 12, 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Kimberly Corp. v. Hartley Pen Co.*,
    237 F.2d 294 (9th Cir. 1956)................................................................. 13, 14

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
    902 F.2d 703 (9th Cir. 1990)....................................................................... 7

*nCube Corp. v. SeaChange Int'l, Inc.*,
    436 F.3d 1317 (Fed. Cir. 2006)................................................................... 15

*Neel v. Magana, Olney, Levy, Cathcart & Gelfand*,
    6 Cal. 3d 176 (1976) ...................................................................... 4, 11, 18

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...................................................................................... 7

*Prudential Home Mortgage Co. v. Super. Ct.*,
    78 Cal. Rptr. 2d 566 (Ct. App. 1998).................................................... 9, 11

*Richardson v. United States*,
    841 F.2d 993 (9th Cir. 1988)........................................................................ 7

*SRI Int'l v. Advanced Tech. Lab.*,
    127 F.3d 1462 (Fed. Cir. 1997)................................................................... 15

*Sontag Chain Stores Co. v. Nat'l Nut Co.*,
    310 U.S. 281 (1940)..................................................................................... 14

*Stark v. Advanced Magnetics, Inc.*,
    29 F.3d 1570 (Fed. Cir. 1994)..................................................................... 17

*Stark v. Advanced Magnetics, Inc.*,
    736 N.E.2d 443 (Mass. App. Ct. 2000)...................................................... 10

*U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
    1 Cal. 3d 586 (1970) .............................................................................. 9, 17

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
    880 F. Supp. 1387 (D. Colo. 1995)
       *aff'd in relevant part*, 196 F.3d 1366 (Fed. Cir. 1999) ........................ 15

*Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*,
    297 U.S. 387 (1936)..................................................................................... 14

*Yeda Research & Dev. Co. v. Imclone Sys. Inc.*,
    443 F. Supp. 2d 570 (S.D.N.Y. 2006)........................................................ 16

**TABLE OF AUTHORITIES**
(continued)

Page

**RULES**

9th Cir. Rule 36-3(c) ........................................................................................................... 12

Fed. R. App. P. 32.1 ........................................................................................................... 12

Fed. Cir. R. 32.1 ................................................................................................................ 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION**

TO ILLUMINA, INC., SOLEXA, INC., AND STEPHEN C. MACEVICZ ("DEFENDANTS") AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 13, 2008, in the Courtroom of the Honorable William H. Alsup, located at 450 Golden Gate Avenue, San Francisco, California, in the hour of 8:00 a.m., Plaintiff Applera Corporation – Applied Biosystems Group ("AB") by and through its counsel, will move and hereby does move this Court for summary judgment that AB's First through Seventh Causes of Action are not barred by the statute of limitations.

This motion is based on the Memorandum of Points and Authorities below, the Declaration of Eric C. Pai ("Pai Decl.") and attached exhibits, the Declaration of Adam M. Tschop ("Tschop Decl.") and attached exhibits, the Declaration of Scott Bortner ("Bortner Decl."), the Declaration of Steven Fung, Ph.D. ("Fung Decl."), the Declaration of Paul Grossman, Ph.D. ("Grossman Decl."), the Declaration of Michael Hunkapiller, Ph.D. ("Hunkapiller Decl."), the Declaration of Vincent M. Powers, Ph.D. ("Powers Decl."), and on all of the documents and records on file in this action, and all matters judicially noticeable therefrom.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

No court has ever held that, *regardless of the particular facts and circumstances of the case*, the issuance of a patent alone constitutes constructive notice sufficient to trigger the statute of limitations for an ownership claim over that patent. This Court ruled just three weeks ago: "Notice of the patent itself, however, may not be enough for our purposes." (1/17/08 Order ("Docket No. 88"), at 9.) Yet, Defendants' motion for summary judgment rests entirely on this unsupportable legal theory.

Numerous courts have rejected Defendants' theory, and for good reason – such a sweeping theory of constructive notice would reward the most pernicious of thieves and saddle innovative companies with impossible burdens. In Defendants' world of constructive notice, AB (and any other innovation-driven company) would be obligated to hire an army of patent

AB's: (1) Opp to Defs' MSJ on Statute of Limitations; (2) Cross-MSJ on Statute of Limitations
Case No. C07 02845 WHA
pa-1225525

1

1    attorneys to monitor constantly all patents that issue, not just those issuing in areas of its business.

2    Yet even this precaution would not be enough.  AB would still have to commission more

3    attorneys and personnel to watch over the shoulders of the very attorneys charged with

4    professional and fiduciary responsibilities to protect AB's intellectual property and interests.  This

5    is not and should not be the law.

6        The Court asked for "a fully developed record" on the statute of limitations.  (Docket No.

7    88, at 10.)  Instead, Defendants brought this motion relying solely on the issuance of the patents

8    and AB's argument that there is no genuine factual dispute that the patents are related to its

9    business, an argument that Defendants successfully persuaded this Court to reject.  Defendants'

10   failure to make any showing as to the relevant facts, and the law of the case, defeat their summary

11   judgment motion.  The consequences of their inattention to the facts do not end there though.  In

12   support of its cross-motion for summary judgment, AB presents undisputed facts that prove, as a

13   matter of law, its First through Seventh Causes of Action are not barred by the statute of

14   limitations.

15       As AB's attorney and Senior Patent Counsel, Dr. Macevicz held a position of trust and

16   owed AB fiduciary duties of the highest character.  As the very fiduciary charged with the

17   responsibility of protecting AB's intellectual property, Dr. Macevicz nonetheless applied for the

18   patents-at-issue secretly and never disclosed his actions to AB.  Based on (1) AB's lack of actual

19   notice, (2) the absence of circumstances sufficient to give rise to a duty of inquiry until February

20   2006, and (3) the legal effect of a fiduciary relationship on the statute of limitations, AB

21   respectfully requests that the Court grant its cross-motion for summary judgment.

22   **II.    STATEMENT OF FACTS**

23       Defendants' motion presents no facts other than the causes of action stated in AB's

24   complaint, the timing of Dr. Macevicz's employment, and the issuance of U.S. Patent Nos.

25   5,750,341; 5,969,119; and 6,306,597 (the "Patents").[1]  Defendants have omitted all other material

---

26       [1] Defendants' motion neither addresses nor seeks relief regarding the foreign counterpart
     patents and applications relating to the Patents, and other United States patent applications made
27   by Dr. Macevicz while employed by AB that were not published and did not result in issued
     patents.
28

1  facts, as well as "all justifiable inferences [that must be] drawn in [AB's] favor." *Eastman Kodak*

2  *Co. v. Image Technical Servs., Inc.* 504 U.S. 451, 456 (1992) (citation omitted).

3  ### A.    Dr. Macevicz's Fiduciary And Contractual Duties To AB

4  Stephen Macevicz is an attorney with a doctorate in biophysics. (Pai Decl. Ex. B at

5  92:23-93:3, 94:4-11.) Beginning at least as early as 1989, Dr. Macevicz was preparing patent

6  applications for AB. (*See id.* Ex. F.) He came to work full-time for AB in 1992. (*Id.* Ex. B at

7  16:25-17:22.) Dr. Macevicz's job was to develop and protect AB's intellectual property spanning

8  the full range of AB's many areas of business. (Hunkapiller Decl. ¶ 2; Pai Decl. Ex. A at 45:8-

9  47:10, 51:21-54:20; Ex. B at 22:5-25:1.)

10  AB's business included making instruments used for synthesis, amplification, purification,

11  isolation, analysis, and sequencing of nucleic acids, proteins, and other biological molecules.

12  (Hunkapiller Decl. ¶ 2; Pai Decl. Ex. A at 54:21-55:7, 151:21-152:10.) Applera's business also

13  included making analytical instruments for determining the composition and structure of chemical

14  substances. (Hunkapiller Decl. ¶ 2.) Those instruments included atomic absorption

15  spectrometers, instruments for elemental analysis, fluorescence spectrophotometers, gas

16  chromatographs, inductively coupled plasma emission spectrometers, infrared

17  spectrophotometers, liquid chromatographs, mass spectrometers, thermal analyzers, thermal

18  cyclers, ultraviolet/visible spectrophotometers and polarimeters, analytical balances, flame

19  photometers, data-handling devices, and data systems for applications in analytical chemistry.

20  (*Id.*) It also included the development of reagents used in such systems. (*Id.*)

21  In addition to his duty to protect AB's intellectual property in all areas of its business, Dr.

22  Macevicz's responsibilities included writing patent applications, managing outside counsel who

23  were developing patent applications, and deciding which of the many inventions developed by

24  AB scientists should be made the subject of patent applications. (*Id.*; Pai Decl. Ex. A at 45:8-

25  47:10, 82:7-85:13.)[2] AB had a process by which employees were required to fill out and submit

26  _____

[2] For a time AB made Dr. Macevicz available to Lynx to assist with the Lynx spinoff from
AB. Dr. Macevicz told AB that he stopped assisting Lynx in 1993, well before he filed for the
27  first of the Patents in 1995. (Pai Decl. Ex. A at 86:13-15; Ex. G at 3; Labbe Decl. Ex. 1.)

28

1   invention disclosure forms for any inventions they made so that AB could decide whether it

2   wanted to pursue the inventions or not.  (Grossman Decl. ¶ 7; Pai Decl. Ex. A at 78:16-79:22.)

3   Dr. Macevicz's responsibilities included reviewing these invention disclosure forms to determine

4   whether and how AB should pursue them.  (Grossman Decl. ¶ 7; Pai Decl. Ex A at 53:4-54:20,

5   78:16-79:22.)

6       Dr. Macevicz held the position of Senior Patent Counsel at AB.  (Pai Decl. Ex. A at

7   16:18-25; Ex. B at 18:18-24.)  As an attorney to AB, Dr. Macevicz held a position of trust and

8   had access to highly confidential information belonging to AB.  (Hunkapiller Decl. ¶ 3; Pai Decl.

9   Ex. A at 23:8-23.)  Accordingly, Dr. Macevicz owed AB fiduciary duties of the highest character.

10  *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 189 (1976).  This fiduciary

11  relationship is an undisputed fact, admitted by Dr. Macevicz at his deposition.  (Pai Decl. Ex. A at

12  23:8-23.)

13      Dr. Macevicz also had contractual duties to AB.  As a condition of his employment, Dr.

14  Macevicz entered into an Employee Invention Agreement with AB.  (Pai Decl. Ex. C; Ex. A at

15  69:5-71:10.)  He promised to disclose to AB, to hold in trust for the sole right and benefit of AB,

16  and to assign to AB any inventions he made while employed by AB.  (Pai Decl. Ex. C ¶¶ 2, 7.)

17  The only exception was for inventions that Dr. Macevicz could prove were developed entirely on

18  his own time, were developed without the use of company resources, and did not relate to the

19  actual or anticipated business or research and development of AB or result from work performed

20  by him for AB.  (*Id.* ¶ 2.)  He further promised that if he made any inventions that he believed fell

21  within this narrow exception, he would disclose those inventions to AB and provide evidence to

22  substantiate his belief.  (*Id.* ¶ 7.)  Dr. Macevicz also did not submit to AB any invention

23  disclosure forms relating to the inventions claimed in the Patents.  (Tschop Decl. ¶ 14; Pai Decl.

24  Ex. A at 76:6-80:6.)

25          **B.    Dr. Macevicz's Failure To Disclose**

26      Despite having both fiduciary and contractual duties to disclose the Patents to AB, Dr.

27  Macevicz instead applied for the Patents secretly.  The entire time he was at AB, Dr. Macevicz

28  did not tell a single AB person that he was applying for patents on DNA sequencing which he

AB's: (1) OPP TO DEFS' MSJ ON STATUTE OF LIMITATIONS; (2) CROSS-MSJ ON STATUTE OF LIMITATIONS
Case No.  C07 02845 WHA
pa-1225525

4

1  intended to claim for himself.  (Hunkapiller Decl. ¶ 4; Bortner Decl. ¶ 7; Fung Decl. ¶¶ 3-5;

2  Grossman Decl. ¶¶ 4-6;  Pai Decl. Ex. A at 172:7-174:4.)

3      Dr. Macevicz did ask two AB employees, Dr. Steven Fung and Dr. Paul Grossman, to

4  sign pages of a notebook that described ideas for DNA sequencing.  (Fung Decl. ¶ 4; Grossman

5  Decl. ¶ 4; Pai Decl. Ex. A at 61:12-68:13, 102:13-103:23; Exs. D-E.)  The notebook pages signed

6  by Dr. Grossman included descriptions of sequencing by ligation that were later claimed in the

7  applications for the Patents, but Dr. Macevicz did not tell either Dr. Fung or Dr. Grossman that he

8  was planning to patent these inventions secretly for his own benefit.  (Fung Decl. ¶¶ 3-5;

9  Grossman Decl. ¶¶ 4-6; Pai Decl. Ex. A at 61:12-68:13, 104:12-15, 104:24-107:23, 172:7-174:4.)

10  These notebook pages relating to the Patents are dated 1994, when Macevicz was working for

11  AB.  (Pai Decl. Ex. A at 82:7-83:10; Ex. E.)

12      While Dr. Macevicz says he discussed the inventions claimed in the Patents with AB

13  employees, Defendants have offered no evidence that even a single AB employee knew that

14  Dr. Macevicz intended to claim those inventions for himself.  (Pai Decl. Ex. A at 172:7-174:4.)

15  Both Dr. Fung and Dr. Grossman interacted with Dr. Macevicz only in the course of their work

16  for AB.  (Fung Decl. ¶ 3; Grossman Decl. ¶ 3.)  They did not consult or work with Dr. Macevicz

17  on any non-AB projects.  (Fung Decl. ¶ 3; Grossman Decl. ¶ 3.)  Dr. Macevicz never asked them

18  to work with him on anything outside of their work for AB.  (Fung Decl. ¶ 4; Grossman Decl.

19  ¶ 4.)  They did not work or socialize with him outside of AB.  (Fung Decl. ¶¶ 3-4; Grossman

20  Decl. ¶¶ 3-4.)  They did not know Dr. Macevicz was applying for the Patents without assigning

21  them to AB.  (*Id.*; Pai Decl. Ex. A at 65:7-18; 172:7-174:4.)

### C.      AB's Limited Patent Searches

23      AB has never conducted routine, comprehensive patent searches for all patents related to

24  all aspects of its business.  (Hunkapiller Decl. ¶ 5; Bortner Decl. ¶ 3.)  Instead, AB occasionally

25  conducts targeted patent searches for a specific competitor or a specific product on an *ad hoc*

26  basis.  (Hunkapiller Decl. ¶ 5; Bortner Decl. ¶¶ 4-5.)  These targeted patent searches have been

27  initiated in response to specific events or circumstances.  For example, in 1996, AB conducted a

28  patent search for all patents assigned to Lynx Therapeutics, Inc. ("Lynx") in connection with

1    licensing discussions between AB and Lynx at that time.  (Bortner Decl. ¶ 4.)  The search did not

2    reveal the Patents, the first of which did not issue until 1998.  (*Id.*)  AB did not conduct patent

3    searches for patents assigned to Lynx or Solexa on any other occasions.  (*Id.*)

4         AB does not conduct searches for patents issued to former or current employees, or other

5    persons having access to AB's confidential information, unless AB has reason to suspect that a

6    specific person has stolen inventions or committed wrongdoing.  (Hunkapiller Decl. ¶ 6; Bortner

7    Decl. ¶ 5.)  In the absence of such suspicions, AB does not conduct these kinds of searches

8    because they would require constant searching for all patents issued to well over ten thousand

9    past and present employees, not to mention the many hundreds, if not thousands, of outside

10   attorneys, consultants, and business partner employees who had access to AB confidential

11   information.  (Hunkapiller Decl. ¶ 6; Bortner Decl. ¶ 5; Tschop Decl. ¶¶ 6, 8-12.)  Instances in

12   which AB employees have secretly applied for patents and taken inventions belonging to AB are

13   extremely rare.  Dr. Macevicz's wrongdoing is an exceptional case.  (Bortner Decl. ¶ 6.)

14        From AB's founding in May 1981 to the present, more than 3 million patents have issued

15   and more than 1.5 million patent applications have been published in the United States.  (Tschop

16   Decl. ¶ 2; Ex. 1 at 7; Pai Decl. ¶¶ 10-11; Exs. H-I.)  Therefore, if AB had performed regular

17   patent searches to monitor all potential theft of its intellectual property, it would have had to

18   cross-reference more than 4.5 million documents against well over ten thousand people who had

19   access to its confidential information.  (Tschop Decl. ¶¶ 6, 8-12.)

20        In the time spanning the issuance dates of the three Patents,[3] which was a 41-month

21   period, over 600,000 patents issued in the United States. (Pai Decl. ¶ 12; Ex. J.)  Averaged over

22   those 41 months, more than 14,000 U.S. patents issued per month.  Even restricting these

23   numbers to areas of technology and subject matter that were related to AB's business at the time,

24   over 83,000 U.S. patents issued during that period, an average of more than 2000 patents per

25   month.  (*Id.* ¶ 13; Ex. K.)

26        [3] Of the three Patents, the first one (U.S. Patent No. 5,750,341) issued on May 12, 1998.
     (Labbe Decl. Ex. 1.)  The third one (U.S. Patent No. 6,306,597) issued on October 23, 2001.  (*Id.*
27   Ex. 3.)

28

1    AB first learned of the Patents in about February 2006, in the course of due diligence for

2    AB's eventual purchase of Agencourt Personal Genomics.  (Bortner Decl. ¶ 7; Fung Decl. ¶ 5.)

3    **III.    ARGUMENT**

4        **A.    The Court Has Ruled That Whether The Patents Were Related To
            AB's Business Is A Disputed Issue Of Fact**

5

6        For purposes of their summary judgment motion, Defendants now claim that the Patents

7    were related to AB's business.  (Defs. Mot. at 2-3, 8.)  Defendants argue that the Patents'

8    relationship to AB's business is "operative information" which is undisputed based on the face of

9    the patent.  (*Id.* at 2-3.)  The law of the case doctrine, however, precludes this argument.

10       "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an

11   issue previously decided by the same court, or a higher court, in the same case."  *Richardson v.*

12   *United States*, 841 F.2d 993, 996 (9th Cir. 1988) (citation omitted).  "A court properly exercises

13   its discretion to reconsider an issue previously decided in only three instances: (1) the first

14   decision was clearly erroneous and would result in manifest injustice; (2) an intervening change

15   in the law has occurred; or (3) the evidence on remand was substantially different."  *Milgard*

16   *Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (citation omitted).

17       In ruling on AB's motion for summary judgment less than a month ago, the Court held

18   that issues of material fact existed as to whether the Patents were related to AB's business:

19                    In sum, a reasonable jury could find that such evidence
                      demonstrates that the invention did not relate to Applied's business
20                    or anticipated research at the time of its conception.

21   (Docket No. 88, at 7.)  Defendants do not argue that the Court's ruling was clearly erroneous or

22   manifestly unjust, or that any change in the law has occurred.  No additional evidence on the issue

23   has entered the record since the Court's order.

24       Therefore, the law of the case doctrine bars Defendants from claiming now, contrary to

25   their original position,[4] that the Patents were related to AB's business.  Since Defendants'

26       [4] Similarly, the doctrine of judicial estoppel also bars Defendants' from making this
     argument.  *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).  Judicial estoppel
27   "protect[s] the integrity of the judicial process" by "prohibiting parties from deliberately changing
     positions according to the exigencies of the moment."  *Id.* (citations omitted).  AB has not
28                                                           (Footnote continues on next page.)

1    summary judgment motion relies upon this "fact" – which the Court has already ruled is a

2    disputed issue of material fact – their motion must be denied.

3                **B.      AB Did Not Have Constructive Notice Of Its Claims Before 2006**

4               Under the discovery rule, a cause of action accrues and the statute of limitations begins to

5    run only when the plaintiff has actual or constructive notice of all facts essential to the claim.

6    *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 432-33 (Ct. App. 1983).  Defendants concede that

7    the discovery rule applies here, and they do not contend that AB had actual notice of its claims

8    before 2006.  (Defs. Mot. at 7.)

9               Instead, Defendants advance the novel and sweeping theory that, *regardless of the*

10   *particular facts and circumstances*, the issuance of a patent alone constitutes constructive notice

11   sufficient to trigger the statute of limitations for an ownership claim over that patent.  Defendants'

12   bright-line theory of constructive notice finds no support in the case law because constructive

13   notice depends on an overall assessment of reasonableness, not an automatic application of rigid

14   rules.  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed.

15   Cir. 1993); *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412, 437-39 (1945).  Whether there is

16   constructive notice is a question of fact:

17               [W]hen the facts are susceptible to opposing inferences, whether "a
                 party has notice of 'circumstances sufficient to put a prudent man
18               upon inquiry as to a particular fact,' and whether 'by prosecuting
                 such inquiry, he might have learned such fact' (Civ. Code, § 19),
19               are themselves questions of fact to be determined by the jury or the
                 trial court."
20
     *Id.* at 440 (citing *Northwestern P. C. Co. v. Atlantic P. C. Co.*, 174 Cal. 308, 312 (1917).[5]  In
21
     relying solely on the issuance of the Patents (and an argument barred by the law of the case),
22

23   (Footnote continued from previous page.)

24   changed its position.  But AB is entitled, indeed obligated, to apply the Court's rulings as the case
     evolves.

25       [5] As explained *infra* in Section III.B.2.a, Defendants' heavy reliance upon *IBM Corp. v.*
     *Zachariades*, No. C 91-20419-JW, 1993 WL 443409 (N.D. Cal. Oct. 27, 1993) is inapt and easily
26   distinguishable.  However, even that case supports the proposition that whether a claimant is on
     constructive notice is a question of fact.  *Id.* at *2 ("Whether a party had constructive notice of its
27   claims is generally a question of fact.").

28

AB'S: (1) OPP TO DEFS' MSJ ON STATUTE OF LIMITATIONS; (2) CROSS-MSJ ON STATUTE OF LIMITATIONS
Case No.  C07 02845 WHA
pa-1225525

8

1    Defendants have failed to present any of the other material facts that bear upon the determination

2    of whether AB had constructive notice.  Therefore, the Court should deny Defendants' motion.

3        **1.    Dr. Macevicz's Fiduciary Relationship With AB Tolled The**
          **Statute Of Limitations And Substantially Reduced AB's Duty**
4         **Of Diligence**

5        Defendants' constructive notice theory depends on their misstatement of both California

6    law regarding the effect of a fiduciary relationship on constructive notice and the fiduciary

7    relationship that existed between Dr. Macevicz and AB.  While Defendants correctly

8    acknowledge that California state law controls the statute of limitations issues in this case (Defs.

9    Mot. at 7 n.19), they misrepresent the line of California cases holding that the existence of a

10   fiduciary relationship can toll the statute of limitations.  *April Enters.*, 195 Cal. Rptr. at 433;

11   *Amen v. Merced County Title Co.*, 58 Cal. 2d 528, 534 (1962).  "Where a fiduciary relationship

12   exists the usual duty of diligence to discover facts does not exist."  *U.S. Liab. Ins. Co. v.*

13   *Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 598 (1970).  As explained by the California Supreme Court

14   in *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412 (1945):

15           Another pertinent factor is that there was a fiduciary relationship
             between the parties at the time of the fraudulent representations.
16           Although the general rules relating to pleading and proof of facts
             excusing a late discovery of fraud remain applicable, it is
17           recognized that in cases involving such a relationship facts which
             would ordinarily require investigation may not excite suspicion, and
18           that the same degree of diligence is not required.

19   *Id.* at 439-440.

20       Furthermore, where a fiduciary has concealed his wrongdoing, the mere fact that there are

21   *public records*, such as an issued patent, from which a plaintiff could theoretically have learned of

22   its claims is not enough.  *Bennett v. Hibernia Bank*, 47 Cal. 2d 540, 562 (1956) ("In view of the

23   allegations indicating that a fiduciary relationship existed, the fact that a document disclosing

24   these events was a matter of public record filed with the Secretary of State cannot alone cause the

25   statute to run."); *Gryczman v. 4550 Pico Partners, Ltd.*, 131 Cal. Rptr. 2d 680, 683 (Ct. App.

26   2003) ("[W]e cannot say as a matter of law plaintiff had a duty to continually monitor public

27   recordings. . . ."); *see also Prudential Home Mortgage Co. v. Super. Ct.*, 78 Cal. Rptr. 2d 566,

28   571-72 (Ct. App. 1998); *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 636 (D. Conn. 2003) (applying

1    Connecticut law to patent ownership dispute and noting that "[a]lthough the fraudulent

2    concealment tolling statute generally requires an affirmative act of concealment beyond mere

3    silence, non-disclosures are sufficient where, as here, the defendant is under a fiduciary duty to

4    disclose material facts"); *Stark v. Advanced Magnetics, Inc.*, 736 N.E.2d 443, 442 (Mass. App.

5    Ct. 2000) (applying Massachusetts law to patent ownership dispute and noting "if the defendants

6    had a fiduciary duty to disclose the facts and failed fully to do so, the fact that the plaintiff had the

7    means of learning the facts would not preclude the tolling of the statute until such time as the

8    plaintiff acquired actual knowledge of the facts").

9        Defendants attempt to downplay the impact of a fiduciary relationship by taking *Cross*

10   and *April Enterprises* out of context.  Neither of these cases stands for Defendants' assertion that

11   the fiduciary must be the "*sole source* of the relevant information, the concealment of which

12   resulted in the delay."  (Defs. Mot. at 10 (emphasis added).)  In fact, even Defendants' own quote

13   from the *Cross* case does not support their distorted interpretation:

14              Put simply, if the "delay in commencing an action is induced by the
             conduct of the defendant, he cannot avail himself of the defense of
15              the statute [of limitations]."

16   *Cross v. Bonded Adj. Bureau*, 55 Cal. Rptr. 2d 801, 809 (Ct. App. 1996) (quoting *Gaglione v.*

17   *Coolidge*, 286 P.2d 568, 574 (Cal. Ct. App. 1955)).  Nothing in this quote suggests that it must be

18   impossible for the plaintiff to learn of its causes of action from any source other than its fiduciary.

19   A fiduciary's concealment of his wrongdoing can induce the plaintiff not to discover the cause of

20   action, even if other sources were available.

21        Likewise, the statement in *April Enterprises* that the discovery rule protects plaintiffs

22   "who are ignorant of their cause of action through no fault of their own" also fails to support

23   Defendants' position.  *April Enters.*, 195 Cal. Rptr. at 437.  Nowhere in *April Enterprises* did that

24   court suggest that "no fault of their own" meant that plaintiffs must have had no other available

25   means to discover their cause of action.  *Id.*  To the contrary, it held that the discovery rule

26   applied where the wrongdoing was committed in secret and the harm "will not be *reasonably*

27   discoverable by plaintiffs until a future time."  *Id.* (emphasis added).

28

1    Indeed, Defendants' notion that the fiduciary must be the sole source of the relevant

2    information is directly contradicted by the holdings in *Bennett*, *Gryczman* and *Prudential*.  As

3    discussed above, these cases make clear that the existence of other sources from which the

4    plaintiff could *theoretically* have learned of its causes of action does not mean that the fiduciary is

5    off the hook.  *Gryczman*, 131 Cal. Rptr. 2d at 682-83; *Prudential*, 78 Cal. Rptr. 2d at 572.

6    Applying the correct law to the facts of this case, the importance of a fiduciary

7    relationship could not be any greater than it is here.  First, Dr. Macevicz was AB's attorney and

8    Senior Patent Counsel.  (Pai Decl. Ex. A at 16:18-25, 23:8-23; Ex. B at 18:18-24; Hunkapiller

9    Decl. ¶ 3.)  "The relation between attorney and client is a fiduciary relation of the very highest

10   character." *Neel*, 6 Cal. 3d at 189.  Tolling the statute of limitations based on this fiduciary

11   relationship is especially appropriate because the client is not in a position to recognize the

12   attorney's wrongdoing.  *Id.* at 188 ("If he must ascertain [the claim] at the moment of its

13   incidence, the client must hire a second professional to observe the work of the first, an expensive

14   and impractical duplication, clearly destructive of the confidential relationship between the

15   practitioner and his client.").

16   Second, and more specifically, Dr. Macevicz was charged with the duty to protect AB's

17   intellectual property.  (Hunkapiller Decl. ¶¶ 2, 3; Pai Decl. Ex. A at 23:8-23, 53:4-54:20, 78:16-

18   79:22.)  By secretly applying for the Patents and then secretly exploiting them for his own

19   benefit, Dr. Macevicz concealed his breach of the very duty he owed to AB as its fiduciary.

20   (Hunkapiller Decl. ¶ 3; Fung Decl. ¶¶ 3-5; Grossman Decl. ¶¶ 4-6; Pai Decl. Ex. A at 172:7-

21   174:4.)  Since AB held Dr. Macevicz in a position of trust and confidence to protect its patent

22   rights, Dr. Macevicz's wrongdoing deprived AB of the very means it depended on to learn of his

23   wrongdoing.  (Hunkapiller Decl. ¶¶ 2, 3; Grossman Decl. ¶ 7; Pai Decl. Ex A. at 53:4-54:20,

24   78:16-79:22.)

25   In sum, the fiduciary relationship between AB and Dr. Macevicz was precisely the type

26   for which the case law holds that the statute of limitations should be tolled and that the plaintiff's

27   usual duty of diligence should not apply.  Defendants present no facts, nor could they, to show

28

1    that AB had a basis before 2006 to suspect that its fiduciary had been dishonest and it should

2    commence an investigation, much less a lawsuit.

3        **2.        Constructive Notice Of The Existence Of The Patents Did Not
             Provide AB With Constructive Notice Of Its Claims**

4

5            **a.        Defendants' Bright-Line Rule Of Constructive Notice
                 Misrepresents The Case Law On Statute Of Limitations**

6            No case cited by Defendants stands for the proposition that the issuance of a patent alone

7    – independent of any other facts or considerations – provides constructive notice sufficient to

8    trigger the statute of limitations.  In each of Defendants' cases, there were factual considerations

9    that significantly affected the outcome.

10           Defendants rely primarily on the unpublished Ninth Circuit opinion and non-precedential

11   district court opinion in the *IBM Corp. v. Zachariades* case.  *IBM Corp. v. Zachariades*, No. 94-

12   15388, 1995 WL 697210 (9th Cir. Nov. 22, 1995); *IBM Corp. v. Zachariades*, No. C 91-20419-

13   JW, 1993 WL 443409 (N.D. Cal. Oct. 27, 1993).  The rules of the Ninth Circuit prohibit citation

14   of non-precedential opinions because, among other reasons, "the disposition is not written in a

15   way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not

16   announced in a way that makes it suitable for governing future cases." *Hart v. Massanari*, 266

17   F.3d 1155, 1178 (9th Cir. 2001); 9th Cir. Rule 36-3(c); *see also* Fed. R. App. P. 32.1; Fed. Cir. R.

18   32.1.  Even with these limitations in mind, however, there are two obvious factual differences that

19   distinguish *IBM Corp.* from the instant case.

20           First, in the section entitled "Background," the district court described facts about the

21   defendant's activities that may have constituted actual or constructive notice of the plaintiff's

22   claims. *IBM Corp.*, 1993 WL 443409, at *1.  Zachariades was an employee of IBM and was

23   bound by an invention assignment agreement with IBM.  He had sought to expand a disclaimer

24   from IBM to allow him to claim for himself the invention that later became the subject of the

25   patent ownership dispute in that case. *Id.*  IBM's chief patent attorney refused to expand the

26   disclaimer. *Id.*

27           These facts are significant because they show that IBM had actual notice of Zachariades's

28   intent to claim the invention for himself.  Furthermore, IBM's chief patent attorney was aware of

1   this information, and it would have been reasonable to expect him or her to follow up with

2   Zachariades to ensure that the invention was assigned to IBM.  By contrast, Dr. Macevicz never

3   told anyone at AB, directly or indirectly, that he intended to apply for DNA sequencing patents

4   and claim them for himself.  (Hunkapiller Decl. ¶ 4; Bortner Decl. ¶ 7; Fung Decl. ¶¶ 3-5;

5   Grossman Decl. ¶¶ 4-6;  Pai Decl. Ex. A at 172:7-174:4.)  Also, Dr. Macevicz himself was AB's

6   Senior Patent Counsel – he was the one who should have ensured that the Patents were assigned

7   to AB, but instead he concealed them for his own benefit and to the harm of AB.  (Pai Decl. Ex.

8   A at 23:8-23, 45:8-47:10, 51:21-54:20; Ex. B at 22:5-25:1.)

9        Second, the district court expressly stated that Zachariades was merely a research staff

10   member who did not owe a fiduciary duty to IBM.  *IBM Corp.*, 1993 WL 443409, at *3.  Dr.

11   Macevicz, on the other hand, was AB's attorney and Senior Patent Counsel.  (Pai Decl. Ex. A at

12   16:18-25, 23:8-23; Ex. B at 18:18-24; Hunkapiller Decl. ¶ 3.)  He owed AB fiduciary duties of

13   the highest character, and these duties specifically obligated him to prevent the very wrongdoing

14   he committed.  (Pai Decl. Ex. A at 23:8-23, 45:8-47:10, 51:21-54:20; Ex. B at 22:5-25:1.)  The

15   district court in *IBM Corp.* relied on the principle that "[m]ere silence is not a fraudulent

16   concealment."  1993 WL 443409, at *3 (citation omitted).  When there is a fiduciary relationship,

17   however, the opposite holds true: "The theory is that although the defendant makes no active

18   misrepresentation, this element is supplied by an affirmative obligation to make full disclosure,

19   and the non-disclosure itself is fraud."  *Amen*, 58 Cal. 2d at 534 (citation and internal quotations

20   omitted).  Therefore, Defendants' reliance on the *IBM Corp.* cases is misplaced.

21        Defendants' discussion of *Hartley Pen* likewise fails to mention the relevant facts, as well

22   as the eventual outcome of that case: summary judgment that the claims were barred by the

23   statute of limitations was denied.  Although Defendants are correct that the district court in

24   *Hartley Pen* initially dismissed the original complaint in that case based on the statute of

25   limitations, they fail to cite the subsequent Ninth Circuit opinion, which explains that the

26   amended complaint survived a summary judgment motion based on the statute of limitations and

27   laches.  *Kimberly Corp. v. Hartley Pen Co.*, 237 F.2d 294, 297 (9th Cir. 1956).  Although it was

28   later found, after a full trial, that the plaintiff's claims to equitable relief were barred by laches,

1   this result was based on evidence and *factual findings* that the plaintiff had both *actual* and

2   constructive notice of its claims.  *Id.*

3       Defendants also misrepresent the *General Bedding* case in attempting to distinguish it.

4   First, and most importantly, *General Bedding* held that "[t]he district court incorrectly ruled that

5   as a matter of law General Bedding had constructive notice when the patent was issued."  *Gen.*

6   *Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1399 (9th Cir. 1991) (reversing summary

7   judgment).  Second, the court did not even need to consider the issue of whether there was a

8   fiduciary relationship or fraudulent concealment to reach its holding.  *Id.*  In other words, *General*

9   *Bedding* held that patent issuance alone is too little to provide constructive notice of the cause of

10  action as a matter of law, even in the absence of a fiduciary relationship to reduce the plaintiff's

11  duty of diligence.  Since there was a fiduciary relationship between Dr. Macevicz and AB, the

12  facts here call even more strongly for denial of Defendants' summary judgment motion.  (Pai

13  Decl. Ex. A at 23:8-23.)

14      In short, Defendants have not cited any legal authority for their assertion that patent

15  issuance alone, without any consideration of other facts or circumstances, is sufficient

16  constructive notice to bar a claim based on the statute of limitations as a matter of law.

17          **b.      Defendants' Theory Of Constructive Notice Overstates**
18                  **The Effect Of Patent Issuance**

19      Throughout their brief Defendants are ambiguous in answering the question: constructive

20  notice *of what*?  (*See, e.g.*, Defs. Mot. at 9:15-17 ("The issue of whether constructive notice was

21  provided by an issued patent, however, was not in doubt.").)  Although Defendants do not

22  expressly cite case support, their theory essentially relies on a general statement from two

23  Supreme Court cases that "issuance of a patent and recordation in the Patent Office constitute

24  notice to the world of its existence."  *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S.

25  387, 393 (1936); *see also Sontag Chain Stores Co. v. Nat'l Nut Co.*, 310 U.S. 281, 295 (1940).

26  Of course, this statement does not say *for what purposes* patent issuance constitutes constructive

27  notice to the world, and later cases have specifically held that it does not provide such notice for

28  all purposes.

AB's: (1) OPP TO DEFS' MSJ ON STATUTE OF LIMITATIONS; (2) CROSS-MSJ ON STATUTE OF LIMITATIONS
Case No.  C07 02845 WHA
pa-1225525

14

1    In particular, courts have held that this general statement about patent issuance does not

2    apply to the defenses of statute of limitations or laches.  "The Supreme Court's dicta in [*Sontag*]

3    and other cases cited by [defendant] to the effect that the issuance of a patent is notice to the

4    world for *certain* purposes, do not support the conclusion that such issuance is notice for all

5    purposes, including the *statute of limitations*."  *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,

6    880 F. Supp. 1387, 1406 n.4 (D. Colo. 1995*), aff'd in relevant part*, 196 F.3d 1366 (Fed. Cir.

7    1999) (affirming rejection of statute of limitations defense) (emphasis added).  The Federal

8    Circuit has stated that "*Sontag Chain Stores* harbors no principles applicable to laches.

9    Constructive notice is not an appropriate substitute for the determination of reasonableness or

10   excuse for delay."  *Advanced Cardiovascular Sys., Inc.*, 988 F.2d at 1162.

11   The limited scope of the constructive notice provided by patent issuance is further

12   illustrated by several other examples in which patent issuance does not constitute sufficient

13   constructive notice.  First, patent issuance does not constitute constructive notice to an accused

14   infringer for purposes of willful infringement.  *See, e.g., nCube Corp. v. SeaChange Int'l, Inc.*,

15   436 F.3d 1317, 1324 (Fed. Cir. 2006) ("Willful infringement in this case hinges on when the

16   defendants had actual knowledge of plaintiff's patent rights, and their actions after that time.").

17   Second, patent issuance does not constitute constructive notice for purposes of induced

18   infringement.  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (*en banc* in

19   relevant part) ("The requirement that the alleged infringer knew or should have known his actions

20   would induce actual infringement necessarily includes the requirement that he or she knew of the

21   patent.").  Third, patent issuance does not constitute constructive notice for purposes of patent

22   damages if the patentee's products are not properly marked.  *SRI Int'l v. Advanced Tech. Lab.*,

23   127 F.3d 1462, 1469 (Fed. Cir. 1997) ("Absent marking, damages may be recovered only after

24   actual notice is given.").  Fourth, patent issuance does not constitute constructive notice to the

25   Patent Office of prior art for inequitable conduct purposes.  *See, e.g., Critikon, Inc. v. Becton*

26   *Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1255-59 (Fed. Cir. 1997) (affirming inequitable

27   conduct for failure to disclose issued patent during prosecution).

28

AB's: (1) Opp to Defs' MSJ on Statute of Limitations; (2) Cross-MSJ on Statute of Limitations
Case No.  C07 02845 WHA
pa-1225525

15

1

### 3.    Defendants' Theory Of Constructive Notice Is Impractical And Unreasonable

2

3    As a practical matter, Defendants' theory of constructive notice would impose inefficient

4    and unsustainable burdens on technology and innovation-driven companies such as AB.  If patent

5    issuance alone were enough to provide constructive notice of AB's patent ownership claims, AB

6    (and other companies) would be under a constant duty to search all patents of all former and

7    current employees, consultants, attorneys, and joint venture partners.  The courts have expressly

8    rejected as impractical the notion that there is such a broad duty to monitor public patent activity.

9    *Yeda Research & Dev. Co. v. Imclone Sys. Inc.*, 443 F. Supp. 2d 570, 630 n.89 (S.D.N.Y. 2006)

10    ("There is simply no legal obligation to track patent applications in order to prevent other

11    scientists from claiming credit for one's own work.").

12    The cost-benefit disproportionality of a rule requiring constant monitoring of thousands of

13    patents per month is easily demonstrated.  From AB's founding in 1981 to the present, more than

14    3 million patents have issued and more than 1.5 million patent applications have been published

15    in the United States.  (Tschop Decl. ¶ 2; Ex. 1, at 7; Pai Decl. ¶¶ 10-11; Exs. H-I.)  Therefore, if

16    AB had performed regular patent searches to monitor all potential theft of its intellectual property,

17    it would have had to cross-reference more than 4.5 million documents against the over ten

18    thousand plus people who had access to its confidential information.  (Tschop Decl. ¶¶ 6, 8-12.)

19    Even in just the 41-month period over which the three Patents issued, over 600,000 other patents

20    issued in the United States.  (Pai Decl. ¶ 12; Ex. J.)  If AB had searched and monitored all of

21    those patents during that time, it would have had to review, on average, over 14,000 U.S. patents

22    per month.  Furthermore, as the Court knows, patents can issue on applications filed decades ago,

23    which means that AB would have to monitor patents issued to former employees, attorneys,

24    consultants, etc. for decades after termination of their relationship with AB.

25    If AB had monitored only those patents in areas of technology and subject matter that

26    were potentially related to AB's business at the time, over 83,000 U.S. patents issued during that

27    period, requiring a review of more than 2000 patents per month.  (*Id.* ¶ 13; Ex. K.)  However,

28    under Defendants' theory of constructive notice, this approach would not have been enough.  The

Employee Invention Agreement between AB and Dr. Macevicz was not limited to inventions related to AB's business – it also required disclosure and assignment of unrelated inventions if the employee had used AB's resources in developing them.  (Pai Decl. Ex. C ¶ 2(c).)  Therefore, complete monitoring to prevent potential theft would have required AB to review for decades every patent issued to any current or former employee and to conduct an investigation for each such patent to determine whether the employee had used AB resources.  (Hunkapiller Decl. ¶ 6.)  In short, if Defendants' theory were adopted, to protect itself AB would have had to become a patent search company, not a life sciences company.

While the costs of such monitoring and patent searching would be extremely high, the benefit would be minuscule.  Dr. Macevicz's taking of AB's intellectual property is a rare case in AB's history.  (Bortner Decl. ¶ 6.)  In sum, Defendants propose a high cost, low benefit rule which protects persons who breach their fiduciary duties.  Such a rule is contrary to the very touchstone of constructive notice: reasonableness.  The doctrine of constructive notice requires <u>reasonable</u> efforts.  *Hobart*, 26 Cal. 2d at 439 ("Plaintiff's evidence, if believed, disclosed certain factors that may have tended to discourage the making of an exhaustive independent investigation, and we cannot hold, as a matter of law, that any of the circumstances known to plaintiff should have put a reasonably prudent man upon inquiry."); *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1576 (Fed. Cir. 1994).  It does not require searching for a needle in a haystack on the assumption that one's fiduciary has been dishonest.

**C.    AB's Cross-Motion For Summary Judgment Should Be Granted**

**1.    Dr. Macevicz's Fiduciary Relationship With AB Tolled The Statute Of Limitations And Substantially Reduced AB's Duty Of Diligence**

As discussed earlier, the existence of a fiduciary relationship tolls the statute of limitations.  *April Enters.*, 195 Cal. Rptr. at 433; *Amen*, 58 Cal. 2d at 534.  Furthermore, AB's duty of diligence or inquiry was substantially reduced because Dr. Macevicz was AB's fiduciary.  "Where a fiduciary relationship exists the usual duty of diligence to discover facts does not exist." *U.S. Liab. Ins. Co.*, 1 Cal. 3d at 598; *Bennett*, 47 Cal. 2d at 563 ("Where there is no such duty [to inquire], for example, because of the existence of a fiduciary relationship, a plaintiff need not

17

1    disprove that an earlier discovery could have been made upon a diligent inquiry but need show

2    only that he made an actual discovery of hitherto unknown information within the statutory

3    period before filing the action.").  Controlling California case law has repeatedly held that in the

4    presence of a fiduciary relationship "facts which would ordinarily require investigation may not

5    excite suspicion, and that the same degree of diligence is not required."  *Hobart*, 26 Cal. 2d at

6    440.

7        This reduced duty of diligence in light of a fiduciary relationship goes to the very purpose

8    of constructive notice in the statute of limitations context.  "It is only where the party defrauded

9    should plainly have discovered the fraud except for his own *inexcusable inattention* that he will

10    be charged with a discovery in advance of actual knowledge on his part."  *Id.* at 439 (citation

11    omitted; emphasis added).  The standard is whether a "reasonably prudent man" would have been

12    put on inquiry under the circumstances and "whether or not the plaintiff was *negligent* in failing

13    to investigate."  *Id.* (emphasis added).  A "reasonably prudent" person is heavily influenced by

14    whether he is dealing with a third party or a trusted fiduciary.  Constructive notice is not a trap for

15    the unwary, but rather a means of preventing plaintiffs from cultivating unreasonable ignorance

16    and taking advantage of their own negligence.  In attempting to fashion a new bright-line rule of

17    constructive notice, Defendants have ignored the purpose of the constructive notice doctrine.

18        Under the undisputed facts and circumstances of this case, AB cannot be considered

19    unreasonable in not discovering its causes of action until 2006.  Dr. Macevicz was AB's attorney

20    and Senior Patent Counsel, which made him a fiduciary of the "very highest character."  *Neel*, 6

21    Cal. 3d at 189.  AB held Dr. Macevicz in a position of trust and had no reason to suspect that he

22    might have taken AB's intellectual property.  (Pai Decl. Ex. A at 16:18-25, 23:8-23; Ex. B at

23    18:18-24; Hunkapiller Decl. ¶ 3.)  It was reasonable for AB to rely on Dr. Macevicz – as a

24    fiduciary of the highest character – not to apply for the Patents secretly, not to conceal them, and

25    not to exploit them for his own benefit and to AB's detriment.  Dr. Macevicz's most important

26    duty as AB's fiduciary was to protect AB's intellectual property and patent portfolio.

27    (Hunkapiller Decl. ¶¶ 2, 3; Pai Decl. Ex. A at 23:8-23, 53:4-54:20, 78:16-79:22.)  It was

28

1    reasonable as a matter of law for AB to rely on its fiduciary not to do the exact opposite of what

2    he was duty-bound to do.

3        The issuance of the Patents after Dr. Macevicz's departure from AB does not alter this

4    conclusion.  The fiduciary relationship existed at the time of Dr. Macevicz's wrongdoing, and AB

5    "was under no duty to make a complete search and re-examination" afterwards "merely because

6    the fiduciary relationship between the parties was terminated."  *Hobart*, 26 Cal. 2d at 440.

7    Applying *Hobart* to this case, AB was reasonable in not assuming, without any cause for

8    suspicion, that its former fiduciary, whose very duty was to protect AB's intellectual property,

9    had taken AB's inventions for his own benefit.

10               **2.    AB Did Not Have Actual or Constructive Notice Of Its Claims
                         Until 2006**

11

12       While Defendants have proffered no facts regarding actual notice, AB has presented

13   undisputed facts that it did not have actual notice of its claims regarding the ownership of the

14   Patents until 2006.  At that time, AB learned of its claims through due diligence performed in

15   connection with its acquisition of Agencourt Personal Genomics.  (Bortner Decl. ¶ 7; Fung Decl.

16   ¶ 5.)  AB filed suit that same year, long before any of the applicable statutes of limitations periods

17   had expired.  (Defs. Mot. at 3 n.6.)  AB did not have actual notice of its claims at any time before

18   2006.  (Bortner Decl. ¶ 7; Fung Decl. ¶¶ 3-5; Grossman Decl. ¶¶ 4-6; Hunkapiller Decl. ¶ 4.)

19       The Court's order on AB's summary judgment motion identified four areas in which

20   Defendants could potentially come forward with evidence raising a factual dispute regarding

21   whether AB was on notice of its claims before 2006.  (Docket No. 88, at 10-11.)  The first area,

22   the issuance of the patents alone, is insufficient as a matter of law, as discussed above.  In support

23   of this cross-motion for summary judgment, AB has set forth the facts which negate the

24   remaining three possibilities.  Although constructive notice is an issue of fact, *Hobart,* 26 Cal.2d

25   at 440-41, here the facts are undisputed.

26       First, AB did not receive notice of its claims through any patent searches conducted before

27   2006.  At all relevant times, AB did not have a practice of conducting routine, comprehensive

28   patent searches for all patents related to all aspects of its business.  (Hunkapiller Decl. ¶ 5;

1   Bortner Decl. ¶ 3.)  Instead, AB occasionally conducted targeted patent searches for a specific

2   competitor or a specific product on an *ad hoc* basis.  (Hunkapiller Decl. ¶ 5; Bortner Decl. ¶¶ 4-

3   5.)  These targeted patent searches were initiated only in response to specific events or

4   circumstances.  In 1996, AB conducted a patent search for patents assigned to Lynx in connection

5   with licensing discussions between AB and Lynx at that time.  (Bortner Decl. ¶ 4.)  The search

6   did not reveal the Patents, the first of which did not issue until 1998.  (*Id.*)  On no other occasions

7   did AB conduct patent searches for patents assigned to Lynx or Solexa.  (*Id.*; Hunkapiller Decl.

8   ¶ 5.)

9        AB also did not conduct searches for patents issued to all former or current employees, or

10  other persons having access to AB's confidential information, unless AB had reason to suspect

11  that a specific person has stolen inventions or committed wrongdoing.  (Hunkapiller Decl. ¶ 6;

12  Bortner Decl. ¶ 5.)  In the absence of such suspicions, AB did not conduct these kinds of searches

13  because they would require repeatedly searching for all patents issued to over ten thousand

14  people.  (Hunkapiller Decl. ¶ 6; Bortner Decl. ¶ 5.)  Because Dr. Macevicz was AB's fiduciary

15  and AB had no reason to suspect that he had taken inventions or committed wrongdoing, AB did

16  not perform any patent searches for his name before 2006.  (Bortner Decl. ¶¶ 5-6.)

17       In sum, the "extent of plaintiff's patent searches and results from 1995 onwards" was

18  limited and did not provide AB with notice of the Patents or AB's claims before 2006.  (Docket

19  No. 88, at 11.)

20       Second, AB did not receive notice of its claims through Dr. Vincent Powers.  (*Id.*).  As

21  Dr. Macevicz's patent attorney, Dr. Powers assisted in the prosecution of the applications for the

22  Patents before the Patent Office.  (Powers Decl. ¶¶ 3-4.)  Dr. Powers later became an employee of

23  AB, but he did not discuss the Patents with anyone at AB.  (*Id.* ¶¶ 2, 5-6.)  Dr. Powers did not

24  commence representation of Dr. Macevicz regarding the Patents until October 1996, when

25  Macevicz was already at Lynx.  (*Id.* ¶ 4; Pai Decl. Ex. A at 17:9-14.)  Dr. Powers did not realize

26  there was an ownership dispute between AB and Lynx (now Illumina) over the Patents until after

27  he left AB in 2007.  (Powers Decl. ¶ 6.)  Therefore, AB did not receive notice of its claims

28  through Dr. Powers.

1    Third and finally, AB did not receive notice of its claims from Dr. Macevicz.  Despite

2  having both fiduciary and contractual duties to disclose the Patents to AB, Dr. Macevicz applied

3  for the Patents secretly, pursued them secretly, and exploited them secretly.  (Pai Decl. Ex. A at

4  23:8-23; Ex. C.)  The entire time he was at AB, Dr. Macevicz never told anyone at AB that he

5  was applying for patents on DNA sequencing that he intended to claim for himself.  (Hunkapiller

6  Decl. ¶ 4; Bortner Decl. ¶ 7; Fung Decl. ¶¶ 3-5; Grossman Decl. ¶¶ 4-6;  Pai Decl. Ex. A at 172:7-

7  174:4.)  Dr. Macevicz did ask two AB employees, Dr. Steven Fung and Dr. Paul Grossman, to

8  sign pages of his invention notebook that described DNA sequencing.  (Fung Decl. ¶ 4; Grossman

9  Decl. ¶ 4; Pai Decl. Ex. A at 61:12-68:13, 102:13-103:23; Exs. D-E.)  The notebook pages signed

10  by Dr. Grossman included descriptions of sequencing by ligation that were later claimed in the

11  applications for the Patents, but Dr. Macevicz did not tell either Dr. Fung or Dr. Grossman that he

12  was planning to patent these inventions secretly for his own benefit.  (Fung Decl. ¶¶ 3-5;

13  Grossman Decl. ¶¶ 4-6; Pai Decl. Ex. A at 61:12-68:13, 104:12-15, 104:24-107:23, 172:7-174:4.)

14    While Dr. Macevicz says he discussed his DNA sequencing ideas with AB employees,

15  Defendants have offered no evidence that AB employees knew that Dr. Macevicz was pursuing

16  those ideas in patent applications for himself.  (Pai Decl. Ex. A at 172:7-174:4.)  Both Dr. Fung

17  and Dr. Grossman interacted with Dr. Macevicz only in the course of their work for AB.  (Fung

18  Decl. ¶ 3; Grossman Decl. ¶ 3.)  They did not consult or work with Dr. Macevicz on any non-AB

19  projects.  (Id.)  Dr. Macevicz never asked them to work with him on anything outside of their

20  work for AB.  (Fung Decl. ¶ 4; Grossman Decl. ¶ 4.)  They did not work or socialize with him

21  outside of AB.  (Fung Decl. ¶¶ 3-4; Grossman Decl. ¶¶ 3-4.)   They had no knowledge that

22  Macevicz was pursuing DNA sequencing patents on his own for his personal benefit.  (Fung

23  Decl. ¶ 5; Grossman Decl. ¶ 5; Pai Decl. Ex. A at 65:7-18; 172:7-174:4.)

24    AB has set forth undisputed facts proving that the only possible avenues by which it could

25  have received notice of its claims before 2006 are dead ends.  Defendants have failed to put forth

26  any facts to show that AB could, would or should have had notice, other than mere issuance of

27  the Patents.  In sum, Defendants have presented no facts on which a reasonable jury could

28

1  conclude that AB had notice, actual or constructive.  The reason is simple – AB did not have

2  notice until it learned of the Patents in 2006.

3      **IV.    CONCLUSION**

4          For the foregoing reasons, AB respectfully requests that the Court deny Defendants'

5  motion for summary judgment and grant AB's cross-motion for summary judgment on the statute

6  of limitations.

7

8  Dated: February 7, 2008                    MORRISON & FOERSTER LLP

9

10                                    By:   /s/
                                          David C. Doyle
11
                                          Attorneys for Plaintiff
12                                        APPLERA CORPORATION –
                                          APPLIED BIOSYSTEMS GROUP
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28