UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

                 SAN FRANCISCO DIVISION

APPLERA CORPORATION - APPLIED
BIOSYSTEMS GROUP, a Delaware
corporation,

        Plaintiff,

vs.                          No. 07-CV-02845 WHA

ILLUMINA, INC., a Delaware
corporation, SOLEXA, INC.,
a Delaware corporation, and
STEPHEN C. MACEVICZ, an
individual,

        Defendants.
_____/




                 Deposition of

             STEPHEN C. MACEVICZ

              November 28, 2007




Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
License No. 5735

            SHARI MOSS & ASSOCIATES
            Certified Shorthand Reporters
            877 Cowan Road, Suite A
            Burlingame, California 94010
               Tel:  (650) 692-8900


25

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 16

1    Q.  And that's your signature on the last page of

2    the agreement?

3    A.  Yes, that's my signature.

4    Q.  And it's Dr. Eletr's signature on the

5    agreement?                                                    01:00

6    A.  Yes, that appears to be Dr. Eletr's

7    signature.

8    Q.  Was it signed on May 1st, 1995?

9    A.  I don't recall the actual date that it was

10   signed on.                                                    01:00

11   Q.  Do you think it was within a few days of

12   May 1st, 1995?

13   A.  I think it was, yes.  But I'm not positive.

14   I don't have specific recollection.

15   Q.  In May of 1995 you were still working at AB,    01:00

16   weren't you?

17   A.  That's correct, yes.

18   Q.  You were the senior patent counsel at AB?

19   A.  Yes, I was a patent counsel at AB.

20   Q.  You were the highest ranking legal officer at    01:00

21   AB other than the general counsel at Perkin Elmer?

22   A.  Well, I'm not sure I can answer that.  I was

23   one of two attorneys at AB.  I was the only patent

24   attorney.  There was another general attorney, and

25   then there was a patent agent.                                01:01

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 17

1      Q.   Who was the other attorney?

2      A.   He's never going to forgive me for forgetting

3   his name.   Rick Weisberg maybe.   I'm not positive of

4   the name.   Rick Weisberg.

5      Q.   Who was the patent agent?                          01:01

6      A.   The patent agent was Paul Grossman.

7      Q.   Were you an officer of Lynx in May of 1995?

8      A.   I don't believe I was an officer of Lynx.

9      Q.   Were you ever an officer of Lynx?

10      A.   Yes, I became an officer of Lynx when I           01:01

11   started working there.

12      Q.   And when was that?

13      A.   I started working at Lynx sometime in

14   September of 1995.

15      Q.   Why did you sign an indemnity agreement with     01:01

16   Lynx in May of 1995 when you were still working for

17   AB?

18      A.   I don't have any precise recollection of why

19   we signed that at that particular time.   It was my

20   intention to leave AB and go to Lynx, and there was a    01:02

21   delay in my termination at AB because of the vesting

22   of some stock options I had, and so the difference in

23   time between when I signed this and when I actually

24   started at Lynx may have been caused by that.

25      Q.   Let's see if we can help pin down a few of        01:02

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 23

1    to me on a visit to Lynx.  I don't know.

2        Q.  Did you tell Dr. Eletr that you had any

3    problem signing this indemnity agreement since you

4    were not an officer of the corporation at the time?

5        A.  I just had no thought about that one way or        01:09

6    the other.  I thought it was a nice generous thing

7    for him to do and so I signed it.

8        Q.  Did you understand that as senior patent

9    counsel for AB, that you owed fiduciary duties to AB?

10        A.  I understand that.                                  01:09

11        Q.  And was there any question in your mind when

12    you were working for AB that you owed the company

13    fiduciary duties?

14        A.  No, there was no question that I owed AB

15    fiduciary duties.                                           01:10

16        Q.  What are fiduciary duties?  Or what was your

17    understanding of fiduciary duties?

18        A.  My understanding is that you're in a position

19    of trust and that you don't self deal, things like

20    that.  If you have a relative that has a business,         01:10

21    that you don't favor the relative.  There's a whole

22    series of things.  Mainly it's to avoid conflicts of

23    interest, things like that.

24        Q.  When you signed the indemnity agreement with

25    Lynx on May 1, 1995, did you give any thought to           01:10

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 45

1    be authentic.

2        Q.   That's your signature on the second page of

3    the letter?

4        A.   Yes, that's my signature.

5        Q.   And March of 1992 is consistent with when you          01:46

6    recall receiving a job offer from AB initially?

7        A.   That seems about the right time frame.

8        MR. WILSON:   Let's mark as Exhibit 23 a copy of

9    your resume.

10       (Exhibit No. 23 was marked for identification.)          01:47

11       BY MR. WILSON:

12       Q.   Is Exhibit 23 a copy of your resume?

13       A.   Yes, this appears to be my resume.

14       Q.   It lists as your second position -- second

15   position going from the top, senior patent attorney          01:47

16   at Perkin-Elmer, Applied Biosystems.  That's the job

17   you had at AB; is that right?

18       A.   Yes, it is.

19       Q.   From 1992 to 1995?

20            And when did you prepare this resume?          01:47

21       A.   I can't recall from the information that's on

22   here.

23       Q.   But in any event it's sometime after 1995

24   because it lists Lynx, correct?

25       A.   That's safe to assume.          01:48

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 46

1    Q.  And it provides a description of the work

2    that you did at AB.  Is the description in here

3    accurate?

4    A.  It looks accurate.

5    Q.  The first item you list is "managed and          01:48

6    expand patent portfolio in genetic analysis field."

7    Can you tell me a little bit more what you mean by

8    that?

9    A.  I think the document describes that itself.

10   It's instrumentation improvements, fluorescent dyes,   01:48

11   diagnostics and genotyping applications of those

12   instruments.

13   Q.  What do you mean when you say you were

14   responsible for managing and expanding the patent

15   portfolio?                                              01:49

16   DR. FLOWERS:  Objection as to form.

17   THE WITNESS:  So, could you ask -- restate the

18   question.

19   BY MR. WILSON:

20   Q.  Were you responsible for managing and              01:49

21   expanding the patent portfolio at AB?

22   A.  My primary duty was patent prosecution.  And,

23   so, in that sense I was responsible for writing new

24   patent applications and communicating with outside

25   attorneys handling patent applications that already    01:49

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 47

1    existed or were prepared outside.

2        Q.  What do you mean by expand patent portfolio?

3        A.  I think I mean writing new patent

4    applications.

5        Q.  Do you mean expanding the scope of the patent        01:49

6    portfolio in terms of the subject matter coverage or

7    just expanding the number of patents, or both?

8        A.  I would say it would be preparing patent

9    applications in response to requests from inventors

10   at ABI.                                                      01:50

11       Q.  Under interests you list analytical

12   technologies and biotechnology and genomics fields.

13   What were you referring to there?

14       A.  I think I was referring to a longstanding

15   interest that I've had in those sorts of                     01:50

16   technologies.

17       Q.  Is one of the interests that you had before

18   you came to work for AB sequencing by hybridization?

19       A.  Yes, that's correct.

20       Q.  Have you done work in sequencing by               01:50

21   hybridization before you went to work for AB?

22       A.  Yes, I had.

23       Q.  What was the work you had done?

24       A.  I prepared a patent application describing an

25   invention.                                                   01:50

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 51

1    doing there in reality.

2        Q.  Where do you think it goes beyond what you

3    were doing in reality?

4        A.  Well, for one thing, in No. 4, there was no

5    invention disclosure system.  And there was no audits    01:55

6    of AB practices and health and safety or no

7    intellectual property that I was aware of at the

8    time.  And my role in licensing matters was very

9    limited at first, and it expanded as my tenure

10   continued there.  But it was not the predominant job    01:56

11   that I did there.  And there was little or no FDA

12   submissions when I was there.

13       Q.  Is No. 1 accurate?  Or to be more specific,

14   is it accurate that part of your job was to "make

15   suggestions as to what research is required to    01:56

16   provide requisite" --

17       (Interruption by the reporter.)

18       MR. WILSON:  -- (continuing) "experimental

19   evidence to attain the broadest possible patent

20   coverage"?    01:57

21       Q.  Let me break that down a little bit.  Was one

22   of the things you were responsible for was obtaining

23   the broadest possible patent coverage for AB?

24       A.  Well, as my job as a patent attorney, that

25   was part of the job when I was given an invention    01:57

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 52

1   disclosure to describe it in a way that provided

2   maximal coverage.

3       Q.  And so much more simply, then, you didn't say

4   there was anything about 1, 2, and 3 on the senior

5   patent attorney job description that you thought was      01:57

6   inaccurate?

7       A.  Well, I didn't say that it was accurate

8   either.

9       Q.  Okay.  Well, that's my next question.  Is it

10  accurate?                                                 01:57

11      Maybe a better way to put it is is it

12  complete?  Is there anything that you did in the

13  course of your job responsibilities for AB that is

14  not included in this job description?

15      A.  Well, my primary job was doing patent         01:57

16  prosecution and preparing patents.  There was some

17  agreement work that usually had an intellectual

18  property component.  There was other duties that were

19  typical of an in-house patent attorney, like giving

20  talks to the staff occasionally.  But the workload      01:58

21  was quite high there per capita so there wasn't a

22  luxury, as I recall, to have a formal, like,

23  invention disclosure system.  There was nothing there

24  when I got there, and there literally wasn't enough

25  time to put into place such structures.                  01:58

---

**EXHIBIT A**

Page 53

1    Q.  So you were really focused on the patent

2    prosecution side of things?

3    A.  That's correct.

4    Q.  And your mission was to get the broadest

5    possible patent coverage that you could for AB?        01:58

6    DR. FLOWERS:  Objection as to form.

7    MR. FTHENAKIS:  Join.

8    THE WITNESS:  When I was given a patent

9    application -- a patent disclosure, invention

10   disclosure, the job of a patent attorney is to do     01:58

11   that.  And that's what I did.

12   BY MR. WILSON:

13   Q.  Did you use your independent judgment to make

14   decisions about the scope of patent protection that

15   you would seek?                                        01:59

16   A.  Well, it would depend greatly on the

17   invention.  If the invention was very simple, I would

18   say yes.  If the invention was more complex, like an

19   organic dye or something, I would rely much more on

20   the chemists that were the inventors.                  01:59

21   Q.  Did you exercise independent judgment about

22   which inventions might be suitable for patent

23   applications and which inventions might not be

24   suitable for patent applications?

25   A.  I mostly recall filing on everything.             01:59

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 54

1      Q.  On everything being what?

2      A.  Well, when somebody would come with an

3   invention disclosure, likely we would file on it.  I

4   don't have any specific recollection of turning

5   somebody down.                                          01:59

6      Q.  Why was that the case that you would likely

7   file on anything that an inventor came to you with?

8      A.  I think the inventors at AB that I dealt with

9   were reasonably sophisticated.  I find that people in

10  the chemistry profession tend to have a fairer         02:00

11  knowledge of what it takes to get a patent and when

12  is something patentable or not.  And my recollection

13  is that I either dealt with chemists or engineers

14  primarily, so both those professions made life very

15  easy.  They came with things that usually were unique  02:00

16  and patentable.

17     Q.  Do you recall ever deciding not to pursue a

18  patent application for something because you thought

19  it was outside of the scope of AB's business?

20     A.  I don't recall anything like that.              02:00

21     Q.  What was the scope of AB's business?

22     DR. FLOWERS:  Objection as to form.

23     MR. FTHENAKIS:  Join.

24     THE WITNESS:  So, my recollection of AB's

25  business was that they prepared instrumentation and    02:01

SHARI MOSS & ASSOCIATES                     (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 55

1    reagents to carry out various analytical processes in

2    the life science area; and typically they would not

3    develop the process itself, they would license it in.

4    Like their DNA sequencing, their protein sequencing,

5    their DNA synthesis are examples of technologies that    02:01

6    they licensed in and then made into a very successful

7    product.

8        BY MR. WILSON:

9        Q.  Was the company involved in basic research

10   and development activities as well as product    02:01

11   development?

12       DR. FLOWERS:  Objection as to form.

13       MR. FTHENAKIS:  Object as to form.

14       THE WITNESS:  I would say the predominant

15   research there was directed towards improving    02:01

16   processes that they licensed in.

17       BY MR. WILSON:

18       Q.  Did any of the research concern or relate to

19   methods of DNA sequencing?

20       MR. FTHENAKIS:  Objection as to form.    02:02

21       THE WITNESS:  It depends on what you mean by

22   relate.  Many of the inventions I would characterize

23   as improvements to existing DNA sequencing

24   methodologies.  In the case of ABI, that would be the

25   Sanger base sequencing methodology.    02:02

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 61

1   the 10 points?

2       A.  I can't recall; but it looks like, again,

3   it's related to the same topic in some sense.

4       Q.  All right.  And this is -- by July of 1992

5   you're now working at AB, correct?                      02:11

6       A.  Yes, I believe that's correct.

7       Q.  But this work, is it your testimony, did not

8   have anything to do with the work you were doing at

9   AB?

10      DR. FLOWERS:  Objection as to form.                 02:11

11      MR. FTHENAKIS:  Join.

12      BY MR. WILSON:

13      Q.  Did this work that's described on pages

14  MAC 31 through MAC 35 of your notebook have anything

15  to do with the work that you were doing at AB?         02:12

16      A.  Well, this work is a -- a hobby invention, my

17  work at AB was being a patent attorney.  So I would

18  say it didn't have anything to do with my work at AB.

19      Q.  Was there any overlap of the subject matter

20  between the hobby invention you're describing on       02:12

21  pages MAC 31 through 35 and the work you were doing

22  at AB?

23      A.  So, overlap in what sense?

24      Q.  Subject matter.

25      DR. FLOWERS:  Objection as to form.                 02:12

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 62

1      THE WITNESS:  There's many pieces of subject

2   matter.  For example, this variant of sequencing by

3   hybridization appears to use a polymerase chain

4   reaction as an element.  And certainly that was

5   something that AB was interested in.  But other than        02:12

6   that, it's not related to anything that they were

7   doing.

8      BY MR. WILSON:

9      Q.  Was AB interested in seeking methods of

10  sequencing by hybridization?                                02:13

11     A.  As far as I know, they were not.

12     Q.  There's a signature down in the bottom of

13  pages MAC 31, 32, 33, 34, and 35.  Whose signature is

14  that?

15     A.  I believe it's a signature of Steve Fung.           02:13

16     Q.  Was he a scientist at AB?

17     A.  That's correct.

18     Q.  What was his position?

19     A.  I believe he was a chemist.

20     Q.  Did he report to you?                                02:13

21     A.  No, he didn't.

22     Q.  Did he work with you?

23     A.  No, he was not connected with the legal

24  department.

25     Q.  Why did you have Dr. Fung sign these pages?         02:13

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 63

1          A.   I knew Steve Fung.

2          Q.   So why did you ask him to sign these pages?

3     Because he's somebody you happened to know?

4          A.   I happened to know he was technically

5     inclined so I thought he would understand these pages          02:13

6     with my description of them.

7          Q.   What was the purpose of having him sign these

8     pages?

9          A.   To have somebody witness the conception date

10    of the idea.                                                    02:14

11         Q.   Why did you want him to do that?

12         A.   Because I believe this was the subject matter

13    of patent applications I filed.

14         Q.   Did you eventually file a patent application

15    on this method of sequencing by hybridization?                 02:14

16         A.   I believe I did.

17         Q.   And did you assign that patent application to

18    Lynx eventually?

19         A.   I believe it was one of those, yes.

20         Q.   One of the four patent applications you            02:14

21    assigned to Lynx?

22         A.   Yes, I believe so.

23         Q.   If we go back and look at the assignment for

24    a moment.  Which I don't think you have in front of

25    you yet.  Do you?                                               02:14

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 64

1           We didn't pull that out yet, did we?

2      A.  I have to dig through there.

3      Q.  I'll do the digging.  That's why I get the

4  big bucks.

5           Since I can't find it, maybe I won't get the        02:15

6  big bucks.

7      DR. FLOWERS:  It was in front of him.

8      MR. WILSON:  Did we put it in front of you?

9      DR. FLOWERS:  The list of the four ap- --

10      MR. WILSON:  I couldn't remember if we actually        02:15

11  pulled it out or just talked about it.

12      Q.  All right.  If we look at Exhibit 8, which I

13  think you're about to get to.  If you -- oh, we put

14  it back.  That's why.  Okay.

15      (Discussion off the record.)        02:15

16      BY MR. WILSON:

17      Q.  So to get ourselves being clear again, is

18  this sequencing by hybridization method that's

19  described in your notebook at pages MAC 31 through

20  MAC 35 the subject of one of the patent applications        02:15

21  that you assigned to Lynx?  And I'll ask you that

22  with reference to the assignment that we've marked as

23  Exhibit 8 previously.

24      A.  Yes, I believe it corresponds to one or more

25  of those patent applications.        02:16

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 65

1    Q.  Which one or more patent applications do you

2  think it applies to?  Corresponds to I should say.

3    A.  I would say that the ideas described in the

4  first three inventions on the list correspond to the

5  entries that we've been discussing in the lab          02:16

6  notebook.

7    Q.  Did you tell Dr. Fung that you would be

8  applying for patents on these inventions that you had

9  him witness?

10   A.  I don't recall what I discussed with          02:16

11 Dr. Fung.

12   Q.  Where did you ask Dr. Fung to sign these

13 notebooks?  Was it at AB?

14   A.  I don't recall.

15   Q.  Did you ever have any interactions with       02:16

16 Dr. Fung outside of the course of your work at AB?

17   DR. FLOWERS:  Objection as to form.

18   THE WITNESS:  I don't recall any.

19   BY MR. WILSON:

20   Q.  Do you have any reason to think that you      02:17

21 asked Dr. Fung to witness these lab notebooks

22 anyplace other than at work at AB?

23   A.  I think that I could have asked him to

24 witness the lab notebooks in Foster City.  We may

25 have had coffee if it was before my tenure at AB.  Or  02:17

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 66

1    it could have been afterwards too.

2        Q.  So the date here is July 19th, 1992, if I'm

3    reading that correctly; and by then you were working

4    at AB, weren't you?

5        A.  Yes.  So then it's a good chance we were at        02:17

6    AB.

7        Q.  Did you tell Dr. Fung that these were patent

8    applications that you were not planning on assigning

9    to AB?

10       A.  I don't recall what our conversation was          02:17

11   about these patent applications.

12       Q.  Do you have any reason to think that Dr. Fung

13   would have understood that these were applications

14   that you did not intend to assign to AB?

15       A.  I don't specifically recall telling him that,     02:18

16   but my general recollection is that was the

17   understanding.

18       Q.  Why is that your general recollection?

19       A.  Because it was in my notebook that I kept

20   outside of work.  And he was also aware of earlier       02:18

21   work I had done on sequencing by hybridization, I

22   believe.

23       Q.  Did you tell Dr. Fung this was a notebook

24   that you kept outside of your work at AB?

25       A.  I don't have a specific recollection of that,     02:18

SHARI MOSS & ASSOCIATES                        (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

1    but it was certainly -- I don't believe there was any

2    indication on the notebook that it was an AB

3    notebook.  It was a different color, it had a

4    flexible cover.  It was just different.

5        Q.  Did Dr. Fung contribute anything to this              02:18

6    invention?

7        A.  No.  I think I approached Dr. Fung after the

8    fact.

9        Q.  Do you recall anything more that you told

10   Dr. Fung about this invention?                               02:18

11       A.  I don't recall talking to him about this

12   invention specifically at all.

13       Q.  When was the last time you spoke with

14   Dr. Fung?

15       A.  I can't recall precisely, but probably be on          02:19

16   the order of years.

17       Q.  Is Dr. Fung somebody you consider to be

18   honest?

19       A.  Yes, I think Dr. Fung's a very fine person.

20       Q.  Somebody I take it for whom you have                   02:19

21   professional respect?

22       A.  Yes, that's true.

23       Q.  If Dr. Fung's testimony was that he

24   understood this disclosure to be in connection with

25   the work you were doing for AB, would you have any            02:19

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 68

1  reason to think that was not true testimony on his

2  part?

3      DR. FLOWERS:  Objection as to form.

4      MR. FTHENAKIS:  Objection as to form.

5      THE WITNESS:  I can't say.                    02:19

6      BY MR. WILSON:

7      Q.  If Dr. Fung's testimony was that you never

8  told him anything to lead him to think that this was

9  outside of your work for AB, would you have any

10  reason to doubt the accuracy of that testimony?     02:19

11      DR. FLOWERS:  Objection to form.

12      MR. FTHENAKIS:  Objection as to form.

13      THE WITNESS:  Yeah, I can't answer that.

14      BY MR. WILSON:

15      Q.  On page MAC 52 there's a note that says "Took     02:20

16  8-9 hours to run on IBM-PC" then in parentheses

17  "(8086)."  Is that your handwriting?

18      MR. FTHENAKIS:  Excuse me.  What page?

19      MR. WILSON:  52.

20      MR. FTHENAKIS:  Thank you.                    02:20

21      THE WITNESS:  Yes, it looks like my writing.

22      BY MR. WILSON:

23      Q.  Where do you do that?  Where do you run that

24  computer program?  Was that at home or at work?

25      A.  At home.                                  02:21

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 69

1    Q.  You had the necessary databases and the

2  software at home?

3    A.  I had the necessary software.  I'm not sure

4  what you mean by databases.

5    Q.  Let me show you or ask you to take out          02:21

6  Exhibit 3 to Ms. San Roman's deposition.  Do you

7  recognize this to be your employee invention

8  agreement with AB?

9    A.  Yes, it appears to be that document.

10    Q.  And you signed this as a condition of your       02:22

11  employment with AB?

12    A.  Well, it wasn't negotiated as a condition of

13  my employment; it was a part of a package that was

14  given to me that I had to sign along with my bank

15  deposit stuff.                                       02:22

16    Q.  Did you understand that if you didn't sign

17  this employee invention agreement, you would not be

18  able to work for AB?

19    A.  That wasn't discussed; but it was my

20  understanding that with a company like AB, that this  02:22

21  is a routine procedure.

22    Q.  And you had no objection to signing it, did

23  you?

24    A.  No, I did not.

25    Q.  Did you understand that this was a standard     02:23

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 70

1    AB form that was used with all employees?

2        A.  Yeah, I had no reason to believe that I was

3    singled out in any way.

4        Q.  Do you know who prepared this form?

5        A.  No, I do not.                                02:23

6        Q.  As far as you know, was it prepared by

7    outside counsel?

8        DR. FLOWERS:  Objection to the form.

9        THE WITNESS:  It could have been.

10       BY MR. WILSON:                                   02:23

11       Q.  Did you sign a similar invention agreement

12   when you went to work for Lynx?

13       A.  Well, it depends on what you mean by similar.

14   I assume I signed an invention -- employee invention

15   agreement at Lynx.  I don't know how similar it was    02:23

16   without actually seeing the document.

17       Q.  All right.  We'll come back to that later.

18           Let me ask you to take a look at a sentence

19   in paragraph 3 of this agreement.  It says, "I have

20   attached hereto a list describing all inventions made   02:23

21   by me prior to my employment with the company

22   belonging to me, relating to the company's proposed

23   business and products and not assigned to the

24   company, or, if no such list is attached, I represent

25   that there are no such inventions."  Did you attach a   02:24

SHARI MOSS & ASSOCIATES              (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 71

1   list of all inventions made by you prior to your

2   employment with the company when you signed this

3   agreement?

4       A.  I had no recollection of attaching a list;

5   but then none of my inventions related to ABI's          02:24

6   business so.

7       Q.  And you had gone through your files, right,

8   in looking for documents to produce in this case and

9   you found no such list?

10      A.  None whatsoever.                                  02:24

11      MR. WILSON:  Ask you to take a look at Exhibit 2

12  of Kathy San Roman's deposition, which is right on

13  top of the pile conveniently.

14      Q.  Do you recognize this to be Applied

15  Biosystems Code Of Business Ethics Policy?               02:25

16      A.  Yes.

17      Q.  Was it part of your job to make sure that

18  employees abided by this policy?

19      A.  I'm not sure I understand the duty you're

20  suggesting that I should have had.                       02:25

21      Q.  Do you recall ever discussing this policy

22  with any employees of AB?

23      A.  No, I do not.

24      Q.  Do you have any objection to complying with

25  this policy?                                             02:26

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 76

1      Q.  But beyond that you don't have any further

2   recollection of how Lynx may have been reimbursing AB

3   for your services?

4      A.  That's correct.  I do not have any further

5   recollection about that subject.                        02:32

6      (Exhibit No. 26 was marked for identification.)

7      BY MR. WILSON:

8      Q.  We've marked as Exhibit 26 a document

9   entitled -- well, it says "Invention Data" at the

10  beginning and then there are several pages            02:32

11  afterwards.  It's a six-page document in all.

12      Is this a document that you recognize,

13  Dr. Macevicz?

14      A.  Yes, I recognize this.

15      Q.  What is it?                                    02:33

16      A.  It's a disclosure of an invention related to

17  some work that Eric Shulse was doing.

18      Q.  Does it reflect work that you were doing too?

19      A.  No.

20      Q.  If you look at the second page of the form,    02:33

21  under point 2 it says "suggested inventor."  And

22  that's your name there, correct?

23      A.  Yes.

24      Q.  Why is your name there if it's not related to

25  work that you were doing?                              02:33

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 77

1    A.  Well, the work that I was doing was preparing

2  patent applications.  One of the -- one of the groups

3  that I would service was Eric Shulse's group.  And

4  they were working on a technology -- or people in his

5  group were working on a technology that involved          02:34

6  amplifying these objects called short terminal

7  repeats.  And that's described in this prior art page

8  3 of 5.

9       And in attending a discussion, I believe,

10  with his group where this technology was described     02:34

11  they explained what it was, the purpose of the steps

12  of the technique were; and I believe on the spot I

13  asked a question why couldn't you do this?  And it

14  turned out that it was something that they had not

15  thought about, even though I considered it a            02:35

16  straightforward question that a patent attorney would

17  ask an inventor or a group working in a technical

18  area.  And so we decided that I'd file an invention

19  disclosure on it.

20    Q.  Because it was a new idea that you had come       02:35

21  up with?

22    A.  It was an idea related to the work that Eric

23  Shulse's group was working on.

24    Q.  Was it a new idea that you came up with?

25    DR. FLOWERS:  Objection as to form.                   02:35

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 78

1      THE WITNESS:  I actually don't know if it was a

2  new idea.  I don't know if a patent application was

3  actually filed and prosecuted on it.

4      BY MR. WILSON:

5      Q.  All of the writing on these -- the five          02:35

6  pages, is all the writing yours on the invention

7  disclosure form?

8      A.  Yes, it appears to be.

9      Q.  Is this your idea?

10      DR. FLOWERS:  Objection as to form.                  02:36

11      THE WITNESS:  I believed it to be, yes.

12      BY MR. WILSON:

13      Q.  And that's why you listed yourself as the

14  suggested inventor?

15      A.  That's correct.                                  02:36

16      Q.  What was this form used for generically?  Not

17  the specific one you filled out here, but the form

18  entitled Invention Disclosure Form?

19      A.  It was a form that when people had an

20  invention or thought they had an invention they could   02:36

21  fill out information related to the invention and

22  bring it to the legal group.  And then the typical

23  process would be to do a prior art search to see

24  whether it was identically -- first off, if it was

25  identically described in the literature.  Typically     02:36

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 79

1    the inventor would help you in that regard.  And then

2    if it looked like it was something related to ABI's

3    business, we'd file a patent application on it.

4        Q.  And the legal department being you and the

5    people who reported to you?  Is that correct?                02:37

6        A.  Yes.  Or Joe Smith.  It depends on my --

7        Q.  And you're listed as one of the contacts,

8    right?  If people have questions about the form?

9            It says do not hesitate to contact Steve

10   Macevicz or Paul Grossman for assistance in filling          02:37

11   out.

12       A.  I don't recognize this cover sheet, so.

13       Q.  Is it consistent with your recollection of

14   the work you were doing at AB that if inventor -- if

15   scientists had questions about an invention                  02:37

16   disclosure, they should call you?

17       A.  Yes, I encouraged them to call me if they had

18   questions about invention disclosures.

19       Q.  And you discussed the invention and whether

20   it might be patentable?                                      02:37

21       A.  I don't have specific recollections of doing

22   that, but generally that's what I would do with them.

23       Q.  Did you ever fill out any other invention

24   disclosure forms besides this that you recall?

25       DR. FLOWERS:  Objection as to form.                      02:38

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 80

1      THE WITNESS:  Not that I recall.

2      BY MR. WILSON:

3      Q.  Did you ever fill out any invention

4  disclosures on any of your work on sequencing by

5  hybridization?                                              02:38

6      A.  I don't believe so.

7      Q.  Can you pull out Exhibit 10 from the Kathy

8  San Roman exhibits.

9          This document has an MAC Bates number, which

10  indicates that it was produced by you in this case.       02:38

11      A.  Uh-huh.

12      Q.  Why is it that you had a copy of the

13  development agreement between Lynx and Dr. Sidney

14  Brenner in your files?

15      A.  My recollection is that when I was discussing   02:38

16  the possibility of working at Lynx with Lynx that the

17  subject of my outside inventions came up.  Which were

18  quite similar to Sidney Brenner's inventions.  And so

19  I recall telling Sam Eletr that I wasn't going to

20  pursue these inventions on my own, that I'd be happy      02:39

21  to assign them to Lynx if they would find it useful.

22      Q.  Which inventions were you referring to?

23      A.  Primarily the sequencing by ligation

24  invention, but also the others.

25      Q.  So sequencing by ligation and sequencing by      02:39

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 82

1    details of the discussion.

2        Q.  How long did you continue -- well, let's mark

3    this the next exhibit.  This will be 26?

4        THE REPORTER:  No.  Twenty-seven.

5        MR. WILSON:  That's what I thought.                    02:41

6        DR. FLOWERS:  You continue to test her.

7        (Exhibit No. 27 was marked for identification.)

8        BY MR. WILSON:

9        Q.  Exhibit 27 is a document entitled Performance

10   Review Form.  Can you turn to the last page of the        02:42

11   form, and tell me if that's your signature under

12   "employee signature."

13       A.  Yes, it looks like my signature.

14       Q.  And it's dated May 19, 1994?

15       A.  Yes.                                               02:42

16       Q.  And below that, is that Joe Smith's

17   signature?

18       A.  I couldn't say it.  I have no reason to

19   believe it's not.

20       Q.  And the last signature I'm quite sure you         02:42

21   won't be able to recognize, but I'll ask anyway.  Can

22   you recognize that bottom signature?

23       A.  I can't recognize it.

24       Q.  What is this performance review form?

25       A.  I have -- I don't recall it at all.               02:42

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 83

1      Q.  There's what appears to be a Post-It on the

2  front page.  "This review was totally prepared by

3  Steve Macevicz" signed by Martha.  Do you know who

4  Martha was?

5      A.  I'm not positive.  I would guess she was the      02:43

6  head of the Human Resources Department.

7      Q.  And it has as employee's name Stephen

8  Macevicz, job title senior patent attorney.  And that

9  was your job title in 1994, right?

10     A.  Yes, I believe so.      02:43

11     Q.  And if you turn to the third page of the

12  document.  Do you see there are two columns, "Major

13  Goals" and "Results Achieved"?

14     A.  Uh-huh.

15     Q.  And you see the number one major goal is      02:43

16  "oversee preparation and prosecution of ABD patent

17  applications and of licensed patent applications;

18  analysis of invention disclosures"?

19     A.  Okay.

20     Q.  Does this refresh your recollection that you      02:43

21  wrote up this description of your major goals?

22     A.  Yeah, it appears to be something I prepared.

23  I just don't remember it.

24     Q.  Is that consistent with your understanding of

25  what the major goals were?      02:44

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 84

1      A.  Yeah, it looks about right.

2      Q.  Under "Results Achieved" there's a column

3   with a number of bullet points.  Did you write those

4   bullet points to summarize the results that you had

5   achieved?                                              02:44

6      A.  Well, again, I don't recall the specifics of

7   preparing this form, but I may have, yes.

8      Q.  The first bullet, "Oversight responsibility

9   for 43 of the 70+ patent families owned by ABD;

10  direct responsibility for 15 families."  Does that     02:44

11  refresh your recollection that that was some of the

12  results you achieved in the 1994 time frame?

13     A.  Well, I'm having trouble understanding what

14  that means.  How does -- from the sentence, the

15  bullet point, it states a function that I provided     02:45

16  the company.  So I'm just having a hard time

17  understanding why I might have thought that that was

18  a result achieved.

19          Now, it may be, you know, the previous year

20  there was only 25 patent families owned by AB.  Then   02:45

21  I could see how the result achieved would be

22  increasing the number.  But in any case, I do see it

23  so.

24     Q.  So you're not necessarily following the logic

25  now, but you agree this is something you did write?    02:46

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 85

1      A.   It appears to be, yes.

2      Q.   What were the patent families owned by ABD?

3    Do you understand what that's a reference to at this

4    point?

5      A.   At this point I'm not sure whether they were        02:46

6    actually owned or licensed in.  There was a large

7    amount of -- I think I recall us doing a fair amount

8    of prosecution on patents that were licensed in, for

9    example, some of the Cal Tech technology that was

10   licensed in, we seemed to be doing quite a bit of the      02:46

11   prosecution on it.  So I'm not sure whether those 43

12   or 70 were things that were actually owned or owned

13   or licensed.

14     Q.   The fourth bullet point says "Provided Lynx

15   with patent services until December 1993.  Found          02:46

16   outside law firm to take over Lynx patent work."  Did

17   you, in fact, provide Lynx with patent services until

18   December 1993?

19     A.   I don't recall if that was actually achieved

20   or something that I wanted to do.                          02:47

21     Q.   Did you find an outside law firm to take over

22   Lynx's patent work, do you recall?

23     A.   I believe the Dellenger firm took over quite

24   a bit of the work at some point in my tenure.

25     Q.   Why?  Do you know?                                  02:47

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 86

1      A.  Again, the workload was fairly high.

2      Q.  So you just couldn't keep up with it?

3      A.  Yeah, it was hard to keep up with everything.

4   And they were increasing their patents, and AB was

5   increasing theirs so.                                    02:47

6      Q.  So you think you had the Dellenger law firm

7   take over providing patent services after December

8   1993?

9      A.  I don't recall the precise details, but I do

10  believe at some point the Dellenger law firm did        02:47

11  assume some of the work.  I don't know if it was all

12  of the work or part of it or what.

13     Q.  Do you recall providing Lynx with any patent

14  services after December 1993?

15     A.  I don't have specific recollections of it.       02:48

16     Q.  The fourth bullet point corresponding to

17  No. 2 says "analyzed patent positions relating to

18  sequencing by hybridization."  Do you know what

19  that's referring to?

20     A.  No, I don't.                                      02:48

21     Q.  Do you have any recollection about analyzing

22  patent positions relating to sequencing by

23  hybridization?

24     A.  I'm just not sure.

25     Q.  Do you have any reason to believe you didn't      02:48

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 102

1        A.   I don't recall doing that.

2        Q.   Speaking of sequencing by ligation, could you

3   take a look at another page of your lab notebook.

4   It's MAC 79.  And really it's MAC 79 through 83 that

5   I'd like you to take a look at.                        03:17

6        Do these pages describe a method for

7   sequencing by ligation that you invented?

8        A.   You're saying 79 through 83?

9        Q.   I think that's right, but I may be off on the

10  page numbers.                                          03:17

11       DR. FLOWERS:  Objection as to form.

12       MR. WILSON:  That's fair.

13       Q.   What is described on pages MAC 79 through

14  MAC 83?

15       A.   I would say there's a collection of          03:18

16  particular embodiments of several inventions.

17       Q.   What are the inventions?

18       A.   They appear to be -- one of them is a

19  particular embodiment of the sequencing by ligation;

20  another one seems to be something entitled           03:18

21  Evolutionary Selection of Oligonucleotide Probes.

22       Another one has something to do with beads

23  with solid support -- used as solid supports, but I

24  can't identify it in particular by looking at it so

25  quickly and not thinking about it.                    03:19

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 103

1    Q.  And you asked Paul Grossman to sign these lab

2    notebook pages?

3    A.  Yes, it appears to be the case.

4    Q.  Did Paul -- who was Paul Grossman?

5    A.  Paul Grossman was the patent agent that        03:19

6    worked in the legal group.

7    Q.  So he reported to you at the time, right?

8    A.  I believe so, yes.

9    Q.  You were his supervisor?

10   A.  If he reported to me, then I was his          03:19

11   supervisor.

12   Q.  Did you bring this lab notebook into work for

13   Dr. Grossman to sign?

14   A.  Yes, I brought it in specifically for him to

15   look at these diagrams and sign.                  03:19

16   Q.  Did you explain to him that it was something

17   you were working on outside of the scope of your work

18   for AB?

19   A.  I don't have a specific recollection, but I

20   believe there was a general discussion of that    03:19

21   nature.  Because the reason I brought it in was to

22   establish a date of conception.  Corroborate a date

23   of conception.

24   Q.  What do you mean a general discussion of that

25   nature?                                           03:20

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 104

1      A.  Well, I can't imagine giving him a notebook

2  and asking him to sign it without explaining the

3  reason why I wanted to have him sign it.  Or that I

4  would ask him to sign it for me.

5      Q.  The reason being that it was -- you wanted to          03:20

6  corroborate the date of conception, right?

7      A.  Yes.

8      Q.  Do you also think that you explained to him

9  that this was something you were doing outside of the

10  scope of your work for AB?                                    03:20

11     A.  Yes.

12     Q.  Do you think you explained to him that you

13  were not planning on assigning this invention to AB?

14     A.  I don't recall specifically or generally that

15  sort of discussion.                                          03:20

16     Q.  Do you recall specifically telling him that

17  this was outside of the scope of your work for AB?

18     A.  I don't have a specific recollection of me

19  saying those words 12 years ago, but I think it was

20  clear from the fact that I brought the notebook from          03:21

21  home and that he was aware that I had this hobby of

22  working on analytical technologies as a pastime, that

23  that was the understanding.

24     Q.  Did you disclose this invention to your

25  supervisor, Joe Smith, at the time?                          03:21

SHARI MOSS & ASSOCIATES                      (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 105

1      A.  I don't believe I did.

2      Q.  Did you discuss these inventions with Joe

3   Smith, your supervisor?

4      A.  I don't recall discussing it with him.

5      Q.  Did you disclose these inventions to              03:21

6   Dr. Hunkapiller?

7      A.  I don't recall disclosing them to him either.

8      Q.  Did you discuss any of these inventions with

9   Dr. Hunkapiller?

10     A.  I don't have a specific recollection, but        03:21

11  these types of inventions are things that would be

12  discussed that -- you know, I wasn't hiding anything.

13  I would discuss them with people in the hallways or

14  at the lunch table.  I just don't have a specific

15  recollection of sitting down, drawing things, and       03:21

16  relating it to this invention.

17     Q.  By the hallways you mean the hallways at

18  work?

19     A.  That's correct.

20     Q.  And by the lunch area you mean the lunch --       03:22

21     A.  Cafeteria.

22     Q.  -- cafeteria at work?

23     A.  Yeah.

24     Q.  Did you ever disclose these inventions on

25  pages MAC 79 through 83 in writing to anybody at AB,     03:22

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 106

1    particularly to any supervisor at AB?

2       MR. FTHENAKIS:  Objection to the form.

3       DR. FLOWERS:  Join.

4       MR. WILSON:  That's fair.

5       Q.  Let's go back to the beginning.  Did you ever      03:22

6    disclose any of the inventions on pages MAC 31

7    through 35 of your lab notebook in writing to any

8    supervisor of yours at AB?

9       A.  What were the pages again?

10      Q.  31 to 35.                                          03:22

11      A.  I don't have a specific recollection of that.

12      Q.  Do you have any reason to think that you did?

13      A.  I have no reason to think that I did because

14   I considered them totally separate from my work at

15   AB.                                                       03:23

16      Q.  Did you ever ask for consent from any of your

17   supervisors at AB to apply for patent applications on

18   the inventions you describe in pages MAC 31 through

19   MAC 35 of your notebook?

20      A.  So, why would I ask for consent for something     03:23

21   that's outside the scope of the work?

22      Q.  Did you -- so is it your understanding, your

23   recollection, that you did not ask for consent to

24   apply for patents on these inventions?

25      A.  I don't recall asking for consent to file on      03:23

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 107

1    these inventions.

2       Q.  And you believe that you had no duty to

3    disclose these inventions to your managers at AB,

4    right?  Your supervisor at AB?

5       A.  Well, I understand -- I understand my duty        03:23

6    under the employee invention agreement if that's what

7    you're getting at.  I didn't consider these

8    inventions to be a part of the AB business.

9           And I wasn't trying to hide them.  I have a

10   general recollection of talking about these            03:24

11   inventions with the people at AB as exemplified by

12   the signatures of Dr. Fung and Dr. Grossman.  But I

13   didn't -- I don't have any recollection of going to

14   my supervisors and showing them and talking about

15   them.                                                  03:24

16      Q.  And that goes for the inventions described at

17   MAC 31 to 35 as well as the inventions described in

18   MAC 79 through 83, correct?

19      A.  73?

20      Q.  83.  I might have misspoken.  79 to 83.         03:25

21      A.  I believe that's the case.  I don't have any

22   specific recollection of discussing these with

23   supervisors.

24      Q.  Am I understanding you correctly that you're

25   not saying that you satisfied obligations under the    03:25

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

EXHIBIT A

Page 151

1    AB would pursue?

2        A.  No, it was not my job.

3        Q.  Was it your job to decide how AB would

4    allocate its research and development dollars?

5        A.  No.  Obviously, my job was a patent attorney.    04:59

6    So I may have an influence on both of those items if

7    I was asked to evaluate the patent position related

8    to some prospect.

9        Q.  But you wouldn't make the ultimate decision?

10       A.  No.  My understanding is I would not be    04:59

11   making those sorts of decisions.

12       Q.  Was it your job responsibility to decide

13   which technologies to license?

14       A.  I would say it's the same answer.  That's --

15   it's just outside of my realm of responsibility.    05:00

16       Q.  So other people would make the decision about

17   what technology AB should license for itself?

18       A.  Again, I think the ultimate decision would be

19   made by other people.  I wasn't a manager at that

20   company.    05:00

21       Q.  Now, we can agree, can't we, that one of the

22   business lines that AB had was DNA sequencing

23   products, right?

24       A.  DNA sequencing products.  Yes, they had

25   instruments and reagents that went along with the    05:00

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 152

1    instruments.

2        Q.  And they also developed methods for DNA

3    sequencing, right?

4        A.  No.  I would say they developed improvements

5    to the methods.                                        05:00

6        Q.  So they would -- in your view, then, they

7    would license basic methods and then develop

8    improvements to those methods?

9        A.  Yes.  To the extent they did research and

10   development, that's a fair characterization.          05:00

11       Q.  And it was not within your job duties to

12   decide which methods to license and which

13   improvements to develop; is that correct?

14       DR. FLOWERS:  Objection as to form.

15       BY MR. WILSON:                                     05:01

16       Q.  Was it within your job duties to decide which

17   methods to license and what improvements to explore?

18       A.  Only to the extent that I would make a

19   contribution from time to time by analyzing patents

20   related to those prospects.                           05:01

21       Q.  But somebody else would have the job of

22   deciding which methods to license?

23       A.  Sure.

24       Q.  And somebody else would have the job of

25   deciding which improvements to pursue?                 05:01

EXHIBIT A

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 172

1       THE WITNESS:  Well, patent applications were one

2   part of my normal job function.  In some cases it was

3   agreement writing, in some cases it was attending

4   meetings to see if there were inventions that needed

5   to be discussed with the scientists or engineers.          05:33

6       BY MR. WILSON:

7       Q.  Did you ever consult with anyone about

8   whether AB might be interested in the subject matter

9   of the patent applications that you assigned to Lynx?

10      A.  Well, it depends on what you mean by subject    05:33

11  matter.  You mean generally DNA sequencing?  Or

12  specifically sequencing by ligation or sequencing by

13  hybridization?

14      Q.  Well, let's start with the latter.  Did you

15  ever ask anybody at AB if they would be interested in    05:34

16  pursuing technology related to sequencing by

17  hybridization?

18      DR. FLOWERS:  Objection as to form.

19      THE WITNESS:  I don't recall specifically.  In

20  the case of sequencing by hybridization I do recall     05:34

21  submitting that document, whatever it was, to

22  somebody at AB.

23      BY MR. WILSON:

24      Q.  So that was prior to the time you were

25  working at AB?                                           05:34

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 173

1      A.   That's correct.

2      Q.   But after you were working at AB and after

3   you filed the patent application --

4      A.   Yes.

5      Q.   -- covering -- or at least relating to                05:34

6   sequencing by hybridization, you never again asked AB

7   if -- anybody at AB if they might be interested in

8   pursuing that technology?

9      A.   I don't recall any discussions like that.

10     Q.   After you filed your patent application           05:34

11  relating to sequencing by ligation did you ever ask

12  anybody at AB if they would be interested -- if AB

13  would be interested in pursuing technology related to

14  sequencing by ligation?

15     A.   I don't recall specifically asking people if      05:34

16  they would be interested in pursuing sequencing by

17  ligation.

18     Q.   You reached the conclusion, based on your own

19  knowledge about AB, that they wouldn't be interested

20  in pursuing sequencing by ligation or sequencing by     05:35

21  hybridization; is that correct?

22     A.   By my own knowledge, you mean knowledge of

23  what they were pursuing commercially and my knowledge

24  of responses, say, in these cafeteria discussions?

25  Is that what you mean?                                   05:35

SHARI MOSS & ASSOCIATES                     (415 ) 402-0004

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

Page 174

1        Q.  That's right.

2        A.  Then I don't have any specific recollection

3    of disclosing or asking whether they'd be interested

4    in pursuing it commercially.

5        Q.  Switching to an entirely different topic, are      05:35

6    you being compensated by anybody for your time here

7    today in deposition?

8        A.  Not unless you're offering.

9        Q.  Are you -- has anybody offered you any

10   compensation in any form based on the outcome of this    05:35

11   litigation?

12       A.  No, not -- no.  Nothing.

13       MR. WILSON:  All right.  That's all I've got.

14       THE WITNESS:  No.  I'm just asking to be left

15   alone.                                                    05:36

16       MR. WILSON:  I appreciate your time today, and

17   we'll see you next time.

18       THE WITNESS:  Okay.

19       DR. FLOWERS:  I have a couple questions.

20       MR. WILSON:  Certainly.  But we have to change        05:36

21   the tape.

22       DR. FLOWERS:  I may be able to get -- change the

23   tape.  Yeah.

24       MR. WILSON:  It's not my decision to make.

25       THE VIDEOGRAPHER:  This marks the end of Tape 2       05:36

**EXHIBIT A**

b8d025a6-4c2c-4881-8a37-dec0587cbf84

1    STATE OF CALIFORNIA)

2    COUNTY OF SAN MATEO)

3         I hereby certify that the witness in the

4    foregoing deposition, STEPHEN C. MACEVICZ, was by me

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth, in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true

9    record of the witness's testimony as reported by me,

10   a duly certified shorthand reporter and a

11   disinterested person, and was thereafter transcribed

12   into typewriting by computer.

13        I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my

18   hand this 11th day of December, 2007.

19

20

21        _Kellie A. Zollars_

22        KELLIE A. ZOLLARS, CSR

23        STATE OF CALIFORNIA

24

25

                                              184