CONFIDENTIAL DEPOSITION OF STEPHEN C. MACEVICZ, PH.D.
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

1 (Pages 1 to 4)

---

**Page 1**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
--oOo--

ENZO BIOCHEM, INC., ENZO LIFE   )
SCIENCES, INC., and YALE        )
UNIVERSITY,                     )
                                )
        Plaintiffs,             )
                                ) Case No.
     vs.                        ) 3-04-CV-929 (JBA)
                                )
APPLERA CORP. and TROPIX,       )
INC.,                           )
                                )
        Defendants.             )
_____)

DEPOSITION OF
STEPHEN C. MACEVICZ, Ph.D.
_____

Wednesday, August 22, 2007
Volume 1  (Pages 1 - 298)

HIGHLY CONFIDENTIAL

REPORTED BY:  ANA M. DUB, RMR, CRR, CSR 7445
2003-399655

---

**Page 2**

I N D E X
INDEX OF EXAMINATIONS
                                                    Page
EXAMINATION BY MS. STEINHAUER ...............  10
EXAMINATION BY MR. GROOMBRIDGE ..............  239
FURTHER EXAMINATION BY MS. STEINHAUER .......  289


PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION
No.         Description                         Page
Exhibit 1   Subpoena In a Civil Case to .....   13
            Stephen C. Macevicz

Exhibit 2   Plaintiffs' Notice of ...........   27
            Deposition of Defendant Applera
            Corp.'s Witness Stephen C.
            Macevicz

Exhibit 3   Letter on the Letterhead of .....   62
            Perkin-Elmer Dated October 20,
            1994 to Elazar Rabbani from
            Steve Macevicz, Production
            No. GT013662

Exhibit 4   DNA Sequencing Chemistry ........   69
            Guide Production
            Nos. E00016839-909

Exhibit 5   Letter on the Letterhead of .....   76
            Perkin-Elmer Dated January 13,
            1995 to Elazar Rabbani from
            Steve Macevicz, Production
            Nos. GT018686-87

Exhibit 6   Fax Transmittal Dated ...........   87
            January 27, 1995 to Elazar
            Rabbani from Steve Macevicz,
            Production Nos. GT013212-14

---

**Page 3**

I N D E X (Cont.)
PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION
No.          Description                         Page
Exhibit 7    United States Patent ............  90
             No. 4,711,955, Production
             Nos. GT015665-89
Exhibit 8    United States Patent ............  90
             No. 5,328,824, Production
             Nos. GT015642-63
Exhibit 9    United States Patent ............  90
             No. 5,449,767, Production
             Nos. GT015619-40
Exhibit 10   United States Patent ............  91
             No. 5,476,928, Production
             Nos. GT015599-663
Exhibit 11   Confidential Disclosure ......... 110
             Agreement, Production
             Nos. AP0012779-80
Exhibit 12   Fax Transmittal Dated ........... 117
             February 3, 1995 to Ronald C.
             Fedus from Steve Macevicz,
             Production Nos. GT013179-81

Exhibit 13   Fax Transmittal Dated ........... 124
             February 10, 1995 to Steve
             Macevicz from Ronald C. Fedus,
             Production Nos. GT013182-99
Exhibit 14   Letter on the Letterhead of ..... 136
             Enzo Dated February 22, 1995 to
             Steve Macevicz from Ronald C.
             Fedus and Attachments,
             Production Nos. GT013202-08
Exhibit 15   Two-page Letter on the .......... 175
             Letterhead of Perkin-Elmer
             Dated March 7, 1995 to Lawrence
             J. Goffney, Jr. from Stephen C.
             Macevicz and Attachments,
             Production Nos. GT008335-39

---

**Page 4**

I N D E X (Cont.)

PLAINTIFFS' EXHIBITS MARKED FOR IDENTIFICATION
No.          Description                         Page
Exhibit 16   Letter on the Letterhead of ..... 227
             Enzo Dated March 30, 1995 to
             Michael W. Hunkapiller from
             Elazar Rabbani, Ph.D. and
             Attachments, Production
             Nos. AP0012771, AP0012760-70

Exhibit 17   Faxed Letter on the ............. 229
             Letterhead of Perkin-Elmer Dated
             May 16, 1995 to Dr. Rabbani from
             Stanley D. Rose, Ph.D.,
             Production No. GT013154

Exhibit 18   Article Entitled "A System for .. 232
             Rapid DNA Sequencing with
             Fluorescent Chain-Terminating
             Dideoxynucleotides," Production
             Nos. AP059813-18

Exhibit 19   European Patent Application ..... 234
             0 252 683, Production
             Nos. AP056582-647

Exhibit 20   United States Patent ............ 235
             No. 5,047,519, Production
             Nos. 116401-35


DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION
No.          Description                         Page
Exhibit 21   New Application Transmittal ..... 276
             08/428683

Exhibit 22   Applied Biosystems, Inc. ........ 286
             Employee Invention Agreement
Exhibit 23   Job Description - Senior ........ 288

---

Page 13

1  being deposed, the one that you're generally
2  speaking about today?
3     A.  Yes.
4     Q.  Have you ever provided testimony at trial?
5     A.  No, I haven't.
6        MS. STEINHAUER:  Now, you're here pursuant
7  to subpoena.  So why don't I have the court reporter
8  mark as Macevicz 1 a subpoena that was issued to
9  Stephen Macevicz from the Northern District of
10 California, and it was dated June 25th, 2007.
11       (Whereupon, Plaintiffs' Exhibit 1 was
12        marked for identification.)
13       MS. STEINHAUER:  Q.  Mr. Macevicz, this is
14 a subpoena that was issued to you by Hunton &
15 Williams.  Have you seen this document before today?
16    A.  Yes.
17    Q.  And how did you get to see it?
18    A.  My attorney sent it to me.
19    Q.  When was that?
20    A.  I would say a matter of weeks ago.
21    Q.  And did you understand why you're being
22 subpoenaed to testify in this case?
23    A.  I'm actually not sure why.
24    Q.  Okay.  When was the first time you learned
25 that there was a suit between Applera and Enzo going

Page 14

1  on?
2     A.  I'm not sure precisely.  More recently, I
3  think I noticed a -- something in the news.
4     Q.  Do you mean something written or something
5  spoken?
6     A.  Something reported on an Internet news
7  source that I look at regularly called GenomeWeb or
8  something like that.
9     Q.  Have you been contacted by the attorneys
10 for Weil in connection with this case?
11    A.  No, I have not.
12    Q.  Have you been contacted by the attorneys
13 for Applera, in-house counsel from Applera, in
14 connection with this case?
15    A.  No, I have not.
16    Q.  Do you recognize the name Michael
17 Hunkapiller?
18    A.  Yes, I do.
19    Q.  When was the last time you spoke to
20 Mr. Hunkapiller?
21    A.  I would guess perhaps two years ago.
22    Q.  And was that in connection with the suit
23 between Applera and Enzo?
24    A.  No, it was not.
25    Q.  Was it in connection with any of the

Page 15

1  subject matter that's at issue in the suit between
2  Applera and Enzo?
3     A.  No, it was not.
4        MR. FTHENAKIS:  I'll object to the extent
5  that it calls for him to speculate.  I think he's
6  told us he doesn't really know what this lawsuit is
7  about.
8        MS. STEINHAUER:  Whether he knows about it
9  or not, I'm still entitled to ask him.  And I
10 believe, since he's been deposed before, he's
11 perfectly capable of answering by himself.
12       I'm sorry.  Could you read the question
13 and answer back.
14       (Record read as follows:
15       "QUESTION:  Was it in connection with
16        any of the subject matter that's at
17        issue in the suit between Applera and
18        Enzo?
19       "ANSWER:  No, it was not.")
20       MS. STEINHAUER:  Q.  How about the name
21 Joseph Smith?  Do you recognize that name?
22    A.  Yes, I do.
23    Q.  And when was the last time you spoke with
24 Mr. Smith?
25    A.  I don't know precisely, but I would say it

Page 16

1  was over a year ago.
2     Q.  And was that in connection with the suit
3  between Applera and Enzo?
4     A.  No, it was not.
5     Q.  Did that discussion have anything to do
6  with the subject matter that's at issue in the suit
7  between Applera and Enzo?
8     A.  No, it did not.
9     Q.  Were the discussions that you had with
10 Dr. Hunkapiller and Mr. Smith in the last two to
11 three years connected in any way to the litigation
12 that's currently going on between Applera and
13 yourself?
14    A.  No.
15    Q.  Have you been asked for -- to produce
16 documents that are relevant to the suit between
17 ABI -- Applera and Enzo?
18    A.  Not that I recall.
19    Q.  So no one's ever asked you for documents?
20    A.  Not that I can recall.
21    Q.  Do you have documents relating to
22 negotiations or discussions with Enzo that occurred
23 in the mid-1990s?
24    A.  No, I do not.
25    Q.  Now, when did you first join Applera?

17

1    A. I believe I joined -- at that time it was,
2  I believe, Perkin-Elmer, and I joined in 1992.
3    Q. And who hired you?
4    A. Joe Smith.
5    Q. And who was or is Mr. Joe Smith?
6    A. Pardon me?
7    Q. Who is Mr. Smith?
8    A. He was an attorney working at
9  Perkin-Elmer, or Applied Biosystems at that time.
10   Q. So you joined in 1992 at Perkin-Elmer, and
11 then Perkin-Elmer merged with Applied Biosystems,
12 and that's how you came to work for Applied
13 Biosystems? Or were you hired -- I'm a little
14 confused about --
15   A. Yes. I don't know what the precise date
16 was when Perkin-Elmer purchased Applied Biosystems.
17 The site and the people I worked with were a part of
18 Applied Biosystems.
19   Q. Okay.
20   A. Now, whether the day I was hired it was
21 officially Applied Biosystems or Perkin-Elmer, I'm
22 not absolutely certain myself.
23   Q. And what was Mr. Smith's position at
24 Applied Bio- -- I'm just going to call Applied
25 Biosystems ABI --

18

1    A. Okay.
2    Q. -- for short.
3       I know Applera and Applied Biosystems and
4  Perkin-Elmer are various names that the company has
5  had over the last 15 or 20 years. But just to make
6  it simple, if it's okay with you, I'd --
7    A. Yeah, that's fine.
8    Q. -- like to just refer to them as ABI.
9       What was Mr. Smith's position at ABI at
10 the time that you joined the company?
11   A. He was -- I don't know what his official
12 title was, but he was the in-house attorney.
13   Q. In-house attorney, generally speaking, or
14 did he have a particular area that he excelled in or
15 specialized in?
16   A. I think he concentrated in patents and
17 various transactions, commercial transactions.
18   Q. Now, were you hired to work in the patent
19 area as well in 1992 when you joined ABI?
20   A. Yes, that's correct.
21   Q. And did you have a title?
22   A. I believe my title was just patent
23 counsel, or it may have been senior patent counsel,
24 something of that nature.
25   Q. Did you report to Mr. Smith while you were

19

1  at Applera, at ABI as senior patent counsel?
2    A. Yes, that's correct.
3    Q. And how about Mr. Hunkapiller? Did you
4  have reporting duties to Mr. Hunkapiller as --
5  Dr. Hunkapiller as well?
6    A. No, I did not.
7    Q. Did you interact with Dr. Hunkapiller from
8  time to time?
9    A. Yes, but only very rarely.
10   Q. And what were the occasions for which you
11 interacted with Dr. Hunkapiller while you were
12 employed at ABI?
13   A. Actually, most of the interactions took
14 place in the lunchroom; and -- and there, the
15 interaction was usually on technical matters in
16 genetics technology.
17   Q. Now, there was a time when Mr. Smith was
18 not working full-time at ABI. Do you recall that?
19   A. I recall that.
20   Q. That was in the mid-'90s, maybe '94, '95;
21 correct?
22   A. That time frame sounds about right.
23   Q. Whom did you report to in Mr. Smith's
24 absence?
25   A. In Mr. -- in Joe Smith's absence, I

20

1  reported directly to Mike Hunkapiller.
2    Q. Now, when you reported to Mr. Smith in
3  your duties as senior patent counsel, what did that
4  generally consist of or typically consist of?
5       MR. GROOMBRIDGE: Let me just caution the
6  witness here that Applera has not waived privilege
7  with respect to any matters in this case; and
8  therefore, while I don't object to a general answer,
9  I would just like to make sure that the witness is
10 careful not to disclose anything now or in response
11 to subsequent questions that might be of a
12 privileged nature.
13      MS. STEINHAUER: Well, I guess that issue
14 is going to come up in this deposition, but we
15 disagree, and I'll state my disagreement fully on
16 the record when the appropriate time arises.
17      Could you read --
18      MR. GROOMBRIDGE: Sorry. With what do you
19 disagree?
20      MS. STEINHAUER: That Applera has not
21 waived privilege for any subject matter relating to
22 this case.
23      MR. GROOMBRIDGE: I guess we'll find out.
24 It comes as a surprise to me, but why don't you
25 proceed.

**21**

However, Mr. Macevicz, I would appreciate it if you took care to avoid disclosing anything that might be privileged.

MS. STEINHAUER: Could you read the question back, please.

(Record read as follows:

"QUESTION: Now, when you reported to Mr. Smith in your duties as senior patent counsel, what did that generally consist of or typically consist of?")

THE WITNESS: Joe Smith gave all his reports a fair amount of leeway to carry out their particular functions. And so I would see Joe from time to time, but not on a regular basis.

MS. STEINHAUER: Q. Did you work in the same office space as Joe Smith?

A. Yes.

Q. And when you say "yes," could you describe what that space was.

A. To the extent I can remember, we occupied several different spaces in the complex. Usually, it would be a large room with office dividers; and Joe would have his space, and other people, support staff, myself and the like, would have other cubicles adjacent.

**22**

Q. So Mr. Smith was in the immediate vicinity of the other attorneys who were working in that area in this mid-1990s time frame; right?

A. Yes.

Q. And what were your duties while you were working for ABI?

A. My primary duties were patent prosecution.

Q. And what did that generally consist of?

A. Working with inventors, writing patent applications, communicating with outside attorneys that handled patent applications of Applied Biosystems, things like that.

Q. Was there a particular technical area that you focused on in your prosecution duties?

A. I don't think there was any particular technical area. Anything that was being done at Applied Biosystems, I would be working on.

Q. And I'm not looking for privileged information here, but just how did you go about filing a patent application on behalf of ABI? Was there some typical process whereby an inventor came to talk to you, or was there some process at all?

A. There was no regular process. Sometimes inventors would come into the office. Other times I'd go to a talk and hear somebody and I would

**23**

approach them. So the process was initiated in several different ways. And some inventors were more patent savvy than others, and so they tended to come to me more often than others.

And then, as for processing an invention disclosure once it was given, that could vary also. If it was closely related to something that an outside attorney was already working on, then chances are I would send it to the outside attorney to work on. If it was different or if it didn't fit into any other category, then I'd work on it myself.

Q. Now, you said that Joe Smith was also involved in various commercial transactions. By that, did you mean that he was preparing and involved with license agreements between ABI and other entities?

A. That was my understanding, yes.

Q. Did you ever get involved in any discussions that involved licensing with other parties while you were at ABI?

A. Yes, eventually I did do some work with agreements.

Q. And what did that work generally consist of?

A. I don't have any specific recollections,

**24**

but I would say there were things like perhaps minor license agreements or supply agreements.

Q. And when you were doing this work in connection with license agreements or supply agreements between ABI and other parties, did Mr. Smith review your work or was there some mechanism by which another party, another person reviewed your work at ABI?

A. No. If I had a question, I would go to Joe and he would answer it; but that's the extent of it.

Q. And how about the patent prosecution? Did you have to report to anyone in connection with the patent applications you were prosecuting?

A. No. Again, it was like the agreements. If I had a question about something, I would ask.

Q. Now, you mentioned a minute ago about invention disclosures. Did you have to get approval or vetting from anybody else at ABI before filing a patent application on behalf of an inventor at the company?

A. No. There was no structure in place and the volume of work was low enough that I would make the decision, perhaps discussing with other people, managers, inventors, just on an informal basis,

**25**

1  whether to file or not.
2     Q. Were some of those other people that you
3  discussed such issues with, did that include
4  Mr. Smith?
5     A. I don't recall specifically, but I
6  wouldn't be surprised.
7     Q. How about Mr. Hunkapiller? Would it
8  typically include Mr. Hunk- -- Dr. Hunkapiller?
9     A. It would definitely not typically include
10 him, because I did not have that much contact with
11 him, but it could have.
12    Q. Now, did you ever get involved in actual
13 negotiations on license agreements and supply
14 agreements in addition to drafting the papers?
15    A. I can only recall one instance when I did.
16    Q. And that was the Enzo matter; right?
17    A. No, actually, it was not.
18    Q. Okay. In that case, do you recall who the
19 company was that you got involved with?
20    A. It was a German government institute.
21    Q. So it wasn't a commercial entity? It was
22 a government entity?
23    A. As far as I know, it was a government
24 entity that had a licensing capability.
25    Q. So your recollection is that this

**26**

1  licensing discussion in the mid-'90s while you were
2  at ABI was in connection with a patent or patents
3  that ABI wanted to license from others; is that
4  correct?
5     A. It was one patent that was owned by this
6  government institute.
7     Q. Does the name Beringer Mannheim mean
8  anything to you?
9     A. I recognize the name, certainly, yes.
10    Q. Did you have any discussions with Beringer
11 in the mid-'90s when you were employed by ABI?
12    A. Not that I can specifically recall.
13    Q. How about Amersham? Did you have any
14 discussions or dealings with Amersham in that same
15 time frame?
16    A. Not that I can specifically recall.
17    Q. How about Bio-Rad? Did you have any
18 discussions with them during that time frame?
19    A. Yes, I remember having discussions with
20 Bio-Rad.
21    Q. And what was the nature of those
22 discussions?
23    A. They related to an interference.
24    Q. And what was the subject matter of the
25 interference?

**27**

1     A. As best as I can recall, it had to do with
2  a ligation technology.
3     Q. Ligation in connection with -- with
4  nucleotides?
5     A. Well, oligonucleotides I think would
6  probably be more accurate.
7     Q. Okay. Did this have anything to do with
8  DNA sequencing?
9     A. No, it did not.
10    MS. STEINHAUER: Now, I just want to put
11 into evidence also our Plaintiffs' notice of
12 deposition of Mr. Macevicz, just to make sure we
13 have everything.
14    MR. GROOMBRIDGE: Perhaps you misspoke,
15 but to the extent that there is an assertion that
16 this is actually evidence, I would disagree with
17 that. I have no objection to you using the document
18 at the deposition.
19       (Whereupon, Plaintiffs' Exhibit 2 was
20        marked for identification.)
21    MS. STEINHAUER: Q. Now, have you seen
22 this document, which is entitled "Plaintiffs' Notice
23 of Deposition of Defendant Applera Corp.'s Witness
24 Stephen C. Macevicz"? And the date of it is -- it
25 was served on Mr. Groombridge and his local counsel

**28**

1  on October 20th, 2006, and it was issued by
2  plaintiffs.
3        Have you seen this document?
4     A. Not before today.
5     Q. Okay. So you've never seen this document.
6  But you have seen the subpoena, as you testified
7  before?
8     A. Yes, I have seen the subpoena that you
9  passed out earlier.
10    Q. Okay. Now, what did you do to prepare for
11 this deposition, Mr. Macevicz?
12    A. The only thing I did was in response to a
13 discussion with my attorney, I reviewed a letter
14 that I wrote in the early '90s.
15    Q. First of all, who is the attorney that
16 you're referring to?
17    A. Mr. Fthenakis.
18    Q. And this letter that you reviewed, did you
19 have it in your possession?
20    A. Yes.
21    Q. Had you -- how did you come by this
22 letter?
23    A. I believe -- actually, I cannot recall
24 directly, but it was either sent to me by
25 Mr. Fthenakis or perhaps the Applied Biosystems

### Page 89

1 was an analysis done in Dr. Rabbani's office or any
2 of those things.
3    Q. So you don't recollect the circumstances
4 of your preparing this January 13th, 1995 letter?
5    A. I only have a general recollection, seeing
6 the letter in front of me, that I did prepare a
7 letter, but I don't remember the circumstances and
8 detail.
9    Q. And you don't know why, either?
10    A. Only from what's said in the letter.
11 Perhaps, again, to obtain clarification as to what
12 specifically was the concern of Enzo Biochem.
13    Q. Just for ease of reference, I guess, I'm
14 going to hand you the patents that are referred to
15 in this suit as the Ward patents and ask you if you
16 recollect them and if you've ever seen them.
17    MR. THOMPSON: All of them?
18    MS. STEINHAUER: Yeah, we might as well
19 mark them all at the same time.
20    MR. THOMPSON: Here's the '955.
21    MS. STEINHAUER: So in order, I guess,
22 it's going to be starting at Macevicz 7, 8, 9 and
23 10.
24    (Discussion off the record.)
25    MR. GROOMBRIDGE: You're welcome to take

### Page 90

1 my copy, if you want.
2    MS. STEINHAUER: I know there's a million
3 copies.
4    MR. GROOMBRIDGE: I've seen them enough
5 times.
6    MS. STEINHAUER: All right. Well, why
7 don't I take this one, because I don't think it's
8 been marked.
9    MR. FTHENAKIS: Well, that was my copy. I
10 handed it to him so he could start looking at it.
11    MS. STEINHAUER: Yeah. Okay. So I'll
12 take Nick's. That's fine.
13    So let's call this one Macevicz 7, which
14 is U.S. Patent 4,711,955.
15    (Whereupon, Plaintiffs' Exhibit 7 was
16    marked for identification.)
17    MS. STEINHAUER: And then -- then we'll do
18 Macevicz 8, which is U.S. Patent 5,328,824.
19    (Whereupon, Plaintiffs' Exhibit 8 was
20    marked for identification.)
21    MS. STEINHAUER: So the next one in the
22 series will be U.S. Patent 5,449,767.
23    (Whereupon, Plaintiffs' Exhibit 9 was
24    marked for identification.)
25    MS. STEINHAUER: And then the last one in

### Page 91

1 the series will be U.S. Patent 5,476,928.
2    (Whereupon, Plaintiffs' Exhibit 10 was
3    marked for identification.)
4    MS. STEINHAUER: Q. Do you have copies of
5 all of those four patents?
6    A. I have four patents.
7    Q. Okay.
8    A. And they all have different numbers.
9    Q. Okay. Now, do you recollect seeing these
10 or some of these at the time that you wrote your
11 letter in January of 1995?
12    A. I don't have a specific recollection, but
13 I note that the number in the letter in the first
14 bullet point is the same as one of the patents you
15 gave me. So it must have been the case.
16    Q. So just so we're -- just to confirm, we're
17 talking about the same thing. That's all. And you
18 can hold on to those, and we may continue to refer
19 to them from time to time.
20    Now, the inventors identified on all four
21 of these patents are David Ward, Pennina Langer, and
22 Alexander Waldrop; right?
23    A. Yes, that's correct.
24    Q. Did you ever meet any of these three
25 individuals?

### Page 92

1    A. I don't recall ever meeting any of them.
2    Q. And the assignee is identified as Yale
3 University. Do you have any connection with Yale
4 University?
5    A. No, I do not.
6    Q. Where did you go to school, Mr. Macevicz?
7 Let's start with college.
8    A. Okay. I went to San Diego State
9 University.
10    Q. And you obtained a degree?
11    A. Yes.
12    Q. What degree was that?
13    A. In mathematics.
14    Q. So a Bachelor of Science?
15    A. It was a Bachelor of Arts, I believe.
16    Q. In math. And that was when?
17    A. I believe it was 1972.
18    Q. Okay. Did you go on to get a graduate
19 degree?
20    A. Yes, I did.
21    Q. And where was that?
22    A. At UC Berkeley.
23    Q. Okay. And you got a Ph.D.?
24    A. Yes.
25    Q. Uh-huh. So we should be referring to you

Page 93

1  as Dr. Macevicz.
2      Q.  And what was your Ph.D. in?
3      A.  Biophysics.
4      Q.  And what year was that?
5      A.  I believe it was 1978 or 1979.
6      Q.  So your first job out of school was not at
7  ABI; correct?
8      A.  That's correct.
9      Q.  Where did you work before you joined ABI?
10     A.  I worked at two places.  The first place
11 was Lawrence Livermore National Lab.
12     Q.  For how long?
13     A.  Must have been around four years, three to
14 four years.
15     Q.  And in the early '80s?
16     A.  That was in the early '80s.
17     Q.  Okay.  After that?
18     A.  DNAX Research Institute.
19     Q.  D?
20     A.  D-A-N-X [sic] Research Institute.
21     Q.  Uh-huh.  Is that a government institute or
22 a private --
23     A.  No.  It's a research subsidiary of
24 Schering-Plough Corporation.
25     Q.  I see.  And how long were you there for?

Page 94

1      A.  About six years.
2      Q.  So that brings us to?
3      A.  1992.
4      Q.  So when did you go to law school?
5      A.  I went to law school, I think I began in
6  1980.  And then I worked part-time at the Lawrence
7  Livermore Lab while I was going to law school.
8      Q.  I see.  So by the time you joined ABI, you
9  were already admitted to the Patent Office; is that
10 right?
11     A.  That's correct.
12     Q.  And you had been -- while you worked at
13 Lawrence Livermore, did you do any patent
14 prosecution or other types of patent work?
15     A.  Yes.  Primarily, that's what I did.
16     Q.  And the same thing at the other -- the
17 research institute?
18     A.  That's correct.
19     Q.  So that was -- by the time you joined ABI,
20 you had been practicing patent law for about ten
21 years; right?
22     A.  Not that long, but probably more than
23 five.
24     Q.  Okay.  And was the nature of the patent
25 practice that you had at Lawrence Livermore and DNAX

Page 95

1  Research Institute usually patent prosecution?
2      A.  That's correct.
3      Q.  Did you ever draft any opinion letters or
4  opinions while you were at either of these
5  institutions?
6      A.  I don't recall specifically.  I may have.
7      Q.  Were they validity opinions or
8  infringement opinions?
9      A.  I don't recall specifically.
10     Q.  Would it be fair to say that by the time
11 you arrived at ABI in 1992, you were familiar with
12 the drafting process that goes into preparing an
13 opinion of counsel?  Correct?
14     A.  Well, I was somewhat familiar, yes.
15     Q.  Why do you hesitate?
16     A.  Well, it wasn't a large part of my
17 practice, if indeed it was a part of my practice at
18 all.
19     Q.  Uh-huh.
20     A.  So I can't say with assurance that, you
21 know, I'm answering your correct -- your question
22 correctly.
23     Q.  Right.  Did you ever, while you were at
24 either of these institutions, Lawrence Livermore or
25 the Research Institute, work with outside counsel

Page 96

1  for them to prepare independent opinions of counsel?
2      A.  I don't recall anything like that.
3      Q.  Okay.  So let's look again at the document
4  we looked at very briefly, Macevicz 6.
5          Now, you see this fax cover sheet which is
6  on page GT013212, that has your name at the bottom
7  as a signature.  Do you recognize this letter?
8      A.  The cover or the --
9      Q.  The whole thing, all three pages.
10     A.  Well, I don't recall writing it or putting
11 it together, but I can recognize it was something
12 that I did.
13     Q.  Okay.  How do you recognize it?
14     A.  From my signature on the third page.
15     Q.  Okay.  Now, the title of the -- on the fax
16 cover sheet, which is page 13212, says "Confidential
17 Disclosure Agreement for allowed patent claims."  Do
18 you see that?
19     A.  Yes.
20     Q.  Could you tell me what that refers to.
21     A.  To the extent I can remember, in the
22 discussions -- and I don't remember whether it was
23 one meeting or another or over the telephone --
24 Enzo -- and I don't recall who it was at Enzo --
25 stated that they had allowed claims that covered

CONFIDENTIAL DEPOSITION OF STEPHEN C. MACEVICZ, PH.D.
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

75 (Pages 297 to 298)

297

1  THE WITNESS: Essentially.
2  MS. STEINHAUER: I'm sorry.
3  I have no further questions.
4  MR. GROOMBRIDGE: I have nothing further.
5  THE VIDEOGRAPHER: This is the end of
6  Volume 1, Videotape No. 5, in the deposition of
7  Stephen Macevicz.
8  The original videotapes will be retained
9  by L.A.D. Reporting, 7654 Standish Place, Rockville,
10 Maryland.
11     We're going off the record. The time is
12 7:51.
13     (Whereupon, the deposition was adjourned
14     at 7:51 p.m.)
15          --oOo--
16 I declare under penalty of perjury the
17 foregoing is true and correct. Subscribed at
18 _____, California, this ____ day
19 of _____, 2007.
20     _____
21          Stephen C. Macevicz, Ph.D.
22
23
24
25

298

1          CERTIFICATE OF REPORTER
2  I, ANA M. DUB, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell
5  the truth, the whole truth, and nothing but the
6  truth in the within-entitled cause;
7      That said deposition was taken down in
8  shorthand by me, a disinterested person, at the time
9  and place therein stated, and that the testimony of
10 the said witness was thereafter reduced to
11 typewriting, by computer, under my direction and
12 supervision;
13     That before completion of the deposition,
14 review of the transcript [X] was [ ] was not
15 requested. If requested, any changes made by the
16 deponent (and provided to the reporter) during the
17 period allowed are appended hereto.
18     I further certify that I am not of counsel
19 or attorney for either or any of the parties to the
20 said deposition, nor in any way interested in the
21 event of this cause, and that I am not related to
22 any of the parties thereto.
23     DATED: August 27, 2007.
24     _____
25          ANA M. DUB, RMR, CRR, CSR No. 7445