# Deposition of
# **STEPHEN MACEVICZ**

**Date:** November 28, 2007
**Volume:** 1

**Case:** APPLERA v. ILLUMINA

SHARI MOSS & ASSOCIATES
877 Cowan Road, Suite A
Burlingame, California 94010
(650) 692-8900
(415) 402-0004
FAX: (650) 692-8909

EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

APPLERA CORPORATION - APPLIED
BIOSYSTEMS GROUP, a Delaware
corporation,

        Plaintiff,

vs.                  No. 07-CV-02845 WHA

ILLUMINA, INC., a Delaware
corporation, SOLEXA, INC.,
a Delaware corporation, and
STEPHEN C. MACEVICZ, an
individual,

        Defendants.
_____/


Deposition of

STEPHEN C. MACEVICZ

November 28, 2007


Reported by:
KELLIE A. ZOLLARS, CSR, RPR, CRR
License No. 5735

SHARI MOSS & ASSOCIATES
Certified Shorthand Reporters
877 Cowan Road, Suite A
Burlingame, California 94010
Tel: (650) 692-8900

25

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 2

1                    I N D E X

2                                        Page Number

3    EXAMINATION BY

4         Mr. Wilson                          6, 177

5         Dr. Flowers                            175

6

7

8                  E X H I B I T S

9    Plaintiff's

10   20    Letter to Mr. Hunkapiller from
           Dr. Macevicz dated 6 June 1995         20
11
     21    Memorandum to Mr. Santos from
12         Dr. Macevicz dated 27 June 1995        36

13   22    Letter to Dr. Macevicz from
           Ms. Preston dated March 17, 1992       44
14
     23    Resume of Stephen C. Macevicz          45
15
     24    Photocopy of a Computation Notebook    57
16
     25    Agreement of Assignment and License
17         of Intellectual Property Rights
           dated June 30, 1992                    72
18
     26    Document entitled Invention Data
19         dated Monday March 05, 2007            76

20   27    Performance Review Form of
           Dr. Macevicz                          115
21
     28    Two pages from the file history
22         of patent application Serial
           08/424663                             115
23
     29    Three pages from a file history
24         Application 08242633                  116

25

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 3

30    Memorandum to Mr. Siegel from
      Dr. Macevicz dated 25 May 1995
      With attached agreement                    117

31    Memorandum to Dr. Macevicz from
      Mr. Van Camp, Mr. Powell and
      Mr. Andrus dated June 19, 1995             118

32    Perkin-Elmer Applied Biosystems
      Division Supervisor's Exit
      Checklist dated 8/7/95                     121

33    Letter to Dr. Hunkapiller from
      Dr. Macevicz dated 4 February 1997         137

34    United States Patent 5,624,800            154

35    United States Patent 5,654,442            160

36    Document entitled Nonstatutory
      Stock Option                               175

-oOo-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 4

1    BE IT REMEMBERED THAT, pursuant to the laws

2    pertaining to the taking and use of depositions, and

3    on November 28, 2007, commencing at the hour of

4    12:47 p.m. thereof, at the offices of Morrison &

5    Foerster LLP, 755 Page Mill Road, Palo Alto,

6    California, before me, KELLIE A. ZOLLARS, CSR

7    No. 5735, a Certified Shorthand Reporter in and for

8    the State of California, personally appeared

9

10    STEPHEN C. MACEVICZ

11

12    being called as a witness by the Plaintiff, who,

13    having been by me first duly sworn, was thereupon

14    examined and interrogated as hereinafter set forth.

15    -oOo-

16    MORRISON & FOERSTER LLP, represented by Bryan

17    Wilson and Dara Tabesh, Attorneys at Law, 755 Page

18    Mill Road, Palo Alto, California 94304-1018, appeared

19    as counsel on behalf of Plaintiff.

20    MARSHALL, GERSTEIN & BORUN LLP, represented by

21    Kevin M. Flowers, Attorney at Law, 233 South Wacker

22    Drive, 6300 Sears Tower, Chicago, Illinois

23    60606-6357, appeared as counsel on behalf of

24    Defendants Illumina, Inc.; Solexa, Inc.; and Stephen

25    Macevicz.

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 5

1      TECHNOLOGY & INTELLECTUAL PROPERTY STRATEGIES

2      GROUP PC, represented by Basil P. Fthenakis, Attorney

3      at Law, 1000 Elwell Court, Suite 150, Palo Alto,

4      California 94303-4318, appeared as counsel on behalf

5      of the witness, Stephen Macevicz.

6          ALSO PRESENT:   Adam Tschop, Applied Biosystems

7                          Joseph Mourgos, Videographer

8

9                      -oOo-

10         THE VIDEOGRAPHER:   Here begins Videotape 1 of          12:46

11     Volume 1 in the deposition of Stephen C. Macevicz in

12     the matter of Applera Corporation versus Illumina,

13     Incorporated, in the United States District Court,

14     Northern District of California, San Francisco

15     Division.   The case number is 07 CV 02845 WHA.           12:46

16     Today's date is November 28th, 2007, the time on the

17     video monitor is 12:47 p.m.   The video operator today

18     is Joseph Mourgos, contracted by Eureka Street Legal

19     Video, 511 Eureka Street, San Francisco, California,

20     (415) 643-9190.                                           12:47

21         This video deposition is taking place at

22     755 Page Mill Road, Palo Alto, California, and was

23     noticed by Morrison & Foerster.

24         Counsel, please voice identify yourselves and

25     state whom you represent.                                 12:47

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 6

1      MR. WILSON:  Bryan Wilson, representing Applied

2  Biosystems.  With me is Dara Tabesh with our office

3  and Adam Tschop from Applied Biosystems.

4      DR. FLOWERS:  Kevin Flowers from Marshall,

5  Gerstein & Borun in Chicago, representing Illumina,          12:47

6  Solexa, and the witness.

7      MR. FTHENAKIS:  Basil Fthenakis for Defendant

8  Stephen Macevicz.

9      THE VIDEOGRAPHER:  Would the reporter please

10  administer the oath.                                        12:48

11      (Witness sworn.)

12                      -oOo-

13                   EXAMINATION

14      BY MR. WILSON:

15      Q.  Good afternoon, Dr. Macevicz.  You've been          12:48

16  deposed a number of times before so I will dispense

17  with most of the preliminaries.  I will remind you of

18  a couple of things.  You're obviously sworn to tell

19  the truth.  I assume that you will tell the truth.

20  Is that a fair assumption for me to make?                   12:48

21      A.  That's a fair assumption.

22      Q.  I will also assume that you understand a

23  question unless you tell me you don't.  Is that a

24  fair assumption?

25      A.  Yes.  Yes.                                          12:48

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 18

1    these dates.  Is it your recollection that you signed

2    this indemnity agreement after you had made the

3    decision to leave AB and go to work for Lynx?

4        A.  I don't have a specific recollection of that.

5        Q.  Is that generally how you remember the                01:03

6    sequence of events?

7        A.  I generally remember that in the spring of

8    1995 I had decided to leave AB.  I don't remember the

9    precise date when that occurred.

10       Q.  Had you told people at AB that you intended        01:03

11   to leave?

12       A.  I have no specific recollection of that.

13       Q.  Do you know or did you tell anybody at AB

14   that you were signing this indemnity agreement with

15   Lynx in May of 1995?                                        01:03

16       A.  I don't recall talking to anybody about this

17   indemnity agreement at AB.

18       Q.  So you don't think that you told Paul

19   Grossman, for example, that you signed an indemnity

20   agreement with AB?                                          01:03

21       A.  I just have no specific recollection.

22       Q.  To whom did you report at AB in May of 1995?

23       A.  I believe I reported to Mike Hunkapiller.

24       Q.  Did you tell Dr. Hunkapiller that you had

25   signed an indemnity agreement with Lynx in May of          01:03

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 19

1  1995?

2     A.  I have no recollection of telling Mike

3  Hunkapiller that I had signed an indemnity agreement.

4     Q.  Did you think there was any conflict or

5  potential conflict with AB that might result from        01:04

6  signing an indemnity agreement with Lynx when you

7  were still working for AB?

8     A.  I have no recollection of thinking of any

9  conflict that would arise out of this indemnity

10  agreement.                                               01:04

11     Q.  That's not something you thought about at the

12  time?

13     A.  I think it's fair to say that I didn't think

14  about it at the time.

15     Q.  Let me -- can we pull out Exhibit 6 to the       01:04

16  last deposition.

17        Exhibit 6 is your job offer letter from Lynx,

18  and it's dated June 1, 1995.

19        Does this help you remember one way or the

20  other whether you had accepted a job offer from Lynx    01:04

21  when you signed the indemnity agreement with Lynx?

22     A.  I don't have a specific recollection.

23     Q.  And then -- let's mark a new exhibit.  This

24  will be Exhibit 20.  We'll pick up from where we were

25  before.                                                 01:05

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 23

1    to me on a visit to Lynx.  I don't know.

2        Q.  Did you tell Dr. Eletr that you had any

3    problem signing this indemnity agreement since you

4    were not an officer of the corporation at the time?

5        A.  I just had no thought about that one way or        01:09

6    the other.  I thought it was a nice generous thing

7    for him to do and so I signed it.

8        Q.  Did you understand that as senior patent

9    counsel for AB, that you owed fiduciary duties to AB?

10       A.  I understand that.                                  01:09

11       Q.  And was there any question in your mind when

12   you were working for AB that you owed the company

13   fiduciary duties?

14       A.  No, there was no question that I owed AB

15   fiduciary duties.                                           01:10

16       Q.  What are fiduciary duties?  Or what was your

17   understanding of fiduciary duties?

18       A.  My understanding is that you're in a position

19   of trust and that you don't self deal, things like

20   that.  If you have a relative that has a business,          01:10

21   that you don't favor the relative.  There's a whole

22   series of things.  Mainly it's to avoid conflicts of

23   interest, things like that.

24       Q.  When you signed the indemnity agreement with

25   Lynx on May 1, 1995, did you give any thought to            01:10

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 45

1   be authentic.

2      Q.  That's your signature on the second page of

3   the letter?

4      A.  Yes, that's my signature.

5      Q.  And March of 1992 is consistent with when you   01:46

6   recall receiving a job offer from AB initially?

7      A.  That seems about the right time frame.

8      MR. WILSON:  Let's mark as Exhibit 23 a copy of

9   your resume.

10     (Exhibit No. 23 was marked for identification.)   01:47

11    BY MR. WILSON:

12      Q.  Is Exhibit 23 a copy of your resume?

13      A.  Yes, this appears to be my resume.

14      Q.  It lists as your second position -- second

15   position going from the top, senior patent attorney   01:47

16   at Perkin-Elmer, Applied Biosystems.  That's the job

17   you had at AB; is that right?

18      A.  Yes, it is.

19      Q.  From 1992 to 1995?

20      And when did you prepare this resume?   01:47

21      A.  I can't recall from the information that's on

22   here.

23      Q.  But in any event it's sometime after 1995

24   because it lists Lynx, correct?

25      A.  That's safe to assume.   01:48

SHARI MOSS & ASSOCIATES        (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 46

1    Q.  And it provides a description of the work

2    that you did at AB.  Is the description in here

3    accurate?

4    A.  It looks accurate.

5    Q.  The first item you list is "managed and          01:48

6    expand patent portfolio in genetic analysis field."

7    Can you tell me a little bit more what you mean by

8    that?

9    A.  I think the document describes that itself.

10   It's instrumentation improvements, fluorescent dyes,   01:48

11   diagnostics and genotyping applications of those

12   instruments.

13   Q.  What do you mean when you say you were

14   responsible for managing and expanding the patent

15   portfolio?                                              01:49

16   DR. FLOWERS:  Objection as to form.

17   THE WITNESS:  So, could you ask -- restate the

18   question.

19   BY MR. WILSON:

20   Q.  Were you responsible for managing and            01:49

21   expanding the patent portfolio at AB?

22   A.  My primary duty was patent prosecution.  And,

23   so, in that sense I was responsible for writing new

24   patent applications and communicating with outside

25   attorneys handling patent applications that already    01:49

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d026a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 47

1  existed or were prepared outside.

2     Q.  What do you mean by expand patent portfolio?

3     A.  I think I mean writing new patent

4  applications.

5     Q.  Do you mean expanding the scope of the patent   01:49

6  portfolio in terms of the subject matter coverage or

7  just expanding the number of patents, or both?

8     A.  I would say it would be preparing patent

9  applications in response to requests from inventors

10  at ABI.                                   01:50

11     Q.  Under interests you list analytical

12  technologies and biotechnology and genomics fields.

13  What were you referring to there?

14     A.  I think I was referring to a longstanding

15  interest that I've had in those sorts of     01:50

16  technologies.

17     Q.  Is one of the interests that you had before

18  you came to work for AB sequencing by hybridization?

19     A.  Yes, that's correct.

20     Q.  Have you done work in sequencing by    01:50

21  hybridization before you went to work for AB?

22     A.  Yes, I had.

23     Q.  What was the work you had done?

24     A.  I prepared a patent application describing an

25  invention.                                01:50

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 102

1      A.  I don't recall doing that.

2      Q.  Speaking of sequencing by ligation, could you

3  take a look at another page of your lab notebook.

4  It's MAC 79.  And really it's MAC 79 through 83 that

5  I'd like you to take a look at.                          03:17

6      Do these pages describe a method for

7  sequencing by ligation that you invented?

8      A.  You're saying 79 through 83?

9      Q.  I think that's right, but I may be off on the

10  page numbers.                                           03:17

11  DR. FLOWERS:  Objection as to form.

12  MR. WILSON:  That's fair.

13      Q.  What is described on pages MAC 79 through

14  MAC 83?

15      A.  I would say there's a collection of           03:18

16  particular embodiments of several inventions.

17      Q.  What are the inventions?

18      A.  They appear to be -- one of them is a

19  particular embodiment of the sequencing by ligation;

20  another one seems to be something entitled            03:18

21  Evolutionary Selection of Oligonucleotide Probes.

22      Another one has something to do with beads

23  with solid support -- used as solid supports, but I

24  can't identify it in particular by looking at it so

25  quickly and not thinking about it.                    03:19

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 103

1    Q.  And you asked Paul Grossman to sign these lab

2    notebook pages?

3    A.  Yes, it appears to be the case.

4    Q.  Did Paul -- who was Paul Grossman?

5    A.  Paul Grossman was the patent agent that         03:19

6    worked in the legal group.

7    Q.  So he reported to you at the time, right?

8    A.  I believe so, yes.

9    Q.  You were his supervisor?

10   A.  If he reported to me, then I was his             03:19

11   supervisor.

12   Q.  Did you bring this lab notebook into work for

13   Dr. Grossman to sign?

14   A.  Yes, I brought it in specifically for him to

15   look at these diagrams and sign.                     03:19

16   Q.  Did you explain to him that it was something

17   you were working on outside of the scope of your work

18   for AB?

19   A.  I don't have a specific recollection, but I

20   believe there was a general discussion of that       03:19

21   nature.  Because the reason I brought it in was to

22   establish a date of conception.  Corroborate a date

23   of conception.

24   Q.  What do you mean a general discussion of that

25   nature?                                              03:20

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 104

1    A.  Well, I can't imagine giving him a notebook

2  and asking him to sign it without explaining the

3  reason why I wanted to have him sign it.  Or that I

4  would ask him to sign it for me.

5    Q.  The reason being that it was -- you wanted to          03:20

6  corroborate the date of conception, right?

7    A.  Yes.

8    Q.  Do you also think that you explained to him

9  that this was something you were doing outside of the

10  scope of your work for AB?                                 03:20

11    A.  Yes.

12    Q.  Do you think you explained to him that you

13  were not planning on assigning this invention to AB?

14    A.  I don't recall specifically or generally that

15  sort of discussion.                                        03:20

16    Q.  Do you recall specifically telling him that

17  this was outside of the scope of your work for AB?

18    A.  I don't have a specific recollection of me

19  saying those words 12 years ago, but I think it was

20  clear from the fact that I brought the notebook from       03:21

21  home and that he was aware that I had this hobby of

22  working on analytical technologies as a pastime, that

23  that was the understanding.

24    Q.  Did you disclose this invention to your

25  supervisor, Joe Smith, at the time?                        03:21

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 105

1       A.  I don't believe I did.

2       Q.  Did you discuss these inventions with Joe

3   Smith, your supervisor?

4       A.  I don't recall discussing it with him.

5       Q.  Did you disclose these inventions to        03:21

6   Dr. Hunkapiller?

7       A.  I don't recall disclosing them to him either.

8       Q.  Did you discuss any of these inventions with

9   Dr. Hunkapiller?

10      A.  I don't have a specific recollection, but     03:21

11  these types of inventions are things that would be

12  discussed that -- you know, I wasn't hiding anything.

13  I would discuss them with people in the hallways or

14  at the lunch table.  I just don't have a specific

15  recollection of sitting down, drawing things, and     03:21

16  relating it to this invention.

17      Q.  By the hallways you mean the hallways at

18  work?

19      A.  That's correct.

20      Q.  And by the lunch area you mean the lunch --   03:22

21      A.  Cafeteria.

22      Q.  -- cafeteria at work?

23      A.  Yeah.

24      Q.  Did you ever disclose these inventions on

25  pages MAC 79 through 83 in writing to anybody at AB,   03:22

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 106

1    particularly to any supervisor at AB?

2        MR. FTHENAKIS:  Objection to the form.

3        DR. FLOWERS:  Join.

4        MR. WILSON:  That's fair.

5        Q.  Let's go back to the beginning.  Did you ever    03:22

6    disclose any of the inventions on pages MAC 31

7    through 35 of your lab notebook in writing to any

8    supervisor of yours at AB?

9        A.  What were the pages again?

10       Q.  31 to 35.                                          03:22

11       A.  I don't have a specific recollection of that.

12       Q.  Do you have any reason to think that you did?

13       A.  I have no reason to think that I did because

14   I considered them totally separate from my work at

15   AB.                                                        03:23

16       Q.  Did you ever ask for consent from any of your

17   supervisors at AB to apply for patent applications on

18   the inventions you describe in pages MAC 31 through

19   MAC 35 of your notebook?

20       A.  So, why would I ask for consent for something    03:23

21   that's outside the scope of the work?

22       Q.  Did you -- so is it your understanding, your

23   recollection, that you did not ask for consent to

24   apply for patents on these inventions?

25       A.  I don't recall asking for consent to file on    03:23

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 107

1    these inventions.

2       Q.  And you believe that you had no duty to

3    disclose these inventions to your managers at AB,

4    right?  Your supervisor at AB?

5       A.  Well, I understand -- I understand my duty        03:23

6    under the employee invention agreement if that's what

7    you're getting at.  I didn't consider these

8    inventions to be a part of the AB business.

9          And I wasn't trying to hide them.  I have a

10   general recollection of talking about these           03:24

11   inventions with the people at AB as exemplified by

12   the signatures of Dr. Fung and Dr. Grossman.  But I

13   didn't -- I don't have any recollection of going to

14   my supervisors and showing them and talking about

15   them.                                                 03:24

16      Q.  And that goes for the inventions described at

17   MAC 31 to 35 as well as the inventions described in

18   MAC 79 through 83, correct?

19      A.  73?

20      Q.  83.  I might have misspoken.  79 to 83.         03:25

21      A.  I believe that's the case.  I don't have any

22   specific recollection of discussing these with

23   supervisors.

24      Q.  Am I understanding you correctly that you're

25   not saying that you satisfied obligations under the   03:25

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 122

1     A.  It is close enough.  It appears to be, yes.

2     Q.  Do you have any reason to think that the

3  content reflected in the exit interview checklist is

4  not correct?

5     A.  I have no opinion one way or the other about     03:57

6  this.  I just don't recall anything about it.

7     Q.  Let's go back to Exhibit 8 from the Kathy

8  San Roman deposition.  It's the assignment to Lynx.

9         It's probably the very bottom document in the

10  pile.  It's the first thing we looked at.          03:58

11        There you go.

12        Did you prepare this form?

13     A.  I don't specifically recall, but I have no

14  reason to think that I didn't.

15     Q.  It says, "For good and valuable consideration   03:59

16  paid to me...receipt of which is hereby

17  acknowledged."  Did you receive consideration for the

18  assignment of these patents?  Patent applications?

19     A.  I believe I did.

20     Q.  What did you receive?                           03:59

21     A.  I received a stock option.

22     Q.  How many stock options?

23     A.  I believe it was 20,000 in Spectragen.

24     Q.  In Spectragen?

25     A.  Yes.                                            03:59

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 123

1      Q.   Now, you were assigning the patent

2   applications to Lynx; right?

3      A.   Correct.

4      Q.   Why was it you were receiving stock options

5   in Spectragen when you were assigning the patent        03:59

6   applications to Lynx?

7      A.   It was my understanding that Spectragen was a

8   subsidiary of Lynx that was involved with developing

9   Sidney Brenner's sequencing technology.

10     Q.   Did you want your patent applications to be      04:00

11  assigned to Lynx or to Spectragen?

12     A.   Well, I have no thoughts on that.  It wasn't

13  material to me.  I assumed that the company, if they

14  were going to use the inventions, they would use it

15  in connection with Sidney Brenner's technology.         04:00

16     Q.   How was the number of options arrived at that

17  you would receive for the patent?

18     A.   I have no recollection of how we arrived at

19  that number.

20     Q.   Who arrived at it?                               04:00

21     A.   I don't know specifically.  Sam was the

22  person that I discussed these issues with.  I don't

23  recall when I first saw the offer.  It may have been

24  when I first started at Lynx.  I just can't recall.

25     Q.   Sam Eletr is who you're referring to?           04:00

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 124

1    A.  Yes.

2    Q.  Did you ever have any discussions with

3  anybody else at Lynx other than Dr. Eletr about

4  receiving options for the assignment of these patent

5  applications?                                          04:01

6    A.  I don't have any specific recollection.

7    Q.  Is there anything in writing that you're

8  aware of that reflects the grant of stock options in

9  Spectragen for the assignment of these patent

10  applications to Lynx?                                 04:01

11    A.  I can't recall anything in writing

12  specifically.

13    Q.  How were the options conveyed to you?

14    A.  I'm not sure I understand.  The document was

15  given to me, and then I believe Lynx had an outside    04:01

16  party that would actually handle the exercise and

17  sale of the stock if you so desired to do that.

18    Q.  What was the document that was given to you?

19    A.  It was a very conventional looking stock

20  option grant.                                          04:01

21    Q.  And who gave it to you?  Dr. Eletr?

22    A.  As I said, I can't recall.

23    Q.  Could it have been one of the attorneys for

24  Lynx?

25    A.  I'm not sure --                                  04:02

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 145

1    A.  Not that I recall talking with.

2    Q.  Was it your expectation that that's all that

3    AB would ever do, was the Sanger method of DNA

4    sequencing?

5    A.  Well, I don't know what I thought at the          04:52

6    time, but I didn't foresee them doing anything

7    different.  At least in-house.

8    Q.  When you were talking to research scientists

9    at AB, did anybody ever say that they were interested

10   in developing new sequencing technologies beyond the   04:52

11   Sanger method?

12   A.  Not that I recall.

13   Q.  When -- did you ever prosecute for any -- any

14   AB scientists any patents outside -- for DNA

15   sequencing methods outside of the Sanger method?       04:52

16   A.  Not that I recall.

17   Q.  Did you participate in developing AB's

18   research and development plans?

19   A.  No.  Not -- I never recall par- -- you mean

20   an organized procedure to determine what they should   04:53

21   spend their research --

22   Q.  Right.

23   A.  No, I did not.

24   Q.  Did you participate in management discussions

25   regarding the directions that research and             04:53

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 146

1  development should take?

2      A.  I don't recall doing that.

3      Q.  Did you provide advice to management about

4  what directions research and development should take?

5      A.  No, I don't recall doing that.                    04:53

6      Q.  Did you -- were you ever told by anybody in

7  management at AB that AB was not interested in

8  developing DNA sequencing technologies outside of the

9  Sanger method?

10     A.  So, was I not told?                               04:53

11     Q.  Did anybody ever tell you -- anybody ever --

12 did anybody in AB management ever tell you that AB

13 was not interested in developing sequencing

14 technologies outside of the Sanger method?

15     A.  I don't recall anybody expressly telling me      04:54

16 that they weren't interested in developing DNA

17 sequencing technology outside of the Sanger method.

18     Q.  Did anybody ever implicitly tell you that?

19     A.  I have no recollection.

20     Q.  Is there anything you can recall anybody in      04:54

21 management ever saying to you that led you to believe

22 that AB was interested in only the Sanger method of

23 DNA sequencing and nothing further?

24     A.  I don't -- well, it's hard to describe a

25 negative like that.  I would say in the decisions      04:54

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0687cbf84

**EXHIBIT 2**

Page 147

1    that what they determine to -- their decisions on

2    what to invest in and what to -- what sort of

3    technologies to bring in through collaborations

4    indicated to me that they were interested in making

5    improvements to the Sanger sequencing technology          04:55

6    solely.

7        Q.  But nobody said that to you directly?

8        A.  No.

9        Q.  If --

10       A.  Not that I can recall.                             04:55

11       Q.  If AB had the opportunity to license or

12   develop internally a better method of DNA sequencing

13   because it was faster or cheaper or otherwise

14   advantageous over the Sanger method, do you have any

15   reason to think they would not have been interested     04:55

16   in pursuing that during the time you worked for AB?

17       A.  Well, again, that's a difficult question.

18   How much money would they have to spend to bring it

19   to market?  That's the key question.

20       Q.  So without knowing that question, you           04:55

21   can't -- without knowing the answer to that question

22   you can't tell me whether or not AB would have been

23   interested in faster, better, or cheaper methods of

24   DNA sequencing as compared to the Sanger method when

25   you were working at AB?                                  04:56

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

e8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 148

1      A.   State the question again.

2      Q.   Yeah.

3           Without knowing how much it would have cost

4      to develop other methods, you can't tell me whether

5      AB would have been interested in better, faster, or        04:56

6      cheaper methods of DNA sequencing other than the

7      Sanger method when you were working there?

8           DR. FLOWERS:   Objection as to form.

9           MR. FTHENAKIS:   Join.

10          THE WITNESS:   Yes.   I'm still struggling with the    04:56

11     question.   And there were even some people that would

12     say that AB, because they had such a large investment

13     in the Sanger sequencing, particularly in the way of

14     reagent streams, that they might even suppress a new

15     sequencing technology.                                      04:56

16          BY MR. WILSON:

17     Q.   Was there anybody out there who was

18     advocating that?   A newer sequencing technology?

19          DR. FLOWERS:   Objection as to form.

20          THE WITNESS:   Do you mean were there other           04:56

21     sequencing technologies available?

22          BY MR. WILSON:

23     Q.   Anybody at AB.   Was there anybody at AB who

24     advocated exploring sequencing technologies other

25     than the Sanger method when you were there at AB?          04:56

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

e8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 149

1     A.  Not to my knowledge.

2     Q.  Never heard that expressed ever?  Not once?

3     A.  Well, I just don't know.

4     Q.  Is it something you explored before you

5  made -- before you made the decision to assign your          04:57

6  patent applications to Lynx?

7     A.  I don't recall.

8     Q.  If AB had been offered a licensing

9  opportunity for a better or faster or cheaper

10  sequencing method that wasn't the Sanger method, is          04:57

11  that something you think AB would have been

12  interested in?

13     MR. FTHENAKIS:  Objection as to form.

14     DR. FLOWERS:  Objection as to form.

15     THE WITNESS:  I can only speculate for the          04:57

16  reasons I told you before.

17     MR. WILSON:  Okay.

18     Q.  One of your jobs at AB was to evaluate

19  technologies, correct?

20     A.  In some cases, yes.  Usually the intellectual          04:57

21  property aspects of the technology.

22     Q.  In that capacity in the course of your

23  business as an AB senior patent counsel, if you had

24  become aware of the possibility of licensing an

25  improved sequencing method over Sanger, is that          04:58

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 150

1  something you would have thought it was your

2  obligation to pursue?

3      A.  Please repeat the question.

4      Q.  Yeah.  In your capacity as senior patent

5  counsel for AB, if you had become aware of a                04:58

6  licensing opportunity for an improved DNA sequencing

7  method, is that something you think you would have

8  been interested in pursuing as AB's senior patent

9  counsel?

10     A.  Well, it doesn't sound like something that     04:58

11 was in my normal course of work.  That sounds more

12 like a business development function.

13     Q.  And you're not qualified to make that

14 decision?

15     A.  Well, if I became aware of something, there   04:58

16 is a possibility I'd discuss it with people.  For

17 example, at these cafeteria meetings.  But I didn't

18 have a forum, like participation in a research

19 planning group or something, to communicate with the

20 rest of the company.                                        04:59

21     Q.  So was it not your job to seek out new

22 technologies?

23     A.  I would say my job was a patent attorney.  It

24 wasn't to seek out new technologies.

25     Q.  Was it your job to decide which technologies   04:59

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 151

1    AB would pursue?

2        A.  No, it was not my job.

3        Q.  Was it your job to decide how AB would

4    allocate its research and development dollars?

5        A.  No.  Obviously, my job was a patent attorney.    04:59

6    So I may have an influence on both of those items if

7    I was asked to evaluate the patent position related

8    to some prospect.

9        Q.  But you wouldn't make the ultimate decision?

10       A.  No.  My understanding is I would not be    04:59

11   making those sorts of decisions.

12       Q.  Was it your job responsibility to decide

13   which technologies to license?

14       A.  I would say it's the same answer.  That's --

15   it's just outside of my realm of responsibility.    05:00

16       Q.  So other people would make the decision about

17   what technology AB should license for itself?

18       A.  Again, I think the ultimate decision would be

19   made by other people.  I wasn't a manager at that

20   company.    05:00

21       Q.  Now, we can agree, can't we, that one of the

22   business lines that AB had was DNA sequencing

23   products, right?

24       A.  DNA sequencing products.  Yes, they had

25   instruments and reagents that went along with the    05:00

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 152

1    instruments.

2      Q.  And they also developed methods for DNA

3    sequencing, right?

4      A.  No.  I would say they developed improvements

5    to the methods.                                    05:00

6      Q.  So they would -- in your view, then, they

7    would license basic methods and then develop

8    improvements to those methods?

9      A.  Yes.  To the extent they did research and

10   development, that's a fair characterization.       05:00

11     Q.  And it was not within your job duties to

12   decide which methods to license and which

13   improvements to develop; is that correct?

14     DR. FLOWERS:  Objection as to form.

15     BY MR. WILSON:                                    05:01

16     Q.  Was it within your job duties to decide which

17   methods to license and what improvements to explore?

18     A.  Only to the extent that I would make a

19   contribution from time to time by analyzing patents

20   related to those prospects.                        05:01

21     Q.  But somebody else would have the job of

22   deciding which methods to license?

23     A.  Sure.

24     Q.  And somebody else would have the job of

25   deciding which improvements to pursue?             05:01

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2

Page 153

1    A.  That's my understanding.

2    Q.  And before you made the decision to license

3    your patent applications to Lynx you didn't talk with

4    any of those people about the inventions in those

5    patent applications that you were licensing, right?    05:01

6    DR. FLOWERS:  Objection as to form.

7    THE WITNESS:  Well, I'm not even sure who those

8    people were, first off.

9        I talked to many of the people that could

10   have been those people at lunchtime talks and in    05:01

11   forums like that.  So if in the course of one of

12   those discussions there's an interest expressed in

13   whatever ideas I put forth, I'm sure I would have

14   heard about it.

15   Q.  Did you ever go to anybody in management at    05:02

16   AB and say "I'm thinking of licensing these patents

17   and patent applications to Lynx.  Are you interested

18   in licensing them instead"?

19   A.  Could you please state the question again.

20   Q.  Yeah.    05:02

21       Did you ever -- more generally, you licensed

22   four patent applications to Lynx.  I think we're

23   agreed on that, right?

24   A.  Assigned.

25   Q.  Assigned.  Right.    05:02

SHARI MOSS & ASSOCIATES                (415 ) 402-0004

**EXHIBIT 2**

Page 173

1    A.  That's correct.

2    Q.  But after you were working at AB and after

3  you filed the patent application --

4    A.  Yes.

5    Q.  -- covering -- or at least relating to          05:34

6  sequencing by hybridization, you never again asked AB

7  if -- anybody at AB if they might be interested in

8  pursuing that technology?

9    A.  I don't recall any discussions like that.

10    Q.  After you filed your patent application         05:34

11  relating to sequencing by ligation did you ever ask

12  anybody at AB if they would be interested -- if AB

13  would be interested in pursuing technology related to

14  sequencing by ligation?

15    A.  I don't recall specifically asking people if    05:34

16  they would be interested in pursuing sequencing by

17  ligation.

18    Q.  You reached the conclusion, based on your own

19  knowledge about AB, that they wouldn't be interested

20  in pursuing sequencing by ligation or sequencing by   05:35

21  hybridization; is that correct?

22    A.  By my own knowledge, you mean knowledge of

23  what they were pursuing commercially and my knowledge

24  of responses, say, in these cafeteria discussions?

25  Is that what you mean?                                05:35

SHARI MOSS & ASSOCIATES                 (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

**EXHIBIT 2**

Page 174

1    Q.  That's right.

2    A.  Then I don't have any specific recollection

3   of disclosing or asking whether they'd be interested

4   in pursuing it commercially.

5    Q.  Switching to an entirely different topic, are    05:35

6   you being compensated by anybody for your time here

7   today in deposition?

8    A.  Not unless you're offering.

9    Q.  Are you -- has anybody offered you any

10  compensation in any form based on the outcome of this    05:35

11  litigation?

12   A.  No, not -- no.  Nothing.

13   MR. WILSON:  All right.  That's all I've got.

14   THE WITNESS:  No.  I'm just asking to be left

15  alone.                                                    05:36

16   MR. WILSON:  I appreciate your time today, and

17  we'll see you next time.

18   THE WITNESS:  Okay.

19   DR. FLOWERS:  I have a couple questions.

20   MR. WILSON:  Certainly.  But we have to change    05:36

21  the tape.

22   DR. FLOWERS:  I may be able to get -- change the

23  tape.  Yeah.

24   MR. WILSON:  It's not my decision to make.

25   THE VIDEOGRAPHER:  This marks the end of Tape 2    05:36

SHARI MOSS & ASSOCIATES                    (415 ) 402-0004

b8d025a6-4c2c-4881-8a37-dec0587cbf84

EXHIBIT 2