BRYAN WILSON (CA SBN 138842)
ERIC C. PAI (CA SBN 247604)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
E-Mail: BWilson@mofo.com; EPai@mofo.com

DAVID C. DOYLE (CA SBN 70690)
STEVEN E. COMER (CA SBN 154384)
BRIAN M. KRAMER (CA SBN 212107)
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California  92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125
E-Mail: DDoyle@mofo.com; SComer@mofo.com;
BMKramer@mofo.com

Attorneys for Plaintiff
APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>Defendants. | Case No.    C07 02845 WHA<br><br>**APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**<br><br>Date:    August 21, 2008<br>Time:    8:00 a.m.<br>Place:    Courtroom 9, 19th Floor<br>Judge:    William H. Alsup |

1

# <u>TABLE OF CONTENTS</u>

2

**Page**

3
I.    INTRODUCTION ........................................................................................................ 2

4
II.   FACTS ....................................................................................................................... 3
III.  ARGUMENT ............................................................................................................ 6

5
      A.   Summary Judgment Standard ......................................................................... 6

6
      B.   The SOLiD System Does Not Identify a Base in the Target Polynucleotide
           Within Each Cycle. ....................................................................................... 7

7
           1.   The SOLiD System Does Not Determine the Identity of Bases
                Within <u>Each</u> Cycle ................................................................................ 7

8

9
           2.   The SOLiD System Does Not Determine the Identity of Bases
                Within <u>Any</u> Cycles. ............................................................................ 10

10
                a.   Illumina's Serial Decoding Theory is Not Based on How the
                     SOLiD System Actually Operates. .............................................. 12

11
                     (i)   Illumina's Serial Decoding Theory Deviates From
                           the Court's Claim Construction. ................................... 12

12
                     (ii)  The SOLiD System Does Not Determine the Identity
                           of Bases Through Serial Decoding. ............................. 13

13
           3.   Illumina is Precluded From Asserting Equivalents ................................. 15

14
      C.   The Primer in the SOLiD System Hybridizes to the Binding Region, Not
           the Target Polynucleotide. .......................................................................... 17

15

16
           1.   The Court Has Rejected Illumina's Proposed Construction .................... 18

17
           2.   Bridge Probes Are Extension Probes, Not Initializing
                Oligonucleotides. ................................................................................. 19
           3.   Illumina is Precluded from Asserting Equivalents. ................................ 19

18
      D.   The SOLiD System Does Not Infringe the '119 Patent Because Its Probes
           Use a Phosphorothiolate Linkage, Not a Phosphoramidate Linkage ............. 20

19

20
           1.   Illumina Concedes That the SOLiD System Does Not Literally
                Infringe the '119 Patent. ....................................................................... 20

21
           2.   Illumina's Application of the Doctrine of Equivalents would Vitiate
                the Claim Limitation. ........................................................................... 21

22
                a.   Simplicity of the Structure ........................................................ 22

23
                b.   Specificity and Narrowness of the Claim.................................... 22
                c.   Foreseeability of Variations ....................................................... 24

24
IV.   CONCLUSION ........................................................................................................ 25

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
216 F.3d 1042 (Fed. Cir. 2000).................................................................. 12

*Exigent Tech. Inc. v. Atrana Solutions, Inc.*,
442 F.3d 1301 (Fed. Cir. 2006)................................................................... 7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) ...................................................................... 15, 16

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005)................................................................. 21

*Joy Techs., Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993)...................................................................... 10

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
264 F.3d 1326 (Fed. Cir. 2001).................................................................. 16

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003).................................................................. 21

*Netword, LLC v. Centraal Corp.*,
242 F.3d 1347 (Fed. Cir. 2001)................................................................... 7

*Norian Corp. v. Stryker Corp.*,
*432 F.3d 1356 (Fed. Cir. 2005)* ........................................................... 16, 20

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006).................................................................. 10

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005).................................................................. 16

*Pods, Inc. v. Porta Stor, Inc.*,
484 F.3d 1359 (Fed. Cir.), *cert. denied*, 128 S. Ct. 618 (2007) ............................ 16

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997)............................................................. 22, 24

*Schwarz Pharma, Inc. v. Paddock Labs., Inc.*,
504 F.3d 1371 (Fed. Cir. 2007).................................................................. 16

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998)................................................................... 7

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

*Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n,*
   109 F.3d 726 (Fed. Cir. 1997) ................................................................. 22, 23, 24

4

5

*TechSearch L.L.C. v. Intel Corp.,*
   286 F.3d 1360 (Fed. Cir. 2002) .................................................................. 16

6

*TorPharm Inc. v. Ranbaxy Pharms., Inc.,*
   336 F.3d 1322 (Fed. Cir. 2003) .................................................................. 23

7

8

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.,*
   206 F.3d 1408 (Fed. Cir. 2000) .................................................................. 7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ILLUMINA, INC., SOLEXA, INC., AND STEPHEN C. MACEVICZ (collectively, "Illumina") AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on August 21, 2008, at 8:00 a.m. in the Courtroom of the Honorable William H. Alsup, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Applera Corporation – Applied Biosystems Group ("AB"),[1] by and through its counsel, will move and hereby does move, pursuant to Fed. R. Civ. P. 56, for summary judgment (or in the alternative partial summary judgment) that AB's SOLiD™ System and the use thereof does not infringe claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of U.S. Patent No. 5,750,341 ("the '341 patent"), claim 1 of U.S. Patent No. 5,969,119 ("the '119 patent"), and claim 1 of U.S. Patent No. 6,306,597 ("the '597 patent") (collectively, "the Macevicz patents").

Specifically, AB seeks summary judgment of noninfringement for the different versions of the SOLiD System as follows: (1) that all versions of the SOLiD System (including any one-base encoding prototypes) do not infringe any asserted claims of the '341 and '119 patents; and (2) that all two-base encoding versions of the SOLiD System do not infringe the sole asserted claim of the '597 patent.  This motion is based on the accompanying Memorandum of Points and Authorities, the Declarations in Support of AB's Motion for Summary Judgment of Noninfringement by Gina Costa, Ph.D. ("Costa Decl."), Lee Jones ("Jones Decl."), Michael L. Metzker, Ph.D. ("Metzker Decl."), Eugene Myers, Ph.D. ("Myers Decl."), and Steven E. Comer ("Comer Decl."), and the exhibits attached thereto, and on all of the documents and records on file in this action and all matters judicially noticeable.

---

[1] On July 1, 2008, Applera Corporation was renamed Applied Biosystems Inc. *See* Applied Biosystems Inc.'s July 1, 2008 SEC Schedule 14A, *available at* http://sec.gov/Archives/edgar/data/77551/000110465908043527/a08-16846_6defa14a.htm.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    INTRODUCTION

3       The Court's February 21, 2008 claim construction order established that AB's SOLiD

4   System does not infringe.  The Court concluded that all of the asserted claims of the '341 and

5   '597 patents require "within each cycle determining the identity of a base in the target

6   polynucleotide."  (Claim Constr. Order ("Order"), Docket No. 133, at 16.)  A key strength of the

7   SOLiD System, however, is that it determines the identity of the bases only after all of the cycles

8   have been run and the results have been compared to a known reference sequence to determine

9   the most likely match.  How and when the system determines the identity of the bases is governed

10  by the system's software.  AB provided the software source code to counsel for Illumina and

11  allowed Illumina's counsel and experts to observe and record all of the data gathered during a

12  complete run of the instrument.  But Illumina's experts never looked at the code or found any

13  evidence in the data that the SOLiD System had determined the identity of bases within each

14  cycle.  Illumina's willful ignorance of how the SOLiD System actually works, and reliance on a

15  litigation-contrived version of how it could work if changed, do not create a genuine issue of

16  material fact.

17      The Court further ruled that the asserted claims of the '341 patent require that the

18  initializing oligonucleotide probe (also known as the primer) hybridize to the target

19  polynucleotide.  The Court stated:  "The language makes clear that a binding region and the target

20  polynucleotide are connected, and together form the template. . . .  The binding region, target

21  polynucleotide, and template are each distinct items."  (Order at 8-9.)  The primer used in the

22  SOLiD System hybridizes to the known binding region, not the target.  Illumina's infringement

23  expert disagrees with the Court, but the Court has already analyzed this issue and is correct.

24      Illumina admits that the sole asserted claim of the remaining patent, the '119, is not

25  literally infringed because the probes used in the SOLiD System do not use the claimed

26  phosphoramidate linkage.  AB's phosphorothiolate linkage cannot be deemed the equivalent of

27  the claimed linkage because to do so would vitiate the phosphoramidate linkage limitation on

28  which the Patent Office expressly relied in issuing the '119 patent.

## II.    FACTS

AB's SOLiD System is a "next generation" DNA sequencing system that delivers results far more quickly than earlier systems. It takes advantage of a unique "two-base" interrogating system, the latest in computing power, and the availability of the entire decoded human DNA sequence as a reference. The result is a system that is fundamentally different from the thirteen-year old technology claimed by Macevicz. For example, whereas the Macevicz '341 and '597 patents require identifying a target nucleotide within each ligation cycle, the SOLiD System uses a two-base interrogating system that does not identify a target nucleotide until after all ligation cycles are complete and the information gathered is compared to a reference sequence.

The SOLiD System works as follows. The DNA sample to be analyzed is cut into small fragments. Each fragment is attached ("ligated") to a known sequence of nucleotides, called the adapter. The combined adapter and target fragment is attached to a microscopic bead, which is deposited onto a slide that is inserted into the SOLiD instrument. Each bead contains thousands of identical copies of a given target fragment, and each slide contains millions of beads, each with a different target fragment. (*See* Backman Report, Comer Decl. Ex. I ¶¶ 141, 144 and 164; Costa Decl. ¶ 4; Comer Decl. Ex. M at 39:5-46:14, 105:17-106:16.)

The instrument adds a solution containing a primer, which is an oligonucleotide that hybridizes to a predetermined position at the end of the adapter, next to the first base in the target fragment. (*See* App. A Fig. 1; Backman Report, Comer Decl. Ex. I ¶¶ 144-145; Costa Decl. ¶ 5; Comer Decl. Ex. M at 56:2-57:4.)

The instrument then adds a mixture of fluorescently labeled probes. Each probe is eight nucleotides long and is designed so that only the nucleotides at two positions produce information about ("interrogate") the target fragment. The other six bases are either randomly-generated bases or "universal bases" that bind nonspecifically to any nucleotide in the target fragment. (*See* App. A Fig. 1; Backman Report, Comer Decl. Ex. I ¶¶ 75-95, 99-100, 102, 144-145; Costa Decl. ¶ 6; Comer Decl. Ex. M at 61:24-65:12, 76:15-85:22.)

If a probe hybridizes to the target fragment immediately adjacent to the primer, a ligase enzyme will ligate (connect) the probe to the primer. The unligated probes are washed away and

1    a camera records a digital image of each slide, which is analyzed by the SOLiD computer to

2    assign a color to each bead that is related to the target nucleotides at the two positions being

3    interrogated.  (Backman Report, Comer Decl. Ex. I ¶¶ 61, 144, 152-153, 157-158, 171, 173-174,

4    177; Costa Decl. ¶ 7; Comer Decl. Ex. M at 80:7-82:6, 99:13-100:8, 102:17-104:1; Myers Decl.

5    Attach. 1 ("Myers Report") ¶ 30.)[2]

6         The color, however, does not identify the target nucleotides.  It would take sixteen

7    different label colors to identify the two nucleotides in the target fragment (four possible bases for

8    the first position multiplied by four possible bases for the second position).  But because the

9    SOLiD System uses only four different labels, each color corresponds to four possible

10   combinations.  A green label, for example, corresponds with the combinations AC, CA, GT, or

11   TG.  Thus, when the computer assigns a green label, it does not reveal which of those four

12   combinations is correct, which means that the target nucleotide at either position can be an A, C,

13   T, or G.  (*See* App. A Fig. 1; Backman Report, Comer Decl. Ex. I ¶¶ 174-175; Costa Decl. ¶ 8;

14   Comer Decl. Ex. M at 102:17-104:1, 106:17-108:2.)

15        This is different from the probes described in the Macevicz patents, which identify a target

16   nucleotide in each ligation cycle.  In the Macevicz patents, each probe is identified by a label

17   corresponding one-to-one to the identity of one interrogating position.  Thus, the color identifies a

18   specific base in the target.  (Backman Report, Comer Decl. Ex. I ¶ 61; Solexa's Opp'n to AB's

19   MSJ on Ownership, Docket No. 76, at 7; Solexa's Opening Claim Constr. Br., Docket No. 82, at

20   2.)  Naturally then, Dr. Macevicz claimed that his method determines the identity of a target

21   nucleotide within each cycle.

22

23        _____

     [2] The first version of the SOLiD System used three rounds of probes that interrogated at
     the 4th and 5th positions, followed by two rounds of probes that interrogated at the 1st and 2nd
24   positions.  The latest version of the SOLiD System, called Version 2.0, uses only probes that
     interrogate at the 1st and 2nd positions.  (*See* Backman Report, Comer Decl. Ex. I ¶ 173; Costa
25   Decl. ¶ 9.)  The two versions are depicted in Appendix A at Figure 2.  AB's predecessor,
     Agencourt Personal Genomics, also made a prototype instrument that used one-base encoding,
26   but that system was never sold.  (Costa Decl. ¶ 18; Comer Decl. Ex. M at 36:7-37:22.)  AB seeks
     summary judgment of noninfringement of the "identifying" limitation only as to the two-base
27   encoded versions.

28

1    After recording the digital image of the slide, the SOLiD System removes the label and

2    the universal bases.  The cycles of ligation are repeated four to six more times, except that the

3    probes are ligated to the end of the previously-ligated and shortened probe, rather than to the

4    primer.  The primer and probes are then removed and a new round is begun with a new primer

5    that hybidizes one position back from where the previous primer was hybridized.  This allows

6    the probes to interrogate one position back from the previous round of cycles.  This process is

7    repeated for a total of five rounds as shown in Figure 2 of Appendix A.  (Backman Report, Comer

8    Decl. Ex. I ¶¶ 183-185; Costa Decl. ¶ 9; Comer Decl. Ex. M at 108:3-109:22, 99:13-100:8.)

9    How the SOLiD System determines the identity of the bases in the target is controlled by

10    its computer software.  (Costa Decl. ¶ 12; Myers Report ¶ 28.)  The digital images are initially

11    processed by a module called "CycleCaller," which collects the color reads for each bead in cycle

12    order and stores them in a file.  No further processing occurs until after all of the cycles are

13    complete.[3]  (Jones Decl. ¶¶ 7, 10-16; Myers Report ¶¶ 30, 34-35.)

14    After all of the cycles of ligations and primer resets have been completed, the computers

15    begin to process the color reads output by the CycleCaller.  The first step is a module called

16    "ReadBuilder," which takes the color readings in the order in which they were read and

17    rearranges them into sequence order.  The last base of the adapter is also prepended to each read

18    (for use in confirming the alignment process discussed below).  (Jones Decl. ¶ 17; Myers Report

19    ¶ 35.)

20    The next step is called "MapReads," which takes a known reference sequence of

21    nucleotides (a sequence that has already been determined for that organism) and converts it into a

22    color sequence by applying the same coding used to interrogate the bases in the target.  (Jones

23    Decl. ¶ 9, Ex. B, Fig. 2 at AB00008517.)  The MapReads software then tries to find where color

24    readings for a given fragment (a string of 25 to 35 color readings) match the reference sequence

25

26    [3] AB provided Illumina's counsel with a copy of the source code and allowed them and
Illumina's experts to perform a run on a SOLiD System and record all of the data produced
during the run.  (Comer Decl. Ex. P; Backman Report, Comer Decl. Ex. I ¶ 64.)  Illumina's

27    experts, however, testified that they have no opinions relating to the software.  (Backman Dep.,
Comer Decl. Ex. K at 20:15-16; Quackenbush Dep., Comer Decl., Ex. L at 42:6-8.)

28

1    (for humans, a string of 3.2 billion colors) as shown in Figure 3 of Appendix A. The output is a

2    list of potential matches for each fragment. (Jones Decl. ¶ 23; Myers Report ¶ 38.)

3         If a fragment has multiple potential matches, the software can take the reading from the

4    probe that interrogated the last position of the known adapter (the "0 position") and the first base

5    of the fragment (the "1 position"), assume that reading is correct, and convert the reading to a

6    base call for position 1 to see if it matches the corresponding base of the reference. This is the

7    only use the SOLiD System makes of reading the "0, 1" position. (Jones Decl. ¶ 24; Myers

8    Report ¶ 39.)

9         The final step is called "consensus calling." The consensus caller evaluates the output of

10   the MapReads program for all of the target fragments. When a color sequence of a target

11   fragment is matched to the color sequence of the reference, the consensus caller performs

12   algorithms that determine whether differences between the target fragment and the reference are

13   measurement errors, or true SNPs (single nucleotide polymorphisms, or "snips," in which a single

14   base in the target differs from the reference genome). Since the colors for the reference are

15   derived from a known base sequence, the computer can decode the colors of the matching target

16   fragment. (Jones Decl. ¶ 25.)

17        One of the advantages of the two-base encoding system is that a true SNP will normally

18   result in two adjacent colors in the target sequence being different from the colors in the reference

19   sequence. (Jones Decl. ¶ 25.) If the target shows only a single color change from the reference,

20   the difference is usually ignored or corrected. (*Id.*) Two-base encoding also allows only certain

21   color combinations, which helps eliminate invalid reads. (Backman Dep., Comer Decl. Ex. K at

22   100:17-101:2.) Additionally, decoding the color reads by aligning to a reference sequence results

23   in significantly greater accuracy than is generated by the raw color reads. The combination of

24   these benefits results in accuracy of greater than 99%. (Myers Report ¶ 64.)

25   **III.    ARGUMENT**

26        **A.    Summary Judgment Standard**

27        A party is entitled to summary judgment of noninfringement when "on the correct claim

28   construction, no reasonable jury could have found infringement on the undisputed facts or when

1   all reasonable factual inferences are drawn in favor of the patentee." *Netword, LLC v. Centraal*

2   *Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).  Summary adjudication of noninfringement is

3   required where "even one limitation is missing or not met as claimed." *Spectrum Int'l, Inc. v.*

4   *Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998); *see also Zodiac Pool Care, Inc. v.*

5   *Hoffinger Indus., Inc.*, 206 F.3d 1408, 1415 (Fed. Cir. 2000).  For the moving party to meet this

6   burden of proof, "nothing more is required than the filing of a summary adjudication motion

7   stating that the patentee had no evidence of infringement and pointing to the specific ways in

8   which accused systems did not meet the claim limitations." *Exigent Tech. Inc. v. Atrana*

9   *Solutions, Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006).

10        **B.      The SOLiD System Does Not Identify a Base in the Target**
                    **Polynucleotide Within Each Cycle.**
11

12        The SOLiD System does not meet the "identifying" limitation required by all of the

13   asserted claims of the '341 and '597 patents for two reasons.  First, the SOLiD System does not

14   determine the identity of a base within <u>each</u> cycle as required by the Court's claim construction.

15   Illumina admits that the SOLiD System does not determine the identity of a base within each

16   cycle.  Second, although Illumina contends that the SOLiD System determines the identity of

17   bases within some cycles, that contention is not based on how the SOLiD System actually works.

18        **1.      The SOLiD System Does Not Determine the Identity of Bases**
                    **Within <u>Each</u> Cycle.**
19

20        Step (c) of claim 1 of the '341 patent and step (b) of claim 1 of the '597 patent require

21   identifying a nucleotide in the target polynucleotide:

22              (c) <u>identifying</u>, in the extended duplex, at least one nucleotide in the
                target polynucleotide that is either (1) complementary to the just-
23              ligated extension probe or (2) the nucleotide residue in the target
                polynucleotide which is immediately downstream of the extended
24              oligonucleotide probe;

25   (Comer Decl. Ex. A at 21:45-50 (emphasis added).)

26              (b) <u>identifying</u> one or more nucleotides of the polynucleotide;

27   (Comer Decl. Ex. C at 21:31-32 (emphasis added).)  All asserted claims of the '341 patent are

28   dependent upon claim 1 and therefore also include the "identifying" limitation.

1    The Court rejected Illumina's argument that the term "identifying" means merely

2    gathering information that could eventually be used to distinguish between nucleotides:

3            The parties' dispute is generally over how specific of an
             identification the claim requires. Solexa urges that "identifying"
4            should mean "obtaining information sufficient to distinguish." AB
             proposes that "identifying" should mean "within each cycle
5            determining the identity of a base, as either A, T, G, or C, in the
             target polynucleotide." AB's candidate, this order holds, is closer to
6            the true mark.

7            For Solexa the word "identifying" can include merely gathering
             information that could eventually be used to distinguish between
8            nucleotides even if insufficient to make a precise determination in
             the (b) to (e) cycle. Such a broad construction is not supported by
9            the specification.

10    (Order at 13.)

11    The Court concluded that the term "identifying" means "within each cycle determining

12    the identity of a base in the target polynucleotide." (Order at 16.) The "within each cycle"

13    limitation is required by the claim language. For example, claim 1 of the '341 patent requires

14    repeating the cycles of ligation and identification "until a sequence of nucleotides in the target

15    polynucleotide is determined." The specification similarly teaches that "[d]uring each cycle, the

16    identity of one or more nucleotides in the template is determined by a label on, or associated with,

17    a successfully ligated oligonucleotide probe."[4]   (Comer Decl. Ex. A at 3:7-10 (emphasis added).)

18    Moreover, during prosecution, Macevicz highlighted the "within each cycle" feature to

19    distinguish his invention from the prior art. Specifically, Macevicz argued that his invention was

20    not obvious in light of Brennan. (Comer Decl. Ex. D at 5-6.) The PTO's rejection stated,

21    "Brennan et al. discloses a method of determining a nucleotide sequence template using a set of

22    ligation primers and probes to identify the unknown nucleotides of the template." (*Id.* at 5.)

23    Macevicz responded by arguing that the Brennan reference did not "suggest extending an

24    initiating oligonucleotide probe by one oligonucleotide probe at a time, and identifying one or

25    more target nucleotides in between each extension/ligation step. Rather, Brennan teaches

26    obtaining sequence information only after all ligations have been completed." (Comer Decl. Ex.

27    _____

28        [4] All three asserted patents share a common specification.

E at 10 (emphasis added).)  Macevicz continued, "[n]owhere does this reference [Brennan] suggest iterative cycles of single-probe ligation and target nucleotide identification in a probe-target duplex, in accordance with the present invention." (*Id.* at 11.)  The Court concluded that the scope of the asserted claims of the '341 and '597 patents had to be consistent with those arguments – "identifying" must occur within each cycle.  (Order at 16.)

The SOLiD System does not determine a base identity within each ligation cycle.  Instead, it gathers partial information within each cycle that it combines with information gathered during all of the cycles and then uses alignment to a reference to determine the identity of the bases only after all cycles have concluded.  Illumina's expert witness, Dr. Backman, admitted that the SOLiD System does not determine the identity of a base in the target polynucleotide within each cycle.  He conceded that in most cycles, no base is determined:

> Q. Right. Okay. Let's talk about just the first round. In the first round in SOLiD, there are a series of ligations that occur, and the labels on the probes are read in each cycle, correct?
>
> A. Yes.
>
> Q. Within each of those cycles, though, in that first round, reading the label does not identify a poly -- does not identify a base in the target polynucleotide, does it?
>
> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: Well, you used the word "identify," and so I'm going to go back to the judge's definition and say that means determine the identity of a base, and say that in those cycles, to the best of my understanding, a -- the identity of a base is not determined.
>
> * * *
>
> Q. Okay. And then in the next cycle of that same round and for the rest of the cycles in that round, the -- reading the label does not determine the identity of a base in the target polynucleotide, right?
>
> A. As I understand it, your statement is correct: Those subsequent cycles do not determine identities.

(Backman Dep., Comer Decl. Ex. K at 79:1-80:13, 81:17-24; *see also id.* at 81:25-82:14.)  Thus, there is no factual dispute that the SOLiD System does not identify a base within <u>each</u> cycle.

2.    **The SOLiD System Does Not Determine the Identity of Bases Within <u>Any</u> Cycles.**

Illumina's expert contends that the requirement that a base be determined in "each" cycle means only that a base be identified in any two cycles.  (*See, e.g.*, Backman Dep., Comer Decl. Ex. K at 92:2-16.)  As discussed above, that is not the Court's construction.  In any event, the SOLiD System does not determine the identity of a base in any cycles.

All of the asserted claims of the '341 and '597 patents are to methods.  To prove infringement of method claims, Illumina must prove that users of the SOLiD System have actually performed the claimed methods, not that the SOLiD System could be changed to perform them or that the SOLiD System has been described as theoretically capable of performing them. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) ("The sale of [an apparatus capable of performing a claimed process is] not a direct infringement because a method or process claim is directly infringed only when the process is performed.").

How and when the SOLiD System identifies a base is governed by the software that processes the information.  There is no material dispute as to how the chemistry described above works in the two-base encoding SOLiD System.  The dispute over the "identifying" limitation focuses on the system's software, and it is not a genuine dispute.  Dr. Backman acknowledges that it is the software that converts the color reads generated by the labeled probes into base determinations.  (Backman Dep., Comer Decl. Ex. K at 86:24-88:11.)  When asked specifically how the SOLiD System converts those color reads into base identities, Dr. Backman answered: "Well, by applying all that software that I didn't -- I didn't feel qualified to look at." (*Id.* at 84:17-19.)

As explained by AB's lead software architect, Lee Jones, and renowned DNA sequencing software expert, Dr. Eugene Myers, the software collects images within each cycle, and begins the process of calling colors, but that is as far as the processing goes while the chemistry is being

1    performed.[5]  (Jones Decl. ¶¶ 7-8; Myers Report ¶ 34.)  Even Dr. Backman concedes, at least as to

2    the first seven cycles, that the color readings do not identify any of the bases.  (Backman Dep.,

3    Comer Decl. Ex. K at 80:1-13.)  It is only after <u>all</u> of the cycles are complete that the software

4    puts the color readings into sequence order and then begins the lengthy process of trying to

5    decode the bases in the target.  This stage of the processing, called secondary analysis, consists of

6    a collection of algorithms that analyze the color readings.  Secondary analysis involves taking the

7    color space reads that have been put into sequence order and finding the places where those

8    colors match a known reference DNA sequence that has been converted to color space.  It is not

9    until this secondary analysis is complete that the identity of any base in the target polynucleotide

10   is determined.  (Jones Decl. ¶¶ 19-29.)

11        AB provided a complete copy of the software source code to Illumina's counsel,

12   performed a complete run of the instrument for Illumina's counsel and experts to observe, and

13   delivered a copy of all of the data recorded during the run.  (Comer Decl. Ex. P; Backman Report,

14   Comer Decl. Ex. I ¶ 64.)  AB also submitted an expert report describing in detail what the source

15   code shows.  (Myers Report ¶¶ 29-54.)  Yet neither of Illumina's experts have any opinion on the

16   code.  Despite having the code, Dr. Backman did not read it.  (Backman Dep., Comer Decl. Ex. K

17   at 20:16 ("I've not read any of the code.").)  Illumina's other expert witness, Dr. John

18   Quackenbush, says that he is an expert on DNA sequencing software and conversant in all of the

19   programming languages used in the SOLiD System.  (Quackenbush Report, Comer Decl. Ex. J

20   ¶ 30; Quackenbush Dep., Comer Decl. Ex. L at 36:23-42:2.)  Yet he too never looked at the

21   software.  (Quackenbush Dep., Comer Decl. Ex. L at 42:6-8 ("Q. Well, have you looked at the

22   software used in SOLiD?  A. No, I haven't.").)  While Dr. Backman's failure to analyze the

23   SOLiD System software may be attributable to his admitted lack of expertise (Backman Dep.,

24   _____

25        [5] Dr. Myers developed the "whole-genome shotgun sequencing" technique, in which a
     target genome is broken into millions of fragments and the sequence is reconstructed using
26   software.  That technique was used to create the first sequence of the human genome.  He is also
     the creator of a popular program called "BLAST," which can compare any DNA sequence with
27   every other sequence in the public databases.  Dr. Myers was a Professor of Computer Science
     and Molecular Biology at the University of Arizona and the University of California at Berkeley.
28   He is currently a group leader at the Howard Hughes Medical Institute.

1  Comer Decl. Ex. K at 20:2-4, 84:17-20, 88:12-17), Dr. Quackenbush's failure to look at the

2  software demonstrates Illumina's strategy of willful ignorance regarding how the SOLiD System

3  actually works.

    **a.      Illumina's Serial Decoding Theory is Not Based on How
4                the SOLiD System Actually Operates.**

5

6          Although Dr. Backman admits that he does not know how the SOLiD System actually

7  decodes the color readings, that did not stop him from offering his theory as to how the SOLiD

8  System could theoretically determine the identity of the bases.

    **(i)      Illumina's Serial Decoding Theory Deviates From
9                the Court's Claim Construction.**

10

11         When trying to explain his argument that the SOLiD System meets the "identifying" claim

12  limitation, Dr. Backman had to qualify his answers to avoid the Court's claim construction:

13              Q. In the run you observed, did the SOLiD system actually identify
                bases in the target polynucleotide within each cycle?
14

15              [Objection]

16              THE WITNESS: In my opinion, yes, it did.

                Q. How did it do that?
17

18              A. In at least some of the cycles, it obtained information necessary
                and sufficient to determine -- and by which I mean -- by determine,
                I mean fix the identity of particular bases. And by fix, I mean that
19              the data was there which would result in a unique output and could
                only result in a unique output.
20

21  (Backman Dep., Comer Decl. Ex. K at 92:2-16.)  Dr. Backman's analysis carefully avoids

22  applying the Court's construction.  First, his testimony ignores the "within each cycle"

23  requirement of the Court's claim construction, substituting that the limitation is satisfied so long

24  as "identifying" occurs in "at least some of the cycles."  Because Dr. Backman's testimony relies

25  on a different claim construction, his testimony cannot create a genuine issue of fact for trial.  *Cf.*

26  *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1047 (Fed. Cir. 2000) (affirming

27  summary judgment of noninfringement and rejecting expert testimony based on claim

28  construction different from court's construction).

1    Second, Dr. Backman's analysis reverts back to Illumina's argument that the Court

2    rejected, that "the word 'identifying' can include merely gathering information that could

3    eventually be used to distinguish between nucleotides even if insufficient to make a precise

4    determination in the (b) to (e) cycle." (Order at 13-14.) Dr. Backman is not saying that the

5    information is actually used to make a precise determination in each cycle. He says only that

6    there is enough information available that one could "fix" a "unique output." A "unique output"

7    is not the same as making "a precise determination in the (b) to (e) cycle." (Order at 13.) The

8    "unique output" he is referring to is a sequence that hypothetically could be derived using

9    Illumina's "serial decoding" theory described *infra*. The most glaring flaw in Dr. Backman's

10    argument is that the SOLiD System does not serially decode within each cycle for many reasons,

11    including that the error rate would be so high that the resulting sequence would be useless.

12    (Myers Report ¶ 43; Metzker Decl. Ex. 1 ("Metzker Report") at 13.)

13    Third, Dr. Backman assumes that the SOLiD System operates in an artificial world

14    without machine error. He defines the word "determine" to mean gathering information that "will

15    result in one output and cannot possibly result in any other output, <u>outside of machine error or</u>

16    <u>something like that</u>." (Backman Dep., Comer Decl. Ex. K at 85:3-86:20 (emphasis added).) The

17    SOLiD System does not serially decode within each cycle because "machine error" cannot be

18    assumed away. "Machine error" is unavoidable, and the SOLiD System determines the identity

19    of bases only by aligning to a reference in part to address the inevitability of "machine error."

20    (Myers Report ¶¶ 53-64.)

21                    (ii)    **The SOLiD System Does Not Determine the**
                            **Identity of Bases Through Serial Decoding.**
22

23    Figure 2 in Appendix A illustrates a typical run of the SOLiD System using the current

24    version's "1, 2 probes." Using this run as an example, Illumina argues that "identifying" occurs

25    when a probe interrogates the last base of the adapter (known as the "0" position) and the first

26    base of the target fragment (known as the "1" position) in the first ligation cycle of the second

27    primer round. (Backman Report, Comer Decl. Ex. I ¶¶ 181-186.) According to Illumina, the

28    SOLiD System "knows" the identity of the 0 position, since it is part of the known binding

1  region, and thus the "0, 1" color "identifies" the base at the 1 position, in the sense that, absent

2  "machine error," the identity of the 1 position could be deduced at that point.  (*Id.* ¶ 181;

3  Backman Dep., Comer Decl. Ex. K at 85:3-86:23.)

4    The SOLiD System (in fact) does not make any such deduction, and Illumina has pointed

5  to nothing in the software to the contrary.  The SOLiD System interrogates the 0, 1 position not to

6  decode that particular position at that time, it does so to interrogate position 1 twice.  (Jones Decl.

7  ¶ 25; Myers Report ¶ 53.)  In the above example, the "1" position is interrogated in the first round

8  (as part of the 1, 2 interrogation), and in the second round (as part of the 0, 1 interrogation).

9  There is no other reason to interrogate the 0 position, since that base is already known.  This

10  double interrogation of the 1 position, as well as all other positions except the final position,

11  improves the accuracy of the SOLiD System.  (Myers Report ¶ 53.)  Indeed, there would be no

12  value in using the 0, 1 reading to determine the identity of a base in the target fragment at this

13  point, since the entire color string will later be aligned against a reference sequence to be

14  decoded.  (Myers Report ¶ 54.)

15    Even if the SOLiD System operated by deducing the identity of the 1 position within the

16  first cycle of the second round (which it does not), it would not meet all the required claim

17  limitations.  A single determination could not constitute "repeating" the steps until a sequence of

18  nucleotides is determined as required by the '341 and '597 patents.  Illumina's solution is to rely

19  on a second theoretical way that the SOLiD System could (but does not) operate — "serial

20  decoding."  (Backman Report, Comer Decl Ex. I ¶¶ 184, 193.)  Illumina hypothesizes that in the

21  fifth round, when the 2, 3 position is interrogated, the SOLiD System could deduce the bases at

22  those positions by "tracing back" the earlier readings all the way to the zero position, then serially

23  decode a sequence.  (*Id.*) Hypothetically, assuming perfect chemistry and no machine error, such

24  a system could be built.  AB has recognized this, but the SOLiD System does not work this way:

25    In principle, it is possible to convert data from color space to the
   corresponding nucleotides or "base space" with knowledge of the
26    identity of any base in the read (Figure 4).  In practice however,
   data from the SOLiD System is automatically aligned to a reference
27    sequence, translated to color space and then analyzed within the
   SOLiD Data Analysis Tools.  It is only after analysis and
28    application of the 2 base encoding rules that the software translates

14

1    the data back into base space and reports it in traditional file
2    formats for downstream analysis.

3    (Jones Decl. ¶ 9, Ex. B at AB00008518.)[6]

4        The way the SOLiD System actually decodes the colors is by aligning them to a reference

5    sequence. (Jones Decl. ¶¶ 9, 19-29; Myers Report ¶ 54.)  Decoding the colors by aligning them to

6    a reference provides a high accuracy rate, estimated to be greater than 99%. (Myers Report ¶ 64.)

7    The standard in the industry is 95% or better to be useful. (*Id.* ¶ 55.)  Serially decoding based on

8    the 0, 1 position color, as hypothesized by Illumina, would result in an unacceptable error rate.

9    (*Id.* ¶¶ 55-64.)  The base called for each color would be entirely dependent on the accuracy of

10   each preceding color.  Thus, if any one color were wrong, the rest would be wrong as well. (*Id.*

11   ¶ 56.)  This compounding is known as the "serial error problem," and it makes Dr. Backman's

12   hypothetical DNA sequencing by serially decoding useless. (*Id.* ¶¶ 56-63.)[7]

13                **3.**      **Illumina is Precluded From Asserting Equivalents.**

14       Reliance on the doctrine of equivalents to broaden the "identifying" limitation to

15   encompass making base calls outside of "each" ligation cycle is barred by statements made

16   during the prosecution of the '341 and '597 patents.  "Prosecution history estoppel requires that

17   the claims of a patent be interpreted in light of the proceedings in the PTO during the application

18   process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

19   "[U]nder the doctrine of prosecution history estoppel, a narrowing of claim scope during

20   prosecution creates a presumption that the patentee has surrendered, for purposes of the doctrine

21   of equivalents, all subject matter falling between the scope of the original claim and the scope of

22   _____

23       [6]AB's recognition of this theoretical possibility, on which Illumina has fixated during
     discovery and that it cites as its sole evidence of infringement in its Patent Local Rule 3-6 Final
24   Infringement Contentions, does not describe the actual operation of the two-base encoding
     version of the SOLiD System. (*See, e.g.,* Costa Decl. ¶ 14.)

25       [7] The SOLiD System does use knowledge of the 0 position base to deduce the base at the
     1 position to double check the sequence determined from aligning the color reads to a reference
26   when a target fragment matches multiple locations on the reference. (Backman Dep., Comer
     Decl. Ex. K at 104:19-24; Jones Decl. ¶ 24.)  But the SOLiD System does not serially decode,
27   and this after-the-fact use of the 0, 1 position information to assist with alignment does not occur
     within the ligation cycles. (Myers Report ¶¶ 52-54.)
28

1    the claim as amended." *Norian Corp. v. Stryker Corp.*, *432 F.3d 1356, 1363* (Fed. Cir. 2005)

2    (citing *Festo Corp.*, 535 U.S. at 741). "[P]rosecution history estoppel can occur during

3    prosecution in one of two ways, either (1) by making a narrowing amendment to the claim

4    ('amendment-based estoppel') or (2) by surrendering claim scope through argument to the patent

5    examiner ('argument-based estoppel')." *Schwarz Pharma, Inc. v. Paddock Labs., Inc.*, 504 F.3d

6    1371, 1375 (Fed. Cir. 2007) (citation omitted). "Prosecution history estoppel . . . precludes a

7    patentee from regaining, through litigation, coverage of subject matter relinquished during

8    prosecution of the application for the patent." *Festo Corp.*, 535 U.S. at 734, citing *Wang Labs.,*

9    *Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577-1578 (Fed. Cir. 1997).

10    Here, Illumina is estopped based on the arguments it made during prosecution.

11    Macevicz's arguments clearly and unambiguously narrowed the scope of the claims, surrendering

12    subject matter relating to when in the claimed process the "identifying" step must be performed.

13    The Court has already determined that the meaning of the "identifying" limitation must be

14    consistent with the arguments Macevicz made to the PTO. (Order at 13-14.) Illumina cannot

15    regain through the doctrine of equivalents subject matter that it surrendered during prosecution.

16    *See, e.g.*, *Pods, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1367-68 (Fed. Cir.), *cert. denied*, 128 S.

17    Ct. 618 (2007) (holding that no range of equivalents was available for claim term that was

18    narrowed in light of arguments made to overcome prior art); *see also Kustom Signals, Inc. v.*

19    *Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001) (holding that arguments made

20    during prosecution history precluded infringement under doctrine of equivalents).[8]

21    _____

22    [8] Even if the doctrine of equivalents were available, Illumina could not meet its burden of setting forth "particularized evidence and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device, or with respect to the

23    'function, way, result' test." *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005). First and foremost, Dr. Backman's opinion is predicated on the incorrect

24    assumption that the SOLiD System serially decodes the color reads within each cycle using the 0, 1 position. (Backman Report, Comer Decl. Ex. I ¶¶ 181-186, 193.) While Dr. Backman pays lip

25    service to the "function, way, result" test, his analysis is inadequate and conclusory. *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (holding that "conclusory statements

26    of experts" are insufficient to avoid summary judgment of noninfringement). He does not express an opinion at all as to whether the differences between the SOLiD System and the methods

27    claimed in the '341 and '597 patents are insubstantial. When asked whether additional information is obtained by aligning to a reference, Dr. Backman agreed and acknowledged the

28    (Footnote continues on next page.)

1

**C.    The Primer in the SOLiD System Hybridizes to the Binding Region, Not the Target Polynucleotide.**

2

3    The SOLiD System does not provide "an initializing oligonucleotide probe hybridized to a

4    target polynucleotide" as required by step (a) in claim 1 and all other asserted claims of the '341

5    patent.[9]  There is no dispute over how this aspect of the SOLiD System works.  The only dispute

6    is the correct construction of "hybridized to a target polynucleotide," which the Court already

7    resolved in determining the correct construction of "initializing oligonucleotide probe."

8    In its Claim Construction Order, the Court found that the patent clearly distinguishes

9    between the binding region and the target polynucleotide:

10        The language makes clear that a binding region and the target
        polynucleotide are connected, and together form the template. . . .
11        <u>The binding region, target polynucleotide, and template are each
        distinct items</u>.

12

13    (Order at 8-9 (emphasis added).)  The Court noted that the specification states "[p]referably, a

14    target polynucleotide is conjugated to a binding region to form a template, and the template is

15    attached to a solid phase support . . . ."  (*Id.* at 8 (quoting '341 patent col. 8:8–10).)

16

17



18

19

20

21

22    (*Id.* at 9 (depicting invention "As Described in Claim 1 of the '341 patent").)  The Court held that

23    the express language of the claim requires that the initializing oligonucleotide probe hybridize to

24    the target polynucleotide, not the binding region.  (*Id.* at 8-9.)  Further, because "the specification

25    —————————————————————

(Footnote continued from previous page.)

26    advantages that the additional information provides.  (Backman Dep., Comer Decl. Ex. K at
    99:24-101:2.)

27

28        [9] This applies to all versions, including the prototype that used one-base encoding.

1    teaches a different method than what is claimed," the Court determined that "the inventor, patent

2    counsel, and the examiner all made a drafting error." (*Id.*)  The Court declined Solexa's request

3    to redraft the language through the claim construction process, holding that "[t]he express

4    language of the claim must govern." (*Id.* at 9.)

5         By contrast, in AB's SOLiD System, the initializing oligonucleotide probe hybridizes to

6    the binding region, not the target polynucleotide.  In the SOLiD System the "primer" (the

7    initializing oligonucleotide probe) is hybridized to the "P1 adapter," which is a fully-known

8    binding region.  (Backman Dep., Comer Decl. Ex. K at 115:18-24, 128:5-8; Backman Report,

9    Comer Decl., Ex. I ¶ 144; Metzker Report at 9.)  Illumina does not dispute any of these facts

10   about the operation of the SOLiD System.  Dr. Backman confirmed this description of the system

11   in his expert report and deposition.  (Backman Dep., Comer Decl. Ex. K at 115:18-24, 128:5-8;

12   Backman Report, Comer Decl., Ex. I ¶ 144.)  Based on these facts and the Court's claim

13   construction, the SOLiD System does not meet the limitation of "an initializing oligonucleotide

14   probe hybridized to a target polynucleotide."  Accordingly, the SOLiD System does not infringe

15   the '341 patent.

16              **1.    The Court Has Rejected Illumina's Proposed Construction.**

17        Illumina seeks to reargue, through its expert, the same claim construction position the

18   Court already rejected.  Dr. Backman again tries to conflate the "binding region" and the "target

19   polynucleotide," despite the Court's conclusion that the terms are distinct:  "I respectfully

20   disagree with Judge Alsup's statement that the use of the term 'target polynucleotide' in claim 1

21   represents a 'drafting error.'"  (Backman Report, Comer Decl. Ex. I ¶ 136.)  Dr. Backman then

22   repeats Illumina's legal argument that the distinctions between the target polynucleotide, the

23   binding region, and the template can be ignored as only part of a preferred embodiment.

24   (Backman Report, Comer Decl. Ex. I ¶ 136; Solexa's Reply Claim Constr. Br., Docket No. 100,

25   at 8, 11.)  This position was addressed and rejected during claim construction.  (Order at 9 ("The

26

27

28

1    binding region, target polynucleotide, and template are each distinct items.”).)  It has not been

2    improved by repetition as purported expert testimony.[10]

3                    **2.     Bridge Probes Are Extension Probes, Not Initializing**
                             **Oligonucleotides.**

4

5          Dr. Backman makes a new argument regarding the “bridge probes” used in the latest

6    version of the SOLiD System.[11]  Bridge probes are ligated to the initializing oligonucleotide

7    probes in some rounds of ligation.  The bridge probe does hybridize to a portion of the target

8    fragment.  Dr. Backman asserts that the primer and the bridge probe combination is the

9    initializing oligonucleotide probe.  (Backman Report, Comer Decl. Ex. I ¶ 144.)  Again, Dr.

10   Backman is incorrect.

11         The Court construed initializing oligonucleotide probe as “the oligonucleotide to which

12   the first extension oligonucleotide probe is first ligated.”  (Order at 10.)  Illumina’s proposed

13   construction of “extension oligonucleotide probe” is “an oligonucleotide probe that can be ligated

14   to an initializing oligonucleotide probe or an extended oligonucleotide probe.”  (Backman Report,

15   Comer Decl. Ex. I ¶ 148; Ex. H (Patent L.R. 4-2 disclosures).)  In the latest version of the SOLiD

16   System, the primer is hybridized to the adapter, then the bridge probe is ligated to the primer.

17   (Costa Decl. ¶¶ 9, 15-16, Fig. 2.)  The steps are distinct.  (*Id.* ¶ 15.)  Thus, the primer is the

18   initializing oligonucleotide probe, and the bridge probe is the first extension oligonucleotide

19   probe.

20                    **3.     Illumina is Precluded from Asserting Equivalents.**

21         Dr. Backman asserts that the SOLiD System, in which the initializing oligonucleotide

22   probe is hybridized to the known binding region, is the equivalent of the claimed system in which

23   the initializing oligonucleotide probe is hybridized to the target polynucleotide.  His argument is

24   _____

25         [10] Dr. Backman’s “expert opinion” on this legal issue tracks Illumina’s claim construction
     briefing word for word.  (Backman Dep., Comer Decl. Ex. K at 49:20-51:5.)  Illumina’s other
     technical expert, Dr. Quackenbush, agreed with the Court that the target polynucleotide, binding
26   region, and template are distinct terms.  (Quackenbush Dep., Comer Decl. Ex. L at 57:4-58:13.)

27         [11] This argument was not disclosed in Illumina’s Final Infringement Contentions.  (Comer
     Decl. Ex. O.)
28

1    untenable.  Amendment-based estoppel bars Illumina from asserting the doctrine of equivalents

2    because Macevicz narrowed the scope of the claim limitation at issue through an amendment in

3    response to a rejection by the Patent Office.  *Norian Corp.*, 432 F.3d at 1363 (citing *Festo Corp.*,

4    535 U.S. at 741).

5         In the original application for the '341 patent, Macevicz drafted claim 1 to read

6    "extending an initializing oligonucleotide along the <u>polynucleotide</u>."  (Comer Decl. Ex. N at 28

7    (emphasis added).)  This original version of the claim language used the broad and general term

8    "polynucleotide," rather than any of the specific terms Macevicz used in the specification:  target

9    polynucleotide, binding region, or template.  The Examiner issued an Office Action rejecting this

10   claim language for indefiniteness.  (Comer Decl. Ex. D at 3.)  In amending the claim in response

11   to this rejection, Macevicz could have chosen to replace "polynucleotide" with any of those three

12   specific terms – "target polynucleotide," "binding region," or "template."  He chose "target

13   polynucleotide" and thereby relinquished any additional claim scope that would have been

14   covered by those other terms or by the original term "polynucleotide."  (Comer Decl. Ex. E at 2-

15   3.)  Illumina cannot recapture that relinquished claim scope through the doctrine of equivalents.[12]

16        **D.    The SOLiD System Does Not Infringe the '119 Patent Because Its
                 Probes Use a Phosphorothiolate Linkage, Not a Phosphoramidate
17               Linkage.**

18             **1.    Illumina Concedes That the SOLiD System Does Not Literally
                      Infringe the '119 Patent.**
19

20        Claim 1 of the '119 patent is closed-ended – that is, it claims a DNA probe of a specific

21   chemical structure including a phosphoramidate linkage.  In its natural form, DNA is comprised

22        _____
              [12] Even if Illumina were entitled to assert the doctrine of equivalents, it could not show
23   that hybridizing the primer to the binding region is equivalent to hybridizing the primer to the
     target polynucleotide.  Dr. Backman admitted that hybridizing the primer to a fully-known
24   binding region provides advantages in efficiency, consistency, and convenience:

25             Linking the target polynucleotide to a binding region of known
               sequence is advantageous because it allows predesigned initializing
26             oligonucleotides to be used in the claimed method. . . . Because
               these regions and oligonucleotides are pre-designed, they can be
27             tested, optimized, and kept conveniently at hand for use.

28   (Backman Report, Comer Decl. Ex. I ¶ 138.)

1    of bases attached to sugars, which in turn are connected to each other by phosphorus-oxygen

2    (phosphodiester) linkages.  In the Macevicz patents, one of these natural linkages is replaced by a

3    phosphorus-<u>nitrogen</u> (phosphoramidate) linkage, which can be cleaved with an acidic solution

4    (TFA).  (Backman Report, Comer Decl. Ex. I ¶ 68; Ex. A at 9-10.)  Claim 1 of the '119 patent

5    claims this probe by drawing its precise chemical structure with a phosphoramidate linkage,

6    which is referred to as "NH," or a nitrogen atom (N) attached to a hydrogen atom (H).

7        Illumina admits that the probes used in the SOLiD System do not contain the claimed

8    phosphoramidate linkage.  (Backman Report, Comer Decl. Ex. I ¶¶ 83-84, 99, 101, 103, and 112.)

9    Instead, the SOLiD System uses a phosphorus-<u>sulfur</u> (phosphorothiolate) linkage, which is

10   cleaved by a non-acidic solution, silver nitrate.  Accordingly, Illumina concedes that the SOLiD

11   System does not literally infringe the '119 patent (Backman Report, Comer Decl. Ex. I ¶ 112;

12   Backman Dep., Comer Decl. Ex. K at 23:9-24:8), and relies solely on the doctrine of

13   equivalents.[13]

14                    **2.    Illumina's Application of the Doctrine of Equivalents would**
                            **Vitiate the Claim Limitation.**
15

16       The Federal Circuit has held that "an element of an accused product or process is not, as a

17   matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely

18   vitiate the limitation." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir.

19   2005) (citation omitted).  The factors in determining whether a limitation would be vitiated

20   include "the simplicity of the structure, the specificity and narrowness of the claim, and the

21   foreseeability of variations at the time of filing the claim with the PTO." *Id.* at 1360.  All of these

22   considerations show that deeming a phosphorothiolate to be the equivalent of the claimed

23   phosphoramidate would vitiate the claim limitation.  Whether an asserted equivalent would vitiate

24   the claim limitation is a question of law for the Court. *Id.* at 1358; *Lockheed Martin Corp. v.*

25   *Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003) (citation omitted) ("[I]f a court

26   determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate

27       [13] Illumina relies on the same argument with respect to Claims 8 and 18 of the '341
     Patent.  (Backman Report, Comer Decl. Ex. I ¶¶ 219-221, 233-235.)

28

1    a particular claimed element,' then the court should rule that there is no infringement under the

2    doctrine of equivalents.").

3                              **a.    Simplicity of the Structure**

4           The simplicity of the structure refers to whether any subtlety of language, complexity of

5    the technology, or subsequent change in the state of the art could have "obfuscated the

6    significance of [the] limitation at the time of its incorporation into the claim." *Sage Prods., Inc.*

7    *v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997). No such possibility exists here.

8    Claim 1 of the '119 patent claims an oligonucleotide probe with a specific chemical formula. The

9    phosphoramidate linkage is spelled out precisely in this formula using the standard chemical

10   notations for nitrogen (N) and hydrogen (H) atoms.

11          The simplicity of the structure was confirmed by Macevicz's own statements to the

12   Examiner during prosecution. The Examiner issued an initial Office Action rejecting claim 1

13   (originally numbered as claim 18 at the time) for lack of enablement and written description.

14   (Comer Decl. Ex. F at 2.) In response to this rejection, Macevicz argued that "methods for

15   synthesizing oligonucleotides containing such phosphoramidate linkages were well known in the

16   art," and therefore it was not even necessary for the patent to teach these methods. (Comer Decl.

17   Ex. G at 4.) Macevicz also cited several references teaching such phosphoramidate linkages.

18   (*Id.*) In short, Macevicz cannot have failed to understand that his claim was limited to a

19   phosphoramidate linkage.

20                         **b.    Specificity and Narrowness of the Claim**

21          The Federal Circuit has held that "the doctrine of equivalents is not available for the

22   attainment in court of a scope of protection which encompasses subject matter deliberately

23   removed from examination by the PTO during prosecution through narrow claiming." *Tanabe*

24   *Seiyaku Co. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 732 (Fed. Cir. 1997) (citation

25   omitted). The rationale is that a patentee desiring broader protection should have sought broader

26   claims during prosecution so that the PTO could ensure that the claims that ultimately issued were

27   novel, useful, and nonobvious. *Sage*, 126 F.3d at 1425.

28

1    Macevicz chose to draft claim 1 of the '119 patent narrowly and specifically with a

2  phosphoramidate linkage limitation. The PTO even pointed out the specificity of this limitation

3  and its central importance to patentability during prosecution:

> Claims 18 would appear to be allowable if rewritten or amended to
> overcome the rejection(s) under 35 U.S.C. 112 set forth in this
> Office action.  Claim 18 appears to be allowable over the prior art
> because of the unique internucleotide linkage comprising a N atom
> in place of a 5' most bridging O atom in an internucleotide linkage.

7  (Comer Decl. Ex. F at 4 (emphasis added).)

8    In response to the rejection, Macevicz amended the claim to deal with the indefiniteness

9  problem and argued that the claim was sufficiently enabled. (Comer Decl. Ex. G at 4-5.) He did

10 not challenge the Examiner's statement that the claim's patentability over the prior art depended

11 on its "unique" phosphoramidate linkage. (*Id.* at 5.) Nor did he attempt to broaden the claim to

12 cover any other types of linkages. (*Id.*) Macevicz acquiesced to the Examiner's determination

13 and relinquished any potential claim scope beyond phosphoramidate linkages. "[T]he public is

14 entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject

15 matter with abandonment of the rest," such as where the inventor "lets stand an examiner's

16 restrictive interpretation of a claim." *TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322,

17 1330 (Fed. Cir. 2003) (citation omitted).

18   Moreover, Macevicz's decision to draft claim 1 as a precise chemical formula further

19 demonstrates the specificity and narrowness of the claim. Macevicz could have more broadly

20 described a class of probes with different types of linkages. In the '341 patent, for example,

21 Macevicz broadly claimed methods that include probes containing any "chemically scissile

22 internucleosidic linkage." (Comer Decl. Ex. A claim 7.) Having chosen a specific formula for

23 claim 1 of the '119 patent, rather than a broad class of linkages, Illumina is barred from asserting

24 the broad class is the equivalent of the specific formula.

25   This scenario is the same as that in the *Tanabe* case. There, the patentee argued that

26 butanone, the solvent used by the accused infringer, was the equivalent of acetone, the solvent

27 claimed in the patent. *Tanabe*, 109 F.3d at 729. The two solvents differed by only a single

28 methylene ($CH_2$) group. *Id*. The Federal Circuit noted that the patentee could have more broadly

1    claimed the class of ketone solvents that would have included both acetone and butanone. *Id.* at

2    732. Because the patentee chose to claim only "acetone" specifically by name, the Federal

3    Circuit upheld the ITC's determination that the doctrine of equivalents should not be applied. *Id.*

4    Here, Macevicz went even further in specificity – he claimed not merely by name, but by precise

5    chemical formula and nomenclature.

6                              **c.    Foreseeability of Variations**

7        As between the patentee and the public at large, "it is the patentee who must bear the cost

8    of its failure to seek protection for [a] foreseeable alteration of its claimed structure." *Sage*, 126

9    F.3d at 1425. In the case of the '119 patent, variations were not only foreseeable at the time of

10   filing, they were also disclosed, but not claimed.

11       The specification of the '119 patent broadly states that any type of chemically scissile

12   internucleosidic linkage may be employed in the oligonucleotides. (Comer Decl. Ex. B at 10:16-

13   30.) A phosphoramidate linkage is described as only one example of the general class of

14   chemically scissile internucleosidic linkages that can be employed. (*Id.*) Furthermore, the

15   availability of these other linkages was well known to persons of ordinary skill in the art, as

16   admitted by Dr. Backman. (Backman Dep., Comer Decl. Ex. K at 25:6-26:8.) Despite the broad

17   disclosure in the '119 patent *specification*, Macevicz pursued only a narrow *claim* for probes with

18   phosphoramidate linkages. He did so despite being well-aware – as evidenced by the

19   specification – of the possible variations that could have been covered through a broader claim.

20   Allowing Illumina to expand the claim to cover these other variations would vitiate the

21   phosphoramidate linkage limitation.[14]

22       ──────────────
         [14] Even if the doctrine of equivalents were available, Illumina could not show that
23   phosphorothiolate linkages are equivalent to phosphoramidate linkages. An important purpose of
     the claimed linkage is that it be chemically cleavable. (Comer Decl. Ex. B at 10:16-30; Backman
24   Report, Comer Decl. Ex. I ¶¶ 116, 141.) Dr. Backman acknowledges that one of the key
     differences between a phosphoramidate linkage and a phosphorothiolate linkage is the pH under
25   which each is cleaved. According to the specification of the '119 patent, phosphoramidate
     linkages are cleaved with trifluoroacetic acid ("TFA") under highly acidic conditions (where pH
26   = 1). (Comer Decl. Ex. B at 9:40-52.) By contrast, phosphorothiolate linkages are cleaved with
     silver nitrate under neutral conditions (where pH = 7). (Metzker Report at 23.) As Dr. Backman
27   admitted, acidic conditions are less favorable for sequencing DNA because they can damage the
     DNA. (Backman Dep., Comer Decl. Ex. K at 44:20-45:11.) He did not know whether the acidic
28   conditions used in the Macevicz patents would damage the DNA. (*Id.*) Dr. Metzker, who has
                                                    (Footnote continues on next page.)

1

IV.    CONCLUSION

2

For the foregoing reasons, AB respectfully requests that the Court enter an order that:

3

(1) all versions of the SOLiD System (including any one-base encoding prototypes) do not

4

infringe any asserted claims of the '341 patent and '119 patent; and (2) all two-base encoding

5

versions of the SOLiD System do not infringe the sole asserted claim of the '597 patent.

6

Dated: July 17, 2008                MORRISON & FOERSTER LLP

7

8

By:    /s/ Steven E. Comer
               Steven E. Comer

9

Attorneys for Plaintiff
APPLERA CORPORATION -
APPLIED BIOSYSTEMS GROUP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Footnote continued from previous page.)

26

studied the issue, stated that the low pH of TFA (approximately the pH of stomach acid) was
recognized as undesirable because of the damage it would do to the sample DNA.  (Metzker
Report at 22.)  Accordingly, a phosphorothiolate linkage cannot be the equivalent of a
phosphoramidate linkage.  *See Tanabe*, 109 F.3d at 733-34 (finding substantial difference where
accused solvent produced better results than claimed solvent).

27

28