HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

**REBUTTAL EXPERT REPORT**

**OF MICHAEL L. METZKER, PH.D.**

Applera Corporation – Applied Biosystems Group,

v.

Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz,

Case No. C07 02845 WHA

EXHIBIT 1

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

## I.    QUALIFICATIONS

My background and experience are summarized on pages 2 and 3 of the Expert Report of

Michael L. Metzker, Ph.D. ("Metzker Report") and in my curriculum vitae (Attachment A to the

Metzker Report).  I have reviewed Dr. Backman's report and the attachments filed with it.  I

have also reviewed other documents for the preparation of this report, a list of which is provided

as Attachment A.

## II.    OVERVIEW OF THE SOLID SYSTEM

If called as a witness, I expect to testify as to how the SOLiD system operates.  My

understanding of the operation of the SOLiD system comes from reviewing the documents listed

below, my discussions with people at AB, and my work and experience in the DNA sequencing

field.  My understanding of the software used in the SOLiD system also comes from my

discussions with Dr. Eugene Myers.  I am also familiar with the operation, function and use of

the SOLiD system from my work at the Baylor College of Medicine, where we have eighteen

systems from AB, 454 Life Sciences, and Illumina/Solexa.  These systems include "next-

generation" sequencing systems including AB's SOLiD System, 454's GS FLX and XLR, and

Solexa's Genome Analyzer.

My discussion of how the SOLiD system operates will focus on running a fragment

library.  The system is also capable of running a mate-pair library, but the analysis for both

libraries is generally the same.  The process starts by extracting genomic DNA and breaking it

into fragments of 60-90 bases in length.  The fragments are attached to adapters on each end (a

mate pair library adds an internal adapter).  The fragments are cloned using emulsion PCR to

make many copies (approximately 20,000) of a given fragment attached to a bead.  The result is

a bead attached to a P1 adapter that is made of a predetermined sequence.  Millions of beads are

placed on a slide.

During operation, the instrument adds a solution containing a primer that hybridizes to

the P1 adapter.  The primer hybridizes up to the last base at the 5' end of the P1 adapter, abutting

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

the target fragment.  The instrument then adds a mixture of labeled probes.  Each probe is eight bases long and is designed so that only the bases at two positions interrogate the target polynucleotide.  The other six bases are either randomly-generated bases or universal bases, called inosines, that are capable of hybridizing to any nucleotide in the target sequence.[1]

Some of the probes will hybridize to the target sequence.  If a probe hybridizes adjacent to the primer, the T4 ligase enzyme will create a covalent bond between the probe and the primer.  The unligated probes are washed away.  A camera images the slide through a microscope object to record the color of the label on the ligated probe.  This gives a color related to the target nucleotides at the two positions being interrogated.

It takes sixteen label colors to identify the two nucleotides in the target sequence -- four possible bases for the first position being interrogated multiplied by four possible bases for the second position being interrogated.  But the SOLiD system uses only four different labels (Texas Red, Cy3, Cy5, FAM), so each color corresponds to four possible two-nucleotide combinations.  Thus, when the camera records a green color label, it does not reveal whether the two target nucleotides being interrogated are TG, GT, CA, or AC.  The color reading narrows the possible two-nucleotide combinations from sixteen possibilities to four, but does not determine which of those four combinations is correct.  Thus, the color imaging step does not reveal whether the nucleotide at the first position is an A, T, C, or G.  The same is true of the second position.[2]

This is different from the probes described in the Macevicz patents, which are used to identify a target nucleotide in each ligation cycle.  In the Macevicz patent, each probe is identifiable by a label corresponding one-to-one to the identity of one interrogating position.  Thus, the color identifies a specific base in the target.

---

[1] Because the probes used in the SOLiD system have five variable bases (three random or "degenerate" bases and two interrogation bases) the total number of different probes in the pool is 1,024 (4 possible bases at 5 positions, or 4 to the 5th power), which are divided into 256 probes per label color.

[2] In the case of sequencing ribonucleic acid (RNA) the bases detected would include uracil (U) in place of thymidine (T).

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Different versions of SOLiD have used different probe sets.  I understand that the first version of the SOLiD System used 4, 5 and 1,2 probes, which interrogated the fourth and fifth and the first and second positions, respectively.  It is my understanding that the single 4,5 probe set system referred to by Dr. Backman was never sold.  The latest version of SOLiD, Version 2.0, uses 1, 2 probes run in seven cycles per round for the five rounds.  Each set of ligation cycles using the same primer is referred to as a "round" of ligation cycles.  In round 1, the universal sequencing primer hybridized to the P1 adapter abutting the target polynucleotide.  In each successive round, the primer is reset to one position away from the target polynucleotide (using the n-1, n-2, n-3, and n-4 primers).  When the primer and probes are stripped off and replaced with a new primer, it is referred to as another round.  Rounds three through five also add unlabeled bridge probes to be used in the first cycle.

Once a probe has been ligated to the primer and its color recorded, the label and the universal bases are removed using silver nitrate to cleave the phosphorothiolate linkage, leaving a 5' phosphate group ready for another ligation.  The cycle is run four to six more times, depending on the version.  The primer and probes are then removed.  A new primer is added, which hybridizes one nucleotide back from where the previous primer was bound.  This allows the probes to interrogate one position back from the previous round of cycles.  This process of primer resets and cycles is repeated as described above.  The resulting string of color recordings, however, still does not identify the target nucleotides.  Once all of the cycles and primer resets are completed, computers convert the color readings from the order in which they were read (the cycle order) into the order in which they appear in the target fragment.  The computers then work to determine where the color reads align to a reference sequence.  The reference sequence is a genome that has already been sequenced and converted to the colors used in the SOLiD system (called "color space").  The reference is used to find where against the long color-space reference the relatively short color-space target fragments most likely fit or "align."  After additional processing to further confirm the alignment, the color reads for the fragments may finally be converted to base calls.  It is my understanding that the computer code does not typically do this

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

for all color reads.  Accurately determining the base sequence is possible only at this point because accuracy depends on knowing where the fragment aligns to the reference.  Once the alignment is known, one can determine the bases in the reference genome to which each color corresponds.

The two-base encoding system used in the SOLiD system offers a number of advantages. Each base in the target is interrogated twice, yielding greater confidence in the reads.  Two-base encoding also provides only certain allowed color transitions and combinations, which helps distinguish accurate reads from invalid reads, thereby improving the accuracy of the results. Additionally, with two-base encoding, true SNPs (single nucleotide polymorphisms, in which a single base in the target differs from the reference genome) are indicated by two adjacent color changes.  Thus, a single-color change can normally be discarded as an invalid read, rather than being incorrectly called as a SNP, further increasing the confidence in SNP calling. Additionally, decoding the color reads by aligning to a reference sequence in color space results in significantly greater accuracy than is generated by the raw color reads.  The combination of these benefits results in read accuracy well beyond the raw read accuracy.  My understanding is that the SOLiD system accuracy rate after processing is better than 99%

## III.    THE PERSON OF ORDINARY SKILL IN THE ART

If called to testify at trial, I expect to testify regarding skills, education, and experience that a person of ordinary skill in the relevant art would have had on April 17, 1995, when the application that ultimately issued as the '341, '597, and '119 Patents was filed.  In my opinion, a person having ordinary skill in the art as of April 1995 would have been a person with graduate level training or post-secondary teaching experience in molecular biology or biochemistry, or the like, and three to five years of experience with nucleic acid chemistry and DNA sequencing technologies.

## IV.    THE ASSERTED CLAIMS

Illumina alleges that AB's SOLiD system infringes claims 1, 2, 6, 7, 11, 12, 16, and 17 of the '341 patent and claim 1 of the '597 patent both literally and under the doctrine of equivalents.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Illumina also alleges that the SOLiD system infringes claims 8 and 18 of the '341 patent and claim 1 of the '119 patent only under the doctrine of equivalents.  The asserted claims are as follows:

### '341 Patent

**Claim 1:**
A method for determining a sequence of nucleotides in a target polynucleotide, the method comprising the steps of:

(a) providing a probe-target duplex comprising an initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus;

(b) ligating an extension oligonucleotide probe to said extendable probe terminus, to form an extended duplex containing an extended oligonucleotide probe;

(c) identifying, in the extended duplex, at least one nucleotide in the target polynucleotide that is either (1) complementary to the just-ligated extension probe or (2) a nucleotide residue in the target polynucleotide which is immediately downstream of the extended oligonucleotide probe;

(d) generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated; and

(e) repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined.

**Claim 2:**
The method of claim 1 wherein each extension probe has a chain-terminating moiety at a terminus distal to said initializing oligonucleotide probe.

**Claim 6:**
The method of claim 2 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

**Claim 7:**
The method of claim 2 wherein said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe.

**Claim 8:**
The method of claim 7 wherein said chemically scissile internucleosidic linkage is a phosphoramidate.

**Claim 11:**
The method of claim 1, wherein step (a) includes providing, in separate aliquots, a plurality of distinct target-primer duplexes, each distinct duplex comprising an initializing oligonucleotide primer hybridized to a target polynucleotide, wherein the target polynucleotide in each duplex is the same, but the initializing oligonucleotide in each duplex is bound to a different sequence of the target polynucleotide; and steps (b) to (e) are carried out independently on each aliquot.

**Claim 12:**
The method of claim 11 wherein for each aliquot, said extension oligonucleotide probe has a chain-terminating moiety at a terminus distal to said primer.

**Claim 16.**
The method of claim 11 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

**Claim 17:**
The method of claim 11 wherein for each aliquot, said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe.

**Claim 18:**
The method of claim 17 wherein said chemically scissile internucleosidic linkage is a phosphoramidate.

**'597 Patent**

**Claim 1:**
A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

(a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

(b) identifying one or more nucleotides of the polynucleotide; and

(c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

**'119 Patent**

**Claim 1:**
An oligonucleotide probe of the formula:
HO—(3')(B)j(5')—OP(==O)(O—)NH—(B)k-Bt*
wherein:
B is a nucleotide or an analog thereof;
j is in the range of from 1 to 12;
k is in the range of from 1 to 12, such that the sum of j and k is less than or equal to 12;
Bt* is a labeled, non-extendable chain-terminating moiety.

It is my understanding that a claim is literally infringed only if every element of the claim is found in the accused product or method. I further understand that a claim is infringed under the doctrine of equivalents if the accused product or method contains a feature that differs from the claim's language, but the difference is insubstantial. I also understand that one test used to determine whether a difference is insubstantial is whether that different feature has the same function and works in the same way to achieve the same result. If the differences between the

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

claimed subject matter and the accused product or method are substantial, I understand that there is no infringement under the doctrine of equivalents.

It is also my understanding that dependent claims incorporate all the limitations of the claims from which they depend. Accordingly, if an independent claim is not infringed because an element of the claim is missing from the accused product or method, a claim depending directly or indirectly from that independent claim cannot be infringed.

With this understanding in mind, it is my opinion that none of the asserted claims are infringed by the SOLiD system.

### A.      The SOLiD System does not infringe the asserted claims of the '341 patent.

#### 1.      Claim 1 of the '341 patent.

The SOLiD System as designed and sold does not infringe the asserted claims of the '341 patent, which comprise claim 1 and claims that depend from it, for at least three reasons. First, claim 1 requires that the initializing primer be hybridized to the target polynucleotide, rather than to the binding region (or adapter) as occurs in the SOLiD System. Second, claim 1 requires that one or more nucleotides in the target nucleotide be identified within each cycle, which the SOLiD System does not do. Third, claim 1 requires that the cycles be repeated until a sequence is determined. For the same reasons, none of the asserted claims that depend from claim 1 are infringed.

##### a.      In the SOLiD System, the primer is not hybridized to the target polynucleotide.

I understand that the Court has construed the claim phrase "an initializing oligonucleotide probe hybridized to a target polynucleotide." The Court stated that "[t]he claim language expressly provides that the initializing probe hybridizes to a target polynucleotide, which is clearly not always a fully-known sequence." Claim construction order at page 9. The Court also stated that "[t]he binding region, target polynucleotide, and template are each distinct items." *Id*. In my opinion, the Court's construction requires that the initializing probe hybridize to the target

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

polynucleotide, which is separate and distinct from the binding region of the template. It is also my opinion that one of ordinary skill in the art would understand the claim language as the Court did. The specification makes it clear that the "template" includes both the "target polynucleotide" and the "binding region." It also makes clear that the "binding region" is distinct from the "target polynucleotide" and the "target polynucleotide" does not include the "binding region."

Dr. Backman's discussion of the initializing oligonucleotide probe does not follow the Court's claim construction. He instead advances his own claim construction that redefines a target polynucleotide as "a single-stranded DNA template" (Backman report at ¶49) with a generic structure that "contains" sequence information to be obtained. In his opinion, the "target polynucleotide" is not a distinct entity, but any entity that "contains" the target polynucleotide, contrary to the Court's construction as I understand it.

Dr. Backman opines that the use of a pre-designed binding region of known sequence to which an initializing probe hybridizes is useful. While he proposes that other methods could be used to establish an initializing point for the ligations, he does not describe how these alternative methods would work. I find no description of any such alternative method in the specification or claim 1 of the patent. Nor am I aware of any practical way of performing such a method.

Dr. Backman further opines that using an initializing oligonucleotide probe that hybridizes to the target polynucleotide is the equivalent of using an initializing oligonucleotide probe that hybridizes to the "binding region" of known sequence. But Dr. Backman does not explain how one of ordinary skill in the art would design initializing oligonucleotide probes that would hybridize to an unknown sequence in a useful manner. Nor does he discuss the advantages of using a single initializing oligonucleotide that hybridizes to a known binding region attached to each target polynucleotide.

Dr. Backman's "function, way, result" analysis admits that there are advantages to use of initializing oligonucleotide probes that hybridize to a binding region of known sequence. Backman report at ¶138. That is how the SOLiD system (and the "one-base" encoding prototype

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Dr. Backman refers to) works – it uses an initializing oligonucleotide probe (also known as "primer") that hybridizes to the P1 adapter, which is a known region. This system has several important advantages. Because the P1 adapter is the same for each fragment on each bead, the same primer can be used to hybridize to the P1 adapter on each fragment. Thus, copies of only a single primer are added to begin the process of ligations from a known starting point. This is an efficient, straightforward way to prime the ligation cycles.

Using primers that hybridize to the target polynucleotide would be far more complex, and in my opinion, unworkable for large-scale sequencing. One of the principal functions of the primer is to create a known starting point for the subsequent probe ligations. The SOLiD system uses millions of beads, each with a different target polynucleotide. If one were to use a primer that hybridizes to the target polynucleotide, one would not know which primers, or how many, hybridized to the target or where on the target each primer hybridized because the hybridizing location is unknown. For example, although it might be possible to use multiple primers, such a system would require a way of tracking where each primer hybridized. Similarly, although it might be possible to design primers that were short enough in length or that contained enough degenerate bases to allow for hybridization to unknown locations on the unknown target sequences, the subsequent ligations would produce little usable information, since one would not know the starting point. Either such system would add an extraordinary amount of unnecessary complexity.

Dr. Backman proposes that one could partially overcome these problems by first sequencing the target polynucleotide (presumably using a different method) in order to determine where the initializing oligonucleotide probe will hybridize. But sequencing each target fragment before sequencing the fragment again is a duplicative and unnecessary step. In my opinion, such a system would not be viable. Nor would such a system be the equivalent of one that uses a single primer that hybridizes to the known binding region per round of ligation cycles.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

        **b.**    **The SOLiD System does not determine the identity of a base within each cycle.**

Claim 1 of the '341 patent requires determining the identity of at least one nucleotide in the target polynucleotide within each cycle. The Court construed the term "identifying" to mean "within each cycle determining the identity of a base in the target polynucleotide." Claim Construction Order, page 16. The Court stated that the claim language, the specification, and the prosecution history of the '341 patent require determining the chemical identity of a nucleotide base in the target polynucleotide during each ligation cycle of the claimed method. *Id.* at 13-14. In my opinion, one of ordinary skill in the art would understand the claim language as the Court did.

The SOLiD system does not determine the identity of a base in the target polynucleotide within each cycle. The color signals from ligated probes are gathered and stored for later analysis, but the identity of a base in the target polynucleotide is determined only after all of the ligation cycles and primer reset rounds have been completed and the color reads have been aligned to a color-space reference. As discussed in more detail above, the SOLiD system's two-base encoding method narrows down the two-base combinations from sixteen to four, but it does not determine which of those four sequences is correct. Thus, each position being interrogated can be an A, T, C, or G. The system does not determine the identity of either base until after all of the cycles and rounds are completed and the information is compared to a reference sequence.

        **(i)**    **"within each cycle"**

The Court held that claim 1 of the '341 patent and claim 1 of the '597 patent require "within each cycle determining the identity of a base in the target polynucleotide." In my opinion, one of ordinary skill in the art would interpret the claims, as construed by the Court, to require that a base be identified in each cycle. One of ordinary skill in the art would understand the phrase "within *each* cycle" as including every cycle. Dr. Backman agrees that in the SOLiD system, during most of the cycles, a base is not and cannot be determined. For example, Dr. Backman agrees that no bases can be determined in the first round, second round (other than the first cycle), the third round, and the fourth round. Thus, use of the SOLiD system does not

infringe this claim limitation because it does not determine the identity of a base in the target nucleotide in each cycle.

### (ii)    Interrogation of the 0, 1 position

Dr. Backman agrees that at least in most cycles, the SOLiD system does not identify a base in the target polynucleotide.  He states "[f]or all ligation cycles for the N/4,5 probe/primer set, absent further information, it may not be possible to identify a nucleotide in the target polynucleotide.  Similarly, for the N-1/4,5, N-2/4,5, and N/1,2 primer/probe combinations, the SOLiD System acquires color images of the glowing beads in each ligation cycle from which it may or may not be possible to identify a nucleotide in the target polynucleotide."  Backman at ¶189.

Dr. Backman opines that the SOLiD system first determines the identity of a base in the target polynucleotide when a probe interrogates the 0 and 1 position.  Backman Report at ¶178.  His opinion is that because the base at the 0 position is known (since it is part of the P1 adapter), the information from the color recorded for the interrogation of the 0 and 1 position determines the identity of the target nucleotide at position 1 and can be further used to decode the reads in a later round of cycles.  I disagree with Dr. Backman's opinion.

In my discussion, I will focus, as Dr. Backman does, on SOLiD Version 2.0.  In that system, the 0, 1 position is interrogated only in the first cycle of the second round.  Dr. Backman agrees that in all of the prior cycles, the identity of a base in the target polynucleotide cannot be determined within a cycle.  See, for example, Backman Report at ¶189.  He also agrees that in the second round, after the 0, 1 position is read, the identity of none of the bases in the target polynucleotide can be determined within any of the next six cycles in that round.  Dr. Backman acknowledges that claim 1 requires that the step of identifying a nucleotide within each cycle must be repeated at least one more time (as discussed above, in fact it must be repeated in *each* cycle).  He opines that this can be done in the fifth (final) round.  His argument is that in the first cycle of the fifth round, the probe interrogates the 2 and 3 positions, and that one could therefore trace back to the readings of the 1 and 2 positions from the first round, and from there trace back

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

to the reading of the 0 and 1 position to "serially decode" the sequence by knowing the base at the 0 position. This, however, is not how the SOLiD system works. (See, e.g., ILL050372, ILL053960, and AB00133136.)

As discussed above, the SOLiD system records color images during each cycle. It is only after all the data is gathered, ordered into color reads, and aligned to a reference that base calls may be made. The base calls may be made by comparing color reads gathered for the target polynucleotide to a reference sequence. The information from the 0, 1 position is not used to make base calls by the SOLiD system during that ligation cycle. Again, the base at the 1 position is not determined until the color readings are aligned to a reference, well after the cycles have been completed. (See, e.g., ILL050372, ILL053960, and AB00133136.) The same is true of the subsequent color reads. The SOLiD system does not "serially decode" the color reads during any subsequent ligation cycles. The color reads are not even put into sequence order until after all of the cycles are complete. Until that point, the color readings are kept in cycle order. Even after the reads are put into color sequence order, they are not serially decoded using the 0 position. They are aligned to a reference in order to determine the bases in the target polynucleotide.

Moreover, step (e) of claim 1 of the '341 (but not claim 1 of the '597) requires repeating steps (b) though (d) until a sequence of nucleotides in the target polynucleotide is determined. In the SOLiD system, the bases are not identified within each cycle. The sequence of bases is not determined until well after all of the cycles have been run. Moreover, the system runs a predetermined number of cycles. Thus, the cycles are not repeated until a sequence is determined. The ligation cycles in the SOLiD system are run until the rounds of cycles have concluded, and at that point, no sequence has been determined. Furthermore, claim 1 of the '341 patent requires that the repeating cycles be performed with the same initializing oligonucleotide hybridized to the target polynucleotide. Step (e) requires repeating steps (b) though (d), but not step (a). The repeating cycles do not include stripping the extended primer or the addition of a new primer. Therefore, even if the SOLiD system Version 2.0 were changed so that it

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

determined the identity of the base at the 1 position, it still would not repeat that identification in any other cycles in that round.

The purpose of probing the 0, 1 position is not to make a base call in that cycle, or to serially decode subsequent color readings during subsequent cycles. Its purpose is to interrogate position 1 twice. One of the benefits of the SOLiD system's two-base encoding is that it interrogates every position twice, except for the last position, which is interrogated only once. To interrogate position 1 twice, the 0, 1 and 1, 2 positions are interrogated.

There are a number of reasons not to use the color image from the interrogation of the 0, 1 position to "decode" that color reading or any subsequent color readings. For one, doing so would undermine the benefits of the two-base encoding system. The two-base encoding system interrogates all the bases of the target polynucleotide twice, except for the 0 position and the last base, which are only interrogated once. As discussed above, it is advantageous to interrogate each position twice. It is also advantageous to keep the color readings in color space and to align them to a color space reference in order to determine the bases in the target polynucleotide. As discussed above, these advantages significantly improve the accuracy rate of the system.

If the color image from interrogation of the 0, 1 position were used to decode the color reads, any erroneous read would make every subsequent base call for that experiment wrong as well. Any error in the chain would also result in all subsequent bases being called incorrectly. This is referred to as a "serial error" problem. It would result in far more errors than doing what the system actually does, which is to align the color reads to a reference. The error rate that would likely result from using serial decoding would be much higher than is observed in the actual SOLiD system. The mathematical analysis of the serial error problem is discussed in Dr. Myers' report, and I agree with his discussion of it. The high error rate would far outweigh any theoretical benefit of relying on the interrogation of the 0, 1 position to make base calls. It is much more accurate to make the base calls by aligning the color calls to a color space reference.

Additionally, the two-base encoding method used in the SOLiD system does not make base calls during each cycle of the method because it does not decode any color readings until

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

after all of the cycles are completed. Dr. Backman suggests that one needs to have only two pieces of information before one can make a base call using the SOLiD system. Backman at ¶178. The first is the color-encoding scheme. The second is the identity of at least one base being interrogated. The SOLiD system, however, does not use the identity of a known base to decode the color readings. Instead, it requires another piece of information before making a base call. The color signal must be decoded by the computers that align the readings to a reference, which occurs only after the cycles are completed. The two-base encoding system gathers color images, which at the time each is gathered does not identify a base in the target polynucleotide. As discussed above, the color images are collected for later analysis. This analysis includes putting the color images into sequence order and then aligning them to a reference sequence in color space to ultimately make base calls. It does not require or rely upon knowing the identity of at least one of the interrogated bases. Without that further analysis, which occurs only after all of the cycles are complete, the identity of a base cannot be accurately determined. Dr. Backman acknowledges this, noting that a color signal by itself only represents the relationship between two adjacent nucleotides. It does not determine the identity of a nucleotide in the target polynucleotide. Backman at ¶168, 171, and 193.

### (iii)    Doctrine of Equivalents

Dr. Backman offers a conclusory opinion on the doctrine of equivalents. He does not express an opinion as to whether the differences between the SOLiD system and the method claimed in claim 1 are insubstantial. Moreover, his opinion is predicated on the incorrect assumption that the SOLiD system decodes the color reads within each cycle using the reading from the 0, 1 position. Dr. Backman does not address whether the SOLiD system as it actually operates performs the same function as the claimed invention, in the same way, to achieve the same result.

I agree with Dr. Backman that the function of the "identifying" step of claim 1 is to "determine the identity of one or more bases in the target polynucleotide within each cycle." Backman Report at ¶¶ 169, 193. I disagree, however, that the SOLiD system performs this

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

function. As discussed above, the SOLiD system does not identify bases within each cycle. If identifying a base long after all cycles are completed were deemed to be the equivalent of identifying bases within each cycle, it would render meaningless the Court's construction of the claim as requiring the determination of the identity of one or more bases in the target polynucleotide *within each cycle*.

The identifying functionality of the SOLiD system is fundamentally different than claim 1 of the '341 patent, because it identifies bases only after the completion of all cycles and extensive computation, not within each cycle. The SOLiD system's method of identifying bases much later, by aligning them to a reference, provides significant advantages in error correction, increased accuracy, and confidence in SNP detection. Its advantages are substantial. As discussed above and in Dr. Myers' report, the SOLiD system's two-base encoding and alignment to a reference genome provides substantially improved error detection and overall accuracy. Those advantages are provided by a number of attributes, including the probing of each base twice, the requirement of particular color changes to result in a SNP, the allowed and disallowed transitions, the consensus calling, and so on. Because next generation sequencing methodologies are sensitive to errors, this enhanced error correction is a crucial advantage.

The way in which the SOLiD system determines the identity is also substantially different from the claimed way. Dr. Backman opines that the "way" the SOLiD system determines the identity of one or more bases within each cycle is by "analyzing data obtained within a cycle in light of previously gathered data and other known parameters, such as the color encoding scheme used and the identity of bases in the adapter sequence." *Id.* I disagree that the method of claim 1 identifies a nucleotide in each cycle by "analyzing data obtained within a cycle in light of previously gathered data and other known parameters, such as the color encoding scheme used and the identity of bases in the adapter sequence."

The claimed method identifies a base within each cycle by using labeled probes that use a single-base encoding system that identifies a base in each cycle by observing the color of the label on the ligated probe. The SOLiD system does not perform the function of identifying a

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

base in the target in that way.  Dr. Backman's opinion is based on the assumption that the SOLiD system decodes the color reads from interrogating the 0, 1 position.  As discussed above, that assumption is false.  The SOLiD system does not determine the identity of any bases in the target polynucleotide until after all of the cycles and rounds are completed and the color reads are assembled and aligned against a reference genome.  It does so using two-base encoded probes, collecting color reads, and only after all cycles are completed, assembling those color reads and, through extensive computation, aligning them to a color space reference.  None of these aspects are the same as the method described in claim 1.  As discussed above, the two-base encoding system offers substantial advantages including improved accuracy and confidence.

The result achieved by the SOLiD system is different, too.  Dr. Backman calls the result "the determination of the identity of a base without requiring access to data generated subsequent to the cycle."  While that may be the result of the claimed invention, it is not the result of the SOLiD system.  Again, Dr. Backman's opinion is based on his incorrect assumption that SOLiD decodes the color reading by using the reading from the 0, 1 position.  In the SOLiD system, access to data generated subsequent to the cycle, such as the alignment to the reference, is needed to determine the identity of the bases in the target polynucleotide.  The result is a higher level of reliability and accuracy.  The SOLiD system's method of identifying bases in the target polynucleotide is substantially different from the claimed method.  In my opinion, there is therefore no infringement under the doctrine of equivalents.

In my opinion, neither the past nor present versions of the SOLiD system infringe independent claim 1 of the '341 patent, either literally or under the doctrine of equivalents.  Because a dependent claim cannot be infringed unless the claim from which it depends is infringed, it is also my opinion that none of the asserted dependent claims are infringed.

### 2.     Claim 8.

The SOLiD system does not infringe claim 8 for the additional reason that it does not use the claimed phosphoramidate bond as the chemically scissile internucleosidic linkage.  The

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

SOLiD system uses a different bond, called a phosphorothiolate.  Formulas illustrating the phosphoramidate and phosphorothiolate linkages are provided below:



Phosphoramidate                    Phosphorothiolate

Dr. Backman agrees that this claim is not literally infringed.  Backman report at ¶220. He opines only that the phosphorothiolate linkage is equivalent to a phosphoramidate linkage. For the reasons discussed below regarding the '119 patent, it is my opinion that a phosphorothiolate linkage used in the SOLiD system is not equivalent to the claimed phosphoramidate linkage.

### 3.    Claim 11.

Dependent claim 11 has at least four significant additional limitations.  First, it requires placing the target polynucleotides into separate aliquots.  Second, it requires that each aliquot contain target polynucleotides having the same sequence.  Third, it requires the use of different primers in each aliquot that hybridize to different parts of the target polynucleotide during the same rounds of sequencing.  Fourth, it requires that the steps (b) to (e) be carried out independently on each aliquot.  The SOLiD system uses none of these features.

As discussed above, the SOLiD system generates target polynucleotides having different sequences.  The target polynucleotides are attached to the same adapters so that each can use the

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

same initializing primer in each round of ligation cycles.  After a full round of ligations is completed, the primer is stripped from the templates and a new initializing oligonucleotide is added.

Multiplexing is a central theme of the SOLiD system.  As discussed above, the system takes a sequence of interest, fragments it, attaches the fragments to adaptors with known sequences, and adds probes to interrogate those fragments.  The adaptors share the same sequences, which enables the system to use the same initializing primer for every template.  Using the same adaptors coupled to different target polynucleotides allows one to gather sequence information from a variety of different portions of a sequence of interest simultaneously, which maximizes efficiency since the same reagents are used on all of the beads at the same time.

The SOLiD system does not use separate aliquots.  The term aliquot is used in the patent specification and refers to a physical separation of portions.  See for example '341 patent at col. 3, lines 15-34; col. 4, lines 49-52; col. 5, lines 20-25; col. 15, lines 39-40 and 50-54; col. 16, lines 1-2; and claims 11-18.  In the SOLiD system, beads containing different target polynucleotides are distributed on a common slide where they are exposed as a group to the same reagents used in the method.  There is no reason to physically separate the beads with the SOLiD system.  Doing so would undermine the system's inherent efficiency and increase the time necessary to perform the chemistry steps.  Physical barriers do not exist between the template beads used in the SOLiD system, and therefore it does not meet this limitation of the claim

My reading of claim 11 is that *each* aliquot, not just some aliquots, must contain exactly the same copy of the target polynucleotide.  The addition of even a single base to a fragment would shift the reading frame of that fragment.  Even if the beads used in the SOLiD system were each considered separate aliquots (which, as discussed above, they are not), the SOLiD system does not use the same target polynucleotide on each bead.  First, the fragments are produced using a shearing protocol that randomly fragments the starting material.  These randomly sheared fragments represent short sequences from different regions of the genome

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

being sequenced, such as the human genome. Second, having completely redundant target nucleotides on different beads would detract from the system's purpose of analyzing large genomes by breaking them into small fragments for simultaneous analysis.

In my opinion it is extremely unlikely that any two beads generated using the random shearing technique called for by the SOLiD system would have the same sequence. It is my understanding that for claim 11 to be infringed, something more than the mere chance of two beads having same sequence is required to satisfy the limitation of this claim. Every target polynucleotide in every physically separate aliquot would have to be exactly the same for this claim to be infringed. Accordingly, in view of the fact that the SOLiD system randomly fragments the starting genomic DNA to generate the different templates for sequencing, it is my opinion that this limitation of claim 11 is not met.

Claim 11 requires the use of different primers that hybridize to different portions of the same target polynucleotide within each cycle of the method within each aliquot. The SOLiD system utilizes a primer that hybridizes to the same sequence within the binding region, thus forming the same primer-template duplexes. Additionally, The SOLiD system uses the same primer to initialize the cycles of ligation. It can utilize the same primer because, unlike claim 1 of the '341 patent, the primers hybridize to the binding region of the template being sequenced and not the target polynucleotide. It is my opinion that a system using different initializing oligonucleotides hybridizing to different portions of the same target polynucleotide would not produce coherent information.

The requirement of claim 11 that steps (b) to (e) be carried out independently on each aliquot is also not part of the SOLiD system. As discussed above, the SOLiD system sequences the fragments simultaneously to maximize efficiency. Because there is no barrier between the beads (which Dr. Backman incorrectly calls aliquots), the steps are not carried out independently on each bead.

Dr. Backman says in paragraph 223 that claim 11 is infringed "by equivalence," but he does not provide any supporting analysis. In my opinion, the SOLiD system is substantially

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

different from claim 11.  The function of the invention of claim 11 is to simultaneously use different primers in order to interrogate all of the nucleotides in the same target polynucleotide. The function of the beads in the SOLiD system is, among other things, to allow simultaneous use of the same primer on all of the different template fragments.  The way the claimed invention achieves its function is by placing copies of the same target into separate batches and adding different primers to each batch.  The way SOLiD achieves its function the opposite way – it places all of the different targets into the same batch and adds the same primer simultaneously, then later strips off the extended primer and probes and adds a different primer.

The SOLiD system offers substantial advantages.  It avoids the step of having to separate out copies of the millions of different target fragments into separate fractions.  Instead, it also allows for cycles of ligation on many different fragments using the same reagent solution simultaneously in a single flowcell.  The result is a system that is capable of simultaneously and efficiently analyzing millions of fragments at the same time.

### 4.    Claim 18.

For the same reasons discussed above regarding claim 8, the SOLiD system does not infringe claim 18.

### B.    The SOLiD System does not infringe claim 1 of the '597 patent.

It is my opinion that the asserted claim of the '597 patent is not infringed literally or under the doctrine of equivalents for same reasons as discussed above regarding the "identifying" step of claim 1 of the '341 patent, except where I have identified certain issues above as being unique to claim 1 of the '341 patent.  I incorporate that discussion herein.

Additionally, regarding Dr. Backman's equivalence argument as to claim 1 of the '597 patent, his position that the timing of the analysis performed on the color space data does not matter is incorrect.  It is Dr. Backman's opinion that merely storing color space data is equivalent to making a base call under the doctrine of equivalents.  Backman report at ¶243.  This view is contrary to claim 1's requirement that the identification step occur during each iterative cycle of the method.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

I also note that the Backman report characterizes claim 1 of the '597 patent. Dr. Backman states:

> "[C]laim 1 in the '597 Patent only requires that steps a and b therein (encompassing ligation and identification) be repeated in each cycle. As a consequence, claim 1 in the '597 Patent does not require, for example, that an extendable terminus be "regenerated" on the extended duplex during each cycle. In other words, claim 1 in the '597 Patent does not require that more than one "extension oligonucleotide probe" be incorporated into a given "extended duplex" through multiple cycles." Backman report, ¶238.

This statement supports the positions I took in my report regarding the references I cited against claim 1 of the '597 patent.

### C.    The SOLiD System does not infringe claim 1 of the '119 patent.

Claim 1 of the '119 patent is not infringed by AB. The SOLiD system does not literally meet the limitations of the claim because it does not use probes containing a phosphoramidate bond. Instead, the SOLiD system uses a phosphorothiolate bond in the backbone of the extension probes. Phosphoramidate and phosphorothiolate bonds are illustrated above. As depicted, a phosphoramidate bond contains an amine group (comprising a nitrogen atom (N) attached to a hydrogen (H) atom) while a phosphorothiolate bond contains a sulfur atom (S). The amine group and the sulfur atom both substitute for the oxygen atom (O) that is found in a standard phosphodiester backbone. Because the chemical formula of the probes used in the SOLiD system differs from that recited in claim 1 of the '119 patent, this claim is not literally infringed. Dr. Backman agrees that the SOLiD system does not literally infringe claim 1. Backman at ¶112.

The probes used in the SOLiD system similarly do not infringe claim 1 of the '119 Patent under the doctrine of equivalents. Phosphoramidate and phosphorothiolate bonds can both be used as chemically scissile linkages, but the similarities end there. In one, the bridging group is an amine comprising nitrogen and hydrogen atoms, in the other, it is a sulfur atom. These

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

different bridging groups cause the linkages to have substantially different chemical reactivities and, therefore, they are not equivalent.

Nitrogen and sulfur have different chemical and physical properties. For example, at standard state conditions, nitrogen exists as a gas with a molecular form of $N_2$, while elemental sulfur exists as a solid. The differences in chemical reactivity between nitrogen and sulfur are substantial and are reflected by their unique positions in the periodic table. Nitrogen is a Group 15 element (Group Va, chemical term: Pnictogens) and belongs to period 2 of the table. Sulfur is a Group 16 element (Group VIa, chemical term: Chalcogen) and belongs to period 3 of the table. One example that highlights these differences is how these elements bond with hydrogen. Nitrogen forms three bonds with hydrogen, which produces ammonia ($NH_3$; the ingredient found in most household cleaners), while sulfur can only form two bonds with hydrogen producing hydrogen sulfide ($H_2S$; used as the pungent odor in natural gas). Hence, the bridging groups also differ in how many hydrogen atoms they contain. The claimed bridging group contains one hydrogen atom, while the SOLiD system bridging group contains none.

Just how different these two types of linkages are is illustrated by the methods used to cleave them. Acidic conditions are used to cleave phosphoramidate bonds. The Macevicz patents teach the use of a 0.8% trifluoroacetic acid (TFA) in the organic solvent dichloromethane for 40 minutes at room temperature. (See '341, Col. 18, lines 14 – 15). A 0.8% TFA solution has a pH = 1, approximately that of gastric fluids.

Those of ordinary skill in the art were aware at the relevant time that subjecting DNA to low pH conditions can have dire consequences. Low pH or acidic conditions were known to cause depurination of nucleic acid templates and subsequent strand breaks. One of ordinary skill in the art would anticipate that repeated exposures of the same target polynucleotide to these acidic conditions would lead to substantially DNA damage. Acidic conditions that damage DNA are not favored by skilled artisans looking to obtain the best sequence data containing the fewest errors.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Contrast the acidic conditions used for cleaving phosphoramidate linkages with the conditions used to cleave the chemically scissile linkages found in the SOLiD system.  Cleavage of phosphorothiolates, containing a bridging sulfur atom, occurs under neutral conditions (pH = 7) with an aqueous solution of 20 mM silver nitrate for one hour at room temperature.  (See Vyle and Cosstick, 1992, Biochemistry, vol. 31, page 3014, lines 14 – 17.)  These neutral conditions are preferable over low pH conditions, because they do not induce damage to the DNA template.  These differences in chemical reactivities of the phosphoramidate and phosphorothiolate linkage are substantial.

Furthermore, Macevicz was aware of additional chemically scissile bonds at the time he drafted the '119 patent.  Phosphorothiolate bonds were commonly known in the art.  Macevicz certainly could have claimed probes with this chemistry, if he had wished, but apparently he decided against it.

## V.     COMPENSATION

I am being compensated at $600 per hour for my time spent on this case.  My compensation is not based upon the outcome of this litigation.

## VI.    PRIOR TESTIMONY

I have testified as an expert witness in the following cases:

Expert witness for HIV criminal case, Lafayette, LA: State of Louisiana v. Richard J. Schmidt, Criminal Docket No. 73313.

Expert witness for Fluorescent Dye Infringement case for ABI:  Perkin Elmer v. Amersham, Civil Action No.  C-00-1937 CRB.

Expert witness for HIV criminal case, Thurston Co., WA: State of Washington v. Anthony Eugene Whitfield, Case No. 04-1-06-17-5.

Signed at Houston, Texas on June 13, 2008.

Michael L. Metzker

24

EXHIBIT 1

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

**Attachment A**

Documents referenced in Metzker Report
SOLiD System User Guide
SOLiD Experiment Tracking System (SETS) Software Guide
SOLiD Experiment Tracking System (SETS) Software Modular Analysis Pipeline (MOAP) and
File Format Guide
SOLiD Analysis Tools (SAT) User Guide
SOLiD Data – 2 Base Encoding (Power Point)
SOLiD System (Power Point)
Discovery/Corona Chemistry Flow Diagram Sequencing (Chase Lig)
Vyle and Cosstick, 1992, Biochemistry, vol. 31, page 3014.
ILL050324
ILL050362-ILL050385
ILL051151-ILL051162
ILL051205-ILL051241
ILL051457-ILL051505
ILL053960
AB00000683-AB00001082
AB00007541
AB00007876-AB00007877
AB00008081-AB00008170
AB00008191-AB00008485
AB00029686-AB00029706
AB00045214-AB00045231
AB00045942-AB00045944
AB00046940-AB00046969
AB00047983
AB00067015-AB00067016
AB00068336-AB00068422
AB00070106-AB00070130
AB00070193-AB00070253
AB00070412-AB00070435
AB00071093-AB00071126
AB00073052-AB00073075
AB00073100-AB00073149
AB00075291-AB00075432
AB00086542-AB00086616
AB00121757-AB00121795
AB00121847-AB00121894
AB00131100-AB00131136
AB00131875-AB00131972
AB00132599-AB00132688
AB00133103-AB00133156
AB00134505-AB00134517
AB00136587-AB00136591
AB00137210-AB00137217

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

AB00137634- AB00137635
AB00137645
AB00137530-AB00137531
AB00137621-AB00137680
AB00138350
AB00138530
AB00138825-AB00138849
AB00138981-AB00139015
AB00139492-AB00139507
AB00140259-AB00140261
AB00144354-AB00144433
AB00144601-AB00144603
AB00145315-AB00145336
AB00145773-AB00145789
AB00146523-AB00146533
AB00147319-AB00147328
AB00160896-AB00160903
AB00187481
AB00216275-AB00216298
AB00243819-AB00243843
AB00245396-AB00245403
AB00276605-AB00276684
AB00288253-AB00288273
AB00296960-AB00296979

EXHIBIT 1

1   BRYAN WILSON (CA BAR NO. 138842)
    ERIC C. PAI (CA BAR NO. 247604)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California 94304-1018
    Telephone: 650.813.5600
4   Facsimile: 650.494.0792
    E-Mail: BWilson@mofo.com; EPai@mofo.com
5
    DAVID C. DOYLE (CA SBN 70690)
6   STEVEN E. COMER (CA SBN 154384)
    BRIAN M. KRAMER (CA SBN 212107)
7   MORRISON & FOERSTER LLP
    12531 High Bluff Drive, Suite 100
8   San Diego, California  92130-2040
    Telephone: 858.720.5100
9   Facsimile: 858.720.5125
    E-Mail: DDoyle@mofo.com; SComer@mofo.com;
10  BMKramer@mofo.com

11  Attorneys for Plaintiff
    APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

17  APPLERA CORPORATION – APPLIED         Case No.    C07 02845 WHA
    BIOSYSTEMS GROUP, a Delaware corporation,
18                                        **CERTIFICATE OF SERVICE**
                Plaintiff,
19
          v.
20
    ILLUMINA, INC., a Delaware corporation,
21  SOLEXA, INC., a Delaware corporation, and
    STEPHEN C. MACEVICZ, an individual,
22
                Defendants.
23

24

25

26

27

28

    CERTIFICATE OF SERVICE
    Case No. C07 02845-WHA                                        1
    sd-429628

                        EXHIBIT 1

1        I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 12531 High Bluff Drive, Suite 100, San Diego, California  92130.  I am not a party to the within cause, and I am over the age of eighteen years.

2

3        I further declare that on the date hereof, I served a copy of:

4        **REBUTTAL EXPERT REPORT OF**

5        **MICHAEL L. METZKER, PH.D.**

6

7    ☐    **BY FACSIMILE, [Fed. Rule Civ. Proc. rule 5(b)]** by sending a true copy from Morrison & Foerster LLP's facsimile transmission telephone number 650.494.0792 to the fax number(s) set forth below, or as stated on the attached service list.  The transmission was reported as complete and without error.  The transmission report was properly issued by the transmitting facsimile machine.

8

9

10      I am readily familiar with Morrison & Foerster LLP's practice for sending facsimile transmissions, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be transmitted by facsimile on the same date that it (they) is (are) placed at Morrison & Foerster LLP for transmission.

11

12

13

14    ☐    **BY U.S. MAIL [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at Morrison & Foerster LLP, 755 Page Mill Road, Palo Alto, California  94304-1018 in accordance with Morrison & Foerster LLP's ordinary business practices.

15

16

17      I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited with the United States Postal Service on the same date that it (they) is (are) placed at Morrison & Foerster LLP with postage thereon fully prepaid for collection and mailing.

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

sd-429628

EXHIBIT 1

**X**    **BY OVERNIGHT DELIVERY [Fed. Rule Civ. Proc. rule 5(b)]** By agreement of the parties, Overnight Delivery service will be accomplished by Monday, June 16, 2008, for delivery on Tuesday, June 17, 2008, by placing a true copy thereof enclosed in a sealed envelope with delivery fees provided for, addressed as follows, for collection by UPS, at 12531 High Bluff Drive, Suite 100, San Diego, California 92130 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS or delivered to an authorized courier or driver authorized by UPS to receive documents on the same date that it (they) is are placed at Morrison & Foerster LLP for collection.

☐    **BY PERSONAL SERVICE [Fed. Rule Civ. Proc. rule  5(b)]** by placing a true copy thereof enclosed in a sealed envelope addressed as follows for collection and delivery at the mailroom of Morrison & Foerster LLP, causing personal delivery of the document(s) listed above to the person(s) at the address(es) set forth below.

I am readily familiar with Morrison & Foerster LLP's practice for the collection and processing of documents for hand delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be taken from Morrison & Foerster LLP's mailroom and hand delivered to the document's addressee (or left with an employee or person in charge of the addressee's office) on the same date that it is placed at Morrison & Foerster LLP's mailroom.

**X**    **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)(2)(a)]** by electronically mailing a true and correct copy  through Morrison & Foerster LLP's electronic mail system to the e-mail address(s) set  forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

CERTIFICATE OF SERVICE

sd-429628

EXHIBIT 1

**COUNSEL FOR ILLUMINA INC., SOLEXA**          _____ Fax
**INC. and STEVEN C. MACEVICZ:**                _____ U.S. Mail
GREGORY E. STANTON                              X_____ Overnight
KEVIN M. FLOWERS                                _____ Personal
THOMAS I. ROSS                                  X_____ Electronic
JEFFREY H. DEAN
JOHN R. LABBE
CULLEN N. PENDELTON
MARK IZRAELEWICZ
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL  60606-6357
Fax: (312) 474-0448
Email: gstanton@marshallip.com
       kflowers@marshallip.com
       tross@marshallip.com
       jdean@marshallip.com
       jlabbe@marshallip.com
       cpendleton@marshallip.com
       mizraelewicz@marshallip.com

**COUNSEL FOR ILLUMINA INC. AND**              _____ Fax
**SOLEXA INC.:**                                _____ U.S. Mail
GEORGE BEST                                     X_____ Overnight
KIMBERLY K. DODD                                _____ Personal
FOLEY & LARDNER LLP                             X_____ Electronic
975 Page Mill Road
Palo Alto, CA 94304-1125
Fax: (650) 856-3700
Email: gbest@foley.com
       kdodd@foley.com


I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Diego, California, this 13th day of June, 2008.


_____          _____
           Brian M. Kramer                              (signature)
              (typed)

CERTIFICATE OF SERVICE                                                          3
sd-429628

EXHIBIT 1