# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |  |
|---|---|---|
| APPLERA CORPORATION—APPLIED BIOSYSTEMS GROUP, a Delaware corporation, | ) ) ) ) | |
| Plaintiff/Counterdefendant, | ) ) | |
| - vs. - | ) ) | Case No. 07-CV-02845 WHA |
| ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual, | ) ) ) ) ) | District Judge William H. Alsup |
| Defendants/Counterclaimants. | ) ) ) ) | |

## EXPERT REBUTTAL STATEMENT OF JOHN E. QUACKENBUSH, PH.D.

I, John E. Quackenbush, Ph.D., have been retained by Solexa to testify as an expert in the above-captioned action. I submit this Statement in compliance with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure. I expect to testify at trial regarding the matters discussed in this Statement, if asked by the Court or the parties' attorneys.

## I.    Qualifications[1]

1.    I live in Dover, Massachusetts.

2.    I currently hold the position of Professor of Biostatistics and Computational Biology and Bioinformatics at the School of Public Health at Harvard University in Boston, Massachusetts.

3.    I joined the faculty at Harvard as a fully tenured Professor in 2005.

4.    Biostatistics is the science that attempts to apply statistical techniques to biological systems and health care data in order to find the best treatments or cures for diseases. For example, biostatistics is used to look at the data connecting salt intake and high blood pressure to figure out what the factors are that increase blood pressure.

5.    Computational Biology and Bioinformatics are scientific disciplines that analyze the immense amounts of data that we are now able to generate using new technologies such as the next-generation sequencing technologies at issue in this case. For example, the human genome contains approximately 3 billion nucleotides. That number is the equivalent of the number of seconds in 95 years. Writing out that sequence on paper would probably fill four- to five-hundred San Francisco telephone books. If we want to try to look through the human genomes of a number of different people, each containing billions of nucleotides, to find mutations associated with diseases, we need new mathematical algorithms and computer

---

[1] Headings and sub-headings are provided in this report for ease of reference. They are not intended, and should not be construed, to be limiting in any way.

EXHIBIT J

programs that can handle and make sense of the massive scope and volume of data generated by such studies. Computational Biology and Bioinformatics are the scientific disciplines developing those algorithms and computer programs.

6.      Finding mutations in the human genome can help guide us in finding treatments or cures for some diseases. One way to think about this is to consider that any cell in the human body is basically a little machine made up of proteins, and it is the proteins that do the work in the cell. The blueprints for those proteins are represented (encoded) in what we call "genes" in the DNA that is present in nearly all of our cells. To a large extent, the functions that any particular cell in our bodies performs, either correctly or incorrectly, depends on what genes are expressed in that cell because gene expression determines what proteins (and how much of each protein) are produced in that cell. A mutation is an error in the DNA sequence that can lead to the creation of an improper protein, or to the improper expression (in amount or timing) of the correct protein. An analogy for a mutation would be if one bought the wrong-size tires or the wrong distributor cap for a car; any such small change could cause the car to not work properly. In the same way, small genetic changes such as mutations can cause a protein to not work properly. For example, mutations in the gene that encodes hemoglobin can cause sickle cell disease because, during exertion, lower oxygen concentrations cause the hemoglobin molecule to fold up the wrong way, which causes the red blood cells to "sickle," and ultimately causes the disease symptoms we see. Other mutations, like those in a gene called BRAC1, can lead to breast cancer. By using Computational Biology and Bioinformatics to find and understand the mutations that cause such changes, we hope to develop tests to detect diseases earlier and to more quickly and efficiently develop cures.

2

7.    As a Professor in the School of Public Health at Harvard, my primary responsibilities include helping to train the next generation of scientists in biology, medicine, and public health.

8.    I am also one of the Directors of the Program for Quantitative Genomics in the Harvard School of Public Health.

9.    As a Co-Director of the Program for Quantitative Genomics at the Harvard School of Public Health, I am working to create an interdisciplinary research and training program in the analysis of large-scale genomic data.

10.    I also hold an appointment as a Professor of Cancer Biology at the Dana-Farber Cancer Institute, and I was recently asked to develop and be the Director of the Center for Cancer Computational Biology at Dana-Farber.

11.    The Dana-Farber Cancer Institute is a principal teaching affiliate of Harvard Medical School, a federally designated Center for AIDS Research, and a founding member of the Dana-Farber/Harvard Cancer Center (DF/HCC), a federally designated comprehensive cancer center.  The Institute employs about 4,000 people supporting more than 200,000 patient visits a year, is involved in more than 600 clinical trials, and is internationally renowned for its blending of research and clinical excellence. The Institute's expertise in these two arms of the fight against cancer uniquely positions it to bring novel therapies that prove beneficial and safe in the laboratory setting into clinical use. Since it was founded in 1947, the Institute has been committed to providing cancer patients with the best treatment available today while developing tomorrow's cures through cutting-edge research. The mission of Dana-Farber is to provide expert, compassionate care to children and adults with cancer while advancing the understanding, diagnosis, treatment, cure, and prevention of cancer and related diseases. Toward

**3**

this end, the Institute provides advanced training in cancer treatment and research for an international faculty, conducts community-based programs in cancer prevention, detection, and control throughout New England, and maintains joint programs with other Boston institutions affiliated with Harvard Medical School and the Partners Health Care System, including Brigham & Women's Hospital, Children's Hospital, and Massachusetts General Hospital. Dana-Farber is supported by the National Cancer Institute, the National Institute of Allergy and Infectious Diseases, and the support of numerous foundations and individuals who contribute to the Institute's individual research and clinic programs or to the Jimmy Fund, the principal charity of the Institute named for one of its child patients.

12.     The goal of the Center for Cancer Computational Biology is to support research at Dana-Farber by providing bioinformatics consulting services to the scientists. We are also developing databases to link clinical and research data and software tools to enable access and data analysis. The Center is also doing research to use large genomic datasets to discover cellular networks.

13.     I am also very involved with fundraising to support cancer care and research and have worked extensively with the Women's Cancer Program, the Women's Executive Committee, and the Jimmy Fund.

14.     The Jimmy Fund started in 1948 when the Variety Club of New England (now the Variety Children's Charity of New England) and the Boston Braves baseball team joined forces to help a 12-year-old cancer patient dubbed "Jimmy." On a national radio broadcast, millions heard the boy visit with his heroes from the Braves as they stood by his hospital bed. Contributions poured in from people everywhere, launching an effort that continues to bring hope to thousands of children and adults facing cancer throughout the world. The Jimmy Fund

**4**

EXHIBIT J

has raised more than $400 million since it was founded in 1948. It attracts tens of thousands who participate in more than 300 fundraising events each year. Nearly 3,000 volunteers help organize and support these events every year. It is an official charity of the Boston Red Sox, as well as the official charity of the Pan-Massachusetts Challenge (a bicycle ride that spans the state each August, which has raised more than $145 million for the Jimmy Fund since it started in 1980), the Massachusetts Chiefs of Police Association, and the Variety Children's Charity of New England.

15.    As part of my work at Harvard and the Dana-Farber Cancer Institute, I have established a laboratory which uses functional genomics and computational biology to study human cancers and animal models of human disease.

16.    Being at the Dana-Farber Cancer Institute, our work is almost exclusively focused on getting a better understanding of cancer to improve diagnostics, improve treatment and better save lives. For the past five years, my work has focused on breast and ovarian cancer, and in particular understanding how genetic mutations lead to breast and ovarian cancer. We also work in what is called "Systems Biology" by combining experimental data with other information to discover new cellular networks.

17.    During my career, I have been awarded and supported by more than fifteen competitive, peer-reviewed research grants from various agencies including the National Institutes of Health, the National Science Foundation, and the Department of Energy. I have also received philanthropic support from a number of organizations, including a recent grant from the "Aid for Cancer Research" organization to purchase a next-generation sequencing instrument for use in ovarian cancer research.

EXHIBIT J

18.    My work has appeared in more than 130 published scientific articles, the vast majority of these on the analysis of genomic data and DNA sequence analysis.

19.    I currently supervise three graduate students and two postdoctoral fellows who are working to develop novel methods for the analysis of genomic data and to integrate these in software for dissemination to the research community. Over the years, I have trained a number of graduate students, and I recently developed and currently teach an introductory course for graduate students at Harvard called "Genetics and Genomics for Health Science Research."

20.    My students come with a wide variety of backgrounds and expertise, including physicians from the in-vitro fertilization clinic at the Brigham and Women's Hospital in Boston, emergency room physicians from the Children's Hospital in Boston, Harvard dental school students, and students pursuing graduate degrees in public health, who are studying, for example, rare tropical diseases in Africa, AIDS research, and epidemiology.

21.    Over the last ten years, I have also taught more than 40 workshops in locations around the world focused on the analysis of data from large-scale genomics studies. I also hold appointments as Professor of Biochemistry at The George Washington University in Washington, D.C., as an Adjunct Professor of Biostatistics at The Johns Hopkins University in Baltimore, Maryland, as an Adjunct Professor of Chemical Engineering at the University of Maryland in Baltimore, Maryland, and as an Adjunct Professor of Bioinformatics at Boston University. I am also currently advising one student at Boston University who is studying analysis of next-generation sequencing data and co-advising another student enrolled in Oxford University's program in Biostatistics and Bioinformatics in England.

22.    I received my Bachelor's Degree in Physics from the California Institute of Technology in Pasadena, California in 1983.

**6**

23.     For my undergraduate senior thesis I developed a body of computer simulation code that was used to optimize the design of a large experiment.

24.      I went on to receive my Master's Degree in Physics from the University of California, Los Angeles (UCLA) in Los Angeles, California in 1984.

25.     I went on to earn a Ph.D. in Theoretical Particle Physics, with a specialization in quantum field theory and string theory models, from UCLA in 1990. The subject of my doctoral research and dissertation was an extension of string theory to develop testable hypotheses that could prove or disprove the existing string-theory models. It involved developing a great deal of new mathematics and creating new quantum mechanical models.

26.     After receiving my Ph.D., I was awarded a two-year postdoctoral fellowship at UCLA in Experimental High Energy Physics, where I worked on the problem called "rare kaon decay." My work involved writing extensive software code for the analysis of data from a large particle physics experiment that was conducted at the Fermi National Accelerator Laboratory in Batavia, Illinois. I also developed software code for a large computer simulation study of a potential new experiment to study kaon decay that was evaluated by the Department of Energy, and I developed computer simulation and data analysis methods for an experiment that attempted to measure antiproton decay.

27.     Starting in 1989, during my final year in graduate school, and throughout my postdoctoral work during the period from 1990-1992, I came to realize that the scientific research climate in the U.S. was beginning to change and that opportunities in physics were beginning to wane. At the same time, new developments in biology were motivating discussion of a program focused on sequencing the human genome, opening a new frontier in scientific research. During that time, I began to attend seminars and audit courses in the molecular biology

7

and biomathematics departments at UCLA, including courses in molecular biology, molecular evolution, and genetics. I also began to read extensively regarding recent developments in molecular biology and became a member of the Center for the Study of the Evolution of Life (CESOL) at UCLA and a participant in their weekly seminar series. My research during this time provided me with the necessary background to write a grant application for a career transition award focused on beginning a research program in molecular genetics.

28.     I began my research career in biology in 1992 when I was awarded a five-year Special Emphasis Research Career Award (SERCA) from what is now the National Human Genome Research Institute of the National Institutes of Health, one of two awarded that year. This fellowship was designed to attract promising scientists with strong computational and quantitative skills to work on the Human Genome Project and related problems.

29.     From 1992 through 1994 the SERCA fellowship allowed me to work as a Staff Scientist in Genomics in the Molecular Genetics Laboratory at the Salk Institute for Biological Studies in San Diego, California. There I developed and improved methods for DNA sequencing, developed combinatorial strategies and devices for screening large DNA clone libraries, and performed simulations and optimization of DNA sequencing strategies, including genomic sequence sampling. I also was Project Director for the STS content mapping of chromosome 11 with a focus on a set of childhood leukemias, and chromosome 4, with a focus on the region associated with Huntington's disease. My work at the Salk Institute involved extensive analysis of DNA sequence data and creation of methods to optimize its use in a variety of genetic applications.

30.     In 1994 I became a Research Associate in Genomics and Bioinformatics at Stanford Human Genome Center at Stanford University under the direction of Professor Rick

EXHIBIT J

Myers and Professor David Cox. My primary job at Stanford was to establish a large-scale DNA sequencing lab to develop the laboratory protocols associated with a new DNA sequencing approach, and to create the databases and software tools necessary to collect, manage, and analyze the data coming from the sequencing lab. Our work at Stanford focused on sequencing human chromosome 21, to better understand the genetic factors contributing to Down Syndrome. I was a project leader for the development and implementation of a transposon-mediated strategy for large-scale genomic DNA sequencing, whereby I developed and implemented laboratory protocols, computer software and instrumentation. In that capacity, I established a large-scale DNA sequencing laboratory and was responsible for developing its experimental protocols, creating its data management systems, analyzing the data that was generated there, and validating the results.

31.     In 1997, I was recruited and accepted an offer to become an Associate Investigator of Functional Genomics and Bioinformatics at The Institute for Genomic Research (TIGR) in Rockville, Maryland.

32.     TIGR (TIGR) was a non-profit genomics research institute founded in 1992 by Dr. Craig Venter in Rockville, Maryland, United States. TIGR sequenced the first genome of a free-living organism, the bacterium *Haemophilus influenzae*, in 1995. This landmark project led to an explosion of genome sequencing projects, all using the whole-genome sequencing technique pioneered earlier but never used for a whole bacterium until TIGR's project. TIGR went on to become the world's leading center for microbial genome sequencing, and it also participated in the Human Genome Project and many other genome projects. Our bioinformatics group at TIGR developed many of the pioneering software algorithms that were used to analyze these genomes. In late 2006, TIGR became a division of the J. Craig Venter Institute (JCVI).

EXHIBIT J

33.    At TIGR, I developed and implemented technologies and strategies necessary for functional analysis of the human genome and other genomes. At TIGR, I was involved in numerous DNA sequencing projects, including the sequencing of *Borrelia burgdorferi*, the microbial species that causes Lyme disease, and sequencing many different gene regions in the human genome. I also led an effort to develop strategies for sequencing the maize genome and was senior author on a paper published in the journal *Science* describing a novel DNA sequencing approach that became important for sequencing many plant species. I and my group also developed a large-scale sequence data analysis project, The Gene Index Project, that has continued since I moved to Harvard and is used to catalog the gene content in more than 100 species. My group also developed many software tools for the analysis of genomic data that are widely distributed to the research community, including a program called MeV that has more than 20,000 users worldwide.

34.    In 2005, I was recruited to the Dana-Farber Cancer Institute and Harvard University. Dana-Farber, as part of its strategic plan, recognized that it needed to build expertise in computational biology in order to stay at the leading edge in cancer research. I was the first senior faculty recruit and part of my responsibility is to help build computational biology as a discipline at Dana-Farber and more generally across the Harvard University system.

35.    I currently hold four editorial positions. I have been an Associate Editor for *Bioinformatics* since 2002, an Editorial Board Member of *Genomics* and *BMC Bioinformatics* since 2002 and 2003, respectively, and an Editorial Board Member for *BioTechniques*. Since March 2006, I have been the Editor-in-Chief of the journal *Genomics*.

36.    I have served on more than 30 grant review panels at the National Institutes of Health, the National Science Foundation, and the Department of Energy, as well as on grant

**10**

review panels for the European Union, the UK National Research Council, the Wellcome Trust, the Natural Sciences and Engineering Research Council of Canada, the Burroughs-Wellcome Fund, and the Broad Foundation. I recently completed a four-year term as a permanent member of the Genomes, Computation, and Technology Study Section at the National Institutes of Health. I also chaired an *ad hoc* review institute of the National Center for Toxicogenomics at the request of the Director of the National Institute for Environmental Health Sciences at the National Institutes of Health.

37.     I currently serve on five panels at the National Research Council of the National Academy of Sciences to provide expertise in computational biology and bioinformatics in the application of genomic technologies to the a range of biological problems and on the collection and analysis of genomic data including gene sequencing information. I also hold appointments on the Scientific Advisory Board for St. Jude's Children's Research Hospital and the Board of Scientific Counselors of the Environmental Protection Agency.

38.     We have one patent application currently being prosecuted that involves a new diagnostic approach to colon cancer and other cancers. It involves the application of neural networks to the analysis of genomic signatures.

39.     I am involved in the analysis of proteomics, which is like a Human Genome Project that looks at our proteins instead of our genes. I am also involved the analysis of metabolomics, which look at the output from metabolism. I am also on the board of the Microarray Gene Expression Data Society (MGED) which established standards for reporting the results of gene expression experiments, and which recently began developing standards for communicated the results of next-generation sequencing experiments.

**11**

40.    I believe that my peers in the scientific community would consider me to be an expert in the fields of genomics, bioinformatics and computational biology, and the associated technologies and their application to the study of human disease.

41.    Attached as Exhibit A is my *curriculum vitae* which describes my educational and professional qualifications, awards and honors received, membership in professional societies and positions on editorial boards of professional journals. If requested, I may testify further about the contents of my *curriculum vitae*, including but not limited to the contents described herein.

## II.    Previous testimony

42.    In the last four years, I was deposed and testified at trial in the *Affymetrix, Inc. v. Illumina, Inc.* (D. Del.) case.

## III.    Compensation

43.    For the time I have spent on my investigation, for my time spent preparing this expert report, and for my time spent testifying in this case, I am being paid at my normal consulting rate of $650 per hour. My compensation is not affected by the content of my testimony or the outcome in this case.

## IV.    Information considered

44.    In the course of my investigation in this case and in preparing this expert report, I reviewed the patents-in-suit (U.S. Pat. Nos. 5,750,341 ("the '341 patent"), 5,969,119 ("the '119 patent") and 6,306,597 ("the '597 patent") (collectively "the Macevicz patents"); the expert report of Dr. D. Ross Sibson; the expert report of Michael L. Metzker, Ph.D.; the prior-art documents cited herein; the April 16, 1996 Office Action in the prosecution of U.S. Patent Application Serial Number 08/424,663 (ILL000263-270); the "Amendment" dated October 16, 1996 in the prosecution of U.S. Patent Application Serial Number 08/424,663 (ILL000280-291);

EXHIBIT J

Judge Alsup's "Claim Construction Order" dated February 21, 2008 (Dkt. No. 131); and the materials cited herein.

## V.    Summary of opinions to be expressed

45.    In the course of my investigation in this case, I reviewed and considered the Expert Reports submitted by Drs. Metzker and Sibson in regard to their analyses of the "Whiteley" reference and whether Whiteley anticipated or rendered the asserted claims of the Macevicz patents obvious.

46.    In my opinion, Whiteley, either alone or in combination with any other prior-art reference cited by Drs. Metzker and Sibson, did not anticipate or render any of the asserted claims obvious to one of ordinary skill in the art in 1994-95.

47.    In my opinion, Drs. Metzker and Sibson do not offer sufficient scientific analysis or sufficiently detailed reasoning to support their arguments. The Macevicz patents describe and claim new methods of sequencing DNA involving the use of individual steps that were not themselves necessarily novel. Dr. Macevicz, however, was the first to realize that one could combine the various scientific methods recited in his claims, such as hybridization and ligation, into a method that could achieve a useful DNA sequencing result. Drs. Metzker and Sibson cite references, such as Whiteley, that discussed some of the individual elements recited in the claims, but they fail to cite a single reference that disclosed all of the elements recited in any given claim, and fail to show how or why one of ordinary skill in the art would have selected and combined these various elements to yield the claimed inventions with a reasonable expectation of success. For these reasons, I believe that Drs. Metzker and Sibson have failed to show that Whiteley anticipated any of the asserted claims, or that any combination of Whiteley with any other prior-art reference rendered any of the asserted claims obvious to one of ordinary skill in 1994-95.

**13**

48. Whiteley discussed a process for detecting single-base mutations, or what are now referred to as single nucleotide polymorphisms (SNPs), in a known target nucleic acid. Whiteley discussed an assay that could be used to determine whether a known nucleotide was present in a given sample at a known position. One of ordinary skill in the art in 1994-95 would have understood that Whiteley did not disclose a sequencing method because Whiteley did not teach a method that would have allowed one to determine the identities of a series of contiguous nucleotides in a target polynucleotide. In my opinion, it would have been highly unusual, and indeed incorrect, in 1994-95 for one of ordinary skill in the art to have referred to Whiteley as having taught a "sequencing" method. By contrast, claim 1 of the '341 patent recites in its preamble that it is directed to a "method for determining a sequence of nucleotides in a target polynucleotide." In contrast to the method discussed in Whiteley, the steps of claim 1, when repeated as required by step (e) of claim 1, will generate information sufficient to determine the identities of two or more contiguous nucleotides in a target polynucleotide.

49. Both Drs. Metzker and Sibson seem to take the elements of Whiteley, such as hybridization and ligation, and suggest that Whiteley's discussion of those elements in another context disclosed Dr. Macevicz's inventions (or rendered them obvious) while ignoring the most crucial aspect of Dr. Macevicz's inventions —putting elements together to create a new sequencing method. It is easy using Dr. Macevicz's claims as a guide to go back and pick and choose technical elements from prior-art references, but what was inventive was to actually accomplish the goal of selecting and combining certain elements to create a new method to achieve an unexpected and non-obvious result, which is what Dr. Macevicz did.

## VI. Person of ordinary skill in the art

50. I disagree with Drs. Metzker and Sibson's conclusion regarding the qualifications of "one of ordinary skill in the art" in the 1994-95 time frame. In my opinion, with respect to the

**14**

inventions described and claimed in the Macevicz patents, a person of ordinary skill in the art in 1994-95 was a research scientist with a Ph.D. (or perhaps an M.D.) and at least two years of postdoctoral research experience in the field of molecular biology and/or nucleic acid biochemistry. In the time period relevant to the inventions described in the patents-in-suit, 1994-95, I was a Ph.D. research scientist working on DNA sequencing methodologies at the Salk Institute, and in 1994, I was recruited to lead the sequencing team at Stanford. So I believe that I would have been considered one of at least ordinary skill in the relevant art in 1994-1995.

51.    On the issue of invalidity, I understand that one must go back to the time when Dr. Macevicz made his inventions (or at least back to when he filed the original application that led to the Macevicz patents) to consider what references were available at that time and how they would have been considered by one of ordinary skill at that time. I understand that one must cast one's mind back to that point, consider what knowledge and skills one of "ordinary" skill would have had, and then from that perspective, determine whether the claimed inventions were new and non-obvious. In this case, I understand that there is evidence that Dr. Macevicz conceived the inventions claimed in the '341 and '597 patents at least as early as July 1994, and that he filed the original application that led to those patents on April 17, 1995. I understand that it is impermissible to rely on information that was only available to one of ordinary skill in the art after the latter date of April 17, 1995.

## VII.    The references cited by Drs. Metzker and Sibson

52.    I understand that the concept of "prior art" is an attempt to allow one to determine what information one of ordinary skill in the art had available to him or her when Dr. Macevicz conceived his inventions or at least just before he filed his original patent application on April 17, 1995. I understand that U.S. patent law contains strict standards for determining what

**15**

information does or does not qualify as prior art, and that before determining whether a given

claim is valid or invalid in light of a reference, we must assess whether that reference qualifies as

prior art, and therefore, is available to use in any attempt to show a claim is invalid as anticipated

or obvious.

53.     For example, if a research article was published in the journal *Nature* on May 10,

1995, it would not qualify as prior art to the Macevicz patents (because that date is after April 17,

1995), and therefore, could not be used in this case for determining whether the claimed

inventions were new and non-obvious.

54.     Drs. Metzker and Sibson rely on a collection of patents and patent applications

that they refer to as "Sibson 1994" and "Sibson 1995" (hereinafter "Sibson" or "the Sibson

references"). I understand that these documents do not qualify as prior art with respect to the

Macevicz patents because the first publication of the Sibson references occurred on July 27,

1995, which is after the April 17, 1995 filing date of Dr. Macevicz's original patent application.

Drs. Metzker and Sibson admit that these references were not published before the filing date of

the original Macevicz patent application, and Dr. Sibson even admits that it does not qualify as

prior art. (Metzker Report, at p. 13; Sibson Report, at p. 23.) Both Drs. Metzker and Sibson,

however, variously cite Sibson 1994 and Sibson 1995 as showing "what was known by one of

ordinary skill in the art as of at least January 1994." (Sibson Report, at p. 9; Metzker Report at p.

13.) I understand that Drs. Metzker and Sibson's reliance on the Sibson references in assessing

the novelty or obviousness of the asserted claims is not permissible, and therefore I do not give

the Sibson references any weight in my analysis. If the Court determines that the Sibson

references are available for use in assessing the novelty or obviousness of any of the asserted

**16**

claims, I reserve the right to supplement this Report to address the impact of those references on my analysis.

## VIII.  Claim 1 of the '341 patent is not invalid

55.    As part of my analysis of the issues addressed in this Report, I reviewed the specification and claims of the '341 patent.

56.    Claim 1 of the '341 patent describes an iterative, sequential process for sequencing polynucleotides, e.g., DNA. The terms "sequence" or "sequencing" involve obtaining information that is necessary to determine the identity of two or more consecutive nucleotides in a given DNA fragment. The first step in the DNA sequencing process of claim 1 of the '341 patent is step (a), which requires the hybridization of an initializing oligonucleotide probe to a target polynucleotide. The initializing oligonucleotide is analogous to a short Lego block that has specifically shaped holes in the bottom of the block that match, and can therefore snap onto, the specifically shaped protrusions on the top of another (usually much longer) Lego block (which represents the polynucleotide). The initializing oligonucleotide probe must have a nucleotide at one end that is extendable, i.e., that can be chemically bonded to a second oligonucleotide. The analogy would be to a short Lego block whose end can be permanently glued to the end of another short Lego block. The second step of the claim, step (b), requires the hybridization of a second, "extension" oligonucleotide probe to the target polynucleotide, in a position adjacent to the prior-hybridized oligonucleotide probe. This would be like putting the two short Lego blocks side-by-side on top of the much longer Lego block. Step (b) then requires "ligating" the two oligonucleotide probes to create an "extended duplex." This ligation, or chemical bonding, is analogous to gluing the two short Lego blocks together on top of the much longer Lego block. This double-layered arrangement of two short (and glued-together) Lego blocks on top of a longer Lego block is analogous to the "extended duplex" recited in the claim.

**17**

The third step in the claim, step (c), requires "identifying," or determining the identity of, the "base" portion of at least one nucleotide in the polynucleotide that makes up part of the extended duplex (or a nucleotide that is immediately adjacent to the extended duplex). I understand "determining the identity of a base in a nucleotide" to mean generating information that is necessary and sufficient to identify the base portion of the nucleotide. What allows this information to be generated in the method of claim 1 is that, as the '341 patent describes, the second oligonucleotide probe will contain a label, for example one of a set of four colored tags. For each extension oligonucleotide probe, the color of the tag attached to the probe identifies at least one of the nucleotides in that probe. If one generates and collects information about which label is present in the extended duplex following the ligation step, that label indicates that one or more specific nucleotides is present in the extension probe, and thus that a "complementary" nucleotide is present in the polynucleotide portion of the extended duplex. This labeling system is analogous to having the short Lego blocks be different colors, where the color of the block indicates the specific shapes of at least one of the sets of holes in the bottom of the short Lego block, which then tells you the shape of at least one of the sets of protrusions on the top of the long Lego block where that short Lego block has "snapped on." The fourth step, step (d), requires modifying the extension product, if necessary, to create an extendible terminus similar to that which existed on the first oligonucleotide. This is analogous to the situation in which the second short Lego block needs to be modified in some way to allow a third short Lego block to be glued to it. Finally, in step (e), steps (b), (c), and (d) are iteratively and sequentially repeated to determine the identities of multiple adjacent nucleotides (i.e., a sequence) in the polynucleotide.

**18**

57.     The '341 patent describes the use of libraries, or "mixtures," of probes, rather than single extension probes ('341 patent at col. 6, lines 34-36):

> Preferably, the oligonucleotide probes are applied to templates as mixtures comprising all possible sequences of a pre-determined length.

The use of such probe mixtures is important as they allow the determination of the sequence of a polynucleotide having a previously unknown sequence, as recited in step (e), through repeated application of steps (b), (c), and (d) of claim 1.

58.     Claim 1 requires that the sequence of steps recited in the claim be performed in a fixed order. Specifically, the first four steps, (a) through (d), are performed in the first "cycle" of the method, and in each subsequent cycle, the final three steps, (b), (c), and (d), are performed in that same order.

**A.     Whiteley did not anticipate claim 1 of the '341 patent**

59.     As part of my analysis of the validity issue, I reviewed the Whiteley reference ("Whiteley").

60.     In my opinion, Whiteley did not disclose each and every limitation in claim 1 of the '341 patent, and therefore, did not anticipate claim 1 of the '341 patent.

61.     Whiteley discussed a process for detecting single-base mutations, what are now known as single-nucleotide polymorphisms (SNPs), in a target nucleic acid. The method involved the hybridization of a first oligonucleotide probe, referred to as a "contiguous probe" (Whiteley, col. 5, lines 48-49 and col. 5, lines 8-11), to a target nucleic acid, followed by the hybridization of a second oligonucleotide probe, which Whiteley referred to as a "diagnostic probe"(col. 5, lines 45-46, and col. 5, lines 5-8), followed by ligation of the two probes. Whiteley indicated that the "diagnostic probe" hybridized to the "diagnostic portion" of the target sequence, "which contains the nucleotide modification, the presence or absence of which is

**19**

detected." (Whiteley, at col. 5, lines 6-7.) This indicated that the probe was designed to be used to detect a specific nucleotide at a specific location within the target nucleic acid.

62.     Whiteley stated that at least one of these oligonucleotide probes could be labeled. Following hybridization and ligation, the unhybridized probes were washed away and the test sample was assayed for the presence of the label.

63.     To get a sense of one example of how the method discussed in Whiteley differed from the method recited in claim 1 of the '341 patent, it might be helpful to use another analogy. In the method recited in claim 1, the recited steps (a) through (d) are practiced once in full, and then steps (b) through (d) are repeated over and over again to obtain information about the sequence of a polynucleotide. This is somewhat like the movie "Groundhog Day," in which Bill Murray's character repeats the same day over and over again until he finally gets it "right," and can stop reliving that day. The method discussed in Whiteley is like the movie "Groundhog Day" without Bill Murray's character repeating the same day over and over again. That is how different the method of Whiteley is from the method recited in claim 1 of the '341 patent.

64.     By "anticipate," I understand that a prior-art reference like Whiteley had to have disclosed each and every limitation in the asserted claim. In the method recited in claim 1, each and every step has to be performed and, as required in step (e), repeated in a specified order. Whiteley did not disclose what is required by step (e). While Whiteley discussed some of the elements found in steps (a) (hybridization), (b) (ligation), and (c) (identification of a nucleotide) in claim 1, Whiteley did not disclose, and apparently did not contemplate, repeating these steps in an iterative fashion so as to generate and accumulate information that could be used to determine a contiguous sequence of nucleotides in a polynucleotide. Whiteley was limited to determining whether a specific nucleotide was present at a specific location. Whiteley did not

**20**

disclose the type of iterative process recited in claim 1 of the '341 patent, using a library of oligonucleotide extension probes, and iteratively hybridizing, ligating, and identifying bases to generate the sequence of the target. The method discussed in Whiteley was not used to determine the identities of contiguous unknown bases but only the presence or absence of a specific mutation at a specific location. Whiteley did not disclose a method of "sequencing" DNA, because Whiteley did not disclose a method in which one generated information that indicated the identities of two or more contiguous, and unknown, nucleotides in a polynucleotide "test substance."

65.    Whiteley also did not disclose step (d) of claim 1, the generation of an extendable terminus on the extension oligonucleotide probe, which allows for another ligation reaction to take place at the probe terminus, and thereby allows steps (b) and (c) to be repeated.

66.    The use of either an initializing oligonucleotide or an extension oligonucleotide probe with a non-extendable terminus would prevent multiple adjacent hybridization and ligation events from occurring in a single round of the process recited in claim 1 of the '341 patent. Preventing extension at one end of the extension oligonucleotide probe within a single cycle of the method is useful in a sequencing application because otherwise the probes might all hybridize to the polynucleotide and be ligated to each other in a single cycle, which would make it difficult, if not impossible, to determine the locations and identities of the nucleotides in the polynucleotide. As illustrated below, when there is no available extendable probe terminus on the first extension oligonucleotide probe, a second extension oligonucleotide probe (shown below as a grey rectangle) cannot hybridize to the polynucleotide at the same time as the first extension probe (shown below as a black rectangle):

21



The use of a non-extendable terminus (as shown in **A** above) prevents the unwanted sequential hybridization and ligation event from occurring (as shown in **B** above), which could produce multiple confounding signals and prevent effective identification of sequence bases in the target nucleotide sequence.

67.    In medical applications, such as the testing of colorectal cancer patients to determine whether they have a mutated form of the KRAS gene before treating them with the monocolonal antibody Erbitux, obtaining a clear and unambiguous signal is essential and this would not be possible without a non-extendable terminus on the extension probe.

68.    In some genetic diseases, a number of causative mutations have been identified, as well as the surrounding DNA sequence. Whiteley discusses a method for determining the presence or absence of a single nucleotide at a particular location. The "contiguous probe" discussed in Whiteley was complementary to the non-varying portion of the target sequence. The diagnostic probe contained one of the possible nucleotide variants at the nucleotide position being interrogated. Whether the hybridization and ligation of these two probes occurred would allow one to determine the presence or absence of the nucleotide at that position. But the process

required prior knowledge of the sequence of the target and its known variants to design the "diagnostic probe."

69.    In contrast, the sequencing method described and claimed in the '341 patent allows one to determine a previously unknown sequence in a target nucleic acid. This allows, for example, the identification of new, previously undiscovered mutations, that could be important for understanding the genetic basis for disease. Whiteley did not disclose a method that could be used for this purpose.

70.    The process recited in step (e) specifically enables the identification of a sequence of nucleotides. Whiteley did not disclose the "repeating" aspect of step (e) in claim 1, i.e., Whiteley did not disclose a process comprising, in order, ligating an extension oligonucleotide probe to an extendable probe terminus in an existing DNA duplex, "identifying [a nucleotide], in the extended duplex," and "generating an extendable probe terminus." There is no explicit "repeating" disclosed in Whiteley. The only sentence that comes close to this is in column 13, at lines 12-17:

> [T]he above techniques are useful in determining if a specific sequence is located next to another specific sequence in a DNA chain, or similarly a series of probes each adjacent to the next could be used to demonstrate the proximity of specific sequences or to increase the size of the ligated probes.

71.    This sentence did not disclose a process of repeating steps of hybridization, ligation, identification, and regeneration that would allow one to determine the identities of a sequence of contiguous nucleotides in a polynucleotide. Rather, this sentence merely speculates that one could use the single-cycle method of Whiteley to confirm that multiple known single-nucleotide mutations are present near each other. As such, neither this passage, nor any other portion of Whiteley, disclosed the repeating step of the '341 patent.

**23**

72.    In its own patents that followed after Whiteley, such as U.S. Patent Nos.

5,912,148 and 6,130,073, AB acknowledged the limitations of Whiteley. In these patents, AB

stated that Whiteley involved the preparation of probes whose sequence matched a known

sequence in a target except for the one nucleotide being assayed:

> A promising approach for identifying polynucleotides in such systems is the
> oligonucleotide ligation assay (OLA), Whiteley et al, U.S. Pat. No. 4,883,750. In
> this assay approach, oligonucleotides are prepared that are complementary to
> adjacent regions of a target sequence. The oligonucleotides are capable of
> hybridizing to the target so that they lie end-to-end and can be ligated when no
> mismatches occur at or near the contiguous ends. Whenever such mismatches do
> occur, then ligation is precluded. As a result, *a set of oligonucleotide pairs may be
> provided which are perfect complements of all the allelic variants of interest at a
> given locus*. By a judicious selection of labeling methodologies, a wide range of
> alleles, either from the same or different loci, can be specifically identified *in a
> single assay*.

(U.S. Patent No. 5,912,148, at col. 1, lines 33-47, emphasis added.) AB never characterized the

"assay approach" of Whiteley as a method of "sequencing" DNA. As this section of AB's patent

shows, Whiteley was not directed to a method for sequencing DNA.

73.    As AB described it, Whiteley suggests only that with the "judicious selection of

labeling methodologies, a wide range of alleles, either from the same or different loci, can be

specifically identified *in a single assay*." This is what Drs. Metzker and Sibson characterize as

Whiteley's disclosure of repeating the cycles as recited in step (e) of claim 1. In my opinion,

AB's characterization of Whiteley in the '148 patent is more accurate because Whiteley merely

suggested that one could assay multiple sites on a given target at the same time, not that the steps

of hybridization, ligation, and identification (not to mention regeneration) should be repeated in

multiple cycles to generate sequence information.

74.    Because it did not disclose steps (d) or (e) of claim 1, Whiteley did not disclose

all of the limitations in claim 1 of the '341 patent, and therefore did not anticipate claim 1.

        **a.**      **Specific rebuttals to Drs. Metzker and Sibson's arguments that Whiteley anticipated claim 1 of the '341 patent**

75.     I do not agree with Drs. Metzker and Sibson's conclusions regarding whether Whiteley anticipated claim 1 of the '341 patent.

76.     While Drs. Metzker and Sibson state that Whiteley discloses "every limitation" in claim 1, Drs. Metzker and Sibson appear to ignore the fact that claim 1 of the '341 patent is directed to a method for sequencing DNA that includes the step of generating an extendable terminus [step (d)], and of repeating steps (b), (c), and (d) [step (e)].

77.     Drs. Metzker and Sibson argue that Whiteley disclosed repeating steps (b), (c), and (d) by stating that "Whiteley clearly teaches ligating subsequent oligonucleotide probes to the extension probe previously ligated to the initializing oligonucleotide." (Metzker Report at p. 20; Sibson Report at p. 13.) However, the support in Whiteley that they both rely on for that assertion is the sentence at column 13, lines 3-17 quoted above. That sentence only suggests the hybridization and ligation of multiple probes at the same time to gather different types of information about the sample. For example, it suggests that the Whiteley method could be used to: (1) determine whether a "specific sequence is located next to another specific sequence in a DNA chain"; (2) to "demonstrate the proximity of specific sequences"; or (3) "to increase the size of the ligated probes." (Whiteley, at col. 13, lines 12-17.) These examples merely involve hybridizing and ligating multiple probes *at the same time*. There is no basis on which Drs. Metzker and Sibson could have concluded that one of ordinary skill in the art in 1994-95 reading Whiteley would have thought that column 13, lines 12-17 was describing the use of repeated steps of hybridization, ligation, and identification.

78.     Dr. Metzker does not discuss in any detail why one of ordinary skill in the art would have (or even how one could have) viewed column 13, lines 3-17 of Whiteley as

disclosing step (e) of claim 1. Dr. Metzker also fails to note that Whiteley did not disclose the use of a mixture of oligonucleotide probes, which are necessary for sequence determination beyond the detection of single-base mutations discussed in Whiteley.

**B.    Claim 1 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

79.    Based on my review of the prior art, the scope of claim 1 of the '341 patent, and my understanding of the level and skill of one of ordinary skill in the art in 1994-95, In my opinion, claim 1 of the '341 was not obvious to one of ordinary skill in the art in 1994-95.

**1.    Whiteley did not render claim 1 of the '341 patent obvious**

80.    After considering the opinion of Dr. Metzker, and the art cited by him, I reached the opposite conclusion. In my opinion, claim 1 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95.

81.    It does not appear that Drs. Metzker and Sibson made any argument regarding the obviousness of claim 1 other than to state they believe that the claim was anticipated by Whiteley. For the same reasons as I stated earlier, it is my opinion that claim 1 was not anticipated by Whiteley because each and every limitation of the claim was not disclosed in Whiteley and that, in fact, Whiteley did not even teach a method for "sequencing" DNA.

82.    I understand that "obviousness" requires that, if each and every limitation of the claimed invention was not disclosed in a particular prior-art reference, then some logical combination of existing prior-art references could be used to infer the claimed invention. I am not aware of any other prior-art reference that when combined with Whiteley rendered claim 1 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

**26**

IX.    **Claim 2 of the '341 patent is not invalid**

83.    Claim 2 depends from claim 1, so it includes all of the limitations of claim 1, and adds the limitation that each extension probe from step (b) of claim 1 of the '341 patent has a chain-terminating moiety at the terminus distal to the initializing oligonucleotide probe.

84.    That means that the extension probes described in step (b) of claim 1 are oligonucleotides that have been modified at one end to prevent a covalent bond from forming with any subsequent probes or through the action of a DNA polymerase or ligase.

A.    **Claim 2 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 2 of the '341 patent obvious**

85.    In my opinion, the combination of Whiteley with either Brennan or Southern would not have rendered claim 2 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

86.    Claim 2 includes all of the limitations of claim 1 and adds the additional limitation of to the use of a chain-terminating moiety on one end of the extension probe. Dr. Metzker cannot establish that claim 1 would have been obvious to one of ordinary skill in the art in 1994-95 based on Whiteley alone, and therefore cannot establish that claim 2 would have been obvious to one of ordinary skill in the art in 1994-95. Dr. Metzker states that Southern and Brennan teach the use of chain-terminating moieties, but that cannot cure the fact that claim 1 was not obvious to one of ordinary skill in 1994-95.

87.    One of ordinary skill in the art would not have combined any of the discussion in Whiteley with the methods discussed in Southern and Brennan because the respective methods discussed in Brennan and Southern are fundamentally different. In my opinion, one of ordinary skill in the art in 1994-95 would not have considered the method of Whiteley to be a method to

**27**

"sequence" DNA because Whiteley did not teach a method that would allow one to obtain sequence information for two contiguous positions on an unknown target DNA. In fact, if I heard a scientist at that time refer to Whiteley as teaching a sequencing method, I would have questioned their understanding of the basic technology and competence.

88.     Unlike Whiteley, which did not disclose the repetition of any steps, the method recited in claim 1 of the '341 patent allows one to continuously generate sequence information using real-time identification "in the extended duplex" of bases in the target sequence. Whiteley is strikingly different from the method of claim 1 because it did not "sequence" DNA by performing a process and then repeating that process. If one wanted to sequence or even re-sequence the human genome, or if one were looking for mutations associated with a disease such as cancer, you would need to sequence long stretches of a target, unknown DNA sample. Because Whiteley did not disclose repeating the steps as in claim 1 of the '341 patent, in my opinion one of ordinary skill in the art in 1994-95 would not even refer to Whiteley as a method for "sequencing" DNA. The order of steps and repetition of those steps is the difference between a method capable of sequencing DNA (obtain sequence information about two contiguous nucleotide positions), and an assay for point mutations as taught by Whiteley.

89.     I understand that "obviousness" requires that if each and every limitation of the claimed invention is not disclosed in a particular prior-art reference (here Whiteley), then some logical combination of prior-art references might be used to add the missing limitation(s), and then by the combination, infer the claimed invention. I am not aware of any other prior-art reference available to one of ordinary skill in the art by April, 1995 that, when combined with Whiteley, rendered claim 2 of the '341 patent obvious to one of ordinary skill in the art.

EXHIBIT J

**X.**     **Claim 6 of the '341 patent is not invalid**

90.     Claim 6 depends from claim 2, so it includes all of the limitations of claims 1 and 2, and adds the additional step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

91.     Capping involves chemically modifying DNA in such a way as to as to destroy an existing extendable terminus and in so doing, prevents any further extension off of the termini that are "capped." The use of a capping step can be useful because not all reactions are 100% efficient and so, to reduce noise in the data being generated, failed reactions in one round are prevented from participating in future rounds of the method.

**A.**     **Claim 6 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

**1.**     **Whiteley did not render claim 6 of the '341 patent obvious**

92.     In my opinion, the combination of Whiteley with Brenner would not have rendered claim 6 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

93.     Claim 6 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1 and 2 would not have been obvious based on Whiteley in combination with any prior art. Specifically, Whiteley did not disclose the repetition of the steps of claim 1. As I said earlier, Whiteley would not have been considered by one of ordinary skill in the art in 1994-95 to be a method for sequencing DNA. Any disclosure in Brenner of capping unligated probes cannot cure these defects in Whiteley.

94.     Dr. Metzker also seems to ignore that a prior-art reference must disclose not only the individual steps of claim 1, but also disclose performing those steps in the same order as in claim 1 and repeating those steps. In failing to appreciate this aspect of claim 1 of the '341

**29**

patent, Dr. Metzker appears to have misunderstood the differences between Whiteley and the method claimed in claim 6 of the '341 patent.

## XI.    Claim 7 of the '341 patent is not invalid

95.    Claim 7 depends from claim 2, so it includes all of the limitations of claims 1 and 2, and adds the additional step of generating includes cleaving a chemically scissile internucleosidic linkage in the extension oligonucleotide probe.

96.    This means that the extension oligonucleotide probe used in step (b) of claim 1 is a particular type of probe. Specifically, it has to be the type of probe that contains a bond between the nucleotides in the probe that can be cleaved by chemical means.

97.    This means that the extension oligonucleotide probe used in step (b) of claim 1 contain a bond between two nucleotides in the probe that can be cleaved by chemical means which does not cleave or damage other features of the probe. In my opinion, the phrase "chemically scissile" requires that the bond be cleavable by chemical means, not by enzymatic means. This is stated in the '341 patent at column 10, lines 11-16:

> The phosphoramidate linkage described above is an example of a general class of internucleosidic linkages referred to herein as "chemically scissile internucleosidic linkages." These are internucleosidic linkages that may be cleaved by treating them with characteristic chemical or physical conditions, such as an oxidizing environment, a reducing environment, light of a characteristic wavelength (for photolabile linkages), or the like.

98.    The '341 patent goes on to state that other chemically scissile linkages that are not internucleosidic can be used as long as they "may be chemically converted into" an extendable nucleotide. ('341 patent, at col. 10, lines 25-29.) Included within the list of references cited under that section of the '341 patent is the Canard reference cited by Dr. Sibson. Canard, however, only discussed the regeneration of an extendable probe terminus by treating the terminal nucleotide with a chemical (*e.g.,* sodium periodate). (*See* Fig. 9 of Canard.)

**30**

**A.    Claim 7 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

**1.    Whiteley did not render claim 7 of the '341 patent obvious**

99.    In my opinion, the combination of Whiteley with any of Southern, Sibson, Brennan, or Brenner would not have rendered claim 7 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

100.    Claim 7 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1 and 2 would not have been obvious in view of Whiteley in combination with either of Sibson, Brennan, or Brenner. Specifically, Whiteley did not disclose repeating the steps of claim 1 in the specific order of claim 1 (repeating steps (b), (c), and (d).) As I have stated, the repetition of the steps in claim 1 is what define claim 1 as a method of sequencing, and compared to the Whiteley method for assaying particular, known mutations at a single position on a target.

101.    I am also not aware of any reference cited in the report of Dr. Metzker where chemically cleavable internucleosidic linkages are used in DNA sequencing. I understand that the obviousness of a claim depends on the combination of two or more pieces of prior art that, when combined, render the claimed invention obvious to one of ordinary skill in the art. Here, there is simply no reference which Dr. Metzker can combine with Whiteley to establish the obviousness of claim 7 because Southern, Sibson, Brennan, and Brenner do not describe the use of extension oligonucleotide probes with chemically scissile internucleosidic linkages. Without the combination of references that collectively teach all of the elements of claim 1, Dr. Metzker cannot establish that claim 7 of the '341 patent would have been obvious to one of ordinary skill in the art in 1994-95.

EXHIBIT J

102.    Furthermore, because Whiteley did not disclose the step of generating an extension oligonucleotide called for in step (d) of claim 1, or the repetition of steps called for in step (e) of claim 1, there would be no reason for one of ordinary skill in the art to use a scissile linkage at all, let alone a chemically scissile internucleosidic linkage. It simply would not be necessary in Whiteley because Whiteley could not take advantage of the benefit of using a cleavable internucleosidic linkage. For this additional reason, one of ordinary skill in the art would not have been motivated to combine any internucleosidic linkage with Whiteley.

103.    I must also reiterate that Whiteley would not have been considered by one of ordinary skill in the art in 1994-95 to be a method for sequencing DNA, and therefore, one of ordinary skill in the art would not have been motivated to combine Whiteley with any other reference. In fact, if I heard a scientist at that time refer to Whiteley as a sequencing method, I would have questioned their understanding of the basic technology and competence. Accordingly, in my opinion, one of ordinary skill in the art would not have been motivated to combine the assay of Whiteley with the disclosures in Southern, Sibson, Brennan, and Brenner.

### a.    Specific rebuttals to Drs. Metzker's arguments regarding claim 7 of the '341 patent and Whiteley

104.    Dr. Metzker cites no prior-art reference where probes containing chemically scissile internucleosidic linkages are used in DNA sequencing. Dr. Metzker states that "it was well known in the art to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction." (Metzker Report at p. 21.) Dr. Metzker appears to have made a mistake in his analysis because he continues on to cite Southern as an example of how well known chemically scissile internucleosidic linkages were in the art.

105.    All of the probes used in Southern contain what Southern refers to as a "tag," and all of the "tags" are located on the terminus of the probes. All of the probes discussed in

Southern feature a scissile linkage between a nucleotide and a "tag," and as such are not internucleosidic linkages. Dr. Metzker offered no evidence showing how chemically scissile internucleosidic linkages were so "well known in the art," and each of Southern, Sibson, Brennan, or Brenner do not teach the use of chemically scissile internucleosidic linkages to generate an extendable probe terminus in a DNA sequencing method.

106.    Sibson, Brennan, and Brenner did not disclose the generation of an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage. Sibson was not published until July 27, 1995, which is after the filing date of Dr. Macevicz's patent application. I understand that Sibson is therefore not available to use as a prior-art reference against the claims of the Macevicz patents. Dr. Metzker admits that Sibson does not qualify as prior art, so his citation to Sibson in this context is puzzling. (Metzker Report, at p. 13.) Furthermore, Sibson discusses the use of restriction enzymes to cleave internucleosidic linkages, not chemical means to cleave the internucleosidic linkages as is required by the limitation of claim 7 that requires the use of "a chemically scissile internucleosidic linkage."

107.    Sibson actually taught away from cleaving internucleosidic linkages to regenerate an extendable probe terminus. Sibson disclosed using an oligonucleotide where the "nucleotides are joined by phosphorothioate linkages so that they are *exonuclease resistant*." (Sibson, at p. 45, lines 5-7.) Sibson did not disclose using phosphorothioate linkages to regenerate an extendable probe terminus, but instead discussed using phosphorothioate linkages because *they do not* cleave under the reactions conditions in Sibson (*i.e.*, exo- and endo-nuclease treatment.)

108.    Brennan also taught away from cleaving internucleosidic linkages to regenerate an extendable probe terminus. Brennan discussed using an oligonucleotide containing phosphorothioate linkages because they are not cleaved by nucleases:

> In some aspects of the invention oligonucleotides containing altered ribose-phosphate backbones can be used such as oligonucleotides containing phosphorothioate or phosphordithioate linkages which are capable of resisting nuclease digestion.

(Brennan, at column 6, lines 21-26.) Brennan discussed the use of phosphorothioate linkages to prevent the cleaving of those linkages, not as an affirmative statement that those linkages are scissile by chemical or any other means.

109.    Brenner discloses the use of restriction enzymes or nucleases to cleave "the ligated complex" in Brenner. (Brenner, at col. 7, lines 22-30.) As noted in Brenner, "a ligated complex is formed with the presence of the labeled chain-terminating nucleotide which is subsequently cleaved with the appropriate nuclease, e.g., a class IIs restriction endonuclease such as Fok I, or the like." (Brenner, at col. 7, lines 28-30.)These are not chemical means of cleavage, and no such methods of cleavage are disclosed in Brenner.

110.    I understand that obviousness depends on the combination of two or more prior-art references that one of ordinary skill in the art at the relevant time would have been motivated to combine to create the claimed invention. There is simply no prior-art reference cited by Dr. Metzker that describes the use of extension oligonucleotide probes containing a chemically scissile internucleosidic linkage that one of ordinary skill in the art in 1994-95 would or could have combined with Whiteley to replicate the process in claim 7 of the '341 patent. Therefore, there is no factual basis for Dr. Metzker's conclusion that one of ordinary skill in the art in 1994-95 would have found claim 7 obvious by combining Whiteley with one of Southern, Sibson, Brennan, or Brenner.

**XII.    Claim 8 of the '341 patent is not invalid**

111.    Claim 8 depends from claim 7, so it includes all of the limitations of claims 1, 2, and 7 and adds the additional limitation that the internucleosidic linkage is a phosphoramidate linkage.

112.    This means that the linkage in the extension oligonucleotide probe used in step (b) of claim 1 is a particular type of probe, one that has a phosphoramidate bond, which can be cleaved using mildly acidic chemicals. Below, is a drawing of a phosphoramidate linkage between two nucleotides (Thymine and Adenine):



EXHIBIT J

A.    **Claim 8 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 8 of the '341 patent obvious**

113.    In my opinion, the combination of Whiteley with Mag would not have rendered claim 8 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

114.    Claim 8 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1, 2 and 7 would not have been obvious. Specifically, Whiteley did not disclose performing the steps in order contained in claim 1, or repeating the steps of claim 1 in the specific order of claim 1 (repeating steps (b), (c), and (d).) As I have stated, Whiteley lacks of any mention of iteratively repeating the steps to obtain what could be regarded as sequence information. One of ordinary skill in the art in 1994-95 would not have considered Whiteley as relevant to the obviousness of the asserted claims. Whiteley is not a method for "sequencing," and one of ordinary skill in the art in 1994-95 would have understood the term "sequencing." In fact, if I heard a scientist at that time referred to Whiteley as a sequencing method, I would have questioned their understanding of the basic technology and competence.

115.    The dodecamer disclosed in Mag did not have any label at all, and there is no basis on which one of ordinary skill in the art could have concluded that the dodecamer oligonucleotide in Mag could be labeled, and then used in Whiteley.

116.    Simply replacing the "diagnostic probe" in Whiteley with the type of dodecamer disclosed in Mag would not change the fact that Whiteley did not disclose repeating of any of the steps in Whiteley, let alone repeating in the same order as in claim 1 [repeating steps (b), (c), and (d)]. This critical deficiency in Whiteley is not cured by the disclosure in Mag of a dodecamer containing a phosphoramidate linkage.

**36**

117.    It is only with the use of hindsight—that is the inclination to view the use of a phosphoramidate in DNA sequencing as more predictable now than it actually was in 1994-95. The bias that results from hindsight is being used by Dr. Metzker in that the fact that Dr. Macevicz invented the use of chemically scissile phosphoramidate linkages in a DNA sequencing method as contained in claim 8 cannot be used to view the prior art in a manner that makes the combination of prior art appear more predictable than it actually was at the time. To avoid the bias of hindsight, I understand the law requires that there be some motivation to combine two references so that the combination is not the result of hindsight.

118.    Dr. Metzker's proposed combination of Whiteley and Mag could only have been achieved with the use of hindsight. The '341 patent describes the use of oligonucleotides containing chemically scissile internucleosidic linkages, and further discloses using a phosphoramidate linkage. As disclosed in the '341 patent, Dr. Macevicz's use of a phosphoramidate linkage stems from his appreciation of their utility in DNA sequencing. Neither the prior art, the knowledge of one of ordinary skill in the art, nor any other source offered this motivation because no one other than Dr. Macevicz thought of the utility of using phosphoramidate linkages in a DNA sequencing method. Dr. Metzker offered no evidence that one of ordinary skill in the art would have been motivated to combine Whiteley with Mag in this way.

119.    Furthermore, because Whiteley did not disclose the step of generating an extension oligonucleotide called for in step (d) of claim 1, or the repetition of steps called for in step (e) of claim 1, there would be no reason for one of ordinary skill in the art to use a scissile linkage at all, let alone a chemically scissile internucleosidic linkage. Whiteley did not cleave any of the probes, and therefore has no need to use a scissile linkage of any sort. For this

**37**

additional reason, one of ordinary skill in the art in 1994-95 would not have been motivated to combine Whiteley with the dodecamer of Mag.

120.    Dr. Metzker failed to offer any motivation to combine Whiteley and Mag, and indeed, one of ordinary skill in the art would not have been motivated to do so.

> a.    **Specific rebuttals to Dr. Metzker's arguments regarding claim 8 of the '341 patent and Whiteley**

121.    Dr. Metzker ignores the lack of motivation to combine Whiteley with Mag. Dr. Metzker simply state without any analysis that "the Mag reference describes the generation of oligonucleotides containing phosphoramidate linkages." (Metzker Report at p. 21.) Nothing more is said about why one of ordinary skill in the art would combine Southern with Mag, or what advantages would be gained by the combination. In my opinion, Dr. Metzker's arguments are not supported by a fair reading of what is disclosed in Whiteley.

## XIII.   Claim 11 of the '341 patent is not invalid

122.    Claim 11 depends from claim 1, so it includes all of the limitations of claim 1 and adds the additional limitations that: (1) step (a) of claim 1 of the '341 patent include, providing in separate aliquots, a plurality of different target/initializing oligonucleotides complexes; and (2) the target polynucleotide is the same in each aliquot, but the initializing oligonucleotide in each complex is bound to a different sequence on the target polynucleotide; and (3) steps (b), (c), (d), and (e) are carried out independently on each aliquot.

123.    This means that as part of step (a) in claim 1 of the '341 patent, the step that calls for providing a probe-target duplex of an initializing oligonucleotide and a target polynucleotide, the duplexes are put in physically separated areas, and the initializing oligonucleotide binds to a different place on the target polynucleotide.

A.    **Claim 11 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 11 of the '341 patent obvious**

124.    In my opinion, the combination of Whiteley with Southern would not have rendered claim 11 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

125.    Claim 11, which depends from claim 1, would not have been obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claim 1 would not have been obvious to one of ordinary skill in the art based on the combination of Whiteley and the purported disclosure in Southern of "multiplex sequencing." (Metzker Report at p. 22.) Any disclosure in Southern of "multiplex sequencing" does not cure the failure of Whiteley to disclose the fundamental element of claim 1—the repeating step (e)—that ensures that the method of claim 1 is capable of sequencing a target DNA sequence. As I said earlier, Whiteley is not a method of DNA sequencing, and Dr. Metzker's reliance on Whiteley as teaching all of the elements of claim 11 except fro "multiplex sequencing" is therefore misplaced.

126.    Whiteley is directed to an assay for determine whether a given sample contains a point mutation. As stated in the column 4, lines 6 to 9 of Whiteley, the method is limited in its usefulness:

> The above method is directly applicable to detecting genetic diseases particularly those resulting from single base pair mutations and may be made more precise by comparative results from tests wherein each of the nor mal and abnormal sequence is made the target sequence.

As stated in column 1, lines 6 to 11 of Whiteley, Whiteley is limited to assaying one position on a known target:

> This invention relates to the detection of specific sequences of nucleotides in a variety of nucleic acid samples, and more particularly to those which contain a sequence characterized by a difference in a single base pair from a standard sequence.

**39**

Also, as I stated earlier, AB's own patents describe Whiteley in a manner that would suggest that AB did not consider Whiteley to be a method for sequencing DNA.

127.    There simply would have been no reason for one of ordinary skill in the art in 1994-95 to combine Whiteley, which is not directed to DNA sequencing with the teaching in Southern of "multiplex sequencing" as suggested by Dr. Metzker. Moreover, Dr. Metzker offers no explanation of how Southern's purported disclosure of "multiplex sequencing" cures all of the other missing elements of Whiteley such as the lack of any repeating step, and the lack of any teaching that would allow one to obtain sequence information on two contiguous positions in an unknown sequence.

128.    Furthermore, because Whiteley did not disclose the step of generating an extension oligonucleotide called for in step (d) of claim 1, or the repetition of steps called for in step (e) of claim 1, there would be no reason for one of ordinary skill in the art to combine Whiteley with Southern. Whiteley is not a method of sequencing DNA, and therefore one of ordinary skill in the art in 1994-95 would not have been motivated to combine Whiteley with Southern's purported disclosure of "multiplex sequencing."

> a.    **Specific rebuttals to Dr. Metzker's arguments regarding claim 11 of the '341 patent and Whiteley**

129.    It appears that Dr. Metzker did not appreciate that Whiteley lacked any disclosure of step (d) in claim 1, generating an extendable probe terminus, and step e, repeating the step (b), (c), and (d). Any disclosure in Southern of "multiplex sequencing" cannot cure this deficiency in the disclosure in Whiteley, and consequently, claim 11 would not have been obvious to one of ordinary skill in the art in 1994-95 based on the combination of Whiteley and Southern.

XIV.    **Claim 12 of the '341 patent is not invalid**

130.    Claim 12 depends from claims 1 and 11, so it includes all of the limitations of claims 1 and 11, and adds the limitation that each extension probe from step (b) of claim 1 of the '341 patent has a chain-terminating moiety at the terminus distal to the initializing oligonucleotide probe.

131.    This means is that the extension probes described in step (b) of claim 1 are oligonucleotides that have been modified at one end to prevent a covalent bond from forming with any subsequent probes or through the action of a ligase enzyme or DNA polymerase.

A.    **Claim 12 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 12 of the '341 patent obvious**

132.    In my opinion, the combination of Whiteley with Southern would not have rendered claim 12 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

133.    Claim 12 includes all of the limitations of claims 1 and 11, and adds the additional limitation of to the use of a chain-terminating moiety on one end of the extension probe. Dr. Metzker cannot establish that claims 1 or 11 would have been obvious to one of ordinary skill in the art in 1994-95 based on Whiteley alone, and therefore cannot establish that claim 12 would have been obvious to one of ordinary skill in the art in 1994-95. Dr. Metzker states that Southern discussed the use of chain-terminating moieties, but that cannot cure the fact that claim 1 was not obvious to one of ordinary skill in 1994-95.

134.    One of ordinary skill in the art would not have combined any of the discussion in Whiteley with the method discussed in Southern because the respective methods discussed in Brennan and Southern are fundamentally different. In my opinion, one of ordinary skill in the art in 1994-95 would not have considered the method of Whiteley to be a method to "sequence"

**41**

DNA because Whiteley did not teach a method that would have allow one to obtain sequence information for two contiguous positions on an unknown target DNA.

135.    I understand that "obviousness" requires that each and every limitation of the claimed invention that is not disclosed by a particular prior-art reference (here Whiteley), then some logical combination of existing prior-art references might be used to add the missing limitation(s), and then by the combination, infer the claimed invention. I am not aware of any other prior-art reference available to one of ordinary skill in the art by April, 1995 that, when combined with Whiteley, rendered claim 12 of the '341 patent obvious to one of ordinary skill in the art.

136.    Unlike Whiteley, which did not disclose the repetition of any steps, claim 1 of the '341 patent including the ability to create systems that continuously generate sequence information using real-time identification "in the extended duplex" of bases in the target sequence. Whiteley is so strikingly different from the method of claim 1 because it did not "sequence" DNA by performing a process and then repeating that process. If one wanted to sequence or even re-sequence the human genome, or if one were looking for mutations associated with a disease such as cancer, you would need to sequence long stretches of a target, unknown DNA sample. Because Whiteley did not allow for the repeating of the steps as in claim 1 of the '341 patent, in my opinion one of ordinary skill in the art in 1994-95 would not even refer to Whiteley as a method for "sequencing" DNA. The order of steps and repetition of those steps is the difference between a method capable of sequencing DNA (obtain sequence information about two contiguous nucleotide positions), and an assay for point mutations as taught by Whiteley.

**42**

EXHIBIT J

**XV.    Claim 16 of the '341 patent is not invalid**

137.    Claim 16 depends from claims 1 and 11, so it includes all of the limitations of claims 1 and 11, and adds the additional step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

138.    Capping involves treating DNA in such a way as to modify the existing extendable terminus so as to prevent any further extension from that terminus. The use of a capping step recognizes that not all reactions are 100% efficient and so, to reduce "noise" in the data being generated, termini that failed to react in one cycle are prevented from participating in future cycles of the method.

**A.    Claim 16 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

**1.    Whiteley did not render claim 16 of the '341 patent obvious**

139.    In my opinion, the combination of Whiteley with Brenner would not have rendered claim 16 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

140.    Claim 16 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1 and 11 would not have been obvious based on Whiteley in combination with any prior art. Specifically, Whiteley did not disclose the repetition of the steps of claim 1. As I said earlier, Whiteley would not have been considered by one of ordinary skill in the art in 1994-95 to be a method for sequencing DNA. Any disclosure in Brenner of capping unligated probes cannot cure these defects in Whiteley.

141.    Dr. Metzker also seems to ignore that a prior-art reference must disclose not only the individual steps of claim 1, but also disclose performing those steps in the same order as in claim 1 and repeating those steps. In failing to appreciate this aspect of claim 1 of the '341

**43**

patent, Dr. Metzker appears to have misunderstood the differences between Whiteley and the method claimed in claim 16 of the '341 patent.

## XVI.    Claim 17 of the '341 patent is not invalid

142.    Claim 17 depends from claim 11, so it includes all of the limitations of claims 1 and 11, and adds the additional limitation in that the step (d) of claim 1, "generating…," includes cleaving a chemically scissile internucleosidic linkage in the extension oligonucleotide probe.

143.    This means that the extension oligonucleotide probe used in step (b) of claim 1 is a particular type of probe that contains a bond between the nucleotides that can be cleaved by a chemical means which does not cleave or damage other features of the probe. In my opinion, the phrase "chemically scissile" requires that the bond be cleavable by chemical means, not by enzymatic means. This is described in the '341 patent at column 10, lines 11-16:

> The phosphoramidate linkage described above is an example of a general class of internucleosidic linkages referred to herein as "chemically scissile internucleosidic linkages." These are internucleosidic linkages that may be cleaved by treating them with characteristic chemical or physical conditions , such as an oxidizing environment, a reducing environment, light of a characteristic wavelength (for photolabile linkages), or the like.

144.    The '341 patent goes on to describe that other chemically scissile linkages that are not internucleosidic can be used in the invention as long as they "may be chemically converted into" an extendable nucleotide. ('341 patent, at col. 10, line 27.) Included within the list of references cited under that section of the '341 patent is the Canard reference ("International application number PCT/FR400345"). Canard, however, discussed the regeneration of an extendable probe terminus by treating the terminal nucleotide with a chemical (*e.g.,* sodium periodate) (see Fig. 9 of Canard).

A.    **Claim 17 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 17 of the '341 patent obvious**

145.    In my opinion, the combination of Whiteley with any of Southern, Sibson, Brennan, or Brenner would not have rendered claim 17 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

146.    Claim 17 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1 and 11 would not have been obvious in view of Whiteley in combination with either of Sibson, Brennan, or Brenner. Specifically, Whiteley did not disclose repeating the steps of claim 1 in the specific order of claim 1 (repeating steps (b), (c), and (d).) As I have stated, the repetition of the steps in claim 1 is what define claim 1 as a method of sequencing, and compared to the Whiteley method for assaying particular, known mutations at a single position on a target.

147.    I am also not aware of any reference cited in the report of Dr. Metzker where chemically cleavable internucleosidic linkages are used in DNA sequencing. I understand that the obviousness of a claim depends on the combination of two or more pieces of prior art that, when combined, render the claimed invention obvious to one of ordinary skill in the art. Here, there is simply no reference which Dr. Metzker can combine with Whiteley to establish the obviousness of claim 17 because Southern, Sibson, Brennan, and Brenner do not describe the use of extension oligonucleotide probes with chemically scissile internucleosidic linkages. Without the combination of references that collectively teach all of the elements of claim 1, Dr. Metzker cannot establish that claim 17 of the '341 patent would have been obvious to one of ordinary skill in the art in 1994-95.

148.    Furthermore, because Whiteley did not disclose the step of generating an extension oligonucleotide called for in step (d) of claim 1, or the repetition of steps called for in step (e) of claim 1, there would be no reason for one of ordinary skill in the art to use a scissile linkage at all, let alone a chemically scissile internucleosidic linkage. It simply would not be necessary in Whiteley because Whiteley could not take advantage of the benefit of using a cleavable internucleosidic linkage. For this additional reason, one of ordinary skill in the art would not have been motivated to combine any internucleosidic linkage with Whiteley.

149.    I must also reiterate that Whiteley would not have been considered by one of ordinary skill in the art in 1994-95 to be a method for sequencing DNA, and therefore, one of ordinary skill in the art would not have been motivated to combine Whiteley with any other reference. In fact, if I heard a scientist at that time refer to Whiteley as a sequencing method, I would have questioned their understanding of the basic technology and competence. Accordingly, in my opinion, one of ordinary skill in the art would not have been motivated to combine the assay of Whiteley with the disclosures in Southern, Sibson, Brennan, and Brenner.

> ### a.    Specific rebuttals to Drs. Metzker's arguments regarding claim 17 of the '341 patent and Whiteley

150.    Dr. Metzker cites no prior-art reference where probes containing chemically scissile internucleosidic linkages are used in DNA sequencing. Dr. Metzker states that "it was well known in the art to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction." (Metzker Report at p. 21.) Dr. Metzker appears to have made a mistake in his analysis because he continues on to cite Southern as an example of how well known chemically scissile internucleosidic linkages were in the art.

151.    All of the probes used in Southern contain what Southern refers to as a "tag," and all of the "tags" are located on the terminus of the probes. All of the probes discussed in

Southern feature a scissile linkage between a nucleotide and a "tag," and as such are not internucleosidic linkages. Dr. Metzker offered no evidence showing how chemically scissile internucleosidic linkages were so "well known in the art," and each of Southern, Sibson, Brennan, or Brenner do not teach the use of chemically scissile internucleosidic linkages to generate an extendable probe terminus in a DNA sequencing method.

152.    Sibson, Brennan, and Brenner did not disclose the generation of an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage. Sibson was not published until July 27, 1995, which is after the filing date of Dr. Macevicz's patent application. I understand that Sibson is therefore not available to use as a prior-art reference against the claims of the Macevicz patents. Dr. Metzker admits that Sibson does not qualify as prior art, so his citation to Sibson in this context is puzzling. (Metzker Report, at p. 13.) Furthermore, Sibson discusses the use of restriction enzymes to cleave internucleosidic linkages, not chemical means to cleave the internucleosidic linkages as is required by the limitation of claim 17 that requires the use of "a chemically scissile internucleosidic linkage."

153.    Sibson actually taught away from cleaving internucleosidic linkages to regenerate an extendable probe terminus. Sibson discussed using an oligonucleotide where the "nucleotides are joined by phosphorothioate linkages so that they are *exonuclease resistant*." (Sibson, at p. 45, lines 5-7.) Sibson did not disclose using phosphorothioate linkages to regenerate an extendable probe terminus, but instead discloses phosphorothioate linkages because *they do not* cleave under the reactions conditions in Sibson (*i.e.*, exo- and endo-nuclease treatment.)

154.    Brennan also taught away from cleaving internucleosidic linkages to regenerate an extendable probe terminus. Brennan discussed using an oligonucleotide containing phosphorothioate linkages because they are not cleaved by nucleases:

> In some aspects of the invention oligonucleotides containing altered ribose-phosphate backbones can be used such as oligonucleotides containing phosphorothioate or phosphordithioate linkages which are capable of resisting nuclease digestion.

(Brennan, at column 6, lines 21-26.) Brennan discussed the use of phosphorothioate linkages to prevent the cleaving of those linkages, not as an affirmative statement that those linkages are scissile by chemical or any other means.

155.    Brenner discloses the use of restriction enzymes or nucleases to cleave "the ligated complex" in Brenner. (Brenner, at col. 7, lines 22-30.) As noted in Brenner, "a ligated complex is formed with the presence of the labeled chain-terminating nucleotide which is subsequently cleaved with the appropriate nuclease, e.g., a class IIs restriction endonuclease such as Fok I, or the like." (Brenner, at col. 7, lines 28-30.)These are not chemical means of cleavage, and no such methods of cleavage are disclosed in Brenner.

156.    I understand that obviousness depends on the combination of two or more prior-art references that one of ordinary skill in the art at the relevant time would have been motivated to combine to create the claimed invention. There is simply no prior-art reference cited by Dr. Metzker that describes the use of extension oligonucleotide probes containing a chemically scissile internucleosidic linkage that one of ordinary skill in the art in 1994-95 would or could have combined with Whiteley to replicate the process in claim 17 of the '341 patent. Therefore, there is no factual basis for Dr. Metzker's conclusion that one of ordinary skill in the art in 1994-95 would have found claim 17 obvious by combining Whiteley with any of Southern, Sibson, Brennan, or Brenner.

EXHIBIT J

## XVII.  Claim 18 of the '341 patent is not invalid

157.    Claim 18 depends from claim 17, so it includes all of the limitations of claims 1, 11, and 17 and adds the additional limitation that the internucleosidic linkage is a phosphoramidate linkage.

158.    This means that the linkage in the extension oligonucleotide probe used in step (b) of claim 1 is a particular type of probe, one that has a phosphoramidate bond, which can be cleaved using mildly acidic chemicals. Below, is a drawing of a phosphoramidate linkage between two nucleotides (Thymine and Adenine):



EXHIBIT J

A.    **Claim 18 of the '341 patent was not obvious to one of ordinary skill in the art in 1994-95**

1.    **Whiteley did not render claim 18 of the '341 patent obvious**

159.    In my opinion, the combination of Whiteley with Mag would not have rendered claim 18 of the '341 patent obvious to one of ordinary skill in the art in 1994-95.

160.    Claim 18 was not obvious to one of ordinary skill in the art in 1994-95 for at least the same reasons that claims 1, 11 and 17 would not have been obvious. Specifically, Whiteley did not disclose performing the steps in order contained in claim 1, or repeating the steps of claim 1 in the specific order of claim 1 (repeating steps (b), (c), and (d).) As I have stated, Whiteley lacks of any mention of iteratively repeating the steps to obtain what could be regarded as sequence information. One of ordinary skill in the art in 1994-95 would not have considered Whiteley as relevant to the obviousness of the asserted claims. Whiteley was not a method for "sequencing" as one of ordinary skill in the art in 1994-95 would have understood the term "sequencing." In fact, if I heard a scientist at that time refer to Whiteley as a sequencing method, I would have questioned their understanding of the basic technology and competence.

161.    The dodecamer disclosed in Mag did not have any label at all, and there is no basis on which one of ordinary skill in the art could have concluded that the dodecamer oligonucleotide in Mag could be labeled, and then used in Whiteley.

162.    Simply replacing the "diagnostic probe" in Whiteley with the type of dodecamer disclosed in Mag would not change the fact that Whiteley did not disclose repeating of any of the steps in Whiteley, let alone repeating in the same order as in claim 1 [repeating steps (b), (c), and (d)]. This critical deficiency in Whiteley is not cured by the disclosure in Mag of a dodecamer containing a phosphoramidate linkage.

**50**

163.     It is only with the use of hindsight—that is the inclination to view the use of a phosphoramidate in DNA sequencing as more predictable now than it actually was in 1994-95. The bias that results from hindsight is being used by Dr. Metzker in that the fact that Dr. Macevicz invented the use of chemically scissile phosphoramidate linkages in a DNA sequencing method as contained in claim 18 cannot be used to view the prior art in a manner that makes the combination of prior art appear more predictable than it actually was at the time. To avoid the bias of hindsight, I understand the law requires that there be some motivation to combine two references so that the combination is not the result of hindsight.

164.     Furthermore, because Whiteley did not disclose the step of generating an extension oligonucleotide called for in step (d) of claim 1, or the repetition of steps called for in step (e) of claim 1, there would be no reason for one of ordinary skill in the art to use a scissile linkage at all, let alone a chemically scissile internucleosidic linkage. Whiteley did not cleave any of the probes, and therefore has no need to use a scissile linkage of any sort. For this additional reason, one of ordinary skill in the art in 1994-95 would not have been motivated to combine Whiteley with the dodecamer of Mag.

> **a.      Specific rebuttals to Dr. Metzker's arguments regarding claim 18 of the '341 patent and Whiteley**

165.     Dr. Metzker ignores the lack of motivation to combine Whiteley with Mag. Dr. Metzker simply states without any analysis that "the Mag reference describes the generation of oligonucleotides containing phosphoramidate linkages." (Metzker Report at p. 21.) Nothing more is said about why one of ordinary skill in the art would have been motivated to combine Southern with Mag, or what advantages would be gained by the combination. In my opinion, Dr. Metzker's arguments are not supported by evidence, and certainly not by a fair reading of what was discussed in Whiteley.

EXHIBIT J

166.    Dr. Metzker's proposed combination of Whiteley and Mag could only have been achieved with the use of hindsight. The '341 patent describes the use of oligonucleotides containing chemically scissile internucleosidic linkages, and further discloses using a phosphoramidate linkage. As disclosed in the '341 patent, Dr. Macevicz's use of a phosphoramidate linkage stems from his appreciation of their utility in DNA sequencing. Neither the prior art, the knowledge of one of ordinary skill in the art, nor any other source offered this motivation because no one other than Dr. Macevicz thought of the utility of using phosphoramidate linkages in a DNA sequencing method.

## XVIII. Claim 1 of the '597 patent is not invalid

167.    As part of my review of the issues in this case, I reviewed the '597 patent. I understand that the '597 patent shares the same specification as the '341 patents, but each have different claims. I also understand that for purposes of determine what references qualify as prior art, the '597 patent, although filed later, shares the same priority date of April 17, 1995.

168.    Claim 1 of the '597 patent describes a method for determining the sequence of a target nucleic acid through the process of hybridization and ligation. The method involves [step (a)] hybridization of an initializing oligonucleotide, followed by hybridization and ligation of an extension oligonucleotide probe to form an extended duplex. The hybridization and ligation of the extension oligonucleotide probe is then used in [step (b)] to identify at least one nucleotide bases in the target sequence. This process is then iterated with a second round that repeat steps (a) and (b).

169.    As shown in Figure 1 of the '597 patent, if the extension oligonucleotides are N bases in length, then the process would involve N steps. In the first round, the initializing oligonucleotide would hybridize to a position on the target sequence that extended up to the position where the unknown sequence to be determined began (the 0 position). Following the

**52**

hybridization and ligation of the extension oligonucleotide, and the identification of the

nucleotide bases in the target sequence, the extended duplex is washed away. Then a second

initializing oligonucleotide is hybridized to the target nucleic acid, but this time extending to a

position one nucleotide base away from the start of the unknown sequence to be determined.

This is followed by hybridization and ligation of the extension oligonucleotide and identification

of one or more bases in the target. Following washing of the extended duplex, a third round of

the process begins, this time with a new initializing oligonucleotide that extends to within 2

bases of the unknown sequence. In the third round, the initializing oligonucleotide extends to

within 3 bases. And so on, until the Nth round, where the initializing oligonucleotide extends to

within N-1 bases of the start of the unknown sequence.

170.    As shown in Figure 1, and encompassed by claim 1 of the '597 patent, this

process allows for the iteration of the cycles in a manner that allows different sites on the target

polynucleotide to be interrogated.

171.    It is also worth noting that the '597 patent describes the use of libraries, or

"mixtures " of probes rather than single extension probes ('597 patent, at col. 6, lines 35-38):

> Preferably, the oligonucleotide probes are applied to templates as mixtures comprising all
> possible sequences of a pre-determined length.

The use of such mixtures is important as they allow the determination of the sequence of an

unknown target, as described in step (c). through repeated application of steps (a) and (d) of

claim 1.

172.    Claim 1 of the '341 patent is directed to using sequential steps within the same

cycle to interrogate positions that are spaced apart on the target polynucleotide. For example, if

the extension oligonucleotide probes are designed to interrogate the fifth position on the target

polynucleotide, claim 1 of the '341 patent is directed to the process whereby, for example, the

fifth position on the target polynucleotide is interrogated, and in the next cycle the tenth position on the target is interrogated.

173.    Claim 1 of the '597 patent, however, is focused on "reregistering" the initializing oligonucleotide to allow for a shifting (or reregistering) of the interrogation position down one or more nucleotides. This is described in the specification of the '597 patent at column 3, lines 19-27:

> In one aspect of the invention , a plurality of different initializing oligonucleotides is provided for separate samples of the template. Each initializing oligonucleotide forms a duplex with the template such that the end undergoing extension is one or more nucleotides out of register, or phase, with that of every other initializing oligonucleotide of the plurality. In other words, the starting nucleotide for extension is different by one or more nucleotides for each of the different initializing oligonucleotides . In this manner, after each cycle of extension with oligonucleotide probes of the same length, the same relative phase exists between the ends of the initializing oligonucleotides on the different templates . Thus, in a preferred embodiment, where, for example, i) the initializing oligonucleotides are out of phase by one nucleotide, ii) 9-mer oligonucleotide probes are used in the extension step , and iii) nine different initializing oligonucleotides are employed, nine template nucleotides will be identified simultaneously in each extension cycle.

As noted in this portion of the specification, in each repeated cycle "different initializing oligonucleotides" are used to allow for the each extension oligonucleotide to be "out of register, or phase" with the other initializing oligonucleotide. This embodiment of the Macevicz inventions is claimed in the '597 patent.

**A.    Claim 1 of the '597 patent was not anticipated by Whiteley**

174.    In my opinion, Whiteley did not disclose each and every limitation in claim 1 of the '597 patent, and therefore did not anticipate claim 1 of the '597 patent.

175.    Whiteley discussed a process for detecting single-base mutations, or what are now known as single nucleotide polymorphisms (SNPs), in a target nucleic acid sequence. The method involved the hybridization of a first oligonucleotide probe, referred to as a "contiguous

probe" (Whiteley, col. 5, lines 48-49 and col. 5, lines 8-11), to a target nucleic acid, followed by the hybridization of a second oligonucleotide probe, which Whiteley referred to as a "diagnostic probe"(col. 5, lines 45-46, and col. 5, lines 5-8), followed by ligation of the two. As Whiteley discussed, the "diagnostic probe" hybridized to the "diagnostic portion" of the target sequence, "which contains the nucleotide modification, the presence or absence of which is detected." (Whiteley, at col. 5, lines 6-7.) This indicated that the probe was designed to be used to detect a specific nucleotide at a specific location within the target nucleic acid.

176.    Whiteley suggested that at least one of these oligonucleotide probes be labeled. Following hybridization and ligation, the unhybridized probes were washed away and the test sample was assayed for the presence of the label.

177.    To "anticipate" a claim, I understand that a prior-art reference, here Whiteley, has to have disclosed each and every limitation in the claim. With regard to claim 1, each and every one of the steps have to be performed, and the steps must be performed in a specified order. Whiteley did not disclose this. While Whiteley discussed some of the elements of steps (a) and (b) in claim 1, it did not discuss them in detail. Whiteley restricted the analysis of the target to a determination of whether specific nucleotides were present or absent at specific locations and did not describe an iterative process, using a library of oligonucleotide extension probes, and iteratively hybridizing, ligating, and identifying bases in the target sequence. The method discussed in Whiteley could not be used to determine unknown bases but only the presence or absence of a specific nucleotide at a specific location.

178.    Whiteley did not teach step (c), the iterative application of steps (a) and (b) following the first application of steps (a) and (b). Because Whiteley did not teach the critical step (c), Whiteley did not anticipate claim 1 of the '597 patent.

179.    As noted above, claim 1 of the '597 patent is focused on the concept of "reregistering" the initializing oligonucleotide to allow for a shifting (or reregistering) of the interrogation position down one or more nucleotides. The repeating of the cycle, as contained in step (c) of claim 1, requires the use of a different initializing oligonucleotide. Whiteley did not disclose repeating the cycle using a different initializing oligonucleotide to "reregister" and allow for the interrogation of different positions on the target. For this additional reason, I find that Whiteley did not anticipate claim 1 of the '597 patent.

180.    The method discussed in Whiteley, unlike is the methods described and claimed in the Macevicz patents, focused on identifying the nucleotide base at a single location within the target DNA rather than a series of nucleotide bases within the target sequence. As such, Whiteley did not envision the type of iterative process recited in claim 1 of the '597 patent. Specifically, Whiteley did not include step (c) of claim 1, which is an iterative repetition of steps (a) and (b) after the initial round of ligation and identification. As such, Whiteley did not disclose the "method for identifying a sequence" described and claimed in the '597 patent.

181.    Whiteley also spoke only to the determination of a single nucleotide modification in a "diagnostic portion" of the target sequence rather than the identification of a sequence of unknown bases in the target nucleic acid.

182.    In some diseases, a number of causative mutations have been identified, as well as the surrounding DNA sequence. Whiteley discussed a method for determining the presence or absence of a particular mutation at a particular location. The "contiguous probe" in Whiteley was complementary to the non-varying portion of the target sequence. The diagnostic probe contained a nucleotide complementary to one of the possible nucleotides at the known position of the mutation. Whether the hybridization and ligation of these two probes occurred would

**56**

allow one to determine the presence or absence of the nucleotide at the known position. But the process required prior knowledge of the sequence of the target and its known variants to design the "diagnostic probe."

183.    The sequencing enabled by the '597 patent allows determination of previously unknown sequence in a target nucleic acid. This would allow, for example, the identification of new, previously undiscovered mutations, that could be important for understanding the genetic basis for disease. The process discussed in Whiteley could not be used for this purpose.

184.    Step (c) is one of the elements in the '597 patent that specifically enables novel sequence determination. Whiteley did not disclose the specific "repeating" steps of claim 1, step (c) of the '597 patent that involve extending a second, different initializing oligonucleotide by ligating an oligonucleotide probe to one end of the initializing oligonucleotide, and identifying one or more nucleotides in the target polynucleotide. There is no explicit "repeating" discussed in Whiteley. The closest Whiteley comes to suggesting this in Col 13, lines 3-17:

> While preferred embodiments of the present invention have been described, it will be apparent to those skilled in the art that many changes and modification may be made without departing from the invention in broader aspects. For example, it is clear that the contiguous probe may be either direction along the nucleic acid, or that the contiguous probe may be longer or shorter than the diagnostic probe, depending on the particular target sequence it is desired to identify. Also, the above techniques are useful in determining if a specific sequence is located next to another specific sequence in a DNA chain, or similarly a series of probes each adjacent to the next could be used to demonstrate the proximity of specific sequences or to increase the size of the ligated probes.

185.    What this paragraph discusses is the determination of whether multiple known nucleotide variants are present near each other, rather than describing a method for determining an unknown sequence. As such, neither this paragraph, nor any other portion of Whiteley, disclosed the repeating step of the '597 patent.

186.    As I said earlier, claim 1 of the '597 patent is directed to "re-registration" of the initializing oligonucleotide to allow for the sequence to be determined. Whiteley not only did not teach any sort of repeating of the steps of claim 1, but Whiteley did not disclose any reference to the re-registration of either the "diagnostic probe" or "contiguous probe."

187.    Based on these differences, I conclude that Whiteley did not disclose all of the limitations in claim 1 of the '597 patent, and therefore did not anticipate claim 1.

> **a.    Specific rebuttals to Drs. Metzker and Sibson's arguments regarding whether Whiteley anticipated claim 1 of the '597 patent**

188.    I do not agree with Drs. Metzker and Sibson's arguments regarding the anticipation of claim 1 by Whiteley.

189.    While Drs. Metzker and Sibson state that Whiteley discloses "every limitation" in claim 1, Drs. Metzker and Sibson appear to ignore the fact that the '597 patent describes and claims a method for sequencing DNA, in which the repeating step is essential. As I previously stated, there is no reference in Whiteley to repeating the steps of hybridizing, ligating, and identifying.

190.    Drs. Metzker and Sibson also do not appear to appreciate that claim 1 of the '597 patent is directed to the re-registration of the initializing oligonucleotide from the first cycle with the use of a different second initializing oligonucleotide. Instead, Drs. Metzker and Sibson appear to be assuming that claim 1 of the '597 patent is identical to claim 1 of the '341 patent with a couple less limitations. As a result of what appears to be an error in Drs. Metzker and Sibson's reading of claim 1 of the '597 patent, their analyses suffer a serious error, which appears, in part, to be the cause of their mistaken conclusions.

191.    Drs. Metzker and Sibson fail to recognize that Whiteley did not disclose the repeating step of claim 1 of the '597 patent, which is necessary for sequence determination

**58**

beyond mutation detection discussed in Whiteley. Drs. Metzker and Sibson both state Whiteley discloses ligating a second oligonucleotide onto the extendable probe terminus of the ligated diagnostic/contiguous probes. (Sibson Report, at p. 21; Metzker Report, at p. 27.) These statements, however, misinterpret the discussion in Whiteley (at col. 3, lines 3-17) that simply states that one could assay multiple sites at the same time. This is a far cry from a disclosure to extend off of the contiguous or diagnostic probes of Whiteley in a second cycle.

**B.    Claim 1 of the '597 patent was not obvious to one of ordinary skill in the art in 1994-95**

**1.    Whiteley did not render claim 1 of the '597 patent obvious**

192.    Based on my review of the prior art, the scope of claim 1 of the '597 patent, and my understanding of the level and skill of one of ordinary skill in the art in 1994-95, I conclude that claim 1 of the '597 was not obvious to one of ordinary skill in the art in 1994-95.

193.    After considering the opinion of Drs. Metzker and Sibson, and the art cited by them, I reached the opposite conclusion. In my opinion, claim 1 of the '597 patent was not obvious to one of ordinary skill in the art in 1994-95.

194.    I disagree with Drs. Metzker and Sibson's arguments that claim 1 of the '597 patent would have been obvious to one of ordinary skill in the art in 1994-95 based on Whiteley alone. It does not appear that Drs. Metzker and Sibson made any argument regarding the obviousness of claim 1 other than to state they believes that the claim is anticipated by Whiteley.[2] For the same reasons as I stated earlier, it is my opinion that claim 1 was not anticipated by Whiteley because each and every limitation of the claim is not taught in Whiteley and that, in fact, Whiteley did not even teach a method for "sequencing" DNA.

---

[2] Dr. Metzker adds some additional discussion of Whiteley (*see* paragraph __), but refrains from citing additional prior art to supply the limitations of claim 1 that are missing from Whiteley.

EXHIBIT J

195.    I understand that "obviousness" requires that, if each and every limitation of the claimed invention was not disclosed in a particular prior-art reference, then some logical combination of prior-art references could be used to infer the claimed invention. I am not aware of any other prior art that when combined with Whiteley rendered claim 1 of the '341 patent obvious to one of ordinary skill in the art. Because Drs. Metzker and Sibson failed to offer any argument on the obviousness of claim 1 of the '341 patent, I understand that Dr. Metzker cannot offer any additional arguments on this issue at trial.

196.    As I noted earlier, Drs. Metzker and Sibson also do not appear to appreciate that claim 1 of the '597 patent is directed to the re-registration of the initializing oligonucleotide from the first cycle with the use of a different second initializing oligonucleotide. Instead, Drs. Metzker and Sibson appear to be assuming that claim 1 of the '597 patent is identical to claim 1 of the '341 patent with a couple less limitations. As a result of what appears to be an error in Drs. Metzker and Sibson reading of claim 1 of the '597 patent, their analyses suffer a serious error, which appears, in part, to be the cause of their mistaken conclusions.

197.    Drs. Metzker and Sibson's error in reading claim 1 of the '597 patent results in a particularly perplexing analysis with regard to the issue of whether one of ordinary skill in the art would have considered claim 1 of the '597 patent obvious based on Whiteley alone. They both made no reference to the concept of re-registration of the initializing oligonucleotide as required by claim 1 and shown in Figure 1 of the '597 patent.

198.    Drs. Metzker and Sibson offers no reference to be combined with Whiteley, and there is therefore no factual basis for their conclusions that claim 1 of the '597 would have been obvious to one of ordinary skill in the art in 1994-95.

**XIX.  Whiteley was not material to the prosecution of the '341 or '597 patents**

    **A.  Whiteley was not material because it did not address DNA sequencing**

199.  Dr. Metzker characterizes Whiteley as disclosing "an assay for determining the presence of absence of a target sequence." (Metzker Report, at 12.)

200.  In contrast to Dr. Metzker's characterization of Whiteley, claim 1 of the '341 patent is directed to "a method for determining a sequence of nucleotides in a target polynucleotide."

201.  One of ordinary skill in the art in 1994-95 would have understood the phrase "determining a sequence of nucleotides in a target polynucleotide" in the '341 patent to mean determining the identities of the bases in a plurality of contiguous and adjacent nucleotides in a target polynucleotide.

202.  In contrast, the method of Whiteley was a genotyping assay, that is, an assay to test for the presence or absence of a previously known and completely characterized target. Whiteley cannot reasonably be read to disclose a method of determining the identities of a plurality of individual nucleotide bases at contiguous and adjacent positions. Consequently, Whiteley was plainly not directed to a method for what one of ordinary skill in the art would have understood to be "sequencing" in 1994-95. The method discussed in Whiteley was simply not related to the method recited in claim 1 of the '341 patent because the method of Whiteley was not a method for sequencing a target polynucleotide, but was instead a method for genotyping, and one of ordinary skill in the art in 1994-95 would have known this.

203.  AB's own patents that followed after Whiteley, such as U.S. Patent Nos. 5,912,148 and 6,130,073, acknowledged the limitations of Whiteley. In these patents, AB stated that Whiteley involves the preparation of probes complementary to a known target, which are designed to match the known sequence except for the one nucleotide being assayed:

**61**

A promising approach for identifying polynucleotides in such systems is the oligonucleotide ligation assay (OLA), Whiteley et al, U.S. Pat. No. 4,883,750. In this assay approach, oligonucleotides are prepared that are complementary to adjacent regions of a target sequence. The oligonucleotides are capable of hybridizing to the target so that they lie end-to-end and can be ligated when no mismatches occur at or near the contiguous ends. Whenever such mismatches do occur, then ligation is precluded. As a result, *a set of oligonucleotide pairs may be provided which are perfect complements of all the allelic variants of interest at a given locus*. By a judicious selection of labeling methodologies, a wide range of alleles, either from the same of different loci, can be specifically identified *in a single assay*.

(U.S. Patent No. 5,912,148, at col. 1, lines 33-47, emphasis added.) Nowhere is the "assay approach" of Whiteley referred to in AB's patents as a method of "sequencing" DNA.

204.    As is evident from this statement in AB's patents, Whiteley only discussed that with the "judicious selection of labeling methodologies, a wide range of alleles, either from the same of different loci, can be specifically identified *in a single assay*." AB's description of Whiteley in these patents was accurate because Whiteley merely suggested that one could assay multiple sites on a given target at the same time, not that the steps could be repeated in multiple cycles to "sequence" a target DNA.

205.    Both Drs. Metzker and Sibson cite the same portion of Whiteley as disclosing the repetition of the steps in Whiteley, but that portion of Whiteley (column 13, lines 3-17) said nothing about repeating or conducting another cycle of the method disclosed in Whiteley. As I noted earlier, that portion of Whiteley merely suggested that one could assay more than one position on the target at the same time using multiple sets of diagnostic and contiguous probes.

206.    Dr. Sibson argues that at least one nucleotide was identified in Whiteley (Sibson Report, at p. 10, 12), but the method discussed in Whiteley was limited to simply choosing between two fixed and previously characterized single-nucleotide choices at a given position. The main thrust of Whiteley was the joining of two probes in an assay to detect the presence or absence of a single nucleotide at a single location in a target, which are now widely known as

**62**

single nucleotide polymorphisms (SNPs). This was not "determining (identifying) a sequence of nucleotides in a (target) polynucleotide" as claimed in the '341 and '597 patents.

207.    Dr. Metzker, citing column 13, lines 3-17, asserts that Whiteley "clearly teaches ligating subsequent oligonucleotide probes to the extension probes previously ligated to the initializing oligonucleotide." (Metzker Report, at p. 20.) It is hardly "clear" that Whiteley discussed this element of the claimed methods. In fact, at another point in his report, Dr. Metzker is more forthcoming about that portion of Whiteley when he states, citing the same passage, "Whiteley also describes that the sequencing method can encompass many changes and modifications without departing from the invention, including the use of a series of probes each adjacent to the next for determining DNA sequence information." (Metzker Report, at p. 12.) Conspicuously absent from Dr. Metzker's summary of the passage at column 13, lines 3 to 17 of Whiteley is his bold statement that Whiteley "clearly" teaches ligating a second oligonucleotide onto the previously ligated probes. Dr. Sibson asserts that Whiteley "teaches ligating a series of adjacent probes to determine sequence information." (Sibson Report, at p. 13.) As I have explained above, Drs. Metzker and Sibson are misreading Whiteley.

208.    I understand that a prior-art reference can only be considered "material" to the patentability of a claimed invention if a reasonable patent examiner would have considered the information important to his decision-making process. Whiteley cannot meet that threshold requirement because it simply was not directed to the same subject matter as the inventions described and claimed in the '341 and '597 patents, i.e., DNA sequencing methods. In my opinion, Whiteley was therefore not material to the patentability of any of the claims of the '341 and '597 patents, and a reasonable examiner would not have considered the information in Whiteley to be important to his decision-making process.

EXHIBIT J

**B.      Whiteley was not material because it was cumulative to Brennan**

209.     I understand that a prior-art reference can only be considered "material" to the patentability of a claimed invention if its disclosure is not cumulative to the disclosures of the prior-art references that were considered by the examiner during the prosecution of the patent.

210.     Drs. Metzker and Sibson variously state that Whiteley disclosed: (1) hybridization of oligonucleotides to a longer polynucleotide; (2) ligation of the oligonucleotides when they are complementary to the longer polynucleotide and are hybridized adjacently; (3) an extendable terminus on at least one of the oligonucleotides; (4) a multiplicity of oligonucleotides to facilitate multiple identifications; and (5) repeating the ligation and identification steps (Metzker Report, at p. 12, 19-20; Sibson Report, at p. 10, 12-13).[3]

211.     Even if one were to accept all of Drs. Metzker and Sibson's characterizations of Whiteley as correct, Whiteley would still not have been material to the patentability of the claimed inventions in the '341 and '597 patents because to the extent that these features were discussed in Whiteley, they were discussed in Brennan, which was considered by the examiner and overcome during prosecution.

212.     Not only did Brennan discuss the same technological features that Drs. Metzker and Sibson say were discussed in Whiteley, Brennan actually disclosed a nearly identical method as the method taught by Whiteley. At column 1, lines 52-58, Brennan discussed the Oligonucleotide Ligation Assay method of Landegren, which I have reviewed and am of the opinion is very similar to Whiteley.

---

[3] I disagree that this teaching is present in Whiteley in this form, but to the extent that it was disclosed in Whiteley, it was also disclosed to at least the same extent in Brennan.

213.    Brennan's explicit description of Landegren's OLA method[4] and citation of the Landegren patent itself are sufficient to establish that the examiner was aware of the methods disclosed in Whiteley if he felt that the description of the OLA method was material to patentability. We know that the patent examiner thoroughly reviewed Brennan because the examiner relied on it in his April 16, 1996 Office Action rejecting the then-pending claims.

214.    Even Drs. Metzker and Sibson seem to understand that the individual technological features they say were disclosed in Whiteley were all discussed in Brennan:

> Brennan describes a DNA sequencing method employing the ligation of multiple labeled extension oligonucleotides to an initializing primer hybridized to a nucleic acid template. The extension oligonucleotides come from a pool of labeled random probes that permit the identification of one or more nucleotides complementary to the ligated probes. (*See* Brennan at Col. 2, line 23 – Col. 3, line 16, Col. 4, lines 31-63, Col. 5, line 42- 54, Col. 7, lines 42 – 54, and Figure 1B.)

(Metzker Report, at p. 8-9.)

> Brennan discloses a DNA sequencing method employing the ligation of labeled oligonucleotides to an initializing primer hybridized to a polynucleotide, where the labeled oligonucleotides permit the identification of one or more nucleotides complementary to the ligated oligonucleotides. (*See* Brennan at Col. 2, line 23 – Col. 3, line 16, Col. 4, lines 30-63, Col. 5, line 42- 54, Col. 7, lines 42 – 55, and Figure 1B.)…Brennan teaches using overlapping primers that anneal to the polynucleotide in separate aliquots, thus forming distinct duplexes. (Brennan at Col. 4, line 44 – Col. 5, line 17, and Figure 1.)

(Sibson Report, at p. 8-9.)

215.    Given that Brennan discussed the technological features that Drs. Metzker and Sibson say were discussed in Whiteley, and indeed Brennan discussed the same method disclosed in Whiteley (OLA), I find that Whiteley (which for reasons stated above is not at all related to the '341 and '597 claimed subject matter, DNA sequencing) was cumulative to Brennan, and therefore was not material to the prosecution of the '341 or '597 patents.

---

[4] Figure 5 of Brennan, which I have annotated in Exhibit B, depicts the individual steps that are said to be discussed in Landegren.

Signed on this __13th__ day of June, 2008, in Dover, Massachusetts

John Quackenbush, Ph.D.

# Exhibit A

# CURRICULUM VITAE

**Date: April 14, 2008**

**Name:**        **John Quackenbush, Ph.D.**

**Office Address: 44 Binney Street, SM822, Boston, MA 02115**

**Home Address: 12 Walpole Street, Dover, MA 02030**

**Work e-mail: johnq@jimmy.harvard.edu Work FAX: 617.582.7760**

**Date & Place of Birth:** January 4, 1962 Kingston, PA

**Education:**

| | | | |
|---|---|---|---|
| 1983 | Physics | B.S. | California Institute of Technology, Pasadena, CA |
| 1984 | Physics | M.S. | University of California, Los Angeles, CA |
| 1990 | Theoretical Particle Physics | Ph.D. | University of California, Los Angeles, CA |

**Postdoctoral Training:**

1990-1992        Postdoc Experimental Particle Physics, University of California, Los Angeles, CA

1992-1994        Staff Scientist Molecular Genetics and Genomics, The Salk Institute for Biological Studies, La Jolla, CA

1994-1996        Research Associate Genomics and Bioinformatics, Stanford Human Genome Center, Palo Alto, CA

**Academic Appointments:**

2005- present        Professor of Biostatistics and Computational Biology, Department of Biostatistics and Computational Biology, Dana-Farber Cancer Institute
Research Activities: Application of genomic technologies and integrative computational analysis and modeling of cellular systems to the understanding of human cancers and other diseases.

2005- present        Professor of Computational Biology and Bioinformatics, Department of Biostatistics, Harvard School of Public Health
Research Activities: Application of genomic technologies and

EXHIBIT J

John Quackenbush

integrative computational analysis and modeling of cellular systems to the understanding of human cancers and other diseases.

1997 - 2001    Associate Investigator, The Institute for Genomic Research Research Activities: Development and implementation of technology and strategies necessary for functional analysis of the human and other genomes. Analysis of human gene expression in colon tumors using microarrays, rodent models of heart, lung, blood and sleep disorders and gene expression in Arabidopsis. Director of the TIGR Gene Index Project

2003- present  Professor, Chemical Engineering, University of Maryland

2002 - 2006    Investigator, The Institute for Genomic Research
Research Activities: Development and implementation of technology and strategies necessary for functional analysis of the human and other genomes. Analysis of human gene expression in colon tumors using microarrays, rodent models of heart, lung, blood and sleep disorders and gene expression in Arabidopsis. Director of the TIGR Gene Index Project.

2000- present  Professor, Department of Biochemistry, The George Washington University Activities: Instructor in various courses, curriculum committee for Genomics.

1998 – 2005    Lecturer, The Department of Biostatistics, The Johns Hopkins University. Activities: Instructor in the Masters In Biotechnology Program

1997           Assistant Investigator, The Institute for Genomic Research
Research Activities: Development and implementation of technology and strategies necessary for functional analysis of the human and other genomes.

1994 - 1997    Research Associate, Stanford Human Genome Center, Stanford University
Research Activities: Project leader for development and implementation of a transposon-mediated strategy for large-scale genomic DNA sequencing including development and implementation of laboratory protocols, computer software, and instrumentation.

1992 - 1994    Staff Scientist, The Salk Institute for Biological Studies, Molecular Genetics Laboratory Research Activities: Development of improved methods for DNA sequencing, combinatoric strategies and devices for screening large libraries, simulation and optimization of single pass sequencing strategies including genome sequence sampling. Project director for the STS content mapping of chromosome 11.

1990 - 1992    Postdoctoral Fellow, Department of Physics, University of California, Los Angeles Research Activities: Research in particle physics, field theory and phenomenology. Founding member of the Antiproton

2

John Quackenbush

| | |
|---|---|
| | Experiment (APEX) collaboration that set the world's best experimental limit on the lifetime of the antiproton. |
| 1987 - 1992 | Visiting Lecturer, Department of Physics, University of California, Los Angeles |
| 1984 - 1996 | Physics Instructor, Southern California Science Institute, New College of California |
| 1983 – 1990 | Teaching Fellow, Department of Physics, University of California, Los Angeles |
| 1983 - 1990 | Research Fellow, Department of Physics, University of California, Los Angeles *Thesis Supervisor: E.T. Tomboulis* <u>Research Activities</u>: Research in elementary particle physics, mathematical physics, field theory focusing on the development of two-dimensional gauge field theory models and the construction of associated string theory models. |

### Hospital or Affiliated Institution Appointments:

| | |
|---|---|
| 2003 – present | Adjunct Professor, Department of Biostatistics, Bloomberg School of Public Health, The Johns Hopkins University |
| 2005- present | Professor, Department of Biostatistics and Computational Biology, Dana-Farber Cancer Institute |

### Hospital and Health Care Organization Service Responsibilities:

| | |
|---|---|
| 2005- present | Primary research areas are functional genomics and bioinformatics focused on the integration of diverse data types to provide insight into biological systems with the goal of identifying mechanisms underlying a range of human diseases. Department of Biostatistics and Computational Biology, Dana-Farber Cancer Institute |

### Major Committee Assignments:

| | |
|---|---|
| 1994 | National Laboratory Genome Project Visit Review Panel, DOE |
| 1995 | Caltech/BAC Library Construction Site Visit Review Panel, DOE |
| 1996-1998 | Bioinformatics Grant Review Panel, DOE |
| 1997-2001 | Grant Review Panel, DOE |
| 1997 | Hollander Fellowship Review Panel, DOE |
| 1997 | Five-Year Program Advisory Committee, NCRR |
| 1997 | Cancer Chromosome Anatomy Project program Steering Committee, NCI |
| 1998 | National Laboratory Functional Genomic Review Panel, DOE |

3

John Quackenbush

| 1998 | Full-Length cDNA Library Construction and Sequencing Advisory, Committee, NCI |
| 1998 | Functional Genomics Panel, Welcome Trust |
| 1998 | Genomics Grant Review Panel, NSF SBIR |
| 1998 | Special Program in Tropical Disease Research Review, UNDP/World Bank/WHO |
| 1999-2000 | Low-Dosage radiation Grant Review Panel, DOE |
| 1999 | Bioinformatics Review Panel, NSF |
| 1999 | Special Emphasis Review Panel, NHLBI |
| 1999 | Microarray Working Group Advisory Panel, NIDCR |
| 1999 | Special Emphasis Review Panel, NIMH |
| 1999 | Plant Biology Review Panel, NSF |
| 1999-2007 | Board of Directors, MGED |
| 2000 | Grant Review Panel, NIDA SBIR |
| 2000 | Plant Biology Review Panel, USDA |
| 2000 | Plant Biology Review Panel, NSF |
| 2000 | Exceptional Chromosome Regions Working Group, DOE |
| 2000 | Working Group on US Scientific Interactions, NSF |
| 2000-2003 | PGA Coordinating Committee, HHLBI |
| 2000-2003 | PGA Bioinformatics Committee, NHLBI |
| 2000-2003 | PGA Microarray Committee, NHLBI |
| 2000 | Working Group on Australia Scientific Interactions, NSF |
| 2001 | Review Meeting RFP ES-01-01 National Center for Toxicogenomics (NCT) Microarray Resource, HIEHS |
| 2001-2003 | Plant Genome Scientific Advisory Board, University of Georgia |
| 2001-2003 | Innovative Technology Review Panel, NCI |
| 2001 | Genome Study Section, NIH |
| 2001 | Bioinformatics in Neuroscience and Sleep Research Workshop, NIDDK |
| 2001 | Plant Genome Site Visit Panel, NSF |
| 2001-2003 | BISTI Review Panel, NIH |
| 2001-2003 | Grant Review Panel, NCI |
| 2002 | Microarray Supplement Review Panel, NHLBI |
| 2002 | Panel on Emerging Issues in Toxicogenomics, NRC |
| 2006-2007 | Harvard School of Public Health, Lefkopoulou Award Committee Member |
| 2006 | Dana Farber Cancer Institute, Computational Biology Search Chair |
| 2006-2007 | Harvard School of Public Health, Seminar Committee Member |
| 2006-2007 | Harvard School of Public Health, Curriculum Committee Member |
| 2006-2008 | Harvard School of Public Health, Computational Biology Search Chair |

## Professional Societies:

| 1988 | American Physical Society | Member |
| 1988 | APS Biophysics Division | Member |
| 1988 | APS International Physics Group | Member |
| 1988 | APS Division of Particles and Fields | Member |
| 1988 | World Federation of Scientists | Member |

4

John Quackenbush

| 1990 | Microarray Gene Expression Database Group (MGED) | Member |
| 1995 | The Human Genome Organization (HUGO) | Member |
| 1996 | Association of Science Professionals (ASP) | Member |
| 1998 | American Association for the Advancement of Science (AAAS) | Member |
| 1999 | Center for the Study of the Evolution of Life (CSEOL) | Member |

**Community Service Related to Professional Work:**

I have presented more than 80 talks, courses, and workshops since joining Dana-Farber and the Harvard School of Public Health in 2005; detailed lists will be provided upon request. I have also taught numerous courses and workshops on the analysis of genomic data, and have served as an organizer of the EMBO course on DNA microarray analysis for more than 5 years.

In addition, I serve on the Scientific Advisory Board of the St. Jude's Children's Research Hospital, the Board of Scientific Counselors of the Environmental Protection Agency

**(Peer Review for Scientific Journals)**

| 1994-2007 | *Genomics* |
| 1994-2007 | *BioTechniques* |
| 1996-2007 | *Genome Research* |
| 2000-2007 | *Genome Biology* |
| 1997-1998 | *Analytical Biochemistry* |
| 1997-2007 | *Nature* |
| 1997-2007 | *Nucleic Acids Research* |
| 1999-2007 | *Nature Genetics* |
| 1999-2007 | *EMBO Reports* |
| 1999-2007 | *Nature Biotechnology* |
| 1999-2007 | *Science* |
| 2000-2007 | *Bioinformatics* |
| 2000-2003 | *Journal of Theoretical Biology* |
| 2000-2006 | *Mammalian Genomics* |
| 2000-2006 | *Gene* |
| 2000-2007 | *BMC Genomics, BMC Bioinformatics* |
| 2001-2007 | *Structural and Functional Genomics* |
| 2001-2007 | *Nature Reviews Genetics* |
| 2001-2006 | *American Journal of Applied Statistics* |

**Editorial Boards:**

| 2000-2006 | Editorial Board | *Genomics* |
| 2000-present | Board Member | *BioTechniques* |
| 2000-present | Board Member | *Bioinformatics* |
| 2000-present | Board Member | *BMC Genomics* |
| 2000-present | Board Member | *BMC Bioinformatics* |

5

John Quackenbush

2006-present  Editor-in-Chief      *Genomics*

**Awards and Honors:**

| | |
|---|---|
| 1985 - 1991 | **Outstanding Teaching Award (7)**, UCLA Physics Department |
| 1986 | **Jun John Sakurai Scholarship**, 24th International School of Subnuclear Physics, Ettore Majorana Centre for Scientific Culture, Erice, Italy |
| 1987 | **UCLA Distinguished Teaching Assistant Award**, UCLA Academic Senate |
| 1987 | **Prize for Best Student** and **Prize for Best Scientific Secretary**, 25th International School of Subnuclear Physics, Ettore Majorana Centre for Scientific Culture, Erice, Italy |
| 1988 | **Graduate Distinguished Scholar Award**, UCLA Alumni Association |
| 1992 - 1997 | **SERCA Fellow**, National Human Genome Research Institute |
| 2007 | **Distinguished International Advisors** at IEE BIBE, the original and the oldest IEEE flagship international conference in Bioinformatics and Bioengineering. |

**Part II: Research, Teaching, and Clinical Contributions**

**A. Narrative report (*500 words or less*) of Research, Teaching, and Clinical Contributions. Please focus primarily on the areas in which most of your time and effort is spent.**

My current research focuses on the application of genomic technologies and the use of integrative approaches to data analysis to develop an understanding of human diseases, including cancer.

With funding from the National Science Foundation, we build and maintain a series of databases called The Gene Index (TGI) databases that allow us to estimate the gene transcript content of more than 100 eukaryotic species. These databases provide detailed annotation for individual sequences and allow us to link genomic resources such as DNA microarrays between technologies and across species boundaries. The TGI databases receive nearly 150,000 hits per day and are vital for a wide variety of projects relevant to public health and human disease.

Our group also builds and maintains the TM4 suite of open-source software tools for the analysis of DNA microarray data. The most widely used of these, MeV, is a powerful data mining software tool, that places sophisticated analytical tools behind an intuitive graphical user interface. Developed to be accessible to laboratory biologists, MeV has more than 100,000 users worldwide. This project is funded by the National Library of Medicine.

6

EXHIBIT J

John Quackenbush

We are also working to create an integrated data warehouse, bringing together information on patient samples, clinical outcome, research data, and data within the public domain in a secure, HIPPA compliant form that only gives access to the relevant data to those with IRB approval. The goals of this data warehouse, funded through an Oracle Commitment grant, are to facilitate discovery by allowing a more comprehensive analysis of genomic signature data and to establish a platform for translational applications.

These resources have been developed to support an active research program in basic and cancer biology. We are currently investigating gene expression in breast cancer using DNA microarrays and methylation profiling to determine whether changes in the "normal" tissue surrounding a tumor exhibit detectable changes that may be useful in developing diagnostics. This work has also allowed us to begin to investigate the relationship between angiogenesis and breast tumor development and we have identified a number of signaling and differentiation pathways that may contain therapeutic targets. We have also recently begun a program in analysis of ovarian cancer with the goal of using mRNA and miRNA expression profiling to understand the problem of chemotherapy resistance. Preliminary data suggests a potential role for copper ion transporters in establishing resistance to platinum therapy.

We are also working to develop predictive network models describing gene interactions in human cells. We have recently developed a seeded Bayesian Network approach that uses information from the literature and DNA microarray data to understand the manner in which gene networks respond to external stimuli; we are currently validating this approach using RNA interference screening and network prediction in an iterative fashion. Additionally, we are investigating the role stochastic processes play in biological networks and their effects on the models we can build.

Finally, I have co-developed and will co-teach a survey course entitled "Genetics and Genomics for Human Health" at HSPH starting in spring 2008.

## B. Funding Information (for research applications)

| 2005-2008 | NIH | Co-PI | Screening for Breast Cancer Using Molecular Signatures-Subcontract: from H. Lee Moffitt Cancer Center |
| 2005-2007 | NSF | PI | Reconstruction and Annotation of Transcribed Sequences in Plants |
| 2006-2010 | NIH/NLM | PI | TM4: Software for High-Dimensional Analysis |
| 2006-2008 | NIDDK | Co-PI | Linkage Analysis in Interstitial subcontract: from Children's Hospital |
| 2007-2008 | NIH/NHGRI | Co-PI | Center of Excellence in Genomic Sciences (CEGS): Genomic Analysis of Network Perturbations in Human Disease |

7

John Quackenbush

| 2006-2011 | NIH | Co-PI | Paracrine TGF-Beta Signaling in Tumor I Initiation and Progression: Genomics & Bioinformatics Core |
| 2007 | DFCI | Co-PI | Ovarian Cancer Genomic Project Women's Cancer |

## C. Report of Current Research Activities other than those mentioned above (bench research, clinical trials, outcome studies, efficacy studies as applicable)

None to report.

## D. Report of Teaching (use only those categories that are applicable)

| 1983 - 1990 | Teaching Fellow, Department of Physics, University of California, Los Angeles |
| 1984 - 1996 | Physics Instructor, Southern California Science Institute, New College of California |
| 1987 - 1992 | Visiting Lecturer, Department of Physics, University of California, Los Angeles |
| 1998 - present | Lecturer, The Johns Hopkins University Instructor in the Masters in Biotechnology Program |
| 2000 - present | Professor, Department of Biochemistry, The George Washington University |
| 2003 - | Adjunct Professor, Department of Biostatistics, Bloomberg School of Public Health, The Johns Hopkins University Developed program in genomics and bioinformatics; instructor in various courses. |

## E. Report of Clinical Activities

1. Description of clinical practice (field, areas of major focus, site(s) of practice [private office, HMO, teaching hospital etc.])

2. Patient load (indicate complexity of cases, as appropriate)

3. Clinical contributions (e.g., introduction of new methods of clinical diagnosis, prevention, treatment, care delivery)

4. Other relevant information about clinical role (receipt of clinical awards, locally or nationally, invitation to participate in clinical activities at other sites, special recognition by peers or professional organizations as a leader in a clinical field)

EXHIBIT J

John Quackenbush

**Part III: Format for Bibliography**

**Original Articles**

1.   **Quackenbush J**. Chiral anomalies in two-dimensional quantum field theory. Physical Review D Particles and Fields. 1989;40(10):3408-14.

2.   Buchanan CD, Cousins R, Dib C, Peccei RD, **Quackenbush J**. Testing CP and CPT violation in the neutral kaon system at a phi factory. Physical Review D Particles and Fields. 1992;45(11):4088-107.

3.   Geer S, Marriner J, Ray R, Streets J, Lindgren M, Muller T, **Quackenbush J**, Armstrong T. Search for antiproton decay at the Fermilab antiproton accumulator. Physical Review Letters. 1994;72(11):1596-9.

4.   Khristich JV, Bailis J, Diggle K, Rodkins A, Romo A, **Quackenbush J**, Evans GA. Large-scale screening of yeast artificial chromosome libraries using PCR. Biotechniques. 1994;17(3):498-501.

5.   Selleri L, Giovannini M, Hermanson GG, Romo A, **Quackenbush J**, Penny L, Khristich JV, Evans GA. Yeast artificial chromosome cloning of 3.2 megabases within chromosomal band 11q24 closely linking c-ets 1 and Fli-1 and encompassing the Ewing sarcoma breakpoint. Genomics. 1994;22(1):137-47.

6.   Kupfer K, Smith MW, **Quackenbush J**, Evans GA. Physical mapping of complex genomes by sampled sequencing: a theoretical analysis. Genomics. 1995;27(1):90-100.

7.   **Quackenbush J**, Davies C, Bailis JM, Khristich JV, Diggle K, Marchuck Y, Tobin J, Clark SP, Rodkins A, Marcano S, et al. An STS content map of human chromosome 11: localization of 910 YAC clones and 109 islands. Genomics. 1995;29(2):512-25.

8.   Schuler GD, Boguski MS, Stewart EA, Stein LD, Gyapay G, Rice K, White RE, Rodriguez-Tome P, Aggarwal A, Bajorek E, Bentolila S, Birren BB, Butler A, Castle AB, Chiannilkulchai N, Chu A, Clee C, Cowles S, Day PJ, Dibling T, Drouot N, Dunham I, Duprat S, East C, Edwards C, Fan JB, Fang N, Fizames C, Garrett C, Green L, Hadley D, Harris M, Harrison P, Brady S, Hicks A, Holloway E, Hui L, Hussain S, Louis-Dit-Sully C, Ma J, MacGilvery A, Mader C, Maratukulam A, Matise TC, McKusick KB, Morissette J, Mungall A, Muselet D, Nusbaum HC, Page DC, Peck A, Perkins S, Piercy M, Qin F, **Quackenbush J**, Ranby S, Reif T, Rozen S, Sanders C, She X, Silva J, Slonim DK, Soderlund C, Sun WL, Tabar P, Thangarajah T, Vega-Czarny N, Vollrath D, Voyticky S, Wilmer T, Wu X, Adams MD, Auffray C, Walter NA, Brandon R, Dehejia A, Goodfellow PN, Houlgatte R, Hudson JR, Jr., Ide SE, Iorio KR, Lee WY, Seki N, Nagase T, Ishikawa K, Nomura N, Phillips C, Polymeropoulos MH, Sandusky M, Schmitt K, Berry R, Swanson K, Torres R, Venter JC, Sikela JM, Beckmann JS, Weissenbach

9

John Quackenbush

J, Myers RM, Cox DR, James MR, Bentley D, Deloukas P, Lander ES, Hudson TJ. A gene map of the human genome. Science. 1996;274(5287):540-6.

9.  Doyle DJ, **Quackenbush J**. Symposium on Genomic Medicine, University of Maryland, Shady Grove Campus, Rockville, Maryland, March 17-18, 1997. Microb Comp Genomics. 1997;2(2):99-102.

10. Fraser CM, Casjens S, Huang WM, Sutton GG, Clayton R, Lathigra R, White O, Ketchum KA, Dodson R, Hickey EK, Gwinn M, Dougherty B, Tomb JF, Fleischmann RD, Richardson D, Peterson J, Kerlavage AR, **Quackenbush J**, Salzberg S, Hanson M, van Vugt R, Palmer N, Adams MD, Gocayne J, Weidman J, Utterback T, Watthey L, McDonald L, Artiach P, Bowman C, Garland S, Fuji C, Cotton MD, Horst K, Roberts K, Hatch B, Smith HO, Venter JC. Genomic sequence of a Lyme disease spirochaete, Borrelia burgdorferi. Nature. 1997;390(6660):580-6.

11. Klenk HP, Clayton RA, Tomb JF, White O, Nelson KE, Ketchum KA, Dodson RJ, Gwinn M, Hickey EK, Peterson JD, Richardson DL, Kerlavage AR, Graham DE, Kyrpides NC, Fleischmann RD, **Quackenbush J**, Lee NH, Sutton GG, Gill S, Kirkness EF, Dougherty BA, McKenney K, Adams MD, Loftus B, Peterson S, Reich CI, McNeil LK, Badger JH, Glodek A, Zhou L, Overbeek R, Gocayne JD, Weidman JF, McDonald L, Utterback T, Cotton MD, Spriggs T, Artiach P, Kaine BP, Sykes SM, Sadow PW, D'Andrea KP, Bowman C, Fujii C, Garland SA, Mason TM, Olsen GJ, Fraser CM, Smith HO, Woese CR, Venter JC. The complete genome sequence of the hyperthermophilic, sulphate-reducing archaeon Archaeoglobus fulgidus. Nature. 1997;390(6658):364-70.

12. Korenberg JR, Aaltonen J, Brahe C, Cabin D, Creau N, Delabar JM, Doering J, Gardiner K, Hubert RS, Ives J, Kessling A, Kudoh J, Lafreniere R, Murakami Y, Ohira M, Ohki M, Patterson D, Potier MC, **Quackenbush J**, Reeves RH, Sakaki Y, Shimizu N, Soeda E, Van Broeckhoven C, Yaspo ML. Report and abstracts of the Sixth International Workshop on Human Chromosome 21 Mapping 1996. Cold Spring Harbor, New York, USA. May 6-8,1996. Cytogenet Cell Genet. 1997;79(1-2):21-52.

13. Tomb JF, White O, Kerlavage AR, Clayton RA, Sutton GG, Fleischmann RD, Ketchum KA, Klenk HP, Gill S, Dougherty BA, Nelson K, **Quackenbush J**, Zhou L, Kirkness EF, Peterson S, Loftus B, Richardson D, Dodson R, Khalak HG, Glodek A, McKenney K, Fitzegerald LM, Lee N, Adams MD, Hickey EK, Berg DE, Gocayne JD, Utterback TR, Peterson JD, Kelley JM, Cotton MD, Weidman JM, Fujii C, Bowman C, Watthey L, Wallin E, Hayes WS, Borodovsky M, Karp PD, Smith HO, Fraser CM, Venter JC. The complete genome sequence of the gastric pathogen Helicobacter pylori. Nature. 1997;388(6642):539-47.

14. El-Sayed NM, Hegde P, **Quackenbush J**, Melville SE, Donelson JE. The African trypanosome genome. Int J Parasitol. 2000;30(4):329-45.

10

15.  Hegde P, Qi R, Abernathy K, Gay C, Dharap S, Gaspard R, Hughes JE, Snesrud E, Lee N, **Quackenbush J**. A concise guide to cDNA microarray analysis. Biotechniques. 2000;29(3):548-50, 52-4, 56 passim.

16.  Liang F, Holt I, Pertea G, Karamycheva S, Salzberg SL, **Quackenbush J**. An optimized protocol for analysis of EST sequences. Nucleic Acids Res. 2000;28(18):3657-65.

17.  Liang F, Holt I, Pertea G, Karamycheva S, Salzberg SL, **Quackenbush J**. Gene index analysis of the human genome estimates approximately 120,000 genes. Nat Genet. 2000;25(2):239-40. Erratum: Nat Genet 2000 Dec;26(4):501

18.  **Quackenbush J**, Liang F, Holt I, Pertea G, Upton J. The TIGR gene indices: reconstruction and representation of expressed gene sequences. Nucleic Acids Res. 2000;28(1):141-5.

19.  Yuan Q, Liang F, Hsiao J, Zismann V, Benito MI, **Quackenbush J**, Wing R, Buell R. Anchoring of rice BAC clones to the rice genetic map in silico. Nucleic Acids Res. 2000;28(18):3636-41.

20.  Brazma A, Hingamp P, **Quackenbush J**, Sherlock G, Spellman P, Stoeckert C, Aach J, Ansorge W, Ball CA, Causton HC, Gaasterland T, Glenisson P, Holstege FC, Kim IF, Markowitz V, Matese JC, Parkinson H, Robinson A, Sarkans U, Schulze-Kremer S, Stewart J, Taylor R, Vilo J, Vingron M. Minimum information about a microarray experiment (MIAME)-toward standards for microarray data. Nat Genet. 2001;29(4):365-71.

21.  Flores-Morales A, Stahlberg N, Tollet-Egnell P, Lundeberg J, Malek RL, **Quackenbush J**, Lee NH, Norstedt G. Microarray analysis of the in vivo effects of hypophysectomy and growth hormone treatment on gene expression in the rat. Endocrinology. 2001;142(7):3163-76.

22.  Gaspard R, Dharap S, Malek J, Qi R, **Quackenbush J**. Optimized growth conditions for direct amplification of cDNA clone inserts from culture. Biotechniques. 2001;31(1):35-6.

23.  Hegde P, Qi R, Gaspard R, Abernathy K, Dharap S, Earle-Hughes J, Gay C, Nwokekeh NU, Chen T, Saeed AI, Sharov V, Lee NH, Yeatman TJ, **Quackenbush J**. Identification of tumor markers in models of human colorectal cancer using a 19,200-element complementary DNA microarray. Cancer Res. 2001;61(21):7792-7.

24.  Huang J, Qi R, **Quackenbush J**, Dauway E, Lazaridis E, Yeatman T. Effects of ischemia on gene expression. J Surg Res. 2001;99(2):222-7.

25.  Kappe SH, Gardner MJ, Brown SM, Ross J, Matuschewski K, Ribeiro JM, Adams JH, **Quackenbush J,** Cho J, Carucci DJ, Hoffman SL, Nussenzweig V. Exploring the transcriptome of the malaria sporozoite stage. Proc Natl Acad Sci U S A. 2001;98(17):9895-900.

11

John Quackenbush

26.  Kawai J, Shinagawa A, Shibata K, Yoshino M, Itoh M, Ishii Y, Arakawa T, Hara A, Fukunishi Y, Konno H, Adachi J, Fukuda S, Aizawa K, Izawa M, Nishi K, Kiyosawa H, Kondo S, Yamanaka I, Saito T, Okazaki Y, Gojobori T, Bono H, Kasukawa T, Saito R, Kadota K, Matsuda H, Ashburner M, Batalov S, Casavant T, Fleischmann W, Gaasterland T, Gissi C, King B, Kochiwa H, Kuehl P, Lewis S, Matsuo Y, Nikaido I, Pesole G, **Quackenbush J**, Schriml LM, Staubli F, Suzuki R, Tomita M, Wagner L, Washio T, Sakai K, Okido T, Furuno M, Aono H, Baldarelli R, Barsh G, Blake J, Boffelli D, Bojunga N, Carninci P, de Bonaldo MF, Brownstein MJ, Bult C, Fletcher C, Fujita M, Gariboldi M, Gustincich S, Hill D, Hofmann M, Hume DA, Kamiya M, Lee NH, Lyons P, Marchionni L, Mashima J, Mazzarelli J, Mombaerts P, Nordone P, Ring B, Ringwald M, Rodriguez I, Sakamoto N, Sasaki H, Sato K, Schonbach C, Seya T, Shibata Y, Storch KF, Suzuki H, Toyo-oka K, Wang KH, Weitz C, Whittaker C, Wilming L, Wynshaw-Boris A, Yoshida K, Hasegawa Y, Kawaji H, Kohtsuki S, Hayashizaki Y. Functional annotation of a full-length mouse cDNA collection. Nature. 2001;409(6821):685-90.

27.  **Quackenbush J**. The power of public access: the human genome project and the scientific process. Nat Genet. 2001;29(1):4-6.

28.  **Quackenbush J**, Cho J, Lee D, Liang F, Holt I, Karamycheva S, Parvizi B, Pertea G, Sultana R, White J. The TIGR Gene Indices: analysis of gene transcript sequences in highly sampled eukaryotic species. Nucleic Acids Res. 2001;29(1):159-64.

29.  Smith TP, Grosse WM, Freking BA, Roberts AJ, Stone RT, Casas E, Wray JE, White J, Cho J, Fahrenkrug SC, Bennett GL, Heaton MP, Laegreid WW, Rohrer GA, Chitko-McKown CG, Pertea G, Holt I, Karamycheva S, Liang F, **Quackenbush J**, Keele JW. Sequence evaluation of four pooled-tissue normalized bovine cDNA libraries and construction of a gene index for cattle. Genome Res. 2001;11(4):626-30.

30.  Tsai J, Sultana R, Lee Y, Pertea G, Karamycheva S, Antonescu V, Cho J, Parvizi B, Cheung F, **Quackenbush J**. RESOURCERER: a database for annotating and linking microarray resources within and across species. Genome Biol. 2001;2(11):SOFTWARE0002.

31.  Yuan Q, **Quackenbush J**, Sultana R, Pertea M, Salzberg SL, Buell CR. Rice bioinformatics. analysis of rice sequence data and leveraging the data to other plant species. Plant Physiol. 2001;125(3):1166-74.

32.  Agrawal D, Chen T, Irby R, **Quackenbush J,** Chambers AF, Szabo M, Cantor A, Coppola D, Yeatman TJ. Osteopontin identified as lead marker of colon cancer progression, using pooled sample expression profiling. J Natl Cancer Inst. 2002;94(7):513-21

EXHIBIT J

John Quackenbush

33. Andersson T, Unneberg P, Nilsson P, Odeberg J, **Quackenbush J**, Lundeberg J. Monitoring of representational difference analysis subtraction procedures by global microarrays. Biotechniques. 2002;32(6):1348-50, 52, 54-6, 58.

34. Ball CA, Sherlock G, Parkinson H, Rocca-Sera P, Brooksbank C, Causton HC, Cavalieri D, Gaasterland T, Hingamp P, Holstege F, Ringwald M, Spellman P, Stoeckert CJ, Jr., Stewart JE, Taylor R, Brazma A, **Quackenbush J**. The underlying principles of scientific publication. Bioinformatics. 2002;18(11):1409.

35. Ball CA, Sherlock G, Parkinson H, Rocca-Sera P, Brooksbank C, Causton HC, Cavalieri D, Gaasterland T, Hingamp P, Holstege F, Ringwald M, Spellman P, Stoeckert CJ, Jr., Stewart JE, Taylor R, Brazma A, **Quackenbush J**. Standards for microarray data. Science. 2002;298(5593):539.

36. Carlton JM, Angiuoli SV, Suh BB, Kooij TW, Pertea M, Silva JC, Ermolaeva MD, Allen JE, Selengut JD, Koo HL, Peterson JD, Pop M, Kosack DS, Shumway MF, Bidwell SL, Shallom SJ, van Aken SE, Riedmuller SB, Feldblyum TV, Cho JK, **Quackenbush J**, Sedegah M, Shoaibi A, Cummings LM, Florens L, Yates JR, Raine JD, Sinden RE, Harris MA, Cunningham DA, Preiser PR, Bergman LW, Vaidya AB, van Lin LH, Janse CJ, Waters AP, Smith HO, White OR, Salzberg SL, Venter JC, Fraser CM, Hoffman SL, Gardner MJ, Carucci DJ. Genome sequence and comparative analysis of the model rodent malaria parasite Plasmodium yoelii yoelii. Nature. 2002;419(6906):512-9.

37. Fahrenkrug SC, Smith TP, Freking BA, Cho J, White J, Vallet J, Wise T, Rohrer G, Pertea G, Sultana R, **Quackenbush J**, Keele JW. Porcine gene discovery by normalized cDNA-library sequencing and EST cluster assembly. Mamm Genome. 2002;13(8):475-8.

38. Kim H, Zhao B, Snesrud EC, Haas BJ, Town CD, **Quackenbush J**. Use of RNA and genomic DNA references for inferred comparisons in DNA microarray analyses. Biotechniques. 2002;33(4):924-30.

39. Lee Y, Sultana R, Pertea G, Cho J, Karamycheva S, Tsai J, Parvizi B, Cheung F, Antonescu V, White J, Holt I, Liang F, **Quackenbush J**. Cross-referencing eukaryotic genomes: TIGR Orthologous Gene Alignments (TOGA). Genome Res. 2002;12(3):493-502.

40. Malek RL, Irby RB, Guo QM, Lee K, Wong S, He M, Tsai J, Frank B, Liu ET, **Quackenbush J**, Jove R, Yeatman TJ, Lee NH. Identification of Src transformation fingerprint in human colon cancer. Oncogene. 2002;21(47):7256-61.

41. Nene V, Lee D, **Quackenbush J**, Skilton R, Mwaura S, Gardner MJ, Bishop R. AvGI, an index of genes transcribed in the salivary glands of the ixodid tick Amblyomma variegatum. Int J Parasitol. 2002;32(12):1447-56.

42. Okazaki Y, Furuno M, Kasukawa T, Adachi J, Bono H, Kondo S, Nikaido I, Osato N, Saito R, Suzuki H, Yamanaka I, Kiyosawa H, Yagi K, Tomaru Y, Hasegawa Y,

13

John Quackenbush

Nogami A, Schonbach C, Gojobori T, Baldarelli R, Hill DP, Bult C, Hume DA, **Quackenbush J**, Schriml LM, Kanapin A, Matsuda H, Batalov S, Beisel KW, Blake JA, Bradt D, Brusic V, Chothia C, Corbani LE, Cousins S, Dalla E, Dragani TA, Fletcher CF, Forrest A, Frazer KS, Gaasterland T, Gariboldi M, Gissi C, Godzik A, Gough J, Grimmond S, Gustincich S, Hirokawa N, Jackson IJ, Jarvis ED, Kanai A, Kawaji H, Kawasawa Y, Kedzierski RM, King BL, Konagaya A, Kurochkin IV, Lee Y, Lenhard B, Lyons PA, Maglott DR, Maltais L, Marchionni L, McKenzie L, Miki H, Nagashima T, Numata K, Okido T, Pavan WJ, Pertea G, Pesole G, Petrovsky N, Pillai R, Pontius JU, Qi D, Ramachandran S, Ravasi T, Reed JC, Reed DJ, Reid J, Ring BZ, Ringwald M, Sandelin A, Schneider C, Semple CA, Setou M, Shimada K, Sultana R, Takenaka Y, Taylor MS, Teasdale RD, Tomita M, Verardo R, Wagner L, Wahlestedt C, Wang Y, Watanabe Y, Wells C, Wilming LG, Wynshaw-Boris A, Yanagisawa M, Yang I, Yang L, Yuan Z, Zavolan M, Zhu Y, Zimmer A, Carninci P, Hayatsu N, Hirozane-Kishikawa T, Konno H, Nakamura M, Sakazume N, Sato K, Shiraki T, Waki K, Kawai J, Aizawa K, Arakawa T, Fukuda S, Hara A, Hashizume W, Imotani K, Ishii Y, Itoh M, Kagawa I, Miyazaki A, Sakai K, Sasaki D, Shibata K, Shinagawa A, Yasunishi A, Yoshino M, Waterston R, Lander ES, Rogers J, Birney E, Hayashizaki Y. Analysis of the mouse transcriptome based on functional annotation of 60,770 full-length cDNAs. Nature. 2002;420(6915):563-73.

43.   Sonstegard TS, Capuco AV, White J, Van Tassell CP, Connor EE, Cho J, Sultana R, Shade L, Wray JE, Wells KD, **Quackenbush J**. Analysis of bovine mammary gland EST and functional annotation of the Bos taurus gene index. Mamm Genome. 2002;13(7):373-9.

44.   Sturn A, **Quackenbush J**, Trajanoski Z. Genesis: cluster analysis of microarray data. Bioinformatics. 2002;18(1):207-8.

45.   Yang IV, Chen E, Hasseman JP, Liang W, Frank BC, Wang S, Sharov V, Saeed AI, White J, Li J, Lee NH, Yeatman TJ, **Quackenbush J**. Within the fold: assessing differential expression measures and reproducibility in microarray assays. Genome Biol. 2002;3(11):research0062.

46.   Agrawal D, Chen T, Irby R, **Quackenbush J**, Chambers AF, Szabo M, Cantor A, Coppola D, Yeatman TJ. Osteopontin identified as colon cancer tumor progression marker. C R Biol. 2003;326(10-11):1041-3.

47.   Brentani H, Caballero OL, Camargo AA, da Silva AM, da Silva WA, Jr., Dias Neto E, Grivet M, Gruber A, Guimaraes PE, Hide W, Iseli C, Jongeneel CV, Kelso J, Nagai MA, Ojopi EP, Osorio EC, Reis EM, Riggins GJ, Simpson AJ, de Souza S, Stevenson BJ, Strausberg RL, Tajara EH, Verjovski-Almeida S, Acencio ML, Bengtson MH, Bettoni F, Bodmer WF, Briones MR, Camargo LP, Cavenee W, Cerutti JM, Coelho Andrade LE, Costa dos Santos PC, Ramos Costa MC, da Silva IT, Estecio MR, Sa Ferreira K, Furnari FB, Faria M, Jr., Galante PA, Guimaraes GS, Holanda AJ, Kimura ET, Leerkes MR, Lu X, Maciel RM, Martins EA, Massirer KB, Melo AS, Mestriner CA, Miracca EC, Miranda LL, Nobrega FG, Oliveira PS, Paquola AC, Pandolfi JR, Campos Pardini MI, Passetti F,

14

John Quackenbush

**Quackenbush J**, Schnabel B, Sogayar MC, Souza JE, Valentini SR, Zaiats AC, Amaral FJ, Arnaldi LA, de Araujo AG, de Bessa SA, Bicknell DC, Ribeiro de Camaro ME, Carraro DM, Carrer H, Carvalho AF, Colin C, Costa F, Curcio C, Guerreiro da Silva ID, Pereira da Silva N, Dellamano M, El-Dorry H, Espreafico EM, Scattone Ferreira AJ, Ayres Ferreira C, Fortes MA, Gama AH, Giannella-Neto D, Giannella ML, Giorgi RR, Goldman GH, Goldman MH, Hackel C, Ho PL, Kimura EM, Kowalski LP, Krieger JE, Leite LC, Lopes A, Luna AM, Mackay A, Mari SK, Marques AA, Martins WK, Montagnini A, Mourao Neto M, Nascimento AL, Neville AM, Nobrega MP, O'Hare MJ, Otsuka AY, Ruas de Melo AI, Paco-Larson ML, Guimaraes Pereira G, Pereira da Silva N, Pesquero JB, Pessoa JG, Rahal P, Rainho CA, Rodrigues V, Rogatto SR, Romano CM, Romeiro JG, Rossi BM, Rusticci M, Guerra de Sa R, Sant' Anna SC, Sarmazo ML, Silva TC, Soares FA, Sonati Mde F, de Freitas Sousa J, Queiroz D, Valente V, Vettore AL, Villanova FE, Zago MA, Zalcberg H. The generation and utilization of a cancer-oriented representation of the human transcriptome by using expressed sequence tags. Proc Natl Acad Sci U S A. 2003;100(23):13418-23.

48. Chen T, Yang I, Irby R, Shain KH, Wang HG, **Quackenbush J**, Coppola D, Cheng JQ, Yeatman TJ. Regulation of caspase expression and apoptosis by adenomatous polyposis coli. Cancer Res. 2003;63(15):4368-74.

49. Cook DN, Wang S, Howles GP, Speer M, Churchhill G, **Quackenbush J**, Schwartz DA. The genetics of innate immunity in the lung. Chest. 2003;123(3 Suppl):369S.

50. Kasukawa T, Furuno M, Nikaido I, Bono H, Hume DA, Bult C, Hill DP, Baldarelli R, Gough J, Kanapin A, Matsuda H, Schriml LM, Hayashizaki Y, Okazaki Y, **Quackenbush J**. Development and evaluation of an automated annotation pipeline and cDNA annotation system. Genome Res. 2003;13(6B):1542-51.

51. Kim H, Snesrud EC, Haas B, Cheung F, Town CD, **Quackenbush J**. Gene expression analyses of Arabidopsis chromosome 2 using a genomic DNA amplicon microarray. Genome Res. 2003;13(3):327-40.

52. Merrick JM, Osman A, Tsai J, **Quackenbush J**, LoVerde PT, Lee NH. The Schistosoma mansoni gene index: gene discovery and biology by reconstruction and analysis of expressed gene sequences. J Parasitol. 2003;89(2):261-9.

53. Pertea G, Huang X, Liang F, Antonescu V, Sultana R, Karamycheva S, Lee Y, White J, Cheung F, Parvizi B, Tsai J, **Quackenbush J**. TIGR Gene Indices clustering tools (TGICL): a software system for fast clustering of large EST datasets. Bioinformatics. 2003;19(5):651-2.

54. Rexroad CE, 3rd, Lee Y, Keele JW, Karamycheva S, Brown G, Koop B, Gahr SA, Palti Y, **Quackenbush J**. Sequence analysis of a rainbow trout cDNA library and creation of a gene index. Cytogenet Genome Res. 2003;102(1-4):347-54.

55. Ronning CM, Stegalkina SS, Ascenzi RA, Bougri O, Hart AL, Utterbach TR, Vanaken SE, Riedmuller SB, White JA, Cho J, Pertea GM, Lee Y, Karamycheva S,

EXHIBIT J

John Quackenbush

Sultana R, Tsai J, **Quackenbush J**, Griffiths HM, Restrepo S, Smart CD, Fry WE, Van Der Hoeven R, Tanksley S, Zhang P, Jin H, Yamamoto ML, Baker BJ, Buell CR. Comparative analyses of potato expressed sequence tag libraries. Plant Physiol. 2003;131(2):419-29.

56.    Saeed AI, Sharov V, White J, Li J, Liang W, Bhagabati N, Braisted J, Klapa M, Currier T, Thiagarajan M, Sturn A, Snuffin M, Rezantsev A, Popov D, Ryltsov A, Kostukovich E, Borisovsky I, Liu Z, Vinsavich A, Trush V, **Quackenbush J**. TM4: a free, open-source system for microarray data management and analysis. Biotechniques. 2003;34(2):374-8.

57.    Wang HY, Malek RL, Kwitek AE, Greene AS, Luu TV, Behbahani B, Frank B, **Quackenbush J**, Lee NH. Assessing unmodified 70-mer oligonucleotide probe performance on glass-slide microarrays. Genome Biol. 2003;4(1):R5.

58.    Wells CA, Ravasi T, Sultana R, Yagi K, Carninci P, Bono H, Faulkner G, Okazaki Y, **Quackenbush J**, Hume DA, Lyons PA. Continued discovery of transcriptional units expressed in cells of the mouse mononuclear phagocyte lineage. Genome Res. 2003;13(6B):1360-5.

59.    Whitelaw CA, Barbazuk WB, Pertea G, Chan AP, Cheung F, Lee Y, Zheng L, van Heeringen S, Karamycheva S, Bennetzen JL, SanMiguel P, Lakey N, Bedell J, Yuan Y, Budiman MA, Resnick A, Van Aken S, Utterback T, Riedmuller S, Williams M, Feldblyum T, Schubert K, Beachy R, Fraser CM, **Quackenbush J**. Enrichment of gene-coding sequences in maize by genome filtration. Science. 2003;302(5653):2118-20.

60.    Yuan Q, Ouyang S, Liu J, Suh B, Cheung F, Sultana R, Lee D, **Quackenbush J**, Buell CR. The TIGR rice genome annotation resource: annotating the rice genome and creating resources for plant biologists. Nucleic Acids Res. 2003;31(1):229-33.

61.    Zhu Y, King BL, Parvizi B, Brunk BP, Stoeckert CJ, Jr., **Quackenbush J**, Richardson J, Bult CJ. Integrating computationally assembled mouse transcript sequences with the Mouse Genome Informatics (MGI) database. Genome Biol. 2003;4(2):R16.

62.    Ball C, Brazma A, Causton H, Chervitz S, Edgar R, Hingamp P, Matese JC, Icahn C, Parkinson H, **Quackenbush J**, Ringwald M, Sansone SA, Sherlock G, Spellman P, Stoeckert C, Tateno Y, Taylor R, White J, Winegarden N. An open letter on microarray data from the MGED Society. Microbiology. 2004;150(Pt 11):3522-4.

63.    Ball C, Brazma A, Causton H, Chervitz S, Edgar R, Hingamp P, Matese JC, Parkinson H, **Quackenbush J**, Ringwald M, Sansone SA, Sherlock G, Spellman P, Stoeckert C, Tateno Y, Taylor R, White J, Winegarden N. Standards for microarray data: an open letter. Environ Health Perspect. 2004;112(12):A666-7.

64.    Ball CA, Brazma A, Causton H, Chervitz S, Edgar R, Hingamp P, Matese JC, Parkinson H, **Quackenbush J**, Ringwald M, Sansone SA, Sherlock G, Spellman P,

EXHIBIT J

Stoeckert C, Tateno Y, Taylor R, White J, Winegarden N. Submission of microarray data to public repositories. PLoS Biol. 2004;2(9):E317.

65. Bloom G, Yang IV, Boulware D, Kwong KY, Coppola D, Eschrich S, **Quackenbush J**, Yeatman TJ. Multi-platform, multi-site, microarray-based human tumor classification. Am J Pathol. 2004;164(1):9-16.

66. Cook DN, Wang S, Wang Y, Howles GP, Whitehead GS, Berman KG, Church TD, Frank BC, Gaspard RM, Yu Y, **Quackenbush J**, Schwartz DA. Genetic regulation of endotoxin-induced airway disease. Genomics. 2004;83(6):961-9.

67. Cronin M, Ghosh K, Sistare F, **Quackenbush J**, Vilker V, O'Connell C. Universal RNA reference materials for gene expression. Clin Chem. 2004;50(8):1464-71.

68. Ghedin E, Pumfery A, de la Fuente C, Yao K, Miller N, Lacoste V, **Quackenbush J**, Jacobson S, Kashanchi F. Use of a multi-virus array for the study of human viral and retroviral pathogens: gene expression studies and ChIP-chip analysis. Retrovirology. 2004;1:10.

69. Grigoryev DN, Ma SF, Irizarry RA, Ye SQ, **Quackenbush J**, Garcia JG. Orthologous gene-expression profiling in multi-species models: search for candidate genes. Genome Biol. 2004;5(5):R34.

70. Imanishi T, Itoh T, Suzuki Y, O'Donovan C, Fukuchi S, Koyanagi KO, Barrero RA, Tamura T, Yamaguchi-Kabata Y, Tanino M, Yura K, Miyazaki S, Ikeo K, Homma K, Kasprzyk A, Nishikawa T, Hirakawa M, Thierry-Mieg J, Thierry-Mieg D, Ashurst J, Jia L, Nakao M, Thomas MA, Mulder N, Karavidopoulou Y, Jin L, Kim S, Yasuda T, Lenhard B, Eveno E, Suzuki Y, Yamasaki C, Takeda J, Gough C, Hilton P, Fujii Y, Sakai H, Tanaka S, Amid C, Bellgard M, Bonaldo Mde F, Bono H, Bromberg SK, Brookes AJ, Bruford E, Carninci P, Chelala C, Couillault C, de Souza SJ, Debily MA, Devignes MD, Dubchak I, Endo T, Estreicher A, Eyras E, Fukami-Kobayashi K, Gopinath GR, Graudens E, Hahn Y, Han M, Han ZG, Hanada K, Hanaoka H, Harada E, Hashimoto K, Hinz U, Hirai M, Hishiki T, Hopkinson I, Imbeaud S, Inoko H, Kanapin A, Kaneko Y, Kasukawa T, Kelso J, Kersey P, Kikuno R, Kimura K, Korn B, Kuryshev V, Makalowska I, Makino T, Mano S, Mariage-Samson R, Mashima J, Matsuda H, Mewes HW, Minoshima S, Nagai K, Nagasaki H, Nagata N, Nigam R, Ogasawara O, Ohara O, Ohtsubo M, Okada N, Okido T, Oota S, Ota M, Ota T, Otsuki T, Piatier-Tonneau D, Poustka A, Ren SX, Saitou N, Sakai K, Sakamoto S, Sakate R, Schupp I, Servant F, Sherry S, Shiba R, Shimizu N, Shimoyama M, Simpson AJ, Soares B, Steward C, Suwa M, Suzuki M, Takahashi A, Tamiya G, Tanaka H, Taylor T, Terwilliger JD, Unneberg P, Veeramachaneni V, Watanabe S, Wilming L, Yasuda N, Yoo HS, Stodolsky M, Makalowski W, Go M, Nakai K, Takagi T, Kanehisa M, Sakaki Y, **Quackenbush J**, Okazaki Y, Hayashizaki Y, Hide W, Chakraborty R, Nishikawa K, Sugawara H, Tateno Y, Chen Z, Oishi M, Tonellato P, Apweiler R, Okubo K, Wagner L, Wiemann S, Strausberg RL, Isogai T, Auffray C, Nomura N, Gojobori T, Sugano S. Integrative annotation of 21,037 human genes validated by full-length cDNA clones. PLoS Biol. 2004;2(6):e162.

17

71. Larkin JE, Frank BC, Gaspard RM, Duka I, Gavras H, **Quackenbush J**. Cardiac transcriptional response to acute and chronic angiotensin II treatments. Physiol Genomics. 2004;18(2):152-66.

72. Nene V, Lee D, Kang'a S, Skilton R, Shah T, de Villiers E, Mwaura S, Taylor D, **Quackenbush J**, Bishop R. Genes transcribed in the salivary glands of female Rhipicephalus appendiculatus ticks infected with Theileria parva. Insect Biochem Mol Biol. 2004;34(10):1117-28.

73. Sharov V, Kwong KY, Frank B, Chen E, Hasseman J, Gaspard R, Yu Y, Yang I, **Quackenbush J**. The limits of log-ratios. BMC Biotechnol. 2004;4:3.

74. Bergman NH, Passalacqua KD, Gaspard R, Shetron-Rama LM, **Quackenbush J**, Hanna PC. Murine macrophage transcriptional responses to Bacillus anthracis infection and intoxication. Infect Immun. 2005;73(2):1069-80.

75. Carninci P, Kasukawa T, Katayama S, Gough J, Frith MC, Maeda N, Oyama R, Ravasi T, Lenhard B, Wells C, Kodzius R, Shimokawa K, Bajic VB, Brenner SE, Batalov S, Forrest AR, Zavolan M, Davis MJ, Wilming LG, Aidinis V, Allen JE, Ambesi-Impiombato A, Apweiler R, Aturaliya RN, Bailey TL, Bansal M, Baxter L, Beisel KW, Bersano T, Bono H, Chalk AM, Chiu KP, Choudhary V, Christoffels A, Clutterbuck DR, Crowe ML, Dalla E, Dalrymple BP, de Bono B, Della Gatta G, di Bernardo D, Down T, Engstrom P, Fagiolini M, Faulkner G, Fletcher CF, Fukushima T, Furuno M, Futaki S, Gariboldi M, Georgii-Hemming P, Gingeras TR, Gojobori T, Green RE, Gustincich S, Harbers M, Hayashi Y, Hensch TK, Hirokawa N, Hill D, Huminiecki L, Iacono M, Ikeo K, Iwama A, Ishikawa T, Jakt M, Kanapin A, Katoh M, Kawasawa Y, Kelso J, Kitamura H, Kitano H, Kollias G, Krishnan SP, Kruger A, Kummerfeld SK, Kurochkin IV, Lareau LF, Lazarevic D, Lipovich L, Liu J, Liuni S, McWilliam S, Madan Babu M, Madera M, Marchionni L, Matsuda H, Matsuzawa S, Miki H, Mignone F, Miyake S, Morris K, Mottagui-Tabar S, Mulder N, Nakano N, Nakauchi H, Ng P, Nilsson R, Nishiguchi S, Nishikawa S, Nori F, Ohara O, Okazaki Y, Orlando V, Pang KC, Pavan WJ, Pavesi G, Pesole G, Petrovsky N, Piazza S, Reed J, Reid JF, Ring BZ, Ringwald M, Rost B, Ruan Y, Salzberg SL, Sandelin A, Schneider C, Schonbach C, Sekiguchi K, Semple CA, Seno S, Sessa L, Sheng Y, Shibata Y, Shimada H, Shimada K, Silva D, Sinclair B, Sperling S, Stupka E, Sugiura K, Sultana R, Takenaka Y, Taki K, Tammoja K, Tan SL, Tang S, Taylor MS, Tegner J, Teichmann SA, Ueda HR, van Nimwegen E, Verardo R, Wei CL, Yagi K, Yamanishi H, Zabarovsky E, Zhu S, Zimmer A, Hide W, Bult C, Grimmond SM, Teasdale RD, Liu ET, Brusic V, **Quackenbush J**, Wahlestedt C, Mattick JS, Hume DA, Kai C, Sasaki D, Tomaru Y, Fukuda S, Kanamori-Katayama M, Suzuki M, Aoki J, Arakawa T, Iida J, Imamura K, Itoh M, Kato T, Kawaji H, Kawagashira N, Kawashima T, Kojima M, Kondo S, Konno H, Nakano N, Ninomiya N, Nishio T, Okada M, Plessy C, Shibata K, Shiraki T, Suzuki S, Tagami M, Waki K, Watahiki A, Okamura-Oho Y, Suzuki H, Kawai J, Hayashizaki Y. The transcriptional landscape of the mammalian genome. Science. 2005;309(5740):1559-63.

John Quackenbush

76.  Cui L, Fan Q, Hu Y, Karamycheva SA, **Quackenbush J**, Khuntirat B, Sattabongkot J, Carlton JM. Gene discovery in Plasmodium vivax through sequencing of ESTs from mixed blood stages. Mol Biochem Parasitol. 2005;144(1):1-9.

77.  Djebbari A, Karamycheva S, Howe E, **Quackenbush J**. MeSHer: identifying biological concepts in microarray assays based on PubMed references and MeSH terms. Bioinformatics. 2005;21(15):3324-6.

78.  Eschrich S, Yang I, Bloom G, Kwong KY, Boulware D, Cantor A, Coppola D, Kruhoffer M, Aaltonen L, Orntoft TF, **Quackenbush J**, Yeatman TJ. Molecular staging for survival prediction of colorectal cancer patients. J Clin Oncol. 2005;23(15):3526-35.

79.  Guerrero FD, Miller RJ, Rousseau ME, Sunkara S, **Quackenbush J**, Lee Y, Nene V. BmiGI: a database of cDNAs expressed in Boophilus microplus, the tropical/southern cattle tick. Insect Biochem Mol Biol. 2005;35(6):585-95.

80.  Hackl H, Burkard TR, Sturn A, Rubio R, Schleiffer A, Tian S, **Quackenbush J, Eisenhaber F**, Trajanoski Z. Molecular processes during fat cell development revealed by gene expression profiling and functional annotation. Genome Biol. 2005;6(13):R108.

81.  Irizarry RA, Warren D, Spencer F, Kim IF, Biswal S, Frank BC, Gabrielson E, Garcia JG, Geoghegan J, Germino G, Griffin C, Hilmer SC, Hoffman E, Jedlicka AE, Kawasaki E, Martinez-Murillo F, Morsberger L, Lee H, Petersen D, **Quackenbush J**, Scott A, Wilson M, Yang Y, Ye SQ, Yu W. Multiple-laboratory comparison of microarray platforms. Nat Methods. 2005;2(5):345-50.

82.  Kim HS, Yu Y, Snesrud EC, Moy LP, Linford LD, Haas BJ, Nierman WC, **Quackenbush J**. Transcriptional divergence of the duplicated oxidative stress-responsive genes in the Arabidopsis genome. Plant J. 2005;41(2):212-20.

83.  Kwong KY, Bloom GC, Yang I, Boulware D, Coppola D, Haseman J, Chen E, McGrath A, Makusky AJ, Taylor J, Steiner S, Zhou J, Yeatman TJ, **Quackenbush J**. Synchronous global assessment of gene and protein expression in colorectal cancer progression. Genomics. 2005;86(2):142-58.

84.  Larkin JE, Frank BC, Gavras H, Sultana R, **Quackenbush J**. Independence and reproducibility across microarray platforms. Nat Methods. 2005;2(5):337-44.

85.  Lee Y, Tsai J, Sunkara S, Karamycheva S, Pertea G, Sultana R, Antonescu V, Chan A, Cheung F, **Quackenbush J**. The TIGR Gene Indices: clustering and assembling EST and known genes and integration with eukaryotic genomes. Nucleic Acids Res. 2005;33(Database issue):D71-4.

86.  Liu F, Vantoai T, Moy LP, Bock G, Linford LD, **Quackenbush J**. Global transcription profiling reveals comprehensive insights into hypoxic response in Arabidopsis. Plant Physiol. 2005;137(3):1115-29.

19

John Quackenbush

87.   Margolin AA, Greshock J, Naylor TL, Mosse Y, Maris JM, Bignell G, Saeed AI, **Quackenbush J**, Weber BL. CGHAnalyzer: a stand-alone software package for cancer genome analysis using array-based DNA copy number data. Bioinformatics. 2005;21(15):3308-11.

88.   Marko NF, Frank B, Quackenbush J, Lee NH. A robust method for the amplification of RNA in the sense orientation. BMC Genomics. 2005;6(1):27.

89.   Pinent M, Blade MC, Salvado MJ, Arola L, Hackl H, **Quackenbush J**, Trajanoski Z, Ardevol A. Grape-seed derived procyanidins interfere with adipogenesis of 3T3-L1 cells at the onset of differentiation. Int J Obes (Lond). 2005;29(8):934-41.

90.   Bruggmann R, Bharti AK, Gundlach H, Lai J, Young S, Pontaroli AC, Wei F, Haberer G, Fuks G, Du C, Raymond C, Estep MC, Liu R, Bennetzen JL, Chan AP, Rabinowicz PD, **Quackenbush J**, Barbazuk WB, Wing RA, Birren B, Nusbaum C, Rounsley S, Mayer KF, Messing J. Uneven chromosome contraction and expansion in the maize genome. Genome Res. 2006;16(10):1241-51.

91.   Chan AP, Pertea G, Cheung F, Lee D, Zheng L, Whitelaw C, Pontaroli AC, SanMiguel P, Yuan Y, Bennetzen J, Barbazuk WB, **Quackenbush J**, Rabinowicz PD. The TIGR Maize Database. Nucleic Acids Res. 2006;34(Database issue):D771-6.

92.   Chan VS, Chau SY, Tian L, Chen Y, Kwong SK, **Quackenbush J,** Dallman M, Lamb J, Tam PK. Sonic hedgehog promotes CD4+ T lymphocyte proliferation and modulates the expression of a subset of CD28-targeted genes. Int Immunol. 2006;18(12):1627-36.

93.   Deutsch EW, Ball CA, Bova GS, Brazma A, Bumgarner RE, Campbell D, Causton HC, Christiansen J, Davidson D, Eichner LJ, Goo YA, Grimmond S, Henrich T, Johnson MH, Korb M, Mills JC, Oudes A, Parkinson IIE, Pascal LE, **Quackenbush J**, Ramialison M, Ringwald M, Sansone SA, Sherlock G, Stoeckert CJ, Jr., Swedlow J, Taylor RC, Walashek L, Zhou Y, Liu AY, True LD. Development of the Minimum Information Specification for In Situ Hybridization and Immunohistochemistry Experiments (MISFISHIE). Omics. 2006;10(2):205-8.

94.   Frith MC, Bailey TL, Kasukawa T, Mignone F, Kummerfeld SK, Madera M, Sunkara S, Furuno M, Bult CJ, **Quackenbush J**, Kai C, Kawai J, Carninci P, Hayashizaki Y, Pesole G, Mattick JS. Discrimination of Non-Protein-Coding Transcripts from Protein-Coding mRNA. RNA Biol. 2006;3(1).

95.   Hu VW, Frank BC, Heine S, Lee NH, **Quackenbush J**. Gene expression profiling of lymphoblastoid cell lines from monozygotic twins discordant in severity of autism reveals differential regulation of neurologically relevant genes. BMC Genomics. 2006;7:118.

EXHIBIT J

96. Maeda N, Kasukawa T, Oyama R, Gough J, Frith M, Engstrom PG, Lenhard B, Aturaliya RN, Batalov S, Beisel KW, Bult CJ, Fletcher CF, Forrest AR, Furuno M, Hill D, Itoh M, Kanamori-Katayama M, Katayama S, Katoh M, Kawashima T, **Quackenbush J**, Ravasi T, Ring BZ, Shibata K, Sugiura K, Takenaka Y, Teasdale RD, Wells CA, Zhu Y, Kai C, Kawai J, Hume DA, Carninci P, Hayashizaki Y. Transcript annotation in FANTOM3: mouse gene catalog based on physical cDNAs. PLoS Genet. 2006;2(4):e62.

97. Maher EA, Brennan C, Wen PY, Durso L, Ligon KL, Richardson A, Khatry D, Feng B, Sinha R, Louis DN, **Quackenbush J**, Black PM, Chin L, DePinho RA. Marked genomic differences characterize primary and secondary glioblastoma subtypes and identify two distinct molecular and clinical secondary glioblastoma entities. Cancer Res. 2006;66(23):11502-13

98. Malek RL, Wang HY, Kwitek AE, Greene AS, Bhagabati N, Borchardt G, Cahill L, Currier T, Frank B, Fu X, Hasinoff M, Howe E, Letwin N, Luu TV, Saeed A, Sajadi H, Salzberg SL, Sultana R, Thiagarajan M, Tsai J, Veratti K, White J, **Quackenbush J**, Jacob HJ, Lee NH. Physiogenomic resources for rat models of heart, lung and blood disorders. Nat Genet. 2006;38(2):234-9.

99. Mar JC, Rubio R, **Quackenbush J**. Inferring steady state single-cell gene expression distributions from analysis of mesoscopic samples. Genome Biol. 2006;7(12):R119.

100. **Quackenbush J**, Stoeckert C, Ball C, Brazma A, Gentleman R, Huber W, Irizarry R, Salit M, Sherlock G, Spellman P, Winegarden N. Top-down standards will not serve systems biology. Nature. 2006;440(7080):24.

101. Rayner TF, Rocca-Serra P, Spellman PT, Causton HC, Farne A, Holloway E, Irizarry RA, Liu J, Maier DS, Miller M, Petersen K, **Quackenbush J**, Sherlock G, Stoeckert CJ, Jr., White J, Whetzel PL, Wymore F, Parkinson H, Sarkans U, Ball CA, Brazma A. A simple spreadsheet-based, MIAME-supportive format for microarray data: MAGE-TAB. BMC Bioinformatics. 2006;7:489.

102. Saeed AI, Bhagabati NK, Braisted JC, Liang W, Sharov V, Howe EA, Li J, Thiagarajan M, White JA, **Quackenbush J**. TM4 microarray software suite. Methods Enzymol. 2006;411:134-93.

103. Stoeckert C, Ball C, Brazma A, Brinkman R, Causton H, Fan L, Fostel J, Fragoso G, Heiskanen M, Holstege F, Morrison N, Parkinson H, **Quackenbush J**, Rocca-Serra P, Sansone SA, Sarkans U, Sherlock G, Stevens R, Taylor C, Taylor R, Whetzel P, White J. Wrestling with SUMO and bio-ontologies. Nat Biotechnol. 2006;24(1):21-2; author reply 3.

104. Walker JK, Ahumada A, Frank B, Gaspard R, Berman K, **Quackenbush J**, Schwartz DA. Multistrain genetic comparisons reveal CCR5 as a receptor involved in airway hyperresponsiveness. Am J Respir Cell Mol Biol. 2006;34(6):711-8

John Quackenbush

105. Danley PD, Mullen SP, Liu F, Nene V, **Quackenbush J**, Shaw KL. A cricket Gene Index: A genomic resource for studying neurobiology, speciation, and molecular evolution. BMC Genomics. 2007;8(1):109.

106. Song JS, Maghsoudi K, Li W, Fox E, **Quackenbush J**, Shirley Liu X. Microarray Blob-Defect Removal Improves Array Analysis. Bioinformatics. 2007.

107. Danley PD, Mullen SP, Liu F, Nene V, **Quackenbush J**, Shaw KL: A cricket Gene Index: a genomic resource for studying neurobiology, speciation, and molecular evolution. BMC Genomics 2007, 8:109.

108. Raj JU, Aliferis C, Caprioli RM, Cowley Jr AW, Davies PF, Duncan MW, Erle DJ, Erzurum SC, Finn PW, Ischiropoulos, Kaminski N, Kleeberger SR, Leikauf GD, Loyd JE, Martin TR, Matalon S, Moore JH, Quackenbush J, Sabo-Attwood T, Shapiro SD, Schnitzer JE, Schwartz DA, Schwiebert LM, Sheppard D, Ware LB, Weiss ST, Whitsett JA, Wurfel MM, Matthay MA: Genomics and Proteomics of Lung Disease: Conference Summary. Am J Physiol Lung Cell Mol Physiol 2007.

**Reviews:**

1. **Quackenbush J**. Viva la revolution! A report from the FANTOM meeting. Nature Genet. 2000;26(3):255-6.

2. **Quackenbush J**. Computational analysis of microarray data. Nat Rev Genet. 2001;2(6):418-27.

3. **Quackenbush J**. Microarray data normalization and transformation. Nat Genet. 2002;32 Suppl:496-501

4. Dudoit S, Gentleman RC, **Quackenbush J**. Open source software for the analysis of microarray data. Biotechniques. 2003;Suppl:45-51.

5. **Quackenbush J**. Extracting meaning from functional genomics experiments. Toxicol Appl Pharmacol. 2005;207(2 Suppl):195-9.

6. **Quackenbush J**. Microarray analysis and tumor classification. N Engl J Med. 2006;354(23):2463-72.

7. **Quackenbush J**. From 'omes to biology. Anim Genet. 2006;37 Suppl 1:48-56.

8. **Quackenbush J**. Computational approaches to analysis of DNA microarray data. Methods Inf Med. 2006;45 Suppl 1:91-103.

9. **Quackenbush J**. Extracting biology from high-dimensional biological data. J Exp Biol. 2007;210(Pt 9):1507-17.

EXHIBIT J

John Quackenbush

**Editorials:**

1. **Quackenbush J**. Data standards for 'omic' science. Nat Biotechnol. 2004;22(5):613-4.

2. **Quackenbush J**, Salzberg SL. It is time to end the patenting of software. Bioinformatics. 2006;22(12):1416-7.

3. **Quackenbush J**. Weighing our measures of gene expression. Mol Syst Biol. 2006;2:63.

4. **Quackenbush J.** Standardizing the standards. Mol Syst Biol. 2006;2:2006 0010.

5. **Quackenbush J**, Irizarry RA. Response to Shields: 'MIAME, we have a problem'. Trends Genet. 2006;22(9):471-2.

**Books:**

1. Coulston H. C., **Quackenbush J.,** Brazma A., **Microarray Gene Expression Data Analysis: A Beginner's Guide**, Blackwell Publishing, 2003.

2. Kelley, J. M. and **Quackenbush J.,** "Sequencing PCR Products," in **PCR Methods Manual,** Second edition, M. Innis, D. Gelfand, and J. Sninsky, eds., Academic Press, 1999.

3. **Quackenbush J.,** Adams M. D., Fraser C. M., and Venter J. C., "Genome Projects:From Microbes to Man, From Sequence to Function," in **Genomics: Commercial Opportunities from a Scientific Revolution,** G. K. Dixon, L. G. Copping, and D. Livingstone, eds. BIOS Scientific Publishers, 1998.

4. **Quackenbush, J.** Using DNA Microarrays to Assay Gene Expression. *In:* A. Baxevanis and B. Ouellette (eds.), Bioinformatics: A Practical Guide to the Analysis of Genes and Proteins, third edition: John Wiley and Sons, 2004.

**Educational Material:** I have taught numerous courses and workshops and make the materials freely available. Material from recent courses on Microarray Data Analysis can be found at http://compbio.dfci.harvard.edu

**Thesis:** Gauge Field Theory in Two Space-Time Dimensions: Anomalies and Applications to String Models.

**Nonprint Materials,** i.e., film strips, films, videotapes and computer-based materials relevant to appointee's academic field. *Include description of item, who commissioned,*

23

John Quackenbush

*purpose, users, penetration in field.*

**Patents**

**Abstracts** (*only those containing data not yet published in complete form.*)

24

Exhibit B

**EXHIBIT B**



Extension Oligonucleotides are Ligated
to the Initializing Oligonucleotide

Oligonucleotide Probes
Hybridize to a Target DNA

Initializing
Oligonucleotide

FIG._5

Each Extension Oligonucleotide
Contains a Label (*)

## PROOF OF SERVICE

I am an attorney, and on June 13, 2008, I caused

### EXPERT REBUTTAL STATEMENT OF JOHN E. QUACKENBUSH, PH.D.

to be served via electronic mail by electronically mailing a true and correct copy through Marshall, Gerstein & Borun LLP's electronic mail system to the e-mail addresses set forth below:

| COUNSEL FOR PLAINTIFF: | |
|---|---|
| BRYAN WILSON<br>DARA TABESH<br>ERIC C. PAI<br>MORRISON & FOERSTER LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304-1018<br>E-Mail: BWilson@mofo.com<br>E-Mail: DTabesh@mofo.com<br>E-Mail: EPai@mofo.com | DAVID C. DOYLE<br>STEVEN E. COMER<br>BRIAN M. KRAMER<br>ANDERS T. AANNESTAD<br>MORRISON & FOERSTER LLP<br>12531 High Bluff Drive, Suite 100<br>San Diego, CA 92130-2040<br>E-Mail: DDoyle@mofo.com<br>E-Mail: SComer@mofo.com<br>E-Mail: BMKramer@mofo.com<br>E-Mail: AAannestad@mofo.com |
| KURTIS MacFERRIN<br>APPLERA CORPORATION –<br>    APPLIED BIOSYSTEMS GROUP<br>850 Lincoln Centre Drive<br>Foster City, CA 94404<br>E-Mail: Kurtis.MacFerrin@appliedbiosystems.com | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Chicago, Illinois, this 13th day of June, 2008.

_____
Mark H. Izraelewicz

EXHIBIT J