# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| APPLERA CORPORATION—APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>Plaintiff/Counterdefendant,<br><br>- vs. -<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>Defendants/Counterclaimants. | Case No. 07-CV-02845 WHA<br><br>District Judge William H. Alsup<br><br><br>**EXPERT STATEMENT OF KEITH C. BACKMAN, PH.D. REGARDING INFRINGEMENT**<br><br>**--CONTAINS HIGHLY CONFIDENTIAL –ATTORNEYS' EYES ONLY INFORMATION OF APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP** |

I, Keith C. Backman, Ph.D., have been retained to testify as an expert on behalf of Solexa, Inc. in the above-captioned action. I submit this Statement in compliance with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure. I expect to testify at trial regarding the matters discussed in this Statement, if asked by the Court or the parties' attorneys.

## I.      QUALIFICATIONS

1.      I live in Bedford, Massachusetts.

2.      Since 1995, I have been largely retired.  However, from time to time I have been asked to be a consultant to the Biotechnology Industry, specializing in technology evaluation and intellectual property litigation.

3.    I provide advice and guidance to such companies regarding biotechnology and biotechnological developments as they may pertain to intellectual property claimed by or asserted against them. I have also consulted for a number of companies as a litigation consultant, serving as an expert consultant in court proceedings like this one.

4.    I received my undergraduate degree in Chemistry from the University of Chicago in 1969. I went on to receive a Ph.D. in Biophysics from Harvard University in 1977.

5.    As an undergraduate student, I conducted research on the structure of polyamino acids in the laboratory of Dr. George Holzwarth.

6.    In graduate school at Harvard, I worked in the laboratory of Dr. Mark Ptashne. My graduate education focused on the areas of gene expression and molecular genetics. In order to be awarded a Ph.D. at Harvard, I had to conduct independent scientific research. The title of my Ph.D. dissertation was "Molecular Cloning of the Lambda Repressor Gene *c*I." Generally, my dissertation research related to using newly developed methods in recombinant DNA to express genes and obtain large quantities of the proteins encoded by those genes.

7.    I worked as a Postdoctoral Fellow in Molecular Biology in the pioneering laboratories of Dr. Herbert Boyer at the University of California, San Francisco and Dr. Boris Magasanik at the Massachusetts Institute of Technology (*see* Backman *Curriculum Vitae*, Exhibit 1).

8.    Dr. Boyer's laboratory focused on the development of recombinant DNA technology. As a postdoctoral fellow in Dr. Boyer's laboratory, I focused my research on understanding how plasmid vectors replicate in bacterial cells.

9.    Dr. Magasanik's laboratory focused on bacterial physiology. As a postdoctoral fellow in Dr. Magasanik's laboratory, I focused my research on how bacteria utilize nitrogen sources for growth.  In this work I made extensive use of recombinant DNA technology.

10.     I have worked broadly in the area of genetic engineering and biotechnology for more than 30 years. From 1978 to 1980, I served as a consultant to Genentech, where I provided input regarding company objectives and scientific staffing. In 1981, I and eleven others founded a company called BioTechnica International, Inc. Over the years at BioTechnica, I held numerous positions, including Program Director, Senior Vice President for Technical Affairs for a subsidiary, BioTechnica Diagnostics, and Vice President of Research and Development for Biochemical Products and Processes. In 1991, I and four others founded a company called OmniGene, Inc, a successor to BioTechnica, where I served as both a Member of the Board of Directors and as Vice President of Research and Development. Between 1992 and 2000, I also served as President of Pleasant Hill Diagnostics, a company that I founded to develop and commercialize technology that I invented (*see* Backman *Curriculum Vitae*, Exhibit 1).

11.     I am an author or co-author of 35 scientific articles, letters, and reviews. These publications reflect my experience in a wide array of biological disciplines and technologies, including gene expression, recombinant vector design, and protein synthesis and purification, as well as DNA probe based diagnostics, biomolecule labeling and detection, and nucleic acid amplification. (*see* Backman *Curriculum Vitae*, Exhibit 1).

12.     I am an inventor or co-inventor on 14 different patents in the United States and Europe. (*see* Backman *Curriculum Vitae*, Exhibit 1).

13.     My patented inventions are primarily in the areas of gene expression technology, production of valuable metabolites using engineered strains of bacteria, and the use of DNA chemistry and biochemistry for the detection of microorganisms.

14.     In all of my activities, I have been required to use and develop techniques relating to the physical, chemical and biochemical processes that affect DNA, such as hybridization, cleavage

**3**

and joining of DNA fragments, and use of DNA as a template for other processes such as replication, digestion, and the like.

15.    My working experience in biotechnology also includes my peer-review work on several NIH study sections charged with reviewing grant applications under the Small Business Innovation Research (SBIR) Program or Small Business Technology Transfer (STTR) Program. (Backman *Curriculum Vitae*, Exhibit 1).

16.    I consider myself, and I believe my peers would consider me, to be an expert in molecular biology, including nucleic acid biochemistry and diagnostic technologies.

## II.    PREVIOUS TESTIMONY

17.    I have testified as a qualified expert witness in the field of molecular biology in actions brought in the U.S. District Courts for New Jersey and Northern California. In the last four years, I was deposed and testified at trial in the *Tercica Inc. v. Insmed Inc*. case, No. 04-5429, filed December 23, 2004 in the United States District Court for Northern District of California. I was also deposed last year in *Gunderson et al. v. Willis et al*. (Intf. No. 105547), a pending interference proceeding in the U.S. PTO.

## III.    COMPENSATION

18.    For the time I have spent on my investigation, for my time spent preparing this expert report, and for my time spent testifying in this case, I am being paid at my normal consulting rate of $300 per hour. My compensation is not affected by the content of my testimony or the outcome in this case.

## IV.    INFORMATION CONSIDERED

19.    In the course of my investigation in this case and in preparing this expert report, I have reviewed the patents-in-suit (U.S. Pat. Nos. 5,750,341 ("the '341 patent"), 5,969,119 ("the '119 patent") and 6,306,597 ("the '597 patent"), various documents produced to the Defendants by

**4**

AB that describe the structure, function and use of the SOLiD System, the other materials cited herein, and other materials listed in Exhibit 2 attached hereto. I also visited AB's headquarters in Foster City, California on May 22 and 23, 2008, and witnessed various portions of a demonstration by AB of the use of the SOLiD System to sequence a target polynucleotide, which was videotaped by Defendants.

## V.    SUMMARY OF OPINIONS TO BE EXPRESSED

20.    As the result of my investigation in this case, I have arrived at an opinion regarding whether AB and its customers who use its SOLiD System infringe any of the asserted claims of the patents-in-suit.

21.    The use of the SOLiD System by AB and its customers literally infringes the asserted claims of the '341 and '597 Patents literally or, and infringes claim 1 of the '119 Patent by equivalence.

## VI.    THE PATENTS-IN-SUIT

22.    The patents-in-suit, generally speaking, describe Dr. Macevicz's inventions relating to methods for sequencing molecules called "nucleic acids," such as the molecule DNA.

23.    The patents-in-suit describe a method of sequencing nucleic acids that can generally be described as a form of "sequencing by ligation."

## VII.    SCIENTIFIC BACKGROUND

24.    Functionally, nucleic acids, such as DNA, are the molecules in the cells of our bodies that carry genetic information and information that mediates the expression or manifestation of that genetic information.

25.    DNA can be defined structurally in terms of its physical and chemical composition. As illustrated in Exhibit 3, Slide 1, DNA is a linear polymer – or chain of similar chemical units – made from 4 chemical building blocks, called nucleotides. As shown in Exhibit 3, Slide 2, each

DNA nucleotide has three components. As shown in Exhibit 3, Slide 2, nucleotides contain a

"phosphate" group, represented by the circle with the letter P. As shown in Exhibit 3, Slide 2,

nucleotides also contain a sugar called "deoxyribose," represented by the pentagon with the letter

S, and one of four "bases," represented as the colored shapes with the letters A, C, G, and T. The

letters A, C, G, and T are used as a shorthand for the longer chemical names of the bases. We

commonly represent the chain of nucleotides that makes up a DNA molecule as a series of the A,

C, G, and T letters. In this common formulation, the sugar and phosphate are not explicitly

indicated because they are identical in almost every natural circumstance and are always present

as part of each monomer in the DNA polymer.  The patents-in-suit describe this aspect of DNA

at Column 1, lines 37-43.

26.     The patents-in-suit describe DNA molecules using this standard format. We can find

this, for example, at column 15, lines 5-6.

27.     As shown in Exhibit 3, Slide 3, throughout the specification of the patents-in-suit, the

notations "5′" and "3′" are associated with sequences of letters representing the nucleotides in a

piece of DNA. These notations 5′ and 3′ refer to the chemical structure of a DNA polymer. As

shown in Exhibit 3, Slide 3, adjacent nucleotides in a DNA molecule are linked together by

chemical bonds. As shown in Exhibit 3, Slide 3, these bonds, called "phosphodiester" bonds, are

formed between specific carbon positions on adjacent sugars, specifically the carbon atoms in the

sugars called the "5′" and "3′" carbons. Because in native DNA these "phosphodiester" bonds

only form between the 5′ and 3′ carbon atoms, the DNA molecule has directionality, much as an

arrow has a point on one end and feathers on the other. Scientists typically write DNA sequences

from 5′ to 3′, going left to right, and sequences without any explicit indication are assumed to be

written according to this convention. If a sequence is written in the other orientation (i.e. 3′ to 5′), this is almost always explicitly indicated so that the reader knows that the standard convention is not being observed.  For example, in the sequence shown in Exhibit 3, Slide 5, the sequence would typically be written T-A-C-G, going from 5′ to 3′. As shown in Exhibit 3, Slide 4, each nucleotide in the DNA chain has the same sugar and phosphate groups as any other nucleotide in the chain, but each has a different "base," and each of these four different bases has the chemical structure shown in the colored regions.

28.     As shown in Exhibit 3, Slide 5, when two chains of DNA are laid next to each other, the bases in the nucleotides of one chain can form chemical bonds with the bases in the nucleotides of the other chain. These are called "hydrogen bonds." Hydrogen bonds are weaker than the kinds of bonds that join the other components within DNA, such as the bonds between the base and the sugar, or the bonds between the sugars and the phosphates. When a nucleotide in one chain is able to bond with the nucleotide in a parallel chain, the nucleotides are said to be "complementary." As shown in Exhibit 3, Slide 5, DNA molecules in the cells of our bodies typically exist as double-stranded chains, each made of two "complementary" strands. As one can see, two DNA chains with complementary nucleotides also only align with each other in a certain way: the top strand runs 5′ to 3′ going from left to right, while the bottom strand runs 5′ to 3′ going from right to left. This is called an "anti-parallel" type of orientation.

29.     Not every nucleotide is complementary to every other nucleotide. Each A, C, G, and T nucleotide in a DNA chain is invariably paired with only one other in a piece of double-stranded DNA. As shown in Exhibit 3, Slide 5, As and Ts only pair with each other, and Gs and Cs also only pair with each other. As shown in Exhibit 3, Slide 5, hydrogen bonds form between the As

**7**

and Ts, and Gs and Cs, respectively. These hydrogen bonds can hold the two strands of DNA together. The formation of hydrogen bonds between anti-parallel complementary strands of DNA causes a stable association between those strands in a process called "hybridization."

30.    In living cells, double-stranded DNA molecules are made by other molecules called "enzymes." For our purposes, it's useful to think of enzymes as being little machines made out of protein that can carry out or shepherd along specific chemical reactions. As shown in Exhibit 3, Slide 6, a DNA strand is synthesized by the joining of individual nucleotides (monomers), which are said to be "polymerized," by an enzyme called "DNA polymerase." In Exhibit 3, Slide 6, the blob-like outline represents the DNA polymerase enzyme. As shown in Exhibit 3, Slide 6, the DNA polymerase uses the lower, longer strand as a template to determine which nucleotides to incorporate into the upper strand, the strand that is being newly synthesized. The little circle with "OH" in it is highlighted. In this illustration, the O is an oxygen atom and the H is a hydrogen atom, and this group is known as a hydroxyl group. It is found at the 3' position of the base in the DNA nucleotide. When DNA polymerase synthesizes a new strand of DNA, the nucleotides in that strand are complementary to the nucleotides in the template DNA strand. As shown in Exhibit 3, Slide 6, a complementary nucleotide – in this case, T, which is complementary to the A nucleotide in the template strand – comes in. The incoming T nucleotide has a string of phosphate groups at the 5' position of its sugar residue, represented by the three P's. A nucleotide with a string of three phosphate groups is called a "nucleoside triphosphate." As shown in Exhibit 3, Slide 6, the T residue is complementary to the A residue, so it "fits" in. As shown in Exhibit 3, Slide 7, if the DNA nucleotide coming in fits with the complementary nucleotide in the template strand, the DNA polymerase recognizes the fit and forms a chemical bond between the adjacent sugar residues in the newly synthesized strand.

31.     As shown in Exhibit 3, Slide 8, after the chemical bond is formed between the G and T,

the DNA polymerase advances along the template and the newly added T nucleotide is ready to

be linked to the next complementary nucleotide. As shown in Exhibit 3, Slide 8, as before, the 3'

OH group on the newly added nucleotide is needed. As shown in Exhibit 3, Slide 8, the next

complementary nucleotide comes in – in this case, a G nucleotide which is complementary to the

C residue in the template. As shown in Exhibit 3, Slide 9, DNA polymerase again forms a

chemical bond between the 3' OH of the strand being synthesized and the 5' phosphate on the

incoming nucleotide.  Repetition of this process results in the synthesis of a strand of DNA that

is complementary to the template strand.

## VIII.   THE PATENTS-IN-SUIT (CONT.)

32.     The "Background" section of the patents-in-suit describes generally the state-of-the-art

in DNA sequencing when the inventions described in the rest of the patents-in-suit were made.

33.     As the '341 Patent says at Column 1, line 44-Col. 2, line 7, prior to Dr. Macevicz's

inventions, the standard method of sequencing was the "dideoxy chain termination method,"

which the patent and most workers in the field referred to as "Sanger" sequencing (Dr. Fred

Sanger shared the Nobel prize for his invention of this method).

34.     To perform Sanger sequencing, one started with the materials shown in Exhibit 3, Slide

10: the DNA to be sequenced, a primer – which is a short fragment of DNA called an

"oligonucleotide," and two types of individual nucleoside triphosphates (abbreviated NTP). The

first type is normal dNTPs, which stands for "deoxynucleoside triphosphates," and the second is

special "ddNTPS," which stands for "dideoxynucleoside triphosphates."  In these nucleotides,

the 'N' can stand for any one of the bases, A, G, C, or T.

35.    The two types of nucleotide monomers have different chemical groups on the 3' position of their sugar portions. The normal dNTPs have an OH (hydroxyl) group at the 3' position of their sugar portion, while the ddNTPs have no hydroxyl, but only an H atom.

36.    Although it might seem minor, this is actually a critical difference. As shown in Exhibit 3, Slide 10, the primer hybridizes to a complementary sequence in the DNA that is being sequenced, and DNA polymerase begins synthesizing a complementary strand. Because a mixture of dNTPs and ddNTPs are present, DNA polymerase could add either type at any given position, so long as the N moiety on the nucleotide was complementary to the base on the strand opposite the position in which it was being added.

37.    As shown in Exhibit 3, Slides 8 & 9, where a normal G nucleotide has just been added, DNA polymerase forms a chemical bond between the OH on the nucleotide at the end of the strand and the phosphate group of the incoming complementary nucleotide. As shown in Exhibit 3, Slide 9, the newly added G residue has been added because it is complementary to the C in the template strand, and after it has been added, it has an OH group at the 3' position that is available for bonding to another nucleotide coming in, i.e., the newly elongated strand can be further extended.

38.    As shown in Exhibit 3, Slides 11-13, a ddATP is complementary to the T in the template strand, so it "fits" in place. This A nucleotide has the three phosphate groups on its 5' end that allow the formation of the chemical bond. But as shown in Exhibit 3, Slides 11-13, the addition of the ddATP is a dead-end and terminates the extension of the complementary strand.

39.    As shown in Exhibit 3, Slides 12-13, the ddATP only has an H at the 3' position – shown in red – rather than the OH group that DNA polymerase needs to keep extending the chain. As shown in Exhibit 3, Slide 13, when the next complementary base comes in, in this case a T

**10**

nucleotide, because the OH group is missing from the A ddNTP that is at the end of the new

chain, DNA polymerase cannot form the chemical bond needed to extend the chain. The chain

has terminated.

40.      As shown in Exhibit 3, Slide 14, a primer is hybridized to a template. The next position

in the template is C, so its complementary nucleotide is G. As shown in Exhibit 3, Slide 14,

starting on the left, if the normal G is added, it has a 3' OH and can be extended. As shown in

Exhibit 3, Slide 14, looking at the template on the right, if the dideoxy G is added, the chain

terminates because the H group cannot be extended.

41.      As shown in Exhibit 3, Slide 14, the next template position is an A, so either type of T

residue is complementary. If the normal T is added, the chain can continue, but if the special T is

added, the chain terminates. Likewise at the next position, depending on whether a normal or a

special nucleotide is added, the chain will either be able to continue extending or will terminate.

42.      One way to do it is to use specifically labeled dideoxynucleotides. You can attach a dye

of a specific color to each of the four ddNTPs.  For example, you might attach a red dye to

ddGTP, and different distinct colors to each of the others. However, as a practical matter, it is

hard to see tiny amounts of dye such as would be present at the end of a terminated DNA chain.

Therefore, what are used in practice are dyes that can glow fluorescently. That means that a

distinct fluorescent dye is linked to each of the special ddNTP nucleotides. If you shine light on

it, the dye will give off fluorescent light of a distinct color which you can detect and record.

43.      As shown in Exhibit 3, Slide 15, if, for example, the special G residues are labeled red,

the special T residues are labeled blue, the A residues are labeled yellow, and the C residues

have their own color, each of the terminated extension products will fluorescently glow with a

distinct color depending on which residue(s) are present at their ends.

**11**

44.    If all of the terminated chains are in one tube, the tube will glow all four colors at once

and it would be impossible to tell what is what.  So we make use of another characteristic of the

newly elongated chains, which is their size.  If the primer oligonucleotide is 9 bases long and the

first base to be added is a G, then every product that is terminated at size 10 bases will end in a

G, and if the ddGTP is labeled as I previously described, it will glow red. Similarly, other

molecules terminated at other specific lengths will glow at their own characteristic color

depending on what base terminated them.  So our task is to sort the products out by size. This is

accomplished in two steps.  First, so that the size of the template strand does not influence

matters, the extension products are separated from their templates by a process called

"denaturation" or "melting," which is simply the reverse of hybridization. The double-stranded

structure is separated into two types of single strands, the template strand and the elongated

strands. Second, as shown in Exhibit 3, Slide 16, the resulting single stranded extension products

– each terminating with a specific fluorescently labeled nucleotide – are passed through a

capillary tube, which is a very fine tube filled with a special gel or liquid.

45.    As a result of the many phosphate groups present in them, DNA molecules have a

negative charge, so if an electric field is applied to the gel in the tube, as shown in Exhibit 3,

Slide 17, by the + and – signs, the negatively charged DNA will move toward the end of the tube

where the positive pole is located.  Importantly, the gel impedes the migration of the DNA

molecules in a size-dependent manner, so the smallest pieces move more quickly. Thus, as

shown in Exhibit 3, Slide 17, fragments of DNA up to many hundreds of bases in length can be

separated based on size at a resolution of only a single nucleotide difference.

46.    As the DNA fragments migrate through the tube, they will pass by a light source and a

light detector. The smallest fragment will pass by first, and then the next larger, and the next

larger, and so on.  The light source illuminates the fragment, causing the fluorescent dye in the special chain-terminating ddNTP at the end of each fragment to fluoresce (glow), which is detected by the light detector. As shown in Exhibit 3, Slides 18-31, as each fragment is detected, the sequence can be read.

47.     As the patents-in-suit describe, Sanger sequencing, like the other methods for DNA sequencing available in the prior art, requires this DNA separation step which "severely limits the size of the DNA chain that can be sequenced at one time," such that they can only "reliably accommodate a DNA chain of up to about 400-450 nucleotides." '341 patent, Col. 1, line 60-Col. 2, line 7. As the patent goes on to discuss, there are a number of other "significant technical problems" with the Sanger method. '341 patent, Col. 2, lines 8-54. The patent describes the kind of technical advance that would address many of the problems associated with Sanger sequencing, beginning at Col. 2, lines 55-60.

48.     The method described in the patents-in-suit, a form of "Sequencing by Ligation," is a completely different way to sequence DNA sequences. The patent summarizes a Sequencing by Ligation method at Col. 2, line 65-Col. 3, line 34. The patent contains diagrams that illustrate aspects of Sequencing by Ligation; these diagrams are briefly explained at Col. 3, lines 35-50. The inventor also tells the reader that he will use certain terms in a specific way by giving them definitions. Col. 3, line 51-Col. 4, line 31. Against this background, the inventor next gives a "detailed description" that illustrates the general scheme of his inventions, including certain aspects and possible embodiments, at Col. 4, line 32-Col. 14, line 40. By way of demonstrating how his inventions might work and be used in specific contexts, the inventor provides real-world examples of sequencing by ligation at Col. 14, line 41-Col. 18, line 17. In conformity with patenting requirements, the inventor also gives detailed descriptions of the specific DNA

**13**

sequences used in describing his inventions. Col. 18, line 18-Col. 21, line 34. Finally, the

inventor provides claims so that others can know whether or not they are using his inventions.

Col. 21, line 35-Col. 24, line 11. The other two patents-in-suit provide nearly identical sections,

other than the claims. If called to testify at trial, I expect that I may briefly "walk through" these

sections of the patent for the jury.

49.    We can focus on just some of the differences. As described in the patents-in-suit and

shown in Exhibit 3, Slide 32, in one example, sequencing by ligation starts off with a single-

stranded DNA template (sometimes called a "target polynucleotide"). In this example, the target

polynucleotide is attached to a microscopic bead or other solid support. *See*, *e.g.*, Figure 1 and

accompanying text at Col. 4, lines 43-Col. 5, line 12. For the sake of simplicity, I will describe

what happens with just one copy of a single target polynucleotide on a single bead, but a person

of ordinary skill in the art in 1994-95 would have understood that any one bead would contain

many identical copies of the target polynucleotide. Moreover, many beads could be used in a

single procedure, each bead bearing its own target polynucleotide, which could be the same or

different from the target polynucleotides on other beads. Starting with the simple example, there

is also an oligonucleotide primer that is complementary to a specific portion of the target. As

shown in Exhibit 3, Slide 32, the primer will therefore hybridize to the complementary sequence

in the target. In addition, the primer has a chemical group at one end that can be used to extend

it. In this case, the primer has a phosphate group at its 5' end, but it could be in the opposite

orientation and have an OH group available at its 3' end, just like the end of the growing strand

in the DNA polymerase synthesis reaction discussed earlier. This is described in the Macevicz

patents. *See*, *e.g.*, Col. 5, line 65-Col. 6, line 14.

50.     From this point on, sequencing by ligation becomes quite different from the Sanger method. Instead of adding a single nucleotide at a time as in the Sanger method, sequencing by ligation uses a library of short single-stranded DNA fragments, also called mixed oligonucleotide probes. As shown in Exhibit 3, Slide 33, this library, for example, could contain every possible variation of a sequence of fragments each consisting of 8 nucleotides, which is referred to as an 8-mer or "octamer." So it would contain oligonucleotides having eight As in a row, other oligonucleotides having eight Gs, others with eight Cs, eight Ts, seven As and one G, six As and two Gs, and every other combination of eight nucleotides. In addition, one could design the probes using fluorescently-labeled nucleotides. In this example, every probe that has an A at the 5th position has a yellow label, every probe that has a T at the 5th position has a blue label, and so on. Of course, one could design probes to use different colors and correlate them with different nucleotides at different positions within the oligonucleotide. Use of labels is discussed in the Macevicz patents. *See*, *e.g.*, Col. 3, lines 7-10; Col. 7, lines 17-42; Fig. 1 and text at Col. 5, lines 10-12; Fig. 2 and text at Col. 9, lines 42-49; Fig. 3A and text at Col. 10, lines 60-64; Fig. 3B and text at Col. 11, lines 9-14; Fig. 4 and text at 35-43.  Such a pool or library of probes can contain many different probes. For example, a pool of dimers could have any one of four bases in the first position and any one of four bases in the second position. Such a pool would have 16 distinct members.  In general, oligonucleotide pools of length n will have $4^n$ distinct members. The DNA probe library represented in Exhibit 3, Slide 33, with 4 nucleotide possibilities at each position in an 8-mer would have $4^8$ or 65,536 members. Pools of oligonucleotides with these characteristics described in the Macevicz patents. *See*, *e.g.*, Col. 6, lines 34-46.

51.     In order to reduce the number of probes that have to be made to correspond to all of the possible complementary 8-mer sequences that could be present in the target polynucleotide, it's

possible to use so-called "universal bases" at various positions. This is referred to as reducing the degeneracy of the probe pool and is discussed, for example, at Col. 3, line 61-Col. 4, line 3, and Col. 6, lines 34-46.

52.     The general scheme of an individual step in sequencing by ligation is as shown in Exhibit 3, Slide 33. Here we see the complementary probe, which here has an A at the 5th position. Under specific conditions, a perfectly complementary probe will preferentially hybridize to the target polynucleotide strand being sequenced, immediately adjacent to the hybridized primer. This is discussed in the Macevicz patents. See, *e.g.*, Col. 6, lines 14-33.

53.     As shown in Exhibit 3, Slide 33, another enzyme called DNA ligase can join, or form a chemical bond, between adjacent pieces of DNA hybridized to a template strand. Such joining is called "ligation." The bond that is formed is the same type of bond that DNA polymerase makes, but while DNA polymerase only works in the 5' to 3' direction, DNA ligase is a very different enzyme and under appropriate conditions can add to either end of the DNA molecule. So in sequencing by ligation, one adds the pool of the probes, and one member of that pool, the probe that is complementary, will preferentially hybridize to the sequence in the target polynucleotide that is immediately adjacent to the sequence in the target polynucleotide to which the primer has hybridized. Then one adds the DNA ligase enzyme, which forms a covalent bond between the adjacent primer and labeled probe when both are hybridized to the target polynucleotide. This is discussed in the Macevicz patents. See, *e.g.*, Col. 7, line 52- Col. 8, line 5. Only a probe that has hybridized to the sequence in the target polynucleotide that is immediately adjacent to the sequence in the target polynucleotide to which the primer has hybridized can be, and will be, ligated to the nucleotide at the end of the primer.  It is important to keep in mind two facts with regard to this step.  First, the primer is made to have a chemical group at its end that can

participate in the joining reaction with the probe, for example, a 5′ phosphate group. This is discussed in the Macevicz patents. See, *e.g.*, Col. 7, lines 4-16. Second, the end of the probe that does not participate in the joining reaction with the primer is made so that it has no ability to join with other probes that might hybridize next to it on the target strand. This is discussed in the Macevicz patents. See, *e.g.*, Col. 3, lines 10-15; Col. 6, lines 4-8. The consequence of these facts is that although one probe can be added to the end of the primer in this one reaction, no more than one probe can be added at a time. This ensures that only one colored dye can be added in any single step.

54.    After ligation, one washes away all of the un-ligated probes. This leaves only the fluorescently labeled probe that hybridized adjacent to the primer and was ligated to it by the DNA ligase enzyme. Washing steps are discussed in the Macevicz patents. *See*, *e.g.*, Col. 5, lines 28-31; Col. 14, lines 56-65; Col. 15, lines 60-65; Col. 16, lines 26-39; and Col. 18, lines, 8-17.

55.    As shown in Exhibit 3, Slide 33, after the non-hybridized, non-ligated probes are washed away, you can shine a special light on the reaction chamber, and the fluorescent dye attached to the just-ligated probes will emit, or "flash," a certain color of fluorescent light. In this example, the flash of yellow light corresponds to the presence of hybridized, ligated probes each having an A at the 5th position in the probe. Identification by use of labeled probes is discussed in the Macevicz patents. *See*, *e.g.*, Col. 3, lines 7-10; Col. 7, lines 17-42; Col. 8, lines 50-52; Col. 14, lines 12-40; and Col. 18, lines 8-17.

56.    You record the color of the light given off by the just-ligated probes. You might do this by looking at the color with your eye and writing the observation in a notebook, but if you are looking at a large number of sequencing reactions at once, it is merely more efficient to have an

automated device do this work for you. Use of automatic detection systems is discussed in the Macevicz patents. *See*, *e.g.*, Col. 13, line 56-Col. 14, line 11.

57.     Then, as shown in Exhibit 3, Slide 33, after detecting the fluorescent light emitted from the just-ligated probes, you use a chemical or an enzyme to cut away, or "cleave," some portion of that just-ligated probe, and you wash that cut-out portion away. Washing steps are discussed in the Macevicz patents. *See*, *e.g.*, Col. 5, lines 28-31; Col. 14, lines 56-65; Col. 15, lines 60-65; Col. 16, lines 26-39; and Col. 18, lines, 8-17.

58.     There are two reasons for doing this.  First, this cleavage separates the portion of the probe that is joined to the primer from the portion of the probe that carries the label you just looked at. Second, when you cleave away some portion containing the free end of the just-ligated probe, you remove the chemical structure at the end of the probe that would otherwise prevent any further ligation of probes to that end, thereby regenerating a free or unmasked group that is capable of participating in subsequent ligations, such as a 5' phosphate group. As the patent describes, there are various ways of doing this cleavage step. Figures 1, 2, 3A, 3B, and 4 and the accompanying text. These various methods are diagrammed on Exhibit 3, Slide 34.

59.     The regeneration step creates a new site that is available for subsequent ligation. Regeneration of an extendable end is discussed in the Macevicz patents. *See*, *e.g.*, Figures 1, 2, 3A, 3B, and 4 and the accompanying text; Col. 6, lines 6-8; Col. 8, line 56-61; Col. 14, lines 62-65; Col. 16, lines 42-44; and Col. 18, lines 13-17.

60.     As shown in Exhibit 3, Slide 35, after you wash away that cleaved portion of the probe, you can add in the same probe library that you added in the first step. Again, the complementary oligonucleotide probes will preferentially hybridize to the sequence in the target polynucleotide that is immediately adjacent to the sequence in the target polynucleotide to which the previously

ligated and cleaved probe hybridized. In Exhibit 3, Slide 35, a new probe with a C at the 5th position is complementary to the target immediately adjacent to the regenerated end on the first probe. Repeated cycles of ligation and identification are discussed in the Macevicz patents. *See*, *e.g.*, Col. 2, line 66-Col. 3, line 33; Col. 8, lines 56-57; Fig. 1 and text at Col. 4, line 66-Col. 5, line 5; Fig. 2 and text at Col. 9, lines 46-47; Fig. 3A and text at Col. 10, lines 62-63; Fig. 3B and text at Col. 11, lines 12-13; Col. 16, lines 44-45; and Col. 18, lines 16-17.

61.     As shown in Exhibit 3, Slide 35, if DNA ligase is added, it will form a chemical bond between the previously-ligated primer (minus its cleaved end portion) and the new complementary probe. Then, as in the previous cycle, one washes away all of the unligated probes, shines the light on the reaction, and records the fluorescent "flash." As shown in Exhibit 3, Slide 35, the green "flash" shows that the 5th position in this just-ligated probe is a C. If these cycles are repeated, as shown in Exhibit 3, Slide 36, it reveals that the 15th position is a T. Repeating these same steps would continue revealing the identities of the nucleotides at every 5th base of each ligated probe: 5th, 10th, 15th, 20th, etc. Repeated cycles of ligation and identification are discussed in the Macevicz patents. *See*, *e.g.*, Col. 2, line 66-Col. 3, line 33; Col. 8, lines 56-57; Fig. 1 and text at Col. 4, line 66-Col. 5, line 5; Fig. 2 and text at Col. 9, lines 46-47; Fig. 3A and text at Col. 10, lines 62-63; Fig. 3B and text at Col. 11, lines 12-13; Col. 16, lines 44-45; and Col. 18, lines 16-17.

62.     As shown in Exhibit 3, Slide 37, information for the other positions can be obtained using different primers. For example, in Exhibit 3, Slide 37, the primer hybridizes to a position in the target that is offset by one nucleotide from where the previous primer hybridized to the target. Thus, as shown in Exhibit 3, Slide 37, subsequent rounds of hybridization, ligation, and detection will reveal the 4th, 9th, and 14th positions. Similarly, sets of primers each offset from the others

by one or more nucleotides provide sequence information for the 3rd, 8th, and 13th positions; the 2nd, 7th, and 12th positions, and the 1st, 6th, and 11th positions. As shown in Exhibit 3, Slide 38, the sequence information obtained by these different reactions can be combined to give a complete sequence of the target over the region to which the oligonucleotide probe sets are hybridized.

63.    As Dr. Macevicz's patent points out, at Col. 2, line 65-Col. 3, line 34 and Col. 4, lines 35-42, Dr. Macevicz's inventions "obviate[] electrophoretic separation of similarly sized DNA fragments, and . . . eliminate[] the difficulties associated with the detection and analysis of spacially [sic – spatially] overlapping bands of DNA fragments in a gel or like medium," "obviate[] the need to generate DNA fragments from long single stranded templates with a DNA polymerase," "generate[] signals more amenable to analysis, and . .  provide[] a means for readily analyzing DNA from heterozygous genetic loci."

## IX.    THE SOLID SYSTEM DEMONSTRATION

64.    As mentioned above, on May 22 and 23, 2008, I visited AB's headquarters in Foster City, California to observe a portion of a sequencing run conducted by an AB employee using the SOLiD System. If I am called to testify at trial in this case, I expect to utilize portions of the video recordings taken of the demonstration on those days (as well as a video recording of the portion of the demonstration conducted on May 19, 2008, which I did not attend) to illustrate the design, structure and operation of the SOLiD System. In addition, I observed the SOLiD System creating and storing files during the sequencing run, including image files. I personally observed the images contained in some of these files during the demonstration, as shown on the videotape of the demonstration. Copies of the files which were stored on the hard drives of the SOLiD System instrument used for the run were transferred onto a portable hard drive in my presence. I

expect to refer to some of these files, including their contents and time of creation, in conjunction with the videotapes of the demonstration, in order to illustrate and explain how the SOLiD System operates.[1]

## X.    THE PROBES USED IN AB'S SOLID SYSTEM SATISFY THE LIMITATIONS OF CLAIM 1 IN THE '119 PATENT

### A.    Claim 1 of the '119 Patent

65.    I have reviewed the specification and claims of the '119 Patent.

66.    Claim 1 of the '119 Patent recites:

1. An oligonucleotide probe of the formula:

$HO—(3')(B)j(5')—OP(==O)(O—)NH—(B)k-Bt*$ wherein:

B is a nucleotide or an analog thereof,

j is in the range of from 1 to 12;

k is in the range of from 1 to 12, such that the sum of j and k is less than or equal to 12; and

Bt* is a labeled, non-extendable chain-terminating moiety.

---

[1] Examples of such files can be found in the following folders generated during the SOLiD System Demonstration in Foster City, CA: Legal_Run_5_19_08_FOCALMAP_V1; Legal_Run_5_19_08_F3_P1_01_V1; Legal_Run_5_19_08_F3_P1_02_V1; Legal_Run_5_19_08_F3_P1_03_V1; Legal_Run_5_19_08_F3_P1_04_V1; Legal_Run_5_19_08_F3_P1_05_V1; Legal_Run_5_19_08_F3_P2_01_V1; Legal_Run_5_19_08_F3_P2_01_V2; Legal_Run_5_19_08_F3_P2_02_V1; Legal_Run_5_19_08_F3_P2_03_V1; Legal_Run_5_19_08_F3_P2_04_V1; Legal_Run_5_19_08_F3_P2_05_V1; Legal_Run_5_19_08_F3_P3_01_V1; Legal_Run_5_19_08_F3_P3_02_V1; Legal_Run_5_19_08_F3_P3_03_V1 ; Legal_Run_5_19_08_F3_P3_04_V1; Legal_Run_5_19_08_F3_P3_05_V1; Legal_Run_5_19_08_F3_P4_01_V1; Legal_Run_5_19_08_F3_P4_02_V1; Legal_Run_5_19_08_F3_P4_03_V1; Legal_Run_5_19_08_F3_P4_04_V1; Legal_Run_5_19_08_F3_P4_05_V1 ; Legal_Run_5_19_08_F3_P5_05_V1; Legal_Run_5_19_08_F3_P5_04_V1; Legal_Run_5_19_08_F3_P5_03_V1; Legal_Run_5_19_08_F3_P5_03_V1; Legal_Run_5_19_08_F3_P5_02_V1; Legal_Run_5_19_08_F3_P5_01_V1; Legal_Run_5_19_08\Sample1; and Legal_Run_5_19_08\Sample2. In conjunction with the video tape of the Demonstration, I may refer to certain image and other files created during the run.

67.     One of ordinary skill in 1995, reading claim 1 of the '119 patent, would have understood it to encompass any oligonucleotide probes that have the chemical formula recited in the claim (as explained in the text of the claim), or the functional equivalent of that structure.

68.     The chemical formula recited in the claim is meant to represent an oligonucleotide probe having one or more nucleotides at its 3' end and two or more nucleotides at its 5' end, together comprising a total of at least three but no more than 13 nucleotides, separated by a chemical group called an "amine" (part of a phosphoramidate linkage) and having both a detectable label (for example, the fluorescent dye discussed earlier) and a "chain terminating" (*i.e.*, non-extendable) moiety (*i.e.*, chemical structure) at its 5' end.

69.     I am familiar with the oligonucleotide probes that AB uses and sells as part of its SOLiD System, as the result of reviewing documents produced by AB in this case that describe those probes.

70.     In my opinion, the oligonucleotide probes that AB uses and sells as part of its SOLiD System satisfy all of the limitations of claim 1 in the '119 Patent, either literally or by equivalence.

## B.    Structure of AB's "one-base-encoding probes"

71.     I have seen a number of AB documents that describe the structure of probes that AB has made or had made on its behalf for its use and/or for sale in the various kits that AB sells as part of its SOLiD System. AB has made at least two types of probes that satisfy all of the elements of claim 1 of the '119 patent, either literally or by equivalence.

72.     In general, I would describe one type of infringing probe as "one-base-encoding" probes, and the other type of infringing probes as "two-base-encoding" probes.

**22**

73.     An AB document (ILL051457-051505 at ILL051471) describes "SOLiD Labeled

Ligation Probes" and contains a diagram with four drawings showing details of the chemical

structures of one-base-encoding octameric labeled ligation probes made by AB and used with the

SOLiD System. I have seen several other AB presentations that have the same or similar figures

(*e.g.*, AB00137621-00137680 at AB00137634).

74.     The four drawings in the diagram do not represent merely four probes, but rather four

pools of probes sharing certain characteristics, as shown in the diagrams and text on ILL051471.

Dr. Gina Costa, the Director of Research and Development for the SOLiD System, whom AB

designated to give testimony on behalf of the company concerning the development, design,

function, structure (including chemical composition of reagents), and operation of the SOLiD

System, testified that this is so. Costa Deposition (Transcript of Fed. R. Civ. P. 30(b)(6)

Deposition of Applera Corporation – Applied Biosystems Group, May 23, 2008) (hereinafter

"Costa Deposition") at 7:1-4; 9:12-10:19; and 61:6-63:12.

75.     As shown on ILL051471, reading from right to left, 3′ to 5′, the sequence of the labeled

ligation probe pools is NNNNYsZZZ*. The drawings also show an arrow pointing down at the

"s" in the sequence. Each drawing also has a colored star shape, green, blue, red, or orange. For

convenience, I have represented the colored star shape with an asterisk.

76.     As discussed below, "N" represents a "degenerate site," Y represents the "interrogation

position" at the 5th base, s represents a "cleavable linkage," the arrow pointing down at the s is

said to indicate "the cleavage site," Z is a universal base, and the asterisk represents a colored

dye label attached to the 5′-most Z residue.

77.     These letters, symbols, and shapes and their relationship to each other describe the

chemical structure of the labeled ligation probes used in the SOLiD System in considerable

detail. For convenience, I will focus on the pool at the top right with the blue star-shape, which I will call the "A pool" or the "A probe." The names "A pool" and "A probe" mean that all the probes in this pool have an A residue at the 5th position from the 3′ end. Dr. Costa agrees with this nomenclature. Costa Deposition at 67:18-68:6. None of my conclusions depends on the assumption that this particular pool is the "A pool"; I have adopted this language because, in my opinion, it accurately reflects the information conveyed on ILL051471-051472 of ILL051457-051505. The diagram on ILL051472 shows the pools of probes described on ILL051471, with some minor changes, as they are employed in the SOLiD cycled ligation sequencing method. For example, there is a diagram on ILL051472 of an octameric oligonucleotide probe with a blue star-shape at its 5′ end that is labeled "A-probe." Based on the text describing the Y position on ILL051471, in my opinion, this drawing has simply replaced the "Y" position referred to above with an "A." In my opinion, this diagram is labeled "A probe" because each probe in the pool has an A residue at the 5th position from the 3′ end. Although the following explanation focuses on the "A pool," it should be understood to apply in essence to the other pools, which I will refer to as the "C pool," "G pool," and "T pool," respectively. These additional pools are identical in all respects to the A pool, except that they have either a C, G, or T at the 5th position from the 3′ end (called the "interrogation" position) and they each have a different dye linked with the 5′ terminal base position that indicates the identity of the base at the interrogation position. Costa Deposition at 67:18-68:19. On ILL051472, the C pool is identified by a red dye, the G pool by an orange dye, and the T pool by a green dye.

78.     The notation NNNNAsZZZ* indicates the chemical structure of the probes in the pool.

79.    ILL051471 says that "N represents a degenerate site," which is in accordance with common notation in the field. Thus, "NNNN" means that starting from the left or 3′ end of the probe as drawn, the first four positions are NNNN, with the 3′ terminal "N" having a hydroxyl (or "OH" group) on the 3′ carbon position of its deoxyribose sugar moiety, in accordance with standard notation. Dr. Costa admitted that both the one-base and two-base-encoding probes made and used by AB have an OH group at this position. Costa Deposition at 64:8-14 (one-base-encoding probe with interrogation position at 5th position from 3′ end); 71:9-20 (one-base-encoding probes with interrogation position at 3′ end); 78:3-5 (4,5-encoded two-base-encoding probes); and 83:1-12 (1,2-encoded two-base-encoding probes).  In addition, the presence of a 3′ OH group is necessarily implied by the fact that these "labeled ligation probes" are ligatable to the 5′ phosphate group found on the end of the "seq primer" or extended probes.

80.    In the context of a pool of DNA oligonucleotides, "degenerate" means that the A pool has members with each possible base – A, C, G, or T - at that position. Here, because multiple positions are degenerate, that means that the A pool will have each possible combination of bases at each position. The number of combinations can be calculated easily: for a sequence x bases in length, there are $4^x$ possibilities. For example, the pool of degenerate oligonucleotides of sequence NN contains $4^2$=16 members, specifically: AA, AT, AG, AC, TA, TT, TG, TC, GA, GT, GG, GC, CA, CT, CG, and CC.

81.    Similarly, the sequence NNNN in the A pool represents $4^4 = 256$ possible combinations of bases: AAAA, AAAC, . . . TTTG, and TTTT. The other three pools shown in the diagram will also have the same 256 combinations for the sequence NNNN, so the total number of probes represented in the diagram is $256 \times 4 = 1,024$. My conclusion is supported by AB00121762,

**25**

entitled "SOLiD: Labeled Ligation Probes," which shows drawings of the same pools of probes and states "this set of probes consists of 1024 distinct molecules."

82.     For the A pool, the Y at the 5th position from the 3′ end is an "A" base. This means that every probe in the A pool has an A base at this position. Similarly, every probe in the C, G, and T pools has a fixed base at that position – specifically, a C, G, or T, respectively. Costa Deposition at 67:18-68:19; 69:13-20.

83.     The s in the diagram of the A pool does not stand for a base, but rather for a cleavable phosphorothiolate linkage, as indicated by the text on ILL051471. My conclusion is supported by AB00121762, entitled "SOLiD: Labeled Ligation Probes," which shows drawings of the same pools of probes and states "s indicates a phosphorothiolate linkage." *See also* Costa Deposition at 70:7-71:3. In addition, the arrow on the diagram indicates that the cleavage site is the cleavable linkage between the 5th and 6th positions. In the A pool on ILL051471, that would be between the A residue at the 5th position and the Z residue at the 6th position.

84.     The chemical structure of the cleavable linkage represented by the "s" in the diagram is a phosphorothiolate, according to the text on ILL051471. The text further states that after cleavage of the linkage with an aqueous solution at neutral pH, "thiolate is the leaving group, producing a native DNA end," which further confirms my opinion. This notation is in accordance with common usage because phosphorothiolate is a sulfur-containing chemical structure, and sulfur's atomic symbol is the letter "S." The exact chemical structure of phosphorothiolate in the AB labeled ligation probes is shown by the chemical structure containing the S, P, and 3 O's on AB00121762 (*see also* Costa Deposition 84:11-85:21).

85.     ILL051471 states that the positions marked "Z" are "universal bases."

86.    The so-called universal bases are DNA bases or base analogs. They are called "universal bases" because they can form a double-stranded DNA structure when paired with any other base, unlike the naturally occurring DNA bases which only form a double-stranded DNA structure when paired with their complementary base (A base-pairs with T, and G base-pairs with C).

87.    An example of a universal base is the nucleotide inosine. *See* AB001444354-00144433 at AB00144409. AB uses inosine as the universal base in the labeled ligation probes it sells for use with the SOLiD System, and has used itself in developing and operating the SOLiD System. Costa Deposition 64:15-20. The AB document marked AB00144409 states "the universal base inosine (I) . . . is capable of bi-dentate hydrogen bonding with any of the four canonical bases in B-DNA; the order of stabilities of inosine base pairs is I:C > I:A > I:T ≈ I:G)."

88.    As discussed earlier, the use of universal bases reduces the complexity of the probe pool as compared with using degenerate bases. Taking the example represented in this diagram, the three bases at the 5′ end of each drawing represent $4^3$=64 possibilities if normal bases were used, but only 1 possibility if universal bases are used ($1^3$=1).

89.    Based on the text of ILL051471-472 and other documents I have reviewed, as discussed below, the Z on the far right of the drawing of each pool in the diagram represents a labeled, chain-terminating moiety at the 5′ end of the labeled ligation probes used in the SOLiD System. Specifically, it is a labeled inosine with a 5′ OH group.

90.    By "labeled," I mean that the 5′-terminal base of the ligation probes in the pools represented on ILL051471-472 have a fluorescent dye attached to them.

91.    In this case, "chain-terminating moiety" means that the terminal nucleotide cannot participate in a ligation reaction.

92.    One way to make the 5'-terminal nucleotide into a chain-terminating moiety is to remove the phosphate group from the 5′ terminal nucleotide using an enzyme called phosphatase. A chemically synthesized oligonucleotide typically already has an OH group at its 5′ end after it is made.

93.    A ligation reaction forms a phosphodiester bond between a phosphate group at the 5′ end of one piece of DNA and a hydroxyl group at the 3′ end of an adjacent piece of DNA. If the 5′ end lacks a phosphate, it is a "chain terminating moiety" because it cannot be further extended by ligation. The 5′-terminal end of the one-base and two-base-encoding probes made by AB, used in the SOLiD System and/or sold in kits for use in the SOLiD System has an OH group, and so is a chain-terminating moiety.

94.    I have several bases for my opinion that the 5′ terminal moiety of AB's ligation probes is "labeled." First, the title of ILL051471 in ILL051457-051505 is "SOLiD: Labeled Ligation Probes." Second, the drawings on this slide show a label attached to the 5′ end of the probe, specifically the colored shape attached by a line to the terminal moiety of each drawing in the diagram on ILL051471. In addition, the text on ILL051471 describes "4-color" probe sets and mentions "dye" twice. I understand this to mean that the "labeled ligation probes" are labeled at their 5′ end using a fluorescent dye. Dr. Costa, AB's 30(b)(6) witness, admitted that the one-base and two-base-encoding probes made by or on behalf of AB and used with the SOLiD System have a fluorescent label on the 5′-terminal universal base in the probes. Costa Deposition 76:15-77:10; 78:11-13; 82:14-17; 91:13-19; 124:10-125:12. *See also*, *e.g.*, AB00134505-00134517.

95.    The terminal base of the labeled ligation probes used in the SOLiD System method described in ILL051457-051505 is also a chain-terminating moiety based on the text of

ILL051471, which states that cleavage of the "universal 3-base tail regenerates a phosphate." I understand that to mean that no phosphate group is present on the end of any of the labeled ligation probes prior to cleavage, but that the cleavage reaction produces a 5′-terminal phosphate group on the shortened probe. Dr. Costa, AB's 30(b)(6) witness, admitted that the 5′ end of the one-base- and two-base-encoding probes AB has made, used, and/or sold for use with the SOLiD System has an OH group. Costa Deposition at 64:11-14; 76:15-79:16; 82:10-84:2.

### C.     Structure of AB's "two-base-encoding probes"

96.     AB's "two-base-encoding" probes are probes that have been designed with two interrogation positions. AB has made, used, and/or sold at least two types for use in the SOLiD System: "4,5" encoded and "1,2" encoded probes. *See*, *e.g.*, AB00121757-00121795; AB00146523-00146533. As discussed below, 4,5- and 1,2-encoded probe sets can be and have been used to sequence a target polynucleotide. A diagram of one such scheme is shown at AB00121774 and AB00146529-00146530.

97.     A 1,2-encoded probe is a labeled ligation probe where the interrogation positions are at positions 1 and 2 counting from the 3′ end of the probe.

98.     A 4,5-encoded probe is a labeled ligation probe where the interrogation positions are at positions 4 and 5 counting from the 3′ end of the probe.

99.     A "1,2-encoded probe" has the structure "3′ XYNNNsZZZ-Dye 5′," where "N" stands for a degenerate position, "X" and "Y" are interrogation positions, "s" stands for a phosphorothiolate linkage between the 5th and 6th positions of the probe, "Z" stands for the universal base inosine, "dye" stands for a fluorescent dye attached to the 5′ inosine, and the 3′ and 5′ terminal residues have a hydroxyl group, as discussed above (see AB00121757-00121795 at AB00121773-774).

**29**

100.    A "4,5-encoded probe" has the structure: "3′ NNNXYsZZZ-Dye 5′," with the letters taking the same meanings as discussed above. *See* AB00121757-00121795 at AB00121768-769 and AB00121771.

101.    My analysis of the structure of the one-base-encoding probes applies in almost all respects to both the "1,2-encoded" and "4,5-encoded"two-base-encoding probes made, used, and/or sold by AB. Dr. Costa, AB's 30(b)(6) witness, admitted that these "two-base-encoding probes" have essentially the same chemical structure as the one-base-encoding probes, with a few minor differences, as discussed below.

102.    The primary difference between "one-base-encoding" and "two-base-encoding" probes is that the latter have two adjacent interrogation positions, instead of just one, as in the former. This difference manifests itself in the way in which the probes are divided into groups. There are actually the exact same numbers of "one-base-encoding" and "two-base-encoding" probes having the structures listed above: 1,024. The difference is that, instead of dividing the 1,024 probes into 4 color groups based on the identity of the base at the single interrogation position in the one-base-encoding system, the two-base-encoding system divides the 1,024 probes into 4 color groups based on the identities of two bases at adjacent positions.

103.    Other than the fact that two-base-encoding probes have two interrogation positions instead of one, and have different groupings of probes assigned to the four color dyes, the probes are otherwise structurally identical to the one-base-encoding probes, as admitted by Dr. Costa, AB's 30(b)(6) witness. Costa Deposition at 76:15-79:12; 82:10-83:16. Specifically, both the 1,2- and 4,5-encoded probes are octameric, have a hydroxyl (OH) group at their 3′ end, have 5 nucleotides on the 3′ end of the probes joined to 3 inosine residues at the 5′ end of the probe by a

**30**

phosphorothiolate linkage, and have a 5′ terminal inosine with an OH group and a fluorescent label attached to it.

104.    For the purposes of the infringement analysis for the '119 Patent, as discussed below, the differences between the "one-base-encoding" and "two-base-encoding" probes made, used, and/or sold by AB have no bearing on whether they satisfy the limitations of claim 1 of the '119 patent.

   **D.    AB's "one-base-encoding" and "two-base-encoding" probes satisfy all limitations of claim 1 of the '119 Patent literally or by equivalence**

105.    Claim 1 of the '119 patent recites:

1. An oligonucleotide probe of the formula:
HO-(3') $(B)_j$ (5')-OP (=0) (O) NH-$(B)_k$-Bt*
wherein:
B is a nucleotide or an analog thereof,
j is in the range of from 1 to 12;
k is in the range of from 1 to 12, such that the sum of j
and k is less than or equal to 12;
Bt* is a labeled, non-extendable chain-terminating moiety.

Thus, as discussed above, the claimed probe has j nucleotides (or analogs thereof) at the 3′ end of the probe, linked by a phosphoramidate bond to k nucleotides (or analogs thereof) at the 5′ end of the probe, where j and k are each in the range of 1 to 12 and the sum of j and k is no more than 12. The k nucleotides or analogs are also linked to a labeled chain terminating moiety at the 5′ end of the probe.

106.    The diagram at the top of the ILL051471 represents the chemical structure of a pool of labeled "one-base-encoding" oligonucleotide probes that infringe claim 1 of the '119 Patent under the doctrine of equivalents. I have reviewed similar diagrams in documents AB00121762 and AB00137634-635. These diagrams all represent the same pools of "one-base-encoding" probes with the interrogation position at the 5th position counting from the 3′ end. The chemical

structures for "one-base-encoding" probes that I will analyze are "3′ NNNNYsZZZ-Dye 5′"and "3′ YNNNNsZZZ-Dye 5′"

107.     AB admits that it has made (or had made on its behalf) and used "one-base-encoding" probes having these chemical structures and an interrogation position at the 5th position from the 3′ end. Costa Deposition at 61:7-64:20; 69:14-71:8; 145:12-20; *see also* AB00136587-AB00136591 at AB00136589. AB also admits that it has made or had made on its behalf and used "one-base-encoding" probes having the same chemical structures, except that the interrogation position was at the 1st position counting from the 3′ end. Costa Deposition at 71:9-71:21; 144:14-145:11; AB00136587-AB00136591 at AB00136589; ILL051151-ILL051162 at ILL051157; *see also* AB00147319-AB00147328 and Costa Deposition 156:2-157:16. In addition to octameric probes with the structures recited above, AB has also made other one-base-encoding probes with similar structures and used them in experiments during the development of the SOLiD System, as described in papers submitted as part of a supplemental application for an NHGRI grant (AB00144601-00144603). As I discuss below, the "one-base-encoding" probes described in the above-referenced documents literally satisfy all elements of claim 1 in the '119 Patent, except for the chemical linkage between the Bj set of bases at the 3′ end and the Bk-Bt* set of bases at the 5′ end, which is satisfied by equivalence.

108.     The chemical structures for the "two-base-encoding" probes that I will analyze are "3′ XYNNNsZZZ-Dye 5′" and "3′ NNNXYsZZZ-Dye 5′,"  which represent the general structures of the 1,2- and 4,5-encoded probe pools, respectively. The specific sequences of the 1,2- and 4,5-encoded, two-base-encoding probes sold as Probe Mix 2 and Probe Mix 1, respectively, for use in the SOLiD System are also found in AB00134505-00134517 at AB00134506 and

AB00134513-514; AB00000803-804; Costa Deposition 123:9-125:12 (confirming that these documents have the dye label incorrectly drawn on the 3′ end of the probes instead of the 5′ end). Structures of "one-base-encoding" and "two-base-encoding" probes of all of the types described above are also found in documents such as AB00147319-AB00147328, as explained in Costa Deposition 156:2-157:16. As I discuss below, the "two-base-encoding" probes represented in the above-referenced documents literally satisfy all elements of claim 1 in the '119 Patent, except for the chemical linkage between the Bj set of bases at the 3′ end and the Bk-Bt* set of bases at the 5′ end, which is satisfied by equivalence. Collectively, I will refer to the AB "one-base-encoding" and "two-base-encoding" probes as "AB's labeled ligation probes."

109.    AB admits that it has made or had made on its behalf and used "two-base-encoding" probes having the chemical structures discussed above. These probes are identical in chemical structure to the "one-base-encoding" probes with regard to length, internucleosidic bonds, phosphorothiolate linkage between the 5 positions at the 3′ end of the probe and the 3 positions at the 5′ end of the probe, presence of a 5′ label, presence of hydroxyl (OH) group at the 3′ and 5′ ends of the probes. As discussed above, these "two-base-encoding" probes differ from the "one-base-encoding" probes only in that they have two interrogation positions, either at the 1,2- or 4,5-positions from the 3′ end, instead of one, and they are divided into different groups for the dye assignment. Costa Deposition at 76:15-79:12; 82:10-84:2; *see also* AB00136587-AB00136591 at AB00136589. As discussed above, the 1,2-encoded and 4,5-encoded labeled ligation probes are packaged as Probe Mix 2 and Probe Mix 1, respectively, and are sold as the SOLiD Sequencing Probes Kit (Catalog Number 4392147), which is listed in the SOLiD System User Guide as a "Required Applied Biosystems Reagent Kit." AB00000683-00000979 at

AB00000803. Dr. Costa, AB's 30(b)(6) witness, admitted that these probes are recommended for use in the SOLiD System, are only sold for use in the SOLiD System, and that AB is not aware that any of its customers use any probes in the SOLiD System other than those sold by AB. Costa Deposition at 111:19-114:9.

> **1.  AB's "one-base-encoding" and "two-base-encoding" probes have an OH group on the 3′ terminal "nucleotide or analog thereof" as recited in claim 1 of the '119 Patent**

110.    All of the labeled ligation probes discussed above would be understood to have an OH (hydroxyl) group on a "nucleotide or analog thereof" at the 3′ end according to common notation practice. Dr. Costa, AB's 30(b)(6) witness, admitted that the "one-base-encoding" and "two-base-encoding" probes that I am analyzing have a 3′ OH group. Costa Deposition at 64:8-10; 76:15-78:7; 82:10-83:12. In addition, as discussed below, the descriptions of the SOLiD System sequencing method I have reviewed in AB's documents necessarily implies the presence of a 3′ OH group because all of these ligation probes are shown to be capable of participating in ligation reactions with 5′ phosphate groups on AB's "universal sequencing primers" and on previously extended sequencing primers. As discussed above, full sets of labeled ligation probes, whether one-base- or two-base-encoding, have 1,024 members, each of which would satisfy this element of claim 1 of the '119 Patent.

> **2.  AB's "one-base-encoding" and "two-base-encoding" probes have a set of j "nucleotide[s] or analog[s] thereof," where j is in the range of 1 to 12**

111.    AB's labeled ligation probes have a group of j nucleotides or analogs thereof at their 3′ end where j is in the range of 1 to 12. Almost all of the probes I have analyzed are octamers where j = 5. Specifically, the octameric one-base-encoding probes described above are described in the AB documents as having the structure "NNNNYsZZZ-dye" or "YNNNNsZZZ-dye,"

depending on whether the interrogation nucleotide is at position 1 or position 5 from the 3′ end. The sequences "NNNNY" and "YNNNN" found in AB's "one-base-encoding" labeled ligation probes satisfy the limitation that the claimed probe have a set of j nucleotides or analogs thereof, with j between 1 and 12. The octameric two-base-encoding probes described above are described in the AB documents as having the structure "NNNXYsZZZ-dye" or "XYNNNsZZZ-dye," depending on whether the interrogation nucleotide is at positions 1,2 or position 4,5 from the 3′ end. The sequences "NNNXY" and "XYNNN" found in AB's "two-base-encoding" labeled ligation probes satisfy the limitation that the claimed probe have a set of j nucleotides or analogs thereof, with j between 1 and 12. As discussed above, full sets of labeled ligation probes, whether one-base or two-base-encoding, have 1,024 members, each of which would satisfy this element of claim 1 of the '119 patent.

> **3.    AB's "one-base-encoding" and "two-base-encoding" probes have the equivalent of the recited phosphoramidate linkage between the Bj and Bk-Bt\* portions of the probes**

112.    From 3′ to 5′, the structure of the phosphorothiolate bond in AB's ligation probes would be as follows: —OP(==O)(O—)S—. This is literally different from the structure of the phosphoramidate bond recited in claim 1 of the '119 Patent, which would be as follows: —OP(==O)(O—)NH—. Consequently, I cannot conclude that AB's probes literally infringe claim 1 in the '119 Patent.

113.    In my opinion, a phosphorothiolate bond is equivalent to the phosphoramidate bond recited in claim 1 in the '119 Patent. One of ordinary skill at the time of Dr. Macevicz's inventions in 1994-95 would have considered the substitution of one for the other to be an insubstantial difference. The phosphorothiolate bond in AB's probes performs the same function (*i.e.*, to join two blocks of nucleotides with a chemically scissile bond), in substantially the same

way (by interposing a chemically reactive heteroatom or heteroatomic moiety between a 5′ phosphate and the 3′ position of a deoxyribose sugar), to achieve substantially the same result (to provide an incipient 5′ phosphate group that can be exposed upon cleavage of the scissile bond in the oligonucleotide) as the phosphoramidate linkage recited in claim 1 of the '119 Patent. *See* '119 Patent at, *e.g.*, Col. 9, lines 32-54; Col. 10, lines 16-40; Col. 17, lines 1-6.

114.     Both the phosphorothiolate and the phosphoramidate bonds perform substantially the same function. Dr. Costa, AB's 30(b)(6) witness admitted that phosphorothiolate bond functions as a chemically scissile bond joining the five nucleotides at the 3′ end of the probe to the three universal bases at the 5′ end of the probe, which includes a labeled 5′ terminal moiety, as discussed above and below. Costa Deposition at 70:10-71:8; 78:23-79:1; 84:11-85:21.

115.     The phosphorothiolate in AB's labeled ligation probes provides a chemically scissile bond in substantially the same way as the bond recited in claim 1 of the '119 Patent. Like the phosphoramidate bond recited in the claim, the phosphorothiolate substitutes a heteroatomic moiety for the bridging O atom typically found in the phosphodiester bond between the 5′ phosphate of one nucleotide and the 3′ position of the adjacent sugar in the nucleotide chain. Instead of substituting an amine group for the bridging O at the 3′ position, however, the AB probes substitutes a sulfur atom.

116.     As far as the probes themselves go, the bond used by AB produces the exact same result as the bond recited in claim 1 in the '119 Patent: it holds the two parts of the probe together with a cleavable linkage. Furthermore, the phosphorothiolate bond provides the same result as a phosphoramidate bond when AB's labeled ligation probes are employed in the SOLiD System, namely, it allows generation of an extendable 5′ phosphate on the end of the cleaved probe, as

**36**

will be discussed below. Dr. Costa, AB's 30(b)(6) witness, admitted that the result of cleavage of the phosphorothiolate bond produces an extendable 5′ phosphate group on the end of the cleaved probe. Costa Deposition 84:23:-86:14. Of course, infringement of claim 1 of the '119 Patent does not depend on the probes being cleaved or even used in the SOLiD System method. Consequently, because the AB labeled ligation probes use a chemical bond that performs substantially the same function in substantially the same way to achieve substantially the same result as the phosphoramidate bond recited in claim 1 of the '119 Patent, I believe that AB's probes should be found to satisfy this limitation of claim 1 under the Doctrine of Equivalents.

> **4.** **AB's "one-base-encoding" and "two-base-encoding" probes have a set of k "nucleotides[s] or analog[s] thereof," where "k is in the range of from 1 to 12, and the sum of j and k is less than or equal to 12**

117.    AB's one- and two-base-encoding labeled ligation probes have a set of j nucleotides or analogs thereof, as recited in claim 1 of the '119 Patent.

118.    As discussed above, AB's documents state that the bases in its probe pools are degenerate (for the bases labeled "N,' which correspond to the Bj bases recited in claim 1), determinate (at the interrogation positions, either "Y" or "X" and "Y"), or universal (for the bases labeled "Z," which correspond to the Bk bases and the Bt* base recited in claim 1), all of which are within the scope of the recited limitation in claim 1 of the '119 Patent that "B is a nucleotide or an analog thereof." Specifically, AB's labeled ligation probes use the nucleotide analog inosine in the universal base "Z" positions, satisfying the limitation that Bk be "nucleotides or analogs thereof." Dr. Costa, AB's 30(b)(6) witness, admitted that Agencourt used inosine as its "universal base." Costa Deposition at 64:15:65:6; 71:14-21; 83:3-12.

119.    As discussed above, all of AB's labeled ligation probes, both one-base and two-base-encoding, satisfy the limitation in claim 1 of the '119 Patent that they have a set of k nucleotides

or analogs thereof, where k is between 1 and 12, and such that the sum of j and k is less than or equal to 12. As is apparent from the structures of the AB probes discussed above, regardless of the number and location of the interrogation positions, k = 2, which satisfies the limitations relating to j and k recited in claim 1 in the '119 Patent (because j = 5, k + j = 7, and 7 < 12). All of the AB labeled ligation probes are octamers, with 5 nucleotides or analogs on the 3′ end (meaning j=5) and 3 nucleotides or analogs on the 5′ end, including the terminal moiety, discussed below, meaning that k=2.

> **5.    AB's "one-base-encoding" and "two-base-encoding" probes have a labeled, non-extendable chain-terminating moiety at the 5′ end**

120.    All of AB's labeled ligation probes, both one-base and two-base-encoding, satisfy the limitation in claim 1 of the '119 Patent that the 5′ terminus of the probe be a labeled, chain-terminating moiety.

121.    Dr. Costa, AB's 30(b)(6) witness, admitted that the one-base and two-base-encoding probes made by or on behalf of AB, including those sold for use in the SOLiD System, have a labeled nucleotide analog with a hydroxyl group at their 5′ end. Costa Deposition 64:8-14; 69:21-70:6; 71:9-21; 78:3-13; 83:3-12; and 144:14-145:17. I have also seen documents that support my conclusion. In a supplemental funding request for Grant R01 HG003570, used by AB to develop the SOLiD System, in the section entitled "Synthesis and evaluation of cleavable oligonucleotides," AB described the synthesis of its oligonucleotide probes with a cleavable phosphorothiolate linkage, a fluorescent dye attached to the 5′ end, and a 5′-terminal nucleotide lacking a phosphate group, which renders it a non-extendable chain-terminating moiety. AB00144354-00144433 at AB00144406-00144407. Specifically, on AB00144407, AB stated "[t]o prevent chain ligation, oligonucleotides were not phosphorylated on the 5′ end." In

accordance with standard scientific notation, the drawings of the labeled ligation probes said to be representative of the "one-base-encoding" and "two-base-encoding" probe pools made by or on behalf of AB for its use or for sale for use in the SOLiD System are consistent with the 5′ inosine being a labeled chain-terminating moiety. *See*, *e.g.*, ILL051471-472; ILL051218-220 and ILL051224; AB00137530-531; AB00147319-AB00147328; AB00137634-637. According to standard scientific notation, the absence of a "p" drawn at the 5′ end indicates that the oligonucleotide has an OH (hydroxyl) group, which is a chain-terminating moiety in a ligation reaction, since a 5′ phosphate is required for DNA ligase to join adjacent pieces of DNA. In addition, all of these drawings show a dye label attached to the 5′ terminal position.

122.    In summary, the one-base and two-base encoding probes made by or on behalf of AB and used in the one-base or two-base encoding format SOLiD System methods by AB and its customers, and having the chemical structures discussed above, infringe the '119 patent under the doctrine of equivalents. This includes, but is not limited to, the two-base encoding probes used, offered for sale, and sold by AB as Probe Mix 1 and Probe Mix 2 in the SOLiD Sequencing Probes Kit (Catalog No. 4392147).

## XI.    THE SOLID SYSTEM INFRINGES THE '341 PATENT

### A.    Construction of claim 1 of the '341 patent

123.    As mentioned above, I have reviewed the specification and claims of the '341 Patent.

124.    Claim 1 in the '341 patent recites:

1. A method for determining a sequence of nucleotides in a target polynucleotide, the method comprising the steps of:

(a) providing a probe-target duplex comprising an initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus;

(b) ligating an extension oligonucleotide probe to said extendable probe terminus, to form an extended duplex containing an extended oligonucleotide probe;

**39**

(c) identifying, in the extended duplex, at least one nucleotide in the target polynucleotide that is either (1) complementary to the just-ligated extension probe or (2) a nucleotide residue in the target polynucleotide which is immediately downstream of the extended oligonucleotide probe;

(d) generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated; and

(e) repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined.

**B.     The SOLiD System infringes claim 1 of the '341 Patent**

125.     As the result of my investigations in this case, I have concluded that the method of sequencing-by-ligation used in AB's SOLiD System satisfies all of the limitations of claim 1 in the '341 Patent, and thus infringes claim 1 in the '341 Patent, literally and/or by equivalence.

126.     I understand that Judge Alsup has construed six of the terms recited in this claim. In my opinions set out herein, I have applied Judge Alsup's constructions for those six terms. As for those terms in claim 1 that have not been construed by Judge Alsup, I have construed the terms as a person of ordinary skill in the art would have construed them in 1994-95, based on the description in the specification. I have reached the conclusions discussed below as to the proper construction of those terms, and have applied those constructions in the opinions set out below.

**1.     "providing a probe-target duplex comprising an initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus"**

**a.     Relevant claim construction**

127.     I understand that Judge Alsup has construed the term "initializing oligonucleotide probe" to mean "the oligonucleotide to which the first extension oligonucleotide probe is first ligated." (Docket No. 133 at 10, lines 3-4). I have applied this construction of "initializing oligonucleotide probe" in the opinions set out below.

40

128.     I have construed the term "target polynucleotide" to mean "a polynucleotide that contains the nucleotide sequence information to be obtained."

129.     Under my proposed construction, although a "target polynucleotide" must "contain[] the nucleotide sequence information to be obtained," it may also contain other nucleotide sequences, such as binding regions for initializing oligonucleotide primers, sequences used for amplification of the polynucleotide (such as binding sites for PCR primers or sequences derived from cloning vectors), and sequences used to attach the target polynucleotide to solid supports.

130.     My construction is consistent with the use of the term in the specification and, based on my experience, with its use in the art when the original patent application was filed in 1995. The specification's Definitions section describes target polynucleotides as being polynucleotides from which sequence information is obtained. '341 Patent at Col. 3, lines 53-60 (defining "determining a nucleotide sequence" and other terms as including a range of levels of information "about a target polynucleotide"). Nowhere in the specification of the patent is it stated that a "target polynucleotide" can only include unknown sequence or excludes known sequences.

131.     The specification also describes the amplification of target polynucleotides using standard cloning and PCR techniques. '341 Patent at Col. 8, lines 19-31. One of ordinary skill in the art in 1994-95 would have understood that these techniques can involve the use of additional nucleotide sequences, such as PCR primer binding sites, multiple-cloning sites and other sequences in cloning vectors. Because the specification does not teach one of ordinary skill that any of these types of sequences have to be removed in order to practice the disclosed methods, one of ordinary skill would expect that such known sequences would remain part of the target polynucleotide. The specification also describes preparation of target polynucleotides "which

permit attachment to magnetic beads, or other solid supports, for ease of separating the target polynucleotide from other reagents used in the method." One example of a method of doing this is to use biotinylated nucleotides at the end of the target polynucleotide, as described in '341 patent at, *e.g.*, Col. 9, lines 12-14; Col. 10, lines 37-39; and Col. 16, line 63 to Col. 17, line 5. The specification also teaches that combinations of these additional sequences can be used to prepare the target polynucleotide. In Example 1, the specification describes amplification of the pUC19 target polynucleotide including the "polylinker region" using biotinylated PCR primers, which allow the amplified target DNA to be attached to streptavidin-coated magnetic beads. '341 Patent at Col. 15, lines 9-28.

132.    Under my proposed construction, the term "target polynucleotide" can encompasses unknown, partially known, and fully known sequences of nucleic acids.

133.    The '341 Patent specification teaches that the sequence of known DNA can be "determined." In Example 2, a "target polynucleotide" is prepared from pUC19. '341 Patent at Col. 16, lines 54-55. This sequence is a bacterial plasmid which had already been fully sequenced at the time the application that issued as the '341 patent was filed. *See* Gene 33(1):103-19 (1985) (containing the complete nucleotide sequences of the pUC vectors). Example 2 describes how the sequencing-by-ligation invention can be carried out to sequence this DNA and concludes "[t]he process continues until the sequence of the target polynucleotide is determined." '341 Patent at Col. 18, lines 16-17. Example 1 in the specification teaches how to test a different aspect of the invention on the same pUC19 vector. '341 Patent at Col. 14, lines 43-Col. 16, line 45. It concludes with the following statement: "The cycles are carried out until all the nucleotides of the test sequence are identified." '341 Patent at Col. 16, lines 44-45. Thus,

42

based on the '341 Patent specification alone, there is nothing unusual about "determining the sequence" of a known polynucleotide.

134.    My conclusion is also consistent with my experience in the field and understanding of how terms were used by those of ordinary skill in molecular biology in 1994-95. One of ordinary skill in the art would not have believed that sequence information could only be "determined" from an unknown or partially known sequence. To the contrary, a "known" sequence can be determined again, just as a "known" book can be read again.

135.    There are many reasons why one of ordinary skill might want to determine the sequence of a known polynucleotide again. For example, one might want to confirm the sequence, determine if there are any variations in the particular sample of "known" DNA being tested, practice techniques, validate reagents, or conduct a control experiment. For example, AB sells a "control" sequencing kit consisting of the known genome of the DH10b strain of *E. coli*. AB00000803-804. The Examples in the '341 Patent specification are instances of determining the sequence of known DNA for these types of reasons.

136.    Although Judge Alsup's claim construction Order makes some comments regarding the term "target polynucleotide," I understand that Judge Alsup did not actually construe this term, nor has Judge Alsup given any binding construction since his Order. As explained below, I respectfully disagree with Judge Alsup's statement that the use of the term "target polynucleotide" in claim 1 represents a "drafting error." It appears that his conclusion is based on the premise that the specification's description of a preferred embodiment, in which a "target polynucleotide" and a separate, known "binding region" are combined to form a "template," limits the scope of claim 1. In my opinion, such a conclusion is unwarranted. The specification clearly states that "the invention is not meant to be limited by the particular features of [the]

43

embodiment [in Fig. 1]," which describes a preferred embodiment where a template "comprising a polynucleotide (50) of unknown sequence and binding region (40) attached to a solid phase support (10)." '341 Patent at Col. 4, lines 44-48. The specification also states that "[p]referably, a target polynucleotide is conjugated to a binding region to form a template . . . ." '341 Patent at Col. 8, lines 8-9. The necessary implication of the word "preferably" is that the description following it is one of a plurality of options, not the only option. One of ordinary skill in the art reading the specification and claim language would not have concluded that the claim was limited to this preferred embodiment.

137.    From the point of view of one of ordinary skill in the art, a preferred embodiment is just a preferred way of carrying out an invention.

138.    Linking the target polynucleotide to a binding region of known sequence is advantageous because it allows predesigned initializing oligonucleotides to be used in the claimed method. In other words, regardless of what target sequence one starts with, one can just attach predetermined binding regions of known sequence and use pre-designed initializing oligonucleotides that are complementary to the binding region. Because these regions and oligonucleotides are pre-designed, they can be tested, optimized, and kept conveniently at hand for use.

139.    One of ordinary skill in the art would have understood that the claimed methods are not limited to the preferred embodiments described in the specification. The pre-designed binding region and complementary initializing oligonucleotides are comparatively useful, and hence preferable but not indispensable, in the practice of the invention. One of ordinary skill in the art would have understood that, alternatively, the claimed method could be practiced on a target

polynucleotide after partial sequence information was obtained (perhaps by some other method) to allow design of one or more complementary initializing oligonucleotides.

> **b.    The one-base-encoding SOLiD System method satisfies step (a) of claim 1 of the '341 patent**

140.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in the one-base-encoding format satisfies the limitations in step (a) of claim 1, both literally and by equivalence.

141.    In ILL051472, AB described the method used in its "SOLiD: cycled ligation sequencing" and showed a "seq primer," drawn in red, which is hybridized to single-stranded DNA attached to a bead. This document also states that "step 2" of the method involves "bind seq primer," which I understand to mean hybridization of the "seq primer" to the target DNA. The single-stranded DNA bound by its 5′ end to the bead is the "target polynucleotide" recited in step (a) of claim 1 of the '341 patent. The "seq primer" hybridized to the target polynucleotide is also shown to have a "p" at its 5′ end, which appears at the juncture between the "seq primer" and the hybridized "A-probe," drawn in red and black, respectively. The "p" at the 5′ end of the probe is standard scientific notation for a phosphate group. The 5′ phosphate group is an "extendable terminus" because it is capable of participating in ligation reactions. Similar diagrams of the one-base-encoding format of the SOLiD System in AB00137621-00137680 at AB00137636-637 and ILL051151-051162 at ILL051157-158 show that the SOLiD System uses a "seq primer" with a 5′ phosphate group, which is an "extendable probe terminus" in a ligation reaction, hybridized to a target polynucleotide. Taken together, these diagrams shows that the "one-base-encoding" format of the SOLiD System begins by "providing a probe-target duplex comprising an

initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus," as recited in step (a) of claim 1 of the '341 patent.

142.    Even if the one-base-encoding format of the SOLiD System were found not to literally satisfy the limitation of step (a) of providing a probe-target duplex comprising an initializing oligonucleotide hybridized to a target polynucleotide (if, for example, "target polynucleotide" were construed to exclude a "binding region" having known sequence), the system should still be found to infringe by equivalence. The function, way, and result of step (a) are the same whether the initializing oligonucleotide is hybridized to a "binding region" containing known sequence or to a "target polynucleotide" containing an unknown sequence or a combination of known and unknown sequence. In each case, the function is to provide a starting point for extension of the initializing oligonucleotide along the target polynucleotide. In each case, the way in which this is done is by hybridization of the initializing oligonucleotide to the polynucleotide containing the sequence to be determined. In each case, the result of this step is a duplex that can be extended along the polynucleotide. Whether the initializing oligonucleotide is hybridized to a known, unknown, or partially known sequence does not change the function, way, or result.

> c.    **The two-base-encoding SOLiD System method satisfies step (a) of claim 1 of the '341 patent**

143.    Based on the information provided in AB's documents describing its SOLiD System, and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion, the use of the SOLiD System in the two-base-encoding format also satisfies the limitations in step (a) of claim 1, both literally and by equivalence.

144.    The document ILL051219 has a diagram of the beginning step of the two-base-encoding method of the SOLiD System. This diagram shows a "universal seq primer" with a 5′ phosphate

group forming a duplex with the portion of the target polynucleotide that directly attaches to the

bead, called the "P1 adapter," which I understand to be a PCR primer binding site used to

amplify the target polynucleotide. *See* ILL051210 and ILL051213; *see also* AB00132599-

00132668 at AB00132612. As discussed above, the specification of the '341 Patent specifically

teaches that target polynucleotides can include such PCR primer binding sites. A similar diagram

in AB00132599-00132668 at AB00132637 also supports my conclusion. In this document, the

top panel in the diagram shows a "primer" with a 5′ phosphate group, again represented by the

notation "p5′," hybridized to a target polynucleotide attached to a bead. I have also reviewed a

Flash animation produced by AB as AB00007541 which shows the formation of a probe-target

duplex between a target polynucleotide and a "universal seq primer" with an extendable 5′ end. I

have also viewed a Flash animation that AB had available on its web site as of late 2006. This

file is entitled "aga.swf." Although I understand this was not produced by AB during discovery,

this file was obtained by Defendants and produced as ILL050324. This video is an animation of

the one-base-encoding format of the SOLiD System. At the beginning of "Step 3-4 – Ligation

Chemistry – Imaging & Basecalling," the animation shows the ligation of an extension

oligonucleotide to the 5′-extendable phosphate at the end of the universal sequencing primer

while both oligonucleotides are hybridized to the target polynucleotide attached to a bead. This

animation is evidence that the "universal seq primers" sold by AB for use in the SOLiD System

are "oligonucleotides to which the first extension oligonucleotide probe is first ligated."

Consequently, the "universal seq primers" used in the SOLiD System, specifically Tag 1 Seq

Primers A, B, and C, and Tag 2 Seq Primers A1, A2, B1, B2, C1, and C2 are "initializing

oligonucleotide probes," as that term has been construed by Judge Alsup, in certain embodiments

47

employed by AB, such as the use of 1,2-encoded probes and 4,5-encoded probes in combination with Tag 1 Seq Primers A, B, and C. In other embodiments, such as in the most recent commercial embodiment of the SOLiD System, the "initializing oligonucleotide probes" are assembled *in situ* by ligating a "universal seq primer" (either Tag 1 Seq Primers C, D, or E) and a "bridge probe" (Bridge Probe Tag 1 C, D, or E, respectively; AB00008317). The diagram on AB00008096 shows that initializing oligonucleotide probes formed in this fashion form a duplex that spans the juncture of the adapter sequence and the rest of the target polynucleotide. Such initializing oligonucleotides, to adapt AB's nomenclature, could be called "n+3," "n+2," and "n+1" "universal seq primers."

145.    Further support for my conclusion is found at AB00029686-00029706 at AB00029687. This slide shows the sequence of the "3′ Forward Ligation Sequencing Primers" sold and used in the SOLiD System. As explained by AB's 30(b)(6) witness, Dr. Costa, the primers 3FLSP(n), 3FLSP(n-1) and 3FLSP(n-2) are the sequencing primers sold by AB as "Tag 1 Seq Primers" A, B, and C, respectively. Costa Deposition at 117:1-19. The 5′ end of Tag 1 Seq Primer A hybridizes immediately adjacent to the "template sequence," called the "n" position. Tag 1 Seq Primer B hybridizes at the "n-1" position, or one nucleotide toward the left on the template, while Tag 1 Seq Primer C hybridizes at the "n-2" position, which is one nucleotide left from the "n-1" primer and two nucleotides left from the "n" primer. Examples of these hybridization positions can be seen in ILL051232, which represents where universal seq primers "n," "n-1," "n-2," "n-3," and "n-4" would hybridize on the target polynucleotide. These primers are sold in both the Fragment and Mate-Paired Library Sequencing Kits sold by AB. AB00000803. The sequences on AB00029687 show that each of these primers has a 5′ phosphate, as indicated by the notation "5′-phos." Furthermore, this same page also provides the sequences for the "3′

**48**

Internal (A/B) Sequencing Primers" sold and used by AB in the SOLiD System. As explained by

AB's 30(b)(6) witness, Dr. Costa, the primers 3IASP(n), 3IASP(n-1), 3IASP(n-2), 3IBSP(n),

3IBSP(n-1), and 3IBSP(n-2) are the sequencing primers sold by AB as "Tag 2 Seq Primers" A1,

B1, C1, A2, B2, and C2, respectively. Costa Deposition at 117:20-118:4. These primers are sold

in the Mate-Paired Library Sequencing Kits sold by AB, along with Tag 1 Seq Primers A, B, and

C. AB00000803; Costa Deposition 114:18-115:2. The sequences of these Internal Sequencing

Primers likewise show that each has a 5′ phosphate group, as indicated by the notation "5′-phos."

I further understand that the most recent commercial embodiment of the SOLiD System uses Tag

1 Seq Primers A-E, which I understand to correspond to the n, n-1, n-2, n-3, and n-4 universal

seq primers discussed above based on my review of AB's documents, including AB00008191-

00008485 at AB00008315-8321; AB00007876-7877 (listing product names and catalog numbers

for equipment and reagents for use in SOLiD System 2.0 version, including, but not limited to,

the SOLiD Analyzer (Cat. No. 4387830); SOLiD Sequencing Probes Kit V2 containing "Probe

Mix A" (Cat. No. 4400412); SOLiD Fragment Library Sequencing Kit V2 (Cat. No. 4400467));

and AB00008081-8170 at AB00008089 and AB00008096.

146.    Even if the two-base-encoding format of the SOLiD System were found not to literally

satisfy the limitation of step (a) of providing a probe-target duplex comprising an initializing

oligonucleotide hybridized to a target polynucleotide (if, for example, "target polynucleotide"

were construed to exclude a "binding region" having known sequence), the system should still be

found to infringe by equivalence. The function, way, and result of step (a) are the same whether

the initializing oligonucleotide is hybridized to a "binding region" containing known sequence or

to a "target polynucleotide" containing an unknown sequence or a combination of known and

unknown sequence. In each case, the function is to provide a starting point for extension of the

initializing oligonucleotide along the target polynucleotide. In each case, the way in which this is done is by hybridization of the initializing oligonucleotide to the polynucleotide containing the sequence to be determined. In each case, the result of this step is a duplex that can be extended along the polynucleotide. Whether the initializing oligonucleotide is hybridized to a known, unknown, or partially known sequence does not change the function, way, or result.

      **2.**      **"ligating an extension oligonucleotide probe to said extendable probe terminus to form an extended duplex containing an extended oligonucleotide probe"**

      **a.**      **Relevant claim construction**

147.    I understand that Judge Alsup has construed the term "ligating an extension oligonucleotide probe to said extendable probe terminus" to mean "forming a covalent bond between an extension oligonucleotide probe and the extendable probe terminus of either an initializing oligonucleotide or an extended oligonucleotide probe while hybridized to a target polynucleotide." (Docket No. 133 at 12, lines 1-4). I have applied this construction in the opinions set out below.

148.    I believe that when Dr. Macevicz made his inventions claimed in the '341 patent, one of ordinary skill in the art would have understood the term "extension oligonucleotide probe" in claim 1 of the '341 patent to mean "an oligonucleotide probe that can be ligated to an initializing oligonucleotide probe or an extended oligonucleotide probe." I have applied this construction in the opinions set out below. I understand that AB did not offer an independent construction for this term, but appears to construe it to mean "a short oligonucleotide probe" in its construction of the phrase "ligating an extension oligonucleotide probe to said extendable probe terminus." (Docket No. 78 at 21). My opinion would be the same using AB's proposed construction.

149.    I believe that when Dr. Macevicz made his inventions claimed in the '341 patent, one of ordinary skill in the art would have understood the term "an extended duplex" in claim 1 of the '341 patent to mean "the double-stranded region formed by hybridization of a target polynucleotide to an extended oligonucleotide probe (i.e., an initializing oligonucleotide probe effectively extended by one or more nucleotides)." I have applied this construction in the opinions set out below.

150.    I understand that Judge Alsup has construed the term "extended oligonucleotide probe" to mean "an initializing oligonucleotide probe effectively extended by one or more nucleotides . . . ." (Docket No. 133 at 13, lines 3-4). I have applied this construction in the opinions set out below.

> **b.    The one-base-encoding SOLiD System method satisfies step (b) of claim 1 in the '341 patent**

151.    Based on my investigation, I have concluded that the use of the SOLiD System satisfies the "ligating an extension oligonucleotide probe to said extendable probe terminus to form an extended duplex containing an extended oligonucleotide probe" limitation in claim 1 in the '341 patent, both literally and by equivalence.

152.    With regard to the "ligating an extension oligonucleotide probe to said extendable probe terminus" limitation recited in step (b) of claim 1 of the '341 patent, I have viewed a Flash animation that AB had available on its web site as of late 2006 entitled "aga.swf," as discussed above. ILL050324. This animation shows, during the first ligation step, the ligation of an extension oligonucleotide to the 5′ extendable phosphate at the end of the universal sequencing primer while both oligonucleotides are hybridized to the target polynucleotide attached to a bead, demonstrating that the first ligation step in the SOLiD System "form[s] a covalent bond between

an extension oligonucleotide probe and the extendable probe terminus of . . . an initializing

oligonucleotide . . . while hybridized to a target polynucleotide." Furthermore, the animation

shows, during subsequent ligation steps, ligation of an extension oligonucleotide to the 5′ end of

a previously extended universal seq primer while both are hybridized to the target

polynucleotide, demonstrating that subsequent ligation steps in the SOLiD System "form a

covalent bond between an extension oligonucleotide probe and the extendable probe terminus of

. . . an extended oligonucleotide probe while hybridized to a target polynucleotide." ILL051151-

051162 at ILL051158 shows that, following the cleavage reaction in the SOLiD System

(discussed below), there is a 5′ phosphate on the end of the previously extended "seq primer."

Specifically, this drawing is found in the bottom drawing in the third box down from the top on

ILL051158, which includes the notation "NNNNXNNNNX(5′p)." Thus, in subsequent cycles of

ligation in the SOLiD System method, an extension oligonucleotide probe is ligated to the

extendable probe terminus of an extended oligonucleotide probe, as construed by Judge Alsup.

153.     With regard to the "extension oligonucleotide probe" limitation recited in step (b) of

claim 1 of the '341 patent, he animation also shows that the labeled ligation probes used in the

SOLiD System are "oligonucleotide probe[s] that can be ligated to an initializing oligonucleotide

probe or an extended oligonucleotide probe," which satisfies the "extension oligonucleotide

probe" limitation recited in step (b). The "labeled ligation probes" shown and described on

ILL051471-472 are "extension oligonucleotide probes," as that term is used in the specification

of the patents-in-suit and in claim 1 of the '341 patent. According to these slides, steps 4 and 5 of

the method used in the SOLiD System are "add ligase" and "probe extension," respectively. The

diagram shows a cartoon representation of a ligase enzyme above the "seq primer" and "A-

probe," which are immediately adjacent to one another. Coupled with the representation of the 5′

phosphate discussed above, I understand these portions of the diagram to represent a DNA ligase enzyme forming a covalent bond between an extension oligonucleotide probe and the extendable probe terminus of the seq primer while hybridized to the target polynucleotide.

154.    With regard to the limitation "extended duplex" recited in step (b) of claim 1 of the '341 patent, the animation also shows that following the initial and subsequent ligation steps in the SOLiD System method, the extended universal "seq primer" forms a double-stranded region with the target polynucleotide, thus satisfying the "extended duplex" limitation recited in step (b) of claim 1 of the '341 patent, which means a "double-stranded region formed by hybridization of a target polynucleotide to an extended oligonucleotide probe (*i.e.*, an initializing oligonucleotide probe effectively extended by one or more nucleotides)."

155.    With regard to the limitation "extended oligonucleotide probe" recited in step (b) of claim 1 of the '341 Patent, the animation also shows that following the initial and subsequent ligation steps in the SOLiD System method, the extended universal "seq primer" formed by the successive ligation of extension oligonucleotide probes is "an initializing oligonucleotide probe effectively extended by one or more nucleotides." As discussed above, as shown in ILL051151-051162 at ILL051158, the extended oligonucleotide probe, following the cleavage reaction in the SOLiD System method, has a 5′ phosphate on its end, as shown by the notation "NNNNXNNNNX(5′p)" found in the bottom drawing in the third box down from the top on ILL051158. Thus, in subsequent cycles of ligation in the SOLiD System method, the limitation "to said extendable probe terminus," as construed by Judge Alsup, is satisfied when an extension oligonucleotide probe is ligated to the extendable probe terminus of an extended oligonucleotide probe.

c.    **The two-base-encoding SOLiD System method satisfies step (b) of claim 1 of the '341 patent**

156.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in the two-base-encoding format also satisfies the limitations in step (b) of claim 1, both literally and by equivalence.

157.    I have reviewed a Flash animation produced by AB as AB00007541 (it is also currently available on AB's website at the following URL:

http://marketing.appliedbiosystems.com/mk/get/SOLID_KNOWLEDGE_LANDING.). This animation shows the steps of the two-base-encoding format of the SOLiD System. In the segment of the animation produced as "AB00007541 – Flash Video Chapter 4 – Ligation and Imaging," the animation shows that during the first ligation step, a 4,5-encoded probe bearing a yellow label and encoding G,A at the 4,5 position is ligated to the 5′ phosphate of the universal seq primer while both are hybridized to the target polynucleotide. The fact that the universal seq primer is hybridized to the "P1 adapter" does not mean that it is not hybridized to the "target polynucleotide," since the target polynucleotide can include additional polynucleotide sequences used for its preparation, as explicitly provided for in the specification of the patents-in-suit, as discussed above for the one-base-encoding format. Simply put, the P1 adapter shown in the animation is just as much a part of the target polynucleotide as the "template sequence" shown in the animation. This animation demonstrates that the first ligation step of the two-base-encoding format of the SOLiD System "form[s] a covalent bond between an extension oligonucleotide probe and the extendable probe terminus of . . . an initializing oligonucleotide . . . while hybridized to a target polynucleotide." Furthermore, the animation shows, during subsequent

ligation steps, ligation of an extension oligonucleotide to the 5′ end of a previously extended

universal seq primer while both are hybridized to the target polynucleotide, demonstrating that

subsequent ligation steps in the SOLiD System "form a covalent bond between an extension

oligonucleotide probe and the extendable probe terminus of . . . an extended oligonucleotide

probe while hybridized to a target polynucleotide." I have also reviewed numerous other

documents describing the two-base-encoding format of the SOLiD System that show the same

thing, including ILL051205-051241 at ILL051220, ILL051224, and ILL051229 and

AB00132599-00132668 at AB00132637.

158.    With regard to the "extension oligonucleotide probe" limitation recited in step (b) of

claim 1 of the '341 patent, he AB00007541 animation also shows that a covalent bond is formed

between a labeled ligation probe and the extendable terminus of the universal seq primer in the

first ligation step. The animation also shows that, in subsequent ligation steps, a covalent bond is

formed between a labeled ligation probe and the extendable probe terminus on the extended

oligonucleotide probe. Because the labeled ligation probes used in the two-base-encoding SOLiD

System format, specifically Probe Mix 1 (4,5-encoded probes) and Probe Mix 2 (1,2-encoded

probes), are "oligonucleotide probe[s] that can be ligated to an initializing oligonucleotide probe

or an extended oligonucleotide probe," the SOLiD System satisfies the "extension

oligonucleotide probe" limitation recited in step (b) of claim 1 of the '341 patent. I have also

reviewed numerous other documents describing the two-base-encoding format of the SOLiD

System that show the same thing, including ILL051205-051241 at ILL051220, ILL051224, and

ILL051229 and AB00132599-00132668 at AB00132637. With regard to the limitation "to form

an extended duplex" in step (b) of claim 1 of the '341 patent, the AB00007541 animation shows

that following the initial and subsequent ligation steps in the two-base-encoding format of the

SOLiD System method, the extended universal seq primer forms a longer double-stranded region with the target polynucleotide because the universal seq primer has been extended by the labeled ligation probes. This satisfies the "extended duplex" limitation recited in step (b) of claim 1 of the '341 patent, which means a "double-stranded region formed by hybridization of a target polynucleotide to an extended oligonucleotide probe (*i.e.*, an initializing oligonucleotide probe effectively extended by one or more nucleotides)." I have also reviewed numerous other documents describing the two-base-encoding format of the SOLiD System that show the same thing, including ILL051205-051241 at ILL051220-227 and ILL051229-231, and AB00132599-00132668 at AB00132637. With regard to the limitation "containing an extended oligonucleotide probe" in step (b) of claim 1 of the '341 patent, the AB00007541 animation shows that following the initial and subsequent ligation steps in the two-base-encoding format of the SOLiD System method, the universal seq primer has been extended by the ligation of labeled ligation probes. This satisfies the "containing an extended oligonucleotide probe" limitation, which means that the extended duplex formed contains "an initializing oligonucleotide probe effectively extended by one or more nucleotides." I have also reviewed numerous other documents describing the two-base-encoding format of the SOLiD System that show the same thing, including ILL051205-051241 at ILL051220-227 and ILL051229-231, and AB00132599-00132668 at AB00132637.

> **3.** **"identifying, in the extended duplex, at least one nucleotide in the target polynucleotide that is . . . complementary to the just-ligated extension probe"**

> **a.** **Relevant Claim Construction**

159.    I understand Judge Alsup has construed the term "identifying" in claim 1 of the '341 patent to mean "within each cycle determining the identity of a base in the target

polynucleotide." (Docket No. 133 at 16, lines 3-4). I have applied this construction in the opinions set out below.

160.    I understand Judge Alsup has construed the term "just-ligated extension probe" to mean "the extension oligonucleotide probe ligated to either the initializing oligonucleotide probe or an extended oligonucleotide probe in the present cycle of the method." (Docket No. 133 at 13, lines 3-7). I have applied this construction in the opinions set out below.

161.    I have construed the term "extension probe" as a person of ordinary skill in the art would have construed the term in 1994-95, based on the description in the specification. I have construed the term "extension probe" to mean the same as the term "extension oligonucleotide probe" used in step (b) of claim 1 of the '341 patent. Specifically, I construe this term to mean "oligonucleotide probe that can be ligated to an initializing oligonucleotide probe or an extended oligonucleotide probe."

> **b.    The one-base-encoding SOLiD System method satisfies step (c) of claim 1 in the '341 patent**

162.    Based on the information provided in AB's documents describing its SOLiD System, and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in the one-base-encoding format also satisfies the limitations in step (c) of claim 1 , both literally and by equivalence.

163.    In the Flash animation entitled "aga.swf," discussed above, "Step 3-4: Ligation Chemistry – Imaging & Basecalling" shows alternating cycles of "ligation reaction" and "visualization." ILL050324. After the first "ligation reaction" in the animation, the "visualization" step, which is part of "Step 4 – Imaging & Basecalling," occurs. During this step, a light source shines on the label attached to the extension probe ligated during the initial ligation step, producing "color emission of the dye." At the same time, the animation shows the

appearance of an "A" and the numeral "5" under the corresponding position of the "template sequence." I understand this animation to mean that the color emission of the dye identifies the base at the interrogation position of the just-ligated extension probe, which in this case is an "A" residue. The identification of the A in the probe also identifies the complementary position in the target polynucleotide as a T, since A pairs with T. Because the animation shows that this same visualization procedure occurs after each subsequent round of ligation, I conclude that a nucleotide in the target polynucleotide that is complementary to the just-ligated extension probe is identified in like manner during each visualization cycle, which occurs between the ligation and cleavage steps in each round of the one-base-encoding format of the SOLiD System method.

164.     I have considered whether the possibility of mismatches between the ligated extension probe and the target polynucleotide would be expected to prevent identification of a nucleotide. It is possible that a mismatch might infrequently occur on individual templates bound to the beads. Costa Deposition at 94:20-95:21. In the absence of evidence that a mismatch had occurred, it is much more likely than not that a color signal identifies a complementary base in the target polynucleotide. Costa Exhibit 95:8-19. Furthermore, even if mismatches occurred at some low frequency, they would not necessarily be expected to result in the incorrect identification of the complementary position in the target polynucleotide. This is because each bead has many copies of the template attached to it, as shown earlier in this animation under "Step 2: Emulsion PCR & Substrate Preparation." In order for the complementary base in the target to be misidentified, mismatches must occur on many, if not most, of the templates attached to the bead, which is highly unlikely.

165.     I have also reviewed documents indicating that AB's scientists understood that the one-base-encoding format of the SOLiD System directly identifies a base as claimed in step (c) of

**58**

claim 1 in the '341 Patent by the color emission of the dye attached to the ligated probe obtained

during the visualization step following each ligation. For example, AB scientist Dr. Alan

Blanchard, discussing the '341 Patent and a one-base-encoding system, stated "[a]fter the

extension probes are ligated on, the identity of the 3' base of the extension probe is determined

by merely identifying the color of the fluorescence. This clearly falls within the meaning of

paragraph (c) of claim 1 of the `341 patent." AB00296960-00296979 at AB00296977-978.

166.     Other AB scientists shared Dr. Blanchard's opinion. In a document marked

AB00245396-00245403, entitled "APG Process Technical Brief: The Supported Oligo Ligation

Detection (SOLiD) Process for Massively Parallel Sequencing by Stepwise Ligation," at

AB00245400, AB scientists state that in the one-base-encoding SOLiD System format, the color

emitted by a just-ligated probe identifies the base of the nucleotide interrogated by that probe.

This description of the SOLiD System method states that, after washing the slide to remove

excess probes and ligase, the next step is to "excite the fluorescent dyes and image the slide,"

and

> **In the resulting picture, you see each productive bead as a spot of particular color: one bead over here says, "I'm an A!"; one nearby says, "I've got a C"; and so on.** Any unproductive beads that happened to survive the enrichment process either stay dark or show an indeterminate signal that can be discounted. That first image, like the colored starts in an astronomical photograph, or like the members of the card section in a football stadium, gives you a starting point. **You know what the first base in the sequence of each of those randomly chopped DNA fragments is. Hurray!**" (emphasis added).

*Id.* Thus, identification of the first base in the sequence of a DNA fragment being analyzed by

the SOLiD System is complete once an image of the colored beads has been obtained. As shown

in the Flash animation aga.swf, the imaging step is completed, and thus identification of a

nucleotide in the target polynucleotide has occurred, prior to the cleavage step. ILL050324. The

APG Process Technical Brief also indicates that the images obtained from subsequent cycles of

its method likewise identify specific bases in the target polynucleotide that are complementary to the probe ligated during each subsequent cycle: "The next cycle will give you another image, in which each of those same points will report another base . . . Because you have a very precise imaging system and the beads don't move around, you can match up those millions of points from cycle to cycle (well, you're [sic – your] eye can't match and track them, but a computer program can) to build out the sequence." AB00245400. An AB diagram of the steps of the one-base-encoding method using labeled ligation probes having the interrogation position at their 3′ end supports my conclusion. This document states "[i]mage beads and record 3′ base." AB00160896-00160903 at AB00160898. I understand this to mean that the image of the beads determines the 3′ base – the interrogation position in the probes used – and thus permits one to "record the 3′ base."

167.    I have also reviewed the testimony of AB's 30(b)(6) witness, Dr. Costa, and find that it supports my conclusion that the one-base-encoding SOLiD System format satisfies step (c) of claim 1 of the '341 Patent, as construed by the Court. Dr. Costa repeatedly admitted that the color signal obtained during the visualization/imaging step of the one-base-encoding format of the SOLiD System identifies a nucleotide in the target polynucleotide. Costa Deposition 92:12-18; 98:1-98:5; 101:2-102:5; 130:16-132:23. The visualization step performed by the SOLiD System in the one-base-encoding format satisfies the requirements of step (c) of claim 1 of the '341 Patent.

168.    In my opinion, one of ordinary skill in the art would not consider the use of automatic or computer-aided detection systems in the practice of the method claimed in the '341 patent to be outside the scope of the claims. *See*, *e.g.*, '341 Patent at Col. 13, line 56 to Col. 14, line 3 ( "The

invention also includes systems and apparatus for carrying out the method of the invention automatically. Such systems and apparatus can take a variety of forms depending on several design constraints, including . . . iii) the detection scheme employed . . . . Generally, the apparatus comprises . . . one or more detection stations, and a computer controlled means for transferring in a predetermined manner reagents from the reagent reservoirs to and from the reaction vessels and the detection stations").

169.    In my opinion, even if the SOLiD System method of identifying the bases is not found to literally satisfy the "identifying" limitation in step (c) of claim 1, it should be found to satisfy the limitation under the doctrine of equivalents. The function of the identification step is to determine the identity of one or more bases in the target polynucleotide within each cycle. Within each cycle of the one-base-encoding format of the SOLiD System, the system obtains all information necessary and sufficient to determine the identity of a base in the target polynucleotide. Even if the system was not found to literally satisfy the limitation because the identity of the base in question is not recorded in a data file within each cycle, the function, way, and result of the identification by the system is the same as if a base were recorded to a data file within each cycle. In each case, the function is to identify a base in the target polynucleotide that is complementary to the just-ligated extension probe. In each case, the way in which this is done is by analyzing data obtained within a cycle in light of previously gathered data and other known parameters, such as the color encoding scheme used. In each case, the result of this analysis is the determination of the identity of a base without requiring access to data generated subsequent to the cycle. The *timing* of the analysis of the data and the recording of the identified base does not change the function, way, or result of this portion of the process.

      **c.**      **The two-base-encoding SOLiD System satisfies step (c) of claim 1 of the '341 patent**

170.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in the two-base-encoding format also satisfies the limitations in step (c) of claim 1, both literally and by equivalence.. As discussed below, the color-encoding scheme used in the SOLiD System is predetermined and known. During each ligation cycle during the final round of ligations, color images are obtained for each dinucleotide pair. Because both the encoding scheme and the identity of one nucleotide in each of the dinucleotide interrogation positions have already been determined, the identity of at least one nucleotide in the target polynucleotide that is complementary to the just-ligated extension probe is determined within each cycle of the method.

171.    In the two-base-encoding SOLiD System format, color images are obtained following the ligation step and prior to the cleavage step during each cycle, just as in the one-base-encoding format. In the two-base-encoding color scheme, however, a color signal by itself represents the relationship between two adjacent nucleotides, rather than the identity of any given nucleotide, as discussed below. Because of this encoding scheme, a color signal for a dinucleotide pair does not unambiguously determine the identity of a nucleotide in the target polynucleotide unless the identity of a nucleotide at one of the interrogation positions is previously known or determined.

172.    According to the documents and testimony I have reviewed, the SOLiD System obtains color signals that unambiguously identify at least one nucleotide in a target polynucleotide during one round of ligation cycles, although the round in which this occurs can vary depending on the order in which specific sets of probes and sequencing primers are employed.

173.    Generally, a SOLiD System sequencing run for a 25-base-pair DNA fragment in the two-base-encoding format consists of 5 rounds of 5 ligation cycles each, for a total of 25 ligation cycles, although in some recent versions, additional steps have been included. Each round of ligation cycles uses a specific universal sequencing primer and set of labeled ligation probes, as discussed below. The documents and testimony I have reviewed indicate that over time AB has used a variety of combinations of sequencing primers and probe mixes in the SOLiD System. One example of how these rounds of ligation cycles can be carried out is shown in AB00121757-00121795 at AB00121774. This diagram represents the outcome of 5 rounds of 5 ligation cycles using 4,5-encoded probes for the first three rounds using universal sequencing primers n, n-1, and n-2, then two rounds with 1,2-encoded probes and universal sequencing primers n and n-1. Another possible scheme is found in ILL051205-051241 at ILL051232, which represents the outcome of 5 rounds of 5 ligation cycles using 4,5-encoded probes for every cycle and a different universal sequencing primer for each round, named "n," "n-1," "n-2," "n-3," and "n-4," respectively, based on their hybridization position relative to the end of the P1 adapter sequence. Finally, during the demonstration of the SOLiD System that I attended, a DH10b control sample was sequenced using n, n-1, n-2, n-3, and n-4 primers, the 1,2-encoded probes, and a "bridge" oligonucleotide.

### (i)    The color encoding scheme is always known

174.    The "two-base-encoding" scheme used in the SOLiD System is shown on Slide 6 of an October 16, 2006 presentation by Dr. Michael Rhodes, an AB scientist. ILL050362-050385 at ILL050367. In the scheme shown on this slide, the color blue, taken alone, identifies the interrogated dinucleotide as one of AA, CC, GG, or TT. Likewise, the color green, taken alone, identifies the interrogated dinucleotide as one of AC, CA, GT, or TG. Similarly, orange or red

alone stand for the sets (AG, CT, GA, and TC) and (AT, CG, GC, ant TA), respectively. This same color encoding scheme is also described in an animated video "webinar" narrated by Dr. Rhodes that is currently available for viewing on AB's website at the following URL: http://marketing.appliedbiosystems.com/mk/get/SOLID_KNOWLEDGE_LANDING. The color encoding scheme used by the two-base-encoding format SOLiD System is thus predetermined and known. This webinar was not produced by AB, but was obtained and produced by Defendants as ILL053960.

> **(ii)** **The two-base-encoding format of the SOLiD System produces a color image that gives information about two adjacent bases**

175.    Unlike the one-base-encoding SOLiD System format, there is not a one-to-one correspondence between the color signal and the identity of a nucleotide at the interrogation position in the extension probes in the two-base-encoding SOLiD System format. Instead, a color signal identifies that one of 4 of the 16 possible pairs of adjacent nucleotides is present at the interrogation positions for that probe set. ILL050362-050385 at ILL050367. For example, a blue signal from a 1,2 encoded probe, in the absence of any other information, identifies the pair of nucleotides immediately adjacent to the ligation site as one of AA, CC, GG, or TT. The same signal from a 4,5 encoded probe, in the absence of any other information, means the same thing for the pair of nucleotides at the 4th and 5th positions from the ligation site. As stated by Dr. Rhodes on ILL050363, "a two base encoded probe tells us information about the 4th and 5th bases which needs further information to resolve the base call."

### (iii)    The SOLiD System obtains color images every cycle between the ligation and cleavage steps

176.    As shown in the AB00007541 animation at Chapters 4 and 5, the two-base-encoding

SOLiD System format obtains four color images within each cycle of the method, between the

ligation step and the cleavage step. Dr. Costa, AB's 30(b)(6) witness, also confirmed that the

SOLiD System takes color images, one for each dye channel, after the ligation step and prior to

the cleavage step. Costa Deposition at 56:18-57:18. As discussed above, the one-base-encoding

format of the SOLiD System also takes four images, one for each dye channel, during the same

time period. During the demonstration of the two-base-encoding format SOLiD System, I saw

that the SOLiD System stored images in four different color channels to a hard drive during the

imaging step following ligation and prior to cleavage. I was able to access these images during

the imaging step and could see the signals from individual beads on the images. The images are

named according to the primer used, the ligation cycle, the section of the slide from which they

were obtained, and the "pass filter" used to obtain them.

177.    The SOLiD System uses a digital camera and 4 pass filters to obtain color images of the

slides during each cycle. A pass filter allows light of specific wavelengths to pass through it to

the camera, while blocking other types of light, thus allowing the beads to be distinguished based

on their color. So, for example, a "blue" pass filter would let light falling into the blue

wavelengths pass through, but would block red, green, and yellow wavelengths. Costa

Deposition at 58:14-59:14. These images are then colored by the computer according to the color

scheme used. Examples of colored images produced by the SOLiD System are found in

ILL051205-051241 at ILL051237, which shows panels colored by the computer as blue, green,

orange, and red, based on the pass filter used to collect each image.

        **(iv)    If the identity of one base in the dinucleotide is known or determined, the identity of the other base is determined when a color image is obtained**

178.    As discussed above, in the one-base-encoding format of the SOLiD System, a color image identifies a nucleotide in the target polynucleotide because the color encoding scheme is predetermined. In my opinion, based on my review of AB documents and the testimony of Dr. Costa, AB's 30(b)(6) witness, a color image similarly identifies a base in a nucleotide in a target polynucleotide in the two-base-encoding system, but only when two things are known or have been determined. First, just as in the one-base-encoding system, the color-encoding scheme has to be known – namely, which color corresponds to which pair of nucleotides. As discussed above, the encoding scheme is always known in the SOLiD System. Second, the identity of one base of the pair of nucleotides must be known or previously determined. In the SOLiD System, when these two requirements are satisfied, a color image representing a dinucleotide pair unambiguously determines the identity of the second base in the pair. Furthermore, because the second base in one pair is the first base in the adjacent dinucleotide pair when using a two-base-encoding format, once the identity of the second base is determined, the color image for the adjacent dinucleotide unambiguously identifies the third base, and so on for all color images of adjacent dinucleotide pairs.

179.    My opinion is supported by numerous AB documents and by the testimony of Dr. Costa, AB's 30(b)(6) witness. For example, an AB document discussing the two-base-encoding SOLiD System method contains the following statement: "Color encodes 4 potential sequences • Fix one base, determines all other bases • Reference sequence or primer can determine sequence." I interpret this statement to mean that, given a series of color images and the identity of one base, the identity of all the other bases are "determined." AB00132599-00132688 at AB00132635.

Other documents support my opinion, including an animated video "webinar" narrated by Dr.

Rhodes that is currently available for viewing on AB's website at the following URL:

http://marketing.appliedbiosystems.com/mk/get/SOLID_KNOWLEDGE_LANDING (produced

by Defendants as ILL053960), which appears to follow a PowerPoint slide presentation dated

June 1, 2007, and a slide presentation by Dr. Michael Rhodes dated October 10, 2006

(ILL050362-050385), which includes a slide, numbered 4 (ILL050365) that is not found in the

2007 presentation, but appears otherwise identical.[2] Several slides in the webinar and the 2006

presentation support my conclusion. Slide 2, entitled "What is two base encoding?" states "a two

base encoded probe tells us information about the 4th and 5th bases which needs further

information to resolve the base call." ILL050363 and ILL053960. Slide 8, entitled

"Consequences of 2 Base Pair Encoding," states that "[t]o decode the bases you **must** know **one**

of the bases in the sequence" (emphasis in original). ILL050369 and ILL053960. This slide

supports my conclusion that, once the SOLiD System identifies a single base in the target

polynucleotide, the color signal for a dinucleotide unambiguously identifies the second base in

the pair. Dr. Rhodes' webinar covers the same slide and further supports my opinion. Slide 10,

entitled "Example of decoding (ii)," shows the color-encoding matrix, a series of colored circles

representing color images, and the four possible sequences represented by the colors, but also

traces the entire decoded sequence when the first base of the sequence is determined (or

previously known) to be an A (shown highlighted in yellow). ILL050371 and ILL053960. The

---

[2] I understand that a number of other AB presentations contain essentially identical content, including AB000469460-00046969; AB00068336-00068422; AB00070106-00070130; AB00070193-00070253; AB00070412-00070435; AB00071093-00071126; AB00073052-00073075; AB00073100-00073124; AB00073125-00073149; AB00075291-00075432; AB00086542-00086616; AB00138825-00138849; AB00216275-00216298; and AB00243819-00243843, although none of these presentations is identical in every detail to ILL050362-050385.

slide states that "[i]f [you] know first base is an A then immediately it decodes 2nd base. This must be an A as Blue translates 2nd base A if first base A." *Id.* This slide supports my conclusion that a color image unambiguously and immediately identifies a base as long as the identity of one of the bases is previously known or determined. Dr. Rhodes' webinar discusses the same slide and further supports my opinion. Slide 11, entitled "Summary of decoding," summarizes how any color image in the two-base-encoding system can be decoded once the identity of a single base is determined (or previously known). ILL050372 and ILL053960. In the example shown, the first color image, corresponding to interrogation positions 1 & 2, is blue, which means that positions 1 and 2 could be AA, CC, GG, or TT, as shown. However, if position 1 is determined or known to be A, as indicated by the yellow highlight, position 2 is determined to be A also, since none of the other possibilities start with A. The next color image, which corresponds to positions 2 and 3, is green, which by itself means only that positions 2 and 3 could be AC, CA, GT, or TG. But because position 2 has been determined to be A, then position 3 has to be C. The rest of the sequence is identified in similar fashion, as shown in the boxed diagrams at the bottom of the slide. *Id.* For each color image, determination or knowledge of one nucleotide in the pair identifies the second nucleotide in the pair, which is the first nucleotide in the next pair, and so on. Dr. Rhodes' webinar discusses the same slide and further supports my opinion.

180.    In addition to the documents and presentations discussed above, I have reviewed other documents that further support my conclusion that the identity of a nucleotide is determined in the two-base-encoding SOLiD System format when a color image is obtained for a dinucleotide as long as one base in the pair is already known or has been determined. An AB presentation dated June 26, 2006, discussing the two-base-encoding system states that "sequence remains unknown unless you know the vector base." AB00131875-00131972 at AB00131911. I interpret

the term "vector base" to refer to the last base of the universal seq primer, which has a known identity, as discussed below. An AB presentation entitled "SOLiD Chemistry: Supported Oligonucleotide Ligation Detection" discussing the two-base-encoding system states that "sequence remains unknown unless you know the vector base or perform alignment in color space." AB00121847-00121894 at AB00121858. I interpret this statement as indicating that the identity of a nucleotide in a sequence can also be determined using a two-base-encoded color image provided alignment can be performed in color space against a reference sequence that has been translated into color space. A document containing an example of a reference sequence which has been translated into color space, AB00121847-00121894 at AB00121859, indicates that, given the identity of one base and the color-encoding scheme, any sequence can be freely translated between "color space" and "base space" and, therefore, the decision to represent the identified bases in either format is simply a matter of nomenclature. A document describing a potential hexameric two-base-encoding probe scheme indicates that color images can be used in such a system to identify nucleotides, even if different length probes are used. This document, entitled "Representation of a 2-base/4-color encoding scheme," AB00140259-00140261 at AB00140259, provides a table that "represents an association of colors and sequences where it is not possible to identify any particular base. For all colors, each base is equally likely to be A, C, G or T." This table supports my conclusion that the color image is one piece of information necessary to identify a nucleotide in the target polynucleotide using the two-base-encoding method, but may not always be sufficient to do so by itself. The document goes on to state that if one has to make an assumption about the first base in the sequence, the color calls alone can only be resolved to four possible sequences. AB00140260. In the table on that page, for example, if the first color call is a yellow, bases 1 and 2 could be CC, TA, GG, or AT. If the first base is

assumed to be C, then the second base is deduced to be C, which in turn means the third base is A, and so on. If one assumes, in turn, that each possible base is the first, one can deduce four possible sequences for a sequence of five color calls, which are written at the bottom of the table on AB00140260. If one of the bases in the sequence is known, however, this document confirms my opinion that there is no ambiguity and the identity of the base is immediately known. As stated on AB00140260: "In practice, one or more bases will be know [*sic*: known] primer sequence, which is enough information to resolve the 4-fold ambiguity." This indicates that in the two-base-encoding SOLiD System format, a color image unequivocally identifies a nucleotide whenever one of the bases of a pair has been determined or is already known. An AB document entitled "SOLiD Chemistry: Sequencing by Oligonucleotide Ligation and Detection," dated August 8, 2006, discussing the two-base-encoding format, states "Detect a single color indicates 4 combinations & eliminates 12," "Detect a single color does NOT indicate a BASE," and "To assign a base for any position, you must read color signal for that position ***and*** know another base in the sequence." AB00133103-00133156 at AB00133131. The document also states that "[i]f you know ONE base in the sequence, you can determine the sequence." AB00133136. Taken together, these statements support my conclusion that a color image alone may not always unequivocally identify a base in the two-base-encoding SOLiD System format, but a color image combined with a determined or already-known identity of one base in the dinucleotide does, and furthermore immediately determines the identities of bases in overlapping dinucleotides. An AB presentation entitled "SOLiD: 2-base encoding" contains a table showing the four possible sequences represented by a sequence of 5 color calls under a two-base-encoding SOLiD System format. In this format, the groups are (AA, CC, GG, TT), (AC, CA, GT, TG), (AG, CT, GA, TC), and (AT, CG, GC, TA), labeled blue (color channel 0), green (color channel

**70**

1), yellow (color channel 2), and red (color channel 3), respectively. In AB00121757-00121795 at AB00121770, the slide states "At each base position, all 4 bases are represented in the list of possible decodings. Not a single base has been identified. But as soon as one base is identified, the entire sequence becomes known."

> **(v)    In the SOLiD System, at least one round of cycles identifies a base within each cycle because the first interrogated dinucleotide contains a known base**

181.    In my opinion, based on the documents I have reviewed and the testimony of Dr. Costa, AB's 30(b)(6) witness, in any given sequencing run the SOLiD System typically will obtain a color image for a dinucleotide consisting of interrogation positions that span the juncture between the P1 adapter sequence and the rest of the target polynucleotide. This dinucleotide consists of a known and unknown base at positions referred to as "0" and "1," respectively. As discussed above, this image immediately identifies the nucleotide at position 1, because the identity of the nucleotide at position 0, which is the last nucleotide of the universal seq primer, is already known.

182.    The time at which the SOLiD System obtains a color image for the dinucleotide at this position (0,1) varies according to the universal sequencing primers and labeled ligation probe sets that are used.

183.    If, for example, the SOLiD System is being used with a set of 4,5-encoded probes, the 0,1 interrogation positions will not be read until the round that uses the n-4 primer, because the sequencing primer must hybridize far enough toward the 5′ end of the target to allow the 4,5-encoded probe to hybridize to the 0,1 positions. Based on the documents I have reviewed, this position will typically be read during the last round of ligation cycles on any given target polynucleotide molecule. An example of this is shown on ILL051205-051241 at ILL051232. I

**71**

interpret this slide to represent a SOLiD System sequencing run in which the sequencing primers n, n-1, n-2, n-3, and n-4 are used in order with a pool of 4,5-encoded probes. I interpret the bottom drawing in the diagram to mean that the "universal seq primer n-4" is used in the last round of ligation cycles. This document also has the notation "0,1," which I interpret to mean that the 0,1 dinucleotide – the juncture between the P1 adapter and the portions of the target polynucleotide that is to be sequenced – is interrogated in the first ligation cycle using universal seq primer n-4. As discussed above, I have also reviewed a Flash animation produced by AB as AB00007541. Chapter 4 of this animation shows that position 0,1 is read for the N-4 primer with a 4,5 encoded probe set. I have also reviewed the SOLiD Experimental Tracking System (SETS) Software manual provided to AB's customers with the SOLiD System. This manual was produced by AB as AB00000980-00001082. Figure 1-1 in this manual, found at AB00000996, shows that Cycle 21 for "primer 5" and a 4,5 encoded probe interrogates the dinucleotide at base numbers 0,1, and also states that Base 0 is the last base of the adapter. This figure also shows a "B" in a row entitled "processed color space," which is said to be the "decoded first base of the sequence . . . ." This document further supports my conclusion that the SOLiD System reads the 0,1 dinucleotide in the first cycle of the last round of ligations in this configuration.

184.    As discussed above, the color image obtained for the 0,1 dinucleotide immediately determines the identity of the base in the nucleotide at position 1. Furthermore, assuming that the n-4 primer is used in the final round of ligation cycles, this also means that the previously obtained color image of the 1,2 dinucleotide unambiguously identifies the nucleotide at position 2 of the target polynucleotide. In like fashion, the identities of the nucleotides at positions 3, 4, and 5 are then also immediately determined in this first ligation cycle. When the image of the 5,6 dinucleotide is obtained in the 2nd cycle of ligation, the identities of positions 6-10 are

determined because the identity of position 5 is known. In like fashion, each successive cycle of ligation in the final round determines the identity of 5 nucleotide positions. This means that each ligation cycle during the final round determines the identity of 5 nucleotides. The first round determines the identity of positions 1-5, the second round determines the identity of positions 6-10, and so on through the fifth round, which determines the identity of positions 21-25.

185.    Depending on the combinations of sequencing primers and labeled ligation probes used, it is possible that the 0,1 position will be read during a different round of ligation cycles. I understand that the commercial embodiment of the two-base-encoding format of the SOLiD System for a fragment library uses a combination of 1,2-encoded probes and 4,5-encoded probes with Tag 1 Seq Primers A, B, and C. A diagram showing how the order in which the primers and probe pools are used in this scheme is in AB00121757-00121795 at AB00121774. I discuss in greater detail below the rounds of ligation cycles performed in the commercial embodiment.

186.    I have also reviewed a document that describes the use of 1,2-encoded probes and primers n through n-4. AB00138530. This document states that the first ligation cycle with the n-1 sequencing primer reads "v,1," which I understand to mean "vector, position 1," which is the same as the 0,1 notation described above. Assuming that the primers are used in order, the document indicates that the "v,1"/"0,1" position is read during the first ligation cycle of the second round of ligations.

### (vi)    The final primer cycle indisputably identifies the identities of the bases in the nucleotides of the target

187.    Based on the analysis above, it is my opinion that the two-base-encoding version of the SOLiD System determines the identity of a base in the target polynucleotide between the ligation step and the cleavage step in each cycle using the final primer. As discussed above, AB's

documents indicate that it has employed several different combinations of primers and two-base-encoding probes for use in its SOLiD System. As discussed above, one combination uses 4,5-encoded probes in conjunction with sequencing primers described as "n," "n-1," "n-2," "n-3," and "n-4." As discussed above, another combination uses 1,2-encoded probes with the same set of primers and "bridge probes," which are ligated to form the initializing oligonucleotide, in a step AB sometimes calls a "dark ligation" cycle (AB00138530); this same scheme was used in the demonstration of the SOLiD System that I observed, where it was called a "bridge ligation." It is my understanding that the most recent commercial version of the SOLiD System uses this combination of primers and probes. Another combination uses a mixture of 1,2 and 4,5-encoded probes and the "n," "n-1," and "n-2" primers; it is my understanding that a previous commercial version of the SOLiD System utilized this scheme for sequencing experimental samples. I incorporate herein by reference my discussion above of the universal sequencing primers and labeled ligation probes used by the SOLiD System, their sequences and characteristics, and the specific primers and probes sold in kits for use in the SOLiD System. In addition, the following documents are among those that provide support for my opinion regarding the structure of the primers and probes used in a commercial embodiment of the SOLiD System: AB00000803 (identifying Probe Mix 1 and Probe Mix 2; Tag 1 Seq Primer A, B & C; and Tag 2 Seq Primers A1, A2, B1, B2, C1, and C2 as components of commercial kits sold by AB for use in the SOLiD System); AB00134513-514 (sequences of the 1,2 and 4,5 probe pools); AB00134517 (identifies 1,2 and 4,5 Probe mixes sold in a SOLiD probe kit); AB00134512-513 (identifies internal AB name for each of the Tag Seq Primers); AB00029687 (provides sequences of each Tag Seq Primer according to its internal AB name); AB00121771 and AB00138530 (identifies the base positions in the target polynucleotide interrogated during each cycle by various primer/probe

combination that have been employed in the SOLiD System); AB00007876-78777 (listing

product names and catalog numbers for equipment and reagents for use in SOLiD System 2.0

version, including, but not limited to, the SOLiD Analyzer (Cat. No. 4387830); SOLiD

Sequencing Probes Kit V2 containing "Probe Mix A" (Cat. No. 4400412); SOLiD Fragment

Library Sequencing Kit V2 (Cat. No. 4400467)); AB00008081-8170 at AB00008089 (relating to

SOLiD System v. 2.0 User Guide) and AB00008096 (diagramming interrogation positions for

1,2-encoded probes used in combination with "bridge probes," and the n, n-1, n-2, n-3, and n-4

universal seq primers and showing 0,1 position is interrogated in first ligation cycle with the n-1

universal seq primer, as discussed above).

188.     In the analysis below, I have used the description of the order in which primer/probe

combinations are applied and base positions are interrogated during each round of ligations in the

SOLiD System found in the diagram on AB00121774. The numbers in the second and third rows

of the figure indicate the base position that is being interrogated. Starting from the left, the

entries in the table read "P, 1, 2, . . . 25," with numbers from 10 to 25 being written vertically

between the 2nd and 3rd rows. It is my opinion that the letter "P" stands for the last position of

the adapter sequence. I assume for the sake of the following analysis that the primers and probe

sets are utilized in order as they are listed in the fourth to eighth rows of the table: the N primer

with the 4,5-encoded primer pools, the N-1 primer with the 4,5-encoded pools, the N-2 primer

with the 4,5-encoded pools, then the N and N-1 primers, in order, with the 1,2-encoded probe

pools. As I will explain below, however, the order in which the primers and probe pools are

actually used is not important: whatever order the primers and pools are used in, the final

primer/pool combination will identify one or more bases in the target polynucleotide in each

cycle. In addition, I also understand based on AB's documents that the SOLiD System is capable

of reading 35 base pair tags. Although the table below only shows the reads obtained by five ligation cycles per primer on a 25-base-pair tag, my conclusion that the final primer/probe cycle determines the identity of one or more bases in the target polynucleotide is the same even if additional reads were made.

189.    For the N primer with the 4,5 encoded probes, the diagram on AB00121774 shows that the SOLiD System interrogates positions 4 and 5 in the first ligation cycle, followed by positions 9 and 10, 14 and 15, 19 and 20, and 24 and 25 in the second through fifth ligation cycles, respectively. Following each ligation of the probe pools and washing to remove unligated probes, the SOLiD System shines a light on the slide, which causes the fluorescent dye on the ligated probes (and hence the locus of the beads to which these probes are attached) to glow. The SOLiD System uses a camera to acquire color images of the glowing beads on the slide. For all ligation cycles for the N/4,5 probe/primer set, absent further information, it may not be possible to identify a nucleotide in the target polynucleotide. Similarly, for the N-1/4,5, N-2/4,5, and N/1,2 primer/probe combinations, the SOLiD System acquires color images of the glowing beads in each ligation cycle from which it may or may not be possible to identify a nucleotide in the target polynucleotide.

190.    In my opinion, the final primer/probe combination, the N-1 primer with the 1,2-encoded probes, allows the identity of a nucleotide to be determined in every ligation cycle. For this final round, just as before, the SOLiD System performs a ligation step, washes away unbound probe, and then acquires a color image of the glowing beads. For the very first ligation cycle, the diagram on AB00121774 shows that the interrogation positions are "P" and "1," meaning that the interrogation positions span the juncture between the "adapter sequence" portion of the target polynucleotide and the DNA being sequenced, which is the remainder of the target

**76**

polynucleotide. In this instance, because the nucleotide at position "P" is known, the color image obtained for the P,1 dinucleotide unambiguously determines the identity of the nucleotide at position 1, which is a nucleotide in the target polynucleotide that is complementary to the just-ligated extension probe. In addition, the identity of the base at position 1 in combination with the previously obtained color image corresponding to the 1,2 interrogation position obtained during the first ligation cycle employing the N/1,2 probe/primer combination unambiguously determines the identity of the nucleotide at position 2. Similarly, the identity of the nucleotides at positions 3, 4, & 5 become determinate.

191.    In the second ligation cycle for the N-1/1,2 primer/probe combination, positions 5 and 6 are interrogated. Since the identity of position 5 was determined in the previous cycle, that fact, in combination with the color image obtained for the 5,6 interrogation position, determines the identity of the base at position 6. Furthermore, by the same logic, the previously obtained color images in combination with the identity of position 6 determine the identity of the nucleotides at positions 7-10. Thus, during this ligation cycle, the identity of at least one nucleotide complementary to the ligation probe ligated during that cycle of the method is determined. Taken together, these sequential identifications satisfy the "identifying" limitation of the asserted claims of the '341 and '597 patents, as I understand the Court to have construed it.

192.    Whenever the SOLiD System performs ligation cycles with a 1,2 encoded probe set with an n-1 primer, or a 4,5-encoded probe set with an n-4 primer, the first ligation step produces a color call for the 0,1 juncture between the adapter and the rest of the target polynucleotide. This ligation cycle could occur in the last round of ligations, as shown in Figure 1-1 on AB00000996, AB00121771, and AB00121774, or it could occur in the second round of ligations as shown on AB00138350. It could also occur at the beginning of another round of ligations, depending on

the order chosen by the operator. In any case, the result is always the same. Because one base of the dinucleotide – specifically, the last base of the adapter sequence – is known, the color image obtained determines the identity of the nucleotide at position 1. Unlike cycles in which a color image is obtained for dinucleotides for which the identity of neither nucleotide has been determined, the color image for positions 0,1 unambiguously determines the identity of the base in the nucleotide at position 1 of the target polynucleotide. If the 0,1 position is read in the last round of ligations, the order in which primer/probe combinations were used in the previous rounds is immaterial: regardless of the order in which the images for the 1,2, the 2,3, the 3,4, and the 4,5 dinucleotides are obtained, reading the 0,1 position last immediately determines the identity of nucleotides 1-5. Changing the order in which primer/probe combinations are applied only effects whether the 2nd-5th ligations in the cycle that interrogates the adapter/target polynucleotide juncture also identify a nucleotide, or whether identification occurs during each cycle of another round of ligation.

193.    For example, I understand that AB's most recent commercial embodiment of its system, the SOLiD System 2.0, became available in May 2008. AB00008192. I understand that this version of AB's system uses 1,2-encoded probes and Tag 1 Seq Primers A-E, which correspond to the n, n-1, n-2, n-3, and n-4 "universal seq primers," as discussed above. In this system, the "0,1" position is read in the first cycle of the n-1 primer, which is typically the second primer used. Under this scheme, the order in which nucleotide identification occurs is different, but it occurs nonetheless. Starting with the n primer, Tag 1 Seq Primer A, with the 1,2-encoded probes in Probe Mix A, the diagram on AB00008096 shows that the SOLiD System interrogates positions 1 and 2 in the first ligation cycle, followed by positions 6 and 7, 11 and 12, 16 and 17, 21 and 22, 26 and 27, and 31 and 32 in the second through seventh ligation cycles, respectively.

Following each ligation of the probe pools and washing to remove unligated probes, the SOLiD

System shines a light on the slide, which causes the fluorescent dye on the ligated probes (and

hence the locus of the beads to which these probes are attached) to glow. The SOLiD System

uses a camera to acquire color images of the glowing beads on the slide. For all ligation cycles

for the n/1,2 primer/probe set, absent further information, it may not be possible to identify a

base in the target polynucleotide. In the following round, however, the n-1/1,2 primer/probe

combination identifies the nucleotide at position 1 because the 0,1 position is interrogated in the

first ligation cycle and the 0 position is known, because it is the last base of the P1 Adapter.

Identification of position 1 also identifies position 2, for which a color image was obtained in the

first ligation cycle of the n/1,2 primer/probe round. However, the subsequent cycles of ligation in

the n-1/1,2 primer/probe round may not allow the identification of bases. The n-2, n-3, and n-4

primer rounds begin with the ligation of a bridge probe (Bridge Probe Tag 1 C, D, and E,

respectively) to the universal seq primer (Tag 1 Seq Primers C, D, and E, respectively) to form

an initializing oligonucleotide probe (corresponding to the n+3, n+2, and n+1 positions,

respectively) prior to the first ligation with a labeled 1,2-encoded probe. If a mate-paired library

is being sequenced, similar ligations are performed to generate the initializing oligonucleotides

to begin the corresponding ligation cycles (reagents for the mate-paired library sequencing in this

commercial embodiment are listed on AB00008318 in the description of SOLiD Mate-Paired

Library Sequencing Kit V2). Similarly, for the n-2/1,2 and n-3/1,2 primer/probe combinations,

the SOLiD System acquires color images of the glowing beads in each ligation cycle following

the generation of the initializing oligonucleotide using labeled ligation probes. As discussed

above, it may or may not be possible to identify a base in the target polynucleotide for these

ligation cycles. For the last primer/probe combination, n-4/1,2, however, the situation is

different. Following generation of the initializing oligonucleotide from the ligation of Tag 1 Seq Primer E and Bridge Probe Tag 1 E, the first ligation cycle with the 1,2-encoded probes obtains color images between the ligation and cleavage cycles for the 2,3 position. Because the identity of the base at position 2 is already determined, the identity of the base at position 3 is likewise determined, as are the identities of the bases at positions 4-7, for the same reason. In the second ligation cycle for the n-4/1,2 combination, the 7,8 position is interrogated and color images obtained. Because the identity of the base at position 7 has already been determined, the images for the 7,8 position immediately determine the identity of the base at position 8, which in turn determines the identities of the bases at positions 9-12 using the previously obtained images for the 8,9, 9,10, 10,11, and 11,12 positions. Similarly, the remaining rounds of ligation, visualization, and cleavage determine the identities of the bases at positions 13-35 in the scheme diagrammed on AB00008096. I have reviewed a number of AB documents that support and inform my opinion, including AB00008191-8485 at AB00008315-8321; AB00007876-7877; AB00008081-8170 at AB00008089 and AB00008096. In summary, based on the foregoing analysis, in my opinion, the SOLiD System satisfies the limitations of step (c) of claim 1 of the '341 patent, both literally and by equivalence. Even if the system was not found to literally satisfy the limitation because the identity of the base in question is not recorded in a data file within each cycle, the function, way, and result of the identification by the system is the same as if a base were recorded to a data file within each cycle. In each case, the function is to identify a base in the target polynucleotide that is complementary to the just-ligated extension probe. In each case, the way in which this is done is by analyzing data obtained within a cycle in light of previously gathered data and other known parameters, such as the color encoding scheme used and the identity of bases in the initializing oligonucleotide. In each case, the result of this

**80**

analysis is the determination of the identity of a base without requiring access to data generated

subsequent to the cycle. The *timing* of the analysis of the data and the recording of the identified

base does not change the function, way, or result of this portion of the process.

4.    **"generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated"**

a.    **Relevant Claim Construction**

194.    One of ordinary skill in the art would have understood the term "said probe having an

extendable probe terminus" recited in claim 1 in the '341 patent to mean "the probe having a

chemical group, such as a terminal 5' phosphate and/or terminal 3' hydroxyl group, capable of

forming a covalent bond with another nucleotide."

195.    One of ordinary skill in the art would have understood the term "the terminus generated

is different from the terminus to which the last extension probe was ligated" recited in claim 1 of

the '341 patent to mean "the extendable probe terminus generated does not occur at the same

nucleotide position as the extendable probe terminus in step b, thereby effectively regenerating

an extendable probe terminus."

b.    **The one-base-encoding SOLiD System method satisfies step (d) of claim 1 of the '341 patent**

196.    Based on the information provided in AB's documents describing its SOLiD System and

on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD

System in the one-base-encoding format satisfies step (d) of claim 1 of the '341 patent, both

literally and by equivalence.

197.    A document entitled "APG Process Technical Brief: The Supported Oligo Ligation

Detection (SOLiD) Process for Massively Parallel Sequencing by Stepwise Ligation" states that

"Step F" of the SOLiD System process is to "cleave off the probe's dye and religate another

probe." AB00245396-00245403 at AB00245400. The document also states that cleaving the

probe:

> "prepares the DNA strand for the next ligation cycle. Very cleverly, the probes
> are designed with a cleavable bond between the 5th and 6th base of the 8-base
> probe. This cleavage is done chemically using a specific wash buffer following
> the imaging step. This cleavage both removes the fluorescent tag and exposes a
> fresh, unmodified DNA end for the next round of probe ligation."

*Id.* I interpret this statement as referring to the cleavage of the phosphorothiolate bond with

aqueous silver nitrate to release the 3 universal bases at the 5′ end of the ligation probe that has

been ligated to the sequencing primer so as to regenerate a 5′ phosphate group for the next round

of ligation. For each round, this 5′ phosphate is not in the same position as the 5′ phosphate used

to extend the universal sequencing primer in the previous rounds. In my opinion, the 5′

phosphate generated on the end of the extended universal seq primer satisfies step (d) of claim 1

of the '341 patent.

198.    A document that contains a diagram of the steps in the one-base-encoding format of the

SOLiD System sequencing method, AB00121757-00121795 at AB00121763-764, also supports

my conclusion. On AB00121764, the top drawing shows a labeled ligation probe (having the

characteristic structure of the one-base-encoding labeled ligation probes discussed above) ligated

to a seq primer, with the notation "[i]mage at this stage." This probe has an "s" in its sequence,

which I interpret to be a phosphorothiolate group, as discussed above. The end of the ligated

probe has no 5′ phosphate group. The text accompanying the second drawing states

"phosphatase" and "cleave with AgNO$_3$." The second drawing shows that the phosphorothiolate

bond is gone, the probe has been shortened by three universal bases, and the end of the ligation

probe has a "P" connected by a line to the end of the probe. I interpret this drawing to mean that

a phosphate group is generated at the 5′ end of the oligonucleotide during the cleavage step of

the SOLiD System method. The Flash animation entitled "aga.swf," which shows the steps in the one-base-encoding SOLiD method also shows the generation of a 5′ extendable terminal phosphate group in each cycle following the visualization/identification step. ILL050324. The testimony of AB's 30(b)(6) witness, Dr. Costa, further supports my conclusion. Costa Deposition at 95:20-96:9 (stating that the cleavage step produces a 5′ phosphate on the end of the extended probe, and that there is no difference between the cleavage step in the one-base and two-base-encoding formats of the SOLiD System); 98:6-11 (stating that the cleavage step in subsequent cycles also produces a 5′ phosphate).

**c.    The two-base-encoding SOLiD System method satisfies step (d) of claim 1 of the '341 patent**

199.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in the two-base-encoding format also satisfies the limitations in step (d) of claim 1, both literally and by equivalence.

200.    As described above, I have reviewed the AB00007541 animation of the two-base-encoding SOLiD System method. This animation also shows the generation of a 5′ phosphate on the end of the extended universal seq primer in each cycle following the visualization/identification step.The testimony of AB's 30(b)(6) witness, Dr. Costa, further supports my conclusion. Costa Deposition at 95:20-96:9 (stating that the cleavage step produces a 5′ phosphate on the end of the extended probe, and that there is no difference between the cleavage step in the one-base and two-base-encoding formats of the SOLiD System); 98:6-11 (stating that the cleavage step in subsequent cycles also produces a 5′ phosphate); 107:3-22 (stating that the cleavage step in the two-base-encoding SOLiD System method produces a 5′

**83**

phosphate on the end of the extended universal seq primer in each cycle). I have also reviewed a

document that supports my conclusion. AB00132599-00132688 at AB00132637 (3rd drawing in

diagram, labeled "3. Cleave").

     **5.**    **"repeating steps (b), (c), and (d) until a sequence of nucleotides in the target polynucleotide is determined"**

     **a.**    **Relevant Claim Construction**

201.    I understand that Judge Alsup has construed the term "repeating steps (b), (c) and (d)

until a sequence of nucleotides in the target polynucleotide is determined" to "have its ordinary

and plain meaning." (Docket No. 133 at 17, lines 12-13). I have applied this construction in the

opinions set out below.

     **b.**    **The one-base-encoding SOLiD System method satisfies step (e) of claim 1 of the '341 patent**

202.    Based on the information provided in AB's documents describing its SOLiD System and

on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD

System in the one-base-encoding format also satisfies the limitations in step (e) of claim 1, both

literally and by equivalence.

203.    As discussed above, the AB documents and testimony I have reviewed establish that the

one-base-encoding SOLiD System method involves repeated cycles of ligation,

visualization/identification, and cleavage. I incorporate herein by reference my analysis from

above regarding each of these steps. I conclude that the SOLiD System method, in its one-base-

encoding format, repeatedly practices each of steps b, c, and d of claim 1 of the '341 Patent as

they have been construed by the Court or according to the understanding of one of ordinary skill

in the art at the time the patent application was filed, which satisfies step (e) of claim 1 of the

'341 Patent. I have reviewed AB documents and testimony which support my conclusion. For

example, in a document marked AB00245396-00245403, entitled "APG Process Technical

**84**

Brief: The Supported Oligo Ligation Detection (SOLiD) Process for Massively Parallel Sequencing by Stepwise Ligation," at AB00245398- AB00245400, AB states that, for a given sequencing primer, the one-base-encoding method of the SOLiD System consists of the following steps: "A. Add a sequencing primer," "B. Add a pool of fluorescently labeled probes," "C. Add the ligase," "D. Wash the slide," "E. Image the slide," "F. Cleave off the probe's dye and religate another probe," and "G. Repeat the cycle steps from B to F." As discussed above, which analysis I incorporate herein by reference, Steps B and C involve ligating an extension oligonucleotide probe to the end of the sequencing primer, or the end of a sequencing primer that was previously extended. The SOLiD System's performance of these two steps satisfies step (b) of claim 1 of the '341 Patent. Step (e) of claim 1 of the '341 Patent involves visualization of the label attached to the one-base-encoding probe. As discussed above, this step identifies a nucleotide in the target polynucleotide that is complementary to the labeled ligation probe that was ligated in each cycle. The SOLiD System's performance of this step satisfies step (c) of claim 1 of the '341 Patent. As discussed above, Step F involves the cleavage of the phosphorothiolate linkage in the labeled ligation probes. This cleavage produces a $5'$ phosphate, which is an extendable probe terminus, at a different location on the extended sequencing primer in each cycle. The SOLiD System's performance of this step satisfies step (d) of claim 1 of the '341 patent. Step G involves the repetition of steps B to F. The SOLiD System's performance of this step satisfies step (e) of claim 1 of the '341 patent.

        c.      **The two-base-encoding SOLiD System method satisfies step (e) of claim 1 of the '341 patent**

204.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD

System in the two-base-encoding format also satisfies the limitations in step (e) of claim 1, both literally and by equivalence.

205.    As discussed above, the AB documents and testimony I have reviewed establish that the two-base-encoding SOLiD System method involves repeated cycles of ligation, visualization/identification, and cleavage. I conclude that the SOLiD System method, in its two-base-encoding format, repeatedly practices each of steps b, c, and d of claim 1 of the '341 Patent as they have been construed by the Court or according to the understanding of one of ordinary skill in the art at the time the patent application was filed, which satisfies step (e) of claim 1 of the '341 patent. I have reviewed AB documents and testimony which support my conclusion. For example, AB00132599-00132688 at AB00132637 (4th drawing in diagram, labeled "4. Repeat Ligation, Image, Cleave.") and the AB00007541 animation further support my conclusion. This animation shows the steps of the two-base-encoding SOLiD System method – ligation, visualization, and cleavage – are repeated in each round of ligation cycles.

> **C.    The SOLiD System infringes claim 2 of the '341 patent**

206.    I have reviewed and analyzed claim 2 in the '341 Patent.

207.    Claim 2 of the '341 patent recites: "The method of claim 1 wherein each extension probe has a chain-terminating moiety at a terminus distal to said initializing oligonucleotide probe."

208.    I understand that Judge Alsup has construed the term "initializing oligonucleotide probe" to mean "the oligonucleotide to which the first extension oligonucleotide probe is first ligated." (Docket No. 133 at 10, lines 3-4). I have applied this construction of "initializing oligonucleotide probe" in the opinions set out below. With regard to the remaining terms, I have construed the terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification.

209.    As discussed above concerning the structure of AB's one-base and two-base-encoding labeled ligation probes in the context of the '119 patent, the evidence and testimony that I have reviewed establishes that both the one-base and two-base-encoding labeled ligation probesmade by or on behalf of AB, used, and/or sold for use in the SOLiD System have a hydroxyl group at the 5′ end. A hydroxyl group is a chain-terminating moiety in the context of the probes used in the SOLiD System. The 5' hydroxyl on the one-base and two-base-encoding probes is at "a terminal distal to said initializing oligonucleotide probe." It is therefore my opinion that the operation of the SOLiD System in either the one-base or two-base-encoding formats satisfies all limitations of claim 2 of the '341 patent, both literally and by equivalence.

### D.    The SOLiD System infringes claim 6 of the '341 patent

210.    I have reviewed and analyzed claim 6 in the '341 Patent.

211.    Claim 6 of the '341 patent recites: "The method of claim 2 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step."

212.    I understand that Judge Alsup has construed the term "extended oligonucleotide probe" to mean "an initializing oligonucleotide probe effectively extended by one or more nucleotides . . . ." (Docket No. 133 at 13, lines 3-4). I have applied this construction in the opinions set out below.

213.    I have construed the term "extendable terminus" to mean "a chemical group, such as a terminal 5′ phosphate and/or terminal 3′ hydroxyl group, capable of forming a covalent bond with another nucleotide." I have construed "capping" to mean "removing or rendering non-functional an extendable terminus." With regard to the remaining terms, I have construed the

terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification.

214.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies all of the limitations of claim 6 of the '341 patent, both literally and by equivalence.

215.    I have reviewed a number of AB documents that support my opinion. For example, step 2 of the diagram in AB00187481, on left side of the poster describing the two-base-encoding SOLiD System sequencing method, which states "phosphatase cap unextended strands." I understand this to mean that the SOLiD System method uses a phosphatase enzyme to remove the extendable terminus from any universal seq primer that did not have a labeled ligation probe ligated to it during the first ligation step. I have reviewed several other AB documents with similar descriptions of a capping step. *See*, *e.g.*, AB00132599-00132688 at AB00132637 (showing step 2 is "image & cap"); AB00276605-276684 at AB00276628 (stating that "[f]ollowing the ligation step, a phosphatase step is used to cap any unfinished strands"). I also note that a phosphatase enzyme is sold in the SOLiD System Sequencing Kits (AB00000803) and that a phosphatase step was performed following the ligation step and prior to the imaging step during the demonstration of the SOLiD System that I observed. Finally, AB's 30(b)(6) witness testified that a phosphatase enzyme is used to remove the phosphate group from the end of sequencing primers or extended sequencing primers that did not participate in the ligation reaction for a given cycle, so as to prevent de-phasing of sequence information. Costa Deposition at 104:2-105:16. Because the '341 specification teaches that the "capping" step can be performed

by use of a phosphatase,[3] I conclude that both formats of the SOLiD System satisfy all the claim limitations of claim 6.

E.    The SOLiD System infringes claim 7 of the '341 patent

216.    Claim 7 of the '341 patent recites: "The method of claim 2 wherein said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe." I understand that Judge Alsup has construed the term "extended oligonucleotide probe" to mean "an initializing oligonucleotide probe effectively extended by one or more nucleotides . . . ." (Docket No. 133 at 13, lines 3-4). I have applied this construction in the opinions set out below. I have construed the term "regenerating" to mean "generating." With regard to the remaining terms, I have construed the terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification.

217.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 7 of the '341 patent, both literally and by equivalence.

218.    I have already discussed the chemical structure of AB's one-base and two-base-encoding labeled ligation probes. In the interests of space, I incorporate by reference all analysis and evidence discussed above pertaining to these probes, and in particular the phosphorothiolate bond linking the 3′ and 5′ portions of the probes. In summary, the phosphorothiolate linkage in the AB ligation probes, whether one-base or two-base-encoding, links the 3′ and 5′ portions of

---

[3] *See*, *e.g.*, Col. 11, lines 13-18 ("A capping step can be included . . . by removing any remaining 5′ monophosphates by treatment with a phosphatase.").

the probes and is cleaved using $AgNO_3$ during each round following the visualization step. thus

satisfying the limitations of claim 7. AB's 30(b)(6) witness, Dr. Costa, testified that the

phosphorothiolate bond is a chemically scissile internucleosidic linkage that is cleaved in order

to generate an extendable terminus on the extended universal sequencing primer, and that there is

no difference in the cleavage step between the one-base and two-base-encoding SOLiD System

methods. Costa Deposition at 84:11-86:14; 95:20-96:9.

### F.    The SOLiD System infringes claim 8 of the '341 patent

219.    Claim 8 recites: "The method of claim 7 wherein said chemically scissile

internucleosidic linkage is a phosphoramidate." I have construed the term "phosphoramidate" as

"a phosphoramidate chemical moiety." I have construed this term as a person of ordinary skill in

the art would have construed them at the time the patent application was filed, based on the

disclosure in the specification. With regard to the remaining terms, I have also construed the

terms as a person of ordinary skill in the art would have construed them at the time the patent

application was filed, based on the disclosure in the specification.

220.    Based on the information provided in AB's documents describing its SOLiD System and

on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD

System in either the one-base or two-base-encoding formats satisfies the limitations of claim 8 of

the '341 patent under the doctrine of equivalents.

221.    I have already discussed the chemical structure of AB's one-base and two-base-encoding

labeled ligation probes. In the interests of space, I incorporate by reference all analysis and

evidence discussed above pertaining to these probes, and in particular the equivalence of the

claimed phosphoramidate linkage and the phosphorothiolate linkage used in the AB probes. In

summary, the AB labeled ligation probes, both one-base and two-base-encoding, contain a

chemically scissile phosphorothiolate linkage. Although this linkage is not literally what is claimed in claim 8 of the '341 patent, one of ordinary skill in the art at the time the '341 patent application was filed would have considered the substitution of the phosphorothiolate linkage for the claimed linkage to be an insubstantial difference. Furthermore, one of ordinary skill at that time would have understood that these two chemically scissile internucleosidic linkages perform substantially the same function in substantially the same way to achieve substantially the same result.

**G.    The SOLiD System infringes claim 11 of the '341 patent**

222.    Claim 11 of the '341 patent recites:

11. The method of claim 1, wherein step (a) includes providing, in separate aliquots, a plurality of distinct target-primer duplexes, each distinct duplex comprising an initializing oligonucleotide primer hybridized to a target polynucleotide, wherein the target polynucleotide in each duplex is the same, but the initializing oligonucleotide in each duplex is bound to a different sequence of the target polynucleotide; and steps (b) to (e) are carried out independently on each aliquot.

I understand that Judge Alsup has construed the term "initializing oligonucleotide probe" to mean "the oligonucleotide to which the first extension oligonucleotide probe is first ligated." (Docket No. 133 at 10, lines 3-4). I have applied this same construction to the term "initializing oligonucleotide primer" and "initializing oligonucleotide" in the opinions set out below. I have construed the term "providing, in separate aliquots" to mean "providing, in different samples or fractions." I have construed this term as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification. With regard to the remaining terms, I have construed the terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification.

223.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 11 of the '341 patent, both literally and by equivalence.

224.    The sample preparation steps used in the SOLiD System produce separate beads which are then affixed to a slide. ILL051205-051241 at ILL051215-216. These sample preparation steps are the same whether the beads are to be used in a one-base or two-base-encoding format. Each of these beads is a physically separate, different sample or fraction. This satisfies the limitation in claim 11 of "providing, in separate aliquots." Furthermore, sample preparation produces multiple beads having the exact same sequence, although the number of such beads varies depending on the complexity of the sample polynucleotide. Within the sample polynucleotide, moreover, certain regions are more likely to be found on multiple beads as compared to others. See, *e.g.*, AB00288253-00288273 at AB00288255-288264 (discussing depth of coverage obtained in resequencing of BAC1065 of almost 30-fold, on average). A small or non-complex genome may have hundreds of beads with the same sequence. Thus, it is more likely than not that any given preparation of beads will have two or more beads with the same target polynucleotide. Costa Deposition at 44:14-24 and 45:16-46:14. For these beads, the limitation of claim 11 that "the target polynucleotide in each duplex is the same" is satisfied. Because a SOLiD System sequencing run uses multiple primers that hybridize to different portions of the target polynucleotide,[4] over the course of a sequencing run, distinct probe-target

---

[4] Such as, for example, the Tag 1 Seq Primers A, B, & C and the Tag 2 Seq Primers A1, A2, B1, B2, C1 and C2 primers sold for use in a commercial embodiment of the SOLiD System, discussed in detail previously, which analysis is incorporated herein by reference, in the interests of space.

duplexes "comprising an initializing oligonucleotide primer hybridized to a target polynucleotide, wherein the target polynucleotide in each duplex is the same, but the initializing oligonucleotide in each duplex is bound to a different sequence of the target polynucleotide" are generated, with steps (b)-(e) carried out separately on each, which satisfy the limitations of claim 11 for both formats of the SOLiD System. The Flash animation "aga.swf," ILL050324, and the AB00007541 animation show that the SOLiD System method involves using multiple sequencing primers, all of which hybridize to a different spot on the target polynucleotide. These sequencing primers are initializing oligonucleotides because they are the "oligonucleotides to which the first extension probe is first ligated," in accordance with the Court's construction. See also AB00144354-00144433 at AB00144403 ("Another important feature of the method is the ability to strip off the chain-ligated extension products and reset the reaction by hybridizing a new primer that terminates at a different position from the first primer."); AB00245396-00245403 at AB00245401-00245402 (showing the SOLiD System uses multiple sequencing primers that hybridize to different portions of the same target polynucleotide); AB00132599-00132688 at AB00132637 (showing that multiple primers are used in the two-base-encoding system).

   **H.    The SOLiD System infringes claim 12 of the '341 patent**

225.    Claim 12 recites: "The method of claim 11 wherein for each aliquot, said extension oligonucleotide probe has a chain-terminating moiety at a terminus distal to said primer." I have construed the term "said primer" to refer to an "initializing oligonucleotide primer," and have applied Judge Alsup's construction for "initializing oligonucleotide probe" in the opinions set forth below. With regard to the remaining terms, I have construed these terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed,

based on the disclosure in the specification, and as previously construed above, where appropriate.

226.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 12 of the '341 patent, both literally and by equivalence.

227.    As discussed in detail above concerning the structure of AB's one-base and two-base-encoding labeled ligation probes in the context of the '119 patent, the evidence and testimony that I have reviewed establishes that both the one-base and two-base-encoding labeled ligation probes made by or on behalf of AB, used, and/or sold for use in the SOLiD System have a hydroxyl group at the 5′ end. In the interests of space, I incorporate by reference all analysis and evidence discussed above pertaining to this issue. In summary, a hydroxyl group is a chain-terminating moiety in the context of the SOLiD System. The 5' hydroxyl on the one-base and two-base-encoding probes is at "a terminal distal to said initializing oligonucleotide probe." It is therefore my opinion that the operation of the SOLiD System in either the one-base or two-base-encoding formats satisfies all limitations of claim 12 of the '341 patent.

       **I.**    **The SOLiD System infringes claim 16 of the '341 patent**

228.    Claim 16 recites: "The method of claim 11 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step." I understand that Judge Alsup has construed the term "extended oligonucleotide probe" to mean "an initializing oligonucleotide probe effectively extended by one or more nucleotides . . . ." (Docket No. 133 at 13, lines 3-4). I have applied this construction in the opinions set out below. With regard to the remaining terms, I have construed these terms

as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification, and as previously construed above, where appropriate.

229.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 16 of the '341 patent, both literally and by equivalence.

230.    In the interest of space, I incorporate the analysis and evidence referred to above in my infringement analysis for claim 6. In summary, each cycle of the SOLiD System method, in either one-base or two-base-encoding format, includes a phosphatase "capping" step to remove the extendable 5′ phosphate from the end of either a universal seq primer or a previously extended universal seq primer.

**J.      The SOLiD System infringes claim 17 of the '341 patent**

231.    Claim 17 recites: "The method of claim 11 wherein for each aliquot, said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe." I understand that Judge Alsup has construed the term "extended oligonucleotide probe" to mean "an initializing oligonucleotide probe effectively extended by one or more nucleotides . . . ." (Docket No. 133 at 13, lines 3-4). I have applied this construction in the opinions set out below. With regard to the remaining terms, I have construed these terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification, and as previously construed above, where appropriate.

232.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 17 of the '341 patent, both literally and by equivalence. In the interest of space, I incorporate the analysis and evidence referred to above in my infringement analysis for claim 7. In summary, AB's documents and the testimony of its 30(b)(6) witness demonstrate that the one-base or two-base-encoding formats of the SOLiD System method both regenerate an extendable 5′ phosphate terminus by cleaving a chemically scissile internucleosidic phosphorothiolate linkage in the extended universal seq primers following each ligation and visualization step.

### K.    The SOLiD System infringes claim 18 of the '341 patent

233.    Claim 18 recites: "The method of claim 17 wherein said chemically scissile internucleosidic linkage is a phosphoramidate." With regard to the terms in this claim, I have construed these terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification, and as previously construed above, where appropriate.

234.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of claim 18 of the '341 patent under the doctrine of equivalents.In the interest of space, I incorporate the analysis and evidence referred to above in my infringement analysis for claim 8. In summary, the use of the phosphorothiolate linkage in AB's one-base and two-base-encoding labeled ligation probes infringes claim 18 under the doctrine of equivalents, for the reasons and based on the evidence cited previously.

235.    In summary, the SOLiD System made, used, and sold by AB and used by its customers infringes the asserted claims of the '341 patent, as discussed above. In particular, the infringing products include the "SOLiD Analyzer" (Catalog No. 4387830), additional equipment with the Catalog Numbers listed on AB00000801-802, and the reagent and probe kits with the Catalog Numbers listed on AB00000803-804, including, but not limited to, the necessary reagent and slide kits for sequencing on the SOLiD Analyzer, such as Catalog Nos. 4392147, 4387896, 4387897, 4387919, and 4391888. *See also* AB00045942-944, AB00137210-216; AB00137217; and AB00047983. In addition, the SOLiD System 2.0 also infringes all of the asserted claims of the '341 patent, literally and/or by equivalence. In particular, additional infringing products include those listed and described in the following documents: AB00007876-78777 (listing product names and catalog numbers for equipment and reagents for use in SOLiD System 2.0 version, including, but not limited to, the SOLiD Analyzer (Cat. No. 4387830); SOLiD Sequencing Probes Kit V2 containing "Probe Mix A" (Cat. No. 4400412); SOLiD Fragment Library Sequencing Kit V2 (Cat. No. 4400467)). In addition, the SOLiD Systems used by AB at its Foster City, CA, and Beverly, MA, and listed on AB00067015-00067016, also infringe the asserted claims of the '341 patent.

## XII.    THE SOLID SYSTEM INFRINGES THE '597 PATENT

236.    I have reviewed the specification and claims of the '597 Patent.

237.    Claim 1 of the '597 patent recites:

1. A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

(a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

(b) identifying one or more nucleotides of the polynucleotide;

and

(c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

238.    Although the two claims use some similar language, claim 1 in the '597 Patent differs in several respects from claim 1 in the '341 Patent. For example, while claim 1 in the '341 Patent requires that steps b, c, and d (encompassing ligation, identification, and regeneration) be repeated within each "cycle" of the claimed method, claim 1 in the '597 Patent only requires that steps a and b therein (encompassing ligation and identification) be repeated in each cycle. As a consequence, claim 1 in the '597 Patent does not require, for example, that an extendable terminus be "regenerated" on the extended duplex during each cycle. In other words, claim 1 in the '597 Patent does not require that more than one "extension oligonucleotide probe" be incorporated into a given "extended duplex" through multiple cycles.

239.    I understand Judge Alsup has construed the term "identifying" in claim 1 of the '341 patent to mean "within each cycle determining the identity of a base in the target polynucleotide." (Docket No. 133 at 16, lines 3-4). I further understand that Judge Alsup has construed the term "initializing oligonucleotide probe" to mean "the oligonucleotide to which the first extension oligonucleotide probe is first ligated." (Docket No. 133 at 10, lines 3-4). I have applied these constructions in the opinions set out below. With regard to the remaining terms, I have construed the terms as a person of ordinary skill in the art would have construed them at the time the patent application was filed, based on the disclosure in the specification.

240.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of step (a) of claim 1 of the '597 patent, both literally and by equivalence.

98

241.    As discussed above, I have reviewed a Flash animation entitled "aga.swf," ILL050324, and the AB00007541 animation, which show the steps of the one-base and two-base-encoding formats of the SOLiD System. These animations show that the SOLiD System ligates an oligonucleotide to the end of the universal seq primer, thereby increasing its length, extending the universal seq primer along the polynucleotide attached to the bead, and forming an extended duplex. This ligation "extend[s] an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex," which satisfies step (a) of claim 1 of the '597 patent. I have also reviewed documents such as AB00137621-00137680 at AB00137634-137648 and ILL051205-051241 at ILL051218-ILL051233, which also show the steps of the one-base and two-base-encoding formats of the SOLiD System. Specifically, extension of an initializing oligonucleotide along a polynucleotide by ligating an oligonucleotide thereto to form an extended duplex is shown at AB00137637 and AB000137645 (one-base-encoding method) and ILL051220 and ILL051229 (two-base-encoding method). AB's 30(b)(6) witness also gave testimony that supports my conclusion. Costa Deposition at 90:8-20 and 100:9-101:1 (extension of universal seq primer by ligation of oligonucleotide to form extended duplex in one-base system); 103:20-104:1 and 108:8-14 (extension of universal seq primer by ligation of oligonucleotide to form extended duplex in two-base system).

242.    Step (b) of claim 1 of the '597 patent requires "identifying one or more nucleotides of the polynucleotide." Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of step (b) of claim 1 of the '597 patent, both literally and by equivalence.

243.    In the interest of space, I incorporate the analysis and evidence referred to above in my infringement analysis for claim 1 of the '341 patent, where appropriate. In particular, I incorporate herein by reference the analysis and evidence concerning the identification of nucleotides for the one-base and two-base-encoding formats of the SOLiD System. In summary, as shown by AB's documents and the testimony of its 30(b)(6) witness, the color image obtained during the visualization step directly identifies the nucleotide at the interrogation position in a one-base-encoding probe, and thereby identifies its complement in the target, which is a "nucleotide[] of the polynucleotide." The color image containing information about a dinucleotide obtained during the visualization step of the two-base-encoding format SOLiD System method identifies a nucleotide of the polynucleotide when the identity of one of the bases of the dinucleotide is known, which first occurs whenever the "0,1" position is interrogated, which is typically the first cycle of the last round of ligations. Even if the system was not found to literally satisfy the limitation because the identity of the base in question is not recorded in a data file within each cycle, the function, way, and result of the identification by the system is the same as if a base were recorded to a data file within each cycle. In each case, the function is to identify a base in the polynucleotide. In each case, the way in which this is done is by analyzing data obtained within a cycle in light of previously gathered data and other known parameters, such as the color encoding scheme used or the identity of bases in the initializing oligonucleotide. In each case, the result of this analysis is the determination of the identity of a base without requiring access to data generated subsequent to the cycle. The *timing* of the analysis of the data and the recording of the identified base does not change the function, way, or result of this portion of the process.

**100**

244.    Based on the information provided in AB's documents describing its SOLiD System and on the testimony of AB's 30(b)(6) witness, Dr. Costa, in my opinion the use of the SOLiD System in either the one-base or two-base-encoding formats satisfies the limitations of step (c) of claim 1 of the '597 patent, both literally and by equivalence.

245.    As discussed above, the SOLiD System, in both its one-base and two-base-encoding formats, involves repeated cycles of ligation, visualization, and cleavage, as shown in the Flash animations of the SOLiD System that AB has made available on its website and/or produced during discovery. The repetition of these steps is also shown by other AB documents and the testimony of its 30(b)(6) witness, discussed above during my infringement analysis of step (e) of claim 1 of the '341 patent, which I incorporate herein by reference in the interests of space. The repeated ligation and visualization steps characterizing both formats of the SOLiD System satisfy the limitations for step (c) of claim 1 of the '597 patent.

## XIII.    AB HAS MADE, USED, OFFERED FOR SALE AND/OR SOLD THE SOLID SYSTEM

246.    Based on my review of AB's documents and the testimony of AB's 30(b)(6) witness, Dr. Costa, AB has made and used multiple apparatus for carrying out the SOLiD System method.

247.    AB has made a large number of SOLiD System apparatus for its own use, all of which are still operational and in use for performing DNA sequencing. Costa Deposition at 34:17-36:2.

248.    All of the instruments at AB's Foster City, CA, and Beverly, MA, facilities are currently being used to perform DNA sequencing using the two-base-encoding SOLiD System format. Costa Deposition at 36:3-6.

249.    Two of the instruments, apparently named "Amy" and "Flo," were used by Agencourt to perform DNA sequencing using the one-base-encoding SOLiD format. Costa Deposition at 36:7-21.

**101**

250.    There is no difference between the instruments used to do one-base and two-base encoding sequencing. The only difference is the reagents and software used. Costa Deposition at 36:7-37:10.

251.    AB has also sold multiple SOLiD Systems to various customers. Costa Deposition at 14:5-18:12 and AB00131100-00131136 at 00131104 (listing potential customers and customers in the Early Access Program).

252.    AB has sold reagent kits for use in the SOLiD System that include the labeled ligation probes discussed above. Costa Deposition at 111:19-113:12; AB00000803-804. AB apparently does not sell these kits for any purpose other than use in the SOLiD System. Costa Deposition 113:13-15.

253.    AB provides a formal training program for its customers as part of the purchase price of the SOLiD System. Costa Deposition at 20:4-16; 21:19-22:13. AB00131100-00131136 at AB00131107.

254.    AB's customers are contractually obligated to perform acceptance tests on the SOLiD System, in which they determine the sequence of DNA samples to ascertain whether the machine is operating within acceptable parameters. Costa Deposition at 24:24-27:1; AB00045214-00045231. For example, in its Purchase Agreement with AB for the SOLiD System, Baylor College of Medicine agreed to operate the SOLiD System using reagents supplied by AB to sequence control DNA samples from the DH10b strain of *E. coli*. Costa Deposition at 27:6-28:22; AB00045214.

255.    AB trains its customers to operate the system in accordance with the instructions provided with the SOLiD System, using reagents supplied by AB, and AB has no reason to

believe its customers operating the SOLiD System other than in accordance with the training and instructions provided by AB. Costa Deposition at 29:18-30:11.

256.    AB is aware and believes that its customers have operated the SOLiD System in accordance with the instructions and training provided by AB. Costa Deposition at 30:4-7.

257.    The warranty for the SOLiD System does not cover the system if non-AB reagents are used in the system. Costa Deposition at 28:23-29:17; AB00045223.

258.    AB sold the SOLiD System to the Broad Institute and trained personnel there to operate the SOLiD System in accordance with the instructions in the User Guide and other manuals. Costa Deposition at 32:1-34:8; AB00138981-00139015; AB00138939-00138956; AB00139492-139507; AB0000145315-00145336. The Broad Institute personnel used the SOLiD System in accordance with the training they received and were able to sequence DNA. Costa Deposition 34:9-16.

259.    AB sold the SOLiD System to Washington University, which operated the SOLiD System to perform DNA sequencing. AB000145782-00145789; AB00145773-00145781.

260.    In summary, the SOLiD System made, used, and sold by AB and used by its customers infringes the asserted claims of the '597 patent, as discussed above. In particular, the infringing products include the "SOLiD Analyzer" (Catalog No. 4387830), additional equipment with the Catalog Numbers listed on AB00000801-802, and the reagent and probe kits with the Catalog Numbers listed on AB00000803-804, including, but not limited to, the necessary reagent and slide kits for sequencing on the SOLiD Analyzer, such as Catalog Nos. 4392147, 4387896, 4387897, 4387919, and 4391888. *See also* AB00045942-944, AB00137210-216; AB00137217; and AB00047983. In addition, the SOLiD System 2.0 also infringes all of the asserted claims of the '341 patent, literally and/or by equivalence. In particular, additional infringing products

include those listed and described in the following documents: AB00007876-78777 (listing product names and catalog numbers for equipment and reagents for use in SOLiD System 2.0 version, including, but not limited to, the SOLiD Analyzer (Cat. No. 4387830); SOLiD Sequencing Probes Kit V2 containing "Probe Mix A" (Cat. No. 4400412); SOLiD Fragment Library Sequencing Kit V2 (Cat. No. 4400467)). In addition, the SOLiD Systems used by AB at its Foster City, CA, and Beverly, MA, and listed on AB00067015-00067016, also infringe the asserted claims of the '341 patent, literally and/or by equivalence. In addition, the SOLiD Systems used by AB at its Foster City, CA, and Beverly, MA, and listed on AB00067015-00067016, also infringe the asserted claims of the '597 patent, either literally or under the doctrine of equivalents, as discussed above.

261.    This Statement is based on information currently available to me. I reserve the right to continue my investigation and study, which may include a review of documents and information that may yet be produced, as well as deposition testimony for which transcripts are not yet available and that may yet be taken in this action, or any other information provided or adduced in this action, including at trial. Therefore, I expressly reserve the right to expand or modify my opinions as my investigation and study continues, and to supplement my opinions in response to any additional information that becomes available to me, to any matters raised by the Plaintiff or its witnesses, or other opinions provided by the Plaintiff's experts. I also understand that the Court has provided a "working" construction of the disputed terms in the asserted claims in this action, and I reserve the right to expand or modify my opinions if a new construction of a claim term is offered by either party in this case, or if the Court changes the construction of a claim term.

262.    To help the jury understand the assays and experimental data described in documents cited in this Statement, as well as the concepts discussed herein, as necessary I will explain the experimental methodology, figures, and tables, and will refer to appropriate demonstratives and graphic aids derived from this information. In connection with my testimony, I may rely upon certain graphic or demonstrative exhibits including those cited herein or attached hereto and perhaps other demonstratives and graphics that have not yet been prepared.

Signed this 30 day of May, 2008, in Bedford, Massachusetts.

Keith C. Backman, Ph.D.

Exhibit 1

# CURRICULUM VITAE

# KEITH CAMERON BACKMAN

Birth Date:          February 22, 1947 at Utica, New York

Citizenship:         United States

Address:             53 Carlisle Road
                     Bedford, MA 01730

Telephone:           (781) 271 1461

Telefax:             (781) 271 1461

E-mail:              backman.phd@comcast.net


Occupation:          Retired; Occasional Consultant to the Biotechnology Industry
                     Specializing in Technology Evaluation and Intellectual Property
                     Litigation


Education:           B.S. in Chemistry with Honors: 1969
                     University of Chicago,
                     Chicago, Illinois.
                     Research Advisor: Dr. George Holzwarth

                     Ph.D. in Biophysics: 1977
                     Harvard University,
                     Cambridge, Massachusetts.
                     Thesis Advisor: Dr. Mark Ptashne


                     Helen Hay Whitney Postdoctoral Fellow, and Charles A. King Trust
                     Research Fellow

                          1977-1979: University of California, San Francisco.  Advisor: Dr.
                          Herbert Boyer

                          1979-1981: Massachusetts Institute of Technology, Cambridge,
                          Massachusetts.  Advisor: Dr. Boris Magasanik

# Career History

1.      1992 to present: Consultant.  Activities and accomplishments: Provide advice, analysis and testimony for institutions in the biotechnology industry and their counsel with respect to intellectual property litigation.  Evaluate extant art and formulate strategic approaches to address the legally protected status of intellectual property being litigated.

2.      1992 to 2000:  President, Pleasant Hill Diagnostics, Inc.  "PHD" was a corporate vehicle for development and commercialization of technology and intellectual property invented by myself.  Activities and accomplishments: Found and organize company, negotiate and acquire rights to novel patented technology, oversee preparation of business plan, manage patenting procedure for in-licensed technology, advance the state of the technology, operate all aspects of the corporation (filings, taxes, etc.).

3.      1991 to 1995: Vice President, Research and Development, OmniGene, Inc.  Responsibilities: Conception, marketing, funding, staffing, and management of research programs in support of overall company business goals.  Areas of technical expertise include molecular mechanisms in the control of prokaryotic gene expression, recombinant DNA techniques, the optimization of gene expression, the genetic regulation of physiological processes, nucleic acid physical chemistry, use of nucleic acid hybridization technology in applications for medical and industrial diagnostics.  Principal Investigator on one Phase I and one Phase II SBIR grants.

4.      1991 to 1995: Member, Board of Directors of OmniGene, Inc.  Activities and accomplishments: Helped organize and lead a buyout of businesses from BioTechnica International, maintaining both outside business arrangements and internal employee support and participation.  Participated in structuring the sale of business groups to spin-off companies in 1995, and orderly wind down of operations at OmniGene.

5.      1995: Corporate Secretary, Treasurer, and CFO, OmniGene, Inc.  Responsibilities: Fiscal oversight of company operations, execution of financial transactions during shut down of operations, including payroll, accounts payable, and bank accounts.  Annual budget of about $1,300,000.  Also responsible for administration of benefits and other human resources aspects of operations.

6.      1985 to 1991: Vice President, Research and Development, Biochemical Products and Processes, BioTechnica International, Inc.  Activities and accomplishments: Invented and led development of a commercial processes for phenylalanine and tryptophan production, currently licensed to European producers.  Managed and set technical goals for scientific group of six to ten people (about one half of whom were Ph.D.'s) with an annual budget of about $1,500,000.

7.      1988 to 1991: Senior Vice President, Technical Affairs, BioTechnica Diagnostics, Inc.  Activities and accomplishments: Invented and led development of Ligase Chain Reaction DNA probe diagnostic technology, subsequently sold to Abbott Laboratories.  Assembled, managed, and set technical goals for scientific group of ten to sixteen people

(about one half of whom were Ph.D.'s) with an annual budget of about $2,000,000. Principal Investigator on several Phase I SBIR grants.

8.    1986 to 1987:  Member, Board of Directors of BioTechnica International, Inc.

9.    1983 to 1987: Chairman, Scientific Oversight Committee, BioTechnica International, Inc. Activities and accomplishments: Provided leadership of the scientific group that co-ordinated hiring, promotion, and resource assignment within the company.  "SOC" served as an interface to outside scientific advisors, maintained harmonious operating environment for group interfaces, and provided scientific judgement for senior management.

10.    1982 to 1985:  Program Director and Senior Scientist, Biosynthesis/Biocatalysis Program, BioTechnica International, Inc.  Activities and accomplishments: Set up first laboratory facilities and assembled first research group at BioTechnica.  Brought in first research contracts and developed first product sold.

11.    1978 to 1981:  Consultant for Genentech, Inc.  Activities: Participated in scientific discussions of company objectives; helped identify, recruit, and review initial scientific staff appointments.

## Companies founded

1. BioTechnica International, Inc., 1981. One of a group of twelve scientists and businessmen.

2. OmniGene, Inc., 1991.  One of a group of five scientists and businessmen.

3. Pleasant Hill Diagnostics, Inc., 1992.  Sole founder.

## Other professional activities

1. Admitted as a qualified expert witness in the field of molecular biology; Federal District Court, Trenton, NJ.  November 1993.

2. Member, National Institutes of Health Study Section in Bacteriology and Mycology reviewing SBIR Grant Applications.  December 1993.

3. Member, National Institutes of Health Study Section (Multidisciplinary Special Emphasis Panel) reviewing SBIR and STTR Grant Applications.  November, 1995.

4. Member, National Institutes of Health Study Section reviewing SBIR and STTR Grant Applications.  July, 1996.

5. Admitted as a qualified expert witness in the field of molecular biology; Federal District Court, Oakland, CA.  November 2006.

## Community service

1. Member, Town Meeting Committee, Bedford, MA.  1983 to 1985.  Worked to develop and implement means of increasing attendance at Town Meeting, the form of local government in Bedford.  Committee recommendations were implemented and continue to be used by the Town Meeting.

2. Volunteer soccer coach, Bedford Recreational Soccer and Traveling Soccer teams.  1993 to 2002.  Teach individual skills and teamwork to youth participants in league soccer; organize and arrange practices and games, including scheduling, transportation, and parent support.

3. Member, Board of Directors, Town Center of Bedford, Inc.  2002 to present.  Vice Chairman, 2006 to present.  This non-profit corporation contributes to the maintenance and preservation of historic Town of Bedford properties by management of rental operations.

# LIST OF PUBLICATIONS, ABSTRACTS, AND PATENTS

# KEITH C. BACKMAN

## Publications

1. Holzwarth, G. and Backman, K.  Electrostatic Effects on Polyproline I-II Transitions. Biochemistry **8**, 833-887 (1969).

2. Maniatis, T., Ptashne, M., Backman, K., Kleid, D., Flashman, S., Jeffrey, A. and Maurer, R.  Recognition Sequences of Repressor and Polymerase in the Operators of Bacteriophage Lambda.  Cell **5**, 109-115 (1975).

3. Humayun, Z., Meyer, B., Sauer, R., Backman, K. and Ptashne, M.  Transcriptional and Translational Control of the Lambda Repressor Gene (cI). In Molecular Mechanisms in Control of Gene Expression, D.P. Nierlich, W.J. Rutter, and C.F. Fox, eds. (Academic Press, New York) pp. 67-73 (1976).

4. Ptashne, M., Backman, K., Humayun, M.Z., Jeffrey, A., Maurer, R., Meyer, B. and Sauer, R.T.  Autoregulation and function of a Repressor in Bacteriophage Lambda. Science **194**, 156-161 (1976).

5. Backman, K., Ptashne, M. and Gilbert, W.  Construction of Plasmids Carrying the cI Gene of Bacteriophage Lambda.  Proc. Natl. Acad. Sci. USA **73**, 4174-4178 (1976).

6. Backman, K., Hawley, D. and Ross, M.J.  Use of Phage Immunity in Molecular Cloning Experiments.  Science **196**, 182-183 (1977).

7. Backman, K.  Molecular Cloning of the Lambda Repressor Gene (cI).  Ph.D. dissertation, Harvard University (1977).

8. Backman, K., and Ptashne, M.  Maximizing Gene Expression on a Plasmid Using Recombination in vitro.  Cell **13**, 65-71 (1978).

9. Greene, P.J., Heyneker, H.L., Bolivar, F., Rodriguez, R.L., Betlach, M.C., Covarrubias, A., Backman, K., Russel, D.J. and Boyer, H.W.  A General Method for the Purification of Restriction Enzymes.  Nucleic Acids Research **5**,  2370-2380 (1978).

10. Backman, K., Betlach, M., Boyer, H.W. and Yanofsky, S.  Genetic and Physical Studies of the Replication of ColEl-type Plasmids.  Cold Spring Harbor Symp. Quant. Biol. **43**, 69-76 (1979).

11.    Sauer, R.T., Meyer, B.J., Pabo, C.O., Ptashne, M. and Backman, K.  The Regulatory Functions of the Lambda Repressor Reside in the Amino Terminal Domain.  Nature **279**, 396-400 (1979).

12.    Bolivar, F. and Backman, K.  Plasmids of E. coli as Cloning Vectors.  In Recombinant DNA,  Volume 65, Methods in Enzymology, R. Wu, ed. (Academic Press, New York) pp. 245-267 (1980).

13.    Backman, K.  A Cautionary Note on the Use of Certain Restriction Endonucleases with Methylated Substrates.  Gene **11**, 169-171 (1980).

14.    Roberts, T.M., Swanberg, S.L., Poteete, A., Reidel, G. and Backman, K.  A Plasmid Cloning Vector Allowing a Positive Selection for Inserted Fragments.  Gene **12**, 123-127 (1980).

15.    Backman, K., Chen, Y.-M. and Magasanik, B.  Physical and Genetic Characterization of the glnA-glnG Region of the Escherichia coli Chromosome.  Proc. Natl. Acad. Sci. USA **78**, 3743-3747 (1981).

16.    Chen, Y.-M., Backman, K. and Magasanik, B.  Characterization of a Gene, glnL, Whose Product is Involved in the Regulation of Nitrogen Utilization of Escherichia coli.  J. Bacteriol. **150**, 214-220 (1982).

17.    Ueno-Nishio, S., Backman, K. and Magasanik, B.  Regulation at the glnL Operator-Promoter of the Complex glnALG Operon of Escherichia coli.  J. Bacteriol. **153**, 1247-1251 (1983).

18.    Backman, K., Chen, Y.-M., Ueno-Nishio, S. and Magasanik, B.  The Product of glnL is Not Essential for the Regulation of Bacterial Nitrogen Assimilation.  J. Bacteriol. **154**, 516-519 (1983).

19.    Backman, K., and Boyer, H.W.  Tetracycline Resistance Determined by pBR322 is Mediated by One Polypeptide.  Gene **26**, 197-203 (1983).

20.    Backman, K., O'Connor, M.J., Maruya, A. and Erfle, M.  Use of Synchronous Site-specific Recombination in vivo to Regulate Gene Expression.  Bio/Technology **2**, 1045-1049 (1984).

21.    Backman, K. In vivo Events in the Generation of pBR322.  Nucleic Acids Res. **14**, 1542 (1986).

22.    Miller, J.E., Backman, K.C., O'Connor, M.J. and Hatch, R.T.  Production of Phenylalanine and Organic Acids By Phosphoenol pyruvate carboxylase-deficient mutants of Escherichia coli.  J. Industrial Microbiol. **2**, 143-149 (1987).

23.    Maruya, A., O'Connor, M.J. and Backman, K.  Genetic Separability of the Chorismate

Mutase and Prephenate Dehydrogenase Components of the Escherichia coli tyrA Gene Product.  J. Bacteriol. **169**, 4852-4853 (1987).

24.     Balakrishnan, R., and Backman, K.  Controllable Alteration of Cellular Genotype in Bacterial Cultures using an Excision Vector.  Gene **67**, 97-103 (1988).

25.     Backman, K., O'Connor, M.J., Maruya, A., Rudd, E., McKay, D., Balakrishnan, R., Radjai, M., DiPasquantonio, V., Shoda, D., Hatch, R. and Venkatasubramanian, K. Genetic Engineering of Metabolic Pathways Applied to the Production of Phenylalanine. Biochemical Engineering VI, Annals of the New York Academy of Sciences **589**, 16-24 (1990).

26.     Lauer, G., Rudd, E.A., McKay, D.L., Ally, A., Ally, D. and Backman, K.C.  Cloning, Nucleotide Sequence, and Engineered Expression of Thermus thermophilus DNA Ligase, a Homolog of Escherichia coli DNA Ligase.  J. Bacteriol. **173**, 5047-5053 (1991).

27.     Backman, K.  Ligase Chain Reaction: A Highly Sensitive Diagnostic Technology. In Biotechnology International 1992. (Century Press, London) pp. 276-279 (1991).

28.     Shimer, Jr., G.H. and Backman, K.C.  Ligase Chain Reaction.  In Non-radioactive Labelling and Detection of Biomolecules.  (Springer-Verlag, Heidelberg) pp.223-228 (1992).

29.     Balakrishnan, R., Frohlich, M., Rahaim, P.T., Backman, K., and Yocum, R.R.  Cloning and Sequence of the Gene Encoding Enzyme E-1 from the Methionine Salvage Pathway of Klebsiella oxytoca.  J. Biol. Chem. **268**, 24792-24795 (1993).

30.     Balakrishnan, R., Bolten, B. and Backman, K.C.  A Gene Cassette for Adapting Escherichia coli Strains as Hosts for att-Int Mediated Rearrangement and $p_L$ Expression Vectors.  Gene **138**, 101-104 (1994).

31.     Shimer, Jr., G.H. and Backman, K.C.  Ligase Chain Reaction.  Methods Mol. Biol.  **46**, 269-278 (1995).

32.     VanArsdell, S.W., DiFronzo, F., Backman, K.C. and Mahler, P.H.  Selling Biotechnology in the Dental Medicine Marketplace: the OmniGene Diagnostics DNA Probe Tests for Periodontal Pathogens.  Technol. Health Care **4**, 339-346 (1996).

## Letters and Reviews

1.     Backman, K.  Re: Comparison of DNA Probe and ELISA Microbial Analysis Methods and Their Association with Adult Periodontitis.  J. Peridontol.  **66**, 536-537 (1995).

2.     Backman, K.  The Advent of Genetic Engineering.  Trends in Biochem. Sci.  **26**, 268-270 (2001).

3.     Backman, K.  The Dangers of Mathematical Models.  Science 314, 419 (2006).

## Abstracts

1.     Venkat, K., Backman, K. and Hatch, R.T.  Genetic Manipulation of the Shikimate Pathway to Overproduce Aromatic Amino Acids.  Food Biotechnol. **4**, 547 (1990).
2.     Backman, K.  Ligase Chain Reaction: Diagnostic Technology for the 1990s and Beyond.  Clinical Chem. **38**, 457-458 (1992).

## United States Patents

1.     Ptashne, M. and Backman, K.  Protein Synthesis.  U.S. Patent No. 4,332,892  (1982).

2.     Ptashne, M. and Backman, K.  Fused Hybrid Gene.  U.S. Patent No. 4,418,149  (1983).

3.     Backman, K.  Regulated Protein Synthesis Using Site-Specific Recombination.  U.S. Patent No. 4,673,640  (1987).

4.     Backman, K. and Balakrishnan, R.  Controlled Gene Excision.  U.S. Patent No. 4,743,546  (1988).

5.     Backman, K. and Balakrishnan, R.  Enzyme Deregulation.  U.S. Patent No. 4,753,883 (1988).

6.     Backman, K.  Method of Biosynthesis and Cells Therefor.  U.S. Patent No. 4,839,286 (1989).

7.     Hatch, R. and Backman, K.  Dual Stage Fermentation.  U.S. Patent No. 4,900,669 (1990).

8.     Backman, K.  Method of Biosynthesis of Phenylalanine.  U.S. Patent No. 5,169,768 (1992).

9.      Backman, K.C. and Munkholm, C.  Ligand Assay Using Interference Modulation.  U.S. Patent No. 5,196,350 (1993).

10.     Backman, K.C., Carrino, J.J., Shimer, G.H. and Yocum, R.R.  Ligase Chain Reaction with Endonuclease IV Correction and Contamination Control.  U.S. Patent No. 5,516,663 (1996).

11.     Backman, K.C., Bond, S.B., Carrino, J.J. and Laffler, T.G.  Method and Kits for Amplifying Target Nucleic Acids Applicable to Both Polymerase and Ligase Chain Reactions.  U.S. Patent No. 5,792,607 (1998).

12.     Wich, G., Leinfelder, W. and Backman, K.  Microorganisms for the Production of Tryptophan and Process for the Preparation Thereof.  U.S. Patent No. 6,180,373 (2001).


## Foreign Patents (other than those corresponding to U.S. issuances)

1.      Backman, K.C. and Wang, C.-N. J.  Assay Using Template-Dependent Nucleic Acid Probe Reorganization.  Australian Patent No. B-26755/88 (1992); Canadian Patent No. 1,323,293 (1993); European Patent No. 0 320 308 B (1994).

2.      Backman, K.C., Rudd, E.A., Lauer, G. and McKay, D.  Isolating Thermostable Enzymes from Engineered Mesophiles.  Australian Patent No. B-46715/89 (1992); Taiwanese Patent No. 061734 (1993); European Patent No. 0 373 962 B (1994).


## Non-Scientific Publications

1.      Backman, K.  It Speaks for Itself.  eBookstand Books 2004 (ISBN 1-58909-232-5).

2.      NeoPublius.  Amendments.  eBookstand Books 2004 (ISBN 1-58909-229-5).

**EXHIBIT 2**

AB 476-507
AB 557-682
AB 683-979
AB 980-1083
AB 1288-1289
AB 67020-67039
AB 68336-68422
AB 69283-69289
AB 69595-69597
AB 69640-69642
AB 72996-73012
AB 73411-73417
AB 75479-75577
AB 75479-75577
AB 75978-76053
AB 87157-87165
AB 121847-121894
AB 121895-121921
AB 122088-122092
AB 122093-122097
AB 132415-132417
AB 132599-132668
AB 133193-133196
AB 136587-136591
AB 136592-136596
AB 136662-136715
AB 137750-137804
AB 137816-137823
AB 140766-140768
AB 144354-144433
AB 144504
AB 144581-144582
AB 144601-144603
AB 144604-144608
AB 160836-160841
AB 187481
AB 221652-221667
AB 245106-245125
AB 249723-249743
AB 250950-250951
AB 276292-276296
AB 276605-276684
AB 288355-288379
AB 291988-291995

AB 384738-384744
AB 384791-384798
AB 385564-385565

Transcript and Exhibits for Rule 30(b)(6) Deposition of Gina Costa, May 20, 2008

DNA Polymerase Fluorescent Substrates with Reversible 3'-Tags, B. Canard and R. Sarfati

ILL53960

ILL 50324

DNA Polymerase Fluorescent Substrates with Reversible 3'-Tags, B. Canard and R. Sarfati
Oligonucleotide N3'-P5' Phosphoramidates as Antisense Agents, S. Gryaznov

Synthesis and Selective Cleavage of an Oligodeoxynucleotide Containing a Bridged
Internucleotide 5'-Phosphorothioate Linkage, M. Mag, et al.

Synthesis of Phosphorothioamidites Derived from 3'-Thio-3'-Deoxythymidine and 3'-Thio-
2',3'-Dideoxycytidine and the Automated Synthesis of Oligodeoxynucleotides Containing a 3'-
S-phosphorothiolate Linkage, G. Sabbagh, et al.

Chemical and Enzymatic Properties of Bridging 5'-5-Phosphorothioester Linkages in DNA, Y.
Xu and E. Kool

1

**PROOF OF SERVICE**

2

I am an attorney, and on May 30, 2008, I caused

3

**EXPERT STATEMENT OF KEITH C. BACKMAN, PH.D. REGARDING INFRINGEMENT**

4

5

to be served via electronic mail by electronically mailing a true and correct copy through Marshall, Gerstein & Borun LLP's electronic mail system to the e-mail addresses set forth below:

6

7

| **COUNSEL FOR PLAINTIFF:** |
| --- |

8
9
10
11
12
13

| | |
| --- | --- |
| BRYAN WILSON<br>DARA TABESH<br>ERIC C. PAI<br>MORRISON & FOERSTER LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304-1018<br>E-Mail: BWilson@mofo.com<br>E-Mail: DTabesh@mofo.com<br>E-Mail: EPai@mofo.com | DAVID C. DOYLE<br>STEVEN E. COMER<br>BRIAN M. KRAMER<br>ANDERS T. AANNESTAD<br>MORRISON & FOERSTER LLP<br>12531 High Bluff Drive, Suite 100<br>San Diego, CA 92130-2040<br>E-Mail: DDoyle@mofo.com<br>E-Mail: SComer@mofo.com<br>E-Mail: BMKramer@mofo.com<br>E-Mail: AAannestad@mofo.com |
| KURTIS MacFERRIN<br>APPLERA CORPORATION –<br>    APPLIED BIOSYSTEMS GROUP<br>850 Lincoln Centre Drive<br>Foster City, CA 94404<br>E-Mail: Kurtis.MacFerrin@appliedbiosystems.com | |

14
15
16
17
18

I declare under penalty of perjury that the foregoing is true and correct.

19

Executed at Chicago, Illinois, this 30th day of May, 2008.

20
21
22

Mark H. Izraelewicz

23
24
25
26
27
28