1    BRYAN WILSON (CA SBN 138842)
     ERIC C. PAI (CA SBN 247604)
2    MORRISON & FOERSTER LLP
     755 Page Mill Road
3    Palo Alto, California 94304-1018
     Telephone: 650.813.5600
4    Facsimile: 650.494.0792
     E-Mail: BWilson@mofo.com; EPai@mofo.com
5
     DAVID C. DOYLE (CA SBN 70690)
6    STEVEN E. COMER (CA SBN 154384)
     BRIAN M. KRAMER (CA SBN 212107)
7    MORRISON & FOERSTER LLP
     12531 High Bluff Drive, Suite 100
8    San Diego, California  92130-2040
     Telephone: 858.720.5100
9    Facsimile: 858.720.5125
     E-Mail: DDoyle@mofo.com; SComer@mofo.com;
10   BMKramer@mofo.com

11   Attorneys for Plaintiff
     APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP
12

13                     UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO DIVISION

16

| | |
|---|---|
| 17   APPLERA CORPORATION – APPLIED<br>BIOSYSTEMS GROUP, a Delaware corporation,<br><br>18<br><br>19                    Plaintiff,<br><br>20         v.<br><br>21   ILLUMINA, INC., a Delaware corporation,<br>SOLEXA, INC., a Delaware corporation, and<br>22   STEPHEN C. MACEVICZ, an individual,<br><br>23                    Defendants. | Case No.    C07 02845 WHA<br><br>**APPLERA CORPORATION –<br>APPLIED BIOSYSTEMS<br>GROUP'S OPPOSITION TO<br>SOLEXA'S MOTION FOR<br>PARTIAL SUMMARY<br>JUDGMENT OF<br>INFRINGEMENT**<br><br>Date:    August 21, 2008<br>Time:    8:00 a.m.<br>Place:   Courtroom 9, 19th Floor<br>Judge:   William H. Alsup |

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................... 1

II.  FACTS ................................................................................................................... 2

III.  ARGUMENT ........................................................................................................ 3

A.  The SOLiD System Probes Do Not Infringe the '119 Patent ................................. 3

1.  Application of the Doctrine of Equivalents Would Vitiate the Phosphoramidate Claim Limitation ................................................................ 4

a.  Simplicity of the Structure ................................................................... 4

b.  Specificity and Narrowness of the Claim ............................................. 5

c.  Foreseeability of Variations ................................................................. 6

2.  Expanding Claim 1 Beyond the Phosphoramidate Limitation Would Render the Claim Invalid. ................................................................ 7

3.  Illumina Cannot Show that a Phosphorothiolate Linkage is the Equivalent of a Phosphoramidate Linkage ................................................. 8

a.  Illumina Does Not Address the Key Differences Between the Linkages ................................................................... 8

b.  The Differences Between the Linkages Are Substantial.............. 10

B.  The One-Base Encoding Prototype Did Not Infringe the '341 Patent Because The Primer Was Hybridized to the Binding Region, Not the Target Polynucleotide ................................................................ 11

1.  The Court Resolved this Issue During Claim Construction .................... 11

2.  The Court Rejected Illumina's Proposed Construction ........................... 13

3.  Illumina is Precluded from Asserting Equivalents................................... 14

a.  Prosecution History Estoppel ........................................................... 14

b.  Disclosure-Dedication Rule ............................................................. 15

4.  Hybridizing the Primer to the Target Polynucleotide is Not Equivalent to Hybridizing the Primer to the Binding Region................... 16

C.  The One-Base Encoding Prototype Was Used To Identify A Base Within Each Cycle, But It Did Not Infringe ................................................................ 17

D.  Illumina Is Not Entitled To Summary Judgment Because It Cannot Overcome AB's Affirmative Defenses ................................................................ 20

1.  AB owns the patents ................................................................ 21

2.  AB has equitable rights to practice the patents based on Macevicz's obligation to assign the inventions to AB. ................................................ 22

3.  The facts establish that Illumina is estopped by Macevicz's breach from asserting the patents against AB ................................................ 22

4.  Illumina's claims are barred by the doctrine of unclean hands................ 23

IV.  CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Arachnid, Inc. v. Merit Indus., Inc.,*
    939 F.2d 1574 (Fed. Cir. 1991) ................................................................ 22

*Baxter Diagnostics, Inc. v. AVL Scientific Corp.,*
    924 F. Supp. 994,
    *modified on other grounds,* 954 F. Supp. 199 (C.D. Cal. 1996) ............ 18

*Digeo, Inc. v. Audible, Inc.,*
    No. C05-464JLR, 2006 U.S. Dist. LEXIS 62994 (W.D. Wash. Aug. 24, 2006) ......... 22

*Embrex, Inc. v. Serv. Eng'g Corp.,*
    216 F.3d 1343 (Fed. Cir. 2000) ................................................................ 18

*Enreach Tech. Inc. v. Embedded Internet Solutions,*
    403 F. Supp. 2d 968 (N.D. Cal. 2005) ...................................................... 22

*Freedman Seating Co. v. Am. Seating Co.,*
    420 F.3d 1350 (Fed. Cir. 2005),
    *cert. denied,* 546 U.S. 1150 (2006) .......................................................... 4

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,*
    339 U.S. 605 (1950) ............................................................................. 8, 9

*Int'l Gamco, Inc. v. Multimedia Games, Inc.,*
    504 F.3d 1273 (Fed. Cir. 2007) ................................................................ 21

*Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co.,*
    285 F.3d 1046 (Fed. Cir. 2002) ................................................................ 15

*K-2 Corp. v. Salomon S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999) ................................................................ 7

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.,*
    324 F.3d 1308 (Fed. Cir. 2003) ................................................................ 4

*Maxon Premix Burner Co. v. Eclipse Fuel Eng'g Co.,*
    471 F.2d 308 (7th Cir. 1972) ................................................................... 18

*Norian Corp. v. Stryker Corp.,*
    432 F.3d 1356 (Fed. Cir. 2005) ................................................................ 14

*PC Connector Solutions LLC v. SmartDisk Corp.,*
    406 F.3d 1359 (Fed. Cir. 2005) ............................................................. 9, 10

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    429 F.3d 1364 (Fed. Cir. 2005) ........................................................................ 15, 16

5

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,*
    355 F.3d 1353 (Fed. Cir. 2004) ........................................................................ 15, 16

6

7

*Purdue Pharma L.P. v. Faulding Inc.,*
    230 F.3d 1320 (Fed. Cir. 2000) ................................................................................ 8

8

9

*Sage Prods., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420 (Fed. Cir. 1997) ........................................................................ 4, 5, 6

10

11

*Starsight Telecast v. Gemstar Dev. Corp.,*
    No. C 93-20777 RMW(EAI), 1995 U.S. Dist. LEXIS 22006 (N.D. Cal. Aug. 11,
    1995) ................................................................................................................. 23, 24

12

13

*Styne v. Stevens,*
    26 Cal. 4th 42 (2001) ............................................................................................. 20

14

*Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n,*
    109 F.3d 726 (Fed. Cir. 1997) ..................................................................... 5, 6, 7, 11

15

16

*U.S. v. Georgia-Pacific Co.,*
    421 F.2d 92 (9th Cir. 1970) .................................................................................... 23

17

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,*
    904 F.2d 677 (Fed. Cir. 1990) .................................................................................. 8

18

19

**STATUTES**

20

21

35 U.S.C. § 154(a)(1) ...................................................................................................... 21

22

23

**OTHER AUTHORITIES**

24

3 Bernard E. Witkin, *California Procedure, Actions* § 423, at 532 (4th ed. 1997) ..................... 20

25

10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*
    § 2734, at 256 (3d ed. 2008) ................................................................................... 20

26

27

28

1    Applera Corporation – Applied Biosystems Group ("AB") hereby opposes Solexa, Inc.'s[1]

2    Motion for Partial Summary Judgment of Infringement ("Illumina's Motion").

3                    **MEMORANDUM OF POINTS AND AUTHORITIES**

4    **I.    INTRODUCTION**

5    Illumina concedes that the sole asserted claim of the '119 patent is not literally infringed

6    because the probes used in the SOLiD™ System do not contain the claimed phosphoramidate

7    linkage.  The Patent Office only allowed the patent to issue because a phosphoramidate linkage is

8    different from other linkages.  Finding the two structures equivalent would vitiate the

9    phosphoramidate linkage limitation on which the Patent Office expressly relied.

10    The '341 patent requires that the initializing oligonucleotide probe (also known as the

11    primer) hybridize to the target polynucleotide.  During claim construction the Court correctly

12    declined to redraft this requirement, stating:  "The language makes clear that a binding region and

13    the target polynucleotide are connected, and together form the template. . . .  The binding region,

14    target polynucleotide, and template are each distinct items."  (Claim Constr. Order ("Order"),

15    Docket No. 33, at 8-9.)  Illumina's continuing disagreement with the Court is not a basis on

16    which it can avoid summary judgment, much less a basis on which it can obtain summary

17    judgment.  In the accused products, the primer hybridizes to the known binding region, not the

18    target polynucleotide, and therefore they do not infringe.

19    Illumina's final assertion – that a prototype system was used to test ligation chemistry – is

20    trivial in the context of the overall case.  Like the Macevicz invention, the prototype used one-

21    base encoded probes in which the label on each probe corresponded one-to-one with the identity

22    of the target nucleotide being interrogated.  The one-base prototype was only for internal research

23    and was never sold.  Illumina did not even have its damages expert evaluate damages attributable

24    to the prototype.  The only significant issue is whether the commercialized SOLiD System, which

---

25

26    [1] AB filed its own motion for summary judgment of noninfringement against all
Defendants, which it refers to collectively as "Illumina."  (AB's Motion for Summary Judgment
of Noninfringement ("AB's Motion"), Docket No. 207, at 1.)  Since Solexa was acquired by

27    Illumina, AB refers to "Illumina" in this brief as well.

28

1    uses two-base encoded probes and corresponding software, determines the identity of a base

2    within each cycle.  Illumina does not address the commercial system in its motion, except in its

3    discussion of the '119 patent.

4        AB's affirmative defenses relating to ownership, standing, shop rights, equitable title,

5    estoppel, and unclean hands also preclude granting summary judgment to Illumina.  While the

6    facts establish that legal and equitable title properly lie with AB, the Court has already held that

7    these issues will be decided at trial, not by motion.  Because infringement cannot be found

8    without first overcoming AB's affirmative defenses, genuine issues of material fact exist, and

9    Illumina's motion must be denied.

10       **II.    FACTS**

11       The operation of the SOLiD System is described in AB's motion for summary judgment

12   of noninfringement.  (AB's Motion at 3-6.)  Illumina does not challenge AB's description of how

13   the accused products work.  Thus, there are no genuinely disputed facts that preclude granting

14   AB's motion for summary judgment.[2]

15       The accused products and asserted patent claims at issue in the parties' motions for

16   summary judgment are summarized in the table below.  On the sole asserted claim of the '119

17   patent, both AB and Illumina seek summary judgment as to all accused products.  On the '341

18   patent, AB seeks summary judgment of noninfringement of all asserted claims as to all accused

19   products.  Illumina has moved only on claim 1 and only as to the one-base encoding prototype.

20   Finally, on the sole asserted claim of the '597 patent, AB seeks summary judgment of

21   noninfringement as to the two-base encoding SOLiD System.  Illumina has moved only as to the

22   one-base encoding prototype.  The overlap is shown in the table below.

23

24

25

26       _____

         [2] In contrast, fact issues on AB's non-technical affirmative defenses, which are not

27   grounded on how the accused products work, preclude granting Illumina's motion.  *See infra*
     section III.D.

28

|  | One-base encoding prototype | Two-base encoding SOLiD System |
|---|---|---|
| **'341 patent** | BOTH (AB on all claims; Illumina on claim 1 only) | AB only |
| **'119 patent** | BOTH | BOTH |
| **'597 patent** | Illumina only | AB only |

## III.    ARGUMENT

### A.    The SOLiD System Probes Do Not Infringe the '119 Patent.

In naturally-occurring strands of DNA, each nucleotide is linked to its neighbor by a linker that has an oxygen atom (O) at one end and is called a "phosphodiester." Claim 1 of the '119 patent requires a modified oligonucleotide probe in which this oxygen atom is replaced with a <u>nitrogen</u> atom (N) and <u>hydrogen</u> atom (H); this linker is called a "phosphoramidate." Illumina concedes that the probes used in the SOLiD System do not literally infringe because they contain a <u>sulfur</u> atom (S) instead of the claimed nitrogen-hydrogen linkage; this linker is called a "phosphorothiolate." (Illumina's Motion at 8.) The three different linkages (along with the Beaton patent linkage, discussed later) are illustrated below.



Illumina should be precluded as a matter of law from asserting the doctrine of equivalents because it would vitiate the phosphoramidate linkage limitation that was critical to the allowance of claim 1. Moreover, Illumina fails to address the central and substantial difference between the

1    claimed phosphoramidate linkage and the phosphorothiolate linkage of the probes used in the

2    SOLiD System.  Therefore, Illumina's motion for summary judgment should be denied.

3              **1.**      **Application of the Doctrine of Equivalents Would Vitiate the**
                         **Phosphoramidate Claim Limitation.**

4

5            The Federal Circuit holds that "an element of an accused product or process is not, as a

6    matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely

7    vitiate the limitation." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir.

8    2005), *cert. denied*, 546 U.S. 1150 (2006) (citation omitted).  The factors in determining vitiation

9    include "the simplicity of the structure, the specificity and narrowness of the claim, and the

10   foreseeability of variations at the time of filing the claim with the PTO." *Id.* at 1360.  All of these

11   considerations show that deeming a sulfur linkage (phosphorothiolate) to be the equivalent of the

12   claimed nitrogen-hydrogen linkage (phosphoramidate) would vitiate the claim limitation.

13   Whether an asserted equivalent would vitiate the claim limitation is a question of law for the

14   Court.  *Id.* at 1358; *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed.

15   Cir. 2003) (citation omitted) ("[I]f a court determines that a finding of infringement under the

16   doctrine of equivalents 'would entirely vitiate a particular claimed element,' then the court should

17   rule that there is no infringement under the doctrine of equivalents.").

18                         **a.**      **Simplicity of the Structure.**

19           The simplicity of the structure refers to whether any subtlety of language, complexity of

20   the technology, or subsequent change in the state of the art could have "obfuscated the

21   significance of [the] limitation at the time of its incorporation into the claim." *Sage Prods., Inc.*

22   *v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997).  No such obfuscation exists here.

23   Claim 1 of the '119 patent claims an oligonucleotide probe with a simple chemical formula.

24   Illumina agrees that the phosphoramidate linkage is spelled out precisely in claim 1 using

25   standard chemical notations.  (Illumina's Motion at 4-5 ("The term '─OP(=O)(O─)NH─'

26   likewise requires no special construction. . . . N represents nitrogen, H represents hydrogen.")).

27           The simplicity of the structure was confirmed by Macevicz's own statements to the

28   Examiner during prosecution.  The Examiner's initial Office Action rejected claim 1 (originally

1    numbered as claim 18 at the time) for lack of enablement and written description.  (Declaration of

2    Steven E. Comer in Support of AB's Motion ("Comer Decl."), Docket No. 212, Ex. F at 2.)  In

3    response to this rejection, Macevicz argued that "methods for synthesizing oligonucleotides

4    containing such phosphoramidate linkages were well known in the art," and therefore it was not

5    necessary for the patent to teach these methods.  (Comer Decl. Ex. G at 4.)  Macevicz also cited

6    several references teaching such phosphoramidate linkages, demonstrating that Macevicz

7    understood that his claim was limited to the simple, well-known phosphoramidate linkage.  (*Id.*)

8                          **b.       Specificity and Narrowness of the Claim.**

9            The Federal Circuit has held that "the doctrine of equivalents is not available for the

10    attainment in court of a scope of protection which encompasses subject matter deliberately

11    removed from examination by the PTO during prosecution through narrow claiming." *Tanabe*

12    *Seiyaku Co. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 732 (Fed. Cir. 1997) (citation

13    omitted).  The rationale is that a patentee desiring broader protection should have sought broader

14    claims during prosecution so that the PTO could ensure that the claims that ultimately issued were

15    novel, useful, and nonobvious. *Sage*, 126 F.3d at 1425.

16            Macevicz chose to draft claim 1 of the '119 patent narrowly and specifically with a

17    phosphoramidate linkage limitation.  In fact, the Examiner allowed claim 1 because it was limited

18    to "the unique internucleotide linkage comprising an N atom in place of a 5' most bridging O

19    atom."  The Examiner also distinguished the claimed invention from the Beaton patent (U.S.

20    Patent No. 5,625,050), which described a probe in which the oxygen atom is replaced with a

21    carbon (C) atom.  The Examiner stated:

22                  Claim 18 {which issued as claim 1 of the '119 patent} appears to be
                     allowable over the prior art because of the unique internucleotide
23                  linkage comprising a N atom in place of a 5' most bridging O atom
                     in an internucleotide linkage.  The examiner is unaware of a
24                  reference that teaches such a construct.  The closest prior art
                     discovered against this claim is Beaton et al. [U.S. Patent no.
25                  5,525,050 {sic} (1997)].  Beaton et al. teach{es} oligos wherein the
                     5' most bridging O atom in an internucleotide linkage is replaced
26                  by a C atom.

27

28

1   (Comer Decl. Ex. F at 4 (square brackets in original, curly brackets added); Declaration of

2   Michael L. Metzker, Ph.D. in Support of AB's Opposition ("Metzker Opp. Decl.") ¶¶ 9-13, Ex. A

3   at Col. 3:20-24; 4:7-16, 22-26, 32-36, 48-60; 5:22-24, 29-33, 48-49, 65-67; 6:1-7:33; 15:25-30.)

4           Macevicz's decision to draft claim 1 as a chemical formula with a precise

5   phosphoramidate limitation rendered the claim specific and narrow.  Claim 1 contains other

6   structures defined by variables, but Macevicz specifically claimed a nitrogen-hydrogen

7   phosphoramidate linkage.[3]  (*See* Illumina's Motion at 3-4.)  Similarly, in the '341 patent,

8   Macevicz broadly claimed methods that include probes containing any "chemically scissile

9   internucleosidic linkage," not just phosphoramidate linkages.  (Comer Decl. Ex. A claim 7.)

10  Macevicz could have used this language in the '119 patent to more broadly claim a class of

11  probes with different types of linkages, but did not.

12          This scenario is like that in the *Tanabe* case.  There, the patentee argued that butanone, the

13  solvent used by the accused infringer, was the equivalent of acetone, the solvent claimed in the

14  patent.  *Tanabe*, 109 F.3d at 729.  The two solvents differ by only a single methylene ($CH_2$)

15  group.  *Id.*  The Federal Circuit noted that the patentee could have more broadly claimed the class

16  of ketone solvents that would have included both acetone and butanone.  *Id.* at 732.  But because

17  the patentee chose to claim only "acetone" specifically by name, the Federal Circuit upheld the

18  ITC's determination that the doctrine of equivalents should not be applied.  *Id.*  Macevicz's claim

19  is even more specific – he claimed not merely by name, but by precise chemical formula.

20                      **c.      Foreseeability of Variations.**

21          As between the patentee and the public at large, "it is the patentee who must bear the cost

22  of its failure to seek protection for [a] foreseeable alteration of its claimed structure."  *Sage*, 126

23  F.3d at 1425.  In the case of the '119 patent, variations were not only foreseeable at the time of

24  ────────────────

25          [3] Claim 1 uses three variables for the chemical formula of the claimed probe.  First, the
    "(B)j" limitation is a set of nucleotides or analogs thereof numbering in the range of 1 to 12.
26  Second, the "(B)k" limitation is a set of nucleotides or analogs thereof numbering in the range of
    1 to 12, such that the total number of nucleotides or analogs thereof in the (B)j and (B)k sets add
27  up to no more than 12.  Third, the "Bt*" limitation is "a labeled, non-extendable chain-
    terminating moiety."  (Comer Decl. Ex. B claim 1; Illumina's Motion at 3-4.)

28

1    filing, they were also disclosed, but not claimed.  The public is entitled to rely on Macevicz's

2    claim drafting choices.

3        The specification of the '119 patent broadly states that any type of chemically scissile

4    internucleosidic linkage may be employed.  (Comer Decl. Ex. B at 10:16-30.)  A

5    phosphoramidate linkage is described as only one example of the general class of chemically

6    scissile internucleosidic linkages.  (*Id.*)  Furthermore, as admitted by Illumina's expert,

7    Dr. Backman, the availability of these other linkages was well known to persons of ordinary skill

8    in the art.  (Backman Dep., Comer Decl. Ex. K at 25:6-26:8.)  Despite the broad disclosure of

9    other linkages in the '119 patent specification, Macevicz pursued only a narrow claim for probes

10   with phosphoramidate linkages.  *See Tanabe*, 109 F.3d at 732 ("the doctrine of equivalents is not

11   available for the attainment in court of a scope of protection which encompasses subject matter

12   deliberately removed from examination by the PTO during prosecution through narrow

13   claiming") (citation omitted).[4]  He did so despite being well-aware of the possible variations that

14   could have been claimed by relying on the specification's broader language.  Allowing Illumina

15   to expand the claim now to cover these other variations would improperly rewrite the claims by

16   vitiating the phosphoramidate linkage limitation.

17              **2.    Expanding Claim 1 Beyond the Phosphoramidate Limitation**
                        **Would Render the Claim Invalid.**
18

19       Additionally, the Federal Circuit has held that a patentee is not entitled to a scope of

20   equivalents that would have rendered the claim invalid.  *See, e.g., K-2 Corp. v. Salomon S.A.*, 191

21   F.3d 1356, 1366-67 (Fed. Cir. 1999).  Ignoring the nitrogen-hydrogen linkage limitation of claim

22   1 would remove the distinction relied on by the Examiner to distinguish the prior art, including

23

24       [4] The '341 patent claims are to methods of sequencing by ligation.  Unlike the '119 patent
     claims, the '341 patent claims are not solely to probes of a particular structure.  Therefore, while
25   Macevicz's claims to methods using probes having any "chemically scissile internucleosidic
     linkage" in the '341 patent show that he knew how to claim probes more broadly than he did in
26   the '119 patent, the broad language in the method claims of the '341 patent did not subject the
     broader class of probes, *as the sole object of a claim*, to Examiner scrutiny.  Because the '341
27   patent does not independently claim the probes themselves, there was no reason for the Examiner
     to consider the patentability of the probes, standing alone, during prosecution of the '341 patent.

28

1    the Beaton patent.  It would also result in invalidity in light of other prior art references disclosing

2    phosphorothiolate linkages, such as the Carr patent (GB 2,236,852), which discloses an

3    oligonucleotide probe with the exact same sulfur atom substitution as in the probes used in the

4    SOLiD System.  (Metzker Opp. Decl. ¶¶ 14-15, Ex. E at 14:13-14, 18:2-10, 19:16-21, 20:6-15,

5    20:23-27.)  The claim expansion Illumina seeks would also result in invalidity due to a lack of

6    written description, since the specification does not disclose that Macevicz had possession of an

7    invention using a phosphorothiolate in place of the claimed phosphoramidate linkage.  *Purdue*

8    *Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323-24 (Fed. Cir. 2000) (finding patent invalid for

9    failure to comply with written description requirement).  Indeed, Macevicz testified that he did

10   not envision using phosphorothiolate as a cleavable linkage.  (Declaration of Eric C. Pai in

11   Support of AB's Opposition ("Pai Decl.") Ex. 1 at 241:13-242:11.)  The Court should reject

12   Illumina's invitation to redraft the claim now to grant claim scope that Macevicz did not, and

13   could not, obtain during prosecution.  *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,

14   904 F.2d 677, 684 (Fed. Cir. 1990) ("[S]ince prior art always limits what an inventor could have

15   claimed, it limits the range of permissible equivalents of a claim.").

16                    **3.    Illumina Cannot Show that a Phosphorothiolate Linkage is the
                              Equivalent of a Phosphoramidate Linkage.**
17

18                         **a.    Illumina Does Not Address the Key Differences Between
                                   the Linkages.**

19                Even if Illumina were entitled to assert the doctrine of equivalents as to the

20   phosphoramidate limitation, Illumina fails to offer the requisite proof to show infringement by

21   equivalents.  Illumina's motion is deficient in at least two ways.

22                First, Illumina applies an incorrect legal standard to its doctrine of equivalents analysis.

23   Illumina asserts that "because claim 1 of the '119 patent is directed to a composition of matter"

24   that "contains only structural limitations," the way in which the probe is used and the manner and

25   conditions in which the linkage is cleaved are irrelevant.  (Illumina's Motion at 10, 13.)  This

26   assertion is directly contradicted by *Graver Tank*, the well-known case on which Illumina bases

27   its argument.  (*Id.* at 11-13.)  *Graver Tank* was a composition of matter case in which the

28

1  Supreme Court held that an equivalents analysis does require consideration of the purpose and

2  function of the claimed ingredient:

3     Consideration must be given to the purpose for which an ingredient
       is used in a patent, the qualities it has when combined with the

4     other ingredients, and the function it [was] intended to perform.

5  *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) (emphasis added).

6  Illumina quotes the same passage in its own brief, but without authority asserts that the law is the

7  opposite of what the Supreme Court said it is.  (*See* Illumina's Motion at 12.)[5]

8         Second, Illumina fails to address the evidence, or even the issue, of the central and

9  substantial difference between phosphoramidate and phosphorothiolate linkages – the manner and

10  conditions in which the linkage is cleaved.  Illumina's motion dismisses this issue as

11  "immaterial," despite its own expert's admission that the function of the linkage and its

12  cleavability are significant.  (Backman Dep., Pai Decl. Ex. 2 at 38:24-39:4 ("Q.  The claim

13  language doesn't say chemically scissile internucleosidic linkage, does it?  A.  No.  But the claim

14  has to be read in light of the specification where the function of the phosphoramidate linkage is to

15  be a chemically scissile internucleosidic linkage.").)  Illumina's conclusory statements that this

16  difference is immaterial fail to meet the Federal Circuit's requirement of "particularized evidence

17  and linking argument as to the 'insubstantiality of the differences' between the claimed invention

18  and the accused device."  *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364

19  (Fed. Cir. 2005).  Such conclusory statements do not raise any genuine issues of material fact to

20         [5] Illumina also incorrectly suggests that *Graver Tank* stands for the blanket proposition
   that "substitution of one element (magnesium) for another (calcium)" is an insubstantial

21  difference.  (Illumina's Motion at 11-12.)  First of all, the actual issue was whether manganese
   silicate could be considered an "alkaline earth metal silicate" under the doctrine of equivalents.

22  339 U.S. at 610 (emphasis added).  Manganese is an element; alkaline earth metals are a group of
   elements having similar properties.  (*See* Metzker Opp. Decl. ¶¶ 16-17 (citing Periodic Table of

23  the Elements) Ex. B.)  The case was not about whether one element could be substituted for
   another element.

24

25         Furthermore, in *Graver Tank*, the Supreme Court affirmed the judgment of infringement
   based on the particular circumstances of the case and the weight of the evidentiary record, which

26  included, *inter alia*, the fact that the specification of the patent-in-suit disclosed the alleged
   equivalent, testimony by experts familiar with both the claimed invention and the accused product

27  as to the purposes of the allegedly equivalent metals, recognized scientific texts, and disclosures
   of the prior art.  *Graver Tank*, 339 U.S. at 610-11.  Illumina has offered no such evidence here.

28

1  avoid summary judgment of <u>noninfringement</u>.  *Id.* at 1364-65.  Illumina bears the burden of proof

2  on this issue, yet it has not presented any evidence to support its assertion of immateriality.  Thus,

3  Illumina cannot prevail on its motion.[6]

4            **b.**      **The Differences Between the Linkages Are Substantial.**

5       Because Illumina ducked the issue, AB's motion for summary judgment of

6  noninfringement showing that the differences between the claimed phosphoramidate linkage and

7  AB's phosphorothiolate linkage are substantial stands unrebutted.  (AB's Motion at 24.)  The

8  most critical difference, which Illumina avoided discussing as "immaterial," is the manner and

9  conditions in which the linkages are cleaved.

10       An important purpose of the claimed linkage is that it is chemically cleavable.  (Comer

11  Decl. Ex. B at 10:16-30; Backman Report, Comer Decl. Ex. I ¶¶ 113-116, 141; Backman Dep.,

12  Pai Decl. Ex. 2 at 38:24-39:4.)  Dr. Backman acknowledges that one of the key differences

13  between a phosphoramidate linkage and a phosphorothiolate linkage is the pH under which each

14  is cleaved.  According to the specification of the '119 patent, phosphoramidate linkages are

15  cleaved with trifluoroacetic acid ("TFA") under highly acidic conditions (where pH = 1).  (Comer

16  Decl. Ex. B at 9:40-52.)  By contrast, phosphorothiolate linkages are cleaved with silver nitrate

17  under neutral conditions (where pH = 7).  (Declaration of Michael L. Metzker in Support of AB's

18  Motion, Docket No. 211, Ex. 1 ("Metzker Report") at 23.)

19       As Dr. Backman admitted, acidic conditions are less favorable for sequencing DNA

20  because they can damage the DNA.  (Backman Dep., Comer Decl. Ex. K at 44:20-45:11.)  He did

21  not know whether the acidic conditions used in the Macevicz patents would damage the DNA.

22  (*Id.*)  Dr. Metzker, who has studied the issue, stated that the low pH of TFA (approximately the

23  pH of stomach acid) was recognized as undesirable because of the damage it would do to the

24  sample DNA.  (Metzker Report at 22.)  Accordingly, a phosphorothiolate linkage cannot be the

25

26      [6] In addition to AB's position that Illumina should be legally precluded from asserting the
  doctrine of equivalents, the substantiality of the differences is an alternative ground on which AB
27  has sought summary judgment of noninfringement of the '119 patent.  (AB's Motion at 24-25.)

28

1  equivalent of a phosphoramidate linkage.  *See Tanabe*, 109 F.3d at 733-34 (finding substantial

2  difference where accused solvent produced better results than claimed solvent).[7]

3        **B.**    **The One-Base Encoding Prototype Did Not Infringe the '341 Patent**
           **Because The Primer Was Hybridized to the Binding Region, Not the**
4          **Target Polynucleotide.**

5        A key limitation of claim 1 of the '341 patent is that step (a) requires "an initializing

6  oligonucleotide probe hybridized to a target polynucleotide."  In its Claim Construction Order,

7  the Court held that the express language of the claim requires that the initializing oligonucleotide

8  probe hybridize to the target polynucleotide, not the binding region.  (Order at 8-9.)  No accused

9  product – including the one-base encoding prototype at issue in Illumina's motion – meets this

10  limitation.  Therefore, it does not infringe the '341 patent as a matter of law.

11        **1.**    **The Court Resolved this Issue During Claim Construction.**

12        Illumina agrees that this is purely a claim construction issue because there is no factual

13  dispute over how this aspect of the one-base prototype worked.  (Illumina's Motion at 17.)  The

14  only dispute is the correct construction of "hybridized to a target polynucleotide," which the

15  Court already resolved in construing the meaning of the "initializing oligonucleotide probe."

16        In its Claim Construction Order, the Court found that the patent clearly distinguishes

17  between the binding region and the target polynucleotide:

18            The language makes clear that a binding region and the target
              polynucleotide are connected, and together form the template. . . .
19            The binding region, target polynucleotide, and template are each
              distinct items.

20

21

22

---

23        [7] Dr. Metzker's report discusses several other fundamental chemical differences between
      sulfur (used in AB's phosphorothiolate linkage) and nitrogen (used in the claimed
24    phosphoramidate linkage).  (Metzker Report at 22.)  Illumina's motion offers only attorney
      argument in response to these differences, such as the argument that sulfur and nitrogen exist in
25    the same form (i.e., solid, liquid, or gas) when used in probes.  (Illumina's Motion at 9.)
      Illumina's argument does not meet the evidentiary standard required for asserting equivalents, nor
26    does it change the fact that the different chemical reactivities of sulfur, nitrogen, and other
      linkages lead to significant differences in the way the linkages function and the results they
27    provide when used as probes in DNA sequencing methods.

28

1    (Order at 8-9 (emphasis added).)  The Court noted that the specification states "[p]referably, a

2    target polynucleotide is conjugated to a binding region to form a template, and the template is

3    attached to a solid phase support . . . " (*Id.* at 8 (quoting '341 patent col. 8:8–10).)



7    (*Id.* at 9 (depicting invention "As Described in Claim 1 of the '341 patent").)  The Court held that

8    the express language of the claim requires that the initializing oligonucleotide probe hybridize to

9    the target polynucleotide, not the binding region.  (*Id.* at 8-9.)  Further, because "the specification

10    teaches a different method than what is claimed," the Court determined that "the inventor, patent

11    counsel, and the examiner all made a drafting error." (*Id.*)  The Court declined Illumina's request

12    to redraft the language, holding that "[t]he express language of the claim must govern." (*Id.* at 9.)

13         By contrast, in the one-base prototype, the initializing oligonucleotide probe hybridized to

14    the binding region, not the target polynucleotide.  In the one-base prototype the "primer" (the

15    initializing oligonucleotide probe) hybridized to the "P1 adapter," which was a fully-known

16    binding region (this is true for AB's SOLiD System as well).  (Backman Dep., Comer Decl.

17    Ex. K at 115:18-24; Backman Report, Comer Decl. Ex. I ¶ 141; Metzker Report at 9; Declaration

18    of Gina Costa, Ph.D. in Support of AB's Opposition ("Costa Opp. Decl.") ¶ 5.)  Illumina's

19    motion does not dispute any of these facts about the operation of the one-base prototype.

20    (Illumina's Motion at 17-18.)  Dr. Backman confirmed this description of the prototype in his

21    expert report and deposition.  (Backman Dep., Comer Decl. Ex. K at 115:18-24; Backman

22    Report, Comer Decl. Ex. I ¶ 141.)

23         Based on these facts and the Court's claim construction, the one-base prototype did not

24    provide "an initializing oligonucleotide probe hybridized to a target polynucleotide."  Therefore,

25    it did not infringe the '341 patent, and Illumina's motion should be denied.

26

27

28

1

**2.    The Court Rejected Illumina's Proposed Construction.**

2       During the claim construction proceedings, AB made clear the impact this issue would

3   have on summary judgment.  Nonetheless, Illumina now seeks to reargue the same claim

4   construction position the Court already rejected.

5       Illumina again conflates the "binding region" and the "target polynucleotide," despite the

6   Court's conclusion that the terms are distinct: "[t]he passage [from the specification] does not

7   provide an express or implied definition that requires the target polynucleotide to be distinct from

8   the template or binding region." (Illumina's Motion at 15.)  Illumina repeats its argument from

9   the claim construction briefing that the distinctions between the target polynucleotide, the binding

10   region, and the template can be ignored as only part of a preferred embodiment.  (Illumina's

11   Motion at 15; Illumina's Reply Claim Constr. Br., Docket No. 100, at 8, 11.)  This position was

12   addressed and rejected during claim construction.[8]  (Order at 9 ("The binding region, target

13   polynucleotide, and template are each distinct items.").)

14       Illumina incorrectly frames this *de facto* motion for reconsideration as a necessary

15   response to the Court's claim construction:  "The Court's comments regarding a 'drafting error'

16   in claim 1 of the '341 patent indicates formal construction is necessary." (Illumina's Motion at

17   14.)  The Court's order, however, already provided a formal construction and held the opposite of

18   what Illumina now seeks:

19               While it is tempting to just fix it up in the claim construction
                process, that temptation would be dangerous course, for it should be
20               up to the PTO in the first instance to amend claims. . . .  Even "a
                nonsensical result does not require the court to redraft the claims."
21               . . .  Solexa's construction must be rejected.

22   (Order at 9 (citations omitted).)  The Court made clear that there is a drafting error in claim 1 and

23   that it would not redraft the claim to fix this error.  Illumina's renewed invitation to redraft the

24   claim language should be rejected.

25

26   _____

27       [8] Illumina also repeats two other arguments it made at the claim construction hearing,
      which were likewise rejected.  (Illumina's Motion at 16-17.)

28

**3.      Illumina is Precluded from Asserting Equivalents.**

Illumina's motion includes the conclusory argument that this limitation could be met alternatively under the doctrine of equivalents.  (Illumina's Motion at 18.)  Illumina asserts that hybridizing the initializing oligonucleotide probe to the known binding region is the equivalent of the claimed invention in which the initializing oligonucleotide probe is hybridized to the target polynucleotide.  (*Id.*)  However, Illumina is barred from asserting equivalents by each of the two legal doctrines below.

**a.      Prosecution History Estoppel.**

First, Illumina is barred by prosecution history estoppel.  Amendment-based estoppel bars Illumina from asserting the doctrine of equivalents because Macevicz narrowed the scope of the claim limitation at issue through an amendment in response to a rejection by the Patent Office.  "[U]nder the doctrine of prosecution history estoppel, a narrowing of claim scope during prosecution creates a presumption that the patentee has surrendered, for purposes of the doctrine of equivalents, all subject matter falling between the scope of the original claim and the scope of the claim as amended."  *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1363 (Fed. Cir. 2005) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 741 (2002)).

In the original application for the '341 patent, Macevicz drafted claim 1 to read "extending an initializing oligonucleotide along the polynucleotide."  (Comer Decl. Ex. N at 28 (emphasis added).)  This original version of the claim language used the broad and general term "polynucleotide," rather than any of the specific terms Macevicz used in the specification:  target polynucleotide, binding region, or template.  The Examiner issued an Office Action rejecting this claim language for indefiniteness.  (Comer Decl. Ex. D at 3.)

In amending the claim in response to this rejection, Macevicz could have chosen to replace "polynucleotide" with any of those three specific terms – "target polynucleotide," "binding region," or "template."  He chose "target polynucleotide" and thereby relinquished any additional claim scope that would have been covered by those other terms or by the original term "polynucleotide."  (Comer Decl. Ex. E at 2-3.)  Illumina cannot recapture that relinquished claim scope through the doctrine of equivalents.

1

**b.    Disclosure-Dedication Rule.**

2

A second independent ground for precluding the doctrine of equivalents is that Macevicz

3

dedicated this disclosed but unclaimed subject matter to the public.  The Federal Circuit has

4

repeatedly held that "a patent applicant who discloses but does not claim subject matter has

5

dedicated that matter to the public and cannot reclaim the disclosed matter under the doctrine of

6

equivalents."  *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1355-56 (Fed.

7

Cir. 2004); *see also Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054

8

(Fed. Cir. 2002).  Yet this is exactly what Illumina attempts to do.

9

Illumina admitted during claim construction that the specification of the '341 patent

10

discloses hybridizing the primer to the known binding region.  Illumina's opening brief stated:

11

"The specifications teach that the 'initializing oligonucleotide' hybridizes to a known sequence."

12

(Illumina's Opening Claim Constr. Br., Docket No. 82, at 7.)  The Court cited the difference

13

between what Macevicz disclosed in the specification and what he claimed as a further reason not

14

to redraft claim 1:  "To be sure, the specification teaches a different method than what is claimed,

15

but the law is full of patents that claim less than taught in the specification (and, sadly, vice

16

versa)."  (Order at 8.)  Thus, the specification's disclosure falls squarely within the disclosure-

17

dedication rule, and Illumina is barred as a matter of law from recapturing the disclosed matter

18

under the doctrine of equivalents.

19

Because of the express and precise terms of the disclosure – which both Illumina and the

20

Court have already recognized – Illumina cannot escape the disclosure-dedication rule by arguing

21

that this alternative was not "specifically identified."  *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*,

22

429 F.3d 1364, 1379 (Fed. Cir. 2005).  The Court already found that the specification teaches

23

precisely the unclaimed alternative that Illumina now asserts as an equivalent:

24

> Binding region (40) has a known sequence, but can vary greatly in
> length and composition.  It must be sufficiently long to

25

> accommodate the hybridization of an initializing oligonucleotide . .
> . . Preferably, the binding region should be long enough to

26

> accommodate a set of different initializing oligonucleotides, each
> hybridizing to the template to produce a different starting point for

27

> subsequent ligation.

28

1   (Order at 8 (citing '341 patent col. 5:13-27).)  Allowing Illumina to redraft the claim to recapture

2   what it dedicated would also undermine the public notice function that is the "driving force"

3   behind the disclosure-dedication rule.  *See Pfizer*, 429 F.3d at 1379; *see also PSC Computer*

4   *Prods.*, 355 F.3d at 1360 ("Were the patentee allowed to reclaim some specifically-disclosed-but-

5   unclaimed [subject] matter under the doctrine of equivalents, the public would have no way of

6   knowing which disclosed matter infringed and which did not.").  The burden of Macevicz's

7   choices in drafting his claims falls on the patentee, not the public.

### 4.   Hybridizing the Primer to the Target Polynucleotide is Not Equivalent to Hybridizing the Primer to the Binding Region.

10          Even if Illumina were entitled to assert the doctrine of equivalents, it could not show that

11  hybridizing the primer to the binding region is equivalent to hybridizing the primer to the target

12  polynucleotide.  Illumina's expert, Dr. Backman, admitted that hybridizing the primer to a fully-

13  known binding region provides advantages in efficiency, consistency, and convenience:

> Linking the target polynucleotide to a binding region of known
> sequence is advantageous because it allows predesigned initializing
> oligonucleotides to be used in the claimed method. . . . Because
> these regions and oligonucleotides are pre-designed, they can be
> tested, optimized, and kept conveniently at hand for use.

17  (Backman Report, Comer Decl. Ex. I ¶ 138.)

18          Moreover, hybridizing the primer to the binding region provides a known starting point

19  for sequencing the target polynucleotide.  (Metzker Report at 9.)  This is a critical and substantial

20  difference.  A target polynucleotide can be over 500-600 nucleotides in length.  (Comer Decl.

21  Ex. A col. 2:2-12.)  Without a pre-designed binding region, the system cannot predict, control, or

22  know where among these hundreds of nucleotides the primer has hybridized to the target

23  polynucleotide.  Multiple primers may hybridize to arbitrary locations, and the specification

24  teaches no way of knowing how many primers have hybridized or where they have hybridized.

25  (Metzker Report at 9.)  In other words, without a predetermined starting point, the system will

26  start at a random, unknown location.

27          This defeats the point of DNA sequencing.  Even if the system continues to operate and

28  generates some information, one has no way of knowing how that information corresponds to the

1   hundreds of nucleotides in the target polynucleotide.  As Dr. Metzker puts it, the system "would

2   produce little usable information, since one would not know the starting point" and it "would add

3   an extraordinary amount of unnecessary complexity" to attempt to solve these problems.  (*Id.*)

4   By contrast, using the binding region as a starting point allows the system to start from a known

5   location and keep track of interrogation positions.

6        Dr. Backman agreed at his deposition that the binding region provides a starting point for

7   sequencing the target polynucleotide, but failed to acknowledge its significance.  (Backman Dep.,

8   Pai Decl. Ex. 2 at 74:15-19.)  Ignoring the problems caused by not having a known starting point,

9   Dr. Backman made only the conclusory statement that "[w]hether the initializing oligonucleotide

10  is hybridized to a known, unknown, or partially known sequence does not change the function,

11  way, or result."  (Backman Report, Comer Decl. Ex. I ¶ 142.)  This is both contrary to his own

12  report, and nothing close to the particularized evidence and linking argument required to show

13  infringement by equivalence.  (*Id.* ¶ 138.)

**C.    The One-Base Encoding Prototype Was Used To Identify A Base Within Each Cycle, But It Did Not Infringe.**

16       Instead of seeking a ruling as to whether AB's commercialized SOLiD System infringes

17  the '597 patent, Illumina seeks judgment that a prototype system, which never progressed beyond

18  proof of concept and was never sold or offered to the public, infringed because it used one-base

19  encoded probes and thus determined the identity of a base in each cycle.  (Declaration of Gina

20  Costa, Ph.D. in Support of AB's Motion ("Costa Decl.") ¶ 18, Docket No. 208; Comer Decl. Ex.

21  M at 36:7-37:22; Costa Opp. Decl. ¶¶ 4-8.)  The one-base prototype is so insignificant that

22  Illumina did not have its damages expert evaluate damages attributable to the prototype.  (Siuta

23  Dep., Pai Decl. Ex. 3 at 160:1-7 ("Q. If we assume that the two base encoding version of the

24  SOLiD system is found not to infringe, what are the appropriate damages in this case?  A. I don't

25  have an opinion on that at this moment.  That's not something that I considered."); *see also id.* at

26  160:8-12, 165:15-166:3.)

27       Although the prototype used one-base encoded probes in which the label on each probe

28  corresponded one-to-one with the identity of the target nucleotide being interrogated, and was

1    therefore used to determine the identity of a base within each cycle, infringement cannot be

2    found, because the use was *de minimis* and because AB's affirmative defenses preclude judgment

3    for Illumina.[9]  *See infra* section III.D.

4         The Federal Circuit recognizes a *de minimis* exception to patent infringement.  *Embrex,*

5    *Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1349 (Fed. Cir. 2000).  While the Federal Circuit has

6    not set precise boundaries for the exception, AB's use of the prototype, which was used for

7    internal research and never marketed or sold to the public, qualifies for the exception.  *See Baxter*

8    *Diagnostics, Inc. v. AVL Scientific Corp.*, 924 F. Supp. 994, 1016, *modified on other grounds*,

9    954 F. Supp. 199 (C.D. Cal. 1996) (*de minimis* infringement exists where the manufacture or sale

10   is insignificant in amount and where alleged infringing activity is terminated at the *de minimis*

11   stage); *Maxon Premix Burner Co. v. Eclipse Fuel Eng'g Co.*, 471 F.2d 308, 317 (7th Cir. 1972)

12   (holding that manufacture and sale of a single experimental prototype would be excused as *de*

13   *minimis* activity).

14        Analysis of the one-base prototype, however, further demonstrates why the

15   commercialized SOLiD System, on which AB has moved for summary judgment, does *not*

16   determine the identity of a base within each cycle as required by all of the asserted claims of the

17   '341 and '597 patents.

18        For one, the prototype used different probes, which were designed so that only one base

19   produced information about (interrogated) the target fragment.  (*See* Costa Opp. Decl. ¶¶ 5-6,

20   Ex. A; Backman Report, Comer Decl. Ex. I ¶¶ 75-95; Comer Decl. Ex. M at 61:24-65:15, 76:15-

21   85:22.)  Each probe had one of four labels that corresponded to the identity of the base at the

22   interrogation position.  The four different types of labels generally emitted energy at different

23   wavelengths.  A digital camera recorded images in four expected wavelength ranges and

24   computers analyzed the images to determine which color to assign to each label.  (Costa Opp.

25

26        [9] The one-base prototype also does not infringe any of the asserted claims of the '341
     patent because the primer was hybridized to the known adapter, not to the target polynucleotide.
27   (*See supra* section III.B. and section III.C. of AB's motion for summary judgment of
     noninfringement.)

28

1   Decl. ¶ 6; Comer Decl. Ex. M at 80:7-82:9, 99:13-100:8, 102:17-104:1.)  Because the prototype

2   probes interrogated only one base at a time, each color corresponded one-to-one with the four

3   possible nucleotides at the position being interrogated.  (*See* Costa Opp. Decl. ¶¶ 5-6, Ex. A.)

4   Thus, a green label indicated that the target nucleotide being interrogated was a C.  (*Id.*; Backman

5   Report, Comer Decl. Ex. I ¶¶ 162-169.)

6       This one-to-one correspondence was similar to the labeling of the probes described in the

7   Macevicz patents (as discussed above with respect to the '119 patent, the probes differ in other

8   ways).  In the Macevicz patents, each probe is identified by a label corresponding one-to-one to

9   the identity of one interrogating position.  Thus, once a color is determined, it identifies a specific

10  base in the target in each ligation cycle.  (Backman Report, Comer Decl. Ex. I ¶ 61; Illumina's

11  Opp'n to AB's MSJ on Ownership, Docket No. 76, at 7; Illumina's Opening Claim Constr. Br.,

12  Docket No. 82, at 2.)

13      This is very different from the commercialized SOLiD System, which uses two-base

14  encoded probes and different software.  In the two-base encoded SOLiD System, a green label,

15  for example, corresponds with the combinations AC, CA, GT, or TG.  (*See* AB's Motion at 3-4.)

16  Thus, in the SOLiD System, a green label does not reveal which of those four combinations is

17  correct, which means that the target nucleotides at either position being interrogated can be an A,

18  C, T, or G.  (*Id.*)

19      The software used in the two systems is also very different.  In the one-base prototype, the

20  bases in the target fragment were identified within each cycle, so the computers needed only to

21  compare the sequence for the fragment to a publicly-available sequence of bases for the target

22  organism's genome not to determine the identity of the bases (they had already been determined)

23  but to see where the fragment sequence fit into the larger genome.  (Costa Opp. Decl. ¶ 7.)  This

24  is very different from the SOLiD System, which requires an alignment process to determine the

25  identity of the target nucleotides.  As discussed in more detail in AB's motion for summary

26  judgment and the accompanying declarations, the software takes a known reference sequence of

27  nucleotides (a sequence that has already been determined for that organism) and converts it into a

28  color sequence by applying the same coding used to interrogate the bases in the target.  (AB's

1    Motion at 5-6.)  The software then tries to find where color readings for a given fragment (a string

2    of 25 to 35 color readings) match the reference sequence (for humans, a string of 3.2 billion

3    colors).  The output is a list of potential matches for each fragment.  (*Id.*)  It is only through the

4    alignment process that the system determines the identity of the bases in the target fragment.

### D.    Illumina Is Not Entitled To Summary Judgment Because It Cannot Overcome AB's Affirmative Defenses.

7    Even if the Court were to accept every representation and argument offered by Illumina,

8    its motion must still be denied because Illumina fails to overcome AB's affirmative defenses.

9    (*See* Docket No. 88 at 11 (statute of limitations defense basis for denial of summary judgment).)

10   At a minimum, the issues of fact regarding AB's defenses, which were not addressed by Illumina,

11   preclude summary judgment of infringement.[10]  Summary judgment of infringement is precluded

12   unless Illumina demonstrates that there is no genuine issue of material fact that AB's affirmative

13   defenses must fail.  *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

14   *Procedure: Civil* § 2734, at 256 (3d ed. 2008) ("A claimant is entitled to summary judgment only

15   when . . . every one of the defenses asserted legally are insufficient").  Illumina cannot do so.

16   AB's defenses ─ ownership, standing, shop rights, equitable rights to practice the patents,

17   estoppel, and unclean hands ─ are all based on its legal or equitable title to the Macevicz patents

18   and Illumina's misconduct in claiming title to the patents.  (*See* Docket Nos. 61, 70.)  The Court

19   has already held that there are disputed issues of fact that require trial.[11]  (*See* Docket Nos. 88,

20   180.)

---

[10] These issues of fact do not impact AB's own motion for summary judgment of noninfringement as they pertain to AB's affirmative defenses.

[11] Even if the Court had ruled on statute of limitations grounds that AB was precluded from making an affirmative claim of ownership of the patents, evidence of ownership would remain relevant to AB's affirmative defenses.  *See Styne v. Stevens*, 26 Cal. 4th 42, 51 (2001) ("Under well-established authority, a defense may be raised at any time, even if the matter alleged would be barred by a statute of limitations if asserted as the basis for affirmative relief."); *see generally* 3 Bernard E. Witkin, *California Procedure, Actions* § 423, at 532 (4th ed. 1997).  Thus, even if AB's affirmative state law causes of action had been barred, defenses based on Macevicz's misconduct would still be viable.

1

### 1.    AB owns the patents.

2    In addition to each of the bases for denying Illumina's motion discussed above, summary

3    judgment of infringement cannot be entered because there are disputed facts establishing that AB

4    is the rightful owner of the Macevicz patents, not Illumina.  *See* 35 U.S.C. § 154(a)(1) (patentee is

5    granted right to "exclude others" from practicing the claimed invention); *Int'l Gamco, Inc. v.*

6    *Multimedia Games, Inc.*, 504 F.3d 1273, 1277 (Fed. Cir. 2007) (patent rights are rights to

7    "exclude others").  AB raised several affirmative defenses addressing its ownership claim,

8    including that it is the legal owner and thus cannot be excluded from practicing the patent,

9    Illumina is not the legal owner so it does not have standing to bring an action for infringement,

10    and that AB has at a minimum rights under the shop rights doctrine or the employed-to-invent

11    doctrine.  (Docket No. 70 at 2-5.)  Illumina's motion is silent on these defenses.

12    As AB set forth in prior briefing, the facts establish that AB is the legal owner of the

13    Macevicz patents.  (*See e.g.*, Docket Nos. 58-63.)  In 1992, Macevicz signed an Invention

14    Agreement, in which he promised to assign his inventions to AB.  (Docket No. 156 Ex. 1 ¶ 2.)

15    The only exception in the Agreement was for inventions that were developed entirely on his own

16    time and without company resources, and unrelated to AB's business.  Macevicz further agreed

17    that if he believed the invention fell within the exception, he would promptly disclose, in writing,

18    what the invention was and the grounds for his belief that it fell within the exception.  (*Id.* ¶ 7.)

19    Thereafter, while working for AB as Senior Patent Counsel, Macevicz purportedly invented the

20    subject matter of the patents-in-suit.  On April 17, 1995, he filed the patent application leading to

21    the three patents.  Four months later, on August 7, 1995, Macevicz left AB.  Three weeks later, on

22    August 31, 1995, he purported to assign the patent application to Illumina's predecessor, Lynx.[12]

23    (Docket No. 156 Ex. 8.)  Macevicz's actions amount to, *inter alia*, breach of contract, breach of

24    fiduciary duty, and conversion, for which AB seeks injunctive relief and a declaration of

25    ownership.

26

_____

27    [12] Lynx merged with Solexa in 2005.  (Docket No. 55 ¶ 2.)  Illumina acquired Solexa in January 2007.  (*Id.*)  The three entities are referred to collectively herein as "Illumina."

28

1    The Court has already found disputed issues of fact regarding the rights to the Macevicz

2    patents and denied cross motions for summary judgment, establishing AB's prima facie case and

3    the existence of disputed issues of material fact relating to these defenses.  (Docket Nos. 88, 180.)

4    Because Illumina has not — and cannot under the Court's order — show that there is no genuine

5    issue of material fact that these defenses fail, summary judgment cannot be granted for Illumina.

6    (*See* Docket Nos. 61, 80.)

7                    **2.      AB has equitable rights to practice the patents based on
                              Macevicz's obligation to assign the inventions to AB.**
8

9        Even if AB's claim for ownership were to fail, there is also a genuine issue of material

10   fact regarding AB's equitable rights to practice the claims.  "Equitable title may be defined as 'the

11   beneficial interest of one person whom equity regards as the real owner, although the legal title is

12   vested in another.'"  *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.3 (Fed. Cir. 1991)

13   (citing *Black's Law Dictionary* 1486 (6th ed. 1990)).  Thus, even if the Court were to find *legal*

14   title in Illumina, Macevicz's contract to assign inventions to AB and his fiduciary duty establish

15   *equitable* title in AB.  *See id.* at 1581 ("an agreement to assign in the future inventions not yet

16   developed may vest the promisee with equitable rights in those inventions"); *Enreach Tech. Inc.*

17   *v. Embedded Internet Solutions*, 403 F. Supp. 2d 968, 975-76 (N.D. Cal. 2005); *see also Digeo,*

18   *Inc. v. Audible, Inc*., No. C05-464JLR, 2006 U.S. Dist. LEXIS 62994, at *18-22 (W.D. Wash.

19   Aug. 24, 2006).  As noted above, the Court has already determined that issues of fact preclude

20   resolution of the ownership issues, legal or equitable, prior to trial.

21                   **3.      The facts establish that Illumina is estopped by Macevicz's
                              breach from asserting the patents against AB.**
22

23       As a condition of his employment with AB, Macevicz agreed to comply with AB's

24   Invention Agreement.  (Pai Decl. Ex. 4. ("[s]igning this [Employee Invention Agreement] is a

25   condition of employment.").)  Under that agreement, if Macevicz made an invention that he did

26   not believe he was required to assign to AB, he was still required to "[a]dvise the Company

27   promptly in writing" about his invention.  (Docket No. 156 Ex. 1 ¶ 7.)  AB relied on Macevicz's

28   statements that he would comply with the invention agreement and offer letter.

Macevicz breached that obligation to disclose.  There is no evidence of any written disclosure that would satisfy the Invention Agreement, and Macevicz admits that he made no such disclosure.  (Pai Decl. Ex. 5 at 97:18-25, 104:24-105:7, 106:5-11, 107:2-15, 114:4-115:4.)  There is evidence, however, that if Macevicz had disclosed the inventions to AB, AB would have been interested in them.  Dr. Hunkapiller, who headed AB at the time, testified to this.  (Pai Decl. Ex. 6 at 100:19-101:25.)  Dr. Frank Oaks, a current Illumina Vice President who worked at AB throughout the time period relevant to this case, confirmed that AB would have wanted to know about the inventions even if AB did not want to pursue them.  (Pai Decl. Ex. 7 at 46:18-47:17.)  As Dr. Oaks explained, ABI "had this broad business involved in multiple things so they certainly would have patented things outside of Sanger sequencing."  (*Id.* at 54:14-17.)  Since Macevicz concealed his inventions from AB, instead of disclosing them, he deprived AB of this opportunity.  Put another way, there is no question that if Macevicz had disclosed his inventions to AB, as he was required to do, any issues would have been resolved in 1995 and this litigation would not have happened.

AB would not have hired Macevicz had he disclosed that he would not comply with the Invention Agreement, and it would not have continued to employ him if it had known that he concealed an invention that he was obligated to disclose.  Macevicz is thus estopped from asserting any claims against AB based on the patents at issue in this case.  *See, e.g., U.S. v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970) ("[e]quitable estoppel is a doctrine adjusting the relative rights of parties based upon consideration of justice and good conscience.") (citations omitted).  Unless Illumina can prove that it is a bona fide purchaser for value, which it cannot do (*see* Docket No. 61 at 15-21), Illumina also cannot enforce the patents against AB.

**4.    Illumina's claims are barred by the doctrine of unclean hands.**

AB's unclean hands defense also precludes summary judgment of infringement.  There are ample facts supporting this defense.  "The [un]clean hands doctrine is applicable when 1) a party seeking affirmative relief 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith 3) directly related to the matter in issue 4) that injures the other party 5) and affects the balance of equities between the litigants."  *See, e.g., Starsight Telecast v. Gemstar Dev. Corp.*,

1    No. C 93-20777 RMW(EAI), 1995 U.S. Dist. LEXIS 22006, at *10-12 (N.D. Cal. Aug. 11, 1995)

2    (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-815 (1945)).

3    The unclean hands defense primarily involves questions of fact, which Illumina's motion does not

4    address. *Id.* at *12.

5          Two sets of facts establish Illumina's unclean hands.  First, as discussed above, Illumina

6    accepted Macevicz's purported assignment of the patents despite Macevicz's breach of his

7    obligation to disclose them to AB.  *See supra* section III.D.3.  Illumina was not a bona fide

8    purchaser for value, yet it has asserted those patents against AB in this case.

9          Second, as early as November 1994, while Macevicz was still employed with AB, Lynx

10   Therapeutics (a predecessor to Illumina) was already negotiating with Macevicz regarding the

11   assignment of a patent application to Lynx.  (Docket No. 72-5.)  On May 1, 1995, again while

12   Macevicz was still employed with AB, Lynx provided Macevicz with an Indemnity Agreement

13   covering liabilities arising from <u>his conduct while working at AB</u>.  (Docket No. 72-3.)  Macevicz

14   believes he received the Indemnity Agreement because he intended to depart from AB to Lynx.

15   (Pai Decl. Ex. 5 at 17:15-24.)  With the Indemnity Agreement in hand, Macevicz left AB without

16   telling AB about his patent applications and joined Lynx.  Macevicz then purported to assign to

17   Lynx several patent applications, including the application resulting in the Macevicz patents

18   asserted by Illumina in this litigation.  (Docket No. 72-6.)

19          That Indemnity Agreement is the basis for which Illumina has been indemnifying and

20   providing counsel for Macevicz in this litigation over his conduct while he was still at AB.

21   (Docket No. 72-3; Docket No. 72-4 at 10:13-12:1, 27:12-28:7, 167:4-12; Pai Decl. Ex. 8.)

22   Illumina's conduct in this litigation thus perpetuates and ratifies its earlier wrongdoing in

23   encouraging Macevicz to breach his obligations to AB.  There is at least a genuine issue of

24   material fact that because Illumina assisted Macevicz's wrongdoing, Illumina should be barred

25   from enforcing the patents against AB.

26   ///

27   ///

28   ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    CONCLUSION**

For the foregoing reasons, AB respectfully requests that Illumina's motion be denied.

Dated: July 31, 2008                    MORRISON & FOERSTER LLP


                              By:    /s/ Steven E. Comer
                                     Steven E. Comer

                                     Attorneys for Plaintiff
                                     APPLERA CORPORATION –
                                     APPLIED BIOSYSTEMS GROUP