# Exhibit 11

# Deposition of
# GERALD SIUTA, PhD

**Date:** June 10, 2008
**Volume:** 1

**Case:** APPLERA v. ILLUMINA

SHARI MOSS & ASSOCIATES
Phone: (650) 692-8900  (415) 402-0004
Fax: (650) 692-8909
Email: sharimoss@sharimoss.com
Internet: www.iptranscripts.com

```
              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

                SAN FRANCISCO DIVISION

-------------------------------------x

APPLERA CORPORATION - APPLIED

BIOSYSTEMS GROUP, a Delaware

corporation,

                    Plaintiff/

                    Counterdefendant,

     -against-                        Civil Action No.

ILLUMINA, INC., a Delaware            07-CV-02845 WHA

corporation, SOLEXA, INC., a

Delaware corporation, and

STEPHEN C. MACEVICZ, an individual,

                    Defendants/

                    Counterclaimants.

-------------------------------------x


              VIDEOTAPED DEPOSITION OF:

                 GERALD J. SIUTA, Ph.D.

                 Tuesday, June 10, 2008

                   New York, New York
```

Reported in stenotype by:
Rich Germosen, CCR, CRCR, RPR, CRR, CLR

Page 2

1         Videotaped Deposition of GERALD J. SIUTA,
2    Ph.D., taken in the above-entitled matter before
3    RICH GERMOSEN, Certified Court Reporter, (License
4    No. 30XI00184700), Certified Realtime Court
5    Reporter-NJ, (License No. 30XR00016800), NCRA
6    Registered Professional Reporter, NCRA Certified
7    Realtime Reporter, Certified LiveNote Reporter, and
8    a Notary Public within and for the States of New
9    York and New Jersey, taken at the offices of
10   MORRISON & FOERSTER, L.L.P., 1290 Avenue of the
11   Americas, New York, New York  10104, on Tuesday,
12   June 10, 2008, commencing at 9:15 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   A P P E A R A N C E S:

 2

 3

 4   MORRISON & FOERSTER, L.L.P.

 5   BY:   ERIC C. PAI, ESQ.

 6        -and-

 7   BY:   BRYAN J. WILSON, ESQ.,

 8   (appearing via Internet realtime connection)

 9   755 Page Mill Road

10   Palo Alto, California  94304-1018

11   (650) 813.5623 / (650) 251.3845 (FAX)

12   epai@mofo.com

13   bwilson@mofo.com

14   Attorneys for the Plaintiff

15

16   MARSHALL, GERSTEIN & BORUN, L.L.P.

17   BY:   THOMAS I. ROSS, ESQ.

18   233 South Wacker Drive

19   6300 Sears Tower

20   Chicago, Illinois  60606-6357

21   (312) 474.6635 / (312) 474.0448 (FAX)

22   tross@marshallip.com

23   Attorneys for the Defendants

24

25
```

Page 4

1  A P P E A R A N C E S:  (CONT'D.)

2

3

4  ALSO PRESENT:

5  LEE BOWRY, Legal Video Specialist

6  DAVID BLACKBURN, NERA Economic Consulting

7  ALAN COX, NERA Economic Consulting,

8  (appearing via Internet realtime connection)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2   WITNESS                              EXAMINATION

 3   GERALD J. SIUTA, Ph.D.

 4     BY MR. PAI                         14,154

 5

 6   AFTERNOON SESSION

 7     BY MR. PAI                         154

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

```
 1                  E X H I B I T S
 2    DESCRIPTION                      PAGE    LINE
 3    (Exhibit 200 for                  12      12
 4     identification, multi page
 5     document entitled Expert
 6     Report of Gerald J. Siuta on
 7     Infringement Damages, not
 8     bearing Bates stamps.)
 9
10    (Exhibit 201 for                  12      17
11     identification, one-page of
12     handwritten notes, not
13     bearing Bates stamps.)
14
15    (Exhibit 202 for                 236       5
16     identification, multi page
17     document entitled
18     Collaboration Agreement,
19     bearing Bates stamps
20     ILL044534 through ILL044578.)
21
22
23
24
25
```

```
 1                E X H I B I T S  (CONT'D.)
 2   DESCRIPTION                       PAGE    LINE
 3   (Exhibit 203 for                  236     11
 4    identification, multi page
 5    document on Lynx letterhead
 6    dated December 19th, 2002,
 7    bearing Bates stamps
 8    ILLI00001 through ILL100004.)
 9
10   (Exhibit 204 for                  236     17
11    identification, multi page
12    document on Takara Bio, Inc.
13    letterhead dated June 30th,
14    2003, bearing Bates stamps
15    ILL044579 through ILL044582.)
16
17   (Exhibit 205 for                  264     3
18    identification, multi page
19    document entitled agreement,
20    bearing Bates stamps
21    ILL044583 through ILL044591.)
22
23
24
25
```

```
 1                E X H I B I T S  (CONT'D.)
 2    DESCRIPTION                        PAGE    LINE
 3    (Exhibit 206 for                   297     22
 4     identification, multi page
 5     document entitled License
 6     Agreement, bearing Bates
 7     stamps AB00301084 through
 8     AB00301131.)
 9
10    (Exhibit 207 for                   298     3
11     identification, two-page
12     document entitled First
13     Amendment to License
14     Agreement, bearing Bates
15     stamps AB00301082 and
16     AB00301083.)
17
18    (Exhibit 208 for                   298     8
19     identification, multi page
20     document entitled License
21     Agreement, bearing Bates
22     stamps AB00301132 through
23     AB00301163.)
24
25
```

```
 1                E X H I B I T S  (CONT'D.)
 2   DESCRIPTION                           PAGE    LINE
 3   (Exhibit 209 for                      342     10
 4    identification, multi page
 5    document entitled Use of the
 6    Twenty-Five Percent Rule In
 7    Valuing IP, not bearing Bates
 8    stamps.)
 9   **original exhibits returned with original
10   transcript by SHARI MOSS & ASSOCIATES to
11   MORRISON & FOERSTER, L.L.P.
12   (exhibit index concluded)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 10

```
 1   PRODUCTION OF DOCUMENTS AND/OR INFORMATION
 2                  Page Line
 3                    (none)
 4
 5
 6   DIRECTION TO WITNESS NOT TO ANSWER
 7                  Page Line
 8                    (none)
 9
10
11   QUESTIONS MARKED FOR LATER RULING
12                  Page Line
13                    (none)
14
15
16
17
18
19
20
21
22
23
24
25
```

1               IT IS HEREBY STIPULATED AND AGREED, by
2  and between the attorneys for the respective parties
3  herein, that filing and sealing be and the same are
4  hereby waived.
5               IT IS FURTHER STIPULATED AND AGREED
6  that all objections, except as to the form of the
7  question, shall be preserved to the time of trial.
8               IT IS FURTHER STIPULATED AND AGREED
9  that the within deposition may be signed and sworn
10 to before any officer authorized to administer an
11 oath, with the same force and effect as if signed
12 and sworn to before the officer before whom the
13 within deposition was taken.
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1                P R O C E E D I N G S
2                MR. PAI:  Let's mark the first two
3   exhibits while we're waiting.
4                Mark this one as 200 and this one
5   as 201, please.
6                COURT REPORTER:  (Complies.)
7                (Whereupon, multi page document
8   entitled Expert Report of Gerald J. Siuta on
9   Infringement Damages, not bearing Bates stamps,
10  is received and marked as Siuta Exhibit 200 for
11  Identification.)
12               COURT REPORTER:  Number 200.
13               (Whereupon, one-page of
14  handwritten notes, not bearing Bates stamps, is
15  received and marked as Siuta Exhibit 201 for
16  Identification.)
17               (Whereupon, a short recess is
18  taken.)
19               THE VIDEOGRAPHER:  Stand by,
20  please.
21               This is Tape Number 1 of the
22  videotaped deposition of Dr. Gerald J. Siuta in
23  the matter of Applera Corporation Applied
24  Biosystems Group versus Illumina, Inc., et al., in
25  the United States District Court, Northern

Page 49

 1                    So the twenty-five percent rule is
 2    a method you used when you have insufficient
 3    information, is that right?
 4         A.     No, not so.  I won't say that.
 5    Many people use it as the first, first means of
 6    determining reasonable royalty.
 7         Q.     If you have more specific
 8    information, do you still use the twenty-five
 9    percent rule to determine the reasonable royalty?
10         A.     Again, it depends upon the
11    information you have and the individual case.
12         Q.     Okay.  Why don't we come back to
13    that.
14                    And the third draft of the report,
15    was that the final draft or were there other
16    intervening drafts?
17         A.     Sounds about right, the third
18    would probably be the final.
19         Q.     Okay.
20                    What opinions have you reached in
21    this matter?
22         A.     That the, the royalty or
23    license -- the technology access fee that a
24    reasonable fee would be fifteen million dollars
25    for APG to continue the development of their

```
 1   product and that a fifteen percent royalty on, on
 2   sales would be reasonable for AB on the sales of
 3   the product.
 4        Q.   And is this assuming that all of
 5   the patents are infringed?
 6        A.   Yes.
 7        Q.   Have you reached any other
 8   opinions on this matter?
 9        A.   No.
10        Q.   So you have no opinion on the form
11   that a reasonable royalty should take?
12        A.   Form?
13        Q.   You have no opinion on whether a
14   reasonable royalty should be a running royalty as
15   opposed to a lump sum up-front payment?
16        A.   No, the -- the -- the royalty,
17   yes, it would be a running royalty.  It's on
18   sales, annual sales.
19        Q.   And do you have any opinion on
20   whether that running royalty would be a
21   percentage or a dollar amount?
22        A.   Percentage.
23        Q.   Could you please turn to Page 38
24   of your report.
25        A.   Okay.
```

1          A.     Because it's twenty-five divided
2    by five hundred twenty-five.
3          Q.     So whatever that comes out to be
4    you consider that a small percentage?
5          A.     It's less than ten percent.
6          Q.     Do you have any opinion on the
7    date of the hypothetical negotiation?
8          A.     Yes.  Two different ones.  For the
9    one base and two based would be September of 2005
10   and that would be APG and for on -- that's for
11   the development.  And then June for 2007 for AB
12   selling the SOLiD instrument as well as the
13   consumables.
14         Q.     So your opinion is that there
15   would be two hypothetical negotiations?
16         A.     Yes.
17         Q.     What is that opinion based on?
18         A.     The fact that APG at the time is
19   just developing and would want to continue
20   developing to get that potential product to a
21   point of being commercializable and the second
22   date being when it's actually commercialized.
23         Q.     Why wouldn't the hypothetical
24   negotiation have taken place when the patents
25   issued?

```
 1          A.     I don't recall specifically the
 2   dates when the patents issued.  Do you?
 3          Q.     I believe they were 1998, 1999,
 4   2001.
 5          A.     Because they weren't infringing at
 6   that time.  APG wasn't infringing at that time.
 7          Q.     Now, why wouldn't AB have found
 8   out about the patents that it wanted to negotiate
 9   a license at the time of the patent issue?
10          A.     AB?
11          Q.     Yes.
12          A.     AB didn't know about the one base
13   and two based systems.  APG was doing the
14   development, not AB.  AB didn't find out about it
15   until February of 2006 when APG made the
16   presentation in Marco Island.
17          Q.     So is there any reason AB would
18   have known about the patents before February of
19   2006?
20          A.     Sure, they probably did, sure.
21          Q.     Why is that?
22          A.     I'm assuming that like most
23   companies do, they keep up-to-date on patents,
24   issue patents, published patent applications
25   especially in the field in which they're working.
```

1        Q.      Would it have continued developing
2   the technology if it didn't know that the product
3   could be commercialized?
4        A.      No, again the assumption being
5   they were developing it because they believed it
6   could be commercialized.
7        Q.      So if they were continuing to
8   develop it only because they believed it could be
9   commercialized, then why would Agencourt pay
10  fifteen million dollars to use developmental
11  technology, to have developmental rights to
12  technology but no commercial rights?
13       A.      Again, they believed that the
14  product, the technology was crucial to their
15  product, and again which I didn't say before, but
16  not having commercial rights doesn't mean that
17  there couldn't be something in the agreement that
18  would allow them to negotiate a commercial
19  license at the time of commercialization rather
20  than at the time when all they needed was to be
21  able to continue development.
22       Q.      Why wouldn't they want to make
23  sure they had the commercial rights at that time
24  as well?
25       A.      Because they did not know what the