1   BRYAN WILSON (CA SBN 138842)
    ERIC C. PAI (CA SBN 247604)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California 94304-1018
    Telephone: 650.813.5600
4   Facsimile: 650.494.0792
    E-Mail: BWilson@mofo.com; EPai@mofo.com
5
    DAVID C. DOYLE (CA SBN 70690)
6   STEVEN E. COMER (CA SBN 154384)
    BRIAN M. KRAMER (CA SBN 212107)
7   MORRISON & FOERSTER LLP
    12531 High Bluff Drive, Suite 100
8   San Diego, California  92130-2040
    Telephone: 858.720.5100
9   Facsimile: 858.720.5125
    E-Mail: DDoyle@mofo.com; SComer@mofo.com;
10  BMKramer@mofo.com

11  Attorneys for Plaintiff
    APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP
12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17  APPLERA CORPORATION – APPLIED            Case No.    C07 02845 WHA
    BIOSYSTEMS GROUP, a Delaware corporation,
18                                           **APPLERA CORPORATION –
                        Plaintiff,           APPLIED BIOSYSTEMS
19                                           GROUP'S REPLY IN SUPPORT
                                             OF MOTION FOR SUMMARY
20          v.                               JUDGMENT OF
                                             NONINFRINGEMENT**
21  ILLUMINA, INC., a Delaware corporation,
    SOLEXA, INC., a Delaware corporation, and  Date:    August 21, 2008
22  STEPHEN C. MACEVICZ, an individual,       Time:    8:00 a.m.
                                              Place:   Courtroom 9, 19th Floor
23                      Defendants.            Judge:   William H. Alsup

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3   I.     INTRODUCTION .................................................................................................. 1

4   II.    UNDISPUTED FACTS ......................................................................................... 1

    III.   ARGUMENT ......................................................................................................... 2

5          A.    SOLiD Does Not Determine The Identity Of Bases Within Each Cycle ............. 2

6          B.    Backman's Theory Conflicts With The Court's Construction Of
                 "Identifying." ......................................................................................................... 4

7                1.    Infringement Requires That The Claimed Method Is Performed,
                       Not That It Could Be Performed. ................................................................... 5

8                2.    The Backman Method Would Be Useless ...................................................... 6

9                3.    Illumina Abandoned The Doctrine Of Equivalents ....................................... 7

10         C.    The Primer In The SOLiD System Hybridizes To The Binding Region, Not
                 the Target Polynucleotide ...................................................................................... 8

11               1.    Illumina Cannot Show Literal Infringement. ................................................. 8

12               2.    Illumina Is Precluded From Asserting Equivalents ....................................... 9

13                     a.    Prosecution History Estoppel ............................................................ 9

                       b.    Illumina Waived The Doctrine Of Equivalents ............................... 11

14         D.    The '119 Patent Is Not Infringed ......................................................................... 11

15               1.    Illumina's Interpretation of Claim 1 Removes The Phosphoramidate
                       Limitation From The Claim. ......................................................................... 12

16
                 2.    Because Cleavage Matters, There Is No Genuine Issue Of Material
17                     Fact Regarding Non-Equivalence. ................................................................ 12

                 3.    Illumina's Remaining Arguments Do Not Raise A Genuine Issue
18                     Of Material Fact. ........................................................................................... 13

    IV.    CONCLUSION .................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

CASES

*Abraxis Bioscience, Inc. v. Mayne Pharma Inc.,*
467 F.3d 1370 (Fed. Cir. 2006) ............................................................. 14, 15

*Bd. of Regents of the Univ. of Tex. Sys. v. Benq Am. Corp.,*
__ F.3d __, No. 2007-1388, 2008 U.S. App. LEXIS 15788 (Fed. Cir. July 24, 2008) ............ 3

*Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.,*
262 F.3d 1258 (Fed. Cir. 2001) ............................................................. 9

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
480 F.3d 1335 (Fed. Cir. 2007),
*cert. denied*, 128 S. Ct. 614 (2007) ...................................................... 10

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
469 F.3d 1005 (Fed. Cir. 2006),
*cert. denied*, 128 S. Ct. 58 (2007) ....................................................... 11

*Dippin' Dots, Inc. v. Mosey,*
476 F.3d 1337 (Fed. Cir. 2007),
*cert. denied*, 128 S. Ct. 375, 128 S. Ct. 391 (2007) ......................................... 2, 3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
535 U.S. 722 (2002) ....................................................................... 9

*Freedman Seating Co. v. Am. Seating Co.,*
420 F.3d 1350 (Fed. Cir. 2005) ............................................................. 13

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,*
339 U.S. 605 (1950) ....................................................................... 15

*Hewlett-Packard Co. v. Mustek Sys.,*
340 F.3d 1314 (Fed. Cir. 2003) ............................................................. 7

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.,*
523 F.3d 1304 (Fed. Cir. 2008) ............................................................. 10

*In re Dippin' Dots Patent Litig.,*
249 F. Supp. 2d 1346 (N.D. Ga. 2003) ...................................................... 3

*Joy Techs., Inc. v. Flakt, Inc.,*
6 F.3d 770 (Fed. Cir. 1993) ............................................................... 5

*Ormco Corp. v. Align Tech., Inc.,*
463 F.3d 1299 (Fed. Cir. 2006) ............................................................. 5

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3   *PC Connector Solutions LLC v. SmartDisk Corp.*,

4       406 F.3d 1359 (Fed. Cir. 2005)............................................................... 8, 11, 13

5   *Phillips v. AWH Corp.*,
        415 F.3d 1303 (Fed. Cir. 2005),

6       *cert. denied*, 546 U.S. 1170 (2006) ........................................................ 7

7   *Spectrum Int'l, Inc. v. Sterilite Corp.*,
        164 F.3d 1372 (Fed. Cir. 1998)................................................................ 3

8

9   *Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n*,
        109 F.3d 726 (Fed. Cir. 1997)................................................................. 13

10  *Tronzo v. Biomet, Inc.*,

11      156 F.3d 1154 (Fed. Cir. 1998)................................................................ 12

12  *USA Petroleum Co. v. Atl. Richfield Co.*,
        13 F.3d 1276 (9th Cir. 1994).................................................................... 7

13

14  *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) ...................... 5

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I. INTRODUCTION

The dispute over noninfringement is legal, not factual. As to the identifying step, the parties do not dispute how the Backman (Illumina's expert) method would work or how AB's SOLiD™ System does work. As to an "initializing oligonucleotide probe hybridized to the target polynucleotide," there is no dispute that where the primers in the SOLiD System hybridize. As to the '119 patent's phosphoramidate limitation, there is no dispute the SOLiD probes use a different cleavable linkage that is cleaved under more favorable DNA sequencing conditions. The issues in dispute involve reargument of claim construction and application of the Court's constructions to undisputed facts.

## II. UNDISPUTED FACTS

In its motion, AB set forth a detailed description of how the SOLiD System works. In its opposition, Illumina does not dispute any aspects of SOLiD's operation. It disputes only their legal effect. Specifically, Illumina does not dispute these aspects of the SOLiD System:

Chemistry: AB's motion described the details of a cycle of ligation in the SOLiD System. In short, the target fragment is attached to an adapter of a known sequence, the primer is hybridized to the adapter, a bridge probe (in some versions) is ligated to the primer, a labeled probe is ligated to the primer or the bridge probe (in versions using bridge probes), a camera records an image, and silver nitrate is used to cleave the phosphorothiolate linkage and remove the label. (Mot. at 3-5; Backman Report, Comer Decl., Docket No. 212, Ex. I ¶¶ 157-158, 177, 200; Costa Decl., Docket No. 208, ¶¶ 4-11, 15-17.) Cleavage at neutral pH is preferable to cleavage under the acidic conditions taught by the Macevicz patents for cleaving the claimed phosphoramidate linkage. (Backman Report, Comer Decl. Ex. I ¶¶ 57-58; Backman Dep., Comer Decl. Ex. K at 44:14-45:11; Metzker Report, Docket No. 211-2, at 22-23.) Illumina does not dispute any of these facts.

Software: AB's motion set forth a detailed discussion of how the SOLiD software processes images after all the cycles are complete in order to determine the identity of bases in the target by aligning colors to a known reference. (Mot. at 5-6; Myers Report, Docket No. 210-2,

1  Attach. 1 ¶¶ 35-38; Jones Decl., Docket No. 209, ¶¶ 19-26.)  Illumina does not dispute any of

2  these facts.

3      Backman method:  There is also no factual dispute regarding Dr. Backman's theoretical

4  method of decoding.  AB agrees that the Backman method is as described in his report.

5      Error rates:  AB's motion set forth that the SOLiD System, through decoding by aligning

6  the colors to a reference, provides a greater than 99% accuracy rate, that the standard in the

7  industry is 95% or better to be useful, and that the method of decoding hypothesized by Backman

8  would result in an error rate that would be so high (only 60% accurate for a 25-base sequence) as

9  to be useless.  (Mot. at 5-6, 13-15; Jones Decl. ¶¶ 9, 19-29, Ex. B, Fig. 2 at AB00008517; Myers

10  Report ¶¶ 38, 43, 53-64; Metzker Report at 13.)  Illumina does not dispute any of these facts.

11      This leaves no material facts for a jury to decide.

12  **III.    ARGUMENT**

13      **A.    SOLiD Does Not Determine The Identity Of Bases Within Each Cycle.**

14      The SOLiD System does not determine the identity of a base within <u>each</u> cycle as required

15  by the Court's claim construction.  Illumina admits that the SOLiD System does not determine

16  the identity of a base in most of the cycles.  (Opp'n at 5.)  Illumina instead offers a new claim

17  construction argument that it did not make during *Markman* briefing – that "within each cycle"

18  does not mean "within each cycle" because the word "comprising" in the preamble means most

19  cycles can be ignored as "additional (non-infringing) steps."  (*Id.* at 5-6.)  Because the only issue

20  Illumina raised is claim construction, it is a question of law to be decided on summary judgment.

21      Illumina incorrectly asserts that it can accuse select cycles as infringing while ignoring the

22  majority of admittedly noninfringing cycles performed by the SOLiD System.  (Opp'n at 5-6.)

23  The Federal Circuit recently rejected nearly the same "comprising" argument in *Dippin' Dots,*

24  *Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 375, 128 S. Ct. 391 (2007).

25      The *Dippin' Dots* case dealt with the Dippin' Dots ice cream often seen in shopping malls.

26  Dippin' Dots held a patent with six steps directed to a "method of preparing and storing a free-

27  flowing, frozen alimentary dairy product, <u>comprising</u> the steps of . . . ."  *Id.* at 1340 (emphasis

28  added).  One of the steps required "freezing said dripping alimentary composition into <u>beads</u>."

1    *Id.* (emphasis added).  The accused method (by competitor Frosty Bites) made a "mixture of

2    beads and irregularly shaped nuggets of ice cream."  *In re Dippin' Dots Patent Litig.*, 249 F.

3    Supp. 2d 1346, 1356 (N.D. Ga. 2003).  The trial court construed "beads" to mean "small frozen

4    droplets . . . which have a smooth, spherical (round or ball shaped) appearance" and held that this

5    excluded "irregular or odd shaped particles such as 'popcorn.'"  476 F.3d at 1342-43.  Because

6    the Frosty Bites process created irregular shaped droplets in addition to the claimed "beads," the

7    trial court granted summary judgment of noninfringement.

8        On appeal, Dippin' Dots made the same argument Illumina is making.  It argued that

9    because the claim used the word "comprising," the claimed process was satisfied so long as the

10   "freezing and dripping step" included making some beads, regardless of whether the process also

11   made irregular shapes.  The Federal Circuit rejected that argument:

12       "Comprising" appears at the beginning of the claim – "comprising the steps of" –
         and indicates here that an infringing process could practice other steps in addition
13       to the ones mentioned.  Those six enumerated steps must, however, all be
         practiced as recited in the claim for a process to infringe.  The presumption raised
14       by the term "comprising" does not reach into each of the six steps to render every
         word and phrase therein open-ended – especially where, as here, the patentee has
15       narrowly defined the claim term it now seeks to have broadened.

16   *Id.* at 1343.

17       In this case, the word "comprising" does not "reach into" the "identifying" step and make

18   that step open ended, allowing some (most) cycles to do something other than "identifying."  In

19   *Dippin' Dots*, the accused step produced some ice cream in bead form and some in irregular

20   forms.  In this case, even if the SOLiD System were modified to use the Backman method to

21   identify a base in eight of the thirty-five ligation cycles, there is no dispute that in the remaining

22   twenty-seven cycles, the system would not identify a base within each cycle.  Just as the plaintiff

23   in *Dippin' Dots* was not allowed to dismiss the production of irregular-shaped ice cream as

24   irrelevant, additional steps, Illumina cannot dismiss the additional cycles as irrelevant additional

25   steps.  *See also Bd. of Regents of the Univ. of Tex. Sys. v. Benq Am. Corp.*, __ F.3d __, No. 2007-

26   1388, 2008 U.S. App. LEXIS 15788, at *21 (Fed. Cir. July 24, 2008) (rejecting patentee's

27   argument that "comprising" means "infringement occurs whenever a match with a syllabic

28   element occurs, even if matches are also made with non-syllabic elements"); *Spectrum Int'l, Inc.*

1  *v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with

2  which to abrogate claim limitations.").

3  **B.    Backman's Theory Conflicts With The Court's Construction Of "Identifying."**

4

5  Illumina does not dispute that the SOLiD System operates as AB described, including that

6  the system determines the identity of the bases in the target fragment by aligning the colors to a

7  reference sequence only after all of the cycles are complete.  (Opp'n at 6-9.)  Illumina instead

8  argues that there is an alternative method available.  (*Id.*)  According to Illumina's expert, Dr.

9  Backman, there is enough information available in eight of the thirty five ligation cycles to

10  decode the identity of those eight bases in the target polynucleotide within those cycles.

11  Dr. Backman does not assert that the color information is actually used by the SOLiD System to

12  determine the identity of the bases.  He contends only that there is enough information available

13  that one could "fix a unique output."  The "unique output" he refers to is a sequence that

14  hypothetically could be derived using his decoding theory.

15  Illumina says that operation of the SOLiD System (through Backman's theoretical

16  method) meets the claim limitation despite four undisputed facts:  (1) the SOLiD System does not

17  use Backman's method, (2) the SOLiD System determines the identity of the bases by aligning

18  the colors to a reference after all of the cycles are complete, (3) the identity of the sequence that

19  would be reported by Backman's method would suffer a 40% error rate, which would make it

20  useless for sequencing, and (4) the identities determined by the SOLiD System are different from

21  those that would result from the Backman method, and have an accuracy rate of over 99%.

22  Illumina incorrectly argues that Dr. Backman's theory of how one could determine the

23  identity of the bases (albeit a highly erroneous identity) creates a factual dispute.  It creates only a

24  legal dispute.  The legal dispute is whether, "determining the identity of a base in each cycle"

25  means merely having information available that could "fix a unique output."  The Court already

26  decided this issue against Illumina during claim construction.

27

28

1

**1.    Infringement Requires That The Claimed Method Is
Performed, Not That It Could Be Performed.**

2

3          A method claim is infringed only if it is actually performed.  The asserted claims of the

4    '341 and '597 patents claim methods.  To prove infringement Illumina must prove that SOLiD

5    users have actually performed the claimed steps, not that the SOLiD System could be changed to

6    perform them or that it has been described as theoretically capable of performing them.  *See, e.g.*,

7    *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only

8    infringed when the claimed process is performed, not by the sale of an apparatus that is capable of

9    infringing use."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).

10          Illumina does not contest this legal requirement.  Instead, it tries to avoid the requirement

11    by citing *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) for the

12    proposition that AB does not avoid infringement "because a non-infringing mode of operation is

13    possible."  (Opp'n at 5-6.)  That statement of law is true, but it has no application to Illumina's

14    very different, very wrong, argument that use of the SOLiD System infringes because it could be

15    radically reprogrammed to an infringing mode of operation.  *See Ormco*, 463 F.3d at 1311.

16          Illumina avoids addressing how the SOLiD System actually determines the identity of

17    bases by asserting that the availability of information alone, with no computation at all,

18    "determines" the identity of the bases within each cycle.  (Opp'n at 7-9.)  Illumina's metaphysical

19    theory that the instrument does not identify, the "information" identifies, does not address the law

20    requiring that the claimed method actually be performed, or meet the Court's construction that the

21    claims require the actual step of determining the identity of a base within each cycle.

22          Even in Backman's theoretical method, the color information alone would not perform the

23    required step of determining the identity of a base within each cycle.  The decoding system he

24    envisions still requires affirmative steps to deduce the identity.  The information obtained within a

25    cycle is an image of the slide.  Assuming that the image is analyzed and a color determined within

26    a cycle, the color alone is insufficient, even under the Backman method, to identify a nucleotide.

27    Backman admits that under his theory, none of the color readings in the first seven cycles provide

28    enough information to identify any of the bases.  He says that the first time a color can identify a

5

1   base is in the eighth cycle, when the 0 and 1 positions are read.  The colors, however, do not

2   decode themselves – a person or machine must deduce the 1 position.[1]

3        Under Backman's method, each additional identification would require increasing levels

4   of computation.  The color must be compared to at least two other color readings in order to be

5   decoded.  For example, Backman says that the second time the SOLiD System has enough

6   information available within a cycle to determine a base is in the 30th ligation cycle (in the fifth

7   primer round).  In that cycle, the probe interrogates positions 2 and 3 in the target fragment.  But

8   the color alone does not identify the bases at positions 2 or 3.  To determine the bases, the color

9   read in cycle 8 (the 0, 1 position) must be carried back and compared to the color read in cycle 1

10  to determine the identity of positions 1 and 2.  That result then must be carried forward to the

11  result of cycle 30 to determine the identity of positions 2 and 3.  Thus, under Backman's theory,

12  the color information to serially decode may be available, but the colors do not perform the step

13  of decoding themselves.  A person or computer would have to do the decoding.  Illumina cites no

14  evidence that the SOLiD System ever performs that step.  AB's evidence that SOLiD does not

15  actually perform the Backman decoding steps is therefore unrebutted.  Because it is undisputed

16  that the SOLiD System does not actually perform Backman's method, its use does not infringe.

17              **2.    The Backman Method Would Be Useless.**

18       The SOLiD System actually determines the identity of bases by aligning the colors to a

19  reference sequence.  (Jones Decl. ¶¶ 9, 19-29; Myers Report ¶ 54.)  This method provides

20  accuracy of greater than 99%.  (Myers Report ¶ 64.)  The standard in the industry for a useful

21  sequence is 95% or better.  (*Id.* ¶ 55.)  The Backman method would result in an unacceptable

22  accuracy rate of only 60% due to serial error.  (*Id.* ¶¶ 55-64.)  Serial error makes Dr. Backman's

23

24       [1] As discussed in AB's motion, the SOLiD System uses knowledge of the 0 position base
     to deduce the base at the 1 position to double check the alignment of color reads to a reference

25  when a target fragment matches multiple locations.  (AB Mot. at 15 n.7 (citing Backman Dep.,
     Comer Decl. Ex. K at 104:19-24; Jones Decl. ¶ 24).)  But the SOLiD System does not serially

26  decode, and this post-alignment use of the 0, 1 position information to check the alignment does
     not occur within the ligation cycles.  (*Id.* (citing Myers Report ¶¶ 52-54).)  Illumina does not

27  provide any conflicting evidence.  Instead, it argues that a different mode of operation, the
     Backman method, could make a different, earlier use of 0, 1 position information.

28

1  method useless.  (*Id.* ¶¶ 56-63.)[2]  The different accuracy rates also demonstrate the undisputed

2  fact that the SOLiD System does not use the Backman method, and that it could not use it.

3       Illumina does not dispute these facts, or the conclusion that Backman's method would be

4  useless.  It instead argues that the claims have no accuracy requirement.  On the contrary, the

5  claims require that the cycles be repeated until the sequence is determined, consistent with the

6  invention's purpose of determining the true sequence.  *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d

7  1303, 1316 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006) ("The construction that stays true

8  to the claim language and most naturally aligns with the patent's description of the invention will

9  be, in the end, the correct construction.").  Additionally, the Court rejected Illumina's claim

10  construction argument that would expand the claim to a method of identifying that is "insufficient

11  to make a precise determination in the (b) to (e) cycle."  (Claim Constr. Order ("Order"), Docket

12  No. 133, at 13-14.)  Backman's undisputedly unused and useless method does not meet the

13  Court's standard.  The Macevicz patents are about DNA sequencing.  In the patents and during

14  prosecution, Macevicz emphasized that his invention identifies a base in each cycle.  The

15  Backman method, however, does not do that and is not usable for sequencing.

### 3.     Illumina Abandoned The Doctrine Of Equivalents.

17       AB set forth in its motion how Macevicz's arguments during prosecution as a matter of

18  law preclude Illumina from asserting the doctrine of equivalents.  Illumina's opposition does not

19  address this preclusion.  Nor does it address whether the differences between the claimed method

20  and the accused method are insubstantial.  Thus, Illumina has waived any reliance on the doctrine

21  of equivalents.  *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994) ("If

22  a party fails to assert a legal reason why summary judgment should not be granted, that ground is

23  waived. . . .") (quoting *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir. 1986)).[3]

24       [2] The color reading in a cycle is wrong about 5% of the time.  The Backman serial
25  decoding method compounds that rate because any error along the chain results in all subsequent
    bases being decoded incorrectly.  His method thus turns a 5% per-cycle error rate into a 40%
26  error rate.  The SOLiD System method reduces the error rate to less that 1%.  (Myers Report ¶¶
    56-63.)

27       [3] In addition, to invoke the doctrine of equivalents, a patentee must present "particularized
28  testimony and linking argument" on a limitation-by-limitation basis.  *Hewlett-Packard Co. v.*
    (Footnote continues on next page.)

1

**C.    The Primer In The SOLiD System Hybridizes To The Binding Region, Not the Target Polynucleotide.**

2

**1.    Illumina Cannot Show Literal Infringement.**

3

4

Nothing prevents resolving this issue in AB's favor on summary judgment.  Illumina

5

agrees that "there is no factual dispute as to where AB's primer hybridizes."  (Opp'n at 17.)  And

6

the Court already held that claim 1 requires that the initializing oligonucleotide probe hybridize to

7

the target polynucleotide, not the binding region.

8

9



10

11

12

(Order at 9 (depicting invention "As Described in Claim 1 of the '341 Patent").)  In declining to

13

redraft the claim, the Court stated: "The language makes clear that a binding region and the target

14

polynucleotide are connected, and together form the template . . . . The binding region, target

15

polynucleotide, and template are each distinct items." (*Id.* at 8-9 (emphasis added).)  Illumina

16

concedes that its infringement expert's opinion on this issue is based on his disagreement with the

17

Court's Claim Construction Order.  (Opp'n at 16.)

18

Illumina's attempt to revisit this issue should be rejected.  During claim construction, AB

19

made clear the impact this issue would have on summary judgment.  (AB's Resp. Claim Constr.

20

Br., Docket No. 92, at 22-23.)  Illumina lost and now seeks to avoid that impact by repeating its

21

argument that the distinctions between the target polynucleotide, the binding region, and the

22

template can be ignored as only part of a preferred embodiment.  (Opp'n at 14, 16; Illumina's

23

Reply Claim Constr. Br., Docket No. 100, at 8, 11.)  The argument is still wrong.

24

(Footnote continued from previous page.)

25

*Mustek Sys.*, 340 F.3d 1314, 1323 (Fed. Cir. 2003) (citation omitted).  Illumina's failure to present any such evidence requires summary judgment of no equivalence.  The Federal Circuit

26

has held that "present[ing] the district court with only conclusory statements regarding

27

equivalence" fails to raise any genuine fact issues and does not avoid summary judgment.  *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)

28

1    As AB explained during claim construction, the specification consistently maintains clear

2    distinctions between the target polynucleotide, binding region, and template.  (AB's Resp. Claim

3    Constr. Br. at 21.)  Nowhere does the specification suggest that these terms can be used

4    interchangeably or synonymously.  As the Federal Circuit has held, "the usage 'preferred' does

5    not of itself broaden the claims beyond their support in the specification."  *Bell Atl. Network*

6    *Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (citation omitted).

7    Illumina cites various passages and examples from the specification, but all of them maintain the

8    distinctions between the target polynucleotide, the binding region, and the template.  (Opp'n at

9    14-16.)  Illumina has presented nothing new to warrant changing the Court's construction.

10    Illumina's fallback is to convert the bridge probes used in the latest version of the SOLiD

11    System into "initializing oligonucleotide probes."  But they are instead "extension

12    oligonucleotide probes," even based on Illumina's construction of that term, which is "an

13    oligonucleotide probe that can be ligated to an initializing oligonucleotide probe or an extended

14    oligonucleotide probe."  (Backman Report, Comer Decl. Ex. I ¶ 148; Ex. H at 2 (Patent L.R. 4-2

15    disclosures).)  This construction has no functional requirement.  Yet Illumina now argues that it

16    does, and argues that the bridge probes do not perform it (whatever it is – Illumina never

17    explains).  (Opp'n at 17.)  However, Dr. Backman could not tie this supposed functional

18    requirement to any claim language, and said that he would not change his construction of the term

19    to add any such functional requirement.  (Decl. of Steven E. Comer in Support of AB's Reply for

20    Summ. J. of Noninfringement ("Comer Reply Decl."), Ex. 1 at 122:14-124:23, concurrently filed

21    herein.)  There is no genuine factual dispute, and summary judgment should be granted for AB.

22    **2.    Illumina Is Precluded From Asserting Equivalents.**

23    **a.    Prosecution History Estoppel.**

24    As explained in AB's opening brief, amendment-based estoppel bars Illumina from

25    asserting the doctrine of equivalents.  (Mot. at 19-20.)  Illumina's only response is to try to duck

26    under an exception that applies when "the rationale underlying the amendment . . . bear[s] no

27    more than a tangential relation to the equivalent in question."  *Festo Corp. v. Shoketsu Kinzoku*

28    *Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002).  (Opp'n at 18-19.)  The Federal Circuit cautions

1    that this exception "for overcoming the *Festo* presumption is very narrow." *Cross Med. Prods.,*

2    *Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1342 (Fed. Cir. 2007), *cert. denied*, 128 S.

3    Ct. 614 (2007) (reversing denial of summary judgment of noninfringement because district court

4    erroneously accepted tangential relation exception).  The amendment changing "polynucleotide"

5    to "target polynucleotide" does not fit this very narrow exception for two alternative reasons.

6              First, no rationale was given for the amendment.  "If the prosecution history reveals no

7    reason for the narrowing amendment, the presumption is not rebutted. . . . Silence does not

8    overcome the presumption." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304,

9    1315-16 (Fed. Cir. 2008) (citation omitted).  Illumina concedes that no reason was given:

10                   [In the amendment] in which the applicant explained the rationales
                 underlying the various amendments to the pending claims, there is
11               <u>no</u> discussion of the change of "polynucleotide" to "target
                 polynucleotide" (or of the terms "binding region" or "template").
12

13   (Opp'n at 19.)  This is an admission that the tangential relation exception cannot be met.

14             Second, if there were any reason for changing "polynucleotide" to "target

15   polynucleotide," it was to overcome the indefiniteness rejection by specifying where the

16   initializing oligonucleotide hybridizes, which is directly related to the equivalent in question.

17   Illumina omits a key passage showing that the indefiniteness rejection did involve the position

18   where the initializing oligonucleotide hybridizes:

19                   The claims are vague and indefinite because in the independent
                 Claim 1, it is unclear as to what limitations are involved in the
20               identifying step (b) and how it is related to step (a), for instance, <u>the
                 relative position of the nucleotide(s), with respect to the initializing
21               oligonucleotide,</u> the oligonucleotide probe and the duplex, which is
                 to be identified is not recited.
22

23   (Comer Decl. Ex. D ¶ 3 (emphasis added).)  Amending the claim to specify "an initializing

24   oligonucleotide probe hybridized to a <u>target</u> polynucleotide" (emphasis added) thereby

25   surrendered any claim scope over potential equivalents based on hybridizing the initializing

26   oligonucleotide probe elsewhere, such as the binding region or template.

27

28

1    On either of these readings of the prosecution history, Illumina cannot invoke the

2    tangential relation exception to prosecution history estoppel.[4] Illumina is therefore precluded

3    from asserting the doctrine of equivalents.

4                    **b.      Illumina Waived The Doctrine Of Equivalents.**

5    Illumina further precludes itself from relying on the doctrine of equivalents by not

6    addressing it in opposition to this motion. *PC Connector Solutions LLC*, 406 F.3d at 1364

7    (affirming summary judgment of noninfringement where patentee offered only "conclusory

8    statements regarding equivalence"). Illumina's opposition does not even offer conclusory

9    statements regarding equivalence – it simply asserts without explanation that there is a "factual

10   dispute." (Opp'n at 17.) Accordingly, Illumina has waived the doctrine of equivalents as a

11   ground for opposing summary judgment of noninfringement as to this limitation.

12              **D.      The '119 Patent Is Not Infringed.**

13   Illumina concedes that the SOLiD System does not literally infringe the phosphoramidate

14   limitation of claim 1 of the '119 patent and judgment should be entered accordingly. Judgment

15   should also be entered that AB does not infringe claim 1 under the doctrine of equivalents

16   because Illumina's arguments would vitiate the phosphoramidate limitation, and because it is

17   undisputed that the phosphorothiolate linkage is cleaved under different and preferable conditions

18   than the claimed phosphoramidate linkage.[5]

19

20

21         [4] Illumina's brief separately labels an argument that the amendment was not made "for a
reason relating to patentability." (Opp'n at 19.) Its argument is the same as the tangential
22   relation argument and fails for the same reasons.

23         [5] Illumina asks the Court to collapse the vitiation doctrine into a "legal sufficiency of the
evidence" ruling. (Opp'n at 20.) That would be error. Even the *Depuy Spine* case quoted by
24   Illumina states that vitiation is found where no reasonable jury could find equivalents "or that the
theory of equivalence to support the conclusion of infringement otherwise lacks legal
25   sufficiency." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1019 (Fed.
Cir. 2006), *cert. denied*, 128 S. Ct. 58 (2007). As discussed in *Depuy Spine*, the Supreme Court
26   held that while a court may enter summary judgment of no infringement by equivalents due to a
deficiency of the evidence, a "second" basis for a judgment is vitiation. *Id.* at 1017 (citing
27   *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39, n.8 (1997)).

28

### 1.    Illumina's Interpretation of Claim 1 Removes The Phosphoramidate Limitation From The Claim.

According to Illumina, the different cleavage conditions for phosphoramidate and phosphorothiolate linkages are irrelevant "because claim 1 does not recite any limitation requiring that the claimed probes be incorporated into DNA, used in a method of sequencing, cleaved, or cleaved in any particular way."  (Illumina's Mot. For Partial Summ. J. of Infringement ("Illumina's Mot."), Docket No. 203, at 10, 13.)  If Illumina were correct that cleavage conditions are irrelevant to the claimed probe, then the phosphoramidate linkage would be vitiated, because *any* linkage could perform the function of linking neighboring nucleotides, including the phosphodiester linkage present in all natural DNA.  *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).

Illumina's argument that any DNA linkage is equivalent to the claimed phosphoramidate linkage is much like the patentee's argument in *Tronzo*.  There, the Federal Circuit rejected the patentee's argument that the claimed conical shape encompassed equivalents of "any other shape" because that would violate the all elements rule.  *Id.* at 1160.  As in *Tronzo*, Illumina's argument would vitiate the phosphoramidate linkage limitation and replace it with the term "any linkage."

### 2.    Because Cleavage Matters, There Is No Genuine Issue Of Material Fact Regarding Non-Equivalence.

Illumina's expert testified that the "function" of the phosphoramidate linkage is to be a "chemically scissile" bond, the "way" is with a "chemically reactive" atomic group, and the "result" is that the atomic group is "exposed upon cleavage of the scissile bond."  (Backman Report, Comer Decl., Ex. I ¶ 113; Backman Dep., Decl. of Eric C. Pai ("Pai Decl."), Docket No. 219, Ex. 2 at 38:24-39:4.)  Thus, Illumina's own expert says that the cleavage matters.

The specification states that phosphoramidate linkages are cleaved with trifluoroacetic acid ("TFA") under highly acidic conditions (pH = 1).  (Comer Decl. Ex. B at 9:40-52; Metzker Report at 22.)  By contrast, it is undisputed that the phosphorothiolate linkage in the SOLiD System probes is cleaved with silver nitrate under neutral conditions (pH = 7).  (Metzker Report at 23.)  Dr. Backman admitted that acidic conditions are less favorable for sequencing DNA

1    because they can damage the DNA.  (Backman Dep., Comer Decl. Ex. K at 44:20-45:11; *see also*

2    Pendleton Decl., Docket No. 213, Ex. 1 at 84:23-85:8; Ex. 3 at 30:18-31:7.)  He did not know

3    whether the acidic conditions used in the Macevicz patents would damage the DNA.  (Pendleton

4    Decl. Ex. 3 at 30:18-31:7.)  Dr. Metzker, who has studied the issue, is unrebutted:  TFA's low pH

5    is undesirable because it would damage the sample DNA.  (Metzker Report at 22.)  Accordingly,

6    a phosphorothiolate linkage is not the equivalent of a phosphoramidate linkage.  *See Tanabe*

7    *Seiyaku Co. v. United States Int'l Trade Comm'n*, 109 F.3d 726, 733-34 (Fed. Cir. 1997) (finding

8    substantial difference where accused solvent produced better results than claimed solvent).[6]

9         Illumina ignores that the doctrine of equivalents extends only to "unimportant and

10   insubstantial substitutes."  *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed.

11   Cir. 2005) (quoting *Festo*, 535 U.S. at 731).  The evidence that cleavage conditions are different

12   and more favorable is undisputed.  Illumina's conclusory statement that the differences are

13   immaterial does not meet the requirement of "particularized evidence and linking argument as to

14   the 'insubstantiality of the differences' between the claimed invention and the accused device."

15   *PC Connector Solutions LLC*, 406 F.3d at 1364.  Such conclusory statements do not raise genuine

16   issues of material fact.  *Id.* at 1364-65.  As in *Tanabe*, Illumina has not shown that

17   phosphorothiolate could simply be substituted for phosphoramidate without also changing the

18   cleavage method to one not taught in the specification.  *See Tanabe*, 109 F.3d at 731 (simply

19   substituting butanone for acetone in the examples would not work without carefully controlling

20   conditions, which was not taught.)  AB's showing that the differences between phosphoramidate

21   and phosphorothiolate linkages are substantial stands unrebutted.  (Mot. at 24-25.)

22

23

24

_____

25        [6] Dr. Metzker's report discusses additional, fundamental differences between sulfur (in
     AB's phosphorothiolate linkage) and nitrogen (in the claimed phosphoramidate linkage).
26   (Metzker Report at 22.)  Illumina offers only *non sequiturs* in response, such as that sulfur and
     nitrogen exist in the same form (solid, liquid, or gas) when used in probes.  (Illumina's Mot. at 9.)
27   That does not meet the evidentiary requirement for asserting equivalents, nor does it change that
     the different reactivities of sulfur, nitrogen, and other atoms affect the way the linkages perform.
28

**3.    Illumina's Remaining Arguments Do Not Raise A Genuine Issue Of Material Fact.**

Illumina raises a smattering of additional arguments based on mischaracterizations.  None of these raise a factual dispute precluding summary judgment:

- Totality of the circumstances ─ As AB stated in its motion, factors in determining vitiation *include* "the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations."  (Mot. at 21-24.)  The *Freedman* tripartite formulation is not inconsistent with, but rather an application of, the totality of the circumstances test, and Illumina does not discuss any other factors that must be considered or that weigh against vitiation.

- Simplicity of the structure ─ Illumina's argument is that *other* parts of the claimed probe are complicated formulas, *not* the phosphoramidate limitation itself.  (Opp'n at 21-22.)  This *non-sequitur* appears to be an attempt to distract attention from the phosphoramidate limitation at issue, but it only reinforces the simplicity of the phosphoramidate limitation.[7]

- Prosecution history ─ Illumina does not dispute that the Examiner relied on the phosphoramidate limitation to allow claim 1.  It instead notes that the Examiner also rejected claim 18 (which issued as claim 1) as anticipated by a reference teaching a phosphoramidate-containing oligonucleotide.  (Comer Reply Decl. Ex. 2 at ILL000116-117, § 3.)  Macevicz overcame the reference by adding *one* more nucleotide to the claimed probe.  (*Id.* Ex. 3 at ILL000171.)  This does not change the importance of the phosphoramidate linkage, or that Macevicz could have chosen claim language that would include other linkages, but did not.

- *Abraxis v. Mayne* ─ Illumina argues that Macevicz did not "clearly and unmistakably surrender" equivalents.  (Opp'n at 24.)  This confuses vitiation with argument based estoppel.  The court in *Abraxis* did not discuss vitiation.  It found no argument-based prosecution history

---

[7]  Macevicz claimed other parts of the oligonucleotide probe using variables, while narrowly claiming the phosphoramidate linkage as "NH."  Claim 1's "(B)j" limitation is a set of nucleotides or analogs thereof numbering in the range of 1 to 12.  The "(B)k" limitation is a set of nucleotides or analogs thereof numbering in the range of 1 to 12, such that the total number of nucleotides or analogs thereof in the (B)j and (B)k sets add up to no more than 12.  The "Bt*" limitation is "a labeled, non-extendable chain-terminating moiety."  (Comer Decl. Ex. B claim 1.)

1    estoppel and proceeded to analyze equivalents under the function/way/result test. *Abraxis*

2    *Bioscience, Inc. v. Mayne Pharma Inc.,* 467 F.3d 1370, 1380-82 (Fed. Cir. 2006). In contrast

3    with the narrow phosphoramidate limitation, the Federal Circuit held that the limitation "edetate"

4    covered a class of compounds: EDTA and derivatives of EDTA. *Id.* at 1378. Moreover, the

5    court relied on the unforeseeability of the equivalent, unlike the alleged equivalent here, which

6    Illumina does not dispute was foreseeable. *See id.* at 1381-82.

7    •  *Graver Tank* ─ Illumina suggests that *Graver Tank* stands for the blanket proposition

8    that substitution of one element (magnesium) for another (calcium) is an insubstantial difference.

9    (Opp'n at 21.) The case was not about whether one element could be substituted for another, but

10    whether <u>manganese</u> silicate could be considered an "<u>alkaline earth metal</u> silicate" under the

11    doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 610

12    (1950) (emphasis added). Manganese is an element; alkaline earth metals are a group of

13    elements. (*See* Metzker Opp'n Decl., Docket No. 218, ¶¶ 16-17 (citing Periodic Table of the

14    Elements) Ex. B.) As discussed in AB's opposition to Illumina's motion (Docket No. 216, at 8-

15    9), the Supreme Court affirmed the judgment of infringement based on, *inter alia,* the

16    specification's disclosure of the alleged equivalent. *Graver Tank*, 339 U.S. at 610-11. Illumina

17    offered no such evidence.

18    **IV.    CONCLUSION**

19    Legal disputes invite, rather than preclude, summary judgment. The legal disputes raised

20    by Illumina were decided against it at the time of claim construction. AB's motion for summary

21    judgment of noninfringement should be granted.

22    Dated: August 7, 2008                MORRISON & FOERSTER LLP

23

24                                         By:    /s/ Steven E. Comer
                                                 Steven E. Comer
25
                                           Attorneys for Plaintiff
26                                         APPLERA CORPORATION -
                                           APPLIED BIOSYSTEMS GROUP
27

28