1
2
3
4
5
6
7
8
9

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLERA CORPORATION-APPLIED BIOSYSTEMS GROUP, a Delaware corporation, | No. C 07-02845 WHA |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT** |
| v. | |
| ILLUMINA, INC., a Delaware corporation, SOLEXA INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual | |
| Defendants. | |
| _____/ | |

**INTRODUCTION**

In this patent action, plaintiff Applera Corporation — Applied Biosystems Group moves for summary judgment of non-infringement as to all asserted claims. Defendant Solexa, Inc., moves for partial summary judgment of infringement as to certain asserted claims. For the reasons stated below, AB's motion is **GRANTED IN PART AND DENIED IN PART**. Solexa's motion is **DENIED**.

**STATEMENT**

Solexa is the assignee of the United States Patent Nos. 5,750,341, 6,306,597, and 5,969,119. The patents are directed towards methods of learning unknown sequences in DNA. DNA consists of a long polymer of simple units called nucleotides. Each nucleotide in human DNA consists of a deoxyribose sugar linked to both a phosphate group and one of four characteristic nitrogen "bases": adenine (A), cystosine (C), guanine (G), or thymine (T).

United States District Court
For the Northern District of California

The deoxyribose sugar has five carbons, numbered 1' to 5', respectively.  It is the *sequence* of these bases that encodes information about the functioning of living organisms.  The bases bond with one another, or "hybridize," to create a structure known as a double helix consisting of two intertwined strands of DNA.  These two strands are perfectly complementary to one another, such that A bonds with its complement T and C bonds with its complement G.

When a single strand of DNA exists in isolation, its sequence is unknown, *i.e.*, the exact lineup of the A, C, G, and T's is unknown.  The patents teach a method whereby a target single strand of DNA may be sequenced, *i.e.*, the lineup of A, C, G, and T's may be exactly discovered.

A method used in the prior art for DNA sequencing was known as "Sanger sequencing."  In a single DNA strand, adjacent nucleotides are chemically bonded.  A dideoxynucleotide, or a ddNTP, is a type of nucleotide that lacks the hydroxyl group of a standard deoxynucleotide, or a dNTP.  Hydroxyl is a molecule consisting of an oxygen atom and a hydrogen atom.  The lack of this hydroxyl group means that when a ddNTP is added to a sequence of DNA on a strand no further nucleotides, a ddNTP or a dNTP, may be added.  The Sanger sequencing method made use of this chemical property.  In Sanger sequencing, each base (*e.g.*, A, C, G, and T) was assigned a fluorescent color and the target DNA to be sequenced was bonded with a known DNA sequence.  The known DNA sequence was then hybridized by an initializing primer, which added stability to the entire structure.  Several strands of the target DNA were then brought into contact with single probe ddNTPs and dNTPs.  The result was that several strands of the target DNA would hybridize to the different probes at various points on the DNA strand.  Because ddNTPs halt further hybridization on any given single strand of the target DNA, many strands would have varying lengths depending on where the ddNTP hybridized.  Some strands that hybridized with the target would be longer (*i.e.*, a ddNTP hybridized at a much later point in the sequence) and some would be shorter (*i.e.*, a ddNTP hybridized at a much earlier point in the sequence).  These several strands that hybridized to the target DNA were then collected and placed in a capillary tube to form a group of strands of varying lengths.  A magnetic field was then placed on the capillary tube causing the various strands to line up in order of length

2

United States District Court
For the Northern District of California

1    (*e.g.*, shortest to longest).  Each individual strand would then be taken out of the tube and put

2    through a light source which allowed the user to identify the fluorescent light associated with

3    the ddNTP of that sequence.  Because the varying strands were lined up according to their

4    length, the user would go through strand by strand to decode each color, and hence base,

5    associated with each nucleotide of the sequence in the correct order, thereby allowing the

6    perfect complement to the target DNA sequence to be determined.  In sum, the Sanger

7    sequencing method allowed a target DNA strand to be sequenced by associating fluorescent

8    labels with specific nucleotides that had hybridized with the target DNA sequence.  Once the

9    identities of the nucleotides that hybridized were determined, it was simply a matter of taking

10   their complements to determine the sequence of the target DNA strand.

11        The patent specification teaches a method of DNA sequencing known as "sequencing

12   by ligation" that builds upon the fluorescent-color identification scheme of Sanger sequencing.

13   It begins by attaching the unknown target DNA sequence (along either the 5' to 3' carbon bonds

14   or the 3' to 5' carbon bonds) to a binding region, whose sequence is known, that has already

15   been hybridized by an "initializing oligonucleotide" (col. 2:66–3:3)[1].  This collective structure

16   is then attached to a support structure called a "bead."  The unknown DNA sequence is then

17   brought into a contact with a set of "oligonucleotide probes" that cover "all possible sequences

18   of a predetermined length" (col. 6:34–36).  For example, if it is determined that the

19   oligonucleotide probes should be eight bases long, then the set of oligonucleotide probes that

20   are brought into contact with the first eight nucleotides of the target DNA sequence will contain

21   all 65,536 (*i.e.*, 4 ^ 8) possible sequences.  Out of these 65,536 possibilities, one will be the

22   perfect complement for the first eight nucleotides of the target DNA sequence.  In addition,

23   each oligonucleotide probe in the set of probes is assigned a label corresponding to the identity

24   of one of the bases located in the same position as the other probes (col. 3:7–9).  To illustrate

25

26

27

28

---

[1]    Unless otherwise stated, all citations to column and lines numbers in this order refer to the '341 patent.

with the same example, every probe in the set of 65,536 whose fifth nucleotide has a base of A

may be assigned a fluorescent color (*e.g.*, yellow) as shown in the Figure 1 below.[2]



Figure 1: '341 Probe Color Assignments

After the set of oligonucleotide probes are brought into contact with the DNA target sequence

only the perfectly complementary oligonucleotide probe will hybridize with the DNA target

sequence (col. 11:49).  The oligonucleotide probe which hybridizes with the target DNA

sequence is then "ligated" (*i.e.*, glued) using an adhesive, ligase, to the adjacent probe (*e.g.*, the

initializing oligonucleotide probe in the first iteration) forming a single longer probe that is

more stably hybridized to the unknown DNA target sequence (col. 3:3–7).  Once the specific

oligonucleotide probe has hybridized, the remaining uncomplementary probes can be washed

away and the hybridized oligonucleotide probe may be cut at the nucleotide whose base has

been designated with a color.  The specific oligonucleotide probe that hybridized may then

be identified by recording the label that had previously been assigned to it (*e.g.*, yellow) as seen

in Figure 2 below (col. 5:10–12).  Once the color for the probe is determined, the user then

knows the specific identity of a nucleotide in the probe (*e.g.*, the fifth nucleotide is an A).

[2]   Unless otherwise stated, all figures in this order were submitted by the parties as part of the claim construction briefing.  The online version of this order is in color.



Figure 2: '341 Recording Color Signal

Repeating this process by ligating further oligonucleotide probes to the previously ligated probe allows additional nucleotide bases in the DNA target sequence to be identified.  For instance, if every fifth nucleotide is assigned a color as in Figure 3 and the process is repeated, then the identity of every fifth nucleotide (*i.e.*, 5, 10, 15, 20, etc.) in the target DNA sequence could be determined.



Figure 3: '341 Recording Second Color Signal

The oligonucleotide probes can then be shifted one position over from the original starting point to interrogate different nucleotides in the target DNA sequence (*e.g.*, every fourth nucleotide). For example, if the first oligonucleotide probe began hybridizing at position N in the sequence, the next cycle may begin by hybridizing at position N - 1.  Repeating this process would then

allow for identification of every fourth nucleotide (*i.e.*, 4, 9, 14, 19, etc.) in the target DNA

sequence to be determined and then every third position for N - 2 (*i.e.*, 3, 8, 13, 18, etc.) as

shown in Figure 4.



Figure 4: '341 Recording Full Color Sequence

Continuing this process ultimately allows for identification of every nucleotide in the target

DNA sequence.  This method allows a target DNA to be sequenced in much shorter time and

with greater accuracy than the prior art.

*            *            *

The accused devices are various versions of AB's SOLiD System.  The SOLiD System

is a DNA sequencing machine that operates by interrogating two bases of an unknown DNA

sequence at a time.  It too relies on ligation.  But the SOLiD System does not determine the

identity (*i.e.*, A, G, C, or T) of a given base on each ligation cycle.  Rather, the sequence of a

target polynucleotide is not identified until after all ligation cycles are complete and the

resulting information gathered is compared to a known reference sequence using pre-developed

software.

The system works as follows.  The target DNA sequence is first attached to an adapter,

whose sequence is known, that has already been hybridized by a "primer."  The target sequence

**United States District Court**
For the Northern District of California

1   is then brought into contact with a mixture of oligonucleotide probes that are each eight

2   nucleotides in length.  The probes cover the range of possible complementary sequences to the

3   first eight nucleotides in the target DNA sequence (*i.e.*, the probes will cover all 65,536 or  4 ^ 8

4   possible sequences).  As such, one of these probes will hybridize to the first eight nucleotides of

5   the target DNA sequence.  Up until this point, the process operates much the same as the

6   invention described in the asserted patents.

7           Unlike the inventions in the asserted patents, however, the SOLiD System assigns a

8   color label that is based on the identity of *two* bases in the probe — not one.

9



22                          Figure 5: AB's Two-Base Probe Color Assignments

23

24   For example, the color blue, as illustrated in Figure 5 above, could be assigned to all probes that

25   have either AA, CC, GG, or TT as their two middle nucleotides.  Similarly, the color green

26   could be assigned to all probes that have either an AC, CA, GT, or TG as their two middle

27   nucleotides.  The other nucleotides in the probe are randomly generated and unknown.  If this

28   process were repeated using two bases as the foundation, there would be a total of sixteen

United States District Court
For the Northern District of California

1   "unique" sequences that would need to be referenced (*i.e.*, 2 ^ 4).  These sixteen sequences

2   could then be broken up into four distinct groups (each containing four sequences) and each

3   group could be represented with a color (*e.g.*, blue, green, yellow, or red as shown above).

4            Returning to the ligation process, when one of the probes eventually hybridizes to the

5   target DNA sequence, it is ligated to the primer and the remaining unhybridized probes are

6   washed away.  The SOLiD System then records the color assigned to the hybridized probe

7   (*i.e.*, the perfect match) and cuts off the unknown nucleotides that follow the two bases that

8   define the color assignment.  Significantly, because each designated color represents four

9   distinct possibilities of two-base arrangements, the system does not yet know the identity of

10  any single nucleotide in the target sequence.  Put in another way, the color captured by the

11  system only narrows the identity of the two-middle nucleotides to four possible arrangements.

12  For example, if a blue is captured, the system knows the middle nucleotides are either AA, CC,

13  GG, or TT (in those particular orders) — it does *not* know the identity of any single base.

14           After the hybridized probe is cut, the SOLiD System removes the label, introduces a

15  new set of probes to the target sequence (*i.e.*, the whole range of possibilities), and the process

16  is repeated except that the newly hybridized probes are ligated to the previously ligated, and

17  now shortened, probes as opposed to the primer.  Figure 6 shows the second probe in the cycles

18  being ligated to the now shortened first probe.

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 6: Second Probe Ligated in AB System

This procedure is repeated until the end of the target sequence is reached.  At this point, the system has interrogated two-base arrangements at periodic locations in the target sequences (*e.g.*, the 4/5, 9/10, 14/15, 19/20, and 24/25 positions).  The primer and all hybridized probes are then removed and a new round of ligation begins with a new primer that hybridizes *one position back* from where the previous primer was hybridized — that is, if the first primer was hybridized at position n of the target sequence, the next primer is hybridized at n - 1.  In this way, two-base arrangements located one position behind those previously analyzed will now be interrogated (*e.g.*, the 3/4, 8/9, 13/14, 18/19, and 23/24 as shown in Figure 7 below).

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 7: Resetting Primer Over Multiple Rounds of Cycles in AB System

By repeating this process, the SOLiD System produces a "unique" sequence of colors that defines the target DNA sequence.  Figure 8 illustrates a sample full color sequence.

Figure 8:  Assembled Full Color Sequence in AB System

**United States District Court**
For the Northern District of California

1   This unique sequence of colors is then processed by pre-programmed software in the SOLiD

2   System.  That software contains a reference sequence that has already been determined for the

3   organism whose DNA is being sequenced.  The color sequence produced by the ligation

4   process is then compared with the reference sequence.  *First*, the reference sequence is

5   converted into a color sequence using the same coding assignment applied to the original DNA

6   sequence.  *Second*, the software finds where the color sequence of the target sequence matches

7   the reference sequence and outputs a list of potential matches for the target being analyzed.

8   Often there are multiple potential matches between the target color sequence and the referenced

9   color sequence.  When this happens, the SOLiD System uses the identity of the last position in

10  the adapter sequence to define the first position in the target sequence, assumes that reading

11  (*i.e.*, for the first position) is correct, and uses the reading to compare with the reference

12  sequence to see which of the potential matches is actually a match.[3]  *Third*, when the color

13  sequence of a target is matched to the color sequence of the reference, the software runs an

14  algorithm that determines whether any differences between the target and the reference can be

15  attributed to measurement error, or whether the difference is genuine (*i.e.*, a single nucleotide in

16  the target differs from the reference).  One of the advantages to using a two-based encoding

17  system is that any genuine difference between the target and reference sequence will normally

18  be exposed when two adjacent colors in the target sequence are both different from the

19  corresponding colors in the reference sequence.  If the target only has one color in the sequence

20  that differs from the reference, the difference can usually be explained by measurement error or

21  invalid reads.

22                          *          *          *

23          This action was filed on May 31, 2007, by AB, alleging that the inventor of the patents,

24  a former employee, had wrongfully assigned the patents to Solexa who was later acquired by

25  defendant Illumina, Inc, and alleging that AB was the true owner.  Illumina counterclaimed

26  alleging AB infringed the '341 patent, '119 patent, and the '597 patent.  AB now moves for

27

28          [3] As discussed further below, this process makes use of the fact that the adapter sequence is known.  Therefore, when the primer is reset to position n-4, the system will be interrogating positions 0/1.  Position 0, however, should theoretically be known because it was originally part of the adapter sequence.

1   summary judgment of non-infringement of all asserted claims.  Solexa moves for partial

2   summary judgment of infringement.

**ANALYSIS**

3

4   **1.    LEGAL STANDARD.**

5       Summary judgment is granted when "the pleadings, depositions, answers to

6   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

7   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

8   matter of law."  FRCP 56(c).  A district court must determine, viewing the evidence in the light

9   most favorable to the nonmoving party, whether there is any genuine issue of material fact.

10  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue

11  of fact is one that could reasonably be resolved, based on the factual record, in favor of either

12  party.  A dispute is "material" only if it could affect the outcome of the suit under the governing

13  law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[4]

14      The moving party "has both the initial burden of production and the ultimate burden of

15  persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

16  *Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).  When the moving party meets its initial

17  burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and

18  by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

19  designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*,

20  477 U.S. 317, 324 (1986).

21      In the patent context, although the comparison of the claims to the accused system is

22  a fact question, summary judgment may be granted if no reasonable jury could find

23  infringement.  *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8

24  (1997).  Literal infringement occurs when each limitation found in a properly construed claim

25  literally reads on the accused product.  The scope of a patent, however, "is not limited to its

26  literal terms but instead embraces all equivalents to the claims described."  *Festo Corp. v.*

27  *Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 732 (2002).  An accused product

28

        [4]  Unless indicated otherwise, internal citations are omitted from all quoted authorities.

United States District Court
For the Northern District of California

may be equivalent to the claims of a patent "if it performs substantially the same function in substantially the same way to obtain the same result."  *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950).

## 2.   THE '341 AND '597 PATENTS.

The principal point of contention between the parties is over the term "identifying." That term appears in all asserted claims on the '341 and '597 patents.  Claim 1 of the '341 patent, for example, recited:

> 1.   A method for determining a sequence of nucleotides in a target polynucleotide, the method comprising the steps of:
>
> (a)  providing a probe-target duplex comprising an initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus;
>
> (b)  ligating an extension oligonucleotide probe to said extendable probe terminus, to form an extended duplex containing an extended oligonucleotide probe;
>
> (c)  *identifying*, in the extended duplex, at least one nucleotide in the target polynucleotide that is either
> > (1) complementary to the just-ligated extension probe or
> > (2) the nucleotide residue in the target polynucleotide which is immediately downstream of the extended oligonucleotide probe;
>
> (d)  generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated; and
>
> (e)  repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined.

At the claim construction hearing, the term "identifying" was highly disputed.  As explained in the claim construction order (Dkt. 133 at 13):

> The parties dispute is generally over how specific of an identification the claim requires.  Solexa urges that "identifying" should mean "obtaining information sufficient to distinguish."  AB proposes that "identifying" should mean "within each cycle determining the identity of a base, as either A, T, G, or C, in the target polynucleotide."  AB's candidate, this order holds, is closer to the true mark.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

> For Solexa the word "identifying" can include merely gathering information that could eventually be used to distinguish between nucleotides even if insufficient to make a precise determination in the (b) to (e) cycle.  Such a broad construction is not supported by the specification.

4   The claim construction order went on to construe "identifying" to mean "within each cycle

5   determining the identity of a base in the target polynucleotide."

6     The record is clear that the SOLiD System does not literally determine the identity of a

7   base in the target sequence on each *and every* cycle when a new probe is hybridized to the

8   target sequence.  This, of course, is because the SOLiD System employs a *two*-base

9   identification scheme with software at the back end of the system to decode the sequence.

10   Solexa admits as much.  At the deposition of their expert, Dr. Keith Backman, he stated

11   (objections omitted) (Backman Dep. 79:20–80:13 and 81:17–24):

12     Q. Right. Okay. Let's talk about just the first round.  In the
     first round in SOLiD, there are a series of ligations that
13        occur, and the labels on the probes are read in each
     cycle, correct?

14

15     A. Yes.

16     Q. Within each of those cycles, though, in that first round,
     reading the label does not identify a poly — does not
     identify a base in the target polynucleotide, does it?

17

18     A. Well, you used the word "identify," and so I'm going to
     go back to the judge's definition and say that means
19        determine the identity of a base, and say that in those
     cycles, to the best of my understanding, a — the
20        identity of a base is not determined.

       *    *    *
21

22     Q. Okay. And then in the next cycle of that same round
     and for the rest of the cycles in that round, the —
23        reading the label does not determine the identity of a
     base in the target polynucleotide, right?

24     A. As I understand it, your statement is correct:  Those
     subsequent cycles do not determine identities.

25

26   Similarly, in their opposition Solexa concedes this point.

  Instead, Solexa rests its entire infringement case on the argument that the SOLiD
27

28   System meets the "identifying" requirement as long as in some cycles it collects some

14

information that could later be used to identify a base in the target sequence. As Illumina puts it (Opp. 1–3):

> To show literal infringement, Solexa does not have to prove that every cycle performed by the SOLiD System infringes: because the claims are "open-ended" ("the method comprising steps of . . ."), Solexa only has to prove that there are cycles in which the SOLiD System collects the information that determines the identity of a base in the target. That the current SOLiD System also performs potentially non-infringing cycles is legally irrelevant. . . . The identity of a base is "determined" when that identity is fixed: in other words, when sufficient information is gathered to establish (within the limits of experimental error) that a base in the target polynucleotide is either an A, G, C, or T.

Under this theory, Solexa now contends that it is only accusing certain cycles of infringement. The entire basis for Solexa's position is built upon the special meaning attached to the term "comprising" in patents. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). As already stated, the claim language here is "[a] method for determining a sequence of nucleotides in a target polynucleotide, *the method comprising the steps of . . . .*" Based on this language, Solexa maintains that the claim term "identifying" (which appears later in the claim, after the preamble) is open ended and thus only requires that at least one cycle infringe the claims.

Solexa's argument must be rejected for several independent reasons. *First*, Solexa's contention that the term "comprising" extends to the word "identifying," thereby permitting the claim to only require a few cycles in the larger process to identify a base is unworkable. In *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007), the claim in question outlined a six-step process to "a method of preparing and storing a free-flowing alimentary dairy product, *comprising the steps of . . . .*" *Id.* at 1340. One of the six steps recited, "freezing said dripping alimentary composition into beads." The district court construed the term beads to mean "small frozen droplets . . . which have a smooth, spherical (round or ball shaped) appearance," and excluded from that definition "irregular or odd shaped particles such as 'popcorn.'" *Id.* at 1342–43. The accused device produced particles having both a smooth and spherical shape

United States District Court
For the Northern District of California

*and* particles that were irregular in shape.  The district court granted summary judgment of non-infringement on the ground that the accused device produced both "beads" as defined in the claim language *and* non-beads, meaning the district court read the claim language as requiring the process to "produce beads and only beads."  *Id.* at 1343.  On appeal, the patentee argued that the district court had erred in refusing to extend the word "comprising" to the term beads as it appeared in one of the steps of the claim.  The Federal Circuit affirmed the district court, holding:

> As to [the patentee's] second argument, we acknowledge that the term "comprising" raises a presumption that the list of elements is nonexclusive.  However, "[c]omprising" is not a weasel word with which to abrogate claim limitations. "Comprising" appears at the beginning of the claim-"comprising the steps of" — and indicates here that an infringing process could practice other steps in addition to the ones mentioned.  Those six enumerated steps must, however, all be practiced as recited in the claim for a process to infringe. The presumption raised by the term "comprising" does not reach into each of the six steps to render every word and phrase therein open-ended-especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened.  The district court's limitation of the claim scope to exclude processes that produce some irregularly shaped particles is correct.

Here, Solexa raises much the same argument already rejected by the Federal Circuit. Solexa attempts to completely ignore the vast majority of cycles where no identification occurs through their strained import of "comprising."[5]  This is rejected.  The term "comprising," as it appears in the claim, merely indicates that an accused product will not escape infringement by adding additional steps beyond what is required by the claim.  The term "identifying" operates independently of this fact.

*Second*, Solexa's infringement theory inexplicably depends on a hypothetical accused product.  That is, for Solexa's arguments to have any force, the SOLiD System would actually have to identify certain bases in at least some of its cycles.  But this is not the case at all. Solexa's infringement expert has simply crafted a non-existent accused product with imaginary processes that fit within his infringement framework.  As explained earlier above, the SOLiD

---

[5]  As discussed further below, Solexa's argument also relies on the erroneous assumption that the SOLiD System does actually "identify" bases in the target DNA sequence.

System operates by running through multiple cycles of ligations at different starting points along the target DNA sequence. Each time a new set of ligations is run, the primer is moved back one position so as to ensure that new configurations of bases are being interrogated. Because the sequence of the primer is fully known, one could theoretically attempt to use the identity of the known (last) base in the primer to narrow the possibilities of the first position of the target sequence from four to one. AB's own documents indicate as much (see Pendleton Decl. Exh. 6). Once the first position of the target is known, the identity of the second position could be determined because only one of the four possibilities generated by the color signal actually matches. For example, if the last position of the known primer is an A and the position 0/1 must be either (AA, GG, CC, or TT) then logically the first position of the target (*i.e.*, position one) must also be an A. This process may be repeated for the entire sequence. As explained by Dr. Backman (Backman Dep. 82:17–83:8):

> It does it by virtue of obtaining that information which is sufficient to determine the identity. In other words, as — as we talked about, when the 0, 1 position was queried, because the 0 position was known, the 1 position was determined. Now, having the 1 position determined, when you go to the final round and you query 1, 2, when you get the result of the query of 1, 2, the 1 position having already been determined, determines the identity of 2. And you've already queried 2, 3, so the 2 position being determined, determines the identity of 3. And you've already queried 3, 4, so the 3 position being determined, determines the identity of 4. And then you go into the next cycle of ligation where you query 4, 5, and so on. It's like a string of dominos falling.

The problem, however, with Dr. Backman's "domino falling" method is that it is not employed by the SOLiD System. This fact is undisputed. As Dr. Beckman stated (*id*. at 104:11–17):

> You know, the identity of certain bases is determined when the 0,1 query is made. Now, if you or the machine or ABI chooses not to look at that until some later date, I can't stop them from doing that, but it doesn't change the fact that the identity of the base has been determined.

Nowhere in the sequencing process ran by the SOLiD System are bases identified using a serial identification scheme based on earlier positioned nucleotides. The reason for this is simple — accuracy. According to AB's expert, such a scheme would result in only 60% accuracy as

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   opposed to the industry standard of 95% or better (Myers Report ¶¶ 55–64).  If only one of the

2   identifications determined along the chain was off there would be a high likelihood that all

3   subsequent identifications would be inaccurate.  Although these facts are undisputed, Solexa

4   maintains that AB cannot avoid infringement "because a non-infringing mode of operation is

5   possible."  *z4 Techs. Inc., v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007).  This may

6   be true but is entirely irrelevant.  The point is not that the accused device has non-infringing

7   modes of operation, but that the accused device does not infringe to begin with.  *See Ormco*

8   *Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006)("Method claims are only

9   infringed when the claimed process is performed, not by the sale of an apparatus that is capable

10   of infringing use.")

11       *Third*, Solexa's position runs directly afoul to an argument already made and rejected at

12   the claim construction stage.  Significantly, Solexa is not saying that the information obtained

13   on those few cycles they allege infringe is independently enough to identify a target nucleotide

14   in each cycle.  Rather, Dr. Backman only argues that such information would be enough to "fix"

15   a "unique output."  This "unique output" can only be identified after a person or the machine

16   goes through each base and traces its identity using the "domino falling" method from above.

17   In other words, the decoding system proposed by Solexa requires affirmative steps beyond

18   merely obtaining the information from the accused cycles.  The color scheme, by itself, is not

19   enough.  The computer or user would have to decode the actual sequence using the information

20   obtained.  To return to the claim construction order (Dkt. 133 at 13):

21           For Solexa the word "identifying" can include merely
            gathering information that could eventually be used to
22          distinguish between nucleotides even if insufficient to make a
            precise determination in the (b) to (e) cycle.  Such a broad
23          construction is not supported by the specification.

24   As explained earlier, the fact that a cycle may generate information that can later be used to

25   decode the target sequence is *not* enough to satisfy the claim language.  Similarly, the fact that a

26   few cycles generate information that could hypothetically be used to derive a target sequence

27   does not suffice.

28

18

**United States District Court**
For the Northern District of California

In sum, Solexa's infringement theory is feeble.  Not only does the SOLiD System fail

to identify target bases on each cycle ran, but it identifies no target base on *any* of its cycles.

Even assuming that it does, the information obtained by the accused cycles fails to comport

with the construction already given to the term "identifying."  Accordingly, summary judgment

of non-infringement as to all asserted claims of the '341 and '597 patents is **GRANTED**.[6],[7]

### 2.  THE '119 PATENT.

Claim 1 is the only asserted claim of the '119 patent.  It claims a DNA probe with a

specific chemical structure including a phosphoramidate linkage.  A phosphoramidate linkage

is a compound that connects a DNA's bases with its sugars.  In its natural form, DNA uses a

phosphorus-*oxygen* linkage.  Claim 1 covers a probe with a phosphorus-*nitrogen* linkage.

The probes used by the SOLiD System use a phosphorus-*sulfur* linkage.  Solexa admits that the

probes used by the SOLiD System are not found in claim 1 literally.  Solexa relies solely on the

doctrine of equivalents.

AB argues that Solexa is barred as a matter of law from asserting the doctrine

of equivalents because its application would vitiate a claim limitation — *i.e.*, the

phosphorus-*nitrogen* linkage limitation.  Under this so called "all-elements rule," "if a court

determines that a finding of infringement under the doctrine of equivalents would entirely

vitiate a particular claim[ed] element, then the court should rule that there is no infringement

under the doctrine of equivalents."  *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,

324 F.3d 1308, 1321 (Fed. Cir. 2003).  As explained in *DePuy Spine, Inc. v. Medtronic Sofamor*

*Danek, Inc.*, 469 F.3d 1005, 1018–19 (Fed. Cir. 2006):

> A holding that the doctrine of equivalents cannot be applied to
> an accused device because it "vitiates" a claim limitation is
> nothing more than a conclusion that the evidence is such that no
> reasonable jury could conclude that an element of an accused

---

[6] In its opposition, Solexa made no infringement argument under the doctrine of equivalents despite the fact that it was raised by AB in its opening brief.  Solexa has thus waived its reliance on this subject.  *See USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 2004)("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") *quoting  Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir. 1986).

[7] Because this order grants summary judgment of non-infringement as to all asserted claims of the '341 and '597 patents, Solexa's motion for partial summary judgment as to those patents is **DENIED**.

United States District Court
For the Northern District of California

1

> device is equivalent to an element called for in the claim, or that
> the theory of equivalence to support the conclusion of
> infringement otherwise lacks legal sufficiency.

2

3  Although the Federal Circuit has underscored "the simplicity of the [claimed] structure, the

4  specificity and narrowness of the claim, and the foreseeability of variations at the time the

5  claim was filed" as factors to be weighed, *see e.g.*, *id.* at 1018, they have emphasized that no

6  set formula can be applied and the "totality of the circumstances" must be considered, *see,*

7  *e.g., Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005).

8      Federal Circuit decisions on this issue seem to blow hot and cold, at least arguably.

9  Some decisions have indicating a higher willingness to apply the all-elements rule and to bar

10 any reliance on equivalence, *see, e.g., Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d

11 1420 (Fed. Cir. 1997), while others have been more reluctant, *see, e.g., Ethicon Endo-Surgery,*

12 *Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309 (Fed. Cir. 1998).  This order further notes that

13 Federal Circuit has warned:

14

> It is important to note that when we have held that the doctrine of
> equivalents cannot be applied to an accused device because it
> "vitiates" a claim limitation, it was not to hold that the doctrine is
> always foreclosed whenever a claim limitation does not literally
> read on an element of an accused device; such an interpretation of
> the "all elements" rule would swallow the doctrine of equivalents
> entirely.

15

16

17

18 *DePuy Spine*, *Inc.*, 469 F.3d at 1018.  The specific record presented on summary judgment

19 here is too undeveloped to be confident on this issue.  Given the totality of the circumstances

20 that must first be considered, it is thus unclear on this record.  Accordingly, summary judgment

21 of non-infringement of claim 1 of the '119 patent is **DENIED** without prejudice to a later

22 motion *in limine* at trial.[8]

23                                    **CONCLUSION**

24      For the above-stated reasons, AB's motion is **GRANTED IN PART AND DENIED IN**

25 **PART**.  Summary judgment as to all asserted claims of the '597 and '341 patents is **GRANTED**.

26

27

28

---

[8]  Similarly, Solexa's motion for summary judgment of infringement as to claim 1 of the '119 patent is also **DENIED**.

Summary judgment of non-infringement as to claim 1 of the '119 patent is **DENIED**.  Solexa's

motion for partial summary judgment of infringement is **DENIED**.

       **IT IS SO ORDERED.**

Dated:  August 22, 2008.

                                       WILLIAM ALSUP
                                       UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

21