1  KEVIN M. FLOWERS (admitted *pro hac vice*)
   THOMAS I. ROSS (admitted *pro hac vice*)
2  JEFFREY H. DEAN (admitted *pro hac vice*)
   JOHN R. LABBE (admitted *pro hac vice*)
3  CULLEN N. PENDLETON (admitted *pro hac vice*)
   MARK H. IZRAELEWICZ (admitted *pro hac vice*)
4  MARSHALL, GERSTEIN & BORUN LLP
   6300 Sears Tower
5  233 South Wacker Drive
   Chicago, Illinois 60606-6357
6  (312) 474-6300 (telephone)
   (312) 474-0448 (facsimile)
7  E-Mail: kflowers@marshallip.com
   E-Mail: tross@marshallip.com
8  E-Mail: jdean@marshallip.com
   E-Mail: jlabbe@marshallip.com
9  E-Mail: cpendleton@marshallip.com
   E-Mail: mizraelewicz@marshallip.com
10
   Counsel for Defendants
11 ILLUMINA, INC., SOLEXA, INC.,
   and STEPHEN C. MACEVICZ

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| APPLERA CORPORATION—APPLIED BIOSYSTEMS GROUP, a Delaware corporation, | Case No. 07-CV-02845 WHA |
| | District Judge William H. Alsup |
| Plaintiff/Counterdefendant, | |
| v. | **EXPERT REPORT OF GERALD J. SIUTA ON INFRINGEMENT DAMAGES** |
| ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual, | |
| Defendants/Counterclaimants. | |

INFRINGEMENT DAMAGES EXPERT REPORT          1          CASE NO. 07-CV-02845
                                                        **HIGHLY CONFIDENTIAL**

**EXHIBIT 4**

Courts generally base reasonable royalties on previous transaction amounts involving the patented product or process or on a hypothetical amount that parties could have predictably agreed upon at the time of the infringement. The courts have also repeatedly held out the fifteen factors identified in the *Georgia Pacific* decision as guiding the analysis for determining the reasonable royalty measure of damages. The reasonable royalty damages can be based on the entire market value of an infringing product. That is, the non-infringing components of a final good may rightfully be included in the royalty base.

### A.   HYPOTHETICAL ROYALTY NEGOTIATION

The touchstone for determining reasonable royalty damages is to hypothesize a royalty negotiation between the patent owner and the infringer at the start of infringement. Stated as *Georgia-Pacific* factor 15, the goal is to determine:

> The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time infringement began both had been reasonably and voluntarily willing to reach an agreement); that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Patent infringement case law has established the following baseline assumptions to be accepted as true in conducting the hypothetical negotiation:

- The patent is known to be valid at the time infringement commences;

- The patent is known to be infringed;

- The licensee will respect the patent;

- The patent holder is willing to grant a license;

- The licensee is willing to accept a license;

- The license is to be negotiated and determined at the start of infringement; and

INFRINGEMENT DAMAGES EXPERT REPORT   10   CASE NO. 07-CV-02845
**HIGHLY CONFIDENTIAL**

**EXHIBIT 4**

1  - commercial success of the patented invention in the form of sales of the patented or allegedly infringing products after the date of first infringement; and

2

3  - other relevant information.

4  In this case, I note that APG did not accept the ▮▮▮▮ purchase price offered by Illumina. Instead, APG accepted a purchase price of $120M presented to it by AB. As a proportion of the overall value accorded the SOLiD technology, it is my opinion that a $10M to $20M technology access fee is fair and even conservative for the right to develop the DNA sequencing to where APG could sell it (or license the technology out). Also, with the subsequent payment by AB of an additional ▮▮▮▮ for the SOLiD technology compared to the first offer by Illumina, APG stood to earn back 50% to 100% of what it would have paid to Solexa for a license under the Solexa patents.

**(ii)** Establish each party's bargaining position

APG would have been in a relatively weak bargaining position negotiating with Solexa for freedom to operate under the Solexa patents. The APG SOLiD technology was being implemented and APG was on the brink ready to commence attracting commercial level investing or offering the company by fall 2005. APG could not afford to risk litigation and would have been anxious for an opportunity to proceed to commercialization of what it considered would be a contender technology in the highly lucrative field of NGS.

Solexa would have been in a very strong bargaining position at the time that APG disclosed its need for a license under the Solexa patents. Solexa would have to be offered a very attractive royalty because Solexa itself was developing its GENOME ANALYZER technology, sale of which would commence in January 2007. And, the GENOME ANALYZER became and would have been expected by Solexa to be recognized as the top performing NGS product without peer unless and until a SOLiD system appeared. (87)

APG found a commercial merger partner with sufficient capital to pay off this technology access license.

## V. ROYALTY DAMAGES FOR AB SALE OF THE SOLiD ANALYZER AND LIGATION SEQUENCING PRODUCTS

Development of the SOLiD technology into a commercial product offering was taken over by AB upon acquiring APG. AB began commercially selling the two-base SOLiD Analyzer and the ligation sequencing products in June 2007. At this time, AB is in need of a license under the Solexa patents to sell these commercial products for the NGS market and avoid litigation. AB would have been willing and expecting to obtain a commercial product license upon acquiring APG by July 2006; however, the patent law says that the "hypothetical negotiation" takes place at the start of unlicensed infringement, which here is the June 2007 commencement of AB's infringing sale activity. The issue for analysis is what this commercial sale license royalty should be.

The AB products at issue consist of the SOLiD Analyzer (consisting of the instrument and computer system) part number is 4387830 and its list price is $525K. (89) The ligation sequencing products are the part numbers, 4392147 (SOLiD Sequencing Probes Kit), 4387896 (SOLiD Fragment Library Sequencing Kit), 4387897 (SOLiD Mate-Paired Library Sequencing Kit), and 4387919 (SOLiD Instrument Buffer Kit). (90, note page AB45944) The list prices for these four convoyed products are as shown in the SOLiD Consumables Price List as follows: 4392147 ($6K), 4387896 ($12K), 4387897 ($14.5K), and 4387919 ($850) for a total cost of $33,350. (91)

### A. QUANTITATIVE METHODS

In this instance, it is appropriate to apply the 25 Per Cent Rule to determine the royalty damages for the sale of the SOLiD Analyzer and the ligation sequencing products. In

Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357

**(i)** Simulate the negotiation environment;

Using a gross profit margin of 53%, AB has room to "absorb" some of the royalty due to Illumina if it chooses not to pass the entire royalty on to its customers. Also, any royalty rate negotiated by Illumina should include compensation for its lost profits from lost collateral product sales. Accordingly, I have increased the per unit base royalty rates of 13.25% to 15%. The resulting higher royalty rate is appropriate because it compensates Illumina fairly for the loss of collateral sales/profits, and still leaves AB with an appropriate profit margin and profit margin percentage.

**(ii)** Establish each party's bargaining position;

Illumina would be in a very strong bargaining position at the time of AB's commencement of commercial sales infringement of the '341, '119 and '597 patents in June 2007. According to the market studies of 2007, Illumina's GENOME ANALYZER established Illumina in the lucrative NGS market. In fact, these NGS products allowed Illumina to obtain the number one market position. (25) And the studies show Illumina's sales and market share growing. As the patent holder, the licensor, and a recognized market leader for these NGS products, Illumina would have approached this royalty negotiation from the viewpoint of its selling price and gross profit margin. Illumina would focus on what it would be giving up if it licensed a competitor to its patented technology. For these reasons, it is appropriate to apply the 25 Per Cent Rule to Illumina's gross profit margins, since these percentages produce a royalty rate that Illumina would have been willing to consider (if judicially forced into) a license negotiation with AB.

Thus, Illumina's GENOME ANALYZER and ligation sequencing products (designated Cluster Station) that competed with AB's SOLiD Analyzer and ligation

cash amount per sale. The product list prices lend themselves to this calculation. Therefore, I apply the determined royalty rate of 15% to the list price and conclude that the royalty amount for each sale of the SOLiD Sequencing Probes Kit (list price of $6,000) would have to be $900 per kit.

As of April 2008, AB's sales chart (94) indicates that it sold ▇ SOLiD Sequencing Probes Kits. Accordingly, the separately determined infringement damages under the patents in suit as of April 2008 amount to ▇▇▇▇ for SOLiD Sequencing Probes Kit (▇ units x $6,000 per unit x 15% royalty rate) (not including interest).

## VII. SUMMARY OF OPINIONS REGARDING DAMAGES

My opinions are based upon an analysis of the various factors referenced in the landmark case, *Georgia-Pacific Corp. v. United States Plywood*, 318 F. Supp. 1116, (S.D.N.Y) 1970) *modified* and *aff.'d*, 446 F.2d 295 (2d Cir. 1971), a review of professional literature on the subject of damages in patent infringement cases, the facts of this case, and my licensing experience.

### A. DAMAGES FOR APG'S DEVELOPMENTAL USE OF THE SOLEXA PATENTS

Prior to commercialization of the SOLiD technology, APG would have required a license under the Solexa patents in suit covering their product development practice of the patented processes and instrumentation. The need for this license under the patents would have been made known to Solexa in September 2005 when APG admittedly had begun operating the SOLiD one-base and two-base systems. (K. McKernan Deposition) Interestingly, the market value for the development of the SOLiD technology was thereafter established by the parties in this case..

Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357

Since APG began using the one-base and two-base versions of the SOLiD system in September 2005, this is the time that I consider appropriate for the parties to have conducted their "hypothetical negotiation." At this time, APG is in need of a license under the Solexa patents in order to continue product development with the goal of producing and selling a commercial product for the NGS market and avoid litigation. However, at this time, there is no commercial product on which to apply a royalty rate per infringing product sale.

The basis for determining the technology access fee is the technology access license negotiated between Takara and Lynx in 2000. (20) There, the lump sum "technology access fee" for a developmental use license under the subject patents was $10M and is limited to Japan, Korea and China, where the companies would not even directly compete. This Agreement provides a strong indication that the parties' negotiation for a worldwide, not just Asia, license would have resulted in an agreement on a substantial lump sum amount greater than $10M. This is confirmed by agreements such as the Applera's out-licensing of chain-terminator technology to ▌ in 2006 (which carried a ▌ upfront payment) and the less relevant January 1, 2002 ▌ agreement (which carried a similar ▌ upfront payment).

Based on the above, I arrive at an upfront license/technology access fee of $10 to $20M. Any reasonable royalty that involved out-licensing of key next generation sequencing technology to a direct competitor would include a substantial upfront payment in this range.

Therefore, after consideration of all Georgia-Pacific factors, an Upfront License/Technology Access Fee would be paid by APG to Solexa in the amount of $15M (not including interest).

### B.  ROYALTY DAMAGES FOR AB SALE OF THE SOLiD ANALYZER AND LIGATION SEQUENCING PRODUCTS

Under either the '341 or '597 system patents, with or without the '119 probe patent, Illumina/Solexa is entitled to a reasonable royalty based upon AB sales of its SOLiD system products. These system patents apply directly to ligation sequencing use of the SOLiD Analyzer which requires the machine itself (P/N 4387830) and the ligation sequencing consumables (P/N 4392147, 4387896, 4387897, 4387919). (89-90)

Using an AB gross profit margin of 53% and applying the 25 Per Cent Rule results in a royalty rate of 13.25%. Taking into account the Georgia-Pacific Factors, I have determined that the royalty rate should be greater than 13.25% and that 15% of total sales for both the SOLiD Analyzer and the ligation sequencing products is reasonable.

As of April 2008, AB's sales chart (94) indicates that it sold ▮ SOLiD Analyzers and ▮ SOLiD Sequencing Probes Kit (P/N 4392147, list price $6,000); ▮ SOLiD Fragment Library Sequencing Kit (P/N 4387896, list price $12,000) ▮ SOLiD Mate-Paired Library Sequencing Kit (P/N 4387897, list price $14,500); and ▮ SOLiD Instrument Buffer Kit (P/N 4387919, list price $850).

Accordingly, the separately determined infringement damages under the patents in suit as of April 2008 amount to ▮▮▮▮ for SOLiD (▮ instruments x $525K x 15%) and ▮▮▮▮ for the ligation sequencing products [(▮ probes kits x $6,000 + ▮ fragment

Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357

library sequencing kits x $12,000 + ▓ mate-paired library sequencing kits x $14,500 + ▓ instrument buffer kits x $850) x 15% royalty rate] (not including interest).

### C. ROYALTY DAMAGES FOR AB SALE OF THE SOLID SEQUENCING PROBES KIT

Under the '119 probe patent alone, Illumina/Solexa is entitled to a reasonable royalty based upon AB's sales of its SOLiD Sequencing Probes Kit (P/N 4392147).

Using an AB gross profit margin of 53% and applying the 25 Per Cent Rule results in a royalty rate of 13.25%. Taking into account the Georgia-Pacific Factors, I have determined that the royalty rate should be greater than 13.25% and that 15% of total sales for the SOLiD Sequencing Probes Kit is reasonable.

As of April 2008, AB's sales chart (94) indicates that it sold ▓ SOLiD Sequencing Probes Kits. Accordingly, the separately determined infringement damages under the patent in suit as of April 2008 amount to ▓▓▓▓ for SOLiD Sequencing Probes Kit (▓ units x $6,000 per unit x 15% royalty rate) (not including interest).

Date May 30, 2008

Gerald J. Siuta, PhD.

Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357