# EXHIBIT 1

Case 3:07-cv-02845-WHA    Document 248-2    Filed 08/29/2008    Page 1 of 15

# EXPERT REPORT
# OF
# ALAN J. COX, PH.D.
### SENIOR VICE PRESIDENT

### In Connection with

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

# NATIONAL ECONOMIC RESEARCH ASSOCIATES

ONE FRONT STREET, SUITE 2600
SAN FRANCISCO, CA 94111
TELEPHONE: 415.291.1000  FACSIMILE: 415.291.1020
INTERNET: HTTP://WWW.NERA.COM

## MAY 30, 2008



*Consulting Economists*

# EXPERT REPORT OF ALAN J. COX

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

### TABLE OF CONTENTS

Table of Contents ....................................................................................................................... ii

I.    Qualifications ..................................................................................................................... 1

II.   Purpose of This Report ...................................................................................................... 2

III.  Information Considered .................................................................................................... 3

IV.   Background ........................................................................................................................ 4

V.    Disgorgement of Payments Made to Dr. Macevicz ......................................................... 6
      1. Introduction .................................................................................................................. 6
      2. Option Valuation Methodology ................................................................................... 7
      3. Valuation of Dr. Macevicz's Option Grants ................................................................ 8

VI.   Additional Harm Suffered by AB ................................................................................... 10

# EXPERT REPORT OF ALAN J. COX

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*

## I. QUALIFICATIONS

My name is Alan J. Cox. I am an economist and Senior Vice President at the San Francisco office of National Economic Research Associates ("NERA") where I participate in the Antitrust, Intellectual Property, and Securities practices. NERA provides expert economic and financial analysis for firms and government bodies on a variety of issues. My business address is 1 Front Street, Suite 2600, San Francisco, CA 94111.

I received a B.Sc. degree in Environmental Science from York University in Toronto in 1976 and an M.A. in Economics from the University of British Columbia in 1978. From 1978 to 1981, I served as a Visiting Economist at the Energy Laboratory at the Massachusetts Institute of Technology in Cambridge, MA. In 1989, I received a Ph.D. in Economic Analysis and Policy from the Haas School of Business Administration at the University of California at Berkeley.

My experience includes calculating damages for intellectual property cases involving alleged infringement of semiconductor process and design patents, (including patents used in components of telecommunications systems), for contract disputes over licensing agreements for pharmaceutical drugs, and for the alleged infringement of patents in the biotechnology, electronic devices, software, and other industries. I also provide patent valuation services in connection with NERA's management advisory services. I have assisted in competition analysis in telephone company mergers and have consulted in strategic and pricing matters to a major telephone company. I have testified in cases involving antitrust allegations arising out of licensing practices and have participated in matters before federal and state Courts, the California Public Utilities Commission, and the Federal Energy Regulatory Commission.

I lecture frequently on market definition and damages calculations in antitrust and intellectual property matters and on the application of rigorous economic techniques for

intellectual property valuation. I have published several papers on a range of competition and intellectual property issues and am a member of the Licensing Executives Society. Appendix A of this report contains my resume, which includes a list of my publications and presentations over the previous ten years and my prior testimony in other cases over the previous four years.

NERA is being compensated for my services in this matter at my usual rate of $535 per hour, and for the services of consultants and researchers at their normal and customary rates.

## II. PURPOSE OF THIS REPORT

On November 7, 2007, Applera Corporation – Applied Biosystems ("AB") filed an amended complaint in this matter ("the Complaint"). According to the Complaint, Dr. Stephen Macevicz ("Dr. Macevicz"), a patent counsel at AB, signed an Employee Invention Agreement in which he promised:

> to disclose to AB, to hold in trust for the sole right and benefit of AB, and to assign to AB any inventions that he might make while employed by AB. The only exception was for inventions that Macevicz could prove were developed entirely on his own time, were developed without the use of company resources, and did not relate to the actual or anticipated business of AB or result from work performed by him for AB. Macevicz further promised that if he made any inventions that he believed fell within this exception, he would disclose those inventions to AB and provide evidence to substantiate his belief that the inventions fell within the exception.[1]

AB further asserts in the Complaint that Dr. Macevicz filed a patent application (United States Patent Application No. 08/424,663, the "the '663 Application") while employed at AB. He never disclosed to AB this patent application, the inventions claimed therein, nor any of his work on the technology related to the patent. The Complaint asserts that this was in contravention of this agreement and seeks relief, including damages.

Counsel for AB has asked me to prepare an independent assessment of damages relating to Illumina, Inc. and Solexa, Inc.'s (collectively, "Illumina") interference with contract and aiding and abetting Dr. Macevicz's breach of fiduciary duty in the alleged misappropriation of the technology by Dr. Macevicz. The misappropriated patents, as claimed in the Complaint,

---

[1] 1st Amended Complaint, ¶ 12.

2

include U.S. Patents 5,750,341 ("the '341 Patent"), 5,969,119 ("the '119 Patent"), and 6,306,597 ("the '597 Patent") (collectively "the Patents").

The total harm to AB includes the additional costs associated with Dr. Macevicz's failure to disclose the technology surrounding the Patents, including the lost value due to business disruption and costs and attorney's fees directly related to the legal prosecution of this matter. In addition, should AB ultimately be deemed the rightful owner of the Patents, AB may incur costs associated with correcting what I understand are errors in the Patents and possibly re-filing the Patents. An additional component of damages, which I have been asked to calculate, is the value of the options granted to Dr. Macevicz. It is my understanding that Dr. Macevicz claims that some or all of the options granted to him were in exchange for the purported assignment of the Patents to Lynx Therapeutics, Inc. ("Lynx"), which is now Illumina. I have calculated the value of the unjust enrichment in Section V.

## III. INFORMATION CONSIDERED

In the preparation of my report and analyses, I and economists working under my direction, reviewed and analyzed documents produced in the course of this litigation, and reviewed deposition testimony from this litigation, and performed independent research and analysis (which is ongoing). A list of the information and documents I have considered to date is included in Appendix B. I also conducted interviews of current and former AB personnel.[2]

The opinions stated in this report are preliminary and are subject to change based upon, among other things, ongoing discovery. I may rely upon additional information that comes to my attention after the date of this report and amend my opinions accordingly to the extent permitted by the court. I have agreed to provide expert testimony (by deposition, at trial, or otherwise) based upon this Expert Report and attached exhibits. I may also be called upon to comment on, and to provide expert testimony in response to, any future reports or expert testimony offered by damages experts for Plaintiffs. I expect that I will review reports by other damages experts submitted in this matter.

---

[2] I and other personnel at NERA interviewed Dr. Michael Hunkapiller (former President), Rosy Lee (Sr. Manager, SOLiD Product Line), Charles Moehle (Sr. Director, Strategic Tech Licensing) and Sam Kirchner (Sr. Director, Finance).

## IV. BACKGROUND

From 1992 to August 1995, Dr. Macevicz served as Senior Patent Attorney for the Applied Biosystems Division of the Perkin-Elmer Corporation ("AB").[3] A press release from February 1995 stated, "the Division offers a comprehensive line of automated DNA research and analysis systems, as well as the leading systems for protein and peptide characterization and analysis and data analysis."[4] Another press release from August 1995 stated, "Perkin-Elmer's Applied Biosystems Division pioneered automated DNA sequencing eight years ago."[5]

On April 17, 1995, Dr. Macevicz filed the '663 Application entitled "DNA sequencing by parallel oligonucleotide extensions" which would later be issued as the '341 Patent on May 12, 1998. On May 1, 1995, Dr. Macevicz signed an indemnity agreement with Lynx. In this document, Dr. Macevicz agreed to "serve…as an Officer of the Corporation or as a director, officer or other fiduciary of an affiliate of the Corporation."[6] Lynx, in turn, agreed to:

> …hold harmless and indemnify Agent [Macevicz]: …against any and all expenses (including attorneys' fees), witness fees, damages, judgments, fines, and amounts paid in settlement and any other amounts that Agent becomes obligated to pay because of any claim…by reason of the fact that Agent is, was or at any time becomes a director, officer, employee or other Agent of Corporation.[7]

On June 1, 1995, Dr. Macevicz received a formal job offer in a letter from Lynx for the position of Vice President, Intellectual Property.[8] On June 6, 1995, Dr. Macevicz submitted his resignation letter identifying his last day at AB to be July 14, 1995.[9] On June 27, 1995, Dr.

---

[3] Deposition of Stephen Macevicz, November 28, 2007 (the "Macevicz Deposition"), p. 45, ll. 14-25.

[4] "New Dna Sequencer Produces Genetic Information Four Times Faster Than Existing Technology", Perkin-Elmer and Applied Biosystems Press Release, February 22, 1995.

[5] "New Enzyme Technology Dramatically Accelerates DNA Sequencing Efforts Worldwide", Perkin-Elmer and Applied Biosystems Press Release, August 10, 1995.

[6] Indemnity Agreement between Stephen C. Macevicz and Lynx Therapeutics, Inc., May 1, 1995, MAC001324-30 (Exhibit 16 to the Macevicz Deposition, November 28, 2007).

[7] Indemnity Agreement between Stephen C. Macevicz and Lynx Therapeutics, Inc., May 1, 1995, MAC001324-30 (Exhibit 16 to the Macevicz Deposition, November 28, 2007).

[8] Letter from Sam Eletr to Stephen Macevicz, June 1, 1995, ILL000869-70 (Exhibit 6 to the Deposition of Kathy San Ramon, November 8, 2007).

[9] Letter to Mike Hunkapiller, dated June 6, 1995, Exhibit 20 to the Macevicz Deposition.

Macevicz sent a memorandum to Hugo Santos of Applied Biosystems stating that he intended to leave Applied Biosystems on August 1, 1995.[10]

On August 31, 1995, Dr. Macevicz purported to assign the rights to four of his patent applications to Lynx, including U.S. Patent No. 08/424,663 ("the '663 Application") which resulted in the '341, the '119 and '597 Patents.[11] In exchange for purportedly assigning the rights to these patent applications to Lynx, Dr. Macevicz has claimed he was granted stock options for the right to buy 20,000 shares of Spectragen, Inc. ("Spectragen") common stock at a price of $0.20 per share on August 14, 1995.[12] He received an additional 50,000 stock options for Spectragen on August 14, 1995 and 150,000 stock options for Lynx on September 1, 1995.[13] Spectragen merged with Lynx on October 23, 1996.[14]

On June 10, 1997, Dr. Macevicz filed U.S. Patent Application No. 08/872,446 entitled "DNA sequencing by parallel oligonucleotide extensions" which would later be issued as the '119 Patent on October 19, 1999. On March 29, 1999, Dr. Macevicz filed U.S. Patent Application No. 09/280,270 entitled "DNA sequencing by parallel oligonucleotide extensions" which would later be issued as the '597 Patent on October 23, 2001. This patent was purportedly assigned to Lynx.

Dr. Macevicz was required to disclose the '663 Application to AB while he was employed there.[15] He failed to do so. For purposes of this report, I have been asked to assume that Dr. Macevicz had contractual and fiduciary duties to disclose this application to AB, and that AB is the rightful owner of '341, '119, and '597 Patents.

---

[10] Memorandum from Stephen Macevicz to Hugo Santos, June 27, 1995, Exhibit 21 to the Deposition of Stephen Macevicz, November 28, 2007.

[11] Assignment Agreement between Stephen Macevicz and Lynx Therapeutics, Inc., August 31, 1995, COOLEY 000009-10 (Exhibit 8 to the Deposition of Kathy San Roman, November 8, 2007). The '663 Application resulted directly the '341 Patent. The application for the '119 Patent (Application No. 08/872,446) was a divisional application of the '663 Application, while the application for the '597 Patent was a continuation of the application for the '119 Patent. I have assumed that all of the Patents were assigned to Lynx through the August 1995 agreement.

[12] The Deposition of Stephen Macevicz, November 28, 2007, p. 122:15-25 and Exhibit 36.

[13] See Response No. 9 in Answers and Objections of Illumina, Inc. to Applied Biosystems' First Set of Interrogatories to Illumina, Inc. [Nos. 1-14].

[14] Lynx Therapeutics, Inc. Form 10-K405 for the Fiscal Year Ended December 31, 1996, Exhibit 10.30, http://www.secinfo.com/dsvNq.8As.6.htm.

[15] The Deposition of Stephen Macevicz, November 28, 2007, pp. 106:5-107:1.

## V. DISGORGEMENT OF PAYMENTS MADE TO DR. MACEVICZ

### 1. Introduction

Dr. Macevicz asserts that the August 14, 1995 grant of 20,000 options on Spectragen, Inc. ("Spectragen") stock that he received from Lynx upon commencement of employment with the company were in consideration for his purported assignment of applications relating to the Patents to Lynx.[16] I understand that this point is in dispute in this litigation, but for the purposes of this report I accept Dr. Macevicz's testimony as true. The terms of this option grant allowed Dr. Macevicz to exercise 20,000 options on Spectragen stock as soon as September 11, 1995, with an exercise price of $0.20 and a time to expiration of 10 years.[17]

Additionally, Dr. Macevicz received other option grants from Lynx as compensation for his employment with the company. These included an August 14, 1995 grant of an additional 50,000 options on Spectragen stock with an exercise price of $0.20 and a time to expiration of 10 years. They also included a September 1, 1995 grant of 150,000 options on Lynx stock with an exercise price of $0.10 and a time to expiration of 10 years.[18] These options were in addition to Dr. Macevicz's annual compensation (salary) of $139,800, and a signing bonus of $10,000. Finally, Dr. Macevicz also received a grant of 20,000 options on Lynx stock on December 13, 1999 with an exercise price of $11.50, and a grant of another 20,000 options on Lynx stock on December 15, 2000 with an exercise price of $10.63. Both the 1999 and 2000 option grants had a time to expiration of 10 years. To the extent that any of these forms of additional compensation related to Dr. Macevicz's breach of contract and breach of fiduciary duty from purporting to assign the Patents to Lynx, they should also be considered in calculating disgorgement damages.

---

[16] Dr. Macevicz claims that he received these options in exchange for the patent applications from Exhibit 8 of his deposition (see p. 122, l. 17 to p. 123, l. 3 of the Deposition of Stephen C. Macevicz, November 28, 2007 ("The Macevicz Deposition"), including application numbers 08/091,603, 08/436,084, 08/436,528 and 08/424,663 ("the '663 application"). The '663 application resulted in the '341 patent, the '119 patent (whose 08/872,446 application was a division of the '663 application) and the '597 patent (which was a continuation for the patent application for the '119 patent).

[17] Deposition of Stephen C. Macevicz, November 28, 2007 ("the Macevicz Deposition"), p. 122:15-25. See also Exhibit 36 to the deposition (Bates no. ILL000912-917). The vesting date is given in ¶ 1 and the termination date is given in ¶ 5.

[18] See Exhibit 6 to the Deposition of Kathy San Roman, November 8, 2007.

6

## 2. Option Valuation Methodology

I have used the Black-Scholes valuation methodology to estimate the value of Dr. Macevicz's various options on their respective grant dates. The valuation of stock options was pioneered by the work of Fisher Black, Myron Scholes and Robert Merton in the early 1970s.[19] Myron Scholes and Robert Merton received the Nobel Prize in Economics for work relating to option pricing.[20] The Black-Scholes model is widely used by valuation professionals and dealers of derivative instruments to analyze tradable equity options. Furthermore, the model can be modified to accommodate certain unique features of employee stock options. According to Generally Accepted Accounting Principles, it is "among the valuation techniques that meet the criteria required by this Statement [FAS 123(R)] for estimating the fair values of employee share options and similar instruments."[21] According to the SEC's Office of Economic Analysis, "there is evidence that the modified Black-Scholes-Merton approach provides reliable estimates of option value."[22] Its relative simplicity and adaptability make it a frequent model of choice among public companies that have to provide estimates of the fair value of option-based compensation to employees for regulatory purposes.

The Black-Scholes model estimates the value of an option as a mathematical formula reflecting the expected payoff from the option. Since the payoff varies depending on the price of the underlying stock, the future stock price is assumed to follow a random walk.[23] The Black-Scholes calculation uses the following inputs: stock price at the valuation date (S), option exercise price (X), time to expiration for the option (T), expected dividend yield (q), expected risk-free rate (r), and expected stock price volatility ($\sigma$). Specifically, the value of an option is given by the following equation:

$$C = S e^{-qT} \Phi(d_1) - X e^{-rT} \Phi(d_2).$$

---

[19] Black, Fischer and Scholes, Myron, "The Pricing of Options and Corporate Securities" *Journal of Political Economy*, May/June, Vol. 81, No. 3 637-654.

[20] Fischer Black died before the Nobel Prize was awarded to Scholes and Merton in 1997.

[21] Statement of Financial Accounting Standards No. 123 (Revised 2004), "Share-Based Payment," paragraph A13.

[22] Memorandum from SEC's Office of Economic Analysis to the Commission's Chief Accountant Re: Economic Perspective on Employee Options Expensing: Valuation and Implementation of FAS 123®.

The $\Phi(\ )$ terms represent cumulative normal distributions with the inputs, $d_1$ and $d_2$, which are given by the following equations:

$$d_1 = \frac{\ln(Se^{-qT}/X) + (r + \sigma^2/2)T}{\sigma\sqrt{T}}$$

$$d_2 = d_1 - \sigma\sqrt{T}$$

### 3. Valuation of Dr. Macevicz's Option Grants

In my calculation of the Black-Scholes option values, I used the same expected dividend yield (q), risk-free rate (r), and expected stock price volatility (σ) that Lynx used in its 10-K filings.[24] The Black-Scholes methodology estimates the fair value of options that are assumed to remain unexercised until expiration. However, Employee Stock Options ("ESO") are often exercised prior to their expiration.[25] In my valuation, I have corrected for this accelerated exercise by using the expected life for Lynx's options, instead of the contractual life of the options, as provided in the company's 10-K filings.[26]

The option exercise price (X) for these grants were obtained from the "Verification of Defendant Stephen C. Macevicz's Responses to Plaintiff's First Set of Interrogatories," dated October 1, 2007. For the two August 14, 1995 option grants for Spectragen stock, I use the terms of Dr. Macevicz's options contract to estimate the approximate value of Spectragen's

---

[23] Random walk is the theory that "[stock] price changes are independent of one another just as gains and losses in…[a] coin-tossing game [a]re independent." See Brealey, Richard A., and Stewart C. Myers, 2003. Principles of Corporate Finance, 7th ed., International Edition (McGraw-Hill, New York), p. 348.

[24] Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 1996, filed March 27, 1997; Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 1999, filed March 14, 2000; and Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 2000, filed March 30, 2001. The periods covered by these reports include the various grant dates of Dr. Macevicz's options. The reports show expected dividend yields of zero for all years; risk-free rates of 6.26 percent, 4.97 percent, and 6.00 percent for 1995, 1999, and 2000, respectively; and expected stock price volatility of 73 percent, 86 percent, and 100 percent for 1995, 1999, and 2000, respectively.

[25] Chip Heath, Steven Huddart and Mark Lang, "Psychological Factors and Stock Option Exercise," *The Quarterly Journal of Economics*, May 1999, p. 603.

[26] Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 1996, filed March 27, 1997; Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 1999, filed March 14, 2000; and Lynx Therapeutics, Inc. Form 10-K for the year ended December 31, 2000, filed March 30, 2001. The reports show expected lives for the options of 4.4 years, 5 years, and 5 years for 1995, 1999, and 2000, respectively.

shares on the options grant date.[27] Estimating Spectragen's stock price in this manner is necessary as Spectragen was not a publicly-traded company and, therefore, had no established market price at the time of the option grants. The contract specifies that "[t]he exercise price of this option is twenty cents ($0.20) per share, being not less than 85% of fair market value of the Common Stock on the date of grant of this option."[28] I assume that the $0.20 strike price was priced at 85% of the value, yielding a market price at grant of ($0.20 / 0.85) = $0.24.

For the three option grants for Lynx stock, I have used Lynx's actual daily closing stock prices downloaded from Bloomberg. For the 1995 option grant for Lynx stock, market price data does not exist on the grant date of the option. For this option, I have used the average price, weighted by volume, for the month prior to grant, from July 26, 1995 through August 28, 1995. For the 1999 and 2000 stock option grants, I have used the actual stock price on the day before the grant date.

My calculation, as of the grant date, of the value of Dr. Macevicz's options for Spectragen and Lynx stock based on the Black-Scholes valuation methodology and the assumptions described above is provided in Exhibit 1. As of August 14, 1995, the value of Dr. Macevicz's 20,000 options on Spectragen stock with an exercise price of $0.20 is $3,058. The aggregate value of Dr. Macevicz's four remaining option grants for Spectragen and Lynx stock is $398,716. The prejudgment interest calculations are shown in Exhibits 2a-2e. For the August 14, 1995 grant of 20,000 options on Spectragen stock, prejudgment interest amounts to $2,479. Prejudgment interest on the remaining four option grants amounts to an additional $171,453.

The actual realized gains from the options granted to Dr. Macevicz are likely to have been considerably more than estimated in my above calculations. On or about June 13, 1996, Dr. Macevicz has stated that he exercised his option to purchase 20,000 shares of common stock of Spectragen at the $0.20 strike price.[29] This implies that he paid $4,000 to acquire 20,000 share of stock. These exercised options appear to be the exact 20,000 options issued in exchange for

---

[27] See "Nonstatutory Stock Option" for Steve Macevicz, Exhibit 36 to the Macevicz Deposition (Bates no. ILL000912-917).

[28] *Ibid*, ¶ 2 (a).

[29] "Response to Interrogatory No. 13," Defendant Stephen C. Macevicz's Response to Plaintiff's Interrogatories.

the purported assignment of the Patents to Lynx.[30] While there was no publicly available Spectragen market price at this time, the value of Spectragen's shares can be calculated four months later. On October 23, 1996, Spectragen merged with Lynx and all Spectragen shares and options were converted to shares and options of Lynx.[31] According to the merger agreement, each share of Spectragen was converted into 1.3 shares of Lynx. Thus, the 20,000 shares Macevicz owned on June 13, 1996 would have been converted to 26,000 Lynx shares. On the day of the merger, October 23, 1996, Lynx's stock price was $4.75. Had Dr. Macevicz sold his converted Spectragen shares on this date, he would have received $123,500 (26,000 shares × $4.75). Deducting the $4,000 price Dr. Macevicz paid for the Spectragen stock, Dr. Macevicz would have been enriched by $119,500. Including pre-judgment interest of $81,495 on this amount (shown in Exhibit 4a), the total unjust enrichment associated with Dr. Macevicz's 20,000 Spectragen options is $200,995.

Due to the lack of a Spectragen stock price, I provide an alternative calculation of the 50,000 Spectragen options still held by Dr. Macevicz around October 1996. On the date of the merger (October 23, 1996), the intrinsic value of the 50,000 shares of Spectragen stock options was $298,350. Including prejudgment interest (shown in Exhibit 4b), the total unjust enrichment associated with these options amounts to $502,488.[32] These calculations are shown in Exhibits 3 and 4b.

## VI. ADDITIONAL HARM SUFFERED BY AB

It is also likely that AB suffered additional harm due to the actions of Dr. Macevicz. Dr. Macevicz's failure to disclose the technology surrounding the Patents has resulted in substantial

---

[30] Dr. Macevicz's grant of 50,000 shares in his employment contract did not vest until September 1996. See "Nonstatutory Stock Option" for Steve Macevicz, Exhibit 36 to the Macevicz Deposition (Bates no. ILL000912-917).

[31] Lynx Therapeutics, Inc. Form 10-K405 for the year ended December 31, 1996, filed March 27, 1997, Exhibit 10.30, ¶ 2.1.

[32] On this date, Dr. Macevicz's other 50,000 options of Spectragen would have been converted to 65,000 options of Lynx. The value of 65,000 shares of Lynx on this date would have been $308,750 (65,000 shares × $4.75). The intrinsic value of these options would be the difference between the stock price and the strike price. Since the conversion of Spectragen share to Lynx share would have made Dr. Macevicz's strike price equal to approximately $0.16 (the original $0.20 strike price divided by the 1.3 conversion rate), the intrinsic value of on each options on October 23, 1996 would have been approximately ($4.75 - $0.16) = $4.59 with a the total intrinsic value of $298,350.

10

expenses, in particular, but not limited to, the defense costs of litigating over the Patents which it may rightfully own. When a party to a contract fails to live up to its contractual obligations, it is often the case that they impose costs on the other party. These costs can arise out of the need to mitigate harm to it as a result of the non-performance of the other party. They can also arise out of litigation costs, both out-of-pocket attorney's fees and the disruption imposed on the other party.

Dr. Macevicz's failure to inform AB of the technology related to the Patents had at least three identifiable additional costs. The first is that AB, upon discovering Dr. Macevicz's failure to inform, was forced to file the current legal action in order to determine what rights it could recover. I understand that AB has had significant out-of-pocket expenses in legal fees and that it will make a full accounting of those fees at trial.

The second source of cost to AB is the disruption caused as a result of the litigation. Internal legal resources are needed to supervise the litigation. These resources could be put to profitable use in some other effort. Possibly more significantly, management time is also diverted from the primary work of the firm, in this case developing improved devices for DNA sequencing. While these costs can be substantial, they are ongoing and can be determined through a full accounting at trial.

Finally, it is my understanding that there were multiple errors associated with the prosecution of the Patents. These errors may render the claims too narrow, invalid, or otherwise less valuable than they would be if the application had been prosecuted properly. If AB is ultimately deemed the rightful owner of the technology associated with the Patents, it may incur additional costs associated with proceedings before the patent office to fix these problems. Such costs must be considered in the context of the specific changes and corrections to the patent filings as well as additional patent filings. These factors would support an award of future costs and may be accounted for at trial.

Highly Confidential – Attorneys' Eyes Only

_____
Alan J. Cox

Highly Confidential – Attorneys' Eyes Only