# Exhibit 1

# EXPERT REBUTTAL REPORT
# OF
# ALAN J. COX, PH.D.
### SENIOR VICE PRESIDENT

### In Connection with

*Applera Corporation – Applied Biosystems Group*
v.
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

# NATIONAL ECONOMIC RESEARCH ASSOCIATES

ONE FRONT STREET, SUITE 2600
SAN FRANCISCO, CA 94111
TELEPHONE: 415.291.1000  FACSIMILE: 415.291.1020
INTERNET: HTTP://WWW.NERA.COM

### JUNE 13, 2008


n/e/r/a
*Consulting Economists*

# EXPERT REBUTTAL REPORT OF ALAN J. COX

*Applera Corporation – Applied Biosystems Group*
v.
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

## TABLE OF CONTENTS

Table of Contents ........................................................................................................................... ii

I.     Qualifications ..................................................................................................................... 1

II.    Purpose of This Report ...................................................................................................... 2

III.   Information Considered ..................................................................................................... 3

IV.    Summary of Opinions ........................................................................................................ 3

V.     Background ........................................................................................................................ 5

VI.    Rebuttal to Dr. Siuta's Expert Report ................................................................................ 6
       A. Introduction .................................................................................................................. 6
       B. 25 Percent Rule ............................................................................................................ 8
       C. There is No Economically Justifiable Reason for Dr. Siuta to Assume Two
          Hypothetical Negotiations ......................................................................................... 11
       D. Dr. Siuta Has Incorrectly Applied the *Georgia-Pacific* Factors ............................... 15
          1. Dr. Siuta's Hypothetical Negotiation ..................................................................... 15
       E. Critique of *Georgia-Pacific* Factor 2 ....................................................................... 19
          1. Dr. Siuta Inappropriately Discounts the Harvard Licenses ................................... 19
          2. Dr. Siuta Has Selectively Chosen Licenses for His Comparables ........................ 22
          3. Conclusion on Dr. Siuta's Comparables ................................................................ 31
       F. Dr. Siuta's Application of the Remaining Factors ..................................................... 31

VII.   Reasonable Royalty Analysis .......................................................................................... 31
       A. Introduction ................................................................................................................ 31
       B. The Hypothetical Negotiation .................................................................................... 32
          1. Hypothetical Bargaining Range – *Georgia-Pacific* Factor 15 ............................. 32
       C. Analysis of the Remaining *Georgia-Pacific* Factors ............................................... 36
          Factor (1): The royalties received by the patentee for the licensing of the patent-in-
              suit, proving or tending to prove an established royalty. ................................... 36
          Factor (2): The rates paid by the licensee for the use of other patents comparable to
              the patent-in-suit. ................................................................................................ 36

Factor (3): The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold. .................................................................. 38

Factor (4): The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. ..................... 39

Factor (5): The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. .......................................................... 39

Factor (6): The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales. ........................................................................................................ 41

Factor (7): The duration of the patent and the term of the license. .................................. 41

Factor (8): The established profitability of the product made under the patent, its commercial success, and its current popularity. ........................................................ 41

Factor (9): The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results; and ................... 42

Factor (10): The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention. ....................................................................................... 42

Factor (11): The extent of which the infringer has made use of the invention, and any evidence probative of the value of that use. .............................................................. 42

Factor (12): The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. ............................................................................. 42

Factor (13): The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. ..................................................................................................................... 43

Factor (14): The opinion and testimony of qualified experts. ........................................... 46

Factor (15): The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee - who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. ............................................... 46

D. Outcome of the Hypothetical Negotiation ................................................................... 47
   1. Solexa's Business Conditions around the Time of First Infringement ..................... 47
   2. APG's Business Considerations around the Time of First Infringement .................. 47
   3. Upfront Payment for the Developmental Use of the Patents ................................... 48
   4. Running Royalty Rate for Sales of the SOLiD Product ........................................... 49
   5. Total Damages .......................................................................................................... 49

| | | |
|---|---|---|
| VIII. | Calculation of Royalties to be Applied to the SOLiD Kits | 50 |
| IX. | Calculations of Damages in the Case that the 1-Base Encoding Infringes but the 2-Base Encoding Does Not | 50 |
| X. | Alternative Calculation of Reasonable Royalties | 51 |

Solexa's but-for market shares. In a presentation by L.E.K. Consulting about SOLiD's commercial opportunity, the worldwide NGS market is forecasted to be $135 million in 2007 and $440 million in 2011. Thus, I interpolate the worldwide NGS market in 2008, 2009, and 2010 by assuming that the market will grow by (440 - 135)/4 every year. The worldwide NGS market from 2012 through 2016 are projected by using the year-over-year increase in APG's revenue for the respective years. By subtracting APG's and Solexa's projected revenue from the worldwide market, I allocate the remainder of the market to other competitors. I calculate Solexa's but-for market share to be a low of 53 percent in 2007 to a high of 89 percent in 2010.

Under this scenario, I forecast Solexa's cost of goods sold, operating expenses, depreciation, capital expenditures, and change in working capital in the same manner as the scenario in which APG receives a license. Using these projections and the but-for market share, I calculate Solexa's lost profits in the but-for world in which APG does not develop a non-infringing alternative.

However, it is probable that a company with the relevant experience that APG enjoyed would be able to turn to alternative technologies that would allow it to sell next generation sequencers. I discussed this issue with Kevin McKernan. He told me that there was a very high probability that, should APG not be able to use the Patents, they would develop an alternative technique that would have been just as acceptable to customers that would have allowed them to enter the market at about the same time that it did in the actual world. I then multiply the stream of cash flows that comprise the lost profits by (1-0.80 = 0.20) to account for an 80 percent probability that AB would develop such a non-infringing alternative. This stream of cash flows is then discounted at a 30 percent discount rate, consistent with the discount rate Houlihan Lokey used in its valuation of APG's intangible assets.

My estimate of Solexa's maximum willingness to accept, summarized in Exhibit 5a, is calculated to be 3.9 percent.

Dr. Macevicz before his departure from AB. That is, Dr. Macevicz has demonstrated that he was willing to have accepted between $3,057 (my low estimate in my previous report) and up to $502,408 (my high estimate assuming all the stock Dr. Macevicz received was for the purported assignment of the Patents).

_____
Alan J. Cox