Exhibit 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

APPLERA CORPORATION – APPLIED
BIOSYSTEMS GROUP, a Delaware corporation,

        Plaintiff,

    v.

ILLUMINA, INC., a Delaware corporation,
SOLEXA, INC., a Delaware corporation, and
STEPHEN C. MACEVICZ, an individual,

        Defendants.

Case No.   C07 02845 WHA

**EXPERT REPORT OF D. ROSS SIBSON, Ph.D.**

**TABLE OF CONTENTS**

I.  BACKGROUND ......................................................................................................... 1

II.  DETAILED OPINIONS ............................................................................................. 2

   A.  Background of the relevant technology .................................................................. 2

   B.  The person of ordinary skill in the art ................................................................... 5

   C.  The '341 Patent ...................................................................................................... 5

   D.  The '119 Patent ...................................................................................................... 6

   E.  The '597 Patent ...................................................................................................... 7

   F.  The prior art ........................................................................................................... 7

      1.  Southern .......................................................................................................... 7

      2.  Brennan ........................................................................................................... 8

      3.  Sibson .............................................................................................................. 9

      4.  Whiteley ........................................................................................................ 10

      5.  Landegren ...................................................................................................... 10

      6.  Brenner .......................................................................................................... 11

      7.  Mag ................................................................................................................ 11

   G.  Claims of the '341 Patent that are anticipated by the prior art ........................... 11

      1.  Claims 1 and 2 are anticipated by Southern 1995 ........................................ 12

      2.  Claim 1 is anticipated by the Whiteley Patent ............................................. 12

      3.  Claim 1 is anticipated by the Landegren Patent ........................................... 13

   H.  Claims of the '341 Patent that are obvious in view of the prior art .................... 13

      1.  Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 are obvious over Southern 1995 ............... 13

      2.  Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 are obvious over the Brennan Patent ......... 16

   I.  Claim 1 of the '597 patent is anticipated by the prior art .................................... 20

      1.  Claim 1 is anticipated by Southern 1995 ..................................................... 20

      2.  Claim 1 is anticipated by the Whiteley Patent ............................................. 21

      3.  Claim 1 is anticipated by the Landegren Patent ........................................... 21

      4.  Claim 1 may be anticipated by other references ........................................... 22

   J.  Claim 1 of the '597 patent is obvious in view of the prior art ............................. 22

      1.  Claim 1 is obvious over Southern 1995 ........................................................ 22

      2.  Claim 1 is obvious over the Whiteley Patent ................................................ 22

3.    Claim 1 is obvious over the Landegren Patent ................................................. 22

4.    Claim 1 is obvious over the Brennan Patent ................................................... 22

K.    Claim 1 of the '119 patent is obvious in view of the prior art ............................ 24

1.    Claim 1 is obvious over the Mag article in view of the Brennan Patent ...................... 24

III.   Prior Testimony in Other Cases. .................................................................. 24

IV.   Rate of Compensation. .............................................................................. 24

V.    Other Testimony .................................................................................... 25

VI.   Documents and Information Considered ............................................................. 25

I, D. Ross Sibson, Ph. D., submit the following report concerning my opinions on the invalidity of U.S. Patent No. 5,750,341 (the "'341 Patent"), U.S. Patent No. 5,969,119 (the "'119 Patent"), and U.S. Patent No. 6,306,597 (the "'597 Patent").

## I.    BACKGROUND

I have been Director of Research at the Clatterbridge Cancer Research Trust (the "CCRT") in England since December 1994. I have also been a Professor at the University of Liverpool since February 2007. My laboratories at the CCRT and the University of Liverpool focus on several areas of research such as cancer genomics using novel genetic techniques, and the relationship between the genetic, physiological and pathological characteristics of certain types of cancers, including brain, breast, head, and neck cancer.

While at the CCRT, I was awarded a grant from the Genetic Innovation Network to develop improved techniques for single molecule nucleic acid sequencing. I was subsequently awarded a £518,268 grant from the Welcome Trust University in 2005 to develop techniques for very low cost high-throughput genotyping of single nucleic acid molecules. We filed a patent application on this subject matter. The Welcome Trust grant funded work through MerseyBio, an incubator. InteraSeq Genetics is the commercialization vehicle for this work. I have been the Director of Research for InteraSeq Genetics from January 2006 through the present.

Prior to joining the CCRT, I was employed at Glaxo Research and Development Limited ("Glaxo"). My research at Glaxo focused on using novel techniques to screen cDNAs for new genes and techniques for detecting expression of these cDNAs.

I joined Glaxo from the Medical Research Council ("MRC"), where I was Biological Manager from 1990-1994. My first two years at the MRC were on secondment from Amersham International. I directed the biological operations of the resource center for the UK. Our unit was interested in physical mapping, genetic mapping, and sequencing. I spent much of my time developing new technologies for nucleic acid analysis and sequencing.

A main focus throughout my career has been the development of new molecular biology and DNA sequencing techniques. While a Senior Development Scientist at Amersham, my

position involved developing molecular biology techniques such as alternatives to the

polymerase chain reaction ("PCR") method for amplifying DNA.  As a post-doctoral fellow, in

developing cloning vectors for plants I investigated the use of replication sequences from other

eukaryotes.  As a graduate student, I studied transcription of plasmids in *E. coli.*

I have authored 36 papers, and 2 book chapters.  While I have been director, the CCRT

group has published 11 further papers.  I am an inventor on 4 issued patents relating to methods

for sequencing nucleic acids and methods for categorizing nucleic acid populations.  I am an

inventor on 4 additional patent applications relating to various technologies, including two

applications relating to sequencing and comparing of nucleic acids.

My membership of Professional Societies has included the Society for Experimental

Biology and the Biochemistry Society.  A copy of my curriculum vitae is attached as Attachment

A.

## II.    DETAILED OPINIONS

### A.    Background of the relevant technology

The sequence of the four nucleotide bases encodes genetic information.  DNA

sequencing encompasses methods used to determining the express identity and order of the

nucleotide bases in the target DNA molecule.

A polynucleotide sequence can be thought of most simply as a series of positions

increasing by one at a time and at which any of 4 possible bases can be found.  A common

requirement in reading the order of the bases  -- DNA sequencing -- has been how to read each

base in turn, i.e., reading the base at a particular position and then moving to the next position in

turn for a new base to be read.  The pioneering work of Sanger and also Maxam and Gilbert

defined a fixed point in a polynucleotide of interest and then created a set of fragments from that

point to all possible places in the polynucleotide in a given direction.  The fragments were

labeled according to the base present at the opposite end to the fixed point.  High resolution gel

electrophoresis was then used to separate the fragments at single base resolution so that the bases

could simply be read in order of their occurrence on fragments of increasing size corresponding

to increasing position in the sequence. Base specific fragments or fragmentation was achieved either constructively, by for example synthesis in the Sanger method or destructively by for example chemical cleavage in the case of the Maxam and Gilbert method. In both cases, it was usually necessary to repeat the methods on different examples of a given polynucleotide but starting at different places in the sequence. This is because the required length of sequence was commonly longer than could be read in a single repetition of the method. In addition, read errors can occur so multiple reads are commonly performed to obtain a consensus sequence, essentially by majority vote.

The Sanger method also pioneered the use of a hybridized, complementary polynucleotide for defining the start point from which processive sequencing processes (i.e., those moving from one position to the next) should begin. In the case of Sanger, the enzyme DNA polymerase catalyzed the addition of bases in order onto the end of the complementary polynucleotide. This is essentially an uncontrolled process and is made specific by the inclusion of terminating bases in the substrate mixture. These so called terminators are incorporated in a base specific manner, and once incorporated, prevent any further incorporation thus defining both the end of a fragment and the identity of the base at its end. The terminators are incorporated at random and their concentration in the substrate is adjusted so that a preferred average length of fragment is produced. Many fragments failed to end in a terminator so it was necessary to follow the terminating reactions with a chase of excess non-terminators, thus forcing short, unterminated fragments to have bases added to the point where they would be too large to appear in the optimum regions of the gels. Essentially they were given extended caps.

Sequence can also be read by direct sensing of the bases present. Sequencing by hybridization is a direct sensing method. Single stranded polynucleotides having complementary sequences of bases are able to accurately reanneal over the complementary region to form a double-stranded polynucleotide. Using a labeled oligonucleotide probe of known sequence therefore allows complementary sequence to be located in a target polynucleotide, simply by allowing them to hybridize. Typically, the polynucleotide of interest is arrayed as multiply

addressable positions (i.e., an array) on a surface. Either the probes can form the array, in which case the target is labeled to identify complementary probes or the targets are arrayed, and hybridized to a succession of known probes.

Such methods found favor because they offered the potential to increase throughput in comparison to gel-based methods. This is achieved because thousands of polynucleotides can form an array and each can be interrogated in parallel. By way of comparison, gel based methods are typically restricted to analyzing hundreds of different polynucleotides.

Hybridization based sequencing does not easily allow sequence to be determined in order from a particular position because probes can potentially find a target anywhere throughout a polynucleotide. Methods combining the benefits of arraying and the use of enzyme directed interrogation of bases were therefore introduced. Essentially, base dependent reactions that could be associated with a base dependent label were catalyzed at defined start points on multiply arrayed polynucleotides. Having determined the base at one position it was necessary to move to the next position to be interrogated. Reversible base specific terminators for use with DNA polymerases were adopted for such purpose. In some cases the terminator was reversed by cleavage back to a defined protected position and in other cases groups that capped or blocked the terminators could be removed to allow further extension.

DNA ligase also found favor as an enzyme for catalyzing the addition of bases to the ends of the complementary polynucleotide, in particular for array based approaches (multiple polynucleotides immobilized on surfaces). In this case, the bases were present in a polynucleotide tested for its ability to anneal adjacent to the first complementary polynucleotide by whether their proximity allowed them to be joined by the action of the ligase. Restricting the reaction to a single addition at each start point is trivial because such reactions are naturally terminated provided the use of a terminal phosphate at the next position for interrogation is avoided (normally the default situation). Adding the missing phosphate after the first cycle of interrogation allows the next cycle of interrogation to proceed. In order to support stringent hybridization, ligation based methods require polynucleotide probes which extend over multiple

4

positions. This was most conveniently achieved by having multiple start points that cover the full required set of end points. Recourse to cleaving back to the required position was also an option.

Thus, all of the principles required for large scale sequencing were known and understood by the time of the period in question.

### B.    The person of ordinary skill in the art

I expect to testify regarding skills, education, and experience that a person of ordinary skill in the art would have had on April 17, 1995, when the application that ultimately issued as the '341, '597 and '119 Patents was filed. In my opinion, a person having ordinary skill in the art as of April 1995 would have been a person with graduate level training in molecular biology or biochemistry or the like, and three to five years experience with nucleic acid chemistry and DNA sequencing technologies.

### C.    The '341 Patent

I expect to testify regarding the disclosure of the '341 Patent and the claims of the '341 Patent. I understand that Patent Application Serial No. 08/424,663 ("the '663 application") was filed April 17, 1995 and issued as the '341 Patent.

I also understand that the Court has construed certain disputed claim terms. I have reviewed the Court's construction of these disputed claim terms and I have applied the Court's construction in my analysis.

The '341 Patent discloses a method of determining the sequence of a DNA molecule. The '341 Patent discloses a method of sequencing by ligation where a "target polynucleotide" is linked to a binding region of known sequence, which is referred to as a "template."

The '341 Patent describes hybridizing an initializing oligonucleotide to the binding region, hybridizing an oligonucleotide probe to the template, ligating the oligonucleotide probe to the initializing oligonucleotide, determining the sequence of at least one nucleotide residue in the target polynucleotide, generating an extendable probe terminus, and then repeating the method steps until the target sequence is determined.

I understand that Illumina alleges that AB infringes claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 Patent.

The Court has construed certain terms of the claims. For example, the Court has construed the term "initializing oligonucleotide" as hybridizing to the "target polynucleotide." The claims of the '341 Patent require that the identity of at least one nucleotide in the oligonucleotide probe be determined after the ligation step is performed. The Court has also construed the term "identify" to mean "within each cycle determining the identity of a base in the target polynucleotide."

### D.    The '119 Patent

Claim 1 of the '119 Patent recites an oligonucleotide probe having a particular chemical structure. The probe consists of a linear oligomer of nucleosides containing a phosphoramidate linkage. A phosphoramidate linkage replaces the 5' most bridging oxygen (O) atom in one internucleoside linkage with a nitrogen (N) atom. Between 1 and 6 nucleoside residues are located on each side of the phosphoramidate linkage, such that the probe is 12 or fewer nucleic acid residues long. A labeled chain-terminating moiety is present at the 5' end of the oligonucleotide.

Claim 1 is set forth below:

An oligonucleotide probe of the formula:

HO—(3')(B)j(5')—OP(═O)(O—)NH—(B)k-Bt*

wherein:

B is a nucleotide or an analog thereof;

j is in the range of from 1 to 12;

k is in the range of from 1 to 12, such that the sum of j and k is less than or equal to 12;

Bt* is a labeled, non-extendable chain-terminating moiety.

### E.    The '597 Patent

As described above, I have applied the Court's claim constructions in my analysis. I understand that there are other claim terms that have not yet been construed by the Court. Depending on the Court's claim construction, additional prior art references may become relevant to my analysis.

Claim 1 of the '597 patent describes hybridizing an initializing oligonucleotide and an oligonucleotide probe to a polynucleotide, ligating the oligonucleotides, and identifying one or more nucleotides of the polynucleotide. The process is repeated until the sequence of nucleotides is determined.

Claim 1 is set forth below:

A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

(a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

(b) identifying one or more nucleotides of the polynucleotide; and

(c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

### F.    The prior art

I have reviewed a number of references to prepare this report. Although the authors of those references use different terminology than Macevicz, my analysis herein uses the terminology as described in the Macevicz Patents.

### 1.    Southern

Sir Edwin Southern and William Jonathan Cummins filed a patent application in Great Britain on July 30, 1993 ("Southern 1993"); a copy which is attached as Attachment B. While Southern 1993 did not publish before the '663 application was filed, I understand that it constitutes evidence of the level of knowledge of those of ordinary skill in the art as of at least July 1993. A PCT application (PCT/GB94/01675) was filed on August 1, 1994, and published on February 9, 1995 ("Southern 1995"); a copy of which is attached as Attachment C. I understand that Southern 1995, which published before the '663 application was filed, is

available as prior art.  The PCT issued as U.S. Patent No. 5,770,367 ("Southern 1998").  A copy of this patent is attached as Attachment D.

Southern 1993, Southern 1995, and Southern 1998 disclose an assay for determining the nucleic acid sequence of a polynucleotide.  (*See* Southern 1995 at page 2, lines 9-13 and 22-26, page 4, lines 33-36, page 14, line 31-32, page 21, lines 4-15, and Figures 4 and 5.)  An initializing oligonucleotide probe and an extension oligonucleotide probe are hybridized to the polynucleotide.  (Southern 1995 at page 14, line 31- page 15, line 8, page 15, lines 22-33, page 19, lines 4 - 15, page 20, lines 17 - 24, page 21, lines 4-15, and Figure 5.)  The two probes are then ligated.  (Southern 1995 at page 15, lines 9-10, page 15, line 33 - page 16, line 1, page 20, lines 25 - 27, page 21, lines 4-15, and Figures 4 and 5.)  At least one nucleotide complementary to the just-ligated extension probe is identified.  (Southern 1995 at page 15, lines 12-14, page 16, lines 7 - 10, page 19, lines 17 - 19, page 20, lines 29 - 31, page 21, lines 4-15, and Figures 4 and 5.)  An extendable probe terminus is generated on the extension oligonucleotide by cleaving off the chain-terminating moiety from the just-ligated oligonucleotide probe.  (Southern 1995 at page 16, lines 7 - 18, page 12, line 20 – page 13, line 8, page 20, lines 32 - 34, and Figures 4 and 5.)  The ligation, identification, and regeneration steps are repeated. (Southern 1995 at page 16, lines 19 - 35, page 19, lines 20 - 24, page 20, line 35 - page 21, line 3, and Figure 4.)

### 2.    Brennan

United State Patent No. 5,403,708 issued on April 4, 1995 to Thomas M. Brennan and Herbert L. Heyneker (the "Brennan Patent"); a copy of which is attached as Attachment E.  The application that issued as the Brennan Patent was filed on July 6, 1992.  The Brennan Patent issued April 4, 1995, before the filing date of the '663 application.  Accordingly, I understand that it is available as prior art.  I have reviewed this reference.  I am aware that the Brennan Patent was cited during the prosecution of the '341 Patent.

Brennan discloses a DNA sequencing method employing the ligation of labeled oligonucleotides to an initializing primer hybridized to a polynucleotide, where the labeled oligonucleotides permit the identification of one or more nucleotides complementary to the

ligated oligonucleotides. (*See* Brennan at Col. 2, line 23 – Col. 3, line 16, Col. 4, lines 30-63, Col. 5, line 42- 54, Col. 7, lines 42 – 55, and Figure 1B.) The labeled oligonucleotide may have a chain-terminating moiety. (Brennan at Col. 3, lines 12-16 and 38-46, Col. 5, lines 18-41, Col. 6, line 27 – Col. 7, line 31, and claims 2 and 3.) Brennan teaches using overlapping primers that anneal to the polynucleotide in separate aliquots, thus forming distinct duplexes. (Brennan at Col. 4, line 44 – Col. 5, line 17, and Figure 1.) Brennan also teaches oligonucleotides containing a cleavable internucleosidic linkage (*e.g.*, a phosphorothioate linkage). (*See* Brennan at Col. 6., lines 21 – 26.)

### 3.    Sibson

I filed a patent application on January 21, 1994 ("Sibson 1994"); a copy of which is attached as Attachment F. While it did not publish before the '663 application was filed, I understand that Sibson 1994 shows what was known to one of ordinary skill in the art as of at least January 1994. A PCT application (PCT/GB95/00109) was filed on January 20, 1995, and published on July 27, 1995 ("Sibson 1995"). A copy of Sibson 1995 is attached as Attachment G. Sibson 1995 entered the national stage and ultimately issued as U.S. Patent No. 6,348,313 ("Sibson 2002"). A copy of Sibson 2002 is attached as Attachment H.

My patent applications disclose a DNA sequencing method that employ an initializing primer and a labeled oligonucleotide that hybridize to a polynucleotide and are ligated to one another. (Sibson 1994 at page 8, lines 1-16, page 11, line 23 – page 12, line 2, and Figure 2.) The label permits the identification of one or more nucleotides in the polynucleotide. (Sibson 1994 at page 13, lines 4-19, page 30, lines 5-10.) The labeled oligonucleotide contains a chain-terminating moiety. (Sibson 1994 at page 6, line 13 – page 7, line 18, and Figure 2.) A portion of the labeled oligonucleotide is removed by enzymatic or chemical cleavage. (Sibson 1994 at page 12, lines 21-24, page 30, line 12 to page 31, line 1, page 34, lines 6-25, and Figure 2.) The process is repeated until the sequence of the polynucleotide is determined. (Sibson 1994 at page 12, line 26 – page 27, line 2.)

### 4.    Whiteley

United States Patent No. 4,883,750 issued on November 28, 1989 to Norman M. Whiteley, Michael W. Hunkapiller, and Alexander N. Glazer (the "Whiteley Patent"); a copy of which is attached as Attachment I. The Whiteley Patent issued more than one year prior to the filing date of the '663 application, and is thus available as prior art.

The Whiteley Patent teaches a method for determining sequence of a polynucleotide. (*See* Whiteley at the Abstract, Col. 3, lines 28-30 and 41-43, and Col. 1, lines 6-8.) The method involves hybridizing an initializing oligonucleotide probe and an extension oligonucleotide probe to a polynucleotide. (Whiteley at Col. 3, lines 44-48, Col. 6, lines 65-66, and Col. 5, lines 8-18.) The two probes are then ligated. (Whiteley at Col. 3, lines 51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.) At least one nucleotide of the polynucleotide is identified. (Whiteley at Col. 3, lines 54-61, Col. 5, line 64 – Col. 6, line 4, and Claim 20.) The extension oligonucleotide contains an extendable probe terminus. (Whiteley at Example 1, claim 4, and Col. 6, lines 37-52.) Whiteley teaches that many changes and modifications may be made, including using a series of probes each adjacent to the next for determining sequence information. (*See* Whiteley at Col. 13, lines 3-17.)

### 5.    Landegren

U.S. Patent No. 4,988,617 issued January 29, 1991 to Ulf Landegren and Leroy Hood (the "Landegren Patent"); a copy of which is attached as Attachment J. The Landegren Patent issued more than one year prior to the filing date of the '663 application. I understand it is available as prior art. I have reviewed the Landegren Patent.

The Landegren Patent discloses an assay for determining the nucleic acid sequence of a polynucleotide. (*See* Landegren at the Abstract, Col. 2, lines 34-39, and Col. 4, lines 12-15.) The method involves hybridizing an initializing oligonucleotide probe and extension oligonucleotide probe to a polynucleotide. (Landegren at Col. 2, line 68 – Col. 3, line 4, Col. 3, lines 5-9, and Col. 7, lines 4-7.) The two probes are then ligated. (Landegren at Col. 3, lines 10-15 and Col. 9, lines 35-36.) At least one nucleotide of the polynucleotide is identified.

(Landegren at Col. 2, lines 56-58, Col. 3, lines 21-22, Col. 8, lines 43-46, Col. 8, lines 63-66, Col. 10, lines 15-18, and Col. 4, lines 31-50.)  Landegren provides a method for repeating the ligation and identification steps using a subsequent probe.  (Landegren at Col. 7, line 67 – Col. 8, line 11, Col. 8, line 66 to Col. 9, line 2, Col. 11, lines 39-44, and Claim 8.)

### 6.    Brenner

U.S. Patent No. 5,552,278 issued September 3, 1996 to Sydney Brenner (the "Brenner Patent").  A copy of the Brenner Patent is attached as Attachment K.  The patent application that issued as the Brenner Patent was filed on July 25, 1994 and is therefore available as prior art.  I have reviewed the Brenner Patent.

The Brenner Patent discloses a sequencing reaction involving the repeated ligation of a double-stranded oligonucleotide probe to a polynucleotide, and the detection of a nucleic acid residue within the polynucleotide.  It further teaches capping of an oligonucleotide that has not undergone ligation to render it inert to further ligation steps.  (Brenner at Col. 13, lines 53-67.)

### 7.    Mag

Mag *et al.* discusses phosphoramidate linkages (the "Mag article").  A copy is provided at Attachment L.  The Mag article published more than one year prior to the filing date of the '663 application, and I understand it is available as prior art.  I have reviewed this document.  The Mag article describes the generation of oligonucleotides containing phosphoramidate linkages, and describes the chemically scissile nature of the linkages.  (Mag at page 7319 and page 7322.)

It discloses a dodecameric oligonucleotide having the formula (12:d[AGAGAT$_{NHp}$ATCTCT]), from 5′ to 3′.  (Mag at page 7321.)  The disclosed dodecamer contains a 5′ O-(dimethoxytrityl) (DMTO) protecting group at position Bt*, which is attached to the oligonucleotide.  (Mag at page 7320, Figure 2.)  The DMTO protecting group is a non-extendable, chain-terminating moiety.  DMTO serves as a label, as shown by color quantitation of the cleaved dimethoxytrityl group at 498 nm.  (Mag at page 7322.)

### G.    Claims of the '341 Patent that are anticipated by the prior art

I understand that a prior art reference anticipates a patent claim if it discloses every element of the claim.

### 1.    Claims 1 and 2 are anticipated by Southern 1995

Claim 1:  Southern 1995 discloses every element of claim 1.  Southern 1995 teaches a sequencing method that employs a library of labeled oligonucleotides to determine the sequence of a target polynucleotide.  In the method an initializing oligonucleotide and an extension oligonucleotide are hybridized to the target polynucleotide.  The extension oligonucleotide is ligated to the initializing oligonucleotide and the identity of one or more bases in the polynucleotide is determined.  The ligation, identification, and regeneration steps are repeated using additional labeled oligonucleotide probes until a sequence of the target polynucleotide is determined. (*See* Southern 1995, page 16, lines 6-25, page 19, lines 20 – 24, page 20, line 35 – page 21, line 3, and Figures 4 and 5.)

Claim 2:  Claim 2 depends from claim 1.  As a dependent claim, I understand it includes all the limitations of the claim from which it depends.  Southern 1995 discloses every limitation of claim 2.  Claim 2 requires that the extension probes used in the method have a chain-terminating moiety.  Southern 1995 teaches extension oligonucleotides with chain-terminating moieties.  (Southern 1995 at page 16, lines 7 - 18, page 12, line 20 – page 13, line 8, page 20, lines 32 - 34, and Figures 4 and 5.)

### 2.    Claim 1 is anticipated by the Whiteley Patent

Claim 1:  The Whiteley Patent discloses every element of claim 1.  The Whiteley Patent teaches a sequencing method that calls for hybridizing an initializing oligonucleotide and an extension oligonucleotide probe to a target polynucleotide.  (Whiteley at Col. 3, lines 44-48, Col. 6, lines 65-66, and Col. 5, lines 8-18.)  The two probes are then ligated.  (Whiteley at Col. 3, lines 51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.)  At least one nucleotide in the polynucleotide is identified.  (Whiteley at Col. 3, lines 54-61, Col. 5, line 64 – Col. 6, line 4, and Claim 20.)  The ligated probe can be detected with or without removing it from the target

sequence. (Whiteley at Col. 7, lines 50-61.) Whiteley also teaches ligating a series of adjacent probes to determine sequence information. (*See* Whiteley at Col. 13, lines 3-17.)

### 3.    Claim 1 is anticipated by the Landegren Patent

<u>Claim 1</u>: The Landegren Patent discloses every element of claim 1. The Landegren Patent discloses an assay for determining the sequence of a polynucleotide by hybridizing an initializing oligonucleotide probe and extension oligonucleotide probe to the polynucleotide. (Landegren at Col. 2, line 68 – Col. 3, line 4, Col. 3, lines 5-9, and Col. 7, lines 4-7.) The two probes are then ligated. (Landegren at Col. 3, lines 10-15 and Col. 9, lines 35-36.) At least one nucleotide of the polynucleotide is identified. (Landegren at Col. 2, lines 56-58, Col. 3, lines 21-22, Col. 8, lines 43-46, Col. 8, lines 63-66, Col. 10, lines 15-18, and Col. 4, lines 31-50.) Landegren provides for repeating the ligation and identification steps. (Landegren at Col. 7, line 67 – Col. 8, line 11, Col. 8, line 66 to Col. 9, line 2, Col. 11, lines 39-44, and Claim 8.)

### H.    Claims of the '341 Patent that are obvious in view of the prior art

I understand that a claim may be invalid if it would have been obvious to a person of ordinary skill in the art at the time the patent was filed in view of the prior art.

### 1.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 are obvious over Southern 1995

Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 of the '341 Patent are obvious over Southern 1995 in view of the state of the art. Southern 1995, taken alone or in view of the state of the art, teaches sequencing by hybridizing oligonucleotide probes to a polynucleotide, followed by ligation of the probes to one another, and as such represents a method that was well known at the time the '663 application was filed.

<u>Claim 1</u>: As described above, Southern 1995 teaches or suggests every limitation of claim 1.

<u>Claim 2</u>: As described above, Southern 1995 teaches or suggests every limitation of claim 2.

Claim 6:  Claim 6 depends from claim 2 and additionally requires capping the extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.  This capping step is performed to avoid "out-of-phase" signals in subsequent cycles of sequencing reaction.

It was well known at the relevant time point that capping was useful to prevent out-of-phase signals during sequencing.  Adding this step would have been obvious to a person of skill in the art in view of Southern 1995.  For example, the Brenner Patent teaches capping an oligonucleotide probe in a DNA sequencing reaction to prevent further ligations in subsequent cycles of sequencing.  The Brenner Patent analogizes capping in sequencing methods to the capping step used in oligonucleotide synthesis.  (See Brenner at Col. 13, lines 53-67.)  Capping as described at Col. 8, line 64 – Col. 9, line 3 of the '341 Patent corresponds almost verbatim to Col. 13, lines 53-60 of the Brenner Patent.

Claim 7:  Claim 7 depends from claim 2 and also requires regenerating an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage.  Cleaving chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction was well known in the art.  For example, both Southern 1993 and 1995 disclose a sequencing method using the sequential incorporation and ligation of an oligonucleotide with a chain-terminating moiety.  The moiety is removed by enzymatic cleavage, thus generating an extendable nucleotide.  In view of these teachings and what was also known to those of skill in the art as represented by Sibson, Brennan, Brenner, and others such as WO 94/23064 ("Canard 1994"), Genome Mapping & Sequencing Abstracts, page 295, May 11-15, 1994 ("Canard & Sarfati"), WO 91/06678 ("Tsien"), Genome Mapping & Sequencing Abstracts, page 222, May 12-16, 1993 ("Rosenthal"), Genome Mapping & Sequencing Abstracts, pp. 164, May 12-16, 1993 ("Metzker 1993"), and Genome Mapping & Sequencing Abstracts, pp. 170, May 11-15, 1994, ("Metzker 1994"), copies of which are provided at Attachments M to R, it is my opinion that one of ordinary skill in the art would have considered the subject matter of claim 7 to be obvious at least over Southern 1995.

14

Claim 8:  Claim 8 depends from claim 7 and additionally requires that the chemically scissile internucleosidic linkage is a phosphoramidate linkage.  Incorporating phosphoramidate linkages into oligonucleotides was well known in the art.  The chemically scissile nature of these linkages was also known.  Southern 1995 describes the synthesis of oligonucleotides using phosphoramidate chemistry.  The Mag article describes the generation of oligonucleotides containing phosphoramidate linkages and describes the chemically scissile nature of the linkages. (Mag at page 7319 and page 7322.)  One of ordinary skill in the art would have considered the subject matter of claim 8 to be obvious over the teachings of Southern 1995.

Claim 11:  Claim 11 of the '341 Patent depends from claim 1.  Southern 1995 also teaches or suggests the additional elements of claim 11.  Southern 1995 teaches annealing different oligonucleotides to the target polynucleotide sequence, thus forming distinct duplexes in aliquots.  The sequencing method steps are carried out independently on each distinct duplex. (*See* Southern 1995, page 17, line 1 – page 18, line 5, and page 20, lines 9-36.)

Claim 12:  Claim 12 of the '341 Patent depends from claim 11.  Claim 12 requires that the extension probes used in the method have a chain-terminating moiety.  As described above for claim 2, Southern 1995 discloses the use of chain-terminating moieties, and thus teaches or suggests every element of claim 12.

Claim 16: Claim 16 depends from claim 11 and requires capping the extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.  Similarly, for the reasons discussed above for claim 6, one of ordinary skill in the art would have considered it obvious to add a capping step to the claimed method

Claim 17: Claim 17 depends from claim 11 and requires the additional element of regenerating an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage.  For the reasons given above for claim 7, one of ordinary skill in the art would have considered claim 17 to be obvious at least over Southern 1995.

Claim 18: Claim 18 depends from claim 17 and specifies that the chemically scissile internucleosidic linkage is a phosphoramidate linkage. Similarly, for the reasons above for claim 8, one of ordinary skill in the art would have considered claim 18 to be obvious over the teachings of Southern 1995.

### 2. Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 are obvious over the Brennan Patent

Claims 1, 2, 6, 7, 8, 11, 12, 16, 17 and 18 of the '341 Patent are obvious over the Brennan Patent in view of the state of the art. While Sibson 1994 and Sibson 1995 did not publish prior to the date the '663 application was filed, I understand that these references constitute evidence as to the level of knowledge in the art at the time the '663 application was filed. One of ordinary skill in the art would have had knowledge of the contents of Sibson 1994 and Sibson 1995 since I publicly presented the principles of the applications at the International Symposium entitled "Large-Scale DNA Sequencing" in Tokyo, Japan on March 18, 1994, and at Glaxo Research and Development Limited in the UK on or about June 9, 1994. Furthermore, I provided materials on the principles of Sibson 1994 and Sibson 1995 to Christopher Mundy to be used in acetates for a presentation he was to give at the Chalk River Laboratories in Ontario, Canada. I believe Dr. Mundy's presentation was given on or about May, 1994.

Claim 1: In my opinion, claim 1 would have been considered obvious over the Brennan Patent. The Brennan Patent teaches or suggests a method for determining the nucleic acid sequence of a target polynucleotide. It teaches forming a duplex between a target polynucleotide and an initializing oligonucleotide probe. It also teaches hybridizing an extension oligonucleotide probe to the target polynucleotide that is adjacent to and contiguous with the initializing oligonucleotide. The extension oligonucleotide probe and initializing oligonucleotide probe are then ligated. The extension oligonucleotide probe contains an extendable probe terminus capable of being extended by further steps of ligation. Brennan teaches the use of phosphorothioate linkages in extension oligonucleotides (See Brennan at Col. 6. lines 24-26), where the Mag reference describes the chemically scissile nature of the phosphorothioate

16

linkages. (*See* Mag at page 7319 and page 7322.)  Brennan does not teach or suggest identifying at least one nucleotide during each round of ligation.  Instead, the Brennan Patent teaches identifying at least one nucleic acid residue per ligated oligonucleotide after multiple probes have been ligated.

As described above, Southern 1995 teaches a method of sequencing employing a library of labeled oligonucleotides to determine the sequence of a target polynucleotide, where at least one nucleotide is identified per round of ligation.

Southern 1993, also teaches or suggests the iterative sequencing method of Southern 1995, employing successive rounds of ligation, cleavage and identification to determine the sequence of a target polynucleotide.  Southern 1993 is evidence that one of skill in the art would envision identifying one or more nucleotides at each round of ligation.

Sibson 1994 and Sibson 1995 are also not prior art to the '341 Patent, but teach or suggest a different iterative sequencing method employing ligation.  The method used successive rounds of oligonucleotide ligation, cleavage and identification to determine a sequence of a target polynucleotide.

In my opinion, in light of the art discussed, and further taking into consideration the sequencing methods used by Tsien, Canard 1994, Canard & Sarfati, Metzker 1993, Metzker 1994, and/or Rosenthal, among others, one of ordinary skill in the art would have considered it obvious to extend repeatedly an initializing primer or ligated probe along a polynucleotide by ligation to an oligonucleotide probe using the method of Brennan modified to identify one or more nucleotides after each round of ligation in the DNA sequencing methods of Southern 1995, Southern 1993, Sibson 1994, and Sibson 1995.

Claim 2:  Claim 2 depends from claim 1 and requires that the extension probes used in the claimed method have a chain-terminating moiety at a terminus distal to said initializing oligonucleotide probe.  Southern 1995, Southern 1993, Sibson 1994, and Sibson 1995 each teach an iterative sequencing method employing the ligation of extension oligonucleotides comprising a chain-terminating moiety at the terminus distal to the initializing oligonucleotide probe.

Brennan also discusses chain-terminating moieties.  (Brennan at Col. 4, lines 1-6, Col. 6, line 27 – Col. 7, line 31, and Figure 4.)  Thus claim 2 would have been considered obvious over Brennan.

Claim 6:  Claim 6 depends from claim 2 and requires capping the extended oligonucleotide probe to render the sequencing reaction inert to further ligation steps to avoid an out-of-phase sequencing reaction.  As described above, the Brenner Patent discloses capping in a sequencing reaction. It is thus my opinion that claim 6 would have been considered obvious over the Brennan Patent in view of the art and in view of Brenner.

Claim 7:  Claim 7 depends from claim 2 and requires the additional element of regenerating an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage.  In my opinion, cleaving chemically scissile internucleosidic linkages in sequencing reactions was well known in the art in April 1995.  Southern 1993 and 1995, and Sibson 1994 and 1995 disclose a DNA sequencing method employing the sequential incorporation and ligation of an oligonucleotide containing a chain-terminating moiety.  Southern 1993 and 1995 teach that the moiety may be removed by enzymatic cleavage, thus generating an extendable nucleoside.  Sibson 1994 and 1995 teach that the just-ligated oligonucleotide may contain cleavable internucleosidic linkages, such as phosphothionate, phosphoramidite and phosphorothioate linkages.  In view of these teachings, one of ordinary skill in the art would have considered the subject matter of claim 7 to be obvious over the Brennan Patent in view of the state of the art.

Claim 8:  Claim 8 depends from claim 7 and requires the additional element of specifying that the chemically scissile internucleosidic linkage is a phosphoramidate linkage.  It is my opinion that it was well known in the art at the relevant time that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile. Southern 1995 describes the synthesis of oligonucleotides using phosphoramidate chemistry. Sibson 1994 and 1995 teach that the just-ligated oligonucleotide may contain cleavable internucleosidic linkages, such as phosphothionate, phosphoramidite and phosphorothioate

linkages.  The Mag article further describes the generation of oligonucleotides containing phosphoramidate linkages, and describes the chemically scissile nature of the linkages.  One of ordinary skill in the art would have considered the subject matter of claim 8 to be obvious to one of ordinary skill in the art over the teachings of the Brennan Patent in view of the state of the art, and further in view of Mag.

Claim 11: Claim 11 of the '341 Patent depends from claim 1. Specifically, claim 11 requires that step (a) include providing a plurality of distinct target-primer duplexes in separate aliquots, each distinct duplex comprising an initializing oligonucleotide primer hybridized to a target polynucleotide.  Claim 11 also requires that the target polynucleotide in each duplex be the same, but that the initializing oligonucleotide in each duplex be bound to a different sequence of the nucleic acid template.  Claim 11 also requires that steps (b) to (e) of claim 1 be carried out independently on each aliquot.

The Brennan Patent teaches or suggests using different overlapping primers annealed to the polynucleotide in separate samples or aliquots, thus forming distinct duplexes with different known origins for each sequencing reaction.  (Brennan at Col. 4, line 44 – Col. 5, line 17, and Figure 1.)  The detection of the nucleic acid residues is carried out separately on each distinct duplex.

Southern 1993 and 1995 discloses a method for DNA sequencing that anneals oligonucleotides having different sequences to the target polynucleotide, thus forming distinct duplexes for multiplex sequencing.  The sequencing methods involving hybridization and ligation of extension oligonucleotides and detection of one or more nucleic acid residues within each ligated extension oligonucleotide is carried out independently on each distinct duplex.

Sibson 1994 and 1995 also disclose a method for DNA sequencing that anneals oligonucleotides having different sequences to a polynucleotide, thus forming distinct duplexes for multiplex sequencing.  The sequencing methods involve repeated rounds of hybridization and ligation of extension oligonucleotides and detection of one or more nucleotides within each ligated extension oligonucleotide, carried out independently on each distinct duplex.

Performing ligation based sequencing reactions on separate aliquots of a target polynucleotide using different primers was well known to those of ordinary skill in the art at the time the '663 application was filed.

Claim 12: Claim 12 depends from claim 11 and requires that the extension probes used in the claimed method have a chain-terminating moiety. Similarly, for the reasons described above for claim 2, claim 12 would have been considered obvious over the Brennan Patent in view of the state of the art.

Claim 16: Claim 16 depends from claim 11 and requires the additional element of capping the extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step. Similarly, for the reasons described above for claim 6, I claim 16 would have been considered obvious over the Brennan Patent in view of Brenner and the state of the art.

Claim 17: Claim 17 depends from claim 11 and requires the additional element of regenerating an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage. Similarly, for the reasons described above for claim 7, one of ordinary skill in the art would have considered claim 17 to be obvious over the Brennan Patent in view of the state of the art.

Claim 18: Claim 18 depends from claim 17 and requires the additional element of specifying that the chemically scissile internucleosidic linkage is a phosphoramidate linkage. Similarly, as described above for claim 8, it is my opinion that one of ordinary skill in the art would have considered the subject matter of claim 18 to be obvious to one of ordinary skill in the art over the teachings of the Brennan Patent in view of the state of the art, and further in view of Mag

## I.    Claim 1 of the '597 patent is anticipated by the prior art

### 1.    Claim 1 is anticipated by Southern 1995

Claim 1: Southern 1995 discloses every element of claim 1. Southern 1995 discloses an assay for determining the nucleic acid sequence of a polynucleotide that is hybridized with an

initializing oligonucleotide probe and an extension oligonucleotide probe. (Southern 1995 at page 14, line 31- page 15, line 8, page 15, lines 22-33, page 19, lines 4 - 15, page 20, lines 17 - 24, page 21, lines 4-15, and Figure 5.) The two probes are then ligated. (Southern 1995 at page 15, lines 9-10, page 15, line 33 - page 16, line 1, page 20, lines 25 - 27, page 21, lines 4-15, and Figures 4 and 5.) At least one nucleotide is identified. (Southern 1995 at page 15, lines 12-14, page 16, lines 7 - 10, page 19, lines 17 - 19, page 20, lines 29 - 31, page 21, lines 4-15, and Figures 4 and 5.) The ligation and identification steps are repeated to determine the sequence of the polynucleotide. (Southern 1995 at page 16, lines 19 - 35, page 19, lines 20 - 24, page 20, line 35 - page 21, line 3, and Figure 4.)

## 2.    Claim 1 is anticipated by the Whiteley Patent

Claim 1:  The Whiteley Patent discloses every element of claim 1.  The Whiteley Patent teaches a method for determining the nucleic acid sequence of a polynucleotide by hybridizing the polynucleotide with an initializing oligonucleotide probe and an extension oligonucleotide probe. (Whiteley at Col. 3, lines 44-48, Col. 6, lines 65-66, and Col. 5, lines 8-18.) The two probes are then ligated. (Whiteley at Col. 3, lines 51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.) At least one nucleotide is identified. (Whiteley at Col. 3, lines 54-61, Col. 5, line 64 – Col. 6, line 4, and Claim 20.) Whiteley teaches ligating a series of adjacent probes. (Whiteley at Col. 13, lines 3-17.) Whiteley teaches ligating a subsequent oligonucleotide probe to the extension probe, which was previously ligated to the initializing oligonucleotide, and identifying one or more nucleotides after each round of ligation.

## 3.    Claim 1 is anticipated by the Landegren Patent

Claim 1:  The Landegren Patent discloses every element of claim 1.  The Landegren Patent discloses an assay for determining the nucleic acid sequence of a polynucleotide by hybridizing an initializing oligonucleotide probe and extension oligonucleotide probe to a polynucleotide. (Landegren at Col. 2, line 68 – Col. 3, line 4, Col. 3, lines 5-9, and Col. 7, lines 4-7.) The two probes are then ligated. (Landegren at Col. 3, lines 10-15 and Col. 9, lines 35-36.) At least one nucleotide of the polynucleotide is identified. (Landegren at Col. 2, lines 56-58,

Col. 3, lines 21-22, Col. 8, lines 43-46, Col. 8, lines 63-66, Col. 10, lines 15-18, and Col. 4, lines 31-50.) Landegren provides a method for repeating the ligation and identification steps using a probe to extend the extendable probe terminus and determine the sequence of the polynucleotide. (Landegren at Col. 7, line 67 – Col. 8, line 11, Col. 8, line 66 to Col. 9, line 2, Col. 11, lines 39-44, and Claim 8.)

### 4.    Claim 1 may be anticipated by other references

As I currently understand claim 1, it is anticipated by Southern 1995, the Whiteley Patent, and the Landegren Patent. Depending on how the Court construes the repeating step, it may also be anticipated by U.S. Patent No. 5,800,994 (the "Martinelli Patent"), U.S. Patent No. 7,070,927 ("Drmanac 2006"), WO 95/09248 ("Drmanac 1995"), the Brennan Patent, and others.

## J.    Claim 1 of the '597 patent is obvious in view of the prior art

### 1.    Claim 1 is obvious over Southern 1995

Claim 1: As described above, Southern 1995 teaches or suggests each claim limitation of claim 1.

### 2.    Claim 1 is obvious over the Whiteley Patent

Claim 1: As described above, the Whiteley Patent teaches or suggests each claim limitation of claim 1.

### 3.    Claim 1 is obvious over the Landegren Patent

Claim 1: As described above, the Landegren Patent teaches or suggests each claim limitation of claim 1.

### 4.    Claim 1 is obvious over the Brennan Patent

Claim 1: Claim 1 would have been considered obvious over the Brennan Patent. The Brennan Patent teaches or suggests a method for determining the nucleic acid sequence of a polynucleotide. It teaches or suggests forming a duplex between a polynucleotide and an initializing oligonucleotide probe. It also teaches hybridizing an extension oligonucleotide probe to the polynucleotide that is adjacent to and contiguous with the initializing oligonucleotide. The extension oligonucleotide probe and initializing oligonucleotide probe are then ligated. The

extension oligonucleotide probe contains an extendable probe terminus capable of being extended by further steps of ligation.  Brennan does not teach or suggest identifying at least one nucleotide complementary to the just-ligated extension probe per each round of the method. Instead, the Brennan Patent teaches identifying at least one nucleic acid residue per ligated oligonucleotide after the ligation of all the probes is complete.

As described above, Southern 1995 teaches a method of sequencing nucleic acids employing a library of labeled oligonucleotides to determine the sequence of a polynucleotide, where at least one nucleotide is identified per round of ligation.

Southern 1993, while not prior art to the '597 Patent, also teaches or suggests the same iterative sequencing method as Southern 1995, employing successive rounds of ligation, and identification to determine the sequence of a target polynucleotide.  Southern 1993 is evidence that one of skill in the art would have envisioned identifying one or more nucleotides at each round of ligation.

Sibson 1994 and Sibson 1995 are also not prior art to the '597 Patent, but teach or suggest a different iterative sequencing method.  The disclosed method employed successive rounds of ligation and nucleotide identification to determine the sequence of a polynucleotide.

In my opinion, in light of the art discussed, and further taking into consideration the sequencing methods used by Tsien, Canard 1994, Canard & Sarfati, Metzker 1993, Metzker 1994, and/or Rosenthal among others, one of ordinary skill in the art would have considered it obvious to extend repeatedly an initializing primer or ligated probe along a polynucleotide by ligation to an oligonucleotide probe using the method of Brennan modified to identify one or more nucleotides after each round of ligation in the DNA sequencing methods of Southern 1995, Southern 1993, Sibson 1994, and Sibson 1995.

### K.    Claim 1 of the '119 patent is obvious in view of the prior art

#### 1.    Claim 1 is obvious over the Mag article in view of the Brennan Patent

Claim 1:  Claim 1 of the '119 Patent would have been considered obvious over the Mag article in view of Brennan.  The Mag article discloses a dodecameric oligonucleotide having the formula (12:d[AGAGAT$_{NH}$pATCTCT]), from 5′ to 3′.  (Mag at page 7321.)  The letters in the dodecamer indicate nucleotides.  (Mag at page 7321.)  The single underlined portion of the oligonucleotide corresponds to (B)k and contains 6 residues.  (Mag at page 7321.)  The double underlined portion of the oligonucleotide corresponds to (B)j and contains 6 residues.  The sum of j and k is equal to 12.  (Mag at page 7321.)  Brennan teaches the use of phosphorothioate linkages in extension oligonucleotides.  (Brennan at Col. 6, lines 24-26.)  The Mag article discusses the chemically scissile nature of such phosphorothioate linkages.  (Mag at page 7319 and 7322.)  Brennan also teaches the use of a labeled terminating moiety.  (Brennan at Col. 6, lines 33-44.)  One of ordinary skill in the art would understand that the labeled chain-terminating moiety of Brennan can be used in the oligonucleotide taught by Mag.  One of ordinary skill in the art would have considered claim 1 of the '119 Patent to be obvious over Mag in view of Brennan.

### III.    PRIOR TESTIMONY IN OTHER CASES.

I have not provided testimony as an expert in any other litigation.

### IV.    RATE OF COMPENSATION.

My rate of compensation is $600 per hour.  My compensation is not contingent on the opinions I reach.

I intend to provide additional overview or background testimony that may assist the trier of fact in understanding my opinion.  I reserve the right to supplement my report after further fact discovery or if I become aware of new information.  I also reserve the right to respond to the opinions offered by the Defendants' expert witnesses on these and related issues.

## V.    OTHER TESTIMONY

My opinions may also require supplementation in view of any other additional information that may come to light or in view of any expert reports from Defendants. I may also testify about matters: (1) raised on direct or cross-examination t trial; (2) necessary to rebut any other matters that the Court allows Defendants to introduce or rely upon; or (3) otherwise raised at trail by counsel or the Court in relation to matters set forth herein. In addition to the items identified above, my testimony may also be based, in part, upon the trial testimony of fact witnesses and other expert witnesses.

## VI.    DOCUMENTS AND INFORMATION CONSIDERED

Attached as Attachment S is a list of documents that I have received, reviewed, and/or relied upon in formulating the opinions expressed above and in conducting an analysis of the issues discussed herein.

Signed at _1 Castlehill Farm Barn, Cookshill, Kingswood, Frodsham Cheshire WA6 6JS England_

on _30th May_, 2008.

D. Ross Sibson

27

1    BRYAN WILSON (CA BAR NO. 138842)
     ERIC C. PAI (CA BAR NO. 247604)
2    MORRISON & FOERSTER LLP
     755 Page Mill Road
3    Palo Alto, California 94304-1018
     Telephone: 650.813.5600
4    Facsimile: 650.494.0792
     E-Mail: BWilson@mofo.com; EPai@mofo.com
5
     DAVID C. DOYLE (CA SBN 70690)
6    STEVEN E. COMER (CA SBN 154384)
     BRIAN M. KRAMER (CA SBN 212107)
7    MORRISON & FOERSTER LLP
     12531 High Bluff Drive, Suite 100
8    San Diego, California  92130-2040
     Telephone: 858.720.5100
9    Facsimile: 858.720.5125
     E-Mail: DDoyle@mofo.com; SComer@mofo.com;
10   BMKramer@mofo.com

11   Attorneys for Plaintiff
     APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP
12

13                  UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16

17   APPLERA CORPORATION – APPLIED          Case No.    C07 02845 WHA
     BIOSYSTEMS GROUP, a Delaware corporation,
18                                          **CERTIFICATE OF SERVICE**
                  Plaintiff,
19
            v.
20
     ILLUMINA, INC., a Delaware corporation,
21   SOLEXA, INC., a Delaware corporation, and
     STEPHEN C. MACEVICZ, an individual,
22
                  Defendants.
23

24

25

26

27

28

CERTIFICATE OF SERVICE                                                      1
Case No. C07 02845-WHA
sd-420456

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 12531 High Bluff Drive, Suite 100, San Diego, California 92130. I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on the date hereof, I served a copy of:

**EXPERT REPORT OF D. ROSS SIBSON, PH.D.**

☐  **BY FACSIMILE, [Fed. Rule Civ. Proc. rule 5(b)]** by sending a true copy from Morrison & Foerster LLP's facsimile transmission telephone number 650.494.0792 to the fax number(s) set forth below, or as stated on the attached service list. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile machine.

I am readily familiar with Morrison & Foerster LLP's practice for sending facsimile transmissions, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be transmitted by facsimile on the same date that it (they) is (are) placed at Morrison & Foerster LLP for transmission.

☐  **BY U.S. MAIL [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at Morrison & Foerster LLP, 755 Page Mill Road, Palo Alto, California 94304-1018 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited with the United States Postal Service on the same date that it (they) is (are) placed at Morrison & Foerster LLP with postage thereon fully prepaid for collection and mailing.

X  **BY OVERNIGHT DELIVERY [Fed. Rule Civ. Proc. rule 5(b)]** By agreement of the parties, Overnight Delivery service will be accomplished by Monday, June 2, 2008, for delivery on Tuesday, June 3, 2008, by placing a true copy thereof enclosed in a sealed envelope with delivery fees provided for, addressed as follows, for collection by UPS, at 12531 High Bluff Drive, Suite 100, San Diego, California 92130 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS or delivered to an authorized courier or driver authorized by UPS to receive documents on the same date that it (they) is are placed at Morrison & Foerster LLP for collection.

☐ **BY PERSONAL SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope addressed as follows for collection and delivery at the mailroom of Morrison & Foerster LLP, causing personal delivery of the document(s) listed above to the person(s) at the address(es) set forth below.

I am readily familiar with Morrison & Foerster LLP's practice for the collection and processing of documents for hand delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be taken from Morrison & Foerster LLP's mailroom and hand delivered to the document's addressee (or left with an employee or person in charge of the addressee's office) on the same date that it is placed at Morrison & Foerster LLP's mailroom.

X **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)(2)(a)]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the e-mail address(s) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

| | |
|---|---|
| **COUNSEL FOR ILLUMINA INC., SOLEXA INC. and STEVEN C. MACEVICZ:** | _____ Fax |
| | _____ U.S. Mail |
| KEVIN M. FLOWERS | X_____ Overnight |
| THOMAS I. ROSS | _____ Personal |
| JEFFREY H. DEAN | X_____ Electronic |
| JOHN R. LABBE | |
| CULLEN N. PENDELTON | |
| MARSHALL, GERSTEIN & BORUN LLP | |
| 6300 Sears Tower | |
| 233 South Wacker Drive | |
| Chicago, IL  60606-6357 | |
| Fax: (312) 474-0448 | |
| Email: kflowers@marshallip.com | |
|    tross@marshallip.com | |
|    jdean@marshallip.com | |
|    jlabbe@marshallip.com | |
|    cpendleton@marshallip.com | |

| | |
|---|---|
| **COUNSEL FOR ILLUMINA INC. AND SOLEXA INC.:** | _____ Fax |
| | _____ U.S. Mail |
| GEORGE BEST | X_____ Overnight |
| KIMBERLY K. DODD | _____ Personal |
| FOLEY & LARDNER LLP | X_____ Electronic |
| 975 Page Mill Road | |
| Palo Alto, CA 94304-1125 | |
| Fax: (650) 856-3700 | |
| Email: kdodd@foley.com | |

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed at San Diego, California, this 30th day of May, 2008.

3

4

5

6    _____          _____
              Rose B. Sheehan                              (signature)
                  (typed)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE                                                    3
sd-420456