Exhibit 4

**EXPERT REPORT**

**OF MICHAEL L. METZKER, PH.D.**

Applera Corporation – Applied Biosystems Group,

v.

Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz,

Case No. C07 02845 WHA

I.     BACKGROUND ............................................................................................. 2

II.    discussion ................................................................................................... 3

       A.    Background of the Technology ............................................................ 3

       B.    The Person of Ordinary Skill in the Art ............................................. 6

       C.    The '341 patent .................................................................................. 6

       D.    The '119 patent .................................................................................. 8

       E.    The '597 patent .................................................................................. 9

       F.    Claim Construction ........................................................................... 10

       G.    The Prior Art .................................................................................... 10

             1.    *Southern* ............................................................................ 11
             2.    *Whiteley* ............................................................................ 12
             3.    *Brennan* ............................................................................ 12
             4.    *Sibson* ............................................................................... 13
             5.    *Brenner* ............................................................................ 14
             6.    *Mag* ................................................................................... 15
             7.    *Landegren* ......................................................................... 15

       H.    Claims 1 and 2 of the '341 patent Are Anticipated By Southern ..................... 16

       I.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious in Light of

             Southern .......................................................................................... 17

       J.    Claim 1 of the '341 patent is Anticipated By Whiteley ............................... 19

       K.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious In Light Of

             Whiteley ........................................................................................... 20

       L.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious In Light Of

             Brennan and the State Of The Art ..................................................... 23

       M.    Claim 1 of the '597 patent is anticipated by the prior art ............................ 27

             1.    Claim 1 of the '597 patent is anticipated by Southern 1995 ................... 27
             2.    Claim 1 of the '597 patent is anticipated by the Whiteley patent ........... 27
             3.    Claim 1 of the '597 patent is obvious over Southern 1995 .................... 27
             4.    Claim 1 of the 597 patent is obvious over the Whiteley patent ............. 28

       N.    Claim 1 of the '119 patent is obvious over Mag ...................................... 29

       O.    Indefiniteness .................................................................................. 29

       P.    Written Description ........................................................................... 29

       Q.    Inequitable Conduct ......................................................................... 30

III.   DOCUMENTS AND INFORMATION CONSIDERED ........................................ 30

IV.    COMPENSATION ......................................................................................... 30

V.     PREVIOUS TESTIMONY .............................................................................. 30

## I.    BACKGROUND

I will testify about my qualifications, background and experience in the field of DNA sequencing and the development of DNA sequencing technologies.

I have been an Assistant Professor in the Department of Molecular & Human Genetics and Human Genome Sequencing Center at the Baylor College of Medicine since 1999. I have also been an Adjunct Assistant Professor in the Cell & Molecular Biology Program at the Baylor College of Medicine since 2000, and an Adjunct Assistant Professor in the Department of Chemistry at Rice University since 2001.

My laboratory is involved in the development of novel technology platforms that address the need for high-throughput DNA sequencing devices capable of directly detecting fluorescently labeled DNA molecules without using cloning or PCR methodologies. One main application for the technology is resequencing to obtain SNP profiles for a given complex disease with a potential of sequencing millions of individuals. With ongoing research activities with Rice University colleagues, we are focused on the development of an innovative fluorescence detector and development of a suitcase DNA sequencer. In addition to the hardware development, the laboratory is engaged in research activities focused on the organic synthesis of novel BODIPY dyes and potentially new classes of fluorescent dyes for the development of 8-color conventional Sanger sequencing and the flexibility to expand the number of independent fluorescent SNP assays. My laboratory is also focused on the synthesis of novel base-modified nucleosides and nucleotides for both conventional sequencing and stepwise DNA sequencing applications.

From 2000 to the present, I have given lectures in the Molecular Methods course at the Baylor College of Medicine. The lectures are Libraries and Screening, Genomics I, and Genomics II. From 2001 to 2003 I also gave a lecture entitled Mammalian Genome Analysis in the Mammalian Genetics course.

My laboratory is currently funded by the NIH.  The NIH awarded $122,020,472 over a 4 year period to Richard Gibbs (PI), and me (Senior Investigator) as a genomics grant to provide "personal genome sequences."  I was also awarded a $2,933,762 grant over a 4 year period to develop ultrafast sequencing-by-synthesis (SBS) technology that is practical on a genomic scale.

I have authored 33 peer-reviewed papers, 5 book chapters, and am an inventor of 15 patents and/or patent applications.  My most recent book chapters discuss the emerging technologies and advances in DNA sequencing.  The patents relate to various aspects of molecular biology and DNA sequencing.  For example, I am an inventor of issued U.S. patents relating to dye-labeled primers for automated DNA sequencing, and photocleavable labeled nucleotides and nucleosides. I have served on review panels for Genome Canada, the NIH Instrumentation and Systems Development study section, NCI, NIBIB, NHGRI, and NIAID.

I am or have been on the editorial/advisory boards for Genome Research, Advances in Genome Biology & Technology Meeting, and Milestones in DNA Technologies.

I belong to the American Association for the Advancement of Science, the American Chemical Society and the American Diabetes Association.

A copy of my curriculum vitae is attached as Attachment A.

II.    DISCUSSION

A.    Background of the Technology

The '341 and '597 patents relate to methods of DNA sequencing using oligonucleotides and the '119 patent relates to an oligonucleotide probe with a particular chemistry.

In the 1994 timeframe, several groups, including one in which I was involved (Metzker/Gibbs), were developing alternatives to Sanger DNA sequencing.  One proposed method utilized enzymes to attach modified nucleic acids to an initializing primer, hybridized to a target sample, to determine DNA sequence information.  In October 1994, two papers were published (Metzker et al., Nucleic Acids Res. 22: 4259-4267 (1994)("Metzker") and Canard and Sarafti, Gene 148: 1-6 (1994)("Canard") that described the use of DNA polymerase coupled with

modified nucleotides that were repetitively incorporated, identified, and then cleaved to generate an extendable end for DNA sequencing purposes.

There were also a number of patents and published patent applications filed before April 17, 1995 that describe methods of DNA sequencing using repetitive cycles, including:

1.     Melamade R.J., US patent number 4,863,849, "*Automatable process for sequencing nucleotide.*", filed July 18, 1985, issued September 5, 1989 (Melamade);

2.     Cheeseman, P. C., US patent number 5,302,509, "*Method for sequencing polynucleotides.*", filed: February, 27, 1991, issued: April 12, 1994 (Cheeseman);

3.     Tsien, R. Y., Ross, P., Fahnestock, M., and Johnston, A. J., PCT number WO 91/06678, "*DNA sequencing.*", filed: October, 26, 1990, published: May 16, 1991; and

4.     Rosenthal, A., Close, K., and Brenner, S., PCT number WO 93/21340, "*DNA sequencing method*", filed: April 22, 1992, published: October 28, 1993 (Rosenthal).

These describe similar cyclic strategies for non-Sanger DNA sequencing methods.  For example, an excerpt from claim 1 in Melamade states:

> "Claim 1:  A method for determining the base sequence of nucleotides comprising: (steps (a) and (b) are omitted for brevity)
>
> (c)     sequentially repeating steps (a) and (b), wherein each sequential repetition adds, and detects the incorporation of one type of activated nucleotide 5'-triphosphate precursor of known nitrogenous base composition; and
>
> (d)     determining the base sequence of the unpaired nucleotide residues of the template from the sequence of incorporation of said nucleotide precursors"

An excerpt from claim 1 in Cheeseman states:

> "Claim 1:  A method for determining the nucleotide sequence of identical single stranded DNA molecules comprising the steps of: (steps (a) through (i) are omitted for brevity)
>
> (j)     repeating steps (e) through (i) through a plurality of cycles until labeled nucleotide 5'-triphosphate derivatives can no longer be added to said oligonucleotide, whereby the result of each cycle identifies the next deoxynucleotide in sequence in said single stranded DNA molecules

An excerpt from claim 1 of Rosenthal states:

> "Claim 1:  A method of determining the sequence of a nucleic acid comprising the steps of: (steps (a) through (e) are omitted for brevity)
>
> (f)    repeating steps (c) to (e) sequentially and recording the order of incorporation of labelled nucleotides

Based on this prior art, the licensing group at Baylor College of Medicine abandoned a patent application, filed in 1991, which described the sequencing method (Base Addition Sequencing Scheme or "BASS") discussed in the Metzker paper.

As a graduate student in the laboratory of Richard A. Gibbs (Gibbs) from August 1991 to September 1996, a major focus of my thesis work involved development of novel DNA sequencing technologies, including the BASS method.  This strategy was considered a promising method as evidenced by efforts of the other groups listed above.  The challenges in creating novel, modified nucleotide analogs, also called reversible terminators, that exhibit the desired properties of efficient incorporation and termination, efficient deprotection and good discrimination of mismatch incorporations for DNA sequencing was formidable at that time.  A significant challenge is the identification of a DNA polymerase, typically derived from large scale mutagenesis screens, that incorporate the four nucleotide analogs of reversible terminators (that is A, C, G, and T) with high efficiency and fidelity.  This is because the modification(s) made to the nucleotide presumably cause steric hindrance within the active site of DNA polymerase, which shows high selectivity for only natural nucleotides.

In the Gibbs lab, one approach to address this challenge was substitution of the enzyme/modified nucleic acids method to that involving DNA ligase and modified oligonucleotides.  This second system was expected to be simpler to put into practice because commercially available enzymes could be used with standard practices to create modified oligonucleotides.  The modifications needed for the termination and cleavable portions of the oligonucleotide probe could be moved a sufficient distance away from the site of incorporation (for DNA ligase reactions, this is called ligation) to not interfere with the enzyme reaction.  For

example, consider a cleavable oligonucleotide probe with the general formula HO-(3')(B)j(5')-OP(=O)(O-)NH-(B)k-Bt*, where j and k are five and Bt* is a fluorescent dye attached directly to the probe's 5'-end, resulting in a non-extendable chain terminating moiety. When coupling to an initializing primer containing a 5'-end $PO_4$ group, the 3'-end of the oligonucleotide probe is the site of ligation (OH group) and the cleavage site (phosphoramidate group) and the termination site (fluorescent dye) are five and ten nucleotide residues, respectively, away from the ligation site. The sequencing by ligation was explored by technician Stephen Richards in the Gibbs lab during my tenure as a graduate student, although the oligonucleotide probe example described above was not used in his feasibility studies. Other research groups were developing similar sequencing by ligation methods, although using different oligonucleotide probes and cleavage chemistries. Examples of these research efforts can be found in published papers, issued patents, and published patent applications, such as those by Whiteley, Landegren, Southern, and Sibson.

### B.    The Person of Ordinary Skill in the Art

If called to testify at trial, I expect to testify regarding skills, education, and experience that a person of ordinary skill in the art would have had on April 17, 1995, when the application that ultimately issued as the '341, '597 and '119 patents was filed. In my opinion, a person having ordinary skill in the art as of April 1995 would have been a person with graduate level training in molecular biology or biochemistry, or the like, and three to five years of experience with nucleic acid chemistry and DNA sequencing technologies.

### C.    The '341 patent

I expect to testify regarding the disclosure of '341 patent and the invention claimed by the '341 patent. I understand that the patent application that issued as the '341 patent was filed on April 17, 1995.

I also understand that the Court has construed certain disputed claim terms. I have reviewed the Court's construction of these disputed claim terms and I have applied the Court's construction in my analysis.

The '341 patent discloses and claims a method of determining the sequence of a target polynucleotide, which is typically a DNA molecule from which the user of the methods wants to obtain sequence information. The '341 patent discloses a method of sequencing by ligation where a DNA sequence of interest, called a "target polynucleotide," is prepared by linking it to a binding region, the combination of which is referred to in the '341 patent as a template. The method described in the specification of the '341 patent describes hybridizing an initializing oligonucleotide to the template, hybridizing an oligonucleotide probe to the target, ligating the oligonucleotide probe to the initializing oligonucleotide, removing unligated oligonucleotide probe, determining the sequence of at least one nucleotide base in the oligonucleotide probe, generating an extendable probe terminus, and then repeating the method by hybridizing another oligonucleotide probe to the template which is then identified.

I understand that Solexa alleges that AB infringes claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent. Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 are set forth below:

**Claim 1:**
A method for determining a sequence of nucleotides in a target polynucleotide, the method comprising the steps of:

(a) providing a probe-target duplex comprising an initializing oligonucleotide probe hybridized to a target polynucleotide, said probe having an extendable probe terminus;

(b) ligating an extension oligonucleotide probe to said extendable probe terminus, to form an extended duplex containing an extended oligonucleotide probe;

(c) identifying, in the extended duplex, at least one nucleotide in the target polynucleotide that is either (1) complementary to the just-ligated extension probe or (2) a nucleotide residue in the target polynucleotide which is immediately downstream of the extended oligonucleotide probe;

(d) generating an extendable probe terminus on the extended probe, if an extendable probe terminus is not already present, such that the terminus generated is different from the terminus to which the last extension probe was ligated; and

(e) repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined.

**Claim 2:**
The method of claim 1 wherein each extension probe has a chain-terminating moiety at a terminus distal to said initializing oligonucleotide probe.

**Claim 6:**
The method of claim 2 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

7

**Claim 7:**
The method of claim 2 wherein said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe.

**Claim 8:**
The method of claim 7 wherein said chemically scissile internucleosidic linkage is a phosphoramidate.

**Claim 11:**
The method of claim 1, wherein step (a) includes providing, in separate aliquots, a plurality of distinct target-primer duplexes, each distinct duplex comprising an initializing oligonucleotide primer hybridized to a target polynucleotide, wherein the target polynucleotide in each duplex is the same, but the initializing oligonucleotide in each duplex is bound to a different sequence of the target polynucleotide; and steps (b) to (e) are carried out independently on each aliquot.

**Claim 12:**
The method of claim 11 wherein for each aliquot, said extension oligonucleotide probe has a chain-terminating moiety at a terminus distal to said primer.

**Claim 16.**
The method of claim 11 further including a step of capping an extended oligonucleotide probe whenever no extension probe has ligated to the extendable terminus in the ligation step.

**Claim 17:**
The method of claim 11 wherein for each aliquot, said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe.

**Claim 18:**
The method of claim 17 wherein said chemically scissile internucleosidic linkage is a phosphoramidate.

### D.    The '119 patent

I expect to testify regarding the disclosure of '119 patent and claim 1 of the patent. The '119 patent discloses and claims an oligonucleotide probe having a specific chemical structure. I understand that the language of claim 1 of the '119 patent is closed in that it does not recite an open-ended transition (i.e., comprising), and that the claimed chemical formula must be met exactly. The formula requires that variables "j" and "k" are numbers ranging from 1 to 12, such that the sum of j and k is less than or equal to 12. This statement is inconsistent with the ranges in the claim. For example, the formula in claim 1 would not apply if $j = 1$, and $k = 12$ because the sum would equal 13. The variable "B" is a nucleotide or an analog thereof. The letters "HO-

" represent a hydroxyl group and the formula presented as "—OP(═O)(O—)NH—" denotes a phosphoramidate linkage. The variable "Bt*" represents a labeled, non-extendable chain-terminating moiety.

I understand that Solexa alleges that AB infringes claim 1 of the '119 patent. Claim 1 is set forth below:

**Claim 1:**

An oligonucleotide probe of the formula:

HO—(3′)(B)j(5′)—OP(═O)(O—)NH—(B)k-Bt*

wherein:

B is a nucleotide or an analog thereof;

j is in the range of from 1 to 12;

k is in the range of from 1 to 12, such that the sum of j and k is less than or equal to 12;

Bt* is a labeled, non-extendable chain-terminating moiety.

### E.    The '597 patent

I expect to testify regarding the disclosure of '597 patent and the subject matter recited in claim 1 of the patent. Claim 1 of the '597 patent recites a similar method to that of the '341 patent, albeit using different claim language. In my opinion, there is no connection between the extending step (a) and the identifying step (b) of this claim. In particular, the language of step (b) does not indicate how the one or more nucleotides of the polynucleotide are to be identified or where those identified bases are located in the polynucleotide relative to the initializing oligonucleotide.

I understand that Solexa alleges that AB infringes claim 1of the '597 patent. Claim 1 is set forth below:

**Claim 1:**
A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

(a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

(b) identifying one or more nucleotides of the polynucleotide; and

(c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

### F.    Claim Construction

I understand that the Court has construed the claim phrases as set forth below.  I have applied these constructions in my analysis.  I understand that there are other claim terms that have not yet been construed by the Court.  Accordingly, depending on the Court's claim construction, additional prior art references, enablement, and written description issues may become relevant to my analysis.

| Claim Term or Phrase | Court's Construction |
|---|---|
| Initializing oligonucleotide probe | The oligonucleotide to which the first extension oligonucleotide probe is first ligated |
| Ligating an extension oligonucleotide probe to said extendable probe terminus | Forming a covalent bond between an extension oligonucleotide probe and the extendable probe terminus of either an initializing oligonucleotide or an extended oligonucleotide probe while hybridized to a target polynucleotide |
| Extended oligonucleotide probe | An initializing oligonucleotide probe effectively extended by one or more nucleotides |
| Just-ligated extension probe | The extension oligonucleotide probe ligated to either the initializing oligonucleotide probe or an extended oligonucleotide probe ligated to either the initializing oligonucleotide probe or an extended oligonucleotide probe in the present cycle of the method |
| Identifying | Within each cycle determining the identity of a base in the target polynucleotide |
| Repeating steps (b), (c), and (d) until a sequence of nucleotides in the target polynucleotide is determined | Ordinary and plain meaning |

The Court also ruled that the language of claim 1(a) of the '341 patent regarding the hybridizing of the initializing oligonucleotide requires that the probe hybridize to the target polynucleotide and not to the binding region.  (Claim Construction Order, page 9, lines 4-24.) The method claims of the '341 and '597 patent claims also require that the identity of at least one nucleotide in the oligonucleotide probe be determined within each ligation cycle.

### G.    The Prior Art

I have reviewed a number of references to prepare this report.  I noticed that the authors of these references use different terms to describe the same reagents or processes.  For the sake

of clarity, I attempt to provide the term used by each investigator and its counterpart as described in the Macevicz patents.

###### 1.     *Southern*

Sir Edwin Southern and William Jonathan Cummins filed a patent application in Great Britain on July 30, 1993 ("Southern 1993"), a copy of which is attached as Attachment B. While not published before the filing date of the '341 patent, Southern 1993 is evidence of the level of knowledge available to those of ordinary skill in the art as of at least July 1993. Approximately one year later, PCT application number PCT/GB94/01675 was filed on August 1, 1994, and published on February 9, 1995 ("Southern 1995"). Because Southern 1995 published before the earliest filing of the '341 patent, I understand that it is presumptively available as prior art. A copy of this patent application is attached as Attachment C. This PCT application led to US patent number 5,770,367 ("Southern 1998"). A copy of this patent is attached as Attachment D. I have reviewed each of these documents.

Southern 1993, Southern 1995, and Southern 1998 all describe a method of sequencing nucleic acids using a library of reagents. (Southern 1995 at page 1.)

Southern 1995 describes an assay for determining the sequence of a target nucleic acid. (*See* Southern 1995 at page 2, lines 9-14 and 22-26, page 4, lines 33-36, page 14, line 31 – page 15, line 14, page 21, lines 4-15, and Figures 4 and 5.) The method involves hybridizing an immobilized oligonucleotide, also known as an initializing oligonucleotide probe to the target nucleic acid and adding a coded oligonucleotide reagent, also known as an extension oligonucleotide probe. (*See* Southern at page 14, line 32- page 15, line 8, page 15, lines 21-34, page 19, lines 4 - 15, page 20, lines 17 - 24, page 21, lines 4-15, and Figure 5.) The two probes are then ligated. (*See* Southern 1995 at page 15, lines 9-10, page 15, line 34 - page 16, line 1, page 20, lines 25 - 27, page 21, lines 4-15, and Figures 4 and 5.) At least one nucleotide complementary to the just-ligated extension probe is identified. (*See* Southern 1995 at page 15, lines 12-14, page 16, lines 7 - 10, page 19, lines 17 - 19, page 20, lines 29 - 31, page 21, lines 4- 15, and Figures 4 and 5.) An extendable probe terminus is generated on the extension

oligonucleotide. (*See* Southern 1995 at page 16, lines 7 - 18, and Figure 4.)  Southern teaches repeating these steps using additional extension probes. (*See* Southern at page 16, lines 19 - 35, page 19, lines 20 - 24, page 20, line 35 - page 21, line 3, and Figure 4.)

### 2.    *Whiteley*

United States patent number 4,883,750 issued on November 28, 1989 to Norman M. Whiteley, Michael W. Hunkapiller, and Alexander N. Glazer (the "Whiteley patent").  A copy of the Whiteley patent is attached as Attachment E.  The patent application that ultimately issued as the Whiteley patent was filed on December 13, 1984, and was assigned to Applied Biosystems, Inc.  I understand that the Whiteley patent is available as prior art against the Macevicz patents because it was published more than one year before the filing date of those patents.  It describes an assay for determining the presence or absence of a target sequence. (*See* Whiteley Abstract, Col. 1, lines 6-8, and Col. 3, lines 41-51.)  The method involves hybridizing to a target sequence a contiguous probe (an initializing oligonucleotide probe) and a diagnostic probe (an extension oligonucleotide probe) adjacent to each other. (*See* Whiteley at Col. 3, lines 44-51, Col. 5, lines 8-18, and Col. 6, lines 65-66.)  The end of the initializing oligonucleotide probe permits ligation to the contiguous probe. (*See* Whiteley at Col. 6, lines 57-58.)  The two probes are then ligated. (*See* Whiteley at Col. 3, lines 51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.)  At least one nucleotide complementary to the just-ligated extension probe is identified. (*See* Whiteley at Col. 3, lines 54-59, Col. 5, line 64 – Col. 6, line 4, and Claim 20.)  Whiteley also describes that the sequencing method can encompass many changes and modifications without departing from the invention, including the use of a series of probes each adjacent to the next for determining DNA sequence information. (*See* Whiteley at Col. 13, lines 3-17.)  In my opinion, this passage teaches ligating a subsequent oligonucleotide probe to the extension probe, which was previously ligated to the initializing oligonucleotide.

### 3.    *Brennan*

United States patent number 5,403,708 issued on April 4, 1995 to Thomas M. Brennan and Herbert L. Heyneker (the "Brennan").  A copy of the Brennan patent is attached as

Attachment F. The patent application that ultimately issued as the Brennan patent was filed on July 6, 1992. Because the Brennan patent published more than one year before the filing date of the Macevicz patents, it is presumptively available as prior art. I am also aware that the Brennan patent was cited during the prosecution of the '341 patent.

Brennan describes a DNA sequencing method employing the ligation of multiple labeled extension oligonucleotides to an initializing primer hybridized to a nucleic acid template. The extension oligonucleotides come from a pool of labeled random probes that permit the identification of one or more nucleotides complementary to the ligated probes. (*See* Brennan at Col. 2, line 23 – Col. 3, line 16, Col. 4, lines 31-63, Col. 5, line 42- 54, Col. 7, lines 42 – 54, and Figure 1B.) The Brennan patent also teaches the use of chain terminating moieties. (*See* Brennan at Col 6., line 27 – Col. 7, line 15, Figures 1 and 4.) Brennan also teaches the use of oligonucleotides containing an internucleosidic linkage, specifically a phosphorothioate linkage. (*See* Brennan at Col. 6, lines 21 – 26.)

### 4.     *Sibson*

David Ross Sibson filed a patent application in Great Britain (GB 9401200) on January 21, 1994 ("Sibson 1994"). A copy of this patent application is attached as Attachment G. While not publishing before the filing date of the '341 patent, it is my opinion that it constitutes evidence of the level of knowledge available to those of ordinary skill in the art as of at least January 1994. Approximately one year later PCT application number PCT/GB95/00109 was filed on January 20, 1995, and published on July 27, 1995 ("Sibson 1995"). A copy of this patent application is attached as Attachment H. This PCT application would issue as U.S. patent number 6,348,313 ("Sibson 2002"). A copy of this patent is attached as Attachment I. I have reviewed each of these documents.

Each of the Sibson references discloses a DNA sequencing method that ligates a labeled oligonucleotide from a pool of labeled random extension oligonucleotides to an initializing primer hybridized to a nucleic acid to be sequenced. (*See* Sibson 1994 at page 8, lines 1-16, page 11, line 23 – page 13, line 19, page 29, line 6 – page 31, line 1, and Figure 2; *see* Sibson

13

1995 at page 6, line 26 – page 7, line 6, page 10, line 21 – page 12, line 1, page 24, line 13 –

page 25, line 27, and Figure 2; and *see* Sibson 2002 at Col. 3, line 60 – Col. 4, line 8, Col. 5, line

40 - Col. 6, line 13, Col 11, line 57 – Col. 12, line 33, and Figure 2.) The oligonucleotide is

labeled to permit the identification of one or more nucleotides complementary to the just-ligated

oligonucleotide. (*See* Sibson 1994 at page 13, lines 4-19, page 30, lines 5-10; *see* Sibson 1995 at

page 11, line 21 - page 12, line 1, page 25, lines 4-9; and *see* Sibson 2002 at Col. 5, line 63 –

Col. 6, line 13, Col. 12, lines 14-19.) The process is repeated to the extent necessary to

determine the sequence of the target nucleic acid. (*See* Sibson 1994 at page 12, line 26 – page

13, line 2, and Figure 2; *see* Sibson 1995 at page 11, lines 16-19, and Figure 2; and *see* Sibson

2002 at Col. 5, lines 63-65, and Figure 2.)

### 5.    *Brenner*

Sydney Brenner filed a patent application on July 25, 1994 ("Brenner"). A copy of this

patent application is attached as Attachment J. I understand that this application contains

additional subject matter as compared to the application it claims priority to, which was filed on

April 4, 1994. The Brenner patent issued on September 3, 1996 as United States patent number

5,552,278. I understand that because the Brenner patent was filed almost 9 months before the

filing date of the Macevicz patents, it is presumptively available as prior art. As the patent

attorney listed on the cover of the Brenner patent, it is clear that Macevicz had access to the

Brenner application. This is supported by the large amount of text in the Macevicz patents that

appears to have been copied from the Brenner application before the application was publicly

available. (*See* U.S. patent number 5,750,341 at Col. 1, line 13 – Col. 2, line 60, Col. 3, line 53 –

Col. 4, line 30, Col. 4, lines 35-42, Col. 8, line 65 – Col. 9, line 3, and Col. 13, line 56 – Col. 14,

line 40.)

The Brenner patent describes a DNA sequencing method based on repeated cycles of

ligation and cleavage of extension probes hybridized to a target polynucleotide. (*See* Brenner at

the Abstract, Col. 2, line 66 – Col. 3, line 10.) The Brenner patent also teaches capping of the

extension probes that have not undergone ligation. Once capped, the probes are rendered unavailable to further ligation steps. (*See* Brenner at Col. 13, lines 53-67.)

### 6.    *Mag*

Matthias Mag, Rainer Schmidt, and Joachim W. Engels published a paper in Tetrahedron Letters, Volume 33, No. 48, pages 7319-7322,in 1992, entitled, "Synthesis and Selection Cleavage of an Oligodeoxynucleotide Containing a Bridged Non-Chiral Internucleotide 3'-Phosphoramidate Linkage," ("Mag"). A copy of this paper is attached as Attachment K. I understand that because this paper published more than one year before the filing date of the Macevicz patents the Mag Reference is available as prior art. Mag describes the generation of oligonucleotides containing phosphoramidate linkages and describes the chemically scissile nature of the linkages. (*See* Mag at page 7319 and page 7322.)

### 7.    *Landegren*

Ulf Landegren and Leroy Hood filed a patent application on March 25, 1988 that would ultimately issue as U.S. patent number 4,988,617 on January 29, 1991 (the "Landegren patent"). I understand the Landegren patent, which issued more than one year prior to the filing date of the Macevicz Patent application, is available as prior art as of its issue date. A copy of the Landegren patent is attached as Attachment L. I have reviewed the teachings of the Landegren patent.

The Landegren patent describes an assay for determining the sequence of a nucleic acid test substance. (*See* Landegren at the Abstract, Col. 2, lines 34-39, and Col. 4, lines 12-15.) The method involves hybridizing an adjacent probe (an initializing oligonucleotide probe) and a target probe (an extension oligonucleotide probe) to a nucleic acid test substance. The initializing oligonucleotide probe is adjacent to and contiguous with an extension oligonucleotide probe. (Landegren at Col. 2, line 68 – Col. 3, line 4, Col. 3, lines 5-9, and Col. 7, lines 4-7.) The two probes are then ligated. A successful ligation indicates that the initializing oligonucleotide and the extension oligonucleotide contain sequence complementary to the nucleic acid test substance. (Landegren at Col. 2, lines 56-58, Col. 3, lines 10-15, lines 21-22, Col. 4, lines 31-50,

Col. 8, lines 43-46, lines 63-66, Col. 9, lines 35-36, and Col. 10, lines 15-18.)  The extension oligonucleotide contains an extendable probe terminus.  (Landegren at Claim 8.)  Landegren provides a method for ligation of multiple probes with extendable probe termini for the identification of more than one nucleotide in the nucleic acid test substance.  (Landegren at Col. 7, line 67 – Col. 8, line 11, Col. 8, line 66 to Col. 9, line 2, Col. 11, lines 39-44, and Claim 8.)

### H.     Claims 1 and 2 of the '341 patent Are Anticipated By Southern

I understand that a claimed invention is invalid if it is anticipated by a prior art reference. I understand that a prior art reference anticipates a patent claim only if the prior art reference discloses every element of the claimed invention.

If called to testify as an expert witness, I expect to testify that the Southern Patent anticipates claims 1 and 2 of the '341 patent.

Claim 1: In my opinion, Southern discloses every limitation of claim 1.  Southern describes creating a probe-target duplex by hybridizing an initializing oligonucleotide probe to a target nucleic acid.  It then hybridizes a labeled extension oligonucleotide probe adjacent to the initializing oligonucleotide, and the two are then ligated.  It then cleaves the label and generates an extendable probe terminus on the extension oligonucleotide.  It discloses identifying at least one nucleotide complementary to the just-ligated extension probe by detecting the label from the extension probe.  Southern discloses a method for repeating these steps using a probe to extend the extendable probe terminus (See Southern 1995, page 16, lines 6-25, page 19, lines 20 – 24, page 20, line 35 –page 21, line 3.)

Claim 2: Claim 2 of the '341 patent depends from claim 1.  I understand that a dependent claim includes all the limitations of the claim from which it depends.  It is my opinion that Southern discloses every limitation of claim 1.  In my opinion, Southern also discloses every limitation of dependent claim 2.  Specifically, claim 2 requires that the extension probe have a chain-terminating moiety.  Southern discloses a DNA sequencing method employing the sequential ligation of oligonucleotides to a primer hybridized to a polynucleotide, where the

oligonucleotide contains a chain terminating moiety. (Southern 1995, page 12, line 20 – page 13, line 8, page 16, lines 6 - 26, and Figures 4 and 5.)

### I.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious in Light of Southern

I understand that a claimed invention is invalid if it would have been obvious to a person of ordinary skill in the art at the time the patent was filed in view of the prior art. Southern 1995 published on February 9, 1995 and is therefore prior art to the '341 patent. Moreover, it is my opinion that Southern 1993, while not published, is evidence of what people developing DNA sequencing methods knew at the time the '341 patent application was filed. Southern, taken alone or with what was known to those of skill in the art developing DNA sequencing methods, teaches that nucleic acid sequences could be sequenced by the hybridization of oligonucleotide probes to a template, followed by ligation of the probes to one another.

Claim 1: As discussed above, it is my opinion that Southern teaches or suggests all the limitations of claim 1.

Claim 2: As discussed above, it is my opinion that Southern teaches or suggests all the limitations of claim 2.

Claim 6: Claim 6 depends from claim 2. The additional elements required by claim 6 relate to a step of capping the extended oligonucleotide probe when no extension probe has ligated to the extendable terminus. A capping step is intended to prevent unwanted ligations from occurring that would otherwise cause "out of phase" signals to be detected. Because one of ordinary skill in the art would want to avoid out of phase signals, it would have been obvious to one of ordinary skill in the art to include a capping step in view of the teachings of Southern taken with the Brenner patent. Brenner, for example, teaches capping an extension probe that has not undergone ligation during a DNA sequencing reaction. The capped probe is rendered unavailable for further ligation in subsequent cycles. (*See* Brenner at Col. 13, lines 53-67.)

Claim 7: Claim 7 depends from claim 2. Claim 7 adds that the step of "regenerating" includes cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide

probe.  It was well known in the art to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.  For example, Southern 1993 and 1995 disclose a DNA sequencing method employing the sequential incorporation and ligation of an oligonucleotide containing a chemically scissile internucleosidic linkage.  The linkage may undergo light induced, enzymatic or free radical induced cleavage, thus generating an extendable nucleoside.  (*See* Southern 1995, page 8, lines 12-18, Figures 4 and 5.)  In view of these teachings and what was also known to those of skill in the art as represented by Sibson, Brennan, Brenner, and others, it is my opinion that one of ordinary skill in the art would have considered claim 7 to be obvious at least over Southern 1995.

Claim 8: Claim 8 depends from claim 7.  Claim 8 adds the limitation of specifying that the chemically scissile internucleosidic linkage is a phophoramidate linkage.  It was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile.  For example, the Mag reference describes the generation of oligonucleotides containing phosphoramidate linkages and it describes the chemically scissile nature of the linkages.  (*See* Mag at page 7319 and page 7322.)  It is my opinion that one of ordinary skill in the art would have considered claim 8 to be obvious in light Southern 1995 and the Mag reference.

Claim 11: Claim 11 of the '341 patent depends from claim 1.  In my opinion, at the time the '341 application was filed it was well known in the art that one could use aliquots containing a variety of combinations including different initializing primers hybridized to copies of the same target nucleic acid.  Southern discloses a method for DNA sequencing that hybridizes different initializing primers to copies of a target nucleic acid distributed on an array, thus forming distinct duplexes for multiplex sequencing.  (*See* Southern 1995, page 17, line 1 – page 18, line 5, and page 20, lines 9-36.) It would have been obvious to one of ordinary skill in the art to use the same target sequence with the teachings of Southern 1995.

Claim 12: Claim 12 of the '341 patent depends from claim 11.  At the time the '341 application was filed it was well known in the art that chain-terminating moieties were useful in

DNA sequencing methods.  Southern discloses a DNA sequencing method employing the sequential ligation of a oligonucleotide probe to a primer hybridized to a target nucleic acid, where the probe contains a chain terminating moiety.  (*See* Southern 1995, page 12, line 20 – page 13, line 8, page 16, lines 7 - 18, page 21, lines 4-15, and Figures 4 and 5.)

Claim 16: Claim 16 depends from claim 11.  As with Claim 6 discussed above, Claim 16 adds a capping step to the claimed method.  Similarly, for the reasons discussed above, one of ordinary skill in the art would have considered it obvious to add a capping step to the claimed method.

Claim 17: Claim 17 depends from claim 11.  As with Claim 7 discussed above, Claim 17 adds a step of cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide probe.  Similarly, for the reasons discussed above, one of ordinary skill in the art would have considered it obvious to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.

Claim 18: Claim 18 depends from claim 17.  As with Claim 8 discussed above, Claim 18 adds the requirement that the chemically scissile internucleosidic linkage be a phosphoramidate linkage.  Similarly, for the reasons discussed above, it was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile.  Therefore it is my opinion that one of ordinary skill in the art would have considered claim 18 to be obvious in light Southern 1995 and the Mag reference.

### J.    Claim 1 of the '341 patent is Anticipated By Whiteley

Whiteley published on November 28, 1989, which is more than one year before the filing date of the'341 patent.  As such, Whiteley is therefore prior art to the '341 patent.

Claim 1: Whiteley anticipates claim 1 of the '341 patent because it discloses every limitation of the claim.  Whiteley discloses a method for determining a sequence of nucleotides in a target sequence.  (*See* Whiteley at Col. 1, lines 6-8 and Col. 3, lines 41-51.)  Whiteley describes creating a probe-target duplex by hybridizing an initializing oligonucleotide probe to a target nucleic acid.  (*See* Whiteley at Col. 3, lines 44-51, Col. 5, lines 8-18, and Col. 6, lines 65-

66.)  It then hybridizes a labeled extension oligonucleotide probe adjacent to the initializing

oligonucleotide, and the two are then ligated.  (*See* Whiteley at Col. 6, lines 57-58, Col. 3, lines

51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.)  The extension oligonucleotide

disclosed by Whiteley contains an extendable probe terminus.  (*See* Whiteley at Col. 13, lines 3-

17.)  Whiteley discloses identifying at least one nucleotide complementary to the just-ligated

extension probe.  (*See* Whiteley at Col. 3, lines 54-59, Col. 5, line 64 – Col. 6, line 4, and Claim

20.)  The Whiteley Patent clearly teaches ligating subsequent oligonucleotide probes to the

extension probes previously ligated to the initializing oligonucleotide.  (*See* Whiteley, Col. 13,

lines 3-17.)

### K.    Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious In Light Of Whiteley

It is my opinion that Whiteley, taken alone or in view of the state of the art, teaches that a

nucleic acid can be sequenced by hybridizing and ligated oligonucleotide probes to one another.

Claim 1: As discussed above, it is my opinion that Whiteley teaches or suggests all the

limitations of claim 1.

Claim 2: Claim 2 depends from claim 1.  Claim 2 requires that the extension probes used

in the method have a chain-terminating moiety.  Whiteley describes extension probes having a

chain-terminating moiety to a primer hybridized to a target sequence.  (*See* Whiteley at Col. 5,

line 64 – Col. 6, line 4, Col. 12, lines 4-6, and Col. 13, lines 3-17.)  Whiteley does not describe a

cleavage step that would remove the chain-terminating moiety and provide a terminus available

for further ligation.  In my opinion, those of ordinary skill in the art would have considered such

a cleavage step to be obvious.  For example, Brennan, Southern, and others teach the use of

chain-terminating moieties and cleavage steps.  (*See* Brennan at Col. 4, lines 1-6, Col. 6, line 27

– Col. 7, line 31, and Figure 4; *see* Southern 1995, page 12, line 20 – page 13, line 8, page 16,

lines 6 - 26, and Figures 4 and 5.)

Claim 6: Claim 6 depends from claim 2.  The additional elements required by claim 6

relate to a step of capping the extended oligonucleotide probe when no extension probe has

ligated to the extendable terminus.  A capping step is intended to prevent unwanted ligations from occurring that would otherwise cause "out of phase" signals to be detected.  Because one of ordinary skill in the art would want to avoid out of phase signals, it would have been obvious to include a capping step with the teachings of Whiteley in combination with the teachings of the Brenner patent.  Brenner, for example teaches capping an extension probe that has not undergone ligation during a DNA sequencing reaction.  The capped probe is rendered unavailable for further ligation in subsequent cycles.  (*See* Brenner at Col. 13, lines 53-67.)

Claim 7: Claim 7 depends from claim 2. Claim 7 adds that the step of "regenerating" includes cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide probe.  It was well known in the art to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.  For example, Southern 1993 and 1995 disclose a DNA sequencing method employing the sequential incorporation and ligation of an oligonucleotide containing a chemically scissile internucleosidic linkage.  The linkage may undergo light induced, enzymatic or free radical induced cleavage, thus generating an extendable nucleoside.  (*See* Southern 1995, page 8, lines 12-18, Figures 4 and 5.)  In view of these teachings and what was also known to those of skill in the art as represented by Sibson, Brennan, Brenner, and others, it is my opinion that one of ordinary skill in the art would have considered the subject matter of claim 7 to be obvious over Whiteley taken with the general state of the art.

Claim 8: Claim 8 depends from claim 7. Claim 8 adds the limitation of specifying that the chemically scissile internucleosidic linkage is a phophoramidate linkage.  It was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile.  For example, the Mag reference describes the generation of oligonucleotides containing phosphoramidate linkages and it describes the chemically scissile nature of the linkages.  (*See* Mag at page 7319 and page 7322.)  It is my opinion that one of ordinary skill in the art would have considered claim 8 to be obvious over Whiteley taken with the general state of the art, and with the Mag reference.

21

Claim 11:  Claim 11 depends from claim 1.  In my opinion, at the time the '341 application was filed it was well known in the art that one could use aliquots containing a variety of combinations including different initializing primers hybridized to copies of the same target nucleic acid.  Southern discloses a method for DNA sequencing that hybridizes different initializing primers to copies of a target nucleic acid distributed on an array, thus forming distinct duplexes for multiplex sequencing.  (*See* Southern 1995, page 17, line 1 – page 18, line 5, and page 20, lines 9-36.)  One of ordinary skill in the art would have considered the use of aliquots as being obvious over the teachings of Whiteley taken with those of Southern 1995.

Claim 12:  Claim 12 depends from claim 11.  At the time the '341 application was filed it was well known in the art that chain-terminating moieties were useful in DNA sequencing methods.  Whiteley describes the use of chain-terminating moieties.  (*See* Whiteley at Col. 5, line 64 – Col. 6, line 4, Col. 12, lines 4-6, and Col. 13, lines 3-17.)  Other references known to those of skill in the art also taught the use of chain-terminating moieties.  For example, Southern discloses a DNA sequencing method employing the sequential ligation of an oligonucleotide probe to a primer hybridized to a target nucleic acid, where the probe contains a chain terminating moiety.  (*See* Southern 1995, page 12, line 20 – page 13, line 8, page 16, lines 7 - 18, page 21, lines 4-15, and Figures 4 and 5.)  It is my opinion that one of ordinary skill in the art would have considered the use of chain-terminating moieties in the claimed method to be obvious over the teachings of Whiteley in view of Southern 1995.

Claim 16:  Claim 16 depends from claim 11.  As with Claim 6 discussed above, Claim 16 adds a capping step to the claimed method.  Similarly, for the reasons discussed above, one of ordinary skill in the art would have considered it obvious to add a capping step to the claimed method.

Claim 17:  Claim 17 depends from claim 11.  As with Claim 7 discussed above, Claim 17 adds a step of cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide probe.  Similarly, for the reasons discussed above, one of ordinary skill in the art

would have considered it obvious to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.

Claim 18: Claim 18 depends from claim 17. As with Claim 8 discussed above, Claim 18 adds the requirement that the chemically scissile internucleosidic linkage be a phosphoramidate linkage. Similarly, for the reasons discussed above, it was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile. Therefore it is my opinion that one of ordinary skill in the art would have considered claim 18 to be obvious in light Southern 1995 and the Mag reference.

L.    **Claims 1, 2, 6, 7, 8, 11, 12, 16, 17, and 18 of the '341 patent Are Obvious In Light Of Brennan and the State Of The Art**

The Brennan patent published on April 5, 1995 and therefore it is prior art to the '341 patent. I am aware that the Brennan patent was cited by the Examiner during the prosecution of the '341 patent and that the claims of the '341 patent are presumed valid over this reference. Notwithstanding this fact, I am also aware that the Brennan patent can properly be combined with other references to constitute a new ground of rejection against the '341 patent and that under these conditions, the '341 patent does not enjoy the presumption of validity.

Claim 1: In my opinion, Brennan teaches or suggests the invention of claim 1. Brennan teaches a method for determining the sequence of a nucleic acid template. Brennan describes creating a probe-target duplex by hybridizing an initializing oligonucleotide probe to a nucleic acid template. It then hybridizes a labeled extension oligonucleotide probe adjacent to the initializing oligonucleotide, and the two are then ligated. It then cleaves the label and generates an extendable probe terminus on the extension oligonucleotide. It discloses identifying at least one nucleotide complementary to the just-ligated extension probe by detecting the label from the extension probe. (See Brennan at Col. 2, line 23 – Col. 3, line 16, Col. 4, lines 31-63, Col. 5, line 42- 54, Col. 7, lines 42 – 54, and Figure 1B.) Brennan teaches the use of phosphorothioate linkages in extension oligonucleotides (See Brennan at Col. 6. lines 24-26), which the Mag reference describes the chemically scissile nature of the phosphorothioate linkages. (See Mag at

page 7319 and page 7322.)  Brennan does not teach or suggest identifying at least one nucleotide complementary to the just-ligated extension probe per each round of the method.  Moreover, Brennan does not explicitly teach a cleaving step.  Southern discloses a method for repeating the methods steps, including using a probe to extend the extendable probe terminus, cleaving, and identify.  (*See* Southern 1995, page 16, lines 6-25, page 19, lines 20 – 24, page 20, line 35 –page 21, line 3.)  One of ordinary skill in the art would have considered claim 1 to be obvious over Brennan modified to identify one or more nucleotides after each round of ligation in the DNA sequencing methods of Southern 1995.

Claim 2: Claim 2 depends from claim 1.  Claim 2 requires that the extension probes used in the claimed method have a chain-terminating moiety at a terminus distal to said initializing oligonucleotide probe.  Brennan discloses a DNA sequencing method employing the sequential ligation of oligonucleotides to a primer hybridized to a polynucleotide.  (Brennan at Col. 2, line 23 – Col. 3, line 13.)  Southern 1993 and Southern 1995 taught the same sequencing method where the oligonucleotide contains a chain terminating moiety.  (Southern 1995, page 16, lines 7 - 18, page 12, line 20 – page 13, line 8, and Figures 4 and 5.)  Brennan also discusses chain terminating moieties.  (Brennan at Col. 4, lines 1-6, Col. 6, line 27 – Col. 7, line 31, and Figure 4.)  One of ordinary skill in the art would have considered claim 2 obvious over the Brennan patent taken in view of the state of the art.

Claim 6: Claim 6 depends from claim 2.  The additional elements required by claim 6 relate to a step of capping the extended oligonucleotide probe when no extension probe has ligated to the extendable terminus.  A capping step is intended to prevent unwanted ligations from occurring that would otherwise cause "out of phase" signals to be detected.  Because avoiding out of phase signals is advantageous, it would have been obvious to one of ordinary skill in the art to include a capping step with the teachings of Brennan in combination with the teachings of Brenner.  Brenner, for example teaches capping an extension probe that has not undergone ligation during a DNA sequencing reaction.  The capped probe is rendered unavailable for further ligation in subsequent cycles.  (*See* Brenner at Col. 13, lines 53-67.)  One

of ordinary skill in the art would have considered the subject matter of claim 6 to have been obvious over Brennan in view of the state of the art at the relevant point in time and in view of Brenner.

Claim 7: Claim 7 depends from claim 2.  The additional limitation present in claim 7 further specifies that the step of "regenerating" includes cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide probe.  It was well known in the art to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.  For example, Southern 1993 and 1995 disclose a DNA sequencing method employing the sequential incorporation and ligation of an oligonucleotide containing a chemically scissile internucleosidic linkages.  The linkage may undergo enzymatic cleavage, thus generating an extendable nucleoside.  (*See* Southern 1995, page 8, lines 12-18, Figures 4 and 5.)  In view of these teachings it is my opinion that one of ordinary skill in the art would have considered claim 7 to be obvious at least over Brennan taken with Southern 1995 and the state of the art as a whole at the relevant point in time.

Claim 8: Claim 8 depends from claim 7.  It was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile.  The Mag reference describes the generation of oligonucleotides containing phosphoramidate linkages, and describes the chemically scissile nature of the linkages.  (*See* Mag at page 7319 and page 7322.)  It is my opinion that one of ordinary skill in the art would have considered claim 8 to be obvious to one of ordinary skill in the art over the teachings of Brennan taken with Southern 1995 and further in view of the Mag reference.

Claim 11:  Claim 11 depends from claim 1.  In my opinion, at the time the '341 application was filed it was well known in the art that one could use aliquots containing a variety of combinations including different initializing primers hybridized to copies of the same target nucleic acid.  Southern discloses a method for DNA sequencing that hybridizes different initializing primers to copies of a target nucleic acid distributed on an array, thus forming distinct duplexes for multiplex sequencing.  (*See* Southern 1995, page 17, line 1 – page 18, line 5, and

page 20, lines 9-36.) One of ordinary skill in the art would have considered the use of aliquots to have been obvious over Brennan taken with Southern 1995.

Claim 12: Claim 12 depends from claim 11. It is my opinion that it was well known in the art at the time of the invention that chain-terminating moieties were useful in DNA sequencing methods. Southern 1995 discloses a DNA sequencing method employing the sequential ligation of oligonucleotides to a primer hybridized to a polynucleotide, where the oligonucleotide contains a chain terminating moiety. (Southern 1995, page 12, line 20 – page 13, line 8, page 16, lines 7 - 18, page 21, lines 4-15, and Figures 4 and 5.) Brennan also discusses chain terminating moieties. (*See* Brennan at Col. 4, lines 1-6, Col. 6, line 27 – Col. 7, line 31, and Figure 4.) Accordingly, one of ordinary skill in the art would have considered claim 12 to have been obvious over the teachings of Brennan over Southern 1995 and the state of the art as a whole during the relevant time point.

Claim 16: Claim 16 depends from claim 11. As with Claim 6 discussed above, Claim 16 adds a capping step to the claimed method. Similarly, for the reasons discussed above, one of ordinary skill in the art would have considered it obvious to add a capping step to the claimed method.

Claim 17: Claim 17 depends from claim 11. As with Claim 7 discussed above, Claim 17 adds a step of cleaving a chemically scissile internucleosidic linkage in the extended oligonucleotide probe. Similarly, for the reasons discussed above, one of ordinary skill in the art would have considered it obvious to cleave chemically scissile internucleosidic linkages to generate a new extendable terminus in a sequencing reaction.

Claim 18: Claim 18 depends from claim 17. As with Claim 8 discussed above, Claim 18 adds the requirement that the chemically scissile internucleosidic linkage be a phosphoramidate linkage. Similarly, for the reasons discussed above, it was well known in the art that phosphoramidate linkages could be incorporated into oligonucleotides and that such linkages were chemically scissile. Therefore it is my opinion that one of ordinary skill in the art would have considered claim 18 to be obvious in light Southern 1995 and the Mag reference.

**M.     Claim 1 of the '597 patent is anticipated by the prior art**

**1.     Claim 1 of the '597 patent is anticipated by Southern 1995**

<u>Claim 1</u>:  In my opinion, Southern 1995 discloses every element of claim 1.  Southern 1995 discloses an assay for determining the sequence of a target nucleic acid.  (*See* Southern 1995 at page 2, lines 9-14 and 22-26, page 4, lines 33-36, page 14, line 31 – page 15, line 14, page 21, lines 4-15, and Figures 4 and 5.)  The target polynucleotide is hybridized to an initializing oligonucleotide, and the two are ligated together.  After ligation, the identity of one or more nucleic acid residues is determined.  Southern 1995 describes repeating the steps of the method.  (*See* Southern 1995 at page 16, lines 7 - 18, and Figure 4.)  The cycle of ligation and detection is repeated until the sequence of the target polynucleotide is determined.  (*See* Southern 1995, page 16, lines 6-25, page 19, lines 20 – 24, page 20, line 35 – page 21, line 3.)

**2.     Claim 1 of the '597 patent is anticipated by the Whiteley patent**

<u>Claim 1</u>:  In my opinion, the Whiteley patent discloses every element of claim 1.  The Whiteley patent teaches a method of sequencing nucleic acids employing labeled oligonucleotides to determine the sequence of a target.  (*See* Whiteley at Col. 1, lines 6-8 and Col. 3, lines 41-51.)  An initializing oligonucleotide is hybridized to a target sequence.  (*See* Whiteley at Col. 3, lines 44-51, Col. 5, lines 8-18, and Col. 6, lines 65-66.)  An extension oligonucleotide is then hybridized to the duplex and the two probes are ligated to one another.  After ligation, the identity of one or more nucleic acid residues in the just-ligated oligonucleotide is determined.  (*See* Whiteley at Col. 6, lines 57-58, Col. 3, lines 51-53, Col. 5, lines 29-40, Col. 7, line 39, and Claim 18.)  In my opinion, the Whiteley patent describes repeating the ligation and identification steps to extend the extendable probe terminus with additional oligonucleotide probes.  (*See* Whiteley at Col. 13, lines 3-17.)  This method permits the sequence of a target to be determined.

**3.     Claim 1 of the '597 patent is obvious over Southern 1995**

<u>Claim 1</u>:  In my opinion, claim 1 is obvious in view of Southern 1995.  Southern 1995 teaches a method of sequencing nucleic acids employing a library of labeled oligonucleotides to

determine the sequence of a target polynucleotide. (*See* Southern at page 15, lines 21 – page 16, line 5). The target polynucleotide is hybridized to an initializing oligonucleotide. (*See* Southern at page 14, line 32- page 15, line 8, page 15, lines 21-34, page 19, lines 4 - 15, page 20, lines 17 - 24, page 21, lines 4-15, and Figure 5.) An extension oligonucleotide is then hybridized to the duplex and the two probes are ligated to one another. After ligation of the labeled extension oligonucleotide to the initializing oligonucleotide, the identity of one or more nucleic acid residues in the just-ligated oligonucleotide is determined. (*See* Southern 1995 at page 15, lines 9-10, page 15, line 34 - page 16, line 1, page 20, lines 25 - 27, page 21, lines 4-15, and Figures 4 and 5.) Southern 1995 describes repeating the cycle of ligation and detection until the sequence of the target is determined. (*See* Southern at page 16, lines 19 - 35, page 19, lines 20 - 24, page 20, line 35 - page 21, line 3, and Figure 4.)

### 4.    Claim 1 of the 597 patent is obvious over the Whiteley patent

Claim 1: Claim 1 of the '597 patent is obvious over the Whiteley patent in view of the state of the art. The Whiteley patent teaches a method of sequencing nucleic acids employing labeled oligonucleotides to determine the sequence of a target sequence. (*See* Whiteley Abstract, Col. 1, lines 6-8, and Col. 3, lines 41-51.) First an initializing oligonucleotide is hybridized to a target followed by the hybridization an extension oligonucleotide. (*See* Whiteley at Col. 3, lines 44-51, Col. 5, lines 8-18, and Col. 6, lines 65-66.) The two probes are ligated and the identity of one or more nucleic acid residues in the just-ligated oligonucleotide is determined. (*See* Whiteley at Col. 3, lines 54-59, Col. 5, line 64 – Col. 6, line 4, and Claim 20.) The Whiteley patent describes the ligation of an unlabeled initializing oligonucleotide to a labeled extension oligonucleotide that is labeled at the 5' end or internally. (*See* Whiteley at Col. 12, lines 4-6.) When labeled internally, the extension oligonucleotide is capable of being extended by further steps of ligation. The probe already has an extendable probe terminus, and as such, there is no need to regenerate an extendable probe terminus. It is also my opinion that the Whiteley patent describes repeating the ligation and identification steps to extend the extendable probe terminus with additional oligonucleotide probes. (*See* Whiteley at Col. 13, lines 3-17.)

### N.    Claim 1 of the '119 patent is obvious over Mag

Claim 1: One of ordinary skill in the art would have considered claim 1 of the '119 patent to have been obvious over the Mag article taken with Brennan. The Mag article discloses a dodecameric oligonucleotide having the formula (12:d[AGAGAT$_{NH}$pATCTCT]), from 5′ to 3′. (See Mag at page 7321.) The letters A, C, G, and T in the dodecamer indicate nucleotides. (See Mag at page 7321.) The $_{NH}$p letters indicate an internucleosidic linkage, specifically a phosphoramidate one (see, Mag at page 7321.) The single underlined portion of the oligonucleotide corresponds to (B)k and contains 6 residues. See (Mag at page 7321.) The double underlined portion of the oligonucleotide corresponds to (B)j and contains 6 residues. The sum of j and k is equal to 12. (See Mag at page 7321.) Brennan teaches the use of an internucleosidic linkage, specifically a phosphorothioate one in extension oligonucleotides. (See Brennan at Col. 6, lines 24-26.) The Mag Reference discusses the chemically scissile nature of such phosphoramidate and phosphorothioate linkages. (See Mag at page 7319 and 7322.) Brennan also teaches the use of a labeled terminating moiety. (See Brennan at Col. 6, lines 33-44.) Taken together, one of ordinary skill in the art would have considered claim 1 of the '119 patent to be obvious over Mag with the teachings of Brennan.

### O.    Indefiniteness

There is no clear relationship existing between step (a) and step (b) of claim 1 of the '597 patent. At best, step (b) merely requires that a nucleotide be identified, but the claim does not state how that identified nucleotide is related to the limitations of step (a). Step (b) does not identify the position of the identified nucleotide with respect to the initializing oligonucleotide, the oligonucleotide probe or the extended duplex. It is also not clear from the claim language what mechanism of identification is used. Given this lack of clarity, one skilled in the art would not be apprised of the scope of the claim.

### P.    Written Description

Claim 1, step (a) of the '341 patent is not supported by an adequate written description because the claim requires that an initializing oligonucleotide probe hybridize to a target

polynucleotide.  The '341 patent provides no support regarding how to design or use an initializing oligonucleotide that hybridizes to a target polynucleotide.  Instead, the '341 patent teaches hybridizing an initializing oligonucleotide to a binding region having a known sequence, which is connected to the target polynucleotide.  Accordingly, it is my opinion that the '341 patent does not describe the invention of claim 1.

### Q.    Inequitable Conduct

Stephen Macevicz alleged that he was under no obligation to disclose the Landegren and Whiteley patents because U.S. patent number 5,407,799, ("the Studier patent") and U.S. Patent number 5,503,980, ("the Cantor Patent") had been disclosed during prosecution.  It was alleged that the teachings of these patents were cumulative to the teachings of the Landegren and Whiteley patents.  The Studier patent describes a method that involves hybridizing multiple primers to a target nucleotide to prime a Sanger-type sequencing reaction.  The Studier patent does not teach a ligation step nor does it teach a repeating step.  An illustrative example from the Cantor patent describes the use of a double-stranded probe to which a target polynucleotide is hybridized.  The target polynucleotide is ligated to the probe and then the sequence of the target is determined by identifying to which probes the target has been ligated.  The Cantor Patent does not teach a repeating step.  It is my opinion that the teachings of Landegren and Whiteley are not cumulative to Studier and Cantor.

### III.    DOCUMENTS AND INFORMATION CONSIDERED

Attached as Attachment M is a list of the documents I have reviewed or relied upon in the formulating the opinions expressed above and in conducting my analysis of the issues discussed in my report.

### IV.    COMPENSATION

I am being compensated at $600.00 per hour for my time spent on this case.  My compensation is in no way based upon the outcome of this litigation.

### V.    PREVIOUS TESTIMONY

I have testified as an expert witness in the following cases:

- o   Expert witness for HIV criminal case, Lafayette, LA: State of Louisiana v. Richard J. Schmidt, Criminal Docket No. 73313

- o   Expert witness for Fluorescent Dye Infringement case for ABI:  Perkin Elmer v. Amersham, Civil Action No.  C-00-1937 CRB

- o   Expert witness for HIV criminal case, Thurston Co., WA: State of Washington v. Anthony Eugene Whitfield, Case No. 04-1-06-17-5

Signed at ~~Houston TX~~ , on ~~May 31~~ , 2008.

BRYAN WILSON (CA BAR NO. 138842)
ERIC C. PAI (CA BAR NO. 247604)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
E-Mail: BWilson@mofo.com; EPai@mofo.com

DAVID C. DOYLE (CA SBN 70690)
STEVEN E. COMER (CA SBN 154384)
BRIAN M. KRAMER (CA SBN 212107)
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California  92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125
E-Mail: DDoyle@mofo.com; SComer@mofo.com;
BMKramer@mofo.com

Attorneys for Plaintiff
APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>Defendants. | Case No.    C07 02845 WHA<br><br>**CERTIFICATE OF SERVICE** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 12531 High Bluff Drive, Suite 100, San Diego, California 92130. I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on the date hereof, I served a copy of:

**EXPERT REPORT OF MICHAEL L. METZKER, PH.D.**

☐ **BY FACSIMILE, [Fed. Rule Civ. Proc. rule 5(b)]** by sending a true copy from Morrison & Foerster LLP's facsimile transmission telephone number 650.494.0792 to the fax number(s) set forth below, or as stated on the attached service list. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile machine.

I am readily familiar with Morrison & Foerster LLP's practice for sending facsimile transmissions, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be transmitted by facsimile on the same date that it (they) is (are) placed at Morrison & Foerster LLP for transmission.

☐ **BY U.S. MAIL [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at Morrison & Foerster LLP, 755 Page Mill Road, Palo Alto, California 94304-1018 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited with the United States Postal Service on the same date that it (they) is (are) placed at Morrison & Foerster LLP with postage thereon fully prepaid for collection and mailing.

X **BY OVERNIGHT DELIVERY [Fed. Rule Civ. Proc. rule 5(b)]** By agreement of the parties, Overnight Delivery service will be accomplished by Monday, June 2, 2008, for delivery on Tuesday, June 3, 2008, by placing a true copy thereof enclosed in a sealed envelope with delivery fees provided for, addressed as follows, for collection by UPS, at 12531 High Bluff Drive, Suite 100, San Diego, California 92130 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS or delivered to an authorized courier or driver authorized by UPS to receive documents on the same date that it (they) is are placed at Morrison & Foerster LLP for collection.

CERTIFICATE OF SERVICE
sd-420456

☐    **BY PERSONAL SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope addressed as follows for collection and delivery at the mailroom of Morrison & Foerster LLP, causing personal delivery of the document(s) listed above to the person(s) at the address(es) set forth below.

I am readily familiar with Morrison & Foerster LLP's practice for the collection and processing of documents for hand delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be taken from Morrison & Foerster LLP's mailroom and hand delivered to the document's addressee (or left with an employee or person in charge of the addressee's office) on the same date that it is placed at Morrison & Foerster LLP's mailroom.

X    **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)(2)(a)]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the e-mail address(s) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

**COUNSEL FOR ILLUMINA INC., SOLEXA**                _____ Fax
**INC. and STEVEN C. MACEVICZ:**                         _____ U.S. Mail
GREGORY E. STANTON                                            X_____ Overnight
KEVIN M. FLOWERS                                                 _____ Personal
THOMAS I. ROSS                                                       X_____ Electronic
JEFFREY H. DEAN
JOHN R. LABBE
CULLEN N. PENDELTON
MARK IZRAELEWICZ
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL  60606-6357
Fax: (312) 474-0448
Email: gstanton@marshallip.com
          kflowers@marshallip.com
          tross@marshallip.com
          jdean@marshallip.com
          jlabbe@marshallip.com
          cpendleton@marshallip.com
          mizraelewicz@marshallip.com

CERTIFICATE OF SERVICE                                                                          2
sd-420456

1  | **COUNSEL FOR ILLUMINA INC. AND**        _____ Fax
2  | **SOLEXA INC.:**                          _____ U.S. Mail
   | GEORGE BEST                               X \_\_\_\_\_ Overnight
3  | KIMBERLY K. DODD                          _____ Personal
   | FOLEY & LARDNER LLP                       X \_\_\_\_\_ Electronic
4  | 975 Page Mill Road
   | Palo Alto, CA 94304-1125
5  | Fax: (650) 856-3700
   | Email: gbest@foley.com
6  |        kdodd@foley.com

7

8  I declare under penalty of perjury that the foregoing is true and correct.

9  Executed at San Diego, California, this 30th day of May, 2008.

10

11

12

13  _____        _____
          Rose B. Sheehan                                Rose Sheehan
             (typed)                                     (signature)