# EXPERT REBUTTAL REPORT
# OF
# ALAN J. COX, PH.D.
### SENIOR VICE PRESIDENT

### In Connection with

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# NATIONAL ECONOMIC
# RESEARCH ASSOCIATES

ONE FRONT STREET, SUITE 2600
SAN FRANCISCO, CA 94111
TELEPHONE: 415.291.1000   FACSIMILE: 415.291.1020
INTERNET: HTTP://WWW.NERA.COM

### JUNE 13, 2008



*Consulting Economists*

**EXHIBIT 2**

# EXPERT REBUTTAL REPORT OF ALAN J. COX

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*
Case No. 07-CV-02845-WHA
(U.S. District Court, Northern District of California, San Francisco Division)

## TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

I.   Qualifications ............................................................................................................. 1

II.  Purpose of This Report .............................................................................................. 2

III. Information Considered ............................................................................................. 3

IV.  Summary of Opinions ................................................................................................ 3

V.   Background ................................................................................................................ 5

VI.  Rebuttal to Dr. Siuta's Expert Report ........................................................................ 6
     A. Introduction .......................................................................................................... 6
     B. 25 Percent Rule .................................................................................................... 8
     C. There is No Economically Justifiable Reason for Dr. Siuta to Assume Two
        Hypothetical Negotiations ................................................................................. 11
     D. Dr. Siuta Has Incorrectly Applied the *Georgia-Pacific* Factors ..................... 15
        1. Dr. Siuta's Hypothetical Negotiation ........................................................... 15
     E. Critique of *Georgia-Pacific* Factor 2 ............................................................. 19
        1. Dr. Siuta Inappropriately Discounts the Harvard Licenses ......................... 19
        2. Dr. Siuta Has Selectively Chosen Licenses for His Comparables .............. 22
        3. Conclusion on Dr. Siuta's Comparables ...................................................... 31
     F. Dr. Siuta's Application of the Remaining Factors ............................................. 31

VII. Reasonable Royalty Analysis ................................................................................... 31
     A. Introduction ........................................................................................................ 31
     B. The Hypothetical Negotiation ............................................................................ 32
        1. Hypothetical Bargaining Range – *Georgia-Pacific* Factor 15 .................. 32
     C. Analysis of the Remaining *Georgia-Pacific* Factors ...................................... 36
     Factor (1): The royalties received by the patentee for the licensing of the patent-in-
        suit, proving or tending to prove an established royalty ................................... 36
     Factor (2): The rates paid by the licensee for the use of other patents comparable to
        the patent-in-suit ................................................................................................ 36

Factor (3): The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold. ................................................................. 38
Factor (4): The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly. ..................... 39
Factor (5): The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter. ........................................................... 39
Factor (6): The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales. .......................................................................................................... 41
Factor (7): The duration of the patent and the term of the license. ................................... 41
Factor (8): The established profitability of the product made under the patent, its commercial success, and its current popularity. ............................................................ 41
Factor (9): The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results; and .................... 42
Factor (10): The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention. ...................................................................................... 42
Factor (11): The extent of which the infringer has made use of the invention, and any evidence probative of the value of that use. ................................................................. 42
Factor (12): The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. ................................................................................ 42
Factor (13): The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer. ......................................................................................................................... 43
Factor (14): The opinion and testimony of qualified experts. ........................................... 46
Factor (15): The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee - who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. ................................................ 46
D. Outcome of the Hypothetical Negotiation ....................................................................... 47
   1. Solexa's Business Conditions around the Time of First Infringement ...................... 47
   2. APG's Business Considerations around the Time of First Infringement .................. 47
   3. Upfront Payment for the Developmental Use of the Patents .................................... 48
   4. Running Royalty Rate for Sales of the SOLiD Product ............................................ 49
   5. Total Damages ............................................................................................................ 49

| | | |
|---|---|---:|
| VIII. | Calculation of Royalties to be Applied to the SOLiD Kits | 50 |
| IX. | Calculations of Damages in the Case that the 1-Base Encoding Infringes but the 2-Base Encoding Does Not | 50 |
| X. | Alternative Calculation of Reasonable Royalties | 51 |

# EXPERT REBUTTAL REPORT OF ALAN J. COX

*Applera Corporation – Applied Biosystems Group*
*v.*
*Illumina, Inc., Solexa, Inc., and Stephen C. Macevicz*

## I.  QUALIFICATIONS

My name is Alan J. Cox.  I am an economist and Senior Vice President at the San Francisco office of National Economic Research Associates ("NERA") where I participate in the Antitrust, Intellectual Property, and Securities practices.  NERA provides expert economic and financial analysis to firms and government bodies on a variety of issues.  My business address is 1 Front Street, Suite 2600, San Francisco, CA 94111.

I received a B.Sc. degree in Environmental Science from York University in Toronto in 1976 and an M.A. in Economics from the University of British Columbia in 1978.  From 1978 to 1981, I served as a Visiting Economist at the Energy Laboratory at the Massachusetts Institute of Technology in Cambridge, MA.  In 1989, I received a Ph.D. in Economic Analysis and Policy from the Haas School of Business Administration at the University of California at Berkeley.

My experience includes calculating damages for intellectual property cases involving alleged infringement of semiconductor process and design patents, for contract disputes over licensing agreements for pharmaceutical drugs, and for the alleged infringement of patents in the biotechnology, electronic devices, software, and other industries.  I also provide patent valuation services in connection with NERA's management advisory services.  I have valued intellectual property to assist in licensing and as part of a corporate acquisition.  I have testified in cases involving antitrust allegations arising out of licensing practices and have participated in matters before federal and state Courts, the California Public Utilities Commission, and the Federal Energy Regulatory Commission.

I lecture frequently on market definition and damages calculations in antitrust and intellectual property matters and on the application of rigorous economic techniques for intellectual property valuation.  I have published several papers on a range of competition and

1

EXHIBIT 2

intellectual property issues and am a member of the Licensing Executives Society. Appendix A of this report contains my resume, which includes a list of my publications and presentations over the previous ten years and my prior testimony in other cases over the previous four years.

NERA is being compensated for my services in this matter at my usual rate of $535 per hour, and for the services of consultants and researchers at their normal and customary rates.

## II.   PURPOSE OF THIS REPORT

On November 7, 2007, Applera Corporation – Applied Biosystems ("AB") filed an amended complaint in this matter ("the Complaint"). Counsel for AB has asked me to prepare an independent assessment of damages relating to Illumina, Inc. and Solexa, Inc.'s (collectively, "Illumina") interference with contract and aiding and abetting Dr. Macevicz's breach of fiduciary duty in the alleged misappropriation of the technology by Dr. Macevicz. The relevant patents include U.S. Patents 5,750,341 ("the '341 Patent"), 5,969,119 ("the '119 Patent"), and 6,306,597 ("the '597 Patent") (collectively "the Patents"). On May 30, 2008, I filed a report with my estimates of damages related to the Complaint.

On December 10, 2007, Illumina filed a response to AB's complaint and separately asserted its claims that AB had infringed the Patents, which Illumina claims it owns. Counsel for AB has asked me to review the expert report of Dr. Gerald Siuta (the "Siuta Report") for damages related to the alleged infringement and to write this report of my findings.

I have also been asked to prepare an independent assessment of a reasonable royalty related to the above analysis, assuming that AB is found to infringe the Patents. In my report, the hypothetical negotiation occurs sometime between September 2004 and February 2005, when the Patents were first allegedly infringed by Agencourt Personal Genomics ("APG"), then a research unit of Agencourt Bioscience, Inc. ("Agencourt Bioscience"). During this period, Solexa was the purported owner of the Patents. For this reason, my analysis and the hypothetical negotiation centers on APG and Solexa.

I also calculate damages under three additional scenarios. In Section VIII, I estimate damages due to Illumina if only the '119 patent is found to be infringed. In Section IX, I estimate damages to Illumina assuming only the 1-base encoding system is found to infringe and the 2-base encoding system is not found to infringe. In Section X, I estimate damages under an

2

EXHIBIT 2

alternative damages scenario based on AB's claim that Dr. Macevicz failed his obligation to make AB aware of the technology related to the Patents during his employment at AB.

## III. INFORMATION CONSIDERED

In the preparation of my report and analyses, I and economists working under my direction, reviewed and analyzed documents produced in the course of this litigation, reviewed deposition testimony from this litigation, and performed independent research and analysis (which is ongoing). Most of these documents were provided to us in response to our requests. A list of the information and documents I have considered to date is included in Appendix B. I also conducted interviews of current and former AB personnel:

- § Dr. Michael Hunkapiller – former President of AB
- § Rosy Lee – Sr. Manager, SOLiD™ Product Line
- § Kevin McKernan – Senior Director of Scientific Operations at AB
- § Charles Moehle – Sr. Director, Strategic Tech Licensing
- § Sam Kirchner – Sr. Director, Finance

I have also interviewed a technical expert in this case, Professor Michael Metzker.

I and my staff have also reviewed the depositions of:

- § John West – Former CEO of Solexa (Senior VP of DNA Sequencing Business after Solexa was acquired by Illumina).
- § Kevin McKernan – Senior Director of Scientific Operations at AB
- § Christian Cabou – Senior Vice President and General Counsel at Illumina
- § Jeff Eidel – Associate Director of Finance at Illumina
- § Adam Lowe – Associate Director of Product Marketing at Illumina
- § Jay Flatley – CEO at Illumina
- § Gina Costa – Director of R&D Projects for SOLiD™ Sequencing
- § Dr. Gerald Siuta – Damages Expert retained by Illumina

The opinions stated in this report are subject to change based upon, among other things, ongoing discovery. I may rely upon additional information that comes to my attention after the date of this report and amend my opinions accordingly to the extent permitted by the Court. I have agreed to provide expert testimony (by deposition, at trial, or otherwise) based upon this Expert Rebuttal Report and attached exhibits.

## IV. SUMMARY OF OPINIONS

With regard to Dr. Siuta's report, I find:

3

**EXHIBIT 2**

Dr. Macevicz before his departure from AB. That is, Dr. Macevicz has demonstrated that he was willing to have accepted between $3,057 (my low estimate in my previous report) and up to $502,408 (my high estimate assuming all the stock Dr. Macevicz received was for the purported assignment of the Patents).

_____
Alan J. Cox