BRYAN WILSON (CA SBN 138842)
ERIC C. PAI (CA SBN 247604)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
E-Mail: BWilson@mofo.com; EPai@mofo.com

DAVID C. DOYLE (CA SBN 70690)
STEVEN E. COMER (CA SBN 154384)
BRIAN M. KRAMER (CA SBN 212107)
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125
E-Mail: DDoyle@mofo.com; SComer@mofo.com; BMKramer@mofo.com

Attorneys for Plaintiff
APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP, a Delaware corporation,

Plaintiff,

v.

ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,

Defendants.

Case No. C07 02845 WHA

**APPLERA CORPORATION – APPLIED BIOSYSTEMS GROUP'S TRIAL BRIEF RE:**

**(1) AB DOES NOT INFRINGE THE '119 PATENT UNDER THE DOCTRINE OF EQUIVALENTS AS A MATTER OF LAW;**

**(2) EQUITABLE DEFENSES TO INFRINGEMENT COUNTERCLAIMS**

Trial Date: September 29, 2008
Time: 7:30 a.m.
Place: Courtroom 9, 19th Floor
Judge: William H. Alsup

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. DISCUSSION ..... 1

A. The Conditions Under Which The Probes Are Cleaved Are Relevant To The Doctrine Of Equivalents And Establish That The Differences Are Substantial ..... 1

1. The Cleavage Conditions Are Critical To The Claimed Invention ..... 2

2. The Cleavage Conditions Are Legally Relevant ..... 3

3. The Differences Between the Linkages Are Undisputed and Substantial. ..... 6

B. Regardless Of The Decision Regarding Legal Title To The Patents, AB Retains Equitable Title To Practice And Cannot Infringe ..... 14

III. CONCLUSION ..... 15

AB'S TRIAL BRIEF RE (1) LEGAL INSUFFICIENCY OF DOE ON '119 PATENT; (2) EQUITABLE DEFENSES
Case No. C07 02845 WHA
pa-1278534

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arachnid, Inc. v. Merit Indus., Inc.*,
939 F.2d 1574 (Fed. Cir. 1991).......... 14

*Digeo, Inc. v. Audible, Inc.*,
No. C05-464JLR, 2006 U.S. Dist. LEXIS 62994 (W.D. Wash. Aug. 24, 2006).......... 14

*Enreach Tech. Inc. v. Embedded Internet Solutions*,
403 F. Supp. 2d 968 (N.D. Cal. 2005) .......... 14

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005).......... 2

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950).......... 4

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999).......... 5

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000).......... 6

*Styne v. Stevens*,
26 Cal. 4th 42 (2001) .......... 14

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008).......... 4

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997).......... 2

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
904 F.2d 677 (Fed. Cir. 1990).......... 6

**OTHER AUTHORITIES**

3B. Witkin, *California Procedure*, Actions § 423, at 532 (4th ed. 1997).......... 14

## I. INTRODUCTION

The central issue remaining in the patent case is whether AB's probes infringe claim 1 of the '119 patent under the doctrine of equivalents. This issue turns on the legal issue of whether the conditions under which the probes are cleaved are relevant to the equivalence analysis. Illumina erroneously argues that because the claim is to a composition of matter, the way in which the probes are used is legally irrelevant. But the Supreme Court in *Graver Tank* held that even in composition of matter claims, consideration must be given to the purpose of the claimed ingredient, the qualities it has when combined with the other ingredients, and the function it was intended to perform.

Illumina's expert agrees that one must consider the purpose of the probe and its linkage. He also agrees that AB's probes are cleaved under different, less acidic conditions, and that it is desirable to avoid acidic conditions that can damage the stability of the DNA. Because the conditions under which the probes are used are material as a matter of law, and because the conditions under which AB's probes are cleaved are undisputedly different, and preferable for DNA stability, judgment of noninfringement should be entered.

An additional legal issue for the Court is AB's equitable right to the Macevicz patents. Even were the jury in the patent ownership phase to determine that AB's ownership claim was barred by the statute of limitations or Illumina's rights as a bona fide purchaser, AB would still be entitled to assert its equitable rights defensively to defeat Illumina's infringement claims.[1]

## II. DISCUSSION

### A. The Conditions Under Which The Probes Are Cleaved Are Relevant To The Doctrine Of Equivalents And Establish That The Differences Are Substantial.

Claim 1 of the '119 patent recites a DNA probe consisting of a number of nucleotides (a range of between 2 and 12), a "NH" (nitrogen-hydrogen, or "phosphoramidate") linkage, and a labeled, non-extendable chain-terminating moiety. Because the probes in the SOLiD System and

[1] Instead of attempting to address every issue in both phases of the trial, AB has focused this trial brief on two specific issues for the Court's consideration.

the one-base prototype system utilize a sulfur (phosphorothiolate) linkage, rather than a phosphoramidate linkage, Illumina alleges infringement solely under the doctrine of equivalents.

The doctrine of equivalents, however, extends only to "unimportant and insubstantial substitutes." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (quoting *Festo Co. v. Shokestsu Kinzodu Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002)). To assess whether the differences between the claimed invention and the accused component are insubstantial, the courts often apply the function-way-result test. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

**1. The Cleavage Conditions Are Critical To The Claimed Invention.**

The Court stated in its Order granting partial summary judgment that all three of the Macevicz patents "are directed towards methods of learning unknown sequences in DNA." (Order at 1, Docket No. 232.) The probes as play a central role in carrying out those DNA sequencing methods. The probes are used as follows. A probe that hybridizes to the target in the desired location is ligated to the primer or the previously ligated probe. ('119 Patent Col. 6:13-25.) The color of its label is read to determine the identity of a base in the target. (*Id*. and Col. 14:16-44.) The probe is then cut at the cleavable linkage to remove the label and the non-extendable chain-terminating moiety in order to make the new end of the shortened probe available for ligation to another probe in the next cycle. Through repeated cycles of ligation, identification, and cleavage, the sequence of the target polynucleotide is determined.

The specification emphasizes that cleavable linkage is a critical feature of the probe because it allows the probe to be cleaved at a particular location, under particular conditions. This predetermined cleavage enables the cycles of ligation and identification to be repeated until the DNA has been sequenced. When using a phosphoramidate linkage, the cleavage is achieved by adding a highly acidic solution called trifluoroacetic acid ("TFA"). The specification states:

> An important feature of the oligonucleotide probe is that after annealing and ligation (204), the label may be removed and the extendable end regenerated by treating the phosphoramidate linkage with acid . . . . By way of example, hydrolysis of the phosphoramidate may be accomplished by treatment with 0.8%

> trifluoroacetic acid in dichloromethane for 40 minutes at room temperature. Thus, after annealing, ligating, and identifying the ligated probe via the label on Bt*, the chain-terminating moiety is cleaved by acid hydrolysis (206) thereby breaking the phosphorus linkage and leaving a 5' monophosphate on the ligated oligonucleotide. The steps can be repeated (208) in successive cycles.

('119 Patent Col. 9:40-55)

The specification also states that the cleavage conditions used depend on the type of linkage. While the phosphoramidate linkage is cleaved with TFA, other types of linkages are cleaved under different chemical or physical conditions:

> The phosphoramidate linkage described above is an example of a general class of internucleosidic linkages referred to herein as "chemically scissile internucleosidic linkages." These are internucleosidic linkages that may be cleaved by treating them with characteristic chemical or physical conditions, such as an oxidizing environment, a reducing environment, light of a characteristic wavelength (for photolabile linkages), or the like.

('119 Patent Col. 10:16-23)

Illumina's expert, Dr. Backman, agreed that the function of the linkage is determined by the purpose described in the specification. (Backman Dep. at 38:24-39:4 ("Q. The claim language doesn't say chemically scissile internucleosidic linkage, does it? A. No. But the claim has to be read in light of the specification where the function of the phosphoramidate linkage is to be a chemically scissile internucleosidic linkage.").) In his opinion, the "function" of the phosphoramidate linkage is to provide a "chemically scissile" bond, the "way" it serves that function is with a "chemically reactive" atomic group, and the "result" is that the atomic group (a phosphate group to which the next probe can be ligated) is "exposed upon cleavage of the scissile bond." (Backman Report ¶¶ 113, 116; Backman Dep. at 38:24-39:4.) Thus, the cleavage conditions are directly relevant to the way in which Illumina's own expert says the linkage performs its function, as well as the result.

### 2. The Cleavage Conditions Are Legally Relevant.

Illumina tries to avoid addressing the cleavage conditions by arguing that they are legally irrelevant. Illumina asserts that "because claim 1 of the '119 patent is directed to a composition

of matter" that "contains only structural limitations," the way in which the probe is used and the manner and conditions in which the linkage is cleaved are irrelevant. (Solexa's Motion for Summary Judgment at 10, 13, Docket No. 203.) Illumina is correct as to literal infringement, but it is relying on infringement under the doctrine of equivalents. In the doctrine of equivalents context, this assertion is directly contradicted by the well-known *Graver Tank* case on which Illumina bases its argument. (*Id.* at 11-13.) *Graver Tank* was a composition of matter case in which the Supreme Court held that an equivalents analysis does require consideration of the purpose and function of the claimed ingredient:

> Consideration must be given to <u>the purpose for which an ingredient is used</u> in a patent, the qualities it has when combined with the other ingredients, and <u>the function it [was] intended to perform</u>.

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) (emphasis added). Illumina quoted the same passage in its summary judgment brief, but without authority asserted the law to be the opposite of the Supreme Court's emphasis on "the purpose for which an ingredient is used." (*See* Solexa's Motion for Summary Judgment at 12.)[2]

The Federal Circuit has been insistent that doctrine of equivalents analysis not be performed at the 30,000 foot level as done by Illumina's expert, Dr. Backman. *See, e.g., TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376-1377 (Fed. Cir. 2008) (affirming noninfringement under the doctrine of equivalents because "Here, we cannot find that the housing in the accused device functions as an equivalent of the 'handle' in the patented invention without

[2] Illumina also incorrectly suggests that *Graver Tank* stands for the blanket proposition that "substitution of one element (magnesium) for another (calcium)" is an insubstantial difference. (Solexa's Motion for Summary Judgment at 11-12.) First of all, the actual issue was whether <u>manganese</u> silicate could be considered an "<u>alkaline earth metal</u> silicate" under the doctrine of equivalents. 339 U.S. at 610 (emphasis added). Manganese is an element; alkaline earth metals are a group of elements having similar properties. (*See* Metzker Opp. Decl. ¶¶ 16-17 (citing Periodic Table of the Elements) Ex. B. Docket No. 218.) The case was not about whether one element could be substituted for another element.

Furthermore, in *Graver Tank*, the Supreme Court affirmed the judgment of infringement based on the particular circumstances of the case and the weight of the evidentiary record, which included, *inter alia*, the fact that the specification of the patent-in-suit disclosed the alleged equivalent, testimony by experts familiar with both the claimed invention and the accused product as to the purposes of the allegedly equivalent metals, recognized scientific texts, and disclosures of the prior art. *Graver Tank*, 339 U.S. at 610-11. Illumina has offered no such evidence here.

rendering the 'housing' limitation meaningless. Furthermore, we note that TIP fails to provide any evidence that the housing functions in substantially the same way as the handle.") (internal citations and quotation omitted). Likewise, Backman ignores the way the phosphorothiolate probes are cleaved in the SOLiD System by adopting Illumina's incorrect legal position that the way does not matter in a composition of matter claim.

Illumina's argument would transform the claim limitation from the specific linkage claimed - NH- to a generic class of chemically-cleavable linkages. Macevicz, however, could have sought to claim the broad class of "chemically scissile internucleosidic" linkages as he did in the '341 patent, but he chose not do so in claim 1 of the '119 patent. Claim 7 of the '341 patent recites the class: "The method of claim 2 wherein said step of regenerating includes cleaving a chemically scissile internucleosidic linkage in said extended oligonucleotide probe." Dependent claim 8 of the '341 patent then defines the phosphoramidate linkage as one specific member of that class: "The method of claim 7 wherein said chemically scissile internucleosidic linkage is a phosphoramidate." These claims demonstrate that Macevicz knew how to claim the broad class of chemically scissile linkages and that he considered the phosphoramidate linkage to be one particular linkage within that class.

As discussed in AB's motion for summary judgment, Illumina's attempted expansion of the claim is also barred because it would vitiate the phosphoramidate limitation. (*See, e.g.*, Docket No. 207 at 21-24.) Furthermore, these claims in the '341 patent were allowed only as dependent claims, which included all of the elements of independent claim 1.

The claim expansion Illumina seeks would also be invalid. *See, e.g., K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366-67 (Fed. Cir. 1999) (patentee not entitled to scope of equivalents that would have rendered claim invalid). Ignoring the NH linkage limitation would remove the distinction relied on by the Examiner to distinguish the prior art, including the Beaton patent. It would also ensnare the Carr patent (GB 2,236,852), which discloses a probe with the same sulfur atom substitution used in the SOLiD System probes. (Metzker Opp. Decl. ¶¶ 14-15, Ex. E at 14:13-14, 18:2-10, 19:16-21, 20:6-15, 20:23-27.) The claim expansion Illumina seeks would also lack written description, since the specification does not disclose that Macevicz had

possession of a probe using a phosphorothiolate linkage. *See Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323-24 (Fed. Cir. 2000). Indeed, Macevicz testified that he did not envision using phosphorothiolate as a cleavable linkage. (Declaration of Eric C. Pai in Support of AB's Opposition ("Pai Decl.") Ex. 1 at 241:13-242:11.) The Court should reject Illumina's invitation to redraft the claim now to grant claim scope that Macevicz did not, and could not, obtain during prosecution. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990) ("[S]ince prior art always limits what an inventor could have claimed, it limits the range of permissible equivalents of a claim.").

**3. The Differences Between the Linkages Are Undisputed and Substantial.**

The evidence that the conditions for cleaving AB's phosphorothiolate probes are different and more favorable to the stability of DNA than the claimed phosphoramidate probe is undisputed. According to the specification of the '119 patent, phosphoramidate linkages are cleaved with TFA under highly acidic conditions (where pH = 1). ('119 Patent Col. 9:40-52.) By contrast, phosphorothiolate linkages in AB's probes are cleaved with silver nitrate under neutral conditions (where pH = 7). (Metzker Rebuttal Report at 23.) These neutral conditions are particularly beneficial in the SOLiD System, which runs 35 ligation cycles.

At his deposition, Dr. Backman admitted that the cleavage conditions in the claimed probes and the SOLiD System's probes are different, and that the acidic conditions required by the claimed probes can damage the DNA:

> Q. Now, going back to the phosphoramidate linkage discussed in Macevicz, Macevicz discusses using .8 percent trifluoroacetic acid to cleave the phosphoramidate bond, correct?
>
> A. Yes.
>
> Q. How acidic is TFA?
>
> A. It's pretty acidic.
>
> Q. Is it a pH of 1?
>
> A. I don't know if that's specifically written down anywhere in the patent, but I would imagine from general chemical considerations, that would be close to correct.

> Q. Does that damage the DNA at all?
>
> A. It's possible that it can in some circumstances.
>
> (Backman Depo. at 30:18-31:7.)

But when asked to compare whether neutral pH conditions used to cleave the SOLiD probes are preferable to the acidic conditions required to cleave the claimed probes, he began a determined course of evasion. Evasion tactic # 1 was adding absurd assumptions to a simple question:

> Q. Which is preferable in a system like SOLiD, acidic conditions or neutral pH conditions for cleavage?
>
> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: Well, that's really a question of -- of, I mean, preferable by what standard? <u>If -- if it were the case that, for example, that silver nitrate cost a million dollars an ounce, it might be preferable to use the acidic conditions</u>. So, you know, there might be factors which would make one decide one way or the other, and I can't say that there's an absolute -- absolute answer to that question.
>
> (*Id.* at 32:15-33:4.)

Dr. Backman, who Illumina offers as its expert on DNA sequencing, then moved on to evasion tactic # 2 saying he could not compare the two methods because he did not know what "standard of judgment" to apply:

> Q. Well, all other things being equal, including the cost, which is preferable, cleaving with a neutral pH solution or an acidic solution?
>
> MR. IZRAELEWICZ: Objection. Asked and answered.
>
> THE WITNESS: Again, I stand on my previous answer, and that is that <u>preferable is according to some standard that somebody has in mind the time, and I don't know what standard to compare it to</u>.
>
> BY MR. COMER:
>
> Q. So you don't have an opinion one way or the another?
>
> A. Well, not as -- not as to the form in which the question was asked, no.
>
> Q. Do you have an opinion as to whether it's preferable to cleave at neutral pH as opposed to a pH of 1?

> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: You're pulling on the same thread. And the answer is <u>preferable according to what standard of judgment?</u> I don't have a standard of judgment that you're asking me to make that decision based upon.
>
> (*Id.* at 33:6-34:5.)

Evasion tactic # 3 was parroting Illumina's legal argument that how the probes are cleaved is irrelevant because the claim is to a composition of matter:

> Q. Well, you give an opinion in this case on the doctrine of equivalents, right?
>
> A. Yes.
>
> Q. And your opinion is that using a phosphorothiolate bond is the equivalent of using a phosphoramidate bond, correct?
>
> MR. IZRAELEWICZ: Objection. Mischaracterizing his opinion.
>
> THE WITNESS: Yeah, let me carefully stick to what it is I said. <u>But this of course is a composition of matter claim, not a method claim</u>. <u>And so equivalence within a composition of matter is a different can of worms</u>. The question is, what function is being served by the specific moiety or element under discussion in the claimed invention and does the substituted moiety in an equivalent perform the same function by -- in the same fashion and yield the same result? And according to those standards, it was my conclusion that -- that yes, that the phosphorothioate linkage did that.
>
> ***
>
> Q. Okay. Well, I want to focus on what advantages you think there are, if any, to using the silver nitrate cleavage step as opposed to the TFA cleavage step.
>
> A. Oh, well, again, the advantages -- you're pointing to advantages and you're pointing toward the method used by SOLiD, <u>but you're asking me to read the '119 patent, which is a composition of matter claim. So when you have a composition of matter, if the two things do the same thing in the same way with the same result, whether or not one of them is more advantageous in a process isn't -- isn't a way to distinguish between them with respect to it being a composition of matter claim.</u>
>
> (*Id.* at 34:7-35:4; 35:16-36:5.)

Evasion tactic # 4 was answering a different question than the one asked. Asked whether the claimed probes and the SOLiD probes are cleaved in the same way, he responded with his opinion regarding the scope of the claim:

> Q. Well, they don't do the cleavage in the same way, do they?
>
> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: They -- yeah. According to the author of the patent, the inventor, he is looking for -- and I'm looking at column 10, line approximately 18, "chemically scissile internucleosidic linkages"; that's what the phosphoramidate is supposed to represent. And the phosphorothioate is a chemically scissile internucleosidic linkage.
>
> BY MR. COMER:
>
> Q. Okay. But I'm talking about -- the claim language requires a phosphoramidate, right?
>
> A. Literally --
>
> Q. Right.
>
> A. -- it requires a phosphoramidate, but it covers equivalence, and equivalence is -- is discussed that the phosphoramidate is a chemically scissile internucleosidic linkage, so other chemically scissile internucleosidic linkages would be covered by equivalents.
>
> Q. Do you think that the claim covers any chemically scissile internucleosidic linkage?
>
> A. That's a question of law. But in my technical opinion, it would look to me that it would.
>
> (*Id.* at 36:6-37:8.)

Backman then returned to his favorite evasion tactic — repeating Illumina's legal argument:

> Q. Yeah. In your opinion, the probe that is used in the SOLiD system, which uses a phosphorothiolate linker, meets all the terms of claim '119 literally, except for the NH portion, which you say it meets by equivalence, correct?
>
> A. Yes. That is the opinion I put in my report.
>
> Q. Okay. And the way the NH bond is cleaved is with TFA, right?
>
> MR. IZRAELEWICZ: Objection.
>
> BY MR. COMER:

Q. That's what's taught in the Macevicz patent, isn't it?

MR. IZRAELEWICZ: Objection.

THE WITNESS: The way -- the way that the chemically scissile internucleosidic linkage is cleaved in its use in a particular process is not -- <u>is not relevant to the claim, as it is a structure of matter</u>. <u>Now, yes, in a process over here, you have this -- you have this claimed composition of matter, and in this process, it's cleaved by a particular method, say for example, acidic conditions. But all's that's required by the composition of matter claim is that there be a chemically scissile internucleosidic linkage</u>. And if you use it in any other process, it doesn't matter if you cleave the internucleosidic linkage chemically in that process, or it inherently can be, then I believe that the requirements of the claim have been met.

(*Id.* at 37:15-38:22.)

***

Q. And I'm just asking, have you compared the one that is -- that is literally claimed, the N-H bond is taught by Macevicz to be cleaved with TFA, right?

MR. IZRAELEWICZ: Objection. Asked and answered.

THE WITNESS: <u>In using that composition of matter in a process</u>, he uses, as I said before already, acidic conditions, .8 percent TFA, to effect cleavage. <u>But that's not relevant to what's being claimed in '119.</u> And we got a fruit cart here and you keep showing me the apple and asking me about the orange.

(*Id.* at 39:5-17.)

Then back to evasion tactic # 2 — not knowing what standard to apply:

Q. The phosphorothiolate bond in SOLiD is cleaved with silver nitrate, right?

A. In the -- in the operation of the SOLiD system, when cleavage occurs, it is my understanding from observation of the run and the materials produced by ABI, that silver nitrate is the cleavage reagent effecting cleavage of the phosphorothiolate bond.

Q. Are there any advantages to cleaving with silver nitrate as opposed to TFA?

MR. IZRAELEWICZ: Objection. Asked and answered a couple of times.

THE WITNESS: Yeah, I go back and say, one -- an advantage or a preferability is always in light of some standard, and you haven't given me a standard to compare these by. So under some sets of

conditions or circumstances, one or another of the two cleavages may be preferable.

BY MR. COMER:

Q. Sure. Let's try just substituting the phosphorothiolate linker in SOLiD with a phosphoramidate linker. Okay? Do you have that in mind now?

A. Yes.

Q. So if you were using a phosphoramidate linker in SOLiD, you would have to use an acidic condition to cleave, correct?

A. In order to perform the process, yes. When you got to the point in the -- in the steps where cleavage of the oligonucleotide was the next incumbent step before going further, the cleavage would be effected under acidic conditions.

Q. So comparing those two circumstances, would there be any advantages to using the silver nitrate cleavage as opposed to the acidic cleavage?

A. Again, advantages are in light of some standard. What standard do you want me to apply?

Q. The standard of a person of ordinary skill in the art looking at these two different systems, would a person see that there's any advantage to avoiding the use of the acidic -- acidic conditions?

MR. IZRAELEWICZ: Objection. Incomplete hypothetical and asked and answered more than two times at this point.

THE WITNESS: <u>Well, again, the standard of a person of ordinary skill in the art isn't really a standard. A standard is a performance standard. It might be the case that somebody could show -- I don't know whether this is true or not -- that one cleavage method produced 85 percent cleavage and another produced 99 percent cleavage.</u> And if you wanted maximum cleavage, if that was particularly important in these things, you would want the one that gave the superior cleavage. I don't know off the top of my head which of these two cleavage methods gives more complete cleavage or how long an incubation would be required. For example, if you could get a time advantage by using one method or the other, in terms of throughput, one took place in 10 minutes and another took place in 2 hours, time might be the standard by which you judge advantage. So as I sit here, without having a standard to say this is more advantageous than that, I can't.

(*Id.* at 39:19-42:12.)

This farce ended with a combination of Nos. 1 and 2 — adding on absurd assumptions and not knowing what standard to apply:

> Q. For a DNA sequencing method using repeated cycles of ligation and cleavage, would neutral pH conditions be preferable to low pH conditions?
>
> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: Yeah, I -- that could -- that question could be interpreted so many ways, I -- I hesitate to speculate what it means. I mean, <u>neutral or low pH at every step in the cycle, at one particular step in the cycle?</u>
>
> BY MR. COMER:
>
> Q. Well, you're changing my question. Assume that it's the same in every cycle.
>
> MR. IZRAELEWICZ: Objection.
>
> BY MR. COMER:
>
> Q. Now can you answer the question?
>
> A. Repeat the question, please.
>
> Q. For DNA sequencing using repeated cycles of ligation and cleavage, are neutral pH conditions preferable to low pH conditions?
>
> A. And you mean continuously through the entire cycle?
>
> Q. Well, the -- the cleavage is done, we're talking about the cleavage step.
>
> A. <u>Oh, simply the cleavage step</u>. Well, again, in terms of how much time it takes to perform one or the other versus cost of the reagents versus the efficiency of cleavage, all these standards -- I don't know what standard you're asking me to apply. <u>And honestly, I don't know the answer -- even if you picked one of those standards, I don't know which one is chemically more efficient or which one is faster, so I can't -- I can't tell you which one is more advantageous</u>.
>
> (*Id.* at 42:14-43:24.)

In the end, Dr. Backman conceded that it is preferable to avoid acidic conditions if they damage DNA, but he said he does not know if the acidic conditions required by the claimed probe can damage DNA:

> Q. Okay. Then all factors being equal except for what happens to the DNA strand being hit by the repeated cycles of acidic conditions versus repeated cycles of neutral pH conditions.
>
> MR. IZRAELEWICZ: Objection. Vague and ambiguous.
>
> THE WITNESS: Well, you asked me earlier a question that had to do with depurination under acidic conditions. And I sense that you may be trying to steer my attention toward that. And I have to answer similar to how I answered back then, and that is, I don't know to what extent depurination with this reagent occurs. I know that it's not -- I know that to get depurination to occur, you have to use relatively strong conditions -- to get it to occur reliably. So I'm going to say I don't know whether there's an advantage. But if it were the case, if it were the demonstrated case, which I don't know it to be, that -- that depurination were occurring, then you probably would want to minimize that.
>
> (*Id.* at 44:14-45:11.)

"I don't know" is not expert testimony on which a reasonable juror could rule that a phosphorothiolate probe is equivalent to a phosphoramidate probe.

Dr. Metzker does know. He testified that those of ordinary skill in the art were aware at the relevant time that subjecting DNA to low pH conditions can have dire consequences. (Metzker Rebuttal Report at 22.) Low pH or acidic conditions were known to cause depurination of nucleic acid templates and subsequent strand breaks. (*Id.*) One of ordinary skill in the art would anticipate that repeated exposures of the same target polynucleotide to these acidic conditions would lead to substantial DNA damage. (*Id.*) Acidic conditions that damage DNA are not favored by skilled artisans looking to obtain the best sequence data containing the fewest errors. (*Id.*)

Dr. Metzker contrasted the acidic conditions used for cleaving phosphoramidate linkages with the conditions used to cleave the phosphorothiolate linkages found in the SOLiD probes. Cleavage of phosphorothiolates, containing a bridging sulfur atom, occurs under neutral conditions (pH = 7) with an aqueous solution of 20 mM silver nitrate for one hour at room

temperature. (*Id.* at 23 (citing Vyle and Cosstick, 1992, Biochemistry, vol. 31, page 3014, lines 14 - 17).) These neutral conditions are preferable because they do not damage the DNA. (*Id.*)

**B. Regardless Of The Decision Regarding Legal Title To The Patents, AB Retains Equitable Title To Practice And Cannot Infringe.**

If the first phase of trial results in a finding that AB's claims to ownership of the patents are valid but barred by the statute of limitations or rights of a bona fide purchaser, AB will be entitled to a ruling that it nevertheless retains the equitable rights to practice the claimed inventions and therefore cannot infringe them.

AB's defenses to infringement based on Macevicz's misconduct would remain viable even if its affirmative state law causes of action are found to be barred. *See Styne v. Stevens*, 26 Cal. 4th 42, 51 (2001) ("Under well-established authority, a defense may be raised at any time, even if the matter alleged would be barred by a statute of limitations if asserted as the basis for affirmative relief."); *see generally* 3B. Witkin, *California Procedure,* Actions § 423, at 532 (4th ed. 1997).

AB possesses equitable rights to practice the claimed inventions. "Equitable title may be defined as 'the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another.'" *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.3 (Fed. Cir. 1991) (citing *Black's Law Dictionary* 1486 (6th ed. 1990)). Thus, even if the jury were to find legal title in Illumina, Macevicz's contract to assign inventions to AB and his fiduciary duty establish equitable title in AB. *See id.* at 1581 ("an agreement to assign in the future inventions not yet developed may vest the promisee with equitable rights in those inventions"); *Enreach Tech. Inc. v. Embedded Internet Solutions*, 403 F. Supp. 2d 968, 975-76 (N.D. Cal. 2005); *see also Digeo, Inc. v. Audible, Inc.*, No. C05-464JLR, 2006 U.S. Dist. LEXIS 62994, at *18-22 (W.D. Wash. Aug. 24, 2006). Thus, at the conclusion of the first phase of trial, AB would seek a ruling from the Court that even if it can no longer claim legal title, it retains equitable title and the right to practice the inventions.

**III. CONCLUSION**

Because the cleavage conditions are highly material as a matter of law, and the conditions under which AB's probes are cleaved are undisputedly different, and preferable for DNA stability, AB's probes do not infringe the '119 patent under the doctrine of equivalents and judgment of noninfringement should be entered. Furthermore, as to all the Macevicz patents, AB has equitable rights that entitle it to practice the patents free of infringement claims.

Dated: August 29, 2008

MORRISON & FOERSTER LLP

By: /s/ Steven E. Comer
Steven E. Comer

Attorneys for Plaintiff
APPLERA CORPORATION - APPLIED BIOSYSTEMS GROUP