THOMAS I. ROSS (admitted *pro hac vice*)
KEVIN M. FLOWERS (admitted *pro hac vice*)
JEFFREY H. DEAN (admitted *pro hac vice*)
MARK H. IZRAELEWICZ (admitted *pro hac vice*)
JOHN R. LABBE (admitted *pro hac vice*)
CULLEN N. PENDLETON (admitted *pro hac vice*)
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606-6357
(312) 474-6300 (telephone)
(312) 474-0448 (facsimile)
E-Mail: tross@marshallip.com
E-Mail: kflowers@marshallip.com
E-Mail: jdean@marshallip.com
E-Mail: mizraelewicz@marshallip.com
E-Mail: jlabbe@marshallip.com
E-Mail: cpendleton@marshallip.com

Counsel for Defendants
ILLUMINA, INC., SOLEXA, INC.,
and STEPHEN C. MACEVICZ

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| APPLERA CORPORATION—APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>Plaintiff/counterdefendant,<br><br>- vs. -<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>Defendants/counterclaimants. | Case No. 07-CV-02845 WHA<br><br>Judge William H. Alsup<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Final Pretrial Conference: Sept. 8, 2008<br>Time: 2:00 P.M.<br><br>Trial: Sept. 29, 2008<br><br>Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

I.    FACTUAL BACKGROUND ................................................................................. 1

II.   AB'S STATE-LAW OWNERSHIP CLAIMS........................................................ 4

    A.    Defendant Solexa currently holds the legal title to the Macevicz
        patents.......................................................................................................... 4

    B.    Because Solexa owns legal title to the Macevicz patents, AB must
        prevail on its claims against Solexa (Illumina) to obtain injunctive
        relief............................................................................................................. 5

    C.    AB cannot prevail on any claims against Dr. Macevicz ............................. 6

        1.    AB has no remedy for any of its claims against Dr. Macevicz.......... 6

        2.    Dr. Macevicz did not breach the assignment provision of the
                Invention Agreement.......................................................................... 6

        3.    Defendants will not rely on California Labor Code § 2870.............. 8

        4.    AB cannot prevail based on Dr. Macevicz's alleged breach of
                the notice requirement in the Invention Agreement.......................... 9

        5.    Dr. Macevicz did not breach his fiduciary duty to AB or
                commit constructive fraud................................................................. 10

        6.    Dr. Macevicz could not have wrongfully converted his own
                inventions, because AB never owned or possessed them ................ 11

    D.    Illumina will defeat AB's claims against it................................................ 12

        1.    Even if Dr. Macevicz breached a duty to AB, Illumina did not
                intentionally induce Macevicz to breach his obligations under
                the Invention Agreement, and did not aid and abet his breach
                of fiduciary duty .............................................................................. 12

        2.    Illumina could not have wrongfully converted Macevicz's
                inventions because AB never owned or possessed them ................. 13

        3.    AB cannot prove damages against Illumina.................................... 13

    E.    The statutes of limitations cut off any affirmative relief against the
        Defendants.................................................................................................. 13

    F.    Illumina's bona-fide-purchaser-for-value defense is a complete
        defense to AB's ownership claims ............................................................. 14

    G.    AB's equitable title defense is a limited defense personal to AB ............. 15

        1.    Equitable title vests in AB only if AB proves that Macevicz
                breached the assignment provision of the Invention Agreement..... 16

2.    Even if equitable title is a defense for AB, it is not a defense for Agencourt's activities before AB acquired Agencourt .............. 17

III.    SOLEXA'S INFRINGEMENT CLAIMS.............................................................. 17

A.    Infringement of the '341 patent claims by the one-base-encoding version of the SOLiD System...................................................... 17

B.    Infringement of the '597 patent by the one-base-encoding version of the SOLiD System...................................................................... 19

C.    Infringement of the '119 patent by the one-base-encoding and two-base-encoding versions of the SOLiD System oligonucleotide probes ...... 20

IV.    SOLEXA'S REQUESTED REMEDIES ............................................................ 21

A.    Solexa requests that the Court enter a preliminary and permanent injunction.................................................................................... 21

B.    Solexa is entitled to damages equivalent to both a lump-sum developmental use license and an ongoing reasonable royalty................. 21

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

## I.    FACTUAL BACKGROUND

Dr. Stephen C. Macevicz is an accomplished scientist who earned his Ph.D. in bio-physics from the University of California at Berkeley and who served as a post-doctoral fellow at the Lawrence Livermore National Laboratories.

Since the late 1980's, Dr. Macevicz has conceived and developed a number of in-ventions relating to molecular biology, particularly inventions relating to the use of oli-gonucleotide probes to determine the sequence of DNA molecules.[1] For many years, he has worked in his spare time to conceive and develop such inventions, recording them in his personal journal which he keeps at his home, and filing patent applications to protect those inventions from would-be infringers. As a result of his work, Dr. Macevicz is a named in-ventor on eleven United States patents in the life sciences, including three on which he is named as a co-inventor with Dr. Sydney Brenner, the 2002 Nobel Laureate in Medicine.

Dr. Macevicz is also a patent attorney. From 1992 through 1995, he was employed as a patent attorney for Applied Biosystems ("AB"). During this time period, AB devel-oped and many different types of automated machines for carrying out experiments in life-sciences research, including machines for sequencing DNA.

In 1994, working entirely on his own time, in his home, Dr. Macevicz conceived several revolutionary inventions utilizing a new method of DNA sequencing called "se-quencing-by-ligation," a method of DNA sequencing completely different from the "Sanger" method of sequencing that AB employed in its line of DNA sequencing machines during the 1990s.

On April 17, 1995, Dr. Macevicz filed U.S. patent application 08/424,663 ("the '663 application"). This application ultimately led to three U.S. patents: U.S. Patent No. 5,750,341 ("the '341 patent"), U.S. Patent No. 5,969,119 ("the '119 patent"), and U.S. Pat-ent No. 6,306,597 ("the '597 patent") (collectively, "the Macevicz patents").

---

[1] For example, the United States Patent & Trademark Office in 1991 granted Dr. Mace-vicz U.S. Patent No. 5,002,867, entitled "Nucleic Acid Sequence Determination By Multi-ple Mixed Oligonucleotide Probes," which matured from a patent application that Dr. Macevicz filed on October 24, 1988.

Later in 1995, Macevicz decided to join Lynx Therapeutics, Inc. ("Lynx") as a patent attorney and a vice-president. Lynx had been spun-out of AB in June, 1992 to develop and commercialize technologies that AB was not interested in pursuing. From 1992 to 1995, pursuant to an agreement between AB and Lynx, Dr. Macevicz had performed legal services for Lynx. Part of the reason that Dr. Macevicz decided to join Lynx was because he knew that Lynx was looking to develop and commercialize methods of DNA sequencing that could provide an alternative to the traditional method of Sanger sequencing.

Just prior to formally joining Lynx, Dr. Macevicz assigned the '663 application to Lynx in exchange for a fully-vested option on 20,000 shares of a Lynx wholly-owned subsidiary called Spectragen, Inc. ("Spectragen"). Lynx had established Spectragen as a separate entity to pursue alternative DNA sequencing technologies, particularly those developed by the pre-eminent molecular biologist (and future Nobel laureate) Dr. Sydney Brenner.

During the 1990s, AB became the dominant company in the field of automated DNA sequencing machines. Indeed, scientists in both the public and private sector relied heavily on AB's Prism 3700 DNA Analyzer to complete the Human Genome Project ahead of schedule. The Prism 3700 relied exclusively upon the Sanger method of DNA sequencing. One of the limitations of the Sanger method is that it requires the user to separate thousands of DNA fragments of different lengths using a process called electrophoresis in order to determine the sequence of a sample of DNA. When AB introduced the Prism 3700, it was revolutionary because it employed 96 capillaries for electrophoresis and greatly reduced the amount of human labor necessary to sequence large amounts of DNA.

Throughout the 1990's, AB pursued a number of research and development efforts relating to DNA sequencing and commercialized many improvements to the hardware, reagents, and methods used in its Prism sequencing machines. However, all of these efforts related to improving the Sanger method of DNA sequencing used in AB's machines (with one exception, in 1997, when AB invested in a company called Hyseq to explore an alternative "sequencing-by-hybridization" method).

In the early part of the current decade, a few individuals within AB's research and

marketing units realized that the Sanger method of sequencing used in all of AB's DNA sequencing machines had nearly reached its theoretical limits of speed, efficiency, and cost-effectiveness. By 2006, AB realized that it could not rely on Sanger-sequencing-based methods forever if it wanted to remain the dominant company in the field of automated DNA sequencing machines. Consequently, AB started looking for "next-generation" sequencing methods in which it could invest and commercialize. In the summer of 2006, its investigation led AB to acquire Agencourt Personal Genomics ("Agencourt"), a small company in Massachusetts that had developed a next-generation method of DNA sequencing that utilized sequencing-by-ligation. In late 2007, AB introduced a new DNA sequencing machine called the SOLiD System, which utilizes the sequencing-by-ligation technology that Agencourt developed.

The Agencourt scientists who developed the SOLiD System were aware of the Macevicz patents. During their negotiations with AB, they brought the Macevicz patents to AB's attention. Shortly after AB acquired Agencourt in 2006, AB turned its attention to the Macevicz patents. Apparently concerned that Agencourt's method of sequencing-by-ligation infringed the Macevicz patents, AB wrote to Lynx (which by then had changed its name to Solexa, Inc. ("Solexa")) and demanded that Solexa assign the Macevicz patents to AB. According to AB, Macevicz should have assigned his inventions to AB pursuant to an Employee Invention Agreement (the "Invention Agreement") between AB and Macevicz that Macevicz signed when he joined AB in 1992.

AB and Solexa negotiated over the Macevicz patents throughout the latter half of 2006. When Solexa did not agree to simply assign the Macevicz inventions to AB, AB filed a lawsuit against Dr. Macevicz and Solexa in California state court seeking the return of those patents. A few months later, AB filed this lawsuit against Dr. Macevicz, Solexa, and Illumina, Inc. ("Illumina"), which had acquired Solexa in early 2007. In its complaint,

AB alleges that Dr. Macevicz and Illumina[2] acted wrongfully when Macevicz assigned the '663 application to Illumina in 1995, and that AB has suffered harm based on such wrongful acts. Moreover, AB seeks a declaratory judgment that its SOLiD System does not infringe the Macevicz patents and that the Macevicz patents are invalid and unenforceable. In response to AB's complaint, Solexa counterclaimed for infringement of the Macevicz patents.

The case is now scheduled for a jury trial to begin on September 29, 2008. The Court has ordered that it will bifurcate the trial into two phases: the first phase will resolve AB's state-law ownership claims and the second phase will resolve Solexa's infringement counterclaims.

## II.    AB'S STATE-LAW OWNERSHIP CLAIMS

AB seeks a declaration that it is the rightful owner of the Macevicz patents and an injunction ordering the Defendants to assign the Macevicz patents to AB. AB also purports to seek damages from Illumina (although AB has never provided any discovery to substantiate its claim for damages).

AB will be unable to recover any remedy for its state-law claims, however, unless it can prove its claims against Illumina and only if Illumina fails on both of its affirmative defenses: (i) that Lynx was a bona fide purchaser for value of the Macevicz patents, and (ii) that AB's claims are barred by several statutes of limitations. Moreover, AB cannot recover any remedy against Dr. Macevicz because AB does not have any damages claims against Dr. Macevicz, and because Dr. Macevicz no longer holds the title to the Macevicz patents.

### A.    Defendant Solexa currently holds the legal title to the Macevicz patents

In the "Employee Invention Agreement" that Dr. Macevicz entered into with AB in 1992, Dr. Macevicz only agreed to assign his future inventions to AB. The Invention Agreement says only that Dr. Macevicz "will assign" certain inventions to AB, not that he

---

[2] For simplicity, the Defendants will sometimes use the name "Illumina" to collectively refer to Lynx, Solexa, and Illumina in this brief, although Solexa technically holds the title to the Macevicz inventions and patents.

"hereby does assign" those inventions. An "agreement to assign" is not an assignment and cannot itself transfer legal title. *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580–81 (Fed. Cir. 1991). Therefore, the Invention Agreement was not a present assignment of his inventions to AB.

Whether Dr. Macevicz breached the Invention Agreement by failing to assign his inventions or patents to AB is an issue for trial, but there can be no legitimate dispute that Dr. Macevicz never assigned his inventions or patents to AB. Instead, as reflected on the face pages of the patents themselves, Dr. Macevicz assigned his rights in the patents to Lynx, which is now Solexa. This assignment, recorded in the Patent Office, transferred legal title to Solexa. AB has never held legal title in the patents.

Accordingly, at the outset of this trial, Solexa holds legal title to the Macevicz patents.

### B.    Because Solexa owns legal title to the Macevicz patents, AB must prevail on its claims against Solexa (Illumina) to obtain injunctive relief

The fact that Solexa currently holds legal title to the Macevicz patents is significant because it means that AB can only recover title to those patents if it prevails on a claim against Solexa (Illumina) and Solexa loses on all of its affirmative defenses. Although AB ostensibly seeks damages from Solexa and Illumina, those damages are speculative and AB never provided any discovery to substantiate them. Presumably, the remedy AB really wants is an injunction ordering the Defendants to assign the Macevicz patents to AB.

Under U.S. patent law, the "general rule is that an individual owns the patent rights to the subject matter of which he is an inventor, even though he conceived it or reduced it to practice in the course of his employment."[3] The only two exceptions to this rule are where the parties have entered an express contract to the contrary or where the "employee is hired to invent something or solve a particular problem" such that there is an "implied-in-fact contract" between the parties obligating the employee to assign his inventions.[4] The

---

[3] *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000).
[4] Id.

only such contract in this case is the Invention Agreement, and it is therefore the only source of any obligation for Dr. Macevicz to assign any inventions to AB. AB's remaining claims for breach of fiduciary duty, constructive fraud, and conversion are all derivative of its breach-of-contract claims, or at best, are claims for money damages only. They cannot provide an independent basis for AB to obtain injunctive relief because Dr. Macevicz's only duty, if any, to assign his inventions is premised on his contract.

### C.    AB cannot prevail on any claims against Dr. Macevicz

#### 1.    AB has no remedy for any of its claims against Dr. Macevicz

Even if AB were to prevail on one of its claims against Macevicz, AB has no remedy available against Macevicz. AB has never pled damages against Macevicz because AB released Macevicz of any possible damages before this litigation began, and the Court denied AB's request to amend its pleading to add damages claims against Macevicz. And AB cannot obtain injunctive relief against Macevicz because Macevicz no longer holds title to the Macevicz patents (as explained above, Macevicz assigned his rights in the Macevicz patents to Lynx in 1995); he no longer has title to assign.

Because AB released Macevicz of any damages liability, and because Macevicz does not hold title to the Macevicz patents, there is no affirmative remedy available to AB for its claims against Macevicz.

#### 2.    Dr. Macevicz did not breach the assignment provision of the Invention Agreement

Dr. Macevicz did not breach paragraph 2 of his Invention Agreement, because the inventions described in the '663 application satisfied the exception criteria of paragraph 2. Under paragraph 2, Dr. Macevicz promised to assign to AB all of his inventions while employed by AB except:

> any invention, discovery, development, improvement or trade secret as to which I can prove that
>
> (a) it was developed entirely on my own time; and
>
> (b) no equipment, supplies, facility or trade secret of the Company was used in its development; and

---

1

2
>(c) (i) it does not relate to the business or actual or demonstrably anticipated research or development of the Company, or

3

4
>(ii) it does not result from any work performed by me for the Company.

5

6
The evidence at trial will prove that the inventions described in the '663 application satisfy all three of these requirements.

7

8

9

10

11

12

13

14

15

16

17

18
First, the evidence will prove (and AB cannot legitimately dispute) that Dr. Macevicz developed his sequencing-by-ligation inventions entirely on his own time. Dr. Macevicz has a long history as an independent inventor. Before he ever worked at AB, he had conceived and developed inventions on his own time, drafted and filed patent applications on his own time, and had already secured at least one issued patent for some of his inventions. He developed the sequencing-by-ligation inventions at issue here on his own time, at his home, and he drafted the '663 application entirely on his own time, at his home. He kept his notes about his sequencing-by-ligation inventions, as well as his other inventions, in his own personal journal, which he purchased from the Stanford bookstore and kept at his home. Although he brought his journal to AB so that he could have a colleague sign and date the pages evidencing his conception of his inventions, that was not part of his development of his inventions.

19

20

21

22

23

24

25

26

27

28
Second, the evidence will prove (and AB cannot legitimately dispute) that Dr. Macevicz did not use any of AB's equipment, supplies, facility or trade secret to develop his sequencing-by-ligation inventions. Although Dr. Macevicz obtained three patents for his inventions, he never actually reduced his sequencing-by-ligation inventions to practice (i.e., he never actually practiced the experimental steps of his inventions in a laboratory). He conceived the inventions in his mind, and he wrote descriptions of those inventions in his personal journal (and later, using his home computer, in the '663 application). He therefore needed little or no equipment or supplies to "develop" his inventions. He only needed his own ingenuity, his journal, and his home computer. He did not need or use any equipment, supplies, facility or trade secret of AB. AB may point to Dr. Macevicz's occasional

---

**DEFENDANTS' TRIAL BRIEF**
CASE NO: 07-CV-02845 WHA

1    use of an AB fax machine to send personal faxes, but AB cannot legitimately argue that Dr.

2    Macevicz ever used an AB fax machine to develop his inventions.

3        Third, the evidence will prove that Dr. Macevicz's inventions did not relate to AB's

4    business or AB's "actual or demonstrably anticipated" research or development in 1994-

5    1995. Dr. Macevicz's inventions relate to what are now known as "next-generation" meth-

6    ods of DNA sequencing. Back in 1994-1995, AB's DNA sequencing business was focused

7    solely on traditional methods of DNA sequencing using the Sanger method, which required

8    the use of electrophoresis to separate DNA fragments of different sizes. The only DNA se-

9    quencing machines that AB was developing, marketing, or selling in 1994-1995 relied ex-

10    clusively upon the Sanger method, including the electrophoretic separation of DNA frag-

11    ments. Indeed, AB did not develop, market or sell a single machine that relied on any other

12    method of sequencing until 2006, when it introduced the sequencing-by-ligation-based

13    SOLiD System which had been developed by Agencourt to pursue the next-generation se-

14    quencing market.

15        Fourth, the evidence will prove that Dr. Macevicz's inventions did not result from

16    any work he performed for AB.[5] Dr. Macevicz's job at AB was solely as a patent attorney.

17    AB never assigned him to research DNA sequencing methods, and certainly did not assign

18    him to research sequencing-by-ligation. Although Dr. Macevicz holds a Ph.D., he was

19    never a research scientist at AB, and he was not hired to develop inventions for AB. Al-

20    though, like many patent attorneys, Dr. Macevicz may have contributed to some inventions

21    developed by research scientists at AB, his sequencing-by-ligation inventions did not result

22    from any work he performed for the company. Rather, his inventions resulted from his own

23    thinking on his own time.

24            **3.    Defendants will not rely on California Labor Code § 2870**

25        California Labor Code § 2870 limits the extent to which an employee invention

26    ───────────────

27        [5] Exception criterion (c) in the Invention Agreement contains two subparts joined by "or." To prove that Dr. Macevicz's inventions fell within exception criterion (c), Defen-dants need only prove that they satisfied either subpart (c)(i) *or* (c)(ii). But Macevicz can

28    prove both.

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

agreement may obligate an employee to assign his own inventions to his employer. Defendants do not need to, and do not intend to, rely on § 2870 at trial. They will rely only on the express provisions of paragraph 2 of the Invention Agreement. They do not contend that those provisions exceed the limits of § 2870.

The Invention Agreement could have been written to say that Dr. Macevicz was obligated to assign all of his inventions to AB up to the extent allowed under § 2870. But the Invention Agreement is not written that way. Rather, paragraph 2 of the Invention Agreement expressly spells out the exception criteria that Dr. Macevicz must prove. Because Defendants do not contend that those criteria run afoul of § 2870, the statute has no relevance. Although paragraph 7 of the Invention Agreement mentions § 2870, it does not "incorporate" § 2870 into the agreement. Rather, the reference to § 2870 is merely a savings clause, which says that the agreement will not apply to any inventions that qualify under § 2870. Defendants will not rely on that savings clause.

### 4. AB cannot prevail based on Dr. Macevicz's alleged breach of the notice requirement in the Invention Agreement

Defendants expect AB to emphasize at trial that Dr. Macevicz did not provide AB with written notice of his inventions, thereby breaching paragraph 7 of the Invention Agreement (which obligated Macevicz to give AB written notice of any inventions "that [he] believe[d] [met] the criteria in subparagraphs 2(a), (b) and (c)").

Defendants do not dispute that Dr. Macevicz did not provide written notice of his inventions to AB. But the fact that Dr. Macevicz did not provide AB with written notice of his inventions is not evidence that his inventions fell within the assignment requirement of the Invention Agreement. Under paragraph 2 of the Invention Agreement, Macevicz was also obligated to give notice of inventions that fell <u>within</u> the assignment requirement. In other words, he was supposed to give AB notice about <u>all</u> of his inventions, whether he was obligated to assign them or not. Therefore, while his failure to give notice might have been a technical breach of the agreement, it is not evidence suggesting that he was obligated to assign his inventions to AB.

---

To the extent that Dr. Macevicz's failure to give written notice was a technical breach of the Invention Agreement, AB has no remedy. Even if Dr. Macevicz currently held title to his disputed inventions (which he does not), his mere failure to give written notice about those inventions (assuming that he was not obligated to assign them to AB) would not form a basis for injunctive relief. While AB might be able to seek some form of speculative damages for Macevicz's failure to give written notice, AB has no damages claim against Macevicz in this case. Therefore, AB's arguments about Macevicz's failure to give notice will ultimately be irrelevant.

### 5. Dr. Macevicz did not breach his fiduciary duty to AB or commit constructive fraud

AB also alleges that Dr. Macevicz breached his fiduciary duty to AB and committed constructive fraud. These claims are related because they both depend on whether Dr. Macevicz breached his fiduciary duties to AB. Defendants do not dispute that as AB's attorney, Dr. Macevicz owed AB certain fiduciary duties. But Dr. Macevicz's obligation, if any, to assign his inventions to AB stemmed from his Invention Agreement, not his fiduciary duties. AB cannot convert this contractual duty into a fiduciary duty. "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."[6] Applying this rule, this Court in *McGehee v. Coe Newnes/McGehee ULC* found that the alleged breach of the assignment provision of an invention agreement could not form the basis for a separate tort claim based on conversion because any duty "with respect to the patents and inventions necessarily arose only from contract."[7] The same is true in this case. To the extent that Dr. Macevicz owed AB a duty to assign it certain inventions, that duty arose from his Invention Agreement, not from any fiduciary duty.

Defendants expect that AB may also allege that Macevicz breached his fiduciary duties because he did not give AB written notice of his inventions. Again, just as where failure to give written notice might breach the Invention Agreement, AB has no remedy

---

[6] *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 460 (Cal. 1994) (quoting *Jones v. Kelly*, 208 Cal. 251, 255, 280 P. 942 (1929)).

[7] *McGehee v. Coe Newnes/McGehee ULC*, 2004 WL 2452855, *3 (N.D. Cal. 2004).

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

10

1  against Dr. Macevicz for any breach of fiduciary duty resulting from a failure to give writ-

2  ten notice of an invention.

3  Moreover, Dr. Macevicz was justified in not giving AB written notice of his inven-

4  tions. He would only have breached his fiduciary duty to AB if he had failed to give AB

5  notice of an important corporate opportunity. He did not. Dr. Macevicz knew that AB was

6  not interested in pursuing inventions such as his. He knew that AB had turned down the

7  opportunity to invest in one of his own sequencing inventions before, and AB had recently

8  turned down the opportunity to invest in other sequencing technology similar to Mace-

9  vicz's. Macevicz knew that AB was focused almost exclusively on refining the Sanger se-

10  quencing method and the methods of electrophoretic separation of DNA fragments used in

11  its machines. Therefore, Macevicz did not breach any fiduciary duty he may have owed to

12  AB by not telling AB about his inventions.

13  Finally, AB has suggested that Macevicz somehow breached his fiduciary duties to

14  AB by accepting the indemnity agreement that Lynx offered him in 1995. He did not. AB

15  had long known that Macevicz was doing legal work for Lynx since Lynx spun out of AB

16  in 1992. The fact that Lynx then agreed to indemnify Macevicz for his work for the com-

17  pany in 1995 does not mean that Macevicz then assumed a position adverse to AB.

**6.    Dr. Macevicz could not have wrongfully converted his own inven-
        tions, because AB never owned or possessed them**

18
19
20  AB has alleged that Dr. Macevicz converted his inventions by denying AB posses-

21  sion of the inventions. Of course, if Dr. Macevicz did not breach his Invention Agreement

22  by failing to assign his inventions to AB, then AB cannot possibly prove conversion

23  against Macevicz because AB's only claim to ownership of the Macevicz patents depends

24  on the Invention Agreement. But even if Macevicz had materially breached the Invention

25  Agreement, AB cannot prevail on the tort of conversion.

26  As discussed above, Macevicz never assigned his inventions to AB. If Macevicz had

27  been obligated to assign his inventions to AB, then AB would have been a beneficiary of

28  an agreement to assign. But in any event, AB never actually owned or possessed those in-

**DEFENDANTS' TRIAL BRIEF**
**CASE NO: 07-CV-02845 WHA**

ventions, which is a predicate to a claim for conversion. Under California law, "[w]here plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion."[8] For instance, in *Del E. Webb Corp. v. Structural Materials Co.*, a general contractor sued a supplier of roofing materials for both breach of an oral contract and conversion when the supplier failed to deliver roofing supplies for which the general contractor had already paid.[9] Although the contractor had already paid for the supplies, the court found that he could not sustain a claim against the supplier for conversion because the contractor never owned or possessed the supplies. Rather, the contractor's "checks represented payment for materials to be delivered in the future."[10] Accordingly, although the contractor could sustain a claim for a breach of an oral contract, he could not sustain his claim for conversion.[11]

Just like in *Del E. Webb*, Dr. Macevicz never actually assigned his inventions to AB. Accordingly, AB never owned or possessed those inventions, and AB therefore cannot succeed on a claim for conversion against Macevicz.

### D.  Illumina will defeat AB's claims against it

####   1.  Even if Dr. Macevicz breached a duty to AB, Illumina did not intentionally induce Macevicz to breach his obligations under the Invention Agreement, and did not aid and abet his breach of fiduciary duty

To prevail on either its intentional-interference-with-contract claim or its aiding-and-abetting claim against Illumina, AB will have to prove that Illumina (i) knew of Macevicz's obligation to AB, (ii) intended to induce him to breach his obligation, and (iii) somehow caused him to breach his obligation or substantially assisted him in breaching his obligation. AB will be unable to prove any of these elements. Even if AB can show that employee invention agreements were common in the relevant industry in 1995, that would not

---

[8] *Moore v. Regents of the Univ. of Cal.*, 793 P.2d 479, 488 (Cal. 1990) (quoting *Del E. Webb Corp. v. Structural Materials Co.*, 176 Cal. Rptr. 824, 833 (Cal. Ct. App. 1981)).

[9] *Del E. Webb Corp. v. Structural Materials Co.*, 176 Cal. Rptr. 824, 827-28 (Cal. Ct. App. 1981).

[10] *Id.* at 833.

[11] Id.

mean that Illumina knew that Dr. Macevicz was obligated to assign his particular inventions to AB. And even assuming *arguendo* that someone at Illumina knew that Dr. Macevicz had executed the Invention Agreement with AB (and there is no evidence of that), a reasonable person at Illumina could have believed that Macevicz was not obligated to assign his inventions to AB because he developed them on his own time, he was not a member of the research group at AB, and the inventions did not pertain to the DNA sequencing machines that AB was selling and developing, which relied exclusively on Sanger sequencing.

### 2. Illumina could not have wrongfully converted Macevicz's inventions because AB never owned or possessed them

AB cannot succeed on its conversion claim against Illumina for the same reason it cannot succeed on its conversion claim against Macevicz: AB never owned or possessed the Macevicz inventions.[12]

### 3. AB cannot prove damages against Illumina

AB never produced any information during discovery to substantiate any damages against Illumina for its alleged wrongful conduct in acquiring the Macevicz patents. In its proposed jury instructions, AB says that it seeks attorney fees from Illumina, but under California law, which follows the American Rule, AB cannot recover attorney fees as damages from Illumina. To the extent that AB seeks any other category of damages, AB never substantiated those damages during discovery and never provided any expert testimony to substantiate those damages.

### E. The statutes of limitations cut off any affirmative relief against the Defendants

The applicable California statutes of limitations provide an additional reason that AB will be unable to recover any relief against the Defendants. Dr. Macevicz is entitled to rely upon California Code of Civil Procedure § 340.6, which sets a special four-year statute of limitations within which actions against an attorney for any "wrongful act or omission,

---

[12] *See* section II.C.6., *supra*.

other than for actual fraud" must be commenced.[13] The statute applies for both tort claims and breach-of-contract claims against an attorney related to the attorney's professional services.[14] Under § 340.6, AB's claims against Dr. Macevicz are barred because he committed his alleged wrongful acts in 1995, more than four years before AB filed this lawsuit.

The statutes of limitations also bar AB's claims against Illumina because AB knew, through the knowledge of its own employees, the necessary facts to put it on actual notice of its claims against Macevicz more than four years before AB filed this action. By the time he joined AB's legal department in 1999, AB's own in-house patent attorney, Vincent Powers, knew that Dr. Macevicz was a patent attorney at AB when he filed the '663 application in 1995, prosecuted the Macevicz patents from 1995 to 1999, and knew that the '341 patent had issued to Dr. Macevicz and was assigned to Lynx (not AB) in 1998. Moreover, Paul Grossman, also a member of the AB legal department, had worked with Dr. Macevicz while he was at AB in 1994-1995 and witnessed Dr. Macevicz's personal journal in which he recorded his conceptions of his inventions. The combined knowledge of Drs. Powers and Grossman means AB knew about its potential claims against Macevicz by the time Dr. Powers joined AB in 1999.

## F.    Illumina's bona-fide-purchaser-for-value defense is a complete defense to AB's ownership claims

Illumina will prove at trial that when Lynx acquired the '663 application (and any resulting patents) in 1995, it was a bona fide purchaser for value. To prove that Lynx was a bona fide purchaser for value, Illumina will show that Lynx paid Dr. Macevicz value for the assignment of the '663 application and that Lynx did not know, and should not have known, that Dr. Macevicz was obligated to assign his inventions or patent applications to AB.

---

[13] Cal. Civ. Proc. Code § 340.6 (four-year statute of limitations).

[14] *Stoll v. Superior Court*, 12 Cal. Rptr. 2d 354, 357 (Cal. Ct. App. 1992) (applying section 340.6 to breach of fiduciary duty claim against an attorney); *Southland Mech. Constructors Corp. v. Nixen*, 173 Cal. Rptr. 917, 924 (Cal. Ct. App. 1981) (holding that section 340.6 applies to breach of contract claims against an attorney).

1    The evidence at trial will establish that when Dr. Macevicz assigned his inventions

2    to Lynx, Lynx paid him value in the form of 20,000 stock options in Spectragen (which

3    was then a wholly-owned subsidiary of Lynx). Moreover, no one at Lynx knew, or should

4    have known, that Dr. Macevicz was obligated to assign his inventions to AB. Even if AB

5    were to establish that someone at Lynx knew that employee invention agreements were

6    common in the relevant industry, there is no reason to believe that they knew that Dr.

7    Macevicz was obligated to assign his particular inventions to AB. Nor would they reasona-

8    bly have suspected it: because Lynx was a spin-off of AB, everyone at Lynx was intimately

9    familiar with AB's business, and no one at Lynx would have reasonably thought at that

10   time that Dr. Macevicz's inventions related to AB's business or resulted from Dr. Mace-

11   vicz's work as a patent attorney at AB. Moreover, people at Lynx understood that Dr.

12   Macevicz developed inventions on his own time, and they knew that Macevicz was a patent

13   attorney for AB, not a researcher.

14   Illumina's bona-fide-purchaser-for-value defense is a complete defense for Illumina

15   against AB's claims, and it cuts off any "equitable title" that AB might claim in the inven-

16   tions.[15]

17   **G.     AB's equitable title defense is a limited defense personal to AB**

18   Assuming that AB does not succeed on any of its claims against Illumina during the

19   ownership trial, the Court will be unable to order Illumina to assign the Macevicz patents to

20   AB. But even in that event, if AB should prove at trial that Macevicz breached the assign-

21   ment provision of his Invention Agreement *and* Illumina were not to prevail on its bona-

22   fide-purchaser-for-value defense, the Defendants would agree that AB would be vested

23   with "equitable title" in the Macevicz patents, which may be a defense to Illumina's patent

24   infringement claims against AB ("Equitable title may be defined as the 'beneficial interest

26   [15] *See, e.g., Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991)
27   ("It is well established that when a legal title holder of a patent transfers his or her title to a
     third party purchaser for value without notice of an outstanding equitable claim or title, the
     purchaser takes the entire ownership of the patent, free of any prior equitable encum-
28   brance.").

---

**DEFENDANTS' TRIAL BRIEF**
**CASE NO: 07-CV-02845 WHA**

of one person whom equity regards as the real owner, although the legal title is vested in another.'").[16]

But AB's equitable title defense is not a complete defense to Solexa's infringement counterclaims; the defense is only available if AB proves that Dr. Macevicz breached the assignment provision of the Invention Agreement, and AB's equitable title defense is only a defense for AB, it is not a defense that can be used against Solexa's claims that Agencourt infringed the Macevicz patents <u>before</u> AB acquired Agencourt.

### 1.    Equitable title vests in AB only if AB proves that Macevicz breached the assignment provision of the Invention Agreement

AB can only secure equitable title in the Macevicz patents if it proves that Dr. Macevicz breached the assignment provision of the Invention Agreement. If Dr. Macevicz only breached the written notice provision of the Invention Agreement, or only breached a fiduciary duty, but did not breach the assignment provision of the Invention Agreement, then AB cannot recover equitable title in the Macevicz patents.

This is true for at least two reasons. First, under U.S. patent law, an employee is entitled to keep his own inventions unless an express contract or an implied-in-fact contract between the employee and employer provides otherwise.[17] The only such contract in this case is the Invention Agreement between AB and Macevicz. But if the assignment provision of that agreement does not apply to the Macevicz patents, then Dr. Macevicz had no obligation to assign the inventions to AB, and AB cannot be vested with equitable title.

Second, as explained above, AB cannot convert Macevicz's contractual obligation to assign his inventions into tort liability. Instead, Macevicz's obligation, if any, to assign his inventions arose solely out of his contractual duty.[18]

---

[16] *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.3 (Fed. Cir. 1991) (quoting *Black's Law Dictionary* 1486 (6th ed. 1990)).

[17] *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000).

[18] *See* section II.C.5., *supra*; *see also McGehee v. Coe Newnes/McGehee ULC*, 2004 WL 2452855, *3 (N.D. Cal. 2004) (finding that the alleged breach of the assignment provision of an invention agreement could not form the basis for a separate tort claim based on conversion because any duty "with respect to the patents and inventions necessarily arose only from contract").

---

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

16

2.    **Even if equitable title is a defense for AB, it is not a defense for Agencourt's activities before AB acquired Agencourt**

Equitable title may be a defense to patent infringement for AB, but it is not a defense that AB can use to avoid liability for Agencourt's infringement of the Macevicz patents before AB acquired Agencourt. Although this scenario rarely arises, if one party holds legal title to a patent and another holds equitable title, a third party cannot defend against a claim of infringement brought by the legal title holder on the basis that the third party holds equitable title. As Professor Chisum explains, "it is no defense that the claimant obtained or retains title in breach of a contractual or other obligation to *another* (such as a contractual obligation to assign the patent to an employer or former employer)."[19] Accordingly, even if AB were to prevail on its equitable title defense, Solexa is entitled to pursue its infringement claims with respect to Agencourt's infringement before AB acquired Agencourt.

## III.    SOLEXA'S INFRINGEMENT CLAIMS
### A.    Infringement of the '341 patent claims by the one-base-encoding version of the SOLiD System

In light of the Court's August 22, 2008 Order granting summary judgment of non-infringement of the asserted claims of the '341 and '597 patents by the two-base-encoding versions of the SOLiD System, the only issues remaining for trial with regard to these patents concern past infringement by the one-base-encoding version of the SOLiD System. Solexa will present evidence, including AB's documents and the testimony of fact and expert witnesses, to establish that the one-base-encoding version of the SOLiD System developed and used at Agencourt satisfied all limitations of the asserted claims of the '341 patent, either literally or under the Doctrine of Equivalents. Much of the documentary evi-

---

[19] 8 *Chisum on Patents* § 21.03[2][f], at 21-274 (2006) (emphasis added); *see also Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572-73 (Fed. Cir. 1991) (noting that the defense of "*jus tertii* (title in a third person)" has been rejected in recent cases); *Mercantile Nat'l Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031, 1034 (7th Cir. 1975) ("It has long been settled that a third party's equitable rights in a patent may not be asserted as a defense in an action for infringement brought by the owner of title to the patent."); *Dorr-Oliver, Inc. v. United States*, 432 F.2d 447, 451 (Ct. Cl. 1970) ("In patent litigation between private parties, equitable rights of ownership of strangers to the suit cannot be raised as defenses against the legal titleholder of a patent.").

1    dence that will be relied upon at trial was presented and discussed in Solexa's Motion for

2    Summary Judgment of Infringement, and for the sake of brevity that discussion will not be

3    repeated here.

4         With regard to the one-base-encoding version of the SOLiD System, AB's *only* non-

5    infringement argument concerning claim 1 of the '341 patent is that the AB primer (the

6    "initializing oligonucleotide" recited in claim 1) used in the one-base-encoding version of

7    the SOLiD System hybridized to an "adapter," which AB contends cannot be part of the

8    "target polynucleotide" recited in step (a) of claim 1. Solexa contends that, when properly

9    construed, the term "target polynucleotide" can encompass both unknown and known se-

10   quences, such as AB's adapter. This was discussed at length in Solexa's recent summary

11   judgment briefs, and again, in the interest of brevity, that discussion will not be repeated

12   here.

13        If the Court agrees with Solexa, then the one-base-encoding version of the SOLiD

14   System literally infringes claim 1 of the '341 patent. Alternatively, if the Court agrees with

15   AB, then infringement of claim 1 of the '341 under the Doctrine of Equivalents must be

16   resolved at trial, where Solexa will offer evidence that the one-base-encoding version of the

17   SOLiD System satisfies the "target polynucleotide" claim limitation under the Doctrine of

18   Equivalents because the hybridization of AB's primer to its adapter performs the same

19   function in the same way to achieve the same result as the hybridization recited in the

20   claim.

21        Solexa has also asserted claims 2, 6, 7, 8, 11, 12, and 16-18 against the one-base-

22   encoding version of the SOLiD System. Because the remaining asserted claims of the '341

23   patent are directly or indirectly dependent from claim 1, AB argues that none of these

24   claims are infringed unless the "target polynucleotide" limitation in claim 1 of the '341

25   patent is satisfied. If the Court adopts Solexa's proposed construction for "target polynu-

26   cleotide," Solexa will present testimonial and documentary evidence that the additional

27   limitations of the asserted dependent claims are literally satisfied by the one-base-encoding

28   version of the SOLiD System. With regard to claims 2, 6 and 7, AB has offered no addi-

1    tional non-infringement argument for the one-base-encoding version of the SOLiD System.

2         Claims 8 and 18 of the '341 patent recite, *inter alia*, that the extension probes con-

3    tain a "phosphoramidate" linkage; because the AB probes used in the one-base-encoding

4    version of the SOLiD System use a "phosphorothiolate" linkage, Solexa contends that

5    claim 8 of the '341 patent is infringed under the Doctrine of Equivalents, and will present

6    evidence at trial that the substituted linkage performs the same function in substantially the

7    same way to achieve substantially the same result as the recited linkage. There will likely

8    be considerable overlap between the evidence offered regarding the "phosphoramidate"

9    limitation in these claims and in claim 1 of the '119 patent.

10        AB argues that claims 11, 12, and 16-18 are not infringed because the SOLiD Sys-

11   tem allegedly does not use separate aliquots each having the same sequence, does not use

12   different primers in each aliquot that hybridize to different parts of the target polynucleo-

13   tide during the same rounds of sequencing, and does not carry out the steps (b) to (e) inde-

14   pendently on each aliquot. Resolution of one or more of these issues at trial may be com-

15   plicated because the Court has not yet construed the additional terms at issue in these

16   claims, such as "separate aliquots" and "carried out independently." Depending on the out-

17   come of the Court's construction, Solexa will present testimonial and documentary evi-

18   dence that the additional limitations of these asserted dependent claims are literally satis-

19   fied by the one-base-encoding version of the SOLiD System.

20        Finally, Solexa is prepared to offer documentary and testimonial evidence that AB's

21   predecessor, Agencourt Personal Genomics, practiced the inventions recited in the asserted

22   claims of the '341 patent.

23   **B.    Infringement of the '597 patent by the one-base-encoding version of the
             SOLiD System**

24

25        Solexa contends that the one-base-encoding version of the SOLiD System used by

26   Agencourt infringed claim 1 of the '597 patent. Solexa will present evidence, including

27   AB's documents and the testimony of fact and expert witnesses, to establish that the one-

28   base-encoding version of the SOLiD System satisfied all claim limitations of claim 1 of the

---

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

'597 patent, either literally or under the Doctrine of Equivalents. Much of this evidence was discussed in Solexa's recent motion for partial summary judgment.

In contrast, AB has offered no expert opinion, other testimony, or evidence regarding how the one-base-encoding version of the SOLiD System failed to satisfy any limitation of claim 1 of the '597 patent. Instead, in response to Solexa's motion for partial summary judgment that the one-base-encoding version of the SOLiD System infringed claim 1 of the '597 patent, AB argued only that its infringement was excusable because it was allegedly "*de minimis*" and was subject to AB's equitable ownership defenses. At trial, Solexa expects to present testimonial and documentary evidence in connection with both the ownership and infringement cases that will establish that Agencourt's infringement was not *de minimis* and which will defeat AB's equitable defenses.

### C. Infringement of the '119 patent by the one-base-encoding and two-base-encoding versions of the SOLiD System oligonucleotide probes

Solexa contends that the various one-base-encoding and two-base-encoding probes ("the accused AB probes") made by or on behalf of, used, sold and/or offered for sale by AB and/or Agencourt infringe claim 1 of the '119 patent. In the event that AB refuses to stipulate, Solexa will present documentary and testimonial evidence that the accused probes literally satisfy all but one limitation of the asserted claim, and will present evidence that the accused probes satisfy the remaining limitation under the Doctrine of Equivalents.

The only issue for trial regarding infringement of this claim is whether the "linker group" between the 3′ and 5′ portions of the accused AB probes, which consists of a phosphorothiolate bond, is equivalent to the linker group recited in the claim, which is a phosphoramidate bond. More precisely, the issue for trial is whether the sulfur atom used in the accused AB probes is functionally equivalent to the nitrogen atom recited in the claims. As stated above, Solexa expects to offer testimony that, in the context of the structure recited in the claim, the substituted atom performs the same function in the same way to achieve the same result and therefore satisfies the claim under the Doctrine of Equivalents.

1    **IV.    SOLEXA'S REQUESTED REMEDIES**

2          As demonstrated in the recent briefing on the parties' cross-motions for summary

3    judgment, Solexa contends that AB has been and is infringing the patents-in-suit based on

4    its use and its inducement of, and contribution to, its customers' use of a "two-base encod-

5    ing" version of the SOLiD System. However, Solexa also contends that an independent

6    company, Agencourt Personal Genomics ("Agencourt"), separately developed and used

7    both a two-base-encoding version and a one-base-encoding version of the SOLiD System,

8    commencing in 2005 and continuing to at least April 2006. AB acquired Agencourt in July

9    2006 in order to then commercialize the SOLiD System.

10         Solexa contends that both companies, AB and Agencourt, are liable for their respec-

11    tive infringement of the patents; however, their alleged infringing activities are of a differ-

12    ent nature and occurred at different times. Also, the '119 patent is directed to an oligonu-

13    cleotide probe which Agencourt is charged to have infringed with its "one-base encoding"

14    and "two-base encoding" versions of its SOLiD System probes and which AB infringes by

15    virtue of its manufacture, use and sale of its "two-base-encoding" versions of those probes.

16         **A.    Solexa requests that the Court enter a preliminary and permanent
             injunction**

17

18         At the close of Phase Two of the trial, Solexa will request that the Court enter both a

19    preliminary and a permanent injunction against AB's manufacture, use, marketing and sale

20    of the "one-base-encoding" or "two-base-encoding" versions of the SOLiD System oli-

21    gonucleotide probes and against any future use of the one-base-encoding version of the

22    SOLiD System. Solexa will be prepared at that time to present evidence as to why such an

23    injunction is warranted.

24         **B.    Solexa is entitled to damages equivalent to both a lump-sum
             developmental use license and an ongoing reasonable royalty**

25

26         During the Phase Two trial, Solexa will present expert testimony (as well as factual

27    testimony from AB's fact witnesses and one or more Illumina fact witnesses) from Dr. Ge-

28    rald Siuta, who will explain why Agencourt's and AB's infringements of the patents-in-suit

---

**DEFENDANTS' TRIAL BRIEF**
**CASE NO: 07-CV-02845 WHA**

1   warrant compensation to Solexa in the form of both the equivalent of a fully paid-up "de-

2   velopmental use" license and an ongoing reasonable royalty. Dr. Siuta's testimony will fo-

3   cus on factors including the following: (i) Agencourt's development of the SOLiD System

4   involved using both the "one-base-encoding" and the "two-base-encoding" versions of the

5   SOLiD System, such that Agencourt would have needed a royalty-bearing license under

6   the patents-in-suit from Solexa; (ii) Agencourt would have required a technology ac-

7   cess/developmental use license (which would not have extended to commercial sales, but

8   would have allowed for a further commercial license to be later negotiated with a commer-

9   cializing entity); (iii) AB's commercialization and sales of the two-base-encoding versions

10  of the SOLiD System would have required a commercial product license in which a royalty

11  rate would be applied to each sale of the SOLiD System; and (iv) under the '119 patent,

12  Solexa would be entitled to a reasonable royalty based upon AB's sales of its two-base-

13  encoding SOLiD System probe kits.

14          The Court's August 22, 2008 Order held that AB does not infringe the '341 and

15  '597 patents by making, using, or selling its commercial two-base-encoding version of the

16  SOLiD System, so the case proceeding to trial will be directed to (i) Agencourt's use of the

17  one-base-encoding version of the SOLiD System, including its use of the one-base-

18  encoding SOLiD System probes; (ii) Agencourt's use of the two-base-encoding version of

19  such probes; and (iii) AB's manufacture, use and sale of it's the two-base-encoding ver-

20  sions of the SOLiD System probes. Thus, all of the patents-in-suit remain at issue in the

21  case for infringement against Agencourt, while only the '119 patent remains at issue in the

22  case for infringement against AB.

23          As to Agencourt, Dr. Siuta will testify that the date of hypothetical negotiation

24  would be not later than September 2005. Dr. Siuta will testify that Agencourt's hypotheti-

25  cal negotiation with Solexa would have been for a developmental use license under all of

26  the patents-in-suit. Dr. Siuta will testify that Agencourt would have been interested in en-

27  tering into a developmental use license covering all possible versions of its SOLiD System

28  by September 2005 (there is no evidence that by September 2005, Agencourt reasonably

DEFENDANTS' TRIAL BRIEF
CASE NO: 07-CV-02845 WHA

1    believed that the two-base-encoding versions of the SOLiD technology would be found not

2    to infringe the '341 and '597 patents, as this Court recently found). Consistent with his ex-

3    pert report, Dr. Siuta will testify that Agencourt's lump-sum payment to Solexa for such a

4    developmental use license would have been on the order of $10 million to $20 million.

5         Given the Court's August 22, 2008 Order, the remaining infringement case against

6    concerns AB's manufacturing, use and sales of its two-base-encoding oligonucleotide

7    probes for use in its commercial SOLiD System under the '119 patent. Consistent with his

8    expert report, Dr. Siuta will testify that the parties' negotiation at the time AB's infringe-

9    ment of this patent commenced would have led to a royalty rate of 15% on each sale of the

10   SOLiD System Sequencing Probes kits.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated: August 29, 2008                Respectfully submitted,

2                                            /s/    John R. Labbé

3                                          THOMAS I. ROSS (admitted *pro hac vice*)
                                           KEVIN M. FLOWERS (admitted *pro hac vice*)
4                                          JEFFREY H. DEAN (admitted *pro hac vice*)
                                           MARK H. IZRAELEWICZ (admitted *pro hac vice*)
5                                          JOHN R. LABBE (admitted *pro hac vice*)
6                                          CULLEN N. PENDLETON (admitted *pro hac vice*)
                                           MARSHALL, GERSTEIN & BORUN LLP
7                                          6300 Sears Tower
                                           233 South Wacker Drive
8                                          Chicago, Illinois 60606-6357
9                                          (312) 474-6300 (telephone)
                                           (312) 474-0448 (facsimile)
10                                         E-Mail: tross@marshallip.com
11                                         E-Mail: kflowers@marshallip.com
                                           E-Mail: jdean@marshallip.com
12                                         E-Mail: mizraelewicz@marshallip.com
                                           E-Mail: jlabbe@marshallip.com
13                                         E-Mail: cpendleton@marshallip.com

14
                                           Counsel for Defendants
15                                         ILLUMINA, INC., SOLEXA, INC.,
16                                         and STEPHEN C. MACEVICZ

17

18

19

20

21

22

23

24

25

26

27

28