# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| APPLERA CORPORATION—APPLIED BIOSYSTEMS GROUP, a Delaware corporation,<br><br>　　　　Plaintiff/Counterdefendant,<br><br>- vs. -<br><br>ILLUMINA, INC., a Delaware corporation, SOLEXA, INC., a Delaware corporation, and STEPHEN C. MACEVICZ, an individual,<br><br>　　　　Defendants/Counterclaimants. | Case No. 07-CV-02845 WHA<br><br>District Judge William H. Alsup |

**EXPERT REBUTTAL STATEMENT OF KEITH C. BACKMAN, PH.D.**

EXHIBIT 2

I, Keith C. Backman, Ph.D., have been retained by Solexa, Inc. to testify as an expert in the above-captioned action. I submit this Statement in compliance with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure. I expect to testify at trial regarding the matters discussed in this Statement, if asked by the Court or the parties' attorneys.

## I. Qualifications[1]

1.  I provided a detailed recitation of my qualifications in my expert report on the issue of infringement, which is incorporated herein by reference. I have included an updated curriculum vitae as Exhibit A hereto.

## II. Previous testimony

2.  I described my previous testimony in legal proceedings in my expert report on the issue of infringement, which is incorporated herein by reference.

## III. Compensation

3.  For the time I have spent on my investigation, for my time spent preparing this expert report, and for my time spent testifying in this case, I am being paid at my normal consulting rate of $300 per hour. My compensation is not affected by the content of my testimony or the outcome in this case.

## IV. Information considered

4.  In the course of my investigation in this case and in preparing this expert report, I reviewed the patents-in-suit (U.S. Pat. Nos. 5,750,341 ("the '341 patent"), 5,969,119 ("the '119 patent") and 6,306,597 ("the '597 patent"); the expert report of Dr. D. Ross Sibson; the expert report of Dr. Michael L. Metzker; prior art cited in the reports of Drs. Metzker and Sibson; the prior art cited on the face of the patents-in-suit; the April 16, 1996 Office Action in the

---

[1] Headings and sub-headings are provided in this report for ease of reference. They are not intended, and should not be construed, to be limiting in any way.

1

EXHIBIT 2

prosecution of U.S. Patent Application Serial Number 08/424,663 (ILL000263-270); the "Amendment" dated October 16, 1996 in the prosecution of U.S. Patent Application Serial Number 08/424,663 (ILL000280-291); "Twenty-Five Years of Advancing Science," Applied Biosystems (June 2006) (Dkt. No. 74-2); AB Press Release, "PE Biosystems Announces Launch of ABI Prism® 3100 Genetic Analyzer," April 25, 2000 (ILL031627-28); Judge Alsup's "Claim Construction Order" dated February 21, 2008 (Dkt. No. 133); and the other materials cited herein.

**V.  Summary of opinions to be expressed**

5.  I have reviewed the reports submitted by Dr. Metzker and Dr. Sibson on May 30, 2008, and the documents cited in those reports.

6.  I disagree with the Drs. Metzker and Sibson's conclusion that the asserted claims in the Macevicz patents are invalid.

7.  In my opinion, Drs. Metzker and Sibson do not offer a sufficiently detailed analysis from which one could conclude that any of the asserted claims in the Macevicz patents are invalid. Although they cite references that disclose some limitations recited in the asserted claims of the Macevicz patents, they fail to cite a single reference that disclosed all of the limitations of any single claim, and they fail to show that one of ordinary skill in the art in 1994-95 would have put the various limitations discussed in the prior-art references together to yield any of the claimed inventions with a reasonable expectation of success.

8.  The Macevicz '341 and '597 patents claim methods for sequencing polynucleotides using a particular sequence of steps, and then repeating those steps as many times as is necessary to obtain the sequence of the polynucleotide, by which is meant the complete identity of every nucleotide in a contiguous series of nucleotides. Drs. Metzker and Sibson liberally borrow from various references that were not directed to sequencing, and

## 2. Brennan did not render claim 8 of the '341 patent obvious

140. It would not have been obvious to one of ordinary skill in the art in 1994-95 to combine the compounds discussed in Mag with the method discussed in Brennan to yield the method recited in claim 8.

141. Claim 8 includes all of the limitations in claims 1, 2, and 7, and adds an additional limitation that specifies a particular type of chemically scissile internucleosidic bond.

142. Claim 8 would not have been obvious to one of ordinary skill in the art in 1995 for at least the same reasons that claims 1, 2, and 7 would not have been obvious to one of ordinary skill in the art. Specifically, Brennan did not disclose a sequencing method that used repetitive cycles, and did not disclose the step of identifying a nucleotide in an extended duplex within each cycle. It would not have been obvious to one of ordinary skill in the art in 1994-95 to combine Brennan with any prior-art reference because Brennan did not teach the sequential steps of claim 1, or the repetition of those steps. Whether Mag disclosed a phosphoramidate bond does not cure that defect.

### a. Specific rebuttals to Drs. Metzker and Sibson's arguments that Brennan rendered claim 8 of the '341 patent obvious

143. Drs. Metzker and Sibson fail to address the fact that Brennan did not teach the sequential steps of identification step, step (c), and the generating an extendable probe terminus, step (d), as is recited in claim 1 of the '341 patent. Brennan only generated information that was used to determine sequence information about a target <u>after</u> all of the ligation steps were complete. Drs. Metzker and Sibson offer no reference to be combined with Brennan that taught the generation of information that could be used to determine sequence information about a target (i.e., the identification of a nucleotide) prior to the generation of an extendable probe terminus within each cycle. Whether Mag taught a phosphoramidate linkage does not in any way

**41**

EXHIBIT 2

cure the underlying defect of Brennan with respect to the obviousness of claims 1, 2, and 7. Drs. Metzker and Sibson also fail to address the fact that claim 1 requires a particular sequence of steps, and in so doing fail to appreciate the differences between Brennan and the method claimed in claim 8 of the '341 patent.

144.    Dr. Sibson's citation of Southern is wholly mistaken. He states that "Southern 1995 describes the synthesis of oligonucleotide using phosphoramidate chemistry." (Sibson Report, at p. 18.) In fact, however, Southern only discussed the synthesis of oligonucleotides using phosphoramid**ite** chemistry (Southern, at p. 42). The difference between these two chemistries is basic and was well-known to one of ordinary skill in the art in 1995. Nowhere in Southern was there a reference to phosphoramidates or the chemistry to synthesize phosphoramidates.

145.    Dr. Sibson's citation of Sibson is also unavailing. Sibson did not teach the generation of an extendable probe terminus by cleaving a phosphoramidate. First, Sibson did not disclose the generation of an extendable probe terminus by cleaving a chemically scissile internucleosidic linkage. Sibson was not published until July 27, 1995, which is after the filing date of Dr. Macevicz's patent application. I understand that Sibson is therefore not available to use as a prior-art reference against the claims of the Macevicz patents. Dr. Sibson seems to admit that Sibson does not qualify as prior art, so his citation to Sibson in this context is puzzling. (Sibson Report, at p. 18.) Furthermore, Sibson discussed the use of restriction enzymes to cleave internucleosidic linkages, not chemical means to cleave the internucleosidic linkages, as is required by the limitation of claim 8 that requires the use of a "a chemically scissile internucleosidic linkage."

146. Sibson actually taught away from cleaving internucleosidic linkages to regenerate an extendable probe terminus. Sibson discussed the use of an oligonucleotide where the "nucleotides are joined by phosphorothioate linkages so that they are *exonuclease resistant*." (Sibson, at p. 45, lines 5-7) (emphasis added). Sibson discussed the use of phosphorothioate linkages as a means to prevent the cleaving of those linkages, not as an affirmative statement that those linkages are scissile by chemical or any other means.

147. It is also important to note that both Brennan and Sibson were reviewed and considered by the examiner during the prosecution of the '341 patent as noted by the listing of those references on the face of the '341 patent under the section "References Cited." Therefore, the arguments involving the combination of Brennan with Sibson proposed by Dr. Sibson were considered by the U.S. Patent & Trademark Office and rejected. I understand that when references are used to establish anticipation or obviousness that were also considered by the patent examiner during the prosecution of the patent, there is a significantly higher standard that must be met in establishing invalidity based on those references. As no detailed arguments were offered by Dr. Sibson, it is my opinion that with respect to any combination of Brennan and Sibson (of which I understand none are legally permissible), not even the most basic standard for obviousness has been met and I defer to, and concur with, the Patent Office's decision in this matter.

## XIII. Claim 11 of the '341 patent is not invalid

148. Claim 11 depends from claim 1, so it includes all of the limitations of claim 1 and adds the additional limitations that: (1) step (a) of claim 1 of the '341 patent include, providing in separate aliquots, a plurality of different target/initializing oligonucleotides complexes; and (2) the target polynucleotide is the same in each aliquot, but the initializing oligonucleotide in each

nucleotides. The fragments were then capped with a moiety for immobilization on a solid support, immobilized, and then sequenced by single-molecule nuclease digestion (*see, e.g.*, Brennan, at Figs. 5 and 6, and col. 9, line 11 to col. 10, line 17).

277.    Nowhere in Brennan was there a teaching of identification of a nucleotide in the probe-target duplex, and neither can such identification be inferred from Brennan (or Southern). Accordingly, the combination of Brennan and Southern would not result in the claimed invention, which inherently requires in step (b) that the identification occur in the probe-target duplex.

278.    I understand that "obviousness" requires that, if each and every limitation of the claimed invention was not anticipated by a particular prior-art reference, then some logical combination of prior-art references could be used to infer the claimed invention. I am unaware of any other prior-art reference available in April, 1995 that, when combined with Brennan, rendered claim 1 of the '597 patent obvious to one of ordinary skill in the art.

## XIX. Claim 1 of the '119 patent is not invalid

279.    I have reviewed the specification and claims of the '119 Patent.

280.    Claim 1 of the '119 patent describes an oligonucleotide probe of the form:

$$HO\text{-}(3')(B)_j\text{-}OP(=O)(O\text{-})NH\text{-}(B)_k\text{-}Bt^*$$

where

B is a nucleotide or an analog thereof;

$(B)_j$ represents an oligonucleotide (or analog) of length between 1 and 12;

$(B)_k$ represents an oligonucleotide (or analog) of length between 1 and 12,

but the where the total length of $(B)_j$ and $(B)_k$ is between 2 and 12 nucleotides;

$Bt^*$ is a labeled, non-extendable chain-terminating moiety;

and $-OP(=O)(O\text{-})NH-$ is a scissible phosphoramidate linking group that can be selectively cleaved using, for example, exposure to acid.

82

EXHIBIT 2

### A. Claim 1 of the '119 patent was not anticipated by Mag

281. I reviewed Mag, and in my opinion Mag did not anticipate claim 1 of the '119 patent.

282. Mag discussed the synthesis of a self-complementary oligonucleotide dodecamer containing a 3' phosphoramidate linking group with the chemical formula 12:d[AGAGAT$_{NH}$pATCTCT], where the $_{NH}$p is another way of representing a phosphoramidate linking group.

283. By "anticipate," I understand that a reference, here Mag, had to have disclosed each and every limitation in the claim. With regard to the claim 1 in the '119 patent, this required an oligonucleotide between 2 and 12 bases in length with a scissible phosphoramidate linking group between two of the oligonucleotide bases and a labeled, non-extendable, chain-terminating moiety at the 5' end. While Mag discussed the synthesis of a dodecamer containing a phosphoramidate linking group, Mag did not teach such an oligonucleotide additionally containing a labeled, non-extendable, chain-terminating moiety at the 5' end. In fact, the oligonucleotides discussed by Mag did not contain any type of detectable label. Therefore, Mag did not anticipate claim 1 of the '119 patent.

284. Neither Dr. Metzker nor Dr. Sibson actually argue that Mag anticipated claim 1 of the '119 patent.

285. Dr. Sibson seems to suggest that Mag disclosed a dodecamer containing a label. (Sibson Report at p. 11.) Specifically, Dr. Sibson states that the dodecamer of Mag "contains a 5' O-(dimethoxytrityl) (DMTO) protecting group…[t]he DMTO protecting group is a non-extendable, chain-terminating moiety." Dr. Sibson is mistaken about what was discussed in Mag. The dodecamer discussed in Mag did not have a "DMTO" group attached to it. The only explanation for Dr. Sibson's mistake is that he confused the compound **11** discussed in Mag with

83

EXHIBIT 2

the dodecamer **12**. The only compounds discussed in Mag that contained a "DMTO" group were nucleosidic dimers, such as structures **11a-d.** These dimers, however, were not the dodecamer discussed in Mag, but rather intermediates in the synthesis of the final dodecamer. In fact, the process for making the dodecamer **12** caused the removal of the DMT (i.e., the free dimethoxytrityl group, unattached through an O atom) group that is found in structure **11**. Instead, Mag discussed visualizing the removed DMT group when structure **11** is incorporated into the dodecamer (as the sixth and seventh nucleotides added to the dodecamer **12**). Therefore, Mag did not disclose a dodecamer having a phosphoramidate internucleosidic linkage with a DMTO attached at the 5' end of the dodecamer.

286.    Dr. Sibson also mistakenly argues that the "DMTO" group served as a label, referring to the fact that, when it was cleaved during synthesis, one monitored the progress of the process by measuring the free dimethoxytrityl (DMT) group by "color quantitation at 498 nm." In fact, the DMTO group, when attached to a nucleotide base as shown in the figure, is colorless and consequently did not serve as an effective label. It is only when the DMTO group is cleaved from the oligonucleotide chain and washed away that colorimetric analysis at 498 nm is effective. As such, the DMTO group, even at an intermediate step in the synthesis, was not a label. And, in addition, the DMTO group was not present in the final dodecamer that Mag discussed. Consequently, Mag did not anticipate claim 1 of the '119 patent.

### B.   Claim 1 of the '119 patent was not obvious to one of ordinary skill in the art in 1994-95

287.    Mag, alone or in combination with any of the prior-art references cited by Drs. Metzker and Sibson, did not render claim 1 of the '119 patent obvious to one of ordinary skill in the art in 1994-95.

288. I understand that to establish that claim 1 was obvious it must be established by clear and convincing evidence that the cited combination of prior-art references together disclosed all of the limitations of the claim, and that one of ordinary skill in the art in 1994-95 would have been motivated to combine the references and would have had a reasonable expectation of success in that combination to arrive at the claimed invention.

289. I understand that the law requires a showing that one of ordinary skill in the art would have been motivated to combine two references to avoid the improper use of hindsight, i.e., the inclination to view the claimed invention as more predictable now than it actually was in 1994-95. One common way that hindsight is employed, and in my opinion is being employed by Drs. Metzker and Sibson, is to use the invention as a guide to choose the prior-art disclosures to be considered in the combination. With hindsight, many inventions appear obvious because most inventions are combinations of previously known elements. Therefore, I understand it is important to ensure that one does not consider the claimed invention itself when considering whether to combine two references.

290. One of ordinary skill in the art would not have been motivated to combine the Mag and Brennan references in the way argued by Drs. Metzker and Sibson, i.e., to label the probes of Mag, because Mag did not teach or suggest that the dodecamer discussed in Mag would be useful for DNA sequencing. Drs. Metzker and Sibson's combination of Mag and Brennan was only achieved with the use of hindsight. The '119 patent describes the use of oligonucleotides containing chemically scissile internucleosidic linkages. The '119 patent indicates that Dr. Macevicz's motivation in creating the claimed compounds was an appreciation of their utility in DNA sequencing. Neither the prior art, the knowledge of one of ordinary skill in the art, nor any other source offered this motivation because no one other than Dr. Macevicz

thought of this, or any other utility of the claimed compounds. Drs. Metzker and Sibson offer no evidence that one of ordinary skill in the art would have been motivated to combine Mag with Brennan in this way.

291. One of ordinary skill in 1994-95 would not have thought that the method discussed in Brennan would be improved by the oligonucleotides discussed in Mag. There is nothing in Brennan that would have suggested or required the use of a phosphoramidate bond in an oligonucleotides probe. In fact, Brennan taught away from using scissile internucleosidic linkages to regenerate an extendable probe terminus. Brennan discussed using an oligonucleotide containing phosphorothioate linkages because they are *not* cleaved by nucleases:

> In some aspects of the invention oligonucleotides containing altered ribose-phosphate backbones can be used such as oligonucleotides containing phosphorothioate or phosphordithioate linkages which are capable of resisting nuclease digestion.

292. (Brennan, at column 6, lines 21-26). Brennan discussed the use of phosphorothioate linkages as a means to prevent the cleaving of those linkages, not as an affirmative statement that those linkages are scissile by chemical or any other means. One of ordinary skill in the art reading Brennan would have actually avoided using any non-standard internucleosidic linkages other than those that are resistant to cleavage by an exo- and/or endo-nuclease, such as phosphorothioates.

293. Accordingly, one of ordinary skill in the art in 1994-95 would not have been motivated to combine Mag and Brennan in the manner suggested by Drs. Metzker and Sibson, and therefore, claim 1 of the '119 patent would not have been obvious to one of ordinary skill in the art.

**86**

EXHIBIT 2